# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-10928-JKO |
| TOUSA, INC., et al.,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

# DECLARATION OF TOMMY L. MCADEN,
## EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL
## OFFICER OF TOUSA, INC., IN SUPPORT OF FIRST DAY PLEADINGS

1.     My name is Tommy L. McAden.  I am over the age of 18 and am competent to testify.  I am the Executive Vice President and Chief Financial Officer of TOUSA, Inc. ("TOUSA").[2]  In that capacity, I am responsible for TOUSA's finance, treasury, tax and information technology functions and I serve as an integral member of the Company's senior management team.  I have worked for TOUSA and its predecessors for more than eight (8) years.  I am generally familiar with the day-to-day operations, business affairs and books and records of

---

[1]    The Debtors in the cases are:  TOUSA, Inc.; Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Homes, L.P.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc.  The Debtors, together with their non-Debtor affiliates, are referred to here as the "TOUSA Group" or the "Company."

[2]    I am the Executive Vice President of all of the Debtors other than Engle Homes Delaware, Inc., TOUSA Delaware, Inc. and TOUSA Funding, LLC.  I have Bachelor of Science degrees in Accounting and Zoology from Texas Tech University.  Before coming to TOUSA in January 2000, I served simultaneously as the Chief Accounting Officer of Pacific USA Holdings Corp. and Chief Financial Officer of its subsidiary, Pacific Realty Group.  Prior to joining Pacific USA Holdings Corp. and Pacific Realty Group, I was a Supervising Senior Auditor with KPMG, working primarily on the real estate portfolios of Southwest Plan thrifts.

TOUSA and each of the above-captioned debtors in these chapter 11 cases (collectively, the "Debtors").

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.

## PRELIMINARY STATEMENT

3.      The Debtors understand the significant downturn that has hit the homebuilding industry and the resulting need for the Debtors to actively manage their restructuring.  Over the last several months, the Debtors have developed strategies to allow them to pursue a financial restructuring -- which is desperately needed to eliminate the Company's enormous debt burden -- while providing assurance to key constituents, such as associates, suppliers, contractors, and consumers, that the Company's homebuilding operations will continue uninterrupted.

These strategies include:

- obtaining a new debtor in possession financing facility with the Company's existing lenders that will finance operations and provide assurance to all associates and trade and customer counterparties that the Company can satisfy its obligations going forward;

- developing and presenting a comprehensive request for first day relief, which includes programs to continue selling and delivering homes, obtaining title insurance, satisfying customer warranties, paying contractors that hold mechanics liens and other critical vendors, and protecting

2

deposits of consumers that purchase homes built by the Company;

- implementing a comprehensive communications plan so all of the Company's key constituents know where they stand and the steps that the Company has taken to help ensure that they are protected;

- reaching an agreement with senior noteholders regarding the initial terms of a plan of reorganization, which will set the framework and timing milestones for the Company's development of a plan to expeditiously emerge from chapter 11; and

- hiring and proposing retention of the right people to assist the Debtors with their reorganization plans. In particular, the Company has retained Lazard Frères & Co., LLP as a financial advisor with significant expertise with restructurings and KZC Services to assist with its finance function and operations. In addition, John R. Boken of KZC Services has joined the company as Chief Restructuring Officer.

4.      To assist the Court in becoming familiar with the Debtors and the first relief sought by the Debtors, I have organized this declaration as follows:  I begin by providing the Court with an overview of the Company, its business and its capital structure.  I then describe the events leading up to these chapter 11 cases and the agreement in principle reached with a majority of the Company's senior noteholders regarding reorganization.  Finally, I describe the relief we seek at the first day hearing, which we believe is critical to the Debtors' reorganization.

## II.

## DESCRIPTION OF THE DEBTORS' BUSINESS, HISTORY AND CAPITAL STRUCTURE

### A.      Corporate History and Structure

5.      TOUSA's predecessor company, which was founded in Houston, Texas in 1983 as Newmark Homes Corp., completed an initial public offering in March 1998.  Technical

Olympic, USA (a subsidiary of Technical Olympic S.A., which is a Greek company whose shares are traded on the Athens Stock Exchange) acquired 80 percent of Newmark's stock in late 1999. Approximately, a year later, Technical Olympic, USA acquired 100 percent of then-public Engle Holdings Corp. In June 2002, Engle Holdings merged with Newmark Homes and the merged company changed its name to Technical Olympic USA, Inc., which was later renamed TOUSA, Inc.

6.      Until recently, TOUSA was publicly traded on the New York Stock Exchange (NYSE: TOA).[3]   TOUSA is currently trading on pink sheets under the listing TOUS. Approximately 67 percent of TOUSA's outstanding common stock is owned by non-debtor Technical Olympic S.A. TOUSA is the direct or indirect parent of each of the Debtors and the non-debtor Financial Services Entities. An organizational chart of the TOUSA Group is attached to this Declaration as Exhibit A. Shaded entities on the organizational chart are the Debtor subsidiaries of TOUSA.

7.      In 2006, the Debtors, on a consolidated basis, delivered 7,824 homes and generated $2.6 billion in homebuilding revenues. In 2005, the Debtors delivered 7,769 homes and generated $2.5 billion in homebuilding revenues. As of the quarter ending September 30, 2007, the Debtors had approximately $2.3 billion in assets and $2.24 billion in liabilities on a consolidated basis.

---

[3]    On November 16, 2007, the New York Stock Exchange (the "NYSE") suspended trading of TOUSA stock. The NYSE stated that its decision was reached in view of the fact that TOUSA was previously notified by NYSE Regulation that it had fallen below the NYSE continued listing standard for average closing price less than $1.00 over a consecutive 30 trading day period. In addition, NYSE Regulation also considered the "abnormally low" trading level of the common stock, which closed at $0.12 on November 15, 2007, with a resultant market capitalization of $7.2 million.

B.      **The Debtors' Business Operations**

      *i.*     *Overview of Business Operations*

      8.     The TOUSA Group is a leading homebuilder, marketing quality homes under various brand names including Engle Homes, Newmark Homes, Fedrick, Harris Estate Homes and Trophy Homes.  The TOUSA Group operates in various metropolitan markets in 10 states, mostly in the South and Southwest (Florida, Tennessee, Texas, Nevada, Colorado and Arizona), but also in the Mid-Atlantic region (Maryland, Pennsylvania, Delaware and Virginia).  The Company sells homes to all segments of the housing market, including first-time homebuyers, "move up" homebuyers, transplants to new cities, buyers of vacation and second homes, and "empty nesters" looking for active community lifestyles.  To serve this diverse customer base, the TOUSA Group offers various types of homes across different price points, including detached single-family residences, town homes, and condominiums that appeal to homeowners with a wide range of lifestyles.

      9.     Compared to other publicly traded homebuilding companies, the TOUSA Group is a medium-sized player – larger than companies focused on only one area or region, but smaller than certain fully national competitors.  Within the various markets where it has operations, however, the TOUSA Group is competitive with other homebuilding companies, regardless of size.  The TOUSA Group has a strong core management team, including both a central group at its corporate headquarters in Hollywood, Florida, and experienced divisional presidents who operate with strong supporting teams in each of the Company's divisions.

      10.     The TOUSA Group is basically a management company coordinating the activities of its many subcontractors.  It is involved in two types of construction, horizontal construction and vertical construction.  Horizontal construction is development necessary to

transform undeveloped land into a site that can support a housing development. This construction includes clearing land, moving earth, installing water and sewer lines, and grading and paving roads, but does not include the actual construction of homes on the site. When horizontal construction is completed (either by the Company or by a third party), the TOUSA Group generally commences vertical construction – that is, the TOUSA Group builds finished houses on the improved lots and markets those homes to consumers. The TOUSA Group may also sell developed and undeveloped lots or parcels to third parties.

### ii.    The Debtors' Non-Debtor Affiliates

11.    As part of the TOUSA Group's effort to provide a quality, integrated home-buying experience to its customers, certain of TOUSA's financial services subsidiaries (collectively, the "Financial Services Entities") offer a variety of financial services such as mortgage financing, title insurance, homeowners insurance, and closing services to homebuyers and other real estate buyers. The TOUSA Group markets its financial services under brand names that include Preferred Home Mortgage Corp., Universal Land Title, and Alliance Insurance and Information Services.

12.    The Financial Services Entities are not Debtors in these chapter 11 cases. Their businesses are profitable and, although they share certain services (such as third-party employee benefits agreements) with the Debtors, they do not depend on funding from the Debtors for financial support. They are not obligors with respect to any of the Debtors' bank facilities or indenture obligations.

### iii.    The Debtors' Option Contracts and Joint Venture Arrangements

13.    In the ordinary course of business, the Debtors enter into option contracts to purchase developed lots (collectively, the "Option Contracts"). Under the Option Contracts, the

6

Debtors have the right to buy homesites at predetermined prices on a predetermined schedule anticipated to be generally commensurate with the start of vertical construction.  The Debtors' obligations with respect to most of the Option Contracts are limited to (i) already-posted deposits or letters of credit and (ii) paying certain expenses related to the homesites until such time as the Debtors either purchase them or decide not to do so.  For other Option Contracts, however, the Debtors may have obligations in connection with mandatory purchase requirements or agreements that require the Debtors to complete the development of optioned land at fixed, reimbursable amounts.

14.     In addition to the Debtors' wholly-owned business operations, the Debtors are involved in more than twelve strategic joint ventures (collectively, the "Joint Ventures") to acquire, develop and sell land and/or homesites, and to construct and sell homes.  None of the Joint Ventures is, or is anticipated to be, a Debtor in these chapter 11 cases.  None of the Joint Ventures is an obligor with respect to any of the Debtors' bank facilities or indenture obligations.  None of the relief requested in the motions to be presented to the Court at the first hearing in the chapter 11 cases seeks authorization for funding of the Joint Ventures or other transactions with respect to them.

15.     The Joint Ventures vary significantly from one to another, both with respect to the Debtors' rights and obligations, and in terms of the Joint Venture's significance to the Debtors' operations.  The TOUSA Group manages some, but not all, of the Joint Ventures.  Some, but not all, of the Joint Ventures have separate indebtedness, and for those that do have their own debt obligations, members of the TOUSA Group have issued limited guarantees in support of some, but not all, of that debt.  The Joint Venture projects are in varying stages of completion, with some Joint Ventures having finished developing and selling substantially all of the homes that

7

they were formed to construct, and other Joint Ventures still in the stage of purchasing land or developing homesites. Some of the Joint Ventures are relatively insignificant to the Debtors' presence in a particular geographic region, but in certain cases -- such as, for example, with respect to the SunBelt joint venture in Phoenix, Arizona -- Joint Ventures form a significant part of the Debtors' overall divisional presence.

16.     Certain of the Joint Ventures, particularly including those that have their own financing arrangements and are currently in the construction or acquisition stage of development, are facing financial difficulties in their own right. Some of those difficulties relate to the overall downturn in the housing industry described above; in addition, certain Joint Ventures may face breaches of their own financing agreements as a result of the TOUSA Group's financial difficulties and, in particular, the filing of these chapter 11 cases. The Debtors anticipate that, in the context of resolution of those financing difficulties, they may enter into certain transactions that would require approval of this Court, and, therefore, the Debtors anticipate that future motions will be filed as appropriate.

**C.     The Debtors' Prepetition Capital Structure**

     ***i.     Secured Bank Loans***

17.     On July 31, 2007, the Debtors entered into a First Lien Term Loan Credit Agreement pursuant to which they borrowed $200 million from the lenders party thereto (the "First Lien Term Debt"), of which approximately $199 million was outstanding as of December 31, 2007.

18.     Also on July 31, 2007, the Debtors amended and restated an existing revolving loan facility (as amended, the "Revolving Loan Facility") to (a) reduce the revolving commitments under that facility by $100 million (from $800 million to $700 million) and

(b) permit the incurrence of the obligations under the First Lien Term Debt and the Second Lien Term Debt (described below).  The total outstanding debt under the Revolving Loan Facility (the "Revolving Facility Debt") as of the Petition Date is approximately $208 million, along with interest, fees and charges accrued and accruing thereon and chargeable with respect thereto.  The Revolving Facility Debt includes amounts owing related to a letter of credit subfacility of $350 million, of which approximately $108 million was outstanding as of the Petition Date.

19.    Also on July 31, 2007, the Debtors entered into a Second Lien Term Loan Credit Agreement pursuant to which they borrowed $300 million from the lenders party thereto (the "Second Lien Term Debt").  Interest on the Second Lien Term Debt is paid in kind.  As of December 31, 2007, approximately $317 million of the Second Lien Term Debt was outstanding.

20.    The aggregate $500 million proceeds of the First Lien Term Debt and the Second Lien Term Debt was used by the Debtors to settle certain disputes regarding one of its joint ventures, Transeastern, in which lenders to the joint venture had alleged that TOUSA was liable under certain guarantees.  Thus, on July 31, 2007, the Debtors drew $200 million under the Existing First Lien Term Loan Credit Agreement and $300 million under the Existing Second Lien Term Loan Credit Agreement.  That debt remains outstanding as of the Petition Date, along with interest, fees and charges accrued and accruing thereon and chargeable with respect thereto.

21.    Each of the Debtors is a Borrower or a Guarantor under of each of the First Lien Term Debt, the Revolving Facility Debt and the Second Lien Term Debt.  The First Lien Term Debt and the Revolving Facility Debt share, in equal priority, a first priority security interest in substantially all of the Debtors' assets (subject to certain permitted prior liens).  The Second Lien Term Debt has a second priority security interest in substantially all of the Debtors' assets (junior

9

to the First Lien Term Debt, the Revolving Facility Debt and the permitted liens referred to above).

22.    The relative rights of the holders of the First Lien Term Debt, the Revolving Facility Debt and the Second Lien Term Debt are set forth in an Intercreditor Agreement, dated as of July 31, 2007 (the "Intercreditor Agreement"), among the lenders in those financing arrangements.

### ii.    Unsecured Notes

23.    The Debtors have $1.1 billion in unsecured notes outstanding, including senior notes, senior subordinated notes and PIK notes.

### a.    Senior Notes

24.    On April 15, 2006, the Debtors issued $250 million of 8¼% senior notes due 2011.  On June 25, 2002, the Debtors issued $300 million of 9% senior notes due 2010.  These two series of notes are collectively referred to as the "Senior Notes," and have an aggregate face amount of $550 million.  The Senior Notes are guaranteed, on a joint and several basis, by each of the Debtors, which constitute all material domestic subsidiaries of TOUSA other than the Financial Services Entities.  The Senior Notes rank *pari passu* in right of payment with all of TOUSA's existing and future unsecured senior debt and senior in right of payment to the Senior Subordinated Notes (defined below) and any future subordinated debt.

### b.    Senior Subordinated Notes

25.    On June 25, 2002, the Debtors issued $185 million of 10⅜% senior subordinated notes due 2012.   On March 17, 2004, the Debtors issued $125 million of 7½% senior subordinated notes due 2011.  On December 21, 2004, the Debtors issued $200 million of 7½% senior subordinated notes due 2015.  These three series of notes are collectively referred to as the

10

"Senior Subordinated Notes," and have an aggregate face amount of $510 million  The Senior Subordinated Notes are guaranteed, on a joint and several basis, by each of the Debtors, which constitute all material domestic subsidiaries of TOUSA other than the Financial Services Entities.

### iii.    PIK Notes

26.    On July 31, 2007, the Debtors issued $20 million of 14 ¾% senior subordinated PIK notes due 2015 (the "PIK Notes") as part of the settlement of certain litigation related to its Transeastern joint venture, which is described in more detail below.

27.    The PIK Notes are guaranteed, on a joint and several basis, by each of the Debtors, which constitute all material domestic subsidiaries of TOUSA other than the Financial Services Entities.  Interest on the PIK Notes is payable semi-annually.  TOUSA is required to pay 1% of the interest in cash and the remaining 13.75%, at TOUSA's option, in cash, by increasing the principal amount of the PIK Notes or issuing new notes or by a combination thereof.

### iv.    Preferred Stock

28.    The Debtors issued convertible PIK preferred stock (the "Preferred Stock") as part of the Transeastern settlement, which ranks senior to all of their capital stock with respect to liquidation and dividends.  The Preferred Stock has an initial aggregate liquidation preference of $117.5 million and accrues dividends semi-annually at 8% per annum as follows:  1% payable in cash and the remaining 7% payable, at TOUSA's option, in cash, additional Preferred Stock, or a combination thereof.  The Preferred Stock is convertible into TOUSA common stock at a conversion price of $1.61 per share.  No dividends have been paid on the Preferred Stock and the Preferred Stock has no voting rights.

11

### v.    *Surety Bonds*

29.     TOUSA is committed under various performance bonds required for certain development activities (collectively, the "Surety Bonds").  As of January 15, 2008, the Debtors estimate that they have total outstanding Surety Bonds in a face amount of approximately $206 million.  They have estimated their likely current exposure on their outstanding surety bonds to be approximately $110 million based on the current projected cost to complete the relevant development activities.  The Debtors also have experienced a reduction in availability of surety bond capacity.  As a result, in addition to increased costs of premiums on new Surety Bonds, there have been some instances in which the Debtors had to obtain a letter of credit or provide other collateral to secure necessary surety bonds.

### III.

### EVENTS LEADING TO THE CHAPTER 11 FILING

#### A.    Adverse Market Conditions

30.     As described above, the homebuilding industry in the United States has, for quite some time, been experiencing a significant and sustained decrease in demand for new homes and an oversupply of new and existing homes available for sale.  The negative impact of these demand and supply trends has been worsened by recent difficulties in the mortgage and overall credit markets.  Similar to the impact on all of our competitors, those difficulties have harmed the TOUSA Group's businesses by further increasing the supply of inventory housing, negatively impacting pricing conditions, decreasing the demand for homes and dampening customer confidence.  Because the homebuilding industry is highly competitive and fragmented, home prices are extremely sensitive to adverse market conditions, as the Company and its competitors compete for a limited universe of homebuyers.

31.     The downturn has been particularly sudden and steep in Florida and in other areas in which the Debtors' operations are concentrated.  Excess supply, particularly in previously strong markets like Florida, Nevada and Arizona, has led to downward pricing pressure for residential homes as well as improved and unimproved land.  In those regions and overall, the result of recent industry trends has been a reduction in home prices and a softening in the pace of home sales.

32.     Homebuilders throughout the United States (large and small, public and private) have reported the negative impacts of the current conditions in the industry.  TOUSA and its subsidiaries are no different in that regard, and the TOUSA Group's management team has recognized that it must take steps in response to the market-driven challenges.

33.     Indeed, the current industry conditions have had significant negative effects on several of the Debtors' competitors.  For example, public reports have shown the following:

a.     on January 23, 2008, Lennar Corporation, one of the nation's largest homebuilders, reported a loss of $1.9 billion, or $12.31 per diluted share, for its year ended November 30, 2007;

b.     on October 25, 2007, Pulte Homes, Inc, a Fortune 200 company with operations in 50 markets and 26 states, announced that it had sustained a loss of approximately $787 million, or $3.12 per share, in the third quarter.  For the first nine months of the year, Pulte Homes reported a loss of $1.3 billion;

c.     on November 1, 2007, Neumann Homes, Inc., a large homebuilder with operations in Chicago, Denver, Detroit and Wisconsin, filed for chapter 11 bankruptcy protection;

d.     on January 23, 2008, Beazer Homes USA, Inc., one of the country's ten largest single-family homebuilders, announced its preliminary results for the quarter ended December 31, 2007.  Beazer Homes disclosed that home closings for the quarter totaled 2,010, a 24% decline from the same period in the prior fiscal year;

      e.       on November 9, 2007, Levitt and Sons, a large homebuilder with operations in the Southeast filed for chapter 11 bankruptcy protection in this District;

      f.       on January 16, 2008, WCI Communities, Inc., a builder of master-planned luxury communities in Florida, the Northeast and Mid-Atlantic, announced the amendment of its senior revolver and term loan agreement. The amendment followed Standard & Poor's Ratings Services' November 2007 downgrade of WCI's debt and the company's reported violation of certain covenants in its loan agreements in the last quarter of 2007.

      g.       on January 17, 2008, Standard Pacific Corp., a leading builder of homes in Florida, the Carolinas and the Southwest, announced that Moody's downgraded Standard Pacific's corporate family rating and the rating of the senior unsecured notes and the senior subordinated unsecured notes.

**B.**     <u>**The Debtors' Cost Saving Efforts**</u>

34.     The TOUSA Group began to take action in late September 2007, in light of the sharpening industry downturn in the prior month, to maximize revenues and minimize cash outflows and prepare a business plan for 2008. As part of these initiatives, the TOUSA Group has taken steps to reduce general and administrative expenses and to streamline their operations and increase efficiencies. The cost reduction effort has included, among other things (i) significantly reducing the Company's workforce at all levels, which included eliminating TOUSA's "Regional Structure" and moving toward a single COO operating structure, (ii) eliminating certain consulting arrangements and indirect costs and (iii) increasing scrutiny of lot option takedowns and option-maintenance payments for the Company's land bank contracts, and stopping those payments when appropriate.

35.     As part of the cash savings exercise, the TOUSA Group analyzed each community based on profit and sales absorption goals that took into account current market

factors such as the oversupply of homes available for sale in most of the Company's markets, less demand, decreased consumer confidence, tighter mortgage loan underwriting criteria and higher foreclosures.  The Company took steps to reduce inventory, limiting new arrangements to acquire land, discussions bulk sales of land and unsold homes, reducing the number of homes under construction and limiting development activities, re-negotiating terms or abandoning rights under Option Contracts and considering other asset dispositions.

36.    As an additional cash-saving measure, the TOUSA Group abandoned its option rights under numerous Option Contracts in the third quarter of 2007, which resulted in a 9,400 unit decline in its controlled homesites.  Abandonment decisions were made following an in-depth, community-by-community analysis of all Option Contracts based on projected returns, amount and timing of incremental cash flow, and its current inventory of controlled homesites in a given region.  In connection with the abandonment of the TOUSA Group's rights under the Option Contracts, the Company conserved actual cash because of reduced option maintenance and take-down costs, but forfeited cash deposits of $166.9 million and had letters of credit of $91.2 million drawn, which increased the outstanding borrowings under its bank loan facility.

## C.    The Transeastern Settlement, and Other Litigation Activity

37.    Even before the sharpening of the housing industry downturn in August 2007, the TOUSA Group had faced challenges, some of which had resulted in increased debt on TOUSA's balance sheet.

38.    In late 2006 and into 2007, TOUSA was a party to litigation which arose out of TOUSA's indirect 50 percent interest in a joint venture (the "Transeastern JV") with Arthur J. Falcone, Edward W. Falcone, Falcon/TEP Holdings, LLC f/k/a/ Falcone/Ritchie LLC ("Falcone/Ritchie") and certain affiliates thereof (collectively, the "Falcone Entities").  The

15

lenders to the Transeastern JV had alleged that TOUSA was liable under certain guarantees that TOUSA signed in support of the debt of the joint venture.  Alleging that the joint venture had breached various reporting, construction and other obligations, the JV's lenders asserted claims directly against TOUSA under the guarantees.

39.    After significant investigation, much deliberation, and certain litigation activity, TOUSA determined to settle the Transeastern claims on the terms described below.  These settlements increased the Company's debt burden and also resulted in certain of the claims being satisfied through the issuance of preferred stock.

40.    In this regard, on July 31, 2007, the TOUSA Group, the lenders to the JV and the Transeastern JV Entities entered into various settlements resulting in the effectuation of a global resolution of all disputes and litigation relating to the Transeastern JV (the "Global Settlement"). As part of the Global Settlement, TOUSA entered into new financing arrangements (its prepetition first-priority and second-priority term loan debt, defined below as the Existing Term Loan Credit Agreements) under which it borrowed $500 million to satisfy the Transeastern JV's bank loan obligations.  In addition to the $500 million in cash, TOUSA issued the PIK Notes and the Preferred Stock, as well as certain warrants to purchase TOUSA's common stock, in favor of the Transeastern JV's bank lenders pursuant to the Global Settlement in return for mutual releases of all claims related to the guarantees and immediate discontinuance and dismissal of the legal actions, related thereto.

41.    Thus, shortly before the unexpected housing industry and capital markets difficulties in August 2007, the TOUSA Group had added $500 million in secured indebtedness, as well as the PIK Notes and the Preferred Stock, to its own balance sheet in settlement of the Transeastern JV litigation.

42.    The TOUSA Group is also party to certain other litigation.    Beginning in December 2006, numerous stockholder plaintiffs filed lawsuits in the United States District Court for the Southern District of Florida seeking class action status: *Durgin v. Technical Olympic USA, Inc.*, No. 06-61844 (S.D. Fla. Dec. 11, 2006); *Henley v. Technical Olympic USA, Inc.*, No. 06-61928 (S.D. Fla. Dec. 28, 2006); *Jutkowitz v. Technical Olympic USA, Inc.*, No. 06-61938 (S.D. Fla. Dec. 29, 2006); *Bui v. Technical Olympic USA, Inc. et al.*, No. 07-60009 (S.D. Fla. Jan. 8, 2007).    These securities lawsuits have now been consolidated into a single suit, under the caption *Durgin v. Technical Olympic USA, Inc.*, No. 06-61844.    The *Durgin* suit alleges that various public disclosures related to the Transeastern JV's financing and financial performance were materially misleading or suffered from material omissions.    TOUSA will file a motion to dismiss the *Durgin* suit on January 30, 2008.

43.    In addition to the *Durgin* suit, in July 2007, TOUSA was contacted by the Miami Regional Office of the Securities and Exchange Commission (the "SEC") requesting the voluntary provision of documents and other information relating primarily to corporate and financial information and communications with respect to the Transeastern JV.    The SEC has advised TOUSA that this informal inquiry should not be construed as an indication that any violations of law have occurred, nor should it be considered a reflection upon any person, entity or security.    The TOUSA Group has been cooperating with the inquiry and intends to continue to do so.

**D.    Third Quarter Covenant Defaults**

44.    As described above, in the third quarter of 2007 the Debtors recorded certain asset impairment charges, deposit write-offs and abandonment charges.    These charges, together with exceedingly difficult market conditions, put pressure on the Debtors' already highly-leveraged

17

balance sheet, which currently carries approximately $1.6 billion (principal amount) of indebtedness for borrowed money, and ultimately contributed to the Debtors' inability to satisfy a representation concerning solvency under their Amended Revolving Loan Facility in late September 2007.  Certification of the truth of that representation is required in connection with each borrowing request under that facility.  As a result of the inability to make the required certification, the Debtors no longer had the ability to make borrowings under the facility and faced serious liquidity concerns.

45.    The Debtors were ultimately successful in negotiating an amendment to the Amended Revolving Loan Facility and the First Lien Term Loan Credit Agreement with a majority of the Existing First Lien Parties, which provided for, among other things, the waiver of solvency certification requirements for the third quarter and permitted borrowings of up to $65 million through the end of 2007.  That amendment permitted the Debtors to resume making borrowings under the Amended Revolving Loan Facility.

46.    Thereafter, the Debtors negotiated a second amendment to the Amended Revolving Loan Facility and the First Lien Term Loan Credit Agreement with a majority of the Existing First Lien Parties.  This second amendment provided for, among other things, an extension of the prior amendment through February 1, 2008.

E.    **Chapter 11 Strategy and the Plan Term Sheet**

47.    Beginning in mid-October 2007, the Debtors and their professionals met with the legal and financial advisors for certain holders of the Debtors' Senior Notes and Senior Subordinated Notes (the "Bondholders") to discuss de-leveraging objectives as well as a general process and timeline for a comprehensive restructuring.  The holders of Senior Notes and the holders of Senior Subordinated Notes each hired separate counsel and financial advisors.  The

18

Debtors' discussions with both groups of Bondholders and their advisors have continued in earnest.

48.     These efforts have been fruitful: the Debtors have successfully negotiated a plan term sheet (the "Plan Term Sheet") with certain holders of Senior Notes, and on January 28, 2008, the Debtors entered into a Restructuring Support Agreement (the "Restructuring Support Agreement") with those holders (collectively, the "Consenting Holders").[4]  The Restructuring Support Agreement obligates the Consenting Holders to, among other things, vote to support a plan of reorganization (the "Plan") consistent with the terms set forth in the Restructuring Support Agreement and the Plan Term Sheet.[5]  Through the Restructuring Support Agreement, a majority of the holders of Senior Notes have committed to vote in favor of the Plan, consistent with the terms of the Plan Term Sheet and subject to certain requirements and "outs" described in more detail below.

49.     The Plan Term Sheet provides, among other things, that the Plan will provide the following treatment for key constituencies: (a) refinance the Revolving Loan Facility and the First Lien Term Debt by borrowings under their debtor-in-possession financing; (b) reinstate the Second Lien Term Debt; (c) satisfy the claims of the holders of Senior Notes by transferring to them substantially all of the common stock of reorganized TOUSA (less amounts transferred to other constituencies as described herein), as well as an interest in, and entitlement to proceeds

---

[4]     A copy of the Restructuring Support Agreement is attached hereto as <u>Exhibit B</u>.  All references to and descriptions of the Restructuring Support Agreement contained herein shall be qualified entirely by reference to the Restructuring Support Agreement and any conflict between the terms of the Restructuring Support Agreement and the descriptions of the Restructuring Support Agreement contained herein shall be resolved in favor of the Restructuring Support Agreement.

[5]     A copy of the Plan Term Sheet is annexed as <u>Exhibit A</u> to the Restructuring Support Agreement.  All references to and descriptions of the Plan Term Sheet contained herein shall be qualified entirely by reference to the Plan Term Sheet and any conflict between the terms of the Plan Term Sheet and the descriptions of the Plan Term Sheet contained herein shall be resolved in favor of the Plan Term Sheet.

received by, a litigation trust to be established pursuant to the terms of the Plan (as further described below, the "Litigation Trust"); (d) satisfy the claims of other general unsecured creditors not paid pursuant to Court order during these chapter 11 cases by transferring to them a pro rata share of common stock of reorganized TOUSA and an interest in, and entitlement to proceeds received by, the Litigation Trust; (e) satisfy the claims of the holders of Subordinated notes by granting them an interest in, and entitlement to proceeds received by, the Litigation Trust as well as additional consideration that likely will take the form of warrants to acquire a specified percentage of common stock of reorganized TOUSA; and (f) cancel the Preferred Stock and the common stock of TOUSA.

50.    The Plan Term Sheet contemplates that substantially all of the Debtors' pre-petition claims, rights and causes of action would be assigned and transferred to the Litigation Trust, to be pursued, for the benefit of unsecured creditors, after effectiveness of the Plan.  The distribution of shares of the litigation trust as between the holders of Senior Notes, general unsecured creditors and holders of Subordinated Notes is to be agreed based upon further valuation analysis and discussions among the parties.

51.    The Plan Term Sheet sets forth certain other agreed Plan provisions and mechanisms, including among other things (i) a mechanism for appointing directors of reorganized TOUSA, (ii) provision for exit financing of the reorganized Company, (iii) a provision that the shares of reorganized TOUSA will be publicly traded on one of three identified exchanges and (iv) an agreement that the parties will explore up to a $200 million new-money investment (in addition to exit financing), with the terms, conditions and treatment of that investment to be determined (the "New Investment").  The Plan Term Sheet provides that the holders of Senior Notes will have an opportunity to participate in the New Investment, with

20

the commitment and timing of such participation to be determined, and the holders of Senior Notes will have the first opportunity to lead or backstop any such New Investment, provided that their commitment is on market terms.

52.    The Restructuring Support Agreement provides that the Consenting Holders of Senior Notes agree (subject to execution of definitive Plan documentation and appropriate approval by this Court of a related disclosure statement) to vote in support of a Plan consistent with the Plan Term Sheet.  Further, the Consenting Holders agree that, for as long as the Restructuring Support Agreement is in effect, they will not transfer their Senior Notes unless the purchaser agrees to be bound by the Restructuring Support Agreement and the Plan Term Sheet.

53.    Notwithstanding the parties' agreement to pursue a Plan consistent with the Plan Term Sheet, the Restructuring Support Agreement allows both the Debtors and the Consenting Holders room to honor and potentially conflicting fiduciary or other duties.  Specifically, the Restructuring Support Agreement makes clear that the Debtors may commit any act or take any actions consistent with their fiduciary obligations under applicable law, and it makes clear that the Consenting Holders may discuss (but not, during the term of the Agreement, support) unsolicited offers that would provide more value to them.

54.    The Restructuring Support Agreement specifies certain termination events, including that it will terminate if, among other things, the Debtors do not meet identified milestones in these chapter 11 cases by specified deadlines, as follows:  (i) the Debtors and each of the Consenting Holders must agree upon a comprehensive business plan within 30 days after the Petition Date; (ii) this Court does not enter a final, non-appealable order approving debtor-in-possession financing within 60 days after the Petition Date; (iii) the Debtors do not file the Plan and corresponding disclosure statement, in a form acceptable to each of the Consenting Holders,

21

within 60 days after the Petition Date; (iv) the disclosure statement is not approved within 120 days after the Petition Date or (v) a Plan confirmation order, in form and substance acceptable to the Debtors and each of the Consenting Holders, is not entered within 180 days after the Petition Date.

55.     The Debtors believe that the debt-for-equity exchange represented by the Plan Term Sheet and the related Restructuring Support Agreement would accomplish the much-needed de-leveraging of TOUSA's balance sheet, provide for an expeditious emergence from chapter 11 while preserving the benefit of litigation claims as assets of the Debtors and provide the possibility of raising new capital to support a robust business plan for the reorganized TOUSA Group.

56.     The Debtors are very mindful, however, that the homebuilding industry is deeply distressed and economic conditions may deteriorate further.  While the Plan Term Sheet and the Restructuring Support Agreement represent important positive steps toward the development of a comprehensive plan of reorganization and the Debtors' ultimate emergence from chapter 11, there can be no assurance that the Debtors will ultimately be able to reach final agreement with the holders of Senior Notes or other constituencies with respect to a business plan, or a plan of reorganization pursuant to the Plan Term Sheet, if the homebuilding industry or Debtors' operating results decline further.  In addition, the milestones and timeline set forth in the Restructuring Support Agreement will require the chapter 11 case to proceed expeditiously if the benefits of that agreement are to be realized. The Debtors intend to bear these considerations firmly in mind in conducting their ongoing business operations and in ongoing discussions  with all of their major constituencies.

K&E 12229421.16

57.     In light of the foregoing, after carefully exploring all possibilities to maximize the going concern value of their businesses for the benefit of the Debtors' estates and all parties in interest, and after engaging in a comprehensive planning process that has resulted, among other things, in the preparation of numerous requests for "first-day relief" to be presented to this Court, the Debtors' determined that the entry into the Restructuring Support Agreement and commencement of these chapter 11 cases was in fact in the best interests of all interested parties.

## IV.

## THE CHAPTER 11 CASES

58.     The purchase of a home is a significant investment, based upon trust and confidence.  As such, a smooth transition into these chapter 11 cases is essential.  It is critically important for the Company to maintain the loyalty and goodwill of its customers and associates, as well as the strong reputation of its branded divisions.  To do so, home sales and deliveries must continue in the ordinary course of business.  It is also key for the TOUSA Group to remain on favorable terms with its suppliers and builders so that current operations continue uninterrupted.

59.     Achieving these goals is likely to be particularly challenging while operating in chapter 11.  To that end, the Debtors have filed "first day" motions and applications (each, a "First Day Pleading") seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer devastating effects as customers, builders and suppliers will refuse to continue to do business with the Debtors.

K&E 12229421.16

60.    I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) described in further detail herein, and based upon that general familiarity and information provided to me by other members of the Debtors' management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests, and the failure to grant the motions described herein would have an immediate and irreparable effect on the Debtors' businesses taken as a whole.

A.    ***Ex Parte* Agreed Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

61.    As discussed herein above, the 38 Debtors in these chapter 11 cases include TOUSA and 37 of its direct and indirect subsidiaries, each of which is wholly-owned or controlled by the Company, or of which the Company holds the power to vote twenty percent (20%) or more of the subsidiaries' outstanding voting securities.  The Debtors, together with the Financial Services Entities, operate as an integrated business with common ownership and control, and they share key financial and operational systems.

62.    The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates.  Thus, I believe individual creditors' rights should not be harmed by the relief requested; by contrast, non-debtor parties in

24

interest will benefit from the cost reductions associated with the joint administration of these cases.

**B.**     ***Ex Parte* Agreed Motion for Entry of an Order Authorizing the Debtors to File Consolidated Chapter 11 Case Management Summary**

63.     I have reviewed Administrative Order 05-1, which states that each individual Debtor is generally required to file with the Court a completed chapter 11 case management summary (the "Case Management Summary") within the earlier of three (3) business days after relief is entered or one (1) business day prior to the date of the first scheduled hearing.

64.     Given the number of Debtors in these cases, the complex and interlinked commercial relationships among the Debtors and the fact that the Debtors intend to file their statements of financial affairs, and schedules of assets and liabilities very soon after the Petition Date, the Debtors believe it would be more efficient to file one consolidated Case Management Summary, substantially in the form annexed to the Case Management Summary as Exhibit B for each of the Debtors.

65.     Allowing the Debtors to file a consolidated Case Management Summary would relieve the Debtors of substantial expense of time, money and effort.  Moreover, a consolidated Case Management Summary should not prejudice the Debtors' creditors or other parties in interest because much of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary will prove more efficient in providing disclosure of key information regarding the Debtors.

**Financing Motions**

**C.**     **Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Secured Postpetition Financing on a Super-Priority Priming Lien Basis, (B) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders and Providing Related Adequate Protection, (C) Modifying the Automatic**

25

**Stay to Allow the Postpetition Lenders to Take Certain Actions and (D)  Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing**

66.     The Debtors have negotiated and reached an agreement to enter into, subject to approval of the Court pursuant to the DIP Orders, a secured super-priority debtor-in-possession credit and guaranty agreement (the "DIP Credit Agreement") in an amount up to $135,000,000, which is expandable if the arranger is successful in syndicating a $650,000,000 first priority and priming secured credit facility, the proceeds of which will be used to refinance the Debtors' outstanding first lien indebtedness.  The DIP Credit Agreement, dated as of January __, 2008, is by and among TOUSA, Inc. and each of its domestic subsidiaries, as borrowers, and Citigroup Global Markets Inc. ("CGMI") as sole lead arranger and bookrunner, Citicorp North America, Inc.'s ("CNAI"), as administrative agent (together the "Agents") and the banks, financial institutions and other lender parties thereto (collectively, the "Lenders," and together with the Agents, the "DIP Lenders").  The Debtors are also seeking authorization to use cash collateral, which together with the debtor in possession financing will be used to, among other things, support the working capital and general corporate purposes of the Debtors.

67.     Well in advance of the Petition Date, the Debtors, with the assistance of their financial advisor and investment banker, Lazard Frères & Co., LLP ("Lazard"), assessed their financing needs and explored various financing alternatives.  Beginning in October 2007, the Debtors and Lazard solicited numerous proposals for financing, including debtor in possession financing, from various institutions.  These efforts culminated in extended discussions with multiple institutions and, ultimately, proposals and negotiations with three financial institutions, including CGMI.  Although CGMI was familiar with the Debtors' business and financing arrangements as a result of CNAI's involvement with the Debtors' prepetition credit facilities, the Debtors and their advisors spent a significant amount of time responding to diligence

26

requests from other financial institutions and answering questions concerning the Debtors' businesses operations and capital structure over an extended period of time.

68.    After fully considering an alternative proposal and the Agents' proposal, together, with the assistance of Lazard in evaluating the terms and costs associated with the Agents' proposal as compared to other similar facilities provided to debtors in the homebuilding industry, I believe that the proposal by the Agents provides the most advantageous and flexible terms to the Debtors' estates.  Among other things, as compared to the other debtor in possession financing proposal that the Debtors' received, the fees to be charged by CGMI were approximately $15-25 million less than the alternative.

69.    In addition to the postpetition financing to be provided under the DIP Credit Agreement, I believe the Debtors will require the use of cash on hand and cash generated post petition, which constitutes proceeds of the existing collateral and, therefore, is cash collateral of prepetition lenders (the "Cash Collateral").  The Debtors require use of the Cash Collateral to, among other things, pay present operating expenses, including payroll and vendors, to ensure a continued supply of goods and services essential to the Debtors' continued viability.  Here, the agent for the Existing First Lien Lenders has consented to the Debtors' use of the Cash Collateral upon the terms and conditions set forth in the proposed Interim DIP Order.

70.    The Debtors seek the relief requested in the DIP Motion on an expedited basis in light of the immediate and irreparable harm that will likely be suffered by the Debtors' estates if they cannot obtain access to debtor in possession financing and use cash collateral for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers and customers, paying employees and satisfying other working capital and operational needs — all of which are vital to preserving and

maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all parties in interest.

71.    Pursuant to the Credit Agreement, the Lenders have agreed to provide funding needed to sustain the Debtors' business operations.  In exchange, the Credit Agreement provides the DIP Lenders with reasonable protections considering the circumstances of these chapter 11 cases.

**D.    Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue Using their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Administrative Expense Priority to Postpetition Intercompany Claims and (C) Authorizing Continued Intercompany Arrangements and Historical Practices (the "Cash Management Motion")**

72.    The TOUSA Group uses an integrated, centralized cash management system in the ordinary course of business.  Under this system (the "Cash Management System"), funds are collected by operating entities, transferred to a main funding account (the "Main Funding Account") at Wachovia Bank, National Association ("Wachovia") and disbursed, through other accounts, to pay operating expenses.  The centralized Cash Management System enables the TOUSA Group to (a) better forecast and report its cash position, (b) monitor collection and disbursement of funds and (c) maintain control over the administration of the various bank accounts, all of which facilitates effective collection, disbursement and movement of cash.

73.    The Cash Management System, which is similar to those utilized by other major corporate enterprises, has been in place since June 2006.  It is managed primarily by the TOUSA Group's financial personnel at corporate headquarters in Hollywood, Florida.

K&E 12229421.16

### i.      The Debtors' Existing Bank Accounts

74.      As of the Petition Date, the Debtors maintain 44 active bank accounts (the "Bank

Accounts"), 36 of which are at Wachovia (collectively, the "Wachovia Bank Accounts").  A list

of the Debtors' bank accounts is annexed to the Cash Management Motion as Exhibit C thereto.[6]

75.      The Debtors maintain the following Bank Accounts at Wachovia:

a.      **Main Funding Account:**  On a nightly basis, funds are swept up from the Debtors other bank accounts into the Main Funding Account (Account No. 2000032609121).

b.      **Regional Accounts:**  The Debtors maintain two zero-balance accounts - one  in the name of TOUSA Homes - East Operating for TOUSA's east operating region (Account No. 2000032609163) and one in the name TOUSA Homes - West Operating for TOUSA's west operating region (Account No. 2000032609176) (collectively, the "Regional Accounts").  Funds in these accounts are swept into the Main Funding Account at the end of every business day.

c.      **Disbursement Accounts:**  The Debtors maintain five [zero-balance] controlled disbursement accounts (collectively, the "Disbursement Accounts").[7]  Funds are automatically transferred into the Disbursement Accounts from the Main Funding Account on an as-needed basis in amounts large enough to cover anticipated disbursements from these accounts.

d.      **Division Depository Accounts:**  The Debtors maintain 22 zero-balance Comprehensive Deposit Reconcilement Accounts (collectively, the "Division Depository Accounts").  Funds are received into these accounts from the Debtors' homebuilding operations in the ordinary course of business.  These funds are swept automatically into the Regional Accounts and then into the Main Funding Account on a nightly basis.

---

[6]      The Debtors believe that Exhibit C constitutes a comprehensive list of all of the Debtors' Bank Accounts.  It is possible, however, that one or more accounts may have been overlooked.  If any other accounts are later identified, such accounts are hereby included in the definition of "Bank Accounts."

[7]      The Disbursement Accounts include Account Nos. 2079900547029, 2079900547100, 2079900578771, 2079900547045 and 2079900545445.

e.   **Standalone Accounts**:   The Debtors maintain six standalone accounts at Wachovia Bank.  These accounts include, among other things, two regional payroll accounts and one corporate payroll account.  Funds are transferred directly between these standalone accounts and the Main Funding Account as required.

f.   **Non-Debtor Accounts**:  Certain non-Debtors also maintain zero-balance accounts, disbursement accounts and standalone accounts at Wachovia Bank.  The amounts in these accounts are not currently swept into the Main Funding Account on a nightly basis.

76.    In addition to the Wachovia Bank Accounts, the Debtors also maintain other accounts as needed.   The Debtors maintain three depository accounts at Wells Fargo, which are used for customer deposits received in Colorado, Phoenix and Nevada.   The Debtors also maintain an escrow account at SunTrust Bank in Florida and an escrow account at M&T Bank in Maryland to comply with the applicable state law requirements.   Lastly, the Debtors maintain three custodial accounts at U.S. Bank that hold fees paid by various members of the TOUSA Group for the rights to certain intangible assets, such as use of TOUSA's trademarks.

77.    Wachovia and SunTrust Bank are designated as authorized depositories by the Office of the U.S. Trustee pursuant to The United States Trustee's Operating Guidelines and Reporting Requirements Issued for Debtors In Possession and Trustees, dated August 31, 2007 (the "U.S. Trustee Guidelines").[8]   Although U.S. Bank, Well Fargo and M&T Bank are not authorized depositories pursuant to the U.S. Trustee Guidelines, the accounts held at U.S. Bank hold less than $100,000 at month end and, therefore, do not represent bank accounts with significant deposits for purposes of the Debtors' Cash Management System.   The escrow account held at M&T Bank holds less than $450,000.

---

[8]    The Debtors estimate that approximately five of their Bank Accounts contain deposits in excess of $100,000.

K&E 12229421.16

ii.     *Flow of Funds in the Debtors' Cash Management System*

78.     The transfer of funds through the Debtors' Cash Management System is described below and is illustrated in the flow chart annexed to the Cash Management Motion as <u>Exhibit D</u> thereto.

79.     <u>Deposits</u>:   In the ordinary course of business, the TOUSA Group routinely receives cash, via check or wire transfer, upon the closings of new home sales.  Collections also include certain other miscellaneous items such as vendor rebates and home buyer deposits (collectively, the "Miscellaneous Funds").  Deposits for closings and home buyer deposits, with the exception of escrow accounts, are deposited by the Debtors' various divisions into their respective Division Depository Accounts.  Vendor rebates are deposited directly into the Main Funding Account.  The Division Depository Accounts are initially swept into the Regional Accounts and are swept again into the Main Funding Account nightly.

80.     <u>Non-payroll Disbursements</u>:  In the ordinary course of business, the Debtors use their Disbursement Accounts to make payments with respect to, among other things, land acquisition costs, construction expenses, non-payroll operating costs and other overhead expenses.  The Disbursement Accounts are zero-balance accounts that are automatically funded each day with amounts necessary to clear checks from the Main Funding Account or Regional Accounts, as applicable.

81.     <u>Payroll Disbursements</u>:  Three of the standalone accounts at Wachovia Bank are used  exclusively for payroll.  Funds are transferred from the Main Funding Account directly to the payroll accounts one to two days before payroll is deducted by the TOUSA Group's payroll agent.

31

### iii.    The Debtors' Existing Business Forms and Checks

82.    In the ordinary course of business, the Debtors use numerous varieties of checks and other business forms.  To minimize expenses to their estates and to avoid confusion and unnecessary distraction on the part of employees and business partners, I believe it would be appropriate for the Debtors to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders and customer communications) as such forms were in existence immediately before the Petition Date — without reference to the Debtors' status as debtors in possession — rather than requiring the Debtors to incur the expense, delay and distraction of ordering entirely new business forms and moving them into daily use.  I believe it will minimize expense and distraction  to the Debtors if they are permitted to use their existing check stock.

### iv.    Intercompany Claims

83.    As described above, under the TOUSA's Group's Cash Management System, funds generated by the business operations of each participating Debtor and Financial Service Entity flow into the Main Funding Account.  The members of the TOUSA Group often engage in intercompany financial transactions (collectively, the "Intercompany Transactions").  Transfers of cash to and from appropriate bank accounts are routinely made on account of the Intercompany Transactions.  Each of these transfers is made between and among the TOUSA Group as part of its consolidated Cash Management System.  Discontinuing the intercompany transfers could impact the Debtors' ability to fund payroll accounts and make timely payments to vendors.

84.    I have been informed by the company's Treasury department that, at any given time, there may be balances due and owing among the various Debtors and non-Debtor members

32

of the TOUSA Group.  I understand that these balances represent extensions of intercompany credit that are an essential component of the Cash Management System or the integrated operations of the TOUSA Group's business, and the Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions.  I further understand that the Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

85.     Maintaining the current Cash Management System would greatly facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Additionally, I believe that parties in interest would not be harmed by the Debtors' maintenance of the existing Cash Management System.  The Debtors have implemented appropriate mechanisms to ensure that they will not make payments inadvertently on any prepetition debt, unless otherwise authorized by the Court.  Specifically, with the assistance of their financial advisors and turnaround consultants, the Debtors have centralized certain of their accounts payable systems and implemented systems restrictions that prohibit payments on account of prepetition debts without prior approval of the Debtors' treasury department.

**Operations Motions**

**E.      Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Sell Homes Free and Clear of Liens, Claims, Encumbrances and Other Interests and (B) Establishing Procedures for the Resolution and Payment of Lien Claims, *Nunc Pro Tunc* to the Petition Date (the "Home Sales Motion")**

86.     The Debtors' ability to satisfy their existing contractual obligations to customers and continue to contract for and complete the construction and sale of homes, including by transferring title to homebuyers "free and clear" of liens, is the essence of the Debtors' business and must continue without any interruption if there is to be a successful reorganization.

### i.    *Contracts to Sell Homes*

87.    As of the Petition Date, the Debtors were parties to approximately 2,500 contracts to build and close on the sale of homes in the various states in which they operate (the "Prepetition Sales Contracts").  The terms of the Prepetition Sales Contracts vary by region.  In most instances, the Prepetition Sales Contracts require a prospective homebuyer to provide the Debtors with a deposit on the purchase price (a "Deposit").  If the Debtors are unable to close on the sale of a particular home, the Debtors may be obligated under the terms of the applicable Prepetition Sales Contract or by law to refund a Deposit.  The Debtors request authority, but not direction, to continue to refund customer Deposits if warranted by the terms of the Prepetition Sales Contracts and consistent with the Debtors' ordinary business practices.

88.    In addition, the Debtors strive to make the home buying experience easy and seamless for their customers.  To that end, the Debtors institute and adopt from time to time certain customer-related programs (the "Customer Programs") designed to incentivize new purchases, enhance customer satisfaction, sustain goodwill and ensure that the Debtors remain competitive.  Certain Customer Program obligations are reflected in the Prepetition Sales Contracts.[9]  Among other things, the Customer Programs may include the Debtors' agreement to pay brokers' or other closing fees on their customers' behalf.[10]  Because the Debtors anticipate that these cases may create some apprehension for homebuyers presently under contract with respect to the Debtors' ability to honor their contractual obligations, the Debtors seek clarification that they retain authority to honor their prepetition obligations and commitments under Prepetition Sales Contracts, to modify such contracts to address market conditions or other

---

[9]    Contemporaneously herewith, the Debtors have filed a separate motion seeking authority to continue certain Customer Programs that may not be reflected in Prepetition Sales Contracts.

[10]    In certain cases, the Debtors may satisfy their customer incentive obligations by making payments to one or more of their affiliated Financial Services Entities.

negotiating changes as is necessary, and to provide appropriate incentives consistent with ordinary business practices.

89.    Moreover, to ensure quality customer service, the Debtors seek clarification that they are authorized to enter into new contracts for the construction and sale of homes, and to close on the sale of such homes in the ordinary course without the expense and delay of seeking and obtaining individual Court orders for each sale.  To continue to close on the sale of homes, the Debtors must be able to transfer title to homebuyers free and clear of all liens and interests in such property, all without the necessity of seeking and obtaining a Court order for each individual sale.

### ii.    *The Lien Claimants*

90.    As part of their homebuilding operations, the Debtors rely on, and routinely contract with, a number of third parties (the "Operational Lien Claimants") who may be able to assert liens against the Debtors' property to secure payment for certain prepetition goods and services or other claims ("Operational Lien Claims").  My understanding is that, in the homebuilding industry, the vast majority of vendors and suppliers involved in the business of construction will have Operational Lien Claims.

91.    The Debtors' title insurance agents and underwriters (collectively, the "Title Insurers") have indicated that they will not proceed with home closings unless the Debtors provide some assurance that the liens on the Debtors' property will not impair title to the homes; the Debtors anticipate that customers and their lenders would have similar concerns.  In addition to the Operational Liens, the Debtors' properties are also subject to liens arising from the Debtors' prepetition secured financing facilities (the "Lender Liens").  The Debtors historically have been able to sell homes without clearing each and every lien because their Title Insurers

35

accepted TOUSA's agreement to indemnify them from and against any valid lien claims (with the Debtors' satisfying those claims post-closing out of sale proceeds). The Title Insurers have indicated, however, that if TOUSA is in chapter 11 they will be unwilling to accept such an indemnity going forward.

92.    The procedures proposed in the Home Sales Motion (the "Lien Procedures") will provide the Debtors with authority to make payments to the Operational Lien Claimants in the amounts and to the extent necessary to satisfy undisputed Operational Liens securing undisputed prepetition claims for materials and services provided. The Lien Procedures do not apply to Lender Liens, which are being addressed in the DIP Motion. The materials and services provided by the Operational Lien Claimants are essential to the Debtors' reorganization and the need to be able to sell homes free and clear of Liens is of paramount importance to the Debtors' ongoing operations.

93.    The ability to continue to deliver homes to customers "free and clear," including, where appropriate, to satisfy valid and enforceable Operational Liens, is integral to the TOUSA Group's business operations and necessary to maintain the confidence and good will of the Debtors' customer base, which is critical to facilitate a successful reorganization. Failure to satisfy prepetition obligations to customers and Operational Lien Claimants upon closing home sales in the ordinary course of business during the early stage of these cases will jeopardize the Debtors' ability to bring in money, as well as customer loyalty and trust. Absent approval of the Home Sales Motion and the Lien Procedures, prospective and current customers may be unwilling to sign contracts to buy homes or to close home purchases, and the Debtors' Title Insurers may refuse to continue with home sale closings. Moreover, there is a substantial risk of negative publicity if the Debtors do not have the requested authorization. In fact, other

K&E 12229421.16

homebuilder debtors who did not immediately fulfill customer obligations after a chapter 11 filing have experienced such negative publicity.

F. **Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations Under Customer Programs and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Customer Programs Motion")**

94.    It is critically important to the TOUSA Group's reorganization effort to maintain the loyalty and goodwill of its customers. Buying a home is a significant investment, based upon trust and confidence. In addition to delivering quality homes and a positive home-buying experience, the TOUSA Group must maintain its positive customer relationships and the strong reputation of its homebuilding brands. Achieving these goals is likely to be particularly challenging while operating in chapter 11 and it will be impossible for the Debtors to retain their customer base and reputation unless they are granted the discretion to continue to honor their customer obligations in the ordinary course of business.

95.    The Debtors' customer-related programs (as described more fully below, the "Customer Programs") are designed to encourage new purchases, enhance customer satisfaction, sustain goodwill and ensure that the Debtors remain competitive in their markets. The programs range in scope from locally-developed and implemented short-term incentive plans, such as advertised discounts or financing incentives, to long-term warranties for customers who purchase homes. The Customer Programs, which typically are similar to those adopted and maintained by other real estate developers and home-builders, are as varied as the divisions in which the Debtors operate; they differ depending on regional tastes and trends, the strength of the housing markets and the varying levels of competition in a particular locality. Because of the wide range of incentives and other offers that are used, it would be prohibitive to describe every currently-effective program; however, an overview of the Debtors' customer obligations can generally be

gained from a review of certain example programs, including the home warranty program, the punch list program, and the financing incentive programs**.**

96.    <u>Home Warranty Program</u>:  As is typical in the homebuilding industry, the Debtors provide all of their homebuyers with standardized limited warranties (the "Home Warranty Program").  During the period in which a home is under warranty, which varies by region and by the particular program in effect at the time of purchase, the Debtors are obligated to repair or replace any part of the new home that is materially defective due to the Debtors' workmanship or materials.  In many states, the Home Warranty  Program is legally mandated.

97. The Debtors' obligations under the Home Warranty Program are administered by Professional Warranty Service Corporation ("PWC").  To help ensure that customers have added confidence in purchasing a home from the Debtors, the Debtors, PWC and Zurich North America worked closely together in the weeks prior to the Petition Date to ensure the future availability of the Home Warranty Program for the TOUSA Group's customer base.  As a result of those discussions, the Company has contracted with PWC to provide, at no cost to the customer, a ten year transferable supplementary warranty to those TOUSA homebuyers with contracts of sale currently in force as well as those customers who sign a contract of sale between now and April 30, 2008.

98.    The new program is insured by one of the member companies of Zurich North America, one of the largest insurance organizations in the United States and rated "A/positive" (Excellent) by A.M. Best and Company, the leading independent insurance company rating service.  In the event that TOUSA is unable to fulfill its obligations to "eligible" homebuyers under its existing program, the insurer will perform according to the terms and conditions contained within the supplemental document.  The Debtors pay enrollment fees in the

approximate amount of $9.97 per every $1,000 in sales for this additional coverage, and hereby request the authority to continue paying such fees in the ordinary course of business.[11]

99.      Although disputed claims under the Home Warranty Program are administered through PWC, a substantial portion of the intake of new warranty claims under the Home Warranty Program (the "Warranty Claims") comes directly to the Debtors from new homebuyers who raise claims at divisional locations.  Most of the Warranty Claims are minor in nature, but some may allege more serious defects.  As a general policy, in the interest of maintaining customer loyalty, the Debtors attempt to address and satisfactorily resolve all Warranty Claims. In the eleven months ending November 30, 2007, the TOUSA Group's accrual for warranty cost was of approximately $5.9 million.  Historically, the TOUSA Group's annual cost with respect to Warranty Claims has been 0.5% of revenues annually.

100.      <u>Punch List Program</u>:  A typical customer obligation of the Debtors, designed to provide assurance that a home being constructed for a customer will meet the buyer's expectations and will match the advertised product, is the "punch-list" program (as described here, the "Punch-List Program").  Under this program, approximately, five to seven days prior to closing a purchase of a new home from the TOUSA Group, the homebuyer will conduct a "walk-through" of the home with a Debtor representative.  During the walk-through, the homebuyer will create a "punch list" identifying certain alleged deficiencies in the new home, such as paint touch-ups and other, usually minor, defects.  Before and after closing, the Debtors attempt to address the deficiencies noted on the punch-list as part of the TOUSA Group's ongoing effort to maintain customer satisfaction.  The Debtors estimate that the amount spent each month to

---

[11]    The enrollment fees for January 2008 are due on or around February 15, 2008.  Failure to pay these fees could result in a cancellation of the policy.  As such, the Debtors seek immediate authority to pay these enrollments as they come due in the ordinary course of business.

K&E 12229421.16

satisfy their obligations under the Punch-List Program is nominal and is included within the Debtors' forecasted costs for construction of the home.

101.    <u>Sales Incentive Programs</u>:  A significant portion of the Debtors' marketing to customers involves participating in various incentive programs to attract prospective homebuyers or referrals from existing customers.  These programs vary from time to time and from division to division.  For instance, in some divisions, the Debtors periodically offer an incentive for recent homebuyers to refer a friend as a new homebuyer to the TOUSA Group:  if the referred friend purchases a home, the referring friend is rewarded with a gift card to a major home improvement store (the "Referral Program").  As another example, the Debtors often offer financing incentives (the "Financing Incentives") to homebuyers, such as buy-downs (in which the Debtors make up-front payments to reduce the homebuyer's mortgage rate) or deferred payment starts (in which the Debtors make the first few payments of a homeowner's mortgage).  Financing Incentives generally are granted and funded by the TOUSA Group upon delivery of the home at closing.

102.    The Customer Programs are critical to the TOUSA Group's business.  They both align and distinguish the TOUSA Group from its competitors, help maintain high levels of customer service and satisfaction, and generally allow the TOUSA Group to remain competitive in the homebuilding industry.  Indeed, the Customer Programs are integral to the TOUSA Group's business operations and are necessary to maintain the confidence and goodwill of the Debtors' customer base, which is critical to facilitate a successful reorganization.  Failure to satisfy obligations with respect to the Customer Programs in the ordinary course of business during the preliminary stages of these cases will jeopardize customer loyalty and trust.  Specifically, prospective customers may be unwilling to sign contracts to buy homes or to close home purchases if they believe we will not be able to fill our customer obligations.  As noted, a

40

portion of our sales result from referrals from prior and existing customers.  Continuing to satisfy our various customer obligations is critical to preserving the value of our excellent brand names.

103.    Moreover, there is a substantial risk of negative publicity if the Debtors do not have the requested authorization.  In fact, other homebuilder debtors who did not immediately fulfill customer obligations after a chapter 11 filing have experienced such negative publicity.

**G.    Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Pay or Honor Certain Prepetition Obligations for (I) Wages, Salaries, Bonuses and Other Compensation, (II) Reimbursable Employee Expenses and (III) Employee Medical and Similar Benefits and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Wages Motion")**

104.    As of the Petition Date, the TOUSA Group employs approximately 1,422 associates (the "Associates").  The Debtors employ approximately 1,156 Associates and the Financial Services Entities employ approximately 266 Associates.[12]

105.    I understand from TOUSA associates responsible for human relations that the Debtors' Associates include the following:

> a.    Approximately 864 regular full-time associates (the "Regular Full-Time Associates"), who are regularly scheduled to work a minimum of 40 hours per week on a continuing basis;[13]
>
> b.    Fewer than ten regular part-time associates (the "Regular Part-Time Associates"), who are regularly scheduled to

---

[12]    The Financial Services Entities typically fund the payroll for those Associates employed by such entities.  The Debtors fund the payroll for those Associates employed by the Debtor entities, including those Associates employed by the Debtors who assist in carrying out the Debtors' contractual obligations to provide management or other services to their joint ventures.  Because there is a risk of confusion on the part of banks, Employees and other parties in interest as to which Employee obligations are prepetition obligations of the Debtors and which are obligations of non-Debtors, the Debtors seek in this motion to avoid any doubt as to the permissibility of a particular payment by seeking authority to pay prepetition obligations to Employees of both the Debtors and non-Debtors.

[13]    The Regular Associates include approximately 199 non-exempt associates, who are covered by the overtime provisions of the Federal Fair Labor Standards Act or any applicable state laws, and are entitled to overtime pay.  The remaining 665 Regular Associates are exempt associates, who are exempt from the overtime provisions in accordance with the Federal Fair Labor Standards Act.

41

> work at least 30 hours per week but less than 40 hours per week;

    c.    Fewer than ten other part time associates (the "Other Part-Time Associates"), who are regularly scheduled to work less than 30 hours per week;

    d.    Approximately 300 sales associates (the "Sales Associates"), who sell detached single-family residences, town homes, and/or condominiums. As described in more detail below, certain of the Sales Associates are compensated in whole or in part by commissions based upon their sales activity during a particular time period (the "Commissions").

106.    The Debtors also have consulting agreements with a few independent contractors (the "Independent Contractors"). In addition, the Debtors from time to time procures the services of temporary employees (the "Temporary Employees") who work on an hourly basis. The Debtors procure the Temporary Employees through employment agencies or by contract with third party firms. The Debtors currently employ approximately five Temporary Employees.

107.    The Associates, Independent Contractors and Temporary Employees (collectively, the "Employees") perform a wide variety of critical functions, including managing our subcontractors, customer sales and service, land analysis and development, management, accounting, marketing, purchasing and sales, tax, technical and warranty services and other tasks. In addition, certain of the Employees perform services for those joint ventures for which the Debtors act as managing partner. I believe the Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses.

108.    Just as the Debtors depend on their Employees to operate, the Employees depend on the Debtors. In fact, it is fair to assume many of the Debtors' Employees rely on their compensation, benefits and reimbursement of their expenses. These Employees may be exposed

to significant financial difficulties if the Debtors are not permitted to pay the Employees full unpaid compensation, benefits and Reimbursable Expenses.

109.    Based upon the regular compensation schedules, as of the Petition Date, some of the Employees have not been paid all of their prepetition wages owed in the ordinary course of business.    In addition, some Employees may be entitled to additional pre-Petition Date compensation to the extent (a) discrepancies exist between amounts paid pre-Petition Date and the amounts that should have been paid and (b) some payroll checks issued to certain of the Employees before the Petition Date have not been presented for payment or have not cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

        a.    Associate Compensation

110.    In general, the Debtors pay the Associates semi-monthly on a current basis (the "Semi-Monthly Wages").    The TOUSA Group's payroll for the period ending January 31, 2008 has been paid in the aggregate amount of $8.1 million.

111.    Approximately 300 Sales Associates are paid in part or in full in the form of commissions (the "Commissions").[14]    The Commissions are typically earned upon the closing of the sale of a home.    Although Commissions are the sole source of income for some of these Associates, other Associates receive a combination of salary and Commissions.    Commissions are typically paid to our sales associates partly when a sale contract is signed and the buyer is qualified with PHMC and partly after the home is delivered to the customer.    In January 2008, the TOUSA Group paid approximately $2.1 million on account of Commissions earned in December 2007.    Approximately 70 Sales Associates received Commissions in January 2008

---

[14]    Approximately 24 percent of the Associates (all of them Sales Associates) do not receive annual salaries or hourly wages, but instead are compensated solely in the form of Commissions.    Approximately one percent of the Associates are paid on an hourly basis, and the remaining 75 percent of the Associates are salaried.    Certain of the salaried Sales Associates also receive some compensation in the form of Commissions.

43

that exceeded $10,000.    Although the Debtors have not yet determined the amount of Commission earned for January 2008, the Debtors anticipate that a similar number of Employees earned more than $10,000 for the month.

112.    In addition, certain Associates, including those Associates employed at the Debtors' various divisions, typically receive additional compensation in the ordinary course of business on a quarterly basis (the "Quarterly Wages").    Other Associates, including those Associates employed at TOUSA's corporate headquarters, receive additional compensation on an annual basis (the "Annual Wages").    Quarterly Wages and Annual Wages are typically agreed upon at the time of hiring or based on performance objectives set within the various divisions.

113.    As of the Petition Date, I understand from my colleagues in TOUSA's human resources department that approximately $659,000 in Quarterly Wages remains unpaid to 268 Associates who earned Quarterly Wages of $10,000 or less for the fourth quarter of 2007, and approximately $269,000 in Annual Wages remains unpaid to 95 Associates who earned $10,000 or less for the year 2007.

114.    Further, the TOUSA Group typically pays bonuses (the "Builder Bonuses") to certain of the Associates who oversee building operations as a reward for meeting predetermined production targets.    Payments on account of Builder Bonuses are typically made at the end of the month following achievement of the applicable target.    On average, the TOUSA Group paid $596,000 per month in Builder Bonuses during 2007.    As of the Petition Date, approximately $470,000 remains unpaid on account of Builder Bonuses earned prior to the Petition Date.

115.    The TOUSA Group typically reimburses Associates for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").    The Reimbursable Expenses include, without limitation, certain expenses for (a) travel expenses for

44

meals, hotels and rental cars, (b) business development expenses, (c) gas mileage expenses, (d) telephone expenses, (e) professional license fees and continuing education costs, (f) working/overtime meals and (g) business relocation expenses. The Reimbursable Expenses are incurred on the Debtors' behalf and with the understanding that the Debtors would reimburse such expenses. As of the Petition Date, the Debtors estimate they owe Employees approximately $5,000 on account of Reimbursable Expenses.

116. In the ordinary course of their business, the TOUSA Group deducts certain amounts from Associates' paychecks in each pay period, including, without limitation, garnishments, child support and other pre-tax and after-tax deductions payable pursuant to certain of the Associate benefit plans discussed herein (such as an Associate's share of health care benefits and insurance premiums, 401(k) contributions and miscellaneous deductions) (collectively, the "Deductions"). The TOUSA Group forwards the amount of the Deductions to the appropriate third-party recipients. In January 2008, these Deductions totaled approximately $188,000.

117. In addition, the TOUSA Group is required by law to withhold amounts related to federal, state and local income taxes, Social Security and Medicare taxes from an Associate's wages for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). In January 2008, the Withheld Amounts totaled approximately $4.6 million.

118. The TOUSA Group must then match from its own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Payroll Taxes, including both the Withheld

45

Amounts described above and the employer portion, totaled approximately $6.1 million in January 2008.

119.    The Debtors use Automatic Data Processing ("ADP") to pay all Associates' Semi-Monthly Wages, Quarterly Wages, Annual Wages, Commissions and Builder Bonuses (collectively, the "Associate Compensation").  In the ordinary course of business, the Debtors provide ADP with payroll data and begin funding the payroll account four days in advance of each payroll date.  ADP is responsible for paying all withholdings to the applicable third parties, including taxing authorities.

120.    As of the Petition Date, the TOUSA Group anticipates that ADP may not have completed the process of forwarding certain of the Deductions or Payroll Taxes to the appropriate third-party recipients or taxing authorities for the fourth quarter of 2007 and January 2008.

### i.        *Independent Contract/Temporary Employee Compensation*

121.    The Debtors pay the Independent Contractors and Temporary Employees who serve the TOUSA Group in a variety of different capacities on a monthly or semi-monthly basis in accordance with a pre-determined, negotiated rate that varies from one Outside Consultant to the next.  The Debtors remit compensation to the Independent Contractors directly, either by check or by wire transfer.  The Debtors remit compensation for the Temporary Employees' services directly to the applicable employment agencies.  In January 2008, the TOUSA Group paid approximately $34,000 to Independent Contractors and $57,000 on account of Temporary Employees.

K&E 12229421.16

### ii.    *Severance Payments*

122.    Since June 2006, the TOUSA Group has reduced its workforce on a monthly, and sometimes semi-monthly, basis.  The Debtors typically offer severance payments to affected Associates based on the Associates' tenure with the Company and any accrued vacation (the "Severance Payments").  Typically, the Severance Payments are funded on the same day the Associate is terminated and released to the former Associate upon execution of a severance agreement.  In general, the Debtors believe it is important to honor their severance obligations to former Associates in order to maintain the morale of those who remain.   In certain circumstances, however, where the Debtors' standard severance program or stand-alone prepetition severance contracts would have given rise to substantial severance claims, the Debtors have determined that it would be inappropriate to seek to pay such claims in the current circumstances.   The Debtors are not seeking any first day relief with respect to Severance Payments not honored in this manner.  I understand from my colleagues in the human resources department at TOUSA that, as of the Petition Date, no Severance Payments remain outstanding to former Associates.

123.    The TOUSA Group also reimburses former TOUSA Associates for up to two months of COBRA expenses.  If a former Associate elects to maintain COBRA coverage, they are required to submit proof of payment before the TOUSA Group issues a check on account of these amounts.  I understand from my colleagues in the human resources department at TOUSA that, as of the Petition Date, the Debtors believe that the maximum exposure on account of prepetition COBRA expenses is approximately $260,000.

K&E 12229421.16

### *iii.*    ***Employee Benefits***

124.    The TOUSA Group offers Associates and certain other Employees a number of benefits, as well as the ability to participate in a number of insurance and benefits programs (collectively, as described in more detail below, the "Employee Benefit Programs").    TOUSA administers and funds the Employee Benefit Plans for all of the eligible TOUSA Group Employees.

125.    <u>Medical and Dental Plans</u>:    The TOUSA Group provides two separate medical insurance plans through CIGNA Healthcare ("CIGNA"): The Preferred Provider Option ("PPO") and the CIGNA Choice Fund Health Reimbursement Arrangement ("HRA").    The TOUSA Group also provides a dental insurance plan PPO through CIGNA.    All of the benefit premiums are paid monthly in arrears.    The Associate benefit deductions are collected on a current basis from payroll and paid into a group health account.    From that account, the TOUSA Group uses the assets to fund an account held by CIGNA to pay monthly claims.    The TOUSA Group also pays CIGNA's administrative/service fees from the group health account.

126.    <u>Vision Plan</u>:    In addition to these programs, the TOUSA Group sponsors a vision policy through CompBenefits, VisionCare.    The vision insurance program, which is supplemental and voluntary on the part of Associates, is entirely funded by participating Associates through payroll deduction.    The TOUSA Group remits payments to CompBenefits through self-bills generated on a monthly basis from the Benefit Solutions Website (portal).

127.    The TOUSA Group's medical and dental insurance plans provide health care coverage to approximately 1,275 Associates and 1,521 dependents.    On average, the TOUSA Group pays approximately 75 percent of the monthly premium for the medical and dental plans.

The vision plan is a fully-insured plan for which the Associates pay 100 percent of the monthly premium.

128.    Before the Petition Date, the TOUSA Group incurred certain administrative obligations to CIGNA, which remain unpaid.  In addition, before the Petition Date, certain Associates filed claims under the medical and dental insurance plans, which remain unpaid.

129.    As of the Petition Date, the Debtors estimate there are total outstanding obligations under the medical and dental plans in the total aggregate amount of $610,000.  If the Debtors are not authorized to honor their various obligations under the insurance programs their Employees rely upon to meet health and medical coverage needs, many of the Debtors' Employees will not be reimbursed or have their benefits claims paid.  In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed and may face termination of health services.

130.    <u>Workers' Compensation Program</u>:  The TOUSA Group provides workers' compensation benefits to their Associates at the statutorily-required level for each state (the "Workers' Compensation Program").  These benefits are currently provided to Associates through Liberty Mutual Insurance Company ("Liberty Mutual"), which administers and pays the TOUSA Group's workers' compensation claims, subject to the contracted deductible of approximately $500,000 per incident or $845,000 in the aggregate.[15]

131.    As of the Petition Date, the Debtors believe that they have paid all of the annual insurance premiums and fees to Liberty Mutual for the current policy period that expires on March 1, 2008.  Liberty Mutual continues to bill the TOUSA Group on a monthly basis for amounts paid by Liberty Mutual that fall below the $500,000 deductible.  These payments in

---

[15]    Under the terms of the policy, this amount may vary depending on the overall size of the payroll at the time of a particular incident.

2007 ranged from a low of $6,828 to a high of $45,139 per month.  Certain benefits under the
Workers' Compensation Program may have been incurred prepetition but have yet to be fully
paid, and certain other claims were filed prepetition but have yet to be resolved.  As of December
31, 2007, the Debtors estimated that outstanding workers' compensation claims were
approximately $546,000.

132.    <u>Vacation</u>:  The TOUSA Group provides vacation time to all Regular Full-Time
Associates and Regular Part-Time Associates entitled to accrued paid vacation ("Vacation
Time").  The amount of Vacation Time available to a particular Employee and the rate at which
such Vacation Time accrues is generally determined by the Employee's position and the length
of full-time employment.

133.    All Regular Full-time Associates accrue vacation time on the following schedule:

| | | |
|---|---|---|
| One year anniversary: (two weeks total) | 10 days vacation | 6.67 hrs per month (3.34 hrs per pay period) |
| Five year anniversary: (three weeks total) | 15 days vacation | 10 hrs per month (5 hrs per pay period) |
| Ten year anniversary: (four weeks total) | 20 days vacation | 13.34 hrs per month (6.67 hrs per pay period) |

134.    All hourly (non-exempt), Regular Part-Time Associates are eligible for 40 hours
(five days) of vacation leave each year (accrued at 3.34 hours per month—1.67 hours per pay
period).

135.    When a Full-Time Employee elects to take Vacation Time, that Employee is paid
his or her regular hourly or salaried rate.  With certain exceptions, a maximum of 40 hours (five
days) of unused vacation may be carried into the following year upon reaching their anniversary

50

date, but those unused days will be forfeited if not used in that next year.  Vacation Time is the only accrued time that will be paid upon separation from the Company.  The TOUSA Group estimates that approximately $2.1 million of earned but unused Vacation Time will have accrued as of the Petition Date.

136.    <u>Sick Leave</u>:  In addition, the TOUSA Group provides accrued sick leave ("Sick Leave") to Regular Full-Time Associates and Regular Part-Time Associates.  Associates in all other employment status categories are not eligible for sick leave benefits.  Accrued Sick Leave that is not used is carried over from year to year.  Regular Full-Time Associates are able to carry over a maximum of 480 hours of sick leave.   Regular Part-Time Associates are able to carry over a maximum of 240 hour of sick leave.  Associates may not receive their unused Sick Leave upon termination or resignation from the Company.

137.    <u>Leaves of Absence</u>:  The Debtors also allow their Associates to take certain other paid leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence").   Leaves of Absence include medical leaves, family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves and bereavement leaves.  Associates also receive two personal days per year.  Associates are not permitted to carry over unused personal days from one year to the next and Associates may not cash out their unused personal days  upon termination or resignation.

138.    <u>Employee Savings and Retirement Plans</u>:  The TOUSA Group maintains a retirement savings plan meeting the requirements of section 401(k) of the Internal Revenue Code for the benefit of eligible Associates (the "401(k) Plan").   Subject to certain exclusions for temporary workers and highly compensated executives, Associates who have completed 90 days of employment are eligible to participate in the 401(k) Plan.   The 401(k) Plan allows for

51

automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. Each year, the TOUSA Group makes matching contributions in an amount equal to 50 percent of the Employees' contributions up to a maximum of six percent of the Employees' eligible contributions. In the aggregate, the TOUSA Group matches approximately three percent of the Associates' contributions. Approximately 1,000 Associates currently participate in the 401(k) Plan. In 2007, the Debtors withheld an average of approximately $570,000 per month from paychecks for 401(k) contributions.

139.    Insurance Coverage:    The TOUSA Group provides the Regular Full-Time Associates with primary life insurance coverage and primary accidental death and dismemberment insurance through CIGNA Life Insurance Company, a third-party insurer ("Life and AD&D Insurance"). The TOUSA Group currently sponsors ten policies: Basic Life Employee, Basic Life Family, Basic Executive Life, Voluntary Life Employee, Voluntary Life Spouse, Voluntary Life Child, Basic AD&D, Voluntary AD&D Employee, Voluntary AD&D Family and Voluntary Long-term Disability.

140.    Every policy except Basic Life Employee, Basic Life Family, Basic AD&D and Basic Executive Life are completely supplemental and voluntary insurance policies that are funded entirely by the Associates through payroll deductions. If an Associate participates in one of the two medical plans, the TOUSA Group funds 100 percent of the cost of the Basic Life Employee, Basic Life Family, Basic AD&D and Basic Executive Life policies. If the Associate does not participate in one of the two medical plans, the Associate does not qualify for Basic Life Employee, Basic Life Family, Basic AD&D and Basic Life Executive.

141.    The Basic Life Employee, the Basic Life Family and Basic AD&D provide a flat benefit amount of $50,000 per associate and cost approximately $19,000 per month based upon a

fixed, per-associate monthly cost.  They have a flat benefit amount of $50,000 per associate.  The Basic Life Family also has a specific per unit charge per month and is based per associate with covered dependents per month.  It has a maximum death benefit of $2,000 per dependent.

142.    AFLAC administers the TOUSA Group's Personal Disability Protector (Short-Term Disability), Personal Cancer Indemnity Plan (levels 1 & 2) and Personal Accident Indemnity Plan (the "Supplemental Policies").  These are all voluntary/supplemental policies that are fully funded by participating Associates through payroll deduction.  These policies are fully insured.  The TOUSA Group estimates that it has withheld approximately $52,000 in Employee contributions for supplemental Life and AD&D Insurance prior to the Petition Date, which amount is currently held by the Debtors and has not yet been transferred to the insurer.

143.    <u>Flexible Benefit Program</u>:  The TOUSA Group offers its Associates two Flexible Spending Account programs.  Associates may choose to participate in one or both plans:

    a.    <u>Health Care Spending Account</u>:  This plan allows Associates to set aside an amount of pre-tax money from each paycheck to pay for qualified unreimbursed medical and dental expenses, including deductibles and co-payments.

    b.    <u>Dependent Daycare Spending Account</u>:  This plan allows Associates to set aside an amount of pre-tax money from each paycheck to pay for qualified dependent day care expenses for qualified elder dependents and/or qualified dependents 12 years of age or younger.

144.    <u>Associate Discounts/Purchases</u>: After one year of employment, Associates are eligible to participate in a discount program on the purchase of a primary residence from the TOUSA Group.  Associates are entitled to receive a discount on the base price determined by their tenure with the Company (an Associate with one year of service receives a three percent

discount; an Associate with two years of service receives a five percent discount; and an Associate with three years of service receives a seven percent discount).

145.   <u>TOUSA Rewards and Recognition Program</u>:   The TOUSA Group provides rewards and recognition to Associates designed to recognize an Associate's contributions, commitments and loyalty (the "Rewards and Recognition Program").   Upon reaching their fifth, tenth, fifteenth and twenty-fifth anniversaries of employment, Associates are invited to select various awards, such as jewelry, home entertainment systems, golf clubs and similar items.

146.   <u>Health Advocate, Inc.</u>:   The Debtors provide Associates with access to Health Advocate, Inc.   ("Health Advocate").   Health Advocate provides help and assistance to Associates with respect to healthcare and insurance related issues.

**H.   <u>Emergency Motion For Entry of an Order (a) Authorizing the Debtors to Pay Certain Prepetition Lien Claims and Priority Claims in the Ordinary Course of Business and (b) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests</u>**

147.   The TOUSA Group routinely contracts with individual homebuyers for the construction and/or sale of homes.   Indeed, the construction and sale of homes is the core of the TOUSA Group's business.   As part of their homebuilding operations, the Debtors rely to a significant degree on, and routinely contract with, a number of third parties (the "Lien Claimants") who may be entitled under applicable non-bankruptcy law to assert liens against the Debtors and their property if the Debtors fail to pay for the goods or services rendered to them. The Debtors depend on these Lien Claimants to provide services, supplies and building materials necessary to ensure that home construction continues in a timely manner.

148.   In addition to the Lien Claimants described above, the Debtors contract with certain parties who, although they supply goods necessary to the Debtors' homebuilding operations, do not have lien rights under applicable non-bankruptcy law.   Nonetheless, I

understand that these parties may be entitled to a claim with administrative expense priority under the Bankruptcy Code (the "503(b)(9) Claimants").

149.    Although the Debtors generally make timely payments to their Lien Claimants, as of the Petition Date, some Lien Claimants may not have been paid for certain prepetition goods and services as to which payment is not yet due.  As a result, I understand that the Lien Claimants may have a right under applicable state laws to assert and perfect materialmans', mechanics', artisans' or other liens (collectively, the "Mechanics' Liens") against the Debtors' unsold homes and related real property.

150.    As of the Petition Date, the Debtors believe the aggregate amount of outstanding claims that may be secured by Mechanics' Liens is $47 million.  I believe that certain of the Lien Claimants may refuse to perform their ongoing obligations under existing agreements with the Debtors until their Mechanics' Liens are satisfied.  In certain instances, the Debtors have contracted with the Lien Claimants for multiple projects, some of which are still in various stages of production, and the Lien Claimants' refusal to continue providing materials and services to the Debtors (and on reasonable terms) may severely hinder the Debtors' business activities during this critical period.

151.    The Debtors seek immediate authority to pay and discharge, on a case-by-case basis, pursuant to the lien payment procedures (the "Lien Payment Procedures") described in the Lien Claims Motion, the prepetition claims of Lien Claimants that have given or could give rise to Mechanics' Liens against the Debtors' homes, regardless of whether such Lien Claimants already have perfected such liens (collectively, the "Lien Claims").

152.    The Debtors further request that all applicable financial institutions be authorized to receive, process, honor and pay all checks presented for payment and to honor all electronic

55

payment requests made by the Debtors related to the prepetition Lien Claims whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.

153.    The Lien Claimants and 503(b)(9) Claimants are critical to the Debtors' operations and failure to pay their claims may lead the Lien Claimants and 503(b)(9) Claimants to refuse to provide building materials and services going forward, which would substantially impede the Debtors' ability to construct homes.  Given the Debtors' dependence on the Lien Claimants and 503(b)(9) Claimants, their ability to assert liens against property that is critical to the Debtors' operations, and the Debtors' ability to pay the amounts required to satisfy the Lien Claims, I believe that payment of the Lien Claims and 503(b)(9) Claims is in the Debtors' best interests and without the ability to continue to construct homes the Debtors' operations would be jeopardized.

154.    As described above, the Lien Claimants and Section 503(b)(9) Claimants provide essential services, supplies and building materials to the TOUSA Group's business operations. The Debtors' failure to satisfy the Lien Claims during the preliminary stages of these cases will halt the Debtors' ongoing homebuilding efforts and will prevent the Debtors from meeting delivery schedules and selling homes to bring money into the Debtors' estates.  Even more, the Debtor's failure to meet specific construction goals may make current and future customers unwilling to sign contracts to buy homes or to close home purchases.  Paying the Lien Claimants and 503(b)(9) Claimants is thus critical to the continuation of the Debtors' business operations and the Debtor's successful reorganization in these chapter 11 cases.

I.      **Emergency Motion for Entry of an Order (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

155.    The TOUSA Group regularly relies on certain third parties to supply goods, materials and services without which the Debtors' business operations either could not operate or would operate at significantly reduced profitability. These vendors provide the diverse services and products that are necessary at all stages of home construction and development. Such services and products include building materials, home designs, cabinetry, plumbing and electrical work. Many of the supplies and services the Debtors use in construction are fungible or available from a variety of different sources, such that, to the best of our ability, no single supplier's failure to do business with the Debtors would have a significant adverse impact on business operations.

156.    There is, however, a class of certain vendors that is critical to the Debtors' business operations and that may choose not to continue providing goods and services to the Debtors during these chapter 11 cases. Generally, these vendors (collectively, the "Critical Vendors") (a) provide either (i) "single source" goods or (ii) other goods and services that are essential to the Debtors' operations and that cannot be obtained elsewhere or cannot be replaced except at exorbitant additional cost or excessive delay and (b) do not have long-term written supply contracts or other relationships with the Debtors such that they could be compelled to continue providing goods or services to the Debtors postpetition. Importantly, the Debtors' contracts with certain vendors provide only a framework for the issuance of purchase orders that are limited in scope to particular construction projects. Thus, the Debtors' postpetition ability to use the contracts to compel their vendors and suppliers to continue to provide goods and services may be limited in certain cases.

157.    The refusal of the Critical Vendors to work with the Debtors during these chapter 11 cases has the potential to greatly limit the Debtors' successful reorganization.  For one, the Debtors' construction and home sales processes would be severely disrupted if a Critical Vendor refused to provide goods or services on a timely basis and on acceptable terms.  Moreover, a failure to receive goods or services could cause the shutdown of construction in entire development projects until an agreement could be reached with the provider in question or an alternate source could be identified.  Further, I perceive a risk that, particularly in the light of an intensely competitive selling environment for homebuilders and developers, even a temporary halt in construction at a particular site could have a significant adverse marketing impact that could slow or depress the value of nearby home sales.

158.    Over and above the impact on future sales, a construction halt or delay may jeopardize the Debtors' ability to realize upon the sales they have already made.  If the construction of homes is delayed or the Debtors fail to deliver homes to their customers' specifications, the Debtors risk delayed closings or contract terminations.  Indeed, even a temporary disruption of this sort in the Debtors' operations could result in a failure to meet their commitments to customers, and thus has potential to cause severe damage to the Debtors' reputation and customer relationships at a time when the loyalty and support of those customers will be extremely important.  Moreover, a breakdown in supply relationships with one vendor in the industry, if it triggers a significant disruption in operations, may erode the confidence of other vendors in the Debtors' ability to continue operations, thus resulting in a follow-on tightening of vendor liquidity and support at a time when the Debtors' relationships with their vendors already may be stressed by these chapter 11 filings.

K&E 12229421.16

159.     The Debtors historically have sought to bargain with their vendors to achieve the lowest price, the best service and quality and the most favorable payment terms possible for each necessary product or service.  The Debtors recognize that efficiency in procurement is critical to achieving profitability.  To that end, the Debtors have developed valued relationships with many suppliers who have met the Debtors' expectations for price, service, quality and payment terms, and they hope to maintain and improve upon those vendor relationships on a postpetition basis.

160.     The Debtors do not seek authorization to pay all Critical Vendor Claims, and have not developed any list of such vendors with the understanding that those vendors would have an entitlement to receive immediate payment of their prepetition claims.   Nevertheless, a small number of the Debtors' most Critical Vendors may refuse to provide goods or services to the Debtors on a postpetition basis if the Debtors do not pay all or part of the vendors' prepetition claims.  Accordingly, the Debtors seek authorization to pay all or part of the Critical Vendor Claims, in an aggregate amount not to exceed $5 million (the "Critical Vendor Fund"), only in accordance with the policy (the "Procurement Policy") set forth in paragraph 12 of the Critical Vendors Motion.  The Critical Vendor Fund represents less than .3 percent of the Debtors' aggregate debt obligations and less than 8 percent of the Debtors' estimated obligations to trade creditors as of the Petition Date.

161.     As discussed above, the Critical Vendors are vital to the Debtors' business operations because they supply the Debtors with goods, materials and services without which the Debtors' business operations either could not operate or would operate at significantly reduced profitability. Satisfaction of the Critical Vendor Claims is essential to ensure that the Debtors can continue to meet delivery schedules and deliver homes, bringing money into their estates.   Failure to satisfy the Critical Vendor Claims in the ordinary course of business during the preliminary stages of these

59

cases will jeopardize the Debtors' business operations at this critical time and is highly likely to limit the sale of homes in an already challenging market.

**J.    Emergency Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

162.    In connection with their homebuilding business, the Debtors routinely incur utility expenses for water, sewer service, electricity, gas, telephone service, internet service, cable service and waste management.  These utility services are provided by approximately 350 utilities (collectively, the "Utility Providers"), including those listed on <u>Exhibit B</u> annexed to the Utilities Motion (the "Utility Service List").[16]  On average, the Debtors spend approximately $1,100,000 each month on utility costs.  As of the Petition Date, I believe that the Debtors are substantially current on utility payments.

163.    The Utility Providers service the Debtors' corporate and divisional headquarters, sales centers and job sites.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to continue selling and building homes and servicing their customers, thereby negatively impacting customer relationships, revenues and profits.  I believe such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries, and is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

---

[16]    Although the Debtors believe that the Utility Service List includes all of their Utility Providers, the Debtors reserve the right, without the need for further order of the Court, to supplement the Utility Service List if any Utility Provider has been omitted.  Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

**K.**    **Emergency Motion for Entry of an Order (A) Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness With Respect to, Certain Common Stock and (B) Granting Related Relief (the "Stock Transfers Motion")**

164.    The Debtors have incurred, and are currently incurring, significant net operating losses ("NOLs").  By the Stock Transfers Motion, the Debtors seek authorization to protect and preserve their valuable tax attributes, including NOL carryforwards and certain other tax and business credits ("Tax Credits" and with the NOLs, the "Tax Attributes").  The motion seeks to establish notification and hearing procedures regarding the trading of Common Stock (described in the Stock Transfers Motion).

165.    The Debtors currently expect to report tax losses of between $600 million to $800 million for the taxable year ending December 31, 2007.  Assuming that these NOLs are fully available to the Debtors, the Debtors should be able to carry these losses back to the prior two preceding taxable years to generate a tax refund of slightly more than $200 million.  Thus the Debtors' Tax Attributes are an extremely valuable asset of the Debtors' estates whose availability will facilitate the Debtors' successful reorganization and serve to improve creditor recoveries.

166.    It is my understanding from accounting professionals who consult with the Company that if no trading restrictions are imposed by this Court, such trading or transfers could severely limit or even eliminate the Debtors' ability to use their Tax Attributes (including their NOLs) which could lead to significant negative consequences for the Debtors, their estates and the overall reorganization process.

**L.**    **Emergency Motion for Entry of an Order Enforcing the Protections of Section 525(a) of the Bankruptcy Code (the "Anti-Discrimination Motion")**

167.    The TOUSA Group's homebuilding business is subject to stringent specifications, building codes and other residential real estate development and home building regulations

imposed by state and local governments.  As such, the Debtors must obtain certain required permits and comply with applicable regulations, building codes and other residential real estate development and home building requirements imposed by state and local governments.

168.    It is my understanding that certain local regulations and other requirements may discriminate against debtors in possession engaged in real estate development and construction, and local governmental authorities may be unaware of bankruptcy laws that would prohibit such discrimination. Any attempts by governmental or quasi-governmental entities to rely on discriminatory provisions or regulations (a) to take action in connection with the Debtors' construction or sales operations or (b) to delay or refuse to authorize necessary permits, licenses, approvals, or disbursements would have a significant adverse impact on the Debtors' businesses and ultimately could give rise to defaults under various agreements.

**Procedural Motions**

**M.**    **Emergency Motion for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent (the "Claims Agent Retention Motion") / Emergency Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Procedures Motion")**

169.    The Debtors may have more than 50,000 potential creditors in these chapter 11 cases.  Accordingly, the Debtors propose to engage Kurtzman Carson Consultants LLC ("KCC") to act as the Debtors' notice, claims and balloting agent, because this is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of the Debtors' chapter 11 cases and other developments in the chapter 11 cases, and of addressing other similar duties during these cases.

**N.    Emergency Motion for Entry of an Order (A) Waiving the Requirement for Filing a List of Creditors and(B) Authorizing the Debtors to (I) File a Consolidated List of the Creditors Holding the 50 Largest General Unsecured Claims and (II) Mail Initial Notices (the "Creditors' Matrix Motion")**

170.    After consulting with the proposed advisors to the Debtors' estates, I believe that preparing the consolidated list of all of the Debtors' creditors in the format or formats currently maintained by the Debtors in the ordinary course of their business will be sufficient to permit the notice, claims and balloting agent to provide prompt notice to all applicable parties.

171.    Many creditors are shared among certain of the Debtors, and the Debtors would expend significant resources and effort to reconcile their accounts to accurately attribute each creditor's claim against each Debtor.

172.    The Debtors form a complex enterprise with operations throughout the United States and consequently have tens of thousands of potential unsecured creditors that would have to be included on any comprehensive creditor list.  Preparing and filing such a list would require significant resources and substantial efforts and I do not believe such a voluminous filing would facilitate the review of creditor claims by any party in interest.

173.    The Debtors have filed a separate list of top twenty creditors in each of their respective cases, as well as a consolidated list of top 50 creditors to facilitate the United States Trustee's efforts in reviewing creditors' claims in these cases.

**Professional Retention and Compensation Motions**

**O.    Emergency Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Kirkland & Ellis LLP Retention Application")**

174.    The Debtors seek to retain Kirkland & Ellis ("K&E") as their attorneys because K&E has extensive experience and knowledge in the field of debtors' and creditors' rights and

63

business reorganizations under chapter 11 of the Bankruptcy Code.  K&E has been working with the TOUSA Group since January 2007 with respect to various restructuring, litigation and other related matters.

**P.**      **Emergency Application for Entry of an Order Authorizing the Employment and Retention of Berger Singerman, P.A. as Attorneys for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Berger Singerman Retention Application")**

175.    The Debtors seek to retain Berger Singerman, P.A. ("Berger Singerman") as their local counsel and conflicts counsel because Berger Singerman has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Berger Singerman has been working with the TOUSA Group since October 2007 with respect to various restructuring and other related matters.

**Q.**      **Emergency Application for Entry of an Order Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker and Financial Advisor for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Lazard Frères & Co. LLC Retention Application")**

176.    The Debtors seek to retain Lazard Frères & Co., LLC ("Lazard") as their financial advisor and investment banker because, among other things, Lazard has extensive experience and an excellent reputation in providing high quality financial advisory and investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings.  Lazard has been working with the TOUSA Group since September 2007 with respect to various restructuring and other related matters.

K&E 12229421.16

**R.** **Emergency Application for Entry of an Order Authorizing (A) the Employment and Retention of KZC Services, LLC as Turnaround Consultants for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date and (B) Appointing John R. Boken Chief Restructuring Officer of the Debtors (the "KZC Retention Application")**

177.    The Debtors seek to retain KZC Services LLC ("KZC") as the Debtors' restructuring consultants and to appoint John R. Boken ("Boken") chief restructuring officer of the Debtors.  KZC has been working with the TOUSA Group since November 2007 with respect to various restructuring and other related matters.

**S.** **Emergency Application for Entry of an Order Authorizing the Employment and Retention of Greenberg Traurig, LLP as Special Counsel for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Greenberg Traurig Retention Application")**

178.    The Debtors seek to retain Greenberg Traurig, LLP ("Greenberg Traurig") as the Debtors' special counsel in these chapter 11 cases.  Greenberg Traurig has been working with the TOUSA Group since 2002 with respect to various corporate and other related matters.

**T.** **Emergency Application for Entry of an Order Authorizing the Employment and Retention of Ernst & Young LLP as Independent Auditors and Accountants for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Ernst & Young Retention Application")**

179.    The Debtors seek to retain Ernst & Young, LLP ("Ernst & Young") as the Debtors' independent auditors and accountants in these chapter 11 cases because of Ernst & Young's renowned expertise, experience and knowledge in performing the auditing and accounting services described in the Ernst & Young retention application.

**U.** **Emergency Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date (the "OCP Motion")**

180.    The TOUSA Group routinely retains various attorneys, accountants and other professionals (each, an "OCP").  The OCPs provide services for the Debtors in a variety of

matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law, accounting services, auditing and tax services and certain consulting services. A list of the Debtors' current OCPs is attached to the OCP Motion as Exhibit B.

181.     The TOUSA Group also employs professional service providers such as architects, engineers, title companies, surveyors, real estate closing professionals, environmental consultants, design consultants, information technology consultants, marketing and business consultants and other service providers (collectively, the "Service Providers").  Although some of the Service Providers have professional degrees and certifications, these parties -- like other vendors, suppliers and service providers -- provide services relating to the day-to-day operation of the Debtors' businesses.

182.     I believe that without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.  Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.  Additionally, in light of the substantial number of OCPs and Service Providers and the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP and Service Provider.

183.     I am aware that although some of the OCPs and Service Providers may hold relatively small unsecured claims against the Debtors in connection with services rendered to the

Debtors prepetition, to the best of my knowledge, none of the OCPs or Service Providers have an interest materially adverse to the Debtors, their creditors or other parties in interest.

I declare under penalty of perjury that the foregoing is true and correct.

By:

Name:   Tommy L. McAden

Title:   Executive Vice President and Chief
Financial Officer