THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT
HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT.  ACCORDINGLY, THIS IS <u>NOT</u> A SOLICITATION OF
ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-10928-JKO |
| TOUSA, INC., *et al.*, | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR FIRST AMENDED
## JOINT PLAN OF TOUSA, INC. AND ITS AFFILIATED DEBTORS AND
## DEBTORS IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### April 17, 2009 VERSION OF PROPOSED DISCLOSURE STATEMENT

Richard M. Cieri
Paul M. Basta
M. Natasha Labovitz
Joshua A. Sussberg
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

Paul Steven Singerman
BERGER SINGERMAN, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile:  (305) 714-4340

*Co-Counsel to the Debtors*

Dated:  April 17, 2009

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ...................................................................................... 1
        A.      The Debtors' Plan Process .......................................................................... 1
        B.      Overview of the Plan .................................................................................. 1
        C.      Summary of Classification and Treatment of Claims and Equity Interests Under
                the Plan and Classes Entitled to Vote on the Plan ...................................... 2
        D.      Plan Distribution Analysis .......................................................................... 5
        E.      Voting on, and Confirmation of, the Plan .................................................. 6
                1.      The Voting Record Date .................................................................. 6
                2.      The Voting Deadline ........................................................................ 6
                3.      The Plan Objection Deadline ........................................................... 6
                4.      The Confirmation Hearing ............................................................... 7

II.     GLOSSARY ........................................................................................................... 8

III.    GENERAL INFORMATION AND DISCLAIMERS ........................................... 19
        A.      Important Dates ......................................................................................... 19
        B.      Why You Are Receiving This Document .................................................. 19
        C.      Persons to Contact for More Information .................................................. 20
        D.      Disclaimers ............................................................................................... 20

IV.     BACKGROUND CONCERNING THE DEBTORS ............................................. 23
        A.      The Debtors' Corporate History ............................................................... 23
        B.      The Debtors' Business Operations ............................................................ 23
                1.      Homebuilding Operations .............................................................. 23
                2.      Employees ..................................................................................... 24
                3.      Land Acquisition ........................................................................... 24
                4.      Construction ................................................................................... 25
                5.      Non-Debtor Financial Service Entities .......................................... 26
        C.      The Debtors' Capital Structure ................................................................. 26
                1.      Secured Bank Debt ........................................................................ 26
                2.      Unsecured Notes ............................................................................ 27
                3.      Preferred Stock .............................................................................. 28

V.      THE DEBTORS' CHAPTER 11 CASES ............................................................. 29
        A.      Events Leading to the Chapter 11 Cases .................................................. 29
                1.      Adverse Market Conditions ........................................................... 29
                2.      The Transeastern Litigation and the July Recapitalization ............ 29
                3.      Liquidity Difficulties ..................................................................... 35
        B.      Other Prepetition Developments ............................................................... 35
                1.      NYSE Delisting ............................................................................. 35
                2.      SEC Inquiry ................................................................................... 35
        C.      Commencement of the Chapter 11 Cases .................................................. 35
        D.      "First Day" Relief ..................................................................................... 36
                1.      Procedural Orders .......................................................................... 36

i

|   |   | 2. | Employment and Retention of Advisors | 36 |
|   |   | 3. | Operational Orders | 37 |
|   |   | 4. | Financing Orders | 40 |
|   | E. | | The Debtors' Plan Process | 41 |
|   |   | 1. | Initial Chapter 11 Restructuring Efforts | 41 |
|   |   | 2. | The First Plan and Disclosure Statement | 41 |
|   |   | 3. | The Alternative Plan | 42 |
|   |   | 4. | The Development of the Proposed Plan and Revised Business Plan | 42 |
|   | F. | | Other Developments During the Chapter 11 Cases | 43 |
|   |   | 1. | Filing of the Debtors' Schedules and SOFAs, Establishment of Deadlines to Submit Written Proofs of Claim and the Claims Process | 43 |
|   |   | 2. | Appointment of the Committee | 44 |
|   |   | 3. | Employee Compensation and Changes in Management | 45 |
|   |   | 4. | Sales of Certain Assets | 47 |
|   |   | 5. | Acquisition of Real Property | 47 |
|   |   | 6. | Litigation and Adversary Proceedings | 48 |
|   |   | 7. | Indemnification Obligations With Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases | 56 |
|   |   | 8. | Review and Analysis of Intercompany Claims | 57 |
|   |   | 9. | Financing the Debtors' Chapter 11 Cases | 59 |
|   |   | 10. | Changes in Certain Joint Ventures and Limited Liability Companies | 61 |
|   |   | 11. | Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property | 66 |
|   |   | 12. | The Home Warranty Program | 67 |
|   |   | 13. | Deregistration Under the Securities and Exchange Act of 1934 | 68 |
|   |   | 14. | Exclusivity | 68 |
| **VI.** | | | **DESCRIPTION OF THE CHAPTER 11 PLAN** | **69** |
|   | A. | | Overview | 69 |
|   | B. | | Classification and Treatment of Claims and Equity Interests | 69 |
|   |   | 1. | Treatment of Unclassified Administrative and Priority Claims | 71 |
|   |   | 2. | Treatment of Classified Claims Against the Debtors | 73 |
|   | C. | | Means for Implementation of the Plan | 80 |
|   |   | 1. | Corporate Existence | 80 |
|   |   | 2. | Vesting of Assets | 81 |
|   |   | 3. | The Plan Administrator | 81 |
|   |   | 4. | Closing of the Debtors' Chapter 11 Cases | 83 |
|   |   | 5. | Method of Distribution Under the Plan | 84 |
|   |   | 6. | Monetization of Assets | 84 |
|   |   | 7. | Books and Records | 84 |
|   |   | 8. | Reporting Duties | 84 |
|   |   | 9. | Tax Obligations | 85 |
|   |   | 10. | Single Satisfaction | 85 |
|   |   | 11. | Postpetition Intercompany Claims | 85 |
|   |   | 12. | Distributions on Account of Claims Allowed as of the Effective Date | 86 |
|   |   | 13. | Distributions on Account of Claims Allowed After the Effective Date | 86 |

ii

|     | 14. | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 89 |
|     | 15. | Compliance with Tax Requirements/Allocations | 93 |
|     | 16. | Surrender of Canceled Instruments or Securities | 93 |
|     | 17. | Resolution of Disputed Claims | 93 |
|     | 18. | Disallowance of Claims | 94 |
|     | 19. | Employment Agreements | 95 |
|     | 20. | Creation of Retained Professionals Fee Account and Fee Funding Reserve | 95 |
|     | 21. | Exemption from Certain Transfer Taxes | 95 |
|     | 22. | Cancellation of Notes and Equity Interests | 96 |
|     | 23. | Discharge of Obligations Under the First Lien Revolving Credit Agreement, First Lien Term Credit Agreement and Second Lien Credit Agreement | 96 |
| D.  | The Litigation Trust | | 96 |
|     | 1.  | Overview | 96 |
|     | 2.  | Generally | 97 |
|     | 3.  | Purpose and Establishment of the Litigation Trust | 98 |
|     | 4.  | Prosecution of Litigation Trust Causes of Action | 99 |
|     | 5.  | Ownership and Shares of the Litigation Trust Causes of Action | 99 |
|     | 6.  | Distributions and Withholding | 99 |
|     | 7.  | Appointment of the Litigation Trustee | 99 |
|     | 8.  | Funding Expenses of the Litigation Trust | 100 |
|     | 9.  | The Litigation Trust Loan | 100 |
|     | 10. | Termination of the Litigation Trust | 100 |
|     | 11. | Litigation Trust Committee | 100 |
| E.  | Conditions for Release From Escrow | | 100 |
| F.  | Treatment of Executory Contracts and Unexpired Leases | | 101 |
|     | 1.  | Assumption and Rejection of Executory Contracts and Unexpired Leases | 101 |
|     | 2.  | Claims on Account of the Rejection of Executory Contracts and Unexpired Leases | 102 |
|     | 3.  | Procedures with Respect to Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan | 103 |
| G.  | Conditions Precedent to the Effective Date | | 103 |
|     | 1.  | Conditions Precedent | 103 |
|     | 2.  | Waiver of Conditions | 104 |
|     | 3.  | Effect of Non-Occurrence of Conditions to the Effective Date | 104 |
| H.  | Settlement, Release, Injunction and Related Provisions | | 104 |
|     | 1.  | Compromise and Settlement | 104 |
|     | 2.  | Debtor Releases and Other Agreements | 105 |
|     | 3.  | Exculpation | 106 |
|     | 4.  | Discharge of the Company | 107 |
| I.  | Binding Nature of the Plan | | 107 |
| J.  | Retention of Jurisdiction | | 107 |
| K.  | Miscellaneous Provisions | | 109 |
|     | 1.  | Dissolution of the Committee | 109 |
|     | 2.  | Modification of the Plan | 109 |

       3.     Revocation of the Plan ..................................................................................110

**VII.   SOLICITATION AND VOTING PROCEDURES** ....................................................**110**
    A.    Overview ......................................................................................................110
    B.    Voting Dates and Deadlines ...........................................................................110
        1.     The Voting Record Date ....................................................................110
        2.     The Voting Deadline...........................................................................110
    F.    Distribution of the Solicitation Package .........................................................111
        3.     Temporary Allowance of Claims for Voting Purposes....................112
    C.    Requirements for Acceptance of the Plan .......................................................112
        1.     Acceptance by Voting Classes ..........................................................112
        2.     Presumed Rejection and "Cram Down"..............................................113
    D.    Completion of Ballots ....................................................................................113

**VIII.  CONFIRMATION OF THE PLAN** ...............................................................................**113**
    A.    Confirmation Hearing ....................................................................................113
    B.    Objections to Confirmation ............................................................................113
    C.    Overview of Statutory Requirements to Confirm the Plan...............................114
    D.    Specific Statutory Confirmation Requirements ..............................................115
        1.     Overview of the Best Interests of Creditors Test / Liquidation Analysis .........115
        2.     Best Interests of Creditors Test .........................................................117
        3.     Feasibility .........................................................................................117
        4.     Acceptance by Impaired Classes .......................................................117
        5.     Confirmation Without Acceptance by All Impaired Classes...............118
        6.     Classification of Claims and Equity Interests Under the Plan ..........119

**IX.    RISK FACTORS AND ALTERNATIVES TO  CONFIRMATION AND CONSUMMATION OF THE PLAN** ...............................................................................**120**
    A.    Bankruptcy Considerations ............................................................................120
        1.     Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests .............................................................120
        2.     Failure to Satisfy Voting Requirements .............................................120
        3.     Failure to Secure Confirmation of the Plan .......................................120
        4.     Nonconsensual Confirmation ............................................................121
        5.     Debtors May Object to the Amount or Classification of a Claim .......121
    B.    Risk Factors Associated with the Value of the Litigation Trust Interests to be Issued Under the Plan .................................................................................121
        1.     Recent Dislocation in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries ................................121
        2.     The Post-Effective Date Debtors May Not be Able to Achieve Projected Financial Results ..............................................................122
        3.     The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims ...........................................................................122
        4.     Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Post-Effective Date Debtors............................122
        5.     Transferability and Evidence of the Litigation Trust Interests .........122

iv

|  | 6. | The Post-Effective Date Debtors May be Subject to an Enforcement Action Brought by the Securities and Exchange Commission Which Could Subject the Post-Effective Date Debtors to Fines and Interfere with its Operations Going Forward. | 122 |
| C. | | Risks Associated with the Debtors' Business Operations | 123 |
|  | 1. | General Homebuilder Industry Downturn | 123 |
|  | 2. | Continued High Cancellation Rates | 123 |
|  | 3. | Unexpected Natural Disasters or Weather Conditions | 123 |
|  | 4. | Fluctuations in Market Conditions | 123 |
|  | 5. | Ability to Recoup Costs | 124 |
|  | 6. | Dependence on Subcontractors | 124 |
|  | 7. | Ability to Retain and Motivate Key Employees | 124 |
|  | 8. | Supply Risks; Labor and Materials Shortages | 124 |
|  | 9. | Effect of Competition Within the Homebuilding Industry | 124 |
|  | 10. | Ability to Obtain Bonds | 125 |
|  | 11. | Product Liability and Warranty Claims | 125 |
|  | 12. | Governmental Regulations | 125 |
| D. | | Liquidation Under Chapter 7 | 126 |
| E. | | Alternatives to the Proposed Plan | 126 |

**X.    CERTAIN SECURITIES LAW MATTERS** ............................................................. **126**

| A. | Issuance Of Securities Under The Plan | 126 |
| B. | Obligations under the Securities Exchange Act of 1934, as Amended | 127 |

**XI.    CERTAIN FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN** ......... **127**

| A. | | Introduction | 127 |
| B. | | Consequences to Holders of Claims and Equity Interests with Respect to TOUSA, Inc. | 128 |
|  | 1. | Consequences to Holders of Class 1A Claims,  Class 1B Claims, and Class 2 Claims | 128 |
|  | 2. | Consequences to Holders of Class 3 Claims | 129 |
|  | 3. | Consequences to Holders of Class 5 Claims | 129 |
| C. | | Withholding and Reporting | 130 |

**XII.    CONCLUSION AND RECOMMENDATION** ............................................................. **132**

TOUSA Disclosure Statement Wind Down Version_(14468796_10)

## EXHIBITS

**Exhibit A**    **First Amended Joint Plan of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code**

**Exhibit B**    **Disclosure Statement Order**

**Exhibit C**    **C-1:  List of Intercompany Loans**

        **C-2:  Intercompany Balances**

**Exhibit D**    **Summary of Classes of Claims Entitled to Vote on the Plan and Not Entitled to Vote on the Plan**

**Exhibit E**    **[Liquidation Analysis]\***

**Exhibit F**    **[Plan Distribution Analysis]\***

**Exhibit G**    **Causes of Action**

**\*  *Document to be provided before the objection deadline for the hearing on this Disclosure Statement.***

# I.  EXECUTIVE SUMMARY[1]

## A.    THE DEBTORS' PLAN PROCESS

Over the course of the last fourteen months, the Debtors and their major creditor constituencies have explored all restructuring possibilities in an expansive effort to maximize value for all parties in interest.  To that end, the Debtors have worked with their creditor groups to develop in detail – and in one case file – no less than three separate chapter 11 plans of reorganization.  Throughout this process, however, the Debtors have faced two difficult and persistent challenges.  First, these chapter 11 cases were filed in the midst of an economic downturn that has profoundly impacted the homebuilding industry.  Pressured by weak sales, extraordinary foreclosure rates and challenging mortgage requirements, the Debtors, like many other homebuilders in the United States, have been caught in a chokehold that is strangling an entire industry.  Second, ongoing litigation among the Debtors' major creditor groups has complicated the Debtors' plan process.  The macroeconomic challenges facing the Debtors as well as the complicating factors relating to litigation among creditor groups have rendered each of the Debtor's previous plans obsolete before they could be finalized.

As a result of these factors and others, the Debtors, with the support of their major creditor groups, recently determined that the prudent course of action was to revise their go-forward operational business plan.  Specifically, on March 23, 2009, the Debtors publicly announced that they would be shifting their focus away from build-to-order new sales and construction starts, and instead would complete homes currently under construction and sell their remaining inventory of pre-built homes and would monetize their land assets over time.  This difficult decision reflects the nearly unprecedented economic challenges facing the homebuilding industry, the lack of any viable alternative and the Debtors' view, developed over the last several months in concert with their major creditor groups, that the revised business plan will maximize distributable value to their creditors.

The Debtors believe that, under the circumstances and for the reasons described in this Disclosure Statement, the proposed Plan will maximize the distributable value in these chapter 11 cases and should be confirmed.

## B.    OVERVIEW OF THE PLAN

The Plan contemplates the orderly monetization of the Debtors' assets over a period of between 24 and 36 months.  With regard to that monetization, the Debtors have developed a comprehensive business plan that is designed to minimize costs and maximize the sale value of assets for the benefit of creditors.  Specifically, the Debtors' revised business plan contemplates that the Debtors will suspend efforts to generate new build-to-order sales and will primarily focus on completing and closing homes currently under construction.  Additionally, the Debtors will sell their remaining inventory of "spec" homes, monetize land assets over time and negotiate the sale of the financial services businesses operated by non-Debtor indirect subsidiaries of TOUSA, Inc.

Under the proposed Plan, the proceeds from the sale of any of the Debtors' assets will be placed into escrow (the "Proceeds Account") for distribution in accordance with the terms and provisions of the Plan upon the resolution of the Committee Action, as defined below.  A Plan Administrator will be

---

[1]    Capitalized terms used but not defined in the Executive Summary shall have the meaning provided to them in the Glossary or as defined in the body of the Disclosure Statement.

1

appointed to administer the Plan and to facilitate the sale of the Debtors' assets. The Plan Administrator will be subject, in certain instances, to the oversight of the Bankruptcy Court and a three person oversight committee appointed by the Committee, the Second Lien Agent and the First Lien Agent (the "Oversight Committee").

The Plan also contemplates the creation and funding of a litigation trust (the "Litigation Trust") for the purpose of pursuing certain identified claims, rights and causes of action, including the fraudulent conveyance action, Adv. Case No. 08-01435, commenced in the Bankruptcy Court by the Committee against the First Lien Revolver Lenders, the First Lien Term Lenders, the Second Lien Lenders and certain other parties (the "Committee Action"). The formation of the Litigation Trust is designed to preserve the relative rights, claims and defenses of all parties to the Committee Action, including the defendants named therein. Additional information concerning the Litigation Trust and the Committee Action is provided in sections VI.D and V.F.6.a of this Disclosure Statement.

**C.      SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND CLASSES ENTITLED TO VOTE ON THE PLAN**

The Plan consists of separate chapter 11 plans for each of the 39 Debtors. The treatment of the classes of claims against each of the Debtors is the same; however, to the extent there is no class of claims against a certain Debtor, there is no treatment for those class of claims. The table below summarizes the classification and treatment of claims and equity interests under the Plan. Additional detail with respect to the information contained in the table below is provided in section VI.B of this Disclosure Statement. Additionally, Exhibit D to this Disclosure Statement provides a summary of the classes and claims entitled to vote on the Plan for each of the 39 Debtors.

The Bankruptcy Code provides that holders of claims against, or equity interests in, a debtor are entitled to vote on a plan of reorganization only if (a) their claims or interests are "impaired" by that plan and (b) they receive some recovery under the plan. A claim or interest is not impaired if the plan does not alter the legal, equitable or contractual rights of the holder of the claim or interest or if the plan reinstates the original terms of the obligation (i.e., cures any default and reinstates the original terms of the obligation); unimpaired classes of claims and interests are deemed to accept the plan and do not vote. If a class of claims or interests will not receive any recovery at all under the plan, that class is deemed to reject the plan and does not vote. In light of these standards, and as reflected in the table below, only certain classes of claims against the Debtors are entitled to vote to accept or reject the Plan.

2

**Summary of Classification and Treatment of**
**Claims and Equity Interests Under the Plan**

| Class | Claim | Plan Treatment of Class | Status | Voting Rights |
|---|---|---|---|---|
| 1A | First Lien Revolver Claims | ***Net Proceeds from Encumbered Assets.*** Pro rata share of the Net Proceeds derived from sale of all encumbered assets of such Debtor available for distribution by the Plan Administrator, up to full payment of the amount of allowed First Lien Revolver Claims, which will be released from escrow following determination of the Committee Action.<br><br>***Fees and Expenses.*** $[1] million placed into a reserve account for reimbursement of reasonable actual out-of-pocket expenses for the defense of the Committee Action. The funds in the reserve account will be available for distribution as follows: (a) if Class 1A accepts the Plan, the First Lien Revolver agent will be permitted to access reserve account funds before final determination by the Court resolving the Committee Action and any objection to Class 1A Claims asserted by a Debtor, or (b) if Class 1A rejects the Plan, the funds will remain in the reserve account pending entry of one or more orders of the Court (which shall not be subject to a stay pending appeal) resolving the Committee Action and any objection to Class 1A Claims in favor of the First Lien Revolver Lenders. | Impaired | Yes |
| 1B | First Lien Term Loan Claims | ***Net Proceeds from Encumbered Assets.*** Pro rata share of the Net Proceeds derived from sale of all encumbered assets of such Debtor available for distribution by the Plan Administrator, up to full payment of the amount of allowed First Lien Term Loan Claims, which will be released from escrow following determination of the Committee Action.<br><br>***Fees and Expenses.*** $[3] million placed into a reserve account for reimbursement of reasonable actual out-of-pocket expenses for the defense of the Committee Action. The funds in the reserve account will be available for distribution as follows: (a) if Class 1B accepts the Plan, the First Lien Term Loan Agent will be permitted to access reserve account funds before final determination by the Court resolving the Committee Action and any objection to Class 1B Claims asserted by a Debtor, or (b) if Class 1B rejects the Plan, the funds will remain in the reserve account pending entry of one or more orders of the Court (which shall not be subject to a stay pending appeal) resolving the Committee Action and any objection to Class 1B Claims in favor of the First Lien Term Loan Lenders. | Impaired | Yes |

3

## Summary of Classification and Treatment of
## Claims and Equity Interests Under the Plan

| Class | Claim | Plan Treatment of Class | Status | Voting Rights |
|-------|-------|------------------------|--------|---------------|
| 2 | Second Lien Claims | *Net Proceeds from Encumbered Assets.* Pro rata share of the Net Proceeds, derived from sale of all encumbered assets of such Debtor available for distribution by the Plan Administrator, following payment in full of all Class 1A Claims and Class 1B Claims, if any, which will be released from escrow following determination of the Committee Action and distributed in accordance with section 5.5 of the Intercreditor Agreement.<br><br>*Fees and Expenses.* $[4] million placed into a reserve account for reimbursement of reasonable actual out-of-pocket expenses for the defense of the Committee Action. The funds in the reserve account will be available for distribution as follows: (a) if Class 2 accepts the Plan, the Second Lien Agent will be permitted to access reserve account funds before final determination by the Court resolving the Committee Action and any objection to Class 2 Claims asserted by a Debtor, or (b) if Class 2 rejects the Plan, the funds will remain in the reserve account pending entry of one or more orders of the Court (which shall not be subject to a stay pending appeal) resolving the Committee Action and any objection to Class 2B Claims in favor of the First Lien Term Loan Lenders. | Impaired | Yes |
| 3 | Other Secured Claims | At the option of the Plan Administrator: (a) Full payment in cash, without interest; (b) delivery of the collateral securing the claim; or (c) any other treatment agreed to by the Plan Administrator and such claim holder. | Impaired | Yes |
| 4 | Other Priority Claims | At the option of the Plan Administrator: (a) Full payment in cash; or (b) any other treatment agreed to by the Plan Administrator and such claim holder. | Unimpaired | No |
| 5A | Senior Note Claims | *Litigation Trust Interests.* On the Effective Date, a pro rata share of subseries A of the series of Litigation Trust Interests for the applicable Debtor. | Impaired | Yes |
| 5B | General Unsecured Claims | *Litigation Trust Interests.* On the Effective Date, a pro rata share of subseries B of the series of Litigation Trust Interests for the applicable Debtor. | Impaired | Yes |
| 5C | Subordinated Note Claims | *Litigation Trust Interests.* On the Effective Date, a pro rata share of subseries C of the series of Litigation Trust Interests for the applicable Debtor. Any distributions will be subject to the subordination provisions of Articles 11 and 12 of the Subordinated Notes Indenture. | Impaired | Yes |

4

| | | Summary of Classification and Treatment of<br>Claims and Equity Interests Under the Plan | | |
|---|---|---|---|---|
| **Class** | **Claim** | **Plan Treatment of Class** | **Status** | **Voting Rights** |
| 5D | PIK Note Claims | ***Litigation Trust Interests.*** On the Effective Date, a pro rata share of subseries D of the series of Litigation Trust Interests for the applicable Debtor. Any distributions will be subject to the subordination provisions of Articles 11 and 12 of the PIK Notes Indenture.<br><br>***Escrow and Disgorgement.*** Distributions will be held in escrow pending the outcome of the Committee Action, and will be paid in accordance with the subordination procedures set forth in Article V.B.15(d) of the Plan and/or the Litigation Trust, as determined by the Court at the conclusion of such litigation. | Impaired | Yes |
| 6 | Claims Subordinated Pursuant to Section 510 of the Bankruptcy Code | No distribution under the Plan. | Impaired | No |
| 7 | Equity Interests in the Debtors | No distribution under the Plan. All equity interests are cancelled and extinguished. | Impaired | No |

## D.   PLAN DISTRIBUTION ANALYSIS

As discussed in detail in section VI.B of this Disclosure Statement, the projected recovery under the Plan for many of the claims against the Debtors is dependent upon the outcome of the Committee Action as well as the value of the Net Proceeds available for distribution by the Plan Administrator. Although the Debtors have not attempted to estimate the possible recovery to each class of claims based on the outcome of the Committee Action, the Debtors have developed an overall analysis regarding the estimated Net Proceeds that may be available to the Debtors' creditors in accordance with the Debtors' revised business plan.

The table below provides a brief summary of the Debtors' plan distribution analysis (the "Plan Distribution Analysis"). The Plan Distribution Analysis presents "High" and "Low" estimates for potential proceeds that would be available to creditors if the Plan were confirmed and effectuated according to its terms. These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors. The Plan Distribution Analysis chart reflects an analysis of estimated distributions to creditors under the Plan and is intended to provide parties in interest with a comparison of estimated distributions to that of a hypothetical chapter 7 liquidation. Additional information with respect to this analysis is provided in sections VIII.D.3 and VIII.D.2 of this Disclosure Statement and Exhibit F hereto.

5

**Plan Distribution Analysis**

(in $000s)

|  | **High** | **Low** |
|---|---|---|
| Aggregate Estimated Proceeds: | $[XXX] | $[XXX] |
| Total Costs: | ([XXX]) | ([XXX]) |
| **Net Proceeds Available for Distribution:** | [XXX] | [XXX] |

E.    VOTING ON, AND CONFIRMATION OF, THE PLAN

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established the following deadlines with respect to voting on, and confirmation of, the Plan:

1.    **The Voting Record Date**

The Voting Record Date is the date on which the Debtors will determine which creditors of the Debtors are entitled to receive this Disclosure Statement and to vote to accept or reject the Plan.  The table above provides a detailed description of which parties will be affected by the Voting Record Date.

| The Voting Record Date is [May 14], 2009 |
|---|

2.    **The Voting Deadline**

Pursuant to the Disclosure Statement Order, the Voting Deadline is the latest date on which all properly executed and completed votes to reject or accept the Plan must be **actually** **received** at the following address:  TOUSA Ballot Center, c/o Kurtzman Carson Consultants LLC 2335 Alaska Avenue, El Segundo, California 90245.  A Ballot or Master Ballot that is submitted by facsimile, email or any other electronic means shall not be counted in voting to accept or reject the Plan.  Section VII of this Disclosure Statement provides additional information and a detailed description of voting instructions for those entitled to vote on the Plan.

| The Voting Deadline is [June 17], 2009 |
|---|

3.    **The Plan Objection Deadline**

The Plan Objection Deadline is the last day on which all properly completed objections to the Plan must filed with the Bankruptcy Court and served upon the Debtors and appropriate parties in interest.

| The Plan Objection Deadline is [June 17], 2009 |
|---|

Section VIII of this Disclosure Statement provides important information on the Confirmation Hearing and the Plan Objection Deadline.

6

4.        **The Confirmation Hearing**

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing on the confirmation of a plan of reorganization under chapter 11.  Section 1128 of the Bankruptcy Code also provides that any party in interest may object to confirmation of the plan.  The Confirmation Hearing will be before the Honorable Judge John K. Olson, United State Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, Courtroom 301, United States Bankruptcy Court, 299 E. Broward Boulevard, Fort Lauderdale, Florida 33301.

| **The Confirmation Hearing will held on** **[June 23], 2009 at [9:30 a.m.](Prevailing Eastern Time)** |
| --- |

# II.  GLOSSARY

The following is a list of many of the defined terms used in this Disclosure Statement.  This list has been provided for your convenience.  Please refer to the Plan for additional definitions.  In the event of any inconsistency between the Plan and this Glossary, the Plan is controlling.

| | |
|---|---|
| *Administrative Claims* | The claims constituting costs and expenses of administration of the Debtors' estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) the actual and necessary costs and expenses, incurred after the applicable Commencement Date, of preserving the respective estates and operating the businesses of the Debtors; (b) allowed Professional Compensation; (c) all U.S. Trustee Fees; (d) allowed reimbursable expenses of members of the Committee; and (e) allowed claims under section 503(b)(9) of the Bankruptcy Code. |
| *Allowed Claim* | Any claim, other than a disputed claim, (a) with respect to which proof of such claim was timely and properly filed, or if no proof of claim was timely and properly filed, which is listed by any of the Debtors on their respective Schedules as liquidated in amount and not disputed or contingent, and in either case, (i) as to which no objection motion or adversary proceeding concerning the allowance thereof or request for estimation has been interposed on or before the Effective Date or the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court or (ii) to the extent any objection, motion or adversary proceeding concerning the allowance thereof or request for estimation interposed in accordance with clause (i) has been determined by a Final Order in favor of the holder of such claim; or (b) to the extent allowed by a Final Order or the provisions of the Plan. |
| *Beacon Hill* | Beacon Hill at Mountain's Edge, LLC, a Debtor in these chapter 11 cases. |
| *Bankruptcy Code* | Title 11 of the United States Code. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division. |
| *Bankruptcy Rules* | The Federal Rules of Bankruptcy Procedure. |
| *Commencement Date* | January 29, 2008, the date on which each of the Debtors commenced its chapter 11 case (except with respect to Beacon Hill at Mountain's Edge, LLC, which filed for chapter 11 relief on July 30, 2008).  For additional information, see section V.C, below. |
| *Committee* | The statutory committee of unsecured creditors appointed in the Debtors' chapter 11 cases. |

8

| | |
|---|---|
| *Committee Action* | The adversary proceeding [Adv. Case. No. 08-01435] commenced by the Committee against the First Lien Revolver Lenders, the First Lien Term Lenders, the Second Lien Lenders and certain other parties, as such complaint and the parties thereto may be amended from time to time and any other avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code or otherwise relating to challenging the validity of or arising from the First Lien Revolver Claims, the First Term Claims or the Second Lien Claims including claims and causes of action in connection with such adversary proceeding. |
| *Confirmation Date* | The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Debtors' chapter 11 cases. |
| *Confirmation Hearing* | [June 23], 2009, the date on which the Debtors will present the Plan to the Bankruptcy Court for confirmation. |
| *Confirmation Order* | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| *[D.E. #___]* | Reference to a "docket entry" on the Bankruptcy Court's docket. Each document identified as a docket entry in this Disclosure Statement is available, free of charge, at http://www.kccllc.net/tousa or, on a subscription basis, at http://pacer.psc.uscourts.gov/. |
| *Debtors* | The Debtors include the following entities: TOUSA, Inc.; Beacon Hill at Mountain's Edge, LLC; Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Homes, L.P.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. |
| *Disclosure Statement* | This document together with the annexed exhibits. |
| *Disclosure Statement Order* | The order of the Bankruptcy Court, dated **[DATE]**, approving this Disclosure Statement and establishing procedures for solicitation of votes on the Plan [D.E. #2680]. A copy of the Disclosure Statement Order is attached hereto as <u>Exhibit B</u>. |

9

| | |
|---|---|
| *Disputed Claim* | Any claim that is not yet allowed or Provisionally Allowed. |
| *Distribution Date* | Any of the Initial Distribution Date or the Periodic Distribution Dates. |
| *Effective Date* | The day selected by the Debtors that is no earlier than the first business day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VII of the Plan have been satisfied or waived. |
| *Equity Interests* | Any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately before the Effective Date. |
| *Encumbered Assets* | Any of the Debtors' assets encumbered by the liens securing the First Lien Revolving Credit Agreement, the First Lien Term Credit Agreement and the Second Lien Credit Agreement. |
| *Excluded Claims* | The Operating Causes of Action and any Causes of Action released in accordance with Article VIII of the Plan. |
| *Final Order* | An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing, has expired and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely made, or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Plan Administrator, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or otherwise shall have been dismissed with prejudice. |
| *First Lien Revolver* | The first lien revolving credit facility provided by the First Lien Revolving Credit Agreement. |
| *First Lien Revolver Agent* | Citicorp North America, Inc., in its capacity as administrative agent, or any successor agent under the First Lien Revolving Credit Agreement. |

10

| | |
|---|---|
| *First Lien Revolver Claims* | All claims derived from or based upon the First Lien Revolving Credit Agreement, including default interest, the reasonable and documented out-of-pocket fees and expenses of the First Lien Revolver Agent and its advisors and contingent and unliquidated Claims arising under the First Lien Revolving Credit Agreement, all to the extent not previously paid by the Debtors. |
| *First Lien Revolving Credit Agreement* | The Second Amended and Restated Revolving Credit Agreement dated July 31, 2007, among TOUSA, Inc. as borrower, the Subsidiary Debtors (excluding Beacon Hill at Mountain's Edge, LLC), as Subsidiary Borrowers, Citicorp North America, Inc., as Administrative Agent, and the banks, financial institutions and other lenders party thereto from time to time and the other credit documents referenced therein. |
| *First Lien Revolver Lenders* | The lenders party to the First Lien Revolving Credit Agreement from time to time. |
| *First Lien Term Agent* | Citicorp North America, Inc., in its capacity as administrative agent, or any successor agent under the First Lien Term Credit Agreement. |
| *First Lien Term Credit Agreement* | The Credit Agreement dated July 31, 2007, among TOUSA, Inc. as administrative borrower, the Subsidiary Debtors (excluding Beacon Hill at Mountain's Edge, LLC), as Subsidiary Borrowers, Citicorp North America, Inc., as Administrative Agent, and the banks, financial institutions and other lenders party thereto from time to time and the other credit documents referenced therein. |
| *First Lien Term Lenders* | Those lenders party to the First Lien Term Credit Agreement from time to time. |
| *First Lien Term Loan* | The $200,000,000 first lien term loan provided pursuant to the First Lien Term Credit Agreement. |
| *First Lien Term Loan Claims* | Any claim derived from or based upon the First Lien Term Credit Agreement including default interest and the reasonable and documented out-of-pocket fees and expenses of the First Lien Term Agent and its advisors and contingent and unliquidated Claims arising under the First Lien Term Credit Agreement, all to the extent not previously paid by the Debtors. |

| | |
|---|---|
| *General Unsecured Claims* | Any unsecured Claim against any Debtor, including any Intercompany Claim or deficiency claim of any secured creditor (including the First Lien Revolver Lenders, the First Lien Term Lenders and the Second Lien Lenders to the extent the Committee is successful in the prosecution of the Litigation Trust Causes of Action and any claim of any such secured creditor that is Allowed or Provisionally Allowed, but rendered unsecured as a result of the Litigation Trust Causes of Action), that is not a Priority Tax Claim, Administrative Claim, Accrued Professional Compensation Claim, Senior Note Claim, Subordinated Note Claim, PIK Note Claim or Other Priority Claim. |
| *Homes L.P.* | TOUSA Homes, L.P., a Debtor in these chapter 11 cases. |
| *Intercompany Claim* | [Any claim of a Debtor against another Debtor.] |
| *Initial Administrative Claims Bar Date* | [DATE], 2009, the date specifically fixed by order of the Bankruptcy Court for the filing of Administrative Claims arising before April 30, 2009. |
| *Initial Distribution Date* | The date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence. |
| *Intercreditor Agreement* | The intercreditor agreement among the First Lien Revolver Agent, the First Lien Term Agent and the Second Lien Agent, dated as of July 31, 2007. |
| *July Recapitalization* | The Debtors' (with the exception of Beacon Hill at Mountain's Edge, LLC) entry into, or amendment of, each of the Prepetition Secured Facilities and TOUSA, Inc.'s issuance of the PIK Election Notes and the Preferred Stock on July 31, 2007, as described in section V.A.2 of this Disclosure Statement.  Section V.A.2 of this Disclosure Statement provides additional detail on the July Recapitalization. |
| *Litigation Trust* | The trust to be created on the Effective Date for the pursuit of the Litigation Trust Causes of Action in accordance with the provisions of the Litigation Trust Agreement. |
| *Litigation Trust Agreement* | The trust agreement to be included in the Plan Supplement, consistent in all material respects with the description contained herein, that, among other things: (a) establishes and governs the Litigation Trust; (b) sets forth the respective powers, duties and responsibilities of the Litigation Trustee and the Litigation Trust Committee; and (c) provides for distribution of Litigation Trust Recovery Proceeds, if any, to the Litigation Trust Beneficiaries. |
| *Litigation Trust Assets* | The (a) Litigation Trust Causes of Action, (b) Litigation Trust Loan and (c) Net Proceeds derived from the monetization of the unencumbered assets of the Debtors, if any. |

TOUSA Disclosure Statement Wind Down Version_(14468796_10)

| | |
|---|---|
| *Litigation Trust Beneficiaries* | Holders of allowed or Provisionally Allowed Class 5A, 5B, 5C and 5D Claims against the Debtors. |
| *Litigation Trust Causes of Action* | Claims or causes of action raised by or on behalf of any of the Debtors, including (i) the Committee Action; (ii) the TOI Causes of Action except to the extent such causes of action are encumbered by the First Lien Revolving Loan, the First Lien Term Loan and the Second Lien Loan; and (iii) any claims or causes of action against (x) the Transeastern Lenders or (y) related to the July Recapitalization, except those Claims or Causes of Action released pursuant to the provisions of the Plan or that would be covered by insurance if not transferred to the Litigation Trust.  For the avoidance of doubt, the Litigation Trust Causes of Action shall not include the Excluded Claims. |
| *Litigation Trust Committee* | The committee to be appointed in accordance with, and to exercise the duties set forth in, the Litigation Trust Agreement, which duties shall be in the nature of and/or include advising with respect to the actions of the Litigation Trustee and administration of the Litigation Trust, removal of the Litigation Trustee and determining whether an entity is a permissible defendant.  The Litigation Trust Committee shall consist of three members, to be appointed by the Committee and to be identified in the Plan Supplement, *provided*, *however*, that if the Committee does not provide the Debtors with the names of the Litigation Trust Committee members five days before the date for filing the Plan Supplement, the Debtors shall appoint the members of the Litigation Trust Committee. |
| *Litigation Trustee* | The Person to be designated by the Committee, identified in the Plan Supplement and retained as of the Effective Date, as the employee or fiduciary responsible for implementing the applicable provisions of the Plan relating to the Litigation Trust in accordance with the Litigation Trust Agreement; *provided*, *however*, that if the Committee does not provide the Debtors with the name of the Litigation Trustee five days before the date for filing the Plan Supplement, the Debtors shall appoint the Litigation Trustee. |
| *Litigation Trust Interests* | The beneficial interests in the Litigation Trust that will entitle the holder thereof to receive, on a pro rata basis, its Litigation Trust Recovery Proceeds, which interests shall be issued in 38 series corresponding to the 38 Debtors, including TOUSA, Inc.  For each of the series of the Litigation Trust Interests, there will be the following subseries:   (a) Senior Note Claims -- subseries A; (b) General Unsecured Claims -- subseries B; (c) Subordinated Note Claims -- subseries C; and (d) PIK Note Claims -- subseries D. |
| *Litigation Trust Loan* | Cash loan to the Litigation Trust in an amount of $7 million to be funded by the Debtors on the Effective Date on the terms specified in the Litigation Trust Agreement and to be repaid to the Post-Effective Date Debtors, and paid into the Proceeds Account, with first priority out of any Litigation Trust Recovery Proceeds. |

| | |
|---|---|
| *Litigation Trust Recovery Proceeds* | The proceeds of the Litigation Trust Assets as recovered by the Litigation Trust, net of direct expenses of the recovery thereof (e.g., the fees, expenses and costs of the subject litigation and collection, including repayment of the Litigation Trust Loan and all expenses paid in connection with the Litigation Trust Causes of Action before the Confirmation Date).   Specifically, the Litigation Trust Recovery Proceeds include the proceeds of any recovery on account of the Litigation Trust Causes of Action including if so determined by the Bankruptcy Court,  the transfer to the Litigation Trust of all or a portion of the Net Proceeds. |
| *Net Proceeds* | The proceeds derived from the sale of the Debtors' assets less any costs related to such sale, whether those costs are subtracted from the proceeds at the time of or after the closing of such sale. |
| *Operating Causes of Action* | (a) all causes of action arising from or related to the Debtors' operations in the ordinary course of business with respect to optioning, buying or selling land, developing homes, entering into, maintaining and terminating employment relationships, procuring goods and services with respect to the Debtors' homebuilding activities, procuring and maintaining surety bonds and insurance with respect to customer claims, leasing office space and model homes, entering into and acting as a member of and terminating joint ventures (all such activities, including entering into contracts related to any of the foregoing, the Operating Activities") and (b) all causes of action arising under chapter 5 of the Bankruptcy Code and arising from or related to the Operating Activities.  For the avoidance of doubt, the Operating Causes of Action shall exclude the Committee Action. |
| *Other Priority Claim* | Any claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim. |
| *Other Secured Claim* | Any secured claim, other than a First Lien Revolver Claim, First Lien Term Loan Claim or Second Lien Claim. |
| *Oversight Committee* | The committee established to oversee certain actions of the Plan Administrator as described in Article V.B.10 of the Plan   The Oversight Committee shall consist of three members, with the (a) the First Lien Agent, (b) the Second Lien Agent and (c) the Committee each appointing one representative to serve as a member of the Oversight Committee, which members shall be identified in the Plan Supplement. |
| *Oversight Procedures* | The procedures by which the Oversight Committee may review and object to certain of the Plan Administrator's actions, as set forth in Article V.B.10 of the Plan. |

14

| | |
|---|---|
| *Periodic Distribution Dates* | Unless otherwise ordered by the Bankruptcy Court, the first business day that is 120 days after the Distribution Date, and for the first year thereafter, the first business day that is 120 days after the immediately preceding Periodic Distribution Date. After one year following the Distribution Date, the Periodic Distribution Date will occur on the first business day that is 180 days after the immediately preceding Periodic Distribution Date. |
| *PIK Election Notes* | The 14.75% Senior Subordinated PIK Election Notes, issued by TOUSA, Inc., due July 1, 2015. |
| *PIK Note Claim* | Any claim other than a claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the PIK Election Notes. |
| *Plan* | The First Amended Joint Plan of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code [D.E. #2680], which the Debtors filed on April 17, 2009. |
| *Plan Administrator* | The person to be designated by the Debtors, identified in the Plan Supplement and retained as of the Effective Date, as the employee or fiduciary responsible for implementing the applicable provisions of the Plan. |
| *Plan Objection Deadline* | [June 17], 2009, the last day on which all properly completed objections to the Plan must be actually received by the Debtors and the other parties. |

15

| | |
|---|---|
| *Plan Supplement* | The compilation of documents and forms of documents, schedules and exhibits to be filed no later than ten business days before the Voting Deadline, as such compilation may be amended, supplemented or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.  The Plan Supplement shall include, without limitation, the following documents: (a) new organizational documents for the Post-Effective Date Debtors; (b) the list of executory contracts and unexpired leases to be assumed and the proposed cure amount; (c) the document governing the role and relationship between the Post-Effective Date Debtors and the Plan Administrator; (d) the Litigation Trust Agreement; (e) the agreement or agreements establishing the Proceeds Account; and (f) the designation of the (i) Litigation Trustee, (ii) Litigation Trust Committee, (iii) the Plan Administrator and (iv) the Oversight Committee.  The Debtors will file the Plan Supplement, but shall not be required to serve the Plan Supplement, except that any exhibit relating to cure claims or another equivalent document detailing cure Claim information will be served (at least in relevant part) on the non Debtor counterparties to contracts or leases to be assumed and the Debtors will serve the Plan Supplement on the U.S. Trustee and counsel to the Committee, the First Lien Revolver Agent, the First Lien Term Agent, the Second Lien Agent. |
| *Post-Effective Date Debtors* | The Debtors or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date. |
| *Proceeds Account* | The escrow or escrows which shall be created to hold, pending the resolution of the Committee Action, the Net Proceeds of the monetization of the Debtors' assets above a cash threshold of $20 million. |
| *Prepetition Collateral* | All "Collateral," as that term is defined in the First Lien Revolving Credit Agreement, the First Lien Term Loan Credit Agreement and Second Lien Credit Agreement, that existed as of the Commencement Date and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents and profits thereof. |
| *Prepetition Secured Facilities* | Collectively, the First Lien Revolver, the First Lien Term Loan and the Second Lien Term Loan. |
| *Prepetition Secured Lenders* | Collectively, the First Lien Revolver Lenders, First Lien Term Lenders and the Second Lien Lenders. |
| *Priority Tax Claims* | Any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |

| | |
|---|---|
| *Provisionally Allowed* | With respect to the First Lien Revolver Claims, the First Lien Term Loan Claims and the Second Lien Claims, allowed solely for the purposes of escrowing distributions under, and voting on, this Plan subject, at all times, to the provisions of the Plan, including Article V.D. and Article VIII.F. |
| *Retained Professionals* | Any entity: (a) employed in these chapter 11 cases pursuant to a final order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, but not including those entities whose compensation or reimbursement is allowed pursuant to the Plan. |
| *Second Lien Agent* | Wells Fargo Bank, N.A., as successor to Citicorp North America, Inc., in its capacity as administrative agent under the Second Lien Credit Agreement, and any of its successors or assigns. |
| *Second Lien Claims* | Any claim derived from or based upon the Second Lien Credit Agreement, including default interest and the reasonable and documented out-of-pocket fees and expenses of the Second Lien Agent and the Second Lien Restricted Lenders and their respective advisors and contingent and unliquidated Claims arising under the Second Lien Credit Agreement, all to the extent not previously paid by the Debtors. |
| *Second Lien Credit Agreement* | The Second Lien Term Loan Credit Agreement, dated July 31, 2007, among TOUSA, Inc., as borrower, the Subsidiary Debtors (excluding Beacon Hill at Mountain's Edge, LLC), as subsidiary borrowers, Citicorp North America, Inc. as Administrative Agent, and the banks, financial institutions and other lenders party thereto from time to time, and the other credit documents referenced therein. |
| *Second Lien Lenders* | The lenders party to the Second Lien Credit Agreement from time to time. |
| *Second Lien Term Loan* | The $300,000,000 second lien term loan plus accrued payment-in-kind interest provided under the Second Lien Credit Agreement. |
| *Senior Note Claims* | Any claim, other than a claim subordinated pursuant to section 510(b) of the Bankruptcy Code, derived from or based upon the Senior Notes. |
| *Senior Notes* | The 9.0% Senior Notes and the 8.25% Senior Notes. |
| *Subordinated Notes* | The 7.5% Senior Subordinated Notes and the 10.375% Senior Subordinated Notes. |
| *Subordinated Notes Claims* | Any claim other than a claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the Subordinated Notes. |

17

| | |
|---|---|
| *Subsidiary Debtors* | Each of the Debtors excluding TOUSA, Inc. |
| *TOI Causes of Action* | Any Cause of Action that is owned in part or in whole by TOUSA, Inc., except the Operating Causes of Action. |
| *TOUSA* | TOUSA, Inc. |
| *TOUSA Homes* | TOUSA Homes, Inc. |
| *U.S. Trustee* | The United States Trustee's office for the Southern District of Florida. |
| *Voting and Claims Agent* | Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent for the Debtors pursuant to the *Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent for the Debtors and Debtors in Possession*, which was entered by the Bankruptcy Court on January 31, 2008 [D.E. #102]. |
| *Voting Classes* | Collectively, Classes 1A, 1B, 2, 3, 5A, 5B, 5C, 5D and 5E for each of the Debtors. |
| *Voting Deadline* | [June 17], 2009, which is the date by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order. |
| *Voting Record Date* | [May 14], 2009, the date established as the voting record date in the Disclosure Statement Order. |

18

# III.  GENERAL INFORMATION AND DISCLAIMERS

**A.**    **IMPORTANT DATES**

| |
|---|
| **VOTING RECORD DATE**<br><br>**[May 14], 2009** |
| **VOTING DEADLINE**<br><br>**[June 17], 2009** |
| **PLAN OBJECTION DEADLINE**<br><br>**[June 17], 2009** |
| **CONFIRMATION HEARING**<br><br>**[June 23], 2009 at 9:30 a.m. (Prevailing Eastern Time)** |

**B.**    **WHY YOU ARE RECEIVING THIS DOCUMENT**

TOUSA, Inc. and its affiliated debtors and debtors in possession are soliciting votes to accept or reject their chapter 11 plans (collectively, the "Plan").  The Debtors build homes in various states throughout the country and have been operating as debtors in possession under chapter 11 of the Bankruptcy Code since January 29, 2008.[1]  The Debtors' proposed Plan will permit the Debtors to exit chapter 11 and maximize distributable value to their creditors.  This Disclosure Statement summarizes the key features of the Plan and provides information relating to the Debtors and the Plan, which will enable creditors to make an independent determination regarding whether to accept or reject the Plan.

The principal objective of a chapter 11 case is the confirmation of a chapter 11 plan.  Among other things, a chapter 11 plan sets forth the means for selling a debtor's assets and satisfying claims against, and interests in, a debtor and its estate to the extent that value is available to do so.  A bankruptcy court order confirming a chapter 11 plan binds the debtor and key parties in interest, including any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor, regardless of whether such creditor is impaired, has accepted the plan or receives or retains any property under the plan.  Subject to certain limited exceptions, an order approving

---

[1]    As discussed in section V.F.10.b of this Disclosure Statement, Beacon Hill at Mountain's Edge, LLC ("Beacon Hill") was formerly a joint venture of TOUSA Homes but became a wholly-owned subsidiary of TOUSA Homes after the Petition Date.  On August 4, 2008, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, pursuant to an order dated August 4, 2008, its chapter 11 case is being jointly administered with the Debtors' chapter 11 cases [D.E. #1512].

confirmation of a chapter 11 plan discharges a debtor from any debt that arose before the date of the confirmation and substitutes the obligations specified in the terms of the confirmed plan.

A bankruptcy court is only permitted to confirm a chapter 11 plan if the required number of holders of claims against (and, where applicable, interests in) a debtor vote to accept the plan.  As part of the process for voting, section 1125 of the Bankruptcy Code requires a debtor to obtain bankruptcy court approval of a document called a "disclosure statement" that contains adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the proposed plan.  **This document is the Disclosure Statement for the Plan proposed by the Debtors.**

This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow to determine whether to confirm the Plan.  This Disclosure Statement also discusses events leading to the Debtors' filing of their chapter 11 cases and developments during their chapter 11 cases.  **A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement.**

The Bankruptcy Court approved this Disclosure Statement by an order dated [DATE] [D.E. #____] (the "Disclosure Statement Order").  The Disclosure Statement Order establishes certain procedures with respect to soliciting and tabulating votes to accept or reject the plan, including the important dates set forth above.  The Disclosure Statement Order also approves this Disclosure Statement as containing adequate information of a kind in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors to make an informed judgment regarding whether to accept or reject the Plan.  **A copy of the Disclosure Statement Order is attached as <u>Exhibit B</u> to this Disclosure Statement.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

All holders of claims against the Debtors, or equity interests in TOUSA, Inc., should carefully review the procedures and instructions set forth in the Disclosure Statement Order for voting to accept or reject the Plan and for filing objections to confirmation of the Plan.  As required by this Disclosure Statement Order, all holders of claims or equity interests that the Debtors believe may be entitled to vote to accept or reject the Plan will receive a copy of this Disclosure Statement as part of a Solicitation Package that will also include a Ballot for use in the voting process.

C.    PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring additional information about this Disclosure Statement or the Plan should contact counsel for the Debtors, Brian Schartz, Kirkland & Ellis LLP, 153 E. 53rd Street, New York, New York 10022, Telephone:  (212) 446-4800.

If you have received this Disclosure Statement or the Plan on a CD ROM but instead desire a paper copy of such documents, or would like additional copies, the documents are available:  (a) at http://www.tousadocket.com, (b) by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (c) by calling 866-381-9100 or (c) by emailing KCC_TOUSA@kccllc.com.

D.    DISCLAIMERS

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE

20

BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATION AND ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS CITED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE INTERPRETED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS INTENDED TO AID AND SUPPLEMENT REVIEW OF THE PLAN ITSELF. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN (INCLUDING EXHIBITS TO THE PLAN) IN ITS ENTIRETY. ACCORDINGLY, THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE PLAN EXHIBITS. IF THERE IS A CONFLICT BETWEEN THE PLAN OR THE PLAN EXHIBITS AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN AND THE PLAN EXHIBITS WILL GOVERN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN EXHIBITS, AS WELL AS READING CAREFULLY THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(B) OF THE

FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH ANY NON-BANKRUPTCY LAW.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS CONCERNING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION CONTAINED OR DISCUSSED IN THIS DISCLOSURE STATEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

# IV.  BACKGROUND CONCERNING THE DEBTORS

Before the Commencement Date, the Debtors built homes in the United States for sale under various brand names, including Engle Homes, Newmark Homes, Fedrick Harris Estate Homes, Trophy Homes and the James Company.  The Debtors' prepetition business operations encompassed a wide array of homebuilding activities, ranging from land acquisition and site development to marketing, design and construction, in target markets including a diverse group of homebuyers, such as "first time" homebuyers, "move up" homebuyers, homebuyers who are relocating to a new city or state, buyers of second or vacation homes, active adult homebuyers and homebuyers with grown children seeking a smaller home.

The Debtors' operate in four major geographic regions in the United States:  Florida, the Mid-Atlantic, Texas and the West.  The break-down for each region in which the Debtors operate is as follows:

| Florida | Mid-Atlantic | Texas | West |
|---------|--------------|-------|------|
| Central Florida | Baltimore / Southern Pennsylvania | Austin | Colorado |
| Jacksonville | Nashville | Houston | Las Vegas |
| Southeast Florida | Northern Virginia | San Antonio | Phoenix |
| Southwest Florida | | | |
| Tampa / St. Petersburg | | | |

For the year ended December 31, 2008, the Debtors' top two largest metropolitan markets, representing approximately 34% of consolidated home deliveries, were Southeast Florida and Houston.

In 2006, the Debtors delivered 7,824 homes and generated $2.6 billion in homebuilding revenues on a consolidated basis.  In 2007, the Debtors delivered 6,580 homes and generated $2.2 billion in homebuilding revenues on a consolidated basis.  In 2008, the Debtors delivered approximately 3,850 homes and generated approximately $1.1 billion in homebuilding revenues on a consolidated basis.

The following sections of this Disclosure Statement provide a brief overview of the Debtors' corporate history, key aspects of the Debtors' business operations and a summary of the Debtors' current capital structure.

## A.    THE DEBTORS' CORPORATE HISTORY

TOUSA, Inc. (formerly known as Technical Olympic USA, Inc.) was initially formed as the result of a merger of Newmark Homes Corp. and Engle Holdings Corp. and grew through a series of acquisitions since 2002.  Technical Olympic S.A., a non-debtor Greek company whose shares are traded on the Athens Stock Exchange, owns 67% of TOUSA, Inc.'s outstanding common stock.

## B.    THE DEBTORS' BUSINESS OPERATIONS

### 1.    Homebuilding Operations

The Debtors' homebuilding operations are divided into four operating divisions, primarily on a geographic basis.  The Debtors' management during these chapter 11 cases has been based on an operating platform under which the Debtors' various local division presidents report to a centralized chief operating officer.  This structure is intended to balance efficiencies necessitated by market conditions with the recognition that homebuilding is a market-specific industry that requires significant involvement from local management.  The Debtors rely on their operating divisions for meaningful input regarding,

23

among other things, (a) selecting appropriate homebuilding sites, (b) negotiating aspects of contracts, (c) obtaining necessary land development and home construction approvals and (d) selecting building plans and architectural schemes.

TOUSA, Inc. maintains a central corporate office in Hollywood, Florida, which houses many of the Debtors' corporate executives and certain functional departments that provide services for the benefit of the Debtors. These executives and departments are responsible for establishing the Debtors' operational policies and internal control standards, as well as monitoring compliance with established policies and controls throughout the Debtors' operations. They also have primary responsibility for many centralized functions, including, among others, (a) financing, (b) treasury and cash management, (c) risk and litigation management, (d) internal audit, (e) approval and funding of land and homesite acquisitions and dispositions and (f) developing marketing and sales strategies. The Debtors utilize a centralized cash management system (see section V.D.4.b herein).

### 2.      Employees

The Debtors employed approximately 1,700 employees on an aggregate basis before the Commencement Date. As of March 31, 2009, the Debtors had 567 employees in their consolidated operations, with 105 employees employed by the non-debtor financial services businesses (discussed below). The decrease in staffing levels during the pendency of these chapter 11 cases is directly tied to the decline in homebuilding and home sales activity in certain of the Debtors' markets, attrition as a result of employees leaving for other opportunities during the chapter 11 cases and the Debtors' revised business plan and operational shift in focus.

### 3.      Land Acquisition

As of March 31, 2009, the Debtors' controlled, on a consolidated basis, approximately 17,959 homesites in continuing operations. Of this amount, the Debtors owned approximately 17,459 homesites and had option contracts on approximately 500 homesites.

Consistent with the Debtor's revised operational plan announced on March 23, 2009, the Debtors have suspended efforts to generate new build-to-order sales. Instead, the Debtors' primary focus is completing and closing homes currently under construction, selling remaining inventory of "spec" homes, and monetizing land assets over time. The Debtors will continue to market and solicit offers for their assets during this process and will in this manner reduce their land inventory. Actions taken in connection with the Debtors' revised business plan include (a) limiting new arrangements to acquire land, (b) engaging in bulk sales of land and unsold homes (see section V.F.4 below), (c) reducing the number of unsold homes under construction and limiting and/or curtailing development activities in any development where the Debtors do not expect to deliver homes in the near future, (d) re-negotiating terms or abandoning rights under certain Option Contracts (as discussed in the next section), (e) considering other asset dispositions including the possible sale of underperforming assets, communities, divisions and joint venture interests and (f) reducing speculative inventory levels.

### a.      Option Contracts

Before the Commencement Date, a key component of the Debtors' land acquisition strategy was the use of option contracts that give the Debtors the right, but not the obligation, to buy homesites at predetermined prices on a predetermined takedown schedule anticipated to be commensurate with home starts (the "Option Contracts"). The Option Contracts generally required the payment of a cash deposit or the posting of a letter of credit, which was typically less than 20% of the underlying land purchase price and which sometimes required monthly maintenance payments. The Option Contracts were either with

24

land sellers or financial investors who had acquired the land and thereafter entered into the respective Option Contract. In certain instances, the Debtors entered into development agreements under Option Contracts that required them to complete the development of the land even if they chose not to exercise their option and forfeit a deposit. Although the Debtors are typically compensated for such work, in certain cases they are responsible for any cost overruns.

### b.    Joint Ventures

In addition to the Option Contracts, the Debtors have traditionally used strategic joint ventures (the "Joint Ventures") to acquire and develop land and/or to build and market homes. The Joint Ventures historically permitted the Debtors to mitigate and share the risks associated with land ownership and development, increase the Debtors' return on equity and extend their capital resources.

At the height of the homebuilding cycle, the Joint Ventures allowed the Debtors to expand rapidly nationwide, thereby competing with larger homebuilders. Since the Commencement Date, however, the Debtors have decreased their reliance on the Joint Ventures. In several cases, the commencement of the Debtors' chapter 11 cases constituted an event of default under the joint venture lender agreements. In other instances, the Debtors have completed planned development activities and therefore have ceased Joint Venture operations. As discussed in section V.F.10 of this Disclosure Statement, since the Commencement Date, the Debtors have limited their use of the Joint Ventures. Additionally, the Debtors' revised business plan contemplates an orderly disposition of the Debtors' interests in the remaining Joint Ventures, which include, as of March 31, 2009, the following:

| Debtor Entity | Joint Venture Partner | Development |
|---|---|---|
| TOUSA Homes, Inc. | Centex Corporation | Centex / Wellington |
| TOUSA Homes, Inc. | Castletop Capital Partners, LLC | Newmark/Castletop Brushy Creek, L.P. |
| TOUSA Homes, Inc. | RR Houston Development, LLC K. Hovnanian of Houston, L.P. | RR Houston Development, L.P. |
| TOUSA Homes, Inc. | Lennar Homes of Texas Land & Construction, Ltd. | CP Red Oak Partners, Ltd. |
| TOUSA Homes, Inc. | Washington Homes | Laurel Highlands, LLC |

### 4.    Construction

The Debtors rely on subcontractors to perform substantially all construction work. The Debtors employ construction superintendents to monitor the construction of each home, coordinate the activities of subcontractors and suppliers, subject the work of subcontractors to quality and cost controls and monitor compliance with zoning and building codes. The Debtors typically retain subcontractors pursuant to a contract that obligates the subcontractor to complete construction at a fixed price in a good and "workmanlike manner" at or above industry standards. In addition, under these contracts the subcontractor generally provides the relevant Debtor with standard indemnifications and warranties. Typically, the Debtors work repeatedly with the same subcontractors within each market, which allows for a stable and reliable trade base and better control over the costs and quality of the work performed. Indeed, although the Debtors do compete with other homebuilders for qualified subcontractors, the Debtors have established long-standing relationships with many of their subcontractors.

25

### 5.        Non-Debtor Financial Service Entities

The Debtors are part of a corporate family that includes subsidiaries offering a variety of financial services, such as mortgage financing, title insurance, homeowner insurance and closing services to homebuyers and other real estate buyers (collectively, the "Financial Service Entities"). The Financial Service Entities are part of the Debtors' efforts to provide a quality, integrated homebuying experience to their customers. The Financial Service Entities are not debtors in these chapter 11 cases.

The Financial Service Entities include Preferred Home Mortgage Company ("PHMC"), a subsidiary mortgage business located in Tampa, Florida that is an approved Fannie Mae seller / servicer and provides a full selection of conventional, FHA-insured and VA-guaranteed mortgage products to homebuyers. On January 28, 2008, PHMC entered into a joint venture with Wells Fargo Ventures, LLC ("Wells Fargo"). PHMC owns 49.9% of the venture, which operates under the name of "Preferred Home Mortgage Company," with the balance owned by Wells Fargo (the "PHMC JV"). As of April 1, 2008, the PHMC JV began to carry on the mortgage business of PHMC. The PHMC JV is managed by a committee composed of six members, three of which are from PHMC and three of which are from Wells Fargo. Wells Fargo provides the general and administrative support and is the end investor for the majority of the loans closed through the joint venture. The PHMC JV has standalone financing in the form of a $20 million revolving credit agreement with Wells Fargo Bank, N.A. The Debtors' revised business plan contemplates that the operations of the PHMC JV will be wound-down concurrent with the Debtors' divisional homebuilding operations.

The Financial Service Entities also include the subsidiary Universal Land Title, Inc. ("ULT"), a title insurance agency. ULT permits the Debtors to obtain competitively-priced title insurance for, and provides settlement services to, the Debtors' homebuyers as well as third-party homebuyers. ULT works with national underwriters and lenders to facilitate client service. It coordinates closings at its offices, and it is equipped to handle e-commerce applications, e-mail closing packages and digital document delivery. The principal sources of revenues generated by the title insurance business are fees paid to ULT for title insurance obtained for the Debtors' homebuyers and other third party residential purchasers. The Debtors' revised business plan contemplates that UTL will either be sold or that its operations wound-down concurrent with the Debtors' divisional homebuilding operations.

For the year ended December 31, 2008, approximately 13% of the Debtors' homebuyers paid in cash and approximately 69% of the Debtors' non-cash homebuyers used the services of their mortgage business.

### C.        THE DEBTORS' CAPITAL STRUCTURE

With certain identified exceptions explained below, each of the Debtors is a borrower or guarantor under several secured and unsecured debt facilities, including:

### 1.        Secured Bank Debt[2]

On March 6, 2006, the Debtors entered into the First Lien Revolving Credit Agreement, a loan facility that provided for revolving credit of up to $800 million, including a letter of credit sub-facility. On July 31, 2007, the First Lien Revolving Credit Agreement was amended to (a) reduce the availability

---

[2]     Beacon Hill is not a signatory to the Prepetition Secured Facilities described in this subsection.

under the facility to $700 million and (b) to permit the borrowers to enter into the First Lien Term Credit Agreement pursuant to which they borrowed $200 million (the "First Lien Term Loan") and a second lien term loan credit agreement (the "Second Lien Credit Agreement"), pursuant to which they borrowed $300 million (the "Second Lien Term Loan" and, together with the First Lien Term Loan and the First Lien Revolver, the "Prepetition Secured Facilities" and the lenders thereto, the "Prepetition Secured Lenders"). The Debtors (other than Beacon Hill) are co-borrowers and guarantors under the Prepetition Secured Facilities.

As more fully described herein, the Debtors entered into the First Lien Term Credit Agreement and the Second Lien Credit Agreement (and amended the First Lien Revolving Credit Agreement) to facilitate settlement of claims relating to a 50/50 joint venture formed by certain of the Debtors on August 1, 2005 for the purpose of acquiring substantially all of the homebuilding assets of Transeastern Property, Inc. (the "Transeastern JV"). Specifically, the Debtors amended the existing First Lien Revolver to reduce the revolving commitment from $800 million to $700 million and to permit the incurrence of the First Lien Term Loan and the Second Lien Term Loan. TOUSA used the approximately $500 million in proceeds from the First Lien Term Loan and the Second Lien Term Loan to settle the claims of several secured lenders against the Transeastern JV and to pay related expenses. Additional discussion regarding the Debtors' settlement of claims relating to the Transeastern JV is included in section V.A.2 below.

The claims under the First Lien Revolver and the First Lien Term Loan are secured by a shared first-priority security interest in substantially all of the Debtors' assets. The claims under the Second Lien Term Loan are secured by a second priority security interest in substantially all of the Debtors' assets, junior to the First Lien Revolver and the First Lien Term Loan. The relative rights of the First Lien Revolver, the First Lien Term Loan and the Second Lien Term Debt are set forth in an Intercreditor Agreement, dated July 31, 2007. As of the Commencement Date, the following amounts were outstanding under the Prepetition Secured Facilities:

- First Lien Revolver (including letter of credit sub-facility): $316,425,229

- First Lien Term Loan: $199,000,000

- Second Lien Term Loan: $317,101,998

Certain causes of action and litigation relating to the Prepetition Secured Facilities are discussed in section V.F.6.a of this Disclosure Statement.

**2.    Unsecured Notes**

Before the Commencement Date, TOUSA issued an aggregate of $1.1 billion in unsecured notes, including the Senior Notes, the Subordinated Notes and the PIK Election Notes, each of which is described below.

**a.    Senior Notes**

The Senior Notes, which total $550 million, consist of (a) the $250 million 8.25% senior notes issued on April 15, 2006 and due 2011 and (b) the $300 million 9.0% senior notes issued under two indentures dated June 25, 2002 ($200 million) and February 3, 2003 ($100 million) and due 2010.

Except as discussed in subsection (d) below, each of the Debtors is a guarantor of the Senior Notes, with joint and several liability to repay the Senior Note obligations. The Senior Notes rank *pari passu* in right of payment with all of the Debtors' existing and future unsecured senior debt, including

27

unsecured trade obligations and other unsecured obligations incurred in the ordinary course of business, but senior in right of payment to the Subordinated Notes and the PIK Election Notes, each as described below.

### b.    Subordinated Notes

The Subordinated Notes total $510 million and consist of the following:  (a) the $125 million 7.5% notes issued on March 17, 2004 and due March 15, 2011; (b) the $200 million 7.5% notes issued on December 21, 2004 and due March 15, 2015; and (c) the $185 million 10.375% notes issued on June 25, 2002 and due July 1, 2012.  Except as discussed in subsection (d), below, each of the Debtors is a guarantor of the Subordinated Notes, with joint and several liability to repay the obligations under those Notes.

### c.    PIK Election Notes

On July 31, 2007, TOUSA issued $20 million in 14.75% senior subordinated PIK Election Notes due 2015.  These Notes were issued in connection with the settlement of certain claims arising from the Transeastern JV.  Interest on the PIK Election Notes is payable semi-annually.  TOUSA is required to pay 1% of the interest in cash.  The remaining 13.75% semi-annual interest payment may be made, at TOUSA's option, in cash, by increasing the principal amount of the PIK Election Notes or by issuing new notes or a combination of cash and new notes.  Except as discussed in subsection (d), below, each of the Debtors is a guarantor of the PIK Election Notes, with joint and several liability to repay the Subordinated Note obligations.

### d.    Non-Guarantor Debtors Under the Unsecured Notes

On November 1, 2007, TOUSA Homes, Inc. ("TOUSA Homes") acquired a 100% interest in Engle Sierra Verde P5, LCC, a joint venture in which TOUSA Homes previously owned a 49% interest. On September 21, 2007, TOUSA Homes acquired a 100% interest in Engle/Gilligan, LLC, a joint venture in which TOUSA Homes had owned a 49% interest.  On July 20, 2008, TOUSA Homes acquired a 100% interest in Beacon Hill at Mountain's Edge, LLC, a joint venture in which TOUSA Homes had owned a 49% interest [D.E. 1388].

Each of Beacon Hill at Mountain's Edge, LLC, Engle Sierra Verde P5, LLC and Engle/Gilligan, LCC are Debtors in these chapter 11 cases; however, none of these entities are guarantors under the Senior Notes, the Subordinated Notes or the PIK Election Notes.

### e.    Preservation of Subordination Provisions in Certain Note Indentures

The Plan is designed to give effect to the provisions of Article 11 and Article 12 of the Subordinated Notes indenture and Article 11 and Article 12 of the PIK Notes indenture.  Specifically, the Plan provides that all distributions made in satisfaction of the Subordinated Note Claims and PIK Note Claims will be made to the holders of "Senior Debt," as such term is defined in the applicable Indentures, unless and until such time as the holders of "Senior Debt" have been paid in full in accordance with the Subordinated Notes Indenture and the PIK Notes Indenture.

### 3.    Preferred Stock

On July 31, 2007, TOUSA issued $117.5 million (in initial aggregate liquidation preference) of 8% Series A Convertible Preferred PIK Preferred Stock (the "Preferred Stock"). The Preferred Stock ranks senior to all of TOUSA's capital stock with respect to liquidation priority and receipt of dividends.

The Preferred Stock accrues dividends semi-annually at 8% per annum, with 1% payable in cash and the remaining 7% payable, at TOUSA's option, in cash and additional Preferred Stock.  The Preferred Stock does not have voting rights.  As of the Commencement Date, TOUSA had not paid dividends on the Preferred Stock.

# V.   THE DEBTORS' CHAPTER 11 CASES

## A.    EVENTS LEADING TO THE CHAPTER 11 CASES

The following is a general description of factors that ultimately led to the Debtors' commencement of these chapter 11 cases.

### 1.        Adverse Market Conditions

As has been widely reported, the homebuilding industry is in the midst of its most severe depression in decades.  The downturn in the homebuilding industry has been particularly pronounced in several areas in which the Debtors have concentrated operations, including Florida, Nevada and Arizona. For example, approximately 53% of the Debtors' homebuilding operations in 2007 were concentrated in Florida, Las Vegas and Phoenix – regions that have suffered particularly severe downturns in homebuying activity.  As discussed in detail in the next section, the Debtors were forced to adjust to the rapidly deteriorating homebuying market in these and other regions of the country.

The downturn in the homebuilding industry is the result of several macroeconomic factors. Among other things, a rapid increase in new and existing home prices in many of the markets in which the Debtors operate over the past several years had the ultimate effect of reducing housing affordability and tempering buyer demand.  In particular, once the market reached its peak, investors and speculators reduced their purchasing activity and instead stepped up their efforts to sell the residential property they had earlier acquired.  These trends, which were more pronounced in markets that had experienced the greatest levels of price appreciation, have resulted in overall fewer home sales, greater cancellations of home purchase agreements by buyers, higher inventories of unsold homes and the increased use by homebuilders, speculators, investors and others of discounts, incentives, price concessions, broker commissions and advertising to close home sales compared to the past several years.

Reflecting these trends, the Debtors and many other regional and national homebuilders have experienced sales difficulties and downward pressure on home prices that stem from severe liquidity challenges in the credit and mortgage markets, diminished consumer confidence, increased home inventories and foreclosures.  Potential buyers have exhibited both a reduction in confidence as to the economy in general and a willingness to delay purchase decisions based on a perception that prices will continue to decline.  Prospective homebuyers continue to be concerned about interest rates and their inability to sell their current homes or to obtain appraisals at sufficient amounts to secure mortgage financing as a result of the recent disruption in the mortgage markets and the tightening of credit standards.

As a result of the market trend facing homebuyers, homebuilders have faced significant operating challenges.  Indeed, in the last year and a half, numerous homebuilders have sought relief under the provisions of the Bankruptcy Code or have taken steps to renegotiate or reorganize their capital structures outside of the in-court bankruptcy process.

### 2.        The Transeastern Litigation and the July Recapitalization

As discussed in section IV.C.1 above, on July 31, 2007, the Debtors (with the exception of

Beacon Hill, Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC, each of which became subsidiaries of the Debtors after July 31, 2007) entered into or amended each of the Prepetition Secured Facilities. Also on July 31, 2007, TOUSA issued the PIK Election Notes and the Preferred Stock. Each of the Prepetition Secured Facilities, the PIK Election Notes and the Preferred Stock were part of a global settlement of certain claims related to the 50/50 joint venture formed by certain of the Debtors on August 1, 2005 for the purpose of acquiring substantially all of the homebuilding assets of Transeastern Property, Inc. (the "July Recapitalization"). This section describes litigation relating to the Transeastern JV and the ultimate global settlement that led to the July Recapitalization.

### a.    Acquisition and Financing of the Transeastern JV

In 2005, the Debtors' management explored the possibility of forming a joint venture to acquire the homebuilding assets of Transeastern Properties, Inc. ("Transeastern"), a homebuilder then owned by Arthur J. Falcone, Edward W. Falcone and certain of their affiliates (collectively, "Falcone"). At that time, Transeastern was one of Florida's largest homebuilders. Due diligence with respect to the potential acquisition led the Debtors' management and Board to conclude that acquiring Transeastern would increase the Debtors' presence in Florida, assure a continued supply of land and generate strong profits.

In the spring of 2005, TOUSA Homes, L.P. ("Homes L.P.") formed TE/TOUSA, LLC ("TE/TOUSA") to acquire Transeastern's homebuilding assets, which included 22,000 owned or optioned lots in major Florida markets. Under the terms of the joint venture, TOUSA agreed to manage the Transeastern JV.

On June 6, 2005, TE/TOUSA entered into an asset purchase agreement with Falcone and various Falcone controlled entities to acquire the Transeastern assets. In addition, the Transeastern JV entered into certain option agreements to purchase land owned by Falcone. As expressly permitted and contemplated by the asset purchase agreement, a second stage of due diligence was then conducted with respect to the assets. After the second due diligence phase was completed, the parties closed the purchase transaction on August 1, 2005.

In order to finance the acquisition, the Transeastern JV sought financing that was implemented in tranches through a series of affiliated LLCs. Specifically, at the same time as the closing of the Transeastern asset acquisition, financing for the acquisition was obtained through a $675 million credit facility that certain entities affiliated with the Transeastern JV entered into with Deutsche Bank Trust Company Americas ("Deutsche Bank"). Deutsche Bank served as administrative agent in connection with each tranche of the Transeastern JV's debt and syndicated such debt to various lenders (collectively, the "Transeastern Lenders"). The $675 million in funding was in the form of three tranches of third-party debt, each governed by a separate credit agreement: (a) $450 million of senior debt, in the form of $335 million in term loans and a $115 million revolving commitment (the "TE Senior Debt Facility"); (b) $137.5 million of senior mezzanine debt; and (c) $87.5 million of junior mezzanine debt (collectively, the "Transeastern Loans").

Each of the three tranches of the Transeastern Loans had one or more different borrowers. Specifically, the borrowers under the TE Senior Debt Facility (the "Senior Debt Borrowers") were EH/Transeastern, LLC, the operating subsidiary of the Transeastern JV, and TE/TOUSA Senior, LLC, a special purpose holding company. Two different special purpose holding companies, TE/TOUSA Mezzanine, LLC and TE/TOUSA Mezzanine TWO, LLC, each borrowed a portion of the mezzanine debt (together with the Senior Debt Borrowers, the "Transeastern Borrowers"). The Transeastern Borrowers secured each of the Transeastern Loans with assets of the specific Transeastern Borrower and each entity's ownership interests in its subsidiary, including the special purpose holding companies.

30

As with most homebuilder financing, the underlying debt documents for the Transeastern Loans included borrowing base formulas and strict financial and operational covenants. Among other things, the Transeastern Loans used a detailed borrowing base mechanism to determine the availability of funds under the revolving commitment and to police compliance with liquidity covenants. The formula used to calculate the borrowing base drew distinctions among assets in different stages of development and established differing advance rates for each stage (e.g., 50% for raw land, 65% for lots under development, etc.). The borrowing base formula drew a similar distinction between owned versus optioned assets in determining advance rates. Advance rates determined with reference to the borrowing base formula were to be applied to asset valuations, reached in accordance with specified valuation requirements, to determine the borrowing base and liquidity covenant compliance for the Transeastern Borrowers.

**b.      Completion and Carve-Out Guarantees**

Although TOUSA and Homes L.P. were not borrowers under the Transeastern Loans, they nonetheless had certain related obligations to the Transeastern Lenders. Specifically, TOUSA and Homes L.P. signed completion guarantees (the "Completion Guarantees") and carve-out guarantees (the "Carve-Out Guarantees") for each of the Transeastern Loans.

Under the terms of the Completion Guarantees, TOUSA and Homes L.P. guaranteed that the Transeastern Borrowers under each of the Transeastern Loans would complete certain "Development Activities" consistent with "Contractual Obligations" and "fully and punctually pay and discharge all Project Costs." The Completion Guarantees defined "Project Costs" as "all costs, expenses, and liabilities for and/or in connection with a Project." The Completion Guarantees defined the term "Project" as the "performance and completion of all Development Activities with respect to any portion of the Mortgaged Property as to which Development Activities have commenced as of the date of this Guarantee," and defined the term "Development Activities" as the "development, construction, equipping, and completion of any fixtures, infrastructure, or other works of improvement." The upshot of these provisions was that TOUSA agreed to complete development activities and pay project costs for those projects where development activities had started by August 1, 2005.

Under the terms of the Carve-Out Guarantees, TOUSA and Homes L.P. agreed to indemnify the Transeastern Lenders under each of the Transeastern Loans for any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses and disbursements arising out of, among other things, fraud or material misrepresentation by any of the borrowing entities, misappropriation by the borrowing entities of certain payments, improper use of insurance proceeds, intentional misconduct or waste with respect to the collateral and/or failure to maintain insurance or pay taxes. Additionally, the Carve-Out Guarantees obligated TOUSA and Homes L.P. to pay all of the obligations and expenses related to bankruptcy filing by the Transeastern JV.

**c.      Market Challenges to the Transeastern JV's Operations**

The Transeastern JV had been built upon a volume sales model, whereby it would enter into home sales contracts far in advance of being able to complete – or sometimes even begin – construction of the contracted home. The long lead time between selling a home and delivering it at closing created unpredictability in terms of profit margin: during the construction period, costs could escalate such that a contract that had been profitable at signing was considerably less attractive by closing.

In late 2005, the Transeastern JV faced operational and integration challenges as the Florida residential real estate market began to soften. By November 2005, TOUSA disclosed that it had intentionally slowed sales at the Transeastern JV to better match sales with deliveries. In the same month,

31

TOUSA disclosed that the 2005 hurricane season had negatively impacted Florida operations due to decreased availability of land and materials.

The general decline in the real estate markets further exacerbated the Transeastern JV's operational problems, similar to difficulties faced by TOUSA's owned operating divisions and other homebuilders.  By February 14, 2006, TOUSA had announced that it "anticipate[d] a more challenging housing market characterized by softening demand, decreased ability to raise home prices, lengthening regulatory processes and higher material costs."  In May 2006, TOUSA announced that the housing market was "slowing," becoming "more challenging," and could be characterized by "softening demand and increased competition."  TOUSA also disclosed in May that its previously announced projections for Transeastern deliveries in 2006 should be decreased by approximately 20%.  By June 2006, TOUSA announced that its 2006 second quarter sales would be down 25-40% compared to second quarter 2005 sales.  In August 2006, TOUSA announced revised, lower annual net income guidance for 2006, and indicated that it continued to expect difficult market conditions for the foreseeable future.

As a result of the decline in the housing market, evidenced in part by customers' cancellation of sales contracts, the Transeastern JV developed new financial projections, which were distributed to its members in September 2006.  The newly revised projections indicated that future sales and deliveries could not support the Transeastern JV's existing capital structure and the Transeastern JV would soon be in default of the Transeastern Loans.

In late September 2006, the parties met to discuss the Transeastern JV's financial condition and the Florida housing market conditions.  Deutsche Bank alleged that the Transeastern JV was already in default of its loan obligations and alleged that the Transeastern Borrowers failed to properly calculate and report the Transeastern JV's borrowing base.  By the beginning of October 2006, Deutsche Bank took steps to take control of the Transeastern JV's cash collateral.

Thereafter, in two letters dated October 31, 2006 and November 1, 2006 (the "Demand Letters"), Deutsche Bank alleged that various events triggered the obligations of TOUSA and Homes L.P. under the Completion and Carve-Out Guarantees.  As a result, Deutsche Bank asserted TOUSA and Homes L.P. were liable for the total obligations under the Transeastern Loans.

With respect to the Carve-Out Guarantees, Deutsche Bank alleged that the Transeastern Borrowers had "made material misrepresentations" in connection with Transeastern Loans, had "engaged in acts of intentional misconduct," and had otherwise triggered the Carve-Out Guarantee.

With respect to the Completion Guarantees, Deutsche Bank alleged that TOUSA and Homes L.P. failed "to make payments of Project Costs in accordance with the loan documents" and failed "to complete or cause the completion of some or all Development Activities with respect to some or all applicable Contractual Obligations."  According to Deutsche Bank, TOUSA's and Homes L.P.'s failure to honor the Completion Guarantees and the Carve-Out Guarantees had resulted in "losses, damages, costs, charges" and similar effects "of a type and magnitude" that resulted in TOUSA and Homes L.P. "effectively guarantying all outstanding Obligations" under the Transeastern Loans.

Accordingly, Deutsche Bank demanded immediate payment of the "full outstanding amount" under the Transeastern Loans.

### d.    Review of the Demand Letter Claims

TOUSA retained a full team of legal and financial advisors in connection with the Deutsche Bank dispute.  The Transeastern JV separately retained its own advisors.  The professionals conducted a

32

thorough factual and legal analysis of the claims in the Demand Letters and worked together with TOUSA and the Transeastern JV to develop an appropriate action plan. The professionals also assisted these entities in a comprehensive evaluation of alternative strategies to resolve the dispute with the Transeastern lenders and developing, evaluating and structuring alternatives to raise capital in connection with any recapitalization of the Transeastern JV or any acquisition of the Transeastern JV by TOUSA or one of its subsidiaries.

e.    **Commencement of the Deutsche Bank Litigation**

On November 28, 2006, TOUSA and Homes L.P. filed a complaint against Deutsche Bank in the Florida Circuit Court in Broward County seeking a declaratory judgment that TOUSA's and Homes L.P.'s liability had not been triggered under either the Completion Guarantees or the Carve-Out Guarantees. One day later, Deutsche Bank brought suit against TOUSA and Homes L.P. in New York Supreme Court, claiming breaches of the Carve-Out Guarantees and Completion Guarantees.

With respect to the Completion Guarantees, Deutsche Bank alleged that TOUSA and Homes L.P. committed to pay all "Project Costs" of the Transeastern JV and to complete or cause the completion of all "Development Activities" (as those terms were defined under the guarantees). According to Deutsche Bank, the Transeastern JV failed to pay these Project Costs or complete or cause the completion of Development Activities with respect to numerous projects. Deutsche Bank pointed to certain option or land bank agreements that had been entered into at the time of the formation of the Transeastern JV and alleged that the Transeastern JV failed to perform required actions in connection with those agreements, which failure allowed the various land owners to terminate the purchase/option agreements and retain the benefits of all prior payments and Development Activities. Deutsche Bank further alleged that TOUSA was obligated to complete both the vertical and horizontal construction on all of the Projects started by August 1, 2005 and that the option maintenance and take down payments were Project Costs which TOUSA and Homes L.P. had agreed to pay.

With respect to the Carve-Out Guarantees, Deutsche Bank alleged that the Transeastern JV made numerous material misrepresentations in its monthly borrowing base certificates and that these certificates overstated the borrowing base by tens of millions of dollars. According to Deutsche Bank, the Transeastern Lenders relied on these false borrowing base statements to advance additional funds to the joint venture under the revolving credit agreement. Deutsche Bank further alleged that the false statements in the borrowing base certificates concealed the existence of defaults under the various the Transeastern Loans. As a result, Deutsche Bank alleged that the lenders were deprived of their rights to exercise remedies under the Transeastern Loans at a time when they could have collected all of the amounts due under the loans from the Transeastern JV itself. In addition, among other things, Deutsche Bank also alleged that the Transeastern JV had triggered the Carve-Out Guarantees and committed waste by willfully and intentionally failing to preserve the value of certain purchase or option agreements, causing or permitting liens to attach to its property and engaging in conduct that constituted waste on its property, thereby triggering TOUSA and Homes L.P.'s obligations under the Carve-Out Guarantees. Deutsche Bank alleged that its potential damages with respect to the Carve-Out Guarantees was up to the approximately $625 million borrowed by the Transeastern JV plus fees, default interest and expenses.

In addition to the litigation with Deutsche Bank, TOUSA subsequently became involved in litigation against Deutsche Bank's investment-banking arm Deutsche Bank Securities, Inc. ("DBSI") with respect to the Transeastern JV. TOUSA had entered into an engagement letter with DBSI in June 2005, under which DBSI agreed to provide TOUSA financial advice in connection with TOUSA's entry into the Transeastern JV. On March 26, 2007, DBSI sued TOUSA, EH/Transeastern and TE/TOUSA Senior, seeking a declaratory judgment that (i) DBSI had no liability to TOUSA under the engagement letter; (ii) DBSI and Deutsche Bank, as its affiliate, were entitled to indemnification from TOUSA under the

engagement letter for any losses resulting from the Transeastern transaction; and (iii) DBSI was entitled to indemnification from EH/Transeastern and TE/TOUSA Senior under the credit agreement for any losses resulting from the Transeastern transaction.  DBSI also sought indemnification from TOUSA, alleging that TOUSA had breached the engagement letter agreement by failing to indemnify DBSI for the losses and expenses that it had already incurred.

**f.        Settlement of the Deutsche Bank Litigation**

During the first half of 2007, TOUSA, TOUSA's subsidiaries and the Transeastern JV (advised by their professionals) continued their investigation and analyses of Deutsche Bank's allegations.  This process included additional interviews of dozens of witnesses, the collection of thousands of documents and multiple meetings with Deutsche Bank and its advisors.  During these meetings, Deutsche Bank elaborated upon its theories and bases for claims against TOUSA and Homes L.P.

After six months of negotiations and at least fifteen variations of settlement proposals (which were presented to and discussed with TOUSA's Board of Directors (the "Board") during at least ten meetings held between January and March 2007), the construct of a global settlement was reached with all interested parties, including Falcone.  The construct of the global settlement led to further negotiations concerning the documentation of, and financing necessary to consummate, the settlement.

On June 20, 2007, the Board convened for many hours and considered all aspects of the global settlement relating to the Transeastern JV, as well as the financing arrangement that would need to be implemented.  Among other things, the Board received and considered a presentation from management regarding the state of the housing market and financial projections for the Debtors.  The Board was advised regarding the terms and conditions of all aspects of the merits of the litigation, the potential impact that a failure to settle would have on the Debtors' business and the ability of the Debtors to service the debt incurred in connection with the settlement.  The turnaround and advisory firm of AlixPartners, LLP ("AlixPartners"), provided the Board and the lenders with an opinion that TOUSA was solvent after giving effect to global settlement with the Transeastern Lenders.

On June 29, 2007, TOUSA publicly announced that it had entered into an agreement with Deutsche Bank to settle all disputes regarding its liability with respect to the Transeastern JV (the "Global Settlement").  Under the Global Settlement, the senior Transeastern lenders received $422.8 million in cash including interest and the Senior and Junior Mezzanine Debt was satisfied for $153.75 million (plus legal fees and expenses) in the form of the following consideration: Subordinated Notes ($20 million); convertible preferred stock (with a liquidation preference of $117.5 million); and warrants to purchase common stock (valued at $16.25 million).  In exchange, Deutsche Bank released TOUSA and Homes L.P. from all claims relating to the Transeastern JV, including all claims relating to the Carve-Out and Completion Guarantees.  Certain of the Debtors also acquired all of the assets of the Transeastern JV as part of the settlement.

The global settlement also resolved certain claims between TOUSA and Falcone. Specifically, the parties agreed that Falcone would give up its equity interest in the Transeastern JV, and the Transeastern JV would surrender its interest in most of its optioned properties owned by Falcone.  In addition, TOUSA agreed to indemnify Falcone for any third party claims relating to the Carve-Out Guarantees and release Falcone from a covenant not to compete.

The Debtors funded the payment due to Deutsche Bank under the global settlement agreement by entering into the First Lien Term Credit Agreement and the Second Lien Credit Agreement.  The parties consummated the July Recapitalization on July 31, 2007.

34

### 3.    Liquidity Difficulties

The housing market, which had softened as explained previously, experienced a further steep and unexpected decline following the July Recapitalization and the associated financing transactions. By September 2007, the Debtors' write-offs and difficult market conditions put additional pressure on the Debtors' highly leveraged balance sheet. In late September 2007, the Debtors (other than Beacon Hill, which is not obligated under the Prepetition Secured Facilities) were unable to provide a solvency certificate under the First Lien Revolver, which was required for each borrowing under that facility. As a result of the Debtors' inability to borrow under the First Lien Revolver, the Debtors faced a serious lack of liquidity that threatened their business operations.

The Debtors ultimately succeeded in negotiating an amendment to the First Lien Revolver and the First Lien Term Loan, which provided, among other things, for a waiver of solvency certificate requirements for the third quarter 2007 and permitted the Debtors to borrow up to $65 million through the end of 2007. The Debtors eventually negotiated a second amendment to the First Lien Term Loan and the First Lien Revolver that extended the first amendment through February 1, 2008, which allowed the Debtors to properly transition into these chapter 11 cases.

### B.    OTHER PREPETITION DEVELOPMENTS

### 1.    NYSE Delisting

Before November 2007, the common stock and debt securities of TOUSA traded on the New York Stock Exchange (the "NYSE"). Effective November 19, 2007, however, NYSE Regulation Inc. suspended trading of TOUSA's common stock and debt securities from trading on the NYSE because of the low trading price of TOUSA's common stock at that time.

TOUSA appealed the suspension. Following the suspension from the NYSE, TOUSA began trading on the Pink Sheet Electronic Quotation Service.

On February 15, 2008, the NYSE denied TOUSA's appeal of the suspension, affirmed the decision to suspend trading in TOUSA's common stock and debt securities on the NYSE and commenced delisting procedures. On March 3, 2008, the NYSE filed Form 25, Notification of Removal of Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, with the SEC, noting its intention to remove TOUSA's common stock, the Senior Notes and the Subordinated Notes from trading on the NYSE.

### 2.    SEC Inquiry

In June of 2007, the Miami Regional Office of the United States Securities and Exchange Commission (the "SEC") contacted TOUSA requesting that it voluntarily provide certain documents, corporate and financial information and communications related to the Transeastern JV. The SEC advised TOUSA that the inquiry was not an indication that any violations of law had occurred and that the inquiry should not be considered a reflection upon any person, entity or security. TOUSA has cooperated, and continues to cooperate, with the inquiry. The inquiry is known as *In the Matter of TOUSA, Inc.*, SEC Inquiry, File No. FL-3310.

### C.    COMMENCEMENT OF THE CHAPTER 11 CASES

On January 29, 2008, the continued decline in the homebuilding industry, together with increased liquidity concerns, led each of the Debtors (except Beacon Hill at Mountain's Edge, LLC) to file a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On July 30, 2008, Beacon Hill, which was formerly a joint venture of TOUSA Homes but became a wholly-owned subsidiary of TOUSA Homes after the Commencement Date (see section V.F.10.b, below), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and its chapter 11 case is being jointly administered with the Debtors' chapter 11 cases.  As of the date hereof, each of the Debtors continues to manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**D.      "FIRST DAY" RELIEF**

The Debtors recognized that a smooth transition into their chapter 11 cases would require careful preparation.  Accordingly, in the weeks before the Commencement Date, the Debtors devoted substantial efforts to prepare for their chapter 11 cases.  In particular, the Debtors sought to stabilize their operations and preserve relationships with their secured lenders, vendors, suppliers, customers, employees, landlords, utility providers and insurance providers, along with other parties that would be affected by the chapter 11 cases.

On the Commencement Date, the Debtors filed a series of motions and applications with the Bankruptcy Court seeking relief designed to minimize disruption of their business operations and to facilitate the chapter 11 process (collectively, the "First Day Motions").  The Debtors also prepared a substantial communications package intended to reach out to parties that would be affected by the chapter 11 filing.

Following a hearing on January 30, 2008, and based upon the Declaration of Tommy L. McAden, Executive Vice President and Chief Financial Officer of TOUSA, Inc., in Support of First Day Pleadings [D.E. #7], the Bankruptcy Court entered several orders (as described more fully in this section, collectively, the "First Day Orders") that were designed to permit the Debtors to operate their businesses during their chapter 11 cases with as little disruption as possible.  These orders ultimately played a crucial role in achieving a "soft landing" into chapter 11.  A brief summary of each of the First Day Orders is provided below.[3]

**1.      Procedural Orders**

To facilitate a smooth and efficient administration of the Debtors' chapter 11 cases, the Bankruptcy Court entered several procedural First Day Orders authorizing the Debtors to (a) jointly administer their chapter 11 cases [D.E. #6]; (b) mail certain initial notices required by the Bankruptcy Code and the Bankruptcy Rules [D.E. #101]; (c) retain Kurtzman Carson Consultants, LLC as the Debtors' notice, claims and balloting agent [D.E. #102]; (d) establish certain noticing, case management and administrative procedures [D.E. #100]; and (e) establish procedures for the interim compensation of, and reimbursement of expenses for, professionals retained during the chapter 11 cases [D.E. #103].

**2.      Employment and Retention of Advisors**

The Bankruptcy Court also entered orders on January 30, 2008 authorizing the Debtors to retain

---

[3]    Pursuant an order of the Bankruptcy Court dated August 4, 2008 [D.E. #1513], all generally applicable orders entered in the Debtors' chapter 11 cases before Beacon Hill filed for chapter 11 relief, other than the order establishing a bar date for submission of claims, are applicable to Beacon Hill.

the following professionals and advisors on an interim basis: (a) Kirkland & Ellis LLP ("K&E"), as counsel to the Debtors [D.E. #104]; (b) Berger Singerman, P.A. ("Berger Singerman"), as conflicts and co-counsel to the Debtors [D.E. #115]; (c) Lazard Frères & Co. LLC ("Lazard"), as investment banker and financial advisor to the Debtors [D.E. #105]; (d) Zolfo Cooper, LLC f/k/a KZC Services LLC, ("Zolfo Cooper") as management services providers to the Debtors (including John R. Boken, who was appointed as the Debtors' chief restructuring officer, and later their chief executive officer) [D.E. #129]; (e) Greenberg Traurig, P.A. ("Greenberg"), as special counsel to the Debtors [D.E. #126]; and (f) Ernst & Young LLP ("E&Y"), as independent auditors and providers of tax services to the Debtors [D.E. #146].

The Bankruptcy Court entered final orders authorizing the Debtors to retain K&E [D.E. #543], Berger Singerman [D.E. #544] and Greenberg [D.E. #545] on March 6, 2008.  The Bankruptcy Court entered a final order authorizing the Debtors to retain E&Y on March 25, 2008 [D.E. #659], and final orders authorizing the employment of Lazard [D.E. #667] and Zolfo Cooper [D.E. #669] on March 26, 2008.  On August 18, 2008, the Bankruptcy Court entered an order expanding Zolfo Cooper's services to the Debtors and authorizing the Debtors to appoint Mr. Boken as chief executive officer [D.E. #1647] (see section V.F.3.b, below).

### 3. Operational Orders

In an effort to avoid harm to the Debtors' business operations associated with their chapter 11 filing, the Debtors filed several operational First Day Motions designed to facilitate their "soft landing" into chapter 11.

#### a. Home Sales

As of the Commencement Date, the Debtors were parties to approximately 2,500 contracts to deliver finished homes in the various states in which they operate.  Although the Debtors believed that the Bankruptcy Code authorized them to continue to sell homes in the ordinary course of business, the Debtors sought an order confirming their authorization to do so, as well as to allow delivery of homes free and clear of liens, claims and interests so as to avoid any title issues and ensure smooth home sale closings (the "Home Sales Motion").  In particular, the Debtors sought authority to (a) make payments to third parties who may have lien rights against the Debtors' property under applicable non-bankruptcy law for prepetition goods and services delivered to the Debtors and (b) sell homes free and clear of all liens, claims and interests, including the prepetition liens granted pursuant to the Prepetition Secured Facilities. The Home Sales Motion sought to establish procedures to satisfy the lien demands of those parties who claimed a secured interest on a home later sold by the Debtors.  Additionally, the Home Sales Motion sought authority to refund, in the Debtors' discretion and in the ordinary course of business consistent with past practice, prepetition customer deposits up to an aggregate of $34 million.

The Debtors believed that, unless the Home Sales Motion was granted, they likely would be unable to satisfy the needs of their customers and title insurance providers during their chapter 11 cases. The Bankruptcy Court entered an order granting the relief sought in the Homes Sales Motion on January 31, 2008 [D.E. #110] (the "Home Sales Order").  The Debtors amended the Home Sales Order on July 15, 2008 [D.E. #1386] to address several issues relating to community development districts with authority over certain of the Debtors' developments.

As of March 25, 2009, the Debtors have returned an aggregate of approximately $2.8 million in prepetition customer deposits pursuant to the terms of the Home Sales Order.

### b.     Lien Claims

The Debtors' homebuilding operations require them to rely on and contract with third parties who are entitled under applicable non-bankruptcy law to assert liens against the Debtors' property if the Debtors fail to pay for the goods or services provided to them.  Because numerous state statutes grant lien rights to contractors and other parties associated with the construction of a home, such as architects and engineers, the percentage of prepetition trade creditors who were entitled to assert lien creditors against the Debtors was relatively high compared to chapter 11 cases outside the homebuilding industry. Although the Debtors generally had made timely payments to their trade creditors in the ordinary course of business, they nevertheless had numerous invoices and other obligations outstanding as of the Commencement Date and therefore the Debtors estimated that they owed significant prepetition amounts to potential lien claimants.  The Debtors were concerned that, absent authority to pay these lien claims, the lien claimants would assert secured claims in the Debtors' chapter 11 cases and would severely hamper the Debtors' business activities by refusing to provide materials or services to the Debtors postpetition.

On January 29, 2008, the Bankruptcy Court entered an order authorizing the Debtors to, among other things, pay in their discretion the prepetition claims of those claimants whose prepetition work gave rise to (or could have given rise to, with a timely lien filing during the chapter 11 cases) liens against the Debtors' property under applicable non-bankruptcy law, up to an aggregate of $47 million [D.E. #14] (the "Mechanics' Lien Order").  The Bankruptcy Court later amended the Mechanics' Lien Order on March 8, 2008 [D.E. #553] to reflect certain agreements with the Committee.

As of March 31, 2009, with the consent of counsel to the Committee and counsel to the Prepetition Secured Lenders, the Debtors have paid an aggregate of approximately $25.9 million to prepetition lien claimants pursuant to the terms of the Mechanics' Lien Order.

### c.     Anti-Discrimination

The Debtors' homebuilding operations are subject to stringent rules and regulations, including building codes and residential real estate development regulations imposed by state and local governments.  In many instances, the Debtors are required to obtain certain permits and comply with applicable regulations and rules on an ongoing basis.  Section 525(a) of the Bankruptcy Code prevents governmental units from, among other things, denying, revoking, suspending or refusing to renew any license, permit, charter, franchise or other similar grant to a debtor because a debtor seeks relief under the Bankruptcy Code.  The Debtors were concerned, however, that certain local regulatory bodies might be unaware of the relief provided by section 525(a) and might therefore attempt to discriminate against the Debtors as a result of their chapter 11 filing.  In order to allow for expeditious resolution of any such situations, the Debtors filed a First Day Motion with the Bankruptcy Court seeking declaratory relief under section 525(a) seeking an order to provide to local agencies who might be unaware of the relevant bankruptcy law.   On February 1, 2008, the Bankruptcy Court entered an order enforcing the anti-discrimination provisions of section 525(a) of the Bankruptcy Code [D.E. #140].

### d.     Customer Programs

Before the Commencement Date, in the ordinary course of business the Debtors engaged in various customer programs to enhance customer satisfaction, sustain goodwill and ensure that the Debtors remain competitive in the markets in which they operate.  These programs ranged in scope from regionally-developed and implemented short-term incentive plans, such as discounts or financing incentives, to long-term warranties for customers who purchase homes.  These customer programs contributed, and continue to contribute, significantly to the Debtors' marketing and business operations.

On January 31, 2008, the Bankruptcy Court entered an order authorizing the Debtors, in their discretion, to continue their customer programs and honor their prepetition and postpetition commitments to customers [D.E. #120].

### e.    Wages and Benefits

The Debtors rely on their employees to operate on a day-to-day basis.  The Debtors believed that, absent the ability to honor prepetition wages, salaries, benefits, commissions and the like, their employees might have sought alternative employment opportunities, thereby hindering the Debtors' ability to successfully reorganize.  On February 28, 2008, the Bankruptcy Court entered an order authorizing the Debtors to pay, in their discretion and up to certain capped amounts, the prepetition claims and obligations for (a) wages, salaries, bonuses and other compensation; (b) reimbursable employee expenses; and (c) employee medical and similar benefits [D.E. #470].  This order did not authorize the Debtors to honor their prepetition deferred compensation obligations to their employees and associates, although a later order (described in section V.F.3.a, below) did authorize the payment of some of those obligations.

### f.    Critical Vendors

The Debtors' homebuilding operations require them to rely on certain "critical vendors" and suppliers who provide "single source" goods or other goods and services that are essential to the Debtors' operations and cannot be obtained elsewhere or cannot be replaced in a cost-effective manner.  To ensure that the "critical vendors" continued to work with the Debtors after the Commencement Date, the Debtors sought authority to pay up to $5 million of the prepetition claims of such critical vendors, without further approval by the Bankruptcy Court and subject to a procurement policy.  The Bankruptcy Court entered an order granting the requested relief on January 31, 2008 [D.E. #112].  The Debtors amended this order to account for certain comments by the Creditor's Committee pursuant to an order dated March 6, 2008 [D.E. #552].

As of March 31, 2009, with consent of the Committee and the Prepetition Secured Lenders, the Debtors have paid an aggregate of approximately $187,000 to critical vendors on account of prepetition claims.

### g.    Utility Providers

The Debtors rely on a large number of utility providers for water, sewer service, electricity, gas, telephone service, internet service and waste management services in each of the Debtors' operating regions.  The Debtors were concerned that any interruption of utility service would threaten the Debtors' business operations.  Accordingly, by an order dated February 1, 2008 [D.E. #128], the Bankruptcy Court prohibited utility providers from (a) altering or discontinuing services on account of the Debtors' commencement of their chapter 11 cases or (b) requiring the payment of an additional deposit or other security on the Debtors' prepetition accounts.  The order also approved a one-time deposit of $550,000 (approximately one-half of the Debtors' total estimated monthly utility bills) as constituting adequate assurance of payment of future utility bills, subject to an objection period for all utility providers.  The Debtors later entered into several agreements with individual utility providers with respect to timely submitted requests for additional adequate assurance amounts.

### h.    Preservation of Certain Tax Attributes

As of the Commencement Date and through the date hereof, the Debtors incurred significant net operating losses ("NOLs") and realized substantial net unrealized built-in losses in their assets.  The Debtors were concerned that they could lose the value of their NOLs, however, if certain equity or claim

39

holders transferred their equity interests or claims and thereby caused an "ownership change" before the effective date of a plan of reorganization.  To protect their NOLs and the ability to craft a plan of reorganization that preserved these losses, the Debtors filed two motions.  One motion, filed as a First Day Motion, sought an order that, among other things, established procedures for trading in the Debtors' common stock and provided that any trade or transfer of common stock in violation of the trading procedures would be void.  The Bankruptcy Court entered an order granting the Debtors' requested relief on January 29, 2008 [D.E. #16].  The Debtors also filed a motion to protect certain tax attributes related to trading in claims against the Debtors' estates.  The Bankruptcy Court entered an interim order granting the Debtors' requested relief with respect to claims trading, *nunc pro tunc* to the Commencement Date, on March 6, 2008 [D.E. #548].

        **4.**       **Financing Orders**

        **a.**       **Debtor-in-Possession Financing**

The Debtors filed a First Day Motion seeking, among other things, authority to obtain (a) secured postpetition financing on a super-priority and priming basis from Citicorp North America, Inc., as administrative agent, and Citigroup Global Markets Inc., as sole lead arranger and bookrunner, and (b) to use cash collateral of the lenders under the Prepetition Secured Facilities (the "DIP Motion").  The Debtors emphasized, both in the DIP Motion and at the hearing held on January 30, 2008, that access to financing and the Prepetition Secured Lenders' cash collateral would prove crucial to the Debtors' successful transition to operations under chapter 11.  Although the Debtors' projections showed they did not intend to borrow under the proposed terms of the DIP facility, the ability to meet those projections would depend on the Debtors' ability to maintain business-as-usual operations, which in turn would depend on the availability of a financing backstop as a means of providing comfort to the Debtors' employees, customers and business partners.  In addition, even without any new borrowing, the use of cash was critical to the Debtors' continued operations.  On January 31, 2008, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on an interim basis [D.E. #113] (the "DIP Order"), thereby authorizing the Debtors to borrow up to $135 million and providing access to cash collateral of the Prepetition Secured Lenders.

The DIP Order provided the Prepetition Secured Lenders with adequate protection in the form of replacement liens and allowed administrative priority claims under section 507(b) of the Bankruptcy Code to the extent of any diminution in the value of the collateral granted by the Debtors under the Prepetition Secured Facilities.  Additionally, the DIP Order provided for the payment of professional fees and expenses incurred by the agents under the Prepetition Secured Lenders.  As required by the banks under the postpetition financing agreement, the DIP Order provided that the Debtors release, waive and discharge each of the First Lien Revolver Lenders and the First Lien Term Lenders and their respective agents from any and all claims and causes of action that the Debtors may have arising out of or related to the First Lien Revolving Credit Agreement and the First Lien Term Credit Agreement.  Nevertheless, the Debtors had bargained to ensure that these releases explicitly did not apply to the rights of any committee or any other party in interest to bring any such action against the First Lien Revolver Lenders and the First Lien Term Lenders.  The DIP Order established June 3, 2008 as the deadline for any party in interest other than a Debtor to file a complaint seeking to invalidate, avoid, subordinate or otherwise challenge the liens or claims of the First Lien Revolver Lenders and the First Lien Term Lenders.  This deadline was later extended, as described below.

b.    **Cash Management**

To avoid administrative inefficiencies that would have been associated with modifying the Debtors' consolidated cash management system, which had been in place prepetition to facilitate streamlined business operations, the Debtors filed a First Day Motion seeking authority to continue their existing cash management system, bank accounts and business forms after the Commencement Date (the "Cash Management Motion"). On January 31, 2008, the Bankruptcy Court entered an order granting the Cash Management Motion on an interim basis [D.E. #106]. The Bankruptcy Court entered a final order with respect to the Cash Management Motion on June 21, 2008 [D.E. #1234] and an order amending the final order on July 18, 2008 [D.E. #1407]. The amended order further authorizes the Debtors to, among other things, invest and deposit funds in an "Evergreen" investment account, so long as the Debtors invest primarily in securities that satisfy the requirements set forth in section 345 of the Bankruptcy Code.

E.    **THE DEBTORS' PLAN PROCESS**

1.    **Initial Chapter 11 Restructuring Efforts**

Before the commencement of the Debtors' chapter 11 cases, the Debtors recognized the need to exit chapter 11 quickly; the reorganization process was harmful to their business, impaired their ability to compete with their competitors and was (and remains) responsible for the creation of enormous administrative expenses that need to cease in order to preserve value for all constituents. Since the outset of these chapter 11 cases, the Debtors have been extremely concerned that litigation between creditor groups would impair a successful reorganization process. Indeed, the Debtors raised this issue with the Court during the very first hearing in these cases. At that time, the Debtors sought to alleviate the litigation risk by reaching agreement with their senior noteholders on the framework for a plan of reorganization that involved converting the senior noteholders to equity, obtaining a new investment of $200 million, preserving the fraudulent conveyance litigation and issuing new secured notes to the Debtors' creditors under the prepetition secured facilities.

During the breathing spell provided by the Court's cash collateral ruling in June 2008, see section F.9.b, the Debtors explored a reorganization plan consistent with that original plan framework. To that end, the Debtors spent several months working with a potential plan sponsor regarding a plan that would provide equity recovery to unsecured creditors. At the same time, the Debtors engaged with potential purchasers of the company as a whole, exploring possible transactions that would be implemented through a sale under section 363 of the Bankruptcy Code. Despite the Debtors' efforts, in the face of continued deterioration in the housing markets and significant declines in the financial markets, the Debtors' original plan sponsor was no longer willing to consummate the transaction. As a result, the Debtors explored restructuring on a standalone basis.

2.    **The First Plan and Disclosure Statement**

On October 13, 2008, the Debtors filed (a) the Joint Plan of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code [D.E. #1952] (as modified from time to time, the "First Plan") and (b) the Disclosure Statement for the First Plan [D.E. #1953] (as revised from time to time, the "First Disclosure Statement"). At the time of the filing of the First Plan and the First Disclosure Statement, the Debtors believed that, while the Plan did not give any constituency what it would have wanted in an ideal world, it represented a compromise that was the best alternative available to maximize distributable value for all constituents. The Debtors designed the First Plan to accomplish two primary objectives: facilitate a swift emergence from chapter 11 and, at the same time, preserve the Committee Action. Specifically, the First Plan included the following features, among others:

- The Debtors' first lien term and revolving lenders would receive new secured notes equal to the amount of their claims, such notes to be subject to disgorgement on account of the outcome of the fraudulent conveyance litigation.

- The Debtors' second lien lenders would receive a new $25 million note as well as the equity in the reorganized company, in each case subject to disgorgement or cancellation/dilution, respectively, depending on the outcome of the fraudulent conveyance litigation.

- Similar to the construct under the current Plan, the Debtors' unsecured creditors would receive interests in a litigation trust, which would be created to pursue, among other actions, the Committee Action.

The Debtors had intended to seek approval of the First Disclosure Statement at the omnibus hearing on November 12, 2008, with the hope of beginning the solicitation process soon thereafter. Several parties, however, filed objections to the First Disclosure Statement, including both the First Lien Lenders and the Committee. Neither of those constituencies was ready to accept the compromises inherent in the First Plan.

**3.       The Alternative Plan**

At the time of the filing of the First Plan, the Debtors made clear that they remained committed to exploring any and all potential plan alternatives that would build consensus and maximize value. In the weeks leading up to and following the November 12, 2008 hearing, the parties – led by the Prepetition Secured Lenders – engaged in extended negotiations with a potential plan investor regarding the details of a plan other than the First Plan (the "Alternative Plan"). As indicated in the Debtors' omnibus response to the objections of the First Disclosure Statement, dated November 12, 2008 [D.E. #2137], the Debtors believed that an adjournment of a hearing on the First Disclosure Statement would allow for exploration of the alternative and would allow for exploration of the Alternative Plan and would benefit the process and maximize the likelihood of creditor consensus.

The Debtors' efforts to negotiate the Alternative Plan are emblematic of the difficulties facing the homebuilding industry as a whole. At a hearing held on January 9, 2009, the Debtors and certain parties in interest provided details with respect to the terms of the Alternative Plan transaction with another homebuilder. That sale transaction was to be accomplished pursuant to a plan that the Debtors hoped would become effective by the end of April 2009.

Subsequent to the January 9 hearing, the Debtors, their major creditor groups and the potential plan investor continued to work towards finalizing and documenting a sale under the Alternative Plan on substantially the terms presented to the Court. By the end of January 2009, however, the Debtors and the creditor groups were made aware that the potential plan investor had determined, based on its due diligence that the preliminary purchase price would be subject to a significant downward adjustment. The Debtors, in consultation with their major creditor groups, determined that the transaction price, as adjusted, was less favorable than recoveries that could be achieved for their stakeholders on a stand-alone basis.

**4.       The Development of the Proposed Plan and Revised Business Plan**

At the end of January and through February, the Debtors and their major creditor groups met to discuss the general direction of the Debtors' plan prospects, during which time the parties reached consensus that the Debtors should explore and develop stand-alone business models for both a going

42

concern and a controlled monetization of the Debtors' assets over time.  The culmination of this process was the development of the revised business plan that the Debtors announced on March 23, 2009, which forms the basis for the currently proposed Plan that is the subject of this Disclosure Statement.

**F.    OTHER DEVELOPMENTS DURING THE CHAPTER 11 CASES**

    **1.    Filing of the Debtors' Schedules and SOFAs, Establishment of Deadlines to Submit Written Proofs of Claim and the Claims Process**

        **a.    Debtors' Schedules of Financial Affairs and Statements of Liabilities and Assets**

On February 13, 2008, each of the Debtors filed its schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and SOFAs").  The Schedules and SOFAs provide information concerning each of the Debtors' assets, liabilities (including accounts payable), executory contracts and other financial information as of the Commencement Date, all as required by section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure. Certain of the Debtors amended and restated their respective Schedules and SOFAs on March 11, 2008. In addition, on October 7, 2008, certain of the Debtors amended and restated their Schedules to reflect postpetition developments, including the payment of certain prepetition claims pursuant to the relief granted in the First Day Orders and other orders in these chapter 11 cases.

On August 15, 2008, Beacon Hill filed its Schedules and SOFAs with the Bankruptcy Court.

        **b.    Establishment of the Main Claims Bar Date**

On March 17, 2008, the Bankruptcy Court entered an order establishing, among other things, May 19, 2008 (the "Bar Date") as the deadline for each person or entity asserting a claim against any of the Debtors to file a written proof of claim against the specific Debtor as to which the claim is asserted [D.E. #614] (the "Bar Date Order").  The Bar Date Order also established July 28, 2008 as the deadline for all governmental units to file a written proof of claim against the Debtors.

In accordance with the Bar Date Order, the Debtors provided written notice of the Bar Date to all known potential creditors of the Debtors according to the Debtors' books and records at the time of mailing of the notice, including, for example, all litigation parties and homebuyers within the previous six years.  The Debtors also provided written notice of the Bar Date, together with a "personalized" proof of claim form approved by the Bankruptcy Court, to each of the parties and entities identified as creditors on the Debtors' Schedules.  The Debtors published notice of the Bar Date in the *Wall Street Journal* and 29 local and trade publications circulated in each of the regions in which the Debtors operate.

        **c.    Additional Bar Dates**

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the last day on which each person or entity asserting a claim against Beacon Hill may file a proof of claim against Beacon Hill's chapter 11 estate [D.E. #1802].

On September 23, 2008, the Bankruptcy Court entered an order establishing October 22, 2008 as the deadline for (a) homeowners' associations to whom the Debtors have contractual or other obligations and (b) community development districts in which the Debtors own or have owned property to file a written proof of claim against any of the Debtors' estates [D.E. #1813].

43

**[NOTE: To be updated for administrative bar date following filing and consideration of the Debtor's request to establish such a bar date, which the Debtors anticipate occurring before or substantially contemporaneous with the hearing on this disclosure statement.]**

### d.      Claims Filed Against the Debtors

As of April 8, 2009, a total of approximately 4,431 claims have been filed against the Debtors on an aggregate basis, totaling approximately $7.2 billion in asserted liabilities.  These claims are comprised of the following: approximately $4.9 million in administrative claims, $218.6 million in secured claims, $75.4 million in priority claims and $6.9 billion in unsecured claims.  In addition, numerous claims (at least 1,418) have been asserted in "unliquidated" amounts or that contain an unliquidated component.  Notably, among the unliquidated claims are the claims of the First Lien Revolver Lenders, the First Lien Term Lenders and the Second Lien Lenders.  The Debtors believe that a substantial number of these claims are duplicative, such that the total amount of claims asserted against the Debtors is significantly less when allowance is made for duplicate claims and unliquidated claims as to which an estimate was provided or can fairly be interpreted.  The Debtors continue to reconcile claims, and expect that estimated claim amounts may be adjusted downward.

### e.      Claims Objection Procedures

In light of the significant number of claims that have been filed or scheduled in the Debtors' chapter 11 cases, on January 27, 2009, the Debtors filed a motion to establish a streamlined process for objecting to and responding to each claim filed against the Debtors (with certain exceptions) (the "Claims Procedures Motion").  The Claims Procedures Motion reflected the Debtors' view that preparing and filing individual pleadings for each objection to a claim would be extremely time-consuming and expensive.  On February 18, 2009, the Court granted the relief sought in the Claims Procedures Motion and entered the Claims Procedures Order [D.E. #2468].

**[NOTE: To be updated for administrative bar date following filing and consideration of the Debtor's first omnibus objection to claims, which the Debtors anticipate occurring before or substantially contemporaneous with the hearing on this disclosure statement.]**

### 2.      Appointment of the Committee

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable (the "Committee").  On February 13, 2008, the U.S. Trustee appointed the Committee [D.E. #185].  The Committee is comprised of the following members:

| | |
|---|---|
| Wilmington Trust Company<br>520 Madison Avenue, 33rd Floor<br>New York, NY 10022 | HSBC Bank USA, N.A.<br>10 East 40th Street, 14th Floor<br>New York NY 10016 |
| Trapeza CDOX, Ltd<br>712 Fifth Avenue, 10th Floor<br>New York, NY 10019 | Capital Research and<br>Management Company<br>630 Fifth Avenue, 36th Floor<br>New York, NY 10111 |
| SMH Capital Advisors, Inc.<br>4800 Overton Plaza, Suite 300 | Geotek, Inc./Geotek Insite, Inc.<br>6835 S. Escondido Street, Suite A |

44

Fort Worth, TX 76109                        Las Vegas, NV 89119

SelectBuild Arizona
c/o BMHC
Four Embarcadero Center, Suite 3250
San Francisco, CA 94111

The Committee subsequently retained the following professionals: (a) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022, as legal counsel [D.E. #657]; (b) Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., as local counsel [D.E. #804]; (c) Jefferies & Co., Inc, as financial advisor and investment banker [D.E. #1701]; (d) Moelis & Company LLC, as successor financial advisor and investment banker [D.E. #1702]; (e) J.H. Cohn LLP, as forensic accountants and advisors [D.E. #1090]; and (f) Robert Charles Lesser & Co, as real estate advisors [D.E. #1091]. The Committee also retained the law firm of Robbins, Russell, Englert, Orseck, Untereiner & Saubert LLP, 1801 K Street N.W., Suite 411, Washington, D.C. 20006, as conflicts counsel with respect to the prosecution of certain claims on behalf of the Debtors' estates (see section V.F.6.a, below) [D.E. #1595].

### 3.        Employee Compensation and Changes in Management

The Debtors took the following steps to retain employees and management during their chapter 11 cases:

#### a.        Deferred Employee Compensation

On February 20, 2008, the Debtors filed a motion for authority to honor their prepetition deferred compensation obligations to their employees and associates. Because some of the Debtors' employees typically received a portion of their compensation on an annual rather than a quarterly basis, as of the Commencement Date the Debtors owed a significant portion of their employees' compensation for performance during the 2007 fiscal year. The Debtors believed that honoring their prepetition deferred compensation obligations was imperative to retain their core workforce during the reorganization process. Accordingly, on May 12, 2008, the Bankruptcy Court entered an order authorizing the Debtors, in their discretion, to pay up to $1,208,805 of outstanding prepetition deferred compensation obligations for the 2007 calendar year [D.E. #950]. The amount authorized for payment did not reflect the entire balance of 2007 deferred compensation obligations: Upon completion and rollout of the Debtors' revised business plan and after negotiations with the Committee, the Debtors determined it was appropriate to pay only certain of the prepetition claims during the chapter 11 cases, and the Bankruptcy Court approved that reduced amount as described above.

#### b.        Senior Management

#### i.        Chief Executive Officer

On May 28, 2008, the Debtors filed a motion seeking authority to enter into an agreement with Mr. Antonio B. Mon (the "EVC Agreement"), then-chief executive officer, president and executive-vice chairman of the board of directors of TOUSA, Inc. Pursuant to the EVC Agreement, Mr. Mon agreed to, among other things, relinquish his role as TOUSA's chief executive officer and remain solely in his position as executive-vice chairman of the Board of Directors through the end of 2008. The Bankruptcy Court entered an order approving the EVC Agreement on June 11, 2008 [D.E. #1184] (the "EVC Order"). The Debtors subsequently amended the EVC Order to permit Mr. Mon to serve as chief executive officer through August 2008 for the purposes of, among other things, finalizing and signing TOUSA's 2007

Form 10-K (which was filed on August 12, 2008) [D.E. #1648]. In accordance with the EVC Order, Mr. Mon's position as executive-vice chairman of the Board of Directors concluded at the end of 2008. Mr. Mon remains a Director of TOUSA.

On June 10, 2008, the Debtors filed an application seeking authorizing to appoint Mr. John R. Boken of Zolfo Cooper as TOUSA's chief executive officer. Mr. Boken had previously been appointed the Debtors' chief restructuring officer pursuant to a First Day Order. On August 18, 2008, the Bankruptcy Court entered an order authorizing the Debtors to appoint Mr. Boken as chief executive officer [D.E. #1647]. Mr. Boken has served as the Debtors' chief executive officer and chief restructuring officer since that time.

## ii.    Chief Financial Officer

On January 18, 2008, Mr. Stephen Wagman resigned as the Company's chief financial officer. Mr. Tommy McAden — previously an executive vice president of TOUSA, Inc. — subsequently replaced Mr. Wagman. Mr. McAden has served as an executive vice president and the chief financial officer throughout the Debtors' chapter 11 cases. Mr. McAden is also a member of TOUSA's Board of Directors.

## iii.    Chief Operating Officer

In May 2005, Mr. George Yeonas became the Debtors' chief operating officer. Mr. Yeonas has served the Debtors as executive vice president and chief operating officer throughout the Debtors' chapter 11 cases.

## iv.    Executive Vice President and Chief of Staff

On February 20, 2008, the Debtors filed a motion for authority to enter into an amended employment agreement with Mr. Paul Berkowitz, who has served as TOUSA, Inc.'s executive vice president and chief of staff since January 1, 2007. As described in the motion, Mr. Berkowitz had planned to leave the Debtors' employ as of the chapter 11 filing and return to his previous employ as a shareholder at the law firm of Greenberg Traurig, LLP ("Greenberg"), from which position he would continue to provide legal services to the Debtors as outside counsel. Before the Commencement Date, however, the U.S. Trustee indicated that it would object to any such arrangement on the ground that Greenberg would not be able to satisfy Bankruptcy Code retention requirements if it were to play a substantial role in the strategy or administration of these chapter 11 cases. As a result, TOUSA, Inc. requested that Mr. Berkowitz remain with the company, and modified employment terms were negotiated.

The proposed employment agreement provided that Mr. Berkowitz would be entitled to (a) receive a base salary of $110,000 per month; (b) remain eligible to receive a bonus; (c) receive certain pay upon termination of his employment; and (d) participate in all customary employee benefit plans, practices and policies in effect for similarly situated employees. The Debtors believed that the employment agreement was necessary to retain Mr. Berkowitz's unique knowledge and expertise during their chapter 11 cases and that the compensation terms would be more advantageous than obtaining comparable partner-level legal services from outside counsel. Under the agreement, Mr. Berkowitz's employment could be terminated by TOUSA on 15-days' notice. On February 28, 2008, the Bankruptcy Court entered an order authorizing the Debtors to enter into the employment agreement with Mr. Berkowitz on the terms described in the motion, provided that the payment of any bonus would require separate approval by the Bankruptcy Court [D.E. #471]. TOUSA, Inc.'s Board of Directors has conducted periodic performance reviews of Mr. Berkowitz, concluding in each instance that his continued employment was in the best interests of the Debtors.

### 4.    Sales of Certain Assets

As of the Commencement Date, the Debtors maintained and controlled a wide array of assets, including real, personal and intangible property interests.  The Debtors' normal practice was to identify certain "non-core" assets unnecessary to the Debtors' business operations and to market those assets for sale.  Such sales allowed the Debtors to streamline their operations by eliminating the cost of maintaining property not essential to their business, allowing for the purchase of other assets and improving their cash position.  In addition, from time to time in the ordinary course of business, the Debtors would sell homes or lots on a bulk basis, in which many homes or lots were sold to a single investor.  The Debtors believed that many of these asset sales (both non-core asset sales and bulk sales) were in the ordinary course of business and would not require a court order approving them; certain potential buyers and title insurers, however, indicated that they would require the Debtors to seek court approval for particular sales.  In fact, at the outset of these chapter 11 cases, the Debtors did seek court approval of certain individual sales.

To continue selling non-core assets during their chapter 11 cases without the expense and inefficiency of filing numerous similar motions with the Court, the Debtors filed a motion on February 13, 2008 to establish streamlined procedures for the sale of assets during their chapter 11 cases (the "Non-Core Asset Sale Procedures").  The Debtors designed the Non-Core Asset Sale Procedures to permit them to dispose of non-core assets and engage in bulk sales pursuant to section 363 of the Bankruptcy Code without further motion to the Bankruptcy Court.  A particular sale qualifies for treatment under these procedures if, among other things, it is (a) for an aggregate sale price of no more than $15 million and (b) not subject to an objection by certain parties entitled to receive notice of each sale.  On March 3, 2008, the Bankruptcy Court entered an order establishing the Non-Core Asset Sale Procedures on an interim basis [D.E. #495].

The Non-Core Asset Sale Procedures have facilitated bulk sales in the ordinary course of the Debtors' business and have enabled the Debtors to shed certain non-performing assets and increase their liquid cash assets throughout their chapter 11 cases.  As of March 31, 2009, the Debtors have generated approximately $61.7 million in cash pursuant to the Non-Core Asset Sale Procedures and certain individual orders of the Bankruptcy Court authorizing bulk sales of property.

### 5.    Acquisition of Real Property

As discussed in section IV.B.3 above, before the Commencement Date, the Debtors routinely entered into purchase agreements, land bank arrangements and option contracts that give the Debtors the right, but not the obligation, to buy homesites at predetermined prices on a predetermined takedown schedule anticipated to be commensurate with home starts (collectively, the "Purchase Contracts").  The Debtors entered into the Purchase Contracts to secure additional inventory for their business.  The Debtors continued to acquire substantial amounts of real property after the Commencement Date in the ordinary course of business.  In certain instances, however, parties to the Purchase Contracts or other participants in the Debtors' purchase transactions have requested or required that the Debtors obtain a court order approving a property purchase.  Accordingly, on June 25, 2008, the Debtors filed a motion for authority to establish streamlined procedures for the implementation of real property acquisitions in the ordinary course of the Debtors' business (the "Acquisition Procedures").  The Bankruptcy Court entered an order approving the Acquisition Procedures on July 15, 2008 [D.E. #1390].  As of the date hereof, the Debtors have not acquired any property pursuant to the Acquisition Procedures.

47

6.        **Litigation and Adversary Proceedings**

a.        **The Committee Action**

i.        **Standing of the Creditors'**
**Committee to Prosecute the Committee Action**

On April 22, 2008, the Committee filed a motion seeking, among other things, authority to investigate, commence and prosecute certain alleged causes of action on behalf of the Debtors' estates against the Prepetition Secured Lenders and former Transeastern Lenders related to the July Recapitalization (the "Standing Motion").  The Committee also sought sole authority to settle such claims.  As discussed in detail in section V.A.2 above, the July Recapitalization was part of a global settlement of litigation claims relating to the Transeastern JV that led to the Debtors' entry into the First Lien Term Credit Agreement and the Second Lien Credit Agreement and the amendment to the First Lien Revolving Credit Agreement.

Specifically, the Committee sought authority to pursue certain fraudulent conveyance and other claims relating to the Debtors' global settlement of the Transeastern JV litigation and, in particular, the Debtors' entry into the Prepetition Secured Facilities (collectively, the "Potential Claims").  Successful prosecution of the Potential Claims could result in (a) avoidance of the claims and/or liens of the Prepetition Secured Lenders with respect to each of the Debtors' chapter 11 estates, other than TOUSA, Inc. and Beacon Hill at Mountain's Edge, LLC (which was not a signatory to the Prepetition Secured Facilities) and (b) a recovery by the Litigation Trust from the Transeastern Lenders of amounts paid to them as part of the Global Settlement.  The Committee also sought authority to commence an action to avoid, as a preference under section 547 of the Bankruptcy Code, the Prepetition Secured Lenders' asserted security interest in a $207 million federal tax refund, which the Debtors received on April 23, 2008 as a result of significant losses incurred during the 2007 fiscal year (the "2007 Federal Tax Refund").

The Debtors consented to the relief sought in the Standing Motion, but only to the extent the Debtors retained authority to settle any and all of the Potential Claims in a chapter 11 plan of reorganization or otherwise.  In addition, the Debtors suggested that, to the extent the Potential Claims were to proceed during the chapter 11 cases, such claims must be pursued in an orderly and expedited fashion in accordance with an agreed scheduling order.  On May 28, 2008, the Bankruptcy Court entered an order granting the Committee's request, but denying the Committee's request for sole authority to settle the Potential Claims [D.E. #1092] (the "Standing Order").

ii.        **The Litigation Schedule**

In connection with the Bankruptcy Court's entry of the Standing Order and the commencement of the Committee Action, the parties to the litigation negotiated an initial case management and scheduling order [Adv. No. 08-01435 D.E. #3] (the "Adversary Proceeding Management Order").  The Adversary Proceeding Management Order established, among other things, a timetable for the Committee Action.

The Adversary Proceeding Management Order also established standards and procedures for written discovery, depositions, experts, pre-trial briefs, motion practice, periodic status conferences and discovery dispute resolution.  On October 16, 2008, the Committee filed a Motion for Modification of the Case Management Order.  [Adv. Proc. D.E. #123].  At a hearing held on October 23, 2008, the Bankruptcy Court moved the trial date to the weeks of July 13 and July 20, 2009.  The parties agreed to file a new proposed case management order to modify the intervening discovery deadlines based on the new trial date, which the Bankruptcy Court entered on November 11, 2008 [Adv. Proc. D.E. #158].

### iii.    The Complaint

On July 14, 2008, the Committee commenced an adversary proceeding to pursue certain of the Potential Claims [D.E. #1383] (Adv. Proc. No. 08-01435) (the "Committee Action").  In the Committee Action, the Committee set forth several bases for recovery against the Prepetition Secured Lenders, the Transeastern Lenders and other parties to the July Recapitalization.

The Committee generally set forth two broad categories of "fraudulent transfer" claims under section 548 of the Bankruptcy Code and applicable non-bankruptcy law.  The first category includes claims brought against the Prepetition Secured Lenders under each of the Debtors' Prepetition Secured Facilities.  With respect to this category of claims, the Committee alleged that the obligations incurred by certain of the Debtors as guarantors and co-borrowers under the Prepetition Secured Facilities were fraudulent transfers.  The second category of claims includes fraudulent transfer claims against the lenders under the credit facility entered into for the purpose of funding the acquisition of the Transeastern JV (the "TE Senior Debt Facility"), each of whom received certain payments and other consideration from the Debtors as part of the global settlement reached in connection with the Transeastern JV litigation.  Specifically, the Committee Action asserts fraudulent transfer claims against the lenders under the TE Senior Debt Facility under several different state and federal statutes, including sections 544, 548 and 550 of the Bankruptcy Code.  The Committee Action seeks relief in the form of recovery to certain of the Debtors of the amounts transferred to the lenders under the TE Senior Debt Facility as part of the global settlement of the Transeastern JV litigation.

In addition to these two categories of fraudulent transfer claims, the Committee sought (a) to avoid as a preference under section 547 of the Bankruptcy Code the Prepetition Secured Lenders' security interest in the 2007 Federal Tax Refund; and (b) to object to the claims of the Prepetition Secured Lenders on account of the "savings clause" contained in the Guaranty agreements, dated July 31, 2007, which were executed in connection with the Prepetition Secured Facilities.

### iv.    The Citigroup Complaint

On August 13, 2008, Citicorp North America, Inc. ("Citigroup"), in its capacity as the First Lien Term Agent, filed its answer to the Committee's complaint in the Committee Action.  In addition to filing its answers, Citigroup included a third-party complaint against TOUSA, Inc. and each of the Debtor signatories, co-borrowers and co-guarantors under the First Lien Term Loan (the "Citigroup Complaint"). In the Citigroup Complaint, Citigroup claims relief based on the theory that, to the extent the Committee establishes its allegations in the Committee Action, the defendants to the Citigroup Complaint will have "materially breached the First Lien Term Loan" by "(a) not having assets whose fair value exceeded their debts and liabilities, subordinated, contingent or otherwise, (b) not having assets whose fair saleable value exceed their debts and other liabilities, subordinated, contingent or otherwise, (c) not being able to pay their debts and liabilities, subordinated, contingent, or otherwise, and/or (d) having unreasonably small capital with which to conduct their business."  On September 30, 2008 the Debtors filed their answer to the Citigroup Complaint, generally denying Citigroup's allegations and asserting affirmative defenses.

### v.    The Bankruptcy Court's Ruling With
### Respect to Motions to Dismiss the Committee Action

On September 19, 2008, the Bankruptcy Court held a hearing on the motions to dismiss filed by the First Lien Revolver Agent and the Second Lien Agent.  Counsel for the Second Lien Agent argued that the Committee's complaint should be dismissed without prejudice for failure to state a claim.  The Bankruptcy Court denied the Second Lien Agent's motion to dismiss, finding that the "Doe" new lenders one through 100 were named properly and that the complaint clearly stated a claim against the Second

49

Lien Agent upon which relief can be granted.  The Court further found that the Second Lien Agent has no standing to assert the potential defenses of other defendants.

Counsel for the First Lien Revolver Agent argued that the Committee's attempt in its complaint to portray the First Lien Revolving Credit Agreement as a new credit facility has no basis in law or fact and that the application of case law as advocated by the Committee would make revolving financing extraordinarily difficult because every draw request under a revolving credit facility would require a solvency analysis at the date of the draw, effectively putting the lender in a position of having to choose between honoring a draw request, or risking the prospect of being held liable for failure to fund under an existing credit facility.

Noting that it was "dubious" about whether case law advocated by the Committee applies to the litigation with respect to the First Lien Revolving Credit Agreement, the Bankruptcy Court granted the First Lien Revolver Agent's motion to dismiss with leave for the Committee to amend.  In doing so, the Bankruptcy Court noted its belief that transfers under section 548 of the Bankruptcy Code occur when a lien granted becomes so perfected that a bona fide purchaser for value could not acquire a superior interest and explained that it was giving the Committee an opportunity to amend to clarify exactly which transfer(s) it believes establish liability on the part of the First Lien Revolving Credit Agreement.

### vi.    The Amended Complaints and Responsive Pleadings

On October 17, 2008, the Committee filed its First Amended Adversary Complaint [Adv. Proc. D.E. #120] ("Amended Complaint").  The Amended Complaint supplemented the Committee's original complaint with additional allegations.  For example, the Amended Complaint provided additional information related to the identity of certain groups of defendants, and provided additional details in the background section as to the Committee's interpretation of the "New Credit Agreements" and their consequences for the Debtors.  The Amended Complaint also included new allegations as to the "Transeastern Transferees'" alleged knowledge as to the consequences of the "New Credit Agreements" on the "Conveying Subsidiaries."  The Committee added certain supplemental language to each of the existing counts alleging fraudulent transfer, including, for example, that "[e]ach of the Conveying Subsidiaries incurred an obligation to repay the First Lien Term Loan and Second Lien Term Loan and transferred an interest in its property on July 31, 2007 when it executed those agreements."  Finally, the Amended Complaint added six new counts, alleging fraudulent transfer claims against the "Transeastern Transferees" under sections 726.105, 726.106 and 726.108 of the Florida Statutes, sections 273, 274, 275 and 278 of the New York Debtors and Creditor Law, and sections 544(b), 548 and 550 of the Bankruptcy Code.

In light of the Amended Complaint, on October 22, 2008 the Bankruptcy Court issued orders [Adv. Proc. D.E. Nos. 128 and 131] continuing the motions to dismiss the original complaint filed by the Senior Transeastern Lenders and Subordinated Noteholders on September 3, 2008 [Adv. Proc. D.E. Nos. 61 and 62].   On November 4, 2008 Citigroup filed a Motion to Dismiss the Amended Complaint [Adv. Proc. D.E. #148].  In its motion, Citigroup argued that the substantive changes in the Amended Complaint failed to cure the fundamental problems identified by the Bankruptcy Court during the September 19, 2008 hearing.  Specifically, Citigroup argued that the Amended Complaint still failed to identify exactly which transfers the Committee sought to have avoided and still sought to avoid transfers that occurred before the perfection of the relevant liens.  Citigroup also argued that the Committee's claims under New York law should be dismissed because none of the Debtors had business operations in New York and the contractual choice of law provision in the First Lien Revolving Credit Agreement did not apply to the claims brought by the Committee.  On the same day it filed its motion to dismiss, Citigroup also filed its answer to the Amended Complaint [Adv. Proc. D.E. #146].  In its Answer Citigroup generally denied the Committee's allegations and asserted affirmative defenses.

50

Also on November 4, 2008 the Second Lien Agent filed its answer to the Third Party Complaint [Adv. Proc. D.E. #152]. In its answer, the Second Lien Agent generally denied the Committee's allegations and asserted affirmative defenses.

On December 4, 2008, the Bankruptcy Court held oral argument on the motion to dismiss filed by Citigroup in its capacity as administrative agent for the First Lien Revolving Credit Agreement. At the hearing, the Bankruptcy Court again granted the motion to dismiss the Committee's claims relating to the First Lien Revolving Credit Agreement. The Bankruptcy Court, however, granted leave to amend the First Amended Complaint to allege claims directed at the First Lien Revolving Credit Agreement "solely to the extent such claims seek to avoid transfers of liens on real property or other collateral first perfected on or after July 31, 2007." At the same hearing, the Bankruptcy Court also denied the motion to dismiss brought by the Transeastern Transferees. The Transeastern Transferees filed a motion for interlocutory appeal of the Bankruptcy Court's ruling to the District Court. On February 11, 2009, the District Court denied the Transeastern Tranferees' motion for interlocutory appeal of the Bankruptcy Court's denial of their motion to dismiss. [Adv. Proc. D.E. #253].

On January 5, 2009, the Committee filed its Second Amended Complaint [Adv. Proc. D.E. #226]. The Second Amended Complaint included the same substantive allegations as the Amended Complaint with respect to the First Lien Revolving Credit Agreement, the First Lien Term Credit Agreement and the Second Lien Credit Agreement. With respect to the First Lien Revolving Credit Agreement, the Second Amended Complaint alleged that the conveying subsidiaries granted certain liens to Citicorp after July 31, 2007. Specifically, the Second Amended Complaint alleged that the Conveying Subsidiaries granted liens on several categories of property, including chattel paper, copyrights, patents, trademarks and customer lists, that had not been subject to liens under the original security agreement. In addition, the Second Amended Complaint alleged that the Conveying Subsidiaries granted mortgages after July 31, 2007 to secure payment obligations under the First Lien Revolving Credit Agreement.

On February 4, 2009, the Committee filed a Third Amended Complaint that removed claims relating to the Revolver. The Committee has, however, appealed to the District Court the dismissal of the Revolver claims in the Amended Complaint, and has requested an expedited appeal. In February and March 2009, the defendants filed their answers to the Third Amended Complaint, each generally denying the allegations contained therein.

### vii.    The Wells Fargo Third-Party Complaint

In addition to filing its answer on November 4, 2008, the Second Lien Agent included a third-party complaint against TOUSA, Inc. and each of the Debtor signatories, co-borrowers and co-guarantors under the Second Lien Facility (the "Second Lien Agent Complaint"). The Second Lien Agent Complaint parallels the Citigroup Complaint, but alleges breaches of the Second Lien Facility as opposed to the First Lien Term Loan. Specifically, the Second Lien Agent Complaint claims relief based on the theory that, to the extent the Committee establishes its allegations in the Committee Action, the defendants to the Second Lien Agent Complaint will have "materially breached the Second Lien Facility" by "(a) not having assets whose fair value exceeded their debts and liabilities, (subordinated, contingent or otherwise), (b) not having assets whose fair saleable value exceed their debts and other liabilities, (subordinated, contingent or otherwise), (c) not being able to pay their debts and liabilities, (subordinated, contingent, or otherwise), and/or (d) having unreasonably small capital with which to conduct their business." On November 25, 2008, the Debtors filed their answer to the Wells Fargo Third-Party Complaint, generally denying Wells Fargo's allegations and asserting affirmative defenses.

51

viii.    **The Senior Transeastern Lenders' and Senior Transeastern Agent's Third-Party Complaint and/or Counterclaim**

On February 24, 2009, the Senior Transeastern Lenders and the CIT Group/Business Credit, Inc. ("CIT") each filed a Counterclaim and Third-Party Complaint against certain of the Debtors. The Senior Transeastern Lenders and CIT allege that they are entitled to indemnification and/or recoupement against any recovery the Committee receives as a result of the Committee's fraudulent transfer claims under the terms of the August 1, 2005 Senior Credit Agreement signed by certain of the Debtors in connection with the formation of the Transeastern Joint Venture. The Senior Transeastern Lenders and CIT seek recoupment for the full amount of any recovery against them on each of the Committee's fraudulent transfer claims.  On April 1, 2009 the Debtors filed a motion to strike or in the alternative to sever and stay the third party complaints filed by CIT and the Senior Transeastern Lenders.  In that motion, the Debtors argued that the third party complaints filed by CIT Group and the Senior Transeastern Lenders were untimely and prejudicial to the Debtors and their estates.  CIT Group and the Senior Transeastern Lenders have not yet responded to the Debtors' motion to strike.

ix.    **Status of Discovery**

Fact discovery in the Committee Action, the Citicorp Third-Party Complaint and the Wells Fargo Third-Party Complaint was substantially completed on March 6, 2009.  On April 6, 2009 the Committee served its expert reports.  Defendants have until April 27, 2009 to serve their expert reports.  The Committee's rebuttal expert reports must be served by May 8, 2009.  The Scheduling Order calls for a supplemental fact discovery period from April 18, 2009 through May 15, 2009 to conduct additional discovery for the purpose of clarifying or addressing issues created by the expert reports.  The Committee has stated that it may move to eliminate the supplemental fact discovery period.  The First and Second Lien Lenders oppose the elimination of the supplemental fact discovery period.

x.    **Judicial Settlement Conference**

On February 11, 2009, the Debtors presented an *ore tenus* Motion to Compel Mediation, and filed a Motion to Compel Mediation and Notice of Hearing.  [Adv. Proc. D.E. #245].  On February 26, 2009, the Bankruptcy Court entered an Order granting the Debtors' Motion to Compel Mediation.  [Adv. Proc. D.E. #278].  Pursuant to the parties' agreement, United States Bankruptcy Judge Laurel Isicoff conducted the judicial settlement conference on March 23-24, 2009.  On April 14, 2009, Judge Isicoff reported that that the parties were at an impasse with respect to the Committee's claims against the First Lien Term Loan Lenders, the First Lien Revolver Lenders, and the Senior Transeastern Lenders.  Judge Isicoff further reported that the other Defendants had either reached an agreement with the Committee or were continuing settlement discussions.

b.    **The Committee's Second Standing Motion**

On February 27, 2009, the Committee filed a motion with the Bankruptcy Court for entry of an order authorizing the Committee to pursue and settle claims and/or causes of action against the fiduciaries (the "Director Defendants") of substantially all of the direct and indirect wholly owned subsidiaries of TOUSA (the "Debtor Subsidiaries") and Technical Olympic, S.A. ("Tech SA") on behalf of the Debtor Subsidiaries' estates (the "Second Standing Motion").  The Committee alleged that the Director Defendants breached their fiduciary duties to the respective Debtor Subsidiaries when they allowed the Debtor Subsidiaries to incur approximately $500 million in new secured debt in the July Recapitalization. The Committee also alleged that Tech SA, as the majority shareholder of TOUSA, Inc. aided and abetted

52

the Director Defendants' breaches of fiduciary duty by encouraging, inducing, and assisting them to enter into the July Recapitalization.  [TO BE UPDATED AFTER APRIL 23 HEARING]

### c.       The *Durgin* Lawsuit

TOUSA, Inc. was previously a defendant in a class action lawsuit pending in the United States District Court for the Southern District of Florida.  This lawsuit also named as defendants several of TOUSA's current or former officers, all of TOUSA's directors, Technical Olympic SA, and the underwriters of certain of TOUSA's offerings.  The original consolidated complaint in the action alleged, among other things, that TOUSA's public filings and other public statements were false and misleading.  On January 30, 2008, TOUSA filed a motion to dismiss the original consolidated complaint on various grounds.  Many of the other defendants also filed motions to dismiss and/or joined TOUSA's motion to dismiss.  On February 5, 2008 the District Court entered an order staying the action as to TOUSA pursuant to section 362 of the Bankruptcy Code.  The action continued with respect to defendants other than TOUSA.

On April 30, 2008, former lead plaintiff Diamondback Capital Management moved to withdraw as lead plaintiff.  On May 22, 2008, the District Court granted the withdrawal motion.  A new lead plaintiff, Bricklayers & Trowel Trades International Pension Fund (the "Bricklayers"), was appointed on July 15, 2008.  On September 19, 2008, the Bricklayers filed a Consolidated Amended Class Action Complaint.   The only defendants named in this new Consolidated Amended Complaint were four of TOUSA's current or former individual officers.  Accordingly, neither TOUSA nor any of the other 38 Debtors in these chapter 11 cases is named as a defendant in the Consolidated Amended Complaint.  The name and case number of the action is *Durgin, et al., v. TOUSA, Inc., et al.*, No. 06 61844 CIV (S.D. Fla).  On November 21, 2008, the defendants filed motions to dismiss the Consolidated Amended Class Action Complaint.

### d.       The *EMF* Lawsuit

On September 29, 2008 plaintiffs EMF Fund III, LLC, EMF Fund IV, LLC and EMF Fund V, LLC filed a lawsuit in the Circuit Court for Broward County, against four of TOUSA's current or former individual officers.  The lawsuit, which does not name TOUSA as a defendant, alleges that the plaintiffs entered into an option agreement with TOUSA based on allegedly false oral and written representations attributed to the current or former individual officers.  The lawsuit seeks damages, together with interest and costs in an unspecified amount.  The name and case number of the action is *EMF Fund III, LLC, et al., v. Antonio P. Mon, et al.*, No. 0845087 (Fla. Cir. Ct.).

### e.       The *Krieff* Litigation

Robert Krieff ("Krieff") was the Tampa Division president of TOUSA Homes Florida, L.P. ("TOUSA Homes Florida") from July 2005 to June 2006 pursuant to an Employment Agreement dated July 28, 2005 (the "Krieff Employment Agreement").  Krieff and TOUSA Homes Florida were also parties to an agreement to arbitrate claims, and upon the termination of Krieff's employment with the Debtors, Krieff filed a demand for arbitration against TOUSA Homes Florida alleging a breach of the Krieff Employment Agreement for improper termination.  On November 16, 2007, the arbitrator issued her findings of fact and interim award (the "Interim Award"), suggesting that Krieff was entitled to damages from TOUSA Homes Florida in the amount of $632,599.  Although the Interim Award was provisional in nature and TOUSA Homes Florida put forth numerous objections, the Circuit Court for the 17th Judicial Circuit, Broward County, Florida (the "Broward Circuit Court") made a verbal ruling on December 4, 2007 that the Interim Award would be treated as final and would be confirmed.  On December 7, 2007, TOUSA Homes Florida filed a motion to reconsider the decision confirming the

arbitrator's award, which the Broward Circuit Court subsequently rejected, and on December 17, 2007 the Broward Circuit Court entered a final judgment confirming the interim arbitration award (the "Circuit Court Judgment").

On December 20, 2007, Krieff served a Writ of Garnishment (the "Writ") on Wachovia Bank, N.A. seeking to collect on the Circuit Court Judgment. Wachovia answered the Writ on January 11, 2008 making clear that it would comply with the Writ. The amount currently retained by Wachovia pursuant to the Writ stands at $632,599 (the "Garnished Funds"). On January 16, 2008, TOUSA Homes Florida appealed the Circuit Court Judgment to the Fourth District Court of Appeals of Florida, which appeal has been stayed as a result of the Debtors' chapter 11 cases.

Krieff subsequently attempted to seek relief from the automatic stay in the Debtors' chapter 11 cases by filing a motion in the Bankruptcy Court on February 29, 2008. The Bankruptcy Court denied the stay motion on March 26, 2008 [D.E. #668]. On April 1, 2009, TOUSA, Inc. and TOUSA Homes Florida filed commenced an adversary in the Bankruptcy Court to recover the Garnished Funds held by Wachovia [Adv. No. 09-01303 D.E. #1]. The matter is currently pending before the Bankruptcy Court.

### f.    Litigation Concerning Customer Deposits

In connection with the sale of homes in the ordinary course of their business, the Debtors routinely enter into contracts with third parties for the purchase of a home that require such purchasers to place a deposit into an escrow account pending the closing of the sale. The purchase agreements for these home sales typically include provisions that govern the return of a deposit in the event the closing on the home does not take place.

During the course of the chapter 11 cases, the Debtors initiated several adversary proceedings in the Bankruptcy Court through the Debtors' special counsel, Greenberg Traurig LLP, to recover customer deposits that are held in escrow and subject to bona fide dispute. Additionally, several customers have commenced adversary proceedings against certain of the Debtors seeking return of customer deposits (collectively, the "Deposit Actions").

### g.    Procedures for the Settlement of Certain Actions

On March 4, 2009, the Debtors filed a motion to establish efficient and cost-effective uniform procedures for the settlement of actions in which all or one of the Debtors are plaintiffs (the "Settlement Procedures Motion"). The Settlement Procedures Motion was designed to permit the Debtors to pursue the settlement of suits and/or potential actions that arose in connection with the day-to-day operation of the Debtors' business, without the added expense of drafting, filing and presenting a motion to the Bankruptcy Court to seek approval of each individual settlement.

On March 26, 2009, the Bankruptcy Court entered an order granting the motion and establishing uniform procedures for settlement of certain actions or potential actions [D.E. #2630] (the "Settlement Procedures Order"). Pursuant to the Settlement Procedures Order, the Debtors have the authority to negotiate and settle actions in connection with the daily operations of the Debtors' business, regardless of the amount of the action, upon notice to certain parties, including the Committee, without further intervention by the Court. Additionally, the Settlement Procedures Order authorizes the Debtors to settle actions regarding customer deposits where the deposit at issue is $100,000 or less, and actions in the ordinary course of business where the amount sought by the Debtors is $150,000 or less, without the need to provide notice of the settlement, provided that the Debtors provide certain notice parties, including the Committee, with a monthly report with respect to such settlements.

As of March 31, 2009, the Debtors have settled claims totaling $105,294 pursuant to the terms of the Settlement Procedures Order.

        **h.**        **Potential Litigation Relating to Chinese Drywall**

TOUSA Homes, Inc. was named as a defendant in two purported class action lawsuits on behalf of certain homeowner plaintiffs who allege that they were sold homes containing drywall imported from China that is alleged to be inherently defective and which been characterized as "Chinese Drywall." The Chinese Drywall allegedly emits various sulfide gasses and/or other chemicals that purportedly cause property damage and potential health hazards. In one case, the Debtors have been voluntarily dismissed without prejudice. In the second case, the lawsuit has been filed, but none of the Debtors have been served. The Debtors are currently conducting diligence in all respects in connection with their use of Chinese Drywall.

        **i.**        **The Lake Las Vegas Litigation**

On our about June 27, 2005, LLV-1, LLC ("LLV") and TOUSA Homes entered into a Purchase Agreement and Escrow Instructions for the sale and purchase of real property in Henderson, Nevada at the Lake Las Vegas Resort (as amended from time to time, the "LLVR Purchase Agreement"). Under the LLVR Purchase Agreement, TOUSA Homes agreed to purchase real property from LLV for $81 million, which lot was split into two phases for sale, at the Lake Los Vegas Resort (the "LLVR Property"). After closing on the first half of the LLVR Property,, TOUSA Homes began construction on the Lake Las Vegas Resort project (the "LLVR Project") at LLV's request. In connection therewith, TOUSA Homes, as general contractor, subcontracted with Las Vegas Paving Corporation ("Las Vegas Paving") to provide certain materials, labor and equipment associated with the construction at the LLVR Project (the "Construction Agreement").

On May 25, 2007, LLV brought an action again TOUSA Homes alleging that TOUSA Homes had breached the terms of the LLVR Purchase Agreement by failing to close on Phase II of the LLVR Project, thereby forfeiting a deposit in the amount of $2.025 million. It the Debtors' position that the deposited acted as security for a liquidated damages provision of $20,500 per day for LLV's failure to fully complete certain designs by December 31, 2007.

On January 16, 2008, Las Vegas Paving commenced the action styled *Las Vegas Paving Corporation v. Engle Homes Nevada, LLC et al.*, Case No. A555448 pending in the District Court for Clark County, Nevada (the "Las Vegas State Court Action") against, among other entities, TOUSA Homes. Pursuant to the Las Vegas State Court Action, Las Vegas Paving seeks payment of approximately $1.3 million under the Construction Agreement. On May 29, 2008, TOUSA Homes filed a cross-complaint and third-party complaint in the Las Vegas State Court Action, asserting a claim against LLV for the unpaid principal sum of approximately $7.6 million owed to TOUSA Homes for the construction work performed by TOUSA Homes as general contractor on the LLVR Project. The amount of TOUSA Homes' claim against LLV includes the full amount of Las Vegas Paving's claim against TOUSA Homes, since Las Vegas Paving was acting as a subcontractor for TOUSA Homes. As a result of TOUSA Homes' filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code, the Las Vegas State Court Action was stayed pursuant to section 362(a)(1) of the Bankruptcy Code. On July 17, 2007, LLV also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the District of Nevada (the "Nevada Bankruptcy Court").

The Debtors believed that an expeditious resolution of this matter would result in a recovery to the Debtors' estates. To that end, on January 27, 2009, TOUSA Homes filed a motion requesting relief from the automatic stay to continue the Las Vegas State Court Action, which the Bankruptcy Court

granted on February 23, 2009 [D.E. #2476]. The matter is currently pending in the Nevada Bankruptcy Court, and the parties continue to explore a resolution.

### j.        The Zuckerman Litigation

#### i.        Sale of Fox Grove Lots

Following oral arguments and briefing, on September 22, 2008, the Bankruptcy Court issued entered an order (along with a full opinion) authorizing TOUSA Homes to sell 20 residential lots located in the community known as Meadow Run, Martin County for an aggregate purchase price of $3 million [D.E. 1803] (the "Fox Grove Order"). The Debtors' authority to consummate the sale contemplated in the Fox Grove Order had been heavily contested by Meadow Run at Palm City, LLC ("Zuckerman") based on a contractual provision with TOUSA Homes that restricted TOUSA from selling any lot for less than $325,000 so long as Zuckerman had lots in the Meadow Run community. On September 23, 2008, following entry of the Fox Grove Order, Zuckerman filed an election to appeal the Fox Grove Order to the District Court [D.E. #1814] (the "Appeal"). Notwithstanding the Appeal, the Debtors consummated the sale of the Property.

#### ii.        The Escrow Action

In addition to the dispute with Zuckerman concerning the Property at Meadow Run, the parties were also subject to litigation concerning that certain Agreement for Sale and Purchase of Real Estate, dated April 22, 2005, with respect to certain property in Collier County, Florida and a related Agreement to Purchase, dated June 1, 2005. Specifically, The Zuckerman Group, Inc. commenced a state court action against TOUSA Homes, Inc. and its non-debtor affiliate Universal Land Title, Inc. ("Universal"), seeking the return of certain escrowed funds totaling $850,000. Zuckerman filed a proof of claim based on its allegations in the State Court Action in the Debtor's chapter 11 case on May 6, 2008 in the amount of $850,000 [#1931] (as amended, "Claim #1931).

#### iii.        The Settlement Agreement

On February 26, 2009, TOUSA Homes and Zuckerman agreed to a resolution of both the Appeal and the State Court Action including, among other things, a release of $475,000 of the disputed amount held in escrow to Zuckerman, with the remaining deposit, including interest accrual thereon, distributed to TOUSA Homes; withdrawal of the Appeal with prejudice; and deemed disallowance of Claim #1931. The Bankruptcy Court approved the settlement on March 26, 2009. On April 6, 2009, the parties filed a joint motion to dismiss the Appeal with prejudice, which the District Court granted on April 9, 2009.

### 7.        Indemnification Obligations With Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases

#### a.        The Debtors' Obligations to Indemnify Directors and Officers

TOUSA's Certificate of Incorporation requires it to indemnify its directors and officers against all costs related to certain suits to the fullest extent permitted under Delaware law. Specifically, TOUSA must indemnify:

> Each person who was or is made a party . . . in any action, suit or proceeding . . . by reason of the fact that he or she . . . is or was or has agreed to become a director or officer of the Corporation . . . whether the basis of such proceeding is alleged action in an official capacity as a director or officer, or in any other

capacity while serving or having agreed to serve as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law, . . . against all expense, liability and loss . . . reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to serve [as a director or officer].

*See* Certificate of Incorporation of TOUSA, Art. X, Sec. II(a).  This indemnification provision applies to pending litigation against the directors and officers, including the *Durgin* and *EMF* lawsuits described in the previous section.  Moreover, the language in the Certificate of Incorporation grants directors and officers who are defendants in that capacity to seek advancement of their defense costs before the final disposition of certain litigation.  Additionally, the former members of TOUSA's board of directors have a right of indemnification pursuant to a director indemnification agreement that was executed by TOUSA and which provides, in relevant part, that TOUSA "shall indemnify and advance Expenses to the Indemnitee . . . to the fullest extent permitted by applicable law in effect."  Pursuant to this provision, directors can demand advancement of expenses within ten days of the date such expense is incurred.

> **b.      The Debtors' Insurance Policies
> and Related Releases of Claims Against Directors and Officers**

The Plan contains provisions relating to the "D&O Liability Insurance Policies," which the Plan defines as all insurance policies for directors and officers' liability maintained by the Debtors.  Generally, the Debtors have seven layers of insurance coverage available to cover losses, costs and expenses of the type incurred in connection with various litigation, including the *Durgin* lawsuit.  The seven layers of insurance consist of a primary policy and six "excess" policies.  Additionally, each of the policies are "claims made," meaning that they cover only those claims made within the coverage period (and any claim that would relate back to such period), including 6 year tail coverage.  Generally, the coverage periods are for one year, and the Debtors update the stack of insurance on an annual basis.  The aggregate amount of the seven layers of insurance is $100 million.

As discussed in section VI.H, below, the Plan provides that none of the Debtors, their estates, the Post-Effective Date Debtors or the Litigation Trust will pursue any claim or action against any of the current or former representatives, directors and officers of the Debtors to the extent such claim(s) exceed the available insurance proceeds (taking into account payment of defense costs and other obligations) under the Debtors' D&O Liability Insurance Policies.

> **8.      Review and Analysis of Intercompany Claims**

In the context of preparing to respond to discovery requests in the Committee Action, the Debtors and their restructuring advisor, Zolfo Cooper f/k/a Kroll Zolfo Cooper ("Zolfo Cooper"), have engaged in an analysis of intercompany claims and cash flow transactions among TOUSA and the various Subsidiary Debtors.  On August 5, 2008, the Debtors and Zolfo Cooper made a presentation to representatives of the Committee, the First Lien Term Lenders, the First Lien Revolver Lenders and the Second Lien Lenders at which the Debtors and Zolfo Cooper disclosed certain preliminary findings.  At the presentation, the Debtors and Zolfo Cooper made clear that the presentation was not intended to be definitive and that further analysis might be necessary.  The presentation was made to key constituents who were at that time party to the Committee Action with the intention of creating a level factual playing field for those parties.

In the August 5, 2008 presentation, the Debtors explained to the creditor groups that their intercompany accounts could be categorized generally as follows:  payroll and payroll taxes, employee benefits, capitalized debt interest, insurance, royalty payments, vendor rebates, capital charges, cash

sweeps (net of disbursements), land purchases/sales, intercompany loans and miscellaneous/other. The Debtors did keep journal-entry records of intercompany transactions in the ordinary course of their business. In their preliminary review of the Debtors' books and records, Zolfo Cooper determined that there were over 400,000 journal-entry line items from the inception of TOUSA, Inc. through the Commencement Date. As set forth in the August 5, 2008 presentation, the documents that support the journal entries, although available, are widely dispersed among various locations both within Corporate and at the various divisions. Upon further review, Zolfo Cooper learned, and disclosed to creditors, that certain supporting documents appear to be held in off-site storage locations.

As part of their review, as explained in the August 5, 2008 presentation, Zolfo Cooper conducted a sample compilation of the Debtors' intercompany accounts for the month of August 2007, as a means toward understanding TOUSA's accounting processes and the recording of journal entries as related to intercompany transactions. As part of that endeavor, Zolfo Cooper compiled books detailing all journal entries and supporting documents by legal entity for the month of August 2007 and made those books available for review by the creditor representatives who attended the August 5, 2008 meeting. Zolfo Cooper did find that the Debtors' books and records, together with available supporting documentation, contained adequate information to allow them to create entity-by-entity intercompany transaction accounts for the month of August 2007. Kroll explained at the August 5, 2008 meeting, however, that this reconciliation for one sample month took a team of reviewers four weeks to complete.

The Debtors and Zolfo Cooper further explained at the August 5, 2008 meeting that the Company's accounting system is set up by divisions and regional operating centers as opposed to legal entity. Further clarification was provided at the meeting and at a subsequent session on August 21, 2008 that the accounting system can be "mapped" to show the correspondence between the divisions / operating centers and the legal entities within the TOUSA group. In the accounting system, as explained at the August 5, 2008 meeting, intercompany transactions are created based on services performed, agreements among the Subsidiary Debtors and certain allocations from the "corporate" division (which maps to TOUSA as a legal entity). In the ordinary course of the Debtors' business, journal entries are generally prepared by an employee in the accounting group. The journal entries are reviewed by an approved reviewer and posted at least quarterly. Some entries are recorded on a monthly basis. As set forth in the August 5, 2008 presentation, based upon Zolfo Cooper's review of the Debtors' books and records, it appeared that 26 of the 39 Debtors had an intercompany balance (either positive or negative) as of the Commencement Date. *See* Exhibits C-1 and C-2.

In addition to intercompany accounts based on journal entries, the August 5, 2008 presentation explained that the Debtors engaged in certain intercompany loan transactions. Specifically, Debtor TOUSA Funding, LLC holds certain notes from Engle Homes Residential Construction, LLC, Newmark Homes, L.P., TOUSA Homes, Inc. and TOUSA, Inc. Engle Homes Delaware, Inc. holds individual notes from TOUSA Homes, Inc. and TOUSA, Inc. TOUSA Delaware, Inc. holds an individual note from TOUSA, Inc. The notes are interest-bearing. In the ordinary course, TOUSA's accounting group calculates the interest accrued based on the note balance, prepares the appropriate journal entries to reflect interest and posts them to the general ledger. *See* Exhibit C-2.

After the August 5, 2008 meeting, the Debtors and Zolfo Cooper conducted follow-up question-and-answer sessions on August 21, 2008, September 4, 2008 and December 9, 2008. The Debtors and Zolfo Cooper also conducted telephonic follow-up question-and-answer sessions on October 1, 2008, November 12, 2008 and December 3, 2008. Creditor representatives were invited to attend those sessions and ask questions regarding intercompany accounts and accounting.

Based upon the results of their preliminary review of intercompany claims, the Debtors and Zolfo Cooper have determined that a full reconciliation of the Debtors' intercompany accounts would be

extremely time-consuming and expensive, such that it cannot be completed within the time frame necessary to allow for an expeditious exit from chapter 11. At this time, the Debtors are not aware of any missing documents or records that would render such a reconciliation impossible; however, the Debtors note that they have not reviewed or inventoried all supporting documentation for the intercompany journal entries, and it is possible that the supporting documentation is incomplete. Because of the current uncertainty with regard to the amount and nature of intercompany claims, the Plan provides a treatment for intercompany claims in the event that any such claims become Allowed, but treats all intercompany claims as disputed claims unless and until they are Allowed. Thus, absent a future finding of the Bankruptcy Court with respect to allowance of intercompany claims, intercompany claims would not receive a distribution under the Plan.

### 9.  Financing the Debtors' Chapter 11 Cases

#### a.  Debtor-in-Possession Financing

As discussed in section V.D.4 above, the Debtors' "first day" relief included an order authorizing the Debtors to (a) obtain secured postpetition financing on a super-priority and priming lien basis from Citicorp North America, Inc., as administrative agent, and Citigroup Global Markets Inc., as sole lead arranger and bookrunner, and (b) use cash collateral of the Prepetition Secured Lenders [D.E. #113] (the "DIP Order"). The DIP Order granted approval for the financing arrangement solely on an interim basis. The Prepetition Secured Lenders originally had agreed to provide financing and permit use of cash collateral only if the arrangement was approved by May 30, 2008. Through a series of agreements, however, the Prepetition Secured Lenders ultimately agreed to extend the financing arrangement on an interim basis through and including June 19, 2008.

The DIP Order played a vital role in the Debtors' smooth transition to chapter 11 operations. Although the Debtors did not borrow under the credit facility made available by the DIP Order, the availability of that facility allowed the Debtors to maintain the confidence of key constituents, thereby minimizing the adverse impact of their chapter 11 filing. In addition to successfully continuing to sell and deliver homes while in chapter 11, the Debtors received a federal tax refund from the Internal Revenue Service of approximately $207 million on April 23, 2008, as a result of carryback of losses incurred during the 2007 tax year (the "2007 Federal Tax Return").

By late April 2008, as a result of the "soft landing" into chapter 11 and receipt of the 2007 Federal Tax Return, the Debtors had increased their total cash holdings to approximately $316 million. Based on their strong cash position, the Debtors determined that they no longer needed debtor in possession financing because their cash holdings would be sufficient to meet projected funding needs. Instead, the Debtors decided to seek final authority to use the cash collateral of their Prepetition Secured Lenders.

#### b.  Cash Collateral

##### i.  The First Cash Collateral Order

On April 25, 2008, the Debtors filed a motion seeking authority to use the Prepetition Secured Lenders' cash collateral pursuant to section 363 of the Bankruptcy Code. The Debtors supplemented that motion on May 19, 2008 (together, the "First Cash Collateral Motion") with a request for approval of an arrangement whereby they would provide the Prepetition Secured Lenders with adequate protection in connection with the consensual use of cash collateral for a six month period pursuant to a proposed agreed order (the "First Cash Collateral Order"), thereby avoiding an expensive, risky and distracting litigation.

In the First Cash Collateral Motion, the Debtors presented a proposed order that contemplated the consensual use of cash collateral for a six month period.  The Debtors negotiated the terms of the Cash Collateral Order with the Prepetition Secured Lenders and presented an agreed order to the Bankruptcy Court for approval.  Although the Debtors' operation results were better than certain of their projections since entering chapter 11, the management team and the Board were concerned that a prolonged and contested dispute over the terms by which the Debtors would have access to cash collateral would threaten the Debtors' business operations in the already distressed homebuilding industry.  During the negotiations with the Secured Lenders, the Debtors continued to explore and prepare for all possibilities in the event an agreement was not reached on terms acceptable to the Debtors.

Ultimately, the Debtors and First Lien Lenders reached an agreement on the terms of the Debtors' use of the Prepetition Secured Lenders' cash collateral, which included an adequate protection component that provided for, among other things, (a) a cash payment to the lenders under the First Lien Revolver and the First Lien Term Loan in the amount of $175 million, subject to certain disgorgement provisions; and (b) the grant of liens and allowed administrative priority claims on substantially all of the Debtors' assets to the extent of any diminution in the value of the Prepetition Secured Lenders' collateral.  The First Cash Collateral Order also included carve-outs from the claims and liens granted to the Prepetition Secured Lenders for the fees incurred by professionals for the Debtors and the Committee, and it provided a limited timeframe in which parties in interest could bring claims against the Prepetition Secured Lenders arising from or relating to the Prepetition Secured Credit Facilities.

The Committee objected to the First Cash Collateral Motion on the basis of, among other things, the payment of $175 million under the First Lien Revolver and the First Lien Term Loan.  The Second Lien Lenders also filed a limited objection to the Cash Collateral Motion contesting the Committee's authority to use cash collateral to pay the fees and expenses associated with prosecution of the Committee Action.  The Bankruptcy Court held hearings on the motion on May 22, 2008 and June 10, 2008, at which counsel for the Debtors, the Committee, the Prepetition Secured Lenders and certain holders of the Debtors' unsecured notes presented arguments in favor of, and objections to, the Debtors' proposed First Cash Collateral Order.  Following the June 10 hearing, at which the Bankruptcy Court issued rulings on several issues, the parties entered into additional discussions and negotiations with respect to the terms of the First Cash Collateral Order, which ultimately led to consensus among the First Lien Lenders, the Debtors and the Committee.  Following a telephonic hearing held on June 19, 2008, during which the parties presented the proposed terms of the final Cash Collateral Order, the Bankruptcy Court granted the First Cash Collateral Motion including (a) the payment of $175 million to the First Lien Revolver and the First Lien Term Loan and (b) the ability of the Committee to use cash collateral to fund  prosecution of the Committee Action.  On June 20, 2008, the Bankruptcy Court entered the stipulated and final First Cash Collateral Order [D.E. #1226].  Subject to certain financial covenants and the other terms and conditions included therein, the Cash Collateral Order provided the Debtors with access to the Prepetition Secured Lenders' cash collateral through December 4, 2008.

### ii.        Appeals of the First Cash Collateral Order

On June 30, 2008, certain of the Debtors' unsecured noteholders – Aurelius Capital Master Ltd., Aurelius Capital Partners, LP, GSO Special Situations Fund L.P., GSO Special Situations Overseas Master Fund Ltd., GSO Credit Opportunities Fund (Helios), L.P., and Carlyle Strategic Partners and  the Second Lien Agent, each separately appealed the First Cash Collateral Order to the United States District Court for the Southern District of Florida (the "District Court").  The appeals were consolidated pursuant to an order of the District Court [Case. No. 08-61317-CIV-Gold/McAliley].  The appellants challenged the Bankruptcy Court's entry of the First Cash Collateral Order and factual findings in connection therewith.  Specifically, the Appellants challenged, among other things, the Bankruptcy COurt's ruling permitting the $175 million payment to the First Lien Lenders and the unrestricted use of cash collateral

by the Committee to pursue the Committee Action. After hearing oral argument on the appeal on December 19, 2008, on February 5, 2009, the District Court entered an order and opinion affirming the First Cash Collateral Order and dismissing the appeals.

### iii.    The Second Cash Collateral Order

On October 28, 2008, the Debtors filed their second motion for authority to use cash collateral pursuant to section 363 of the Bankruptcy Code (the "Second Cash Collateral Motion"). On December 4, 2008, the Bankruptcy Court held a hearing on the Second Cash Collateral Motion on an interim basis and, on the same day, entered an interim order authorizing the Debtors to use cash collateral on consensual basis through January 9, 2009 on substantially the same terms provided in the First Cash Collateral Order, including providing the Prepetition Secured Lenders with similar forms of adequate protection with respect to the Debtors' use of cash collateral (except for the payment of $175 million to the First Lien Revolver Lenders and the First Lien Term Lenders) [D.E. #2236] (the "Interim Cash Collateral Order"). Additionally, the Interim Cash Collateral Order, as with the First Cash Collateral Order, permits the Committee to use cash collateral to pursue the Committee Action.

On January 6, 2009, after discussions among the Debtors and the First Lien Term Agent, the First Lien Term Agent filed a limited objection to the Second Cash Collateral Motion, stating that the First Lien Revolver Lenders and the First Lien Term Lenders were prepared to extend the Debtors' use of cash collateral pursuant to the terms of the Interim Cash Collateral Order through March 30, 2009, provided that such order expressly prohibit the use of cash collateral by the Committee to prosecute the Committee Action. The Debtors did not agree to this limitation. Indeed, at a hearing held on January 9, 2009, the Debtors sought to use cash collateral of the Prepetition Secured Lenders on a contested basis. Following argument and testimony presented at that hearing, the Bankruptcy Court entered the Second Cash Collateral Order, which, subject to certain financial covenants and other terms and conditions included therein, provided the Debtors with access to the Prepetition Secured Lenders' cash collateral through April 30, 2009 [D.E. #2356], and permitted the Committee to use cash collateral to fund the Committee Action.

### iv.    The Third Cash Collateral Order

On April 8, 2009, the Debtors filed their third motion to use cash collateral pursuant to section 363 of the Bankruptcy Code (the "Third Cash Collateral Motion"). [TO BE UPDATED AFTER APRIL 23 HEARING]

### 10.    Changes in Certain Joint Ventures and Limited Liability Companies

As discussed in section IV.B.3.b above, a key part of the Debtors' homebuilding operations before the Commencement Date was the entry into joint ventures to acquire and develop land and, in certain cases, build and sell homes (the "Joint Ventures"). During the course of these chapter 11 cases, and as explained herein, the Debtors have experienced several changes in the status of their Joint Ventures.

### a.    The Sunbelt JV

In December 2004, TOUSA Homes entered into a Joint Venture with Suntous Investors, LLC ("Suntous") to form Engle/Sunbelt Holdings, LLC (the "Sunbelt JV"), the purpose of which was to develop and deliver homes in the Phoenix, Arizona market. TOUSA Homes held a 49% voting interest and an 85% equity interest in the Sunbelt JV and was responsible for day-to-day management of the joint venture. In addition to capital contributions from Suntous and TOUSA Homes, the Sunbelt JV also

61

obtained stand-alone financing (the "Sunbelt Facility") from J.P. Morgan Securities, Inc. and CapitalSource Finance, LLC (together, the "Sunbelt Lenders").  As of May 7, 2008, the Sunbelt JV had outstanding obligations totaling approximately $90.5 million.

Although TOUSA was not directly obligated to the Sunbelt Lenders under the Sunbelt Facility, TOUSA did agree with the Sunbelt Lenders that it would complete any property development commitments of the Sunbelt JV.  TOUSA and Suntous also agreed to indemnify the Sunbelt Lenders for potential losses from fraud, misappropriation and similar acts by the Sunbelt JV.  As part of these obligations, the Sunbelt Facility included certain provisions and events of default specifically tied to the financial health of TOUSA.  On September 30, 2007, certain TOUSA-related events resulted in the Sunbelt Lenders declaring a default under the Sunbelt Facility.  Although the Sunbelt Lenders eventually waived the default in January 2008, the lack of liquidity caused considerable stress on the Sunbelt JV and damage to its business operations.

Following several unsuccessful attempts to consummate certain strategic transactions with respect to the Sunbelt JV, the Debtors filed a motion on May 7, 2008, for authority to enter into a settlement agreement with several parties in interest.  The settlement agreement provided, in relevant part, that a foreclosure would be commenced, that a receiver would be appointed to dispose of the Sunbelt JV's assets and that neither the Sunbelt JV nor the joint venture partners would contest the foreclosure or receivership.  In exchange for these and certain related actions, the Sunbelt Lenders agreed to release TOUSA from its guarantee obligations and the Debtors agreed to fully release the Sunbelt Lenders and the agent thereto in connection with the Sunbelt Facility upon the earlier of the liquidation of the joint venture's assets or six months after entry of an order by the Bankruptcy Court granting the relief requested in the motion.  On May 23, 2008, the Bankruptcy Court granted the Debtors' motion with respect to the Sunbelt JV [D.E. #1062].  Pursuant to that order and the related agreement, the Debtors no longer have an economic interest in the Sunbelt JV.

### b.    The Beacon Hill JV

On September 29, 2004, TOUSA Homes and ORA Residential Investments I, L.P. ("ORA") formed the joint venture Beacon Hill at Mountain's Edge, LLC ("Beacon Hill").  The parties formed Beacon Hill to develop homesites and deliver homes in the Las Vegas, Nevada market.  In 2006, a dispute arose between TOUSA Homes and ORA concerning the funding of certain cost overruns by Beacon Hill and whether the Debtors' chapter 11 cases triggered a default under the joint venture agreement.  By June 2008, ORA indicated that it wished to dissolve Beacon Hill.

The Debtors, however, believed that Beacon Hill remained a valuable development and did not wish to liquidate the venture.  Accordingly, after arms' length negotiations with ORA, the Debtors filed a motion on June 25, 2008 for authority to enter into a settlement agreement providing that (a) TOUSA Homes would acquire all of ORA's stake in the Beacon Hill JV and cash held in escrow totaling $2.2 million and (b) the parties would enter into mutual releases with respect to any and all claims arising from the joint venture agreement.  On July 15, 2008, the Bankruptcy Court granted the relief requested by the Debtors [D.E. #1388].

Following the closing of the acquisition, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to an order dated August 4, 2008, Beacon Hill's chapter 11 case is being jointly administered with the Debtors' chapter 11 cases [D.E. 1512].  Moreover, the Bankruptcy Court entered an order authorizing that all generally applicable orders in the chapter 11 cases (other than the Bar Date Order) to apply to Beacon Hill following its chapter 11 filing [D.E. #1513].

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the last day on which each person or entity asserting a claim against Beacon Hill is required to file a written proof of claim against Beacon Hill's chapter 11 estate [D.E. #1802]. The Prepetition Secured Lenders filed proofs of claim asserting secured claims against Beacon Hill similar to those filed against the Subsidiary Debtors. The Debtors anticipate that these claims will be subject to an objection either by the Debtors or other parties in interest based on, among other things, the alternative arguments that Beacon Hill is not obligated to the Prepetition Secured Lenders and that any existing obligation would be avoidable by the application of section 552 of the Bankruptcy Code.

### c.    The Hearthstone JV

On May 5, 2006, TOUSA Homes entered into a Joint Venture with Lake County Investors, LLC ("LCI") for the purpose of developing and selling homes in Lake County, Florida (the "Hearthstone JV"). The agreement governing the Hearthstone JV provided, among other things, that either TOUSA Homes or LCI could exercise a right to buy 100% of the interests in the joint venture upon 120 days' notice to the other party, as long as the notifying party was not otherwise in default under the agreement. The agreement also provided that the non-notifying party was deemed to accept the notifying party's exercise of its buy/sell option if it did not agree, during the 120-day notice period, to buy out the notifying party's joint venture interest at an equivalent price.

On October 26, 2007, LCI informed TOUSA Homes of its intent to purchase TOUSA Homes' interest in the Hearthstone JV. TOUSA Homes did not respond within the 120-day limit provided in the joint venture agreement, and in fact did not have the ability (or desire) to buy LCI's interest in the joint venture. Accordingly, on June 16, 2008 LCI filed a motion seeking to modify the automatic stay provided by section 362 of the Bankruptcy Code to allow LCI to enforce its right to purchase TOUSA Homes' interest in the Hearthstone JV. The Debtors did not object to LCI's motion. On August 27, 2008, the Bankruptcy Court entered an agreed order granting LCI's requested relief [D.E. #1706]. Pursuant to that order, TOUSA Homes has since sold its interest in the Hearthstone JV to LCI.

### d.    The Waterview Partners JV

Effective as of December 29, 2005, TOUSA Homes entered into the Limited Liability Company Agreement of Waterview JV Partners, LLC (the "Waterview Agreement") with Lennar Colorado, LLC ("Lennar"). The purpose of the Waterview JV Partners, LLC("Waterview Partners JV") was to acquire and develop real property in Fountain Valley, Colorado. Pursuant to the terms of the Waterview Agreement, TOUSA Homes held a 50% interest in Waterview Partners LLC. The Waterview Agreement provided, among other things, that TOUSA Homes and Lennar would pay additional capital contributions to Waterview Partners JV, equal to the percentage interest in the company as necessary for Waterview Partners JV to acquire certain property. Following the Commencement Date, Lennar made certain additional contributions to Waterview Partners JV, but TOUSA Homes did not. On December 22, 2008, Lennar filed a motion with the Bankruptcy Court seeking to compel TOUSA Homes to accept or reject the Waterview Agreement. The Debtors did not object to Lennar's motion. On January 21 2009, the Bankruptcy Court entered an agreed order rejecting the Waterview Agreement [D.E. #2386].

### e.    The TOUSA/Kolter JV

On January 7, 2005, TOUSA Homes and Kolter Real Estate Group, LLC ("Kolter") formed TOUSA/Kolter Holdings, LLC, which was the owner of TOUSA/Kolter, LLC (the "TOUSA/Kolter JV"). Both TOUSA Homes and Kolter had a 50 percent interest in the JV. The parties formed the TOUSA/Kolter JV to develop approximately 500 acres of property located in Cooper City, Florida in the community known as Estrada at Monterra ("Monterra"). The TOUSA/Kolter JV obtained financing (the

"TOUSA/Kolter Facility") from KeyBank, N.A. and certain other lenders (together, the "TOUSA/Kolter Lender"), and had outstanding obligations totaling approximately $40 million.

Before and after the Commencement Date, the deterioration in the housing markets and a decrease in housing demand directly (and negatively) impacted the fair market value of the land owned by the TOUSA/Kolter JV.  Moreover, the absence of lot sales, which was the TOUSA/Kolter JV's sole source of revenue, resulted in a depletion of cash flow necessary to satisfy ongoing obligations, including interest payments due under the TOUSA/Kolter Facility in September 2007.  As a result of its asset value deterioration, TOUSA/Kolter JV could not satisfy the financial and inventory covenants included in the TOUSA/Kolter Facility and found itself in default of the TOUSA/Kolter Facility.  The TOUSA/Kolter JV also failed to satisfy obligations to pay special assessments to the Monterra Community Development District ("CDD") and defaulted under that master trust indenture (the "Indenture").  Consequently, the CDD filed a complaint for foreclosure pursuant to which the CDD sought to, among other things, foreclosure on its interest in Monterra (the "CDD Action").

Additionally, TOUSA Homes breached certain remarginging agreements in December 2007 and failed to satisfy under certain completion agreements when it failed to honor its guarantee and complete construction and development of Monterra.  TOUSA Homes had entered into the remarginging agreements and the completion agreements in connection with the TOUSA/Kolter Facility.

In an effort to avoid litigation with respect to the CDD Action and a potential foreclosure on the Monterra lots, CDD, the Debtors and CC Loan Acquisition ("CC Loan") – which had acquired all of the outstanding debt under the TOUSA/Kolter Facility from the TOUSA/Kolter Lender – entered into arm's length negotiations to effectuate a settlement with respect to the overall dispute and the JV generally.  On December 26, 2008, the Debtors filed a motion with the Bankruptcy Court for authority to enter into an agreement pursuant to which (a) the TOUSA/Kolter JV transferred Monterra to an affiliate of CC Loan in satisfaction of approximately $8.5 million of outstanding debt under the TOUSA/Kolter Facility, (b) CC Loan agreed to amend, reduce and limit its proofs of claim against TOUSA Homes and reduce TOUSA Home's exposure to certain bonds and letter of credit and (c) the maturity of the "B Bonds" issued under the CDD would be extended from November 1, 2010 until May 1, 2013.  Before the entry of the agreement, and in connection with the extension of the relevant maturity and payment dates under the Indenture, the CDD agreed to withdraw the CDD Action.  On January 9, 2008, the Bankruptcy Court granted the relief requested by the Debtors [D.E. #2354].  This agreement additionally afforded TOUSA Homes the opportunity to develop and deliver homes in the Monterra community.

### f.        The Layton Lakes  JV

TOUSA Homes and Lennar Communities Development, Inc. ("Lennar Communities") were previously the sole members of LH-EH Layton Lakes Estates, L.L.C. (the "Layton Lakes JV"), a joint venture that was intended to develop a master planned community in Gilbert, Arizona known as "Layton Lakes" (the "Layton Lakes Community").  On November 29, 2005, the Layton Lakes JV and the town of Gilbert, Arizona entered into an Off-Site Improvements Agreement (the "Off-Site Improvements Agreement"), pursuant to which the Layton Lakes JV agreed to construct certain improvements for the Layton Lakes Community.  The Layton Lakes JV had been funding development within the Layton Lakes Community with, among other things, the proceeds of an acquisition and development loan in the original principal amount of $90 million (the "Midwest Loan") from Bank Midwest N.A. ("Bank Midwest"), which is evidenced by a Promissory Note dated October 16, 2006.

The prolonged deterioration in the housing markets caused the Layton Lakes JV's asset values to deteriorate.  On November 26, 2007, Bank Midwest made a demand for repayment of $14.5 million in principal and accrued interest outstanding under the Loan.  The Layton Lakes JV was unable to make the

64

requested payment and defaulted under the Midwest Loan. As a result, Bank Midwest refused to advance additional funds to the Layton Lakes JV and following this refusal, the Layton Lakes JV was unable to fund further improvements under the Off-Site Improvements Agreement. Correspondingly, the town of Gilbert, Arizona ceased issuing certificates of occupancy ("COs") for single-family residences completed by Lennar Communities and TOUSA Homes within the Layton Lakes Communities, thereby preventing the sale of completed residences. Additionally, on October 24, 2008, the Town filed a lawsuit (the "Layton Lakes Lawsuit") against the Layton Lakes JV and others alleging, among other things, breach of contract and seeking to recover the costs to complete the Improvements. Lennar Communities subsequently filed a proof of claim against TOUSA Homes for failure to fulfill funding obligations to the Layton Lakes JV.

On November 17, 2008, TOUSA Homes submitted a motion to approve a settlement agreement (the "Layton Lakes Settlement Agreement") between, among other entities, Lennar Communities, TOUSA Homes, the Layton Lakes JV and the town of Gilbert, Arizona, which the Bankruptcy Court granted on November 25, 2008 [D.E. #2204]. The Layton Lakes Settlement Agreement provided that TOUSA Homes would deposit $1.3 million (the "TOUSA Homes Deposit") into a construction escrow (the "Construction Escrow"), which would secure completion of the improvements required under the Off-Site Improvements Agreement. Additionally, the town of Gilbert, Arizona agreed that once the TOUSA Homes Deposit was placed into the Construction Escrow, it would process and issue COs and also maintain an ongoing extension of the answer deadline in the Layton Lakes Lawsuit so long as Improvements were being completed.

Importantly, the Layton Lakes Settlement Agreement further provides that TOUSA Homes would withdraw as a member of the Layton Lakes JV and Lennar Communities would dissolve the Layton Lakes JV and assume obligations of the Layton Lakes JV. Lennar Communities and TOUSA Homes also agreed to mutually release one another from any and all claims arising under the agreements concerning the Layton Lakes JV.

The Layton Lakes Settlement Agreement also provides for TOUSA Homes and Lennar Communities to enter into an option agreement (the "Layton Lakes Option Agreement") with respect to 207 residential lots within the Layton Lakes Community. Specifically, on the effective date of the Layton Lakes Option Agreement, TOUSA Homes would be deemed to have exercised the option to purchase 7 lots within the Layton Lakes Community for approximately $425,000 and would have the option to purchase the remaining 200 lots prior to May 31, 2009. To maintain its option for the remaining 200 lots after May 31, 2009, TOUSA Homes is required to pay Lennar Communities an option consideration fee in the amount of $1 million. Beginning on June 30, 2009, TOUSA Homes will be required to purchase a minimum six lots per month to maintain its option going forward. To date, TOUSA Homes has acquired a total of 16 lots in the Layton Lakes Community pursuant to the Layton Lakes Option Agreement.

### g.    The Lennar/Central JV

On August 8, 2006, TOUSA Homes, Newmark Homes, L.P. (together with TOUSA Homes, the "TOUSA JV Members"), Lennar Texas Holding Company ("LTHC") and Lennar Homes of Texas Land and Construction, Ltd. (together with LTHC, the "Lennar JV Members") formed Newmark/Lennar Central Texas, L.P. (the "Newmark/Lennar JV"), a joint venture formed for the purpose of acquiring and developing certain real property in Texas. The TOUSA JV Members held a combined 50 percent interest in the Newmark/Lennar JV.

The Newmark/Lennar JV had access to a revolving loan (the "Revolver Loan") from Colonial Bank, N.A. ("Colonial Bank"), which was in default on and after the Commencement Date. As a result, Colonial Bank was unwilling to permit further draws on the Revolver Loan. Accordingly, the

Newmark/Lennar JV looked to its members for an infusion of capital. The Lennar JV Members made cash advances to the Newmark/Lennar JV that were to be treated as loans under the Newmark/Lennar Agreement, which would be required to be repaid before recovery was available to the TOUSA JV Members on account of their equity interests. The TOUSA JV Members subsequently determined, based on their current liquidity needs and the Debtors' determination not to continue to participate in the Newmark/Lennar JV. Accordingly, after discussions with the Lennar JV Members, on February 9, 2009, the Debtors filed a motion for approval of the TOUSA JV Members' sale of their respective partnership interests in the joint venture to the Lennar JV Members for total cash consideration of $250,000 and certain releases related to the Newmark/Lennar JV and the Revolver Loan. The Bankruptcy Court issued an order approving the motion on February 19, 2009 [D.E. #2472].

### 11. Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property

#### a. Option Contracts

As discussed in section IV.B.3, above, another key component of the Debtors' prepetition homebuilding operations includes the entry into option contracts to purchase lots in various housing developments (the "Option Contracts"). The Option Contracts generally give the Debtors the right to purchase homesites at predetermined prices and on predetermined "take down" schedules after another entity has finished "horizontal" construction on the lot (e.g., clearing land, moving earth, installing water and sewer lines).

Before the Commencement Date, the Debtors had abandoned their option rights under certain of the Option Contracts that the Debtors believed, in their business judgment, no longer provided a benefit to their homebuilding and home sales operations. In many cases, the Debtors decided to abandon their option rights because, among other things, the option price to acquire the relevant land exceeded the then-current fair market value of that land. On February 13, 2008, the Debtors filed a motion to reject the Option Contracts the Debtors had terminated before the Commencement Date, to the extent those contracts were executory, *nunc pro tunc* to the Commencement Date. On March 17, 2008, the Bankruptcy Court entered an order granting the Debtors' request [D.E. #618]. The Debtors rejected additional Option Contracts pursuant to an order dated June 11, 2008 [D.E. #1183].

#### b. Executory Contracts, Equipment and Advertising Leases

As of the Commencement Date, the Debtors were party to numerous leases of nonresidential-real property and executory contracts as part of the ordinary course of their business operations. These agreements included, among others, leases of various types and forms of advertising space, leases of various office equipment such as computers, monitors and copiers and agreements for ongoing telecommunications services, licenses and construction services. By orders dated May 12, 2008 [D.E. #952], June 11, 2008 [D.E. #1183], August 12, 2008 [D.E. #1597], August 18, 2008 [D.E. #1644], September 22, 2008 [D.E. #1811], October 24, 2008 [D.E. #2010], December 9, 2008 [D.E. #2243], February 12, 2009 [D.E. #2458], March 10, 2009 [D.E. 2572] and March 25, 2009 [D.E. #2627], the Bankruptcy Court authorized the Debtors to reject identified leases and executory contracts that the Debtors had determined, in their business judgment, no longer provided a benefit to the Debtors' ongoing business operations.

#### c. Nonresidential Real Property Leases

As of the Commencement Date, the Debtors were also party to numerous nonresidential real property leases as part of the ordinary course of their business operations. These agreements included

leases of "model" homes that the Debtors show to potential customers and leases of office space.  The Bankruptcy Court authorized the Debtors to reject several of these nonresidential real property leases in the course of the chapter 11 cases.

Under section 365(d)(4) of the Bankruptcy Code, a debtor is deemed to reject nonresidential real property leases to which it is a party by the earlier of 120 days from the Commencement Date or the date on which a bankruptcy court confirms a plan of reorganization.  Accordingly, the Debtors' initial period to assume or reject such leases expired on May 28, 2008.  On May 12, 2008, the Bankrupt Court entered an order granting the Debtors' request to extend the time within which to assume unexpired leases of nonresidential real property to August 26, 2008 [D.E. #951].

On August 8, 2008, the Debtors filed a motion for authority to assume identified nonresidential real property leases and pay related cure amounts [D.E. #1547].  The Bankruptcy Court granted that motion on August 25, 2008, and the ruling was memorialized in an order docketed on August 27, 2008 [D.E. #1703].  On August 28, 2008, the Debtors filed a notice of the August 28th deadline and the requirement for parties with a claim with respect to any such rejection to file a proof of claim on or before September 25, 2008 [D.E. #1698].  The Debtors also had individual agreements with certain individual landlords that have been resolved as of the date hereof.

### 12.    The Home Warranty Program

#### a.    The Debtors' Initial Home Warranty Program

As discussed in section V.D.3.d, above, on the Commencement Date, the Debtors filed a motion to continue fulfilling obligations under their prepetition customer programs [D.E. #10], including standardized limited warranties typically provided to all of their homebuyers  (the "Home Warranty Program").  The Home Warranty Program generally required that the Debtors repair or replace any part of a new home that is materially defective due to the Debtors' workmanship or materials.  These obligations under the Home Warranty Program were administered by Professional Warranty Service Corporation ("PWC").

To ensure that purchasers of the Debtors' homes would continue to have confidence in the Debtors' home warranties, the Debtors, PWC and Zurich North America ("Zurich") provided a program in which the Debtors contracted with PWC to provide a ten year transferable supplemental warranty to TOUSA homebuyers with contracts of sale in force at that time as well as those customers who signed a contract of sale between the Commencement Date and April 30, 2008 (the "Original Program").  The Original Program provided that in the event the Debtors failed to fulfill their obligations to eligible homebuyers, one of the member companies of Zurich would perform according to the terms and conditions contained within the supplemental warranty.  Prior to the expiration of the Original Program on April 30, 2008, the Debtors extended the Original Program through June 30, 2009.

#### b.    The Debtors New Home Warranty Program

In connection with the Debtors' business decision to curtail build-to-order new sales and construction starts while focusing on closing sales of homes currently under construction, selling their remaining inventory of spec homes and monetizing their land assets over time, the Debtors have implemented a new home warranty program with PWC, which the Bankruptcy Court approved on April 7, 2009 [D.E. #2652] (the "New Warranty Program").  The New Warranty Program will apply to (a) homes as to which a sale has closed since June 30, 2008 and which are not covered by the Original Program and (b) approximately 1,100 homes that the Debtors anticipate selling and delivering during the twelve month period following April 1, 2009 (the "Warranty Effective Date").  The New Warranty

Program provides that all warranty claims after April 15, 2009 will be covered by PWC, while the Debtors will cover all open warranty claims up to April 15, 2009. The New Warranty Program further provides that in the event the Debtors have not sold and delivered all eligible homes within the twelve month period following the Warranty Effective Date, PWC and the Debtors will negotiate a reasonable extension of the New Warranty Program to include any remaining unsold eligible homes.

13.     **Deregistration Under the Securities and Exchange Act of 1934**

As noted in section V.B.1, above, the Debtors' equity securities were delisted by the NYSE before the Commencement Date. Since that time, the Debtors' equity securities were traded on the Pink Sheet Electronic Quotation Service. Nonetheless, the Debtors remained as a "reporting company" under the Securities and Exchange Act of 1934 (the "1934 Act"). At a meeting of TOUSA, Inc.'s Board of Directors held on March 31, 2009, the Board determined that, in light of the revised business plan and to avoid the cost and expense associated with being a reporting company, it was appropriate for the Debtors to file such forms and take such actions as are necessary and appropriate to deregister the Debtors' securities under the 1934 Act. The Debtors filed the appropriate forms on March 20, 2009. Although such filings terminated the obligation of the Debtors to file periodic reports under the 1934 Act, the Debtors intend to file the Quarterly Report of Form 10-Q for the three and nine month periods ended September 30, 2009.

14.     **Exclusivity**

The Bankruptcy Code grants a debtor in possession the exclusive right to file and solicit acceptances of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief under chapter 11 of the Bankruptcy Code. If a debtor files a plan within this exclusive period, the debtor has the exclusive right for 180 days from the Commencement Date to solicit acceptances of the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization. A court may, however, extend these exclusive periods upon the request of a party in interest and "for cause," for a period up to 18 months from the Commencement Date.

On May 22, 2008, the Bankruptcy Court entered an order extending the Debtors' exclusive periods to file and solicit acceptances of a plan or plans of reorganization through and including October 25, 2008 and December 24, 2008, respectively [D.E. #1051]. The Debtors subsequently filed a motion seeking a further 120-day extension of the exclusive periods to February 22, 2009 and April 23, 2009, and the Bankruptcy Court approved the relief requested in that motion in a hearing on October 23, 2008 [D.E. #2011].

On April 8, 2009, the Debtors filed a motion seeking a further 90-day extension of the exclusive periods to July 29, 2009 and September 27, 2009, which the Bankruptcy Court granted on [April 23, 2009] [D.E. #____].

# VI.  DESCRIPTION OF THE CHAPTER 11 PLAN

## A.    OVERVIEW

The Plan consists of separate chapter 11 plans for each of the 39 Debtors.  The Plan contemplates the orderly monetization of the Debtors' assets over a period of between 24 and 36 months.  The Debtors have developed a comprehensive business plan that is designed to minimize costs and maximize the sale value of assets for the benefit of creditors.  Specifically, the Debtors' revised business plan contemplates that the Debtors will suspend efforts to generate new build-to-order sales and will primarily focus on completing and closing homes currently under construction.  Additionally, the Debtors will sell the remaining inventory of "spec" homes, monetize land assets over time and negotiate the sale of the financial services businesses operated by non-Debtor indirect subsidiaries of TOUSA, Inc.

Under the proposed Plan, the proceeds from the sale of any of the Debtors' assets will be placed into escrow (the "Proceeds Account") for distribution in accordance with the terms and provisions of the Plan upon the resolution of the Committee Action.  A Plan Administrator will be appointed to administer the Plan and to facilitate the sale of the Debtors' assets.  The Plan Administrator will be subject, in certain instances, to the oversight of the Bankruptcy Court and a three person oversight committee appointed by the Committee, the Second Lien Agent and the First Lien Agent (the "Oversight Committee").

The Plan also contemplates the creation and funding of a litigation trust (the "Litigation Trust") for the purpose of pursuing certain identified claims, rights and causes of action, including the adversary proceeding, Adv. Case No. 08-01435, commenced in the Bankruptcy Court by the Committee against the First Lien Revolver Lenders, the First Lien Term Lenders, the Second Lien Lenders and certain other parties (the "Committee Action").  The formation of the Litigation Trust is designed to preserve the relative rights, claims and defenses of all parties to the Committee Action, including the defendants named therein.  Additional information concerning the Litigation Trust and the Committee Action is provided in sections D and V.F.6.a of this Disclosure Statement.

## B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and this Disclosure Statement.  In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees (or in the event of a dispute, that the Bankruptcy Court has determined) that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor and that any asserted priority or security status is correct.

Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  Section 502(b) of the Bankruptcy Code, however, specifies certain claims that may not be "allowed" in bankruptcy — even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

69

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as (a) the right to vote on the plan and (b) the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (a) does not alter the legal, equitable and contractual rights of the holders or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive, on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or, if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than with respect to the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's bankruptcy case not been commenced.

Section 1126(c) of the Bankruptcy Code provides that a proposed plan is binding if it is approved by a majority in number and two thirds in amount of each voting class.  Approval by the requisite majorities of a particular class constitutes "acceptance" of the plan by that class.  A class that is not impaired by a plan is conclusively deemed to accept that plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization.  For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests.  If a class or classes is deemed to reject or votes to reject a proposed plan, the debtor may confirm its plan only if it satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to any rejecting class.  Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such classes (see section VIII.D, below).

With these requirements in mind, the Plan provides the following separate classifications of claims.

1.      **Treatment of Unclassified Administrative and Priority Claims**

    a.      **Administrative Claims**

    "Administrative Claims" are claims constituting the costs and expenses of administering the Debtors' chapter 11 cases, as provided by sections 503(b), 507(b) and 1114(e)(2) of the Bankruptcy Code. Administrative Claims generally include the actual and necessary costs and expenses incurred after the applicable Commencement Date of preserving the Debtors' estates and operating the business of the Debtors. Administrative Claims also consist of the fees and expenses of various legal, financial and other professionals incurred during the chapter 11 cases, all of the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and allowed reimbursable expenses of the members of the Committee.

    The Plan provides that, except to the extent any entity with an allowed Administrative Claim agrees otherwise, each holder of an allowed Administrative Claim will be paid the full unpaid amount of such claim in cash as of the Distribution Date or, if such claim is allowed after the Distribution Date, on or as soon as reasonably practicable after the date such claim is allowed. The Plan also permits holders of allowed Administrative Claims to request separate treatment as agreed to by the Debtors, the Post-Effective Date Debtors, the Plan Administrator or otherwise determined by order of the Bankruptcy Court.

    The Debtors estimate, as of April 8, 2009, that the aggregate amount of allowed Administrative Claims, for all Debtors, will be approximately $[4.9] million.[4] The projected recovery under each of the Plans for Administrative Claims is 100%.

            i.      **Administrative Claims Bar Date**

    The Plan provides that, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Plan Administrator pursuant to the procedures specified in the Confirmation Order no later than 60 days after the Effective Date (the "Administrative Claims Bar Date"). Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claim by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claim against the Debtors or their property. Objections to a request for payment on account of an Administrative Claim, if any, must be filed and served on the Plan Administrator and the requesting party no later than 180 days after the Effective Date.

            ii.      **Professional Compensation**

    The Plan requires that any claim by "Retained Professionals" or any party that assets a claim based on "Accrued Professional Compensation," must file and serve an application for final allowance of such claim no later than 45 days after the Effective Date upon the Plan Administrator and such other parties designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court.

---

[4]    This number is a preliminary estimate. This number does not include professionals' fees incurred during the course of the Debtors' chapter 11 cases, which are the subject of a fully-funded escrow established in connection with the [Cash Collateral Order] **[TO BE UPDATED PER HEARING ON 4/23]** or operating expenses payable post-confirmation in the ordinary course of business.

The Plan defines a "Retained Professional" as (a) an entity that is employed in the Debtors' chapter 11 cases pursuant to a final order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

The Plan defines "Accrued Professional Compensation" as all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code and that were rendered before the Effective Date by any Retained Professional in the Debtors' chapter 11 cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, and that the Bankruptcy Court has not denied by a final order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by a final order any amount of a professional's fees or expenses, then those reduced or denied amounts will not constitute Accrued Professional Compensation.

Notwithstanding the requirement that Retained Professionals and entities seeking payment of Accrued Professional Compensation file a final application as described above, the Plan provides that the Plan Administrator shall pay Retained Professionals or other parties in the ordinary course of business for any work performed after the Effective Date. Additionally, the Post-Effective Date Debtors shall continue to compensate and reimburse any professional entitled to such payment pursuant to the terms of the Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business, entered by the Bankruptcy Court on February 4, 2008 [D.E. #148] (the "Ordinary Course Professionals Order") after the Effective Date, and without further order of the Bankruptcy Court, pursuant to the terms of the Ordinary Course Professionals Order, unless otherwise ordered by the Bankruptcy Court.

Objections to any claim for Accrued Professional Compensation must be filed and served on the Plan Administrator and the requesting party no later than 75 days after the Effective Date. Moreover, to facilitate this deadline, the Plan provides that the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of claims for Accrued Professional Compensation. Each holder of a claim for allowed Accrued Professional Compensation will be paid by the Plan Administrator in cash from a segregated account established on the Effective Date solely for the purpose of paying claims based on Accrued Professional Compensation (the "Retained Professionals Fee Account") or directly from the Plan Administrator or the Purchase Price Escrow.

### b.    Priority Tax Claims

"Priority Tax Claims" are any claim of a governmental unit as contemplated in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, each holder of an Allowed Priority Tax Claim will, at the option of the Plan Administrator, receive one of the following treatments on account of such claim: (a) cash in an amount equal to the amount of such allowed Priority Tax Claim; (b) cash in an aggregate amount such allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the applicable Commencement Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed to by such holder and the Debtors or the Plan Administrator or otherwise determined upon an order of the Bankruptcy Court.

The Debtors estimate that the aggregate amount of allowed Priority Tax Claims, for all Debtors, will be approximately $4.9 million. The projected recovery under each Debtor's Plan for Priority Tax Claims is 100%.

### c.    U.S. Trustee Fees

The Plan provides that, on the Distribution Date, the Plan Administrator will pay in full, in cash any fees due to the U.S. Trustee on the Confirmation Date pursuant to 28 U.S.C. § 1930(a)(6) (the "U.S. Trustee Fees").

On and after the Confirmation Date, the Plan Administrator will pay the applicable U.S. Trustee Fees until the entry of a final decree in each Debtor's chapter 11 cases or until such chapter 11 case is converted or dismissed.

In the event there are sufficient funds are not available at any Debtor's estate at the conclusion of its chapter 11 case to pay U.S. Trustee Fees that are then due and owing, any such fees will be funded from the cash held in the Purchase Price Escrow.

The Debtors estimate that the aggregate amount of the U.S. Trustee Fees, for all Debtors, will be approximately $300,000 as of the Confirmation Date. U.S. Trustee Fees will be paid in full under the Plan.

### d.    Cure Claims

The Plan defines "Cure Claims" as any claim based upon a monetary default by a Debtor with respect to an executory contract or unexpired lease at the time such contract or unexpired lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code. The treatment of Cure Claims is provided in section VI.F below.

### 2.    Treatment of Classified Claims Against the Debtors

### a.    Class 1A – First Lien Revolver Claims

The Plan defines "First Lien Revolver Claim" as any claim that is derived from or based upon the First Lien Revolving Credit Agreement, including claims for default interest, the reasonable and documented out-of-pocket fees and expenses of Citicorp North America, Inc., in its capacity as administrative agent, or any successor agent under the First Lien Revolving Credit Agreement (the "First Lien Revolver Agent") and its advisors and contingent and unliquidated claims arising under the First Lien Revolving Credit Agreement, all to the extent not previously paid by the Debtors.

The Plan provides that the First Lien Revolver Claims against each of the Debtors will be "Provisionally Allowed" – i.e., allowed solely for the purposes of escrowing distributions under, and voting on, the Plan – in the amount of $214,091,452.48,[5] plus (a) unpaid reasonable and documented out-of-pocket fees and expenses of the First Lien Revolver Agent through and including the Effective Date and (b) contingent and unliquidated claims arising under the First Lien Revolving Credit Agreement.

---

[5]    This number is based on a calculation as of March 31, 2009 and is subject to change based on outstanding amounts as of the actual date of the Debtors' emergence from chapter 11.

The Plan provides that each holder of a Provisionally Allowed First Lien Revolver Claim will receive the following in full and final satisfaction of its claim:

- ***Net Proceeds from Encumbered Assets.*** A pro rata share (calculated with reference to all allowed Class 1 Claims against the applicable Debtor) of all encumbered proceeds derived from the sale of the Debtors' assets less any costs related to such sale, whether those costs are subtracted from the proceeds at the time of or after the closing of such sale (the "Net Proceeds") available for distribution by the Plan Administrator. The Plan provides that the Net Proceeds will be held in the Proceeds Account pending a determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1A Claims asserted by a Debtor on account of the First Lien Revolver Claims and will be released from escrow following such determination and distributed in accordance with Article V.D of the Plan, unless such order is subject to a stay pending appeal.

- ***Fees and Expenses.*** On or as soon as reasonably practicable after the Effective Date, an amount equal to $[1] million will be placed into a reserve account (the "Revolver Fee Reserve") for reimbursement of reasonable and documented actual out-of-pocket fees and expenses, for the defense of the Committee Action, as provided for in the First Lien Revolving Credit Agreement. The funds held in the Revolver Fee Reserve will be distributed as follows: (a) if the holders of Provisionally Allowed Claims in Class 1A vote to accept the Plan, such holders are permitted to access the amount held in the Revolver Fee Reserve before determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1A Claims asserted by a Debtor on account of the First Lien Revolver Claims against each Debtor a determination by the Court resolving the Committee Action and any objection to Class 1A Claims asserted by a Debtor, unless such order is subject to a stay pending appeal and (b) if the holders of Provisionally Allowed Claims in Class 1A vote to reject the Plan, the amount held in the Revolver Fee Reserve will be held in such reserve pending a determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1A Claims asserted by a Debtor on account of the First Lien Revolver Claims against each Debtor, unless such order is subject to a stay pending appeal.

The projected recovery under the Plan for the First Lien Revolver Claims is dependent upon the outcome of the Committee Action and the value of the encumbered Net Proceeds available for distribution by the Plan Administrator. The Debtors note that the Court has entered an order in the Committee Action dismissing the plaintiff's claims with respect to the First Lien Revolver Claims, which order is currently the subject of an appeal but is not currently the subject of a stay as described in section V.F.6.a. This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

### b.       Class 1B – First Lien Term Loan Claims

The Plan defines "First Lien Term Loan Claim" as any claim that is derived from or based upon the First Lien Term Credit Agreement, including claims for default interest, the reasonable and documented out-of-pocket fees and expenses of Citicorp North America, Inc., in its capacity as administrative agent, or any successor agent under the First Lien Term Credit Agreement (the "First Lien Term Agent") and its advisors and contingent and unliquidated claims arising under the First Lien Term Credit Agreement, all to the extent not previously paid by the Debtors.

74

The Plan provides that the First Lien Term Loan Claims will be "Provisionally Allowed" – i.e., allowed solely for the purposes of escrowing distributions under, and voting on, the Plan – in the amount of $135,977,236.61,[6] plus (a) unpaid reasonable and documented out-of-pocket fees and expenses of the First Lien Term Agent through and including the Effective Date and (b) contingent and unliquidated claims arising under the First Lien Term Credit Agreement.

The Plan provides that each holder of a Provisionally Allowed First Lien Term Loan Claim will receive the following in full and final satisfaction of its claim:

- ***Net Proceeds from Encumbered Assets.*** A pro rata share (calculated with reference to all allowed Class 1 Claims against the applicable Debtor) of all encumbered Net Proceeds available for distribution by the Plan Administrator derived from liquidation of all encumbered assets of such Debtor, if any. The Net Proceeds will be held in the Proceeds Account pending a determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1B Claims asserted by a Debtor on account of the First Lien Term Loan Claims and will be released from escrow following such determination and distributed in accordance with Article V.D of the Plan, , unless such order is subject to a stay pending appeal.

- ***Fees and Expenses.*** On or as soon as reasonably practicable after the Effective Date, an amount equal to $[3] million will be placed into a reserve account (the "Term Fee Reserve") for reimbursement of reasonable and documented actual out-of-pocket fees and expenses for the defense of the Committee Action, as provided for in the First Lien Term Credit Agreement. The funds held in the Term Fee Reserve will be distributed as follows: (a) if the holders of Provisionally Allowed Claims in Class 1B vote to accept the Plan, such holders are permitted to access the amount held in the Term Fee Reserve before determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1B Claims asserted by a Debtor on account of the First Lien Term Loan Claims against each Debtor, unless such order is subject to a stay pending appeal and (b) if the holders of Provisionally Allowed Claims in Class 1B vote to reject the Plan, the amount held in the Term Fee Reserve will be held in such reserve pending a determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 1B Claims asserted by a Debtor on account of the First Lien Term Loan Claims against each Debtor, unless such order is subject to a stay pending appeal.

The projected recovery under the Plan for the First Lien Term Loan Claims is dependent upon the outcome of the Committee Action and the value of encumbered Net Proceeds available for distribution by the Plan Administrator. This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

    **c.**        **Class 2 – Second Lien Claims**

The Plan defines "Second Lien Claim" as any claim that is derived from or based upon the Second Lien Credit Agreement, including claims for default interest, the reasonable and documented

---

[6]    This number is based on a calculation as of March 31, 2009 and is subject to change based on outstanding amounts as of the actual date of the Debtors' emergence from chapter 11.

out-of-pocket fees and expenses of Wells Fargo Bank, N.A., in its capacity as administrative agent, or any successor agent under the Second Lien Credit Agreement (the "Second Lien Agent") and those holders of a majority in principal amount of the Second Lien Claims who have agreed to receive confidential information from the Debtors pursuant to the confidentiality provisions of the Second Lien Credit Agreement (the "Second Lien Restricted Lenders") and their respective advisors, and contingent and unliquidated claims arising under the Second Lien Credit Agreement, all to the extent not previously paid by the Debtors.

The Plan provides that the Second Lien Claims will be "Provisionally Allowed" – i.e., allowed solely for the purposes of escrowing distributions under, and voting on, the Plan – in the amount of $367,415,973.43,[7] plus (a) unpaid reasonable and documented out-of-pocket fees and expenses of the Second Lien Agent and the Second Lien Restricted Lenders through and including the Effective Date and (b) contingent and unliquidated claims arising under the Second Lien Credit Agreement.

The Plan provides that each holder of a Provisionally Allowed Second Lien Claim will receive the following in full and final satisfaction of its claims:

- **Net Proceeds from Encumbered Assets.** A pro rata share (calculated with reference to all allowed Class 2 Claims against the applicable Debtor) of all encumbered Net Proceeds available for distribution by the Plan Administrator derived from liquidation of all encumbered assets of such Debtor, if any. The Net Proceeds will be held in the Proceeds Account pending a determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 2 Claims asserted by a Debtor on account of the Second Lien claims against each Debtor and will be released from escrow following such determination and distributed in accordance with Article V.D of the Plan, unless such order is subject to a stay pending appeal. The Plan further provides that any distribution in satisfaction of the Provisionally Allowed Second Lien Claims is subject to section 5.5 of the Intercreditor Agreement, and it is anticipated that the Plan Administrator will process distributions accordingly.

- **Fees and Expenses.** On or as soon as reasonably practicable after the Effective Date, an amount equal to $[4] million will be placed into a reserve account (the Second Lien Fee Reserve") for reimbursement of reasonable and documented actual out-of-pocket fees and expenses, for the defense of the Committee Action, as provided for in the Second Lien Credit Agreement. The funds held in the Second Lien Fee Reserve will be distributed as follows: (a) if the holders of Provisionally Allowed Claims in Class 2 vote to accept the Plan, such holders are permitted to access the amount held in the Second Lien Fee Reserve before determination by the Bankruptcy Court resolving the Committee Action and any objection to Class 2 Claims asserted by a Debtor on account of the Second Lien Claims asserted against each Debtor, unless such order is subject to a stay pending appeal and (b) if the holders of Provisionally Allowed Claims in Class 2 vote to reject the Plan, the amount held in the Second Lien Fee Reserve will be held in such reserve pending a determination by the Bankruptcy Court resolving the Committee Action and any

---

[7]    This number is based on a calculation as of March 31, 2009 and is subject to change based on outstanding amounts as of the actual date of the Debtors' emergence from chapter 11.

objection to Class 2 Claims asserted by a Debtor on account of the Second Lien Claims against each Debtor , unless such order is subject to a stay pending appeal.

The projected recovery under the Plan for the Second Lien Claims is dependent upon the outcome of the Committee Action and the value of encumbered Net Proceeds available for distribution by the Plan Administrator.  This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

### d.      Class 3 – Other Secured Claims

The Plan defines "Other Secured Claims" as any secured claims other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Claim.

The Plan provides that, on or as soon as reasonably practicable after the Distribution Date, each holder of an allowed Other Secured Claim that is secured by valid liens on a Debtor's property will receive, in full and final satisfaction of such claim (and to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of lien claims during the chapter 11 cases), one of the following treatments:  (a) payment of the claim in full, in cash, without interest, (b) delivery of the collateral securing such allowed Other Secured Claim to the secured creditor or (c) such other treatment as may be agreed to by the Plan Administrator and such claim holder.

The Debtors estimate that the amount of the Other Secured Claims will aggregate approximately $42,285,506 as of the Confirmation Date.  The projected recovery under the Plan for the Other Secured Claims is 100%.  This class of claims, however, will not receive interest on their claims and is therefore impaired.  Accordingly, holders in this class are permitted to vote to accept or reject the Plan.

### e.      Class 4 – Other Priority Claims

The Plan defines "Other Priority Claim" as any claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that each holder of an allowed Other Priority Claim will receive, on or as soon as reasonably practicable after the Initial Distribution Date in full and final satisfaction of its claims, one of the following treatments on account of the claim, determined at the option of the Plan Administrator: (a) payment of the Allowed Claim in full in cash or (b) such other treatment as may be agreed to by the Plan Administrator and the holder of the claim.

The Debtors estimate that the amount of the Other Priority Claims will aggregate approximately $1,890,599 as of the Confirmation Date.  The projected recovery under the Plan for the Other Priority Claims is 100%.  This class of claims is unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, holders in this class are conclusively deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### f.      Class 5A – Senior Note Claims

The "Senior Note Claims" consist of any claim derived from or based upon the Senior Notes. The Plan provides that the Senior Note Claims will be allowed against all Debtors, excluding Beacon Hill at Mountain's Edge, LLC, in the aggregate amount of $573,518,195, plus interest and reasonable and documented out-of-pocket fees and expenses of the Indenture Trustee for the Senior Notes, if any.

The Plan provides that each holder of a Senior Note Claim will receive the following in full and final satisfaction of its claim:

- ***Litigation Trust Interests***.  On the Effective Date, its pro rata share (calculated with reference to all allowed Class 5A Claims against the applicable Debtor) of subseries A of the series of Litigation Trust Interests for the applicable Debtor.

The projected recovery under the Plan for the Senior Note Claims is dependent upon the outcome of the Committee Action.  This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

### g.      Class 5B – General Unsecured Claims

The Plan defines "General Unsecured Claims" as any unsecured claim against any Debtor, including any Intercompany Claim or deficiency claim of any secured creditor (including the First Lien Revolver Lenders, the First Lien Term Lenders and the Second Lien Lenders to the extent the Committee is successful in the prosecution of the Litigation Trust Causes of Action) and any claim of any such secured creditor that is Allowed or Provisionally Allowed, but rendered unsecured as a result of the Litigation Trust Causes of Action, that is not a Priority Tax Claim, Administrative Claim, Accrued Professional Compensation Claim, Senior Note Claim, Subordinated Note Claim, PIK Note Claim or Other Priority Claim.

The deficiency claims of secured creditors against TOUSA, Inc. include holders of Second Lien Claims against TOUSA, Inc. and the potential deficiency claims of the Debtors' secured lenders as a result of the prosecution of the Committee Action, and, in particular, whether the Committee is partially successful in that action.  Accordingly, the amount of such deficiency claims is not known at this time.

The Debtors estimate that the amount of the General Unsecured Claims will aggregate approximately $1.7 billion as of the Confirmation Date.

The Plan provides that each holder of an allowed General Unsecured Claim will receive the following in full and final satisfaction of such claim:

- ***Litigation Trust Interests***.  On the Effective Date, its pro rata share (calculated with reference to all allowed class 5B claims against the applicable Debtor) of subseries B of the series of Litigation Trust Interests for the applicable Debtor.

The projected recovery under the Plan for the General Unsecured Claims is dependent upon the outcome of the Committee Action.  This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

### h.      Class 5C – Subordinated Note Claims

The Plan defines "Subordinated Note Claims" as any claim other than a claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the Subordinated Notes.

The Plan provides that the Subordinated Note Claims will be allowed against all Debtors, excluding Beacon Hill at Mountain's Edge, LLC, in the aggregate amount of $554,371,093, plus interest and reasonable and documented out-of-pocket fees and expenses of the Indenture Trustee under the Subordinated Notes, if any.

Each holder of an allowed Subordinated Note Claim will receive the following in full and final satisfaction of its claims:

- ***Litigation Trust Interests.*** On the Effective Date, its pro rata share (calculated with reference to all allowed Class 5C Claims against the applicable Debtor) of subseries C of the series of Litigation Trust Interests for the applicable Debtor. The Plan further provides that any distribution in satisfaction of the Subordinated Note Claims is subject to the subordination provisions of Article 11 and Article 12 of the Subordinated Notes Indenture. It is anticipated that the Indenture Trustee will process distributions accordingly and, specifically, that any distribution in satisfaction of the Subordinated Note Claims will be paid to holders of "Senior Debt," as such term is defined in the Subordinated Notes Indenture, in accordance with Article V.B.15(d) of the Plan.

The projected recovery under the Plan for the Subordinated Note Claims is dependent upon the outcome of the Committee Action. This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

### i.      Class 5D – PIK Note Claims

The Plan defines a "PIK Note Claim" as any claim other than a claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the PIK Election Notes.

The Plan provides that the PIK Note Claims will be "Provisionally Allowed" – *i.e.*, allowed solely for the purposes of escrowing distributions under, and voting on, the Plan –and expenses of the Indenture Trustee, if any. This Provisionally Allowed Claim will be asserted against every Debtor, excluding Beacon Hill at Mountain's Edge, LLC.

The Plan provides that, on the Distribution Date, each holder of an allowed PIK Note Claim will receive the following in full and final satisfaction of such claim:

- ***Litigation Trust Interests.*** Its pro rata share (calculated with reference to all allowed class 5D claims against the applicable Debtor) of subseries D of the series of Litigation Trust Interests for the applicable Debtor subject to disgorgement. The Plan further provides that any distribution in satisfaction of the PIK Note Claims is subject to the subordination provisions of Article 11 and Article 12 of the PIK Notes Indenture, and it is anticipated that any distribution in satisfaction of PIK Note Claims will ultimately be paid to holders of Senior Debt in accordance with Article V.B.15(d) of the Plan.

- ***Disgorgement.*** All payments to holders of PIK Note Claims shall be held in escrow by the Litigation Trustee pending the outcome of the Committee Action, and shall be paid to the holders of PIK Note Claims or the holders of Senior Debt in accordance with the subordination procedure set forth in Article V.B.15(d) of the Plan and/or the Litigation Trust, as appropriate, as determined by order of the Bankruptcy Court at the conclusion of such litigation.

The projected recovery under the Plan for the PIK Note Claims is dependent upon the outcome of the Committee Action. This class of claims is impaired and holders of claims in this class are entitled to vote to accept or reject the Plan.

79

**j.      Class 6 – Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code**

This class of claims consists of all claims arising against such Debtor under section 510, which provides for the enforcement of a subordination agreement to the extent such agreement is enforceable under applicable non-bankruptcy law.

Pursuant to the Plan, each holder of a claim under section 510 of the Bankruptcy Code against the Debtors will not receive a distribution on account of such claim.  Accordingly, this class of claims is impaired, is not entitled to vote to accept or reject the Plan and is conclusively deemed to reject the Plan.

**k.      Class 7 – Equity Interests in the Debtors**

The Plan defines "Equity Interests" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, issued and outstanding immediately before the Effective Date, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately before the Effective Date.

Pursuant to the Plan, on the Effective Date all Equity Interests in each of the Debtors will be cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests in the Debtors.  Accordingly, this class of claims is impaired, is not entitled to vote to accept or reject the Plan and is conclusively deemed to reject the Plan.

**C.      MEANS FOR IMPLEMENTATION OF THE PLAN**

**1.      Corporate Existence**

The Plan provides that each Debtor will continue to exist after the Effective Date as a separate corporate entity, limited partnership or limited liability company, with all the powers of a corporation, limited partnership or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect before the Effective Date. The Plan further provides, however, that to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be authorized pursuant to the Plan and without the need for any other approvals, authorizations, actions or consents.

The Plan also provides that, on the Effective Date, the authority, power and incumbency of the persons acting as directors and officers of each of the Debtors will be terminated and such directors and officers will be deemed to have resigned or been removed without cause.  Thereafter, the Plan states that the Plan Administrator will be appointed as and become, and will succeed to such powers as would have been applicable to, each of the Debtors' directors and officers, as described in more detail below.  The organizational documents of each of the Debtors will be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will be amended to, among other things: (a) authorize one share of new common stock, $0.01 par value per share, of each of the Debtors (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities, and (c) limit the activities of each of the Debtors to matters related to the implementation of the Plan.  The share of new common stock of the Post-Effective Debtor will be issued to the Proceeds Account, which share of common stock will be cancelled at the end of the Implementation

80

Term or such earlier date as determined by the Plan Administrator as described below.  Additionally, pursuant to the Plan, each of the Debtors will be permitted on or after the Effective Date, to change its corporate structure as necessary to become an LLC either by merger or by election.

After the Effective Date, the Plan Administrator has the authority to decide, in its sole discretion, to maintain the corporate existence of each Post-Effective Date Debtor until such time as all aspects of the Plan pertaining to such Post-Effective Date Debtor have been completed (*provided*, *however*, that the Post-Effective Date Debtors will conduct no business except as necessary or appropriate to implement the Plan).  At such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to each Post-Effective Date Debtor, the Plan Administrator will dissolve such Post-Effective Date Debtor and complete the winding up thereof in accordance with applicable law.  The Plan provides that in connection with the liquidation of each Post-Effective Debtor, the Plan Administrator will act as liquidating agent for such Post-Effective Debtor.  As soon as practicable after all aspects of the Plan pertaining to each Post-Effective Date Debtor have been completed, each Post-Effective Date Debtor will be dissolved and wound up in accordance with applicable law.

### 2.      Vesting of Assets

Pursuant to section 1141(b) and (c) of the Bankruptcy Code, except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate and any property acquired by any of the Debtors pursuant to the Plan will vest in each respective Post-Effective Date Debtor and will be monetized and distributed by the Plan Administrator under the terms of the Plan and the Confirmation Order.

### 3.      The Plan Administrator

#### a.      Duties and Powers of the Plan Administrator

The Plan provides that the Confirmation Order will name the Plan Administrator, as designated by the Debtors, who will work together with any representatives and professionals he or she may retain to implement the terms of the Plan.  Generally, the duties and powers of the Plan Administrator will include all powers necessary to implement the Plan with respect to all Debtors and administer and monetize the assets of the Debtors.  Specifically, the Plan provides that the Plan Administrator will have the following responsibilities and duties:

- *Claims and Causes of Action.*  The Plan Administrator may object to, seek to subordinate, compromise or settle any and all claims against the Debtors and causes of action of the Debtors, including the Operating Causes of Action, that have not already been allowed or Provisionally Allowed as of the Effective Date.  This authority does not extend to any of the Litigation Trust Causes of Action.

- *Retention of Professionals*.  The Plan Administrator has authority to retain professionals to assist in performing its duties under the Plan.

- *Agreements.*  The Plan Administrator has authority to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' obligations under the Plan.

- *Reasonable Fees and Expenses*.  The Plan Administrator may incur any reasonable and necessary expenses in connection with the performance of its duties under the

81

Plan. This authority includes the retention of professionals and/or entering into agreements, as described above. Any proceeds generated from the sale of the Debtors' assets available for distribution from the Proceeds Account to holders of allowed claims and/or Provisionally Allowed claims against the Debtors will first be distributed to the Plan Administrator in satisfaction of any expenses incurred in connection with Article V.B.3 of the Plan.

- *Other Actions.* The Plan Administrator is permitted to take all other actions not inconsistent with the provisions of the Plan, which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.

### b.    Oversight of the Plan Administrator

The Plan provides that the Plan Administrator will be subject to the oversight of the Oversight Committee. Specifically, the Oversight Committee will oversee the following duties of the Plan Administrator

- Monetizing the Debtors' assets and the incurrence of any expense outside the ordinary course of business (i.e., not related to the build-out and sale of CIP or the sale, take-down or maintenance of lots) of more than $500,000;

- Prosecuting operational causes of action, and

- Prosecuting claims objections.

In addition to being overseen by the Oversight Committee, the Plan provides that the Bankruptcy Court will oversee the following duties of the Plan Administrator:

- Responding to discovery requests and taking other actions related to the Committee Action; and

- Reviewing other issues and questions that may arise in connection with administration of the Plan.

The Plan contemplates that the Bankruptcy Court's oversight will take the form of periodic reporting requirements to the Bankruptcy Court, and any such other actions or reporting as the Bankruptcy Court may require at periodic status conferences scheduled in connection with the litigation. This oversight also includes the Bankruptcy Court's retention of jurisdiction over the matters enumerated in Article X of the Plan and described in section VI.J of this Disclosure Statement.

### c.    Oversight Procedures

In addition to the above standards concerning oversight of the Plan Administrator, the Plan provides that the Oversight Committee will have the opportunity to review and object to designated proposed actions by the Plan Administrator using procedures similar to the bulk sales and land take-down procedures approved in the chapter 11 cases, as described in sections VI.C.3.c.i and ii of this Disclosure Statement, as follows:

82

### i.    Notice Procedures

- Each member of the Oversight Committee will receive notice of the salient terms of the proposed asset sale, incurrence of expense, settlement of claims objections, or settlement of an operational cause of action, as applicable.

- Each member of the Oversight Committee will have the opportunity to object to the proposed action.

- Upon receiving an objection from any member of the Oversight Committee, the Plan Administrator will work with that member to address and resolve the objection.

- If an objection cannot be resolved, then the procedures will provide for an expedited means for Bankruptcy Court review of the issue.

The Plan further provides that, if resolving an objection results in a material change to the proposed action, the action will be re-noticed and the Oversight Committee will have a new (abbreviated) review and objection period.

### ii.    Notice Thresholds

The following actions will be subject to the notice procedures described above:

- For each proposed asset sale in excess of $5,000,000, or for any asset sale in which the consideration is not 100% cash, the members of the Oversight Committee will receive notices setting forth the salient information and terms of the sale.  For the avoidance of doubt, notices will not be provided (pursuant to the current bulk land sale procedures or otherwise) for any asset sale that is less than $5,000,000.

- For each incurrence of any expense outside the ordinary course of business (i.e., not related to the build-out and sale of CIP or the sale, take-down or maintenance of lots) of more than $500,000, the members of the Oversight Committee will receive notices setting forth the salient information and terms of the transaction.

- All proposed settlements of Claims Objections will be noticed to the members of the Oversight Committee (in accordance with the Claims Procedures Order).

- For each proposed settlement of an Operating Cause of Action in excess of $100,000 the members of the Oversight Committee will receive notices setting forth the salient information and terms of the sale.

### 4.    Closing of the Debtors' Chapter 11 Cases

The Plan provides that when all Disputed Claims filed against a Debtor have become allowed or have been disallowed by Final Order, and all appropriate distributions have been made pursuant to the Plan, the Plan Administrator will see authority from the Bankruptcy Court to close such Debtor's chapter 11 case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 5. Method of Distribution Under the Plan

The Plan provides that Distributions to holders of allowed claims and Provisionally Allowed claims against the Debtors will be made by the Plan Administrator in accordance with the terms of the Plan on the first Distribution Date after which funds have become available.

### 6. Monetization of Assets

The Plan provides that the Plan Administrator will, in an expeditious but orderly manner, monetize and convert the Debtors' assets to cash and make timely distributions and not unduly prolong the duration of the Post-Effective Date Debtors. In so doing, the Plan Administrator is permitted to exercise its reasonable business judgment in monetizing the assets of the Post-Effective Date Debtors to cash to maximize recoveries. The monetizing of the Debtors' assets may be accomplished through the sale of such assets (in whole or in combination) all as the Plan Administrator may determine is in the best interests of the holders of claims against the Debtors. The Plan provides, however, that the Plan Administrator's actions will be subject to the Oversight Procedures described in section VI.C.3.c of this Disclosure Statement. The Plan Administrator will have no liability to any of the Debtors, their estates, their creditors, the Committee, its members or any other party for the outcome of its decisions in this regard.

In connection with the monetization of each Post-Effective Date Debtor's assets, the Plan Administrator will maintain individual ledgers for each Debtor, which will include a record of the purchase price for each sale of such Post-Effective Date Debtor's assets and any costs or expenses associated with that sale. The Net Proceeds of such sales will be placed in the Proceeds Account.

If, at the end of the Implementation Term, any of the Debtors' assets remain unsold (the "Unsold Assets"), the Plan Administrator will submit a certification to the Bankruptcy Court, on notice to: (a) the U.S. Trustee, (b) counsel to the First Lien Term Agent, (c) counsel to the Second Lien Agent, (d) the Oversight Committee and (e) the Litigation Trustee (collectively, the "Notice Parties"), which certification will include salient information with respect to why the Plan Administrator believes that it would be inefficient or ineffective to sell the Unsold Assets at that time. If any of the Notice Parties object, the Bankruptcy Court will schedule a hearing with respect to the certification. At such hearing, the Bankruptcy Court may order (x) that the Unsold Assets be valued and transferred to one entity which will issue a note for the remaining secured First Lien debt, if any and which will issue equity to be distributed to or escrowed for the benefit of the holders of Second Lien Claims or Unsecured Claims, as applicable or (y) an auction at which the Unsold Assets will be sold for the highest Cash value available at the time, which Cash will be distributed to the Proceeds Account or to the holders of Claims against the Debtors, as applicable, in accordance with the terms and provisions of the Plan.

### 7. Books and Records

The Plan provides that the Debtors' books and records will be maintained by the Plan Administrator. The Plan Administrator will maintain a separate record of the Net Proceeds derived from each Debtor and any costs associated with the sale of that Debtor's assets. After the Effective Date, the Plan Administrator will make available to the Litigation Trustee, on a reasonable basis and subject to appropriate confidentiality restrictions the books and records of each Post-Effective Date Debtor.

### 8. Reporting Duties

Pursuant to the Plan, the Plan Administrator will be responsible for filing informational returns on behalf of the Post-Effective Date Debtors and paying any tax liability of the Debtors and Post-Effective

Date Debtors.  Additionally, the Plan Administrator will file, or cause to be filed, any other statements, returns or disclosures relating to the Debtors or Post-Effective Debtors that are required by any governmental unit or applicable law.

### 9.    Tax Obligations

The Plan provides that the Plan Administrator will have the powers of administration regarding all of the Debtors and Post-Effective Debtors tax obligations, including filing of returns.  The Plan Administrator will (a) endeavor to complete and file within ninety (90) days after the dissolution of each Post-Effective Debtor's final federal, state and local tax returns, (b) request, if necessary, an expedited determination of any unpaid tax liability of the Debtors or their estates under Bankruptcy Code section 507(b) for all taxable periods of the Debtors ending after the Applicable Commencement Date through the dissolution of  the Post-Effective Debtors as determined under applicable tax laws and (c) represent the interest and account of the Post-Effective Debtors or their estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

### 10.    Single Satisfaction

The Plan provides that the holders of allowed Secondary Liability Claims may assert such claims against each Debtor obligated with respect to such claim, and such claims will be entitled to share in the recovery provided for the applicable class of claims against each obligated Debtor based upon the full allowed amount of the Secondary Liability Claim.  The Plan also provides that in no case will the aggregate value of all property received or retained under the plan on account of (a) any allowed claim and (b) all allowed Secondary Liability Claims associated with such allowed claim (the "Aggregate Recovery") exceed 100% of the underlying allowed claim.  In the event that any creditor's Aggregate Recovery would exceed 100% of its allowed claim but for application of Article V.B.11 of the Plan, then the distribution to such creditor by each obligated Debtor will be reduced by multiplying the unadjusted distribution that would have been received from that Debtor absent Article V.B.11 of the Plan by the ratio of the allowed claim to the unadjusted Aggregate Recovery that would be received on account of such allowed claim absent Article V.B.11 of the Plan, as follows:

adjusted  distribution  =  unadjusted  distribution  *  (allowed  claim  /  unadjusted  Aggregate Recovery).

The Plan defines "Secondary Liability Claims" as any claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort or other obligation of another Debtor, including, without limitation, any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation of another Debtor that is the basis of a claim.

### 11.    Postpetition Intercompany Claims

Pursuant to the Plan, to the extent it is determined by Final Order that all or a portion of the First Lien Revolver Claims, the First Lien Term Loan Claims or Second Lien Claims against any Debtor that has transferred or transfers property (including cash or cash collateral) (a "Transferring Debtor") from and after the Commencement Date to or for the benefit of any other Debtor are avoided, no provision of the

Plan will impair or otherwise prejudice the ability of the Bankruptcy Court to fashion a legal or equitable remedy to ensure that the position of the First Lien Revolver Lenders, the First Lien Term Loan Lenders or the Second Lien Lenders is neither improperly enhanced nor impaired by such Transferring Debtor's transfer and that neither the Transferring Debtor and its creditors nor the First Lien Revolver Lenders, the First Lien Term Loan Lenders or the Second Lien Lenders are prejudiced by such transfer and, upon either occurrence, the Bankruptcy Court will fashion such a remedy.

The Plan further provides that, to the extent it is determined that all or a portion of the 2007 Federal Tax Refund is, whether by operation of any applicable tax allocation agreements among the Debtors (including any predecessor thereof), the Internal Revenue Code, Treasury Regulations, or otherwise, property of the estate of one or more of the Debtors other than, or in addition to, TOUSA, the Bankruptcy Court will fashion a legal or equitable remedy to ensure that the 2007 Federal Tax Refund is transferred in such a manner that the creditors of one Debtor are not inappropriately advantaged over the creditors of another Debtor of which, all or a portion of the 2007 Federal Tax Refund is property of such Debtor's estate.

### 12.    Distributions on Account of Claims Allowed as of the Effective Date

The Plan provides that except as otherwise provided in the Plan, in a Final Order or as agreed to by the relevant parties, the Plan Administrator will make initial distributions under the Plan on account of claims allowed before the Effective Date on or as soon as practicable after the Distribution Date.

### 13.    Distributions on Account of Claims Allowed After the Effective Date

#### a.    Payments and Distributions on Disputed Claims

Pursuant to the Plan, on the Distribution Record Date, the Claims Register will be closed and any party responsible for making distributions will instead be authorized and entitled to recognize only those holders of claims listed on the Claims Register as of the close of business on the Distribution Record Date.  The Plan also states that if a claim is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent will make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

#### b.    Special Rules for Distributions to Holders of Disputed Claims

The Plan provides that no partial payments and no partial distributions will be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Plan Administrator will establish appropriate reserves for potential payment of such claims pursuant to Articles V.B.14(d) and (e) of the Plan.

#### c.    Special Rules for Claims Arising Under Section 502(h) of the Bankruptcy Code

Section 502(h) of the Bankruptcy Code governs the treatment of claims held by entities from which property is recoverable under the avoidance powers permitted a debtor in possession under the Bankruptcy Code.  Given the nature of the fraudulent transfer and preference claims brought pursuant to the Committee Action, the Plan provides a reserve mechanism to handle distributions on account of section 502(h) claims against the Debtors after the Effective Date of the Plan.

86

Generally, the Plan provides that, to the extent that the Committee Action is successful, all rights, if any of the defendants therein to assert a Claim pursuant to section 502(h) of the Bankruptcy Code are expressly preserved and the Bankruptcy Court will fashion an appropriate remedy to provide for distribution on account of such 502(h) claims in the same percentage recovery as the distribution to holders of General Unsecured Claims against the applicable Debtor.

### d.    Reserve for Disputed General Unsecured Claims and Claims Arising Under Section 502(h) of the Bankruptcy Code

As discussed elsewhere in this Disclosure Statement, a significant component of the interests to be distributed to holders of allowed claims against the Debtors includes Litigation Trust Interests. Because certain holders of disputed claims against the Debtors may become entitled to receive a distribution of Litigation Trust Interests on account of their claim, the Plan provides for a mechanism to reserve and distribute Litigation Trust Interests after the Distribution Date.

### i.    Deposit of Litigation Trust Interests on the Effective Date

The Plan provides that, on the Effective Date (or as soon thereafter as is reasonably practicable), each Debtors will deposit the amount of such Debtor's series of Litigation Trust Interests, or, as applicable, the amount of such Debtor's Litigation Trust Recovery Proceeds, that would have been distributed to the holders of disputed General Unsecured Claims if such disputed General Unsecured Claims had been allowed on the Effective Date in a reserve known as the "Disputed General Unsecured Claim Reserve."  This amount will be determined based on the lesser of (a) the asserted amount of the Disputed General Unsecured Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or (c) the amount otherwise agreed to by the Debtors and the holder of such Disputed General Unsecured Claims.

### ii.    Distributions After Allowance

The Plan permits the Plan Administrator or Distribution Agent to make a distribution from the Disputed General Unsecured Claim Reserve to the holder of any disputed General Unsecured Claim as soon as practicable after such claim has become an allowed claim, of the Litigation Trust Interests or, as applicable, the Litigation Trust Recovery Proceeds that such holder would have received on account of such claim if such claim had been an allowed claim on the Effective Date.

### iii.    Distributions After Disallowance

If a disputed General Unsecured Claim is disallowed, in whole or in part, before any distribution of Litigation Trust Recovery Proceeds, the Litigation Trust Interests reserved on account of such claim will be cancelled.  To the extent disputed General Unsecured Claims are disallowed, in whole or in part, after distributions of Litigation Trust Recovery Proceeds have begun, then the Litigation Trustee will be required, on a quarterly basis, to distribute the Litigation Trust Recovery Proceeds reserved in respect of such disallowed disputed General Unsecured Claims to holders of allowed General Unsecured Claims in a manner designed to ensure that the holders of allowed General unsecured Claims receive the same pro rata share of the Litigation Trust Recovery Proceeds.

### iv.    Property Held in the Disputed Claims Reserve

With respect to property held in the Disputed General Unsecured Claims Reserve, the Plan provides that each holder of an allowed General Unsecured Claim (or a disputed General Unsecured Claim that ultimately becomes an allowed General Unsecured Claim) will have recourse only to the undistributed Litigation Trust Interests, or as applicable, the Litigation Trust Recovery Proceeds held in the Disputed General Unsecured Claims Reserve for satisfaction of the distributions to which holders of allowed General Unsecured Claims are entitled under the Plan, and not to any Debtor, their property or any assets previously distributed on account of any Allowed Claim.

### v.    Claims Arising Under Section 502(h) of the Bankruptcy Code

The Plan contemplates that, to the extent the Committee Action is successful, all rights, if any of the defendants therein to assert a claim pursuant to section 502(h) of the Bankruptcy Code are expressly preserved and the Bankruptcy Court will fashion an appropriate remedy to provide for distribution on account of such 502(h) claims in the same percentage recovery as the distribution to holders of General Unsecured Claims against the applicable Debtor.

### e.    Disputed Claims Reserve for Claims other than General Unsecured Claims and Section 502(h) Claims

The Plan provides for the creation of a "Disputed Claim Reserve," as follows:

### i.    Deposit of Cash on the Effective Date

The Plan provides that, on the Effective Date or as reasonably practicable thereafter, each of the Debtors will deposit cash in a "Disputed Claim Reserve" for each Debtor, to the extent that cash would have been distributed to holders of disputed claims if such disputed claims had been allowed as of the Effective Date.

The amount deposited in the Disputed Claim Reserve will be determined based on the lesser of (a) the asserted amount of the applicable disputed claims filed with the Bankruptcy Court, or, if no proof of claim was filed, as included on the applicable Debtor's Schedules and SOFAs, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or (c) the amount otherwise agreed to by the Debtors and the holder of such disputed claims.

### ii.    Distribution After Allowance

The Plan authorizes the Plan Administrator to make a distribution from the Disputed Claims Reserve to the holder of a disputed claim that becomes an allowed claim, as soon as is practicable after the end of the calendar month in which such disputed claim becomes an allowed claim in an amount equal to the distribution that would have been payable with respect to such claim if it had been an allowed claim on the Effective Date.

### iii.    Distributions After Disallowance

In the event a Disputed Claim is disallowed, in whole or in part, the Plan Administrator is authorized, on a monthly basis (and in no event later than the fifth business day after the end of each calendar month) to distribute the cash reserved in respect of such disallowed disputed claim of any Debtor

for use in the ordinary course of business without further restrictions or limitations or for distribution to the General Unsecured Creditors of TOUSA in accordance the applicable terms of the Plan.

### iv.      Property Held in the Disputed Claims Reserve

#### (A)      Distributions

The Plan further provides that cash held in the Disputed Claim Reserve will (a) be, deposited and held in trust, pending distribution by the Plan Administrator for the benefit of holders of Allowed Claims, (b) be accounted for separately and (c) not constitute property of the Post-Effective Date Debtors.

#### (B)      Recourse

Pursuant to the Plan, each holder of a disputed claim that ultimately becomes an allowed claim will have recourse only to the cash and their proportionate share of the proceeds from the investment of the cash, if any, held in the Disputed Claim Reserve for satisfaction of the distributions to which holders of allowed claims are entitled under the Plan, and not to any Post-Effective Date Debtor, their property or any assets previously distributed on account of any allowed claim.

### 14.      Delivery and Distributions and Undeliverable or Unclaimed Distributions

#### a.      Record Date for Distributions

The Plan provides that the Confirmation Date will be used as the record date for determining which holders of claims are eligible to receive distributions under the Plan (the "Distribution Record Date").  The Plan provides that, as of the Distribution Record Date, the official register of claims against the Debtors maintained by the Voting and Claims Agent will be closed (the "Claims Register").  All parties responsible for making distributions (e.g., the Plan Administrator or the Plan Administrator) will be authorized and entitled to recognize only those holders of claims on the Claims Register as of the close of the business on the Distribution Record Date.  The First Lien Revolver Agent and the First Lien Term Agent reserve their rights to establish a separate Distribution Record Date under the First Lien Revolving Credit Agreement and the First Lien Term Credit Agreement as necessary to effectuate distributions to the First Lien Lenders, which separate date would take precedence over any Distribution Record Date set in the Plan.

With respect to claims that are transferred within 20 days before the Distribution Record Date (other than a claim based on a publicly traded security), all parties responsible for making distributions under the Plan will make distributions to the transferee, but only to the extent practical and only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### b.    Delivery of Distributions in General

Generally, distributions required by the Plan will be to each applicable holder of an allowed claim against the Debtors, including funds provided to the Plan Administrator for distribution in accordance with the Litigation Trust, at the address for each such holder, as indicated on the Debtors' records as of the date of any such distribution.  For these purposes, the address for each holder of an allowed claim against the Debtors will be deemed to be the address included in any proof of claim filed by that holder. The appropriate Plan Administrator will have the discretion to determine the manner of any distribution under the Plan.

### c.    Delivery of Distributions to the Holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Claims

With respect to distributions to holders of claims based on the First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims, the claims will be deemed completed when made to the applicable Agent for each of the First Lien Revolving Credit Agreement, First Lien Term Loan Credit Agreement and Second Lien Term Credit Agreement (collectively, the "Secured Credit Agreements").  Notwithstanding any provisions in the Plan to the contrary, the Secured Credit Agreements shall continue in effect to the extent necessary to allow the applicable agents to receive and make distributions pursuant to the Plan.

### d.    Delivery of Distributions to Holders of Senior Note Claims, Subordinated Note Claims and PIK Note Claims

With respect to distributions to holders of claims based on the Senior Notes, the Subordinated Notes and PIK Note Claims, the claims will be governed by the Senior Note Indentures, the Subordinated Note Indentures or the PIK Notes Indenture, respectively, and will be deemed completed when made to the applicable Indenture Trustee as set forth in the paragraph below.  Notwithstanding any provisions in the Plan to the contrary, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Notes Indenture will continue in effect to the extent necessary to (a) allow the applicable Indenture Trustees to receive and make distributions pursuant to the Plan, (b) exercise their respective charging liens against any such distributions and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.

Importantly, the Plan contains the following important language:

For the avoidance of doubt, the Distribution Agent for each Debtor shall give effect to the provisions of Article 11 and Article 12 of the Subordinated Notes Indentures and Article 11 and Article 12 of the PIK Notes Indenture such that all distributions made pursuant to the Plan in satisfaction of the Subordinated Note Claims and PIK Note Claims shall be made to the holders of Senior Debt, unless and until such time as the holders of Senior Debt have been paid in full in accordance with and Article 12 of the Subordinated Notes Indentures and Article 11 and Article 12 of the PIK Notes Indenture.  If, the aggregate value received by the holders of Senior Debt  results in payment in full of such Senior Debt to the extent required by Article 11 and Article 12 of the Subordinated Notes Indentures and Article 11 and Article 12 of the PIK Notes Indenture, then the holders of Subordinated Note Claims and PIK Note Claims shall receive any remaining distribution, including any proceeds from the Litigation Trust Causes of Action, otherwise allocable to the holders of Subordinated Note Claims and PIK Note Claims pursuant to the Plan.  All distributions on account of Subordinated Note Claims and the PIK Note Claims shall be held in escrow to be released in accordance with an order of the

Bankruptcy Court after a Final Order has been entered regarding the Litigation Trust Causes of Action.

### i.       Timing and Calculation of Amounts to be Distributed

Unless expressly provided for under the Plan, holders of claims against the Debtors will not be entitled to interest, dividends or accruals on account of the distributions provided for under the Plan, regardless of whether a distribution is made on or at any time after the Effective Date.

### ii.      Distribution by Distribution Agents

The Plan authorizes each of the Debtors and each of the Plan Administrator to enter into agreements with one or more entities for the purpose of facilitating the distributions required under the Plan (a "Distribution Agent") and to pay the Distribution Agents' reasonable and documented fees and expenses without other additional approvals or consents.

### iii.     Setoffs and Withholdings

The Plan authorizes each of the Plan Administrator or Distributing Agent, as applicable, to withhold from the distribution to an allowed claim against the Debtors amounts equal in value to any claims, rights and causes of actions of any nature that the Debtor may hold against the holder of such claim.

With respect to the claims on account of the Revolving Facility, the First Lien Term Loan and the Second Lien Term Loan, however, the Plan does not permit the Plan Administrator or the Distributing Agents to withhold amounts on account of the Litigation Trust Causes of Action.

The Plan authorizes each of the Plan Administrator or Distributing Agent, as applicable to setoff amounts from distributions to holders of allowed claims against the Debtors, but only to the extent that the value of the offsetting Debtor's claim against a claimant is undisputed, resolved by settlement or adjudicated by a final order or judgment of any court.

### iv.      Minimum Distributions

The Plan provides that the Plan Administrator or Distributing Agent, as applicable, are not required to make distributions or payments that are less than $1,000 or make partial distributions or payments of fractions of dollars.  Fractional distributions will be rounded to the nearest whole dollar, share, interest or other form of distribution, as applicable.

### v.    Undeliverable Distributions

### A.  Holding of Certain Undeliverable Distributions

The Plan authorizes the Plan Administrator or the Distribution Agent, as applicable, to hold any distribution to a holder of an allowed claim made in accordance with the Plan that is returned unless and until the Post-Effective Date Debtors (or their Distribution Agent) are notified in writing of such holder's then current address, at which time all currently due missed distributions will be made to such holder on the Periodic Distribution Date.  The Subsidiary Debtors will hold such undeliverable distribution until such time as any such distributions become deliverable.

Undeliverable distributions will not be entitled to receive any interest, dividends or other accruals of any kind.

No later than 90 days after the Effective Date, the Plan Administrator will file a list with the Bankruptcy Court of the holders of undeliverable distributions, together with the date on which such distribution was attempted (the "Undeliverable Distribution Register").  The Plan Administrator will maintain and update the list on a quarterly basis so long as the applicable chapter 11 case stays open.  The Plan does not require the Plan Administrator attempt to locate any holder of an allowed claim.

### B.  Failure to Claim Undeliverable Distributions

Each of the holders of an allowed claim that is listed on the Undeliverable Distribution Register will be responsible for providing the Plan Administrator or Distribution Agent with a current, verifiable address for mailing of distributions on or before the **latest** of

- one year after the Effective Date;

- 60 days after the attempted delivery of the undeliverable distribution; and

- 180 days after the date the holder's claim becomes an allowed claim.

If a holder of an allowed claim listed in the Undeliverable Distribution Register does not provide a current, verifiable address within the above time period, the holder will be discharged and forever barred, estopped and enjoined from asserting its claim against the Debtors or their property.

The Plan deems undeliverable distributions to be unclaimed property under section 347(b) of the Bankruptcy Code, which will be redistributed as follows:

- With respect to the TOUSA, Inc. Plan, redistributed to other creditors in accordance with such Plan; and

### C.  Failure to Present Checks

The Plan provides that checks issued by the Plan Administrator or Distribution Agent on account of an allowed claim against a Debtor will be null and void if not negotiated within 120 days after the issuance of such check.

In an effort to ensure that all holders of allowed claims receive their allocated distributions, no later than 120 days after the issuance of such checks, the Post-Effective Date Debtors will file a list with the Bankruptcy Court of the holders of any un-negotiated checks.  The Plan Administrator will maintain

and update each such list, to the extent of any changes, on a quarterly basis for so long as the applicable chapter 11 case stays open.

A holder of an allowed claim against a Debtor may make a direct request to an applicable Distribution Agent for a reissued check with respect to an originally issued check. If a holder of an allowed claim holding an un-negotiated check not request reissuance of that check within 180 days after the date on which the check was mailed or otherwise delivered to the holder, the allowed claim will be discharged and the holder thereof will be forever barred, estopped and enjoined from asserting any claim against any of the Post-Effective Date Debtors or their property. In such cases, any cash held for payment on account of such claims will be deemed property of the Post-Effective Date Debtors, free of any claims of such holder with respect thereto. The Plan does not require the Plan Administrator to attempt to locate any holder of an allowed claim.

### 15. Compliance with Tax Requirements/Allocations

The Plan provides that the Plan Administrator will comply with all tax withholding and reporting requirements imposed on the Plan Administrator by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Distribution Agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Under the Plan, for tax purposes, distributions in full or partial satisfaction of allowed claims will be allocated first to the principal amount of allowed claims, with any excess allocated to unpaid interest that accrued on such claims.

### 16. Surrender of Canceled Instruments or Securities

The Plan requires that, as a condition precedent to holder of a Senior Note Claim or a Subordinated Note Claim receiving any distribution on account of its allowed claim, each record holder of claim will be deemed to have surrendered the certificates or other documentation underlying each such claim, and all such surrendered certificates and other documentations will be deemed to be canceled. The Indenture Trustees may (but will not be required to) request that registered holders of the Senior Notes or the Subordinated Notes surrender their notes for cancellation.

### 17. Resolution of Disputed Claims

#### a. Allowance of Claims

The Plan provides each of the Post-Effective Date Debtors and each Plan Administrator will retain any and all rights and with respect to any claim, except with respect to any claim deemed allowed or Provisionally Allowed under the Plan. A claim will not become an allowed claim unless such claim is deemed allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court enters a final order (including but not limited the Confirmation Order) allowing such claim.

93

### b.    No Distribution Pending Allowance

The Plan does not permit payment of any portion of a claim that is a disputed claim or unless and until such claim is allowed.  Holders of disputed claims other than Provisionally Allowed Claims are not entitled to interest if such disputed claim becomes allowed, except to the extent such holder is entitled to interest under the Plan as a holder of an allowed claim.

### c.    Prosecution of Objections to Claims Against the Debtors

With the exception of the Litigation Trust Causes of Action, the Plan grants the Debtors the exclusive authority to file objections to, settle, compromise, withdraw or litigate to judgment objections to any and all claims, regardless of whether such claims are in a class or otherwise during the period after the Confirmation Date but before the Effective Date.

After the Effective Date, the Plan Administrator will have the exclusive authority with respect to objecting and settling claims.  Additionally, the Plan Administrator may settle or compromise any disputed claim and will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises, all without any further notice to or action, order or approval of the Bankruptcy Court.

With respect to all tort claims, the Plan provides that an objection is deemed to have been filed timely, thus making each such claim a disputed claim as of the Claims Objection Deadline.  Each such tort claim will remain a disputed claim unless and until it becomes an allowed claim.

Notwithstanding the foregoing, the authority settle claims and objections does not extend to the Litigation Trust Causes of Action and the Objection to Bank Claims.

### d.    Deadline to File Objections to Claims

The Plan requires that all objections to claims be filed no later than the "Claims Objection Deadline."  The Plan defines the "Claims Objection Deadline" as the date of the Confirmation Hearing, unless otherwise ordered by the Bankruptcy Court.

### 18.    Disallowance of Claims

Pursuant to the Plan, all claims of any entity or party from which property is sought by the Debtors, the Plan Administrator or the Litigation Trust, under sections 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors, the Post-Effective Date Debtors or the Litigation Trust allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code will be disallowed if: (a) the entity on the one hand, and the Debtors, the Plan Administrator or the Litigation Trust, on the other hand, agree or the Bankruptcy Court has determined by a final order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such entity or transferee has failed to turnover such property by the dates set forth in such agreement or final order.

The Plan contains the following important language with respect to the disallowance of claims:

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE**

**BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY** FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (**a**) THE CONFIRMATION HEARING AND (**b**) 45 DAYS AFTER THE APPLICABLE BAR **DATE.**

### 19. Employment Agreements

The Plan provides that the Post-Effective Date Debtors may enter into employment agreements with certain individuals on or immediately after the Effective Date.  The terms of such agreements, if any, will be included in the Plan Supplement.

### 20. Creation of Retained Professionals Fee Account and Fee Funding Reserve

#### a. Retained Professionals Fee Account

On the Effective Date, the Post-Effective Date Debtors will be required to establish a segregated account, funded in the full amount of the Accrued Professional Compensation, solely for the purpose of paying "Allowed Professional Compensation" (the "Retained Professionals Fee Account").  The Plan defines "Allowed Professional Compensation" as all Accrued Professional Compensation allowed or awarded from time to time by an order of the Bankruptcy court or any other court of competent jurisdiction.

The Retained Professionals Fee Account will be funded in part with any and all amounts held on the Effective Date in the "Professional Fee Escrow" established pursuant to paragraph 12 of the Second Stipulated Final Order (I) Authorizing Limited Use of Cash Collateral Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, (II) Granting Replacement Liens, Adequate Protection and Super Priority Administrative Expense Priority to Secured Lenders, dated January 9, 2009 [D.E. #2355] [TO BE UPDATED AFTER APRIL 23 HEARING.]

#### b. Fee Funding Reserve

The Plan further provides that, on the Effective Date, the Post-Effective Date Debtors will establish a segregated account, funded in the aggregate amount of the Revolver Fee Reserve, the Term Fee Reserve and the Second Lien Fee Reserve, solely for the purpose of paying the actual out-of-pocket fees and expenses incurred in connection with the defense of the Committee Action and as provided for under the First Lien Revolving Credit Agreement, First Lien Term Loan Credit Agreement and Second Lien Term Credit Agreement in accordance with Article III of the Plan.

### 21. Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Debtor to any person pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

95

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies , without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Litigation Trust Causes of Action to the Litigation Trust and (ii) any sale or other transfer of the Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

### 22. Cancellation of Notes and Equity Interests

The Plan provides that, on the Effective Date, and except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes, the Subordinated Notes, the PIK Election Notes and existing equity interests in the Debtors will be deemed cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released and discharged.

Additionally, on the Effective Date, and except to the extent otherwise provided in the Plan, any indenture relating to any of the foregoing, including, without limitation, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture will be deemed canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder will be fully released and discharged. Notwithstanding the foregoing, however, the Subordinated Note Indentures, the Senior Note Indentures and the PIK Note Indenture will continue in effect solely for the purposes of: (a) allowing holders of the Senior Note Claims, the Subordinated Note Claims and the PIK Note Claims to receive distributions under the Plan; (b) allowing holders of the Senior Debt to enforce the subordination provisions in Article 11 and Article 12 of the Subordinated Notes Indentures and the PIK Note Indentures; and (c) allowing and preserving the rights of the Indenture Trustees to (i) make distributions in satisfaction of Allowed Senior Note Claims, Allowed Subordinated Note Claims and Allowed PIK Note Claims, (ii) exercise their respective charging liens against any such distributions and (iii) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.

### 23. Discharge of Obligations Under the First Lien Revolving Credit Agreement, First Lien Term Credit Agreement and Second Lien Credit Agreement

On the Effective Date, except to the extent otherwise provided in the Plan, the Debtors' obligations under the First Lien Revolving Credit Agreement, the First Lien Term Credit Agreement and the Second Lien Term Credit Agreement will be fully released and discharged except that such agreements will continue in full force and effect solely to permit the relevant agents to make distributions of plan consideration to the lenders under the credit agreements.

### D.    THE LITIGATION TRUST

### 1.    Overview

The Plan provides that certain holders of unsecured claims against the Debtors will receive beneficial interests in a litigation trust established to pursue certain causes of actions belonging to the Debtors (the "Litigation Trust"). The Litigation Trust will be funded by a loan from the Debtors in the amount of $[7] million (the "Litigation Trust Loan"). The Plan provides, however, that the Litigation Trust Loan will be reduced by any amount the Litigation Trust receives pursuant to any settlement of the

Litigation Trust Causes of Action prior to the Effective Date, and the proceeds of any such settlement shall be funded into the Litigation Trust on the Effective Date.

Specifically, the Litigation Trust will be authorized, to pursue the Litigation Trust Causes of Action.  The Plan defines "Litigation Trust Causes of Action" as claims or causes of action raised by or on behalf of any of the Debtors, including (a) the Committee Action; (b) the TOI Causes of Action except to the extent such causes of action are encumbered by the First Lien Revolving Loan, the First Lien Term Loan and the Second Lien Term Loan; and (c) any claims or Causes of Action against (x) the Transeastern Lenders or (y) related to the July Recapitalization, except those claims or causes of action released pursuant to the provisions of the Plan or that would be covered by insurance if not transferred to the Litigation Trust.

The Litigation Trust Causes of Action do not include certain "Excluded Claims," including:

- **Operating Causes of Action**, consisting of (a) all causes of action arising from or related to the Debtors' operations in the ordinary course of business with respect to optioning, buying or selling land, developing homes, entering into, maintaining and terminating employment relationships, procuring goods and services with respect to the Debtors' homebuilding activities, procuring and maintaining surety bonds and insurance with respect to customer claims, leasing office space and model homes, entering into and acting as a member of and terminating joint ventures (all such activities, including entering into contracts related to any of the foregoing, the "Operating Activities") and (b) all causes of action arising under chapter 5 of the Bankruptcy Code and arising from or related to the Operating Activities.  The Operating Causes of Action exclude the Committee Action.

- Any causes of action released in accordance with Article VIII of the Plan.

In addition to the Litigation Trust Causes of Action, the assets included in the Litigation Trust will consist of the Litigation Trust Loan as well as the Net Proceeds derived from the monetization of the unencumbered assets of the Debtors, if any (collectively, the "Litigation Trust Assets").

Holders of allowed or Provisionally Allowed Class 5A, 5B, 5C and 5D claims against any of the Debtors (collectively, the "Litigation Trust Beneficiaries") will receive the "Litigation Trust Interests." The Plan defines "Litigation Trust Interests" as the beneficial interests in the Litigation Trust that will entitle the holder thereof to receive, on a pro rata basis, its Litigation Trust Recovery Proceeds, which interests shall be issued in 38 series corresponding to the 38 Debtors, including TOUSA, Inc.  For each of the series of the Litigation Trust Interests, there will be the following subseries:  (i) Senior Note Claims -- subseries A; (ii) General Unsecured Claims -- subseries B; (iii) Subordinated Note Claims -- subseries C; and (iv) PIK Note Claims -- subseries D.

The Litigation Trust will be governed by an agreement (the "Litigation Trust Agreement"), administered by a trustee (the "Litigation Trustee") and overseen by a committee (the "Litigation Trust Committee").

### 2.    Generally

The powers, authority, responsibilities and duties of the Litigation Trust, the Litigation Trustee and the Litigation Trust Committee are set forth in and will be governed by the Litigation Trust Agreement.

97

The Committee (or, if the Committee fails to make a timely appointment, the Debtor) will appoint the initial Litigation Trustee, which will be disclosed in the Plan Supplement. In the event the Litigation Trustee dies, is terminated or resigns for any reason, the Litigation Trust Committee will designate a successor.

The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation, to the extent not set forth in the Plan, will be set forth in the Litigation Trust Agreement or the Confirmation Order. The Litigation Trust Agreement will contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust and the Litigation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Litigation Trust and the Litigation Trustee will be bound by the Plan and will not challenge any provision of the Plan. The Plan provides, however, that the Litigation Trust and the Litigation Trustee may seek clarification from the Bankruptcy Court with respect to any ambiguity in the Plan or Litigation Trust Agreement.

### 3.    Purpose and Establishment of the Litigation Trust

The Plan provides that, on the Effective Date, the Litigation Trust will be established for the primary business of prosecuting the Litigation Trust Causes of Action with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust.

Upon the transfer by the Debtors, as applicable, of the Litigation Trust Assets to the Litigation Trust, the Debtors or the Post-Effective Date Debtors, as applicable, will have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust, except for the obligation to repay the Litigation Trust Loan.

For all federal income tax purposes, the Litigation Trust Beneficiaries will be treated as grantors and owners thereof and it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is owned by the Litigation Trust Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Litigation Trust Beneficiaries will be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. Accordingly, the Litigation Trust shall, in an expeditious, but prudent, reasonable and orderly manner, liquidate the Litigation Trust Assets, make timely distributions, if any, to the Litigation Trust Beneficiaries pursuant to the Plan and the Litigation Trust Agreement and not unduly prolong its duration. The Litigation Trust will  not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Litigation Trust Agreement. The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the trust.

The Plan further provides that, on the Effective Date, the Plan Administrator, on behalf of the Litigation Trust Beneficiaries, will execute the Litigation Trust Agreement and will take all other steps necessary to establish the Litigation Trust pursuant to the Litigation Trust Agreement and consistent with the Plan. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, each of the Debtors will transfer, assign and deliver to the Litigation Trust all of their rights, title and interests in all of the Litigation Trust Assets notwithstanding any prohibition of assignability under non-bankruptcy law. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust will vest in the Litigation Trust and its representatives, and the Debtors and the Litigation Trust are authorized to take all necessary actions to effectuate the transfer of such

TOUSA Disclosure Statement Wind Down Version_(14468796_10)

privileges.  The Litigation Trust will agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Plan and the Litigation Trust Agreement.  All parties (including the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) will execute any documents or other instruments as necessary to cause title to the Litigation Trust Assets to be transferred to the Litigation Trust, which documents and instruments will be subject in form and substance to the prior reasonable approval of the Debtors and the Committee.

### 4.        Prosecution of Litigation Trust Causes of Action

The Plan provides that the Litigation Trust Causes of Action may only be prosecuted or settled by the Litigation Trust.  The Post-Effective Date Debtors may not prosecute or settle any Litigation Trust Causes of Action.

### 5.        Ownership and Shares of the Litigation Trust Causes of Action

The Plan provides that, based upon the outcome of, and factual findings in, the Litigation Trust Causes of Action, including the TOI Causes of Action, the Litigation Trustee will determine each Debtor's ownership and share, if any, in the Litigation Trust Recovery Proceeds (the "Litigation Trust Recovery Shares") and will distribute the Litigation Trust Recovery Shares to the Plan Administrator or Distribution Agent for distribution to creditors of each such Debtor on account of the applicable series and subseries of Litigation Trust Interests in accordance with the Plan.  The Plan provides, however, that the Litigation Trustee will first (a) file a motion with the Bankruptcy Court seeking approval of the proposed distribution of the Litigation Trust Recovery Shares or (b) otherwise obtain a Final Order or judgment of the Bankruptcy Court determining the appropriate distribution of such Litigation Trust Recovery Shares prior to making any such distribution thereof.  Such distribution must be with the consent of the Litigation Trust Committee and on notice to: (a) the U.S. Trustee, (b) the Bankruptcy Court, (c) the Distribution Agent, (d) the Plan Administrator, (e) counsel to the Second Lien Agent and the Second Lien Restricted Lenders, (f) counsel to the First Lien Term and Revolver Agents and (g) any Person who filed notice of appearance or request for notice specifically with respect to the Litigation Trust Causes of Action.

### 6.        Distributions and Withholding

The Litigation Trust will make distributions, if any, to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement and the Plan.  The Litigation Trust Committee may authorize the Litigation Trust to retain Litigation Trust Recovery Proceeds to fund additional litigation with respect to Litigation Trust Causes of Action, but only after having repaid the Litigation Trust Loan and all costs of the prosecution of the Litigation Trust Causes of Action incurred by the Debtors' estates before the Effective Date.  The Litigation Trust may withhold from amounts otherwise distributable to any Entity any and all amounts required by the Litigation Trust Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement.

### 7.        Appointment of the Litigation Trustee

On the Effective Date and in compliance with the provisions of the Plan and the Litigation Trust Agreement, the person set forth in the Plan Supplement will be appointed Litigation Trustee in accordance with the Litigation Trust Agreement.  Thereafter, any successor Litigation Trustee will be appointed and serve in accordance with the Litigation Trust Agreement.  The Litigation Trustee or any successor thereto will administer the Litigation Trust in accordance with the Litigation Trust Agreement.

8.        **Funding Expenses of the Litigation Trust**

All fees, expenses and costs of the Litigation Trust, including, without limitation, fees and expenses incurred by professionals retained by the Litigation Trustee (in accordance with the terms and conditions set forth in the Litigation Trust Agreement) will be paid by the Litigation Trust, and none of the defendants, the Plan Administrator or the Post-Effective Date Debtors will be responsible for any fees, expenses and costs of the Litigation Trust.

9.        **The Litigation Trust Loan**

The Plan provides that, on the Effective Date, the Plan Administrator will transfer cash in an amount of $[7] million, to be loaned to the Litigation Trust on the terms to be specified in the Litigation Trust Agreement. The Plan provides, however, that the Litigation Trust Loan will be reduced by any amount the Litigation Trust receives pursuant to any settlement of the Litigation Trust Causes of Action prior to the Effective Date (and the proceeds of any such settlement will be funded into the Litigation Trust on the Effective Date). Any Litigation Trust Recovery Proceeds received will be used to repay the Litigation Trust Loan before making any distribution to Litigation Trust Beneficiaries or funding any other costs of the Litigation Trust. In the event that the Litigation Trust receives Litigation Trust Recovery Proceeds in a form other than cash, the Litigation Trust will transfer Litigation Trust Recovery Proceeds having a fair market value equal to all amounts then due with respect to the Litigation Trust Loan to the Proceeds Account. "Fair Market Value" shall be determined in good faith by the Litigation Trust Committee, subject to the approval of the Bankruptcy Court.

10.       **Termination of the Litigation Trust**

The Plan provides that the Litigation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date (the "Initial Trust Termination Date"). The Plan further provides that on or later than the date that is six months before the Initial Trust Termination Date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period (any such extension representing an "Extended Trust Termination Date") if such an extension is necessary to complete any pending litigation or any distribution required under the Litigation Trust Agreement. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained no more than six months before the expiration of each Extended Trust Termination Date.

11.       **Litigation Trust Committee**

The Plan provides that the membership, duties, responsibilities and powers of the Litigation Trust Committee will be as set forth in the Litigation Trust Agreement.

E.        **CONDITIONS FOR RELEASE FROM ESCROW**

The Plan provides that all of the Net Proceeds derived from the monetization of the Debtors' assets shall be held in the Proceeds Account pending a resolution of the Committee Action. The Proceeds Account will be monitored, maintained and administered by the Plan Administrator.

Upon entry of one or more orders or judgments by the Bankruptcy Court resolving the Committee Action as to one or more defendants (except to the extent any such order or judgment is stayed pending appeal), all, or a portion, of the Net Proceeds will be distributed to (a) holders of allowed First Lien Revolver Claims, First Lien Term Loan Claims or Second Lien Claims, as applicable, in accordance with Article III of the Plan, if and to the extent so ordered by the Bankruptcy Court and/or (b) to holders of

100

Litigation Trust Interests in accordance with Article III of the Plan, all to the extent ordered by the Bankruptcy Court, as applicable and necessary to effectuate a complete remedy consistent with the order or judgment resolving the Committee Action.  Any such distribution order will give effect to the priorities of payment as provided under the Intercreditor Agreement.

**F.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The Plan provides for the treatment of all the Debtors' unexpired leases and executory contracts that the Debtors did not assume or reject during the course of their chapter 11 cases.

**1.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

**a.      Rejection of Executory Contracts and Unexpired Leases**

The Plan contemplates that, as of the Effective Date, each executory contract or unexpired lease of the Debtors will be deemed automatically rejected in accordance with sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease:

- has been previously assumed by the Debtors by a final order of the Bankruptcy Court;

- has been assumed by the Debtors by order of the Bankruptcy Court that becomes final as of the Effective Date;

- is the subject of a motion to assume or reject pending as of the Effective Date;

- is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; or

- is otherwise assumed pursuant to the express terms of the Plan.

To this end, the Plan provides that the Confirmation Order will be deemed to be an order of the Bankruptcy court approving the Debtors' rejection of the executory contracts and unexpired leases that do not meet these criteria pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non Debtor parties to executory contracts and unexpired leases that the Plan deems rejected will have the right and opportunity to assert and file a written proof of claim on account of such rejection, including under section 503 of the Bankruptcy Code.

**b.      Deemed Abandonment of Personal Property**

The Plan deems the Debtors to abandon any furniture, fixtures, equipment, inventory and other personal property located at the premises of an unexpired lease of nonresidential real property (as such term is used in section 365 of the Bankruptcy Code) for those rejections effective on or after the Effective Date.  The Plan further provides that the Debtors will have no administrative expense liability to any of their landlords for rental charges or occupancy of the leases premises after such abandonment by virtue of the continue presence of such property at the premises.  Landlords at premises with abandoned property of the Debtors may, in their discretion and without additional notice, dispose of such property without liability to the Debtors or any non-Debtor that claims or may claim an interest in such property.  The Plan requires the Debtors to provide reasonable notice with respect to the Debtors' abandonment of such property.

c.      **Assumption of Executory Contracts and Unexpired Leases**

The Plan provides that the Debtors will assume, as of the Effective Date, those executory contracts and unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," which the Debtors will provide in the Plan Supplement.

d.      **Approval of Assumptions**

The Confirmation Order will constitute an order of the Bankruptcy Court as of the Effective Date approving the assumption of the Debtors' executory contracts and unexpired leases pursuant to sections 365 and 1123 in accordance with the Plan.  A non-Debtor party to an executory contract or unexpired lease that fails to object to the proposed assumption of such executory contract or unexpired leases, including objection to the amount of a Cure Claim designated by the Debtors as payable in connection with such assumption, will be deemed to have consented to such assumption and the specified amount of such Cure Claim.

2.      **Claims on Account of the Rejection of Executory Contracts and Unexpired Leases**

All proofs of claims arising from the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Voting and Claims Agent in accordance to the procedures established for the filing of proofs of claim in the Order (A) Setting Bar Dates for Filing Proofs of Claim (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof [D.E. #614] (the "Bar Date Order").  All such proofs of claim must be filed on or before the later of (a) the applicable date set forth in the Bar Date Order and (b) 30 days after the Effective Date of the rejection of such executory contract or unexpired lease.

A party that fails to timely and properly file a proof of claim arising from the rejection of an executory contract or unexpired lease will be forever barred, estopped and enjoined from asserting such claims, and such claim will not be enforceable against any Debtor or Post-Effective Date Debtor or their respective estates and property.  The Plan contains the following important notice with respect to the requirement to file a proof of claim on account of a rejected executory contract or unexpired lease:

**YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE IS AUTOMATICALLY REJECTED AS OF THE EFFECTIVE DATE, UNLESS YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE:  (A) WAS PREVIOUSLY ASSUMED BY THE DEBTORS BY FINAL ORDER OF THE BANKRUPTCY COURT; (B) WAS ASSUMED BY THE DEBTORS BY ORDER OF THE BANKRUPTCY COURT AS OF THE EFFECTIVE DATE, WHICH ORDER BECOMES A FINAL ORDER AFTER THE EFFECTIVE DATE; (C) IS THE SUBJECT OF A MOTION TO ASSUME OR REJECT PENDING ON OR BEFORE THE EFFECTIVE DATE; (D) IS LISTED ON THE SCHEDULE OF "ASSUMED CONTRACTS AND UNEXPIRED LEASES" IN THE PLAN SUPPLEMENT; OR (E) IS OTHERWISE ASSUMED PURSUANT TO THE TERMS HEREIN.**

**THE BAR DATE FOR FILING CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES IS THE LATER OF: (A) THE APPLICABLE CLAIMS BAR DATE AND (B) 30 DAYS AFTER THE EFFECTIVE DATE OF THE REJECTION OF SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. A NOTICE OF THE EFFECTIVE DATE OF THE PLAN, INCLUDING NOTICE REGARDING THE REJECTION OF**

**EXECUTORY CONTRACTS OR UNEXPIRED LEASES, WILL BE SENT TO ALL KNOWN CREDITORS.**

**3.    Procedures with Respect to Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan**

**a.    Notice to Parties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Terms of the Plan**

With respect to executory contracts and unexpired leases that are deemed to be assumed as of the Effective Date, the Plan contains the following important notice:

**A NOTICE OF THE EFFECTIVE DATE OF THE PLAN, INCLUDING NOTICE REGARDING THE ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, WILL BE SENT TO ALL KNOWN CREDITORS.**

The Plan further provides that for known non-Debtor parties to assumed or assumed and assigned executory contracts and unexpired leases pursuant to the terms of the Plan, such notice (or separate notice) will be sent on or as soon as practicable after the Effective Date to notify each such party regarding the executory contract(s) or unexpired lease(s) to which it is a counterparty that have been assumed or assumed and assigned pursuant to the Plan.

**b.    Treatment of Cure Claims of Executory Contracts and Unexpired Leases (Other than Unexpired Leases of Nonresidential Real Property) Assumed Pursuant to the Plan**

The Plan contemplates that, with respect to any executory contract or unexpired lease (other than unexpired leases of nonresidential real property) that is assumed pursuant to the terms of the Plan, the Debtors will satisfy in cash any Cure Claim that is based upon a monetary default by any Debtor under an executory contract or unexpired lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code. Any payment of a Cure Claim will be made on the Effective Date or as soon as reasonably practicable thereafter, as set forth in the Plan or on such terms as the Debtors and the counterparties to such executory contract or unexpired lease may otherwise agree without further notice or order of the Bankruptcy Court. Each of the Debtors' proposed amounts of the respective Cure Claims will be set forth on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement.

**G.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**1.    Conditions Precedent**

The Plan provides that each of the following is a condition to the Effective Date:

- The Confirmation Order will have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors. The Confirmation Order will provide that, among other things, the Debtors or the Post-Effective Date Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

103

- All documents and agreements necessary to implement the Plan, will have (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery and (c) been effected or executed.

- All actions, documents, certificates and agreements necessary to implement this Plan will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

- The Litigation Trust is established and funded in accordance with the provisions hereof and the Litigation Trust Agreement.

- The Confirmation Order will be in form and substance reasonably acceptable to the Debtors and it will contain provisions consistent with those set forth in the Purchase Agreement and will approve the Debtors' consummation of the Plan and entry into and performance under related agreements, including the Plan Documents.

### 2.    Waiver of Conditions

The Plan provides that the conditions set forth above may be waived by the Debtors without notice, leave or order of the Bankruptcy court or any formal action other than proceeding to confirm or consummate the Plan.

### 3.    Effect of Non-Occurrence of Conditions to the Effective Date

The Plan provides that, if the Effective Date does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will:  (a) constitute a waiver or release of any claims by or claims against or equity interests in the Debtors; (b prejudice in any manner the rights of the Debtors, any holders or any other entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other entity in any respect.

### H.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

The Plan contains important provisions with respect settlement, release, injunction and related provisions to be executed in connection with the Plan.

### 1.    Compromise and Settlement

The Plan contains the following language with respect to the nature of the compromises and settlements contained therein:

Notwithstanding anything contained herein to the contrary, subject to the Litigation Trust Causes of Action, the allowance, classification and treatment of all Allowed Claims and Provisionally Allowed Claims and their respective distributions and treatments hereunder takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto.  The Confirmation Order will constitute the

Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (a) in the best interests of the Debtors, their estates and all holders of Claims, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims and Provisionally Allowed Claims take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist:  (i) between the Debtors, on the one hand, and the Plan Releasees, on the other (to the extent set forth in Article VIII.B.1 hereof); and (ii) between and among the Plan Agreement Parties (to the extent set forth in Article VIII.B.2 hereof); and, as of the Effective Date, any and all such Causes of Action are settled, compromised and released to the extent set forth in this Plan.  The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.  Nothing in this Article VIII.A shall compromise or settle in any way whatsoever, any Litigation Trust Causes of Action except as expressly set forth herein or in the Confirmation Order, the TOI Causes of Action or the Objection to Bank Claims.  Further, this paragraph is specifically limited by Article VIII.F hereof.

## 2.        Debtor Releases and Other Agreements

The Plan provides the following language with respect to Debtor releases and other agreements:

### a.        Creditors, Agents, Advisors and Professionals

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their estates and the Post Effective Date Debtors will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to Effective Date in any way relating to the Debtors, the chapter 11 cases, the Plan, or the Disclosure Statement, that could have been asserted at any time, past or present or future by or on behalf of the Debtors or their estates against (a) the current and former members of the Committee and the advisors and attorneys for the Committee, in each case, in their capacity as such, (b) the First Lien Agents, and the advisors and professionals to the First Lien Revolver Lenders and First Lien Term Lenders and all other holders of the First Lien Revolver Claims and First Lien Term Loan Claims , in each case in their capacity as agents, professionals and advisors, (c)  the Second Lien Agent, and the advisors and professionals to the Second Lien Lenders and all other holders of the Second Lien Claims, in each case in their capacity as agent, professionals and advisors and (d) the Debtors' agents, advisors and professionals employed as of the Petition Date or retained or employed during the Chapter 11 Cases, in each case in their capacity as such, except solely to the extent that any such agent, advisor or professional has executed  a tolling agreement with the Debtors preserving the Debtors' rights to pursue certain causes of action (the "Identified Actions") (all parties identified in subsections (a) through (d), above, the "Plan Releasees").

105

### b.        Representatives, Directors and Officers

The Plan provides the following treatment with respect to the Debtors' representatives, directors and officers:

> In addition, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their estates and the Post Effective Date Debtors will agree, and the terms of the Litigation Trust Agreement (the "Agreeing Parties") will provide, that none of the Debtors, their estates, the Post-Effective Date Debtors or the Litigation Trust will pursue any claim, obligation, suit, judgment, damages, demand, debt, right or other cause of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the current or former representatives, directors, and officers of the Debtors (together with the Agreeing Parties, the "Plan Agreement Parties") to the extent that such claim exceeds the available insurance proceeds (taking into account payment of defense costs and other obligations) under any applicable D&O Liability Insurance Policy.

### 3.        Exculpation

The Plan defines "Exculpated Parties" to include the following parties:  (a) the current and former members of the Committee and the advisors and attorneys for the Committee, in each case, in their capacity as such, (b) the First Lien Agents, and the advisors and professionals to the First Lien Revolver Lenders and First Lien Term Lenders and all other holders of the First Lien Revolver Claims and First Lien Term Loan Claims , in each case in their capacity as agents, professionals and advisors, (c) the Second Lien Agent, and the advisors and professionals to the Second Lien Lenders and all other holders of the Second Lien Claims, in each case in their capacity as agent, professionals and advisors and (d) the Debtors' agents, advisors and professionals employed as of the Petition Date or retained or employed during the Chapter 11 Cases, in each case in their capacity as such, except solely to the extent that any such agent, advisor or professional has executed  a tolling agreement with the Debtors preserving the Debtors' rights to pursue certain causes of action.

The Plan provides the following language with respect to the Exculpated Parties:

> The Exculpated Parties shall neither have, nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided*, *however*, that the foregoing exculpation shall have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; *provided still further*, that the foregoing exculpation shall not apply to any contingent Claims or to any Causes of Action that is (i) expressly set forth in and preserved in the Litigation Trust (ii) constitutes all or part of a Defensive Claim (solely to the extent required for defense of a Litigation Trust Cause of Action) and (iii) is expressly set forth in and preserved by the

Plan, any Plan Supplement or related documents.

**4.      Discharge of the Company**

The Plan provides the following language with respect to discharge of the company:

Except as otherwise provided herein, on the Effective Date and effective as of the Effective Date: (a) the rights afforded in the Plan and the Litigation Trust and the treatment of all claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge and release of all claims and Equity Interests of any nature whatsoever, including any interest accrued on such claims from and after the petition date, against the Debtors, or any of their assets, property or estates; (b) subject to applicable law, the Plan shall bind all holders of claims and Equity Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full or cancelled as provided in the Plan, and the Debtors' liability with respect thereto shall be extinguished completely, including, without limitation, any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against any of the Debtors, the Debtors' estates, the Post-Effective Date Debtors, each of their successors and assigns and each of their assets and properties, including without limitation the Litigation Trust Assets and the Proceeds Account, any other claims or Equity Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

**I.      BINDING NATURE OF THE PLAN**

The Plan provides the following language with respect to its binding nature:

**THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDERS FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**J.      RETENTION OF JURISDICTION**

The Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, after the Effective Date, retain the maximum legally permissible jurisdiction over the Debtors' chapter 11 cases and all entities with respect to all matters related to the chapter 11 cases, the Debtors and the Plan, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any claim, including, without limitation, the resolution of any request for payment of any administrative claim, the resolution of any and all objections to the allowance or priority of any claim and the resolution of any and all issues related to the release of liens upon payment of a secured claim;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

107

- resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to adjudicate and, if necessary, liquidate, any claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

- ensure that distributions to holders of allowed claims or Provisionally Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other causes of action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Post-Effective Date Debtors after the Effective Date, provided that the Post-Effective Date Debtors shall reserve the right to commence actions in all appropriate for a and jurisdictions;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or this Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- hear and determine all causes of action that are pending as of the date hereof or that may be commenced in the future, including but not limited to the Litigation Trust Causes of Action;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

- resolve any ambiguities between the Litigation Trust Agreement and the Plan;

- resolve any dispute related to any Unsold Assets in accordance with Article V.B.6 of the Plan;

- interpret and enforce the Oversight Procedures;

- resolve any dispute relating to the Notice Actions;

- enforce Article V.B.10 of the Plan;

- enforce Article V.C.4 of the Plan;

- enforce Article VIII.A, Article VIII.B, Article VIII.C, Article VIII.D, Article VIII.E, Article VIII.F and VIII.G of the Plan;

- enforce the injunction set forth in Article VIII.G of the Plan;

- order release of the Net Proceeds held in escrow pursuant to Article V.D of the Plan;

- resolve any cases, controversies, suits or disputes with respect to the Debtor Release, the Exculpation and other provisions contained in Article VIII of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

- enter an order concluding any or all of the chapter 11 cases.

## K.    MISCELLANEOUS PROVISIONS

### 1.    Dissolution of the Committee

The Plan provides that, after the Effective Date, the Committee will dissolve with respect to the Debtors and its respective members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to the Chapter 11 Cases.  The Plan provides, however, that the Committee and its retained professionals shall be retained with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or the Confirmation Order and (3) pending appeals and related proceedings.  Such Committee dissolution, release and discharge shall take place after the Effective Date upon the filing by the Committee of a notice of such dissolution, release and discharge, which notice shall be filed no later than the latest of: (i) 30 days after the Effective Date; (ii) 30 days after any appeal of the Confirmation Order pending after the Effective Date terminates or is denied; and (iii) such other date as may be set by the Bankruptcy Court for cause.

### 2.    Modification of the Plan

The Plan contains the following language with respect to modification of the Plan:

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Post-Effective Date Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 3.    Revocation of the Plan

The Plan provides that the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  In addition, the Debtors reserve the right to seek confirmation of some, but not all of the chapter 11 Plans for TOUSA, Inc., the Subsidiary Debtors and Beacon Hill at Mountain's Edge, LLC.  If the Debtors revoke or withdraw one or more of the Plans, or if confirmation or the Effective Date does not occur, then: (a) the applicable Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the applicable Plan, assumption or rejection of executory contracts or unexpired leases effected by the applicable Plan and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the applicable Plan shall: (x) constitute a waiver or release of any Claims by or against such Debtor or any other Entity; (y) prejudice in any manner the rights of the Debtors or any other Entity; or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other entity.

# VII. SOLICITATION AND VOTING PROCEDURES

### A.    OVERVIEW

The Disclosure Statement Order established certain procedures that govern the Debtors' solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation and Voting Procedures"). This section provides an overview of those procedures; however, the Disclosure Statement Order is attached to this Disclosure Statement as Exhibit B, and should be reviewed in its entirety.

### B.    VOTING DATES AND DEADLINES

The Bankruptcy Court has established several deadlines with respect to voting on the Plan.

### 1.    The Voting Record Date

The Bankruptcy Court has established [May 14], 2009 as the "Voting Record Date."  The Voting Record Date is the date on which the Debtors and the Bankruptcy Court will determine: (a) those holders of claims against the Debtors (including holders of bonds, debentures, notes and other securities) that are entitled to vote to accept or reject the Plan and receive a solicitation package that will contain important information and required voting material with respect to the Plan (the "Solicitation Package"); (b) those holders of claims, including the identity of beneficial holders, that are entitled to vote to accept or reject the Plan; and (c) those transferred claims that have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a claim against the Debtors.

| The Voting Record Date is [May 14], 2009 |
|---|

### 2.    The Voting Deadline

The Voting Deadline is the latest date on which all properly executed and completed votes to reject or accept the Plan must be **actually received** by the Voting and Claims Agent at the following address:  TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, or, in the case of Master Ballots, by the Securities Voting Agent at the following address:  Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, New York 10017, Attn:  TOUSA Ballot Processing..

| The Voting Deadline is [June 17], 2009 |
|---|

110

F.    **DISTRIBUTION OF THE SOLICITATION PACKAGE**

The Solicitation Package contains important information and required voting material. The Solicitation Package contains, among other things: (a) a cover letter urging holders of claims entitled to vote to accept the Plan; (b) an appropriate form of Ballot or Master Ballot, as applicable; (c) voting instructions; (d) a copy of the Disclosure Statement Order; (e) a copy of the notice of hearing scheduling the Confirmation Hearing; and (f) a copy of this Disclosure Statement, as approved by the Bankruptcy Court.

The Bankruptcy Code provides that a creditor or holder of a claim against a debtor is not entitled to vote to accept or reject a plan of reorganization if the proposed plan does not impair that creditor's rights or if the creditor will not receive property under the plan. Conversely, parties whose interests are impaired under a proposed plan or who receive property under the plan are entitled to vote on such plan.

In light of this standard, the classes listed on <u>Exhibit D</u> hereto are "impaired" and are the <u>only</u> classes of claims or interests entitled to vote to accept or reject the Plan. The Debtors have distributed the Solicitation Packages no fewer than 30 days before the Voting Deadline by first class mail to holders of claims in the Voting Classes who are entitled to vote on the Plan, as determined by the following criteria:

- holders of claims for which proofs of claim have been timely filed, as reflected on the Court's claims register as of the Voting Record Date; provided, however, that holders of claims to which an objection is pending at least 15 days before the Confirmation Hearing shall not be entitled to vote unless such holders become eligible to vote through a Resolution Event in accordance with subsection (v)(f) below;

- parties listed in the Debtors' most recently filed schedules of assets and liabilities (as amended and restated from time to time, the "Schedules"); provided, however, that claims that are scheduled as contingent, unliquidated or disputed, or any combination thereof and that have been superseded by a timely filed proof of claim shall not receive a Solicitation Package; provided, further, that holders of claims that are scheduled as contingent, unliquidated or disputed for which the applicable bar date for such holder has not passed shall receive a Solicitation Packages;

- holders of claims that arise pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a proof of claim with respect to such claim has been filed;

- applicable nominees with respect to a beneficial holder of a claim, as reflected in the relevant records as of the Voting Record Date; and

- the assignee of any transferred or assigned claim, but only if such transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the claims register on or before the Voting Record Date.

If your claim or interest is in one of these classes and satisfies one of these criteria, you will have received a document upon which you may indicate your acceptance or rejection of the Plan (each, a "Ballot" or "Master Ballot," as the case may be) along with this Disclosure Statement (*see* section VII below). If your claim or interest is not in one of these classes, or is in a Voting Classes but does not meet

111

one of these criteria, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement. **DETAILED VOTING INSTRUCTIONS ARE PROVIDED ON THE BALLOT. YOU SHOULD READ YOUR BALLOT CAREFULLY AND FOLLOW ALL LISTED INSTRUCTIONS.**

Please use only the Ballot and/or Master Ballot that accompanies this Disclosure Statement. If a Ballot or Master Ballot is damaged or lost, or you have any questions concerning voting procedures, you may contact the Debtors' Voting and Claims Agent by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (b) by calling 866-381-9100 or (c) by emailing KCC_TOUSA@kccllc.com.

### 3.    Temporary Allowance of Claims for Voting Purposes

The Disclosure Statement Order establishes certain criteria by which the Debtors will calculate the amount of each claim for voting purposes. If, however, a creditor disagrees with the resulting amount of its claim (such claim, a "Disputed Claim"), the holder of such Disputed Claim may seek to obtain one of the following "Resolution Events" at least five business days before the Voting Deadline:

- an order by the Bankruptcy Court, after notice and a hearing, allowing a Disputed Claim in a specified amount;

- an order by the Bankruptcy Court temporarily allowing a Disputed Claim in a specified amount for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

- a stipulation or other agreement is executed between the holder of a Disputed Claim and the Debtors resolving the objection and allowing such Disputed Claim in an agreed upon amount;

- a stipulation or other agreement is executed between the holder of Disputed Claim and the Debtors temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or

- the Debtors voluntarily withdraw a pending objection to a Disputed Claim.

Additionally, in the event the Debtors' object to a claim at least 15 days before the Confirmation Hearing but after such holder of a claim receives a Solicitation Package, the Debtors' notice of objection is required to inform such holder of the rules applicable to claims subject to a pending objection and the procedures for temporary allowance for voting purposes described above. Furthermore, if the holder of a claim receives a Solicitation Package and the Debtors object to such Claim less than 15 days before the Confirmation Hearing, the holder's claim will be deemed temporarily allowed for voting purposes only without further action by the holder of such claim and without further order of the Bankruptcy Court.

### C.    REQUIREMENTS FOR ACCEPTANCE OF THE PLAN

### 1.    Acceptance by Voting Classes

The Bankruptcy Code determines whether a class entitled to vote accepts a plan of reorganization by calculating the number of claims voting to accept, based on the actual total claims voting. Acceptance requires an affirmative vote of a majority of the total claims voting and two-thirds in amount of the total claims voting.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in the accordance with the provisions of the Bankruptcy Code.

> **2.      Presumed Rejection and "Cram Down"**

For purposes of voting on the Plan, interests in TOI Class 6 and Class for each of the Subsidiary Debtors are conclusively presumed to have rejected the Plan.  It is possible that other classes of claims may vote to reject the Plan as well.  With respect to each of the individual plans for each of the Debtors, in the event at least one class of impaired claims votes to accept the plan for a particular debtor, and as discussed further in section VIII.D.5, below, the Debtors will use the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan notwithstanding the deemed rejections and any rejection of any class entitled to vote on the Plan.

**D.      COMPLETION OF BALLOTS**

A Ballot or Master Ballot will <u>not</u> be counted in determining the acceptance or rejection of the Plan if it is:

- Illegible or contains insufficient information to permit the identification of the holder of a claim;

- Submitted by a holder of a claim in a class that is not entitled to vote on the Plan;

- Submitted by a holder of a claim listed in the Schedules as contingent, unliquidated or disputed, or any combination thereof, for which the applicable Bar Date has passed and no proof of claim was timely filed;

- Unsigned;

- Not **clearly marked** to accept or reject the Plan or any Ballot marked both to accept and reject the Plan; or

- Submitted by any entity not entitled to vote pursuant to the Solicitation Procedures.

# VIII. CONFIRMATION OF THE PLAN

**A.      CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  The Confirmation Hearing has been scheduled for [June 22], 2009 at 9:30 a.m. (Prevailing Eastern Time) before the Honorable John K. Olson United States Bankruptcy Judge, at the United States Bankruptcy Court, Room 301, 299 E. Broward Boulevard, Fort Lauderdale, Florida 33301.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

**B.      OBJECTIONS TO CONFIRMATION**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be:

- made in writing;

- must conform to the Bankruptcy Rules and the Local Rules;

- must set forth the name of the objector and the nature and amount of claims or interest held or asserted by the objector against the Debtors, the basis for the objection and the specific grounds therefor;

- must be filed with the Bankruptcy Court electronically; and

- be served upon (a) the office of United States Trustee for the Southern District of Florida, 33 Whitehall Street, 21st Floor, New York, New York, 10004 (Attention: Steven D. Schneiderman, Esq.); (b) Kirkland & Ellis LLP, attorneys for the Debtors,153 53rd Street, New York, New York 10022 (Attention: M. Natasha Labovitz); (c) [other parties to come] and (d) all other parties required by the Bankruptcy Court's March 25, 2008 Amended Order Establishing Certain Notice, Case Management and Administrative Procedures [D.E. #655].

All objections to the Plan must be **actually** **received** no later than [June 17], 2009. All objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER A PLAN OBJECTION UNLESS IT IS TIMELY SERVED AND FILED IN COMPLIANCE WITH THIS DISCLOSURE STATEMENT ORDER.**

## C.   OVERVIEW OF STATUTORY REQUIREMENTS TO CONFIRM THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements in section 1129 of the Bankruptcy Code have been satisfied with respect to each Plan:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of affiliates of the Debtors participating in the Plan, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy,

114

and the Debtors have disclosed the identity of any insider that will be employed or the Debtors and the nature of any compensation for such insider.

- With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan. TOI Class 6 and Class for 6 each of the Subsidiary Debtors are deemed to have rejected the Plan. The Plan can be confirmed only if the requirements of section 1129(b) of the Bankruptcy Code are met.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that Administrative Expense Claims, Priority Tax Claims and Other Priority Claims will be paid in full on the Effective Date.

- At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of TOUSA or any successor to TOUSA under the Plan, unless such liquidation or reorganization is proposed in the Plan. See section VIII.D.3, below.

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant by the provisions of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors are obligated to provide such benefits.

**D.    SPECIFIC STATUTORY CONFIRMATION REQUIREMENTS**

**1.    Overview of the Best Interests of Creditors Test / Liquidation Analysis**

As mentioned above, the Bankruptcy Code provides that one of the factors a bankruptcy court must consider before confirming a proposed plan of reorganization, regardless of whether or not anyone objects to confirmation, is that the proposed plan is in the "best interests" of all classes of claims and equity interests which are impaired.

The "best interests" test will be satisfied by a finding of the bankruptcy court that either (a) all holders of impaired claims or equity interests have accepted the plan or (b) the plan will provide such a holder that has not accepted the plan with a recovery at least equal in value to the recovery such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

115

The first step in determining whether the liquidation component of this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of a debtor's assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the debtor and any preference recoveries, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the termination of the debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the value of such allocations (not taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

A debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the chapter 11 cases allowed in a chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the debtor and statutory committees of unsecured creditors appointed in the chapter 11 cases, and costs and expenses of members of the statutory committee of unsecured creditors, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the debtor during the pendency of the chapter 11 cases.

After considering the effects that a chapter 7 liquidation would have on the proceeds ultimately available for distribution to creditors in the chapter 11 cases, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (b) additional costs associated with the rapid transfer or cessation of operations at the facilities and the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (c) the substantial increases in claims that would be satisfied on a priority basis, each of TOUSA and the Subsidiary Debtors has determined that confirmation of the Plan will provide each holder of an allowed claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7.

The Debtors also believe that the value of any distributions to each class of allowed claims in a chapter 7 case, including all secured claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for one or more years after the completion of such liquidation to resolve claims and prepare for distributions. In the event litigation was necessary to resolve claims asserted in a chapter 7 case, the delay could be prolonged and administrative expenses increased.

The Debtors' consolidated liquidation analysis (the "Liquidation Analysis"), as provided in the next section, is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors. The analysis is based on a number of significant assumptions. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

116

### 2.    Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that each holder of a claim or interest in each impaired class: (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each chapter 11 case were converted to a chapter 7 case and the assets of such estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting holder of a claim or interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtors' management, together with Zolfo Cooper, prepared the analysis of estimated distributions to creditors under the Plan set forth below (the "Plan Distribution Analysis") and the Liquidation Analysis attached hereto as Exhibit E.

The Plan Distribution Analysis is attached to this Disclosure Statement as Exhibit F.  The Plan Distribution Analysis presents "High" and "Low" estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms. These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors. The Plan Distribution Analysis has the same projected Effective Date as the Liquidation Analysis. In addition, management's assumptions in the Plan Distribution Analysis regarding anticipated events and proceeds expected to be realized prior to the Effective Date are the same as those used to prepare the Liquidation Analysis.

If the Plan is confirmed, on the Effective Date the Debtors will transfer certain of their assets to the Litigation Trust, and the Plan Administrator will continue to administer the Debtors' business operations in accordance with the Debtors' revised business plan discussed in section I.B of this Disclosure Statement.

### 3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the creditors pursuant to the terms of the Plan. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

### 4.    Acceptance by Impaired Classes

The Bankruptcy Code generally requires that each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b)

117

cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Exhibit D hereto identifies the classes that are not impaired under the Plan that receive or retain no property under the Plan. The holders of claims in those classes are deemed to have accepted the Plan.

Exhibit D also identifies the classes that are impaired under the Plan, and as a result, are entitled to vote on the Plan (the "Voting Classes"). Pursuant to section 1129 of the Bankruptcy Code, the holders of claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, classes of claims entitled to vote will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 5.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted the plan, if that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### a.    Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### b.    Fair and Equitable

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims (to the extent that the Bankruptcy Court determines that the claims are allowed and fully secured) includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims*:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests*:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, in view of the deemed rejection by the classes listed in <u>Exhibit D</u> hereto and the possible rejection of the plan by certain of the Voting Classes.  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors reserve the right to modify the Plan in accordance with Article XIII of the Plan.

**6.        Classification of Claims and Equity Interests Under the Plan**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar."  The Plan establishes classes of claims and equity interests as required by the Bankruptcy Code and summarized in section VI.B, above.

TOUSA Disclosure Statement Wind Down Version_(14468796_10)

# IX.  RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

## A.    BANKRUPTCY CONSIDERATIONS

### 1.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in that class.  The Debtors believe that the classification of holders of claims against and holders of equity interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interests.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Voting Requirements

If the Debtors receive votes in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, to confirm the Plan.  In the event the Debtors do not receive sufficient votes, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance, however, that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the current proposed Plan.

### 3.    Failure to Secure Confirmation of the Plan

As discussed in sections VIII.C and VIII.D, above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires the Bankruptcy Court to make a series of specified, independent findings.

Even if the Debtors receive the required votes accepting the Plan, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less

favorable treatment of any non-accepting Class, as well as of any classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.        Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm the plan under the procedure for nonconsensual confirmation described in section VIII.D.5, above.  The Debtors believe that the Plan satisfies the requirements for nonconsensual confirmation.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5.        Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the Post-Effective Date Debtors reserve the right to object to the amount or classification of any claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a claim against the Debtors where such claim is subject to an objection.  Any holder of a claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**B.        RISK FACTORS ASSOCIATED WITH THE VALUE OF THE LITIGATION TRUST INTERESTS TO BE ISSUED UNDER THE PLAN**

### 1.        Recent Dislocation in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries

The recent disruption within numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy, and has impacted the homebuilding industry in particular.  While the ultimate effects of this crisis on the homebuilder industry are as yet unclear, it is possible that this financial market will prevent even qualified borrowers from being able to obtain mortgages on affordable terms, if at all.  Presently, approximately 90% of the Debtors' customers finance their purchases through mortgage financing obtained from the Debtors or other sources.  A continued sustained freeze of the credit markets as a result of the recent dislocation in the financial markets could have a significant adverse impact on the homebuilder industry and the Debtors.

Indeed, approximately 90% of the Debtors' customers finance their purchases through mortgage financing obtained from the Debtors or other sources.  As a result, the availability of mortgage financing is a critical factor in the Debtors' marketing efforts, and any limitations or restrictions on the availability of financing could reduce the Debtors' home sales and the lending volume at the Debtors' mortgage subsidiary.

During 2007, the mortgage lending and mortgage finance industries experienced significant instability due to, among other things, defaults on subprime loans and a resulting decline in the market value of such loans.  These developments led to reduced investor demand for mortgage loans and mortgage backed securities, tightened credit requirements, reduced liquidity, increased credit risk premiums and regulatory actions.  Deterioration in credit quality among subprime and other nonconforming loans also caused most lenders to eliminate subprime mortgages.

Recently, the severe dislocation in the financial markets has further impacted the ability of customers to obtain mortgages — even among qualified borrowers not seeking subprime mortgages.  This

has led to a further decrease in demand for new homes, as purchasers are unable to obtain sufficient financing. If this trend continues, it could have a significant materials adverse effect on the Debtors' businesses, by reducing both the Debtors' overall home sales and the lending volume at the Debtors' mortgage subsidiary.

**2.      The Post-Effective Date Debtors May Not be Able to Achieve Projected Financial Results**

The Debtors' projected financial results reflect management's best estimate of the Post-Effective Date Debtors' future financial performance based on currently known facts and hypothetical assumptions about, among other matters, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Post-Effective Date Debtors, homebuilder industry performance and general business and economic conditions. Many of these factors are beyond the control of the Post-Effective Date Debtors. As a consequence, the Post-Effective Date Debtors' actual financial results may differ significantly from the projections. Specifically, the Post-Effective Date Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects.

**3.      The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims**

The claims estimates set forth in this Disclosure Statement are based on various assumptions. The actual allowed claims amounts may differ significantly from those estimates should one or more of those underlying assumptions prove to be incorrect. Such differences may materially and adversely affect the percentage recovery to holders of such claims under the Plan.

**4.      Certain Tax Implications of the Debtors' Bankruptcy May Increase the Tax Liability of the Post-Effective Date Debtors**

Holders of claims and equity interests should carefully review section XI hereof to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Post-Effective Date Debtors.

**5.      Transferability and Evidence of the Litigation Trust Interests**

The Plan provides that the Litigation Trust Interests will not be transferable. If the Litigation Trust Interests are tradable, the Debtors believe that certain adverse consequences would result under tax and securities laws.

**6.      The Post-Effective Date Debtors May be Subject to an Enforcement Action Brought by the Securities and Exchange Commission Which Could Subject the Post-Effective Date Debtors to Fines and Interfere with its Operations Going Forward.**

TOUSA is required to file annual, quarterly, and periodic reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). For reasons indicated in various filings with the SEC, TOUSA did not file its annual report on Form 10-K for the year ended December 31, 2007 with the SEC when it was due nor did TOUSA timely file its quarterly reports for the fiscal quarters ended March 31, 2008, June 30, 2008, and September 30, 2008. The SEC has indicated to the Debtors that it may seek to bring an enforcement action pursuant to Section 21 of the Exchange Act which may include civil penalties in connection with such delinquent filings.

**C.       RISKS ASSOCIATED WITH THE DEBTORS' BUSINESS OPERATIONS**

**1.       General Homebuilder Industry Downturn**

As described in detail in section V.A.1 of this Disclosure Statement, the homebuilding industry has experienced a significant and sustained decrease in demand for new homes, an oversupply of new and existing homes available for sale and a more restrictive mortgage lending environment.  Reflecting these trends, the Debtors, like many other homebuilders, have experienced the impact of severe liquidity challenges in the credit and mortgage markets, diminished consumer confidence, increased home inventories and foreclosures and downward pressure on home prices.  This downturn in the homebuilding market may continue for an indefinite period.  Continued weakness in the homebuilding market would have a further adverse effect on the Debtors' business and results of operations as compared to those of earlier periods.

**2.       Continued High Cancellation Rates**

Notwithstanding the implementation of new sales strategies to combat adverse industry trends, the Debtors have continued to experience an elevated rate of sales contract cancellations.  The Debtors believe that the elevated cancellation rate reflects a decrease in homebuyer confidence, with continued price declines and increases in the level of sales incentives for both new and existing homes prompting homebuyers to forgo or delay home purchases, a more restrictive mortgage lending environment and the inability of buyers to sell their existing homes.  Many of the factors that affect new orders and cancellation rates, including the level of employment, consumer confidence, consumer income, the availability of financing and interest rate levels, are beyond the Debtors' control.  As a result, continued reduced sales levels and the increased cancellation levels would continue to have an adverse effect on the Debtors' business and results of operations.

**3.       Unexpected Natural Disasters or Weather Conditions**

Homebuilders are particularly subject to natural disasters and severe weather conditions that can delay the ability to timely complete or deliver homes, damage partially complete or other unsold homes in inventory, negatively impact the demand for homes and negatively affect the price and availability of qualified labor and materials.  The Debtors' operations are located in many areas that are especially subject to natural disasters.  To the extent that hurricanes, severe storms, floods, tornadoes or other natural disasters or similar weather events occur, the Debtors' business may be adversely affected.  To the extent the Debtors' insurance is not adequate to cover business interruption or losses resulting from these events, the Debtors' revenues and profitability may be adversely affected.

**4.       Fluctuations in Market Conditions**

As a homebuilder, the Debtors must constantly locate and acquire new tracts of land for development and developed homesites to support their homebuilding operations.  There is generally a lag between the time the Debtors acquire land for development or developed home sites and the time that the Debtors can bring the communities to market and sell homes.  Lag time varies on a project by project basis; however, historically, the Debtors have experienced a lag time of up to three years.  As a result, the Debtors face the risk that demand for housing may decline or costs of labor or materials may increase during this period, in which case the Debtors may not be able to dispose of developed properties, undeveloped land or homesites acquired for development at expected prices or profit margins or within anticipated time frames.  Moreover, lag time can increase inventory carrying costs (including interest on funds used to acquire land or build homes) which can be significant and adversely affect performance.  If

123

the current downturn in the housing market continues, these effects may continue, which could have a continuing material adverse impact on the Debtors' businesses.

**5.      Ability to Recoup Costs**

In accordance with the Debtors' business model, the Debtors incur many costs before construction commences in a community. These costs range from the costs of developing land and installing roads, sewage and other utilities to taxes and other costs related to ownership of the land on which the Debtors plan to build homes. The Debtors recover these costs through the sale of homes; a reduction in home sales extends the length of time it takes the Debtors to recover these costs.

**6.      Dependence on Subcontractors**

Substantially all of the Debtors' construction work is performed by subcontractors. As a result, insufficient availability of, or unsatisfactory performance by, these unaffiliated third party subcontractors could have a material adverse effect on the Debtors' businesses.

**7.      Ability to Retain and Motivate Key Employees**

The Debtors' overall success is largely dependent on the skills, experience and efforts of the Debtors' people, particularly senior management. The Debtors' ability to attract, motivate and retain key and essential personnel has been impacted by the Chapter 11 Cases and the Bankruptcy Code, which limits the Debtors' ability to implement a retention program or take other measures intended to motivate employees to remain with the Debtors. Indeed, certain employees, including certain key members of senior management, have resigned following the filing of the Chapter 11 cases. The continued loss of such individuals or other key personnel could have a material adverse effect upon the Debtors' business operations and their ability to reorganize successfully.

**8.      Supply Risks; Labor and Materials Shortages**

The homebuilding industry from time to time has experienced significant difficulties with respect to: shortages of qualified trades people and other labor; inadequately capitalized local subcontractors; shortages of materials; and volatile increases in the cost of certain materials, including lumber, framing, roofing and cement, which are significant components of home construction costs, associated with the rapid rise in the cost of oil, energy, and other factors. These difficulties can cause unexpected short term increases in construction costs and construction delays.

Historically, the Debtors have been able to offset sustained increases in the costs of materials with increases in the prices of their homes and through operating efficiencies. In the future, however, factors such as pricing competition, oversupply of new and existing homes and tightening mortgage qualifications may restrict the Debtors' ability to pass on additional costs, which would have a negative impact on the Debtors' profit margins.

**9.      Effect of Competition Within the Homebuilding Industry**

The homebuilding industry is highly competitive and fragmented. The Debtors compete in each of their markets with numerous national, regional and local builders. Some of those competitors have greater financial resources, more experience, more established market positions, better opportunities for land and homesite acquisitions and lower costs of capital, labor and material than the Debtors. Thus, certain of the Debtors' principal competitors may be better able to withstand market conditions in the homebuilding industry.

There can be no assurance that the Debtors will be able to compete successfully for homebuyers, or desirable properties, raw materials and skilled subcontractors, or that the Debtors will not face increased competition in the future.  Competitive conditions in the homebuilding industry could have a materially adverse effect on the Debtors' businesses, financial conditions and results of operations, including but not limited to: increased costs, including selling and marketing expenses, with reduced revenues and/or profit margins; necessity of increasing selling commissions and other incentives; delays in construction arising from delays in procuring materials or hiring laborers; and lower sales volumes.

### 10.    Ability to Obtain Bonds

The Debtors routinely obtain and provide performance bonds, as required under certain contracts. The market for performance bonds, however, has been severely impacted by corporate failures in recent years and continues to be impacted by general economic conditions.  Consequently, less overall bonding capacity is available in the market than in the past, and surety bonds have become more expensive and restrictive.  Additionally, in certain cases where the Debtors have stopped activities in a community, the Debtors may have failed to complete the infrastructure for which the performance bond was posted.  In such cases, sureties for the performance bonds are required to fulfill the Debtors' obligations; as a result, these sureties may be unwilling to issue performance bonds or may require additional collateral to issue or renew performance bonds in the future.  An inability to obtain new or renew existing performance bonds in a timely manner, on acceptable terms, could limit the Debtors' ability to enter into new contracts or fulfill existing contracts, which would have a material adverse effect on the Debtors' financial condition and results of operations.

### 11.    Product Liability and Warranty Claims

In the ordinary course of business, the Debtors provide homebuyers with a limited warranty covering workmanship and materials and a limited warranty covering major structural defects.  Claims arising under these warranties and general liability claims are common in the homebuilding industry and can be costly.  Although the Debtors maintain liability insurance, the coverage offered by, and availability of, liability insurance for construction defects is currently limited and, where coverage is available, it may be costly.  Moreover, in certain instances, the Debtors' insurance coverage may contain limitations with respect to coverage; this insurance coverage may not be adequate to cover all liability and warranty claims for which the Debtors may be liable.  In addition, coverage may be further restricted and become more costly in the future.  Furthermore, although the Debtors generally seek to require subcontractors and design professionals to indemnify the Debtors for liabilities arising from their work, the Debtors may be unable to enforce such contractual indemnities.  Uninsured and unindemnified liability and warranty claims, as well as the cost of insurance coverage, could adversely affect the Debtors' results of operations.

### 12.    Governmental Regulations

Various aspects of the Debtors' business operations are subject to governmental regulations that may delay, increase the cost of, prohibit or severely restrict our development and homebuilding projects. These include laws and regulations regarding, among other matters: the land development and homebuilding process, including laws and regulations related to zoning, permitted land uses, levels of density, building design, elevation of properties, water and waste disposal, and use of open spaces; workers health and safety; environmental protection; financial services operations and licensing; title insurance; and real estate lending.  The Debtors must also obtain permits and approvals from local authorities to complete residential development or home construction.  The laws and regulations under which the Debtors and their subcontractors operate, and their obligations to comply with such laws and regulations, may result in delays in construction and development, cause the Debtors to incur substantial

compliance and other increased costs, and prohibit or severely restrict development and homebuilding activity in certain areas in which the Debtors operate.

Finally, several states, cities and counties in which the Debtors operate have approved, or may approve, various "slow growth" or "no growth" initiatives and other ballot measures that could negatively impact the availability of land and building opportunities within those localities. Approval of such measures would reduce the Debtors' ability to build and sell homes in the affected markets and create additional costs and administration requirements, which in turn could have an adverse effect on the Debtors' future revenues.

## D.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to a case (or cases) under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan in light of the following considerations: (a) the likelihood that the assets of the Debtors would be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (b) additional administrative expenses involved in the appointment of a trustee; and (c) additional expenses and claims, some of which would be entitled to priority status, arising from, among other things, the rejection of leases and executory contracts in connection with a cessation of the Debtors' business operations.  The Debtors' Liquidation Analysis is attached hereto as <u>Exhibit D</u>.

## E.    ALTERNATIVES TO THE PROPOSED PLAN

If the Plan is not confirmed, the Debtors could attempt to formulate a different plan.  Such a plan might involve either (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code (a "363 Sale").  With respect to an alternative plan of reorganization, the Debtors have explored various restructuring alternatives in the formulation of the Plan and believe that the Plan, as described herein, enables creditors to realize a greater value under the circumstances than would other restructuring alternatives.

In a 363 Sale, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation scenario under chapter 7, which could result in greater (but indeterminate) recoveries than would be obtained in chapter 7.  Furthermore, because the appointment of a trustee is not required in a 363 Sale scenario, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 liquidation.  However, while a chapter 11 liquidation through a 363 Sale is preferable to a chapter 7 liquidation, the Debtors believe that any liquidation or sale scenario is a much less attractive alternative to holders of claims and equity interests than the Plan because the Plan provides for a greater recovery for holders of claims and equity interests.

# X.   CERTAIN SECURITIES LAW MATTERS

## A.    ISSUANCE OF SECURITIES UNDER THE PLAN

Given the nature of the Litigation Trust Interests the Debtors do not believe such Litigation Trust Interests constitute securities under the Securities Act of 1933, as amended.  If the Litigation Trust Interests were deemed to be securities, the Debtors believe such Litigation Trust Interests would qualify for the exemption contained in Section 1145 of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code generally exempts the issuance of securities under a plan of reorganization from registration under

the Securities Act and under state securities "blue sky" laws if three principal requirements are satisfied: (a) the securities are issued "under a plan of reorganization" by the debtor or its successor under a plan or an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor; and (c) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.

**B.**     **OBLIGATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

The Securities and Exchange Act of 1934, as amended (the "Exchange Act") governs the secondary trading of securities and requires issuers subject thereto to file reports with the Securities and Exchange Commission including on a quarterly and annual basis.  The Debtors do not anticipate that the Litigation Trust will be subject to the reporting requirements of the Exchange Act given the characteristics of the Litigation Trust Interests and therefore the Litigation Trust will not file reports with the Securities and Exchange Commission.

# XI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.**     **INTRODUCTION**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and certain holders of claims and equity interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The Debtors have not requested and do not intend to request a private letter ruling from the IRS or an opinion of counsel with respect to any of the aspects of the Plan.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to holders of claims and equity interests that are not "U.S. persons" (as such phrase is defined in the IRC) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  The following discussion assumes that each holder of a claim holds its claim as a "capital asset" within the meaning of Section 1221 of the IRC.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.    CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS WITH RESPECT TO TOUSA, INC.**

Pursuant to the Plan, the Debtors intend to sell their assets in an orderly liquidation during the Wind-down Term.  These sales may result in the recognition of taxable gain or loss to the Debtors, based on the difference between the fair market value of these assets and the Debtor's tax basis in these assets. To the extent that the Debtors realize gain from the transfer of these assets the Debtors believe that they will have sufficient current losses and net operating loss carryovers to shelter these gains, although it is possible that the Debtors may be required to pay federal income tax on some or all of any gains recognized.  There could also be some liability for taxes in certain states and under the federal alternative minimum tax.

### 1.    Consequences to Holders of Class 1A Claims,  Class 1B Claims, and Class 2 Claims

Class 1A Claims, Class 1B Claims, and Class 2 Claims will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive their Pro Rata share of the Net Proceeds from the Wind-Down Proceeds Account.   A Holder should recognize gain or loss equal to the difference between the fair market value as of the Effective Date of such Holder's  right to receive the Net Proceeds (to the extent such right is not allocable to accrued interest) and the Holder's tax basis in the Claims surrendered by the Holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.  To the extent that any portion of the right to receive the Net Proceeds in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the right to receive the Net Proceeds should be equal to the fair market value of such right as of the Effective Date.  A Holder's holding period for the right should begin on the day following the Effective Date.

It is plausible that a holder of a Class 1A Claim, Class 1B Claim, and Class 2 Claim  could treat the exchange of such Claim for the right to receive Net Proceeds as an "open" transaction for United States federal tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of cash that will actually be distributed to such holders from the Wind-down Proceeds Account.  The United States federal income tax consequences of an open transaction are uncertain and highly complex, and a holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the

128

extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for consideration (or the right to receive consideration) on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Gain, if any, recognized by a Holder on the exchange of a Claim pursuant to the Plan that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

**2.      Consequences to Holders of Class 3 Claims**

Class 3 Claims will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive either payment in cash or delivery of the collateral securing such Claim. If a Holder of a Class 3 Claim receives cash or has all collateral securing such Claim returned in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the IRC. The Holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the Holder has held its Claim for more than one year) (subject to the "market discount" rules described above) equal to the difference between (x) the amount of cash or the fair market value of other property received and (y) the Holder's adjusted tax basis in its Claim. To the extent that the cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder may recognize ordinary interest income. A Holder's tax basis in any property received should be equal to the fair market value of such property as of the Effective Date. A Holder's holding period for the property should begin on the day following the Effective Date.

**3.      Consequences to Holders of Class 5 Claims**

Class 5 Claims will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive (i) their Pro Rata share of the Net Proceeds from the Wind-Down Proceeds Account and (ii) their Pro Rata share of the applicable series of Litigation Trusts Interests for the applicable Debtor. The amount to be received, if any, with respect to the Litigation Trust Interests is contingent on the outcome of the Claims placed into the Litigation Trust.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation Section 301.7701-4(d) and related regulations, the Litigation Trustee intends to take a position on the Litigation Trust's tax return that the Litigation Trust should be treated as a grantor trust set up for the benefit of the Litigation Trust Beneficiaries. Holders of Allowed Claims that receive Litigation Trust Interests will be treated for United States federal income tax purposes as receiving their pro rata shares of the Litigation Trust Assets from the Debtors in a taxable exchange and then depositing them in the Litigation Trust in exchange for Litigation Trust Interests.

Holders of Class 5 Claims should recognize gain or loss equal to the difference between (a) the fair market value as of the Effective Date of their pro rata share of the Litigation Trusts Assets (to the extent it is not allocable to accrued interest) and (b) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the Litigation Trust Interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Litigation Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

Holders of Allowed Claims that receive Litigation Trust Interests will be required to report on their United States federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Litigation Trust. This requirement may result in such holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. Holders of Allowed Claims that receive Litigation Trust Interests are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Litigation Trust.

## C.    WITHHOLDING AND REPORTING

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if such holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is provided to the IRS.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS**

130

**TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# XII.  CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all holders of claims against the Debtors and urge all parties entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Debtors' Voting and Claims Agent or the Securities Voting and Claims Agent, as appropriate, no later than **5:00** p.m. prevailing Pacific Time on [June 17], 2009.

Dated:  April 17, 2009

Respectfully submitted,

TOUSA, INC.

By:  /s/
Its:  **[TITLE]**

| | |
|---|---|
| Beacon Hill at Mountain's Edge, LLC | Engle Homes Commercial Construction, LLC |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| Engle Homes Delaware, Inc. | Engle Homes Residential Construction, L.L.C. |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| Engle Sierra Verde P4, LLC | Engle Sierra Verde P5, LLC |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| Engle/Gilligan LLC | Engle/James LLC |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| LB/TE #1, LLC | Lorton South Condominium, LLC |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| McKay Landing LLC | Newmark Homes Business Trust |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |
| | |
| Newmark Homes Purchasing, L.P. | Newmark Homes, L.L.C. |
| By:  /s/ | By:  /s/ |
| Its:  **[TITLE]** | Its:  **[TITLE]** |

Newmark Homes, L.P.
By:    /s/
Its:    **[TITLE]**

Reflection Key, LLC
By:    /s/
Its:    **[TITLE]**

TOI, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Delaware, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Arizona, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Florida, L.P.
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Investment #2, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Mid-Atlantic Holding, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Nevada, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes, L.P
By:    /s/
Its:    **[TITLE]**

TOUSA Mid-Atlantic Investment, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA, LLC
By:    /s/
Its:    **[TITLE]**

Preferred Builders Realty, Inc.
By:    /s/
Its:    **[TITLE]**

Silverlake Interests, L.L.C.
By:    /s/
Its:    **[TITLE]**

TOUSA Associates Services Company
By:    /s/
Its:    **[TITLE]**

TOUSA Funding, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Colorado, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Investment #1, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Investment #2, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes Mid-Atlantic, LLC
By:    /s/
Its:    **[TITLE]**

TOUSA Homes, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA Investment #2, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA Realty, Inc.
By:    /s/
Its:    **[TITLE]**

TOUSA/West Holdings, Inc.
By:    /s/
Its:    **[TITLE]**

133

Prepared and submitted by:

**BERGER SINGERMAN, P.A.**
Paul Steven Singerman (Florida Bar No. 378860)
200 South Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile:  (305) 714-4340

       -and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 420712)
Paul M. Basta (New York Bar No. 2568046)
M. Natasha Labovitz (New York Bar No. 2813251)
Joshua A. Sussberg (New York Bar No. 4216453)
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

*Co-Counsel to the Debtors*

134

## Exhibit A

**First Amended Joint Plan of TOUSA, Inc. and Its Affiliated
Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code**

**<u>Exhibit B</u>**

**Disclosure Statement Order**

## Exhibit C

**C-1:  List of Intercompany Loans**

**C-2:  Intercompany Balances**

## <u>Exhibit C-1</u>

### Intercompany Loan Agreements

| Sum of Amount of Loan | Payee | | | |
| --- | --- | --- | --- | --- |
| Borrower | Engle Homes Delaware, Inc. | TOUSA Delaware, Inc. | TOUSA Funding, LLC | Grand Total |
| Engle Homes Residential Construction, LLC | | | 62,027,000.00 | 62,027,000.00 |
| Newmark Homes, L.P. | | | 54,338,171.00 | 54,338,171.00 |
| TOUSA Homes, Inc. | 32,889,513.83 | | 613,540,079.00 | 646,729,592.83 |
| TOUSA, Inc. fka Technical Olympic USA, Inc. | 100,000,000.00 | 100,000,000.00 | 250,000,000.00 | 450,000,000.00[1] |
| **Grand Total** | **$132,889,513.83** | **$100,000,000.00** | **$979,905,250.00** | **$1,212,794,763.83** |

---

[1]    TOUSA, Inc. has been issued revolver commitments up to $450,000,000.

➔ **Intercompany Balances as of the Petition Date (January 28, 2008) as reported by TOUSA, Inc.**

➔ *Note: Payables/(Receivables)*



TOUSA Consolidated

(2)

| Newmark Homes | TOUSA Homes | TOUSA, Inc. | TOUSA Homes Florida LP | Engle Homes Delaware | Engle Homes Residential Construction | TOUSA Funding | TOUSA Delaware |
|---|---|---|---|---|---|---|---|
| 218,002,138 | 831,741,796 | (413,022,281) | 141,037,450 | (89,316,947) | (18,582,843) | (255,070,977) | (112,469,801) |

| Preferred Builders Realty | TOUSA Associated Services | Silverlake Interests LLC | TOUSA Mid-Atlantic Investments | Sierra Verde P4 | Sierra Verde P5 | Engle/Gilligan LLC | LB/TE #1 LLC |
|---|---|---|---|---|---|---|---|
| (823,593) | (1,769,900) | 727,414 | 7,114,674 | 345,925 | 4,474,351 | 143,849 | 4,475,670 |

| Lorton South | Newmark Homes Business Trust | Newmark Homes Purchasing LP | Newmark Homes LLC | Reflection Key | TOI LLC | TOUSA Homes LP | TOUSA Realty |
|---|---|---|---|---|---|---|---|
| 10,875,033 | (848,183) | (856,751) | 194,326.138 | 10,638,530 | 118,042,725 | 119,235,076 | 1,230,082 |

| TOUSA LLC | TOUSA/West Holdings | Universal Land Title | Preferred Home Mortgage Co. | Eliminations |
|---|---|---|---|---|
| 1,192,351 | 724,547,190 | 4,810,097 | 1,865,850 | (1,502,065,063) |

**Exhibit D**

**Summary of Classes of Claims Entitled to Vote on the Plan and Not Entitled to Vote on the Plan**

| | Debtor | Class | Claim | Status | Voting Rights |
|---|---|---|---|---|---|
| 1) | Tousa, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Tousa, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Tousa, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | Tousa, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | Tousa, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | Tousa, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | Tousa, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | Tousa, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | Tousa, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | Tousa, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Tousa, Inc. | 7 | Equity Interests in Tousa, Inc. | Impaired | No |
| 2) | Engle Homes Commercial Construction, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle Homes Commercial Construction, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Engle Homes Commercial Construction, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle Homes Commercial Construction, LLC | 7 | Equity Interests in Engle Homes Commercial Construction, LLC | Impaired | No |
| 3) | Engle Homes Delaware, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 4 | Other Priority Claims | Unimpaired | No |

| | | | | | |
|---|---|---|---|---|---|
| | Engle Homes Delaware, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | Engle Homes Delaware, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle Homes Delaware, Inc. | 7 | Equity Interests in Engle Homes Delaware, Inc. | Impaired | No |
| 4) | Engle Homes Residential Construction, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle Homes Residential Construction, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Engle Homes Residential Construction, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle Homes Residential Construction, LLC | 7 | Equity Interests in Engle Homes Residential Construction, LLC | Impaired | No |
| 5) | Engle Sierra Verde P4, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle Sierra Verde P4, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Engle Sierra Verde P4, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |

2

| | | | | | |
|---|---|---|---|---|---|
| | Engle Sierra Verde P4, LLC | 7 | Equity Interests in Engle Sierra Verde P4, LLC | Impaired | No |
| 6) | Engle Sierra Verde P5, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle Sierra Verde P5, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Engle Sierra Verde P5, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle Sierra Verde P5, LLC | 7 | Equity Interests in Engle Sierra Verde P5, LLC | Impaired | No |
| 7) | Engle/Gilligan, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle/Gilligan, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Engle/Gilligan, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle/Gilligan, LLC | 7 | Equity Interests in Engle/Gilligan, LLC | Impaired | No |
| 8) | Engle/James, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Engle/James, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Engle/James, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Engle/James, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Engle/James, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Engle/James, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Engle/James, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Engle/James, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Engle/James, LLC | 5D | PIK Note the Claims | Impaired | Yes |

3

| | | | | | |
|---|---|---|---|---|---|
| | Engle/James, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Engle/James, LLC | 7 | Equity Interests in Engle/James, LLC | Impaired | No |
| 9) | LB/TE #1, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | LB/TE #1, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | LB/TE #1, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | LB/TE #1, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | LB/TE #1, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | LB/TE #1, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | LB/TE #1, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | LB/TE #1, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | LB/TE #1, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | LB/TE #1, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | LB/TE #1, LLC | 7 | Equity Interests in LB/TE #1, LLC | Impaired | No |
| 10) | Lorton South Condominium, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Lorton South Condominium, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Lorton South Condominium, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Lorton South Condominium, LLC | 7 | Equity Interests in Lorton South Condominium, LLC | Impaired | No |
| 11) | McKay Landing, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | McKay Landing, LLC | 1B | First Lien Term Loan | Impaired | Yes |

4

| | | | | | |
|---|---|---|---|---|---|
| | | | Claims | | |
| | McKay Landing, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | McKay Landing, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | McKay Landing, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | McKay Landing, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | McKay Landing, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | McKay Landing, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | McKay Landing, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | McKay Landing, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | McKay Landing, LLC | 7 | Equity Interests in McKay Landing, LLC | Impaired | No |
| 12) | Newmark Homes Business Trust | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 2 | Second Lien Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 3 | Other Secured Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 4 | Other Priority Claims | Unimpaired | No |
| | Newmark Homes Business Trust | 5A | Senior Note Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 5B | General Unsecured Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 5C | Subordinated Note Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 5D | PIK Note Claims | Impaired | Yes |
| | Newmark Homes Business Trust | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Newmark Homes Business Trust | 7 | Equity Interests in Newmark Homes Business Trust | Impaired | No |
| 13) | Newmark Homes Purchasing, LP | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 2 | Second Lien Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 3 | Other Secured Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 4 | Other Priority Claims | Unimpaired | No |
| | Newmark Homes Purchasing, LP | 5A | Senior Note Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 5B | General Unsecured Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 5C | Subordinated Note Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 5D | PIK Note Claims | Impaired | Yes |
| | Newmark Homes Purchasing, LP | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Newmark Homes Purchasing, LP | 7 | Equity Interests in | Impaired | No |

K&E 14480597.1

| | | | Newmark Homes Purchasing, LP | | |
|---|---|---|---|---|---|
| 14) | Newmark Homes, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Newmark Homes, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Newmark Homes, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Newmark Homes, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Newmark Homes, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Newmark Homes, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Newmark Homes, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Newmark Homes, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Newmark Homes, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Newmark Homes, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Newmark Homes, LLC | 7 | Equity Interests in Newmark Homes, LLC | Impaired | No |
| 15) | Newmark Homes, LP | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Newmark Homes, LP | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Newmark Homes, LP | 2 | Second Lien Claims | Impaired | Yes |
| | Newmark Homes, LP | 3 | Other Secured Claims | Impaired | Yes |
| | Newmark Homes, LP | 4 | Other Priority Claims | Unimpaired | No |
| | Newmark Homes, LP | 5A | Senior Note Claims | Impaired | Yes |
| | Newmark Homes, LP | 5B | General Unsecured Claims | Impaired | Yes |
| | Newmark Homes, LP | 5C | Subordinated Note Claims | Impaired | Yes |
| | Newmark Homes, LP | 5D | PIK Note Claims | Impaired | Yes |
| | Newmark Homes, LP | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Newmark Homes, LP | 7 | Equity Interests in Newmark Homes, LP | Impaired | No |
| 16) | Preferred Builders Realty, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | Preferred Builders Realty, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | Preferred Builders Realty, Inc. | 5D | PIK Note Claims | Impaired | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | Preferred Builders Realty, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Preferred Builders Realty, Inc. | 7 | Equity Interests in Preferred Builders Realty, Inc. | Impaired | No |
| 17) | Reflection Key, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Reflection Key, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Reflection Key, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Reflection Key, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Reflection Key, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Reflection Key, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Reflection Key, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Reflection Key, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Reflection Key, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Reflection Key, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Reflection Key, LLC | 7 | Equity Interests in Reflection Key, LLC | Impaired | No |
| 18) | Silverlake Interests, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | Silverlake Interests, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | Silverlake Interests, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | Silverlake Interests, LLC | 7 | Equity Interests in Silverlake Interests, LLC | Impaired | No |
| 19) | TOI, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOI, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOI, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOI, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOI, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOI, LLC | 5A | Senior Note Claims | Impaired | Yes |

7

| | | | | | |
|---|---|---|---|---|---|
| | TOI, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOI, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOI, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOI, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOI, LLC | 7 | Equity Interests in TOI, LLC | Impaired | No |
| 20) | TOUSA Associates Services Company | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Associates Services Company | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Associates Services Company | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Associates Services Company | 7 | Equity Interests in TOUSA Associates Services Company | Impaired | No |
| 21) | TOUSA Delaware, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Delaware, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Delaware, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Delaware, Inc. | 7 | Equity Interests in | Impaired | No |

8

TOUSA Delaware, Inc.

| | | | | | |
|---|---|---|---|---|---|
| 22) | TOUSA Funding, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Funding, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Funding, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Funding, LLC | 7 | Equity Interests in TOUSA Funding, LLC | Impaired | No |
| 23) | TOUSA Homes Arizona, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Arizona, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Arizona, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Arizona, LLC | 7 | Equity Interests in TOUSA Homes Arizona, LLC | Impaired | No |
| 24) | TOUSA Homes Colorado, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Colorado, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Colorado, LLC | 5D | PIK Note Claims | Impaired | Yes |

9

| | | | | | |
|---|---|---|---|---|---|
| | TOUSA Homes Colorado, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Colorado, LLC | 7 | Equity Interests in TOUSA Homes Colorado, LLC | Impaired | No |
| 25) | TOUSA Homes Florida, LP | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Florida, LP | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Florida, LP | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Florida, LP | 7 | Equity Interests in TOUSA Homes Florida, LP | Impaired | No |
| 26) | TOUSA Homes Investment #1, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Investment #1, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #1, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Investment #1, Inc. | 7 | Equity Interests in TOUSA Homes Investment #1, Inc. | Impaired | No |
| 27) | TOUSA Homes Investment #2, | 1A | First Lien Revolver | Impaired | Yes |

10

| | | | | | |
|---|---|---|---|---|---|
| | Inc. | | Claims | | |
| | TOUSA Homes Investment #2, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Investment #2, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Investment #2, Inc. | 7 | Equity Interests in TOUSA Homes Investment #2, Inc. | Impaired | No |
| 28) | TOUSA Homes Investment #2, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Investment #2, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Investment #2, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Investment #2, LLC | 7 | Equity Interests in TOUSA Homes Investment #2, LLC | Impaired | No |
| 29) | TOUSA Homes Mid-Atlantic Holding, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic | 2 | Second Lien Claims | Impaired | Yes |

11

| | | | | | |
|---|---|---|---|---|---|
| | Holding, LLC | | | | |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Mid-Atlantic Holding, LLC | 7 | Equity Interests in TOUSA Homes Mid-Atlantic Holding, LLC | Impaired | No |
| 30) | TOUSA Homes Mid-Atlantic, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Mid-Atlantic, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Mid-Atlantic, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Mid-Atlantic, LLC | 7 | Equity Interests in TOUSA Homes Mid-Atlantic, LLC | Impaired | No |
| 31) | TOUSA Homes Nevada, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes Nevada, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 5B | General Unsecured | Impaired | Yes |

12

| | | | | | |
|---|---|---|---|---|---|
| | | | Claims | | |
| | TOUSA Homes Nevada, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes Nevada, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes Nevada, LLC | 7 | Equity Interests in TOUSA Homes Nevada, LLC | Impaired | No |
| 32) | TOUSA Homes, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes, Inc. | 7 | Equity Interests in TOUSA Homes, Inc. | Impaired | No |
| 33) | TOUSA Homes, LP | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Homes, LP | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Homes, LP | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Homes, LP | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Homes, LP | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Homes, LP | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Homes, LP | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Homes, LP | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Homes, LP | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Homes, LP | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Homes, LP | 7 | Equity Interests in TOUSA Homes, LP | Impaired | No |
| 34) | TOUSA Investment #2, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |

13

| | | | | | |
|---|---|---|---|---|---|
| | TOUSA Investment #2, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Investment #2, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Investment #2, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Investment #2, Inc. | 7 | Equity Interests in TOUSA Investment #2, Inc. | Impaired | No |
| 35) | TOUSA Mid-Atlantic Investment, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Mid-Atlantic Investment, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA Mid-Atlantic Investment, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Mid-Atlantic Investment, LLC | 7 | Equity Interests in TOUSA Mid-Atlantic Investment, LLC | Impaired | No |
| 36) | TOUSA Realty, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA Realty, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA Realty, Inc. | 5D | PIK Note Claims | Impaired | Yes |

14

| | | | | | |
|---|---|---|---|---|---|
| | TOUSA Realty, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA Realty, Inc. | 7 | Equity Interests in TOUSA Realty, Inc. | Impaired | No |
| 37) | TOUSA, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA, LLC | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA, LLC | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA, LLC | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA, LLC | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA, LLC | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA, LLC | 7 | Equity Interests in TOUSA, LLC | Impaired | No |
| 38) | TOUSA/West Holdings, Inc. | 1A | First Lien Revolver Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 2 | Second Lien Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 3 | Other Secured Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 4 | Other Priority Claims | Unimpaired | No |
| | TOUSA/West Holdings, Inc. | 5A | Senior Note Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 5B | General Unsecured Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 5C | Subordinated Note Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 5D | PIK Note Claims | Impaired | Yes |
| | TOUSA/West Holdings, Inc. | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| | TOUSA/West Holdings, Inc. | 7 | Equity Interests in TOUSA/West Holdings, Inc. | Impaired | No |
| 39) | Beacon Hill at Mountain's Edge, LLC | 1A | First Lien Revolver Claims | Impaired | Yes |
| | Beacon Hill at Mountain's Edge, LLC | 1B | First Lien Term Loan Claims | Impaired | Yes |
| | Beacon Hill at Mountain's Edge, LLC | 2 | Second Lien Claims | Impaired | Yes |
| | Beacon Hill at Mountain's Edge, LLC | 3 | Other Secured Claims | Impaired | Yes |

K&E 14480597.1

| | | | | |
|---|---|---|---|---|
| Beacon Hill at Mountain's Edge, LLC | 4 | Other Priority Claims | Unimpaired | No |
| Beacon Hill at Mountain's Edge, LLC | 5B | General Unsecured Claims | Impaired | Yes |
| Beacon Hill at Mountain's Edge, LLC | 6 | Claims Against the Debtors Subordinated Pursuant to Section 510 of the Bankruptcy Code | Impaired | No |
| Beacon Hill at Mountain's Edge, LLC | 7 | Equity Interests in Beacon Hill at Mountain's Edge, LLC | Impaired | No |

16

**<u>Exhibit E</u>**

**Liquidation Analysis**

**[Document to be filed before the objection deadline for the hearing on this Disclosure Statement.]**

**Exhibit F**

**Plan Distribution Analysis**

**[Document to be filed before the objection deadline for the hearing on this Disclosure Statement.]**

**<u>Exhibit G</u>**

**Causes of Action**

## Exhibit G

### Causes of Action

The following exhibit lists the Debtors' known potential causes of action against third parties.  Exhibit G-1 sets forth transfers made to third parties within the preference period; Exhibit G-2 sets forth certain other known current and potential causes of action against third parties; and Exhibit G-3 sets forth certain current and potential tax-related causes of action.  In addition, each of the Debtors expressly reserves its right to pursue other, non-enumerated, claims or causes of action after the Effective Date including, without limitation, the following general categories of claims:

(1)     Claims related to or arising from any warranty or indemnification against any supplier or subcontractor or such supplier or subcontractor's insurance carriers.

(2)     Claims against or with respect to any provider of professional services or such provider's insurance carriers.

(3)     Counterclaims in connection with any warranty claims or deposit return claims asserted against any of the Debtors.

(4)     All tax refund claims, including without limitation all appeal or other recovery rights with any taxing authority for any overpayment on any type of taxes, including, but not limited to, claims for recalculation of real estate taxes in the cases when the assessed value exceeds the market value of real property.

(5)     Claims arising out of any current, former or future contracts to which the Debtors were or are a party.  A list of each Debtor's contracts is set forth in each such Debtor's Schedule G of its Schedule of Assets and Liabilities filed on February 13, 2008 and as amended and restated on March 11, 2008 and October 7, 2008.

(6)     Claims against or with respect to any insurance policy of any of the Debtors.

(7)     Claims against or with respect to or any beneficiary of a letter of credit with the Debtors who is holding amounts as collateral against any claim against the Debtors.

## EXHIBIT G-1

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Engle Homes Residential Construction, LLC | 6K Consulting |
| Engle Homes Residential Construction, LLC | Aardvark Septic Services, LLC |
| Engle Homes Residential Construction, LLC | Able Drywall, Inc. |
| Engle Homes Residential Construction, LLC | Acacia Enterprises, LLC |
| Engle Homes Residential Construction, LLC | Adair Plumbing, LLC |
| Engle Homes Residential Construction, LLC | Aggie, Inc. |
| Engle Homes Residential Construction, LLC | Alb Industries |
| Engle Homes Residential Construction, LLC | Aloha Grading, Inc. |
| Engle Homes Residential Construction, LLC | American Woodmark Corp. |
| Engle Homes Residential Construction, LLC | Andrew Lauren Cabinets |
| Engle Homes Residential Construction, LLC | Anozira Door Systems |
| Engle Homes Residential Construction, LLC | Arizona American Water Co. |
| Engle Homes Residential Construction, LLC | Arizona Construction Cleaning |
| Engle Homes Residential Construction, LLC | Arizona Drywall Co, Inc |
| Engle Homes Residential Construction, LLC | Arizona Public Service |
| Engle Homes Residential Construction, LLC | Arizona Public SVC Co |
| Engle Homes Residential Construction, LLC | Arizona Ram Jack |
| Engle Homes Residential Construction, LLC | Arrow Masonry Co., Inc. |
| Engle Homes Residential Construction, LLC | Artistic Stairs, LTD. |
| Engle Homes Residential Construction, LLC | Aspen Block LLC |
| Engle Homes Residential Construction, LLC | Atrium Door & Window Company |
| Engle Homes Residential Construction, LLC | Atwell-Hicks |
| Engle Homes Residential Construction, LLC | Automatic Gate Systems |
| Engle Homes Residential Construction, LLC | Aztec Lighting Inc. |
| Engle Homes Residential Construction, LLC | B/H Drywall Co. |
| Engle Homes Residential Construction, LLC | Banker Insulation, Inc. |
| Engle Homes Residential Construction, LLC | BBP Construction Company |
| Engle Homes Residential Construction, LLC | Bebout Concrete, Inc. |
| Engle Homes Residential Construction, LLC | Beebe Plumbing, Inc. |
| Engle Homes Residential Construction, LLC | Bell Concrete, Inc. |
| Engle Homes Residential Construction, LLC | Bendigo Custom Stone, Inc. |
| Engle Homes Residential Construction, LLC | Blackstone Security |
| Engle Homes Residential Construction, LLC | Blue Star Electric, Inc. |
| Engle Homes Residential Construction, LLC | Catalina Roofing & |
| Engle Homes Residential Construction, LLC | Celectric, Inc. |
| Engle Homes Residential Construction, LLC | Central Arizona Project/CAGRD |
| Engle Homes Residential Construction, LLC | Central Valley Specialties,Inc |
| Engle Homes Residential Construction, LLC | Chas. Roberts Air |
| Engle Homes Residential Construction, LLC | Chris's Custom Cabinets |
| Engle Homes Residential Construction, LLC | Cibola Vista Community Assoc. |
| Engle Homes Residential Construction, LLC | Circle B Grading & Hauling Inc |
| Engle Homes Residential Construction, LLC | Circle Cross Ranch HOA |
| Engle Homes Residential Construction, LLC | City of Goodyear - Permits |
| Engle Homes Residential Construction, LLC | City Of Peoria      -Util |
| Engle Homes Residential Construction, LLC | City of Phoenix- Permits |
| Engle Homes Residential Construction, LLC | Clayton Glass & |
| Engle Homes Residential Construction, LLC | CMX, LLC |
| Engle Homes Residential Construction, LLC | Construction 70, Inc |
| Engle Homes Residential Construction, LLC | Creative Environments Design |
| Engle Homes Residential Construction, LLC | Cuesta Construction, Inc |
| Engle Homes Residential Construction, LLC | Custom Fence & Gate |
| Engle Homes Residential Construction, LLC | Damage Control, LLC |
| Engle Homes Residential Construction, LLC | Dei Professional Services |
| Engle Homes Residential Construction, LLC | Del Martenson Development Corp |
| Engle Homes Residential Construction, LLC | Dennis Sage Home |
| Engle Homes Residential Construction, LLC | Desert Systems Landscape |
| Engle Homes Residential Construction, LLC | Desert Vista, Inc. |
| Engle Homes Residential Construction, LLC | Desierto Verde, Inc. |
| Engle Homes Residential Construction, LLC | Design Drywall West, Inc |
| Engle Homes Residential Construction, LLC | Design Lighting & Control, Inc |
| Engle Homes Residential Construction, LLC | DFD Architecture, Inc. |
| Engle Homes Residential Construction, LLC | Diversified Builders |
| Engle Homes Residential Construction, LLC | Diversified Roofing, Inc |
| Engle Homes Residential Construction, LLC | Dixon Brothers, Inc. |
| Engle Homes Residential Construction, LLC | Dysart USD #89 |
| Engle Homes Residential Construction, LLC | Earth & Sun Adobe, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Engle Homes Residential Construction, LLC | Electrical District No.3 |
| Engle Homes Residential Construction, LLC | Eurodex Holdings, Inc. |
| Engle Homes Residential Construction, LLC | Eyesite Surveillance |
| Engle Homes Residential Construction, LLC | Fast Signs |
| Engle Homes Residential Construction, LLC | Felten Engineering GRP. |
| Engle Homes Residential Construction, LLC | FGI Masonry LLC |
| Engle Homes Residential Construction, LLC | First Impression Security |
| Engle Homes Residential Construction, LLC | G&C Glass, Inc. |
| Engle Homes Residential Construction, LLC | Gale Industries, Inc Dba |
| Engle Homes Residential Construction, LLC | Gecko Underground |
| Engle Homes Residential Construction, LLC | General Electric Co |
| Engle Homes Residential Construction, LLC | GeoTek, Inc. |
| Engle Homes Residential Construction, LLC | Greey/Pickett |
| Engle Homes Residential Construction, LLC | Guard-O-Matic, Inc |
| Engle Homes Residential Construction, LLC | H.W. Johnson, Inc. |
| Engle Homes Residential Construction, LLC | Hand Painted Ceramic |
| Engle Homes Residential Construction, LLC | Home Builders Services of |
| Engle Homes Residential Construction, LLC | Home Depot/Gecf |
| Engle Homes Residential Construction, LLC | Husky Construction Clean |
| Engle Homes Residential Construction, LLC | Imagination Graphics, Inc. |
| Engle Homes Residential Construction, LLC | Imperial Tile Imports |
| Engle Homes Residential Construction, LLC | Indigo Contracting LLC |
| Engle Homes Residential Construction, LLC | Integrated Stucco, Inc. |
| Engle Homes Residential Construction, LLC | JCM Ventures, LLC |
| Engle Homes Residential Construction, LLC | JLC Roofing, Inc. |
| Engle Homes Residential Construction, LLC | KBI Construction, LLC -Windows |
| Engle Homes Residential Construction, LLC | Kelco Contracting, LLC |
| Engle Homes Residential Construction, LLC | Kelco Environmental LLC |
| Engle Homes Residential Construction, LLC | Kitchell Contractors, Inc. |
| Engle Homes Residential Construction, LLC | Knochel Bros, Inc |
| Engle Homes Residential Construction, LLC | L & M Laminates And |
| Engle Homes Residential Construction, LLC | Labor Finders of Arizona |
| Engle Homes Residential Construction, LLC | Landa & Assoc., Inc. |
| Engle Homes Residential Construction, LLC | Laveen Pump, Inc. |
| Engle Homes Residential Construction, LLC | Leach Painting, Inc. |
| Engle Homes Residential Construction, LLC | Lewcon Contracting LLC |
| Engle Homes Residential Construction, LLC | Loftco Trim, Inc. |
| Engle Homes Residential Construction, LLC | Loftco, Inc. |
| Engle Homes Residential Construction, LLC | M.R.Tanner Dev & Con,Inc |
| Engle Homes Residential Construction, LLC | Madj, Inc. Dba |
| Engle Homes Residential Construction, LLC | Maricopa County Dept. Of |
| Engle Homes Residential Construction, LLC | Maricopa Mountain Excavating |
| Engle Homes Residential Construction, LLC | Markham Contracting Co., |
| Engle Homes Residential Construction, LLC | Marley Park Community Assoc. |
| Engle Homes Residential Construction, LLC | Marley Park Phase I LLC |
| Engle Homes Residential Construction, LLC | MasterBrand Cabinets, Inc. |
| Engle Homes Residential Construction, LLC | Mesa Fully Formed, Inc. |
| Engle Homes Residential Construction, LLC | Michael J. Valente Contracting |
| Engle Homes Residential Construction, LLC | Misc. Vendor |
| Engle Homes Residential Construction, LLC | Mitchell Electric Co,Inc |
| Engle Homes Residential Construction, LLC | Model Home Liquidators |
| Engle Homes Residential Construction, LLC | Monte Vista Construction LLC |
| Engle Homes Residential Construction, LLC | National Construction Rentals |
| Engle Homes Residential Construction, LLC | New Electric, Inc |
| Engle Homes Residential Construction, LLC | Nu-Treat, Inc. |
| Engle Homes Residential Construction, LLC | Outdoor Environmental Systems |
| Engle Homes Residential Construction, LLC | Overhead-Underground Electric |
| Engle Homes Residential Construction, LLC | Pacific Aquascape,Inc. |
| Engle Homes Residential Construction, LLC | Paddock Pools Const Co |
| Engle Homes Residential Construction, LLC | Paradise Southwest |
| Engle Homes Residential Construction, LLC | Peoria Unifield School Dist. |
| Engle Homes Residential Construction, LLC | Phoenix Testing & |
| Engle Homes Residential Construction, LLC | Power Plus! |
| Engle Homes Residential Construction, LLC | Pratte Building |
| Engle Homes Residential Construction, LLC | Protex |
| Engle Homes Residential Construction, LLC | QFX Holdings LLC dba |
| Engle Homes Residential Construction, LLC | QHP-Quality House Painting,Inc |
| Engle Homes Residential Construction, LLC | R.J. Cole Investments LLC |
| Engle Homes Residential Construction, LLC | R/S Service & Supply, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Engle Homes Residential Construction, LLC | Riggs Plumbing, LLC |
| Engle Homes Residential Construction, LLC | Roadrunner Drywall Corp |
| Engle Homes Residential Construction, LLC | Ron Brock's Heating & Cooling |
| Engle Homes Residential Construction, LLC | Rudolfo Brothers Plastering |
| Engle Homes Residential Construction, LLC | S.O.S. Exterminating, Inc. |
| Engle Homes Residential Construction, LLC | Samons Bros. Framing, Inc. |
| Engle Homes Residential Construction, LLC | San Tan Arizona Roof |
| Engle Homes Residential Construction, LLC | Santa Cruz Water Co Utilities, |
| Engle Homes Residential Construction, LLC | SBS Construction Holdings LLC |
| Engle Homes Residential Construction, LLC | SC Design Granite LLC |
| Engle Homes Residential Construction, LLC | SC Design, Inc |
| Engle Homes Residential Construction, LLC | SCP Construction, LLC |
| Engle Homes Residential Construction, LLC | Security Response, Inc. |
| Engle Homes Residential Construction, LLC | SelectBuild Arizona LLC - HVAC |
| Engle Homes Residential Construction, LLC | SelectBuild Arizona,LLC- Wndw |
| Engle Homes Residential Construction, LLC | SelectBuild Arizona,LLC-Frame |
| Engle Homes Residential Construction, LLC | Sharico Enterprises, Inc |
| Engle Homes Residential Construction, LLC | Sharp Drywall, Inc |
| Engle Homes Residential Construction, LLC | Sierra Verde Community Assoc. |
| Engle Homes Residential Construction, LLC | Silver Fern MGMT, LLC |
| Engle Homes Residential Construction, LLC | SJL Construction  of AZ |
| Engle Homes Residential Construction, LLC | Solitude Building and |
| Engle Homes Residential Construction, LLC | Sonoran Sweep LLC |
| Engle Homes Residential Construction, LLC | Southwest Gas Corp. |
| Engle Homes Residential Construction, LLC | Specialty Roofing, Inc. |
| Engle Homes Residential Construction, LLC | SRP |
| Engle Homes Residential Construction, LLC | Sunbelt Conveyered |
| Engle Homes Residential Construction, LLC | Sunstate Fire Protection, Inc |
| Engle Homes Residential Construction, LLC | Superstition Carpentry, |
| Engle Homes Residential Construction, LLC | Superstition Carpentry-MF,LLC |
| Engle Homes Residential Construction, LLC | TC's Cleaning Service, Inc. |
| Engle Homes Residential Construction, LLC | Tempe Paint & Decorator Center |
| Engle Homes Residential Construction, LLC | Todd Whittaker Drywall, Inc. |
| Engle Homes Residential Construction, LLC | Top Grading & Waste Services |
| Engle Homes Residential Construction, LLC | Tortosa Homeowners Association |
| Engle Homes Residential Construction, LLC | Total Maintenance Erosion |
| Engle Homes Residential Construction, LLC | Town of Buckeye - Permits |
| Engle Homes Residential Construction, LLC | Town of Queen Creek |
| Engle Homes Residential Construction, LLC | Townsquare at Sierra Verde |
| Engle Homes Residential Construction, LLC | Trench Tech, Inc |
| Engle Homes Residential Construction, LLC | Triple S Fence Company |
| Engle Homes Residential Construction, LLC | Tyers Contracting |
| Engle Homes Residential Construction, LLC | U&I Enterprises, Inc. |
| Engle Homes Residential Construction, LLC | U.S. Waste Industries, LLC |
| Engle Homes Residential Construction, LLC | United Fence Co., Inc. |
| Engle Homes Residential Construction, LLC | United Ornamental Iron |
| Engle Homes Residential Construction, LLC | United Site Services, Inc. |
| Engle Homes Residential Construction, LLC | United Subcontractors, Inc. |
| Engle Homes Residential Construction, LLC | United Waterworks Plumbing,Inc |
| Engle Homes Residential Construction, LLC | Valley Wide Plastering, |
| Engle Homes Residential Construction, LLC | Vistancia Village A Community |
| Engle Homes Residential Construction, LLC | VW Dig, Inc |
| Engle Homes Residential Construction, LLC | W.W.Williams |
| Engle Homes Residential Construction, LLC | Whitton Concrete, Inc. |
| Engle Homes Residential Construction, LLC | Whitton Plumbing |
| Engle Homes Residential Construction, LLC | William Scotsman, Inc |
| Engle Homes Residential Construction, LLC | Winpro Of Arizona LLC |
| Engle Homes Residential Construction, LLC | Woody'S Painting, Inc. |
| Engle Homes Residential Construction, LLC | Younger Brothers Development |
| Engle Homes Residential Construction, LLC | Younger Brothers Door & Trim |
| Engle Sierra Verde P4, LLC | Andrew Lauren Cabinets |
| Engle Sierra Verde P4, LLC | Aztec Lighting Inc. |
| Engle Sierra Verde P4, LLC | Babakitis*Deborah |
| Engle Sierra Verde P4, LLC | Banker Insulation, Inc. |
| Engle Sierra Verde P4, LLC | Chas. Roberts Air |
| Engle Sierra Verde P4, LLC | Construction 70, Inc |
| Engle Sierra Verde P4, LLC | Creative Environments |
| Engle Sierra Verde P4, LLC | Desert Vista, Inc. |
| Engle Sierra Verde P4, LLC | Diversified Builders |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Engle Sierra Verde P4, LLC | Dysart USD #89 |
| Engle Sierra Verde P4, LLC | General Electric Co |
| Engle Sierra Verde P4, LLC | Imperial Tile Imports |
| Engle Sierra Verde P4, LLC | Indigo Contracting LLC |
| Engle Sierra Verde P4, LLC | Loftco Trim, Inc. |
| Engle Sierra Verde P4, LLC | Loftco, Inc. |
| Engle Sierra Verde P4, LLC | Maricopa Co Treasurer |
| Engle Sierra Verde P4, LLC | Mitchell Electric Co,Inc |
| Engle Sierra Verde P4, LLC | Model Home Liquidators |
| Engle Sierra Verde P4, LLC | Portney*Richard |
| Engle Sierra Verde P4, LLC | SC Design, Inc |
| Engle Sierra Verde P4, LLC | Security Response, Inc. |
| Engle Sierra Verde P4, LLC | SelectBuild Arizona,LLC- Wndw |
| Engle Sierra Verde P4, LLC | Sharp Drywall, Inc |
| Engle Sierra Verde P4, LLC | Sierra Verde Community Assoc. |
| Engle Sierra Verde P4, LLC | Specialty Roofing, Inc. |
| Engle Sierra Verde P4, LLC | Whitton Concrete, Inc. |
| Engle Sierra Verde P4, LLC | Whitton Plumbing |
| Engle Sierra Verde P4, LLC | Yamron*Barry B. |
| Engle Sierra Verde P5, LLC | Andrew Lauren Cabinets |
| Engle Sierra Verde P5, LLC | Arizona Dept. Of Revenue |
| Engle Sierra Verde P5, LLC | Blue Star Electric, Inc. |
| Engle Sierra Verde P5, LLC | Chas. Roberts Air |
| Engle Sierra Verde P5, LLC | Circle B Grading & Hauling Inc |
| Engle Sierra Verde P5, LLC | Construction 70, Inc |
| Engle Sierra Verde P5, LLC | Desert Vista, Inc. |
| Engle Sierra Verde P5, LLC | Diversified Roofing, Inc |
| Engle Sierra Verde P5, LLC | Dysart USD #89 |
| Engle Sierra Verde P5, LLC | General Electric Co |
| Engle Sierra Verde P5, LLC | Imperial Tile Imports |
| Engle Sierra Verde P5, LLC | Indigo Contracting LLC |
| Engle Sierra Verde P5, LLC | Kelco Contracting, LLC |
| Engle Sierra Verde P5, LLC | Landa & Assoc., Inc. |
| Engle Sierra Verde P5, LLC | Maricopa Co Treasurer |
| Engle Sierra Verde P5, LLC | Mesa Fully Formed, Inc. |
| Engle Sierra Verde P5, LLC | SC Design, Inc |
| Engle Sierra Verde P5, LLC | SCP Construction, LLC |
| Engle Sierra Verde P5, LLC | Security Response, Inc. |
| Engle Sierra Verde P5, LLC | SelectBuild Arizona,LLC- Wndw |
| Engle Sierra Verde P5, LLC | SelectBuild Arizona,LLC-Frame |
| Engle Sierra Verde P5, LLC | Sunstate Fire Protection, Inc |
| Engle Sierra Verde P5, LLC | TC's Cleaning Service, Inc. |
| Engle Sierra Verde P5, LLC | Townsquare at Sierra Verde |
| Engle Sierra Verde P5, LLC | Whitton Plumbing |
| Engle/Gililgan LLC | Clean Harbors Environmental |
| Engle/Gililgan LLC | General Electric Co |
| Engle/Gililgan LLC | Misc. Vendor |
| Engle/Gililgan LLC | WJCM Enterprises, LLC |
| Engle/Gililgan LLC | Wyndham Commons Condominium |
| Newmark Homes Purchasing, LLC | 1st Infiniti Ent. Inc. |
| Newmark Homes Purchasing, LLC | 3-S Construction |
| Newmark Homes Purchasing, LLC | ABC Supply |
| Newmark Homes Purchasing, LLC | Abc Supply Co. Inc.- Nash |
| Newmark Homes Purchasing, LLC | Acme Brick |
| Newmark Homes Purchasing, LLC | Acme Brick Company |
| Newmark Homes Purchasing, LLC | Acme Brick Company- Dallas |
| Newmark Homes Purchasing, LLC | Acme Brick-Houston |
| Newmark Homes Purchasing, LLC | Action Gypsum Supply |
| Newmark Homes Purchasing, LLC | AHI Supply Inc.        -D |
| Newmark Homes Purchasing, LLC | All Pan |
| Newmark Homes Purchasing, LLC | Alley-Cassetty Brick |
| Newmark Homes Purchasing, LLC | Allied Concrete |
| Newmark Homes Purchasing, LLC | Allied Overhead Door Co., LLC |
| Newmark Homes Purchasing, LLC | Arc Works Welding |
| Newmark Homes Purchasing, LLC | Ariza*Patricio |
| Newmark Homes Purchasing, LLC | Austin Roofers Supply Inc. |
| Newmark Homes Purchasing, LLC | Bar W Services LLC |
| Newmark Homes Purchasing, LLC | Bison Building Materials, Ltd |
| Newmark Homes Purchasing, LLC | BMC West |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes Purchasing, LLC | BMCW Southcentral LP   -N |
| Newmark Homes Purchasing, LLC | BMCW Southcentral LP  -N Mill |
| Newmark Homes Purchasing, LLC | Boral Bricks Inc. |
| Newmark Homes Purchasing, LLC | Boral/Henderson Brick |
| Newmark Homes Purchasing, LLC | Bozman Sign Co., Inc. |
| Newmark Homes Purchasing, LLC | Branecky*Anthony |
| Newmark Homes Purchasing, LLC | Brown Lighting Corp. |
| Newmark Homes Purchasing, LLC | Builders Blinds |
| Newmark Homes Purchasing, LLC | Builders Blinds of Texas, Ltd |
| Newmark Homes Purchasing, LLC | Calvin's Electric, LTD |
| Newmark Homes Purchasing, LLC | Cast Fireplaces, Inc. |
| Newmark Homes Purchasing, LLC | CB Hardware, Inc. |
| Newmark Homes Purchasing, LLC | Cemex |
| Newmark Homes Purchasing, LLC | Champion Window, L.P.    -D&H |
| Newmark Homes Purchasing, LLC | Champion Windows    -SA |
| Newmark Homes Purchasing, LLC | Champion Windows-Austin |
| Newmark Homes Purchasing, LLC | Champions Columns & Shutters |
| Newmark Homes Purchasing, LLC | Christianson Company |
| Newmark Homes Purchasing, LLC | Corey Construction, LP |
| Newmark Homes Purchasing, LLC | Crosslin Supply Company,Inc. |
| Newmark Homes Purchasing, LLC | Dale Insulation Company |
| Newmark Homes Purchasing, LLC | DuDco Vinyl Siding |
| Newmark Homes Purchasing, LLC | Dupure International |
| Newmark Homes Purchasing, LLC | East Coast Wall System, Inc. |
| Newmark Homes Purchasing, LLC | Espinoza*Ezequiel |
| Newmark Homes Purchasing, LLC | Ferguson Enterprises    -Nash |
| Newmark Homes Purchasing, LLC | Fyre-Stone Manufacturing |
| Newmark Homes Purchasing, LLC | Galindo*Jesus |
| Newmark Homes Purchasing, LLC | Ge Appliances        - Austin |
| Newmark Homes Purchasing, LLC | Ge Appliances        - Houston |
| Newmark Homes Purchasing, LLC | GE Appliances    - San Antonio |
| Newmark Homes Purchasing, LLC | General Electric-Nashville |
| Newmark Homes Purchasing, LLC | Glass Craft Door LP |
| Newmark Homes Purchasing, LLC | GlassCraft Door Corporation |
| Newmark Homes Purchasing, LLC | GP Contractors |
| Newmark Homes Purchasing, LLC | Graham's Lighting, Inc. |
| Newmark Homes Purchasing, LLC | Gulf Coast Concrete LLC |
| Newmark Homes Purchasing, LLC | H&H Glass Design |
| Newmark Homes Purchasing, LLC | Hanson Brick         -A |
| Newmark Homes Purchasing, LLC | Hanson Brick    -SA |
| Newmark Homes Purchasing, LLC | Hardware Resources |
| Newmark Homes Purchasing, LLC | Home Lumber and Hardware -Mill |
| Newmark Homes Purchasing, LLC | Hope Lumber & Supply LP |
| Newmark Homes Purchasing, LLC | Houston-Stafford Electrical |
| Newmark Homes Purchasing, LLC | Huskey Truss & Building Supply |
| Newmark Homes Purchasing, LLC | IronWood Connection |
| Newmark Homes Purchasing, LLC | Irving Materials, Inc. |
| Newmark Homes Purchasing, LLC | JCA Construction |
| Newmark Homes Purchasing, LLC | JCA Industrial Partners LTD-T |
| Newmark Homes Purchasing, LLC | JEH/Gulf Eagle |
| Newmark Homes Purchasing, LLC | Job Site Recycling |
| Newmark Homes Purchasing, LLC | KCG Inc. |
| Newmark Homes Purchasing, LLC | KCG, Inc. |
| Newmark Homes Purchasing, LLC | KellyKraft Doors, Inc. |
| Newmark Homes Purchasing, LLC | Kenco Distributors, Inc. |
| Newmark Homes Purchasing, LLC | Kent Moore Cabinets, Ltd.  -A |
| Newmark Homes Purchasing, LLC | Lattimore Materials Company |
| Newmark Homes Purchasing, LLC | Lauren Concrete LP |
| Newmark Homes Purchasing, LLC | Lighting Connection, Inc. |
| Newmark Homes Purchasing, LLC | Loera*Edward |
| Newmark Homes Purchasing, LLC | Lone Star Ready-Mix |
| Newmark Homes Purchasing, LLC | Mandujano Framing Co., Inc |
| Newmark Homes Purchasing, LLC | Martin Door & Window Co., Inc. |
| Newmark Homes Purchasing, LLC | Master Brick Inc. |
| Newmark Homes Purchasing, LLC | MBS |
| Newmark Homes Purchasing, LLC | Nashville Conveying LLC |
| Newmark Homes Purchasing, LLC | Nashville Marble & Whirlpool |
| Newmark Homes Purchasing, LLC | Overhead Door Co.- San Antonio |
| Newmark Homes Purchasing, LLC | Palacios Carpenter Corp. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes Purchasing, LLC | Porter Ready Mix, Inc |
| Newmark Homes Purchasing, LLC | Project Lighting Co. Inc. |
| Newmark Homes Purchasing, LLC | Quezada Masonry |
| Newmark Homes Purchasing, LLC | Royal Bath Mfg. Co-San Antonio |
| Newmark Homes Purchasing, LLC | Royal Baths Manufacturing -H |
| Newmark Homes Purchasing, LLC | Royal Baths MFG. - Austin |
| Newmark Homes Purchasing, LLC | RS Concrete LLC |
| Newmark Homes Purchasing, LLC | Salgado*Gerardo Ramirez |
| Newmark Homes Purchasing, LLC | Sanchez Fence Co. LLC |
| Newmark Homes Purchasing, LLC | Scholl Forest Industries, LLC |
| Newmark Homes Purchasing, LLC | Scholl Truss & Component Co. |
| Newmark Homes Purchasing, LLC | Sequatchie Concrete Service |
| Newmark Homes Purchasing, LLC | Seybro Door & Weatherstrip |
| Newmark Homes Purchasing, LLC | Seybro Door & Weatherstrip Co. |
| Newmark Homes Purchasing, LLC | Southland Glass |
| Newmark Homes Purchasing, LLC | Star Light Distribution, Inc. |
| Newmark Homes Purchasing, LLC | Stewart Door Ltd |
| Newmark Homes Purchasing, LLC | Stewart Lumber |
| Newmark Homes Purchasing, LLC | Stock Building Supply  -A |
| Newmark Homes Purchasing, LLC | Stock Building Supply -SA-P |
| Newmark Homes Purchasing, LLC | Stock Building Supply, Inc. -D |
| Newmark Homes Purchasing, LLC | Suncoast Postension Co |
| Newmark Homes Purchasing, LLC | Suncoast Post-Tension, L.P. |
| Newmark Homes Purchasing, LLC | Suncoast-Austin |
| Newmark Homes Purchasing, LLC | Texas Concrete Materials, Ltd |
| Newmark Homes Purchasing, LLC | Texas Light Bulb Inc. |
| Newmark Homes Purchasing, LLC | The Wortham Brothers, Inc. |
| Newmark Homes Purchasing, LLC | Trim Tech Of Austin, Inc. |
| Newmark Homes Purchasing, LLC | Valley Interior Products, Inc. |
| Newmark Homes Purchasing, LLC | Vulcan Materials, Inc. |
| Newmark Homes Purchasing, LLC | WBM Heritage Roofing |
| Newmark Homes Purchasing, LLC | Webco Distributing Co., Inc. |
| Newmark Homes Purchasing, LLC | Williams Consolidated I Ltd |
| Newmark Homes Purchasing, LLC | Williams Insulation |
| Newmark Homes Purchasing, LLC | Wisenbaker Builder Services-H |
| Newmark Homes Purchasing, LLC | Yantis Company |
| Newmark Homes Purchasing, LLC | Zeal Construction LLC |
| Newmark Homes, LP | 1st Infiniti Ent. Inc. |
| Newmark Homes, LP | 31-W Insulation Co., Inc. |
| Newmark Homes, LP | 3-S Construction |
| Newmark Homes, LP | A-1 Landscape |
| Newmark Homes, LP | AB Erosion Control |
| Newmark Homes, LP | A-B Window Service |
| Newmark Homes, LP | ABC Supply |
| Newmark Homes, LP | Access Control Systems, LLC |
| Newmark Homes, LP | Ace Concrete |
| Newmark Homes, LP | Acme Brick |
| Newmark Homes, LP | Acme Brick-Houston |
| Newmark Homes, LP | Advantage Const. |
| Newmark Homes, LP | Advantage Framer Construction |
| Newmark Homes, LP | Adventure Electric |
| Newmark Homes, LP | Aguilar Masonry, LLC |
| Newmark Homes, LP | Aguilar*Jose Guadalupe |
| Newmark Homes, LP | Air Systems, Inc. |
| Newmark Homes, LP | Airtron LP |
| Newmark Homes, LP | Alberto Jauregui Designs |
| Newmark Homes, LP | Alexander Landscaping |
| Newmark Homes, LP | All About Decks |
| Newmark Homes, LP | All Fence Company |
| Newmark Homes, LP | All Points Surveying, Inc. -A |
| Newmark Homes, LP | Alley & Associates Inc. |
| Newmark Homes, LP | Alley-Cassetty Brick |
| Newmark Homes, LP | Allied Concrete |
| Newmark Homes, LP | Allied Concrete Pumping, LP |
| Newmark Homes, LP | Allstate Plastering, Inc. |
| Newmark Homes, LP | Alonso*Celso |
| Newmark Homes, LP | Alvarado*Antonio |
| Newmark Homes, LP | Alvarado*Encarnacion |
| Newmark Homes, LP | AM Plus Construction |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Newmark Homes, LP | American Erosion Control |
| Newmark Homes, LP | American Grading & Excavating |
| Newmark Homes, LP | American Woodmark Corp |
| Newmark Homes, LP | Amerispec Home Inspection |
| Newmark Homes, LP | Anderson*Brian |
| Newmark Homes, LP | Andrade Concrete & Const. |
| Newmark Homes, LP | Anselmo*Florentino |
| Newmark Homes, LP | Antunez*Bernardo |
| Newmark Homes, LP | Arc Works Welding |
| Newmark Homes, LP | Ariza*Patricio |
| Newmark Homes, LP | Atlantic Exterior Specialists |
| Newmark Homes, LP | Atlas Rain Gutter Systems |
| Newmark Homes, LP | Atmos Energy |
| Newmark Homes, LP | Austin Budget Paint Creations |
| Newmark Homes, LP | Austin Countertops 10TH |
| Newmark Homes, LP | Austin Lanehart Electric, Inc. |
| Newmark Homes, LP | Avila Enterprises, Inc.  dba |
| Newmark Homes, LP | Bailey*Roy |
| Newmark Homes, LP | Balderas*Ernesto A. |
| Newmark Homes, LP | Balleza Roofing |
| Newmark Homes, LP | Bar W Services LLC |
| Newmark Homes, LP | Bell Construction Services Inc |
| Newmark Homes, LP | Bermea*Manuel |
| Newmark Homes, LP | Best Buy Stores, L.P. |
| Newmark Homes, LP | Bexar Metro Water Dist. |
| Newmark Homes, LP | Big Boys Lawn & Landscape, Inc |
| Newmark Homes, LP | Big Tenn Air Conditioning, Inc |
| Newmark Homes, LP | Big Tex A/C Heating Austin |
| Newmark Homes, LP | Big Tex A/C San Antonio, Inc. |
| Newmark Homes, LP | Big Tex Inc  Houston |
| Newmark Homes, LP | Bison Building Materials, Ltd |
| Newmark Homes, LP | Blanca's Cleaning Service |
| Newmark Homes, LP | Blinker Lite Safety, Inc. |
| Newmark Homes, LP | BMCW Southcentral LP    -N |
| Newmark Homes, LP | BMCW Southcentral LP  -N Mill |
| Newmark Homes, LP | Boral Bricks Inc. |
| Newmark Homes, LP | Brandt Surveying Company, Inc. |
| Newmark Homes, LP | Brentwood Granite Marble &Tile |
| Newmark Homes, LP | Briagas*Pablo |
| Newmark Homes, LP | Brown*Ric |
| Newmark Homes, LP | Buffalo Framing |
| Newmark Homes, LP | Buffalo Framing and Truss LP |
| Newmark Homes, LP | Builders & Landscape Serv. Inc |
| Newmark Homes, LP | Builders Blinds of Texas, Ltd |
| Newmark Homes, LP | Builders Cleaning Service |
| Newmark Homes, LP | Builders Fence Corp. |
| Newmark Homes, LP | Builders Mechanical, Inc. |
| Newmark Homes, LP | Builders Plus of Central Texas |
| Newmark Homes, LP | Builders Plus of Central Texas |
| Newmark Homes, LP | Builders Plus of Houston |
| Newmark Homes, LP | C & G Turf Management, LLC |
| Newmark Homes, LP | C&H Drywall, Inc. |
| Newmark Homes, LP | C&M Pressure Washing |
| Newmark Homes, LP | C&Q Foundations, Inc. |
| Newmark Homes, LP | Calderon*Rodolfo |
| Newmark Homes, LP | Calvillo*Sirena |
| Newmark Homes, LP | Calvin's Electric, LTD |
| Newmark Homes, LP | Cantu's Carpenter |
| Newmark Homes, LP | Capital Pumping, LP |
| Newmark Homes, LP | Cardenas*Francisco A |
| Newmark Homes, LP | Carpet Den, Inc. |
| Newmark Homes, LP | Carrillo*Yamileth |
| Newmark Homes, LP | Carvajal*Andres |
| Newmark Homes, LP | Casa Mechanical Services, LLP |
| Newmark Homes, LP | Castaneda Framers, Inc. |
| Newmark Homes, LP | Castellano*Henry Didi |
| Newmark Homes, LP | Castro*Jose L |
| Newmark Homes, LP | CB Hardware, Inc. |
| Newmark Homes, LP | Cemex |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes, LP | CenterPoint Energy |
| Newmark Homes, LP | CenterPoint Energy - Utility |
| Newmark Homes, LP | Central Environmental Services |
| Newmark Homes, LP | Cervantes*Uriel Eduardo |
| Newmark Homes, LP | Champion Window, L.P.    -D&H |
| Newmark Homes, LP | Champion Windows    -SA |
| Newmark Homes, LP | Champion Windows-Austin |
| Newmark Homes, LP | Christianson Company |
| Newmark Homes, LP | Christianson Plumbing- S A |
| Newmark Homes, LP | Chuy's Fence Co. |
| Newmark Homes, LP | Cifuentes*Juan A. |
| Newmark Homes, LP | Circuit City |
| Newmark Homes, LP | City Of Austin |
| Newmark Homes, LP | City Of Austin        Util |
| Newmark Homes, LP | City of Brentwood W&S |
| Newmark Homes, LP | City Of Cedar Park-Taps |
| Newmark Homes, LP | City Of Cedar Park-Util |
| Newmark Homes, LP | City Of Franklin |
| Newmark Homes, LP | City of Franklin Water Dept. |
| Newmark Homes, LP | City Of Houston - Util. |
| Newmark Homes, LP | City of Pearland -Util |
| Newmark Homes, LP | City Of Pearland- Permits |
| Newmark Homes, LP | City of Richmond |
| Newmark Homes, LP | City Of Round Rock    -    Util |
| Newmark Homes, LP | City of Sugar Land-Permits |
| Newmark Homes, LP | City Public Service    -Util |
| Newmark Homes, LP | Classic Interiors |
| Newmark Homes, LP | Concrete Mystique |
| Newmark Homes, LP | Consolidated Houston Plumbing |
| Newmark Homes, LP | Construction Cleaning Services |
| Newmark Homes, LP | Corey Construction, LP |
| Newmark Homes, LP | Cosco Electric, Inc. |
| Newmark Homes, LP | Creativescapes |
| Newmark Homes, LP | Crosslin Supply Company,Inc. |
| Newmark Homes, LP | Curie Enterprises, Inc. |
| Newmark Homes, LP | Custom Fabrication, Inc. |
| Newmark Homes, LP | Custom Irrigation |
| Newmark Homes, LP | D.I. Environmental Inc. |
| Newmark Homes, LP | D.N.T. Investments, Inc. |
| Newmark Homes, LP | Dale Insulation Company |
| Newmark Homes, LP | Dal-Worth Drywall, LP |
| Newmark Homes, LP | Davis Air Conditioning & |
| Newmark Homes, LP | Decked Out & Fenced In Const. |
| Newmark Homes, LP | DEH Structural Engineering,Inc |
| Newmark Homes, LP | DeJesus*Roberto |
| Newmark Homes, LP | Dela Rosa*Jose |
| Newmark Homes, LP | DeLa Torre*Leonel |
| Newmark Homes, LP | Dewalt Sand Pit |
| Newmark Homes, LP | Direct Energy |
| Newmark Homes, LP | Dodd Electric, Inc. |
| Newmark Homes, LP | Don Wood Plumbing Co. Inc. |
| Newmark Homes, LP | Double "G" Trucking |
| Newmark Homes, LP | DPIS Engineering, LLC |
| Newmark Homes, LP | Driver*Ray |
| Newmark Homes, LP | Drymala Trees, Inc. |
| Newmark Homes, LP | Duarte*Hilaria |
| Newmark Homes, LP | DuDco Vinyl Siding |
| Newmark Homes, LP | Durango Drywall |
| Newmark Homes, LP | E&E Painting Co. |
| Newmark Homes, LP | Energy Sense Systems |
| Newmark Homes, LP | Engel Enterprises |
| Newmark Homes, LP | Entergy |
| Newmark Homes, LP | Enterprise Plumbing, Inc. |
| Newmark Homes, LP | Epitacio Gomez |
| Newmark Homes, LP | Era Pathfinder Properties |
| Newmark Homes, LP | Espinoza*Ezequiel |
| Newmark Homes, LP | Espinoza*Reynaldo |
| Newmark Homes, LP | Estrella Trucking Co., Inc. |
| Newmark Homes, LP | EW Painting |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes, LP | Exum*Ronald E. |
| Newmark Homes, LP | Falcon Stucco |
| Newmark Homes, LP | Family of Builders |
| Newmark Homes, LP | Fashion Glass & Mirror    -H |
| Newmark Homes, LP | Fashion Glass & Mirror Inc. |
| Newmark Homes, LP | Fiberglass Insulators, Inc. |
| Newmark Homes, LP | Figueroa*Epi |
| Newmark Homes, LP | First Choice Power, Inc. |
| Newmark Homes, LP | Floors Inc. |
| Newmark Homes, LP | Flores*Angel |
| Newmark Homes, LP | Flores*Francisco A. |
| Newmark Homes, LP | Fort Bend County Mud #146-Taps |
| Newmark Homes, LP | Fort Bend County MUD #35   -P |
| Newmark Homes, LP | Fort Bend MUD #57- Taps |
| Newmark Homes, LP | Foster Inspections Const. Inc. |
| Newmark Homes, LP | Four Seasons Landscaping |
| Newmark Homes, LP | Frias*John |
| Newmark Homes, LP | Fry Roofing, Inc. |
| Newmark Homes, LP | G H Masonry, Inc. |
| Newmark Homes, LP | G&L Masonry, LLC |
| Newmark Homes, LP | G.O. Weiss, Inc. |
| Newmark Homes, LP | Galindo*Jesus |
| Newmark Homes, LP | Garcia*Melissa Jeanette |
| Newmark Homes, LP | Garman Engineering Company LLC |
| Newmark Homes, LP | Garza Ramon Masonry Inc. |
| Newmark Homes, LP | Garza*Fernando |
| Newmark Homes, LP | Ge Appliances        - Austin |
| Newmark Homes, LP | Ge Appliances        - Houston |
| Newmark Homes, LP | GE Appliances    - San Antonio |
| Newmark Homes, LP | General Electric-Nashville |
| Newmark Homes, LP | GlassCraft Door Corporation |
| Newmark Homes, LP | Gomez Construction |
| Newmark Homes, LP | Gomez*Gilberto |
| Newmark Homes, LP | Gomez*Heriberto |
| Newmark Homes, LP | Gonzales*Bernabe |
| Newmark Homes, LP | Gonzales*Celso Vazquez |
| Newmark Homes, LP | Gonzalez*Eucario |
| Newmark Homes, LP | GP Contractors |
| Newmark Homes, LP | Greg Stadther Trim Carpentry |
| Newmark Homes, LP | Grimaldo*Victor |
| Newmark Homes, LP | Guadalupe*Paz |
| Newmark Homes, LP | Guardian Security |
| Newmark Homes, LP | Gulf Coast Windstorm |
| Newmark Homes, LP | Gutierrez*Jesus |
| Newmark Homes, LP | Gutierrez*Luis |
| Newmark Homes, LP | H&H Foradory Const., Inc. |
| Newmark Homes, LP | H.R. Wesson Sand Co Inc. |
| Newmark Homes, LP | Hampton Plastering |
| Newmark Homes, LP | Hanson Brick    -SA |
| Newmark Homes, LP | Hardware Resources |
| Newmark Homes, LP | Harris County Mud #278 -Util |
| Newmark Homes, LP | Harris County MUD #96 |
| Newmark Homes, LP | Harris County-Permits Dept. |
| Newmark Homes, LP | HC Painting |
| Newmark Homes, LP | Heflin*Bronson |
| Newmark Homes, LP | Hernandez*Jose Jesus |
| Newmark Homes, LP | Hernandez*Thomas |
| Newmark Homes, LP | Hernandez*William |
| Newmark Homes, LP | Hicks*Joseph W. |
| Newmark Homes, LP | Hoffman Land Surveying, LLP |
| Newmark Homes, LP | Hope Lumber & Supply LP |
| Newmark Homes, LP | Houk Air Cond., Inc. |
| Newmark Homes, LP | Houston Carpet Service |
| Newmark Homes, LP | Houston-Stafford Electric- S A |
| Newmark Homes, LP | Houston-Stafford Electrical |
| Newmark Homes, LP | Hou-Tex Glass & Mirror Co. |
| Newmark Homes, LP | Hudson*Stephen |
| Newmark Homes, LP | Huerta-Galicia*Jorge |
| Newmark Homes, LP | Humphries*James |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Newmark Homes, LP | Huskey Truss & Building Supply |
| Newmark Homes, LP | IESI |
| Newmark Homes, LP | Interior Communications, LLC |
| Newmark Homes, LP | IronWood Connection |
| Newmark Homes, LP | Irving Materials, Inc. |
| Newmark Homes, LP | J&P Construction |
| Newmark Homes, LP | J.L. Martinez Framing, Inc. |
| Newmark Homes, LP | Jacinto's Cleaning Inc |
| Newmark Homes, LP | JC Quality Painting & |
| Newmark Homes, LP | JCA Construction |
| Newmark Homes, LP | JCA Industrial Partners LTD-T |
| Newmark Homes, LP | Jendry Construction Co., Inc. |
| Newmark Homes, LP | Jerry T. Beech Concrete |
| Newmark Homes, LP | Jewell GC & Roofing |
| Newmark Homes, LP | Jimenez*Angel |
| Newmark Homes, LP | JJ's Window Services |
| Newmark Homes, LP | JM's Cleaning Co. |
| Newmark Homes, LP | Job Site Recycling |
| Newmark Homes, LP | Johnson Fence |
| Newmark Homes, LP | Jose F Gomez Construction, Inc |
| Newmark Homes, LP | Jose Umana and |
| Newmark Homes, LP | JRR Construction LLC |
| Newmark Homes, LP | J's Home Contractors |
| Newmark Homes, LP | Juan Suarez Framing, Inc. |
| Newmark Homes, LP | K&M Landscape Irrigation,Light |
| Newmark Homes, LP | Kaiser Plumbing |
| Newmark Homes, LP | Kamal Inc.  -San Antonio |
| Newmark Homes, LP | KCG Inc. |
| Newmark Homes, LP | Kent Moore Cabinets |
| Newmark Homes, LP | Kent Moore Cabinets, Ltd.  -A |
| Newmark Homes, LP | Kimball*Charles Anthony |
| Newmark Homes, LP | Koester Inc.*Phillip J. |
| Newmark Homes, LP | Kydicon, Inc. |
| Newmark Homes, LP | L&S Plumbing |
| Newmark Homes, LP | L&S Plumbing Partnership, Ltd |
| Newmark Homes, LP | L&W Weatherstripping, LLC |
| Newmark Homes, LP | Lance Dahse, Inc. |
| Newmark Homes, LP | Landmark Electric |
| Newmark Homes, LP | Lane*Scott |
| Newmark Homes, LP | Lauren Concrete LP |
| Newmark Homes, LP | Lavender Design Group    -W |
| Newmark Homes, LP | Leon's Tile, Inc. |
| Newmark Homes, LP | Light Duty Labor |
| Newmark Homes, LP | Lighting Connection, Inc. |
| Newmark Homes, LP | Limited Drywall & Paint, Inc. |
| Newmark Homes, LP | Lisbon, Inc. |
| Newmark Homes, LP | Loera*Edward |
| Newmark Homes, LP | Lone Star Ready-Mix |
| Newmark Homes, LP | Loomis Austin, Inc. |
| Newmark Homes, LP | Lopez*Osbaldo |
| Newmark Homes, LP | Loyd*Richard Lee |
| Newmark Homes, LP | Lozano*Carlos |
| Newmark Homes, LP | LV Landscape |
| Newmark Homes, LP | Lyssy Drywall, Inc. |
| Newmark Homes, LP | LZT Architects Inc. |
| Newmark Homes, LP | M&A Ramirez Masonry, Inc. |
| Newmark Homes, LP | M.L. Rendlemen Co. |
| Newmark Homes, LP | Madison Paving LLC |
| Newmark Homes, LP | Magic Man Surfaces, Inc. |
| Newmark Homes, LP | Magnolia Environmental Const. |
| Newmark Homes, LP | Maldonado*Vicente |
| Newmark Homes, LP | Mandujano Framing Co., Inc |
| Newmark Homes, LP | Manzano*Cipriano |
| Newmark Homes, LP | Marino's Construction Clean-Up |
| Newmark Homes, LP | Markim Construction, Inc. |
| Newmark Homes, LP | Martin Door & Window Co., Inc. |
| Newmark Homes, LP | Martinez*Agustin |
| Newmark Homes, LP | Martinez*Antonio |
| Newmark Homes, LP | Martinez*Francisco |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes, LP | Martinez*Rafaela |
| Newmark Homes, LP | Martinez*Ricardo C. |
| Newmark Homes, LP | Master Brick Inc. |
| Newmark Homes, LP | Maverick Land Surveying Co. |
| Newmark Homes, LP | Mayorga*Joaquin |
| Newmark Homes, LP | McGee*Danny |
| Newmark Homes, LP | McKnight*Keith |
| Newmark Homes, LP | MDC Roofing |
| Newmark Homes, LP | Meadows*Ricky |
| Newmark Homes, LP | Mendez*Silverio |
| Newmark Homes, LP | Mendoza*Felipe |
| Newmark Homes, LP | Metro Water |
| Newmark Homes, LP | Meyer Lytton Allen Whitaker |
| Newmark Homes, LP | Meza*Alfredo |
| Newmark Homes, LP | Mid. TN Erosion & Sediment |
| Newmark Homes, LP | Middle Tennessee Electric |
| Newmark Homes, LP | Mid-South Electric Inc. |
| Newmark Homes, LP | Milcrofton Utility |
| Newmark Homes, LP | Miller Brothers Floors |
| Newmark Homes, LP | Mireles*Servando |
| Newmark Homes, LP | Misc. Vendor |
| Newmark Homes, LP | Modern Granite and Marble, Inc |
| Newmark Homes, LP | Modern Painting, Inc. |
| Newmark Homes, LP | Modern Pest Control |
| Newmark Homes, LP | Monroy*Jesus |
| Newmark Homes, LP | Mora's Painting, Inc. |
| Newmark Homes, LP | Moreno*Santiago |
| Newmark Homes, LP | Moya*Alfonso |
| Newmark Homes, LP | Munoz*Armando |
| Newmark Homes, LP | Mustang Drywall Co., Inc. |
| Newmark Homes, LP | Mustang Plumbing, Inc. |
| Newmark Homes, LP | Nashville Electric Service |
| Newmark Homes, LP | Natures Source |
| Newmark Homes, LP | Nava*Enrique |
| Newmark Homes, LP | New Tex Seamless Rain Gutters |
| Newmark Homes, LP | Nguyen*Phuc Van |
| Newmark Homes, LP | N-L Excavation |
| Newmark Homes, LP | Nolensville College Grove |
| Newmark Homes, LP | Norex Engineering, Inc. |
| Newmark Homes, LP | Ochoa*Baltazar |
| Newmark Homes, LP | Ojeda*Raul |
| Newmark Homes, LP | Olague*Juan Gaberiel |
| Newmark Homes, LP | Onteriors LLC |
| Newmark Homes, LP | Orozco*Ruben Charles |
| Newmark Homes, LP | Outdoor Woodworks, L.L.C. |
| Newmark Homes, LP | Overhead Door Co.- San Antonio |
| Newmark Homes, LP | Padilla*Daniel |
| Newmark Homes, LP | Paradiso Villas HOA |
| Newmark Homes, LP | Paredes*Albert |
| Newmark Homes, LP | Patino*Eddie |
| Newmark Homes, LP | Patino*Jose Luis |
| Newmark Homes, LP | Pedernales Electric   Perm N |
| Newmark Homes, LP | Pedernales Electric Coop.Util |
| Newmark Homes, LP | Pena Gallegos*Jorge |
| Newmark Homes, LP | Perez*Jorge |
| Newmark Homes, LP | Perez*Jose G |
| Newmark Homes, LP | Perez*Jose G. |
| Newmark Homes, LP | Perez*Tomas Miguel |
| Newmark Homes, LP | Petersen & Sons, LLC |
| Newmark Homes, LP | Pina*Juan |
| Newmark Homes, LP | Pizano*Virginia |
| Newmark Homes, LP | Plant Source Landscaping |
| Newmark Homes, LP | PM Masonry LLC |
| Newmark Homes, LP | Porter Ready Mix, Inc |
| Newmark Homes, LP | Portillo*Rosa |
| Newmark Homes, LP | Precision Plumbing |
| Newmark Homes, LP | Precision Tractor Service |
| Newmark Homes, LP | Premier Garage of |
| Newmark Homes, LP | Presiado*Miguel A. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Newmark Homes, LP | Pride*Terence |
| Newmark Homes, LP | Project Lighting Co. Inc. |
| Newmark Homes, LP | Pruitt & Assoc Inc.*Garvin |
| Newmark Homes, LP | Pumpco |
| Newmark Homes, LP | Pumpco, Inc. |
| Newmark Homes, LP | Quality Built |
| Newmark Homes, LP | Quezada Masonry |
| Newmark Homes, LP | R&R Masonry & Paint |
| Newmark Homes, LP | R.G.Z. Const. |
| Newmark Homes, LP | R.G.Z. Construction |
| Newmark Homes, LP | R.H. Hernandez Drywall, Inc. |
| Newmark Homes, LP | R.T. Masonry Inc. |
| Newmark Homes, LP | Ramon*Modesto |
| Newmark Homes, LP | Ramsey Land Surveying |
| Newmark Homes, LP | Ranger American of Texas |
| Newmark Homes, LP | Ranger American Of TX. Inc-Aus |
| Newmark Homes, LP | Relay Services, Inc |
| Newmark Homes, LP | Reyes*Guillermo Sanchez |
| Newmark Homes, LP | Reyes*Sergio |
| Newmark Homes, LP | Rey-Mex Painting, Inc. |
| Newmark Homes, LP | RH Hernandez Drywall, Inc. |
| Newmark Homes, LP | Riata Landscape Services |
| Newmark Homes, LP | Ricario*Jesus |
| Newmark Homes, LP | Richardson*Angela |
| Newmark Homes, LP | Richter*Kristofor D. |
| Newmark Homes, LP | Rios Masonry |
| Newmark Homes, LP | River City Environmental |
| Newmark Homes, LP | River City Rolloff, Inc. |
| Newmark Homes, LP | Roach Construction Services |
| Newmark Homes, LP | Rodrigo Mendoza Painting |
| Newmark Homes, LP | Rodriguez*Cesar |
| Newmark Homes, LP | Rodriguez*Gilbert |
| Newmark Homes, LP | Rodriguez*Ricardo |
| Newmark Homes, LP | Romero*Jose |
| Newmark Homes, LP | Romero*Jose Alberto |
| Newmark Homes, LP | Rose*Ruby Ann |
| Newmark Homes, LP | Rosenberg Plumbing Service,Inc |
| Newmark Homes, LP | Royal Baths Manufacturing -H |
| Newmark Homes, LP | RS Concrete LLC |
| Newmark Homes, LP | Salaiz Obregon Services |
| Newmark Homes, LP | Saldierna Framing Inc. |
| Newmark Homes, LP | Salgado*Gerardo Ramirez |
| Newmark Homes, LP | Salvador Custom Carpentry, Inc |
| Newmark Homes, LP | San Antonio Fence Co. |
| Newmark Homes, LP | San Antonio Framing, Inc. |
| Newmark Homes, LP | San Antonio Water System |
| Newmark Homes, LP | San Antonio Water Systems -SAW |
| Newmark Homes, LP | Sanchez Fence Co. LLC |
| Newmark Homes, LP | Santana Painting |
| Newmark Homes, LP | Sarmiento*Mario W. |
| Newmark Homes, LP | Sepulveda*Dora |
| Newmark Homes, LP | Sequatchie Concrete Service |
| Newmark Homes, LP | Serrano*J Refujio |
| Newmark Homes, LP | Servpro of Sharpstown |
| Newmark Homes, LP | Servpro of South Austin |
| Newmark Homes, LP | Servpro of Stafford/Missouri |
| Newmark Homes, LP | Seybro Door & Weatherstrip Co. |
| Newmark Homes, LP | Seybro Door & Weatherstrip Inc |
| Newmark Homes, LP | Sienna Plantation Residential |
| Newmark Homes, LP | Silva-Aguilar*Hector |
| Newmark Homes, LP | Smith & Sons, Inc. |
| Newmark Homes, LP | Solid Foundations, LTD |
| Newmark Homes, LP | Soliz*Arturo |
| Newmark Homes, LP | Sorto*Jose O. |
| Newmark Homes, LP | South Texas Surveying Assoc.-W |
| Newmark Homes, LP | Southern Mechanical, Inc. |
| Newmark Homes, LP | Southland Electric |
| Newmark Homes, LP | Southland Electrical Contr Inc |
| Newmark Homes, LP | Southland Glass |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| Newmark Homes, LP | Southside Shrubbery, LLC |
| Newmark Homes, LP | Spanish Oak Tractor Service |
| Newmark Homes, LP | Specialty Window Coverings |
| Newmark Homes, LP | Splash Water Systems |
| Newmark Homes, LP | Sprint Sand & Clay |
| Newmark Homes, LP | SRJ Construction Removal, Inc. |
| Newmark Homes, LP | Stadther*Greg |
| Newmark Homes, LP | Stephens Site Prep |
| Newmark Homes, LP | Stereo East, Inc. |
| Newmark Homes, LP | Stewart Door Ltd |
| Newmark Homes, LP | Stewart Lumber |
| Newmark Homes, LP | Stock Building Supply  -A |
| Newmark Homes, LP | Stock Building Supply -SA-P |
| Newmark Homes, LP | Stricklin's L.P. |
| Newmark Homes, LP | Sun Tile Corp |
| Newmark Homes, LP | Sun Tile Corporation |
| Newmark Homes, LP | Suncoast Postension Co |
| Newmark Homes, LP | Suncoast-Austin |
| Newmark Homes, LP | Swientek*Jiminy |
| Newmark Homes, LP | Sylva Construction, LLC |
| Newmark Homes, LP | T&D Moravits & Company, Inc. |
| Newmark Homes, LP | T.E.S |
| Newmark Homes, LP | Tabb*David |
| Newmark Homes, LP | Tamez*Eloy |
| Newmark Homes, LP | T-Bar Fence |
| Newmark Homes, LP | TD Hunt Plastering |
| Newmark Homes, LP | TES Ventures LP |
| Newmark Homes, LP | Texas Community Propane, Inc. |
| Newmark Homes, LP | Texas Concrete Materials, Ltd |
| Newmark Homes, LP | Texas Curb Cut Inc. |
| Newmark Homes, LP | Texas Fence & Iron |
| Newmark Homes, LP | Texas Finest Trim Carpenter |
| Newmark Homes, LP | Texas Gas Service |
| Newmark Homes, LP | Texas Light Bulb Inc. |
| Newmark Homes, LP | Texas Service Specialists, LLC |
| Newmark Homes, LP | Texas Woodsmith Inc. |
| Newmark Homes, LP | Tex-Style Fence Inc. |
| Newmark Homes, LP | Texsun Landscape & Irrigation |
| Newmark Homes, LP | Texwood Industries, L.P. |
| Newmark Homes, LP | The Brooks Group |
| Newmark Homes, LP | The Raindance Company |
| Newmark Homes, LP | The Villas at Treemont |
| Newmark Homes, LP | The Window Guide Co. Inc. |
| Newmark Homes, LP | Top Solutions, Inc. |
| Newmark Homes, LP | Torres*Juan Fabian |
| Newmark Homes, LP | Torres*Omar Valente |
| Newmark Homes, LP | Torres*Patricia |
| Newmark Homes, LP | Town of Nolensville Codes |
| Newmark Homes, LP | Town of Nolensville Taxes |
| Newmark Homes, LP | Tracy*Pat |
| Newmark Homes, LP | Traditional Plastering, Inc. |
| Newmark Homes, LP | Trash Solutions LLC |
| Newmark Homes, LP | Trevino*Jesus |
| Newmark Homes, LP | Trevino*Juan |
| Newmark Homes, LP | Trim Tech Of Austin, Inc. |
| Newmark Homes, LP | TruClean Homes, Inc. |
| Newmark Homes, LP | Trussway Ltd-Trusses |
| Newmark Homes, LP | TSSA, Inc. |
| Newmark Homes, LP | Two G Windows |
| Newmark Homes, LP | TXU Electric    -Dallas |
| Newmark Homes, LP | Valdez*Carmen |
| Newmark Homes, LP | Vazquez*Jose |
| Newmark Homes, LP | VC Jr. Construction Inc. |
| Newmark Homes, LP | Vega*Saturnino |
| Newmark Homes, LP | Velazquez*Zenon |
| Newmark Homes, LP | Venture Underground Services |
| Newmark Homes, LP | Vidal*Jose Manuel |
| Newmark Homes, LP | Villareal Drywall |
| Newmark Homes, LP | Villarreal Drywall, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| Newmark Homes, LP | Vintage Construction, Inc. |
| Newmark Homes, LP | Virge*Thomas |
| Newmark Homes, LP | W R Watson, Inc. |
| Newmark Homes, LP | Waste Management - San Antonio |
| Newmark Homes, LP | Waste Management of Tenn, Inc. |
| Newmark Homes, LP | Watson Carpet & Floor Covering |
| Newmark Homes, LP | Watson-Boyce Cabinet |
| Newmark Homes, LP | WBM Heritage Roofing |
| Newmark Homes, LP | Weatherford & Associates, LLC |
| Newmark Homes, LP | Weathershield Building |
| Newmark Homes, LP | Weiss Sand & Clay, LP |
| Newmark Homes, LP | Westside At Buttercup Creek |
| Newmark Homes, LP | Wheeler Tractor Service |
| Newmark Homes, LP | Wholesale Building Materials |
| Newmark Homes, LP | Williams Consolidated I Ltd |
| Newmark Homes, LP | Williams Contractor Service |
| Newmark Homes, LP | Williams Insulation |
| Newmark Homes, LP | Williams Insulation - Hous |
| Newmark Homes, LP | Williams Insulation Co. Dallas |
| Newmark Homes, LP | Williamson Co Trustee    Taxes |
| Newmark Homes, LP | Williamson County Insulation |
| Newmark Homes, LP | Willie Binkley'S Concrete |
| Newmark Homes, LP | Wisenbaker Builder |
| Newmark Homes, LP | Wisenbaker Builder Services -M |
| Newmark Homes, LP | Wisenbaker Builder Services-H |
| Newmark Homes, LP | World Wide Windstorm, Inc. |
| Newmark Homes, LP | Wortham Brothers, Inc. |
| Newmark Homes, LP | Xevex LLC |
| Newmark Homes, LP | Zeal Construction LLC |
| Newmark Homes, LP | Zelaya*Nelson |
| Newmark Homes, LP | Zuniga's Painting |
| Reflection Key, LLC | All American Shutters |
| Reflection Key, LLC | Allied Doors, Inc. |
| Reflection Key, LLC | American Woodmark Corp |
| Reflection Key, LLC | B & W Custom Glass and |
| Reflection Key, LLC | Briggs Smith Bldg & Dev. Inc. |
| Reflection Key, LLC | Buckshot Excavation, Inc. |
| Reflection Key, LLC | C.A. Steelman, Inc |
| Reflection Key, LLC | Circle L Roofing, Inc |
| Reflection Key, LLC | Contractor's Choice |
| Reflection Key, LLC | Florida Power & Light |
| Reflection Key, LLC | Gateswork, Inc. |
| Reflection Key, LLC | Gator Electrical |
| Reflection Key, LLC | General Electric Company |
| Reflection Key, LLC | Green Acres USA, Inc. |
| Reflection Key, LLC | Hambro Structural Systems |
| Reflection Key, LLC | Hinkle*Thomas W. |
| Reflection Key, LLC | J & D Heating & A/C, Inc. |
| Reflection Key, LLC | J.M. Carrigan Corporation |
| Reflection Key, LLC | Jade Home Decor, Inc. |
| Reflection Key, LLC | Jonathan M Kay |
| Reflection Key, LLC | Morrison Aluminum |
| Reflection Key, LLC | Precision Cleaning, Inc. |
| Reflection Key, LLC | Purified Air Conditioning, Inc |
| Reflection Key, LLC | Raymond Building Supply |
| Reflection Key, LLC | Reflection Key Condo Assoc.Inc |
| Reflection Key, LLC | Regal Custom Products, |
| Reflection Key, LLC | Roadway Paving Stones,Inc. |
| Reflection Key, LLC | Royal Cleaning, Inc. |
| Reflection Key, LLC | Seabreeze Electric, Inc. |
| Reflection Key, LLC | SelectBuild Florida, LLC |
| Reflection Key, LLC | Spiro & Associates |
| Reflection Key, LLC | Sterling Manufacturing |
| Reflection Key, LLC | Tampco Group, Inc. |
| Reflection Key, LLC | ThyssenKrupp Elevator |
| Reflection Key, LLC | Total Flooring Systems Inc |
| Reflection Key, LLC | Tropix Marble Company |
| Reflection Key, LLC | Wayne Automatic Fire |
| Reflection Key, LLC | West Coast Insulation |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes Florida LP | 31-W Insulation Co., Inc |
| TOUSA Homes Florida LP | A S Of South Florida Inc |
| TOUSA Homes Florida LP | A&A Acrylic Decking and |
| TOUSA Homes Florida LP | A/C Masters Hvac, Inc. |
| TOUSA Homes Florida LP | Absolute Erosion Control, LLC |
| TOUSA Homes Florida LP | Acacia Roofing Company, Inc. |
| TOUSA Homes Florida LP | Advanced Recreational |
| TOUSA Homes Florida LP | Alpha Emc |
| TOUSA Homes Florida LP | Alpha Environmental Mgmt Corp |
| TOUSA Homes Florida LP | Al's Wholesale |
| TOUSA Homes Florida LP | Al'S Wholesale Blinds & |
| TOUSA Homes Florida LP | Alufab Hurricane Shutters Inc |
| TOUSA Homes Florida LP | Alvin Chang |
| TOUSA Homes Florida LP | American Access Controls, Inc |
| TOUSA Homes Florida LP | American Door & Millwork Co. |
| TOUSA Homes Florida LP | American Electrical Services |
| TOUSA Homes Florida LP | American Woodmark Corp |
| TOUSA Homes Florida LP | Armstrong Fence Company |
| TOUSA Homes Florida LP | Ash-Brooke Construction |
| TOUSA Homes Florida LP | Ashton Pools & Spas, Inc. |
| TOUSA Homes Florida LP | Atlantic Marble Products |
| TOUSA Homes Florida LP | AVI eConsulting, LLC |
| TOUSA Homes Florida LP | B & W Custom Glass and |
| TOUSA Homes Florida LP | Badger Construction And Associ |
| TOUSA Homes Florida LP | Banko Overhead Doors, Inc |
| TOUSA Homes Florida LP | Banks Engineering Inc |
| TOUSA Homes Florida LP | Barry & Elinor Schimel |
| TOUSA Homes Florida LP | Battista Farms |
| TOUSA Homes Florida LP | Bay Area New Homes Guide |
| TOUSA Homes Florida LP | Bayonet Plumbing Heating and |
| TOUSA Homes Florida LP | Bayside Insulation |
| TOUSA Homes Florida LP | Benchmark Fence and Rail LLC |
| TOUSA Homes Florida LP | BET-ER Mix, Inc. |
| TOUSA Homes Florida LP | Big Boys Plumbing Company |
| TOUSA Homes Florida LP | Big D Building Center - |
| TOUSA Homes Florida LP | Blackton, Inc. |
| TOUSA Homes Florida LP | Briggs Smith Bldg & Dev. Inc. |
| TOUSA Homes Florida LP | Build America |
| TOUSA Homes Florida LP | Builders First Source |
| TOUSA Homes Florida LP | Builders First Source |
| TOUSA Homes Florida LP | Bullseye |
| TOUSA Homes Florida LP | Burnett & Thomas, PA |
| TOUSA Homes Florida LP | C Q Insulation Inc |
| TOUSA Homes Florida LP | C.A. Steelman, Inc |
| TOUSA Homes Florida LP | Capital Painting Corp. |
| TOUSA Homes Florida LP | Capital Painting Group, Inc. |
| TOUSA Homes Florida LP | Capri Engineering LLC |
| TOUSA Homes Florida LP | Carlton Walker Masonry, Inc. |
| TOUSA Homes Florida LP | Carpenter Contractors of |
| TOUSA Homes Florida LP | Carrollwood Window & Door Inc |
| TOUSA Homes Florida LP | Cash Building Materials |
| TOUSA Homes Florida LP | Cast-Crete |
| TOUSA Homes Florida LP | Catalina Furniture |
| TOUSA Homes Florida LP | CBS Outdoor |
| TOUSA Homes Florida LP | Central Florida Roofing |
| TOUSA Homes Florida LP | Cherry Tree Landscape |
| TOUSA Homes Florida LP | Chung-Lam*Juan Carlos |
| TOUSA Homes Florida LP | Circle L Roofing, Inc |
| TOUSA Homes Florida LP | CIT Technology Financial |
| TOUSA Homes Florida LP | City Of Bartow |
| TOUSA Homes Florida LP | City Of Cape Coral Utility Bil |
| TOUSA Homes Florida LP | Clay Drywall |
| TOUSA Homes Florida LP | Clear Channel Outdoor |
| TOUSA Homes Florida LP | Clowney Site Services |
| TOUSA Homes Florida LP | Coastal Craftsmen Aluminum |
| TOUSA Homes Florida LP | Cohen & Company Creative Inc |
| TOUSA Homes Florida LP | Collis Roofing, Inc |
| TOUSA Homes Florida LP | Collis Roofing, Inc. |
| TOUSA Homes Florida LP | Concepts in Greenery, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes Florida LP | Corner Stone Design Group, Inc |
| TOUSA Homes Florida LP | Cougar Contracting Specialties |
| TOUSA Homes Florida LP | Coverall Interiors LLC |
| TOUSA Homes Florida LP | Cox Lumber Co. |
| TOUSA Homes Florida LP | Creative Concrete & Excavating |
| TOUSA Homes Florida LP | Creative Mailbox Designs |
| TOUSA Homes Florida LP | Creekside Nursery Inc |
| TOUSA Homes Florida LP | Crooks Printing Service Inc |
| TOUSA Homes Florida LP | Cross Member Services, Inc. |
| TOUSA Homes Florida LP | Custom Design Of Central Flori |
| TOUSA Homes Florida LP | Custom Woodworking by Andy |
| TOUSA Homes Florida LP | D Maxwell Holdings Inc. |
| TOUSA Homes Florida LP | Danielle Fence Manufacturing C |
| TOUSA Homes Florida LP | Darley's Plumbing, Inc. |
| TOUSA Homes Florida LP | Deck Crete, Inc. |
| TOUSA Homes Florida LP | Del-Air Heating & Air |
| TOUSA Homes Florida LP | Design Center At The Avenues |
| TOUSA Homes Florida LP | Dewitt Excavating, Inc. |
| TOUSA Homes Florida LP | Dick Joyce Well Drilling, Inc. |
| TOUSA Homes Florida LP | Diverse Building Service |
| TOUSA Homes Florida LP | Diversicom Corporation Of Rive |
| TOUSA Homes Florida LP | Donnie Daniels PLBG Inc |
| TOUSA Homes Florida LP | Doug Johnson & Associates Dba |
| TOUSA Homes Florida LP | Driftwood At Live Oak Preserve |
| TOUSA Homes Florida LP | Driggers Engineering Services |
| TOUSA Homes Florida LP | Duane Morris LLC |
| TOUSA Homes Florida LP | Dun-Rite Concrete, Inc. |
| TOUSA Homes Florida LP | Earl K Wood - Tax |
| TOUSA Homes Florida LP | East Coast Lumber & |
| TOUSA Homes Florida LP | East Pasco Electric Inc |
| TOUSA Homes Florida LP | Eduardo & Avelina Posadas |
| TOUSA Homes Florida LP | Embarq |
| TOUSA Homes Florida LP | Engle Homes/Orlando |
| TOUSA Homes Florida LP | Enviro Tech Cleaning Solution |
| TOUSA Homes Florida LP | Fan & Lighting World |
| TOUSA Homes Florida LP | Fcci Insurance Company |
| TOUSA Homes Florida LP | Fedy Belizaire |
| TOUSA Homes Florida LP | First Choice Aluminum, Inc. |
| TOUSA Homes Florida LP | First Choice Supply |
| TOUSA Homes Florida LP | First Choice Trim Carpentry |
| TOUSA Homes Florida LP | Florida Builders Appliances |
| TOUSA Homes Florida LP | Florida Choice Realty |
| TOUSA Homes Florida LP | Florida Rock Industries Inc |
| TOUSA Homes Florida LP | Floyd & Lopez Builders, Inc. |
| TOUSA Homes Florida LP | Franklin Surveying |
| TOUSA Homes Florida LP | Future Plumbing, Inc. |
| TOUSA Homes Florida LP | Gale Insulation |
| TOUSA Homes Florida LP | Ganung-Belton Assoc, Inc |
| TOUSA Homes Florida LP | Gary'S Grading, Inc. |
| TOUSA Homes Florida LP | Gasmasters, Inc |
| TOUSA Homes Florida LP | Gator Electrical |
| TOUSA Homes Florida LP | GBR Associates, Inc. |
| TOUSA Homes Florida LP | GBR Associates,Inc. |
| TOUSA Homes Florida LP | Ge Appliances |
| TOUSA Homes Florida LP | Ge Capital Modular Space |
| TOUSA Homes Florida LP | General Electric Appliances |
| TOUSA Homes Florida LP | General Electric Company |
| TOUSA Homes Florida LP | Glatting Jackson Kercher |
| TOUSA Homes Florida LP | Godbold, Downing Et Al Trust A |
| TOUSA Homes Florida LP | Good Dirt Man, The, LLC |
| TOUSA Homes Florida LP | Granger Lumber - Hardware, Inc |
| TOUSA Homes Florida LP | Green Acres USA, Inc. |
| TOUSA Homes Florida LP | Greenberg Traurig P.A. |
| TOUSA Homes Florida LP | Guajardo & Son, Inc. |
| TOUSA Homes Florida LP | Hamway Flooring Inc |
| TOUSA Homes Florida LP | Hamway Flooring Inc |
| TOUSA Homes Florida LP | Heritage Flooring Systems Of T |
| TOUSA Homes Florida LP | Hillsborough County Bocc |
| TOUSA Homes Florida LP | HIS Cabinetry, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes Florida LP | Homebuilder Marketing |
| TOUSA Homes Florida LP | Hugh Mac Donald Construction |
| TOUSA Homes Florida LP | I-4 Commerce Center LLP |
| TOUSA Homes Florida LP | Ibm Corporation |
| TOUSA Homes Florida LP | Infante Services, Inc |
| TOUSA Homes Florida LP | Integrity Pavement Markings |
| TOUSA Homes Florida LP | Jade Home Decor, Inc. |
| TOUSA Homes Florida LP | Jea  Jacksonville Electric |
| TOUSA Homes Florida LP | Jeff Chears Stucco & Lath Inc |
| TOUSA Homes Florida LP | Jeff Riley Irrigation, Inc. |
| TOUSA Homes Florida LP | Jennifer Holmes |
| TOUSA Homes Florida LP | Joe-Hannah Avril |
| TOUSA Homes Florida LP | John R Beach & Associates Inc |
| TOUSA Homes Florida LP | Jonathan M Kay |
| TOUSA Homes Florida LP | Kappes Electric Corporation |
| TOUSA Homes Florida LP | Keller & Heckman LLP |
| TOUSA Homes Florida LP | Ken Statham Construction |
| TOUSA Homes Florida LP | Kevin E Wolf - Wolf'S |
| TOUSA Homes Florida LP | King Engineering Associates |
| TOUSA Homes Florida LP | Knowles Excavating & |
| TOUSA Homes Florida LP | Konica Minolta Business |
| TOUSA Homes Florida LP | Lagueux*Les |
| TOUSA Homes Florida LP | Landmark Commercial Janitorial |
| TOUSA Homes Florida LP | Laurel Oak At Live Oak Pres. |
| TOUSA Homes Florida LP | Lawson Industries Inc |
| TOUSA Homes Florida LP | Lcec |
| TOUSA Homes Florida LP | Legacy Park Master Hoa,Inc. |
| TOUSA Homes Florida LP | Lifestyle Interiors Of |
| TOUSA Homes Florida LP | Lil Gil's Painting, Inc. and |
| TOUSA Homes Florida LP | Live Oak Preserve Association |
| TOUSA Homes Florida LP | Lloveras Baur And Stevens |
| TOUSA Homes Florida LP | Mac Communications |
| TOUSA Homes Florida LP | Marco Electrical Contractors, |
| TOUSA Homes Florida LP | Masterpiece Collection, Inc. |
| TOUSA Homes Florida LP | Masterpiece Interiors Inc |
| TOUSA Homes Florida LP | Mci    (371355) |
| TOUSA Homes Florida LP | Mci    (371392) |
| TOUSA Homes Florida LP | Meares Plumbing Inc |
| TOUSA Homes Florida LP | Media General Florida |
| TOUSA Homes Florida LP | Melissa'S Custom Painting, Inc |
| TOUSA Homes Florida LP | Mid Continent Cabinetry |
| TOUSA Homes Florida LP | Miller Sellen Conner & Walsh |
| TOUSA Homes Florida LP | Miller-Sellen Assoc, Inc |
| TOUSA Homes Florida LP | Misc. Vendor |
| TOUSA Homes Florida LP | Montes Turf Corporation |
| TOUSA Homes Florida LP | Morgan*Deborah |
| TOUSA Homes Florida LP | Nail It Framing, Inc. |
| TOUSA Homes Florida LP | New Home Media |
| TOUSA Homes Florida LP | Nextel Communications |
| TOUSA Homes Florida LP | Nordis Direct |
| TOUSA Homes Florida LP | Northeast Drywall |
| TOUSA Homes Florida LP | On Time Finish Carpentry |
| TOUSA Homes Florida LP | Orange County Utilities- Util |
| TOUSA Homes Florida LP | Orange CTY Building Dept |
| TOUSA Homes Florida LP | Orlando Decorative Concrete |
| TOUSA Homes Florida LP | Palmer Electric Co. |
| TOUSA Homes Florida LP | Pasco County - Bocc |
| TOUSA Homes Florida LP | Pasco County Utilities Departm |
| TOUSA Homes Florida LP | Peach Glass & Mirror Inc |
| TOUSA Homes Florida LP | Pencav, Inc |
| TOUSA Homes Florida LP | Pina Genio |
| TOUSA Homes Florida LP | Pinnacle Pool Construction Inc |
| TOUSA Homes Florida LP | Plant Adoption Center |
| TOUSA Homes Florida LP | Power Images, Inc. |
| TOUSA Homes Florida LP | Premier Plastering Of |
| TOUSA Homes Florida LP | Prime Drywall & Painting, Inc |
| TOUSA Homes Florida LP | Prince Plumbing Inc |
| TOUSA Homes Florida LP | Printers Ink |
| TOUSA Homes Florida LP | Pro-Final Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes Florida LP | Progress Energy |
| TOUSA Homes Florida LP | Progressive Air Systems |
| TOUSA Homes Florida LP | Protech Security Co., Inc. |
| TOUSA Homes Florida LP | Protection Plus of The Florida |
| TOUSA Homes Florida LP | Protective Barriers, Inc. |
| TOUSA Homes Florida LP | Quest Design & Production |
| TOUSA Homes Florida LP | R.J. Kielty Plumbing Inc |
| TOUSA Homes Florida LP | Randolph's A/C & Heating, Inc. |
| TOUSA Homes Florida LP | Raney Construction, Inc. |
| TOUSA Homes Florida LP | Ranger American Of Florida |
| TOUSA Homes Florida LP | Raymow Enterprises Inc |
| TOUSA Homes Florida LP | Republic Waste Services |
| TOUSA Homes Florida LP | Resaul Misra And Debra Ann |
| TOUSA Homes Florida LP | Residential Planners, Inc. |
| TOUSA Homes Florida LP | Rew Landscape Corp. |
| TOUSA Homes Florida LP | Richard Van Sickle Communicati |
| TOUSA Homes Florida LP | Riviera Pools Inc |
| TOUSA Homes Florida LP | Roadway Paving Stones,Inc. |
| TOUSA Homes Florida LP | Robert Green Drywall, Inc |
| TOUSA Homes Florida LP | Robertson Glass & Door Service |
| TOUSA Homes Florida LP | Royal Cleaning Inc. |
| TOUSA Homes Florida LP | Sandhill Recycle Center |
| TOUSA Homes Florida LP | Scosta Corporation |
| TOUSA Homes Florida LP | Scott Alarm, Inc. |
| TOUSA Homes Florida LP | Sde/A Total Solution |
| TOUSA Homes Florida LP | SelectBuild Florida, LLC |
| TOUSA Homes Florida LP | Seminole Masonry, Inc |
| TOUSA Homes Florida LP | Senica Air Conditioning Inc |
| TOUSA Homes Florida LP | Setzers & Co Inc. |
| TOUSA Homes Florida LP | Signs BY Design Of Miami |
| TOUSA Homes Florida LP | SignText Incorporated |
| TOUSA Homes Florida LP | Smith Drywall Service |
| TOUSA Homes Florida LP | Sonshine Drywall & Metal |
| TOUSA Homes Florida LP | Southern Building Products Inc |
| TOUSA Homes Florida LP | Southern Land Services of |
| TOUSA Homes Florida LP | Spiro & Associates |
| TOUSA Homes Florida LP | Steelcase Financial Services I |
| TOUSA Homes Florida LP | Sterling Manufacturing |
| TOUSA Homes Florida LP | Stock Building Supply |
| TOUSA Homes Florida LP | Stone Age Pavers Inc |
| TOUSA Homes Florida LP | Stone Systems Of Orlando |
| TOUSA Homes Florida LP | Structure Image Glass, Inc. |
| TOUSA Homes Florida LP | Sun State Landscaping |
| TOUSA Homes Florida LP | Sunset Air, Inc. |
| TOUSA Homes Florida LP | Susan & Michael Heath |
| TOUSA Homes Florida LP | Tampa Bay Golf and Country |
| TOUSA Homes Florida LP | Tampa Bay Resources LLC |
| TOUSA Homes Florida LP | Tampa Electric Co (31318) |
| TOUSA Homes Florida LP | Tampa Electric Company (Deposi |
| TOUSA Homes Florida LP | Tampco Group, Inc. |
| TOUSA Homes Florida LP | Telecom South, Inc. |
| TOUSA Homes Florida LP | Tem Systems Inc |
| TOUSA Homes Florida LP | Texwood Industries, LP |
| TOUSA Homes Florida LP | The Brockman Corp. |
| TOUSA Homes Florida LP | The Hammocks Townhome Hoa |
| TOUSA Homes Florida LP | The Lamar Companies |
| TOUSA Homes Florida LP | The Ledger |
| TOUSA Homes Florida LP | Total Flooring Systems Inc |
| TOUSA Homes Florida LP | Townhomes Of Kendall Pointe |
| TOUSA Homes Florida LP | Towns of Westyn Bay COA, Inc. |
| TOUSA Homes Florida LP | Tri-City Electrical Contractor |
| TOUSA Homes Florida LP | Trusses Unlimited aka Lumber |
| TOUSA Homes Florida LP | United Site Services |
| TOUSA Homes Florida LP | Valleycrest Landscape Developm |
| TOUSA Homes Florida LP | Vato's, Inc. |
| TOUSA Homes Florida LP | Vericenter Inc |
| TOUSA Homes Florida LP | Verizon Florida Inc |
| TOUSA Homes Florida LP | Victoria Pointe Hoa, Inc. |
| TOUSA Homes Florida LP | Vitex Systems Inc |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes Florida LP | Walsh Engineering, Inc |
| TOUSA Homes Florida LP | WBC Construction LLC |
| TOUSA Homes Florida LP | WDG Construction, Inc |
| TOUSA Homes Florida LP | Werle Associates, P.L. |
| TOUSA Homes Florida LP | WI 825 Partners, LLC |
| TOUSA Homes Florida LP | Williams Scotsman |
| TOUSA Homes Florida LP | Windtie Systems |
| TOUSA Homes Florida LP | Woodsman Kitchens & Floors Inc |
| TOUSA Homes Florida LP | Woolf & Associates, Inc |
| TOUSA Homes Florida LP | Zephyr Stripe 'N Seal Inc. |
| TOUSA Homes, Inc | 31-W Insulation Co, Inc |
| TOUSA Homes, Inc | 31-W Insulation Co., Inc. |
| TOUSA Homes, Inc | 5th Gear Advertising |
| TOUSA Homes, Inc | 84 Lumber Company |
| TOUSA Homes, Inc | 84 Lumber Company |
| TOUSA Homes, Inc | A & A Asphalt Paving Company |
| TOUSA Homes, Inc | A Master Closet Designs |
| TOUSA Homes, Inc | A&S Sale, Inc. |
| TOUSA Homes, Inc | A.B. General Construction, Inc |
| TOUSA Homes, Inc | A-1 Quality Painting, Inc |
| TOUSA Homes, Inc | A-1 Superior Painting & |
| TOUSA Homes, Inc | ABCO Engineering Corporation |
| TOUSA Homes, Inc | AC Masters HVAC, Inc. |
| TOUSA Homes, Inc | Acacia Roofing Company, Inc. |
| TOUSA Homes, Inc | Academy Insulation |
| TOUSA Homes, Inc | Access Control |
| TOUSA Homes, Inc | Access Labor Service |
| TOUSA Homes, Inc | Accountemps |
| TOUSA Homes, Inc | Admiral Windows & Doors, Inc. |
| TOUSA Homes, Inc | Advanced Concrete Solutions |
| TOUSA Homes, Inc | Advanced Modular Structures |
| TOUSA Homes, Inc | Advanced Pro Remediation, LLC |
| TOUSA Homes, Inc | Advanced Wrapping Solutions |
| TOUSA Homes, Inc | Advantage Glass, Inc |
| TOUSA Homes, Inc | Advantage Plumbing, Inc. |
| TOUSA Homes, Inc | AEL Financial, LLC |
| TOUSA Homes, Inc | Aero Gutter Co., Inc |
| TOUSA Homes, Inc | Afc Electric, Inc. |
| TOUSA Homes, Inc | Ahmad*Naveeda |
| TOUSA Homes, Inc | Air Advantage Heating and |
| TOUSA Homes, Inc | Air Flow Designs, Inc. |
| TOUSA Homes, Inc | Aji Fence LTD |
| TOUSA Homes, Inc | Alafaya Utilities |
| TOUSA Homes, Inc | Albert's Air Conditioning,Inc. |
| TOUSA Homes, Inc | Alfonso*Francisco and Barbara |
| TOUSA Homes, Inc | All American Cleaning Inc. |
| TOUSA Homes, Inc | All American Doors, Inc. |
| TOUSA Homes, Inc | All American Shutters, Inc. |
| TOUSA Homes, Inc | All Offsite, Inc |
| TOUSA Homes, Inc | All Phase Landscape |
| TOUSA Homes, Inc | Allen Plumbing & Heating Inc. |
| TOUSA Homes, Inc | Allied Doors, Inc. |
| TOUSA Homes, Inc | Allied Doors, Inc. |
| TOUSA Homes, Inc | Allied Insulation |
| TOUSA Homes, Inc | Allied Systems Corp. |
| TOUSA Homes, Inc | Alpha Environmental Mgmt. Corp |
| TOUSA Homes, Inc | Alpine Lumber Company |
| TOUSA Homes, Inc | Al's Wholesale |
| TOUSA Homes, Inc | American Asphalt & Grading Co. |
| TOUSA Homes, Inc | American Door & Millwork Co. |
| TOUSA Homes, Inc | American Express |
| TOUSA Homes, Inc | American Home Landscape |
| TOUSA Homes, Inc | American Pools & Spas |
| TOUSA Homes, Inc | American Residential Services, |
| TOUSA Homes, Inc | American Surveying & |
| TOUSA Homes, Inc | American Window Company |
| TOUSA Homes, Inc | American Woodmark Corp |
| TOUSA Homes, Inc | American Woodmark Corp. |
| TOUSA Homes, Inc | American Woodmark Corporation |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | American/Gale Insulation Inc. |
| TOUSA Homes, Inc | Amick Construction Comp. |
| TOUSA Homes, Inc | Anderson Promotions |
| TOUSA Homes, Inc | Andrew, Miller & Associates |
| TOUSA Homes, Inc | Ankmar Door Inc |
| TOUSA Homes, Inc | Annandale Millwork Corp |
| TOUSA Homes, Inc | Anne Arundel County |
| TOUSA Homes, Inc | Any Season Insulation, LLC |
| TOUSA Homes, Inc | Apollo Air Conditioning |
| TOUSA Homes, Inc | Aqua Doc Inc |
| TOUSA Homes, Inc | Aqua Tech Water |
| TOUSA Homes, Inc | Arapahoe Utilities & Infrastr |
| TOUSA Homes, Inc | Archidynamics, Inc. |
| TOUSA Homes, Inc | Architectural Arts by |
| TOUSA Homes, Inc | Architectural Foam Industries |
| TOUSA Homes, Inc | Architecture Collaborati |
| TOUSA Homes, Inc | Architecture Works, Inc. |
| TOUSA Homes, Inc | Arcia Finish Carpentry Corp. |
| TOUSA Homes, Inc | Arden Realty Limited Ptnr. |
| TOUSA Homes, Inc | Armstrong Fence Company |
| TOUSA Homes, Inc | Arrow Graphics Inc |
| TOUSA Homes, Inc | Artistic Glass & Mirror |
| TOUSA Homes, Inc | Ash-Brooke Construction |
| TOUSA Homes, Inc | Askey Hughey, Inc. |
| TOUSA Homes, Inc | Ast Construction Inc |
| TOUSA Homes, Inc | Ast Construction Inc |
| TOUSA Homes, Inc | Ast Construction Inc. |
| TOUSA Homes, Inc | AT&T |
| TOUSA Homes, Inc | ATCS, P.L.C. |
| TOUSA Homes, Inc | Athena Stone, Inc. |
| TOUSA Homes, Inc | Atlantic Building Supply |
| TOUSA Homes, Inc | Atlantic Marble Co., Inc. |
| TOUSA Homes, Inc | ATM Cleaning, Inc. |
| TOUSA Homes, Inc | Atrium Shutters, Inc. |
| TOUSA Homes, Inc | Atrium Windows & Doors of FL |
| TOUSA Homes, Inc | Atwell-Hicks |
| TOUSA Homes, Inc | Aurea Floor System, Inc. |
| TOUSA Homes, Inc | Aurora Plumbing Corp. |
| TOUSA Homes, Inc | Aurora, City of |
| TOUSA Homes, Inc | Autumn Landscaping, Inc. |
| TOUSA Homes, Inc | AVI eConsulting, LLC |
| TOUSA Homes, Inc | AVID RATINGS |
| TOUSA Homes, Inc | Aztec Consultants, Inc. |
| TOUSA Homes, Inc | B & K Distributors, Inc. |
| TOUSA Homes, Inc | B & W Custom Glass and |
| TOUSA Homes, Inc | B&A Design Studio, Inc. |
| TOUSA Homes, Inc | B&B Site Management, Inc |
| TOUSA Homes, Inc | B. Scott Bennewitz Consulting |
| TOUSA Homes, Inc | Badger Construction Corp. |
| TOUSA Homes, Inc | Bahama Glass & Windows Inc |
| TOUSA Homes, Inc | Balloon Biz, Inc. |
| TOUSA Homes, Inc | Baltimore Sun*The |
| TOUSA Homes, Inc | Banks Engineering, Inc |
| TOUSA Homes, Inc | Barnhardt*Jon |
| TOUSA Homes, Inc | Barnyard Framing, Inc. |
| TOUSA Homes, Inc | Barrick & Sons, LLC |
| TOUSA Homes, Inc | Barton Supply |
| TOUSA Homes, Inc | Bath, Inc. |
| TOUSA Homes, Inc | BBLS Surveyors & Mappers, Inc. |
| TOUSA Homes, Inc | BBP Construction Company |
| TOUSA Homes, Inc | Beautiful Mailbox Co |
| TOUSA Homes, Inc | Becker & Poliakoff, PA |
| TOUSA Homes, Inc | Beech Media |
| TOUSA Homes, Inc | Beltway Iron Co. Inc. |
| TOUSA Homes, Inc | Belvedere Contracting, Inc. |
| TOUSA Homes, Inc | Ben Car Corporation |
| TOUSA Homes, Inc | Benchmark Fence and Rail LLC |
| TOUSA Homes, Inc | Berkey*Ben |
| TOUSA Homes, Inc | Beta Drywall, LLC |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Beus Gilbert PLLC |
| TOUSA Homes, Inc | Big Red Welding |
| TOUSA Homes, Inc | Bill Cuddy Painting And |
| TOUSA Homes, Inc | Bill Scott Drywall,Inc |
| TOUSA Homes, Inc | Bill's Custom Glass & |
| TOUSA Homes, Inc | Bio-Tech Consulting, Inc. |
| TOUSA Homes, Inc | Bison Brothers jointly |
| TOUSA Homes, Inc | Blackton, Inc |
| TOUSA Homes, Inc | Blake Stucco Contracting, Inc |
| TOUSA Homes, Inc | Blanchard Machinery |
| TOUSA Homes, Inc | Blankman*Douglas A. |
| TOUSA Homes, Inc | Blinds Plus |
| TOUSA Homes, Inc | Block*Walker |
| TOUSA Homes, Inc | Bloodgood Sharp Buster |
| TOUSA Homes, Inc | Blue Dot Ridge |
| TOUSA Homes, Inc | Blue Moon Communications,Inc. |
| TOUSA Homes, Inc | Blue Ribbon Stairs, Inc. |
| TOUSA Homes, Inc | BMC Millwork |
| TOUSA Homes, Inc | Board of Comm. of Brevard Cty |
| TOUSA Homes, Inc | Boaz Publishing, Inc. |
| TOUSA Homes, Inc | Bosley*Dan |
| TOUSA Homes, Inc | Boyle & Drake, Inc. |
| TOUSA Homes, Inc | Brackens Landscape |
| TOUSA Homes, Inc | Brannan Sand & Gravel Co., LLC |
| TOUSA Homes, Inc | Breedlove, Dennis & Associates |
| TOUSA Homes, Inc | Brickell Realty Group, Inc. |
| TOUSA Homes, Inc | Briggs Smith Bldg & Dev. Inc. |
| TOUSA Homes, Inc | Brinks Home Security, Inc. |
| TOUSA Homes, Inc | Broomfield Sports & |
| TOUSA Homes, Inc | Broomfield, City of |
| TOUSA Homes, Inc | Bryan Miller Company Inc |
| TOUSA Homes, Inc | BSB Design |
| TOUSA Homes, Inc | Builder Homesite, Inc. |
| TOUSA Homes, Inc | Builders Blinds |
| TOUSA Homes, Inc | Builders Blinds and |
| TOUSA Homes, Inc | Builders Design & |
| TOUSA Homes, Inc | Builders First Source |
| TOUSA Homes, Inc | Builders Firstsource |
| TOUSA Homes, Inc | Builders Services Group, Inc. |
| TOUSA Homes, Inc | BullsEye Telecom, Inc. |
| TOUSA Homes, Inc | Burgemeister-Bell, Inc. |
| TOUSA Homes, Inc | Burgess & Niple, Inc. |
| TOUSA Homes, Inc | Burgess Construction |
| TOUSA Homes, Inc | Burnham Painting and Drywall |
| TOUSA Homes, Inc | Byers*Wilma K. |
| TOUSA Homes, Inc | C & C Drywall Contractors, Inc |
| TOUSA Homes, Inc | C & C Marble, Inc. |
| TOUSA Homes, Inc | C & S Drywall, Inc. |
| TOUSA Homes, Inc | C J Roofing Co. and |
| TOUSA Homes, Inc | C.A. Steelman, Inc |
| TOUSA Homes, Inc | C.B. Flooring, LLC |
| TOUSA Homes, Inc | C.S.S. Enterprises, Inc. |
| TOUSA Homes, Inc | Cabinet Connection of |
| TOUSA Homes, Inc | CabineTec, Inc. |
| TOUSA Homes, Inc | Cam Guard Systems, Inc. |
| TOUSA Homes, Inc | Capital Lighting Supply, Inc. |
| TOUSA Homes, Inc | Capital Painting Corp. |
| TOUSA Homes, Inc | Capri Engineering, LLC |
| TOUSA Homes, Inc | Carlin J Phillips and |
| TOUSA Homes, Inc | Carmel & Carmel PC |
| TOUSA Homes, Inc | Carnahan,Proctor and Cross Inc |
| TOUSA Homes, Inc | Carpenter Contractors of |
| TOUSA Homes, Inc | Carpets N More |
| TOUSA Homes, Inc | Carroll Insulation Co. |
| TOUSA Homes, Inc | Carroll*Melanie |
| TOUSA Homes, Inc | Casabella HOA, Inc. |
| TOUSA Homes, Inc | Cash Building Materials |
| TOUSA Homes, Inc | Castle Rock Development |
| TOUSA Homes, Inc | Castlewood Ranch LLC |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| TOUSA Homes, Inc | CBS Radio |
| TOUSA Homes, Inc | CD & E Services, Inc. |
| TOUSA Homes, Inc | Cedco, Inc. |
| TOUSA Homes, Inc | Celorico Masonry, Inc. |
| TOUSA Homes, Inc | Central Steel Supply Inc |
| TOUSA Homes, Inc | Central Supply Company |
| TOUSA Homes, Inc | Century Lumber Co., Inc. |
| TOUSA Homes, Inc | Century Tile Inc |
| TOUSA Homes, Inc | Cercy Construction, Inc. |
| TOUSA Homes, Inc | Certa Pro Painters |
| TOUSA Homes, Inc | Chadwick Electric Inc. |
| TOUSA Homes, Inc | Chahal*Jatinder |
| TOUSA Homes, Inc | Champion Pools, Inc. |
| TOUSA Homes, Inc | Champion Professional |
| TOUSA Homes, Inc | Chatfield Bluffs Cond. Assoc. |
| TOUSA Homes, Inc | Cherry Tree Landscape |
| TOUSA Homes, Inc | Christopher Consultants |
| TOUSA Homes, Inc | Cin's Professional CleaningInc |
| TOUSA Homes, Inc | Circle L Roofing, Inc |
| TOUSA Homes, Inc | Cit Technology Fin Serv, Inc. |
| TOUSA Homes, Inc | Citadel I Limited Partnership |
| TOUSA Homes, Inc | City Of Apopka |
| TOUSA Homes, Inc | City Of Deland Utility Dept. |
| TOUSA Homes, Inc | City of Doral |
| TOUSA Homes, Inc | City of Eustis- Utility |
| TOUSA Homes, Inc | City of Fort Myers |
| TOUSA Homes, Inc | City of Fort Myers Utilities |
| TOUSA Homes, Inc | City Of Littleton |
| TOUSA Homes, Inc | City of Maricopa |
| TOUSA Homes, Inc | City of Mesquite |
| TOUSA Homes, Inc | City of North Las Vegas-permit |
| TOUSA Homes, Inc | City Of Oviedo |
| TOUSA Homes, Inc | City of Oviedo   -Permits |
| TOUSA Homes, Inc | City of Peoria - Permits |
| TOUSA Homes, Inc | City of Phoenix - Revolving |
| TOUSA Homes, Inc | City of Scottsdale - Permits |
| TOUSA Homes, Inc | City of St Cloud- Utility |
| TOUSA Homes, Inc | City Of St. Cloud |
| TOUSA Homes, Inc | City of Surprise - Permits |
| TOUSA Homes, Inc | Civiltec, Inc. |
| TOUSA Homes, Inc | Clark Builders, LLC |
| TOUSA Homes, Inc | Clark County Air Quailty |
| TOUSA Homes, Inc | Clark County Treasurer |
| TOUSA Homes, Inc | Clark County Treasurer's |
| TOUSA Homes, Inc | Classic Tile & Carpet, Inc. |
| TOUSA Homes, Inc | Clay County Building Dept. |
| TOUSA Homes, Inc | Clay Drywall |
| TOUSA Homes, Inc | Clay Electric Cooperative |
| TOUSA Homes, Inc | Clear Channel Broadcasting |
| TOUSA Homes, Inc | Clear Channel Broadcasting Inc |
| TOUSA Homes, Inc | Clear Channel Outdoor |
| TOUSA Homes, Inc | Clear Choice Development and |
| TOUSA Homes, Inc | Clouse Engineering, Inc. |
| TOUSA Homes, Inc | CMX, LLC |
| TOUSA Homes, Inc | Coast West Plumbing |
| TOUSA Homes, Inc | Coastal Flooring Corp |
| TOUSA Homes, Inc | Cobra Construction, Inc |
| TOUSA Homes, Inc | Collier County Board Of |
| TOUSA Homes, Inc | Collis Roofing, Inc |
| TOUSA Homes, Inc | Colonial Sash & Door, Inc. |
| TOUSA Homes, Inc | Colorado Constructors, Inc. |
| TOUSA Homes, Inc | Colorado Countertops Inc |
| TOUSA Homes, Inc | Coloradonewhomes.com, Inc. |
| TOUSA Homes, Inc | Comet Electric and Equipment |
| TOUSA Homes, Inc | Comfort House, Inc. |
| TOUSA Homes, Inc | Commercial Scapes, Inc. |
| TOUSA Homes, Inc | Commonwealth Building & |
| TOUSA Homes, Inc | Complete Compliance Services |
| TOUSA Homes, Inc | CompUSA, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Comtel International |
| TOUSA Homes, Inc | Concepts in Greenery, Inc. |
| TOUSA Homes, Inc | Concrete Services, Inc. |
| TOUSA Homes, Inc | Coniglio Construction, Inc. |
| TOUSA Homes, Inc | Con-Serv Industries Inc |
| TOUSA Homes, Inc | Construction Services & |
| TOUSA Homes, Inc | Consul-Tech Development |
| TOUSA Homes, Inc | Consumer Source, Inc. |
| TOUSA Homes, Inc | Container Services LLC |
| TOUSA Homes, Inc | Contractors Cleaning |
| TOUSA Homes, Inc | Cooley Godward LLP |
| TOUSA Homes, Inc | Cooper City Utilities Dept. |
| TOUSA Homes, Inc | Corey Electrical Engineering |
| TOUSA Homes, Inc | Cormorant Park Professional |
| TOUSA Homes, Inc | Coronado Concrete |
| TOUSA Homes, Inc | Counter Collective, Inc. |
| TOUSA Homes, Inc | County-Wide Heavy Equipment |
| TOUSA Homes, Inc | Coverall Interiors, LLC |
| TOUSA Homes, Inc | Cowell Construction, Inc |
| TOUSA Homes, Inc | Cox Lumber Co. |
| TOUSA Homes, Inc | Cox Radio, Inc. |
| TOUSA Homes, Inc | Creative Mailbox Designs |
| TOUSA Homes, Inc | Creative Surface Solutions,Inc |
| TOUSA Homes, Inc | Cross Enterprises of Florida |
| TOUSA Homes, Inc | CRP-2 Holdings CC, L.P. |
| TOUSA Homes, Inc | CRT Construction, Inc. |
| TOUSA Homes, Inc | CTL Thompson Inc. |
| TOUSA Homes, Inc | Custom Fence and Supply Inc |
| TOUSA Homes, Inc | Custom Flag Co Inc. |
| TOUSA Homes, Inc | Custom Hearth Distributors,Inc |
| TOUSA Homes, Inc | Custom Woodworking by Andy |
| TOUSA Homes, Inc | CWI LLC Builder's Insulation |
| TOUSA Homes, Inc | D & B Interiors |
| TOUSA Homes, Inc | D & D Roofing, Inc. |
| TOUSA Homes, Inc | D & K Drywall, Inc. |
| TOUSA Homes, Inc | D & L Telecomm., Inc. |
| TOUSA Homes, Inc | D & S Landscaping, LLC |
| TOUSA Homes, Inc | D&E Electrical SYS, Inc |
| TOUSA Homes, Inc | D&R Framing |
| TOUSA Homes, Inc | D&S Ceramic Tilers, Inc |
| TOUSA Homes, Inc | D&S Cleaning |
| TOUSA Homes, Inc | Dale*Ron C., Inc. |
| TOUSA Homes, Inc | Daniel A. Morgan Constr. |
| TOUSA Homes, Inc | Daniel Painting Service and |
| TOUSA Homes, Inc | Darley's Plumbing, Inc. |
| TOUSA Homes, Inc | Database Marketing, Inc |
| TOUSA Homes, Inc | David S. Smith Fence, Inc. |
| TOUSA Homes, Inc | David W. Crawley, Inc. |
| TOUSA Homes, Inc | Davis & Ceriani, P.C. |
| TOUSA Homes, Inc | Davis, Graham & Stubbs, |
| TOUSA Homes, Inc | Deck Crete, Inc. |
| TOUSA Homes, Inc | Deer Creek Electric |
| TOUSA Homes, Inc | Dei Professional Services |
| TOUSA Homes, Inc | Del-Air Electrical Service Inc |
| TOUSA Homes, Inc | Del-Air Heating & Air |
| TOUSA Homes, Inc | Delant-Transflorida Joint |
| TOUSA Homes, Inc | Deloreto Interiors, Inc. |
| TOUSA Homes, Inc | Deluca Tile, Inc. |
| TOUSA Homes, Inc | Denver Newspaper Agency |
| TOUSA Homes, Inc | Dependable Lawn Service of |
| TOUSA Homes, Inc | Desert Plastering, LLC |
| TOUSA Homes, Inc | Design Center At The Avenues |
| TOUSA Homes, Inc | Design Center Inc |
| TOUSA Homes, Inc | Dewitt Custom Concrete |
| TOUSA Homes, Inc | Dex Imaging, Inc. |
| TOUSA Homes, Inc | Di Fazio*Frank |
| TOUSA Homes, Inc | Diamond B up to Grade, Inc. |
| TOUSA Homes, Inc | Diana Rodriquez and Company |
| TOUSA Homes, Inc | Dick Joyce Well Drilling, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Direct Grading & Paving |
| TOUSA Homes, Inc | Dirt Devil Grading Inc |
| TOUSA Homes, Inc | Distinctive Framing, LLC |
| TOUSA Homes, Inc | Distinctive Marble, Inc. |
| TOUSA Homes, Inc | Diversified Excavating, Inc. |
| TOUSA Homes, Inc | DMB White Tank, LLC |
| TOUSA Homes, Inc | DMS XI, Inc. |
| TOUSA Homes, Inc | Dominion Trim, Inc. |
| TOUSA Homes, Inc | Don King'S Concrete, Inc |
| TOUSA Homes, Inc | Donald Mcintosh Assoc., |
| TOUSA Homes, Inc | Donnie Daniels PLBG Inc |
| TOUSA Homes, Inc | Don's Bobcat Service,Inc |
| TOUSA Homes, Inc | Don's Johns, Inc |
| TOUSA Homes, Inc | Doorpro America Inc. |
| TOUSA Homes, Inc | Doug Hambel's Plumbing, Inc. |
| TOUSA Homes, Inc | Douglas*Horace |
| TOUSA Homes, Inc | DRA CRT Orlando University |
| TOUSA Homes, Inc | Drees Custom Homes |
| TOUSA Homes, Inc | Dreher/Williams*Natalie |
| TOUSA Homes, Inc | Drew Asphalt Paving, Inc. |
| TOUSA Homes, Inc | DRI Residential Corporation |
| TOUSA Homes, Inc | Dririte of Central FL, Inc. |
| TOUSA Homes, Inc | Dropeski*Cynthia R. |
| TOUSA Homes, Inc | Dual-Temp Mechanical, Inc. |
| TOUSA Homes, Inc | Duane Morris LLP |
| TOUSA Homes, Inc | Duane Morris LLP |
| TOUSA Homes, Inc | Dubose Model Home Income |
| TOUSA Homes, Inc | Dubose Model Home Investments |
| TOUSA Homes, Inc | Dulando Screening And |
| TOUSA Homes, Inc | Dunn's Floor Covering, Inc. |
| TOUSA Homes, Inc | Duratek Precast Technologies, |
| TOUSA Homes, Inc | Duval County Tax Collector |
| TOUSA Homes, Inc | Dysart USD #89 |
| TOUSA Homes, Inc | E T & T Distributors, Inc. |
| TOUSA Homes, Inc | E.B.S. Constructon, LLC |
| TOUSA Homes, Inc | Eagle Dunes HOA, Inc. |
| TOUSA Homes, Inc | Eagle Heating & Air |
| TOUSA Homes, Inc | Eagle Lighting, Inc |
| TOUSA Homes, Inc | Eagle Plastering, Inc. |
| TOUSA Homes, Inc | Earl K Wood - Tax |
| TOUSA Homes, Inc | Earth & Sun Adobe, Inc. |
| TOUSA Homes, Inc | Earth's Creation |
| TOUSA Homes, Inc | East Coast Lumber & |
| TOUSA Homes, Inc | East Coast Poured Floors, Inc. |
| TOUSA Homes, Inc | East Naples Fire Dept. |
| TOUSA Homes, Inc | EBS Plumbing, Inc. |
| TOUSA Homes, Inc | Ecendant Interactive Ltd. |
| TOUSA Homes, Inc | Edge Creek Builders |
| TOUSA Homes, Inc | El Paso Drywall |
| TOUSA Homes, Inc | Electric Co, The Inc |
| TOUSA Homes, Inc | Electrical Design, Inc. |
| TOUSA Homes, Inc | Elite Drywall Of S. FL. |
| TOUSA Homes, Inc | Encore Draperies of Colorado |
| TOUSA Homes, Inc | Encore Landscape & Design, Inc |
| TOUSA Homes, Inc | EnergyLogic, Inc. |
| TOUSA Homes, Inc | Engineered Air LLC |
| TOUSA Homes, Inc | Engineering & Environmental |
| TOUSA Homes, Inc | Engle Homes |
| TOUSA Homes, Inc | Engle Homes/Orlando |
| TOUSA Homes, Inc | Environmental Alternatives Inc |
| TOUSA Homes, Inc | Environmental Materials, LLC |
| TOUSA Homes, Inc | Environmental Stoneworks |
| TOUSA Homes, Inc | Erie, Town of |
| TOUSA Homes, Inc | Erosion Stoppers, Inc. |
| TOUSA Homes, Inc | Ers Constructors |
| TOUSA Homes, Inc | Estrella Mountain Ranch |
| TOUSA Homes, Inc | Exclusive Millwork, Inc. |
| TOUSA Homes, Inc | Executive Floors & Inter |
| TOUSA Homes, Inc | Executive Plumbing |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Executives International Inc. |
| TOUSA Homes, Inc | Expert Tile and Flooring, Inc. |
| TOUSA Homes, Inc | F & M Erosion Contr. Inc |
| TOUSA Homes, Inc | F.A. Finish Carpentry, Inc. |
| TOUSA Homes, Inc | Falcon Forming, Inc. |
| TOUSA Homes, Inc | Fedex |
| TOUSA Homes, Inc | Fennemore Craig, PC |
| TOUSA Homes, Inc | Ferguson Trenching Company |
| TOUSA Homes, Inc | Ferraro*John J. |
| TOUSA Homes, Inc | Finest Drywall, Inc. |
| TOUSA Homes, Inc | Finnish Granite GRP, Inc |
| TOUSA Homes, Inc | Fireservice, Inc. |
| TOUSA Homes, Inc | First Choice Supply, Inc. |
| TOUSA Homes, Inc | First Service Realty |
| TOUSA Homes, Inc | Fisher Mechanical Contractors |
| TOUSA Homes, Inc | Five Star Glass & Mirror, Inc. |
| TOUSA Homes, Inc | Flagler Development Co. |
| TOUSA Homes, Inc | Flags & Marketing Unlimited |
| TOUSA Homes, Inc | Floor Technologies, Inc. |
| TOUSA Homes, Inc | Floors, Inc. |
| TOUSA Homes, Inc | Florida Builders Specialty Co. |
| TOUSA Homes, Inc | Florida Cleaning Services |
| TOUSA Homes, Inc | Florida Digital Network |
| TOUSA Homes, Inc | Florida Irr. & Putting Greens |
| TOUSA Homes, Inc | Florida Mold Inspections, Inc. |
| TOUSA Homes, Inc | Florida Pools, Inc. |
| TOUSA Homes, Inc | Florida Power & Light |
| TOUSA Homes, Inc | Florida Silt Fencing |
| TOUSA Homes, Inc | Florida Windows & Doors, Inc. |
| TOUSA Homes, Inc | Flow Fire Protection, Inc. |
| TOUSA Homes, Inc | Focal Point Landscape, Inc. |
| TOUSA Homes, Inc | Fort Collins Coloradoan |
| TOUSA Homes, Inc | Fossil Creek Drywall |
| TOUSA Homes, Inc | Fountain, City of |
| TOUSA Homes, Inc | Four Seasons Gas SVC,Inc |
| TOUSA Homes, Inc | Fox Meadows Hoa Asso Inc |
| TOUSA Homes, Inc | Foxworth-Galbraith Lumber Co. |
| TOUSA Homes, Inc | Frank Enterprises, Inc. |
| TOUSA Homes, Inc | Frank Iovino & Sons Masonry, |
| TOUSA Homes, Inc | Franklin Surveying |
| TOUSA Homes, Inc | Franks*William Colby |
| TOUSA Homes, Inc | Fraser Wallace Advertising Ltd |
| TOUSA Homes, Inc | Freedom House Productions |
| TOUSA Homes, Inc | Frehner Masonry, Inc. |
| TOUSA Homes, Inc | Friendly John, Inc. |
| TOUSA Homes, Inc | Front Range Cabinet Inc. |
| TOUSA Homes, Inc | Front Range Seamless |
| TOUSA Homes, Inc | Futura Engineering Inc |
| TOUSA Homes, Inc | Future Plumbing, Inc. |
| TOUSA Homes, Inc | G & H Trim, Inc. |
| TOUSA Homes, Inc | G. E. Enterprises, Inc. |
| TOUSA Homes, Inc | Gale Building Products |
| TOUSA Homes, Inc | Gale Industries, Inc |
| TOUSA Homes, Inc | Ganung-Belton Assoc, Inc |
| TOUSA Homes, Inc | Garcia Framing, Inc. |
| TOUSA Homes, Inc | Garry Walker Dba |
| TOUSA Homes, Inc | Gary'S Grading, Inc. |
| TOUSA Homes, Inc | Gateswork, Inc. |
| TOUSA Homes, Inc | Gatesystems Unlimited, Inc. |
| TOUSA Homes, Inc | Gator Electrical |
| TOUSA Homes, Inc | Gazette Inc. |
| TOUSA Homes, Inc | GBR Associates, Inc. |
| TOUSA Homes, Inc | Ge Appliances |
| TOUSA Homes, Inc | GE Appliances    - San Antonio |
| TOUSA Homes, Inc | Ge Capital |
| TOUSA Homes, Inc | Ge Capital |
| TOUSA Homes, Inc | Ge Capital Modular Space |
| TOUSA Homes, Inc | Gems*Lisa |
| TOUSA Homes, Inc | General Electric Appliances |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | General Electric Co |
| TOUSA Homes, Inc | General Electric Co |
| TOUSA Homes, Inc | General Electric Company |
| TOUSA Homes, Inc | General Electric Corp. |
| TOUSA Homes, Inc | General Labor Staffing |
| TOUSA Homes, Inc | General Stair Corp. |
| TOUSA Homes, Inc | GeoTek, Inc. |
| TOUSA Homes, Inc | Gilbert Unified School |
| TOUSA Homes, Inc | Glades First Center, LLC |
| TOUSA Homes, Inc | Global Building Supply, |
| TOUSA Homes, Inc | GLR Ventures, Inc. |
| TOUSA Homes, Inc | Go Development Corp. |
| TOUSA Homes, Inc | Godbold,Downing,Sheahan |
| TOUSA Homes, Inc | Goldstein*Larry |
| TOUSA Homes, Inc | Gonzalez Carpentry Inc. |
| TOUSA Homes, Inc | Gope Sajnani and Domingo Perez |
| TOUSA Homes, Inc | Grande Champion Parcel SW-29 |
| TOUSA Homes, Inc | Granger Lumber - Hardware |
| TOUSA Homes, Inc | Greater Washington Publishing |
| TOUSA Homes, Inc | Greater Washington Publishing |
| TOUSA Homes, Inc | Green Acres USA, Inc. |
| TOUSA Homes, Inc | Green MTN Excavatng Inc |
| TOUSA Homes, Inc | Green Tree Landscape |
| TOUSA Homes, Inc | Green Tree Landscape |
| TOUSA Homes, Inc | Green Tree Landscape |
| TOUSA Homes, Inc | Green Tree Landscape |
| TOUSA Homes, Inc | Greenberg Traurig |
| TOUSA Homes, Inc | Greenberg Traurig |
| TOUSA Homes, Inc | Greenberg Traurig |
| TOUSA Homes, Inc | Greenberg Traurig, P.A. |
| TOUSA Homes, Inc | Greenmountain Enterprise |
| TOUSA Homes, Inc | Gregory & Lewis, Inc. |
| TOUSA Homes, Inc | Griffin & Wilson Stucco, Inc. |
| TOUSA Homes, Inc | Grits Cleaning, Inc. |
| TOUSA Homes, Inc | Ground Cover Unlimited, Inc |
| TOUSA Homes, Inc | Guardian Protection Services |
| TOUSA Homes, Inc | Gunderson Plumbing Company |
| TOUSA Homes, Inc | Gustafson Heating & Air- |
| TOUSA Homes, Inc | Gypsum Floors of Denver LLC |
| TOUSA Homes, Inc | H & M Coatings, Inc. |
| TOUSA Homes, Inc | H F S Orlando, Inc. |
| TOUSA Homes, Inc | Hadley Design Group |
| TOUSA Homes, Inc | Hall Mechanical Assoc |
| TOUSA Homes, Inc | Hall-Irwin Corporation |
| TOUSA Homes, Inc | Hammond Kitchen & Bath, Inc. |
| TOUSA Homes, Inc | Hampstead Garage Doors |
| TOUSA Homes, Inc | Hardin-Kight Assoc., Inc |
| TOUSA Homes, Inc | Hardrives of Delray, Inc. |
| TOUSA Homes, Inc | Harrington Design Company |
| TOUSA Homes, Inc | Harris*Alan |
| TOUSA Homes, Inc | Hastings Garage Door Co. |
| TOUSA Homes, Inc | Hearth & Home Technologies dba |
| TOUSA Homes, Inc | Heatherbrooke Estates HOA |
| TOUSA Homes, Inc | Henry Case Cleaning Svcs  Inc. |
| TOUSA Homes, Inc | Heritage Carpet & Tile Co. |
| TOUSA Homes, Inc | Hertz Equipment Rental Corp. |
| TOUSA Homes, Inc | HGS, LLC, Dba Angler |
| TOUSA Homes, Inc | Hidden Rains Sprinkler |
| TOUSA Homes, Inc | High Plains Grading |
| TOUSA Homes, Inc | Highland Meadows CDD |
| TOUSA Homes, Inc | Highplains Excavating Inc |
| TOUSA Homes, Inc | Highway Striping & Signs |
| TOUSA Homes, Inc | Hinkle*Thomas W. |
| TOUSA Homes, Inc | Hirschfeld Backhoe & |
| TOUSA Homes, Inc | Hi-Tech Worktops Inc. |
| TOUSA Homes, Inc | Hitt*Dana |
| TOUSA Homes, Inc | Home Builders Assoc.  Of |
| TOUSA Homes, Inc | Home Builders Serv Inc |
| TOUSA Homes, Inc | Home Cleaning Services, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Home Depot |
| TOUSA Homes, Inc | Home Lumber Company |
| TOUSA Homes, Inc | Homebuilder Marketing |
| TOUSA Homes, Inc | Homesafe Security Systems |
| TOUSA Homes, Inc | Hood*Michael |
| TOUSA Homes, Inc | Houston-Stafford Electric |
| TOUSA Homes, Inc | Howard Davis Masonry |
| TOUSA Homes, Inc | Howard's Masonry |
| TOUSA Homes, Inc | Hudson Pest Control, Inc. |
| TOUSA Homes, Inc | Hudspeth And Assoc.Inc |
| TOUSA Homes, Inc | Hughes Supply Inc. |
| TOUSA Homes, Inc | Hunt Valley Electric, LLC |
| TOUSA Homes, Inc | Huntley, Nyce & Assoc. Ltd. |
| TOUSA Homes, Inc | Hurricane Prevention, Inc. |
| TOUSA Homes, Inc | Hyatt & Stubblefield, PC |
| TOUSA Homes, Inc | Hydra Dry, Inc. |
| TOUSA Homes, Inc | HydroDynamics, Inc. |
| TOUSA Homes, Inc | Hydro-Turf, Inc. |
| TOUSA Homes, Inc | Hypoluxo Plumbing, Inc. |
| TOUSA Homes, Inc | Iacoboni Site Specialties Inc |
| TOUSA Homes, Inc | Iberia Electrical Corp. |
| TOUSA Homes, Inc | IBI Group, Inc. |
| TOUSA Homes, Inc | IBR Corporation |
| TOUSA Homes, Inc | IKON Financial Services |
| TOUSA Homes, Inc | Imperial Iron, Inc. |
| TOUSA Homes, Inc | Indian River County |
| TOUSA Homes, Inc | Indian River County Utilities |
| TOUSA Homes, Inc | Indigo Development, Inc. |
| TOUSA Homes, Inc | Innovative Spaces LLC |
| TOUSA Homes, Inc | Instant Landscape Group Inc. |
| TOUSA Homes, Inc | Integrity Plumbing Corp. |
| TOUSA Homes, Inc | Interior Trim Design,Inc |
| TOUSA Homes, Inc | International Alf Quality Corp |
| TOUSA Homes, Inc | Iron Mountain Rec Mgmt |
| TOUSA Homes, Inc | Islands at Doral Town Homes |
| TOUSA Homes, Inc | J & J Imports and Fabrication |
| TOUSA Homes, Inc | J & R Masonry |
| TOUSA Homes, Inc | J A Quintana, Inc. |
| TOUSA Homes, Inc | J&N Stone, Inc |
| TOUSA Homes, Inc | J.A. Fardella |
| TOUSA Homes, Inc | J.C. Bosland Fence Supply, Inc |
| TOUSA Homes, Inc | J.E.A. - Tax Collector |
| TOUSA Homes, Inc | J.E.A. - Tax Collector |
| TOUSA Homes, Inc | J.M. Carrigan Corporation |
| TOUSA Homes, Inc | J.M. Simpson Enterprises, Inc. |
| TOUSA Homes, Inc | JA Cesare & Associates, Inc. |
| TOUSA Homes, Inc | Jackpot Sanitation Services |
| TOUSA Homes, Inc | Jade Home Decor, Inc |
| TOUSA Homes, Inc | James C Valenti PA |
| TOUSA Homes, Inc | James M. Weir |
| TOUSA Homes, Inc | James W. Wingo   Dba: |
| TOUSA Homes, Inc | Jamieson*Daniel |
| TOUSA Homes, Inc | Jayhawk Grading, Inc. |
| TOUSA Homes, Inc | JB Garage Doors, Inc. |
| TOUSA Homes, Inc | JBR Exteriors Inc |
| TOUSA Homes, Inc | JEA Smart Solution |
| TOUSA Homes, Inc | Jee Man Construction, Inc. |
| TOUSA Homes, Inc | Jeff & Jerry's Electric |
| TOUSA Homes, Inc | Jeff Kaizer |
| TOUSA Homes, Inc | Jefferson County Bldg. |
| TOUSA Homes, Inc | Jensen*Anthony D. |
| TOUSA Homes, Inc | Jessup'S Spec. Products |
| TOUSA Homes, Inc | Jill S. Schwartz & Associates |
| TOUSA Homes, Inc | Jim Asbury |
| TOUSA Homes, Inc | JMHC, Inc. |
| TOUSA Homes, Inc | JMWA Architects, Inc. |
| TOUSA Homes, Inc | John Coughlin |
| TOUSA Homes, Inc | John S. Hambey |
| TOUSA Homes, Inc | Johnson & Parrish of |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Johnson Diversified Inc. |
| TOUSA Homes, Inc | Jon G's Portable Toilets, Inc. |
| TOUSA Homes, Inc | Jonathan M Kay |
| TOUSA Homes, Inc | JR Engineering, LTD |
| TOUSA Homes, Inc | JR Engineering-Greenwood Villa |
| TOUSA Homes, Inc | Just Concrete And |
| TOUSA Homes, Inc | Just Floors, Inc. |
| TOUSA Homes, Inc | JWilliams Staffing, Inc. |
| TOUSA Homes, Inc | K & G Glass & Mirror,Inc |
| TOUSA Homes, Inc | K & K Door & Trim, LLC |
| TOUSA Homes, Inc | K & K Framers, Inc. |
| TOUSA Homes, Inc | K & L Grading, Inc. |
| TOUSA Homes, Inc | K & W Painting, Inc. and |
| TOUSA Homes, Inc | K&D Construction, LLC |
| TOUSA Homes, Inc | Karl Richeson Photography Inc. |
| TOUSA Homes, Inc | Kaskre Marketing GRP LTD |
| TOUSA Homes, Inc | Kauffman Group, Inc. |
| TOUSA Homes, Inc | KBI Mechanical |
| TOUSA Homes, Inc | KBI Windows |
| TOUSA Homes, Inc | Keegan & Assoc., PLC |
| TOUSA Homes, Inc | KELLER AND HECKMAN LLP |
| TOUSA Homes, Inc | Kelly Cable Corporation |
| TOUSA Homes, Inc | Ken Caryl Glass Inc. |
| TOUSA Homes, Inc | Kenna Co., LLC |
| TOUSA Homes, Inc | Kenna Company LLC and |
| TOUSA Homes, Inc | KEPHART |
| TOUSA Homes, Inc | Kevin E Wolf - Wolf'S |
| TOUSA Homes, Inc | Kevin Lynch Carpentry, Inc. |
| TOUSA Homes, Inc | Key Sign Plazas, LLC |
| TOUSA Homes, Inc | Kilowatt Electric Co |
| TOUSA Homes, Inc | Kimble*Tom |
| TOUSA Homes, Inc | Kinco, Ltd. |
| TOUSA Homes, Inc | King Landscaping & Sod |
| TOUSA Homes, Inc | Kissimmee Utility Auth. |
| TOUSA Homes, Inc | Knight Images, Inc. |
| TOUSA Homes, Inc | Knowles Excavating & |
| TOUSA Homes, Inc | Ko*James |
| TOUSA Homes, Inc | Kolesar & Leatham CHTD |
| TOUSA Homes, Inc | KST Building & Land, LLC |
| TOUSA Homes, Inc | KTGY Group, Inc. |
| TOUSA Homes, Inc | Kuhn, LLC |
| TOUSA Homes, Inc | Kummer Kaempfer Gonner & |
| TOUSA Homes, Inc | KUSA-TV/KTVD-TV/KUSAWX |
| TOUSA Homes, Inc | L & M Masonry Co Inc |
| TOUSA Homes, Inc | L & W Supply Corp |
| TOUSA Homes, Inc | L W, Inc. |
| TOUSA Homes, Inc | L. M. Equipment Services, Inc. |
| TOUSA Homes, Inc | L.F.I. FT. Pierce Inc. |
| TOUSA Homes, Inc | Labor Systems |
| TOUSA Homes, Inc | Lafarge West, Inc. |
| TOUSA Homes, Inc | Lafarge West, Inc. |
| TOUSA Homes, Inc | Lake County Board Of |
| TOUSA Homes, Inc | Lamar Advertising of Penn Inc |
| TOUSA Homes, Inc | Lamar Companies |
| TOUSA Homes, Inc | Lamar Texas Ltd. Partnership |
| TOUSA Homes, Inc | Lamps Plus Centennial, Inc. |
| TOUSA Homes, Inc | Land Design, Inc. |
| TOUSA Homes, Inc | Landpro Outdoors LLC |
| TOUSA Homes, Inc | LaPointe and Associates |
| TOUSA Homes, Inc | Las Vegas Review-Journal |
| TOUSA Homes, Inc | Las Vegas Valley Water Dist. |
| TOUSA Homes, Inc | Laughlin & Sons Inc. |
| TOUSA Homes, Inc | Lavallee*Gregory P. |
| TOUSA Homes, Inc | Lee County Board Of |
| TOUSA Homes, Inc | Lee's Gas Supplies, Inc |
| TOUSA Homes, Inc | Liberty Aluminum Co. |
| TOUSA Homes, Inc | Liberty Mutual Insurance Co. |
| TOUSA Homes, Inc | Life Safety Technologies LLC |
| TOUSA Homes, Inc | Lifestyle Interiors Of |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Lil Gil's Painting, Inc. and |
| TOUSA Homes, Inc | Linton Truss Corporation |
| TOUSA Homes, Inc | Little & Associates, Inc |
| TOUSA Homes, Inc | Live Green Environmental Group |
| TOUSA Homes, Inc | Livingston Fire |
| TOUSA Homes, Inc | Llanes and Sons, Inc. |
| TOUSA Homes, Inc | Loiederman Soltesz Assoc.,Inc. |
| TOUSA Homes, Inc | Longmont, City of |
| TOUSA Homes, Inc | Loudoun Stairs |
| TOUSA Homes, Inc | Louis Costanza & Assoc |
| TOUSA Homes, Inc | LTRD Corporation |
| TOUSA Homes, Inc | Lucas Construction, Inc. |
| TOUSA Homes, Inc | Lumber Unlimited |
| TOUSA Homes, Inc | Lunas Construction Clean Up |
| TOUSA Homes, Inc | LYN-Way Design & |
| TOUSA Homes, Inc | M K Plumbing Company Inc and |
| TOUSA Homes, Inc | M.L.C.Bobcat Service Inc |
| TOUSA Homes, Inc | M.R.Tanner Dev & Con,Inc |
| TOUSA Homes, Inc | MAG Enterprises, LLC |
| TOUSA Homes, Inc | Mainstreet Mailboxes & More |
| TOUSA Homes, Inc | Malouff Engineering Inc |
| TOUSA Homes, Inc | Manhard Consulting LTD |
| TOUSA Homes, Inc | Manhattan Electric & Hardware |
| TOUSA Homes, Inc | Manucy Land Surveyors, Inc. |
| TOUSA Homes, Inc | Marbella Lakes Community Assoc |
| TOUSA Homes, Inc | Marble Connection, Inc |
| TOUSA Homes, Inc | Marble Crafters |
| TOUSA Homes, Inc | Marble-Lite Corp. |
| TOUSA Homes, Inc | Marco Electrical Contractors, |
| TOUSA Homes, Inc | Mario's Painting of S FL, Inc. |
| TOUSA Homes, Inc | Mark P. Rems Dba |
| TOUSA Homes, Inc | Marley Park Phase I LLC |
| TOUSA Homes, Inc | Martim Concrete Co, Inc. |
| TOUSA Homes, Inc | Martin & Sons |
| TOUSA Homes, Inc | Martin County Utilities |
| TOUSA Homes, Inc | Martinez Concrete, Inc. |
| TOUSA Homes, Inc | Masco Contractor Services, Inc |
| TOUSA Homes, Inc | Masco CSE |
| TOUSA Homes, Inc | Master Drywall & Textures,Inc. |
| TOUSA Homes, Inc | MasterBrand Cabinets, Inc. |
| TOUSA Homes, Inc | Masterpiece Collection, Inc. |
| TOUSA Homes, Inc | Masters Glenn at Grand |
| TOUSA Homes, Inc | MATO |
| TOUSA Homes, Inc | Matthews Landscaping,Inc |
| TOUSA Homes, Inc | Mavel Carpet & Tile |
| TOUSA Homes, Inc | Maximum Air Conditioning |
| TOUSA Homes, Inc | McClure Concrete Inc. and |
| TOUSA Homes, Inc | Mccoy Irrigation, Inc. |
| TOUSA Homes, Inc | Mccrea Equipment Co Inc |
| TOUSA Homes, Inc | McGough Group, Inc. |
| TOUSA Homes, Inc | McManus, Schor, Asmar and |
| TOUSA Homes, Inc | McNees Wallace & Nurick, LLC |
| TOUSA Homes, Inc | Meadows Concrete Const. Inc. |
| TOUSA Homes, Inc | Meandsuz, Inc. |
| TOUSA Homes, Inc | Melco Electric, LLC |
| TOUSA Homes, Inc | Melco Painting, Inc. and |
| TOUSA Homes, Inc | Merillat LP |
| TOUSA Homes, Inc | Merrell*Don C. |
| TOUSA Homes, Inc | Merten*Mary Beth |
| TOUSA Homes, Inc | Metco Landscaping |
| TOUSA Homes, Inc | Metric Roofing |
| TOUSA Homes, Inc | Miami Herald*The |
| TOUSA Homes, Inc | Miami-Dade Water & Sewer Dept |
| TOUSA Homes, Inc | Michael Petulla Professional |
| TOUSA Homes, Inc | Michael R. Gironda |
| TOUSA Homes, Inc | Michael T. Kerns Dba |
| TOUSA Homes, Inc | Miles Electric Co. Inc. |
| TOUSA Homes, Inc | Milgard Manufact. Inc. |
| TOUSA Homes, Inc | Miller Legg & Assoc, Inc |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Minogue Bros., Inc. |
| TOUSA Homes, Inc | Misc. Vendor |
| TOUSA Homes, Inc | Mitchell & Stark |
| TOUSA Homes, Inc | MMW CORP |
| TOUSA Homes, Inc | MMW CORP and Mile High Trim |
| TOUSA Homes, Inc | Model Excellence, Inc. |
| TOUSA Homes, Inc | Model Financing Corp. LLC |
| TOUSA Homes, Inc | Model Home Interiors |
| TOUSA Homes, Inc | Modern Comfort, Inc |
| TOUSA Homes, Inc | ModSpace |
| TOUSA Homes, Inc | Modular Space Corporation |
| TOUSA Homes, Inc | Mohr Partners, Inc |
| TOUSA Homes, Inc | Mold Specialist, Inc |
| TOUSA Homes, Inc | Money Pages of Florida, Inc. |
| TOUSA Homes, Inc | Moor Disposal Service |
| TOUSA Homes, Inc | Mopsy Cleaning Service |
| TOUSA Homes, Inc | Moralmar Kitchen |
| TOUSA Homes, Inc | Moreno & Moreno Corp |
| TOUSA Homes, Inc | Morrison Aluminum |
| TOUSA Homes, Inc | Motivational Systems Inc. |
| TOUSA Homes, Inc | Mountain Air Comfort Systems |
| TOUSA Homes, Inc | Move Sales, Inc. |
| TOUSA Homes, Inc | Mowrey Elevator Company, Inc. |
| TOUSA Homes, Inc | MS Concrete Co., Inc. |
| TOUSA Homes, Inc | MS Door & Trim |
| TOUSA Homes, Inc | MS Interior Design, Inc. |
| TOUSA Homes, Inc | MTJ Orlando, LLC |
| TOUSA Homes, Inc | Munitions Management Group LLC |
| TOUSA Homes, Inc | Murray*Steve |
| TOUSA Homes, Inc | Nail It Framing, Inc. |
| TOUSA Homes, Inc | National Construction Rentals |
| TOUSA Homes, Inc | Nations Fence, Inc |
| TOUSA Homes, Inc | Nelco Testing & Engineering |
| TOUSA Homes, Inc | Neshite*Lisa |
| TOUSA Homes, Inc | Nevada Construction Clean Up |
| TOUSA Homes, Inc | Nevada Power |
| TOUSA Homes, Inc | New Crete |
| TOUSA Homes, Inc | New Home Media Inc |
| TOUSA Homes, Inc | New Homes and Living |
| TOUSA Homes, Inc | New Homes Guide |
| TOUSA Homes, Inc | New Windsor Lawn Service Inc. |
| TOUSA Homes, Inc | News-Journal Corp |
| TOUSA Homes, Inc | Nextel |
| TOUSA Homes, Inc | Nicol Associates, Inc. |
| TOUSA Homes, Inc | Noble Construction Inc |
| TOUSA Homes, Inc | Noble*Richard |
| TOUSA Homes, Inc | Norelius Corporation |
| TOUSA Homes, Inc | Norris Building Corp. |
| TOUSA Homes, Inc | Norris Design |
| TOUSA Homes, Inc | North American Dev Corp |
| TOUSA Homes, Inc | Northeast Florida Design, Inc. |
| TOUSA Homes, Inc | Northern Colorado Air |
| TOUSA Homes, Inc | Northern Virginia |
| TOUSA Homes, Inc | Oakbrooke Estates Property |
| TOUSA Homes, Inc | Ocean Shutters MFG Inc |
| TOUSA Homes, Inc | Office Movers, Inc. |
| TOUSA Homes, Inc | Office Team |
| TOUSA Homes, Inc | OfficeMax Contract, Inc |
| TOUSA Homes, Inc | Ok Painting Inc. |
| TOUSA Homes, Inc | Olaya*Shirley |
| TOUSA Homes, Inc | Old Dominion Carpentry, |
| TOUSA Homes, Inc | Oligam Drain |
| TOUSA Homes, Inc | Olivia Brick, Inc. |
| TOUSA Homes, Inc | Omi Safety Services Inc |
| TOUSA Homes, Inc | On Time Finish Carpentry |
| TOUSA Homes, Inc | One Waste Services,Inc. |
| TOUSA Homes, Inc | Orange County Board Of |
| TOUSA Homes, Inc | Orange County Utilities- Util |
| TOUSA Homes, Inc | Orange CTY Building Dept |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Orbis Properties, LLC |
| TOUSA Homes, Inc | Orlando Sentinel |
| TOUSA Homes, Inc | Orlando Telephone |
| TOUSA Homes, Inc | Outdoor Living Pool and |
| TOUSA Homes, Inc | Overhead-Underground Electric |
| TOUSA Homes, Inc | Oviedo Forest HOA |
| TOUSA Homes, Inc | Owens Geotechnical, Inc. |
| TOUSA Homes, Inc | P.K. Austin, Inc. |
| TOUSA Homes, Inc | Pacific Marble and Granite |
| TOUSA Homes, Inc | Page Specialty Company |
| TOUSA Homes, Inc | Painting Concepts, Inc. |
| TOUSA Homes, Inc | Palm Beach County Board |
| TOUSA Homes, Inc | Palm Beach County Water |
| TOUSA Homes, Inc | Palm Beach Post |
| TOUSA Homes, Inc | Palmer Electric Co. |
| TOUSA Homes, Inc | Pamela J. Mccarthy  Dba: |
| TOUSA Homes, Inc | Paradigm Engineering, Ltd. |
| TOUSA Homes, Inc | Parkside at Erroll Estates HOA |
| TOUSA Homes, Inc | Pase Construction Services Inc |
| TOUSA Homes, Inc | Pathway Communications |
| TOUSA Homes, Inc | Patrick Coomer |
| TOUSA Homes, Inc | Patterson*Charlotte |
| TOUSA Homes, Inc | Patton, Martin and Assoc., PLC |
| TOUSA Homes, Inc | PBS&J |
| TOUSA Homes, Inc | Pederson'S Recycling And |
| TOUSA Homes, Inc | Per4mance Consulting and |
| TOUSA Homes, Inc | Perfection Aluminum, Inc |
| TOUSA Homes, Inc | Permits Express |
| TOUSA Homes, Inc | Perret & Associates, Inc. |
| TOUSA Homes, Inc | Philip Charles Gribbons |
| TOUSA Homes, Inc | Piece of the Rock |
| TOUSA Homes, Inc | Pinal Co Treasurer |
| TOUSA Homes, Inc | Piney Branch Motors, Inc. |
| TOUSA Homes, Inc | Plan-It Granite & Marble |
| TOUSA Homes, Inc | Platte River Plumb Inc |
| TOUSA Homes, Inc | Plomex Plumbing, Inc. |
| TOUSA Homes, Inc | Pool People, Inc.*The |
| TOUSA Homes, Inc | Portable Rental Systems |
| TOUSA Homes, Inc | Positive Electric, LLC |
| TOUSA Homes, Inc | Post Newsweek Media |
| TOUSA Homes, Inc | Post Newsweek Stations FLA Inc |
| TOUSA Homes, Inc | Postmaster |
| TOUSA Homes, Inc | Precision Service Electric,Inc |
| TOUSA Homes, Inc | Preferred Air Conditioning & |
| TOUSA Homes, Inc | Premier Contractors Group Inc. |
| TOUSA Homes, Inc | Premier Home Improvements Inc. |
| TOUSA Homes, Inc | Premier Lifts, Inc. |
| TOUSA Homes, Inc | Premier Plastering Of |
| TOUSA Homes, Inc | Prestige Comm. Inc.Dba |
| TOUSA Homes, Inc | Price Cleaning |
| TOUSA Homes, Inc | Pride Painting, Inc. |
| TOUSA Homes, Inc | Prime Manufacturing |
| TOUSA Homes, Inc | Prince William Service |
| TOUSA Homes, Inc | Printers Ink |
| TOUSA Homes, Inc | Pro Clean of Southwest Florida |
| TOUSA Homes, Inc | Pro Finish Solutions |
| TOUSA Homes, Inc | Professional Insulators of |
| TOUSA Homes, Inc | Proforma Promotions Plus |
| TOUSA Homes, Inc | Progress Energy FL. Inc. |
| TOUSA Homes, Inc | Progressive Cleaning, Inc |
| TOUSA Homes, Inc | ProSystems, Professional |
| TOUSA Homes, Inc | Protech Security Co., Inc. |
| TOUSA Homes, Inc | Protective Barriers, Inc |
| TOUSA Homes, Inc | Proto Construction & Paving In |
| TOUSA Homes, Inc | Province Community Assoc., Inc |
| TOUSA Homes, Inc | Public Service Co. of Colorado |
| TOUSA Homes, Inc | Pucon, Inc. |
| TOUSA Homes, Inc | Pulino Pigot LLC dba |
| TOUSA Homes, Inc | Purchase Power |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Quality Built |
| TOUSA Homes, Inc | Quince Diamond, LP |
| TOUSA Homes, Inc | Qwest Corporation |
| TOUSA Homes, Inc | R & M Drain & Waterproofing, |
| TOUSA Homes, Inc | R&E Cabling, Inc. |
| TOUSA Homes, Inc | R&F Metals, Inc. |
| TOUSA Homes, Inc | Rake Bros Stucco |
| TOUSA Homes, Inc | Rake Brothers Stucco & |
| TOUSA Homes, Inc | Ramirez*Juan Carlos |
| TOUSA Homes, Inc | RAMM Corporation |
| TOUSA Homes, Inc | Ranger Construction Industries |
| TOUSA Homes, Inc | Ray Maddux   Dba: |
| TOUSA Homes, Inc | Raymond Building Supply |
| TOUSA Homes, Inc | Ray's Brick & Stone,Inc. |
| TOUSA Homes, Inc | RE and Son, Inc. |
| TOUSA Homes, Inc | Reaux and Associates |
| TOUSA Homes, Inc | Red Rock Insulation |
| TOUSA Homes, Inc | Red Rock Mechanical |
| TOUSA Homes, Inc | Redbuck at Sorrel Ranch HOA |
| TOUSA Homes, Inc | Reel Sound, LLC |
| TOUSA Homes, Inc | Reeser's Cleaning Svc. |
| TOUSA Homes, Inc | Reflection Isles Master Assoc. |
| TOUSA Homes, Inc | Reflection Lakes at Naples |
| TOUSA Homes, Inc | Regal Kitchens, Inc. |
| TOUSA Homes, Inc | REICO Distributors |
| TOUSA Homes, Inc | Reliable Contracting Co. |
| TOUSA Homes, Inc | Reliable One Cleaning |
| TOUSA Homes, Inc | Reliable Roofing And |
| TOUSA Homes, Inc | Repairs Unique Inc. |
| TOUSA Homes, Inc | Research Irrigation, Inc |
| TOUSA Homes, Inc | Residential Design Systems |
| TOUSA Homes, Inc | Residential Planners, Inc. |
| TOUSA Homes, Inc | Reston Town Center Property |
| TOUSA Homes, Inc | Reuben*Gary |
| TOUSA Homes, Inc | Riazati*Masoud |
| TOUSA Homes, Inc | Richard and Elizabeth Dykema |
| TOUSA Homes, Inc | Richardson*Dee & Bradford |
| TOUSA Homes, Inc | Ridgeway Plumbing, Inc. |
| TOUSA Homes, Inc | Rieser*Robert |
| TOUSA Homes, Inc | Rill*Robert |
| TOUSA Homes, Inc | River Construction |
| TOUSA Homes, Inc | River Glen Condominium Assoc. |
| TOUSA Homes, Inc | River Oaks Reserve Phase 2 |
| TOUSA Homes, Inc | RJ&G Concrete, Inc. |
| TOUSA Homes, Inc | RKS Developments LLC |
| TOUSA Homes, Inc | Roadrunner Drywall Corp. |
| TOUSA Homes, Inc | Roadway Paving Stones,Inc. |
| TOUSA Homes, Inc | Robert Allard Pool |
| TOUSA Homes, Inc | Roberts Aluminum Furniture |
| TOUSA Homes, Inc | Rogers & Hardin |
| TOUSA Homes, Inc | Rogina & Associates, Ltd. |
| TOUSA Homes, Inc | Royal Cleaning, Inc. |
| TOUSA Homes, Inc | Royal Construction Group, Inc. |
| TOUSA Homes, Inc | Royal Fence & Equipment Co. |
| TOUSA Homes, Inc | RS Framing, Inc. |
| TOUSA Homes, Inc | Rugtex of Florida, Inc. |
| TOUSA Homes, Inc | Rupp*Louis |
| TOUSA Homes, Inc | Ryan Sales & Service, Inc. |
| TOUSA Homes, Inc | Ryley Carlock & Applewhite |
| TOUSA Homes, Inc | S & J Plastering, Inc. |
| TOUSA Homes, Inc | S.C.S. Trucking, Inc. |
| TOUSA Homes, Inc | S.W. Maintenance, Inc |
| TOUSA Homes, Inc | Safe-T-Rail Company |
| TOUSA Homes, Inc | Safety Rail Of Fla., Inc |
| TOUSA Homes, Inc | Sampson Services, Inc. |
| TOUSA Homes, Inc | Sanders Planning Group |
| TOUSA Homes, Inc | Sandhill Recycle Center |
| TOUSA Homes, Inc | Santa Cruz Water Co LLC |
| TOUSA Homes, Inc | Santa Rose All Weather |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Sara Maliva |
| TOUSA Homes, Inc | Sarabia's Custom Stucco, Inc. |
| TOUSA Homes, Inc | Savannah Millwork, Co |
| TOUSA Homes, Inc | SBS Const-Door & Trim Division |
| TOUSA Homes, Inc | SC Design, Inc |
| TOUSA Homes, Inc | Scheer's Incorporated |
| TOUSA Homes, Inc | Schnars Enginering Corp. |
| TOUSA Homes, Inc | Scott Alarm, Inc. |
| TOUSA Homes, Inc | Screen Builders, Inc. |
| TOUSA Homes, Inc | SCS Electrical Contractors Inc |
| TOUSA Homes, Inc | Sears, Roebuck And Co. |
| TOUSA Homes, Inc | SelectBuild Florida, LLC |
| TOUSA Homes, Inc | Seminole Masonry, Inc |
| TOUSA Homes, Inc | Seminole Site Works, Inc. |
| TOUSA Homes, Inc | Seminole Trim, Inc. |
| TOUSA Homes, Inc | Sens Mechanical |
| TOUSA Homes, Inc | Sergio Redondo & Assoc. |
| TOUSA Homes, Inc | Shelter Systems Corp Of MD |
| TOUSA Homes, Inc | SHJ Studio, Inc. |
| TOUSA Homes, Inc | Short Builder Services, Inc. |
| TOUSA Homes, Inc | Shuaib*Mohammad |
| TOUSA Homes, Inc | Sidehill Condo HOA |
| TOUSA Homes, Inc | Sign Associates Inc |
| TOUSA Homes, Inc | Sign Plazas West |
| TOUSA Homes, Inc | Silver Fern MGMT, LLC |
| TOUSA Homes, Inc | Silver State Builder Services |
| TOUSA Homes, Inc | Silver Trend, Inc. |
| TOUSA Homes, Inc | Site Maintenance, Inc. |
| TOUSA Homes, Inc | Site Works, Inc. |
| TOUSA Homes, Inc | Slater Hanifan Group |
| TOUSA Homes, Inc | Sloane*Michael |
| TOUSA Homes, Inc | Smith*Roy V, |
| TOUSA Homes, Inc | Snow's Concrete FRMG Inc |
| TOUSA Homes, Inc | Snyder Egbue Design Group, Inc |
| TOUSA Homes, Inc | Snyder's Pipe Cleaning, Inc. |
| TOUSA Homes, Inc | So. Florida Curb & Walk |
| TOUSA Homes, Inc | Solid Rock Excavation LLC |
| TOUSA Homes, Inc | Solidtop Specialists,Inc |
| TOUSA Homes, Inc | Sonshine Drywall & Metal |
| TOUSA Homes, Inc | Sorrel Ranch Metropolitan |
| TOUSA Homes, Inc | South Adams County Water & |
| TOUSA Homes, Inc | Southern Building Products Inc |
| TOUSA Homes, Inc | Southern Exposure Landscape |
| TOUSA Homes, Inc | Southern Gulf Equipment Rental |
| TOUSA Homes, Inc | Southland Insulators of DE,LLC |
| TOUSA Homes, Inc | Southwest Gas Corporation |
| TOUSA Homes, Inc | Spear Security Inc. |
| TOUSA Homes, Inc | Specialties Supply Co. Inc. |
| TOUSA Homes, Inc | Specialty Products of SWF, Inc |
| TOUSA Homes, Inc | Spirit Underground |
| TOUSA Homes, Inc | Spiro & Associates |
| TOUSA Homes, Inc | Split-Rail Fence Company |
| TOUSA Homes, Inc | Sprint PCS |
| TOUSA Homes, Inc | Sprint-921642340 |
| TOUSA Homes, Inc | Squire, Sanders & Dempsey LLP |
| TOUSA Homes, Inc | St. John's Properties, Inc. |
| TOUSA Homes, Inc | Stahl Roofing Inc. and |
| TOUSA Homes, Inc | Stanley Pools Inc. |
| TOUSA Homes, Inc | Stephens Lynn Klein La Cava |
| TOUSA Homes, Inc | Sterling Manufacturing |
| TOUSA Homes, Inc | Steve Ha |
| TOUSA Homes, Inc | Stirling Associates, Ltd. |
| TOUSA Homes, Inc | Stock Building Supply |
| TOUSA Homes, Inc | Stofko Masonry and |
| TOUSA Homes, Inc | Stone Age Pavers, Inc |
| TOUSA Homes, Inc | Stoney Creek Concrete In |
| TOUSA Homes, Inc | Structural Component Systems, |
| TOUSA Homes, Inc | Structural Preservation |
| TOUSA Homes, Inc | Stryan Builders, LLC |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Homes, Inc | Summit Steel Fabricators, Inc. |
| TOUSA Homes, Inc | Summit Usa Land Dev. Inc |
| TOUSA Homes, Inc | Sumter Electric |
| TOUSA Homes, Inc | Sun Realty |
| TOUSA Homes, Inc | Sun State Nursery & |
| TOUSA Homes, Inc | Sundew Painting, Inc. |
| TOUSA Homes, Inc | Sun-Sentinel |
| TOUSA Homes, Inc | Sunset Air, Inc. |
| TOUSA Homes, Inc | Sunshine Roofing & |
| TOUSA Homes, Inc | Sunstar Properties, LC |
| TOUSA Homes, Inc | Suntech Electrical Contractors |
| TOUSA Homes, Inc | Superb Roofing, Inc. |
| TOUSA Homes, Inc | Superior Concrete, LLC |
| TOUSA Homes, Inc | Superior Fence Inc |
| TOUSA Homes, Inc | Superior Site Services |
| TOUSA Homes, Inc | Superior Truss Systems, Inc. |
| TOUSA Homes, Inc | Surface Crafters |
| TOUSA Homes, Inc | Surface Technology Corp. |
| TOUSA Homes, Inc | SWCA, Inc. |
| TOUSA Homes, Inc | Sytsema*Jeanne |
| TOUSA Homes, Inc | T & A Excavating & Hauli |
| TOUSA Homes, Inc | T & G Painting Inc. |
| TOUSA Homes, Inc | T&B Construction, Inc |
| TOUSA Homes, Inc | T&R Painting & Drywall |
| TOUSA Homes, Inc | T.W.A. Ind. |
| TOUSA Homes, Inc | Tailored Foam Of Florida |
| TOUSA Homes, Inc | Tampco Group, Inc. |
| TOUSA Homes, Inc | Taneytown Drywall |
| TOUSA Homes, Inc | Tax Collector |
| TOUSA Homes, Inc | Team Plumbing Inc. |
| TOUSA Homes, Inc | Tejon & Pikes Peak Ptnrs,LLLP |
| TOUSA Homes, Inc | Temp Smart |
| TOUSA Homes, Inc | TempSmart, Inc. |
| TOUSA Homes, Inc | Terracon - Kansas City |
| TOUSA Homes, Inc | Thales Builders Corp. |
| TOUSA Homes, Inc | The Baltimore Sun |
| TOUSA Homes, Inc | The Briar Corp. |
| TOUSA Homes, Inc | The Brockman Corp. |
| TOUSA Homes, Inc | The Contractor Yard, Inc |
| TOUSA Homes, Inc | The Dunn Corp. |
| TOUSA Homes, Inc | The Hodges Group, Inc |
| TOUSA Homes, Inc | The Howard Hughes Corporation |
| TOUSA Homes, Inc | The Klean One, Inc. |
| TOUSA Homes, Inc | The Lumber Yard |
| TOUSA Homes, Inc | The Map Guide Co. |
| TOUSA Homes, Inc | The Masonry Group Nevada Inc. |
| TOUSA Homes, Inc | The Miami Herald Media Company |
| TOUSA Homes, Inc | The Register |
| TOUSA Homes, Inc | Thermal Concepts Inc.dba |
| TOUSA Homes, Inc | Thomas Masonry Inc. |
| TOUSA Homes, Inc | Thornton, City of |
| TOUSA Homes, Inc | Thoutt Bros., Inc. |
| TOUSA Homes, Inc | Three Star Constr jointly |
| TOUSA Homes, Inc | Tim Graboski Roofing,Inc |
| TOUSA Homes, Inc | Tim Marshal |
| TOUSA Homes, Inc | Timberlake Cabinet Co. dba |
| TOUSA Homes, Inc | Tino's Marble & Granite, Inc. |
| TOUSA Homes, Inc | Titan Stairs, Inc. |
| TOUSA Homes, Inc | TJ's Quality Construction |
| TOUSA Homes, Inc | TKM Interiors, Inc. |
| TOUSA Homes, Inc | Torgerson Electric Inc |
| TOUSA Homes, Inc | Total Flooring Systems Inc |
| TOUSA Homes, Inc | Total Sign Systems |
| TOUSA Homes, Inc | Town of Buckeye - Permits |
| TOUSA Homes, Inc | Town of Callahan |
| TOUSA Homes, Inc | Town of Gilbert - Permits |
| TOUSA Homes, Inc | Townhouse Sprinklers, Inc |
| TOUSA Homes, Inc | Trans Florida Development Corp |
| TOUSA Homes, Inc | TRC Engineers, Inc. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| TOUSA Homes, Inc | Tri-Core Surveying |
| TOUSA Homes, Inc | Trim Craft, Inc. |
| TOUSA Homes, Inc | Trim Pak Corporation |
| TOUSA Homes, Inc | Tri-Star Drywall Inc |
| TOUSA Homes, Inc | Tropix Marble Company |
| TOUSA Homes, Inc | True House, Inc. |
| TOUSA Homes, Inc | Tuck's, Inc. |
| TOUSA Homes, Inc | Tulk*Glen |
| TOUSA Homes, Inc | Tuscany Granite |
| TOUSA Homes, Inc | TyMetrix Inc |
| TOUSA Homes, Inc | Union Pacific Construction |
| TOUSA Homes, Inc | United Civil Group Corp. |
| TOUSA Homes, Inc | United Communication and |
| TOUSA Homes, Inc | United Framers |
| TOUSA Homes, Inc | United Land Clearing Inc. |
| TOUSA Homes, Inc | United Power Utilities |
| TOUSA Homes, Inc | United Rentals Highway Tech |
| TOUSA Homes, Inc | Universal Eng Sciences |
| TOUSA Homes, Inc | Universal Forest Product |
| TOUSA Homes, Inc | Urs Corporation |
| TOUSA Homes, Inc | US Bancorp Services |
| TOUSA Homes, Inc | Utility Solutions |
| TOUSA Homes, Inc | Van Kirk & Sons, Inc. |
| TOUSA Homes, Inc | Vanasse & Daylor, LLP |
| TOUSA Homes, Inc | Varsity Glass, Inc. |
| TOUSA Homes, Inc | Vendegna*Alfred |
| TOUSA Homes, Inc | Verizon |
| TOUSA Homes, Inc | VERIZON WIRELESS 620357248 |
| TOUSA Homes, Inc | Vieira*Sebastiao |
| TOUSA Homes, Inc | Virginia Power |
| TOUSA Homes, Inc | Vista, Inc. |
| TOUSA Homes, Inc | Volusia County BLDG Dept |
| TOUSA Homes, Inc | W. Jackson & Sons |
| TOUSA Homes, Inc | Walker Electrical Contractors |
| TOUSA Homes, Inc | Walker Landscape, Inc. |
| TOUSA Homes, Inc | Walker*Carla |
| TOUSA Homes, Inc | Walsh Engineering, Inc |
| TOUSA Homes, Inc | Walt Disney Parks & Resorts |
| TOUSA Homes, Inc | Washington Gas |
| TOUSA Homes, Inc | Washington Post Newspaper |
| TOUSA Homes, Inc | Waste Management of Denver |
| TOUSA Homes, Inc | Waste Management of Florida |
| TOUSA Homes, Inc | Waste Pro of Florida |
| TOUSA Homes, Inc | Wastepro of Florida |
| TOUSA Homes, Inc | Water Resource Solutions |
| TOUSA Homes, Inc | Waterford Estates CDD |
| TOUSA Homes, Inc | Waterproofing Systems of |
| TOUSA Homes, Inc | Watertite Gutter Co.,Inc.*The |
| TOUSA Homes, Inc | Watson Trucking & Equip. |
| TOUSA Homes, Inc | Watson-McFeely & Associates |
| TOUSA Homes, Inc | Waybright*Cheryl |
| TOUSA Homes, Inc | Wayne Dalton Corporation |
| TOUSA Homes, Inc | Wayne Rogers Framing Inc. |
| TOUSA Homes, Inc | WBC Construction, LLC |
| TOUSA Homes, Inc | Weathermaster Building |
| TOUSA Homes, Inc | Weber Builders &Remodeling,Inc |
| TOUSA Homes, Inc | West Coast Countertops |
| TOUSA Homes, Inc | West Coast Insulation |
| TOUSA Homes, Inc | West Fork Constructor's, Inc. |
| TOUSA Homes, Inc | West Manheim Township |
| TOUSA Homes, Inc | Western Sign & Flag |
| TOUSA Homes, Inc | Western States Contracting,Inc |
| TOUSA Homes, Inc | Westport Stucco of South |
| TOUSA Homes, Inc | Westyn Bay COA, Inc |
| TOUSA Homes, Inc | WFLX- Fox 29 |
| TOUSA Homes, Inc | White Roofing, Inc. |
| TOUSA Homes, Inc | William A. Hazel, Inc. |
| TOUSA Homes, Inc | William Scotsman, Inc. |
| TOUSA Homes, Inc | Wilson Crook*Kathy |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| TOUSA Homes, Inc | Wind Tie Systems |
| TOUSA Homes, Inc | Wjna-Am, James Crystal |
| TOUSA Homes, Inc | Wojciechowski*Lisa |
| TOUSA Homes, Inc | Woodshire Preserve Homeowners |
| TOUSA Homes, Inc | Woodsman Kitchens & Floors |
| TOUSA Homes, Inc | WORKFLOWONE |
| TOUSA Homes, Inc | Wright Structrual Engineers, |
| TOUSA Homes, Inc | WRMF- FM Radio |
| TOUSA Homes, Inc | WTC Contractors, Inc. |
| TOUSA Homes, Inc | Xpress Concrete, Inc. |
| TOUSA Homes, Inc | Yuen-Dinh*Meimee |
| TOUSA Homes, Inc | Zerep Towers |
| TOUSA Homes, Inc | Zurich North America |
| TOUSA Inc. | A&R Fix It, Inc. |
| TOUSA Inc. | ACE American Insurance Co |
| TOUSA Inc. | Acree*Derek |
| TOUSA Inc. | Advanced Financial Solutions |
| TOUSA Inc. | AFLAC |
| TOUSA Inc. | Akin Gump Strauss Hauer & Feld |
| TOUSA Inc. | AlixPartners, LLP |
| TOUSA Inc. | Allied World Assurance Company |
| TOUSA Inc. | ALVAREZ AND MARSAL |
| TOUSA Inc. | American Express |
| TOUSA Inc. | American International Group |
| TOUSA Inc. | AON Consulting Inc. |
| TOUSA Inc. | AppWright, Inc. |
| TOUSA Inc. | Arch Insurance Company |
| TOUSA Inc. | Arena Operating Company, Ltd |
| TOUSA Inc. | Arent Fox LLP |
| TOUSA Inc. | Axis Specialty US Services Inc |
| TOUSA Inc. | Beazley Insurance Company Inc |
| TOUSA Inc. | Berger Singerman PA |
| TOUSA Inc. | Bilzin Sumberg Baena Price & |
| TOUSA Inc. | Bowne of Atlanta, Inc. |
| TOUSA Inc. | Bracewell & Giuliani LLP |
| TOUSA Inc. | Builder1440 LLC |
| TOUSA Inc. | BullsEye Telecom, Inc. |
| TOUSA Inc. | Cahill Gordon & Reindel LLP |
| TOUSA Inc. | CARMEL & CARMEL P.C. |
| TOUSA Inc. | CCA Financial,LLC |
| TOUSA Inc. | CDR Presidential, LLC |
| TOUSA Inc. | CDW Direct,LLC |
| TOUSA Inc. | Ceridian |
| TOUSA Inc. | CGLIC-CHATTANOOGA EASC |
| TOUSA Inc. | Chadbourne & Parke LLP |
| TOUSA Inc. | CompBenefits Company |
| TOUSA Inc. | Comptroller of Maryland |
| TOUSA Inc. | Concord Camera Corp. |
| TOUSA Inc. | CROWN APPRAISAL GROUP, INC. |
| TOUSA Inc. | CT Corporation System |
| TOUSA Inc. | DavidWood Temporaries |
| TOUSA Inc. | De Lage Landen Financial Svcs. |
| TOUSA Inc. | DELAWARE SECRETARY OF STATE |
| TOUSA Inc. | Deloitte Tax LLP |
| TOUSA Inc. | Devendorf*Russell |
| TOUSA Inc. | DRA CRT Orlando University |
| TOUSA Inc. | Duff & Phelps, LLC. |
| TOUSA Inc. | EPIQ eDISCOVERY SOLUTIONS, INC |
| TOUSA Inc. | Ernst & Young - Atlanta-933514 |
| TOUSA Inc. | Fedex |
| TOUSA Inc. | FIRST ADVANTAGE LITIGATION |
| TOUSA Inc. | Ford & Harrison LLP |
| TOUSA Inc. | Fox Rothschild LLP |
| TOUSA Inc. | FTI CONSULTING INC. |
| TOUSA Inc. | Gall*Valerie |
| TOUSA Inc. | GLOBAL SOURCING AND GLOBAL |
| TOUSA Inc. | Greenberg Traurig, P.A. |
| TOUSA Inc. | Greenway - Crestwood Park |
| TOUSA Inc. | Hasler*William A |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
| --- | --- |
| TOUSA Inc. | Hilb Rogal and Hobbs |
| TOUSA Inc. | Horner*Larry D |
| TOUSA Inc. | Houlihan Lokey Howard & Zukin |
| TOUSA Inc. | Houston G.P.I. Ltd. |
| TOUSA Inc. | HSBC Bank USA |
| TOUSA Inc. | Hughes Hubbard & Reed LLP |
| TOUSA Inc. | IKON Financial Services |
| TOUSA Inc. | IKON Office Solutions |
| TOUSA Inc. | Imperial Capital LLC |
| TOUSA Inc. | Intercall |
| TOUSA Inc. | Intralinks |
| TOUSA Inc. | J.R. Friedman |
| TOUSA Inc. | Jefferies & Company, INC. |
| TOUSA Inc. | Jennifer E. Mercer |
| TOUSA Inc. | JLT Risk Solutions (Bermuda) |
| TOUSA Inc. | Jones Day |
| TOUSA Inc. | Kasowitz Benson Torres & |
| TOUSA Inc. | Kenny Nachwalter, PA |
| TOUSA Inc. | KIRKLAND & ELLIS LLP |
| TOUSA Inc. | Kolesar & Leatham, CHTD. |
| TOUSA Inc. | Kroll Zolfo Cooper, LLC |
| TOUSA Inc. | KTR VALUATION |
| TOUSA Inc. | Kurtzman Carson Consultants |
| TOUSA Inc. | LaSalle Bank National Assoc. |
| TOUSA Inc. | Lazard Freres & Co. LLC |
| TOUSA Inc. | Lemnah*Christopher |
| TOUSA Inc. | Liberty Mutual Insurance Co. |
| TOUSA Inc. | LINA |
| TOUSA Inc. | Marriott International |
| TOUSA Inc. | McDONALD*BRIAN |
| TOUSA Inc. | Miami-Dade County |
| TOUSA Inc. | Midland Loan Services, Inc. |
| TOUSA Inc. | Misc Vendor |
| TOUSA Inc. | Mohr Partners, Inc |
| TOUSA Inc. | M-TECH INFORMATION TECH. INC. |
| TOUSA Inc. | NetIQ Corporation |
| TOUSA Inc. | New York Stock Exchange |
| TOUSA Inc. | Nextel |
| TOUSA Inc. | Office Depot INC   (CA) |
| TOUSA Inc. | Optimus Solutions LLC |
| TOUSA Inc. | Orlando Business Telephone |
| TOUSA Inc. | PA Department of Revenue |
| TOUSA Inc. | Parks*Susan B. |
| TOUSA Inc. | Paul, Weiss, Rifkind |
| TOUSA Inc. | Poulos*Michael J |
| TOUSA Inc. | PROSKAUER ROSE LLP |
| TOUSA Inc. | Quest Software, Inc. |
| TOUSA Inc. | Quinn Emanuel Trial Lawyers |
| TOUSA Inc. | RIA |
| TOUSA Inc. | RSUI Indemnity Company |
| TOUSA Inc. | Schiegg*John |
| TOUSA Inc. | Shawe Consulting, Inc. |
| TOUSA Inc. | SITRICK AND COMPANY INC. |
| TOUSA Inc. | Software House International, |
| TOUSA Inc. | Sprint PCS |
| TOUSA Inc. | Sprint-13098531 |
| TOUSA Inc. | Squire, Sanders & Dempsey LLP |
| TOUSA Inc. | State Comptroller |
| TOUSA Inc. | Sungard Availability Services |
| TOUSA Inc. | The Law Offices of Ronald Weil |
| TOUSA Inc. | The Mergis Group |
| TOUSA Inc. | The Network |
| TOUSA Inc. | The Sullivan Group, LLC |
| TOUSA Inc. | The Tharpe Company, Inc. |
| TOUSA Inc. | Thomson Financial Corporate |
| TOUSA Inc. | Thomson Property Tax Services |
| TOUSA Inc. | Towers Perrin Forster & Crosby |
| TOUSA Inc. | Venable LLP |
| TOUSA Inc. | VERICENTER, INC. |

Potential Preference Payments by Vendor by Legal Entity

| Legal Entity Name | Vendor Name |
|---|---|
| TOUSA Inc. | Vogt*Jeff |
| TOUSA Inc. | Wasser*Nicole |
| TOUSA Inc. | Werle Associates, P.L. |
| TOUSA Inc. | Whitworth* J. Bryan |
| TOUSA Inc. | Wilmington Trust Company |
| TOUSA Inc. | WORKFLOWONE |
| TOUSA Inc. | XL Professional Finance |
| TOUSA Inc. | Zurich North America |
| TOUSA Mid-Atlantic Investment, LLC | American Woodmark Corporation |
| TOUSA Mid-Atlantic Investment, LLC | Brackens Landscape |
| TOUSA Mid-Atlantic Investment, LLC | Brumfield*Glenda |
| TOUSA Mid-Atlantic Investment, LLC | Burgemeister-Bell, Inc. |
| TOUSA Mid-Atlantic Investment, LLC | Charles A. Klein & Sons, Inc. |
| TOUSA Mid-Atlantic Investment, LLC | Dixie Construction Co., Inc. |
| TOUSA Mid-Atlantic Investment, LLC | General Electric Co |
| TOUSA Mid-Atlantic Investment, LLC | Iacoboni Site Specialist |
| TOUSA Mid-Atlantic Investment, LLC | Miles Electric Co. Inc. |
| TOUSA Mid-Atlantic Investment, LLC | Misc. Vendor |
| TOUSA Mid-Atlantic Investment, LLC | Morris & Ritchie Assoc., Inc. |
| TOUSA Mid-Atlantic Investment, LLC | Reliable Contracting Co. |
| TOUSA Mid-Atlantic Investment, LLC | Site Maintenance, Inc. |
| TOUSA Mid-Atlantic Investment, LLC | The Baltimore Sun |
| TOUSA Mid-Atlantic Investment, LLC | Weber Builders &Remodeling,Inc |

**TOUSA Debtor - Current and Potential Third-Party Claims**

# EXHIBIT G-2

| Debtor Entity | Case Caption, If Applicable | Claim Against: | Description of Claim |
|---|---|---|---|
| Newmark Homes, L.P. | | 1626 Willows, L.P.; Holford Group; Holford Project Management, LLC; Bury + Partners, Inc.; City of Austin, Texas; Land America Lawyers Title; Lawyers Title Insurance Corporation | Claims involving drainage easements in the Meadows at Double Creek, a subdivision in Austin, Texas and breach of warranties of title with respect thereto for missing an easement on a plat that has caused Newmark additional expenses and loss of sales. |
| Newmark Homes, L.P. | Salado Quarry, Inc. v. Newmark Homes, L.P. et al; Cause no. 281,225 in the County Civil Court at Law No. 2 of Travis County, Texas | Salado Quarry, Inc. | Newmark Homes, L.P. has counterclaimed in the lawsuit brought by Salado Quarry, Inc. to recover from Salado the sum of at least $22,890.15 which Newmark overpaid. |
| Newmark Homes, L.P. | | Big Tex | Newmark has a claim against Big Tex, an HVAC subcontractor, for warranty, indemnification, and defense in the claim brought by Bradley and Debra Bryson against Newmark for defective installation of an HVAC unit. |
| Newmark Homes, L.P. | | Big Tex | Newmark has a claim against Big Tex, the HVAC subcontractor, for warranty and indemnification in the claim brought against Newmark by Vivian and Lee Green for a defective air conditioning compressor. |
| Newmark Homes, L.P. | | Employer of Mark Hubbard (Currently unknown) | Newmark Homes, LP has a claim for contribution and/or indemnity in connection with the claim for reimbursement of medical expenses made by Mark Hubbard.  Newmark's claim is against the subcontractor who employed Hubbard (whose name is not currently known) as well as against the roofer  (also currently not known). |
| Newmark Homes, L.P. | | H & L Partners, L.P. JDG Development, Ltd. | Newmark Homes, L.P. has a claim against H & L Partners, L.P. and JDG Development, Ltd. for payment/reimbursement of roll-back taxes due on a parcel acquired by Newmark from H & L Partners, L.P. and JDG Development, Ltd. |
| Newmark Homes, L.P. | | Land America Lawyers Title | Newmark Homes, L.P. has a claim against Land America Lawyers Title under the title insurance policy issued in connection with the acquisition of a parcel from H & L Partners, L.P. for the value of the roll-back taxes unpaid by H & L Partners, L.P. |
| TOUSA Homes, Inc. | TOUSA Homes, Inc. v. Charles W. Johnson and Linda A. Johnson | Charles W. Johnson and Linda A. Johnson | This is a complaint for determination of dischargeability of a debt.  The debtors/defendants are the sole officers and directors of Johnson Diversified, Inc. ("JDI"), a plumbing subcontractor of TOUSA.  JDI contracted with plumbing suppliers for TOUSA's Chatfield Bluffs project.  TOUSA paid JDI, but JDI did not pay the suppliers, and the suppliers have recorded liens against the project.  TOUSA also has a claim against JDI for the value of the recorded liens, costs, and damages. |
| TOUSA Homes, Inc. | TOUSA Homes, Inc. v. Xcel Energy, Inc. | Xcel Energy, Inc. | This is a complaint for damages against Xcel Energy which negligently installed an electric feeder cable and caused damage to a home.  TOUSA is also seeking to recover expenses it incurred in remediating the damage. |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| TOUSA Homes, Inc. | | Encana Oil and Gas | TOUSA contracted with Encana Oil and Gas to remove and replace contaminated soils adjacent to an abandoned well associated with Encana's oil well facilities during the course of TOUSA's construction of the McKay Landing project. After the work was performed, significant settlement occurred apparently due to improper compaction and settlement of the soils after removal and replacement by Encana, which settlement resulted in damage to an alley way and private driveway. TOUSA has a claim against Encana for the cost of the remedial work. |
| TOUSA Homes, Inc. | | Citywide Banks | TOUSA contracted with Coastal Flooring to provide design center services for TOUSA's northern Colorado operations. TOUSA and its subcontractor suppliers had placed a number of display and sample items in Coastal's design center. In January 2008, TOUSA demanded that Coastal return the property to TOUSA and TOUSA's suppliers, but Coastal had ceased operations and did not do so. TOUSA made several attempts to take possession of its personal property in Coastal's design center, but was unsuccessful and learned at the end of May 2008, that Citywide, Coastal's lender, had seized and sold the property without notice or accounting to TOUSA. In June of 2008, TOUSA sent written notice to Citywide that it had violated the automatic stay and committed civil theft under C.R.S. § 18-4-405, subjecting it to judgment for the value of the converted property, plus treble damages and attorney fees and demanding an accounting and return of the proceeds, which Citywide has not done. |
| TOUSA Homes, Inc. | | ERS Constructors, Inc. | Potential claim concerning distress and settlements present in the asphalt and concrete at service areas at Overlook at Wolf Ranch project in Colorado Springs, Colorado. |
| TOUSA Homes, Inc. | | Sidehill Homeowners Association & Bartran | The Sidehill Homeowners Association (HOA) and Bartran (declarant) has, at times, refused to irrigate or maintain landscape areas that are their responsibility to maintain. TOUSA may pursue a claim against the HOA to irrigate and maintain. |
| TOUSA Homes, Inc. | | Richmond American Homes of Colorado, Inc. | TOUSA has a claim against Richmond American Homes of Colorado, Inc. for an outstanding balance of $40,000.00 remaining on a 77 finished lot purchase agreement in the Sorrel Ranch Subdivision. |
| TOUSA Homes, Inc. | | Autumn Landscape | TOUSA has warranty and indemnification claims against Autumn Landscape for installation and maintenance deficiencies with respects to common area landscaping installed at the Overlook Townhomes project in Colorado Springs. |
| TOUSA Homes, Inc. | | MMC Engineering | TOUSA has a claim jointly with the Adams 12 Five Star School District against MMC for (i) improper design of drainage channel in relation to existing sanitary sewer mainline damaged during construction of the drainage channel, and (ii) improper engineering, cost overruns and delays in completion of their work in relation to the preparation and submittal of a Letter of Map Revision with the Federal Emergency Management Agency. |
| TOUSA Homes, Inc. | | Adams 12 Five Star School District | TOUSA has a reimbursement claim of $1.4 million against Adams 12 Five Star School District for onsite and offsite development improvements built by TOUSA under a cost reimbursement agreement between TOUSA and the District. TOUSA has completed the work, and receied only partial payment |
| TOUSA Homes, Inc. | | Lennar Colorado, LLC | Potential claims against Lennar Colorado regarding improper drainage on finished single family lots in the Coyote Run community, Mead, Colorado. |
| TOUSA Homes, Inc. | | Lennar Colorado, LLC and Merrick & Company | TOUSA has claims against Lennar Colorado, LLC and Lennar's contractors and consultants (including Merrick & Company) for cost overruns, construction delays and negligence on construction management on the Waterview subdivision, Fountain, Colorado. |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| TOUSA Homes, Inc. | | TOP Operating Company<br>Rodney K. Herring<br>Murray J. Herring | TOP Operating Company ("TOP") operates a gas well located on a parcel of land owned by TOUSA in the City of Longmont, Boulder County, Colorado, pursuant to an existing oil and gas lease.  TOP is owned by the Herring family and Rodney and Murray Herring are the principals of TOP.  TOUSA has two potential claims: (i) a claim against TOP for unpaid royalty payments under the oil and gas lease and (ii) statutory and common law environmental contamination claims against TOP and its principals relating to benzene soil and groundwater contamination that resulted from TOP's operations. |
| TOUSA, Inc. | | Akerman Senterfitt (and the individual lawyers involved) | Potential claim for professional negligence in connection with advice on certain disclosures in certain SEC filings. |
| TOUSA Homes Florida, L.P. | | BDO Seidman | TOUSA Homes Florida, L.P., as successor by merger to EH/Transeastern, LLC, ("TOUSA") has a potential claim for professional negligence against BDO Seidman under BDO's engagement by TOUSA related to TOUSA's compliance with its Senior Credit Agreement. |
| TOUSA, Inc. | | KPMG | Potential claim against KPMG for professional negligence in connection with the Transeastern acquisition. |
| TOUSA, Inc. | | Greenberg Traurig LLP | Potential claim against Greenberg Traurig LLP for professional negligence in connection with the Transeastern acquisition. |
| TOUSA, Inc. | | Real Estate Engineering (REE) | Potential claim for professional negligence in connection with the Transeastern acquisition. |
| Newmark Homes, L.P. | | Childress Engineering | Potential claim against Childress Engineering for framing issues which Newmark has repaired. |
| Newmark Homes, L.P. | | Gastite | Potential claim against Gastite, plumber and/or electrician regarding gas line design, manufacture and installation which allegedly caused fire. |
| Newmark Homes, L.P. | | Enterprise Plumbing | Potential claim against Enterprise Plumbing and/or manufacturer of parts for plumbing leak for warranty and indemnification in connection with claim made by Khon against Newmark. |
| Newmark Homes, L.P. | | Enterprise Plumbing | Potential claim against Enterprise Plumbing and/or manufacturer of parts for plumbing leak for warranty and indemnification in connection with claim made by Marascio against Newmark. |
| Newmark Homes, L.P. | | Saye Plumbing Contractors, Inc. | Newmark has made a demand for indemnification against the subcontractor Saye Plumbing Contractors, Inc. in the subrogation claim asserted by Farmers Insurance Exchange pursuant to its insured, Carolyn & Donnie Kirkpatrick, in the amount of $46,211.52. |
| Newmark Homes, L.P. | | Houston Stafford Plumbing | Newmark has made a demand for indemnification against the subcontractor Houston Stafford Plumbing in the subrogation claim asserted by Allstate Texas Lloyds Company pursuant to its insured Howard Tan in the amount of $13,497.89. |
| Newmark Homes, L.P. | | Houston Stafford Plumbing | Newmark has made a demand for indemnification against the subcontractor Houston Stafford Plumbing in the subrogation claim asserted by Allstate Insurance Company pursuant to its insured Tamara Tapia. |
| Newmark Homes, L.P. | | Saye Plumbing and its insurer | Newmark has made a demand for indemnification against the subcontractor Saye Plumbing Contractors, Inc. in the subrogation claim asserted by Travelers pursuant to its insured, Mitchell Trotter, for alleged damages due to a defective water supply line in the amount of $45,804.64. |
| Newmark Homes, L.P. | | Christianson Plumbing | Newmark has made a demand for indemnification against the subcontractor Christianson Plumbing in the subrogation claim State Farm has asserted pursuant to its insured, Robert Linder for alleged damages due to a plumbing leak. |
| TOUSA Homes, Inc. | | B&C Development of Duval Inc | TOUSA may have a claim for reimbursement of its deposit that was released to the developer. |
| TOUSA Homes, Inc. | | Amhurst Oaks LLC | TOUSA has a claim for $15,000 for amenity package that was not provided as required contractually. |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| TOUSA Homes, Inc. | | Gary Barnhill, owner<br>Master Drywall & Textures, Inc.<br>1124 Kings Road<br>Neptune Beach, FL 32266<br>Fed ID #20-1597335 | Barnhill, the owner of Master Drywall &Textures, Inc., left town with no forwarding information.  TOUSA had to pay his vendors who had valid liens on our properties.  TOUSA has a claim for reimbursement, costs, and damages in the amount of $12,900.53. |
| TOUSA Homes, Inc. | | LLV-1, LLC<br>Credit Suisse Cayman Islands | Las Vegas Paving filed a lawsuit which includes a lien foreclosure action seeking nearly $1.3 million for equipment, labor and material to build the Woodside community in Henderson (Lake Las Vegas).  TOUSA recorded a Notice of Lien against LLV-1, LLC in the amount of $7,558,603.48 in January 2008.  Soon thereafter TOUSA received a Notice to Lien Claimants to File and Serve Statement of Facts Constituting Lien in the Las Vegas Paving litigation and inviting others with liens on the same property to join in the lawsuit so all liens foreclosed together.  In May 2008 TOUSA filed its joinder in that action entitles "Statement of Facts Constituting Lien" along with a Counterclaim against LLV-1,LLC for breach of contract, and a Third-Party Complaint against Credit Suisse Cayman Islands alleging that TOUSA's mechanic's lien has priority over their Deed of Trust.  LLV-1 has filed bankruptcy. |
| TOUSA Homes, Inc. | | LLV-1, LLC | TOUSA did not close on Phase 2 of the Bluffs project because LLV-1 had not satisfied the conditions precedent. LLV-1 is seeking to obtain TOUSA's deposit in the amount of $2,025,000 and damages in an unspecifiied amount. TOUSA contends it is entitled to the $2,025,000 deposit held in escrow and to the reconveyance of a portion of the land. LLV-1 has filed bankruptcy. |
| TOUSA Homes, Inc. | TOUSA Homes, Inc.v Willis Slagles Willis, LLC | Willis Slagles Willis, LLC | Tousa Homes, Inc. is litigating a claim for the return of the deposit under a contract to purchase land from Willis Slagles Willis, LLC (WSW) which WSW breached by failing to meet one of the conditions precedent.  After a bench trial, the Court found in WSW's favor. Tousa has appealed the ruling to Maryland's Court of Special Appeals. |
| TOUSA Homes, Inc. | | Haymarket North LLC | Failure to complete land development improvements. |
| TOUSA Homes, Inc. | | Port Potomac Associates, LLC | Failure to complete land development improvements. |
| TOUSA Homes, Inc. | | Parks at Piedmont LLC | Failure to complete land development improvements. |
| TOUSA Homes, Inc. | | Piedmont LC | Failure to complete land development improvements. |
| TOUSA Homes, Inc. | | KSI Services, Inc | Failure to complete land development improvements. |
| TOUSA Homes, Inc. | Thomas E. Feher v.  Technical Olympic USA, Inc. v. Delaware Siding; C.A. No.: 07C-08-023 ESB | Westfield Insurance<br>Delaware Siding | Feher filed a complaint due to an injury suffered at a construction project/property owned by Tousa Homes, Inc.  TOUSA filed a third-party complaint for indemnification against Feher's employer, Delaware Siding (a TOUSA subcontractor) and Westfield Insurance (its insurer) for indemnification. |
| Newmark Homes, L.P. | MetLife Auto & Home A/S/O Jerry DePriest and Susan DePriest; General Sessions Court for Williamson County, No. 23893A | Jerry DePriest and Susan DePriest | Newmark Homes, LP may have a counterclaim against Jerry DePriest and Susan DePriest for recovery of Newmark's attorney fees and litigation expenses in the claim against Newmark Homes (MetLife Auto & Home A/S/O Jerry DePriest and Susan DePriest; General Sessions Court for Williamson County, No. 23893A). |
| Newmark Homes, L.P. | Jay Welch and Margaret Welch v. Newmark Homes, L.P.; Chancery Court for Davidson County, No. 07-708-IV | Jay Welch and Margaret Welch | Newmark Homes, LP may have a counterclaim against Jay Welch and Margaret Welch for recovery of Newmark Homes' attorney fees and litigation expenses in the claim against Newmark Homes (Jay Welch and Margaret Welch v. Newmark Homes, L.P.; Chancery Court for Davidson County, No. 07-708-IV). |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| Newmark Homes, L.P. | State Farm A/S/O Robin Clark v. Newmark Homes, L.P.; General Sessions Court for Williamson County, No. 26070A | Civil Constructors, Inc. | Newmark Homes, LP has a claim against Civil Constructors for indemnification for any damages, attorney fees, and litigation expenses Newmark Homes may incur as a result of the subrogation claim filed by State Farm Insurance against Newmark for $11,352.56 in property damage. |
| Newmark Homes, L.P. | GTI South, Inc. v. Bric Contractors, LLC, Newmark Homes, L.P., Trinity Land Group, LLC, Civil Site Design Group, PLLC and Greenbank f/d/a Cumberland Bank; Chancery Court for Davidson County, No. 08-1050-III | Bric Contractors, LLC; Trinity Land Group, LLC | Newmark Homes, LP has a claim against Bric Contractors and Trinity Land Group for indemnification of any damages, attorney fees and litigation expenses Newmark Homes may incur as a result of the claim made by GTI against Newmark Homes for $22,025.00. |
| Newmark Homes, L.P. | | Trillium Farms, L.P. and Trillium Ventures, Inc. | Newmark Homes is considering the assertion of a claim against Trillium Farms and Trillium Ventures for the remedies available under the Purchase and Sale and Development Agreement as a result of Trillium Venture's non-performance of its obligations under the Agreement. |
| TOUSA Homes, Inc. | | Florida Pools | TOUSA has a claim for damages of $15,000 against Florida Pools for warranty work they refuse to perform. |
| TOUSA Homes, Inc. | | Franklin, Hart & Reid and Markel Shand, Inc. | The surveyor used by TOUSA Homes, Inc., Franklin, Hart & Reid, in one of its subdivisions, incorrectly interpreted a prior survey, or the notes of a prior surveyor, and mistook the footprint for a home within the setback.  TOUSA incured damages of about $55,000.00 as a result of this mistake.  TOUSA made a demand against the errors and omissions carrier for the surveyor (Markel Shand, Inc). |
| TOUSA Homes, Inc. | E.J. Strickland Construction, Inc. v. International Fidelity Insurance Company and Tousa Homes, Inc., d/b/a Engle Homes/Orlando, Inc. Seminole County Case Number: 06-CA-1656-15-G | E.J. Strickland Construction, Inc. | TOUSA Homes, Inc. has filed a Counterclaim in this matter for approximately $200,000.00 against E.J. Strickland ("Strickland"), a site contractor.  TOUSA was forced to remove Strickland from the job because of faulty work and hire another site contractor to complete Strickland's work.  TOUSA's damages are for costs associated with the hiring of the replacement contractor, remediating the work improperly performed by Strickland, etc. |
| TOUSA Homes, Inc. | SRP v. McCloud Investors, LCC, et al. [Salt River Project Agricultural Improvement and Power District v. McCloud Investors, LLC; Maricopa Stanfield Irrigation and Drainage District; TOUSA Homes, Inc. d/b/a Engle Homes; Red River/Ed Dorado 6500, LLC; Rancho Sierra Vista, LLC; Engle/Red River, LLC; ACCO Finance Co.; MMA Capital Corp.], Pinal County Superior Court case no. CV2007-01868. | Salt River Project Agricultural Improvement and Power District v. McCloud Investors, LLC | TOUSA has a claim for a portion of the $323,000 condemnation proceeds in the condemnation action started by Salt River Project Agricultural Improvement by virtue of its joint development and related agreements with McCloud Investors, LLC. |
| TOUSA Homes, Inc. | | Terry Landa | Terry Landa has made numerous construction defect claims against TOUSA, some of them to the press.  TOUSA may have a defamation claim against Mr. Landa. |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| Newmark Homes, L.P. | Cause No. 2006-CI-00301; Jose Isidro Perez v. Newmark Homes L.P., D&S Roofing, et al.; In the 225th Judicial District Court of Bexar County, Texas | Jose Isidro Perez | Newmark Homes, L.P. has a claim for indemnity and contribution from D&S Roofing in the personal injury claim filed by Jose Isidro Perez.  D&S is currently defending this claim. |
| TOUSA Homes Florida, L.P. | Cause No. 502006CA003320: Herculano Juarez v. TEP Holding, Inc., f/k/a Transeastern Properties, Inc., and Construction Services & Consultants, Inc., and J.A.A. Construction, Inc. | Construction Services & Consultants, Inc. | TOUSA Homes Florida, L.P., as successor by merger to EH/Transeastern, LLC may have claims for contribution, common law and/or contractual indemnity against this entity pursuant to the Herculano Juarez lawsuit, a claim for bodily injuries sustained in a construction site accident. |
| TOUSA Homes Florida, L.P. | Cause No. 502006CA003320: Herculano Juarez v. TEP Holding, Inc., f/k/a Transeastern Properties, Inc., and Construction Services & Consultants, Inc., and J.A.A. Construction, Inc. | J.A.A. Construction, Inc. and Sunshine Masonry | TOUSA Homes Florida, L.P., as successor by merger to EH/Transeastern, LLC may, in the future, have claims for contribution, common law and/or contractual indemnity against J.A.A. Construction, Inc. and Sunshine Masonry pursuant to the Herculano Juarez lawsuit, a claim for bodily injuries sustained in a construction site accident. |
| TOUSA Homes Florida, L.P. | Causeway Lumber Company, Inc. v. TEP Holdings, Inc., f/k/a Transeastern Properties of South Florida, Inc. (NYGW&L File No. 7967-18726). | Causeway Lumber Company | Causeway Lumber's complaint seeks recovery of approximately $21,000.00 of invoices they claim remain unpaid.  TOUSA Homes Florida, L.P. ("TOUSA"), as successor by merger to EH/Transeastern, LLC, filed a Counterclaim for recovery of back charges in an amount equal to or in excess of $28,398.78.  TOUSA also raised, as an affirmative defense, that Causeway Lumber provided non-conforming goods. |
| TOUSA Homes, Inc. | Tousa Homes, Inc. v. American Residential Services of Florida, Inc., Case No. 50-2007-CA-019870-AF, pending in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, File No. 13157.099100 | American Residential Services of Florida, Inc. | Tousa filed a complaint against American Residential Services, an HVAC contractor (ARS), seeking indemnification, contribution and damages for breach of contract and negligence in connection with the settlement of a claim filed by Paul and Jodi Prescott. |
| TOUSA Homes, Inc. | The Zuckerman Group, Inc. v. Tousa Homes, Inc. and Universal Land Title, Inc., Case No. 07-09880-CA-09 pending in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida, File No. 13157.066200. | The Zuckerman Group, Inc. | Tousa filed a counterclaim against the Zuckerman Group, Inc. for breach of contract and promissory estoppel and has a claim to the $850,000.00 deposit posted by Zuckerman in connection with the Agreement to Purchase dated June 1, 2005. |
| TOUSA Homes, Inc. | | United Drywall and Stucco | TOUSA has claims against United Drywall and Stucco for damages incurred by TOUSA as a result of United Drywall's use of faulty construction materials. |
| TOUSA Homes, Inc. | | United Framers | TOUSA has claims against United Framers for damages incurred by TOUSA as a result of United Framerl's use of faulty construction materials. |
| TOUSA Homes, Inc. | | Sun Realty | TOUSA has a claim for return of advance commissions paid to Sun Realty in connection with home purchase agreements customers subsequently defaulted on |
| TOUSA Homes, Inc. | | Mark Allen and Becker & Poliakoff (the latter as escrow agent) | TOUSA demanding release of escrow deposit from Becker & Poliakoff (escrow agent) for Mark Allen's failure to close as required by contract. |

**TOUSA Debtor - Current and Potential Third-Party Claims**

| | | | |
|---|---|---|---|
| TOUSA Homes, Inc. | | Prince Plumbing, Inc. | TOUSA has a claim against Prince Plumbing, Inc. for damages arising out of not installing plumbing in accordance with building code (Back Pitched). |
| TOUSA Homes, Inc. | | Caloosa Cooling, LLC | TOUSA has a claim against Caloosa Cooling, LLC for damages arising out of faulty work (HVAC condensate line not connected behind wall). |
| TOUSA Homes Florida, L.P. | | Specialized Services, Inc. | TOUSA has a counterclaim in the lawsuit filed by Specialized Services, Inc. (SSI) for failure by SSI to complete the work in accordance with the contract and for remediation work necessary in connection with faulty work performed by SSI. |
| TOUSA Homes Florida, L.P. | | S&S Pools, Inc. | S&S Pools, Inc. (S&S) failed to complete the construction for which it was paid in excess of $145,000.00.  They subsequently filed Chapter 7 Bankruptcy.  To date, several claims of lien have been filed by subcontractors of S&S pools, against the properties for which S&S received payment.  TOUSA has filed a Proof of Claim in S&S's Bankruptcy, in the amount of $145,000.00 and received an order to lift the automatic stay.  TOUSA also has a claim of fraudulent transfer against the individual officers of S&S. |
| TOUSA Homes Florida, L.P. | | American Access Controls. Inc. | TOUSA has a claim for the return of the deposit in the amount of  $15,698.00 held by American Access Controls, Inc. |
| TOUSA, Inc. | | Greenberg Traurig (and the individual lawyers involved) | Potential claim  for professional negligence arising from the Transeastern acquisition. |
| TOUSA Homes, Inc. | | Catherine Adams | Potential claim for attorney fees incurred as Defendant in underlying litigation.  Catherine Adams v. Engle/TOUSA, Loudoun County Circuit Court |
| TOUSA Homes, Inc. | | Colorado Taxing Authorities | TOUSA has a number of tax bill appeals against a number of counties in Colorado on the ground that the assessed value exceeds the market value of the real property assessed. |

**EXHIBIT G-3**

**TOUSA, Inc. and Subsidiaries**
**Open & Pending Tax Claims**
**As of 11/1/08**

| Asserted/Filed Against | Claimant | Status | Description of the Claim |
|---|---|---|---|
| United States Treasury | TOUSA, Inc. | Open/Not Yet Filed | Carryback of capital loss from the year ended 12/31/06 to the year ended 12/31/03 |
| United States Treasury | TOUSA, Inc. | Open/Not Yet Filed | Carryback of the Credit for Employers Affected by Hurricane Willma from the year ended 12/31/05 to the year ended 12/31/04 |
| State of Virginia | TOUSA Homes, Inc. | Filed/Pending | Carryback of 2007 Net Operating Loss to Years Ended 12/31/05 & 12/31/06 |
| State of Pennsylvania | Tousa Homes, Inc. | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Texas | Tousa Homes, Inc. | Filed | Estimated Franchise Taxes on Behalf of TOUSA, Inc. and subsidiaries |
| State of Pennsylvania | Tousa Associate Services Company | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Maryland | Tousa Associate Services Company | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Florida | Tousa Associate Services Company | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Delaware | Tousa Associate Services Company | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Tennessee | Tousa Associate Services Company | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Tennessee | Newmark Homes Purchasing, L.P.. | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |
| State of Tennessee | Newmark Homes, L.P. | Filed | Overpayment of 2007 State Income Taxes Applied to Claimant's 2008 Estimated Tax Payments and Estimated Tax Payments Made in 2008 |