THIS DISCLOSURE STATEMENT IS BEING SUBMITTED
FOR APPROVAL BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT.  ACCORDINGLY, THIS IS NOT A SOLICITATION OF
ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES
OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-10928-JKO |
| TOUSA, INC., *et al.*, | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION
## OF TOUSA, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS
## IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### July 16, 2010 VERSION OF PROPOSED DISCLOSURE STATEMENT

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
Natalie E. Levine (New York Bar No. 4617288)
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

**ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP**
Lawrence S. Robbins  (D.C. Bar No. 420260)
Michael Waldman (D.C. Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**

Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile:  (305) 789-3395

*Co-counsel to the Official Committee of Unsecured Creditors of TOUSA, Inc.,* et al.

Dated:  July 16, 2010

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ...................................................................................1
        A.      The Plan Process ...............................................................................1
        B.      The Official Committee of Unsecured Creditors of TOUSA, Inc., et al. ...............1
        C.      Overview of the Plan .........................................................................2
        D.      The Committee Action and Pending Litigation ...............................3
        E.      Summary of Classification and Treatment of Claims and Equity Interests
                Under the Plan and Classes Entitled to Vote on the Plan.....................4
        F.      Voting on, and Confirmation of, the Plan .........................................5
                1.      The Voting Record Date.........................................................5
                2.      The Voting Deadline .............................................................5
                3.      The Plan Objection Deadline .................................................5
                4.      The Confirmation Hearing ....................................................5

II.     GENERAL INFORMATION AND DISCLAIMERS ........................................6
        A.      About this Disclosure Statement.......................................................6
        B.      Why You are Receiving this Document..............................................6
        C.      Persons To Contact for More Information ..........................................8
        D.      Disclaimers .........................................................................................8

III.    QUESTIONS AND ANSWERS REGARDING THE DISCLOSURE
        STATEMENT AND JOINT PLAN.................................................................10
        A.      What is Chapter 11?..........................................................................10
        B.      Am I entitled to vote on the Plan?  What will I receive if the Plan is
                consummated?..................................................................................11
        C.      What happens to my recovery if the Plan is not confirmed or does not
                become effective? ...........................................................................11
        D.      If the Plan provides that I get a distribution, do I get it upon Confirmation
                or when the Plan goes effective, and what do you mean when you refer to
                "Confirmation" and the "Effective Date"? ......................................11
        E.      How are the Plan Debtors obtaining the Cash and other value required to
                make distributions to satisfy Claims? .............................................11
        F.      Are there risks to owning Liquidation Trust Interests upon emergence
                from bankruptcy?.............................................................................12
        G.      Is there potential litigation related to the Plan? ...........................12
        H.      What is included in the solicitation packages to be sent to holders of
                Claims who are eligible to vote on the Plan?...................................12
        I.      Will there be releases granted to parties in interest as part of the Plan?...............13
        J.      Why is TOUSA Homes, L.P. not a "Plan Debtor?" ..........................14
        K.      What is the deadline to vote on the Plan? .......................................14
        L.      How do I vote for or against the Plan? ............................................14
        M.      Why is the Bankruptcy Court holding a Confirmation Hearing? ...........14
        N.      When is the Confirmation Hearing set to occur?.............................15
        O.      What is the deadline to object to Confirmation? ............................15

i

|   | P. | What role does the Bankruptcy Court play after the Confirmation Hearing?...................................................................................15 |
|---|---|---|
|   | Q. | What is the effect of Confirmation on the Plan Debtors' businesses?...................15 |
|   | R. | Does the Committee recommend voting in favor of the Plan?............................16 |
| IV. | | BACKGROUND CONCERNING THE DEBTORS .........................................16 |
|   | A. | The Debtors' Corporate History..................................................................16 |
|   | B. | The Debtors' Business Operations...............................................................17 |
|   |   | 1.     Homebuilding Operations.................................................................17 |
|   |   | 2.     Employees....................................................................................17 |
|   |   | 3.     Land Acquisition............................................................................17 |
|   |   | 4.     Construction..................................................................................18 |
|   |   | 5.     Non-debtor Financial Service Entities...............................................19 |
|   | C. | The Debtors' Capital Structure ....................................................................20 |
|   |   | 1.     Secured Bank Debt ........................................................................20 |
|   |   | 2.     Unsecured Notes ...........................................................................21 |
|   |   | 3.     Preferred Stock..............................................................................22 |
| V. | | THE DEBTORS' CHAPTER 11 CASES ...........................................................22 |
|   | A. | Events Leading to the Chapter 11 Cases .......................................................22 |
|   |   | 1.     Adverse Market Conditions .............................................................22 |
|   |   | 2.     The Transeastern Settlement ...........................................................23 |
|   |   | 3.     Liquidity Difficulties and Prepetition Negotiations with Creditors...........28 |
|   | B. | Other Prepetition Developments..................................................................29 |
|   |   | 1.     NYSE Delisting .............................................................................29 |
|   |   | 2.     SEC Inquiry ..................................................................................29 |
|   | C. | Commencement of the Chapter 11 Cases .......................................................29 |
|   | D. | "First Day" Relief ...................................................................................30 |
|   | E. | The Plan Process .....................................................................................31 |
|   |   | 1.     Initial Chapter 11 Restructuring Efforts.............................................31 |
|   |   | 2.     The First Plan and Disclosure Statement ...........................................31 |
|   |   | 3.     The Alternative Plan ......................................................................32 |
|   |   | 4.     The Debtors' Wind Down Plan ........................................................33 |
|   |   | 5.     Exclusivity ...................................................................................33 |
|   | F. | Significant Contested Matters During the Chapter 11 Cases................................34 |
|   |   | 1.     Financing the Chapter 11 Cases .......................................................34 |
|   |   | 2.     Litigation and Adversary Proceedings ...............................................39 |
|   |   | 3.     Indemnification Obligations with Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases ...........59 |
|   |   | 4.     Review and Analysis of Prepetition Intercompany Transactions ..............60 |
|   | G. | Other Developments During the Chapter 11 Cases ...........................................61 |
|   |   | 1.     Filing of the Debtors' Schedules and SOFAs, Bar Dates and the Claims Process ............................................................................61 |
|   |   | 2.     Employee Compensation and Changes in Management...........................63 |
|   |   | 3.     Sales of Certain Assets ...................................................................65 |
|   |   | 4.     Acquisition of Real Property ...........................................................69 |
|   |   | 5.     Changes in Certain Joint Ventures and Limited Liability Companies.....................................................................................70 |

|     |     | 6. | Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property | 77 |
|     |     | 7. | The Home Warranty Program | 78 |
|     |     | 8. | Deregistration Under the Securities and Exchange Act of 1934 | 79 |
| VI. |     | DESCRIPTION OF THE CHAPTER 11 PLAN | | 79 |
|     | A. | Overview | | 79 |
|     |     | 1. | Application of Intercreditor Agreement | 79 |
|     |     | 2. | Application of Disgorgement Amounts to the First Lien Revolver Claims | 82 |
|     | B. | Classification and Treatment of Claims Against and Equity Interests in the Plan Debtors | | 82 |
|     |     | 1. | Treatment of Unclassified Administrative and Priority Claims | 84 |
|     |     | 2. | Treatment of Classified Claims Against and Equity Interests in the Plan Debtors | 86 |
|     | C. | Means for Implementation of the Plan | | 97 |
|     |     | 1. | Corporate Existence | 97 |
|     |     | 2. | The Transeastern Reimbursement | 97 |
|     |     | 3. | The Liquidation Trust | 98 |
|     |     | 4. | Funding Expenses of the Liquidation Trust | 100 |
|     |     | 5. | Closing of the Plan Debtors' Chapter 11 Cases | 100 |
|     |     | 6. | Method of Distribution Under the Plan | 101 |
|     |     | 7. | Monetization of Assets | 101 |
|     |     | 8. | Books and Records | 101 |
|     |     | 9. | Reporting Duties | 101 |
|     |     | 10. | Tax Obligations | 102 |
|     |     | 11. | Valuation | 102 |
|     |     | 12. | Postpetition Intercompany Claims | 102 |
|     |     | 13. | Segregated Accounts at TOUSA | 103 |
|     |     | 14. | Prepetition Intercompany Claims | 103 |
|     | D. | Distributions | | 103 |
|     |     | 1. | Single Satisfaction | 103 |
|     |     | 2. | Distributions on Account of Claims Allowed as of the Effective Date | 103 |
|     |     | 3. | Distributions on Account of Claims Allowed After the Effective Date | 104 |
|     |     | 4. | Disallowance of Claims | 107 |
|     |     | 5. | Delivery of Distributions | 107 |
|     |     | 6. | Timing and Calculation of Amounts to be Distributed | 109 |
|     |     | 7. | Setoffs and Withholdings | 109 |
|     |     | 8. | Fractional, De Minimis and Undeliverable Distributions | 109 |
|     |     | 9. | Claims Paid or Payable by Third Parties | 110 |
|     |     | 10. | Federal Income Tax Treatment of Liquidation Trust | 111 |
|     |     | 11. | Surrender of Cancelled Instruments or Securities | 114 |
|     |     | 12. | Employment Agreements | 114 |
|     |     | 13. | Professionals Fee Accounts | 114 |
|     |     | 14. | Exemption from Certain Transfer Taxes | 114 |

|       | 15. | Cancellation of Notes and Equity Interests | 115 |
|       | 16. | Satisfaction of Obligations Under the Loan Documents | 116 |
| E.    |     | Treatment of Executory Contracts, Unexpired Leases and Postpetition Contracts | 116 |
|       | 1.  | Assumption and Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts | 116 |
|       | 2.  | Claims on Account of the Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts | 117 |
|       | 3.  | Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan | 118 |
| F.    |     | Conditions Precedent to Confirmation and Consummation of the Plan | 118 |
|       | 1.  | Conditions Precedent to Confirmation | 118 |
|       | 2.  | Conditions Precedent to Consummation | 119 |
|       | 3.  | Waiver of Conditions | 119 |
|       | 4.  | Effect of Non-occurrence of the Effective Date | 119 |
| G.    |     | Settlement, Release, Injunction and Related Provisions | 119 |
|       | 1.  | Compromise and Settlement | 120 |
|       | 2.  | Plan Debtor Releases and Other Agreements | 120 |
|       | 3.  | Exculpation | 121 |
|       | 4.  | Preservation of Rights and Causes of Action | 121 |
|       | 5.  | Injunction | 122 |
| H.    |     | Binding Nature of the Plan | 123 |
| I.    |     | Retention of Jurisdiction | 123 |
| J.    |     | Miscellaneous Provisions | 125 |
|       | 1.  | Payment of Indenture Trustees' Fees | 125 |
|       | 2.  | Dissolution of the Committee | 125 |
|       | 3.  | Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P. | 126 |
|       | 4.  | Modification of the Plan | 126 |
|       | 5.  | Filing of Additional Documents | 126 |
|       | 6.  | Revocation of Plan | 126 |
|       | 7.  | Successors and Assigns | 127 |
|       | 8.  | Reservation of Rights | 127 |
|       | 9.  | Further Assurances | 127 |
|       | 10. | Severability | 127 |
| VII.  |     | SOLICITATION AND VOTING PROCEDURES | 127 |
| A.    |     | Overview | 127 |
| B.    |     | Voting Dates and Deadlines | 128 |
|       | 1.  | The Voting Record Date | 128 |
|       | 2.  | The Voting Deadline | 128 |
| C.    |     | Distribution of the Solicitation Package | 128 |
|       | 1.  | Voting Classes | 128 |
|       | 2.  | Temporary Allowance of Claims for Voting Purposes | 130 |
| D.    |     | Requirements for Acceptance of the Plan | 130 |
|       | 1.  | Acceptance by Voting Classes | 130 |
|       | 2.  | Presumed Rejection and "Cram Down" | 131 |
| E.    |     | Completion of Ballots | 131 |

VIII.   CONFIRMATION OF THE PLAN ...................................................................131
    A.   Confirmation Hearing ...........................................................................131
    B.   Objections to Confirmation...................................................................132
    C.   Overview of Statutory Requirements to Confirm the Plan....................133
    D.   Specific Statutory Confirmation Requirements ....................................134
        1.   Overview of the Best Interests of Creditors Test/Liquidation
           Analysis.......................................................................................134
        2.   Best Interests of Creditors Test ..................................................135
        3.   Feasibility....................................................................................136
        4.   Acceptance by Impaired Classes .................................................136
        5.   Confirmation Without Acceptance by All Impaired Classes .......137
        6.   Classification of Claims and Equity Interests Under the Plan.....138

IX.   RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND
    CONSUMMATION OF THE PLAN..........................................................139
    A.   Bankruptcy Considerations...................................................................139
        1.   Parties in Interest May Object to the Classification of Claims and
           Equity Interests ...........................................................................139
        2.   Failure to Satisfy Voting Requirements .....................................139
        3.   Failure to Secure Confirmation of the Plan ...............................139
        4.   Nonconsensual Confirmation.......................................................140
        5.   Stay Pending Appeal ...................................................................140
        6.   The Plan Debtors, the Committee or the Liquidation Trustee May
           Object to the Amount or Classification of a Claim....................140
        7.   The Actual Allowed Amounts of Claims May Differ from the
           Estimated Claims and Adversely Affect the Percentage Recovery
           on Unsecured Claims ...................................................................140
        8.   Administrative Expenses and Priority Claims May Exceed
           Expected Levels ..........................................................................141
        9.   Liquidation Trust Cause of Action Recoveries and Results are
           Speculative and Uncertain ..........................................................141
    B.   Risk Factors Associated with the Value of the Liquidation Trust Interests
        to be Issued Under the Plan ..................................................................141
        1.   Recent Dislocation in the Financial Markets and Deterioration of
           the Mortgage Lending and Financing Industries .......................141
        2.   Certain Tax Implications of the Plan Debtors' Bankruptcy May
           Increase the Tax Liability of the Liquidation Trust....................142
    C.   Risks Associated with the Debtors' Business Operations....................142
        1.   General Homebuilder Industry Downturn ...................................142
        2.   Unexpected Natural Disasters or Weather Conditions..............142
        3.   Dependence on Subcontractors....................................................143
        4.   Product Liability and Warranty Claims ......................................143
    D.   Liquidation Under Chapter 7 ...............................................................143
    E.   Alternatives to the Proposed Plan ........................................................143

X.   CERTAIN SECURITIES LAW MATTERS .............................................144
    A.   Issuance of Liquidation Trust Interests ................................................144
    B.   Obligations Under the Securities Exchange Act of 1934, as Amended..............144

XI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................144
     A.    Introduction..........................................................................................144
     B.    Federal Income Tax Consequences to Plan Debtors............................145
     C.    Federal Income Tax Consequences to Holders of Claims ...................146
          1.    Consequences to Holders of TOUSA Class 1A Claims and Class
              1B Claims and Conveying Subsidiaries Class 1 Claims..........................146
          2.    Consequences to Holders of TOUSA Class 3 Claims, Conveying
              Subsidiaries Class 2 Claims and Beacon Hill Class 1 Claims................146
          3.    Consequences to Holders of TOUSA Class 4 Claims, Conveying
               Subsidiaries Class 3 Claims and Beacon Hill Class 2 Claims and
              Class 3 Claims........................................................................................147
          4.    Consequences to Holders of TOUSA Class 5 Claims and
              Conveying Subsidiaries Class 4 Claims .................................................147
          5.    Accrued but Unpaid Interest ...................................................................148
          6.    Market Discount.......................................................................................149
          7.    Limitation on Use of Capital Losses.......................................................149
     D.    Withholding and Reporting..................................................................149

**EXHIBITS**

**Exhibit A - Plan of Liquidation**

**Exhibit B - Glossary**

**Exhibit C - Disclosure Statement Order**

**Exhibit D - Classes of Claims Against and Equity Interests in the Plan Debtors**

**Exhibit E - Liquidation Analysis**

# I.    EXECUTIVE SUMMARY[1]

## A.    THE PLAN PROCESS

The Plan described in this Disclosure Statement (and attached hereto as <u>Exhibit A</u>) is the culmination of the Committee's efforts to increase the value available for the Debtors' unsecured creditors.  Over the course of the last twenty-four months, the Committee has engaged in extensive litigation against the Debtors' Prepetition Secured Lenders and the Transeastern Lenders to avoid certain prepetition transfers to the Prepetition Secured Lenders and the Transeastern Lenders.  Although the Committee, the Debtors and the Prepetition Secured Lenders made three attempts at developing a consensual plan of reorganization, ongoing litigation among the Debtors' major creditor groups and against the Debtors' officers and directors has complicated the plan process and created difficult negotiating dynamics. Mixed incentives, combined with the macroeconomic challenges facing the Debtors, have rendered each of the Debtors' previous plans obsolete before they could be finalized. Therefore, upon the Committee's successful prosecution of the Committee Action, the Committee began to develop the proposed Plan that will allow distributions to be made to holders of Allowed Claims against the Plan Debtors' Estates.

## B.    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., <u>ET AL.</u>

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable.  Accordingly, on February 13, 2008, the U.S. Trustee appointed the Committee [D.E. # 185].  The Committee is currently comprised of the following members:

| | |
|---|---|
| Wilmington Trust Company<br>520 Madison Avenue, 33rd Floor<br>New York, NY 10022 | HSBC Bank USA, N.A.<br>10 East 40th Street, 14th Floor<br>New York NY 10016 |
| Capital Research and<br>Management Company<br>630 Fifth Avenue, 36th Floor<br>New York, NY 10111 | SMH Capital Advisors, Inc.<br>4800 Overton Plaza, Suite 300<br>Ft. Worth, TX  76109 |
| Geotek, Inc./Geotek Insite, Inc.<br>6835 S. Escondido Street, Suite A<br>Las Vegas, NV  89119 | SelectBuild Arizona<br>c/o BMHC<br>Four Embarcadero Center, Suite 3250<br>San Francisco, CA 94111 |

The Committee has retained the following professionals: (a) Akin Gump Strauss Hauer & Feld LLP, as legal counsel [D.E. # 657]; (b) Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., as local counsel [D.E. # 804]; (c) Jefferies & Co., Inc, as financial advisor and

---

[1] Capitalized terms used but not defined in the Executive Summary shall have the meaning provided to them in the Glossary, attached hereto as <u>Exhibit B</u>, or as defined in the body of the Disclosure Statement.

investment banker [D.E. # 1701]; (d) Moelis & Company LLC, as financial advisor and investment banker [D.E. # 1702]; (e) J.H. Cohn LLP, as forensic accountants and advisors [D.E. # 1090]; and (f) Robert Charles Lesser & Co, as real estate advisors [D.E. # 1091]. The Committee also retained the law firm of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, as conflicts counsel with respect to the prosecution of the Committee Action (see section V.F.2.a, below) [D.E. # 1595].

As required by the Bankruptcy Code, the Committee is the fiduciary representative of the holders of Unsecured Claims against the thirty-nine Debtors' Estates. Specifically, the Committee is composed of the Indenture Trustees for each of the Debtors' bond issuances, unsecured bondholders and trade creditors.

## C.    OVERVIEW OF THE PLAN

The Plan contemplates the timely and orderly monetization of the Plan Debtors' remaining assets. Other than Cash and certain Causes of Action, only limited assets remain in the Plan Debtors' Estates at this time, and the Plan anticipates that all such assets, including all Causes of Action, will be transferred to a Liquidation Trust on the Effective Date for the benefit of unsecured creditors. The Liquidation Trustee, at the direction of the Liquidation Trust Committee, will supervise the liquidation of such assets, including the prosecution of Causes of Action and the distribution of Liquidation Trust Interests and/or Cash to the holders of Allowed Claims. The Liquidation Trustee will be appointed by the Committee at or prior to the Confirmation Hearing.

In order to resolve certain of the pending litigation, the Plan proposes to relieve the First Lien Term Loan Lenders and Second Lien Term Loan Lenders of certain disgorgement obligations provided for in the Decision through the enforcement of the Intercreditor Agreement between the First Lien Agents, the Second Lien Term Loan Agent and the Debtors. Specifically, the Plan provides that, in lieu of disgorgement, all payments (i) previously made to the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders or (ii) in respect of the First Lien Term Loan Credit Agreement or the Second Lien Term Loan Credit Agreement that are required to be disgorged pursuant to the Decision will be deemed to have been made to the First Lien Revolver Lenders and redistributed in accordance with the waterfall provisions of the Intercreditor Agreement. Based on this reallocation, the remaining First Lien Revolver Claims will be paid on the Distribution Date from (i) the 2007 Federal Tax Refund, (ii) a share of the Net Proceeds of the Encumbered Assets of TOUSA and (iii) Cash from the assets of the Conveying Subsidiaries, to the extent applicable and as set forth in the Plan. Such distributions will result in the First Lien Revolver Claims being paid in full pursuant to the Plan.

Unsecured creditors (other than unsecured creditors at Beacon Hill, who will receive Cash) will receive Liquidation Trust Interests in the series corresponding to the Plan Debtor against which such unsecured creditor holds a Claim.[2] Accordingly, there will be thirty-seven

---

[2] As there are no assets at TOUSA Homes, L.P. and, therefore, no plan can be confirmed, the Plan does not include a liquidation of TOUSA Homes, L.P. The Committee anticipates filing a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of the Confirmation Hearing. The Debtors that will be liquidated through this joint Plan are referred to herein as the "Plan Debtors."

different series of Liquidation Trust Interests – one for each Plan Debtor (other than Beacon Hill) – entitling unsecured creditors to Cash distributions from the Liquidation Trust as the remaining assets of the Plan Debtors against which they hold Allowed Claims are liquidated.

Except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Committee), the Liquidation Trust shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date. Initial distributions of Cash on account of the Liquidation Trust Interests will be made on or as soon as practicable after the Effective Date.

## D.    THE COMMITTEE ACTION AND PENDING LITIGATION

In July 2007, TOUSA caused the Conveying Subsidiaries to borrow $500 million in secured debt and to pay the proceeds of such loans to the creditors of the Transeastern JV in settlement of pending litigation against the Transeastern JV, TOUSA, and TOUSA Homes, L.P. The Conveying Subsidiaries were not defendants in the litigation, nor were they liable on the Transeastern JV's bank debt. Nevertheless, TOUSA required the Conveying Subsidiaries to take on $500 million of obligations at a time when the Conveying Subsidiaries were already suffering financial distress.

Shortly after the Petition Date, the Committee sought standing to bring litigation to avoid the Prepetition Secured Lenders' Claims and related Liens at the Conveying Subsidiaries, alleging, among other things, that the Conveying Subsidiaries (i) were insolvent both before and after the Transeastern Settlement and (ii) did not receive reasonably equivalent value for the transfers in connection with the Transeastern Settlement. Based on the foregoing, the Committee asked the Bankruptcy Court to unwind the Transeastern Settlement. The Committee also asked the Bankruptcy Court to avoid the Liens of the Prepetition Secured Lenders on the 2007 Federal Tax Refund as a preference under the Bankruptcy Code.

On October 30, 2009, the Bankruptcy Court entered the Decision in the Committee Action, avoiding the Claims and Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders as to the Conveying Subsidiaries. The Decision also determined that the Lien on the 2007 Federal Tax Refund constituted a preference, and the First Lien Term Loan Lenders and Second Lien Term Loan Lenders could therefore not assert a Lien against such funds. Among other things, the Decision ordered the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders to disgorge all payments received under their respective Loan Documents, plus prejudgment interest. In order to fully unwind the Transeastern Settlement, the Bankruptcy Court also ordered the Transeastern Lenders to disgorge certain funds received pursuant to the Transeastern Settlement. The monetary portions of the Decision are stayed pending appeal. The Committee Action as to the First Lien Revolver Lenders was dismissed before trial and such dismissal is also on appeal in the District Court.

The Committee is currently pursuing additional litigation against other parties to the Transeastern Settlement and against the Plan Debtors' directors and officers in an effort to compensate the Plan Debtors' creditors for damages caused by the Transeastern Settlement. Pursuant to the Plan, the Liquidation Trust would continue these Causes of Action for the benefit

of certain of the Liquidation Trust Beneficiaries.  Additional recoveries from these Causes of Action will be distributed in accordance with the Plan as described below.

E.    **SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND CLASSES ENTITLED TO VOTE ON THE PLAN**

The Plan consists of separate chapter 11 plans for each of the Plan Debtors.  The treatment of the Classes of Claims against each of the Plan Debtors is described in three parts: (i) Claims against TOUSA; (ii) Claims against the Conveying Subsidiaries; and (iii) Claims against Beacon Hill.  Detail with respect to the nature of the distributions to each Class is provided in section VI.B of this Disclosure Statement.

The Bankruptcy Code provides that holders of claims against, or equity interests in, a debtor are entitled to vote on a plan only if (a) their claims or interests are "impaired" by that plan and (b) they receive some recovery under the plan.  A claim or interest is not impaired if the plan does not alter the legal, equitable or contractual rights of the holder of the claim or interest or if the plan reinstates the original terms of the obligation (i.e., cures any default and reinstates the original terms of the obligation); unimpaired classes of claims and interests are deemed to accept the plan and do not vote.  If a class of claims or interests will not receive any recovery at all under the plan, that class is deemed to reject the plan and does not vote.  In light of these standards, only certain Classes of Claims against the Plan Debtors are entitled to vote to accept or reject the Plan.

Exhibit D to this Disclosure Statement provides a detailed list of (i) the Classes of Claims entitled to vote on the Plan for each of the thirty-eight Plan Debtors, (ii) the estimated Claims in each Class for each of the Plan Debtors and (iii) the projected recovery for Claims in each Class.  Under the Plan, recoveries for holders of General Unsecured Claims vary by Plan Debtor and, therefore, holders of such Claims should refer to Exhibit D.

Holders of Allowed General Unsecured Claims (including the First Lien Term Loan Lenders and Second Lien Term Loan Lenders on account of their Lender Deficiency Claims at TOUSA) will receive Liquidation Trust Interests under the Plan, with a series of Liquidation Trust Interests being established for each of the Plan Debtors (other than Beacon Hill).  Holders of First Lien Revolver Claims will receive an aggregate recovery of 100% of their Allowed Claims, subject to the provisions of the Intercreditor Agreement as discussed in section VI.A.1 below.  Recoveries for holders of First Lien Term Loan Claims at TOUSA will range from 2.8%, as an initial distribution, to 100% upon the Committee's successful prosecution of the appeal in the Committee Action, and will be subject to the Intercreditor Agreement, as discussed in section VI.A.1 below.  The recoveries for holders of Second Lien Term Loan Claims at TOUSA are similarly dependent on the outcome of the Committee Action and will range from 0% to 45.2%.  The recoveries for holders of Senior Note Claims will range from 52.0% to 82.3%.  Under the Plan, holders of PIK Note Claims, Subordinated Note Claims, 510 Claims and Equity Interests at each Plan Debtor will receive no distributions.

The foregoing recovery percentages are estimates only and are subject to the caveats contained herein, including the outcome of the Liquidation Trust Causes of Action (including the appeals of the Committee Action), as well as the ultimate amount of Allowed Claims and the

value of assets available for distribution on account of the various series of Liquidation Trust Interests.

F.    **VOTING ON, AND CONFIRMATION OF, THE PLAN**

Pursuant to the Disclosure Statement Order, attached hereto as <u>Exhibit C</u>, the Bankruptcy Court has established the following deadlines with respect to voting on, and Confirmation of, the Plan:

1.    **The Voting Record Date**

The Voting Record Date is the date on which the Committee will determine which creditors of the Plan Debtors are entitled to receive this Disclosure Statement and to vote to accept or reject the Plan.  Exhibit D attached hereto provides a detailed description of which parties will be affected by the Voting Record Date.

| The Voting Record Date is [    ], 2010 |
| --- |

2.    **The Voting Deadline**

Pursuant to the Disclosure Statement Order, the Voting Deadline is the latest date on which all properly executed and completed votes to reject or accept the Plan must be <u>actually received</u> at the following address: TOUSA Ballot Center, c/o Kurtzman Carson Consultants LLC 2335 Alaska Avenue, El Segundo, California 90245.  A Ballot that is submitted by facsimile, email or any other electronic means shall not be counted in voting to accept or reject the Plan. Section VII of this Disclosure Statement provides additional information and a detailed description of voting instructions for those entitled to vote on the Plan.

| The Voting Deadline is [    ], 2010 |
| --- |

3.    **The Plan Objection Deadline**

The Plan objection deadline is the last day on which all properly completed objections to the Plan must be filed with the Bankruptcy Court and served upon the Committee and appropriate parties in interest.

| The Plan Objection Deadline is [    ], 2010 |
| --- |

4.    **The Confirmation Hearing**

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing on the confirmation of a plan under chapter 11. Section 1128 of the Bankruptcy Code also provides that any party in interest may object to confirmation of the plan. The Confirmation Hearing will be before the Honorable Judge John K. Olson, United State Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, Courtroom 301, United States Bankruptcy Court, 299 E. Broward Boulevard, Fort Lauderdale, Florida 33301.

| The Confirmation Hearing will held on [    ], 2010 at [    ] (Prevailing Eastern Time) |
| --- |

Section VII of this Disclosure Statement provides important information on the Confirmation Hearing and the Plan objection deadline.

## II. GENERAL INFORMATION AND DISCLAIMERS

### A. ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the Plan, which the Committee is seeking to have confirmed by the Bankruptcy Court. The Committee believes that the Plan is in the best interests of all stakeholders. The Committee urges all holders of Claims who are entitled to vote on the Plan to vote to accept the Plan.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent contained in Article VII of the Plan and described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or otherwise waived.

The Committee believes that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Committee other than as set forth in this Disclosure Statement. Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim entitled to vote to accept or reject the Plan.

For additional information about the Debtors' business operations, please refer to TOUSA's Annual Report on Form 10-K filed on August 12, 2008, for the fiscal year ended December 31, 2007 and any other report filed by the Debtors with the SEC. These filings are available through the SEC's website at http://www.sec.gov.

### B. WHY YOU ARE RECEIVING THIS DOCUMENT

The Committee is soliciting votes to accept or reject the Plan. Until their decision to wind down their operations in March 2009, the Debtors built homes in various states throughout the country. The Debtors have been operating as debtors in possession under chapter 11 of the

Bankruptcy Code since January 29, 2008.[3]  The Committee's proposed Plan will permit the Plan Debtors to exit chapter 11, efficiently liquidate their remaining assets, and maximize distributable value to their creditors.  This Disclosure Statement summarizes the key features of the Plan and provides information relating to the Debtors and the Plan, which will enable creditors to make an independent determination regarding whether to accept or reject the Plan.

The principal objective of a chapter 11 case is the confirmation of a chapter 11 plan. Among other things, a chapter 11 plan sets forth how a debtor will treat its claims and equity interests to the extent that value is available to do so.  A bankruptcy court order confirming a chapter 11 plan binds the debtor and key parties in interest, including any person acquiring property under the plan and any creditor or equity interest holder of a debtor, regardless of whether such creditor is impaired, has accepted the plan or receives or retains any property under the plan.

A bankruptcy court is only permitted to confirm a chapter 11 plan if the required number of holders of claims against (and, where applicable, equity interests in) a debtor vote to accept the plan.  As part of the process for voting, section 1125 of the Bankruptcy Code requires a plan proponent to obtain bankruptcy court approval of a document called a "disclosure statement" that contains adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the proposed plan.  **This document is the Disclosure Statement for the Plan proposed by the Committee**.

This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow to determine whether to confirm the Plan.  This Disclosure Statement also discusses events leading to the Debtors' filing of the Chapter 11 Cases and developments during the Chapter 11 Cases.  **A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement**.

The Bankruptcy Court approved this Disclosure Statement by an order dated [DATE] [D.E. #_____] (the "Disclosure Statement Order").  The Disclosure Statement Order establishes certain procedures with respect to soliciting and tabulating votes to accept or reject the Plan, including the important dates set forth in section I.F above.  The Disclosure Statement Order also approves this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Plan Debtors' creditors to make an informed judgment regarding whether to accept or reject the Plan.  **A copy of the Disclosure Statement Order is attached as <u>Exhibit C</u> to this Disclosure Statement**.

All holders of Claims entitled to vote on the Plan should carefully review the procedures and instructions set forth in the Disclosure Statement Order for voting to accept or reject the Plan and for filing objections to Confirmation of the Plan.  As required by the Disclosure Statement Order, all holders of Claims that the Committee believes may be entitled to vote to accept or

---

[3] As discussed in section V.G.5.b of this Disclosure Statement, Beacon Hill was formerly a joint venture of TOUSA Homes, Inc. but became a wholly-owned subsidiary of TOUSA Homes, Inc. after the Petition Date. On August 4, 2008, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, pursuant to an order dated August 4, 2008, its Chapter 11 Case is being jointly administered with the other Chapter 11 Cases [D.E. # 1512].

reject the Plan will receive a copy of this Disclosure Statement as part of a solicitation package that will contain important information and a Ballot for use in the voting process (the "Solicitation Package").

## C.    PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring additional information about this Disclosure Statement or the Plan should contact counsel for the Committee, Akin Gump Strauss Hauer & Feld LLP, Attn: Daniel H. Golden, Philip C. Dublin and Natalie E. Levine, One Bryant Park, New York, New York 10036, Telephone: (212) 872-1000.

If you have received this Disclosure Statement or the Plan on a CD-ROM but instead desire a paper copy of such documents, or would like additional copies, the documents are available: (a) at http://www.tousadocket.com, (b) by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (c) by calling (888) 647-1742 or (d) by emailing KCC_TOUSA@kccllc.com.

## D.    DISCLAIMERS

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSES.  THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE COMMITTEE AND THE U.S. TRUSTEE.    APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE REGULATORY AUTHORITY. NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN, AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.    THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE REQUIREMENTS OF FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.**

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATION AND ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS CITED IN SECTION IX HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE INTERPRETED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.  IN PREPARING THIS DISCLOSURE STATEMENT, THE COMMITTEE RELIED ON CERTAIN FINANCIAL DATA DERIVED FROM INFORMATION PROVIDED TO THE COMMITTEE BY THE DEBTORS THAT WAS AVAILABLE AT THE TIME OF PREPARATION AND FINANCIAL DATA DERIVED BY THE COMMITTEE THAT WAS AVAILABLE AT THE TIME OF PREPARATION.  ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE COMMITTEE HAVE PREPARED THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS CONCERNING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE COMMITTEE OR THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION CONTAINED OR DISCUSSED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS INTENDED TO AID AND SUPPLEMENT REVIEW OF THE PLAN ITSELF. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN (INCLUDING

EXHIBITS TO THE PLAN) IN ITS ENTIRETY.  ACCORDINGLY, THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE PLAN EXHIBITS. IF THERE IS A CONFLICT BETWEEN THE PLAN OR THE PLAN EXHIBITS AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN AND THE PLAN EXHIBITS WILL GOVERN.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN EXHIBITS, AS WELL AS READ CAREFULLY THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE PLAN DEBTORS IN THE CHAPTER 11 CASES.

### III.    QUESTIONS AND ANSWERS REGARDING THE DISCLOSURE STATEMENT AND JOINT PLAN

#### A.    WHAT IS CHAPTER 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.  Chapter 11 may also be used as a vehicle for a debtor to liquidate its assets in an orderly fashion to maximize value for creditors.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization or liquidation is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's claims and interests in accordance with the terms of the confirmed plan.

**B.**     **AM I ENTITLED TO VOTE ON THE PLAN?  WHAT WILL I RECEIVE IF THE PLAN IS CONSUMMATED?**

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depends on what kind of Claim or Equity Interest you hold.  As described in section VI of this Disclosure Statement, entitled "Description of the Chapter 11 Plan," Article III of the Plan creates categories of holders of Claims and Equity Interests, each of which is referred to as a "Class."  A list of the Classes of Claims and Equity Interests and their respective entitlement to vote are set forth on Exhibit D to the Disclosure Statement.

You should refer to this entire Disclosure Statement, the Plan and the Plan Supplement for a complete description of the classification and treatment of each Class of Claims and Equity Interests.

For more information about the treatment of Claims and Equity Interests, see "Description of the Chapter 11 Plan," which begins on page 79.

**C.**     **WHAT HAPPENS TO MY RECOVERY IF THE PLAN IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE?**

In the event that the Plan is not confirmed or does not become effective, there is no assurance that a plan will be confirmed.  If the Plan is not confirmed in a timely manner, it is unclear what holders of Claims would ultimately receive in respect of such Claims.  It is possible that any alternative plan of liquidation may provide holders of Claims with less than they would have received pursuant to the Plan.  Moreover, non-Confirmation of the Plan may result in an extended chapter 11 proceeding.  For a more detailed description of the consequences of non-Confirmation of the Plan, see "Confirmation of the Plan," beginning on page 131 and the Liquidation Analysis attached as Exhibit E to this Disclosure Statement.

**D.**     **IF THE PLAN PROVIDES THAT I GET A DISTRIBUTION, DO I GET IT UPON CONFIRMATION OR WHEN THE PLAN GOES EFFECTIVE, AND WHAT DO YOU MEAN WHEN YOU REFER TO "CONFIRMATION" AND THE "EFFECTIVE DATE"?**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court.  Confirmation does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective.  References to the "Effective Date" in the Plan and Disclosure Statement mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.  Distributions will only be made on the Effective Date or as soon as practicable thereafter, in accordance with Article V of the Plan (and for Claims that are not yet Allowed, distributions will be further delayed).  For a discussion of the conditions to Confirmation, see "Confirmation of the Plan," which begins on page 131.

**E.**     **HOW ARE THE PLAN DEBTORS OBTAINING THE CASH AND OTHER VALUE REQUIRED TO MAKE DISTRIBUTIONS TO SATISFY CLAIMS?**

The Plan provides that the Plan Debtors' Cash and assets will be transferred to the Liquidation Trust on the Effective Date.  The Liquidation Trust will convert the Plan Debtors'

non-Cash assets to Cash and make distributions to holders of Allowed Claims in accordance with the treatment provided for under the Plan. The monetization of the Liquidation Trust Assets may be accomplished through the sale of such assets (in whole or in combination), as the Liquidation Trustee may determine is in the best interests of the Liquidation Trust Beneficiaries.

**F.**     **ARE THERE RISKS TO OWNING LIQUIDATION TRUST INTERESTS UPON EMERGENCE FROM BANKRUPTCY?**

Yes. Please see the discussion of "Risk Factors," which begins on page 139.

**G.**     **IS THERE POTENTIAL LITIGATION RELATED TO THE PLAN?**

Yes. In the event that certain Classes of Claims vote to reject the Plan, the Committee may nevertheless seek Confirmation of the Plan. In that case, the Bankruptcy Court may confirm the Plan pursuant to the "cram down" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm the Plan even if it has been rejected by an impaired Class of Claims or Equity Interests if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. However, there may be litigation to determine whether such requirements have been met. For a more detailed discussion, see "Risk Factors — Bankruptcy Considerations," beginning on page 139. The Committee expects that the Prepetition Secured Lenders and the Transeastern Lenders will object to the Plan and initiate litigation with respect to several aspects of the Plan, including, among other things, the enforcement of the waterfall provisions of the Intercreditor Agreement, the mootness of the appeals of the Decision that are currently pending, the calculation of the amount the Conveying Subsidiaries are to receive pursuant to the Decision, the entitlement of the Conveying Subsidiaries to retain monies to compensate them for the diminution in value of their liens as a result of the Transeastern Settlement, the diminution in value of the Prepetition Secured Lenders' collateral during the course of the Chapter 11 Cases, and the payment of transaction costs and the professional fees of the Debtors and the Committee in connection with the Committee Action.

**H.**     **WHAT IS INCLUDED IN THE SOLICITATION PACKAGES TO BE SENT TO HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the Committee will seek Confirmation of the Plan. Additionally, holders of Claims against the Plan Debtors who are eligible to vote on the Plan will receive appropriate solicitation materials that will contain important information about voting to accept or reject the Plan. The solicitation materials and documents will include an appropriate form of Ballot, a copy of the Disclosure Statement (in CD-ROM form), detailed instructions about voting on the Plan and a copy of the Disclosure Statement Order.

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto and related documents are available to any party free of charge from Kurtzman Carson Consultants LLC, the voting and claims agent retained by the Debtors in the Chapter 11 Cases, by: (a) calling the Debtors' restructuring hotline at 1 (888) 647-1742; (b) visiting the Debtors' restructuring website at: www.kccllc.net/tousa; (c) e-mailing the Committee at tousamail@akingump.com; (d) emailing the claims and voting agent at

KCC_TOUSA@kccllc.com; and/or (e) writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave., El Segundo, California 90245. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: https://ecf.nysb.uscourts.gov.

**I.    WILL THERE BE RELEASES GRANTED TO PARTIES IN INTEREST AS PART OF THE PLAN?**

Yes, under the Plan, the Plan Debtors will fully release the following parties (collectively, the "Plan Releasees"):

- the current and former members of the Committee;

- the advisors and attorneys for the Committee;

- the Indenture Trustees and their respective attorneys; and

- certain of the Debtors' advisors and professionals employed as of the Petition Date or retained or employed during the Chapter 11 Cases.

The Plan Debtors, for good and valuable consideration, including their service to facilitate the reorganization/liquidation of the Plan Debtors and the implementation of the liquidation under the Plan, will be deemed to release all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Plan Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, that could have been asserted at any time, past, present or future against the Plan Releasees. This release, however, does not release claims or liabilities arising out of or relating to any act or omission of a Plan Releasee that constitutes willful misconduct (including fraud) or gross negligence.

The Plan also includes a provision that exculpates the Plan Releasees from any and all claims related to any act or omission first occurring on or after the Petition Date in connection with, relating to or arising out of the Plan Debtors' postpetition restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance of Liquidation Trust Interests, or the distribution of property under the Plan or any other related agreement. This exculpation, however, does not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud. No Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement will be released.

**J.      WHY IS TOUSA HOMES, L.P. NOT A "PLAN DEBTOR?"**

TOUSA Homes, L.P., unlike the Conveying Subsidiaries, had certain obligations to the Transeastern Lenders that were settled pursuant to the Transeastern Settlement.  To that end, unlike the Conveying Subsidiaries, TOUSA Homes, L.P. was not a plaintiff in the Committee's lawsuit seeking to avoid the Claims and Liens of the Prepetition Secured Lenders and the payments to the Transeastern Lenders.  As a result, TOUSA Homes, L.P. continues to be obligated to the Prepetition Secured Lenders and to the noteholders under their respective indentures.  Similarly, TOUSA Homes, L.P. is not a plaintiff in the Fiduciary Duty Action or Falcone Action and, therefore, will not receive a recovery on account of a successful prosecution of such Claims.   As of the date of this Disclosure Statement, TOUSA Homes, L.P. has no assets and no interest in any pending litigation.  Based on the lack of assets available to satisfy the Claims at TOUSA Homes, L.P., the Committee does not believe that any plan can be confirmed for TOUSA Homes, L.P. and intends to file a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P.

**K.      WHAT IS THE DEADLINE TO VOTE ON THE PLAN?**

[TIME OF DAY] (Eastern Time) on [INSERT DATE]

**L.      HOW DO I VOTE FOR OR AGAINST THE PLAN?**

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan.  If you are a holder of a Claim in TOUSA Classes 1B,  2, 5A, 5B and 5C, Conveying Subsidiaries Classes 4A and 4B, or Beacon Hill Class 3, you may vote for or against the Plan by completing the Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures included in the Disclosure Statement Order, which is attached hereto as Exhibit C.

Detailed instructions regarding how to vote on the Plan are contained on the Ballots and in the Solicitation and Voting Procedures.  For your vote to be counted, your Ballot must be completed, signed and actually received by [TIME] (Eastern Time), on the Voting Deadline, [DATE], 2010.

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan, or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim entitled to vote on the Plan may cast only one Ballot per each Claim held.  It is important to follow the specific instructions provided on each Ballot.  For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 127.

**M.      WHY IS THE BANKRUPTCY COURT HOLDING A CONFIRMATION HEARING?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest

may object to Confirmation and be heard at the Confirmation Hearing. The confirmation of a chapter 11 plan by a bankruptcy court binds a debtor, any person acquiring property under the plan, any creditor or interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**N.    WHEN IS THE CONFIRMATION HEARING SET TO OCCUR?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [DATE], 2010 to take place at [___] a.m. (prevailing Eastern Time) before the Honorable Judge John K. Olson, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Florida, located at 299 E. Broward Blvd., Room 112, Fort Lauderdale, FL 33301. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**O.    WHAT IS THE DEADLINE TO OBJECT TO CONFIRMATION?**

Objections to Confirmation must be filed and served on the Committee, and certain other parties in interest, so that they are actually received no later than [DATE], 2010 at [____] p.m. (prevailing Eastern Time) in accordance with the requirements set forth in the Disclosure Statement Order, which is attached to this Disclosure Statement as Exhibit C. Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

**P.    WHAT ROLE DOES THE BANKRUPTCY COURT PLAY AFTER THE CONFIRMATION HEARING?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims are accomplished pursuant to the Plan. See Article X of the Plan.

**Q.    WHAT IS THE EFFECT OF CONFIRMATION ON THE PLAN DEBTORS' BUSINESSES?**

The Plan Debtors are liquidating under chapter 11 of the Bankruptcy Code. As a result, the Plan Debtors' assets will be liquidated and the proceeds thereof distributed to creditors in accordance with the terms of the Plan, and the Plan Debtors' businesses will be wound up. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Committee that is the first Business Day after which all conditions to Confirmation have been satisfied or waived. See Article VII of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

In the event that the Plan is not consummated, the Plan will be null and void in all respects. Accordingly, any settlement or compromise, distribution on account of any Claim, assumption or rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

**R.      DOES THE COMMITTEE RECOMMEND VOTING IN FAVOR OF THE PLAN?**

Yes.  The Committee believes that the Plan provides for a larger distribution to the Plan Debtors' creditors than would result from any other available alternative.  The Committee believes the Plan is in the best interests of all holders of Claims.  Moreover, the Plan preserves certain ongoing litigation, while allowing distributions to be made to creditors on a current basis. Thus, the Committee recommends that holders of Claims who are entitled to vote on the Plan vote to accept it.

## IV.      BACKGROUND CONCERNING THE DEBTORS[4]

Prior to the filing of the Chapter 11 Cases, the Debtors built homes in the United States for sale under various brand names, including Engle Homes, Newmark Homes, Fedrick Harris Estate Homes, Trophy Homes and the James Company. The Debtors' prepetition business operations encompassed a wide array of homebuilding activities, ranging from land acquisition and site development to marketing, design and construction, in target markets including a diverse group of homebuyers, such as "first time" homebuyers, "move up" homebuyers, homebuyers relocating to a new city or state, buyers of second or vacation homes, active adult homebuyers and homebuyers with grown children seeking a smaller home.

The Debtors operated in four major geographic regions in the United States: Florida, the Mid-Atlantic, Texas and the West. The break-down for each region in which the Debtors operated is as follows:

| Florida | Mid-Atlantic | Texas | West |
|---|---|---|---|
| Central Florida | Baltimore / Southern Pennsylvania | Austin | Colorado |
| Jacksonville | Nashville | Houston | Las Vegas |
| Southeast Florida | Northern Virginia | San Antonio | Phoenix |
| Southwest Florida | | | |
| Tampa / St. Petersburg | | | |

The following sections of this Disclosure Statement provide a brief overview of the Debtors' corporate history, key aspects of the Debtors' business operations and a summary of the Debtors' current capital structure.

**A.      THE DEBTORS' CORPORATE HISTORY**

TOUSA made its initial public offering of common stock in March 1998 under the name Newmark Homes Corp. ("Newmark").  In 1995, Newmark acquired The Adler Companies, Inc., which had operated in southern Florida since 1990.  In December 1999, Technical Olympic USA, Inc. acquired 80% of Newmark's common stock.  In November 2000, Technical Olympic

---

[4] This Disclosure Statement includes information that is based on representations made by the Debtors in their *Disclosure Statement for First Amended Joint Plan of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code* [D.E. # 2681] and other information provided to the Committee by the Debtors.

USA, Inc. purchased Engle Holdings, Inc., a Florida-based publicly traded homebuilding company. In June 2002, Engle Holdings Corp. merged into Newmark, and the company changed its name to Technical Olympic USA, Inc. In 2007, the company officially changed its name to TOUSA, Inc. TOUSA grew rapidly through a series of acquisitions. In October 2002, TOUSA acquired the net assets of DS Ware Homes LLC, a homebuilder operating in Jacksonville, Florida. In November 2002, TOUSA acquired the net assets of Masonry Homes, Inc., a homebuilder operating in the northwestern suburbs of Baltimore, Maryland and southern Pennsylvania. In February 2003, TOUSA acquired Trophy Homes, Inc., a homebuilder operating in the Las Vegas area, and James Construction Company, a homebuilder operating in the greater Denver area. During 2004, TOUSA acquired certain assets of Gilligan Homes, a homebuilder with operations in Maryland, Pennsylvania, and Delaware.

## B.    THE DEBTORS' BUSINESS OPERATIONS

### 1.    Homebuilding Operations

Prepetition, the Debtors' homebuilding operations were divided into four operating divisions, primarily on a geographic basis. The Debtors' management was based on an operating platform under which the Debtors' various local division presidents reported to a centralized chief operating officer. The Debtors relied on their operating divisions for meaningful input regarding, among other things, (a) selecting appropriate homebuilding sites, (b) negotiating aspects of contracts, (c) obtaining necessary land development and home construction approvals and (d) selecting building plans and architectural schemes. TOUSA maintained a corporate office in Hollywood, Florida, which housed many of the Debtors' corporate executives.

### 2.    Employees

The Debtors employed approximately 1,700 employees on an aggregate basis before the Petition Date. As of June 4, 2010, the Debtors had 29 employees.[5] The decrease in staffing levels during the pendency of the Chapter 11 Cases is tied to the decline in homebuilding and home sales activity, attrition as a result of employees leaving for other opportunities during the Chapter 11 Cases and the Debtors' revised wind down plan.

### 3.    Land Acquisition

As of March 31, 2009, the Debtors controlled, on a consolidated basis, approximately 17,959 homesites in continuing operations. Of this amount, the Debtors owned approximately 17,459 homesites and had option contracts on approximately 500 homesites.

Consistent with the Debtors' revised operational plan announced on March 23, 2009, the Debtors suspended efforts to generate new build-to-order sales. Instead, the Debtors' primary focus shifted to completing and closing homes currently under construction, selling remaining inventory of "spec" homes, and monetizing land assets over time. The Debtors continue to market and solicit offers for their remaining assets. Actions taken in connection with the

---

[5] See discussion regarding the Debtors' Revised Incentive Plan in section V.G.2.c below.

Debtors' revised wind down plan include (a) engaging in bulk sales of land and unsold homes (see section VI.F.4 below), (b) renegotiating terms or abandoning rights under certain option contracts (as discussed in the next section), (c) considering other asset dispositions including the possible sale of underperforming assets, communities, divisions and joint venture interests and (d) reducing speculative inventory levels.

### a.    Option Contracts

Before the Petition Date, a key component of the Debtors' land acquisition strategy was the use of option contracts that gave the Debtors the right, but not the obligation, to buy homesites at predetermined prices on a predetermined takedown schedule (the "Option Contracts"). The Option Contracts generally required the payment of a cash deposit or the posting of a letter of credit, which was typically less than 20% of the underlying land purchase price and which sometimes required monthly maintenance payments. Historically, the Option Contracts were either with land sellers or financial investors who had acquired the land and thereafter entered into the respective Option Contract. In certain instances, the Debtors entered into development agreements under Option Contracts that required them to complete the development of the land even if they chose not to exercise their option and to forfeit a deposit. Although the Debtors were typically compensated for such work, in certain cases they were responsible for any cost overruns.

### b.    Joint Ventures

In addition to the Option Contracts, the Debtors traditionally used joint ventures (the "Joint Ventures") to acquire and develop land and/or to build and market homes. The Joint Ventures were intended to permit the Debtors to mitigate and share the risks associated with land ownership and development, increase the Debtors' return on equity and extend their capital resources.

At the height of the homebuilding cycle, the Joint Ventures allowed the Debtors to expand rapidly nationwide, thereby competing with larger homebuilders. Over the course of the Chapter 11 Cases, the Debtors have ceased their reliance on the Joint Ventures. In several cases, the commencement of the Chapter 11 Cases constituted an event of default under the applicable Joint Venture lender agreements. In other instances, the Debtors completed planned development activities and therefore ceased Joint Venture operations. Upon information and belief, as contemplated by the Debtors' revised wind down plan, the Debtors have liquidated substantially all of their joint venture interests and are seeking to dispose of the limited remaining Joint Venture interests or assets.

### 4.    Construction

The Debtors historically relied on subcontractors to perform substantially all construction work. The Debtors employed construction superintendents to monitor the construction of each home, coordinate the activities of subcontractors and suppliers, subjected the work of subcontractors to quality and cost controls and monitored compliance with zoning and building codes. The Debtors typically retained subcontractors pursuant to a contract obligating the subcontractor to complete construction at a fixed price in a "good and workmanlike" manner at

or above industry standards. In addition, under these contracts the subcontractor generally provided the relevant Debtor with standard indemnifications and warranties.

### 5.        Non-debtor Financial Service Entities

Prepetition, the Debtors offered a variety of financial services, such as mortgage financing, title insurance, homeowner insurance and closing services to homebuyers and other real estate buyers, through certain financial services subsidiaries (collectively, the "Financial Service Entities"). The Financial Service Entities are not debtors in the Chapter 11 Cases.

The Financial Service Entities include Preferred Home Mortgage Company ("PHMC"), a subsidiary mortgage business located in Tampa, Florida that is an approved Fannie Mae seller/servicer and provides a full selection of conventional, FHA-insured and VA-guaranteed mortgage products to homebuyers. On January 28, 2008, PHMC entered into a joint venture with Wells Fargo Ventures, LLC ("Wells Fargo"). PHMC owns 49.9% of the venture, which operates under the name of "Preferred Home Mortgage Company," with the balance owned by Wells Fargo (the "PHMC JV"). As of April 1, 2008, the PHMC JV began to carry on the mortgage business of PHMC. The PHMC JV is managed by a committee composed of six members, three of which are from PHMC and three of which are from Wells Fargo. Wells Fargo provides the general and administrative support and is the end investor for the majority of the loans closed through the joint venture. The PHMC JV has standalone financing in the form of a $20 million revolving credit agreement with Wells Fargo Bank, N.A. The Debtors' revised wind down plan contemplates that the operations of the PHMC JV will be wound down concurrent with the Debtors' divisional homebuilding operations.

Another such Financial Service Entity, Universal Land Title, Inc. ("ULT"), provided title and escrow services to the Debtors prior to the Petition Date. ULT previously sold title insurance and provided closing escrow and settlement services to customers buying homes from the Debtors. The principal sources of revenues generated by the title insurance business were fees paid to ULT for title insurance obtained for the Debtors' homebuyers and other third-party residential purchasers. On August 12, 2009, the Debtors filed a motion seeking authority to sell substantially all of the assets of ULT to Universal Land Title, LLC [D.E. # 3056]. According to the Debtors, such sale would generate approximately $6.3 million in net recoveries to the Debtors' estates, largely in the form of avoided funding obligations related to ULT. On August 28, 2009, the Bankruptcy Court entered an order [D.E. # 3135] granting the sale motion and approving the sale. Subsequently, on June 28, 2010, the Debtors filed a motion seeking authority to dissolve ULT and its subsidiaries, with any assets remaining at ULT after payment of dissolution costs and any outstanding liabilities to be transferred to TOUSA Homes, Inc. [D.E. # 5694].

ULT's assets consist primarily of Cash in the approximate amount of $285,620 and certain Postpetition Intercompany Claims. Upon information and belief, there is only one alleged third-party claim against ULT and one of its subsidiaries, ULT North Texas, LLC, in the approximate aggregate amount of $1.1 million. The Debtors believe that the actual liabilities, if any, of ULT and its subsidiaries are significantly lower than the $1.1 million claim asserted against ULT and ULT North Texas, LLC. Pursuant to the motion, ULT will utilize all of its assets to satisfy any valid Claims against the Financial Service Entities and any remaining Cash

will be transferred to TOUSA Homes, Inc.  On July 15, 2010, the Bankruptcy Court entered an order granting the relief requested in the motion [D.E. # 5786].

## C.    THE DEBTORS' CAPITAL STRUCTURE

With certain identified exceptions explained below, each of the Debtors is a borrower or guarantor under several secured and unsecured debt facilities, including:

### 1.    Secured Bank Debt[6]

On March 6, 2006, the Debtors entered into the First Lien Revolving Credit Agreement, a secured loan facility that provided for revolving credit of up to $800 million, including a letter of credit sub-facility.  On July 31, 2007, the First Lien Revolving Credit Agreement was amended to (a) reduce the availability under the facility to $700 million and (b) permit the Debtors to enter into the First Lien Term Loan Credit Agreement, pursuant to which they borrowed $200 million, and the Second Lien Term Loan Credit Agreement, pursuant to which they borrowed $300 million.  The Debtors (other than Beacon Hill) were co-borrowers and guarantors under the Loan Documents.  As discussed in detail below, the Bankruptcy Court has entered an order avoiding the Claims and Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders as they relate to certain of the Debtors.

The First Lien Revolver Claims are secured by a first-priority security interest in substantially all of the Debtors' assets, with the exception of the 2008 Federal Tax Refund and the proceeds of certain litigation.  The First Lien Term Loan Claims are secured in substantially all of the assets of TOUSA and TOUSA Homes, L.P., other than the 2007 Federal Tax Refund, the 2008 Federal Tax Refund and the proceeds of certain litigation, and the Second Lien Term Loan Claims are secured by a second-priority security interest in the same assets as the First Lien Term Loan Claims.  The relative rights of the lenders vis-à-vis each other are set forth in the Intercreditor Agreement.  Prior to the entry of the Decision in the Committee Action, as of the Petition Date, the following principal amounts were outstanding pursuant to the Loan Documents:

- First Lien Revolving Credit Agreement (including letter of credit sub-facility): $316,425,229

- First Lien Term Loan Credit Agreement: $199,000,000

- Second Lien Term Loan Credit Agreement: $317,101,998

The Committee's litigation, which avoided the obligations in the Loan Documents as to the Conveying Subsidiaries, is discussed in detail in section V.F.2.a of this Disclosure Statement.

---

[6] Beacon Hill is not a signatory to the Loan Documents described in this subsection.

### 2.    Unsecured Notes

Before the Petition Date, TOUSA issued an aggregate of $1.1 billion in unsecured notes, including the Senior Notes, the Subordinated Notes and the PIK Notes, each of which is described below.

#### a.    Senior Notes

The Senior Notes, which totaled $550 million in principal and interest outstanding as of the Petition Date, consist of (a) the $250 million 8.25% senior notes issued on April 15, 2006 and due 2011 and (b) the $300 million 9.0% senior notes issued under two indentures dated June 25, 2002 ($200 million) and February 3, 2003 ($100 million) and due 2010.

Except as discussed in subsection (d) below, each of the Debtors is a guarantor of the Senior Notes, with joint and several liability to repay the Senior Note Claims. The Senior Notes rank *pari passu* in right of payment with all of the Debtors' existing unsecured senior debt, including unsecured trade obligations and other unsecured obligations incurred in the ordinary course of business, but senior in right of payment to the Subordinated Notes and the PIK Notes, each as described below.

#### b.    Subordinated Notes

The Subordinated Note Claims, which totaled $510 million in principal and interest outstanding as of the Petition Date, consist of the following: (a) the $125 million 7.5% notes issued on March 17, 2004 and due March 15, 2011; (b) the $200 million 7.5% notes issued on December 21, 2004 and due March 15, 2015; and (c) the $185 million 10.375% notes issued on June 25, 2002 and due July 1, 2012.  Except as discussed below in subsection (d), each of the Debtors is a guarantor of the Subordinated Notes, with joint and several liability to repay the Subordinated Note Claims.

#### c.    PIK Notes

On July 31, 2007, TOUSA issued $20 million in 14.75% senior subordinated PIK Notes due 2015.  The PIK Notes were issued in connection with the Transeastern Settlement. Interest on the PIK Notes is payable semi-annually.  TOUSA is required to pay 1% of the interest in cash. The remaining 13.75% semi-annual interest payment may be made, at TOUSA's option, in cash, by increasing the principal amount of the PIK Notes or by issuing new notes or a combination of cash and new notes.  Following a mediation of the Committee Action in March 2009, the Committee, the Debtors and certain holders of the PIK Notes entered into the PIK Notes Stipulation.  Pursuant to the PIK Notes Stipulation, holders of PIK Notes agreed to release their Claims against the Conveying Subsidiaries.  The Plan will enforce the PIK Notes Stipulation by disallowing all PIK Note Claims at the Conveying Subsidiaries.

#### d.    Non-guarantor Debtors Under the Unsecured Notes

On September 21, 2007, TOUSA Homes, Inc. acquired a 100% interest in Engle/Gilligan, LLC, a joint venture in which TOUSA Homes, Inc. had owned a 49% interest.  On November 1, 2007, TOUSA Homes, Inc. acquired a 100% interest in Engle Sierra Verde P5, LLC, a joint

venture in which TOUSA Homes, Inc. previously owned a 49% interest.    On July 20, 2008, TOUSA Homes, Inc. acquired a 100% interest in Beacon Hill at Mountain's Edge, LLC, a joint venture in which TOUSA Homes, Inc. had owned a 49% interest [D.E. # 1388].

Each of Beacon Hill, Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC are Debtors in the Chapter 11 Cases; however, none of these entities are guarantors under the Senior Notes, the Subordinated Notes or the PIK Notes.

### e.    Preservation of Subordination Provisions in Certain Note Indentures

The Plan is designed to give effect to the provisions of Articles 11 and 12 of the Subordinated Notes Indentures and Articles 11 and 12 of the PIK Note Indenture.  Specifically, the Plan provides that all distributions made in satisfaction of the Subordinated Note Claims and PIK Note Claims will be made to the holders of "Senior Debt," as such term is defined in the Subordinated Note Indentures or the PIK Note Indenture, as applicable, for the Plan Debtors.

### 3.    Preferred Stock

On July 31, 2007, TOUSA issued $117.5 million (in initial aggregate liquidation preference) of 8% Series A Convertible Preferred PIK Preferred Stock (the "Preferred Stock"). The Preferred Stock ranks senior to all of TOUSA's capital stock with respect to liquidation priority and receipt of dividends.  The Preferred Stock accrues dividends semi-annually at 8% per annum, with 1% payable in cash and the remaining 7% payable, at TOUSA's option, in cash and additional Preferred Stock.  The Preferred Stock does not have voting rights.  As of the Petition Date, TOUSA had not paid dividends on the Preferred Stock.  The Preferred Stock will be cancelled under the Plan and the holders of Preferred Stock will not receive a distribution on account of such Preferred Stock under the Plan.

## V.    THE DEBTORS' CHAPTER 11 CASES

### A.    EVENTS LEADING TO THE CHAPTER 11 CASES

The following is a general description of factors that ultimately led to the Debtors' commencement of the Chapter 11 Cases.

### 1.    Adverse Market Conditions

As has been widely reported, since at least early 2007, the homebuilding industry has suffered a severe downturn.  Indeed, TOUSA executives began to see the signs of a slowdown as early as February of 2006.  See Decision at 9.  The downturn in the homebuilding industry has been particularly pronounced in several areas in which the Debtors had concentrated operations, including Florida, Nevada and Arizona.  For example, approximately 53% of the Debtors' homebuilding operations in 2007 were concentrated in Florida, Las Vegas and Phoenix.

The downturn in the homebuilding industry was the result of several macroeconomic factors.  Among other things, a rapid increase in new and existing home prices in many of the markets in which the Debtors operated over the past several years had the ultimate effect of reducing housing affordability and tempering buyer demand.  In particular, once the market

reached its peak, investors and speculators reduced their purchasing activity and instead stepped up their efforts to sell the residential property they had earlier acquired. These trends, which were more pronounced in markets that had experienced the greatest levels of price appreciation, resulted in overall fewer home sales, greater cancellations of home purchase agreements by buyers, higher inventories of unsold homes and the increased use by homebuilders, speculators, investors and others of discounts, incentives, price concessions, broker commissions and advertising to close home sales compared to the past several years.

Reflecting these trends, the Debtors and many other regional and national homebuilders experienced sales difficulties and downward pressure on home prices that stemmed from severe liquidity challenges in the credit and mortgage markets, diminished consumer confidence, increased home inventories and foreclosures. Potential buyers exhibited both a reduction in confidence as to the economy in general and a willingness to delay purchase decisions based on a perception that prices would continue to decline.

As a result of the market trend facing homebuyers, homebuilders have faced significant operating challenges. Indeed, since the Petition Date, numerous homebuilders have sought relief under the provisions of the Bankruptcy Code or have taken steps to renegotiate or reorganize their capital structures outside of the chapter 11 process.

### 2.    The Transeastern Settlement

On July 31, 2007, TOUSA entered into the Transeastern Settlement, in which it borrowed, and caused each of the Conveying Subsidiaries to borrow, $500 million. The loans were secured by liens on substantially all of the Debtors' assets (other than Beacon Hill). The proceeds of the loans were used to settle litigation against TOUSA and TOUSA Homes, L.P. arising from the alleged default of TOUSA and TOUSA Homes, L.P. on debt incurred to finance the Transeastern JV, a disastrous business venture that TOUSA undertook in 2005. The Conveying Subsidiaries, which were not defendants in the litigation and were not liable to the entities that financed the Transeastern JV, nonetheless incurred substantial obligations in connection with the Transeastern Settlement.

This section describes in detail the litigation relating to the Transeastern JV and the ultimate global settlement of the litigation through the Transeastern Settlement. As discussed in V.F.2.a below, the Committee Action sought to unwind the Transeastern Settlement pursuant to the Bankruptcy Code, to avoid the Claims and related Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders and to return the Debtors to their pre-transaction positions.

### a.    Acquisition and Financing of the Transeastern JV

In June 2005, TOUSA Homes, L.P. and Falcone/Ritchie LLC ("Falcone") formed the Transeastern JV to acquire certain assets of Transeastern Properties, Inc., a homebuilder then-owned by Arthur J. Falcone, Edward W. Falcone and certain of their affiliates. TOUSA Homes, L.P. and Falcone each held a 50% voting interest in the Transeastern JV. In addition, the Transeastern JV entered into certain option agreements to purchase land owned by Falcone. The parties closed the purchase transaction on August 1, 2005.

The Transeastern JV was funded with $675 million of third-party debt capacity, a $20 million subordinated loan from TOUSA Homes, L.P. and $165 million of equity, of which TOUSA Homes, L.P. contributed $90 million in cash and Falcone contributed $75 million in property. None of the Conveying Subsidiaries was an obligor or guarantor on this third-party debt. The Transeastern JV's financing was implemented in tranches through a series of affiliated limited liability companies. Specifically, at the same time as the closing of the Transeastern asset acquisition, financing for the acquisition was obtained through a $675 million credit facility that certain entities affiliated with the Transeastern JV entered into with Deutsche Bank Trust Company Americas ("Deutsche Bank"). Deutsche Bank served as administrative agent in connection with each tranche of the Transeastern JV's debt and syndicated such debt to the Transeastern Lenders. The $675 million in funding was in the form of three tranches of third-party debt, each governed by a separate credit agreement: (a) $450 million of senior debt, in the form of $335 million in term loans and a $115 million revolving commitment; (b) $137.5 million of senior mezzanine debt; and (c) $87.5 million of junior mezzanine debt (collectively, the "Transeastern Loans"). Each of the three tranches of the Transeastern Loans had one or more different borrowers. Specifically, the borrowers under the Transeastern senior debt facility were EH/Transeastern, LLC, the operating subsidiary of the Transeastern JV, and TE/TOUSA Senior, LLC, a special purpose holding company. Two different special purpose holding companies, TE/TOUSA Mezzanine, LLC and TE/TOUSA Mezzanine TWO, LLC, each borrowed a portion of the mezzanine debt (collectively, the "Transeastern Borrowers"). The Transeastern Borrowers secured each of the Transeastern Loans with assets of the specific Transeastern Borrower and each entity's ownership interests in its subsidiary, including the special purpose holding companies.

The underlying debt documents for the Transeastern Loans included borrowing base formulas and strict financial and operational covenants. Among other things, the Transeastern Loans used a borrowing base mechanism to determine the availability of funds under the revolving commitment and to police compliance with liquidity covenants.

### b.    Completion and Carve-out Guarantees

Although TOUSA and TOUSA Homes, L.P. were not borrowers under the Transeastern Loans, they nonetheless had certain obligations to the Transeastern Lenders. As a condition precedent to the Transeastern credit agreements, TOUSA and TOUSA Homes, L.P. executed three unsecured completion guaranties (the "Completion Guarantees") and three unsecured carve-out guaranties (the "Carve-out Guarantees" and, together with the Completion Guarantees, the "Transeastern Guaranties"). None of the Conveying Subsidiaries was a guarantor on the Transeastern Guaranties.

Under the terms of the Completion Guarantees, TOUSA and TOUSA Homes, L.P. guaranteed that the Transeastern Borrowers under each of the Transeastern Loans would complete certain "Development Activities" consistent with "Contractual Obligations" and "fully and punctually pay and discharge all Project Costs." The Completion Guarantees defined "Project Costs" as "all costs, expenses, and liabilities for and/or in connection with a Project." The Completion Guarantees defined the term "Project" as the "performance and completion of all Development Activities with respect to any portion of the Mortgaged Property as to which Development Activities have commenced as of the date of this Guarantee," and defined

"Development Activities" as the "development, construction, equipping, and completion of any fixtures, infrastructure, or other works of improvement." The result of these provisions was that TOUSA and TOUSA Homes, L.P. agreed to complete development activities and pay project costs for those projects where development activities had started by August 1, 2005.

Under the terms of the Carve-out Guarantees, TOUSA and TOUSA Homes, L.P. agreed to indemnify the Transeastern Lenders under each of the Transeastern Loans for any liabilities, obligations, losses, and expenses arising out of, among other things, fraud or material misrepresentation by any of the borrowing entities, intentional misconduct or waste with respect to the collateral and/or failure to maintain insurance or pay taxes. Additionally, the Carve-out Guarantees obligated TOUSA and TOUSA Homes, L.P. to pay all of the obligations and expenses related to any bankruptcy filing by the Transeastern JV.

### c.    Market Challenges to the Transeastern JV's Operations

In late 2005, the Transeastern JV faced operational and integration challenges as the Florida residential real estate market began to soften. As a result of the decline in the housing market, evidenced in part by customers' cancellations of sales contracts, the Transeastern JV developed new financial projections, which were distributed to its members in September 2006. The revised projections indicated that future sales and deliveries could not support the Transeastern JV's existing capital structure and that the Transeastern JV would soon be in default of the Transeastern Loans.

In late September 2006, the parties met to discuss the Transeastern JV's financial condition and the Florida housing market conditions. Deutsche Bank alleged that the Transeastern JV was already in default of its obligations under the Transeastern Loans. On September 29, 2006, the Transeastern JV and the Transeastern Lenders entered into a "Consent and Agreement," whereby the parties agreed that a potential default or an event of default, as defined in the Transeastern credit agreements, had occurred. Citicorp, in its capacity as administrative agent for the First Lien Revolving Credit Agreement, in turn notified TOUSA that the potential default constituted a material adverse change under the First Lien Revolving Credit Agreement and insisted that TOUSA secure the First Lien Revolving Credit Agreement by having the Conveying Subsidiaries grant liens on their assets. By the beginning of October 2006, Deutsche Bank took steps to take control of the Transeastern JV's cash collateral.

On October 4, 2006, the Transeastern JV received a letter from certain affiliates of Falcone giving notice of defaults on four existing option agreements for failure by the Transeastern JV to make required payments of approximately $29 million. On October 30, 2006, the Transeastern JV received a notice of default from Kendall Land Development, LLC ("Kendall"), a land bank.

Deutsche Bank sent letters dated October 31, 2006, and November 1, 2006, to TOUSA and TOUSA Homes, L.P. demanding payment under the Transeastern Guaranties. The demand letters alleged that potential defaults and events of default had occurred under the Transeastern credit agreements, triggering the guarantors' obligations. Deutsche Bank asserted that TOUSA and TOUSA Homes, L.P.'s guaranty obligations equaled or exceeded all of the outstanding obligations under the Transeastern credit agreements and that TOUSA and TOUSA Homes, L.P.

were also liable for default interest, costs, and expenses. TOUSA's 8-K, filed November 7, 2006, acknowledged receipt of the demand letters from Deutsche Bank and reported that Deutsche Bank contended that TOUSA was liable under the Transeastern Guaranties. TOUSA disclosed in its Form 10-Q dated November 14, 2006 that the Transeastern JV's management had concluded that the Transeastern JV would not have the ability to continue as a going concern under its current debt structure. TOUSA also announced that it would write off $143.6 million of its investment in the Transeastern JV.

#### d.      Commencement of the Deutsche Bank Litigation

On November 28, 2006, TOUSA and TOUSA Homes, L.P. filed a complaint against Deutsche Bank in the Florida Circuit Court in Broward County (the "Broward Circuit Court") seeking a declaratory judgment that TOUSA's and TOUSA Homes, L.P.'s liability had not been triggered under the Transeastern Guaranties. The next day, Deutsche Bank brought suit against TOUSA and TOUSA Homes, L.P. in New York Supreme Court, claiming breaches of the Transeastern Guaranties.

With respect to the Completion Guarantees, Deutsche Bank alleged that TOUSA and TOUSA Homes, L.P. committed to pay all "Project Costs" of the Transeastern JV and to complete or cause the completion of all "Development Activities" (as such terms were defined under the Completion Guarantees). According to Deutsche Bank, the Transeastern JV failed to pay these Project Costs or complete or cause the completion of Development Activities with respect to numerous projects. Deutsche Bank further alleged that TOUSA was obligated to complete both the vertical and horizontal construction on all of the projects started by August 1, 2005 and that the option maintenance and take down payments were Project Costs that TOUSA and TOUSA Homes, L.P. had agreed to pay.

With respect to the Carve-out Guarantees, Deutsche Bank alleged that the Transeastern JV made numerous material misrepresentations in its monthly borrowing base certificates and that these certificates overstated the borrowing base by tens of millions of dollars. According to Deutsche Bank, the Transeastern Lenders relied on these false borrowing base statements to advance additional funds to the Transeastern JV under the revolving Transeastern Loan. In addition, among other things, Deutsche Bank alleged that the Transeastern JV had triggered the Carve-out Guarantees and committed waste by willfully and intentionally failing to preserve the value of certain purchase or option agreements, causing or permitting liens to attach to its property and engaging in conduct that constituted waste on its property, thereby triggering TOUSA's and TOUSA Homes, L.P.'s obligations under the Carve-out Guarantees. Deutsche Bank alleged that its potential damages with respect to the Carve-out Guarantees were approximately equal to the $625 million borrowed by the Transeastern JV plus fees, default interest and expenses.

In addition to the litigation with Deutsche Bank, TOUSA subsequently became involved in litigation against Deutsche Bank Securities, Inc. ("DBSI") with respect to the Transeastern JV. TOUSA had entered into an engagement letter with DBSI in June 2005, under which DBSI agreed to provide TOUSA financial advice in connection with TOUSA's entry into the Transeastern JV. On March 26, 2007, DBSI sued TOUSA and certain of the Transeastern Borrowers seeking a declaratory judgment that (i) DBSI had no liability to TOUSA under the

engagement letter; (ii) DBSI and Deutsche Bank, as its affiliate, were entitled to indemnification from TOUSA under the engagement letter for any losses resulting from the Transeastern transaction; and (iii) DBSI was entitled to indemnification from certain of the Transeastern Borrowers under the credit agreement for any losses resulting from the Transeastern transaction. DBSI also sought indemnification from TOUSA, alleging that TOUSA had breached the engagement letter agreement by failing to indemnify DBSI for the losses and expenses that it had already incurred.  In its 8-K announcing the lawsuit, TOUSA stated that the lawsuit was "without merit."  See Decision, p.7.

### e.    Settlement of the Deutsche Bank Litigation

Market conditions during this time period continued to be bleak.  Documents produced during the Committee Action showed that executives at all levels of the Debtors' enterprise, as well as industry experts, were concerned about depressed sales prices and decreased foot traffic unlike anything they had seen in years.

Investors also recognized that TOUSA faced increasingly long odds.  TOUSA's stock price fell from a high of $23 during 2006 to below $4 by April 2007.  As discussed above, to facilitate its rapid growth, TOUSA had taken on more than $1 billion of indebtedness in respect of the Senior Notes and the Subordinated Notes.  TOUSA was the obligor on the bond debt and the Conveying Subsidiaries were jointly and severally liable as guarantors.  Even before the Transeastern Settlement, in May 2007, the Senior Notes and Subordinated Notes were already trading at discounts of 30% and 40%.

Lehman Brothers, as advisors to TOUSA, prepared a bankruptcy waterfall analysis for TOUSA in February 2007 and advisors to the company suggested that a chief restructuring officer be put in place.  Additionally, management began to search for equity infusions to support the company.  However, TOUSA's management was faced with ownership (the Stengos family in Greece, which owned about two-thirds of TOUSA's issued and outstanding shares) that opposed dilution of its controlling position.

In this context, TOUSA and TOUSA Homes, L.P. agreed to the Transeastern Settlement in global settlement of the Deutsche Bank, Falcone and Kendall claims.  Upon information and belief, on June 20, 2007, the TOUSA board of directors (the "Board") convened and considered the global settlement relating to the Transeastern JV and the financing arrangement that would be required to implement the transaction.  The turnaround and advisory firm of AlixPartners, LLP provided the Board with an opinion that TOUSA was solvent after giving effect to the Transeastern Settlement.  However, as discussed in detail in the Decision, this solvency opinion, while costing $2 million, was flawed in many respects.  No meetings were held to discuss the impact of the Transeastern Settlement on the Conveying Subsidiaries and no professionals opined on the benefits rendered to the Conveying Subsidiaries.  Lehman Brothers expressly declined to opine whether the Transeastern Settlement was the best alternative for TOUSA's creditors and expressly stated that it was not offering an opinion on the fairness of the settlement.

On June 29, 2007, TOUSA publicly announced that it had entered into the Transeastern Settlement to settle all disputes regarding its liability with respect to the Transeastern JV.  Under the Transeastern Settlement, the senior Transeastern Lenders received approximately $421

million in cash including interest and the senior and junior mezzanine debt was satisfied for $153.75 million (plus legal fees and expenses) in the form of the following consideration: subordinated notes ($20 million), convertible preferred stock (with a liquidation preference of $117.5 million), and warrants to purchase common stock (valued at $16.25 million).   In exchange, Deutsche Bank released TOUSA and TOUSA Homes, L.P. from all claims relating to the Transeastern JV, including all claims relating to the Transeastern Guaranties.  Certain of the Debtors also acquired all of the assets of the Transeastern JV as part of the Transeastern Settlement.

The Transeastern Settlement also resolved certain claims between TOUSA and Falcone. Specifically, the parties agreed that Falcone would give up its equity interest in the Transeastern JV, and the Transeastern JV would surrender its interest in most of its optioned properties owned by Falcone.  In addition, TOUSA agreed to indemnify Falcone for any third-party claims relating to the Carve-out Guarantees and to release Falcone from a covenant not to compete.  Additional information about this portion of the Transeastern Settlement can be found in section V.F.2.a below.

The Debtors, including the Conveying Subsidiaries who were not parties to the Deutsche Bank litigation nor obligors under the agreements with the Transeastern Lenders, funded the payment due to Deutsche Bank pursuant to the Transeastern Settlement by entering into the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement.  The parties consummated the Transeastern Settlement on July 31, 2007.

### 3.    Liquidity Difficulties and Prepetition Negotiations with Creditors

The housing market continued to suffer following the Transeastern Settlement and the associated financings.   By September 2007, the Debtors' write-offs and difficult market conditions put additional pressure on the Debtors' highly leveraged balance sheet.   In late September 2007, the Debtors (other than Beacon Hill, which is not obligated under the Loan Documents) were unable to provide a solvency certificate under the First Lien Revolving Credit Agreement, which was required for each borrowing under that facility.   As a result of the Debtors' inability to borrow under the First Lien Revolving Credit Agreement, the Debtors faced a lack of liquidity that the Debtors believed threatened their business operations.

The Debtors ultimately succeeded in negotiating an amendment to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement, which provided, among other things, for a waiver of solvency certificate requirements for the third quarter 2007 and permitted the Debtors to borrow up to $65 million through the end of 2007.  The Debtors eventually negotiated a second amendment to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement that extended the first amendment through February 1, 2008.

In October of 2007, certain unaffiliated holders of the Senior Notes and the Subordinated Notes (the "Ad Hoc Committee"), represented by Akin Gump Strauss Hauer & Feld LLP, approached the Debtors to raise concerns regarding (i) a potential restructuring of the Debtors' obligations and (ii) the need to file for chapter 11 to pursue a litigation action against the Transeastern Lenders.  Although the Ad Hoc Committee urged the Board to file the Debtors for

chapter 11 prior to October 31, 2007 in order to preserve actions against the Transeastern Lenders under section 547 of the Bankruptcy Code, the Board refused.  By mid-December 2007, the negotiations among the Ad Hoc Committee and the Debtors broke down, and the Ad Hoc Committee ceased to function.

In the weeks prior to the Petition Date, the Debtors attempted to negotiate a consensual restructuring that would reserve certain of the litigation issues for future investigation.  The proposed restructuring, which was not implemented, is discussed below in section V.E.1.

## B.    OTHER PREPETITION DEVELOPMENTS

### 1.    NYSE Delisting

Before November 2007, the common stock of TOUSA traded on the New York Stock Exchange (the "NYSE"). Effective November 19, 2007, however, NYSE Regulation Inc. suspended trading of TOUSA's common stock from trading on the NYSE because of the low trading price of TOUSA's common stock at that time. TOUSA appealed the suspension. Following the suspension from the NYSE, TOUSA began trading on the Pink Sheet Electronic Quotation Service.

On February 15, 2008, the NYSE denied TOUSA's appeal of the suspension, affirmed the decision to suspend trading in TOUSA's common stock on the NYSE and commenced delisting procedures. On March 3, 2008, the NYSE filed Form 25, Notification of Removal of Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, with the SEC, noting its intention to remove TOUSA's common stock from trading on the NYSE.

### 2.    SEC Inquiry

In June of 2007, the Miami Regional Office of the SEC contacted TOUSA requesting that it voluntarily provide certain documents, corporate and financial information and communications related to the Transeastern JV.  The SEC advised TOUSA that the inquiry was not an indication that any violations of law had occurred and that the inquiry should not be considered a reflection upon any person, entity or security.  The inquiry is known as In the Matter of TOUSA, Inc., SEC Inquiry, File No. FL-3310.

## C.    COMMENCEMENT OF THE CHAPTER 11 CASES

On January 29, 2008, the continued decline in the homebuilding industry, together with increased liquidity concerns, led each of the Debtors (except Beacon Hill) to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On July 30, 2008, Beacon Hill, which was formerly a joint venture of TOUSA Homes, Inc. but became a wholly-owned subsidiary of TOUSA Homes, Inc. after the Petition Date (see section V.G.5.b, below), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and its Chapter 11 Case is being jointly administered with the other Debtors' Chapter 11 Cases. As of the date hereof, each of the Debtors continues to manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**D.    "FIRST DAY" RELIEF**

On the Petition Date, the Debtors filed a series of motions and applications with the Bankruptcy Court seeking relief designed to minimize disruption of their business operations and to facilitate the chapter 11 process (collectively, the "First Day Motions").  The Debtors also prepared a substantial communications package intended to reach out to parties that would be affected by the chapter 11 filing.

Following a hearing on January 30, 2008, and based upon the *Declaration of Tommy L. McAden, Executive Vice President and Chief Financial Officer of TOUSA, Inc., in Support of First Day Pleadings* [D.E. # 7], the Bankruptcy Court entered several order that were designed to permit the Debtors to operate their businesses during the Chapter 11 Cases with as little disruption as possible.

Among the First Day Motions filed by the Debtors on the Petition Date was a motion seeking, among other things, authority to obtain (a) secured postpetition financing on a super-priority and priming basis from The First Lien Revolver Agent, and Citigroup Global Markets Inc., as sole lead arranger and bookrunner, and (b) to use cash collateral of the Prepetition Secured Lenders (the "DIP Motion").  The Debtors emphasized, both in the DIP Motion and at the hearing held on January 30, 2008, that access to financing and cash collateral would prove crucial to the Debtors' successful transition to operations under chapter 11. The Debtors asserted that although the Debtors' projections showed they did not intend to borrow under the terms of the proposed DIP facility, the ability to meet those projections would depend on the Debtors' ability to maintain business-as-usual operations, which in turn would depend on the availability of a financing backstop as a means of providing comfort to the Debtors' employees, customers and business partners. In addition, even without any new borrowing, the use of cash was critical to the Debtors' continued operations. On January 31, 2008, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on an interim basis [D.E. # 113] (the "DIP Order"), thereby authorizing the Debtors to borrow up to $135 million and providing access to cash collateral of the Prepetition Secured Lenders. The DIP Motion also sought authority to use the proceeds of the DIP facility to refinance the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement through a "roll-up."

The DIP Order provided the Prepetition Secured Lenders with adequate protection in the form of replacement liens and allowed administrative priority claims under Bankruptcy Code section 507(b) to the extent of any diminution in the value of the collateral granted by the Debtors under the Loan Documents.  Additionally, the DIP Order provided for the payment of professional fees and expenses incurred by the agents for the Prepetition Secured Lenders.  As required by the banks under the DIP financing agreement, the DIP Order provided that the Debtors release, waive and discharge each of the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the First Lien Agents from any and all claims and causes of action that the Debtors may have arising out of or related to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement.  Nevertheless, the releases explicitly did not apply to the rights of any committee or any other party in interest to bring any such action against the First Lien Revolver Lenders and the First Lien Term Loan Lenders.  The DIP Order established June 3, 2008 as the deadline for any party in interest other than a Debtor to file a complaint seeking to invalidate, avoid, subordinate or otherwise challenge the liens or claims of the First

Lien Revolver Lenders and the First Lien Term Loan Lenders. As described below, the DIP Order was modified by the subsequent financing orders and the June 3, 2008 deadline was extended. Eventually, the Debtors, in consultation with the Committee, determined that the Debtors could fund the Chapter 11 Cases solely through the use of cash collateral and thus the Debtors withdrew the DIP Motion. See section V.F.1.b herein for a further discussion regarding the use of cash collateral in the Chapter 11 Cases.

## E.    THE PLAN PROCESS

### 1.    Initial Chapter 11 Restructuring Efforts

Since the outset of the Chapter 11 Cases, the Debtors were concerned that litigation between creditor groups would impair a successful reorganization process. Indeed, the Debtors raised this issue with the Bankruptcy Court during the first hearing in the Chapter 11 Cases. At that time, the Debtors sought to alleviate the litigation risk by reaching agreement with certain holders of the Senior Notes on the framework for a plan of reorganization that involved converting the Senior Notes to equity, obtaining a new investment of $200 million, preserving the fraudulent conveyance litigation against the Prepetition Secured Lenders and issuing new secured notes to certain of the Prepetition Secured Lenders. The initial term sheet and related restructuring support agreement required, among other things, that the proposed DIP financing be approved within 60 days and that the Debtors file a plan consistent with the term sheet within 60 days. The Debtors were ultimately persuaded to abandon the proposed term sheet because of, among other things, the objections to the proposed DIP financing and the lack of support from the Committee for the proposed transaction.

During the breathing spell provided by the Bankruptcy Court's cash collateral ruling in June 2008 (see section V.F.1.b herein) the Debtors explored a reorganization plan consistent with the originally contemplated framework. To that end, the Debtors, the Committee and the other parties in interest spent several months working with a potential plan sponsor regarding a plan that would provide a limited equity recovery to the Debtors' unsecured creditors. At the same time, the Debtors engaged with potential purchasers of the company as a whole, exploring possible transactions that would be implemented through a sale under section 363 of the Bankruptcy Code. Despite the parties' efforts, in the face of continued deterioration in the housing markets and significant declines in the financial markets, the Debtors' original plan sponsor was no longer willing to consummate the transaction and there was no party willing to purchase all or substantially all of the Debtors' assets for fair consideration. As a result, the Debtors and their creditor constituencies explored restructuring on a standalone basis.

### 2.    The First Plan and Disclosure Statement

On October 13, 2008, the Debtors filed (a) the *Joint Plan of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [D.E. # 1952] (as modified from time to time, the "First Plan") and (b) the Disclosure Statement for the First Plan [D.E. # 1953] (as revised from time to time, the "First Disclosure Statement"). At the time of the filing of the First Plan and the First Disclosure Statement, the Debtors' stated goal was to take a neutral stance in the ongoing litigation. To that end, the Debtors believed that the

First Plan would facilitate emergence from chapter 11 and, at the same time, preserve the Committee Action. The First Plan included the following features, among others:

- The First Lien Revolver Lenders and First Lien Term Loan Lenders would receive new secured notes equal to the amount of their Claims, subject to disgorgement depending on the outcome of the fraudulent conveyance litigation.

- The Second Lien Term Loan Lenders would receive a new $25 million note as well as the equity in the reorganized company, in each case subject to disgorgement or cancellation/dilution, respectively, depending on the outcome of the fraudulent conveyance litigation.

- Similar to the construct under the current Plan, the Debtors' unsecured creditors would receive interests in a litigation trust, which would be created to pursue, among other actions, the Committee Action.

The Debtors had intended to seek approval of the First Disclosure Statement at the omnibus hearing on November 12, 2008, with the hope of beginning the solicitation process soon thereafter. Several parties, however, filed objections to the First Disclosure Statement, including the First Lien Agents and the Committee. The Committee believed that the First Plan prejudiced its ability to continue the litigation against the Prepetition Secured Lenders by making distributions on account of the claims of the Prepetition Secured Lenders. Moreover, the First Plan provided insufficient funding for the ongoing Committee Action and sought releases for parties, including members of the Debtors' management, against whom the Committee intended to bring (and now has brought) additional litigation.

### 3.    The Alternative Plan

At the time of the filing of the First Plan, all parties remained open to exploring other potential plan alternatives that would build consensus and maximize value. In the weeks leading up to and following a November 12, 2008 hearing, the parties engaged in extended negotiations with a potential plan investor regarding the details of a plan other than the First Plan (the "Alternative Plan"). As indicated in the Debtors' omnibus response to the objections of the First Disclosure Statement, dated November 12, 2008 [D.E. # 2137], the Debtors believed that an adjournment of the hearing on the First Disclosure Statement would allow for exploration of the Alternative Plan and maximize the likelihood of creditor consensus.

At a hearing held on January 9, 2009, the Debtors and certain parties in interest provided details with respect to the terms of the Alternative Plan transaction with another homebuilder. That sale transaction was to be accomplished pursuant to a plan that the Debtors hoped would become effective by the end of April 2009. Subsequent to the hearing, the Debtors, their major creditor groups and the potential plan investor continued to work towards finalizing and documenting a sale under the Alternative Plan. By the end of January 2009, however, the Debtors and the creditor groups were made aware that the potential plan investor had determined, based on its due diligence, that the preliminary purchase price would be significantly lower than originally anticipated. The Debtors, in consultation with their major creditor groups,

determined that the transaction price, as adjusted, was less favorable than recoveries that could be achieved for their stakeholders on a standalone basis.

**4.      The Debtors' Wind Down Plan**

At the end of January and through February 2009, the Debtors and their major creditor groups met to discuss the general direction of the Debtors' plan prospects, during which time the parties reached consensus that the Debtors should explore and develop standalone business models for both a going concern and a controlled monetization of the Debtors' assets over time. The culmination of this process was the development of the revised wind down plan that the Debtors announced on March 23, 2009, which formed the basis of the Debtors' *First Amended Plan of Tousa, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code; April 17, 2009 Version of Proposed Plan* [D.E. # 2680] (the "Wind Down Plan").

The Committee immediately identified a number of objections to the Wind Down Plan, including the Debtors' proposal to fund the professional fees of the Prepetition Secured Lenders in connection with the Committee Action, the releases of certain directors and officers in excess of available insurance proceeds and the requirement that the Litigation Trust repay the "Litigation Trust Loan" before making any distributions to unsecured creditors.   Following discussions with the Committee and the Prepetition Secured Lenders, the Debtors determined not to pursue confirmation of the Wind Down Plan or approval of the related disclosure statement.

Since the filing of the Wind Down Plan, no other proposed plan of reorganization had been filed prior to the Plan.

**5.      Exclusivity**

The Bankruptcy Code grants a debtor in possession the exclusive right to file and solicit acceptances of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief under chapter 11 of the Bankruptcy Code. If a debtor files a plan within this exclusive period, the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances of such plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization. A court may, however, extend these exclusive periods upon the request of a party in interest and "for cause," for a period up to 18 months from the Petition Date.

On May 22, 2008, the Bankruptcy Court entered an order extending the Debtors' exclusive periods to file and solicit acceptances of a plan or plans of reorganization through and including October 25, 2008 and December 24, 2008, respectively [D.E. # 1051]. The Debtors subsequently filed a motion seeking a further 120-day extension of the exclusive periods to February 22, 2009 and April 23, 2009, respectively, and the Bankruptcy Court granted the relief requested in such motion at the October 23, 2008 hearing [D.E. # 2011].  On April 8, 2009, the Debtors filed a motion seeking a further 90-day extension of the exclusive periods to July 29, 2009 and September 27, 2009, respectively, which the Bankruptcy Court granted on May 6, 2009 [D.E. # 2745].

On August 7, 2009, the Debtors filed a motion [D.E. # 3043] seeking approval of a stipulation (the "First Stipulation") entered into among the Debtors, the First Lien Agents, the Second Lien Term Loan Agent, the Prepetition Secured Lenders and the Committee, pursuant to which the parties agreed that none of the parties would (a) propose a chapter 11 plan or (b) vote in favor of or support any chapter 11 plan until 30 days from the earlier of (i) the conclusion of the trial in the Committee Action, including any post-trial (but pre-judgment) submissions, or (ii) entry of any order or series of orders approving the settlement of, or otherwise disposing of, the entirety of the Committee Action, but in any event no later than September 15, 2009.  The Bankruptcy Court entered an order approving the Stipulation on September 9, 2009 [D.E. # 3166].

On October 1, 2009, the Debtors filed an *ex parte* motion [D.E. # 3212] seeking approval of a second stipulation (the "Second Stipulation") entered into among the Debtors, the First Lien Agents, the Second Lien Term Loan Agent, the Prepetition Secured Lenders and the Committee, pursuant to which the parties agreed that none of the parties would (a) propose a chapter 11 plan or (b) vote in favor of or support any chapter 11 plan until 30 days from the earlier of (i) the conclusion of the trial in the Committee Action, including any post-trial (but pre-judgment) submissions, (ii) entry of any order or series of orders approving the settlement of, or otherwise disposing of, the entirety of the Committee Action or (iii) a determination in the Revolver Appeal[7] of the Committee Action, but in any event no later than October 31, 2009.

As the Second Stipulation expired on October 31, 2009, there are no restrictions on the ability of the Committee to propose the Plan and solicit acceptances thereof, subject to the Bankruptcy Court's approval of the Disclosure Statement.

### F.    SIGNIFICANT CONTESTED MATTERS DURING THE CHAPTER 11 CASES

#### 1.    Financing the Chapter 11 Cases

##### a.    Debtor-in-Possession Financing

As discussed in section V.D herein, the Debtors' "first day" relief included the DIP Order authorizing the Debtors to (a) obtain secured postpetition financing on a super-priority and priming lien basis and (b) use cash collateral of the Prepetition Secured Lenders.  The DIP Order granted approval for the financing arrangement solely on an interim basis.  The Prepetition Secured Lenders originally had agreed to provide financing and permit use of cash collateral only if the arrangement were approved by May 30, 2008.  Following negotiation with the Committee, the Prepetition Secured Lenders ultimately agreed to extend the financing arrangement on an interim basis through and including June 19, 2008.

On April 23, 2009, the Debtors received the 2007 Federal Tax Refund, which made such financing unnecessary because the Debtors' cash holdings would be sufficient to meet projected funding needs.  Instead, the Debtors, after consultation with the Committee, decided to seek final authority to use the cash collateral of the Prepetition Secured Lenders.

---

[7] The Revolver Appeal, District Court Case No. 09-60589, is more fully described in section V.F.2.a.vi below.

### b.    Cash Collateral

### i.    The First Cash Collateral Order

On April 25, 2008, the Debtors filed a motion seeking authority to use the Prepetition Secured Lenders' cash collateral pursuant to section 363 of the Bankruptcy Code.  The Debtors supplemented that motion on May 19, 2008 (the "First Cash Collateral Motion"), and proposed an arrangement whereby the Debtors would provide the Prepetition Secured Lenders with adequate protection in exchange for their consent to the use of cash collateral for a six-month period.

The terms of the agreement for use of cash collateral agreed to by the Debtors and First Lien Agents contained twenty forms of adequate protection, including (a) a cash payment to the First Lien Revolver Lenders and the First Lien Term Loan Lenders in the amount of $175 million, subject to certain disgorgement provisions, and (b) a grant of liens and allowed administrative priority claims on substantially all of the Debtors' assets to the extent of any diminution in the value of the Prepetition Secured Lenders' collateral.  The proposed order regarding the First Cash Collateral Motion also included a carve-out for the fees incurred by professionals for the Debtors and the Committee and a limited timeframe in which parties in interest could bring claims against the Prepetition Secured Lenders or relating to the Loan Documents.

The Committee objected to the First Cash Collateral Motion on the basis of, among other things, the payment of $175 million to the holders of disputed claims.  The Committee emphasized that the Debtors' creditors had been studying potential challenges to the Prepetition Secured Lenders' Claims since before the Petition Date and certain creditors had filed objections to the Proofs of Claim filed by the Prepetition Secured Lenders shortly after the Petition Date. The Committee alleged that the Debtors had taken insufficient steps to ensure that the Prepetition Secured Lenders could be compelled to return the funds received through the proposed pay down in the event of an adverse determination on their Claims.  Moreover, the Committee believed the proposed order limited the ability of the Committee or any other party in interest to bring claims against the Prepetition Secured Lenders by creating a challenge period, after which all claims and defenses not already plead were to be released.  The Second Lien Term Loan Lenders also filed a limited objection to the First Cash Collateral Motion contesting the Committee's request for authority to use cash collateral to pay the fees and expenses associated with prosecution of the Committee Action.

The Bankruptcy Court held hearings on the First Cash Collateral Motion on May 22, 2008 and June 10, 2008, at which counsel for the Debtors, the Committee, the Prepetition Secured Lenders and certain holders of the Debtors' unsecured notes presented arguments regarding the proposed First Cash Collateral Order.  Following the June 10 hearing, at which the Bankruptcy Court issued rulings on several issues, the parties entered into additional discussions and negotiations with respect to the terms of the proposed order.  Ultimately, the First Lien Agents, the Debtors and the Committee agreed on a form of order.  Among other things, the Committee negotiated for a pay down certification process, through which any recipient of funds pursuant to the cash collateral order would be required to provide the Committee with quarterly affirmations related to the recipient's (i) net or liquid assets in excess of the pay down received

and (ii) consent to the jurisdiction of the Bankruptcy Court.  Following a telephonic hearing held on June 19, 2008, during which the parties presented the proposed terms of the final cash collateral order, the Bankruptcy Court approved the proposed agreement, including (a) the payment of $175 million to the First Lien Revolver Lenders and the First Lien Term Loan Lenders and (b) the ability of the Committee to use cash collateral to fund prosecution of the Committee Action.  Accordingly, on June 20, 2008, the Bankruptcy Court entered the stipulated and final First Cash Collateral Order [D.E. # 1226].  Given the inability or unwillingness of certain lenders to provide certifications, the Debtors did not pay the full $175 million to the Prepetition Secured Lenders upon entry of the order but, rather, have disbursed the pay down funds over the course of the Chapter 11 Cases.

### ii.      Appeals of the First Cash Collateral Order

On June 30, 2008, (i) certain of the Debtors' unsecured noteholders – Aurelius Capital Master Ltd., Aurelius Capital Partners, LP, GSO Special Situations Fund L.P., GSO Special Situations Overseas Master Fund Ltd., GSO Credit Opportunities Fund (Helios), L.P., and Carlyle Strategic Partners (the "Objecting Noteholders") and (ii) the Second Lien Term Loan Agent each appealed the First Cash Collateral Order to the District Court.  The appeals were assigned to Judge Gold and Judge Aldaberto Jordan, respectively.  The appeals were subsequently consolidated as Case No. 08-61317 before Judge Gold [D.E. # 10].

The Objecting Noteholders challenged, among other things, the Bankruptcy Court's ruling permitting the $175 million payment to the First Lien Revolver Lenders and the First Lien Term Loan Lenders, while the Second Lien Term Loan Agent challenged the unrestricted use of cash collateral by the Committee to pursue the Committee Action.  After hearing oral argument on the appeal on December 19, 2008, on February 5, 2009, the District Court entered an order and opinion affirming the First Cash Collateral Order and dismissing the appeals.  The District Court order noted that the Second Lien Term Loan Agent's argument was mooted by the Intercreditor Agreement, which prohibited the Second Lien Term Loan Agent from raising an objection to financing approved by the First Lien Agents.

### iii.      The Second Cash Collateral Order

On October 28, 2008, the Debtors filed their second motion for authority to use cash collateral pursuant to section 363 of the Bankruptcy Code (the "Second Cash Collateral Motion").  On December 4, 2008, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral on a consensual basis through January 9, 2009 on substantially the same terms as provided in the First Cash Collateral Order, including providing the Prepetition Secured Lenders with similar forms of adequate protection with respect to the Debtors' use of cash collateral (except for the payment of $175 million to the First Lien Revolver Lenders and the First Lien Term Loan Lenders) [D.E. # 2236] (the "Second Interim Cash Collateral Order").  Additionally, the Second Interim Cash Collateral Order, as with the First Cash Collateral Order, permitted the Committee to continue to use cash collateral to pursue the Committee Action.

On January 6, 2009, after discussions among the Debtors and the First Lien Term Loan Agent, the First Lien Term Loan Agent filed a limited objection to the Second Cash Collateral Motion, stating that the First Lien Revolver Lenders and the First Lien Term Loan Lenders were

prepared to extend the Debtors' use of cash collateral pursuant to the terms of the Interim Cash Collateral Order through March 30, 2009, provided that such order expressly prohibited the use of cash collateral by the Committee to prosecute the Committee Action. The Debtors did not agree to this limitation.  At a hearing held on January 9, 2009, the Debtors sought to use cash collateral of the Prepetition Secured Lenders on a contested basis.  Following argument and testimony presented at that hearing, the Bankruptcy Court entered an order providing the Debtors with access to cash collateral through April 30, 2009, subject to certain financial covenants and other terms and conditions included therein, and permitting the Committee to use cash collateral to fund the Committee Action [D.E. # 2355].

### iv.    The Third Cash Collateral Order

On April 8, 2009, the Debtors filed their third motion to use cash collateral pursuant to section 363 of the Bankruptcy Code (the "Third Cash Collateral Motion"), indicating their intent to seek contested use of cash collateral if the Debtors could not reach agreement with the Prepetition Secured Lenders.  In their limited objection [D.E. # 2682] to the Third Cash Collateral Motion, the First Lien Revolver Lenders and the First Lien Term Loan Lenders expressed concern regarding the decreased value of their collateral, the impact of the Debtors' decision to wind down their businesses on the collateral securing the Claims of the Prepetition Secured Lenders and the proposal to continue to allow the Committee to use cash collateral to pursue the Committee Action.  In response, the Committee argued, among other things, that (i) the Committee's entitlement to fees in connection with the Committee Action had already been determined by the previous cash collateral orders and (ii) when awarding adequate protection, the Bankruptcy Court was required to consider the fact that the liens to be protected were subject to dispute.  The Second Lien Term Loan Agent also filed a statement regarding the Third Cash Collateral Motion and the First Lien Agents' objection, arguing that, under the Intercreditor Agreement, the Debtors were required to pay the Second Lien Term Loan Agent's fees before any payments could be made to the First Lien Revolver Lenders or First Lien Term Loan Lenders.  On April 30, 2009, the Bankruptcy Court determined that the Prepetition Secured Lenders were adequately protected and ordered continued use of cash collateral through August 31, 2009 [D.E # 2726] (the "Third Cash Collateral Order").

### v.    The Fourth Cash Collateral Order

On August 18, 2009, the Debtors filed their fourth motion for authority to use cash collateral [D.E. # 3076] (the "Fourth Cash Collateral Motion").  In the Fourth Cash Collateral Motion, the Debtors explained that, although the trial in the Committee Action had been scheduled to end in July 2009, additional testimony required an adjournment until late August, just before the expiration of the Third Cash Collateral Order.  On September 10, 2009, the Bankruptcy Court entered an interim order [D.E # 3177] authorizing the Debtors to use cash collateral until October 31, 2009, provided that upon the entry of a judgment or other order resolving the Committee Action, any party would be permitted to file a request for reconsideration.  On September 24, 2009, the Bankruptcy Court entered an order approving use of cash collateral, on substantially the same terms as the previous orders, until October 31, 2009 [D.E. # 3207].

### vi.    The Fifth Cash Collateral Order

On October 7, 2009, prior to entry of the Decision, the Debtors filed their fifth motion to use cash collateral [D.E. # 3218] (the "Fifth Cash Collateral Motion").  In the Fifth Cash Collateral Motion, the Debtors reiterated the importance of the Committee Action to the ongoing cash collateral negotiations: if the Prepetition Secured Lenders' Liens were avoided at the Conveying Subsidiaries, the nature and extent of the adequate protection required might change. On October 22, 2009, in advance of the hearing on the Fifth Cash Collateral Motion, the Debtors filed a proposed order that reflected the Bankruptcy Court's findings in the Committee Action [D.E. # 3248].  On October 28, 2009, the Bankruptcy Court entered an interim order that, among other things, made clear that the Claims and related Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders are limited to TOUSA and TOUSA Homes, L.P. and any adequate protection must be on account of the interests at those entities [D.E. # 3263] (the "Fifth Interim Cash Collateral Order").  The language of the Fifth Interim Cash Collateral Order tracked the Decision's findings, providing:

> Pursuant to 11 U.S.C. §§ 544 and 548 and under applicable New York and Florida fraudulent transfer law, (a) all obligations of the Conveying Subsidiaries to the First and Second Lien Lenders arising from the July 31 Transaction; (b) all claims of the First and Second Lien Lenders asserted or assertable against the Conveying Subsidiaries; and (c) all liens granted by the Conveying Subsidiaries to secure such obligations and claims, are . . . AVOIDED and all such claims are DISALLOWED.

> The Decision further concluded that:

> Pursuant to 11 U.S.C. § 550 and under applicable New York and Florida fraudulent transfer law, the First and Second Lien Lenders shall DISGORGE to the Conveying Subsidiaries' estates any and all principal, interest, costs, expenses and other fees or amounts paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders or in respect of the First and Second Lien Lenders' asserted claims or obligations against the Conveying Subsidiaries' estates . . . [which f]or the avoidance of doubt . . . shall include, but not be limited to, any and all (a) fees and expenses paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders' respective counsel and advisors, pursuant to the First and Second Lien Term Loan Agreements, and (b) payments to, for the benefit of, or on behalf of, the First and Second Lien Lenders pursuant to [the prior financing orders].

The Fifth Interim Cash Collateral Order superseded all previous financing orders.  The Bankruptcy Court agreed to reconsider the Fifth Interim Cash Collateral Order in the event of a successful appeal of the Decision.

On November 19, 2009, the Bankruptcy Court entered an order continuing the hearing on the Fifth Cash Collateral Motion from December 3, 2009 to December 4, 2009 [D.E. # 3329].  In addition, on the record at the hearing on December 4, 2009, the Bankruptcy Court extended the Fifth Interim Cash Collateral Order through and including December 16, 2009.

On January 8, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to use cash collateral and providing for certain additional changes to the form used in the period orders [D.E. # 3480] (the "Fifth Cash Collateral Order"). The Fifth Cash Collateral Order, among other things, required the Debtors and the Committee to operate within an agreed budget attached to the Fifth Cash Collateral Order. To the extent the Debtors or the Committee exceeded the budget, any party could request reconsideration of the order. The Fifth Cash Collateral Order provided for the use of cash collateral through April 30, 2010.

### vii.    The Sixth Cash Collateral Order

On March 31, 2010, the Debtors filed their sixth motion for authority to use cash collateral and advised the Bankruptcy Court that the parties were in discussions regarding the appropriate form of order to address (i) the Decision in the Committee Action and (ii) ongoing appeals of the Decision. On April 15, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral on substantially the same terms as provided in the Fifth Cash Collateral Order [D.E. # 5419] (the "Sixth Interim Cash Collateral Order"). In connection with their consent to use of cash collateral, the First Lien Revolver Lenders requested that the Debtors segregate approximately (a) $32.3 million, corresponding to the estimated remaining amount of the 2007 Federal Tax Refund and (b) approximately $98 million, corresponding to the 2008 Federal Tax Refund. Pursuant to the Sixth Interim Cash Collateral Order, all parties reserved their rights to argue, among other things, that such proceeds (i) were not properly segregated upon receipt, (ii) do not constitute tax refund funds or (iii) are otherwise free from restriction or encumbrance. The parties also agreed to a further revised professional fee budget.

On May 18, 2010, the Bankruptcy Court entered an order [D.E. # 5580], authorizing the Debtors to use cash collateral on substantially the same terms as the previous orders through August 31, 2010.

### 2.    Litigation and Adversary Proceedings

### a.    The Committee Action

The Committee has successfully prosecuted avoidance actions against the Prepetition Secured Lenders and Transeastern Lenders. The Bankruptcy Court issued its amended Decision in the Committee Action on October 30, 2009. As described in detail below, the Decision provided for avoidance of the Claims and related Liens of the First Lien Term Loan Lenders and Second Lien Term Loan Lenders with respect to the Conveying Subsidiaries and the return of certain funds paid to the Transeastern Lenders. The Bankruptcy Court also determined that the First Lien Term Loan Lenders' and Second Lien Term Loan Lenders' asserted security interest in the 2007 Federal Tax Refund, which the Debtors received on April 23, 2008 as a result of significant losses incurred during the 2007 fiscal year, constituted an avoidable preference under section 547 of the Bankruptcy Code. The Bankruptcy Court further ruled that the parties should, to the extent possible, be placed in the position that they were in prior to the Transeastern Settlement and, consequently, the Conveying Subsidiaries were entitled to retain the portion of the disgorgement of the payments to the Transeastern Lenders that corresponded to the transaction costs of the Transeastern Settlement, certain attorneys' fees of the Debtors and the

Committee incurred in connection with the Committee Action, and the diminution in value of the Liens granted to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders. The defendants were required to disgorge monies that they had received as a result of such fraudulent conveyances, plus prejudgment interest.

### i.        Standing of the Committee to Prosecute the Committee Action

On April 22, 2008, the Committee filed a motion seeking, among other things, authority to investigate, commence and prosecute certain Causes of Action on behalf of the Debtors' Estates against the Prepetition Secured Lenders, the Transeastern Lenders and certain other parties to the Transeastern Settlement related to the Transeastern Settlement [D.E. # 850] (the "Standing Motion"). The Committee also sought sole authority to settle such claims. As discussed in detail in section V.A.2 herein, the Transeastern Settlement was part of a global settlement of litigation claims relating to the Transeastern JV that led to the Debtors' entry into the Loan Documents.

By the Standing Motion, the Committee sought authority to pursue certain fraudulent conveyance and other claims relating to the Transeastern Settlement and, in particular, the Debtors' entry into the Loan Documents (collectively, the "Committee Action Claims"). The Debtors consented to the relief sought in the Standing Motion, but only to the extent the Debtors retained authority to propose settlements of any and all of the Committee Action Claims in a chapter 11 plan of reorganization or otherwise. In addition, the Debtors suggested that, to the extent the Committee Action Claims were to proceed during the Chapter 11 Cases, such claims must be pursued in an orderly and expedited fashion in accordance with an agreed scheduling order. On May 28, 2008, the Bankruptcy Court entered an order granting the relief sought in the Standing Motion, but denying the Committee's request for sole authority to settle the Committee Action Claims [D.E. # 1092].

### ii.        The Complaint

On July 14, 2008, the Committee commenced the Committee Action. In the Committee Action, the Committee set forth several bases for recovery against the Prepetition Secured Lenders, the Transeastern Lenders and other parties to the Transeastern Settlement.

The Committee generally set forth two broad categories of "fraudulent transfer" claims under section 548 of the Bankruptcy Code and applicable non-bankruptcy law. The first category included claims brought against the Prepetition Secured Lenders under each of the Loan Documents. With respect to this category of claims, the Committee alleged that the obligations incurred by certain of the Debtors as guarantors and co-borrowers under the Loan Documents were fraudulent transfers. The second category of claims included fraudulent transfer claims against the Transeastern Lenders, each of whom received certain payments and other consideration from the Debtors as part of the Transeastern Settlement. Specifically, the Committee Action asserted fraudulent transfer claims against the Transeastern Lenders under several different state and federal statutes, including sections 544, 548 and 550 of the Bankruptcy Code. The Committee Action sought relief in the form of recovery to certain of the Debtors of the amounts transferred to the Transeastern Lenders as part of the Transeastern Settlement.

In addition to these two categories of fraudulent transfer claims, the Committee sought (a) to avoid as a preference under section 547 of the Bankruptcy Code the Prepetition Secured Lenders' security interests in the 2007 Federal Tax Refund and (b) to object to the Claims of the Prepetition Secured Lenders on account of the "savings clause" contained in the guaranty agreements, dated July 31, 2007, which were executed in connection with the Loan Documents. As described below, the Committee amended its complaint on three occasions.

### iii.    The First Lien Term Loan Agent Answer and Third-Party Complaint

On August 13, 2008, the First Lien Term Loan Agent filed its answer to the Committee's complaint in the Committee Action.  In addition to filing its answer, the First Lien Term Loan Agent filed a third-party complaint against TOUSA and each of the Debtor signatories, co-borrowers and co-guarantors under the First Lien Term Loan Credit Agreement (the "First Lien Term Loan Complaint").  In the First Lien Term Loan Complaint, the First Lien Term Loan Agent claimed relief based on the theory that, to the extent the Committee established its allegations in the Committee Action, the defendants to the First Lien Term Loan Complaint would have "materially breached the First Lien Term Loan" because it would be contrary to solvency representations in the First Lien Term Loan Credit Agreement (the "Lender Breach Claims").  On September 30, 2008, the Debtors filed their answer to the First Lien Term Loan Complaint, generally denying the First Lien Term Loan Agent's allegations and asserting affirmative defenses.  The First Lien Term Loan Agent also filed a Proof of Claim against certain of the Debtors for the allegations contained in the First Lien Term Loan Complaint.

On June 8, 2009, the Debtors, as third-party defendants, filed a motion for summary judgment, asserting that the First Lien Term Loan Agent had failed to produce any evidence that such solvency representations had been breached.  On July 9, 2009, the Bankruptcy Court entered an order granting the Debtors' motion for summary judgment and dismissing the First Lien Term Loan Complaint on the basis that, among other things, the First Lien Term Loan Agent had not identified any evidence that the Debtors were in breach of the solvency representations at the time of the Transeastern Settlement, and thus there was no dispute between the parties regarding that fact [D.E. # 523].  The Bankruptcy Court further held that the dismissal of the First Lien Term Loan Complaint was without prejudice to the First Lien Term Loan Agent's assertions made in its timely filed Proofs of Claim, and that such Claims were more appropriately resolved through the claims reconciliation process.

For the avoidance of doubt, pursuant to the Decision, all Claims asserted or assertable by the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders against the Conveying Subsidiaries, including any claims for breach of the solvency representations in the Loan Documents, have been avoided and disallowed.  No further objection to such Claims shall be required and no distributions pursuant to the Plan will be made on account of such Claims.

### iv.    The Bankruptcy Court's Ruling With Respect to Motions to Dismiss the Committee Action

On September 19, 2008, the Bankruptcy Court held a hearing on motions to dismiss the Committee Action filed by the First Lien Revolver Agent and the Second Lien Term Loan Agent.

In its motion to dismiss, counsel for the First Lien Revolver Agent argued that, as a matter of law, the First Lien Revolving Credit Agreement was not a new credit facility and that every draw request under a revolving credit facility was not a new loan obligation. The Bankruptcy Court granted the First Lien Revolver Agent's motion to dismiss with leave for the Committee to amend.

Counsel for the Second Lien Term Loan Agent argued that the Committee's complaint should be dismissed without prejudice for failure to state a claim. The Bankruptcy Court denied the Second Lien Term Loan Agent's motion to dismiss, finding that the "Doe" new lenders one through 100 were named properly and that the complaint clearly stated a claim against the Second Lien Term Loan Agent upon which relief could be granted. The Bankruptcy Court further found that the Second Lien Term Loan Agent has no standing to assert the potential defenses of other defendants.

### v.      The Amended Complaints and Responsive Pleadings

On October 17, 2008, the Committee filed its first amended adversary complaint [D.E. # 120] (the "Amended Complaint"). The Amended Complaint supplemented the Committee's original complaint with additional information related to the identity of certain groups of defendants and named certain new defendants. The Amended Complaint also included additional allegations about the First Lien Revolving Credit Agreement. Finally, the Amended Complaint added six new counts, alleging fraudulent transfer claims against the Transeastern Lenders under sections 726.105, 726.106 and 726.108 of the Florida Statutes, sections 273, 274, 275 and 278 of the New York Debtors and Creditor Law, and sections 544(b), 548 and 550 of the Bankruptcy Code.

On November 4, 2008, the First Lien Term Loan Agent filed its answer to the Amended Complaint [D.E. # 146], which generally denied the Committee's allegations and asserted affirmative defenses. On the same day, the First Lien Revolver Agent filed a motion to dismiss the Amended Complaint [D.E. # 148]. In its motion, the First Lien Revolver Agent argued that the substantive changes in the Amended Complaint failed to cure the fundamental problems identified by the Bankruptcy Court during the September 19, 2008 hearing. Specifically, the First Lien Revolver Agent argued that the Amended Complaint still failed to identify exactly which transfers the Committee sought to have avoided and still sought to avoid transfers that occurred after the perfection of the relevant liens.

Also on November 4, 2008, the Second Lien Term Loan Agent filed its answer to the Amended Complaint [D.E. # 152]. In its answer, the Second Lien Term Loan Agent generally denied the Committee's allegations and asserted affirmative defenses. On that date, the Second Lien Term Loan Agent also asserted a third-party complaint against TOUSA and each of the Debtor signatories, similar to the First Lien Term Loan Complaint.

On December 4, 2008, the Bankruptcy Court held oral argument on the First Lien Revolver Agent's motion to dismiss the Amended Complaint. At the hearing, the Bankruptcy Court again granted the motion to dismiss the Committee's claims relating to the First Lien Revolving Credit Agreement. The Bankruptcy Court, however, granted the Committee leave to amend the Amended Complaint to allege claims arising out of the First Lien Revolving Credit

Agreement "solely to the extent such claims seek to avoid transfers of liens on real property or other collateral first perfected on or after July 31, 2007." At the same hearing, the Bankruptcy Court also denied the motion to dismiss brought by the Transeastern Lenders.

The Transeastern Lenders filed a motion for interlocutory appeal of the Bankruptcy Court's ruling to the District Court. The appeal was docketed as Case No. 09-60055 before Judge Jordan. On February 11, 2009, the District Court denied the Transeastern Lenders' motion for interlocutory appeal of the Bankruptcy Court's denial of their motion to dismiss [D.E. # 253].

On February 4, 2009, the Committee filed a further amended complaint (the "Third Amended Complaint") that removed all claims relating to the First Lien Revolving Credit Agreement [D.E. # 243]. As discussed below, the Committee appealed the dismissal of the Amended Complaint to the District Court.

### vi.    The Revolver Appeal

On February 25, 2009, the Bankruptcy Court issued a judgment under Federal Rule of Civil Procedure 54(b) dismissing the majority of claims against the First Lien Revolver Lenders [D.E. # 268, 271]. The Committee filed a notice of appeal of such order on March 9, 2009 [D.E. # 290]. The parties fully briefed the appeal in May and June 2009. On August 14, 2009, oral arguments on the appeal were heard by Judge Jordan. The appeal is currently pending as Case No. 09-60589 before the District Court.

### vii.   The Transeastern Lenders' and Transeastern Agent's Third-party Complaint and/or Counterclaim

On February 24, 2009, the Transeastern Lenders and CIT Group/Business Credit, Inc. ("CIT"), in its capacity as administrative agent for the Transeastern Lenders, each filed a counterclaim and third-party complaint against certain of the Debtors [D.E. # 259, 260, 264, 265]. The Transeastern Lenders and CIT alleged that they were entitled to indemnification and/or recoupment against any recovery the Committee received as a result of the Committee's fraudulent transfer claims under the terms of the credit agreement signed by certain of the Debtors in connection with the formation of the Transeastern JV. The Transeastern Lenders and CIT sought recoupment for the full amount of any recovery against them on each of the Committee's fraudulent transfer claims. On April 1, 2009, the Debtors filed a motion to strike or, in the alternative, to sever and stay the third-party complaints filed by CIT and the Transeastern Lenders [D.E. # 311]. The Debtors argued that such third-party complaints were untimely and prejudicial to the Debtors and their Estates.

### viii.  Judicial Settlement Conference

On February 11, 2009, the Debtors filed a motion to compel mediation of the Committee Action [D.E. # 245], and on February 26, 2009, the Bankruptcy Court entered an order granting such motion [D.E. # 278]. Pursuant to the parties' agreement, United States Bankruptcy Judge Laurel Isicoff conducted a judicial settlement conference on March 23-24, 2009. On April 14, 2009, Judge Isicoff reported that that the parties were at an impasse with respect to the Committee's claims against the Transeastern Lenders, the First Lien Revolver Lenders, and the First Lien Term Loan Lenders. Judge Isicoff further reported that the other defendants in the

Committee Action had either reached an agreement with the Committee or were continuing settlement discussions.  Following the settlement conference, the Committee, the Debtors and the holders of the PIK Note Claims entered into the PIK Notes Stipulation, by which holders of the PIK Note Claims released their claims against the Conveying Subsidiaries.

### ix.    Pretrial Orders and Interlocutory Appeals

On April 16, 2009 and May 1, 2009, respectively, the First Lien Term Loan Agent and the Committee each filed a motion for summary judgment based on the allegations in the Third Amended Complaint [D.E. # 315, 335].  Following a July 6, 2009 hearing, on July 8, 2009, the Bankruptcy Court entered an order granting the Committee's motion for summary judgment finding that, as a matter of law, the defendants could not establish the elements of defenses of substantive consolidation, single business enterprise and alter ego [D.E.# 513] (the "Summary Judgment Order").

On July 2, 2009, the Bankruptcy Court entered an order striking CIT's and the Transeastern Lenders' counterclaims and third-party complaints based on its findings that (i) such counterclaims and third-party complaints were not timely filed, (ii) the late filing was prejudicial to other parties in interest, and (iii) CIT had resolved its third-party complaints through a stipulation [D.E. # 508] (the "Counterclaim Order").  In addition, the Bankruptcy Court held that the Transeastern Lenders would be permitted to try their affirmative defense during the trial of the Committee Action.

On July 10, 2009, the Transeastern Lenders filed a notice of appeal of the Counterclaim Order [D.E. # 534].  The appeal was docketed in the District Court as Case No. 09-61308 before Judge Jordan.  On July 20, 2009, the Transeastern Lenders filed a notice of appeal of the Summary Judgment Order [D.E. # 560].  The appeal was consolidated with District Court Case No. 09-61308 before Judge Jordan.  On November 12, 2009, the District Court entered an order exercising its discretion to decline to hear the Transeastern Lenders' interlocutory appeals and finding that all relevant issues could be addressed through a post-judgment appeal [Case No. 09-61308, D.E. # 22].  Accordingly, Judge Jordan dismissed both appeals as moot and closed the cases.

### x.    The Trial on the Committee Action

A thirteen-day trial on the Committee Action took place in July and August 2009 before the Bankruptcy Court.  Opening and closing arguments were replaced by written submissions, and on October 13, 2009, the Bankruptcy Court released the Decision [D.E. # 658, 659].  On October 30, 2009, the Bankruptcy Court amended the Decision [D.E. # 721, 722] to remove certain findings with respect to the First Lien Revolver Lenders.

In the Decision, the Bankruptcy Court found that, among other things: (i) the obligations incurred, and the liens granted, by the Conveying Subsidiaries in respect of the First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement in the Transeastern Settlement were fraudulent transfers; (ii) the Transeastern Lenders were entities for whose benefit the transfers were made; (iii) the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders did not take in good faith and thus were not entitled to a defense under

44

section 548(c) of the Bankruptcy Code; (iv) the Transeastern Lenders did not take in good faith and thus were not entitled to a defense under section 550 of the Bankruptcy Code and were not entitled to recoupment as a defense to the Committee's claims; (v) on an alternative theory, the payment under the Transeastern Settlement to the Transeastern Lenders was avoidable as a fraudulent transfer; and (vi) the liens granted to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders on the 2007 Federal Tax Refund were preferential transfers.   The Bankruptcy Court further ruled that the parties should, to the extent possible, be placed in the position that they were in prior to the Transeastern Settlement and, consequently, the Conveying Subsidiaries were entitled to transaction costs, attorneys' fees, and diminution in value of the Liens granted to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders and the defendants were required to disgorge monies that they had improperly received as a result of such fraudulent conveyances, plus prejudgment interest.

### xi.      The Defendants' Post-trial Appeals and the Requests for Stay Pending Appeal

Following the entry of the Decision, on October 20, 2009, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders, and the Transeastern Lenders each filed a notice of appeal [D.E. # 664, 668, 670].  The three appeals were docketed on the same day and assigned to Judge Jordan, Judge Cecilia Altonaga and Judge Gold, respectively.

On October 20, 2009, each such defendant also filed a motion to stay the Decision pending appeal [D.E. # 666, 669, 671].  The Committee filed its opposition to these motions on October 23, 2009 [D.E. # 695], and a hearing was held on October 26, 2009.  On October 30, 2009, the Bankruptcy Court granted the defendants' stay motions as to their payment and disgorgement obligations, subject to the posting of supersedeas bonds in the amount of 110% of such amounts [D.E. # 723].

On November 10, 2009, certain defendants filed emergency motions for stays pending appeal in the District Court seeking to eliminate or lower the bond amounts.  The District Court issued an order in each such case on November 20, 2009, modifying the Bankruptcy Court's order on the amount of the supersedeas bonds with respect to the First Lien Term Loan Lenders. With respect to the Transeastern Lenders, the order provided that (i) the surety needed only obtain an A rather than an A+ rating from the major ratings agencies; (ii) the deadline for posting the bonds was extended to December 22, 2009; and (iii) the Bankruptcy Court could schedule a January 2010 hearing for challenges to the adequacy of any bonds posted prior to that time. The majority of the defendants posted supersedeas bonds on or before December 22, 2009, as required by the District Court's order.

### xii.      First Lien Term Loan Lenders' Appeal

The First Lien Term Loan Lenders' appeal of the Decision was docketed in the District Court on January 5, 2010 as Case No. 10-60019 and assigned to Judge Jordan.  On March 5, 2010, the Committee filed a motion in each of the three appeals to consolidate the appeals.  The First Lien Term Loan Lenders, Second Lien Term Loan Lenders, and Debtors have all agreed that the appeals should be consolidated, but the Transeastern Lenders have opposed consolidation.  On April 7, 2010, the District Court issued an order [D.E. # 60] holding in

abeyance the Committee's motion to consolidate and setting a briefing and argument schedule substantially identical to that set in the Transeastern Lenders' appeal (Case No. 10-60017, as described in section V.F.2.a.xiii below).

On June 1, 2010, the First Lien Term Loan Lenders filed their brief in the appeal [D.E. # 69]. In their brief, the First Lien Term Loan Lenders argue, among other things, that: (i) the Bankruptcy Court erred as a matter of law in holding that the grant of a security interest in the 2007 Federal Tax Refund was an avoidable preference; (ii) the Bankruptcy Court improperly failed to recognize reasonably equivalent value given to the Conveying Subsidiaries in the Transeastern Settlement; (iii) several of the disgorgement remedies ordered by the Bankruptcy Court were improper; and (iv) their third-party claims against the Debtors were improperly dismissed. The First Lien Term Loan Lenders also adopted certain arguments made in the Second Lien Term Loan Lenders' brief (as discussed below).

The Committee's and Debtors' responses are currently due to be filed no later than August 2, 2010, with any reply brief to be filed no later than September 3, 2010. Argument is currently scheduled for October 22, 2010.

On June 8, 2010, the Loan Syndications and Trading Association and Commercial Finance Association filed motions for leave to appear as *amici curiae* in each of the three appeals. The Committee filed a response to these motions on June 17, 2010, requesting that, if potential *amici*'s motions are granted, the briefing schedule be extended by two weeks, which motions are currently pending.

### xiii.    Second Lien Term Loan Lenders' Appeal

The Second Lien Term Loan Lenders' appeal was docketed in the District Court on January 5, 2010 as Case No. 10-60018 and assigned to Judge Altonaga. On February 3, 2010, Judge Altonaga recused herself, and the case was reassigned to Chief Judge Federico A. Moreno. On March 29, 2010, pursuant to District Court Local Rule 3.8, Chief Judge Moreno transferred the case to Judge Gold. On March 30, 2010, Judge Gold issued an order setting a briefing and argument schedule substantially identical to the schedule in both the First Lien Term Loan Lenders' and Transeastern Lenders' appeals, except that oral argument in the Second Lien Term Loan Lenders' appeal is currently scheduled for October 29, 2010.

On June 1, 2010, the Second Lien Term Loan Lenders filed their brief in the appeal [D.E. # 71]. In their brief, the Second Lien Term Loan Lenders argue, among other things, that: (i) the Bankruptcy Court improperly failed to consider evidence of the solvency of Debtors on a consolidated basis; (ii) testimony of two of the Committee's experts was improperly admitted; and (iii) the Bankruptcy Court improperly held that the Conveying Subsidiaries did not receive reasonably equivalent value. The Second Lien Term Loan Lenders also incorporated by reference arguments made by the First Lien Term Loan Lenders in their brief.

The *amici* motions described in the First Lien Term Loan Lenders' appeal above are also pending in the Second Lien Term Loan Lenders' appeal, and the appeals are on a substantially identical schedule.

### xiv.    Transeastern Lenders' Appeal

The Transeastern Lenders' appeal was docketed in the District Court on January 5, 2010 as Case No. 10-60017 and assigned to Judge Gold. On June 1, 2010, the Transeastern Lenders filed their brief in the appeal [D.E. # 75]. In their brief, the Transeastern Lenders argue, among other things, that: (i) the Bankruptcy Court improperly found them liable as either direct transferees or entities for whose benefit the fraudulent transfers were made; (ii) the Bankruptcy Court ordered impermissible remedies; (iii) they are entitled to liens against assets held by TOUSA Homes Florida, L.P., the Conveying Subsidiary that holds the former Transeastern property; and (iv) the case should be reassigned to a different bankruptcy judge upon remand. The Transeastern Lenders also incorporated by reference the arguments relating to insolvency made by the First Lien Term Loan Lenders and Second Lien Term Loan Lenders in their respective appeals.

On May 28, 2010, the First Lien Term Loan Lenders filed a motion to intervene in the Transeastern Lenders' appeal, which the Transeastern Lenders opposed. Such motion is currently pending.

The same *amici* motions described in the First Lien Term Loan Lenders' appeal above are also pending in the Transeastern Lenders' appeal. The appeals are on substantially identical schedules, except that oral argument in the Transeastern Lenders' appeal is currently scheduled for October 29, 2010.

### xv.    The Quantification Motion

As part of the Bankruptcy Court's Decision, as amended, the Debtors were ordered to file an analysis of the value of their assets as of October 13, 2009, and the First Lien Term Loan Lenders and Second Lien Term Loan Lenders were ordered to file accountings relating to the monies that they had received pursuant to the Transeastern Settlement. As described in section VI.A herein, the estimated distributions under the Plan are based on the Debtors' analysis (the "RVA") as adjusted by the Committee's professionals. In connection with the Quantification Motion, the Prepetition Secured Lenders agreed with certain of the adjustments by the Committee's professionals, including (i) TOUSA's ownership of the 2007 Federal Tax Refund and 2008 Federal Tax Refund and (ii) elimination of a proposed negative cash balance at TOUSA.

On March 16, 2010, the Committee filed a motion to set payment amounts in the Bankruptcy Court [D.E. # 937] (the "Quantification Motion") in order to finalize the amounts owed by each of the defendants. Each of the defendants filed responses to the Quantification Motion on April 14, 2009 [D.E. # 964, 965, 966], and the Committee filed its reply on May 3, 2010 [D.E. # 974]. A hearing on the Quantification Motion was held on May 17, 2010.

On May 28, 2010, the Bankruptcy Court issued an order granting the Quantification Motion in part, and setting the amounts to be disgorged by each Transeastern Lender [D.E. # 985]. The Bankruptcy Court ordered the disgorgement of the total of approximately $400 million, plus prejudgment interest of 9% running from July 31, 2007 through the date of final judgment as to the Transeastern Lenders. On the same date, the Bankruptcy Court also issued a

final judgment as to Counts VII-XVII of the Third Amended Complaint (the counts asserting claims against the Transeastern Lenders) under Federal Rule of Civil Procedure 54(b) [D.E. # 986]. The Transeastern Lenders filed a notice of appeal of such judgment on June 11, 2010 [D.E. # 1011]. Such appeal is currently pending as Case No. 10-60017 in the District Court before Judge Gold.

The Bankruptcy Court further ruled, as to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders, that: (i) the First Lien Term Loan Lenders would disgorge principal and interest payments they received pursuant to the First Lien Term Loan Credit Agreement, totaling approximately $29.5 million; (ii) the First Lien Term Loan Lenders and Second Lien Term Loan Lenders would disgorge fees paid to their professionals out of the Debtors' Estates arising out of the fraudulent transfer, totaling approximately $25.2 million and $22.8 million, respectively; and (iii) the First Lien Term Loan Lenders would disgorge $70.9 million paid in connection with the pay down under the First Cash Collateral Order. From the amounts to be disgorged by the Transeastern Lenders, the Conveying Subsidiaries would receive from such disgorged funds (i) approximately $17.0 million in transaction costs from the Transeastern Settlement; (ii) the Committee's and the Debtors' fees arising from the Committee Action, totaling approximately $37.7 million; and (iii) a total of $88.5 million for diminution in value of the liens (based on the Bankruptcy Court's ruling that the starting point for calculating diminution of value would be $500 million and the parties' later agreement that the remaining value of the liens was $411.5 million). The Bankruptcy Court further ruled that prejudgment interest at 9% would run on all of the amounts to be disgorged and paid to the Conveying Subsidiaries, running until the date of final judgment. On July 13, 2010, the Bankruptcy Court entered an order setting forth these amounts [D.E. # 1037].

### xvi.    The Distressed High Yield Settlement Agreement

In February 2008, two defendants in the Committee Action—Distressed High Yield Trading Opportunities Fund Ltd. (the "Offshore Fund") and Distressed High Yield Trading Opportunities Fund LLC (collectively, the "Funds")—decided to liquidate pursuant to British Virgin Islands law and began distributing their assets to their redeeming investors. Because the Funds had not distributed all of their assets at the time they were served in the Committee Action, the Offshore Fund voluntarily set up a Cayman Islands trust to hold a reserve for the claims of the Conveying Subsidiaries. The trust originally held $3 million, but approximately $300,000 of the trust was spent by the Funds in defense costs in connection with the Committee Action.

After entry of the Decision, counsel for the Funds informed the Committee that the Funds lacked sufficient assets to pay their creditors in full. Accordingly, the Funds and the Committee negotiated a settlement agreement (the "Funds Settlement Agreement") resolving the Committee's claims against the Funds. Pursuant to the Funds Settlement Agreement, the Offshore Fund agreed to pay $2.9 million to the Conveying Subsidiaries (representing a distribution of approximately 70% of the Conveying Subsidiaries' claims against the Offshore Fund), subject to adjustment to ensure that the Conveying Subsidiaries received the same percentage recovery as other unsecured creditors of the Funds in accordance with British Virgin

Islands law.[8]  As a condition to the settlement, the parties agreed that any order approving the Funds Settlement Agreement would include an injunction barring any other defendant in the Committee Action from pursuing any claim or cause of action against the Funds arising out of the Transeastern Settlement.  On March 19, 2010, the Bankruptcy Court entered an order approving the Funds Settlement Agreement [D.E. # 948].

        **b.**        **The Fiduciary Duty Action**

        **i.**        **The Complaint**

On June 9, 2009, the Committee commenced the Fiduciary Duty Action to pursue damages from (i) certain of the Debtors' officers and directors for breaching their fiduciary duties to the Conveying Subsidiaries and their creditors in connection with the Transeastern Settlement and (ii) TOUSA's majority shareholder, Technical Olympic S.A. ("Tech SA"), for aiding and abetting such breaches.  Following a stay in the proceedings pending the outcome of the Committee Action, the Defendants moved on January 29, 2010 to dismiss the Committee's complaint [D.E. # 57, 61-64].

On February 19, 2010, the Committee filed an amended complaint (the "Amended Fiduciary Duty Complaint"), [D.E. # 93], asserting certain supplemental and alternative causes of action, including claims for aiding and abetting against certain members of the Board.

On March 12, 2010, the defendants moved to dismiss the Amended Fiduciary Duty Complaint [D.E. # 107-14].  Defendants Konstantinos Stengos, Andreas Stengos, George Stengos, Marianna Stengou (collectively, the "Stengos Defendants") and Tech SA contended that: (i) the Committee is not permitted to bring a direct claim on behalf of TOUSA's creditors; (ii) the Stengos Defendants did not owe fiduciary duties to the Conveying Subsidiaries; and (iii) the Amended Fiduciary Duty Complaint failed to state a claim for breach of fiduciary duty because the Stengos Defendants were entitled to the protection of the business judgment rule. Tech SA also contended that the Amended Fiduciary Duty Complaint failed to state an aiding and abetting claim upon which relief can be granted.

Defendant Antonio Mon joined the arguments made by the Stengos Defendants. Defendants Larry Horner, William Hasler, Michael Poulos, Susan Parks, and J. Bryan Whitworth (collectively, the "Outside Director Defendants") advanced the same arguments in their motion to dismiss as the Stengos Defendants, with the additional claim that the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Decision.

Defendants Paul Berkowitz, David Schoenborn, Stephen Wagman, and Russell Devendorf (the "Officer Defendants") made the same arguments in their motion to dismiss as the Outside Director Defendants, except they did not deny that they owed fiduciary duties to the Conveying Subsidiaries.  The Officer Defendants also argued that the Fiduciary Duty Action

---

[8] The Funds had also filed a notice of appeal of the Decision.  As part of the Funds Settlement Agreement, the Funds agreed to withdraw such appeal with prejudice.

should be dismissed because of certain exculpation clauses in the Conveying Subsidiaries' governing documents.

In his motion to dismiss, defendant Brian Konderik, like the Stengos Defendants, argued that the Committee is not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors.  He also argued that the Amended Fiduciary Duty Complaint failed to state a claim because of certain limitations on liability in the Conveying Subsidiaries' governing documents.  In their motion to dismiss, defendants Candace Corra, Tom McAndrew, and Gordon Stewart argued that: (i) the Committee is not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors; (ii) the Complaint fails to allege sufficient facts to establish a fiduciary relationship; (iii) they are entitled to the protection of the business judgment rule; (iv) the Amended Fiduciary Duty Complaint fails to state a claim because of certain limitations on liability in the Conveying Subsidiaries' governing documents; and (v) the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Committee Action.

Defendant Tommy McAden was granted additional time to respond to the Amended Fiduciary Duty Complaint.  He filed a motion to dismiss on April 2, 2010 [D.E. # 129].  McAden argued that (i) he does not owe fiduciary duties to the Conveying Subsidiaries; (ii) the Committee is not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors; (iii) McAden abstained from voting on the Transeastern Settlement and thus could not have breached his fiduciary duties; and (iv) the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Committee Action.

The Bankruptcy Court held oral argument on the motions to dismiss, with the exception of defendant McAden's motion to dismiss, on April 19, 2010.  The Bankruptcy Court's decision on the motions to dismiss remains pending as of the date hereof.

### ii.    The Defendants' Withdrawal Motion

Certain of the defendants filed a motion in the District Court to withdraw the reference of the Fiduciary Duty Action [Adv. Case No. 10-60206, D.E. # 1] (the "Withdrawal Motion"), which would have removed the Fiduciary Duty Action from the Bankruptcy Court to the District Court.  The Committee opposed the Withdrawal Motion and, on April 19, 2010, Judge James I. Cohn of the District Court denied the Withdrawal Motion without prejudice.

In denying the Withdrawal Motion, the District Court held that the Bankruptcy Court was the appropriate forum for the Fiduciary Duty Action, largely due to the Bankruptcy Court's familiarity with the underlying facts.  The District Court also found that (i) denying the Withdrawal Motion furthered judicial economy, (ii) the Committee had successfully raised the possibility that the Withdrawal Motion was motivated by a desire to "forum shop" in light of the Bankruptcy Court's criticism of the defendants' decision-making in the Decision, and (iii) given the defendants' failure to demand a jury trial, withdrawal based on a potential jury demand was premature. Because the District Court's decision is without prejudice, it leaves open the possibility that the defendants might renew the Withdrawal Motion at a later date.

### c.      The Insurance Coverage Action

#### i.      Background

On January 16, 2009, the Debtors notified their two primary insurance carriers whose policies may cover the claims made in the Fiduciary Duty Action, XL Specialty Insurance Company and Federal Insurance Company (together with the Debtors secondary insurance carriers, the "Insurers"), that the Committee intended to bring claims against certain directors and officers  (the "D&O Defendants").  However, each Insurer denied coverage of the Fiduciary Duty Action, arguing that the asserted claims fall within the other Insurer's policy period.

#### ii.      The Complaint

Subsequently, the Debtors engaged in negotiations with the Insurers, who continued to deny coverage and refused to advance defense costs to the D&O Defendants.  On November 5, 2009, the Debtors commenced the Insurance Coverage Action against the Insurers.  The Insurance Coverage Action seeks a declaration that the Insurers must cover, and advance defense costs for, the Fiduciary Duty Action.  The Insurers moved to dismiss the complaint, arguing that (i) the Debtors lack standing to bring the Insurance Coverage Action; (ii) the Debtors fail to state a claim for which they are entitled to relief; and (iii) the D&O Defendants are indispensible parties to the Insurance Coverage Action [D.E. # 86, 91, 92, 94].  The Insurers also filed a motion to withdraw reference of the Insurance Coverage Action to the Bankruptcy Court and to instead have the action tried in the District Court [D.E. # 96].

#### iii.      The Agreement to Mediate

The Committee filed a motion to intervene in the Insurance Coverage Action on December 21, 2009 [D.E. # 122].  However, the Committee agreed to hold its motion in abeyance while the Debtors negotiated with the Insurers.  Shortly thereafter, the Debtors and the Insurers reached an agreement whereby defense costs will be advanced to the D&O Defendants while the issue of coverage is litigated [D.E. # 156].  Additionally, the Debtors and the Insurers agreed to stay the Insurance Coverage Action while the parties attempt to mediate the dispute [D.E. # 155, 160].

On April 15, 2010, the parties selected David Geronemus to mediate the Insurance Coverage Action [D.E. # 161].  The dispute will be mediated on August 3-4, 2010 in New York, New York.  Prior to the mediation, the parties will exchange a statement of facts, a mediation brief, and a reply.  The Committee has reached an agreement with the other parties to actively participate in the mediation and submit a brief.

The Insurance Coverage Action is stayed in its entirety through August 15, 2010, pending the outcome of the foregoing mediation [D.E. # 166].

### d.    The Falcone Action

#### i.    Standing of the Committee to Pursue the Falcone Action

On December 23, 2009, the Committee filed a motion in the Bankruptcy Court seeking authority to investigate, commence and prosecute certain Causes of Action on behalf of certain of the Debtors' Estates against the Debtors' former joint venture partners (the "Falcones") and certain related parties (collectively, the "Falcone Action Defendants") relating to settlement agreements made as part of the Transeastern Settlement [D.E. # 3446]. On January 22, 2010, the Bankruptcy Court entered an order granting the Committee standing to pursue such Causes of Action [D.E. # 4408].

#### ii.    The Complaint

On January 26, 2010, the Committee commenced the Falcone Action, which sets forth fraudulent transfer claims under the Bankruptcy Code and applicable non-bankruptcy law.

As part of the Transeastern Settlement, the Debtors exercised certain land purchase option agreements, and terminated others, resulting in payments of over $50 million to certain of the Falcone Action Defendants. The assets of the Transeastern JV were assumed by TOUSA Homes Florida, L.P., and the Falcones relinquished their ownership interest in the Transeastern JV. Simultaneously, certain of the Debtors entered into releases and indemnification agreements with the Falcone Action Defendants, pursuant to which they agreed to provide indemnification for any claims relating to the Transeastern JV.

The Committee alleges that the Debtors did not receive reasonably equivalent value for cash transfers made to the Falcone Action Defendants, nor for the releases and indemnification given in connection therewith. The Committee alleges that the land received pursuant to the exercised option agreements was worth approximately $28 million, but was encumbered with $42 million in liabilities. Moreover, as to the Conveying Subsidiaries, who were not obligated on the Transeastern Loans, the Committee alleges that no benefit was received from the transfers made to the Falcone Action Defendants. The Committee alleges that because the Debtors were insolvent at the time of these transfers, they should be avoided as constructively fraudulent.

#### iii.    The Falcone Action Defendants' Motions to Dismiss

The Falcone Action Defendants filed motions to dismiss the Falcone Action or, in the alternative, for a more definite statement, arguing, among other things, that: (i) the Falcone complaint is a shotgun pleading, (ii) the Falcone complaint improperly lumps together all of the Falcone Action Defendants and fails to specify which of the Falcone Action Defendants received the alleged fraudulent transfers, and (iii) the exercise of an option agreement should not be the basis of a fraudulent transfer claim as a matter of public policy [D.E. # 25, 27, 37, 38].

After oral argument on June 16, 2010, the Bankruptcy Court granted the motions to dismiss in part, without prejudice, on the grounds that the Falcone complaint constituted a shotgun pleading, improperly lumped the Falcone Action Defendants together and failed to identify the recipients of the allegedly fraudulent transfers. The Bankruptcy Court rejected the argument that exercise of an option agreement should not be subject to fraudulent transfer law.

The Bankruptcy Court granted the Committee leave to file an amended complaint, which the Committee did on July 7, 2010 [D.E. # 79].

### iv.    The Amended Complaint

The Committee's First Amended Adversary Complaint (the "Amended Falcone Complaint") alleges that the Debtors did not receive reasonably equivalent value in exchange for the cash transfers that the TOUSA entities made to certain defendants.  In addition, it seeks the avoidance of a release (the "Release Transfer"), which the TOUSA entities provided to one defendant, Falcone/Ritchie LLC.

To address the issued raised in defendants' motions to dismiss, the Amended Falcone Complaint identifies the provisions in four settlement agreements that created payment obligations to certain defendants and specifies the amounts paid to each of these defendants.  It also identifies the liability from which Falcone/Ritchie was released pursuant to the Release Transfer.  In contrast to the original complaint, the Amended Falcone Complaint does not seek to avoid all of the releases and grants of indemnification provided for in each of the settlement agreements.  Rather, by the Amended Falcone Complaint, the Committee seeks to avoid the release related to the guaranties entered into by Falcone/Ritchie as part of the formation of the Transeastern JV.

Because the Conveying Subsidiaries were not obligated on the Transeastern Loans, and because the Conveying Subsidiaries were insolvent at the time of these transfers, the Committee seeks to have such transfers avoided as constructively fraudulent.  In addition, because none of the Debtors received reasonably equivalent value in exchange for the Release Transfer, and because the Release Transfer was predicated upon the provision of the cash transfers, the Amended Falcone Complaint also seeks the avoidance of the Release Transfer.

The Falcone Action Defendants have until August 11, 2010 to respond to the Amended Falcone Complaint.

### e.    The Durgin Lawsuit

TOUSA was previously a defendant in a class action lawsuit pending in the District Court that also named as defendants several of TOUSA's current or former officers, all of TOUSA's directors, Tech SA, and the underwriters of certain of TOUSA's offerings. The original consolidated complaint in the action alleged, among other things, that TOUSA's public filings and other public statements were false and misleading. On January 30, 2008, TOUSA and other defendants filed motions to dismiss the original consolidated complaint on various grounds. On February 5, 2008, the District Court entered an order staying the action as to TOUSA pursuant to Bankruptcy Code section 362. The action continued with respect to the other defendants.

On April 30, 2008, former lead plaintiff Diamondback Capital Management moved to withdraw as lead plaintiff.  On May 22, 2008, the District Court granted the withdrawal motion. A new lead plaintiff, Bricklayers & Trowel Trades International Pension Fund (the "Bricklayers"), was appointed on July 15, 2008. The Bricklayers filed a consolidated amended class action complaint (the "Amended Complaint") on September 19, 2009.  The only defendants named in the Amended Complaint were four of TOUSA's current or former individual officers.

Accordingly, neither TOUSA nor any of the other thirty-eight Debtors in the Chapter 11 Cases is named as a defendant in the Amended Complaint. The name and case number of the action is *Durgin, et al., v. TOUSA, Inc., et al.*, No. 06 61844 CIV (S.D. Fla).

On November 21, 2008 and March 2, 2009, the defendants filed their respective motions to dismiss the Amended Complaint, and on September 21, 2009, the District Court entered an order granting the defendants' motions to dismiss due to various pleading deficiencies, but also granting the Bricklayers leave to file a second amended complaint. The Bricklayers chose not to file a second amended complaint and on October 22, 2009, the District Court entered a judgment in favor of the defendants. The parties each filed appeals with the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit"). The Eleventh Circuit subsequently granted Tommy McAden's motion to dismiss the appeal as moot. The other appeals remain pending as of the date hereof.

### f.    The EMF Lawsuit

On September 23, 2008, plaintiffs EMF Fund III, LLC, EMF Fund IV, LLC and EMF Fund V, LLC filed a lawsuit in the Broward Circuit Court against four of TOUSA's former directors and officers. The lawsuit, which does not name TOUSA as a defendant, alleges that the plaintiffs entered into an option agreement with TOUSA based on allegedly false oral and written representations attributed to the current or former individual officers. The lawsuit seeks damages, together with interest and costs in an unspecified amount. The defendants filed motions to dismiss, which were denied on May 27, 2010. The plaintiff has served discovery requests on TOUSA and the defendants on June 6, 2010 and June 21, 2010, respectively. The lawsuit remains pending. The name and case number of the action is *EMF Fund III, LLC, et al., v. Antonio P. Mon, et al.*, No. 0845087 (Fla. Cir. Ct.).

### g.    The Krieff Litigation

Robert Krieff ("Krieff") was the Tampa Division president of TOUSA Homes Florida, L.P. from July 2005 to June 2006 pursuant to an Employment Agreement dated July 28, 2005 (the "Krieff Employment Agreement"). Krieff and TOUSA Homes Florida, L.P. were also parties to an agreement to arbitrate claims, and upon the termination of Krieff's employment with the Debtors, Krieff filed a demand for arbitration against TOUSA Homes Florida, L.P. alleging a breach of the Krieff Employment Agreement for improper termination. On November 16, 2007, the arbitrator issued her findings of fact and interim award (the "Interim Award"), suggesting that Krieff was entitled to damages from TOUSA Homes Florida, L.P. in the amount of $632,599. Although the Interim Award was provisional in nature and TOUSA Homes Florida, L.P. put forth numerous objections, the Broward Circuit Court made an oral ruling on December 4, 2007 that the Interim Award would be treated as final and would be confirmed. On December 7, 2007, TOUSA Homes Florida, L.P. filed a motion to reconsider the decision confirming the arbitrator's award, which the Broward Circuit Court subsequently rejected, and on December 17, 2007 the Broward Circuit Court entered a final judgment confirming the interim arbitration award (the "Circuit Court Judgment").

On December 20, 2007, Krieff served a Writ of Garnishment (the "Writ") on Wachovia Bank, N.A. ("Wachovia") seeking to collect on the Circuit Court Judgment. Wachovia answered

the Writ on January 11, 2008 making clear that it would comply with the Writ. The amount currently retained by Wachovia pursuant to the Writ stands at $632,599 (the "Garnished Funds"). On January 16, 2008, TOUSA Homes Florida, L.P. appealed the Circuit Court Judgment to the Fourth District Court of Appeals of Florida, which appeal has been stayed as a result of the Chapter 11 Cases.

Krieff subsequently attempted to seek relief from the automatic stay in the Chapter 11 Cases by filing a motion in the Bankruptcy Court on February 29, 2008. The Bankruptcy Court entered an order denying the stay motion on March 26, 2008 [D.E. # 668]. On April 1, 2009, TOUSA and TOUSA Homes Florida, L.P. commenced an adversary proceeding in the Bankruptcy Court to recover the Garnished Funds [Adv. Case No. 09-01303, D.E. # 1]. On March 5, 2010, TOUSA and TOUSA Homes Florida, L.P. filed a motion for summary judgment seeking an order, among other things, avoiding Krieff's judicial lien pursuant to sections 547 and 550 of the Bankruptcy Code, dissolving the Writ and instructing Wachovia to release the Garnished Funds [D.E. # 30]. On June 7, 2010, the Bankruptcy Court entered an order granting the motion for summary judgment and rendering judgment against Krieff [D.E. # 42].

### h.    Litigation Concerning Customer Deposits

In connection with the sale of homes in the ordinary course of their business, the Debtors routinely entered into contracts with third parties for the purchase of a home that required such purchasers to place a deposit into an escrow account pending the closing of the sale. The purchase agreements for these home sales typically included provisions that governed the return of a deposit in the event the closing on the home did not take place.

During the course of the Chapter 11 Cases, the Debtors initiated several adversary proceedings in the Bankruptcy Court through the Debtors' special counsel, Greenberg Traurig LLP, to recover customer deposits that were held in escrow and subject to bona fide dispute. Additionally, several customers commenced adversary proceedings against certain of the Debtors seeking return of customer deposits (collectively, the "Deposit Actions").

Given the substantial number of potential Deposit Actions, on March 4, 2009, the Debtors filed a motion to establish settlement procedures with respect to such Deposit Actions (the "Deposit Action Settlement Procedures") to avoid the expense and delay that would be associated with filing individual, and likely repetitive, pleadings in each of the Deposit Actions [D.E. # 2535]. Pursuant to the Deposit Action Settlement Procedures, the Debtors were required to provide notice of each proposed settlement to counsel for the Committee, the U.S. Trustee, counsel for the First Lien Agents, and counsel for the Second Lien Term Loan Lenders, with each such party given an opportunity to review and object to such proposed settlement. On March 26, 2009, the Bankruptcy Court entered an order approving the Deposit Action Settlement Procedures [D.E. # 2630].

### i.    Procedures for the Settlement of Certain Actions

On March 4, 2009, the Debtors filed a motion to establish efficient and cost-effective uniform procedures for the settlement of de minimis actions (the "Settlement Procedures Motion"). On March 26, 2009, the Bankruptcy Court entered an order granting the motion and

establishing uniform procedures for settlement of certain actions or potential actions [D.E. # 2630] (the "Settlement Procedures Order"). Pursuant to the Settlement Procedures Order, the Debtors have the authority to negotiate and settle actions in connection with the daily operations of the Debtors' business, regardless of the amount of the action, upon notice to certain parties, including the Committee, without further intervention by the Bankruptcy Court. Upon information and belief, as of June 2010, the Debtors had settled claims totaling approximately $160,000 pursuant to the terms of the Settlement Procedures Order.

### j.    Potential Litigation Relating to Chinese Drywall

TOUSA Homes, Inc. was named as a defendant in two purported class action lawsuits on behalf of certain homeowner plaintiffs who alleged that the Debtors sold them homes containing drywall imported from China that is alleged to be inherently defective and which been characterized as "Chinese Drywall." The Chinese Drywall allegedly emits various sulfide gasses and/or other chemicals that purportedly cause property damage and potential health hazards. Upon information and belief: (i) in one lawsuit, the Debtors have been voluntarily dismissed without prejudice and  (ii) in a second, the lawsuit has been filed, but none of the Debtors have been served. Two groups of Chinese Drywall plaintiffs have sought and been granted permission to file late-filed Proofs of Claim in the Chapter 11 Cases on the grounds that such claimants became aware of personal injury and or property damage to their homes after the deadline to file Proofs of Claim in the Chapter 11 Cases had passed. The Debtors have disputed certain of the Chinese Drywall related Proofs of Claim. The Debtors and the Committee continue to conduct diligence in all respects in connection with the Debtors' use of Chinese Drywall.

### k.    The Lake Las Vegas Litigation

In June 2005, LLV-1, LLC ("LLV") and TOUSA Homes, Inc. entered into a Purchase Agreement and Escrow Instructions (as amended, the "LLVR Purchase Agreement"), whereby TOUSA Homes, Inc. agreed to purchase certain real property in Henderson, Nevada at the Lake Las Vegas Resort (the "LLVR Property") from LLV for $81 million. The LLVR Property was split into two phases for sale. After closing on Phase I of the LLVR Property, at LLV's request, TOUSA Homes, Inc. began construction on the Lake Las Vegas Resort project (the "LLVR Project"). In connection therewith, TOUSA Homes, Inc., as general contractor, subcontracted with Las Vegas Paving Corporation ("Las Vegas Paving") to provide certain materials, labor and equipment associated with the construction at the LLVR Project (the "Construction Agreement").

### i.    The LLV Action

On May 25, 2007, LLV brought an action against TOUSA Homes, Inc. (the "LLV Action") alleging that TOUSA Homes, Inc. had breached the terms of the LLVR Purchase Agreement by failing to close on Phase II of the LLVR Property, thereby forfeiting a deposit in the amount of $2.025 million (the "Escrow Deposit"). On July 5, 2007, TOUSA Homes, Inc. filed its answer, counterclaim and third-party complaint in the LLV action, alleging claims against LLV for, among other things, breach of contract, breach of the covenants of good faith and fair dealing and specific performance, and seeking return of the Escrow Deposit, plus interest. On July 17, 2007, LLV filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the District of Nevada (the "Nevada

Bankruptcy Court"). Following its chapter 11 filing, LLV obtained relief from the automatic stay in the Chapter 11 Cases and removed the LLV Action to the Nevada Bankruptcy Court, where it is currently pending as Adv. Case No. 08-01418-LBR.

On September 9, 2009, the Debtors sought Bankruptcy Court approval of a settlement agreement (the "LLV Action Settlement Agreement"), whereby TOUSA Homes, Inc. and LLV agreed to settle the LLV Action based on the following terms: (i) the Escrow Deposit was divided between the parties, with LLV receiving approximately $1,097,930 and TOUSA Homes, Inc. receiving approximately $1,135,000, (ii) TOUSA Homes, Inc. agreed to withdraw its proofs of claim filed in LLV's chapter 11 cases with prejudice, and (iii) TOUSA Homes, Inc. and LLV agreed to dismiss the LLV Action with prejudice. LLV and LLV's prepetition lenders and TOUSA Homes, Inc. agreed to release one another from all claims related to the LLV Action, but expressly reserved the parties' rights with respect to the Las Vegas State Court Action (as described in the next section). On September 23, 2009, the Bankruptcy Court entered an order approving the LLV Action Settlement Agreement [D.E. # 3205].

### ii.    The Las Vegas State Court Action

On January 16, 2008, Las Vegas Paving commenced the action styled Las Vegas Paving Corporation v. Engle Homes Nevada, LLC et al., Case No. A555448 pending in the District Court for Clark County, Nevada (the "Las Vegas State Court Action"), against, among other entities, TOUSA Homes, Inc. Pursuant to the Las Vegas State Court Action, Las Vegas Paving seeks payment of approximately $1.3 million under the Construction Agreement, alleging claims of breach of contract and unjust enrichment and seeking to foreclose on an asserted mechanic's lien. On May 29, 2008, TOUSA Homes, Inc. filed a cross-complaint and third-party complaint in the Las Vegas State Court Action, asserting a claim against LLV for the unpaid principal sum of approximately $7.6 million owed to TOUSA Homes, Inc. for the construction work performed by TOUSA Homes, Inc. as general contractor on the LLVR Project (the "Mechanics Lien Claim"). The amount of the Mechanics Lien Claim includes the full amount of Las Vegas Paving's Claim against TOUSA Homes, Inc., since Las Vegas Paving was acting as a subcontractor for TOUSA Homes, Inc. at the time it performed work on the LLVR Project. The third-party complaint was subsequently amended to include causes of action against LLV's pre-petition lenders for the imposition of an equitable lien, equitable subrogation, determination of lien priority and fraudulent conveyance. As a result of TOUSA Homes, Inc.'s filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code, the Las Vegas State Court Action was stayed. TOUSA Homes, Inc.'s third-party complaint against LLV in the Las Vegas State Court Action has been removed to the Nevada Bankruptcy Court and is currently pending as Adv. Case No. 09-01064-LBR.

On December 1, 2009, the Debtors sought Bankruptcy Court approval of a settlement agreement (the "Las Vegas State Court Action Settlement Agreement"), whereby LLV, LLV's pre-petition lenders and TOUSA Homes, Inc. agreed to execute and file a stipulated judgment in the Las Vegas State Court Action resolving, in favor of TOUSA Homes, Inc., the dispute over TOUSA Homes, Inc.'s and the LLV pre-petition lenders' relative lien priorities and otherwise dismissing with prejudice all causes of action against LLV and LLV's pre-petition lenders in the Las Vegas State Court Action. Such dismissal was without prejudice to TOUSA Homes, Inc.'s right to assert claims related to the amount of the Mechanics Lien Claim, which is to be

determined in mandatory binding arbitration. Upon information and belief, the arbitration has not yet resulted in any determination of the amount of the Mechanics Lien Claim nor any distributions on account of the Mechanics Lien Claim. The Las Vegas State Court Action Settlement Agreement also governed the apportionment of the Mechanics Lien Claim over parcels owned by LLV and provided a mechanism whereby LLV could exchange real property with third parties free and clear of the Mechanics Lien Claim provided that the real property received by LLV in the exchange became subject to the Mechanics Lien Claim. On December 17, 2009, the Bankruptcy Court entered an order approving the Las Vegas State Court Action Settlement Agreement [D.E. # 3420].

### l.    The Zuckerman Litigation

#### i.    Sale of Fox Grove Lots

Following oral arguments and briefing, on September 22, 2008, the Bankruptcy Court issued an order (along with a full opinion) authorizing TOUSA Homes, Inc. to sell 20 residential lots located in the community known as Meadow Run, Martin County ("Meadow Run") for an aggregate purchase price of $3 million [D.E. # 1803]. The Debtors' authority to consummate the sale was heavily contested by Meadow Run at Palm City, LLC ("Zuckerman") based on a contractual provision that prevented TOUSA Homes, Inc. from selling any lot for less than $325,000 so long as Zuckerman had lots in Meadow Run. On September 23, 2008, following entry of the Fox Grove Order, Zuckerman filed an election to appeal the Fox Grove Order to the District Court [D.E. # 1814] (the "Appeal"). Notwithstanding the Appeal, the Debtors consummated the sale of Meadow Run.

#### ii.    The Escrow Action

In addition to the dispute with Zuckerman concerning the property at Meadow Run, the parties were also subject to litigation concerning that certain Agreement for Sale and Purchase of Real Estate, dated April 22, 2005, with respect to certain property in Collier County, Florida and a related Agreement to Purchase, dated June 1, 2005. Specifically, The Zuckerman Group, Inc. commenced a state court action against TOUSA Homes, Inc. and ULT, seeking the return of certain escrowed funds totaling $850,000. Zuckerman filed a proof of claim based on its allegations in the State Court Action in the Chapter 11 Cases on May 6, 2008 in the amount of $850,000 (as amended, "Claim # 1931").

#### iii.    The Settlement Agreement

On February 26, 2009, TOUSA Homes, Inc. and Zuckerman agreed to a resolution of both the Appeal and the State Court Action including, among other things, a release of $475,000 of the disputed amount held in escrow to Zuckerman, with the remaining deposit, including interest accrual thereon, distributed to TOUSA Homes, Inc.; withdrawal of the Appeal with prejudice; and deemed disallowance of Claim # 1931. The Bankruptcy Court approved the settlement on March 26, 2009. On April 6, 2009, the parties filed a joint motion to dismiss the Appeal with prejudice, which the District Court granted on April 9, 2009.

### 3.    Indemnification Obligations with Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases

#### a.    The Debtors' Obligations to Indemnify Directors and Officers

TOUSA's certificate of incorporation requires TOUSA to indemnify its directors and officers against all costs related to certain suits to the fullest extent permitted under Delaware law.  Specifically, TOUSA must indemnify:

> Each person who was or is made a party . . . in any action, suit or proceeding . . . by reason of the fact that he or she . . . is or was or has agreed to become a director or officer of the Corporation . . . whether the basis of such proceeding is alleged action in an official capacity as a director or officer, or in any other capacity while serving or having agreed to serve as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law. . . against all expense, liability and loss . . . reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to serve [as a director or officer].

<u>See</u> Certificate of Incorporation of TOUSA, Art. X, Sec. II(a).  These indemnification provisions may apply to pending litigation against certain directors and officers, including the Fiduciary Duty Action, Durgin, and EMF lawsuits described in the previous section.  The language in the certificate of incorporation allows directors and officers to seek advancement of their defense costs before the final disposition of certain litigation if such an indemnified party provides TOUSA with an undertaking to repay in the event that such an indemnified party is found not to be entitled to indemnification.  Certain of TOUSA's subsidiaries' formation documents also contain various indemnification provisions that also may be implicated by pending litigation.

Additionally, former members of the Board may have a right of indemnification pursuant to a director indemnification agreement that was executed by TOUSA and which provides, in relevant part, that TOUSA "shall indemnify and advance Expenses to the Indemnitee . . . to the fullest extent permitted by applicable law in effect." Pursuant to this provision, directors can demand advancement of expenses within ten days of the date such expense is incurred, however these expenses must be reimbursed to TOUSA if a director is found not to be entitled to indemnification.

Certain of the Debtors' directors and officers have requested indemnification and/or the advancement of defense costs in connection with various litigations.  The Committee believes that all such claims for indemnification made by the Debtors' directors and officers, to the extent they are found to be valid, constitute prepetition, unsecured claims.

#### b.    The Debtors' Insurance Policies

The Plan contains provisions relating to the "D&O Liability Insurance Policies," which the Plan defines as all insurance policies for directors and officers' liability maintained by the Debtors.  Generally, the Debtors have a primary policy and several "excess" policies to cover losses, costs and expenses of the type incurred in connection with various litigation. Additionally,

each of the policies are "claims made," meaning that they cover only those claims made within the coverage period (and any claim that would relate back to such period). The aggregate amount of coverage is $100 million.

### 4.     Review and Analysis of Prepetition Intercompany Transactions

In connection with the Committee Action, the Committee's professionals became concerned with the Debtors' ability to reconcile their prepetition books and records. In the context of preparing to respond to discovery requests in the Committee Action, the Debtors and their restructuring advisor, Zolfo Cooper f/k/a Kroll Zolfo Cooper ("Zolfo Cooper"), undertook an analysis of intercompany claims and cash flow transactions among the Debtors. On August 5, 2008, the Debtors and Zolfo Cooper made a presentation to representatives of the Committee and the Prepetition Secured Lenders, at which time the Debtors and Zolfo Cooper disclosed certain preliminary findings.

According to the Debtors, their intercompany accounts could be categorized generally as follows: payroll and payroll taxes, employee benefits, capitalized debt interest, insurance, royalty payments, vendor rebates, capital charges, cash sweeps (net of disbursements), land purchases/sales, intercompany loans and miscellaneous/other. The Debtors kept journal-entry records of intercompany transactions in the ordinary course of their business. In their preliminary review of the Debtors' books and records, Zolfo Cooper determined that there were over 400,000 journal-entry line items from the inception of TOUSA through the Petition Date. The documents that support the journal entries, though available, are widely dispersed among various locations both within corporate and at the various divisions.

As explained in the August 5, 2008 presentation, Zolfo Cooper conducted a sample compilation of the Debtors' intercompany accounts for the month of August 2007, as a means toward understanding TOUSA's accounting processes and the recording of journal entries as related to intercompany transactions. Zolfo Cooper explained at the August 5, 2008 meeting that this reconciliation for one sample month took a team of reviewers four weeks to complete.

Historically, the Debtors' accounting system was set up by divisions and regional operating centers as opposed to by legal entity. Nonetheless, the accounting system can be "mapped" to show the correspondence between the divisions/operating centers and the legal entities within the TOUSA group. In the accounting system, intercompany transactions are created based on services performed, agreements among the Debtors and certain allocations from the "corporate" division (which maps to TOUSA as a legal entity). In the ordinary course of the Debtors' business, journal entries were allegedly prepared by an employee in the accounting group. The journal entries were purportedly reviewed by an approved reviewer and posted at least quarterly. Some entries were recorded on a monthly basis. As set forth in the August 5, 2008 presentation, based upon Zolfo Cooper's review of the Debtors' books and records, it appeared that twenty-six of the thirty-nine Debtors had an intercompany balance (either positive or negative) as of the Petition Date.

According to the Debtors, they did not consistently reconcile their intercompany journal entries on a legal entity basis. Instead, the Debtors consistently treated the intercompany balances as equity investments. As discussed in the Decision, the Debtors' filings with the SEC

disclosed that the intercompany balances were recorded as equity investments. Based on (i) the Debtors' historical treatment of intercompany balances as equity investments and (ii) the Debtors' inability to fully reconcile the prepetition intercompany transactions, for purposes of maintaining postpetition books and records, the Debtors have assumed the intercompany balances to be zero as of the Petition Date.

In addition to intercompany accounts based on journal entries, the Debtors historically engaged in certain intercompany loan transactions.  Specifically, TOUSA Funding, LLC holds certain notes from Newmark Homes, L.P. and TOUSA Homes, Inc..  The notes are interest-bearing.  In the ordinary course, TOUSA's accounting group calculates the interest accrued based on the note balance, prepares the appropriate journal entries to reflect interest and posts them to the general ledger.

Based on the findings in the Decision that the Prepetition Intercompany Claims are appropriately characterized as equity investments in the applicable Debtors, the Plan provides for treatment of Prepetition Intercompany Claims as equity.  Therefore, there will be no distributions on account of Prepetition Intercompany Claims.  However, subject to validation based on a review of the Debtors' books and records, it is anticipated that the documented Intercompany Notes will be honored.  Postpetition Intercompany Claims, which were documented as required by the financing orders, will be honored under the Plan and paid as administrative expenses to the extent not accounted for in the Remaining Value Analysis, as amended by the Committee or in the Debtors' wind down forecast.

## G.    OTHER DEVELOPMENTS DURING THE CHAPTER 11 CASES

### 1.    Filing of the Debtors' Schedules and SOFAs, Bar Dates and the Claims Process

#### a.    Debtors' Schedules of Financial Affairs and Statements of Liabilities and Assets

On February 13, 2008, the Debtors filed their Schedules, which provide information concerning each Debtor's assets, liabilities (including accounts payable), Executory Contracts and other financial information as of the Petition Date, all as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.  Certain of the Debtors amended and restated their respective Schedules on March 11, 2008.  In addition, on October 7, 2008, certain of the Debtors amended and restated their Schedules to reflect postpetition developments, including the payment of certain prepetition claims pursuant to the relief granted in the First Day Orders and other orders in the Chapter 11 Cases.

On August 15, 2008, Beacon Hill filed its Schedules with the Bankruptcy Court.

#### b.    Establishment of the Initial Claims Bar Date

On March 17, 2008, the Bankruptcy Court entered the Initial Claims Bar Date Order establishing, among other things, the Initial Claims Bar Date and the Governmental Bar Date [D.E. # 614].

In accordance with the Initial Claims Bar Date Order, the Debtors provided written notice of the Initial Claims Bar Date to all known potential creditors of the Debtors according to the Debtors' books and records at the time of mailing of the notice, including all litigation parties and homebuyers within the previous six years. The Debtors also provided written notice of the Initial Claims Bar Date, together with a "personalized" proof of claim form approved by the Bankruptcy Court, to each of the parties and entities identified as creditors on the Debtors' Schedules. The Debtors published notice of the Initial Claims Bar Date in the *Wall Street Journal* and twenty-nine local and trade publications circulated in each of the regions in which the Debtors operate.

### c.    Additional Bar Dates

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the last day on which each person or entity asserting a claim against Beacon Hill may file a Proof of Claim against Beacon Hill's Estate [D.E. # 1802].

On September 23, 2008, the Bankruptcy Court entered an order establishing October 22, 2008 as the deadline for (a) homeowners' associations to whom the Debtors have contractual or other obligations and (b) community development districts in which the Debtors own or have owned property to file a written Proof of Claim against any of the Debtors' Estates [D.E. # 1813].

On March 1, 2010, the Bankruptcy Court entered orders establishing May 14, 2010 as the deadline for (i) customers asserting claims arising from or related to a signed agreement to purchase a home from, or a home closed with, the Debtors to file a written Proof of Claim against any of the Debtors' Estates [D.E. # 5123]; (ii) third parties entitled to assert prepetition liens against the Debtors or their property under non-bankruptcy law to (a) file written proof of such liens or (b) take actions to perfect such liens under applicable non-bankruptcy law [D.E. # 5124]; and (iii) parties to file Proofs of Claim with respect to administrative expenses for goods provided or services rendered to the Debtors from the Petition Date through September 1, 2009 [D.E. # 5125].

### d.    Claims Filed Against the Debtors

As of July 15, 2010, more than 7,660 Proofs of Claim had been filed against the Debtors on an aggregate basis, totaling approximately $7.3 billion in asserted liabilities. These Proofs of Claim are comprised of the following: approximately $12.3 million in Administrative Claims, $219.5 million in secured Claims, $77.3 million in priority Claims and $7.1 billion in Unsecured Claims. In addition, approximately 3,800 Claims have been asserted in "unliquidated" amounts or in amounts that contain an unliquidated component. Certain of these Claims may be duplicative, such that the total amount of Claims asserted against the Debtors is significantly less when allowance is made for duplicate Claims and unliquidated Claims as to which an estimate was provided or can fairly be interpreted. The Debtors continue to reconcile Claims, and the estimated Claim amounts will likely be adjusted.

### e. Claims Objection Procedures

In light of the significant number of Claims that were filed or scheduled in the Chapter 11 Cases, on January 27, 2009, the Debtors filed a motion to establish a streamlined process for objecting to and responding to each Claim filed against the Debtors' Estates (with certain exceptions) [D.E. # 2400] (the "Claims Procedures Motion"). The Claims Procedures Motion reflected the Debtors' view that preparing and filing individual pleadings for each objection to a claim would be extremely time-consuming and expensive. On February 18, 2009, the Bankruptcy Court entered an order granting the relief sought in the Claims Procedures Motion [D.E. # 2468].

On February 17, 2010, the Debtors filed an omnibus objection to Claims [D.E. # 5091], whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 3,000 Claims based on thirty-five distinct categories of objections to claims. The first order on the objection expunged or reduced 1,80 Claims [D.E.# 5461]. The Bankruptcy Court has entered four additional orders granting the relief sought in the First Omnibus Claims Objection to the extent set forth therein [D.E. # 5523, 5579, 5667, 5788]. The remaining Claims objected to in the First Omnibus Claims Objection have been adjourned to a future date to be determined by the Bankruptcy Court.

### 2. Employee Compensation and Changes in Management

The Debtors took the following steps to retain employees and management during the Chapter 11 Cases:

### a. Deferred Employee Compensation

On February 20, 2008, the Debtors filed a motion for authority to honor their prepetition deferred compensation obligations to their employees and associates [D.E. # 320]. Because some of the Debtors' employees typically received a portion of their compensation on an annual rather than a quarterly basis, as of the Petition Date, the Debtors owed a significant portion of their employees' compensation for performance during the 2007 fiscal year. As stated in the motion, the Debtors believed that honoring their prepetition deferred compensation obligations was imperative to retain their core workforce during the reorganization process. Accordingly, on May 12, 2008, the Bankruptcy Court entered an order authorizing the Debtors, in their discretion, to pay up to $1,208,805 of outstanding prepetition deferred compensation obligations for the 2007 calendar year [D.E. # 950]. The amount authorized for payment did not reflect the entire balance of 2007 deferred compensation obligations. After negotiations with the Committee, the Debtors determined it was appropriate to pay only certain of the prepetition claims during the Chapter 11 Cases, and the Bankruptcy Court approved the reduced amount as described above.

### b. Senior Management

### i. Chief Executive Officer

On May 28, 2008, the Debtors filed a motion seeking authority to enter into an agreement with Antonio B. Mon (the "EVC Agreement"), then-chief executive officer, president and executive-vice chairman of the Board [D.E. # 1086]. Pursuant to the EVC Agreement, Mr. Mon

agreed to, among other things, relinquish his role as TOUSA's chief executive officer and remain solely in his position as executive-vice chairman of the Board through the end of 2008. The Bankruptcy Court entered an order approving the EVC Agreement on June 11, 2008 [D.E. # 1184] (the "EVC Order"). The Debtors subsequently amended the EVC Order to permit Mr. Mon to serve as chief executive officer through August 2008 for the purposes of, among other things, finalizing and signing TOUSA's 2007 Form 10-K (which was filed on August 12, 2008) [D.E. # 1648]. In accordance with the EVC Order, Mr. Mon's position as executive-vice chairman of the Board of Directors concluded at the end of 2008. Mr. Mon remains a director of TOUSA.

On June 10, 2008, the Debtors filed an application seeking authorization to appoint John R. Boken of Zolfo Cooper (f/k/a KZC Services, LLC) as TOUSA's chief executive officer [D.E. # 1167]. Mr. Boken had previously been appointed the Debtors' chief restructuring officer pursuant to a First Day Order [D.E. # 129]. On August 18, 2008, the Bankruptcy Court entered an order authorizing the Debtors to appoint Mr. Boken as chief executive officer [D.E. # 1647]. Mr. Boken has served as the Debtors' chief executive officer and chief restructuring officer since that time.

### ii.   Chief Financial Officer

On January 18, 2008, Stephen Wagman resigned as the Debtors' chief financial officer. Tommy McAden — previously an executive vice president of TOUSA — subsequently replaced Mr. Wagman. Mr. McAden has served as an executive vice president and chief financial officer throughout the Chapter 11 Cases. Mr. McAden is also a member of the Board.

### iii.   Chief Operating Officer

In May 2005, George Yeonas became the Debtors' chief operating officer. Mr. Yeonas served as the Debtors as executive vice president and chief operating officer throughout the Chapter 11 Cases until leaving the Debtors' employ on March 31, 2010.

### iv.   Executive Vice President and Chief of Staff

On February 13, 2008, the Debtors filed a motion for authority to enter into an amended employment agreement with Paul Berkowitz, who had served as TOUSA's executive vice president and chief of staff since January 1, 2007 [D.E. # 241]. As described in the motion, Mr. Berkowitz had planned to leave the Debtors' employ as of the chapter 11 filing and return to his previous employ as a shareholder at the law firm of Greenberg Traurig, LLP ("Greenberg"), from which position he would continue to provide legal services to the Debtors as outside counsel. Before the Petition Date, however, the U.S. Trustee indicated that it would object to any such arrangement on the ground that Greenberg would not be able to satisfy Bankruptcy Code retention requirements if it were to play a substantial role in the strategy or administration of the Chapter 11 Cases. As a result, TOUSA requested that Mr. Berkowitz remain with the company, and modified employment terms were agreed to and approved by the Bankruptcy Court. The Debtors subsequently determined that Mr. Berkowitz's services were no longer required and Mr. Berkowitz left TOUSA on December 31, 2009 and returned to Greenberg.

### c.    Incentive Plans

On April 8, 2009, the Debtors filed a motion to establish an associate incentive plan (the "Original Associate Incentive Plan") to incentivize their employees during the process of completing the development and sales of homes under construction, selling and delivering remaining inventory of pre-built homes and monetizing the Debtors' remaining land assets [D.E. # 2660]. The Original Associate Incentive Plan was proposed to be in effect from April 1, 2009 through March 31, 2010. The Debtors asserted that the Original Associate Incentive Plan was necessary to encourage key employees to remain with the Debtors and to continue marketing the Debtors' assets in light of the virtual certainty that their jobs would be eliminated at some point. On May 6, 2009, the Bankruptcy Court entered an order approving the Original Associate Incentive Plan [D.E. # 2746].

The Debtors did not simultaneously file a motion seeking to implement an incentive plan for their senior management because the Debtors and their major creditor constituencies were continuing to negotiate a management incentive. Ultimately, on June 16, 2009, the Debtors, with the support of the Committee and their other major constituencies, filed a motion seeking to establish a management incentive plan (the "Original Management Incentive Plan" and, together with the Original Associate Incentive Plan, the "Original Incentive Plans") to incentivize three key members of senior management to remain with the Debtors during the monetization of the Debtors' remaining assets [D.E. # 2893]. The Original Management Incentive Plan was also proposed to be in effect from April 1, 2009 through March 31, 2010. On July 16, 2009, the Bankruptcy Court entered an order approving the Original Management Incentive Plan [D.E. # 2985].

Following the implementation of the Original Incentive Plans, the Debtors reduced their workforce by 537 employees. However, 29 persons remained employed by the Debtors as of March 31, 2010. Accordingly, the Debtors began negotiating with the Committee and other parties in interest regarding extensions of the Original Incentive Plans for their remaining employees. On June 4, 2010, the Debtors filed a motion seeking to implement a revised incentive plan (the "Revised Incentive Plan") to incentivize their remaining employees through the conclusion of the monetization of the Debtors' assets and to thus maximize value for the Debtors' creditors for the period from April 1, 2010 through March 31, 2011 [D.E. # 5612]. On June 17, 2010, the Bankruptcy Court entered an order approving the Revised Incentive Plan [D.E. # 5659].

### 3.    Sales of Certain Assets

### a.    Sales of Non-core Assets

As of the Petition Date, the Debtors maintained and controlled a wide array of assets, including real, personal and intangible property interests. The Debtors' normal practice was to identify certain "non-core" assets unnecessary to the Debtors' business operations and to market those assets for sale. Such sales allowed the Debtors to streamline their operations by eliminating the cost of maintaining property not essential to their business, allowing for the purchase of other assets and improving their cash position. In addition, from time to time in the ordinary course of business, the Debtors would sell homes or lots on a bulk basis, in which many

homes or lots were sold to a single investor.  The Debtors believed that many of these asset sales (both non-core asset sales and bulk sales) were in the ordinary course of business and would not require a court order approving them; certain potential buyers and title insurers, however, indicated that they would require the Debtors to seek court approval for particular sales.  In fact, at the outset of the Chapter 11 Cases, the Debtors did seek court approval of certain individual sales.

To continue selling non-core assets during the Chapter 11 Cases without the expense and inefficiency of filing numerous similar motions with the Bankruptcy Court, the Debtors filed a motion on February 13, 2008 to establish streamlined procedures for the sale of assets during the Chapter 11 Cases [D.E. # 240] (the "Non-core Asset Sale Procedures").  The Debtors designed the Non-core Asset Sale Procedures to permit them to dispose of non-core assets and engage in bulk sales pursuant to section 363 of the Bankruptcy Code without further motion to the Bankruptcy Court.  A particular sale qualifies for treatment under these procedures if, among other things, it is (a) for an aggregate sale price of no more than $15 million and (b) not subject to an objection by certain parties entitled to receive notice of each sale.  On March 3, 2008, the Bankruptcy Court entered an order establishing the Non-core Asset Sale Procedures on an interim basis [D.E. # 495].

The Non-core Asset Sale Procedures have facilitated bulk sales in the ordinary course of the Debtors' business and have enabled the Debtors to shed certain non-performing assets and increase their liquid cash assets throughout the Chapter 11 Cases.  As of May 2010, the Debtors have generated approximately $196 million in cash pursuant to the Non-core Asset Sale Procedures and certain individual orders of the Bankruptcy Court authorizing bulk sales of property.

### b.    Sale of Florida Assets

Consistent with their revised wind down plan, beginning in early 2009, the Debtors ceased taking sale orders for new homes on unstarted lots through Florida and began selling all construction in progress.  Specifically, beginning in mid-February 2009, the Debtors and Lazard Frères & Co. LLC ("Lazard") contacted approximately twenty-seven potential buyers with respect to the Debtors' assets in Florida.  In addition to the offers described above, the Debtors received an offer from Starwood Land Ventures, L.L.C. ("Starwood") to purchase substantially all of the Debtors' Florida assets.  After analyzing the various offers received, the Debtors and Lazard determined that value would be best maximized through acceptance of Starwood's offer.  Thereafter, Starwood served as a "stalking horse" bidder for the property, whereby Starwood agreed to hold open its offer to purchase the Debtors' Florida assets, with the ultimate sale subject to a higher and better offer being made at an auction for such assets.  Starwood was the winning bidder for the Florida assets with a final purchase price of $81,000,000.  Accordingly, on January 29, 2010, the Bankruptcy Court entered an order approving the sale of the Debtors' Florida assets to Starwood [D.E. # 5030].

### c.    Sale of Texas Assets

Prepetition, the Debtors had operations in three Texas markets: Austin, Houston and San Antonio.  Consistent with their revised wind down plan, beginning in February 2009, the Debtors

and Lazard contacted potential buyers for the Debtors' remaining Texas assets. After receiving several preliminary proposals, only two buyers made offers to purchase the assets of all three Texas divisions. Ultimately, the Debtors determined that value would be maximized if their Texas assets were sold by division rather than as a whole.

### i.    Austin Division

Scott Felder Homes, LLC ("Felder") made an offer to purchase certain assets in the Debtors' Austin division pursuant to a takedown schedule for a purchase price of $11,500,000. On June 1, 2009, the Bankruptcy Court entered an order approving the sale of the Austin division to Felder [D.E. # 2829]. Following execution of the purchase agreement, Felder sought an amendment to the purchase agreement[9] modifying the takedown timeline in exchange for the payment of interest to the Debtors. On May 4, 2010, the Bankruptcy Court entered an order approving the amendment to the Felder purchase agreement [D.E. # 5515].

### ii.    Houston Division

Moody Fedrick Holdings, LLC ("Moody") made an offer to purchase nineteen (of thirty-two) lots in the Debtors' Houston division for a purchase price of $8,800,000. On June 1, 2009, the Bankruptcy Court entered an order approving the sale of such assets to Moody [D.E. # 2830].

Moody subsequently assigned its rights related to this transaction to Newmark Homes Houston LLC ("NHH"). Pursuant to the purchase agreement, the Debtors were permitted to continue to use the name "Newmark Homes" while their Nashville, Austin, Houston and San Antonio divisions were still operating during their respective wind-down periods, for a period not to exceed twelve months. After such period, the name of the entity would be changed to TOUSA Texas, LP. In January 2010, the Debtors began filing approximately 1,400 adversary complaints seeking to avoid and recover payments that were made by the Debtors to certain suppliers of NHH, causing NHH to face issues with suppliers who were confused by the use of the name "Newmark Homes" in the adversary complaints. In settlement of threatened litigation with NHH, on June 30, 2010, the Debtors filed a motion seeking to confirm the change of the entity's name to TOUSA Texas, LP and to clarify that NHH is unrelated to the Debtors and is not a party to any of the avoidance actions [D.E. # 5707]. A hearing on the motion is currently scheduled for August 12, 2010.

### d.    Sale of Mid-Atlantic Assets

Prepetition, the Debtors sold a significant portion of their assets in the Baltimore/Southern Pennsylvania, Nashville and Virginia markets (the "Mid-Atlantic Region") to NVR, Inc. ("NVR"). On May 4, 2009, pursuant to the Non-core Asset Sale Procedures (more fully described in section V.G.3.a), the Debtors and NVR entered into a postpetition agreement for the sale of 57 finished lots in the Mid-Atlantic Region, representing substantially all of the Debtors' remaining assets in the region. The sale was consummated on May 15, 2009.

---

[9] On or about May 20, 2009, Felder and the Debtors entered into the first amendment to the purchase agreement, which corrected certain scrivener's errors and did not materially alter the terms of the purchase agreement.

Subsequently, the Debtors approached a local developer and JNP Capital Management, L.L.C. ("JNP Capital") regarding a potential purchase of the Debtors' remaining assets in the Mid-Atlantic Region, consisting of fifteen finished and five unfinished lots (the "Remaining Mid-Atlantic Assets"). Because the construction and completion costs related to the Remaining Mid-Atlantic Assets (estimated at $1,230,000) far exceeded the market value of such assets and the return on any further investment would not have been realized until such assets were sold, the Debtors determined that value could be maximized by a sale of the Remaining Mid-Atlantic Assets to JNP Capital for a purchase price of $100,000. On September 9, 2009, the Bankruptcy Court entered an order approving the sale of the Remaining Mid-Atlantic Assets to JNP Capital [D.E. # 3173].

### e.    Sale of Western Assets

The Debtors' western region is comprised of five metropolitan markets including three in Colorado (Denver, Boulder and Colorado Springs), as well as Phoenix, Arizona and Las Vegas, Nevada. The Debtors have historically marketed their homes in this region under the "Engle Homes" brand names. As of April 30, 2009, these assets in the western U.S. (the "Western Assets") consisted of approximately 8,707 unstarted lots.

### i.    Initial Marketing Efforts

The Debtors, in conjunction with the Committee's advisors, began an intensive marketing effort in April 2007. Through this process, the Debtors entered into several one-off transactions with respect to certain portions of the Western Assets including, a sale of sixty lots in the "Sidehill Subdivision," located in Fort Collins, Colorado to Gino Campana [D.E. # 3382], as well as the sale of lots in the Colorado communities of Castlewood Ranch, Riverdale Park, Fox Meadow and Jasper Street to NexGen Lot Holdings, L.L.C. [D.E. # 3503].

### ii.    The Paulson Agreement and the Red River Assets

In mid-November 2009, at a time when the Debtors were negotiating various one-off transactions for the Western Assets, the Debtors received an offer from Paulson RERF Acquisition Corp. ("Paulson") that contemplated the purchase of substantially all the remaining assets within the entire Western Region — approximately 8,277 unstarted lots and 22 models. Importantly, the offer included the Debtors' assets in a development known as Red River described in further detail below. On March 4, 2010, certain of the Debtors and Paulson entered into an agreement with Paulson for the sale of the remaining Western Assets.

In March of 2005, TOUSA Homes, Inc. purchased approximately 4,025 acres of land, referred to as the "Red River Property," in Pinal County Arizona. In connection with this purchase, TOUSA Homes, Inc. agreed to make certain payments to Pinal Development Advisory Services ("PDAS") and its wholly owned subsidiaries, Santa Rosa Water Company and Santa Rosa Utility Company, to provide utility services for the Red River Property. In connection therewith, TOUSA Homes, Inc. paid PDAS approximately $2.4 million and provided a letter of credit for approximately $9.6 million to secure its obligation to continue to make payments. TOUSA Homes, Inc. did not develop the Red River Property and, as a result, PDAS did not commence utility services. Shortly after the Petition Date and pursuant to the terms of the

agreement between TOUSA Homes, Inc. and PDAS, PDAS drew down on the letter of credit. In total, PDAS received approximately $12.1 million from TOUSA Homes, Inc.

On December 18, 2009, TOUSA Homes, Inc. filed a complaint in Arizona Superior Court (the "Arizona Court") against PDAS and its subsidiaries seeking the return of the $12.1 million on the basis that PDAS was paid for work it never performed. On February 8, 2010, PDAS filed a motion to dismiss the proceeding, claiming that it is entitled to all payments made because it has been, and remains willing, to perform on the contract and provide utility services for the Red River Property. TOUSA Homes, Inc. and PDAS filed additional replies in further support of their positions on March 8, 2010 and March 31, 2010, respectively.

TOUSA Homes, Inc. and PDAS engaged in settlement negotiations, and the Arizona Court placed the matter on the inactive calendar without ruling on any motions. Following entry into the purchase agreement for the remaining Western Assets, TOUSA Homes, Inc., Paulson, and PDAS negotiated a settlement of the litigation, which is reflected in an "Amended Developer Payments Agreement."

On June 28, 2010, the Debtors filed a motion to approve bidding procedures for the Western Assets, with Paulson serving as a stalking horse [D.E. # 5691]. As described in the motion, Paulson has offered approximately $42 million for substantially all of the Western Assets. On July 15, 2010, the Bankruptcy Court entered an order approving the requested relief [D.E. # 5783]. The Debtors expect to conduct an auction for the Western Assets at the end of August 2010.

The sale motion seeks, among other things, approval for TOUSA Homes, Inc. to enter into the Amended Developer Payments Agreement with PDAS, which will be assumed by the purchaser of the Western Assets. Upon Bankruptcy Court approval of the sale motion, pursuant to the Amended Developer Payments Agreement, TOUSA Homes, Inc. will dismiss its claims against PDAS with prejudice, and TOUSA Homes, L.P. and PDAS will release one another from all obligations relating to the Red River Property. PDAS will provide TOUSA Homes, Inc. with a refund payment of $2.5 million. The purchaser of the Red River Property will be obligated to make payments to PDAS pursuant to the Amended Developer Payments Agreement.

**4.        Acquisition of Real Property**

Before the Petition Date, the Debtors routinely entered into purchase agreements, land bank arrangements and option contracts that gave the Debtors the right, but not the obligation, to buy homesites at predetermined prices on a predetermined takedown schedule anticipated to be commensurate with home starts. On June 25, 2008, the Debtors filed a motion for authority to establish streamlined procedures for the implementation of real property acquisitions in the ordinary course of the Debtors' business [D.E. # 1249] (the "Acquisition Procedures"). The Bankruptcy Court entered an order approving the Acquisition Procedures on July 15, 2008 [D.E. # 1390]. Upon information and belief, as of the date hereof, the Debtors have not acquired any property pursuant to the Acquisition Procedures.

### 5. Changes in Certain Joint Ventures and Limited Liability Companies

As discussed in section IV.B.3.b above, a key part of the Debtors' homebuilding operations before the Petition Date was the entry into joint ventures to acquire and develop land and, in certain cases, build and sell homes (the "Joint Ventures"). During the course of the Chapter 11 Cases, the Debtors have sold either their interests in or the asset of the majority of their joint ventures.

#### a. The Sunbelt JV

In December 2004, TOUSA Homes, Inc. entered into a Joint Venture with Suntous Investors, LLC ("Suntous") to form Engle/Sunbelt Holdings, LLC (the "Sunbelt JV"), to develop and deliver homes in the Phoenix, Arizona market. TOUSA Homes, Inc. held a 49% voting interest and an 85% equity interest in the Sunbelt JV and was responsible for day-to-day management of the joint venture. In addition to capital contributions from Suntous and TOUSA Homes, Inc., the Sunbelt JV also obtained stand-alone financing (the "Sunbelt Facility") from J.P. Morgan Securities, Inc. and CapitalSource Finance, LLC (together, the "Sunbelt Lenders"). As of May 7, 2008, the Sunbelt JV had outstanding obligations totaling approximately $90.5 million.

Although TOUSA was not directly obligated to the Sunbelt Lenders under the Sunbelt Facility, TOUSA did agree to complete any property development commitments of the Sunbelt JV. TOUSA and Suntous also agreed to indemnify the Sunbelt Lenders for potential losses from fraud, misappropriation and similar acts by the Sunbelt JV. As part of these obligations, the Sunbelt Facility included certain provisions and events of default specifically tied to the financial strength of TOUSA. On September 30, 2007, the Sunbelt Lenders declared a default under the Sunbelt Facility. Although the Sunbelt Lenders eventually waived the default in January 2008, the lack of liquidity caused considerable stress on the Sunbelt JV and damage to its business operations.

Following several unsuccessful attempts to consummate certain strategic transactions with respect to the Sunbelt JV, the Debtors filed a motion on May 7, 2008, for authority to enter into a settlement agreement with several parties in interest. The settlement agreement provided, in relevant part, that a foreclosure would be commenced, a receiver would be appointed to dispose of the Sunbelt JV's assets and neither the Sunbelt JV nor the joint venture partners would contest the foreclosure or receivership. In exchange, the Sunbelt Lenders agreed to release TOUSA from its guarantee obligations and the Debtors agreed to fully release the Sunbelt Lenders and the agent thereto in connection with the Sunbelt Facility upon the earlier of the liquidation of the joint venture's assets or six months after entry of an order by the Bankruptcy Court granting the relief requested in the motion. On May 23, 2008, the Bankruptcy Court granted the Debtors' motion with respect to the Sunbelt JV [D.E. # 1062]. Pursuant to the order and the related agreement, the Debtors no longer have an economic interest in the Sunbelt JV.

#### b. The Beacon Hill JV

On September 29, 2004, TOUSA Homes, Inc. and ORA Residential Investments I, L.P. ("ORA") formed the joint venture Beacon Hill. The parties formed Beacon Hill to develop

homesites and deliver homes in the Las Vegas, Nevada market. In 2006, a dispute arose between TOUSA Homes, Inc. and ORA concerning the funding of certain cost overruns by Beacon Hill and whether the Chapter 11 Cases triggered a default under the joint venture agreement. By June 2008, ORA indicated that it wished to dissolve Beacon Hill.

After negotiations with ORA, the Debtors filed a motion on June 25, 2008 for authority to enter into a settlement agreement providing that (a) TOUSA Homes, Inc. would acquire all of ORA's stake in Beacon Hill and cash held in escrow totaling $2.2 million and (b) the parties would enter into mutual releases with respect to any and all claims arising from the joint venture agreement.  On July 15, 2008, the Bankruptcy Court granted the relief requested by the Debtors [D.E. # 1388].

Following the closing of the acquisition, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to an order dated August 4, 2008, Beacon Hill's Chapter 11 Case is being jointly administered with the other Chapter 11 Cases [D.E. # 1512].  Moreover, the Bankruptcy Court entered an order providing that all generally applicable orders in the Chapter 11 Cases (other than the Initial Claims Bar Date Order) would apply to Beacon Hill following its chapter 11 filing [D.E. # 1513].

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the Beacon Hill Bar Date [D.E. # 1802]. The Prepetition Secured Lenders filed Proofs of Claim asserting secured Claims against Beacon Hill's Estate in an unliquidated amount, similar to those filed by the Prepetition Secured Lenders against the Conveying Subsidiaries' Estates.  The Committee anticipates that these Claims will be subject to an objection either by the Debtors, the Committee, or other parties in interest based on, among other things, the alternative arguments that Beacon Hill is not obligated to the Prepetition Secured Lenders and that any existing obligation would be avoidable by the application of section 552 of the Bankruptcy Code.  Accordingly, the Plan provides for no distribution on account of the Prepetition Secured Lenders' Claims at Beacon Hill.

     **c.**    **The Hearthstone JV**

On May 5, 2006, TOUSA Homes, Inc. entered into a joint venture with Lake County Investors, LLC ("LCI") for the purpose of developing and selling homes in Lake County, Florida (the "Hearthstone JV"). The agreement governing the Hearthstone JV provided, among other things, that either TOUSA Homes, Inc. or LCI could exercise a right to buy 100% of the interests in the joint venture upon 120 days' notice to the other party, as long as the notifying party was not otherwise in default under the agreement. The agreement also provided that the non-notifying party was deemed to accept the notifying party's exercise of its buy/sell option if it did not agree, during the 120-day notice period, to buy out the notifying party's joint venture interest at an equivalent price.

On October 26, 2007, LCI informed TOUSA Homes, Inc. of its intent to purchase TOUSA Homes, Inc.'s interest in the Hearthstone JV.  TOUSA Homes, Inc. did not respond within the 120-day period provided in the joint venture agreement. Accordingly, on June 16, 2008, LCI filed a motion seeking to modify the automatic stay provided by section 362 of the Bankruptcy Code to allow LCI to enforce its right to purchase TOUSA Homes, Inc.'s interest in

the Hearthstone JV. The Debtors did not object to LCI's motion. On August 27, 2008, the Bankruptcy Court entered an agreed order granting LCI's requested relief [D.E. # 1706]. Pursuant to that order, TOUSA Homes, Inc. sold its interest in the Hearthstone JV to LCI for approximately $19 million, minus assumed liabilities.

### d.    The Waterview Partners JV

Effective as of December 29, 2005, TOUSA Homes, Inc. entered into the Limited Liability Company Agreement of Waterview JV Partners, LLC (the "Waterview Agreement") with Lennar Colorado, LLC ("Lennar Colorado"). The purpose of the Waterview JV Partners, LLC ("Waterview Partners JV") was to acquire and develop real property in Fountain Valley, Colorado.  Pursuant to the terms of the Waterview Agreement, TOUSA Homes, Inc. held a 50% interest in the Waterview Partners JV. The Waterview Agreement provided, among other things, that TOUSA Homes, Inc. and Lennar Colorado would make additional capital contributions to Waterview Partners JV to make property acquisitions. Following the Petition Date, Lennar Colorado made certain additional contributions to Waterview Partners JV, but TOUSA Homes, Inc. did not. On December 22, 2008, Lennar Colorado filed a motion with the Bankruptcy Court seeking to compel TOUSA Homes, Inc. to accept or reject the Waterview Agreement.  The Debtors did not object to Lennar Colorado's motion. On January 21 2009, the Bankruptcy Court entered an agreed order rejecting the Waterview Agreement and allowing the Waterview Partners JV thirty days in which to file a proof of claim related to the rejection of the Waterview Agreement [D.E. # 2386].

### e.    The TOUSA/Kolter JV

In January 2005, TOUSA Homes, Inc. and Kolter Real Estate Group, LLC ("Kolter") formed TOUSA/Kolter Holdings, LLC, which was the owner of TOUSA/Kolter, LLC (the "TOUSA/Kolter JV"). TOUSA Homes, Inc. and Kolter each had a 50% interest in the TOUSA/Kolter JV.   The parties formed the TOUSA/Kolter JV to develop approximately 500 acres of property located in Cooper City, Florida in the community known as Estrada at Monterra ("Monterra"). The TOUSA/Kolter JV (the "TOUSA/Kolter Facility") had funded debt from KeyBank, N.A. and certain other lenders (together, the "TOUSA/Kolter Lender") totaling approximately $40 million as of December 2008.   In connection with the formation of the TOUSA/Kolter JV, the TOUSA/Kolter JV granted TOUSA Homes, Inc. an option to purchase certain property within Monterra, and as of December 2008, TOUSA Homes, Inc. owned 118 lots within the development.

As a result of its asset value deterioration, TOUSA/Kolter JV could not satisfy the financial and inventory covenants included in the TOUSA/Kolter Facility. The TOUSA/Kolter JV also failed to satisfy its obligations under bonds issued by the Monterra Community Development District (the "CDD") and the CDD commenced an action seeking to foreclose on the lots in Monterra, including the lots owned by TOUSA Homes, Inc. (the "CDD Action).

In an effort to avoid litigation with respect to the CDD Action and a potential foreclosure on the Monterra lots, CDD, the Debtors and CC Loan Acquisition ("CC Loan") – which had acquired all of the outstanding debt under the TOUSA/Kolter Facility from the TOUSA/Kolter Lender – entered into arm's length negotiations to effectuate a settlement with respect to the

overall dispute and the TOUSA/Kolter JV. On December 26, 2008, the Debtors filed a motion with the Bankruptcy Court for authority to enter into an agreement pursuant to which (a) the TOUSA/Kolter JV transferred Monterra to an affiliate of CC Loan in satisfaction of approximately $8.5 million of outstanding debt under the TOUSA/Kolter Facility, (b) CC Loan agreed to amend, reduce and limit its proofs of claim against TOUSA Homes, Inc., (c) the maturity of certain bonds issued under the CDD would be extended from November 1, 2010 until May 1, 2013 and (d) TOUSA Homes, Inc. would avoid a foreclosure on its lots within the Monterra community. Before the entry of the agreement, and in connection with the extension of the relevant maturity and payment dates under the Indenture, the CDD agreed to withdraw the CDD Action. On January 9, 2008, the Bankruptcy Court approved the Debtors' entry into the settlement agreement [D.E. # 2354].

### f.    The Layton Lakes JV

TOUSA Homes, Inc. and Lennar Communities Development, Inc. ("Lennar Communities") were previously the sole members of LH-EH Layton Lakes Estates, L.L.C. (the "Layton Lakes JV"), a joint venture that was intended to develop a master planned community in Gilbert, Arizona known as "Layton Lakes" (the "Layton Lakes Community"). On November 29, 2005, the Layton Lakes JV and the town of Gilbert, Arizona entered into an Off-Site Improvements Agreement (the "Off-Site Improvements Agreement"), pursuant to which the Layton Lakes JV agreed to construct certain improvements for the Layton Lakes Community. The Layton Lakes JV had been funding development within the Layton Lakes Community with, among other things, the proceeds of an acquisition and development loan in the original principal amount of $90 million (the "Midwest Loan") from Bank Midwest N.A. ("Bank Midwest"), which was evidenced by a Promissory Note dated October 16, 2006.

The prolonged deterioration in the housing markets caused the Layton Lakes JV's asset values to deteriorate. On November 26, 2007, Bank Midwest made a demand for repayment of $14.5 million in principal and accrued interest outstanding under the Midwest Loan. The Layton Lakes JV was unable to make the requested payment and defaulted under the Midwest Loan. As a result, Bank Midwest refused to advance additional funds to the Layton Lakes JV and following this refusal, the Layton Lakes JV was unable to fund further improvements under the Off-Site Improvements Agreement. Correspondingly, the town of Gilbert, Arizona ceased issuing certificates of occupancy ("COs") for single-family residences completed by Lennar Communities and TOUSA Homes, Inc. within the Layton Lakes Communities, thereby preventing the sale of completed residences. Additionally, on October 24, 2008, the town of Gilbert, Arizona filed a lawsuit (the "Layton Lakes Lawsuit") against the Layton Lakes JV and others alleging, among other things, breach of contract and seeking to recover the costs to complete certain improvements. Lennar Communities subsequently filed a proof of claim against TOUSA Homes, Inc. for failure to fulfill funding obligations to the Layton Lakes JV.

On November 17, 2008, TOUSA Homes, Inc. filed a motion to approve a settlement agreement (the "Layton Lakes Settlement Agreement") between, among other entities, Lennar Communities, TOUSA Homes, Inc., the Layton Lakes JV and the town of Gilbert, Arizona, which the Bankruptcy Court granted on November 25, 2008 [D.E. # 2204]. The Layton Lakes Settlement Agreement provided that TOUSA Homes, Inc. would deposit $1.3 million (the "TOUSA Homes Deposit") into a construction escrow (the "Construction Escrow"), which

would secure completion of the improvements required under the Off-Site Improvements Agreement. Additionally, the town of Gilbert, Arizona agreed that once the TOUSA Homes Deposit was placed into the Construction Escrow, it would process and issue COs and also maintain an ongoing extension of the answer deadline in the Layton Lakes Lawsuit so long as improvements were being completed.

Importantly, the Layton Lakes Settlement Agreement further provided that TOUSA Homes, Inc. would withdraw as a member of the Layton Lakes JV and Lennar Communities would dissolve the Layton Lakes JV and assume obligations of the Layton Lakes JV. Lennar Communities and TOUSA Homes, Inc. also agreed to mutually release one another from any and all claims arising under the agreements concerning the Layton Lakes JV.

The Layton Lakes Settlement Agreement also provided for TOUSA Homes, Inc. and Lennar Communities to enter into an option agreement (the "Layton Lakes Option Agreement") with respect to 207 residential lots within the Layton Lakes Community. Specifically, on the effective date of the Layton Lakes Option Agreement, TOUSA Homes, Inc. would be deemed to have exercised the option to purchase 7 lots within the Layton Lakes Community for approximately $425,000 and would have the option to purchase the remaining 200 lots prior to May 31, 2009 and would be required to pay Lennar Communities an option consideration fee in the amount of $1 million to maintain its option for the remaining 200 lots after May 31, 2009. Upon information and belief, TOUSA Homes, Inc. did not exercise the option with respect to the additional 200 lots.

### g.    The Lennar/Central JV

On August 8, 2006, TOUSA Homes, Inc., Newmark Homes, L.P., Lennar Texas Holding Company ("LTHC") and Lennar Homes of Texas Land and Construction, Ltd. ("Lennar Texas" and, together with LTHC, the "Lennar JV Members") formed Newmark/Lennar Central Texas, L.P. (the "Newmark/Lennar JV"), a joint venture formed for the purpose of acquiring and developing certain real property in Texas. TOUSA Homes, Inc. and Newmark Homes, L.P. held a combined 50% interest in the Newmark/Lennar JV.

The Newmark/Lennar JV had access to a revolving loan from Colonial Bank, N.A. ("Colonial"), which was in default on and after the Petition Date. Given that the Newmark/Lennar JV lacked other liquidity, the Lennar JV Members made cash advances to the Newmark/Lennar JV that were to be treated as loans, which would be required to be repaid before recovery was available to TOUSA Homes, Inc. and Newmark Homes, L.P. on account of their equity interests. After discussions with the Lennar JV Members, on February 9, 2009, the Debtors filed a motion for approval of the sale of the respective partnership interests of TOUSA Homes, Inc. and Newmark Homes, L.P. in the Newmark/Lennar JV to the Lennar JV Members for total cash consideration of $250,000 and certain releases related to the Newmark/Lennar JV and the Colonial loan. The Bankruptcy Court issued an order approving the relief requested on February 19, 2009 [D.E. # 2472].

### h.    The Brushy Creek JV

Prior to the commencement of the Chapter 11 Cases, Newmark Homes, L.P. entered into a purchase agreement with Silverado Austin Development, Ltd. to acquire approximately 318 acres in Williamson County, Texas to be developed as a master planned residential project to be known as "The Ranch at Brushy Creek" (the "Brushy Creek Project"). Newmark/Buffington Brushy Creek, L.P. (the "Brushy Creek JV"), of which TOUSA Homes, Inc. was a general partner and Newmark Homes, L.P. was a limited partner, was formed to acquire certain property within the Brushy Creek Project.

Colonial financed certain acquisitions and operations of the Brushy Creek JV. The Chapter 11 Cases created certain technical defaults under the financing provided by Colonial. To cure such defaults, Colonial required that TOUSA Homes, Inc. be replaced as general partner of the Brushy Creek JV. Accordingly, on September 17, 2008, the Debtors filed a motion seeking approval of an amendment to the Agreement of Limited Partnership for the Brushy Creek JV (the "Brushy Creek Partnership Agreement"), whereby TOUSA Homes, Inc. agreed to withdraw and be replaced with Castletop Capital Partners GP, LLC ("Castletop") as general partner of the Brushy Creek JV. Pursuant to the amendment, TOUSA Homes, Inc. also agreed to make certain additional contributions to the Brushy Creek JV in accordance with the revised partner contribution percentages. On October 24, 2008, the Bankruptcy Court entered an order granting the requested relief [D.E. # 2007].

As a result of the Debtors' determination to suspend new construction efforts and monetize their remaining assets, the Debtors and Castletop negotiated the terms of a further amendment to the Brushy Creek Partnership Agreement to address the consequences of a possible default by the Debtors on their funding obligations pursuant to the agreement. Accordingly, on June 22, 2009, the Debtors filed a motion seeking approval of an amendment to the Brushy Creek Partnership Agreement whereby Castletop was authorized to take certain actions without the Debtors' approval, and the non-defaulting parties agreed to waive their right to acquire the partnership interest of any defaulting partner and the right to wind up the Brushy Creek JV as a result of the Debtors' failure to make certain capital contributions pursuant to the agreement. On July 16, 2009, the Bankruptcy Court entered an order granting the requested relief [D.E. # 2984].

### i.    The Centex JV

On November 14, 2005, TOUSA Homes, Inc. and Centex Real Estate Corporation ("Centex") entered into a joint venture agreement for the purpose of acquiring and developing real estate, primarily located in Florida. Centex and TOUSA Homes, Inc. owned all of the outstanding memberships in the joint venture (the "Centex JV").

The Centex JV was funded by a loan in the principal amount of $50,400,000 (the "PNC Loan") from PNC Bank, National Association ("PNC"). In connection with the Loan, TOUSA (as parent to TOUSA Homes, Inc.) entered into to the following agreements in favor of PNC: (i) a completion guarantee; (ii) a repayment guarantee; and (iii) an environmental indemnity agreement (collectively, the "Centex Agreements"). PNC filed Proofs of Claim asserting

unliquidated general unsecured claims against TOUSA Homes, Inc. and TOUSA arising from the Debtors' obligations relating to the Centex JV and the Centex Agreements.

As part of the Debtors' revised business plan, TOUSA Homes, Inc. agreed to sell its membership interests in the Centex JV and certain residential lots in a development owned by the Centex JV to Centex for the purchase price of $1,100,000. Pursuant to the agreement, Centex and TOUSA Homes, Inc. also agreed to mutually release one another from all liability relating to the PNC Loan or the Centex JV. On May 13, 2009, the Debtors filed a motion seeking to approve the sale agreement, and the Bankruptcy Court entered an order approving the requested relief on June 3, 2009 [D.E. # 2834].

### j.    The Lennar Central JV

In August of 2006, TOUSA Homes, Inc. and Newmark Homes, L.P. entered into an agreement with Lennar Texas Holding Company and Lennar Homes of Texas Land and Construction, Ltd. (together, "Lennar") establishing a joint venture, Newmark/Lennar Central Texas, L.P. (the "Lennar Central JV"), for the purpose of developing lots for sale to the parties to the agreement or to third parties.

The Lennar Central JV was funded with the proceeds of a revolver loan from Colonial in the amount of $35 million (the "Colonial Loan"). In connection with the Colonial Loan, TOUSA (as parent to TOUSA Homes, Inc.) executed a completion guarantee and agreed to assume responsibility for half of the Lennar Central JV's obligations to Colonial if the Lennar Central JV filed for bankruptcy. TOUSA also signed an environmental indemnity in favor of Colonial which protected Colonial from any environmental liabilities in connection with the Lennar Central JV. Lennar Corporation ("Lennar Corp.") executed similar agreements on behalf of Lennar. After the Debtors failed to comply with certain provisions of the Colonial Loan, which constituted events of default thereunder, Colonial refused to permit further draws on the Colonial Loan.

Although Lennar made additional cash advances to the Lennar Central JV after Colonial's refusal to provide further funds to the Lennar Central JV, as part of their revised business plan, the Debtors determined that their interests in the Lennar Central JV were no longer a valuable asset for their business. Accordingly, on February 9, 2009, the Debtors filed a motion seeking to sell their interests in the Lennar Central JV to Lennar for the purchase price of $250,000. In exchange, the parties agreed to mutually release one another with respect to all obligations relating to the Lennar Central JV. In addition, Colonial agreed to release TOUSA, TOUSA Homes, Inc. and Newmark Homes, L.P. from all obligations relating to the Colonial Loan. On February 19, 2009, the Bankruptcy Court entered an order granting the requested relief [D.E. # 2472].

### k.    The Remington Ranch JV

On February 9, 2010, the Debtors filed a motion seeking authority for Newmark Homes, L.P. and TOUSA Homes, Inc. to enter into a transaction to unwind their position within the community known as Remington Ranch, in Harris County, Texas and divest all of their interests in RR Houston Development, L.P. (the "Remington Ranch JV") and its general partner, RR

Houston Developers, L.L.C. ("RR Houston"). Among other things, the motion provided for a payment to TOUSA Homes, Inc. and Newmark Homes, L.P. of $750,000 in exchange for their interest in the Remington Ranch JV and the RR Houston. Following a series of other transactions, including a lot swap with a third party, the most valuable assets of the Remington Ranch JV would have been fifty lots in Fort Bend County, Texas.

After discussions with the Committee, the Debtors determined that the lots in Fort Bend County were likely worth more than $750,000. The Debtors reopened negotiations with the other counterparties to the agreements and agreed to purchase the joint venture partner's interest in exchange for forgiveness of an outstanding $750,000 letter of credit. Pursuant to the revised global settlement agreement, among other things, the Debtors assumed ownership of the 50 lots and agreed to dissolve the Remington Ranch JV and RR Houston. On March 16, 2010, the Debtors filed a motion to approve the revised settlement agreement. The Bankruptcy Court entered an order approving the relief requested in the revised motion on March 23, 2010 [D.E. #5274].

### 6.    Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property

#### a.    Option Contracts

Before the Petition Date, the Debtors had abandoned their option rights under certain of the Option Contracts that the Debtors believed, in their business judgment, no longer provided a benefit to their homebuilding and home sales operations. In many cases, the Debtors decided to abandon their option rights because, among other things, the option price to acquire the relevant land exceeded the then-current fair market value of that land. On February 13, 2008, the Debtors filed a motion to reject the Option Contracts the Debtors had terminated before the Petition Date, to the extent those contracts were executory, *nunc pro tunc* to the Petition Date. On March 17, 2008, the Bankruptcy Court entered an order granting the Debtors' request [D.E. # 618]. The Debtors rejected additional Option Contracts pursuant to an order dated June 11, 2008 [D.E. # 1183].

#### b.    Executory Contracts, Equipment and Advertising Leases

As of the Petition Date, the Debtors were party to numerous leases of nonresidential real property and contracts as part of the ordinary course of their business operations. These agreements included, among others, leases of various types and forms of advertising space, leases of various office equipment such as computers, monitors and copiers and agreements for ongoing telecommunications services, licenses and construction services. By orders dated May 12, 2008 [D.E. # 952], June 11, 2008 [D.E. # 1183], August 12, 2008 [D.E. # 1597], August 18, 2008 [D.E. # 1644], September 22, 2008 [D.E. # 1811], October 24, 2008 [D.E. # 2010], December 9, 2008 [D.E. # 2243], February 12, 2009 [D.E. # 2458], March 10, 2009 [D.E. # 2572], March 25, 2009 [D.E. # 2627], June 12, 2009 [D.E. #2863], August 5, 2009 [D.E. #3036], September 10, 2009 [D.E. # 3180], November 10, 2009 [D.E. #3315], and January 8, 2010 [D.E. #3482] the Bankruptcy Court authorized the Debtors to reject identified Unexpired Leases and Executory Contracts that the Debtors had determined, in their business judgment, no longer provided a benefit to the Debtors' ongoing business operations.

### c. Nonresidential Real Property Leases

As of the Petition Date, the Debtors were also party to numerous nonresidential real property leases as part of the ordinary course of their business operations. These agreements included leases of "model" homes that the Debtors showed to potential customers and leases of office space. The Bankruptcy Court authorized the Debtors to reject several of these nonresidential real property leases during the Chapter 11 Cases.

Under section 365(d)(4) of the Bankruptcy Code, a debtor is deemed to reject nonresidential real property leases to which it is a party by the earlier of 120 days from the Petition Date or the date on which a bankruptcy court confirms a plan of reorganization. Accordingly, the Debtors' initial period to assume or reject such leases expired on May 28, 2008. On May 12, 2008, the Bankruptcy Court entered an order granting the Debtors' request to extend the time within which to assume unexpired leases of nonresidential real property to August 26, 2008 [D.E. # 951].

On August 8, 2008, the Debtors filed a motion for authority to assume identified nonresidential real property leases and pay related cure amounts [D.E. # 1547]. The Bankruptcy Court granted that motion on August 25, 2008, and the ruling was memorialized in an order docketed on August 27, 2008 [D.E. # 1703]. On August 28, 2008, the Debtors filed a notice of the August 28th deadline and the requirement for parties with a Claim with respect to any such rejection to file a Proof of Claim on or before September 25, 2008 [D.E. # 1698]. The Debtors also had individual agreements with certain individual landlords that have been resolved as of the date hereof.

### 7. The Home Warranty Program

### a. The Debtors' Initial Home Warranty Program

On the Petition Date, the Debtors filed a motion to continue fulfilling obligations under their prepetition customer programs [D.E. # 10], including standardized limited warranties typically provided to all of their homebuyers (the "Home Warranty Program"). The Home Warranty Program generally required that the Debtors repair or replace any part of a new home that was materially defective due to the Debtors' workmanship or materials. In many states, the Home Warranty Program was legally mandated. The Debtors' obligations under the Home Warranty Program were administered by Professional Warranty Service Corporation ("PWC").

To ensure that purchasers of the Debtors' homes would continue to have confidence in the Debtors' home warranties, the Debtors, PWC and Zurich North America ("Zurich") provided a program in which the Debtors contracted with PWC to provide a ten-year transferable supplemental warranty to homebuyers with contracts of sale in force at that time as well as those customers who signed a contract of sale between the Petition Date and April 30, 2008 (the "Original Program"). The Original Program provided that in the event the Debtors failed to fulfill their obligations to eligible homebuyers, one of the member companies of Zurich would perform according to the terms and conditions contained within the supplemental home warranty. Before the Original Program expired on April 30, 2008, the Debtors extended the Original Program through June 30, 2009.

### b.    The Debtors New Home Warranty Program

In connection with the Debtors' business decision to sharply curtail and ultimately eliminate new construction starts while focusing on closing sales of homes currently under construction, selling their remaining inventory of spec homes and monetizing their land assets over time, the Debtors implemented a new home warranty program with PWC, which the Bankruptcy Court approved on April 7, 2009 [D.E. # 2652] (the "New Warranty Program"). The New Warranty Program applied to (a) homes as to which a sale closed after June 30, 2008 and which were not covered by the Original Program and (b) approximately 1,100 homes that the Debtors anticipated selling and delivering during the twelve-month period following April 1, 2009 (the "Warranty Effective Date"). The New Warranty Program provided that all warranty claims after April 15, 2009 would be covered by PWC, while the Debtors would cover all open warranty claims until April 15, 2009. The New Warranty Program further provided that if the Debtors had not sold and delivered all eligible homes within the twelve-month period following the Warranty Effective Date, PWC and the Debtors would negotiate a reasonable extension of the New Warranty Program to include any remaining unsold eligible homes.

As set forth in more detail in section V.G.1.c of this Disclosure Statement, the Bankruptcy Court established May 14, 2010 as the Customer Claims Bar Date [D.E. # 5123]. Accordingly, the Debtors are currently in the process of reconciling such customer Claims.

### 8.    Deregistration Under the Securities and Exchange Act of 1934

As noted in section V.B.1, above, the Debtors' equity securities were delisted by the NYSE before the Petition Date. Since that time, the Debtors' equity securities have traded on the Pink Sheet Electronic Quotation Service. Nonetheless, the Debtors remained as a "reporting company" under the Securities and Exchange Act of 1934 (the "1934 Act"). The Debtors determined that, in light of the revised wind down plan and to avoid the cost and expense associated with being a reporting company, it was appropriate for the Debtors to file such forms and take such actions as are necessary and appropriate to deregister the Debtors' securities under the 1934 Act. The Debtors filed the appropriate forms on March 20, 2009. Such filings terminated the obligation of the Debtors to file periodic reports under the 1934 Act.

## VI.    DESCRIPTION OF THE CHAPTER 11 PLAN

### A.    OVERVIEW

The Plan consists of separate chapter 11 plans for each of the thirty-eight Plan Debtors. The Plan does not seek to effect a substantive consolidation or other combination of the separate Estate of each Plan Debtor. Rather, the Plan provides that creditors of each Plan Debtor will be permitted to assert their Claims only against the Plan Debtor(s) against which they hold Claims and will receive a recovery based on the value of the related Estate(s).

### 1.    Application of Intercreditor Agreement

The Plan contemplates satisfaction of the First Lien Revolver Claims in full from (i) payments previously made to the First Lien Revolver Lenders, (ii) payments previously made to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders that are required to be

disgorged pursuant to the Decision and (iii) additional Cash distributions from the Plan Debtors' Estates. The distributions outlined in Article III of the Plan enforce the following provisions of the Intercreditor Agreement and the Loan Documents, among others:

Pursuant to Section 4.1 of the Intercreditor Agreement, distributions must be made in accordance with the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement.

Section 4.1 of the Intercreditor Agreement requires all proceeds of Collateral (as defined in the Loan Documents) received by any of the parties to the Intercreditor Agreement to be distributed: (i) first, to the costs and expenses of the First Lien Agents and the Second Lien Term Loan Agent in connection with an Enforcement Action (as defined in the Intercreditor Agreement), on a *Pro Rata* basis; (ii) second, to the First Lien Revolver Lenders and the First Lien Term Loan Lenders, on a *Pro Rata* basis; (iii) third, to the Second Lien Term Loan Lenders; and (iv) fourth, to the Debtors or any other party lawfully entitled to such proceeds.

Section 2.6(d) of the Intercreditor Agreement requires any proceeds received in violation of the foregoing waterfall to be turned over to the First Lien Revolver Agent or the First Lien Term Loan Agent.

Sections 2.2 and 8.1 of the Intercreditor Agreement require enforcement of the foregoing waterfall, even if the obligations of any of the Debtors are avoided.

Pursuant to Section 10.23 of the First Lien Revolving Credit Agreement, Section 10.22 of the First Lien Term Loan Credit Agreement and Section 10.22 of the Second Lien Term Loan Credit Agreement, the Prepetition Secured Lenders and the First Lien Agents and Second Lien Term Loan Agent each agree not to take any action that is "inconsistent with the terms of the Intercreditor Agreement." A failure to apply the proceeds of Collateral in accordance with Section 4.1 of the Intercreditor Agreement would be inconsistent with the Intercreditor Agreement.

Therefore, pursuant to the Plan, amounts paid to the Prepetition Secured Lenders as of the Effective Date and under the Plan, whether as principal, interest, fees, adequate protection or otherwise (the "Secured Lender Payments"), must be allocated in accordance with the Intercreditor Agreement.

Based on, among other things, the Cash Collateral Order and the terms of the Loan Documents, the Secured Lender Payments made during the Chapter 11 Cases were made from two sources: (i) the 2007 Federal Tax Refund and (ii) operating cash held at TOUSA for the benefit of the Conveying Subsidiaries. Pursuant to the Decision, the Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders on the 2007 Federal Tax Refund were avoided. Under the Decision and the amended final judgment in the Committee Action [D.E. # 729], the Bankruptcy Court ordered, among other things, the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders to return to the Debtors' Estates all prepetition and postpetition payments made by the Debtors in connection therewith, plus prejudgment interest. The Plan provides that, in lieu of disgorgement, the Secured Lender Payments that would otherwise be disgorged will be deemed to have been paid to the First Lien Revolver Lenders

(and, therefore, credited against the First Lien Revolver Claims) and then subject to reallocation in accordance with the waterfall provisions and pay-over provisions of the Intercreditor Agreement and the Loan Documents. The waterfall provisions of the Intercreditor Agreement allow the First Lien Term Loan Agent and the Second Lien Term Loan Agent to retain their agent fees in their full amounts before any payments are made to the Prepetition Secured Lenders. The waterfall further requires that the First Lien Revolver Lenders and the First Lien Term Loan Lenders share *Pro Rata* in any distributions, including any distributions under the Plan. Accordingly, after payment of the fees incurred by the First Lien Term Loan Agent and the Second Lien Term Loan Agent, the First Lien Term Loan Lenders may retain up to approximately 37.6% of the amounts paid in respect of the First Lien Revolver Claims from the Petition Date through the Distribution Date (including amounts paid on account of First Lien Revolver Claims under the Plan).

From the Petition Date through and including an assumed Distribution Date of October 31, 2010, the Plan Debtors will have paid, be deemed to have been paid through application of the amounts required to be disgorged by the First Lien Term Loan Lenders and Second Lien Term Lenders under the Decision, or are projected to have paid in respect of the First Lien Revolver Claims under the Plan, approximately $294.7 million in principal and approximately $49.7 million in interest, for a total of approximately $344.4 million (exclusive of fees and expenses of the First Lien Revolver Agent, the "First Lien Revolver Payments").

In order to determine how much of the First Lien Revolver Payments would need to be shared with the First Lien Term Loan Lenders under the Intercreditor Agreement, the following formula applies:

$(x-y-z)*a$

where:

x = First Lien Revolver Payments;

y = fees and expenses of the First Lien Term Loan Agent required to be disgorged under the Decision;

z = fees and expenses of the Second Lien Term Loan Agent required to be disgorged under the Decision; and

 a = the percentage resulting from the total amount of First Lien Term Loan Claims (exclusive of prepetition fees and expenses incurred by the First Lien Term Loan Agent) ($207.3 million) divided by the sum of First Lien Term Loan Claims (exclusive of prepetition fees and expenses incurred by the First Lien Term Loan Agent) and the First Lien Revolver Payments ($551.7 million), or 37.6%.

Based on the foregoing, x = $344.4 million; y =$25.2 million; z = $22.8 million; and a = 37.6%.

As a result of application of the foregoing, pursuant to the Plan, the First Lien Term Loan Lenders would be entitled to receive approximately $111.4 million of amounts paid in respect of

the First Lien Revolver Claims pursuant to the Intercreditor Agreement. The First Lien Term Loan Lenders, however, have received, to date, approximately $129.1 million on account of the First Lien Term Loan Claims. In order to give effect to the terms of the Intercreditor Agreement, the First Lien Term Loan Lenders would be required to pay over to the First Lien Revolver Lenders approximately $17.7 million. In order to effectuate the applicable terms of the Intercreditor Agreement, the distributions to be made to the First Lien Term Loan Lenders under the Plan in respect of First Lien Term Loan Claims (which distributions are estimated to aggregate approximately $5.8 million) and Lender Deficiency Claims (which distributions are estimated to aggregate approximately $10.4 million) will be reallocated to the holders of First Lien Revolver Claims. The remaining approximately $1.5 million due to the First Lien Revolver Lenders from the First Lien Term Loan Lenders shall either be paid pursuant to the allocation additional distributions, if any, on account of the First Lien Term Loan Claims, the Lender Deficiency Claims or the Transeastern Reimbursement, as described in Article V.A.2 of the Plan or through the First Lien Revolver Lenders pursuing a claim against the First Lien Term Loan Lenders. The effect of the implementation of the Intercreditor Agreement is that the First Lien Revolver Lenders will have a right to receive their *Pro Rata* share in any amounts received by the First Lien Term Loan Lenders from the Transeastern Reimbursement.

### 2.    Application of Disgorgement Amounts to the First Lien Revolver Claims

The Plan provides that as of the Effective Date, it is expected that, not taking into account Secured Lender Payments made on account of the First Lien Term Loan Claims and the Second Lien Term Loan Claims, the outstanding principal amount due on the First Lien Revolver Claims would be approximately $194 million. Once the Secured Lender Payments made on account of the First Lien Term Loan Claims (including all principal, interest and fees) and Second Lien Term Loan Claims (including all professional fees) are taken into account and applied to the First Lien Revolver Claims in accordance with the terms of the Intercreditor Agreement, the remaining Allowed amount of First Lien Revolver Claims assertable against the applicable Plan Debtors' Estates is approximately $46.0 million. The $46.0 million will be satisfied through the Encumbered Assets at TOUSA (including amounts remaining in TOUSA's Estate in respect of the 2007 Federal Tax Refund) and Encumbered Assets of the Conveying Subsidiaries.

### B.    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE PLAN DEBTORS

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and this Disclosure Statement. In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees (or in the event of a dispute, that the Bankruptcy Court has determined) that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor and that any asserted priority or security status is correct.

Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. Section 502(b) of the Bankruptcy Code, however, specifies certain claims that may not be "allowed" in bankruptcy — even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or

applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11  plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as (a) the right to vote on the plan and (b) the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (a) does not alter the legal, equitable and contractual rights of the holders or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency), the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive, on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or, if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than with respect to the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's bankruptcy case not been commenced.

Section 1126(c) of the Bankruptcy Code provides that a proposed plan is binding if it is approved by a majority in number and two-thirds in amount of each voting class.  Approval by the requisite majorities of a particular class constitutes "acceptance" of the plan by that class. A class that is not impaired by a plan is conclusively deemed to accept that plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan.  For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests.  If a class or classes is deemed to reject or

votes to reject a proposed plan, the debtor may confirm its plan only if it satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to any rejecting class. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such classes (see section VIII.D, below).

With these requirements in mind, the Plan provides the following separate classifications of claims.

### 1.    Treatment of Unclassified Administrative and Priority Claims

#### a.    Administrative Claims

"Administrative Claims" are Claims constituting the costs and expenses of administering the Plan Debtors' Chapter 11 Cases, as provided by sections 503(b), 507(b) and 1114(e)(2) of the Bankruptcy Code. Administrative Claims generally include the actual and necessary costs and expenses incurred after the applicable Petition Date of preserving the Estates and operating the business of the Plan Debtors.  Administrative Claims also consist of the fees and expenses of various legal, financial and other professionals incurred during the Plan Debtors' Chapter 11 Cases, all of the U.S. Trustee Fees due pursuant to 28 U.S.C. § 1930(a)(6) and Allowed reimbursable expenses of the Committee Members.

The Plan provides that, except to the extent any holder of an Allowed Administrative Claim otherwise agrees with the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, each holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Claim in Cash (i) on the later of (a) the Distribution Date, (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Claim or (c) the date on which the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, and the holder of such Allowed Administrative Claim otherwise agree; and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Plan Debtors, (b) are allowed by the Bankruptcy Court, (c) may be agreed upon between the holder of such Allowed Administrative Claim and the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, or (d) may otherwise be required under applicable law.

The Committee estimates that the aggregate amount of Allowed Administrative Claims (including Postpetition Intercompany Claims), for all Plan Debtors, will be approximately $81 million.  The projected recovery for Administrative Claims is 100%.

#### i.    Administrative Claims Bar Date

The Plan provides that, unless previously filed pursuant to the Initial Administrative Claims Bar Date, requests for payment of Administrative Claims (other than Postpetition Intercompany Claims) must be filed and served on the Liquidation Trustee pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claim by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claim against the Plan Debtors or their property and such Administrative claims will be deemed satisfied in full as of the

Effective Date. Objections to a request for payment on account of an Administrative Claim, if any, must be filed and served on the Liquidation Trustee and the requesting party no later than ninety days after the Effective Date.  No requests for payment of Postpetition Intercompany Claims shall be required.

### ii.    Professional Compensation

The Plan requires that any "Retained Professional," or any party that asserts a Claim based on "Accrued Professional Compensation," must file and serve an application for final allowance of such Claim no later than 45 days after the Effective Date upon the Liquidation Trustee and such other parties designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court.

The Plan defines a "Retained Professional" as an entity (a) employed in the Plan Debtors' Chapter 11 Cases pursuant to a Final Order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

The Plan defines "Accrued Professional Compensation" as all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code and that were rendered before the Effective Date by any Retained Professional in the Plan Debtors' Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, and that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by Final Order any amount of a Retained Professional's fees or expenses, then those denied or reduced amounts will not constitute Accrued Professional Compensation.

Notwithstanding the requirement that Retained Professionals and entities seeking payment of Accrued Professional Compensation file a fee final application as described above, the Plan provides that the Liquidation Trustee shall pay Retained Professionals or other parties in the ordinary course of business for any work performed in furtherance of the Plan after the Effective Date.   Additionally, the Liquidation Trustee shall continue to compensate and reimburse any professional entitled to such payment pursuant to the terms of the Ordinary Course Professionals Order for services rendered after the Effective Date pursuant to the terms of the Ordinary Course Professionals Order and without further order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

Objections to any Claim for Accrued Professional Compensation must be filed and served on the Liquidation Trustee and the requesting party no later than ninety days after the Effective Date. Moreover, to facilitate this deadline, the Plan provides that the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Claims for Accrued Professional Compensation. Each holder of a Claim for Allowed

Accrued Professional Compensation will be paid by the Liquidation Trustee in Cash from the Professionals Fee Accounts and, following the depletion of the Professionals Fee Accounts, from the Liquidation Trust Assets.

### b.    Priority Tax Claims

A "Priority Tax Claim" is any Claim of a governmental unit as contemplated in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, each holder of an Allowed Priority Tax Claim will, at the option of the Liquidation Trustee, receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, payable in installment payments over a period of not more than five years after the applicable Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed to by such holder and the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, or as otherwise determined by an order of the Bankruptcy Court.

The Committee estimates that the aggregate amount of Allowed Priority Tax Claims, for all Debtors, will be approximately $2.5 million. The projected recovery under each Plan Debtor's Plan for Priority Tax Claims is 100%.

### c.    U.S. Trustee Fees

The Plan provides that, on the Distribution Date, the Liquidation Trustee will pay all U.S. Trustee Fees due on the Effective Date in full, in Cash.  On and after the Effective Date, the Liquidation Trustee will pay the applicable U.S. Trustee Fees until the entry of a final decree in each Plan Debtor's Chapter 11 Case or until each such Plan Debtor's Chapter 11 Case is converted or dismissed.

U.S. Trustee Fees will be paid as required by law until the closing of the applicable Plan Debtor's Chapter 11 Case.

### 2.    Treatment of Classified Claims Against and Equity Interests in the Plan Debtors

### a.    Classes with Respect to TOUSA

### i.    Class 1 – First Lien Claims

### (A)    Class 1A – First Lien Revolver Claims

The Plan defines "First Lien Revolver Claim" as the secured portion of any Claim that is derived from or based upon the First Lien Revolving Credit Agreement, including Claims for interest, the reasonable and documented out-of-pocket fees and expenses of the First Lien

Revolver Agent and its advisors, and contingent and unliquidated claims arising under the First Lien Revolving Credit Agreement, all to the extent not previously paid by the Plan Debtors.

The Plan provides that the First Lien Revolver Claims will be Allowed against TOUSA in the aggregate amount of $46.0 million, plus unpaid interest at the non-default contract rate, plus reasonable and documented out-of-pocket fees and expenses of the First Lien Revolver Agent through and including the Effective Date. The Plan further provides that, pursuant to the Intercreditor Agreement and related Loan Documents, the total amount of the Allowed First Lien Revolver Claims will be determined as follows: the First Lien Revolver Claims outstanding on the Petition Date, plus any applicable unpaid postpetition interest at the non-default contract rate, minus all principal, interest, fees, adequate protection and other payments previously paid to the Prepetition Secured Lenders or their agents, as applicable, including any amounts required to be disgorged by the First Lien Term Loan Lenders or Second Lien Term Loan Lenders or their agents, as applicable, pursuant to the Decision.

The Plan provides that each holder of an Allowed First Lien Revolver Claim against TOUSA will receive on the Distribution Date, in full and final satisfaction of such Claim, payment in Cash of all amounts outstanding on such Claim from (a) the 2007 Federal Tax Refund and (b) its *Pro Rata* share of Net Proceeds available for distribution by the Liquidation Trustee derived from liquidation of all Encumbered Assets of TOUSA. The foregoing distributions, plus Cash from the assets of the Conveying Subsidiaries, to the extent applicable and as set forth in the Plan, will result in the First Lien Revolver Claims being paid in full. After enforcing the terms of the Intercreditor Agreement and related Loan Documents as described herein and in the Plan, the Committee estimates that the amount of First Lien Revolver Claims satisfied from TOUSA will be approximately $46.0 million.

Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### (B)    Class 1B – First Lien Term Loan Claims

The Plan defines "First Lien Term Loan Claim" as the secured portion of any Claim that is derived from or based upon the First Lien Term Credit Agreement.

The Plan provides that the First Lien Term Loan Claims will be Allowed against TOUSA in the aggregate amount of $207.8 million.

The Plan provides that each holder of an Allowed First Lien Term Loan Claim against TOUSA will receive on the Distribution Date, in full and final satisfaction of such Claim, subject to the turnover obligations in the Intercreditor Agreement, (i) its *Pro Rata* share of the proceeds of the Encumbered Assets of TOUSA (other than the 2007 Federal Tax Refund) and (ii) its share of the Transeastern Reimbursement, if any, in accordance with the Decision.

The projected recovery under the Plan for the First Lien Term Loan Claims against TOUSA is dependent upon the value of the encumbered Net Proceeds available for distribution by the Liquidation Trustee. This Class of Claims is impaired. Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### ii.      Class 2 – Second Lien Term Loan Claims

The Plan defines "Second Lien Term Loan Claim" as the secured portion of any Claim that is derived from or based upon the Second Lien Term Loan Credit Agreement.

The Plan provides that the Second Lien Term Loan Claims will be Allowed against TOUSA in the aggregate amount of $318.9 million.

The Plan provides that on the Distribution Date, each holder of an Allowed Second Lien Term Loan Claims against TOUSA will receive, in full and final satisfaction of such Claim, its share of the Transeastern Reimbursement, if any, in accordance with the Decision.  This Class of Claims is impaired.  Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### iii.      Class 3 – Other Secured Claims

The Plan defines "Other Secured Claim" as the secured portion of any Claim other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Initial Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against TOUSA that is secured by valid Liens on property of TOUSA will receive, in full and final satisfaction of such Claim (and to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases), one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable: (a) payment of the Claim in full, in Cash, (b) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim or (c) such other treatment as may be agreed to by the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, and such Claim holder.

The Committee estimates that the amount of Other Secured Claims against TOUSA will total approximately $1.6 million as of the Effective Date. The projected recovery under the Plan for the Other Secured Claims against TOUSA is 100%. This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iv.      Class 4 – Other Priority Claims

The Plan defines "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Initial Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against TOUSA will receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in Cash.

The Committee estimates that the amount of Other Priority Claims against TOUSA will total approximately $0 as of the Effective Date. The projected recovery under the Plan for Other Priority Claims against TOUSA is 100%. This Class of Claims is unimpaired.  Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

v.       **Class 5 – Unsecured Claims**

(A)      **Class 5A – Senior Note Claims**

The Plan defines "Senior Note Claim" as any Claim derived from or based upon the Senior Notes, other than a Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

The Plan provides that the Senior Note Claims will be Allowed against TOUSA in the aggregate amount of $573.5 million.

The Plan provides that each holder of an Allowed Senior Note Claim against TOUSA will receive, on the Distribution Date, in full and final satisfaction of such Claim: (a) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Plan Debtor) of the series of Liquidation Trust Interests allocable to such Plan Debtor and (b) pursuant to the subordination provisions of Articles 11 and 12 of the Subordinated Note Indentures and Articles 11 and 12 of the PIK Note Indenture, its *Pro Rata* share (calculated with reference to all Allowed Senior Note Claims and Allowed Lender Deficiency Claims against the applicable Plan Debtor) of Liquidation Trust Interests for the applicable Plan Debtor that would otherwise be allocable to the holders of Subordinated Note Claims and the PIK Note Claims.

This Class of Claims is impaired.  Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

(B)      **Class 5B – Lender Deficiency Claims**

The Plan defines "Lender Deficiency Claims" as any Claims of the First Lien Term Loan Lenders and Second Lien Term Loan Lenders against TOUSA for the portion of such lenders' Claims that exceeds the value of such lenders' interests in the Estates' property securing such Claims.

The Plan provides that the Lender Deficiency Claims of the First Lien Term Loan Lenders will be Allowed against TOUSA in the aggregate amount of $202 million and the Lender Deficiency Claims of the Second Lien Term Loan Lenders will be allowed against TOUSA in the aggregate amount of $318.9 million, in each case, subject to a dollar-for-dollar reduction for any amounts paid to the First Lien Term Loan Lenders and Second Lien Term Loan Lenders, respectively, of any amounts received on account of the Transeastern Reimbursement.

The Plan provides that each holder of an Allowed Lender Deficiency Claim against TOUSA will receive, on the Distribution Date, in full and final satisfaction of such Claim: (i) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of the series of Liquidation Trust Interests allocable to TOUSA and (ii) pursuant to the

subordination provisions of Articles 11 and 12 of the Subordinated Note Indentures and Articles 11 and 12 of the PIK Note Indenture, its *Pro Rata* share (calculated with reference to all Allowed Senior Note Claims and Allowed Lender Deficiency Claims against TOUSA) of Liquidation Trust Interests for TOUSA that would otherwise be allocable to the holders of Subordinated Note Claims and the PIK Note Claims; *provided*, *however*, that distributions to the First Lien Term Loan Lenders on account of the Lender Deficiency Claims shall be subject to turnover to the First Lien Revolver Lenders pursuant to the Intercreditor Agreement as described in the Plan.

This Class of Claims is impaired.  Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (C)    Class 5C – General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor, including (a) any Claims derived from documented, prepetition Intercompany Notes, (b) Chinese Drywall Claims, to the extent not covered by an insurance policy, (c) Homeowner Claims, to the extent not covered by an insurance policy, (d) Tort Claims, to the extent not covered by an insurance policy, and (e) Deficiency Claims.

The Committee estimates that the Allowed amount of General Unsecured Claims against TOUSA will be approximately $103.6 million as of the Effective Date.

The Plan provides that each holder of an Allowed General Unsecured Claim against TOUSA will receive, on the Distribution Date, in full and final satisfaction of such Claim, its *Pro Rata* share (calculated with reference to all Allowed General Unsecured Claims against TOUSA) of the series of Liquidation Trust Interests for TOUSA.

This Class of Claims is impaired.  Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (D)    Class 5D – Subordinated Note Claims

The Plan defines "Subordinated Note Claim" as any Claim derived from or based upon the Subordinated Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the Subordinated Note Claims will be Allowed against TOUSA in the aggregate amount of $532.8 million.

The Plan provides that, on the Distribution Date, each holder of an Allowed Subordinated Note Claim against TOUSA shall be deemed to receive, in full and final satisfaction of such Claim, its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of the series of Liquidation Trust Interests for TOUSA.  Any distribution in satisfaction of Subordinated Note Claims is subject to Articles 11 and 12 of the Subordinated Note Indentures and, therefore, any distribution in satisfaction of Subordinated Note Claims will be paid to holders of Senior Note Claims (in accordance with the Senior Note Indentures) and Lender Deficiency Claims as set forth in Article V.D.5(d) of the Plan.

90

This Class of Claims is impaired. Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### (E) Class 5E – PIK Note Claims

The Plan defines "PIK Note Claim" as any Claim derived from or based upon the PIK Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the PIK Note Claims will be Allowed against TOUSA in the aggregate amount of $21.6 million.

The Plan provides that, on the Distribution Date, each holder of an Allowed PIK Note Claim against TOUSA will be deemed to receive, in full and final satisfaction of such Claim, its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of the series of Liquidation Trust Interests for TOUSA. Any distribution in satisfaction of PIK Note Claims is subject to Articles 11 and 12 of the PIK Note Indenture and, therefore, any distribution in satisfaction of PIK Note Claims will be paid to holders of Senior Note Claims (in accordance with the Senior Note Indentures) and Lender Deficiency Claims as set forth in Article V.D.5(d) of the Plan.

This Class of Claims is impaired. Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### vi. Class 6 – 510 Claims

The Plan defines "510 Claims" as all Claims against each of the Plan Debtors that are subordinated pursuant to section 510 of the Bankruptcy Code, which provides for the enforcement of a subordination agreement to the extent such agreement is enforceable under applicable non-bankruptcy law.

The Plan provides that each holder of a 510 Claim against TOUSA will not receive a distribution on account of such Claim. Accordingly, this Class of Claims is impaired. Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### vii. Class 7 – Equity Interests

The Plan defines "Equity Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Equity Interests in TOUSA will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Equity Interests in TOUSA will receive no distribution on account of such Equity Interests. This Class of Claims is impaired. Holders of Claims in this Class are

conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### b.    Classes with Respect to Conveying Subsidiaries

#### i.    Class 1 – First Lien Revolver Claims

The Plan defines "First Lien Revolver Claim" as the secured portion of any Claim that is derived from or based upon the First Lien Revolving Credit Agreement, including Claims for default interest, the reasonable and documented out-of-pocket fees and expenses of the First Lien Revolver Agent and its advisors, and contingent and unliquidated claims arising under the First Lien Revolving Credit Agreement, all to the extent not previously paid or deemed to have been paid by the Debtors.

The Plan provides that the First Lien Revolver Claims will be Allowed against the Conveying Subsidiaries in the aggregate amount of $46.0 million, plus unpaid interest at the non-default contract rate, plus reasonable and documented out-of-pocket fees and expenses of the First Lien Revolver Agent through and including the Effective Date. The Plan provides that, pursuant to the Intercreditor Agreement and the related Loan Documents, the total amount of the Conveying Subsidiaries Class 1A Claims will be determined as follows: the First Lien Revolver Claims outstanding on the Petition Date, plus any applicable unpaid postpetition interest, minus all principal, interest, fees, adequate protection and other payments previously paid to the Prepetition Secured Lenders or their agents, as applicable, including any amounts required to be disgorged by the First Lien Term Loan Lenders or Second Lien Term Loan Lenders or their agents, as applicable, pursuant to the Decision. All First Lien Revolver Claims at the Conveying Subsidiaries will be satisfied in full from Encumbered Assets at TOUSA and the Conveying Subsidiaries, which will result in the First Lien Revolver Claims being paid in full. The amount of First Lien Revolver Claims satisfied from the Conveying Subsidiaries is expected to aggregate approximately $0.7 million.

This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

#### ii.    Class 2 – Other Secured Claims

The Plan defines "Other Secured Claim" as the secured portion of any Claim other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against one or more of the Conveying Subsidiaries that is secured by valid Liens on property of one or more of the Conveying Subsidiaries will receive, in full and final satisfaction of such Claim (and to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases), one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable: (a) payment of the Claim in full, in Cash; (b) delivery of the collateral securing such Allowed

Other Secured Claim to the holder of such Claim; or (c) such other treatment as may be agreed to by the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, and such Claim holder.

The Committee estimates that the amount of Other Secured Claims against the Conveying Subsidiaries will total approximately $8.5 million as of the Effective Date. The projected recovery under the Plan for the Other Secured Claims against the Conveying Subsidiaries is 100%. This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iii.    Class 3 – Other Priority Claims

The Plan defines "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Initial Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against one or more of the Conveying Subsidiaries will receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in Cash.

The Committee estimates that the amount of Other Priority Claims against the Conveying Subsidiaries will total approximately $31,000 as of the Effective Date. The projected recovery under the Plan for Other Priority Claims against the Conveying Subsidiaries is 100%. This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iv.    Class 4 – Unsecured Claims

### (A)    Class 4A – Senior Note Claims

The Plan defines "Senior Note Claim" as any Claim derived from or based upon the Senior Notes, other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the Senior Note Claims will be Allowed against each of the Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC, in the aggregate amount of $573.5 million.

The Plan provides that, on the Distribution Date, each holder of an Allowed Senior Note Claim against the Conveying Subsidiaries will receive, in full and final satisfaction of such Claim: (a) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Plan Debtor) of the series of Liquidation Trust Interests allocable to such Plan Debtor and (b) pursuant to the subordination provisions of Articles 11 and 12 of the Subordinated Note Indentures, its *Pro Rata* share (calculated with reference to all Allowed Senior Note Claims) of the series of Liquidation Trust Interests for the applicable Plan Debtor that would otherwise be allocable to the holders of Subordinated Note Claims.

This Class of Claims is impaired. Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (B)    Class 4B – General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor, including (a) any Claims derived from documented, prepetition Intercompany Notes, (b) Chinese Drywall Claims, to the extent not covered by an insurance policy, (c) Homeowner Claims, to the extent not covered by an insurance policy, (d) Tort Claims, to the extent not covered by an insurance policy, and (e) Deficiency Claims.

The Plan provides that the amount of General Unsecured Claims against the Conveying Subsidiaries will be approximately $229 million[10] as of the Effective Date.

The Plan provides that, on the Distribution Date, each holder of an Allowed General Unsecured Claim against one or more of the Conveying Subsidiaries will receive, in full and final satisfaction of such Claim, its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Plan Debtor) of the series of Liquidation Trust Interests allocable to such Plan Debtor.

This Class of Claims is impaired. Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (C)    Class 4C – Subordinated Note Claims

The Plan defines "Subordinated Note Claim" as any Claim derived from or based upon the Subordinated Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the Subordinated Note Claims will be allowed against each of the Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC, in the aggregate amount of $532.8 million. The holders of Subordinated Note Claims are only entitled to recover one satisfaction on account of each Subordinated Note Claim.

The Plan provides that, on the Distribution Date, each holder of an Allowed Subordinated Note Claim against the Conveying Subsidiaries shall be deemed to receive, in full and final satisfaction of such Claim: its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Plan Debtor) of the series of Liquidation Trust Interests for the applicable Plan Debtor. Any distribution in satisfaction of Subordinated Note Claims is subject to Articles 11 and 12 of the Subordinated Note Indentures and, therefore, any distribution in satisfaction of Subordinated Note Claims will be paid to holders of Senior Note Claims (in accordance with the Senior Note Indentures) as set forth in Article V.D.5(d) of the Plan.

---

[10] This amount excludes Intercompany Notes.

This Class of Claims is impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### v.      Class 5 – 510 Claims

The Plan defines "510 Claims" as all Claims against each of the Plan Debtors that are subordinated pursuant to section 510 of the Bankruptcy Code, which provides for the enforcement of a subordination agreement to the extent such agreement is enforceable under applicable non-bankruptcy law.

The Plan provides that each holder of a 510 Claim against one or more of the Conveying Subsidiaries will not receive a distribution on account of such Claim.  Accordingly, this Class of Claims is impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### vi.     Class 6 –Equity Interests

The Plan defines "Equity Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Equity Interests in the Conveying Subsidiaries will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Equity Interests in the Conveying Subsidiaries will receive no distribution on account of such Equity Interests.  This Class of Claims is impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### c.      Classes with Respect to Beacon Hill

### i.      Class 1 – Other Secured Claims

The Plan defines "Other Secured Claim" as any secured Claim other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Initial Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against Beacon Hill that is secured by valid Liens on property of Beacon Hill will receive, in full and final satisfaction of such Claim (and to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases), one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable: (a) payment of the Claim in full, in Cash; (b) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or

(c) such other treatment as may be agreed to by the Committee (in consultation with the Plan Debtors) or the Liquidation Trustee, as applicable, and such Claim holder.

The Committee estimates that the amount of Other Secured Claims against Beacon Hill will total approximately $0 as of the Effective Date.  The projected recovery under the Plan for the Other Secured Claims against Beacon Hill is 100%.  This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### ii.      Class 2 – Other Priority Claims

The Plan defines "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Initial Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against Beacon Hill will receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in Cash.

The Committee estimates that the amount of Other Priority Claims against Beacon Hill will aggregate approximately $0 as of the Effective Date.  The projected recovery under the Plan for Other Priority Claims against Beacon Hill is 100%.  This Class of Claims is unimpaired. Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iii.      Class 3 – General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor, including (a) any Claims derived from documented, Prepetition Intercompany Notes, (b) Chinese Drywall Claims, to the extent not covered by an insurance policy, (c) Homeowner Claims, to the extent not covered by an insurance policy, (d) Tort Claims, to the extent not covered by an insurance policy, and (e) Deficiency Claims.

The Plan provides that the amount of General Unsecured Claims against Beacon Hill will be approximately $151,041 as of the Effective Date.

The Plan provides that, on the Distribution Date, each holder of an Allowed General Unsecured Claim against Beacon Hill will receive, in full and final satisfaction of such Claim, payment of such Allowed Claim in full in Cash (without postpetition interest).

This Class of Claims is impaired.  Holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### iv.      Class 4 – Equity Interests

The Plan defines "Equity Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not

transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Equity Interests in Beacon Hill will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Equity Interests in Beacon Hill will receive no distribution on account of such Equity Interests. This Class of Claims is impaired. Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

## C. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. Corporate Existence

Upon entry of the Confirmation Order, all matters provided for in the Plan involving the corporate structure of the Plan Debtors will be deemed immediately approved and authorized. The Plan provides that, on the Effective Date, each Plan Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan. To facilitate the transfer of the Plan Debtors' assets to the Liquidation Trust in a manner that is in the best interests of the Plan Debtors' creditors, the Plan Debtors may, with the Committee's consent, or shall, at the Committee's direction, (a) preserve the corporate existence of some or all of the Plan Debtors, (b) create new entities and transfer certain assets to such entities, or (c) effect other transactions determined by the Committee to be appropriate, all to the extent necessary to permit the transfer of the Plan Debtors' assets to the Liquidation Trust. To the extent not used in the transfer of such assets prior to the Effective Date, the Plan Debtors and their respective boards of directors will dissolve following the Effective Date and are authorized to dissolve or terminate the existence of wholly owned non-Plan Debtor subsidiaries following the Effective Date, as well as any remaining health, welfare or benefit plans.

### 2. The Transeastern Reimbursement

Pursuant to the Plan, subject to the entry of a Final Order in the Committee Action, the Transeastern Reimbursement, if any, shall be distributed in accordance with the Decision. As provided in the Decision, the first distributions from the Transeastern Reimbursement will be to the Conveying Subsidiaries for (i) diminution in value; (ii) transaction costs in connection with the Transeastern Settlement; and (iii) legal costs in connection with the Committee Action, which total approximately $157.1 million.

The Plan provides that amounts remaining from the Transeastern Reimbursement after the payments to the Conveying Subsidiaries will be distributed to the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders in accordance with the terms of the Decision and the Intercreditor Agreement; provided, however, that, to the extent that payments from the Transeastern Reimbursement would result in the holders of First Lien Term Loan Claims being paid in full (when not taking into account distributions under the Plan or the First Lien Term Loan Lenders' receipt or deemed receipt of a Pro Rata share of amounts paid to the First Lien Revolver Lenders pursuant to the Intercreditor Agreement), (i) amounts equivalent to those paid

to the First Lien Term Loan Lenders on account of the First Lien Term Loan Claims under the Plan (regardless of whether an equivalent of such amounts has been turned over to the First Lien Revolver Lenders pursuant to the terms of the Intercreditor Agreement) will be reallocated from the Transeastern Reimbursement to the holders of Second Lien Term Loan Claims (except for an equivalent amount paid to the First Lien Revolver Lenders from the Conveying Subsidiaries' Estates, which amount shall be reallocated to the Conveying Subsidiaries) and (ii) amounts equivalent to those paid to the First Lien Term Loan Lenders on account of the Lender Deficiency Claims under the Plan (including amounts pursuant to the subordination provisions in the Subordinated Note Indentures and the PIK Note Indenture and regardless of whether an equivalent of such amounts has been turned over to the First Lien Revolver Lenders pursuant to the terms of the Intercreditor Agreement) will be reallocated from the Transeastern Reimbursement to the Liquidation Trust for Pro Rata distributions to holders of Allowed Unsecured Claims at TOUSA and treated in accordance with the provisions of the Plan.

The Plan further provides that to the extent that the holders of First Lien Term Loan Claims receive less than a full recovery on account of distributions in respect of the Transeastern Reimbursement and/or the holders of Second Lien Term Loan Claims receive a recovery under the Transeastern Reimbursement, such distributions from the Transeastern Reimbursement shall have the effect of reducing the related Lender Deficiency Claims on a dollar-for-dollar basis, and amounts equivalent to distributions received by the First Lien Term Loan Lenders and Second Lien Term Loan Lenders under the Plan, as applicable, in respect of the higher Lender Deficiency Claims (including amounts pursuant to the subordination provisions in the Subordinated Note Indentures and the PIK Note Indenture) will be reallocated from the Transeastern Reimbursement to the Liquidation Trust to be redistributed Pro Rata to holders of Allowed Unsecured Claims at TOUSA and treated in accordance with the provisions of the Plan.

For the avoidance of doubt, the First Lien Revolver Lenders shall be entitled to receive from the First Lien Term Loan Lenders amounts paid from the Transeastern Reimbursement in accordance with the provisions of the Intercreditor Agreement.  If the Decision is modified on appeal, the Transeastern Reimbursement will be distributed in accordance with any Final Order entered in the Committee Action.

### 3.    The Liquidation Trust

The Plan provides that, on the Effective Date, the Plan Debtors will create and transfer all of their assets to the Liquidation Trust, whose purpose will be to (i) pursue the Liquidation Trust Causes of Action; (ii) complete the claims reconciliation process; and (iii) take all other actions necessary to liquidate the Liquidation Trust Assets, wind down the Plan Debtors' Estates and make the distributions provided for in the Plan.  Pursuant to the Plan, the Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trust, under the supervision of the Liquidation Trustee and the Liquidation Trust Committee.

The Committee will appoint a Liquidation Trustee to manage the Liquidation Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement, whose identity will be disclosed at or prior to the Confirmation Hearing.  In addition, the Plan provides that the Liquidation Trustee will be subject to the oversight of the Liquidation Trust Committee, which

will consist of three members.  The initial members of the Liquidation Trust Committee will be appointed by the Committee and will be disclosed at or prior to the Confirmation Hearing.

### a.    Duties and Powers of the Liquidation Trustee

Generally, the Plan provides that the duties and powers of the Liquidation Trustee will include all powers necessary to implement the Plan with respect to all Plan Debtors and administer and monetize the Liquidation Trust Assets.  Specifically, the Plan provides that the Liquidation Trustee will have the following responsibilities and duties:

- *Claims and Causes of Action*. The Liquidation Trust, under the supervision of the Liquidation Trust Committee, may object to, seek to estimate, subordinate, compromise or settle any and all Claims against the Plan Debtors and Causes of Action of the Plan Debtors that have not already been Allowed as of the Effective Date.  The Liquidation Trustee will prepare and make available to Liquidation Trust Beneficiaries, on a semi-annual basis, a written report detailing, among other things, the litigation status of Claims or Causes of Action transferred to the Liquidation Trust, any settlements entered into by the Liquidation Trust, the proceeds recovered to date by the Liquidation Trust and the distributions made by the Liquidation Trust.

- *Retention of Professionals*. The Liquidation Trustee has authority to retain professionals to pursue the Liquidation Trust Causes of Action and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust.  However, the Plan provides that the Liquidation Trustee shall continue to employ Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP and Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. to provide such services that the Liquidation Trust may require related to the Committee Action.  In addition, Berger Singerman, P.A. will continue to prosecute all Causes of Action under section 547 that it commenced on behalf of the Plan Debtors' Estates prior to the Effective Date.  Unless an alternative fee arrangement has been agreed to, professionals retained by the Liquidation Trustee will be compensated first from the Liquidation Trust Account and then, to the extent necessary, from the Liquidation Trust Assets.

- *Agreements*. The Liquidation Trustee has authority to enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Plan Debtors' obligations under any such agreement.  The Liquidation Trustee also has authority to enter into employment agreements with certain individuals in the Plan Debtors' employ on or immediately after the Effective Date, provided that the terms of any such employment agreements are acceptable to the Liquidation Trust Committee.

- *Reasonable Fees and Expenses*. The Liquidation Trustee may incur any reasonable and necessary expenses in connection with the performance of its duties under the Plan.  This authority includes the retention of professionals and/or entering into agreements as described above.  The fees and expenses of the Liquidation Trustee will be paid first from the Liquidation Trust Account and then, to the extent necessary, from the Liquidation Trust Assets.

- *Other Actions*. The Liquidation Trustee has authority to take all other actions not inconsistent with the provisions of the Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

### b.    Insurance

The Plan provides that the Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trust Committee and the Liquidation Trustee on and after the Effective Date.

### c.    Exculpation; Indemnification

The Plan provides that the Liquidation Trustee, the Liquidation Trust, the Liquidation Trust Committee, the professionals of the Liquidation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement.

### d.    Transferability of the Liquidation Trust Interests

To the extent practicable, the Liquidation Trust Interests shall be transferable in accordance with the terms of the Liquidation Trust Agreement.

### 4.    Funding Expenses of the Liquidation Trust

All fees, expenses and costs of the Liquidation Trust, including, without limitation, fees and expenses incurred by professionals retained by the Liquidation Trust (in accordance with the terms and conditions set forth in the Liquidation Trust Agreement) shall be paid by the Liquidation Trust.  On the Effective Date, $20 million shall be placed in the Liquidation Trust Account to pay the Liquidation Trust's costs and expenses, with any funds remaining after the liquidation of the Liquidation Trust Assets is complete to be distributed to the Liquidation Trust Beneficiaries.

### 5.    Closing of the Plan Debtors' Chapter 11 Cases

The Plan provides that when (i) all Disputed Claims filed against a Plan Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) the Committee Action has been resolved by Final Order, (iii) except as set forth herein for Unsold Assets, all Liquidation Trust Assets have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan; and (iv) all other actions required to be taken by the Liquidation Trust under the Plan and Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek

authority from the Bankruptcy Court to close such Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 6.      Method of Distribution Under the Plan

The Plan provides that distributions to holders of Allowed Claims against the Plan Debtors will be made by the Liquidation Trustee in accordance with the terms of the Plan on the first Distribution Date after which funds have become available.

### 7.      Monetization of Assets

The Plan provides that the Liquidation Trustee will, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions to holders of Allowed Claims in accordance with the terms of the Plan.  In so doing, the Liquidation Trustee has authority to exercise its reasonable business judgment in monetizing the Liquidation Trust Assets to maximize recoveries to Liquidation Trust Beneficiaries.  The monetization of the Liquidation Trust Assets may be accomplished through the sale of such assets (in whole or in combination) as the Liquidation Trustee may determine is in the best interests of the Liquidation Trust Beneficiaries. The Liquidation Trustee will have no liability to any party for the outcome of its decisions in this regard.

In connection with the monetization of the Liquidation Trust Assets, the Liquidation Trustee will maintain individual ledgers for each Plan Debtor, which will include a record of the purchase price for each sale of such assets and any costs or expenses associated with such sale. The proceeds of such sales will be distributed in accordance with the terms of the Plan.

If, at the end of the Implementation Term, any of the Liquidation Trust Assets remain unsold (the "Unsold Assets"), the Liquidation Trustee will submit a motion to the Bankruptcy Court, on notice to: (a) the U.S. Trustee, (b) counsel to the First Lien Agents, (c) counsel to the Second Lien Term Loan Agent, and (d) the Liquidation Trust Committee (collectively, the "Notice Parties"), which motion will set forth the Liquidation Trustee's proposed treatment of such Unsold Assets.  If any of the Notice Parties object, the Bankruptcy Court will schedule a hearing with respect to such motion.

### 8.      Books and Records

The Plan provides that the Debtors' books and records will be maintained by the Liquidation Trustee.  The Liquidation Trustee will maintain separate records for the assets of each Debtor.

### 9.      Reporting Duties

Pursuant to the Plan, the Liquidation Trustee will be responsible for filing informational returns on behalf of the Liquidation Trust and paying any tax liability of the Plan Debtors and the Liquidation Trust.  Additionally, the Liquidation Trustee will file, or cause to be filed, any other statements, returns or disclosures relating to the Plan Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.

## 10.    Tax Obligations

The Plan provides that the Liquidation Trustee will have the powers of administration regarding all of the Plan Debtors' and Liquidation Trust's tax obligations, including filing of returns.  The Liquidation Trustee will (a) endeavor to complete and file, within 120 days after the Effective Date, each Plan Debtor's final federal, state and local tax returns; (b) request, if necessary, an expedited determination of any unpaid tax liability of the Plan Debtors or their Estates under section 507(b) of the Bankruptcy Code for all taxable periods of the Plan Debtors ending after the applicable Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws; and (c) represent the interests and accounts of the Liquidation Trust or the Plan Debtors' Estates before any Tax Authority in all matters including, without limitation, any action, suit, proceeding or audit.

## 11.    Valuation

The value of each Plan Debtor for all purposes associated with the Plan, including distributions under the Plan, shall be determined by the Committee (in consultation with the Plan Debtors), based on, among other things, the RVA, Postpetition Intercompany Claims, Intercompany Notes and the Plan Debtors' books and records.

## 12.    Postpetition Intercompany Claims

The Cash Collateral Order provides:

Notwithstanding anything to the contrary contained in (i) the Interim DIP Order, (ii) this Order, (iii) the Interim Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Administrative Expense Priority to Postpetition Intercompany Claims (C) Authorizing Continued Intercompany Arrangements and Historical Practices and (D) Scheduling a Final Hearing with Respect to the Relief Granted Herein (the "Interim Cash Management Order") or (iv) any final order with respect to the Interim Cash Management Order (collectively, the "Financing Orders"), to the extent it is determined by final, non-appealable order that all or a portion of the Prepetition Liens or claims held by the Prepetition Secured Parties against any Debtor that has transferred or transfers property (including cash and Cash Collateral) (the "Transferring Debtor") from and after the Petition Date to or for the benefit of any other Debtor are avoided, no provision of the Financing Orders shall impair or otherwise prejudice the ability of the Court to fashion a legal or equitable remedy to ensure that the position of the Prepetition Secured Parties is neither improperly enhanced nor impaired by such Transferring Debtor's transfer and that neither the Transferring Debtor and its creditors nor the Prepetition Secured Parties are prejudiced by such transfer and, upon either occurrence, this Court shall fashion such a remedy. To the extent it is determined that all or a portion of the 2007 Federal Tax Refund is, whether by operation of any applicable tax allocation agreements among the Debtors (including any predecessor thereof), the Internal Revenue Code,  Treasury Regulations, or otherwise, property of the estate of one or more of the Debtors

other than, or in addition to, TOUSA, Inc., this Court shall fashion a legal or equitable remedy to ensure that the 2007 Federal Tax Refund is transferred in such a manner that the creditors of one Debtor are not inappropriately advantaged over the creditors of another Debtor of which, all or a portion of the 2007 Federal Tax Refund is property of such Debtor's estate.

The Plan further provides that all Postpetition Intercompany Claims will be reconciled and Allowed based on an informal audit to be performed by the Committee in consultation with the Plan Debtors, with the values for each Plan Debtor to take into account any such Postpetition Intercompany Claims. Unless otherwise agreed to by the Committee, the Plan provides that all Postpetition Intercompany Claims will be satisfied in full.

### 13.    Segregated Accounts at TOUSA

Pursuant to the Sixth Final Cash Collateral Order [D.E. # 5580], the Debtors segregated (a) $32.3 million (corresponding to the approximate amount of funds remaining in the Debtors' operating accounts from the 2007 Federal Tax Refund) and (b) approximately $98 million (corresponding to the approximate amount of the 2008 Federal Tax Refund). Consistent with the Decision, pursuant to the Plan, the 2007 Federal Tax Refund and the 2008 Federal Tax Refund, including any amounts from such segregated accounts will be treated as assets of TOUSA for purposes of the Plan.

### 14.    Prepetition Intercompany Claims

Consistent with the Decision, the Plan treats Prepetition Intercompany Claims as Equity Interests in the applicable Plan Debtor. Therefore, such Prepetition Intercompany Claims will receive no distributions pursuant to the Plan.

## D.    DISTRIBUTIONS

### 1.    Single Satisfaction

The Plan provides that, except to the extent set forth in the Plan, the holders of Allowed Claims may assert such Claims against each Plan Debtor obligated with respect to such Claims, and holders of such Claims will be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Plan Debtor based upon the full Allowed amount of each such Claim. The Plan also provides that in no case will the aggregate value of all property received or retained under the Plan (or from third parties, including the Transeastern Reimbursement) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim, plus postpetition interest, to the extent applicable.

### 2.    Distributions on Account of Claims Allowed as of the Effective Date

The Plan provides that except as otherwise provided in the Plan, in a Final Order of the Bankruptcy Court or as agreed to by the relevant parties (which, prior to its dissolution, includes the Committee), the Liquidation Trust will make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial

Distribution Date. Distributions of Cash on account of the Liquidation Trust Interests will be made on or as soon as practicable after the Effective Date.

### 3. Distributions on Account of Claims Allowed After the Effective Date

#### a. Resolution of Disputed Claims

##### i. Allowance of Claims

The Plan provides that after the Effective Date, the Liquidation Trustee will retain any and all rights and defenses, including rights of setoff, that the Plan Debtors had with respect to any Claim. A Claim will not become an Allowed Claim unless such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court enters a Final Order (including, but not limited to, the Confirmation Order) allowing such Claim.

##### ii. No Distributions Pending Allowance

The Plan does not permit payment of any portion of a Claim that is a Disputed Claim unless and until such Claim is Allowed. Holders of Disputed Claims are not entitled to interest if such Disputed Claim becomes Allowed, except to the extent such holder is entitled to interest under the Plan as a holder of an Allowed Claim.

##### iii. Prosecution of Objections to Claims Against the Plan Debtors

After the Confirmation Date but before the Effective Date, the Plan Debtors and the Committee, and after the Effective Date, the Liquidation Trustee, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment objections to any and all Claims. From and after the Effective Date, the Liquidation Trustee will have the exclusive authority with respect to objecting to and settling Claims. Additionally, the Liquidation Trustee will have the exclusive authority to administer and adjust the Claims Register to reflect any such settlements or compromises.

With respect to all Tort Claims, Chinese Drywall Claims and Claims of the Transeastern Lenders, the Plan provides that an objection is deemed to have been timely filed, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline. Each such Tort Claim, Chinese Drywall Claim and Claim of the Transeastern Lenders shall remain a Disputed Claim unless and until it becomes an Allowed Claim.

The Plan provides that, for the avoidance of doubt, pursuant to the Decision, all Claims asserted or assertable by the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders against the Conveying Subsidiaries, including any claims for breach of the solvency representations in the Loan Documents, have been avoided and disallowed. Accordingly, no further objection to such Claims shall be required and no distributions will be made on account of such Claims.

### iv.     Deadline to File Objections to Claims

The Plan requires that all objections to Claims be filed no later than the Claims Objection Deadline, which is 180 days after the Effective Date or such other date as may be ordered by the Bankruptcy Court.

### v.     Claims Estimation

The Plan provides that after the Confirmation Date, but before the Effective Date, the Plan Debtors and the Committee, and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate any Disputed, contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Plan Debtors, the Committee, or the Liquidation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In addition, pursuant to the Plan, the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation concerning any objection to such Claim or during the pendency of any appeal relating to any such objection.

Pursuant to the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order of the Bankruptcy Court will be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions. The Liquidation Trustee may elect to pursue additional objections to the ultimate distribution on such estimated Claim.

### vi.     Expungement or Adjustment to Claims Without Objection

Pursuant to the Plan, any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Liquidation Trustee, and any Claim that has been amended may be adjusted on the Claims Register by the Liquidation Trustee, without the Liquidation Trustee having to file an objection to such Claim. The Plan provides that beginning at the end of the first full calendar quarter that is at least ninety days after the Effective Date, each calendar quarter, the Liquidation Trustee will file a list of all Claims that have been paid, satisfied, superseded or amended during such prior calendar quarter.

### b.     Payments and Distributions on Disputed Claims

### i.     Distributions to Holders of Disputed Claims

Pursuant to the Plan, except as otherwise provided in the Plan, a Final Order of the Bankruptcy Court, or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes Allowed after the Effective Date will be made on the Distribution Date that is at least thirty days after the Disputed Claim becomes Allowed.

The Plan provides that except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions will be made with respect to a Disputed Claim until all

disputes in connection with such Disputed Claim have been resolved by settlement or a Final Order of the Bankruptcy Court.  In the event that there are Disputed Claims requiring adjudication and resolution, the Liquidation Trustee will establish appropriate reserves for potential payment of such Claims pursuant to Article V.D.4 of the Plan.  For the avoidance of doubt, the Liquidation Trustee is nevertheless authorized to make distributions to holders of First Lien Revolver Claims, First Lien Term Loan Claims or Lender Deficiency Claims pursuant to the Plan.

### ii.      Disputed Claims Reserve

#### (A)      Creation of Disputed Claims Reserve

The Plan provides that, on each Distribution Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall deposit Cash or Liquidation Trust Interests, as applicable, in the Disputed Claims Reserve for each Plan Debtor in the amount that would have been distributed on account of each Disputed Claim had it been Allowed as of the applicable Distribution Date.  The amount of such Disputed Claim will be determined based on the lesser of (a) the amount asserted in a Proof of Claim filed with respect to such Claim, (b) the amount estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or (c) the amount otherwise agreed to by the Plan Debtors (with the consent of the Committee), the Committee, or the Liquidation Trustee, as applicable, and the holder of such Claim.

For the avoidance of doubt, Cash held in the Disputed Claims Reserve will (i) be held in trust, pending distribution by the Liquidation Trustee, for the benefit of holders of Allowed Claims, (ii) be accounted for separately and (iii) not constitute property of the Liquidation Trust.

#### (B)      Distributions After Allowance of Disputed Claims

Pursuant to the Plan, the Liquidation Trustee or Distribution Agent will make a distribution from the Disputed Claims Reserve to the holder of a Disputed Claim that has become Allowed as soon as practicable after the end of the calendar month in which such Disputed Claim becomes Allowed.  Such distribution will be in the amount that would have been payable to the holder of such Claim if the Claim had been Allowed on the Effective Date.

For the avoidance of doubt, each holder of a Disputed Claim that ultimately becomes Allowed will have recourse only to the Liquidation Trust Interests and Cash held in the Disputed Claims Reserve for satisfaction of its distribution.  Each such holder will not have recourse to the Liquidation Trust, the Liquidation Trust Account or any assets previously distributed on account of any Allowed Claim.

#### (C)      Distributions After Disallowance of Disputed Claims

The Plan provides that at such time a Disputed Claim is disallowed, the Liquidation Trustee will cancel any reserve Liquidation Trust Interest with respect to such Claim and distribute the Cash held in the Disputed Claims Reserve with respect to such Claim to the holders of Allowed Claims against the applicable Plan Debtor in accordance with the Plan on the Distribution Date that is at least thirty days after the date the Claim is disallowed.

### c. Special Rules for Claims Arising Under Section 502(h) of the Bankruptcy Code

Section 502(h) of the Bankruptcy Code governs the treatment of claims held by entities from which property is recoverable under the avoidance powers permitted a debtor in possession under the Bankruptcy Code.   The Plan provides that Claims arising under section 502(h) of the Bankruptcy Code will be deemed timely filed notwithstanding the filing of such Claims after any otherwise applicable Claims Bar Date, provided that such Claims must be filed against the applicable Plan Debtor(s) no later than thirty days after entry of a Final Order by the Bankruptcy Court for recovery of property under section 550, 552 or 553 of the Bankruptcy Code.

### 4. Disallowance of Claims

Pursuant to the Plan, all Claims of any entity from which property is sought by the Plan Debtors' Estates or the Liquidation Trustee, as applicable, under sections 542, 543, 550 or 553 of the Bankruptcy Code or that the Plan Debtors, the Committee or the Liquidation Trustee, as applicable, allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code will be disallowed if: (a) the entity on the one hand, and the Plan Debtors (with the consent of the Committee), the Committee or the Liquidation Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by a Final Order that such entity is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such entity has failed to turn over such property by the dates set forth in such agreement or Final Order.  Notwithstanding the foregoing, the Plan provides that distributions will be made under the Plan to holders of First Lien Term Loan Claims and Lender Deficiency Claims.

The Plan contains the following important language with respect to the disallowance of Claims:

> **EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (A) THE CONFIRMATION HEARING AND (B) 45 DAYS AFTER THE APPLICABLE BAR DATE.**

### 5. Delivery of Distributions

#### a. Delivery of Distributions in General

Generally, distributions required by the Plan will be to each applicable holder of an Allowed Claim against the Plan Debtors at the address for each such holder as indicated on the Plan Debtors' records as of the date of any such distribution.  For these purposes, the address for each holder of an Allowed Claim against the Plan Debtors will be deemed to be the address

included in any Proof of Claim filed by that holder. The Liquidation Trustee will have the discretion to determine the manner of any distribution under the Plan.

### b. Distributions by Distribution Agents

The Plan authorizes the Liquidation Trustee and, prior to the Effective Date, the Committee on behalf of the Plan Debtors' Estates, to enter into agreements with one or Distribution Agents for the purpose of facilitating the distributions required under the Plan and to pay each such Distribution Agent's reasonable fees and expenses without additional approval.

### c. Record Date for Distributions

The Plan provides that the Confirmation Date will be used as the Distribution Record Date. As of the Distribution Record Date, the Claims Register will be closed and the Liquidation Trustee or the Distribution Agent, as applicable, will be authorized and entitled to recognize only those holders of Claims on the Claims Register as of the close of the business on the Distribution Record Date.

With respect to Claims that are transferred twenty or fewer days before the Distribution Record Date (other than a Claim based on a publicly traded instrument), the Liquidation Trustee or other Distribution Agent, as applicable, will make distributions to the transferee, but only to the extent practical and only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### d. Delivery of Distributions to the Holders of First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims and Lender Deficiency Claims

Distributions to holders of First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims and Lender Deficiency Claims will be deemed completed when made to the agent under the applicable Loan Document. Notwithstanding any provisions in the Plan to the contrary, such Loan Documents and related documents will continue in effect to the extent necessary to allow the applicable agents to receive and make distributions pursuant to the Plan.

### e. Delivery of Distributions to Holders of Unsecured Claims

Distributions to holders of Senior Note Claims, Subordinated Note Claims and PIK Note Claims will be governed by the Senior Note Indentures, the Subordinated Note Indentures or the PIK Note Indenture, respectively, and will be deemed completed when made to the applicable Indenture Trustee as set forth in the paragraph below. Notwithstanding any provisions in the Plan to the contrary, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture will continue in effect to the extent necessary to (a) allow the applicable Indenture Trustees to receive and make distributions pursuant to the Plan, (b) exercise their respective charging liens against any such distributions, (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions and (d) enforce the subordination provisions of the applicable indentures.

Importantly, the Plan contains the following language:

For the avoidance of doubt, the Distribution Agent for each Plan Debtor shall give effect to the provisions of Articles 11 and 12 of the Subordinated Note Indentures such that all distributions made pursuant to the Plan in satisfaction of the Subordinated Note Claims shall be made to the holders of Senior Debt at the applicable Plan Debtor.  Pursuant to the PIK Notes Stipulation, solely with respect to TOUSA, the Distribution Agent shall give effect to the provisions of Articles 11 and 12 of the PIK Note Indenture, such that all distributions made pursuant to the Plan in satisfaction of the PIK Note Claims shall be made to the holders of Senior Debt at TOUSA.  For the avoidance of doubt, any PIK Note Claims against the Conveying Subsidiaries have been released pursuant to the PIK Notes Stipulation and are hereby disallowed.

### 6.    Timing and Calculation of Amounts to be Distributed

Unless expressly provided for under the Plan, pursuant to the Plan, holders of Claims against the Plan Debtors will not be entitled to interest, dividends or accruals on account of the distributions provided for under the Plan, regardless of whether a distribution is made on or at any time after the Effective Date.

### 7.    Setoffs and Withholdings

The Plan authorizes the Liquidation Trustee or other Distribution Agent, as applicable, to withhold from the distribution to a holder of an Allowed Claim against the Plan Debtors an amount equal in value to any Claim, right or Cause of Action of any nature that the Plan Debtor may hold against the holder of such Claim.

The Plan authorizes the Liquidation Trustee or other Distribution Agent, as applicable, to set off amounts against distributions to holders of Allowed Claims against the Plan Debtors, but only to the extent that the value of the offsetting Plan Debtor's Claim against such claimant is undisputed, resolved by settlement or adjudicated by a Final Order or judgment of any court. Neither the failure of the Liquidation Trustee or other Distribution Agent to effect such a setoff nor the allowance of any Claim will operate as a waiver or release by the Plan Debtors or the Liquidation Trustee of any such Claims, rights or Causes of Action.

### 8.    Fractional, De Minimis and Undeliverable Distributions

### a.    Fractional or De Minimis Distributions

The Plan provides that the Liquidation Trustee or other Distribution Agent, as applicable, is not required to make distributions or payments that have a value of less than $1,000 or make partial distributions or payments of fractions of dollars or Liquidation Trust Interests. Fractional distributions will be rounded to the nearest whole number, with half or less being rounded down.

### b.      Undeliverable Distributions

### i.      Holding of Certain Undeliverable Distributions

The Plan authorizes the Liquidation Trustee or other Distribution Agent, as applicable, to hold any distribution to a holder of an Allowed Claim made in accordance with the Plan that is returned as undeliverable unless and until the Liquidation Trustee is notified in writing of such holder's then current address, at which time all currently due missed distributions will be made to such holder, without interest, on the next applicable Distribution Date.  If the Liquidation Trustee or Distribution Agent is not notified of the holder's current address within six months after the applicable Distribution Date, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited, and such holder will be forever barred, estopped and enjoined from asserting its Claim against the Plan Debtors or the Liquidation Trust.  After such date, all "unclaimed property" or interests in property shall revert to the Liquidation Trust, notwithstanding any applicable federal or state law to the contrary, and the Claim of any holder to such property or interest in property shall be forever barred.  The Plan does not require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

### ii.      Failure to Present Checks

The Plan provides that checks issued by the Liquidation Trustee or other Distribution Agent on account of an Allowed Claim against a Plan Debtor will be null and void if not negotiated within 120 days after the issuance of such check.

In an effort to ensure that all holders of Allowed Claims receive their allocated distributions, no later than 120 days after the issuance of such checks, the Liquidation Trustee will file a list with the Bankruptcy Court of the holders of any un-negotiated checks. The Liquidation Trustee will maintain and update each such list, to the extent of any changes, on a quarterly basis for so long as the applicable Chapter 11 Case stays open.

A holder of an Allowed Claim against a Plan Debtor may make a direct request to the Liquidation Trust for a reissued check with respect to an originally issued check.  If a holder of an Allowed Claim holding an un-negotiated check does not request reissuance of such check within 180 days after the date on which the check was mailed or otherwise delivered to the holder, the Allowed Claim will be released and such holder will be forever barred, estopped and enjoined from asserting any Claim against any of the Plan Debtors, the Liquidation Trust or the Liquidation Trustee.  In such cases, any Cash held for payment on account of such Claims will be deemed property of the Liquidation Trust, free of any Claim of such holder with respect thereto.

### 9.      Claims Paid or Payable by Third Parties

### a.      Claims Paid by Third Parties

The Plan provides that the Liquidation Trustee will reduce in full a Claim, and such Claim shall be disallowed without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court, to the extent the holder of such Claim receives payment on account of such Claim from a party that is not a Plan Debtor or

the Liquidation Trust. Further, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Plan Debtor or the Liquidation Trust on account of such Claim, such holder must, within two weeks of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the two-week grace period specified above until such amount is repaid.

### b.    Claims Payable by Insurance

The Plan provides that holders of Claims that are covered by the Plan Debtors' insurance policies must seek payment of such Claims from applicable insurance policies, provided that the Plan Debtors and the Liquidation Trust, as applicable, will have no obligation to pay any amounts in respect of prepetition deductibles or self insured retention amounts. No distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Plan Debtors' insurance policies until the holders of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Plan Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### c.    Applicability of Insurance Policies

Pursuant to the Plan, distributions to holders of Allowed Claims will be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan against the Plan Releasees and Exculpated Parties, nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Plan Debtors, the Liquidation Trust or any entity may hold against any other entity, including insurers under any policy of insurance, nor will anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 10.    Federal Income Tax Treatment of Liquidation Trust

### a.    Liquidation Trust Assets Treated as Owned by Creditors

The Plan provides that for all U.S. federal income tax purposes, all parties will treat the transfer of the Liquidation Trust Assets to the Liquidation Trust as (i) a transfer of the Liquidation Trust Assets directly to the Liquidation Trust Beneficiaries and, to the extent Liquidation Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve, followed by (ii) the transfer of the Liquidation Trust Assets by the Liquidation Trust Beneficiaries to the Liquidation Trust (other than the Liquidation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Liquidation Trust Interests. Accordingly, the Liquidation Trust Beneficiaries will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such

Liquidation Trust Assets as are allocable to the Disputed Claims Reserve). Pursuant to the Plan, the foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

      **b.**      **Tax Reporting**

      Pursuant to the Plan, the Liquidation Trustee will file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Plan also provides that the Liquidation Trustee will annually send to each Liquidation Trust Beneficiary a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. In accordance with the Plan, the Liquidation Trustee will also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidation Trust that is required by any governmental unit.

      The Plan further provides that allocations of Liquidation Trust taxable income among the Liquidation Trust Beneficiaries (other than taxable income allocable to the Disputed Claims Reserve) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve) to the Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

      Pursuant to the Plan, the Liquidation Trustee will be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including the Disputed Claims Reserve. To the extent any Cash retained in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

      The Plan provides that the Liquidation Trustee may request an expedited determination of Taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the

Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidating Trust.

### c.      Tax Withholdings by Liquidating Trustee

Pursuant to the Plan, the Liquidation Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to Liquidation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement.  The Liquidation Trustee, in its discretion, has authority to collect such tax information from Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidation Trust Agreement.  The Plan provides that in order to receive distributions under the Plan, all Liquidation Trust Beneficiaries (including, without limitation, holders of Allowed Other Secured Claims and Allowed Unsecured Claims) will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidation Trustee deems appropriate.  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  Pursuant to the Plan, the Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered.  If the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidation Trustee is later held liable for the amount of such withholding, the Plan provides that such holder must reimburse the Liquidation Trustee for such liability.

### d.      Foreign Tax Matters

The Plan provides that the Liquidation Trustee will comply on a timely basis with all obligations imposed on the Liquidation Trustee or the Liquidation Trust under non-U.S. law relating to Taxes.  Further, the Liquidation Trustee, or any other legal representative of the Liquidation Trust, will not distribute the Liquidation Trust Assets or proceeds thereof without having first obtained all certificates required to have been obtained under applicable non-U.S. law relating to Taxes.

### e.      Dissolution

Pursuant to the Plan, the Liquidation Trustee, the Liquidation Trust Committee and the Liquidation Trust shall be dissolved at such time as (i) all Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines, in consultation with the Liquidation Trust Committee, that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional Liquidation Trust proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made.  However, in no event will the Liquidation Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed

period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If at any time the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain, and in consultation with the Liquidation Trust Committee, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the remaining Liquidation Trust Assets, the Plan provides that the Liquidation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation", as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Plan Debtors, the Liquidation Trust, and any insider of the Liquidation Trustee, and (iii) dissolve the Liquidation Trust.

### 11.    Surrender of Cancelled Instruments or Securities

The Plan requires that, as a condition precedent to a holder of a Senior Note Claim, a Subordinated Note Claim or a PIK Note Claim receiving any distribution on account of its Allowed Claim, such holder will be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations will be deemed to be cancelled. The Indenture Trustees may (but will not be required to) request that registered holders of the Senior Notes, the Subordinated Notes or the PIK Notes surrender their notes for cancellation to the extent such notes are certificated.

### 12.    Employment Agreements

The Plan provides that the Liquidation Trustee may enter into employment agreements with certain individuals on or immediately after the Effective Date. The terms of such agreements, if any, will be acceptable to the Liquidation Trust Committee.

### 13.    Professionals Fee Accounts

Pursuant to the Plan, the Professionals Fee Accounts will be used to fund the full amount of the Accrued Professional Compensation. In the event that the Professionals Fee Accounts is insufficient to pay all Accrued Professional Compensation, the Liquidation Trustee will fund such account from the Liquidation Trust Assets, in the full amount of the Accrued Professional Compensation in full.

### 14.    Exemption from Certain Transfer Taxes

Pursuant to the Plan, the Plan Debtors (with the consent of or at the request of the Committee), the Committee, or the Liquidation Trustee may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the Liquidation Trust Interests to be

issued pursuant to the Plan without the need for any approvals, authorizations, actions or consents. The secretary and any assistant secretary of each Plan Debtor shall be authorized to certify or attest to any of the foregoing actions.

Before, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Plan Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Plan Debtors, or the need for any approvals, authorizations, actions or consents.

Pursuant to sections 106, 1141 and 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Plan Debtor to any person pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Plan Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Causes of Action to the Liquidation Trust and (ii) any sale or other transfer of the Plan Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

## 15.    Cancellation of Notes and Equity Interests

The Plan provides that, on the Effective Date, and except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes, the Subordinated Notes, the PIK Notes and Equity Interests in the Plan Debtors will be deemed cancelled, and the obligations of the Plan Debtors thereunder or in any way related thereto will be fully released.

Additionally, on the Effective Date, and except to the extent otherwise provided in the Plan, any indenture relating to any of the foregoing, including, without limitation, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture will be deemed cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Plan Debtors thereunder will be fully released. Notwithstanding the foregoing, however, the Senior Note Indentures, the Subordinated Note Indenture and the PIK Note Indenture will

continue in effect solely for the purposes of: (a) allowing holders of the Senior Note Claims, the Subordinated Note Claims and the PIK Note Claims to receive distributions under the Plan, if applicable; (b) allowing holders of Senior Debt to enforce the subordination provisions in Articles 11 and 12 of the Subordinated Note Indentures and the PIK Note Indenture; and (c) allowing and preserving the rights of the Indenture Trustees to (i) make distributions in satisfaction of Allowed Senior Note Claims, Allowed Subordinated Note Claims and Allowed PIK Note Claims, (ii) exercise their respective charging liens against any such distributions and (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions.

### 16.    Satisfaction of Obligations Under the Loan Documents

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Debtors' obligations under the Loan Documents will be satisfied and fully released except that such agreements will continue in full force and effect solely to permit the relevant agents to make distributions of Plan consideration or the Transeastern Reimbursement to the Prepetition Secured Lenders.

### E.    TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND POSTPETITION CONTRACTS

The Plan provides for the treatment of all the Plan Debtors' Unexpired Leases and Executory Contracts that the Plan Debtors did not assume or reject during the course of the Chapter 11 Cases.

### 1.    Assumption and Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts

#### a.    Assumption of Executory Contracts and Unexpired Leases

The Plan provides that, as of the Effective Date, the Plan Debtors will assume all of the Executory Contracts and Unexpired Leases and reaffirm that they will continue to comply with the terms of the postpetition contracts and leases (including executory contracts and unexpired leases previously assumed) (each a "Postpetition Contract") listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," which the Committee will file as part of the Plan Supplement.

#### b.    Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts

The Plan contemplates that, as of the Effective Date, each Executory Contract, Unexpired Lease and Postpetition Contract, shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract, Unexpired Lease or Postpetition Contract:

- is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; or

- • is otherwise assumed pursuant to the express terms of the Plan.

To this end, the Plan provides that the Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Non-Plan Debtor parties to Executory Contracts, Unexpired Leases and Postpetition Contracts that the Plan deems rejected will have the right and opportunity to assert and file a written Proof of Claim on account of such rejection, including under section 503 of the Bankruptcy Code.

### c.    Deemed Abandonment of Personal Property

The Plan deems the Plan Debtors to abandon any furniture, fixtures, equipment, inventory and other personal property located at the premises of leases of nonresidential real property (as such term is used in section 365 of the Bankruptcy Code) for those rejections effective on or after the Effective Date as of the later of (i) the Effective Date, (ii) the effective date of such rejection and (iii) the date the Plan Debtors have turned over possession of such premises to the applicable landlord. The Plan further provides that the Plan Debtors will have no administrative expense liability to any of their landlords for rental charges or occupancy of the leased premises after such abandonment by virtue of the continued presence of such property at the premises. Landlords at premises with abandoned property of the Plan Debtors may, in their discretion and without additional notice, dispose of such property without liability to the Plan Debtors or any non-Plan Debtor that claims or may claim an interest in such property (including holders of any First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims or Other Secured Claims). The Plan requires the Plan Debtors to provide reasonable notice with respect to the Plan Debtors' abandonment of such property.

### 2.    Claims on Account of the Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts

All Proofs of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract must be filed with the Voting and Claims Agent according to the procedures established for the filing of Proofs of claim in the Initial Claims Bar Date Order.  All such Proofs of Claim must be filed with the Voting and Claims Agent on or before the later of (a) the applicable Claims Bar Date and (b) thirty days after the effective date of the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable against any Plan Debtor, its Estate or property or the Liquidation Trust or its property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.E of the Plan.

3.      **Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan**

With respect to Executory Contracts and Unexpired Leases that are deemed to be assumed as of the Effective Date, the Plan contains the following important notice:

**A NOTICE OF THE EFFECTIVE DATE OF THE PLAN, INCLUDING NOTICE REGARDING THE ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, WILL BE SENT TO ALL KNOWN CREDITORS.**

The Plan further provides that for known non-Plan Debtor parties to Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to the terms of the Plan, such notice (or separate notice) will be sent on or as soon as practicable after the Effective Date to notify each such party regarding the Executory Contract(s) or Unexpired Lease(s) to which it is a counterparty that have been assumed or assumed and assigned pursuant to the Plan.

Pursuant to section 365(b)(1) of the Bankruptcy Code, the Plan provides that any monetary defaults under Executory Contracts and Unexpired Lease to be assumed pursuant to the Plan will be paid in full, in Cash, on the Effective Date, unless the parties to such contract or lease otherwise agree.  Any dispute regarding (a) the amount of such payment, (b) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, such payment will be made following the entry of a Final Order resolving the dispute.

The Plan provides that at least twenty days prior to the Confirmation Hearing, the Committee (in consultation with the Plan Debtors) will send notices of proposed assumption and proposed cure amounts to the applicable counterparties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty must be filed, served and actually received by the Plan Debtors and the Committee at least ten days prior to the Confirmation Hearing.  Any counterparty that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and proposed cure amount.

F.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

1.      **Conditions Precedent to Confirmation**

The Plan provides that each of the following is a condition to Confirmation of the Plan:

- The Bankruptcy Court will have entered an order, in form and substance acceptable to the Committee, approving this Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

- The Confirmation Order will have become a Final Order in form and substance acceptable to the Committee.

118

- The Plan Supplement and all of the schedules, documents and exhibits thereto will have been filed in form and substance acceptable to the Committee.

### 2.    Conditions Precedent to Consummation

The Plan provides that each of the following is a condition to the Effective Date:

- The Confirmation Order will have been entered and become a Final Order in form and substance satisfactory to the Committee.

- All documents and agreements necessary to implement the Plan will have been effected or executed and tendered for delivery in a form acceptable to the Committee, and all conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements.

- The Liquidation Trust is established and funded in accordance with the provisions hereof and the terms of the Liquidation Trust Agreement.

- The Plan Supplement and all of the schedules, documents and exhibits thereto will have been filed in form and substance acceptable to the Committee.

### 3.    Waiver of Conditions

The Plan provides that the conditions set forth above may be waived by the Committee without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan *provided* that the condition that the Confirmation Order be entered as a condition precedent to consummation cannot be waived.

### 4.    Effect of Non-occurrence of the Effective Date

The Plan provides that, if the Effective Date does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any claims by, Claims against or Equity Interests in the Plan Debtors; (b) prejudice in any manner the rights of the Plan Debtors, the Committee, any holders of Claims or any other entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Plan Debtors, the Committee, any holders of Claims or any other entity in any respect.

### G.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

The Plan contains important provisions relating to settlements, releases, injunctions and related provisions to be executed in connection with the Plan.

### 1.       Compromise and Settlement

The Plan provides that, notwithstanding anything contained in the Plan to the contrary, subject to the Liquidation Trust Causes of Action, the allowance of Claims and the classification and treatment of Allowed Claims and their respective distributions and treatments under the Plan takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) or (c) of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan.   The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, which include (i) the allocation of the costs of the Plan Debtors' Chapter 11 Cases, (ii) the allocation of the payment of the First Lien Revolver Claims among the Plan Debtors, and (iii) the treatment of Postpetition Intercompany Claims, are (a) in the best interests of the Plan Debtors, their Estates and all holders of Claims, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  For the avoidance of doubt, nothing contained in Article VIII of the Plan shall compromise or settle in any way whatsoever any Liquidation Trust Causes of Action.

### 2.       Plan Debtor Releases and Other Agreements

The Plan provides the following language with respect to Plan Debtor releases and other agreements:

> Upon the Effective Date of the Plan, the Plan Debtors and their Estates will be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Plan Debtors, the Plan Debtors' Chapter 11 Cases, the Plan or the Disclosure Statement, that could have been asserted at any time, past, present or future by or on behalf of the Plan Debtors or their Estates against (a) the current and former members of the Committee and the advisors, attorneys and professionals for the Committee, in each case, in their capacity as such; (b) the Indenture Trustees and the advisors and attorneys for the Indenture Trustees, in each case, in their capacity as such; and (c) the Debtors' advisors, attorneys and professionals employed as of the Petition Date or retained or employed during the Plan Debtors' Chapter 11 Cases, in each case in their capacity as such, except to the extent that any such advisor, attorney or professional has executed a tolling agreement preserving the Plan Debtors' rights to pursue certain causes of action (the "Identified Actions") (all parties identified in subsections (a), (b) and (c), above, the "Plan Releasees"); *provided*, *however*, that the foregoing release shall not apply to Claims or liabilities arising out of or relating to any act or omission of a

Plan Releasee that constitutes willful misconduct (including fraud) or gross negligence; *provided*, *further*, *however*, that the Plan shall not operate to waive or release any party that is (i) the subject of a pending action on behalf of the Plan Debtors' Estates as of the Effective Date; (ii) a potential defendant under a Liquidation Trust Cause of Action; (iii) the subject of an express preservation herein or in the Liquidation Trust Agreement; or (iv) is the subject of an Identified Action.

### 3.    Exculpation

The Plan defines "Exculpated Parties" to include the following parties: (a) the current and former members of the Committee and the advisors and attorneys for the Committee, in each case, in their capacity as such; (b) the Indenture Trustees and the advisors and attorneys for the Indenture Trustees, in each case, in their capacity as such; and (c) the Plan Debtors' advisors and attorneys employed as of the Petition Date or retained or employed during the Plan Debtors' Chapter 11 Cases, in each case in their capacity as such.  However, the Plan further provides that the Plan Debtors' current and former directors and officers will not be exculpated with respect to any litigation pending against them on the Effective Date or expressly preserved in the Plan or the Liquidation Trust Agreement.  In addition, the Plan provides that the foregoing does not apply to the extent that any Exculpated Party has entered into a tolling agreement preserving the Plan Debtors' rights with respect to litigation against such Exculpated Party.

The Plan provides the following language with respect to the Exculpated Parties:

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (including fraud), but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Plan Debtors, the Committee, the Indenture Trustees, and the Liquidation Trustee (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the distributions contemplated by the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4.    Preservation of Rights and Causes of Action

#### a.    Maintenance of Causes of Action

The Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, after the Effective Date, the Liquidation Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Liquidation Trust Causes of Action, whether existing

as of the applicable Petition Date or thereafter arising, including those Causes of Action arising after the Effective Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Plan Debtors' Chapter 11 Cases.

### b.    Preservation of All Causes of Action Not Expressly Settled or Released by the Plan Debtors

The Plan provides that unless a Claim or Cause of Action against a holder of a Claim or an Equity Interest or other entity is expressly waived, relinquished, released, compromised or settled (including, without limitation, the release contained in Article VIII.B of the Plan) pursuant to the Plan or any Final Order (including, without limitation, the Confirmation Order) entered in the Plan Debtors' Chapter 11 Cases, such Claim or Cause of Action is preserved for later adjudication by the Plan Debtors or the Liquidation Trustee, as applicable, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or *laches* shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Liquidation Trustee expressly reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Plan Debtors are a plaintiff, defendant or an interested party, against any entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

### 5.    Injunction

The Plan provides for the following injunction:

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all entities who have held, hold, or may hold Claims against or Equity Interests in the Plan Debtors are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests against the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties or the property of the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties or the Estates on account of or in connection with or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties or against the property of the Plan Debtors, the Liquidation Trust, the Plan Releasees or the Exculpated Parties or the Estates on account of or in connection with or with respect to any such Claims or Equity Interests notwithstanding an indication in a Proof of Claim or Equity Interest or

otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any entity from pursuing an action against one or more of the Plan Debtors in a nominal capacity to recover insurance proceeds so long as the Committee or the Liquidation Trustee, as applicable, and any such entity agree in writing that such entity will: (a) waive all Claims against the Plan Debtors or the Liquidation Trust, as applicable, related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

## H.    BINDING NATURE OF THE PLAN

The Plan provides the following language with respect to its binding nature:

**THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDER FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## I.    RETENTION OF JURISDICTION

The Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will, after the Effective Date, retain the maximum legally permissible jurisdiction over the Plan Debtors' Chapter 11 Cases and all entities with respect to all matters related to the Plan Debtors' Chapter 11 Cases, the Plan Debtors and the Plan, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim and the resolution of any and all issues related to the release of Liens upon payment of a secured Claim;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract, Unexpired Lease or Postpetition Contract to which a Plan Debtor is party or with respect to which a Plan Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date and to add Executory

123

Contracts, Unexpired Leases and Postpetition Contracts to the list of Executory Contracts, Unexpired Leases and Postpetition Contracts to be assumed;

- ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other causes of action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any motions involving a Plan Debtor that may be pending on the Effective Date or instituted by the Liquidation Trustee after the Effective Date, provided that the Liquidation Trustee shall reserve the right to commence actions in all appropriate fora and jurisdictions;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or this Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the occurrence of the Effective Date, Confirmation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- hear and determine all causes of action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action;

- issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

- resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

- resolve any dispute related to any Unsold Assets in accordance with Article V.B.4 of the Plan;

- resolve any matters related to the Liquidation Trust;

- enforce Article VIII.A, Article VIII.B, Article VIII.C, Article VIII.D and Article VIII.E of the Plan;

- enforce the injunction set forth in Article VIII.E of the Plan;

124

- resolve any cases, controversies, suits or disputes with respect to the releases, Exculpation and other provisions contained in Article VIII of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

- enter an order or orders concluding any or all of the Plan Debtors' Chapter 11 Cases.

## J.    MISCELLANEOUS PROVISIONS

### 1.    Payment of Indenture Trustees' Fees

The Plan provides that on the Effective Date, the Liquidation Trustee will pay all reasonable fees and expenses incurred by the Indenture Trustees prior to the Effective Date.  The Plan further provides that following the Effective Date, the Liquidation Trustee will pay, in the ordinary course and without the need for Bankruptcy Court approval, all reasonable fees and expenses incurred by the Indenture Trustees in connection with the distributions required pursuant to the Plan as evidenced in invoices provided to the Liquidation Trustee by the Indenture Trustee, including, but not limited to, the reasonable fees, and expenses incurred by the Indenture Trustees' professionals in carrying out the Indenture Trustees' duties as provided for in each of the Senior Note Indentures, Subordinated Note Indentures and PIK Note Indenture. The foregoing fees, costs and expenses shall be paid by the Liquidation Trustee in the ordinary course, upon presentation of invoices by the Indenture Trustees and without the need for approval by the Bankruptcy Court, or the filing of a request for payment of an Administrative Claim as required by Article II.A.2 of the Plan, but any disputes concerning such fees, costs and expenses shall be resolved by the Bankruptcy Court.

### 2.    Dissolution of the Committee

The Plan provides that, on the Effective Date, the Committee will dissolve and the Committee Members will be released from all further authority, duties, responsibilities and obligations relating to the Plan Debtors' Chapter 11 Cases.  The Plan provides, however, that the Committee and its retained professionals shall nevertheless be retained with respect to (a) appeals and related proceedings regarding the Plan and (b) the resolution of applications filed for Accrued Professional Compensation.

125

### 3.    Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P.

Debtor TOUSA Homes, L.P. has no assets and no interest in any pending litigation. Accordingly, no plan can be confirmed at TOUSA Homes, L.P.  The Committee will file a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of the Confirmation Hearing.

### 4.    Modification of the Plan

The Plan contains the following language with respect to modification of the Plan:

Effective as of the date hereof and subject to the limitations and rights contained herein: (a) the Committee reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Committee or the Liquidation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 5.    Filing of Additional Documents

The Plan provides that on or before the Effective Date, the Committee may file with the Bankruptcy Court all agreement or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 6.    Revocation of Plan

The Plan provides that the Committee reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  In addition, the Committee reserves the right to seek or not seek Confirmation of the Plan with respect to any of the Plan Debtors.  If the Committee revokes or withdraws the Plan with respect to any of the Plan Debtors, or if Confirmation or the Effective Date does not occur with respect to one or more of the Plan Debtors, then: (1) the Plan shall be null and void in all respects with respect to such Plan Debtor or Plan Debtors; (2) any assumption or rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, as applicable, effected by the Plan and any document or agreement executed pursuant thereto shall be deemed null and void with respect to such Plan Debtor or Plan Debtors; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against such Plan Debtor or any other entity with respect to such Plan Debtor or Plan Debtors; (b) prejudice in any manner the rights of the Plan Debtors, the Committee or any other entity with respect to such Plan Debtor or Plan Debtors; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Debtors, the Committee, or any other entity with respect to such Plan Debtor or Plan Debtors.

### 7.    Successors and Assigns

The Plan provides that the rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 8.    Reservation of Rights

The Plan provides that, except as expressly set forth therein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Accordingly, neither the filing of the Plan, any statement or provision contained therein nor the taking of any action by a Plan Debtor, the Committee or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Plan Debtor, the Committee or the Liquidation Trust with respect to the holders of Claims or Equity Interests or any other entity or (b) any holder of a Claim or an Equity Interest or any other entity before the Effective Date.

### 9.    Further Assurances

Pursuant to the Plan, the Plan Debtors (at the direction of the Committee), the Committee or the Liquidation Trustee, as applicable, all holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 10.    Severability

The Plan provides that if, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court has the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable and in form and substance acceptable to the Committee, consistent with the original purpose of such term or provision, and such term or provision then will be applicable as altered or interpreted.  The Plan further provides that notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  Pursuant to the Plan, the Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## VII.    SOLICITATION AND VOTING PROCEDURES

### A.    OVERVIEW

The Disclosure Statement Order establishes certain procedures that govern the Committee's solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation and Voting Procedures").  This section provides an overview of those procedures; however, the Disclosure Statement Order is attached to this Disclosure Statement as Exhibit C, and should be reviewed in its entirety.

**B.    VOTING DATES AND DEADLINES**

The Bankruptcy Court has established several deadlines with respect to voting on the Plan.

**1.    The Voting Record Date**

The Bankruptcy Court has established [___], 2010 as the "Voting Record Date." The Voting Record Date is the date on which the Committee and the Bankruptcy Court will determine: (a) those holders of Claims against the Plan Debtors that are entitled to vote to accept or reject the Plan and receive a Solicitation Package; (b) those holders of Claims that are entitled to vote to accept or reject the Plan; and (c) those transferred Claims that have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim against the Plan Debtors.

| The Voting Record Date is [   ], 2010 |
|:---:|

**2.    The Voting Deadline**

The Voting Deadline is the latest date on which all properly executed and completed votes to accept or reject the Plan must be **actually received** by the Voting and Claims Agent at the following address: TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

| The Voting Deadline is [  ], 2010 |
|:---:|

**C.    DISTRIBUTION OF THE SOLICITATION PACKAGE**

The Solicitation Package contains important information and required voting material, including, among other things: (a) a cover letter urging holders of Claims entitled to vote to accept the Plan; (b) an appropriate form of Ballot or Master Ballot, as applicable; (c) a copy of the Disclosure Statement Order; (d) a copy of the notice of the Confirmation Hearing; (e) a copy of this Disclosure Statement, as approved by the Bankruptcy Court; and (f) a copy of the Plan.

**1.    Voting Classes**

The Bankruptcy Code provides that a creditor or holder of a claim against a debtor is not entitled to vote to accept or reject a plan if the proposed plan does not impair that creditor's rights or if the creditor will not receive any property under the plan. Conversely, parties whose interests are impaired under a proposed plan or who receive property under the plan are entitled to vote on such plan.

In light of this standard, Exhibit D attached hereto indicates which Classes of Claims are entitled to vote to accept or reject the Plan. The Committee will have distributed the Solicitation Packages no fewer than 30 days before the Voting Deadline by first class mail to holders of Claims in the Voting Classes who are entitled to vote on the Plan, as determined by the following criteria:

- holders of Claims for which Proofs of Claim have been timely filed, as reflected on the Claims Register as of the Voting Record Date, *provided*, *however*, that holders of Claims to which an objection is pending at least 15 days before the Confirmation Hearing shall not be entitled to vote unless such holders become eligible to vote through a "Resolution Event," as such term is defined in section VII.C.2 herein;

- parties listed in the Schedules; *provided*, *however*, that Claims that are scheduled as contingent, unliquidated or Disputed, or any combination thereof and that have been superseded by a timely filed Proof of Claim shall not receive a Solicitation Package; *provided*, *further*, that holders of Claims that are scheduled as contingent, unliquidated or Disputed for which the applicable Claims Bar Date for such holder has not passed shall receive a Solicitation Package;

- holders of Claims that arise pursuant to an agreement or settlement with the Plan Debtors, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Plan Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a Proof of Claim with respect to such Claim has been filed;

- applicable nominees with respect to a beneficial holder of a Claim, as reflected in the relevant records as of the Voting Record Date; and

- the assignee of any transferred or assigned Claim, but only if such transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on or before the Voting Record Date.

If your Claim is in one of these Classes and satisfies one of these criteria, you will have received a Ballot along with this Disclosure Statement upon which you may indicate your acceptance or rejection of the Plan.  If your Claim is not in one of these Classes, or is in a Voting Class but does not meet one of these criteria, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement. **DETAILED VOTING INSTRUCTIONS ARE PROVIDED ON THE BALLOT. YOU SHOULD READ YOUR BALLOT CAREFULLY AND FOLLOW ALL LISTED INSTRUCTIONS**.

Please use only the Ballot and/or Master Ballot that accompanies this Disclosure Statement. If a Ballot or Master Ballot is damaged or lost, or you have any questions concerning voting procedures, you may contact the Voting and Claims Agent by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (b) by calling (888) 647-1742 or (c) by emailing KCC_TOUSA@kccllc.com.

### 2.    Temporary Allowance of Claims for Voting Purposes

The Disclosure Statement Order establishes certain criteria by which the Committee will calculate the amount of each Claim for voting purposes.  The holder of a Disputed Claim may seek to obtain one of the following "Resolution Events" by filing a motion with the Bankruptcy Court at least five Business Days before the Voting Deadline:

- an order by the Bankruptcy Court, after notice and a hearing, allowing a Disputed Claim in a specified amount;

- an order by the Bankruptcy Court temporarily allowing a Disputed Claim in a specified amount for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

- a stipulation or other agreement executed between the holder of a Disputed Claim and the Plan Debtors (with the consent of the Committee) or the Committee resolving the objection and allowing such Disputed Claim in an agreed-upon amount;

- a stipulation or other agreement executed between the holder of Disputed Claim and the Committee temporarily allowing the holder of such Claim to vote its Claim in an agreed-upon amount; or

- the Plan Debtors, with the consent of the Committee, voluntarily withdraw a pending objection to a Disputed Claim.

Additionally, in the event the Plan Debtors or Committee object to a Claim at least 15 days before the Confirmation Hearing but <u>after</u> such holder of a Claim receives a Solicitation Package, the notice of objection is required to inform such holder of the rules applicable to Claims subject to a pending objection and the procedures for temporary allowance for voting purposes described above. Furthermore, if the holder of a Claim receives a Solicitation Package and the Plan Debtors or Committee object to such Claim less than 15 days before the Confirmation Hearing, the holder's Claim will be deemed temporarily Allowed for voting purposes only without further action by the holder of such Claim and without further order of the Bankruptcy Court.

### D.    REQUIREMENTS FOR ACCEPTANCE OF THE PLAN

### 1.    Acceptance by Voting Classes

The Bankruptcy Code determines whether a class entitled to vote accepts a chapter 11 plan by calculating the number of claims voting to accept, based on the total number and amount of claims actually voting.  Acceptance requires an affirmative vote of a majority in number of the total claims voting and two-thirds in amount of the total claims voting.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in the accordance with the provisions of the Bankruptcy Code.

### 2. Presumed Rejection and "Cram Down"

For purposes of voting on the Plan, Classes 5D, 5E, 6 and 7 for TOUSA, Classes 4C, 5 and 6 for the Conveying Subsidiaries, and Class 4 for Beacon Hill are conclusively presumed to have rejected the Plan.  It is possible that other Classes of Claims may vote to reject the Plan as well.  With respect to the individual Plan for each Plan Debtor, in the event at least one Class of impaired Claims votes to accept the Plan, and as discussed further in section VIII.D.5, below, the Committee will use the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation notwithstanding the deemed rejections and the rejection of any Class entitled to vote on the Plan.

### E.   COMPLETION OF BALLOTS

A Ballot or Master Ballot will <u>not</u> be counted in determining the acceptance or rejection of the Plan if it is:

- Illegible or contains insufficient information to permit the identification of the holder of a Claim;

- Submitted by a holder of a Claim in a Class that is not entitled to vote on the Plan;

- Submitted by a holder of a Claim listed in the Schedules as contingent, unliquidated or Disputed, or any combination thereof, for which the applicable Claims Bar Date has passed and no Proof of Claim was timely filed;

- Unsigned;

- Not **clearly marked** to accept or reject the Plan or any Ballot marked both to accept and reject the Plan; or

- Submitted by any entity not entitled to vote pursuant to the Solicitation Procedures.

## VIII.   CONFIRMATION OF THE PLAN

### A.   CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing has been scheduled for [_____], 2010 at [_____] (prevailing Eastern Time) before the Honorable John K. Olson United States Bankruptcy Judge, at the United States Bankruptcy Court, Room 301, 299 E. Broward Boulevard, Fort Lauderdale, Florida 33301.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

B.    OBJECTIONS TO CONFIRMATION

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation must:

- be made in writing;

- conform to the Bankruptcy Rules and the Local Rules;

- set forth the name of the objector and the nature and amount of Claims held or asserted by the objector against the Plan Debtors, the basis for the objection and the specific grounds therefor;

- be filed with the Bankruptcy Court electronically

- if practicable, be accompanied by a proposed modification to the Plan that would resolve such objection; and

- be served upon (a) the office of United States Trustee for the Southern District of Florida, 33 Whitehall Street, 21st Floor, New York, New York, 10004 (Attn: Steven D. Schneiderman, Esq.); (b) Akin Gump Strauss Hauer & Feld LLP, co-counsel for the Committee, One Bryant Park, New York, New York 10036 (Attn: Daniel H. Golden, Philip C. Dublin and Natalie E. Levine); (c) Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., co-counsel for the Committee, 150 West Flagler Street, Miami, Florida 33130 (Attn: Patricia A. Redmond); (d) Kirkland & Ellis LLP, co-counsel for the Debtors, 153 53rd Street, New York, New York 10022 (Attn: M. Natasha Labovitz, Joshua Sussberg and Ashley Share); (e) Berger Singerman, P.A., co-counsel for the Debtors, 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131 (Attn: Paul Steven Singerman); (f) Chadbourne & Parke LLP, co-counsel for the First Lien Agents, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Seven Rivera); (g) Smith Hulsey & Busey, co-counsel for the First Lien Agents, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 (Attn: Stephen D. Busey and James H. Post); (h) Stichter, Riedel, Blain & Prosser, P.A., co-counsel for the First Lien Agents, 110 E. Madison Street, Suite 200, Tampa, Florida 33602 (Attn: Amy D. Harris, Harley Edward Riedel and Richard Craig Prosser); (i) Bracewell & Giuliani LLP, co-counsel for the Second Lien Term Loan Agent, Goodwin Square, 225 Asylum Street, Suite 2600, Hartford, Connecticut 06103 (Attn: Gregory W. Nye, Evan Flaschen and Marcy Kurtz); (j) Bilzin Sumber Baena Price & Axelrod LLP, co-counsel for the Second Lien Term Loan Agent, 2500 Wachovia Financial Center, 200 South Biscayne Boulevard, Miami, Florida 33131 (Attn: Scott L. Baena, Matthew I. Kramer and Jason Z. Jones); and (k) all other parties required by the Bankruptcy Court's March 25, 2008 *Amended Order Establishing Certain Notice, Case Management and Administrative Procedures* [D.E. # 655].

All objections to the Plan must be actually received no later than [_____], 2010. All objections to Confirmation are governed by Bankruptcy Rule 9014.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER A PLAN OBJECTION UNLESS IT IS TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**C.    OVERVIEW OF STATUTORY REQUIREMENTS TO CONFIRM THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following Confirmation requirements set forth in section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Committee has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed by the Committee in good faith and not by any means forbidden by law.

- Any payment made or promised by the Plan Debtors' Estates or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Plan Debtors' Chapter 11 Cases, or in connection with the Plan and incident to the Plan Debtors' Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation is reasonable or if such payment is to be fixed after Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the applicable Plan Debtor was liquidated under chapter 7 of the Bankruptcy Code.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan. Classes 5D, 5E, 6 and 7 with respect to TOUSA, Classes 4C, 5 and 6 with respect to the Conveying Subsidiaries, and Class 4 with respect to Beacon Hill are each deemed to have rejected the Plan.    Accordingly, the Plan can be confirmed only if the requirements of section 1129(b) of the Bankruptcy Code are met.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full on the Effective Date.

- At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Plan Debtors or any successor to the Plan Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See section VIII.D.3, below.

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant by the provisions of the Bankruptcy Code at any time prior to Confirmation, for the duration of the period the Plan Debtors are obligated to provide such benefits.

**D.    SPECIFIC STATUTORY CONFIRMATION REQUIREMENTS**

**1.    Overview of the Best Interests of Creditors Test/Liquidation Analysis**

As mentioned above, section 1129(a)(7) of the Bankruptcy Code provides that one of the factors a bankruptcy court must consider before confirming a proposed plan of reorganization or liquidation, regardless of whether any party in interest objects to confirmation, is that the proposed plan is in the "best interests" of all classes of claims and equity interests that are impaired.

The "best interests" test requires that the Bankruptcy Court find, as a condition to Confirmation, that either (a) all holders of impaired Claims or Equity Interests have accepted the Plan or (b) the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether the liquidation component of this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of a debtor's assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the debtor and any preference recoveries, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the value of such allocations (not taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

A debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in a chapter 7 bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the chapter 11 cases allowed in a chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the debtor and statutory committee of unsecured creditors appointed in the chapter 11 cases and costs and expenses of members of the statutory committee of unsecured creditors, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the debtor during the pendency of the chapter 11 cases.

After considering the effect that a chapter 7 liquidation would have on the proceeds ultimately available for distribution to creditors in the chapter 11 cases, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (b) additional costs associated with the rapid transfer or cessation of operations at the facilities and the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (c) the substantial increases in claims that would be satisfied on a priority basis, the Committee has determined that Confirmation with respect to each Plan Debtor will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Plan Debtors under chapter 7.

The Committee also believes that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including secured Claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for one or more years after the completion of such liquidation to resolve Claims and prepare for distributions. In the event litigation was necessary to resolve Claims asserted in a chapter 7 case, the delay could be prolonged and Administrative Claims increased.

The Committee's consolidated Liquidation Analysis, attached hereto as Exhibit E, is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Plan Debtors. The Liquidation Analysis is based on a number of significant assumptions. The Liquidation Analysis does not purport to be a valuation of the Plan Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

### 2.    Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each holder of a Claim or Equity Interest in each impaired Class: (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Plan Debtor's Chapter 11

135

Case were converted to a chapter 7 case and the assets of such Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's Liquidation Distribution to the distribution that such holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Committee's financial advisors prepared an analysis of estimated distributions to creditors under the Plan attached hereto as Exhibit D and the Liquidation Analysis attached hereto as Exhibit E.

Exhibit D presents, where applicable, "High" and "Low" estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms. These estimates represent a range of the Committee's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors. The Committee's recovery analysis has the same projected Effective Date as the Liquidation Analysis. In addition, the Committee's assumptions in Exhibit D regarding anticipated events and proceeds expected to be realized prior to the Effective Date are the same as those used to prepare the Liquidation Analysis.

### 3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the debtor, unless such liquidation is proposed in the plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Plan Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the creditors pursuant to the terms of the Plan. Since no further reorganization of the Plan Debtors will be possible, the Committee believes that the Plan meets the feasibility requirement. The Committee believes that sufficient funds will exist to make all payments required by the Plan.

### 4.    Acceptance by Impaired Classes

The Bankruptcy Code generally requires that each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than

one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Exhibit D hereto identifies the Classes that are not impaired under the Plan. The holders of Claims in those Classes are deemed to have accepted the Plan.

Exhibit D also identifies the Voting Classes, which are impaired under the Plan and are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims entitled to vote will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Exhibit D also identifies the Classes of Claims and Equity Interests that are impaired under the Plan and will receive no distribution under the Plan. The holders of Claims and Equity Interests in those Classes are deemed to have rejected the Plan.

5.      **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted the plan, if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

a.      **Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment of such classes be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b.      **Fair and Equitable**

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the

amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

_Secured Claims_: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims (to the extent that the Bankruptcy Court determines that the claims are allowed and fully secured) requires that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

_Unsecured Claims_: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest in any property.

_Equity Interests_: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests requires that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (x) the allowed amount of any fixed liquidation preference to which such holder is entitled; (y) any fixed redemption price to which such holder is entitled; or (z) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

In view of the deemed rejection by certain Classes, as indicated on Exhibit D hereto, and the possible rejection of the Plan by certain of the Voting Classes, the Committee intends to seek Confirmation under section 1129(b) of the Bankruptcy Code, To the extent that any of the Voting Classes vote to reject the Plan, the Committee reserves the right to modify the Plan in accordance with Article XI of the Plan.

### 6.      Classification of Claims and Equity Interests Under the Plan

The Committee believes that the Plan meets the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Plan establishes Classes of Claims and Equity Interests as required by the Bankruptcy Code and as summarized in section VI.B, above.

## IX.    RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

> **PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

### A.    BANKRUPTCY CONSIDERATIONS

#### 1.    Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in that class. The Committee believes that the classification of Claims against and Equity Interests in the Plan Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    Failure to Satisfy Voting Requirements

If the Committee receives votes in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Committee intends to seek, as promptly as practicable thereafter, to confirm the Plan. In the event the Committee does not receive sufficient votes, the Committee may seek to accomplish an alternative chapter 11 plan. There can be no assurance, however, that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Committee's proposed Plan.

#### 3.    Failure to Secure Confirmation of the Plan

As discussed in sections VIII.C and VIII.D, above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires a bankruptcy court to make a series of specified, independent findings.

Even if the Committee receives the required votes accepting the Plan, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. The Committee expects that certain parties, including the Prepetition Secured Lenders, will oppose the Plan. Any objections to the Plan may result in

significant litigation which could delay or even prevent confirmation. Litigation surrounding confirmation could be expensive and therefore, recoveries to creditors may be decreased.

The Committee, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, the bankruptcy court may nevertheless confirm the plan under the procedure for nonconsensual confirmation described in section VIII.D.5, above. The Committee believes that the Plan satisfies the requirements for nonconsensual confirmation. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. Stay Pending Appeal

If the Plan is confirmed by the Bankruptcy Court, an objecting party may seek a stay of consummation of the transactions contemplated in the Plan pending an appeal of the Confirmation Order. A request for a stay pending appeal would require additional litigation before the Bankruptcy Court and before any appellate court. Such litigation may create significant additional Administrative Claims and may delay distributions until a stay is denied or, if a stay is imposed, until the appeal is decided.

### 6. The Plan Debtors, the Committee or the Liquidation Trustee May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Plan Debtors, the Committee and the Liquidation Trustee reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim against the Plan Debtors where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7. The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims

The estimated Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed Claims may differ significantly from the estimated amount of Allowed Claims contained herein. As a result, such differences may materially and adversely affect the recovery realized by holders of such Claims under the Plan.

### 8.    Administrative Expenses and Priority Claims May Exceed Expected Levels

Section 1129(a) of the Bankruptcy Code requires that, in order to confirm a chapter 11 plan, administrative expenses of the chapter 11 case and various classes of priority claims must be paid in full in cash, unless the respective holders of such expenses and claims agree to less favorable treatment.    The Committee currently expects that the amount of Allowed Administrative Claims (including Postpetition Intercompany Claims), Priority Tax Claims, and Other Priority Claims will not exceed the amounts reflected in the Plan, but there can be no assurance that such amounts will not be exceeded.

### 9.    Liquidation Trust Cause of Action Recoveries and Results are Speculative and Uncertain

The success of the Liquidation Trust in pursuing the Liquidation Trust Causes of Action and defenses is speculative and uncertain.    Litigation may be complex and involve significant delay.    Furthermore, even if successful in the Liquidation Trust Causes of Action, in some cases, the Liquidation Trust may encounter difficulty in collection.    Although potential recoveries from the Liquidation Trust Causes of Action (other than the Transeastern Reimbursement) are not included in the Plan Distribution Analysis attached hereto as Exhibit D or the Liquidation Analysis attached hereto as Exhibit E, such recoveries may have a significant impact on creditors.

The Decision in the Committee Action is currently on appeal to the District Court. Because of, among other things, the number of issues on appeal, the outcome of such appeals is uncertain and may be unfavorable to the Plan Debtors' unsecured creditors.    If the District Court upholds the Decision, in whole or in part, further appeals may be pursued.    The Committee cannot predict the timeframe for completing such appeals or the likelihood of success on the merits of such appeals.

### B.    RISK FACTORS ASSOCIATED WITH THE VALUE OF THE LIQUIDATION TRUST INTERESTS TO BE ISSUED UNDER THE PLAN

### 1.    Recent Dislocation in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries

The recent disruption within numerous major financial institutions and the resulting crisis in the financial markets has rippled through the economy and has impacted the homebuilding industry in particular.    While the ultimate effects of this crisis on the homebuilder industry are unclear, it is possible that this financial market will prevent even qualified borrowers from being able to obtain mortgages on affordable terms, if at all.    A continued sustained freeze of the credit markets as a result of the recent dislocation in the financial markets could have a significant adverse impact on the homebuilder industry and the Liquidation Trust's ability to liquidate individual homes directly to customers.

From 2007 through the present time, the mortgage lending and mortgage finance industries experienced significant instability due to, among other things, defaults on subprime loans and a resulting decline in the market value of such loans.    These developments led to reduced investor demand for mortgage loans and mortgage backed securities, tightened credit

requirements, reduced liquidity, increased credit risk premiums and regulatory actions. Deterioration in credit quality among subprime and other nonconforming loans also caused most lenders to eliminate subprime mortgages.

Recently, the severe dislocation in the financial markets has further impacted the ability of customers to obtain mortgages — even among qualified borrowers not seeking subprime mortgages. This has led to a further decrease in demand for new homes, as purchasers are unable to obtain sufficient financing. Similarly, large scale strategic buyers who may be interested in acquiring the Plan Debtors' assets for development or resale may not be able to obtain financing. Such unpredictability of the capital markets may prevent certain purchasers from closing on contracts entered into with the Plan Debtors or the Liquidation Trust. If this trend continues, it could have a significant materials adverse effect on the Plan Debtors' and the Liquidation Trust's ability to liquidate the Liquidation Trust Assets.

### 2.    Certain Tax Implications of the Plan Debtors' Bankruptcy May Increase the Tax Liability of the Liquidation Trust

Holders of Claims and Equity Interests should carefully review section XI hereof to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Liquidation Trust.

### C.    RISKS ASSOCIATED WITH THE DEBTORS' BUSINESS OPERATIONS

### 1.    General Homebuilder Industry Downturn

As described in detail in section V.A.1 of this Disclosure Statement, the homebuilding industry has experienced a significant and sustained decrease in demand for new homes, an oversupply of new and existing homes available for sale and a more restrictive mortgage lending environment. Reflecting these trends, the Debtors, like many other homebuilders, have experienced the impact of severe liquidity challenges in the credit and mortgage markets, diminished consumer confidence, increased home inventories and foreclosures and downward pressure on home prices. This downturn in the homebuilding market may continue for an indefinite period. Continued weakness in the homebuilding market would have a further adverse effect on the Debtors' ability to liquidate their assets at favorable prices as compared to those of earlier periods.

### 2.    Unexpected Natural Disasters or Weather Conditions

Homebuilders are particularly subject to natural disasters and severe weather conditions that can delay the ability to timely complete or deliver homes, damage partially complete or other unsold homes in inventory, negatively impact the demand for homes and negatively affect the price and availability of qualified labor and materials. The Debtors' assets are located in many areas that are especially subject to natural disasters. To the extent that hurricanes, severe storms, floods, tornadoes or other natural disasters or similar weather events occur, the Debtors' business may be adversely affected. To the extent the Debtors' insurance is not adequate to cover business interruption or losses resulting from these events, the distributions to creditors may be adversely affected.

### 3.    Dependence on Subcontractors

Substantially all of the Debtors' construction work was performed by subcontractors.  As a result, unsatisfactory performance by these unaffiliated third-party subcontractors could have a material adverse effect on the Debtors' businesses.

### 4.    Product Liability and Warranty Claims

In the ordinary course of business, the Debtors provided homebuyers with a limited warranty covering workmanship and materials and a limited warranty covering major structural defects.  Claims arising under these warranties and general liability claims are common in the homebuilding industry and can be costly.  Although the Debtors maintain liability insurance, the coverage offered by, and availability of, liability insurance for construction defects is currently limited and, where coverage is available, it may be costly.  Moreover, in certain instances, the Debtors' insurance coverage may contain limitations with respect to coverage; this insurance coverage may not be adequate to cover all liability and warranty claims for which the Debtors may be liable.  In addition, coverage may be further restricted and become more costly in the future.  Furthermore, although the Debtors generally seek to require subcontractors and design professionals to indemnify the Debtors for liabilities arising from their work, the Debtors may be unable to enforce such contractual indemnities.  Uninsured and unindemnified liability and warranty claims, as well as the cost of insurance coverage, could adversely affect the Debtors' results of operations.

### D.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Plan Debtors' Chapter 11 Cases may be converted to a case (or cases) under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Plan Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Committee believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan in light of the following considerations: (a) the likelihood that the assets of the Plan Debtors would be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (b) delays in distributions to creditors and (c) additional administrative expenses involved in the appointment of a trustee.  The Committee's Liquidation Analysis is attached hereto as Exhibit E.

### E.    ALTERNATIVES TO THE PROPOSED PLAN

If the Plan is not confirmed, other parties in interest could attempt to formulate a different plan.  With respect to an alternative plan of reorganization or liquidation, the Committee has explored various restructuring alternatives in the formulation of the Plan and believes that the Plan, as described herein, enables creditors to realize a greater value under the circumstances than would other restructuring alternatives.

# X.    CERTAIN SECURITIES LAW MATTERS

## A.    ISSUANCE OF LIQUIDATION TRUST INTERESTS

Given the nature of the Liquidation Trust Interests, the Committee does not believe such Liquidation Trust Interests constitute securities under the Securities Act of 1933, as amended (the "Securities Act").  If the Liquidation Trust Interests were deemed to be securities, the Committee believes such Liquidation Trust Interests would qualify for the exemption contained in section 1145 of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code generally exempts the issuance of securities under a chapter 11 plan from registration under the Securities Act and under state securities "blue sky" laws if three principal requirements are satisfied: (a) the offer is of securities in the debtor or its successor under a plan and the securities are issued under a plan of reorganization or liquidation; (b) the recipients of the securities hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor; and (c) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.

## B.    OBLIGATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED

The Securities and Exchange Act of 1934, as amended (the "Exchange Act") governs the secondary trading of securities and requires issuers subject thereto to file reports with the SEC on a quarterly and annual basis.  The Committee does not anticipate that the Liquidation Trust will be subject to the reporting requirements of the Exchange Act given the characteristics of the Liquidation Trust Interests.  Therefore, the Liquidation Trust will not file reports with the SEC.

# XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    INTRODUCTION

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Plan Debtors and certain holders of Claims and Equity Interests.  This summary is based on the Tax Code, the Treasury Regulations, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Neither the Plan Debtors nor the Committee have requested, nor do they intend to request, a private letter ruling from the IRS or an opinion of counsel with respect to any of the aspects of the Plan.  The discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Plan Debtors or to such holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies).  No aspect of state, local,

estate, gift, or non-U.S. taxation is addressed.  The following discussion assumes that each holder of a Claim holds its Claim as a "capital asset" within the meaning of Section 1221 of the Tax Code.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## B.    FEDERAL INCOME TAX CONSEQUENCES TO PLAN DEBTORS

Pursuant to the Plan, the Plan Debtors' assets will be transferred to the Liquidation Trust, which will be created solely for the purposes of liquidating and monetizing the Liquidation Trust Assets, prosecuting the Liquidation Trust Causes of Action, and making distributions to certain holders of Allowed Claims in an orderly liquidation during the Implementation Term.  The sale of Liquidation Trust Assets may result in the recognition of taxable gain or loss to the Plan Debtors or the Liquidation Trust, based on the difference between the fair market value of such assets and the Plan Debtors' or the Liquidation Trust's tax basis in such assets.  To the extent that the Plan Debtors or Liquidation Trust realize gain from the transfer of such assets or recognize any cancellation of indebtedness income, the Committee believes that the Plan Debtors or the Liquidation Trust, as applicable, will have sufficient current losses and net operating loss carryovers to shelter these gains, although it is possible that the Plan Debtors or the Liquidation Trust may be required to pay federal income tax on some or all of any gains recognized.  There could also be some liability for Taxes in certain states and under the federal alternative minimum tax.

**C.**     **FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

**1.**     **Consequences to Holders of TOUSA Class 1A Claims and Class 1B Claims and Conveying Subsidiaries Class 1 Claims**

Class 1A Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive a payment in Cash of all amounts outstanding on such Claims from (i) the 2007 Federal Tax Refund and (ii) their *Pro Rata* share of the proceeds of the Encumbered Assets of TOUSA.  Class 1B Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive payment from the estate of their *Pro Rata* share of the proceeds of the Encumbered Assets of TOUSA (other than the 2007 Federal Tax Refund).  Class 1 Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to their *Pro Rata* share of the proceeds of the Encumbered Assets of the Conveying Subsidiaries.

A holder should recognize gain or loss equal to the difference between the fair market value as of the Effective Date of such holder's right to receive Cash from the 2007 Federal Tax Refund and/or their *Pro Rata* share of the proceeds of the Encumbered Assets of the applicable Plan Debtor(s) (to the extent such right is not allocable to accrued interest), as applicable, and the holder's tax basis in the Claims surrendered by the holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the holder.  To the extent that any portion of the right to receive Cash in the exchange is allocable to accrued but unpaid interest, the holder may recognize ordinary income, which is addressed in the discussion below regarding accrued but unpaid interest.  A holder's tax basis in the right to receive the Cash should be equal to the fair market value of such right as of the Effective Date.  A holder's holding period for the right should begin on the day following the Effective Date.

**2.**     **Consequences to Holders of TOUSA Class 3 Claims, Conveying Subsidiaries Class 2 Claims and Beacon Hill Class 1 Claims**

Class 3 Claims at TOUSA, Class 2 Claims at the Conveying Subsidiaries and Class 1 Claims at Beacon Hill will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive either payment in Cash or delivery of the collateral securing such Claim.  If a holder receives Cash or has all collateral securing such Claim returned in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the Tax Code.  The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received and (y) the holder's adjusted tax basis in its Claim.  To the extent that the Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income (see discussion below).  A holder's tax basis in any property received should be equal to the fair market value of such property as of the Effective Date.  A holder's holding period for the property should begin on the day following the Effective Date.

### 3. Consequences to Holders of TOUSA Class 4 Claims, Conveying Subsidiaries Class 3 Claims and Beacon Hill Class 2 Claims and Class 3 Claims

Class 4 Claims at TOUSA, Class 3 Claims at the Conveying Subsidiaries and Class 2 Claims at Beacon Hill will receive Cash in full satisfaction of their Claims on the Effective Date. The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received and (y) the holder's adjusted tax basis in its Claim.  To the extent that the Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income (see discussion below).

Pursuant to the Plan, each Class 3 Claim at Beacon Hill will be cancelled on the Effective Date and will be entitled to receive payment in Cash.  The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash received and (y) the holder's adjusted tax basis in its Claim.  To the extent that the Cash received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income (see discussion below).

### 4. Consequences to Holders of TOUSA Class 5 Claims and Conveying Subsidiaries Class 4 Claims

Class 5 Claims at TOUSA and Class 4 Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive their *Pro Rata* share of the applicable series of Liquidation Trust Interests for the applicable Plan Debtor. The amount to be received, if any, with respect to the Liquidation Trust Interests is contingent, in part, on the outcome of the Liquidation Trust Causes of Action.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation section 301.7701-4(d) and related regulations, the Liquidation Trustee intends to take a position on the Liquidation Trust's tax return that the Liquidation Trust should be treated as a grantor trust set up for the benefit of the Liquidation Trust Beneficiaries.  Holders of Allowed Claims that receive Liquidation Trust Interests will be treated for U.S. federal income tax purposes as receiving their *Pro Rata* shares of the Liquidation Trust Assets from the applicable Plan Debtors in a taxable exchange and then depositing them in the Liquidation Trust in exchange for Liquidation Trust Interests.

Holders of Class 5 Claims at TOUSA and Class 4 Claims at the Conveying Subsidiaries should recognize gain or loss equal to the difference between (a) the fair market value as of the Effective Date of their *Pro Rata* share of the Liquidation Trusts Assets (to the extent such *Pro Rata* share is not allocable to accrued interest) and (b) the holder's tax basis in the Claims surrendered by the holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the holder.  To the extent that any portion of the Liquidation Trust

Interests received in the exchange is allocable to accrued interest, the holder may recognize ordinary income (see discussion below).  A holder's tax basis in the Liquidation Trust Interests received should equal their fair market value as of the Effective Date.  A holder's holding period for the Liquidation Trust Interests should begin on the day following the Effective Date.

Holders of Allowed Claims that receive Liquidation Trust Interests will be required to report on their U.S. federal income tax returns their share of the Liquidation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Liquidation Trust.  This requirement may result in such holders being subject to tax on their allocable share of the Liquidation Trust's taxable income prior to receiving any Cash distributions from the Liquidation Trust.  Holders of Allowed Claims that receive Liquidation Trust Interests are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Liquidation Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (A) elect to treat any Liquidation Trust Assets allocable to, or retained on account of, Disputed Claims (the "Liquidation Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Liquidation Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions from such reserves (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Plan Debtors.  All parties (including, without limitation, the Plan Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

## 5.    Accrued but Unpaid Interest

To the extent that any amount received by a holder of a Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Plan Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a holder of a Claim will be attributable to accrued interest is unclear.  Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to

148

any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for holders of Allowed Claims.

### 6.      Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for consideration (or the right to receive consideration) on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Gain, if any, recognized by a holder on the exchange of a Claim pursuant to the Plan that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

### 7.      Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### D.    WITHHOLDING AND REPORTING

Certain payments, including payments in respect of Claims pursuant to the Plan, are generally subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding at a rate of 28% unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished to the IRS.

In addition, a Liquidation Trust Beneficiary that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders of Claims.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. These requirements are different from, and in addition to, the withholding tax requirements described in the preceding paragraph. Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

Dated:  July 16, 2010

Respectfully submitted,

**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
TOUSA, INC. ET AL.**


By: /s/ *Patricia A. Redmond*
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, Florida  33130
Telephone: (305) 789–3553
Facsimile:  (305) 789–3395


–and–


**AKIN GUMP STRAUSS HAUER &
FELD LLP**
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
Natalie E. Levine (New York Bar No. 4617288)
One Bryant Park
New York, NY  10036
Telephone: (212) 872–1000
Facsimile: (212) 872–1002


–and–


**ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP**
Lawrence S. Robbins (D.C. Bar No. 420260)
Michael Waldman (D.C. Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Co–counsel to the Official Committee of
Unsecured Creditors of TOUSA Inc., et al.*