THIS DISCLOSURE STATEMENT IS BEING SUBMITTED
FOR APPROVAL BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT.  ACCORDINGLY, THIS IS NOT A SOLICITATION OF
ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES
OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-10928-JKO |
| TOUSA, INC., *et al.*, | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR AMENDED JOINT PLAN OF LIQUIDATION
## OF TOUSA, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS
## IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### MAY 15, 2013 VERSION OF PROPOSED DISCLOSURE STATEMENT

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

**ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP**

Lawrence S. Robbins  (DC Bar No. 420260)
Michael Waldman (DC Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Co-counsel to the Official Committee of Unsecured
Creditors of TOUSA, Inc., et al.*

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**

Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile:  (305) 789-3395

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar No. 4216453)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Co-counsel to the Debtors*

Dated: May 15,2013

**BERGER SINGERMAN LLP**
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ....................................................................................... 1
    A.    The Plan Process ............................................................................................ 1
    B.    Overview of the Plan .................................................................................... 1
    C.    The Committee Action and Pending Litigation ........................................... 3
    D.    Summary of Classification and Treatment of Claims and Interests Under the Plan
        and Classes Entitled to Vote on the Plan .................................................... 4
    E.    Voting on, and Confirmation of, the Plan .................................................... 5
        1.    The Voting Record Date ................................................................... 5
        2.    The Voting Deadline ........................................................................ 5
        3.    The Plan Objection Deadline ........................................................... 5
        4.    The Confirmation Hearing ............................................................... 5

II.   GENERAL INFORMATION AND DISCLAIMERS ........................................... 6
    A.    About This Disclosure Statement ................................................................. 6
    B.    Why You Are Receiving This Document ...................................................... 7
    C.    Persons To Contact for More Information .................................................... 8
    D.    Disclaimers ................................................................................................... 8

III.  QUESTIONS AND ANSWERS REGARDING THE DISCLOSURE STATEMENT
    AND JOINT PLAN ............................................................................................. 10
    A.    What is Chapter 11? .................................................................................... 10
    B.    Am I entitled to vote on the Plan?  What will I receive if the Plan is
        consummated? ............................................................................................. 10
    C.    What happens to my recovery if the Plan is not confirmed or does not become
        effective? ..................................................................................................... 11
    D.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
        when the Plan goes effective, and what do you mean when you refer to
        "Confirmation" and the "Effective Date"? ................................................. 11
    E.    How are the Plan Debtors obtaining the Cash and other value required to make
        distributions to satisfy Claims? ................................................................... 11
    F.    Are there risks to owning Liquidation Trust Interests upon emergence from
        bankruptcy? ................................................................................................. 11
    G.    Is there potential litigation related to the Plan? .......................................... 11
    H.    What is included in the solicitation packages to be sent to holders of Claims who
        are eligible to vote on the Plan? .................................................................. 12
    I.    Will there be releases granted to parties in interest as part of the Plan? ........... 12
    J.    Why is TOUSA Homes, L.P. not a "Plan Debtor"? .................................... 13
    K.    What is the deadline to vote on the Plan? ................................................... 14
    L.    How do I vote for or against the Plan? ....................................................... 14
    M.    Why is the Bankruptcy Court holding a Confirmation Hearing? ............... 14
    N.    When is the Confirmation Hearing set to occur? ........................................ 14
    O.    What is the deadline to object to Confirmation? ........................................ 15
    P.    What role does the Bankruptcy Court play after the Confirmation Hearing? ... 15
    Q.    What is the effect of Confirmation on the Plan Debtors' businesses? ............ 15
    R.    Do the Proponents recommend voting in favor of the Plan? ...................... 15

IV.   BACKGROUND CONCERNING THE DEBTORS ......................................... 15
    A.    The Debtors' Corporate History ................................................................. 16

i

|   | B. | The Debtors' Business Operations | 16 |
|---|---|---|---|
|   |   | 1. Homebuilding Operations | 16 |
|   |   | 2. Employees | 17 |
|   |   | 3. The Debtors' Revised Business Plan | 17 |
|   |   | 4. Land Disposition | 17 |
|   |   | 5. Construction | 18 |
|   |   | 6. Non-debtor Financial Service Entities | 18 |
|   | C. | The Debtors' Capital Structure | 19 |
|   |   | 1. Secured Bank Debt | 19 |
|   |   | 2. Unsecured Notes | 20 |
|   |   | 3. Preferred Stock | 21 |
| V. |   | THE DEBTORS' CHAPTER 11 CASES | 21 |
|   | A. | Events Leading to the Chapter 11 Cases | 21 |
|   |   | 1. Adverse Market Conditions | 22 |
|   |   | 2. The Original Transeastern Settlement | 22 |
|   |   | 3. Liquidity Difficulties and Prepetition Negotiations with Creditors | 28 |
|   | B. | Other Prepetition Developments | 29 |
|   |   | 1. NYSE Delisting | 29 |
|   |   | 2. SEC Inquiry | 29 |
|   | C. | Commencement of the Chapter 11 Cases | 29 |
|   | D. | "First Day" Relief | 29 |
|   |   | 1. The Proposed DIP Order | 30 |
|   |   | 2. Cash Management | 31 |
|   | E. | The Official Committee of Unsecured Creditors of TOUSA, Inc., *et al.* | 31 |
|   | F. | The Plan Process | 32 |
|   |   | 1. Initial Chapter 11 Restructuring Efforts | 32 |
|   |   | 2. The First Plan and Disclosure Statement | 32 |
|   |   | 3. The Alternative Plan | 33 |
|   |   | 4. The Debtors' Wind Down Plan | 33 |
|   |   | 5. Exclusivity | 34 |
|   |   | 6. The Committee's Plan and the Plan Mediation | 35 |
|   | G. | Significant Contested Matters During the Chapter 11 Cases | 36 |
|   |   | 1. Financing the Chapter 11 Cases | 36 |
|   |   | 2. The Committee Action | 42 |
|   |   | 3. Additional Litigation and Adversary Proceedings | 57 |
|   |   | 4. Indemnification Obligations with Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases | 75 |
|   |   | 5. Review and Analysis of Prepetition Intercompany Transactions | 76 |
|   | H. | Other Developments During the Chapter 11 Cases | 78 |
|   |   | 1. Filing of the Debtors' Schedules and SOFAs, Bar Dates and the Claims Process | 78 |
|   |   | 2. Employee Compensation and Changes in Management | 81 |
|   |   | 3. Sales of Certain Assets | 83 |
|   |   | 4. Acquisition of Real Property | 87 |
|   |   | 5. Changes in Certain Joint Ventures and Limited Liability Companies | 87 |
|   |   | 6. Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property | 95 |
|   |   | 7. The Home Warranty Program | 96 |
|   |   | 8. Deregistration Under the Securities and Exchange Act of 1934 | 96 |
| VI. |   | DESCRIPTION OF THE CHAPTER 11 PLAN | 97 |

A.     Overview.......................................................................................................... 97
B.     Classification and Treatment of Claims Against and Interests in the Plan Debtors ......... 97
       1.     Treatment of Unclassified Claims ...................................................... 98
       2.     Treatment of Classified Claims Against and Interests in the Plan Debtors ....... 101
C.     Means for Implementation of the Joint Plan ............................................... 111
       1.     Overview of Settlements in Connection with the Joint Plan .............. 111
       2.     The Models .......................................................................................... 112
       3.     Components of the Mediation Settlement and the D&O Insurance
              Coverage Settlement ........................................................................... 114
       4.     Existing Officers' Insurance and Indemnification ............................. 124
       5.     Valuation............................................................................................. 124
       6.     Postpetition Intercompany Claims..................................................... 124
       7.     Prepetition Intercompany Claims and Prepetition Intercompany Notes........... 124
       8.     Post-Effective Date Means for Implementation of the Joint Plan .................. 125
       9.     Distributions ........................................................................................ 131
D.     Treatment of Executory Contracts, Unexpired Leases and Postpetition Contracts ......... 138
       1.     Assumption and Rejection of Executory Contracts, Unexpired Leases
              and Postpetition Contracts.................................................................. 138
       2.     Claims on Account of the Rejection of Executory Contracts, Unexpired
              Leases or Postpetition Contracts......................................................... 139
       3.     Procedures for Counterparties to Executory Contracts and Unexpired
              Leases Assumed Pursuant to the Plan ................................................ 140
E.     Conditions Precedent to Consummation of the Plan ................................... 140
       1.     Conditions Precedent to Consummation............................................ 140
       2.     Waiver of Conditions .......................................................................... 141
       3.     Effect of Non-Occurrence of Conditions to the Effective Date........ 141
F.     Release, Injunction and Related Provisions................................................ 141
       1.     Compromise and Settlement of Claims, Interests and Controversies............... 141
       2.     Settlement Party Release ..................................................................... 142
       3.     Third-party Release.............................................................................. 142
       4.     Exculpation .......................................................................................... 143
       5.     Bar Order ............................................................................................. 144
       6.     Preservation of Rights and Causes of Action .................................... 144
       7.     Injunction............................................................................................. 145
G.     Binding Nature of the Plan ......................................................................... 146
H.     Retention of Jurisdiction ............................................................................ 147
I.     The Liquidation Trust ................................................................................. 149
       1.     Generally.............................................................................................. 149
       2.     Purposes and Establishment of the Liquidation Trust ....................... 149
       3.     Liquidation Trust Assets ..................................................................... 150
       4.     Valuation of Assets ............................................................................. 150
       5.     Appointment of the Liquidation Trustee and the Liquidation Trust
              Advisory Board .................................................................................... 151
       6.     Duties and Powers of the Liquidation Trustee.................................... 151
       7.     Funding of the Liquidation Trust ........................................................ 153
       8.     Investment Powers............................................................................... 154
       9.     Fees and Expenses of the Liquidation Trust ...................................... 154
       10.    Liquidation Trustee's Tax Power for Plan Debtors ........................... 154
       11.    Prosecution of Liquidation Trust Causes of Action........................... 155
       12.    Distributions; Withholding ................................................................. 155
       13.    Insurance.............................................................................................. 155

iii

|  | 14. | Exculpation; Indemnification | 155 |
|  | 15. | Transferability of the Liquidation Trust Interests | 156 |
|  | 16. | Registry of Beneficial Interests | 156 |
|  | 17. | Federal Income Tax Treatment of Liquidation Trust | 156 |
| J. | | Miscellaneous Provisions | 158 |
|  | 1. | Payment of Indenture Trustees' Fees | 158 |
|  | 2. | Dissolution of Committee | 159 |
|  | 3. | Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P. | 159 |
|  | 4. | Modification of the Plan | 159 |
|  | 5. | Revocation of Plan | 159 |
|  | 6. | Successors and Assigns | 160 |
|  | 7. | Reservation of Rights | 160 |
|  | 8. | Further Assurances | 160 |
|  | 9. | Severability | 160 |
|  | 10. | Time | 161 |
|  | 11. | Exhibits/Schedules | 161 |
|  | 12. | Payment of Statutory Fees | 161 |
|  | 13. | Substantial Consummation | 161 |
|  | 14. | Filing of Additional Documents | 161 |
| VII. | | SOLICITATION AND VOTING PROCEDURES | 161 |
| A. | | Overview | 161 |
| B. | | Distribution of the Solicitation Package | 161 |
|  | 1. | Voting Classes | 161 |
|  | 2. | Temporary Allowance of Claims for Voting Purposes | 163 |
| C. | | Requirements for Acceptance of the Plan | 163 |
|  | 1. | Acceptance by Voting Classes | 163 |
|  | 2. | Presumed Rejection and "Cram Down" | 164 |
| D. | | Completion of Ballots | 164 |
| VIII. | | CONFIRMATION OF THE PLAN | 164 |
| A. | | Confirmation Hearing | 164 |
| B. | | Objections to Confirmation | 165 |
| C. | | Overview of Statutory Requirements To Confirm the Plan | 166 |
| D. | | Specific Statutory Confirmation Requirements | 166 |
|  | 1. | Overview of the Best Interests of Creditors Test/Liquidation Analysis | 166 |
|  | 2. | Feasibility | 168 |
|  | 3. | Acceptance by Impaired Classes | 168 |
|  | 4. | Confirmation Without Acceptance by All Impaired Classes | 169 |
|  | 5. | Classification of Claims and Interests Under the Plan | 170 |
| IX. | | RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 170 |
| A. | | Bankruptcy Considerations | 170 |
|  | 1. | Failure to Satisfy Voting Requirements | 170 |
|  | 2. | Nonconsensual Confirmation | 170 |
|  | 3. | Failure to Secure Confirmation of the Plan | 171 |
|  | 4. | Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan | 172 |
|  | 5. | Failure to Consummate the Plan | 172 |
|  | 6. | The Proponents or the Liquidation Trustee May Object to the Amount or Classification of a Claim | 172 |

iv

7. The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims .................................................................................... 172

8. Administrative Expenses and Priority Claims May Exceed Expected Levels................................................................................................ 173

9. Liquidation Trust Cause of Action Recoveries and Results are Speculative and Uncertain ...................................................... 173

B. Risk Factors Associated with the Value of the Liquidation Trust Interests To Be Issued Under the Plan ...................................................... 173

C. Risks Associated with the Wind Down of the Debtors' Business Operations............... 173

 1. Dependence on Subcontractors................................................................. 173

 2. Product Liability and Warranty Claims .................................................. 173

D. Liquidation Under Chapter 7 ....................................................................... 174

E. Alternatives to the Proposed Plan ................................................................ 174

X. CERTAIN SECURITIES LAW MATTERS ................................................................ 174

A. Issuance of Liquidation Trust Interests ........................................................ 174

B. Obligations Under the Securities Exchange Act of 1934, as Amended......................... 174

XI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN............................ 175

A. Introduction................................................................................................. 175

B. Federal Income Tax Consequences to Plan Debtors................................................. 175

C. Federal Income Tax Consequences to Holders of Claims ........................................ 176

 1. Consequences to Holders of TOUSA Class 1 Claims, Class 2 Claims, Class 5A Claims and Class 5B Claims and Conveying Subsidiaries Class 1 Claims, Class 4A Claims and Class 4B Claims on Account of Distributions Other Than Liquidation Trust Interests....................................... 176

 2. Consequences to Holders of TOUSA Class 3 Claims, Conveying Subsidiaries Class 2 Claims and Beacon Hill Class 1 Claims on Account of Distributions Other Than Liquidation Trust Interests ........................ 177

 3. Consequences to Holders of TOUSA Class 4 Claims, Conveying Subsidiaries Class 3 Claims and Beacon Hill Class 2 Claims and Class 3 Claims on Account of Distributions Other Than Liquidation Trust Interests ............................................................................................. 177

 4. Consequences to Holders of TOUSA Class 1B Claims, Class 2 Claims, Class 5A Claims and Class 5B Claims and Conveying Subsidiaries Class 4A Claims and Class 4B Claims on Account of Distributions of Liquidation Trust Interests................................................................... 178

 5. Accrued but Unpaid Interest ...................................................................... 179

 6. Market Discount .......................................................................................... 179

 7. Limitation on Use of Capital Losses.......................................................... 180

D. Withholding and Reporting .......................................................................... 180

## <u>EXHIBITS</u>

**<u>Exhibit A</u>**    **Plan of Liquidation**

**<u>Exhibit B</u>**    **Disclosure Statement Order**

**<u>Exhibit C</u>**    **Recovery Analysis**

**<u>Exhibit D</u>**    **Liquidation Analysis**

**<u>Exhibit E</u>**    **Schedule of Liquidation Trust Assets**

**<u>Exhibit F</u>**    **Schedule of Prepetition Intercompany Notes**

**<u>Exhibit G</u>**    **Schedule of Assumed Executory Contracts,
Unexpired Leases and Postpetition Contracts**

# I.    EXECUTIVE SUMMARY[1]

## A.    THE PLAN PROCESS

The Plan described in this Disclosure Statement (and attached hereto as <u>Exhibit A</u>) is the culmination of the Proponents' efforts to maximize the value available for the Debtors' unsecured creditors and to memorialize the progress made over the past thirty-three months by the Settlement Parties as a result of the Mediation, which was ordered by the Bankruptcy Court on August 27, 2010 pursuant to the Mediation Order.  During the pendency of the Mediation, the Settlement Parties—which include the Debtors, the Committee, the First Lien Revolver Agent, the First Lien Revolver Sub-Agent, the First Lien Term Loan Agent, the Second Lien Term Loan Agent, the First Lien Revolver Lenders, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders, the Settling Transeastern Lenders, MatlinPatterson, Monarch and the Non-Defendant Directors and Officers—with the assistance of Peter L. Borowitz, the mediator appointed by the Bankruptcy Court pursuant to the Mediation Order (the "<u>Mediator</u>"), have resolved many of the outstanding issues in these cases, culminating in the Mediation Settlement, the Unsecured Creditor Settlement and the Plan.  The Proponents believe that the terms of the Mediation Settlement, the Unsecured Creditor Settlement and the Plan described herein represent a fair and reasonable distribution to the Debtors' secured and unsecured creditors.

## B.    OVERVIEW OF THE PLAN

The Plan contemplates the timely and orderly monetization of the Plan Debtors' remaining assets. Other than Cash and certain Causes of Action, only limited assets remain in the Plan Debtors' Estates at this time, and the Plan contemplates the transfer of all such assets, including all Causes of Action, to a Liquidation Trust on the Effective Date for the benefit of the Plan Debtors' creditors.  The Liquidation Trustee, at the direction of the Liquidation Trust Advisory Board, will supervise the liquidation of such assets, including the prosecution or settlement of the Liquidation Trust Causes of Action and the distribution of Liquidation Trust Interests and/or Cash to the holders of Allowed Claims.

The First Lien Revolver Claims (other than with respect to unpaid postpetition interest that accrued on the amount outstanding under the First Lien Revolving Credit Agreement, including non-default interest and default interest at the contract rate from the Petition Date through November 21, 2011) have been satisfied in full during the Chapter 11 Cases.  Pursuant to the Plan, holders of Allowed First Lien Revolver Claims will receive their *Pro Rata* payment in Cash of the Default Interest Amount, 34.5% of which is deemed to be paid from TOUSA and 65.5% of which is paid from the Conveying Subsidiaries.

Holders of First Lien Term Loan Claims against TOUSA will receive payment in Cash on account of their First Lien Term Loan Secured Claims of their applicable *Pro Rata* share of the Encumbered Assets at TOUSA, plus their share of the Term Loan Lender Tax Refund Recovery, which was determined as part of the Mediation Settlement.  On account of their First Lien Term Loan Deficiency Claims, holders of First Lien Term Loan Claims will receive payment in Cash of their applicable *Pro Rata* share of the Unencumbered Assets at TOUSA, the TOUSA Term Loan Lender Disgorgement Share and the Unsecured Creditor Tax Refund Recovery, which were determined as part of the Mediation Settlement, plus Liquidation Trust Interests entitling such holders to Cash distributions from the Liquidation Trust as the RSUI Insurance Coverage Action and the Remaining Contingent Assets of the Plan Debtors are settled or otherwise resolved.  On account of their third-party claims settled

---

[1] Capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan, which is attached hereto as <u>Exhibit A</u>.

pursuant to the Plan, holders of First Lien Term Loan Claims will receive their applicable *Pro Rata* share of the Term Loan Lender D&O Recovery, which was determined as part of the Mediation Settlement, plus Liquidation Trust Interests entitling such holders to Cash distributions from the Liquidation Trust as the Transeastern Litigation is settled or otherwise resolved. Pursuant to the Intercreditor Agreement, Cash distributions otherwise allocable to holders of Second Lien Term Loan Claims against TOUSA on account of their Second Lien Term Loan Deficiency Claims will be reallocated *Pro Rata* to holders of First Lien Term Loan Claims against TOUSA.

To implement the Intercreditor Settlement Agreement, Cash allocable to holders of First Lien Revolver Claims and First Lien Term Loan Claims against TOUSA will be distributed to or for the benefit of the First Lien Revolver Lenders and the First Lien Term Loan Lenders in accordance with the Intercreditor Settlement Agreement. In addition, Liquidation Trust Interests issued on account of First Lien Term Loan Claims against TOUSA will be allocated among holders of the First Lien Revolver Claims and First Lien Term Loan Claims against TOUSA in accordance with the Intercreditor Settlement Agreement.

Holders of Second Lien Term Loan Claims against TOUSA will receive, on account of their Second Lien Term Loan Deficiency Claims, their *Pro Rata* share of Liquidation Trust Interests entitling such holders to Cash distributions from the Liquidation Trust as the RSUI Insurance Coverage Action and the Remaining Contingent Assets of the Plan Debtors are settled or otherwise resolved. On account of their third-party claims settled pursuant to the Plan, holders of Second Lien Term Loan Claims will receive their applicable *Pro Rata* share of the Term Loan Lender D&O Recovery, which was determined as part of the Mediation Settlement, plus Liquidation Trust Interests entitling such holders to Cash distributions from the Liquidation Trust as the Transeastern Litigation is settled or otherwise resolved. For the avoidance of doubt, pursuant to the Intercreditor Agreement, Cash distributions that would have otherwise been allocable to holders of Second Lien Term Loan Claims against TOUSA on account of Second Lien Term Loan Deficiency Claims shall have been reallocated *Pro Rata* to holders of First Lien Term Loan Claims against TOUSA. Pursuant to the Mediation Settlement, the foregoing distributions of Cash and Liquidation Trust Interests shall not be subject to turnover or sharing with the First Lien Term Loan Lenders or First Lien Revolver Lenders under the Intercreditor Agreement.

Unsecured creditors at TOUSA will receive payment in Cash of their applicable share of the Unencumbered Cash at TOUSA, the TOUSA Term Loan Lender Disgorgement Share and the Unsecured Creditor Tax Refund Recovery, which were determined as part of the Mediation Settlement, plus their *Pro Rata* share of Liquidation Trust Interests entitling such holders to Cash distributions from the Liquidation Trust as the Remaining Contingent Assets of TOUSA are settled or otherwise resolved.

Unsecured creditors at the Conveying Subsidiaries will receive payment in Cash of their applicable *Pro Rata* share of the Unencumbered Cash at the applicable Conveying Subsidiary and their applicable *Pro Rata* share of the Monarch Settlement Payments, the Unsecured Creditor D&O Recovery, the Transeastern Offshore Disgorgement and the Conveying Subsidiaries Term Loan Lender Disgorgement Share, each of which were determined as part of the Mediation Settlement. Unsecured creditors at the Conveying Subsidiaries will also receive Liquidation Trust Interests in the series corresponding to the Conveying Subsidiary against which such unsecured creditor holds a Claim entitling such holders to Cash distributions from the Liquidation Trust as the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets of each applicable Conveying Subsidiary are settled or otherwise resolved. Accordingly, there will be a different series of Liquidation

Trust Interests for each Plan Debtor other than Beacon Hill[2] entitling unsecured creditors (and the Term Loan Lenders on account of their Term Loan Deficiency Claims) to *Pro Rata* Cash distributions from the Liquidation Trust as the remaining Liquidation Trust Assets are liquidated and the Liquidation Trust Causes of Action are settled or resolved by Final Order.

Except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Committee), the Liquidation Trust shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as reasonably practicable after the Initial Distribution Date. Initial distributions of Cash on account of the Liquidation Trust Interests will be made on or as soon as reasonably practicable after the Effective Date.

## C.    THE COMMITTEE ACTION AND PENDING LITIGATION

In July 2007, TOUSA caused the Conveying Subsidiaries to borrow $500 million in secured debt and to pay the proceeds of those loans to the creditors of the Transeastern JV (who also asserted claims against TOUSA and TOUSA Homes, L.P.) in settlement of pending litigation against the Transeastern JV, TOUSA and TOUSA Homes, L.P. (the "Original Transeastern Settlement"). The Conveying Subsidiaries were not defendants in the litigation, nor were they liable on the Transeastern JV's bank debt. Nevertheless, TOUSA required the Conveying Subsidiaries to take on $500 million of obligations at a time when the Conveying Subsidiaries were already suffering financial distress.[3]

Shortly after the Petition Date, the Committee sought standing to bring litigation to avoid (i) the payments made to the Transeastern Lenders as part of the Original Transeastern Settlement and (ii) the Prepetition Secured Lenders' Claims and related Liens at the Conveying Subsidiaries, alleging, among other things, that the Conveying Subsidiaries (a) were insolvent both before and after the Original Transeastern Settlement and (b) did not receive reasonably equivalent value for the transfers in connection with the Original Transeastern Settlement. Based on the foregoing, the Committee asked the Bankruptcy Court to unwind the Original Transeastern Settlement. In connection therewith, the Committee also asked the Bankruptcy Court to avoid the Liens of the Prepetition Secured Lenders on the 2007 Federal Tax Refund as a preference under the Bankruptcy Code.

On October 30, 2009, the Bankruptcy Court issued the Bankruptcy Court Decision, which avoided the Claims and Liens of the Term Loan Lenders as to the Conveying Subsidiaries. The Bankruptcy Court Decision also determined that the Lien on the 2007 Federal Tax Refund constituted a preference and, therefore, the Term Loan Lenders could not assert a Lien against such funds. Among other things, the Bankruptcy Court Decision ordered the Term Loan Lenders to disgorge all payments received under their respective Loan Documents, plus prejudgment interest. To fully unwind the Original Transeastern Settlement, the Bankruptcy Court also ordered the Transeastern Lenders to disgorge certain funds received pursuant to the Original Transeastern Settlement.

---

[2] Unsecured creditors at Beacon Hill will receive Cash and no Liquidation Trust Interests will be issued with respect to Beacon Hill.

[3] In the Bankruptcy Court Decision, the Bankruptcy Court found, among other things, that TOUSA's management made no effort to determine the amount of the benefit (if any) to the Conveying Subsidiaries from the Original Transeastern Settlement, that "TOUSA itself never even considered whether the Conveying Subsidiaries would benefit" from the Original Transeastern Settlement and that the officers who signed consents to the Original Transeastern Settlement on behalf of the Conveying Subsidiaries did not analyze the Original Transeastern Settlement from the Conveying Subsidiaries' perspective at all. *See* Bankruptcy Court Decision, at 107, 112-14.

All of the defendants in the Committee Action appealed the Bankruptcy Court Decision to the District Court.[4]   The appeal of the Transeastern Lenders was assigned to Judge Alan S. Gold and the appeals of the Term Loan Lenders were assigned to Judge Adalberto Jordan. A hearing on the appeals was held on October 22, 2010 in the District Court.  On February 11, 2011, Judge Gold issued an opinion that set aside the Bankruptcy Court Decision with respect to the Transeastern Lenders, and the Committee appealed to the Eleventh Circuit.  The appeals of the Term Loan Lenders were stayed pending a ruling by the Eleventh Circuit with respect to the appeal of the Transeastern Lenders.  On May 15, 2012, the Eleventh Circuit reversed Judge Gold's decision, affirmed the Bankruptcy Court's findings of liability, and remanded to the District Court for further proceedings.  Such proceedings are currently pending before Judge K. Michael Moore.

**D.     SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND CLASSES ENTITLED TO VOTE ON THE PLAN**

The Plan consists of separate chapter 11 plans for each of the Plan Debtors.  The treatment of the Classes of Claims against each of the Plan Debtors is described in three parts: (i) Claims against TOUSA; (ii) Claims against the Conveying Subsidiaries; and (iii) Claims against Beacon Hill.  Detail with respect to the nature of the distributions to each Class is provided in section VI.B of this Disclosure Statement, entitled "Classification and Treatment of Claims Against and Interests in the Plan Debtors."

Exhibit C to this Disclosure Statement summarizes the treatment for all Classes of Claims and Interests under the Plan.  Specifically, Exhibit C provides a detailed list of (i) the Classes of Claims entitled to vote on the Plan for each of the thirty-eight[5] Plan Debtors, (ii) the proposed treatment of each Class of Claims and Interests pursuant to the Plan, (iii) the estimated amount of Claims that will ultimately be Allowed in each Class for each of the Plan Debtors and (iv) the projected recovery for Claims and Interests in each Class.  Holders of Claims and Interests should refer to Exhibit C for information relating to the treatment of their specific Class of Claims or Interests pursuant to the Plan because recoveries under the Plan, and particularly those for holders of General Unsecured Claims, may vary by Plan Debtor.  The recovery percentages show recoveries based on potential resolution of the Liquidation Trust Causes of Action.

The Plan contemplates that holders of Allowed Unsecured Claims (including the First Lien Term Loan Lenders and Second Lien Term Loan Lenders on account of the Term Loan Deficiency Claims), Allowed Senior Note Claims and Allowed Senior Note Guaranty Claims will receive Liquidation Trust Interests under the Plan, with a series of Liquidation Trust Interests being established for each of the Plan Debtors (other than Beacon Hill).  Because there are limited Claims at Beacon Hill, the Plan contemplates that holders of Allowed General Unsecured Claims at Beacon Hill will receive payment in full in Cash (without postpetition interest) on the Distribution Date or as soon thereafter as their Claims are Allowed. Pursuant to the Plan, holders of Allowed Subordinated Note Claims, Allowed Subordinated Note Guaranty Claims and Allowed PIK Note Claims will not receive a distribution as distributions otherwise allocable to holders of such Claims shall be reallocated to the holders of Senior Debt in accordance with the terms of the Subordinated Note Indentures and the PIK Note Indenture, as applicable.

---

[4] The Committee Action as to the First Lien Revolver Lenders was dismissed before trial.  Such dismissal was affirmed on appeal to the District Court and the Committee did not further appeal.

[5] As there are no assets held by TOUSA Homes, L.P. and, therefore, no plan can be confirmed at TOUSA Homes, L.P., the Plan does not include a liquidation of TOUSA Homes, L.P.  The Committee anticipates filing a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of the Confirmation Hearing.  The Debtors that will be liquidated through the Plan are referred to herein as the "Plan Debtors."

E.    **VOTING ON, AND CONFIRMATION OF, THE PLAN**

The Bankruptcy Code provides that holders of claims against, or interests in, a debtor are entitled to vote on a plan only if (a) their claims or interests are "impaired" by that plan and (b) they receive some recovery under the plan.  A claim or interest is not impaired if the plan does not alter the legal, equitable or contractual rights of the holder of the claim or interest or if the plan reinstates the original terms of the obligation (i.e., cures any default and reinstates the original terms of the obligation) or pays such claim in full.  Unimpaired classes of claims and interests are deemed to accept the plan and do not vote.  If a class of claims or interests will not receive any recovery at all under the plan, that class is deemed to reject the plan and does not vote.  In light of these standards, only certain Classes of Claims against the Plan Debtors are entitled to vote to accept or reject the Plan.  Creditors should consult Exhibit C for a complete list of the Classes of Claims entitled to vote on the Plan.

Pursuant to the Bankruptcy Court's order approving this Disclosure Statement dated [_____] [ECF No. ____] (the "Disclosure Statement Order"), attached hereto as Exhibit B, the Bankruptcy Court has established the following deadlines with respect to voting on, and Confirmation of, the Plan:

1.    **The Voting Record Date**

The Voting Record Date, which shall be the date the Disclosure Statement Order is entered, is the date on which the Proponents will determine which creditors of the Plan Debtors are entitled to receive this Disclosure Statement and to vote to accept or reject the Plan.  Exhibit C attached hereto provides a description of the Classes of Claims entitled to vote to accept or reject the Plan.

| The Voting Record Date is [_____] |
|---|

2.    **The Voting Deadline**

Pursuant to the Disclosure Statement Order, [_____], 2013 (the "Voting Deadline") is the latest date on which all properly executed and completed votes to reject or accept the Plan must be actually received at the following address: TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  A Ballot that is submitted by facsimile, email or any other electronic means shall not be counted in voting to accept or reject the Plan. Section VII of this Disclosure Statement provides additional information and a detailed description of voting instructions for those entitled to vote on the Plan.

| The Voting Deadline is [_____] |
|---|

3.    **The Plan Objection Deadline**

The Plan objection deadline is the last day on which all properly filed and served objections to the Plan must be filed with the Bankruptcy Court and served upon the Proponents and appropriate parties in interest.

| The Plan objection deadline is [        ] |
|---|

4.    **The Confirmation Hearing**

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing on the confirmation of a plan under chapter 11.  Section 1128 of the Bankruptcy Code also provides that any party in interest may object to confirmation of the plan. The Confirmation Hearing will be before the

Honorable John K. Olson, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, 299 E. Broward Boulevard, Courtroom 301, Fort Lauderdale, FL 33301.

| The Confirmation Hearing will begin on [         ] at [    ] (prevailing Eastern Time) |
|---|

Section VII of this Disclosure Statement provides important information about the Confirmation Hearing and the Plan objection deadline.

## II.  GENERAL INFORMATION AND DISCLAIMERS

### A.  ABOUT THIS DISCLOSURE STATEMENT

The Proponents hereby transmit this Disclosure Statement pursuant to section 1126(b) of the Bankruptcy Code in connection with the solicitation of votes with respect to the Plan.  This Disclosure Statement provides important information regarding the Plan, which the Proponents are seeking to have confirmed by the Bankruptcy Court.  The Proponents believe that the Plan is in the best interests of all creditors and stakeholders.  The Proponents urge all holders of Claims who are entitled to vote on the Plan to vote to accept the Plan.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent contained in Article VII of the Plan and described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to be consummated will be satisfied or otherwise waived.

The Proponents believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Proponents other than as set forth in this Disclosure Statement.  Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim entitled to vote to accept or reject the Plan.

For additional information about the Debtors' former business operations, please refer to TOUSA's Annual Report on Form 10-K filed on August 12, 2008 for the fiscal year ended December 31, 2007 and any other report filed by the Debtors with the SEC.  These filings are available through the SEC's website at http://www.sec.gov.  In addition, the Debtors' monthly operating reports are available on the case docket and may be accessed at http://www.tousadocket.com.  Further information about the Debtors' Chapter 11 Cases and copies of the pleadings filed in the Chapter 11 Cases are also available at http://www.tousadocket.com.

**B.        WHY YOU ARE RECEIVING THIS DOCUMENT**

The Proponents are soliciting votes to accept or reject the Plan.  Until their decision to wind down their operations in March 2009, the Debtors built homes in various states throughout the country.  The Debtors have been operating as debtors in possession under chapter 11 of the Bankruptcy Code since January 29, 2008.[6]  The Proponents' proposed Plan will permit the Plan Debtors to complete their liquidation, efficiently monetize their remaining assets and maximize distributable value to their unsecured creditors.  This Disclosure Statement summarizes the key features of the Plan and provides information relating to the Debtors and the Plan, which will enable creditors to make an independent determination regarding whether to accept or reject the Plan.

The principal objective of a chapter 11 case is the confirmation of a chapter 11 plan.  Among other things, a chapter 11 plan sets forth how a debtor will treat its claims and interests to the extent that value is available to do so.  A bankruptcy court order confirming a chapter 11 plan, to the extent not modified or reversed on appeal (as with any other order), binds the debtor and key parties in interest, including any person acquiring property under the plan and any creditor or interest holder of a debtor, regardless of whether such creditor is impaired, has accepted the plan or receives or retains any property under the plan.

A bankruptcy court is only permitted to confirm a chapter 11 plan if (i) the required number of holders of claims against (and, where applicable, interests in) a debtor vote to accept the plan and (ii) certain other requirements are met.  As part of the process for voting, section 1125 of the Bankruptcy Code requires a plan proponent to obtain bankruptcy court approval of a document called a "disclosure statement" that contains adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the proposed plan.  **This document is the Disclosure Statement for the Plan proposed by the Proponents**.

This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow to determine whether to confirm the Plan.  This Disclosure Statement also discusses events leading to the Debtors' filing of the Chapter 11 Cases and developments during the Chapter 11 Cases.  **A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement**.

The Disclosure Statement Order establishes certain procedures with respect to soliciting and tabulating votes to accept or reject the Plan, including the important dates set forth in section I.E, above.  The Disclosure Statement Order also approved this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Plan Debtors' creditors to make an informed judgment regarding whether to accept or reject the Plan.  **A copy of the Disclosure Statement Order is attached as <u>Exhibit B</u> to this Disclosure Statement**.

All holders of Claims entitled to vote on the Plan should carefully review the procedures and instructions set forth in the Disclosure Statement Order for voting to accept or reject the Plan and for filing objections to Confirmation of the Plan.  As required by the Disclosure Statement Order, all holders of Claims that the Proponents believe may be entitled to vote to accept or reject the Plan will receive a

---

[6] As discussed in section V.H.5.b of this Disclosure Statement, Beacon Hill was formerly a joint venture of TOUSA Homes, Inc. but became a wholly-owned subsidiary of TOUSA Homes, Inc. after the Petition Date. On August 4, 2008, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, pursuant to an order dated August 4, 2008, its Chapter 11 Case is being jointly administered with the other Debtors' Chapter 11 Cases [ECF No. 1512].

copy of this Disclosure Statement as part of a solicitation package that will contain important information and a Ballot for use in the voting process (the "Solicitation Package").

C.    PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring additional information about this Disclosure Statement or the Plan should contact counsel for the Debtors, Kirkland & Ellis LLP, Attn: Richard M. Cieri and Joshua A. Sussberg, 601 Lexington Avenue, New York, New York 10022 or counsel for the Committee, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), Attn: Philip C. Dublin and Sara L. Brauner, One Bryant Park, New York, New York 10036, Telephone: (212) 872-1000.

If you have received this Disclosure Statement or the Plan on a CD-ROM but instead desire a paper copy of such documents, or would like additional copies, the documents are available: (a) at http://www.tousadocket.com, (b) by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (c) by calling (888) 647-1742 or (d) by emailing KCC_TOUSA@kccllc.com.

D.    DISCLAIMERS

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSES. THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS, COUNSEL TO THE COMMITTEE AND THE U.S. TRUSTEE. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE REGULATORY AUTHORITY. NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN, AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE REQUIREMENTS OF FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

NOTHING HEREIN IS INTENDED TO CONSTITUTE AN ADMISSION OF LIABILITY, WRONGDOING OR ERROR ON THE PART OF ANY SETTLEMENT PARTY OR AN ACKNOWLEDGEMENT OR ADMISSION AS TO THE TRUTH OR ACCURACY OF ANY STATEMENT HEREIN BY THE SETTLEMENT PARTIES OTHER THAN THE PROPONENTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE MUST RELY ON THEIR OWN EVALUATION AND ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS CITED IN SECTION IX HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE INTERPRETED OR CONSTRUED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES. IN PREPARING THIS DISCLOSURE STATEMENT, THE PROPONENTS RELIED ON CERTAIN FINANCIAL DATA DERIVED FROM INFORMATION PROVIDED TO THE COMMITTEE BY THE DEBTORS THAT WAS AVAILABLE AT THE TIME OF PREPARATION AND FINANCIAL DATA DERIVED BY THE PROPONENTS THAT WAS AVAILABLE AT THE TIME OF PREPARATION. ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE PROPONENTS HAVE PREPARED THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS CONCERNING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS INTENDED TO AID AND SUPPLEMENT REVIEW OF THE PLAN ITSELF. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN (INCLUDING THE EXHIBITS TO THE PLAN) IN ITS ENTIRETY. ACCORDINGLY, THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND THE PLAN EXHIBITS. IF THERE IS A CONFLICT BETWEEN THE PLAN OR THE PLAN EXHIBITS AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN AND THE PLAN EXHIBITS WILL GOVERN. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN EXHIBITS, AS WELL AS READ CAREFULLY THIS DISCLOSURE

**STATEMENT IN ITS ENTIRETY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE PLAN DEBTORS IN THE CHAPTER 11 CASES.**

**III.    QUESTIONS AND ANSWERS REGARDING THE DISCLOSURE STATEMENT AND JOINT PLAN**

**A.    WHAT IS CHAPTER 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.  Chapter 11 may also be used as a vehicle for a debtor to liquidate its assets in an orderly fashion to maximize value for creditors.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the petition date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization or liquidation is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court (by an order that has not been modified or reversed on appeal) and becomes effective is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the claims against and interests in the debtor in accordance with the terms of the confirmed plan.

**B.    AM I ENTITLED TO VOTE ON THE PLAN?  WHAT WILL I RECEIVE IF THE PLAN IS CONSUMMATED?**

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depends on what kind of Claim or Interest you hold.  As described in section VI of this Disclosure Statement, entitled "Description of the Chapter 11 Plan," Article III of the Plan creates categories of holders of Claims and Interests, each of which is referred to as a "Class."  A list of the Classes of Claims and Interests and their respective entitlement to vote are set forth on Exhibit C to this Disclosure Statement. Depending on the resolution of the Liquidation Trust Causes of Action, it is possible that actual recoveries for holders of Claims will differ from the proposed recoveries under the Plan.

You should refer to this entire Disclosure Statement and the Plan (including exhibits) for a complete description of the classification and treatment of each Class of Claims and Interests.

For more information about the treatment of Claims and Interests, see section VI of this Disclosure Statement entitled "Description of the Chapter 11 Plan," which begins on page 97.

10

**C.      WHAT HAPPENS TO MY RECOVERY IF THE PLAN IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE?**

In the event that the Plan is not confirmed or does not become effective, there is no assurance that an alternative plan will be confirmed or, if such an alternative plan is confirmed, when confirmation would occur.  Moreover, if the Plan is not confirmed in a timely manner, it is unclear what holders of Claims would ultimately receive in respect of such Claims.  It is possible that any alternative plan of liquidation may provide holders of Claims with less than they would have received pursuant to the Plan.  Moreover, non-Confirmation of the Plan may result in an extended chapter 11 proceeding.  For a more detailed description of the consequences of non-Confirmation of the Plan, see the "Risk Factors" section of this Disclosure Statement, beginning on page 170 and the liquidation analysis attached as <u>Exhibit D</u> to this Disclosure Statement.

**D.      IF THE PLAN PROVIDES THAT I GET A DISTRIBUTION, DO I GET IT UPON CONFIRMATION OR WHEN THE PLAN GOES EFFECTIVE, AND WHAT DO YOU MEAN WHEN YOU REFER TO "CONFIRMATION" AND THE "EFFECTIVE DATE"?**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court.  Confirmation does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective.  References to the "Effective Date" in the Plan and Disclosure Statement mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.  Initial distributions will be made on the Effective Date, or as soon as reasonably practicable thereafter, in accordance with Article V of the Plan (and for Claims that are not yet Allowed, distributions will be further delayed).  The Plan can only be consummated if the Confirmation Order is not stayed.  For a discussion of the conditions to Confirmation, see section VIII of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 164.  For a discussion of the conditions to the Effective Date of the Plan, see section VI.E of this Disclosure Statement, entitled "Conditions Precedent to Consummation of the Plan," which begins on page 140.

**E.      HOW ARE THE PLAN DEBTORS OBTAINING THE CASH AND OTHER VALUE REQUIRED TO MAKE DISTRIBUTIONS TO SATISFY CLAIMS?**

The Plan provides that the Plan Debtors' Cash and assets will be transferred to the Liquidation Trust on the Effective Date.  The Liquidation Trustee will convert the Plan Debtors' non-Cash assets to Cash and make distributions to holders of Allowed Claims in accordance with the treatment provided for under the Plan.  As discussed in section IV.B.3 of this Disclosure Statement, the vast majority of the Debtors' non-litigation assets have already been converted to Cash that is currently being held in investment accounts approved by the Bankruptcy Court.  The Debtors' only remaining non-litigation assets include certain joint venture interests and receivables.  A detailed breakdown of these assets owned by each Plan Debtor is attached as <u>Exhibit E</u>.

**F.      ARE THERE RISKS TO OWNING LIQUIDATION TRUST INTERESTS UPON EMERGENCE FROM BANKRUPTCY?**

Yes.  Please see the discussion of "Risk Factors" that begins on page 170.

**G.      IS THERE POTENTIAL LITIGATION RELATED TO THE PLAN?**

Yes.  Because certain Classes of Claims and Interests are deemed to reject the Plan, and because certain Classes of Claims may vote to reject the Plan, the Proponents intend to seek Confirmation of the

11

Plan pursuant to the "cram down" provisions of the Bankruptcy Code. The Bankruptcy Code "cram down" provisions allow the Bankruptcy Court to confirm the Plan even if it has been rejected by an Impaired Class of Claims or Interests if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. However, there may be litigation to determine whether such requirements have been met. For a more detailed discussion, see "Risk Factors and Alternatives to Confirmation and Consummation of the Plan," beginning on page 170.

**H.    WHAT IS INCLUDED IN THE SOLICITATION PACKAGES TO BE SENT TO HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the Proponents will seek Confirmation of the Plan. Additionally, holders of Claims against the Plan Debtors in Classes that are eligible to vote on the Plan and that are otherwise eligible to vote will receive appropriate solicitation materials that will contain important information about voting to accept or reject the Plan. The solicitation materials and documents will include an appropriate form of Ballot, a copy of the Disclosure Statement (in CD-ROM form), detailed instructions about voting on the Plan and a copy of the Disclosure Statement Order.

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto and related documents are available to any party free of charge from Kurtzman Carson Consultants LLC, the Voting and Claims Agent retained by the Debtors in the Chapter 11 Cases, by: (a) calling the Debtors' restructuring hotline at 1 (888) 647-1742; (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/tousa; (c) emailing the Voting and Claims Agent at KCC_TOUSA@kccllc.com; or (d) writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave., El Segundo, California 90245. You may also obtain copies of any pleadings filed in the Chapter 11 Cases at http://www.tousadocket.com. You may also email the Committee at tousamail@akingump.com.

**I.    WILL THERE BE RELEASES GRANTED TO PARTIES IN INTEREST AS PART OF THE PLAN?**

Yes, under the Plan, the Releasing Settlement Parties will be deemed to forever release, waive and discharge each of the Settlement Parties, as well as each Settlement Party's predecessors, predecessors in interest, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of the foregoing's current and former officers, directors, managers, principals, shareholders, members, partners, employees, trustees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, each solely in its capacity as such (collectively, the "Released Parties"). However, the Plan provides that Released Parties shall not include (i) any professional engaged by the Debtors prior to the Petition Date that was not retained by the Debtors in connection with the Chapter 11 Cases as an ordinary course professional or pursuant to an order of the Bankruptcy Court or (ii) any Entity that entered into a tolling agreement in connection with the Chapter 11 Cases.

The Plan also provides that each holder of a Claim or Interest against the Plan Debtors (other than a Releasing Settlement Party) shall be deemed to forever release, waive and discharge the Released Parties from all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other circumstance taking place on or prior to the Effective Date in connection with, arising out of or in any way relating to the Released Settlement Claims that could have been asserted at any time in the past, present or future by or on behalf of a Releasing Settlement Party against a Released

12

Party in connection with, arising out of or in any way relating to the Debtors, the Chapter 11 Cases or the Settled Mediation Causes of Action. This release, however, shall not apply to Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or criminal misconduct.  Further, the Plan provides that such release shall not operate to waive or release any Released Party that is (i) the subject of a pending action commenced by the Plan Debtors' Estates as of the date of entry of an order approving the Disclosure Statement, except for the Settled Mediation Causes of Action, which are released pursuant to the terms of the Plan and the various agreements constituting the Mediation Settlement; (ii) a defendant or a potential defendant under a Liquidation Trust Cause of Action; (iii) a party to any agreement effectuating the assignment, participation or other transfer of any Claims against a Plan Debtor or the assumption of any liability to a Plan Debtor or (iv) the subject of an express preservation in, or any right or obligation under or that is part of, the Plan, the Liquidation Trust Agreement, the Intercreditor Settlement Agreement, or any agreement entered into pursuant to, in connection with or contemplated by the Plan.  For the avoidance of doubt, nothing contained in the Plan shall (x) release (a) any Non-Settling Transeastern Lender from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the Transeastern Litigation or (b) RSUI from any Claims, obligations, suits, judgments, damages, demands debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the D&O Insurance Coverage Action or (y) impact the bar order and releases contained in the D&O Insurance Coverage Settlement Agreement or the D&O Settlement Order.

The Plan also includes a provision that exculpates the Settlement Parties, the Indenture Trustees, the Liquidation Trustee and the Distribution Agent, if any, from any Claim related to any act or omission arising from and after the Petition Date in connection with, relating to or arising out of the Plan Debtors' postpetition restructuring efforts, the Plan Debtors' Chapter 11 Cases, the Mediation, the Settled Mediation Causes of Action and other related settlement discussions, the formulation, preparation, dissemination, negotiation, filing, confirmation, approval, implementation or administration of the Disclosure Statement, the Plan (and all previous disclosure statements and plans), the property to be distributed under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Plan Debtors' Chapter 11 Cases (including the Mediation and the Mediation Settlement), the pursuit of Confirmation, the issuance of Liquidation Trust Interests or the distribution of property under the Plan or any other related agreement (each such Claim, an "Exculpated Claim").  This exculpation, however, shall not apply to any act or omission that is determined in a Final Order to have constituted actual fraud or criminal misconduct.  No Claim, Cause of Action, obligation or liability expressly set forth in or preserved by the Plan constitutes an Exculpated Claim.   As with other portions of the Plan, parties in interest may object to the proposed releases and exculpation.

**J.    WHY IS TOUSA HOMES, L.P. NOT A "PLAN DEBTOR"?**

TOUSA Homes, L.P., unlike the Conveying Subsidiaries, had certain obligations to the Transeastern Lenders that were settled pursuant to the Original Transeastern Settlement.  To that end, unlike the Conveying Subsidiaries, TOUSA Homes, L.P. was not a plaintiff in the Committee's lawsuit seeking to avoid the Claims and Liens of the Prepetition Secured Lenders and the payments to the Transeastern Lenders and was not entitled to share in the settlement with respect to the Transeastern Litigation pursuant to the Mediation Settlement.  As a result, TOUSA Homes, L.P. continues to be obligated to the Prepetition Secured Lenders and to the noteholders under their respective indentures.  Similarly, TOUSA Homes, L.P. is not party to any of the other Mediation Causes of Action or the Falcone Action and, therefore, will not receive a recovery on account of a successful prosecution or settlement of such causes of action.   As of the date of this Disclosure Statement, TOUSA Homes, L.P. has no assets and no interest in any pending litigation.  Based on the lack of assets available to satisfy

Claims at TOUSA Homes, L.P., the Proponents do not believe that any plan can be confirmed for TOUSA Homes, L.P. and intend to file a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of, and to be considered in connection with, the Confirmation Hearing. To the extent that the Proponents determine that additional Plan Debtors have no assets and no ability to confirm a Plan, the Proponents may amend the Plan to exclude such entities.

**K.     WHAT IS THE DEADLINE TO VOTE ON THE PLAN?**

[_____] (prevailing Eastern Time) on [_____].

**L.     HOW DO I VOTE FOR OR AGAINST THE PLAN?**

This Disclosure Statement, accompanied by a Ballot to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of a Claim in TOUSA Classes 1A, 1B, 2, 5A or 5B, Conveying Subsidiaries Classes 1, 4A or 4B or Beacon Hill Class 3 and you are otherwise entitled to vote, you may vote to accept or reject the Plan by completing the Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures included in the Disclosure Statement Order, which is attached hereto as Exhibit B.

Detailed instructions regarding how to vote on the Plan are contained on the Ballots and in the Solicitation and Voting Procedures. For your vote to be counted, your Ballot must be completed, signed and actually received by [_____] (prevailing Pacific Time), on the Voting Deadline, [_____].

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan, or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim entitled to vote on the Plan may cast only one Ballot with respect to each Claim held. It is important to follow the specific instructions provided on each Ballot. For information regarding voting, see section VII entitled "Solicitation and Voting Procedures," which begins on page 161.

**M.     WHY IS THE BANKRUPTCY COURT HOLDING A CONFIRMATION HEARING?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation and be heard at the Confirmation Hearing. The confirmation of a chapter 11 plan by a bankruptcy court (unless the confirmation order is modified or reversed on appeal) binds a debtor, any person acquiring property under the plan, any creditor or interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**N.     WHEN IS THE CONFIRMATION HEARING SET TO OCCUR?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [_____] to begin at [___] (prevailing Eastern Time) before the Honorable John K. Olson, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Florida, located at 299 E. Broward Blvd., Courtroom 301, Fort Lauderdale, FL 33301. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

14

**O.      WHAT IS THE DEADLINE TO OBJECT TO CONFIRMATION?**

Objections to Confirmation must be filed and served on the Proponents, and certain other parties in interest, so that they are actually received no later than [_____] at [____] (prevailing Eastern Time) in accordance with the requirements set forth in the Disclosure Statement Order, which is attached hereto as Exhibit B.  Only objections to Confirmation that are timely served and filed in compliance with the Disclosure Statement Order may be considered by the Bankruptcy Court.

**P.      WHAT ROLE DOES THE BANKRUPTCY COURT PLAY AFTER THE CONFIRMATION HEARING?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction (other than appellate jurisdiction, and subject to any withdrawal of the reference by which the District Court has conferred jurisdiction on the Bankruptcy Court pursuant to section 157 of title 28 of the United States Code) over all matters arising out of, or related to, the Chapter 11 Cases and the Plan.  In addition, subject to the same qualifications, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims are accomplished pursuant to the Plan.  *See* Article X of the Plan.

**Q.      WHAT IS THE EFFECT OF CONFIRMATION ON THE PLAN DEBTORS' BUSINESSES?**

The Plan Debtors are liquidating under chapter 11 of the Bankruptcy Code.  As a result, the Plan Debtors' remaining assets will be liquidated and the proceeds thereof will be distributed to creditors in accordance with the terms of the Plan and the Plan Debtors' businesses will be wound up.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the first Business Day selected by the Proponents after which all conditions to consummation of the Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.  *See* Article VII of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

In the event that the Plan is not consummated, the Plan will be null and void in all respects.  Accordingly, any settlement or compromise, distribution on account of any Claim, assumption or rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

**R.      DO THE PROPONENTS RECOMMEND VOTING IN FAVOR OF THE PLAN?**

Yes.  The Proponents believe that the Plan provides for a larger distribution to the Plan Debtors' creditors than would result from any other available alternative.  The Proponents believe the Plan is in the best interests of all holders of Claims.  Moreover, the Plan preserves certain ongoing litigation and authorizes the Liquidation Trustee to continue to prosecute and/or settle certain cases of action, while allowing distributions to be made to creditors on a current basis.  Thus, the Proponents recommend that holders of Claims who are entitled to vote on the Plan vote to accept it.

## IV.      BACKGROUND CONCERNING THE DEBTORS[7]

Prior to the filing of the Chapter 11 Cases, the Debtors built homes in the United States for sale under various brand names, including Engle Homes, Newmark Homes, Fedrick Harris Estate Homes,

---

[7] This Disclosure Statement includes information that is based on representations made by the Debtors in their *Disclosure Statement for First Amended Joint Plan of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 2681] and other information provided to the Committee by the Debtors.

Trophy Homes and the James Company.  The Debtors' prepetition business operations encompassed a wide array of homebuilding activities, ranging from land acquisition and site development to marketing, design and construction, in target markets including a diverse group of homebuyers, such as "first time" homebuyers, "move up" homebuyers, homebuyers relocating to a new city or state, buyers of second or vacation homes, active adult homebuyers and homebuyers with grown children seeking a smaller home.

The Debtors operated in four major geographic regions in the United States: Florida, the Mid-Atlantic, Texas and the West.  The break-down for each region in which the Debtors operated is as follows:

| Florida | Mid-Atlantic | Texas | West |
|---|---|---|---|
| Central Florida | Baltimore / Southern Pennsylvania | Austin | Colorado |
| Jacksonville | Nashville | Houston | Las Vegas |
| Southeast Florida | Northern Virginia | San Antonio | Phoenix |
| Southwest Florida | | Dallas | |
| Tampa / St. Petersburg | | | |

The following sections of this Disclosure Statement provide a brief overview of the Debtors' corporate history, key aspects of the Debtors' historical business operations and a summary of the Debtors' current capital structure.

## A.    THE DEBTORS' CORPORATE HISTORY

TOUSA made its initial public offering of common stock in March 1998 under the name Newmark Homes Corp. ("Newmark").  In 1995, Newmark acquired The Adler Companies, Inc., which had operated in southern Florida since 1990.  In December 1999, Technical Olympic USA, Inc. acquired 80% of Newmark's common stock.  In November 2000, Technical Olympic USA, Inc. purchased Engle Holdings Corp., a Florida-based publicly traded homebuilding company.  In June 2002, Engle Holdings Corp. merged into Newmark, and the company changed its name to Technical Olympic USA, Inc.  In 2007, the company officially changed its name to TOUSA, Inc.  TOUSA grew rapidly through a series of acquisitions.  In October 2002, TOUSA acquired the net assets of DS Ware Homes LLC, a homebuilder operating in Jacksonville, Florida.  In November 2002, TOUSA acquired the net assets of Masonry Homes, Inc., a homebuilder operating in the northwestern suburbs of Baltimore, Maryland and southern Pennsylvania.  In February 2003, TOUSA acquired the assets of Trophy Homes, Inc., a homebuilder operating in the Las Vegas area, and James Construction Company, a homebuilder operating in the greater Denver area.  During 2004, TOUSA acquired certain assets of Gilligan Homes, a homebuilder with operations in Maryland, Pennsylvania and Delaware.  In August 2005, TOUSA, through a joint venture which it managed and in which it held a 50% interest, acquired the assets of Transeastern Homes, a homebuilder operating throughout Florida.  As a result of a settlement among TOUSA, the joint venture, and the joint venture's lenders in August of 2007, TOUSA acquired 100% of the interest in the joint venture, now known as TOUSA Homes Florida, L.P.

## B.    THE DEBTORS' BUSINESS OPERATIONS

### 1.    Homebuilding Operations

Prepetition, the Debtors' homebuilding operations were divided into four operating regions, primarily on a geographic basis.  The Debtors' management was based on an operating platform under which the Debtors' various local division presidents reported to a regional chief operating officer.  The Debtors relied on their operating divisions for meaningful input regarding, among other things,

(a) selecting appropriate homebuilding sites, (b) negotiating aspects of contracts, (c) obtaining necessary land development and home construction approvals and (d) selecting building plans and architectural schemes.  TOUSA maintained a corporate office in Hollywood, Florida, which housed many of the Debtors' corporate executives.

### 2.    Employees

The Debtors employed approximately 1,700 employees on an aggregate basis before the Petition Date.  As of February 15, 2013, the Debtors had 3 employees.  The decrease in staffing levels during the pendency of the Chapter 11 Cases was tied, at first, to the decline in homebuilding and home sales activity, but is ultimately the result of the implementation of the Debtors' wind down plan.

### 3.    The Debtors' Revised Business Plan

Beginning in March 2009, in the face of the prolonged and ongoing decline in the homebuilding industry and after consulting with and receiving the support of each of their major creditor constituencies, the Debtors shifted their focus away from build-to-order new sales and construction starts.  Instead, the Debtors commenced a wind-down process and began focusing on closing sales of homes currently under construction, selling their remaining inventory of "spec" homes and monetizing their land assets over time.  Presently, virtually all of the Debtors' non-litigation assets have been liquidated into Cash that is currently being held in investment accounts approved by the Bankruptcy Court.  As of January 31, 2013, the Debtors' only remaining non-litigation assets include certain joint venture interests and receivables, as described in more detail in the attached Exhibit E.

### 4.    Land Disposition

Consistent with the Debtors' revised business plan, the Debtors disposed of all their remaining land assets.  In connection therewith, the Debtors (a) engaged in bulk sales of land and unsold homes (see section V.H.3, below), (b) renegotiated terms or abandoned rights under certain option contracts (as discussed in the next section), (c) disposed of core assets (see section V.H.3, below), (d) abandoned the Debtors' interests in certain properties that were no longer of any value to the Debtors' Estates and (e) disposed of certain of the Debtors' joint venture interests.

#### a.    Option Contracts

Before the Petition Date, a key component of the Debtors' land acquisition strategy was the use of option contracts that gave the Debtors the right, but not the obligation, to buy home sites at predetermined prices on a predetermined takedown schedule (the "Option Contracts").  The Option Contracts generally required the payment of a cash deposit or the posting of a letter of credit, which was typically less than 20% of the underlying land purchase price and which sometimes required monthly maintenance payments.  In certain instances, the Debtors entered into development agreements under Option Contracts that required them to complete the development of the land even if they chose not to exercise their option and to forfeit a deposit.  Although the Debtors were typically compensated for such work, in certain cases they were responsible for any cost overruns.  Consistent with the Debtors' wind down plan, the Debtors have either terminated or rejected each of their Option Contracts.  The Debtors' liability for terminated or rejected Option Contracts generally was limited to the prepaid deposit held by the optionors.

17

### b.    Joint Ventures

In addition to the Option Contracts, the Debtors traditionally used joint ventures to acquire and develop land and/or to build and market homes.  Such joint ventures were intended to permit the Debtors to mitigate and share the risks associated with land ownership and development, increase the Debtors' return on equity and extend their capital resources.

At the height of the homebuilding cycle, the Debtors' joint ventures allowed the Debtors to expand rapidly nationwide, thereby competing with larger homebuilders.  Over the course of the Chapter 11 Cases, the Debtors ceased their reliance on the joint ventures.  In several cases, the commencement of the Chapter 11 Cases constituted an event of default under the applicable joint venture lender agreements.  In other instances, the Debtors completed planned development activities and therefore ceased joint venture operations.  As contemplated by the Debtors' wind-down plan and as discussed in further detail in section V.H.5 herein, the Debtors have liquidated substantially all of their joint venture interests and are seeking to dispose of their limited remaining joint venture interests or assets or otherwise wind down such joint ventures.

### 5.    Construction

The Debtors historically relied on subcontractors to perform substantially all construction work.  The Debtors employed construction superintendents to monitor the construction of each home and coordinate the activities of subcontractors and suppliers.  The work of subcontractors was subject to certain quality and cost controls and monitored compliance with zoning and building codes.  The Debtors typically retained subcontractors pursuant to a contract obligating the subcontractor to complete construction at a fixed price in a "good and workmanlike" manner at or above industry standards.  In addition, under these contracts the subcontractor generally provided the relevant Debtor with standard indemnifications and warranties.

### 6.    Non-debtor Financial Service Entities

Prepetition, the Debtors offered a variety of financial services, such as mortgage financing, title insurance, homeowner insurance and closing services to homebuyers and other real estate buyers, through certain financial services subsidiaries (collectively, the "Financial Service Entities").  The Financial Service Entities are not (and have never been) debtors in the Chapter 11 Cases.

The Financial Service Entities included Preferred Home Mortgage Company ("PHMC"), a subsidiary mortgage business that was located in Tampa, Florida and that was an approved Fannie Mae seller/servicer, which provided a full selection of conventional, FHA-insured and VA-guaranteed mortgage products to homebuyers.  On January 28, 2008, PHMC entered into a joint venture with Wells Fargo Ventures, LLC ("Wells Fargo").  PHMC owned 49.9% of the venture, which operated under the name of "Preferred Home Mortgage Company," with the balance owned by Wells Fargo (the "PHMC JV").  The Debtors' wind down plan contemplated that the operations of the PHMC JV would be wound down concurrent with the Debtors' divisional homebuilding operations.  Consistent with such wind down plan, PHMC sold its interest in the PHMC JV to Wells Fargo in September 2009.  Subsequent to such sale, PHMC continued to hold, service and market for sale a portfolio of 28 loans with an unpaid principal balance as of July 31, 2011 in the amount of $4,353,873.36.  PHMC sold 23 loans from this loan portfolio to MountainView Capital Group in August 2011 for just over $2 million.  Two of the remaining loans held by PHMC were paid in full, and three of them went into foreclosure.  As a result of the foreclosure process, PHMC became the owner of one home in Las Vegas, Nevada, which PHMC sold in August 2012, and two homes in Orlando, Florida, which PHMC sold in April 2013.  PHMC has no other assets or employees at this time.

Another such Financial Service Entity, Universal Land Title, Inc. ("ULT"), provided title and escrow services to the Debtors prior to the Petition Date. ULT previously sold title insurance and provided closing escrow and settlement services to customers buying homes from the Debtors. The principal sources of revenue generated by the title insurance business were fees paid to ULT for title insurance obtained for the Debtors' homebuyers and other third-party residential purchasers. On August 12, 2009, the Debtors filed a motion seeking authority to sell substantially all of the assets of ULT to Universal Land Title, LLC [ECF No. 3056]. According to the Debtors, such sale would generate approximately $6.3 million in net recoveries to the Debtors' estates, largely in the form of avoided funding obligations related to ULT. On August 28, 2009, the Bankruptcy Court entered an order [ECF No. 3135] granting the sale motion and approving the sale.

Subsequently, on June 28, 2010, the Debtors filed a motion seeking authority to dissolve ULT and its subsidiaries, with any assets remaining at ULT after payment of dissolution costs and any outstanding liabilities to be transferred to TOUSA Homes, Inc. [ECF No. 5694]. On July 15, 2010, the Bankruptcy Court entered an order granting the relief requested in the motion [ECF No. 5786]. All of ULT's subsidiaries have been dissolved. ULT is still in existence pending resolution of one remaining claim against ULT. This remaining claim is covered by ULT's professional liability insurance and, accordingly, ULT's exposure is limited to the deductible amount under this policy ($25,000).

## C.    THE DEBTORS' CAPITAL STRUCTURE

With certain identified exceptions explained below, each of the Debtors is a borrower or guarantor under several secured and unsecured debt facilities, including:

### 1.    Secured Bank Debt[8]

On March 6, 2006, certain of the Debtors entered into the First Lien Revolving Credit Agreement, a secured loan facility that provided for revolving credit of up to $800 million, including a letter of credit sub-facility. On July 31, 2007, as part of the Original Transeastern Settlement, the First Lien Revolving Credit Agreement was amended to (a) reduce the availability under the facility to $700 million and (b) permit the signatory Debtors to enter into the First Lien Term Loan Credit Agreement, pursuant to which they borrowed $200 million, and the Second Lien Term Loan Credit Agreement, pursuant to which they borrowed $300 million. The Debtors (other than Beacon Hill) were co-borrowers and guarantors under the Loan Documents. As discussed in detail below, pursuant to the Bankruptcy Court Decision, the Claims and Liens of the Term Loan Lenders were avoided as they related to certain of the Debtors.

The First Lien Revolver Claims are secured by a first-priority security interest in substantially all of the Debtors' assets, with the exception of the 2008 Federal Tax Refund and the proceeds of certain litigation. Based upon the Bankruptcy Court Decision, as affirmed on appeal by the Eleventh Circuit, the First Lien Term Loan Claims are secured (*pari passu* with the First Lien Revolver Claims) in substantially all of the assets of TOUSA and TOUSA Homes, L.P., other than the 2007 Federal Tax Refund, the 2008 Federal Tax Refund and the proceeds of certain litigation, and the Second Lien Term Loan Claims are secured by a second-priority security interest in the same assets as the First Lien Term Loan Claims. The relative rights of the Prepetition Secured Lenders vis-à-vis one another are set forth in the Intercreditor Agreement.

Prior to the entry of the Bankruptcy Court Decision, as of the Petition Date, the following principal amounts were outstanding pursuant to the Loan Documents:

---

[8] Beacon Hill is not a signatory to the Loan Documents described in this subsection.

- First Lien Revolving Credit Agreement (including letter of credit sub-facility): $316,425,229

- First Lien Term Loan Credit Agreement: $199,000,000

- Second Lien Term Loan Credit Agreement: $317,101,998

The Bankruptcy Court Decision, as affirmed on appeal, avoided the Conveying Subsidiaries' obligations under the Loan Documents and the Liens granted in connection therewith with respect to the Term Loan Lenders. *See* section V.G.2 herein.

### 2.    Unsecured Notes

Before the Petition Date, TOUSA issued an aggregate of $1.1 billion in unsecured notes, including the Senior Notes, the Subordinated Notes and the PIK Notes, each of which is described below.

#### a.    Senior Notes

The Senior Notes, which totaled $550 million in principal outstanding as of the Petition Date, consist of (a) the $200 million 9.0% senior notes due July 1, 2010, (b) the $100 million 9.0% senior notes due July 1, 2010 and (c) the $250 million 8.25% senior notes due April 1, 2011, all issued by TOUSA and guaranteed by certain subsidiaries of TOUSA pursuant to the indentures (as supplemented) dated June 25, 2002, February 3, 2003 and April 12, 2006, respectively.

Except as discussed in subsection (d) below, each Conveying Subsidiary is a guarantor of the Senior Notes, with joint and several liability to repay obligations owed by the Debtors in respect of the Senior Notes.  The Senior Notes rank *pari passu* in right of payment with all of the Debtors' existing unsecured senior debt, including unsecured trade obligations and other unsecured obligations incurred in the ordinary course of business, but senior in right of payment to the Subordinated Notes and the PIK Notes, each as described below.

#### b.    Subordinated Notes

The Subordinated Notes, which totaled $510 million in principal outstanding as of the Petition Date, consist of: (a) the $125 million 7.5% senior subordinated notes issued on March 17, 2004 and due March 15, 2011; (b) the $200 million 7.5% senior subordinated notes issued on December 21, 2004 and due March 15, 2015; and (c) the $185 million 10.375% senior subordinated notes issued on June 25, 2002 and due July 1, 2012.  Except as described in subsection (d) below, each Conveying Subsidiary is a guarantor of the Subordinated Notes, with joint and several liability to repay obligations owed by the Debtors in respect of the Senior Notes.

#### c.    PIK Notes

On July 31, 2007, TOUSA issued $20 million in 14.75% senior subordinated PIK Notes due July 1, 2015.  The PIK Notes were issued in connection with the Original Transeastern Settlement.  Interest on the PIK Notes is payable semi-annually.  TOUSA is required to pay 1% of the interest in cash.  The remaining 13.75% semi-annual interest payment may be made, at TOUSA's option, (a) in cash, (b) by increasing the principal amount of the PIK Notes or (c) by issuing new notes or a combination of cash and new notes. Following a mediation of the Committee Action in March 2009, the Committee, the Debtors and certain holders of the PIK Notes entered into the PIK Notes Stipulation, pursuant to which holders of

PIK Notes agreed to release their Claims against the Conveying Subsidiaries. The Plan will enforce the PIK Notes Stipulation by disallowing all PIK Note Claims at the Conveying Subsidiaries.

### d.    Non-guarantor Debtors Under the Unsecured Notes

On September 21, 2007, TOUSA Homes, Inc. acquired a 100% interest in Engle/Gilligan, LLC, a joint venture in which TOUSA Homes, Inc. had owned a 49% interest. On November 1, 2007, TOUSA Homes, Inc. acquired a 100% interest in Engle Sierra Verde P5, LLC, a joint venture in which TOUSA Homes, Inc. previously owned a 49% interest. On July 20, 2008, TOUSA Homes, Inc. acquired a 100% interest in Beacon Hill, a joint venture in which TOUSA Homes, Inc. had owned a 49% interest [ECF No. 1388].

Beacon Hill, Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC are Debtors in the Chapter 11 Cases, but are not guarantors under the Senior Notes, the Subordinated Notes or the PIK Notes.

### e.    Preservation of Subordination Provisions in Certain Note Indentures

The Plan is designed to give effect to the provisions of articles 11 and 12 of the Subordinated Notes Indentures and articles 11 and 12 of the PIK Note Indenture. Specifically, the Plan provides that all distributions made in satisfaction of the Subordinated Note Claims, the Subordinated Note Guaranty Claims and PIK Note Claims will be made to the holders of "Senior Debt," as such term is defined in the Subordinated Note Indentures or the PIK Note Indenture, as applicable, for the Plan Debtors unless and until holders of Senior Debt are paid in full (including postpetition interest). "Senior Debt," as defined in the Subordinated Notes Indentures and PIK Note Indenture, refers to all of the applicable Debtors' obligations with respect to the debt under the applicable indentures and includes (1) all obligations for interest, including any interest accrued and (2) all related fees, expenses and all other amounts payable. Certain trade creditors or other holders of Claims other than funded debt claims may assert that their Claims are entitled to status as "Senior Debt" within this definition. However, the Proponents believe, and the Plan contemplates, that only Senior Note Claims, Senior Note Guaranty Claims and Term Loan Deficiency Claims are "Senior Debt."

### 3.    Preferred Stock

On July 31, 2007, TOUSA issued $117.5 million (in initial aggregate liquidation preference) of 8% Series A Convertible Preferred PIK Preferred Stock (the "Preferred Stock"). The Preferred Stock ranks senior to all of TOUSA's capital stock with respect to liquidation priority and receipt of dividends. The Preferred Stock accrues dividends semi-annually at 8% per annum, with 1% payable in cash and the remaining 7% payable, at TOUSA's option, in cash and additional Preferred Stock. The Preferred Stock does not have voting rights. As of the Petition Date, TOUSA had not paid dividends on the Preferred Stock. The Preferred Stock will be cancelled under the Plan and the holders of Preferred Stock will not receive a distribution on account of such Preferred Stock under the Plan.

## V.    THE DEBTORS' CHAPTER 11 CASES

### A.    EVENTS LEADING TO THE CHAPTER 11 CASES

The following is a general description of factors that ultimately led to the Debtors' commencement of the Chapter 11 Cases.

### 1.    Adverse Market Conditions

As has been widely reported, since at least early 2007, the homebuilding industry has suffered a severe downturn.  Indeed, the Bankruptcy Court found in the Bankruptcy Court Decision that TOUSA's chief executive officer informed the TOUSA board of directors that he began to see the signs of a slowdown as early as February 2006.  *See* Bankruptcy Court Decision, p. 9.  The downturn in the homebuilding industry has been particularly pronounced in several areas in which the Debtors had concentrated operations, including Florida, Nevada and Arizona, where over 50% of the Debtors' homebuilding operations were concentrated as of the Petition Date.

The downturn in the homebuilding industry was the result of several macroeconomic factors.  Among other things, a rapid increase in new and existing home prices in many of the markets in which the Debtors operated over the several years prior to the Petition Date had the ultimate effect of reducing housing affordability and tempering buyer demand.  In particular, once the market reached its peak, investors and speculators reduced their purchasing activity and instead stepped up their efforts to sell the residential property they had earlier acquired.  These trends, which were more pronounced in markets that had experienced the greatest levels of price appreciation, resulted in overall fewer home sales, greater cancellations of home purchase agreements by buyers, higher inventories of unsold homes and the increased use by homebuilders, speculators, investors and others of discounts, incentives, price concessions, broker commissions and advertising to close home sales compared to the previous several years.

As a result of these trends, the Debtors and many other regional and national homebuilders experienced sales difficulties and downward pressure on home prices that stemmed from severe liquidity challenges in the credit and mortgage markets, diminished consumer confidence, increased home inventories and foreclosures.  Potential buyers exhibited both a reduction in confidence as to the economy in general and a willingness to delay purchase decisions based on a perception that prices would continue to decline.

As a result of the market trend facing homebuyers, homebuilders have faced significant operating challenges.  Indeed, since the Petition Date, numerous homebuilders have sought relief under the provisions of the Bankruptcy Code or have taken steps to renegotiate or reorganize their capital structures outside of the chapter 11 process.

### 2.    The Original Transeastern Settlement

On July 31, 2007, TOUSA entered into the Original Transeastern Settlement, whereby TOUSA borrowed, and caused each of the Conveying Subsidiaries to borrow, $500 million.  The loans were secured by liens on substantially all of the Debtors' assets (other than the assets of Beacon Hill).  The proceeds of such loans were used to settle litigation against TOUSA and TOUSA Homes, L.P. arising from the alleged default of TOUSA and TOUSA Homes, L.P. on debt incurred to finance the Transeastern JV, a "disastrous" business venture that TOUSA undertook in 2005.  *See* Bankruptcy Court Decision, p. 3.  The Conveying Subsidiaries, which were not defendants in the litigation and were not liable to the entities that financed the Transeastern JV, nonetheless incurred substantial obligations in connection with the Original Transeastern Settlement.  The Debtors assert that the Conveying Subsidiaries entered into these obligations because the creditors of the Transeastern JV had brought suit seeking over $2 billion in damages from TOUSA and TOUSA Homes, L.P.  The Debtors further assert that the Conveying Subsidiaries faced potential direct consequences of the litigation because if TOUSA were to lose, the entire TOUSA enterprise might be forced into bankruptcy and that the Conveying Subsidiaries were bound by default and guarantee provisions in financing agreements that would be triggered by a judgment of $10 million or more against TOUSA and TOUSA Homes, L.P.  The

Bankruptcy Court, however, found in the context of the Committee Action that the Conveying Subsidiaries "could have come to an accord with the bondholders" even in the event of a default, and that "even assuming that *all* of the TOUSA entities would have spiraled immediately into bankruptcy without the [Original Transeastern Settlement], the [Original Transeastern Settlement] was *still* the more harmful option." *See* Bankruptcy Court Decision, pp. 99-100.

This section describes in detail the litigation relating to the Transeastern JV and the ultimate global settlement of the litigation through the Original Transeastern Settlement. As discussed in section V.G.2 below, the Committee Action sought to unwind the Original Transeastern Settlement pursuant to the Bankruptcy Code, to avoid the Claims and related Liens of the Term Loan Lenders, and to return the Debtors to their pre-transaction positions.

### a.      Acquisition and Financing of the Transeastern JV

In June 2005, TOUSA Homes, L.P. and Falcone/Ritchie LLC ("Falcone") formed the Transeastern JV to acquire certain assets of Transeastern Properties, Inc., a homebuilder then-owned by Arthur J. Falcone, Edward W. Falcone and certain of their affiliates. The Debtors assert that due diligence with respect to the potential acquisition led the Debtors' management and the TOUSA board of directors (the "Board") to conclude that acquiring the assets of Transeastern Properties, Inc. would increase the Debtors' presence in Florida, assure a continued supply of land, and generate strong profits. TOUSA Homes, L.P. and Falcone each held a 50% voting interest in the Transeastern JV. In addition, the Transeastern JV entered into certain option agreements to purchase land owned by Falcone. The parties closed the purchase transaction on August 1, 2005.

The Transeastern JV was funded with $675 million of third-party debt capacity, a $20 million subordinated loan from TOUSA Homes, L.P., and $165 million of equity, of which TOUSA Homes, L.P. contributed $90 million in cash and Falcone contributed $75 million in property. None of the Conveying Subsidiaries was an obligor or guarantor on this third-party debt. The Transeastern JV's financing was implemented in tranches through a series of affiliated limited liability companies. Specifically, at the same time as the closing of such asset acquisition, financing for the acquisition was obtained through a $675 million credit facility entered into between certain entities affiliated with the Transeastern JV and Deutsche Bank Trust Company Americas ("Deutsche Bank"). Deutsche Bank served as administrative agent in connection with each tranche of the Transeastern JV's debt and syndicated such debt to the Transeastern Lenders. The $675 million in funding was in the form of three tranches of third-party debt, each governed by a separate credit agreement: (a) $450 million of senior debt, in the form of $335 million in term loans and a $115 million revolving commitment; (b) $137.5 million of senior mezzanine debt; and (c) $87.5 million of junior mezzanine debt (collectively, the "Transeastern Loans"). Each of the three tranches of the Transeastern Loans had one or more different borrowers. Specifically, the borrowers under the senior debt facility were EH/Transeastern, LLC, the operating subsidiary of the Transeastern JV, and TE/TOUSA Senior, LLC, a special purpose holding company. Two different special purpose holding companies, TE/TOUSA Mezzanine, LLC and TE/TOUSA Mezzanine TWO, LLC (together with EH/Transeastern, LLC and TE/TOUSA Senior, LLC, the "Transeastern Borrowers"), were the borrowers under the senior mezzanine debt and the junior mezzanine debt, respectively. The Transeastern Borrowers secured each of the Transeastern Loans with assets of the applicable Transeastern Borrower and each entity's ownership interests in its subsidiary, including the special purpose holding companies.

The underlying debt documents for the Transeastern Loans included borrowing base formulas and strict financial and operational covenants. Among other things, the Transeastern Loans used a borrowing base mechanism to determine the availability of funds under the revolving commitment and to police compliance with liquidity covenants.

### b.    Completion and Carve-out Guarantees

Although TOUSA and TOUSA Homes, L.P. were not borrowers under the Transeastern Loans, they nonetheless had certain obligations to the Transeastern Lenders.  As a condition precedent to the credit agreements related thereto, TOUSA and TOUSA Homes, L.P. executed three unsecured completion guarantees (the "Completion Guarantees") and three unsecured carve-out guarantees (the "Carve-out Guarantees" and, together with the Completion Guarantees, the "Transeastern Guarantees").  None of the Conveying Subsidiaries was a guarantor on the Transeastern Guarantees.

Under the terms of the Completion Guarantees, TOUSA and TOUSA Homes, L.P. guaranteed that the Transeastern Borrowers would each complete certain "Development Activities" consistent with "Contractual Obligations" and "fully and punctually pay and discharge all Project Costs."  The Completion Guarantees defined "Project Costs" as "all costs, expenses, and liabilities for and/or in connection with a Project."  The Completion Guarantees defined the term "Project" as the "performance and completion of all Development Activities with respect to any portion of the Mortgaged Property as to which Development Activities have commenced as of the date of this Guarantee," and defined "Development Activities" as the "development, construction, equipping, and completion of any fixtures, infrastructure, or other works of improvement."  The result of these provisions was that TOUSA and TOUSA Homes, L.P. agreed to complete Development Activities and pay Project Costs for those projects where Development Activities had started by August 1, 2005.

Under the terms of the Carve-out Guarantees, TOUSA and TOUSA Homes, L.P. agreed to indemnify the Transeastern Lenders under each of the Transeastern Loans for any liabilities, obligations, losses and expenses arising out of, among other things, fraud or material misrepresentation by any of the Transeastern Borrowers, intentional misconduct or waste with respect to the collateral, or failure to maintain insurance or pay taxes.  Additionally, the Carve-out Guarantees obligated TOUSA and TOUSA Homes, L.P. to pay all of the obligations and expenses related to any bankruptcy filing by the Transeastern JV.

### c.    Market Challenges to the Transeastern JV's Operations

In late 2005, the Transeastern JV faced operational and integration challenges as the Florida residential real estate market began to soften.  As a result of the decline in the housing market, evidenced in part by customers' cancellations of sales contracts, the Transeastern JV developed new financial projections that were distributed to its members in September 2006.  The revised projections indicated that future sales and deliveries could not support the Transeastern JV's existing capital structure and that the Transeastern JV would soon be in default under the Transeastern Loans.

In late September 2006, the parties met to discuss the Transeastern JV's financial condition and the Florida housing market conditions.  Deutsche Bank alleged that the Transeastern JV was already in default of its obligations under the Transeastern Loans.  On September 29, 2006, the Transeastern JV and the Transeastern Lenders entered into a "Consent and Agreement," whereby the parties agreed that a potential default or an event of default, as defined in the applicable credit agreements, had occurred.  Citicorp, in its capacity as First Lien Revolver Agent, in turn notified TOUSA that the potential default constituted a material adverse change under the First Lien Revolving Credit Agreement and insisted that TOUSA secure the First Lien Revolving Credit Agreement by having the Conveying Subsidiaries grant liens on their assets.  In October 2006, Deutsche Bank took steps to take control of the Transeastern JV's cash collateral.

On October 4, 2006, the Transeastern JV received a letter from certain affiliates of Falcone giving notice of defaults on four existing option agreements for failure by the Transeastern JV to make required

payments of approximately $29 million.  On October 30, 2006, the Transeastern JV received a notice of default from Kendall Land Development, LLC ("Kendall"), a land bank.

Deutsche Bank sent letters, dated October 31, 2006, and November 1, 2006, to TOUSA and TOUSA Homes, L.P. demanding payment under the Transeastern Guarantees.  The demand letters alleged that potential defaults and events of default had occurred under the credit agreements, triggering the guarantors' obligations.  Deutsche Bank asserted that TOUSA and TOUSA Homes, L.P.'s guaranty obligations equaled or exceeded all of the outstanding obligations under the credit agreements and that TOUSA and TOUSA Homes, L.P. were also liable for default interest, costs and expenses.  TOUSA's Form 8-K, filed November 7, 2006, acknowledged receipt of the demand letters from Deutsche Bank and reported that Deutsche Bank contended that TOUSA was liable under the Transeastern Guarantees.  TOUSA disclosed in its Form 10-Q dated November 14, 2006 that the Transeastern JV's management had concluded that the Transeastern JV would not have the ability to continue as a going concern under its current debt structure.  TOUSA also announced that it would write off $143.6 million of its investment in the Transeastern JV.

### d.    Commencement of the Deutsche Bank Litigation

On November 28, 2006, TOUSA and TOUSA Homes, L.P. filed a complaint against Deutsche Bank in the Florida Circuit Court in Broward County (the "Broward Circuit Court") seeking a declaratory judgment that TOUSA's and TOUSA Homes, L.P.'s liability had not been triggered under the Transeastern Guarantees.  The next day, Deutsche Bank brought suit against TOUSA and TOUSA Homes, L.P. in New York Supreme Court, claiming breaches of the Transeastern Guarantees.

With respect to the Completion Guarantees, Deutsche Bank alleged that TOUSA and TOUSA Homes, L.P. committed to pay all "Project Costs" of the Transeastern JV and to complete or cause the completion of all "Development Activities" (as such terms were defined under the Completion Guarantees).  According to Deutsche Bank, the Transeastern JV failed to pay these Project Costs or complete or cause the completion of Development Activities with respect to numerous projects.  Deutsche Bank further alleged that TOUSA was obligated to complete both the vertical and horizontal construction on all of the projects started by August 1, 2005 and that the option maintenance and take-down payments were Project Costs that TOUSA and TOUSA Homes, L.P. had agreed to pay.

With respect to the Carve-out Guarantees, Deutsche Bank alleged that the Transeastern JV made numerous material misrepresentations in its monthly borrowing base certificates and that these certificates overstated the borrowing base by tens of millions of dollars.  According to Deutsche Bank, the Transeastern Lenders relied on these false borrowing base statements to advance additional funds to the Transeastern JV under the revolving Transeastern Loan.  In addition, among other things, Deutsche Bank alleged that the Transeastern JV had triggered the Carve-out Guarantees and committed waste by willfully and intentionally failing to preserve the value of certain purchase or option agreements, causing or permitting liens to attach to its property, and engaging in conduct that constituted waste on its property, thereby triggering TOUSA's and TOUSA Homes, L.P.'s obligations under the Carve-out Guarantees.  Deutsche Bank alleged that its potential damages with respect to the Carve-out Guarantees were approximately equal to the $625 million borrowed by the Transeastern JV plus fees, default interest and expenses.  The Debtors assert that an adverse judgment in excess of $10 million against TOUSA and TOUSA Homes, L.P. would have put TOUSA in default on its five different bond issuances totaling $1.06 billion, of which each of the Conveying Subsidiaries was a guarantor.  However, the Bankruptcy Court found in the Committee Action that the Conveying Subsidiaries "could have come to an accord with the bondholders" in the event of a default under that provision of the bonds.  *See* Bankruptcy Court Decision, p. 109.

In addition to the litigation with Deutsche Bank, TOUSA subsequently became involved in litigation against Deutsche Bank Securities, Inc. ("DBSI") with respect to the Transeastern JV.  TOUSA entered into an engagement letter with DBSI in June 2005, under which DBSI agreed to provide TOUSA financial advice in connection with TOUSA's entry into the Transeastern JV.  On March 26, 2007, DBSI sued TOUSA and certain of the Transeastern Borrowers seeking a declaratory judgment that (i) DBSI had no liability to TOUSA under the engagement letter; (ii) DBSI and Deutsche Bank, as its affiliate, were entitled to indemnification from TOUSA under the engagement letter for any losses resulting from the transactions related to the Transeastern JV; and (iii) DBSI was entitled to indemnification from certain of the Transeastern Borrowers under the credit agreement for any losses resulting from the transactions related to the Transeastern JV.  DBSI also sought indemnification from TOUSA, alleging that TOUSA had breached the engagement letter agreement by failing to indemnify DBSI for the losses and expenses that it had already incurred.  In its Form 8-K announcing the lawsuit, TOUSA stated that the lawsuit was "without merit."  *See* Bankruptcy Court Decision, p. 7 (quoting TOUSA, Inc. Form 8-K at 5 (Dec. 8, 2006)).

### e.    Settlement of the Deutsche Bank Litigation

Market conditions during this time period continued to be bleak.  Documents produced during the Committee Action showed that executives at all levels of the Debtors' enterprise, as well as industry experts, were concerned about depressed sales prices and decreased foot traffic unlike anything they had seen in years.  The litigation, however, appeared to have had less of an effect on operations.  The Bankruptcy Court found that at no point did TOUSA's management ever attempt to calculate the effect of this purported "overhang" on TOUSA's business.  *See* Bankruptcy Court Decision, p. 107.  The Bankruptcy Court also found that "[e]mployees outside of TOUSA's headquarters supervising the day-to-day operations were largely oblivious to the Transeastern litigation," except for those employees whose operating divisions included Transeastern JV properties.  *See* Bankruptcy Court Decision, pp. 107-08.

"Investors also recognized that TOUSA faced increasingly long odds."  *See* Bankruptcy Court Decision, p. 12.  TOUSA's stock price fell from a high of $23 during 2006 to below $4 by April 2007.  As discussed above, to facilitate its rapid growth, TOUSA had taken on more than $1 billion of indebtedness in respect of the Senior Notes and the Subordinated Notes.  TOUSA was the obligor on the bond debt and the Conveying Subsidiaries were jointly and severally liable as guarantors.  Even before the Original Transeastern Settlement, in May 2007, the Senior Notes were trading at a discount of approximately 5% of face value and the Subordinated Notes were trading at discounts of 30% and 40% of face value.

Lehman Brothers, as advisors to TOUSA, prepared a bankruptcy waterfall analysis for TOUSA in February 2007 and advisors to the company suggested that a chief restructuring officer be put in place.  Additionally, management began to search for equity infusions to support the company.  However, as the Bankruptcy Court found in the Committee Action, TOUSA's management was faced with ownership (the Stengos family in Greece, which owned about two-thirds of TOUSA's issued and outstanding shares) that opposed dilution of its controlling position.  *See* Bankruptcy Court Decision, pp. 13-14.

In this context, TOUSA and TOUSA Homes, L.P. agreed to the Original Transeastern Settlement in global settlement of the Deutsche Bank, Falcone and Kendall claims.  Upon information and belief, on June 20, 2007, the Board convened and considered the Original Transeastern Settlement and the financing arrangement that would be required to implement the transaction.  The Bankruptcy Court identified several troubling aspects of this analysis.  First, the total amount of time spent in that Board meeting discussing the impact of the Original Transeastern Settlement on the Conveying Subsidiaries was "[i]f not zero, close to zero."  *See* Bankruptcy Court Decision, p. 107.  No meetings were held to discuss the impact of the Original Transeastern Settlement on the Conveying Subsidiaries and no professionals

opined on the benefits rendered to the Conveying Subsidiaries.  The Bankruptcy Court also found that the Conveying Subsidiaries did not receive any substantial benefits relating to the revolving credit agreement entered into in connection with the Original Transeastern Settlement.  *See* Bankruptcy Court Decision, p. 111.  Second, the turnaround and advisory firm of AlixPartners, LLP ("Alix") provided the Board with an opinion that TOUSA would be solvent after giving effect to the Original Transeastern Settlement.  The First Lien Agents required TOUSA to obtain a solvency opinion from a "nationally recognized, independent financial advisory firm that has substantial experience in providing solvency opinions in connection with transactions similar to the Transactions contemplated hereby."  *See* Bankruptcy Court Decision, p. 96.  Alix had not provided a solvency opinion for any homebuilder since at least 2005.  *See* Bankruptcy Court Decision, p. 96.  As discussed in detail in the Bankruptcy Court Decision, this solvency opinion, while costing $2 million, was flawed in many respects and was reached "in remarkable speed."  *See* Bankruptcy Court Decision, p. 97.  After being retained on June 15, 2007, Alix indicated that it expected to deliver a favorable opinion at the Board's meeting on June 20, 2007, and a draft solvency opinion was in circulation by June 27, 2007.  *See* Bankruptcy Court Decision, p. 97.  The Bankruptcy Court found that Alix's opinion was significantly weakened because it simply accepted management's projections at face value without any further analysis.  *See* Bankruptcy Court Decision, pp. 97-100.  Third, Lehman Brothers expressly declined to opine whether the Original Transeastern Settlement was the best alternative for TOUSA's creditors and expressly stated that it was not offering an opinion on the fairness of the Original Transeastern Settlement.

On June 29, 2007, TOUSA publicly announced that it had entered into the Original Transeastern Settlement to settle all disputes regarding its liability with respect to the Transeastern JV.  Under the Original Transeastern Settlement, the senior Transeastern Lenders received approximately $421 million in cash including interest[9] and the senior and junior mezzanine debt was satisfied for $153.75 million (plus legal fees and expenses) in the form of the following consideration: subordinated notes ($20 million), convertible preferred stock (with a liquidation preference of $117.5 million) and warrants to purchase common stock (valued at $16.25 million).  In exchange, Deutsche Bank released TOUSA and TOUSA Homes, L.P. from all claims relating to the Transeastern JV, including all claims relating to the Transeastern Guarantees.  Certain of the Debtors also acquired all of the assets of the Transeastern JV as part of the Original Transeastern Settlement.

The Original Transeastern Settlement also resolved certain claims between TOUSA and Falcone.  Specifically, the parties agreed that Falcone would give up its equity interest in the Transeastern JV and the Transeastern JV would surrender its interest in most of the optioned properties owned by Falcone.  In addition, TOUSA agreed to indemnify Falcone for any third-party claims relating to the Carve-out Guarantees and to release Falcone from a covenant not to compete.  Additional information about this aspect of the Original Transeastern Settlement can be found in section V.G.3.c below.

_____
[9] In connection with the Original Transeastern Settlement, the First Lien Revolver Agent withheld $14,838,514.58 from the loan proceeds as fees for financing, loan syndication and restructuring; $3,742,701.02 for legal, advisory and other professional fees and $5,000,000.00 as an Original Issue Discount (as defined in the First Lien Revolving Credit Agreement), for a total of $23,581,215.60.  The First Lien Revolver Agent also wired $476,418,784.40 to CIT Group/Business Credit, Inc. ("CIT"), as agent for the Transeastern Lenders.  In addition to the loan proceeds, CIT also received $21,973,803.50 from TOUSA.  CIT distributed $421,015,089.15 to the Transeastern Lenders for principal, interest and fees under the Transeastern Loans; $5,368,739.93 to counsel and financial advisors to the Transeastern Lenders; $2,748.21 in fees to Deutsche Bank; $8,861,198.15 to Deutsche Bank for fees regarding letters of credit; $250,000 as a "breakage fee" to CIT; $57,338,172.18 to the Falcone entities for the satisfaction of claims, the release of certain land bank obligations and the resolution of issues regarding property taxes; and $5,809,389.49 to ULT for title insurance.

The Debtors, including the Conveying Subsidiaries who were not parties to the Deutsche Bank litigation nor obligors under the agreements with the Transeastern Lenders, funded the payment due to Deutsche Bank/CIT pursuant to the Original Transeastern Settlement by entering into the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement.  The parties consummated the Original Transeastern Settlement on July 31, 2007.

### 3.    Liquidity Difficulties and Prepetition Negotiations with Creditors

The housing market continued to suffer following the Original Transeastern Settlement and the associated financings.  By September 2007, the Debtors' write-offs and difficult market conditions put additional pressure on the Debtors' highly leveraged balance sheet.  In late September 2007, the Debtors (other than Beacon Hill, which is not obligated under the Loan Documents) were unable to provide a solvency certificate under the First Lien Revolving Credit Agreement, which was required for each borrowing under that facility.  As a result, the Debtors faced a lack of liquidity that the Debtors believed threatened their business operations.

The Debtors assert that the housing market worsened significantly in the second half of 2007 and experts testified in the Committee Action that, prior to August 2007, many credible market participants and market observers believed the housing market was bottoming out and would begin to recover in late 2007 or early 2008.  The Bankruptcy Court ultimately did not accept the testimony of these experts and instead found in the Committee Action that, before the Original Transeastern Settlement occurred, "[a] reasonable assessment of TOUSA's finances prior to the [Original Transeastern Settlement] would have shown that the Conveying Subsidiaries were already insolvent and were going to be left with unreasonably small capital" at the conclusion of the Original Transeastern Settlement.  The Bankruptcy Court further found that sufficient public information existed to put investors on notice of that fact.  *See* Bankruptcy Court Decision, p. 116.

The Debtors ultimately negotiated an amendment to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement, which provided, among other things, for a waiver of solvency certificate requirements for the third quarter 2007 and permitted the Debtors to borrow up to $65 million through the end of 2007.  The Debtors eventually negotiated a second amendment to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement that extended the previous amendment through February 1, 2008.

In October of 2007, certain unaffiliated holders of the Senior Notes and the Subordinated Notes (the "Ad Hoc Committee"), represented by Akin Gump, approached the Debtors to raise concerns regarding (i) a potential restructuring of the Debtors' obligations and (ii) the need to file for chapter 11 to pursue litigation against the Transeastern Lenders.  Although the Ad Hoc Committee urged the Board to seek chapter 11 protection for the Debtors prior to October 31, 2007 to preserve actions against the Transeastern Lenders under section 547 of the Bankruptcy Code, the Board refused.  By mid-December 2007, the negotiations between the Ad Hoc Committee and the Debtors broke down and the Ad Hoc Committee ceased to function.

In the weeks prior to the Petition Date, the Debtors attempted to negotiate a consensual restructuring that would reserve certain of the litigation issues for future investigation.  The proposed restructuring, which was not implemented, is discussed in section V.F.1 of this Disclosure Statement.

B.    **OTHER PREPETITION DEVELOPMENTS**

1.    **NYSE Delisting**

Before November 2007, the common stock of TOUSA traded on the New York Stock Exchange (the "NYSE").  Effective November 19, 2007, however, NYSE Regulation Inc. suspended trading of TOUSA's common stock from trading on the NYSE because of the low trading price of TOUSA's common stock at that time.  TOUSA appealed the suspension. Following the suspension from the NYSE, TOUSA began trading on the Pink Sheet Electronic Quotation Service.

On February 15, 2008, the NYSE denied TOUSA's appeal of the suspension, affirmed the decision to suspend trading in TOUSA's common stock on the NYSE and commenced delisting procedures.  On March 3, 2008, the NYSE filed Form 25, Notification of Removal of Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "34 Act"), with the SEC, noting its intention to remove TOUSA's common stock from trading on the NYSE.

2.    **SEC Inquiry**

In June of 2007, the Miami Regional Office of the SEC requested that TOUSA voluntarily provide certain documents, corporate and financial information and communications related to the Transeastern JV.  The SEC advised TOUSA that the inquiry was not an indication that any violations of law had occurred and that the inquiry should not be considered a reflection upon any person, entity or security.  The inquiry is known as In the Matter of TOUSA, Inc., SEC Inquiry, File No. FL-3310. According to the Debtors, in May 2009, TOUSA received word that the investigation had been completed and the SEC did not intend to recommend any enforcement action.

C.    **COMMENCEMENT OF THE CHAPTER 11 CASES**

On January 29, 2008, the continued decline in the homebuilding industry, together with increased liquidity concerns, led each of the Debtors (except Beacon Hill) to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On July 30, 2008, Beacon Hill, which was formerly a joint venture of TOUSA Homes, Inc. but became a wholly owned subsidiary of TOUSA Homes, Inc. after the Petition Date (see section V.H.5.b of this Disclosure Statement), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and its Chapter 11 Case is being jointly administered with the other Debtors' Chapter 11 Cases.  As of the date hereof, each Debtor continues to manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

D.    **"FIRST DAY" RELIEF**

On the Petition Date, the Debtors filed a series of motions and applications with the Bankruptcy Court seeking relief designed to minimize disruption of their business operations and to facilitate the chapter 11 process (collectively, the "First Day Motions").  The Debtors also prepared a substantial communications package intended to reach out to parties that would be affected by the chapter 11 filing.

Following a hearing on January 30, 2008, and based upon the *Declaration of Tommy L. McAden, Executive Vice President and Chief Financial Officer of TOUSA, Inc., in Support of First Day Pleadings* [ECF No. 7], the Bankruptcy Court entered several orders that were designed to permit the Debtors to

operate their businesses during the Chapter 11 Cases with as little disruption as possible.[10]  These orders included orders authorizing the Debtors to, among other things, (a) continue to sell homes in the ordinary course of business, (b) pay prepetition claims of claimants whose prepetition work gave rise to (or could have given rise to) liens against the Debtors' property, (c) continue their customer programs and honor their prepetition and postpetition commitments to customers, (d) pay certain prepetition claims and obligations for wages and other compensation, reimbursable employee expenses, and employee medical and similar benefits, (e) pay prepetition claims of certain critical vendors, (f) pay a one-time deposit to utility providers as adequate assurance of payment of future utility bills and (g) establish procedures for trading in the Debtors' common stock.

### 1.        The Proposed DIP Order

        Among the First Day Motions filed by the Debtors on the Petition Date was a motion seeking, among other things, authority to obtain (a) secured postpetition financing on a super-priority and priming basis from the First Lien Revolver Agent and Citigroup Global Markets Inc., as sole lead arranger and bookrunner and (b) to use cash collateral of the Prepetition Secured Lenders [ECF No. 70] (the "DIP Motion").  The Debtors emphasized, both in the DIP Motion and at the hearing held on January 30, 2008, that access to financing and cash collateral would prove crucial to the Debtors' successful transition to operations under chapter 11.  The Debtors asserted that although the Debtors' projections showed they did not intend to borrow under the terms of the proposed DIP facility, the ability to meet those projections would depend on the Debtors' ability to maintain business-as-usual operations, which in turn would depend on the availability of a financing backstop as a means of providing comfort to the Debtors' employees, customers and business partners.  In addition, even without any new borrowing, the use of cash was critical to the Debtors' continued operations.  The DIP Motion also sought authority to use the proceeds of the DIP facility to refinance the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement through a "roll-up."  On January 31, 2008, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on an interim basis [ECF No. 113] (the "DIP Order"), thereby authorizing the Debtors to borrow up to $135 million and providing the Debtors with access to cash collateral of the Prepetition Secured Lenders.

        The DIP Order provided the Prepetition Secured Lenders with adequate protection in the form of replacement liens and allowed administrative priority claims under section 507(b) of the Bankruptcy Code to the extent of any diminution in the value of the collateral granted by the Debtors under the Loan Documents.  Additionally, the DIP Order provided for the payment of professional fees and expenses incurred by the Agents for the Prepetition Secured Lenders.  As required by the banks under the DIP financing agreement, the DIP Order provided that the Debtors release, waive and discharge each of the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the First Lien Agents from any and all claims and causes of action that the Debtors may have arising out of or related to the First Lien Revolving Credit Agreement and the First Lien Term Loan Credit Agreement.  Nevertheless, the releases explicitly did not apply to the rights of any committee or any other party in interest to bring any such action against the First Lien Revolver Lenders and the First Lien Term Loan Lenders.  The DIP Order established June 3, 2008 as the deadline for any party in interest other than a Debtor to file a complaint seeking to invalidate, avoid, subordinate or otherwise challenge the liens or claims of the First Lien Revolver Lenders and/or the First Lien Term Loan Lenders.  As described below, the DIP Order was modified by subsequent financing orders and the June 3, 2008 deadline was extended.  Eventually, the Debtors, in consultation with the Committee, determined that the Debtors could fund the Chapter 11 Cases solely through the use of cash collateral given that the Debtors' tax refund was received earlier than

---

[10] Although the Debtors filed multiple motions in advance of the first-day hearing, the Committee does not believe that extensive discussion of operational and administrative orders is beneficial to creditors voting on the Plan.

anticipated, and thus the Debtors withdrew the DIP Motion.  See section V.G.1.b of this Disclosure Statement for a further discussion regarding the use of cash collateral in the Chapter 11 Cases.

### 2.    Cash Management

The Debtors also filed a First Day Motion seeking authority to continue their existing cash management system, bank accounts and business forms after the Petition Date (the "Cash Management Motion").  On January 31, 2008, the Bankruptcy Court entered an order granting the Cash Management Motion on an interim basis [ECF No. 106].  The Bankruptcy Court entered a final order with respect to the Cash Management Motion on June 21, 2008 [ECF No. 1234] and an order amending the final order on July 18, 2008 [ECF No. 1407].  The amended order further authorizes the Debtors to, among other things, invest and deposit funds in an "Evergreen" investment account, so long as the Debtors invest primarily in securities that satisfy the requirements set forth in section 345 of the Bankruptcy Code.

### E.    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOUSA, INC., ET AL.

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable. Accordingly, on February 13, 2008, the U.S. Trustee appointed the Committee [ECF No. 185].[11]   The Committee is currently comprised of the following members:

| | |
|---|---|
| Wilmington Trust Company | HSBC Bank USA, N.A. |
| 520 Madison Avenue, 33rd Floor | 10 East 40th Street, 14th Floor |
| New York, NY 10022 | New York NY 10016 |
| | |
| Capital Research and | SMH Capital Advisors, Inc. |
| Management Company | 4800 Overton Plaza, Suite 300 |
| 630 Fifth Avenue, 36th Floor | Ft. Worth, TX  76109 |
| New York, NY 10111 | |
| | |
| Geotek, Inc./Geotek Insite, Inc. | SelectBuild Arizona |
| 6835 S. Escondido Street, Suite A | c/o BMHC |
| Las Vegas, NV  89119 | Four Embarcadero Center, Suite 3250 |
| | San Francisco, CA 94111 |

The Committee has retained the following professionals: (a) Akin Gump, as legal counsel [ECF No. 657]; (b) Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., as local counsel [ECF No. 804]; (c) Jefferies & Co., Inc, as financial advisor and investment banker [ECF No. 1701]; (d) Moelis & Company LLC, as financial advisor and investment banker [ECF No. 1702]; (e) CohnReznick LLP (f/k/a J.H. Cohn LLP), as forensic accountants and advisors [ECF No. 1090]; and (f) Robert Charles Lesser & Co, as real estate advisors [ECF No. 1091].  The Committee also retained the law firm of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell"), as conflicts counsel with respect to the prosecution of the Committee Action (see section V.G.2, below) [ECF No. 1595].

The Committee is the fiduciary representative of the holders of Unsecured Claims against the thirty-nine Debtors' Estates.  Specifically, the Committee is composed of the Indenture Trustees for each of the Debtors' bond issuances, unsecured bondholders and trade creditors.

---

[11] References to "ECF No." in this Disclosure Statement refer to docket entries in Case No. 08-10928 unless otherwise specified.

F.      THE PLAN PROCESS

1.      **Initial Chapter 11 Restructuring Efforts**

Since the outset of the Chapter 11 Cases, the Debtors were concerned that litigation between creditor groups would impede a successful reorganization process.  Indeed, the Debtors raised this issue with the Bankruptcy Court during the first hearing in the Chapter 11 Cases.  At that time, the Debtors sought to alleviate the litigation risk by reaching agreement with certain holders of the Senior Notes on the framework for a plan of reorganization that involved converting the Senior Notes to equity, obtaining a new investment of $200 million, preserving the fraudulent conveyance litigation against the Prepetition Secured Lenders and issuing new secured notes to certain of the Prepetition Secured Lenders.  The initial term sheet and related restructuring support agreement required, among other things, that the proposed DIP financing be approved within 60 days and that the Debtors file a plan consistent with the term sheet within 60 days.  The Debtors were ultimately persuaded to abandon the proposed term sheet because of, among other things, the objections to the proposed DIP financing and the lack of support from the Committee for the proposed transaction.

During the breathing spell provided by the Bankruptcy Court's cash collateral ruling in June 2008 (see section V.G.1.b of this Disclosure Statement), the Debtors explored a reorganization plan consistent with the originally contemplated framework.  To that end, the Debtors, the Committee and the other parties in interest spent several months working with a potential plan sponsor regarding a plan that would provide a limited equity recovery to the Debtors' unsecured creditors.  At the same time, the Debtors and their major creditor constituencies engaged with potential purchasers of the company as a whole, exploring possible transactions that would be implemented through a sale under section 363 of the Bankruptcy Code.  Despite the parties' efforts, in the face of continued deterioration in the housing markets and significant declines in the financial markets, the Debtors' original plan sponsor was no longer willing to consummate the transaction and there appeared to be no party willing to purchase all or substantially all of the Debtors' assets for an acceptable value.  As a result, the Debtors and their creditor constituencies explored restructuring on a standalone basis.

2.      **The First Plan and Disclosure Statement**

On October 13, 2008, the Debtors filed (a) the *Joint Plan of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 1952] (as modified from time to time, the "First Plan") and (b) the Disclosure Statement for the First Plan [ECF No. 1953] (as revised from time to time, the "First Disclosure Statement").  At the time of the filing of the First Plan and the First Disclosure Statement, the Debtors' stated goal was to take a neutral stance in the ongoing litigation and to set forth a compromise among competing interests that was the best alternative available to maximize distributable value for all constituents. To that end, the Debtors believed that the First Plan would facilitate emergence from chapter 11 and, at the same time, preserve the Committee Action.  The First Plan included the following features, among others:

- The First Lien Revolver Lenders and First Lien Term Loan Lenders would receive new secured notes equal to the amount of their Claims, subject to disgorgement depending on the outcome of the Committee Action.

- The Second Lien Term Loan Lenders would receive a new $25 million note as well as the equity in the reorganized company, in each case subject to disgorgement or cancellation/dilution, respectively, depending on the outcome of the Committee Action.

32

- The Debtors' unsecured creditors would receive interests in a Liquidation Trust, which would be created to pursue, among other actions, the Committee Action.

The Debtors had intended to seek approval of the First Disclosure Statement at the omnibus hearing on November 12, 2008, with the hope of beginning the solicitation process soon thereafter. Several parties, however, filed objections to the First Disclosure Statement, including the First Lien Agents and the Committee. The Debtors believed, even absent a third-party plan sponsor or purchaser of their businesses, that an expeditious emergence from chapter 11 would benefit all parties in interest because it would eliminate the business overhang of operating under chapter 11, thereby improving the Debtors' ability to sell homes to customers, and also would eliminate the administrative expense and intangible burdens of operating a national business while in chapter 11. The Debtors believe that neither of the objecting constituencies was ready to accept the compromises inherent in the First Plan.

The Committee disagreed with the Debtors' assertions that the First Plan was the best available alternative. Specifically, the Committee believed that the First Plan prejudiced the Committee's ability to continue the litigation against the Prepetition Secured Lenders by making distributions on account of the Claims of the Prepetition Secured Lenders. Moreover, the Committee believed that the First Plan provided insufficient funding for the ongoing Committee Action and sought releases for parties, including members of the Debtors' management, against whom the Committee intended to bring (and now has brought) additional litigation (see section V.G.2 of this Disclosure Statement).

### 3.    The Alternative Plan

At the time of the filing of the First Plan, all parties remained open to exploring other potential plan alternatives that would build consensus and maximize value. In the weeks leading up to and following the November 12, 2008 hearing, the parties engaged in extended negotiations with a potential plan investor regarding the details of a plan other than the First Plan (the "Alternative Plan"). As indicated in the Debtors' omnibus response to the objections of the First Disclosure Statement, dated November 12, 2008 [ECF No. 2137], the Debtors believed that an adjournment of the hearing on the First Disclosure Statement would allow for exploration of the Alternative Plan and maximize the likelihood of creditor consensus.

At the hearing held on January 9, 2009, the Debtors and certain parties in interest provided details with respect to the terms of the Alternative Plan transaction with another homebuilder. The Alternative Plan was to embody a sale transaction to be accomplished pursuant to a plan that the Debtors hoped would become effective by the end of April 2009. Subsequent to the hearing, the Debtors, their major creditor groups and the potential plan investor continued to work towards finalizing and documenting a sale under the Alternative Plan. By the end of January 2009, however, the Debtors and the creditor groups were made aware that the potential plan investor had determined, based on its due diligence, that the preliminary purchase price would be significantly lower than originally anticipated. The Debtors, in consultation with their major creditor groups, determined that the transaction price, as adjusted, was less favorable than recoveries that could be achieved for their stakeholders on a standalone basis.

### 4.    The Debtors' Wind Down Plan

At the end of January and through February 2009, the Debtors and their major creditor groups met to discuss the general direction of the Debtors' plan prospects, during which time the parties reached consensus that the Debtors should explore and develop standalone business models for both a going concern and a controlled monetization of the Debtors' assets over time. The culmination of this process was the development of the revised business plan – effectively, a wind-down plan – that the Debtors announced on March 23, 2009, which formed the basis of the Debtors' *First Amended Plan of Tousa, Inc.*

*and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code; April 17, 2009 Version of Proposed Plan* [ECF No. 2680] (the "Wind Down Plan").

The Committee immediately identified a number of objections to the Wind Down Plan, including the Debtors' proposal to fund the professional fees of the Prepetition Secured Lenders in connection with the Committee Action, the releases of certain Directors and Officers in excess of available insurance proceeds and the requirement that the Liquidation Trust repay the "Liquidation Trust Loan" provided for in the Wind Down Plan before making any distributions to unsecured creditors.

Following discussions with the Committee and the Prepetition Secured Lenders, the Debtors determined not to pursue confirmation of the Wind Down Plan or approval of the related disclosure statement. Instead, the Debtors pursued the operational wind down of their business and sale of virtually all remaining assets under the auspices of chapter 11 of the Bankruptcy Code. As discussed previously in section IV.B.3 of this Disclosure Statement, that wind down has since been nearly completed, with only a handful of non-litigation assets remaining to be liquidated.

**5.        Exclusivity**

The Bankruptcy Code grants a debtor in possession the exclusive right to file and solicit acceptances of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief under chapter 11 of the Bankruptcy Code. If a debtor files a plan within this exclusive period, the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances of such plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization. A court may, however, extend these exclusive periods upon the request of a party in interest and "for cause," for a period up to 18 months from the Petition Date.

On May 22, 2008, the Bankruptcy Court entered an order extending the Debtors' exclusive periods to file and solicit acceptances of a plan or plans of reorganization through and including October 25, 2008 and December 24, 2008, respectively [ECF No. 1051]. The Debtors subsequently filed a motion seeking a further 120-day extension of the exclusive periods to February 22, 2009 and April 23, 2009, respectively, and the Bankruptcy Court granted the relief requested in such motion by order dated October 24, 2008 [ECF No. 2011]. On April 8, 2009, the Debtors filed a motion seeking a further 90-day extension of the exclusive periods to July 29, 2009 and September 27, 2009, respectively, which the Bankruptcy Court granted on May 6, 2009 [ECF No. 2745].

On August 7, 2009, the Debtors filed a motion [ECF No. 3043] seeking approval of a stipulation (the "First Stipulation") entered into among the Debtors, the First Lien Agents, the Second Lien Term Loan Agent, the Prepetition Secured Lenders and the Committee, pursuant to which the parties agreed that none of the parties would (a) propose a chapter 11 plan or (b) vote in favor of or support any chapter 11 plan until 30 days from the earlier of (i) the conclusion of the trial in the Committee Action, including any post-trial (but prejudgment) submissions or (ii) entry of any order or series of orders approving the settlement of, or otherwise disposing of, the entirety of the Committee Action, but in any event no later than September 15, 2009. The Bankruptcy Court entered an order approving the First Stipulation on September 9, 2009 [ECF No. 3166].

On October 1, 2009, the Debtors filed an *ex parte* motion [ECF No. 3212] seeking approval of a second stipulation (the "Second Stipulation") entered into among the Debtors, the First Lien Agents, the Second Lien Term Loan Agent, the Prepetition Secured Lenders and the Committee, pursuant to which the parties agreed that none of the parties would (a) propose a chapter 11 plan or (b) vote in favor of or support any chapter 11 plan until 30 days from the earlier of (i) the conclusion of the trial in the Committee Action, including any post-trial (but prejudgment) submissions, (ii) entry of any order or

series of orders approving the settlement of, or otherwise disposing of, the entirety of the Committee Action or (iii) a determination in the Revolver Appeal[12] of the Committee Action, but in any event no later than October 31, 2009.

As the Second Stipulation expired on October 31, 2009, there are no restrictions on the ability of the Proponents to propose the Plan and solicit acceptances thereof, subject to the Bankruptcy Court's approval of the Disclosure Statement.

### 6.    The Committee's Plan and the Plan Mediation

Following the entry of the Bankruptcy Court Decision, the Committee engaged in discussions with the Debtors and certain other creditor constituencies regarding the structure of a plan for the Debtors and the allocation of plan distributions among various creditor groups.  On July 16, 2010, the Committee filed the *Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 5799] (the "Committee Plan") and the accompanying disclosure statement [ECF No. 5798] (the "Committee Disclosure Statement").

By a letter to counsel dated July 21, 2010 [ECF No. 5808], the Bankruptcy Court directed mediation with respect to the Committee Plan to take place in November 2010 and appointed Peter L. Borowitz to serve as the Mediator.  At a hearing on August 12, 2010, the Committee advised the Bankruptcy Court that it was willing to move forward on the Mediation as soon as possible and requested that the Mediation be set for early September 2010.  As a result, the Bankruptcy Court directed the Committee to contact the Mediator and the other parties in interest to schedule the Mediation during the week of September 20, 2010 and a disclosure statement hearing in early October 2010.  Following discussions with the Mediator and due to scheduling conflicts, the Prepetition Secured Lenders, the Debtors, the Transeastern Lenders and the Committee agreed to participate in the Mediation on October 12, 2010.  By order dated August 27, 2010, the Bankruptcy Court approved the proposed mediation schedule and permitted the Mediator to begin informal mediation discussions with each of the parties in advance of the formal mediation conference [ECF No. 6042].

After these initial discussions, the parties agreed to adjourn the Mediation to November 15, 2010 and, in order to identify the most relevant issues and facilitate the Mediation, the parties agreed to file objections to the Committee Disclosure Statement by November 11, 2010, in advance of the mediation. By order dated September 30, 2010, the Bankruptcy Court approved the proposed revised schedule [ECF No. 6129].  By a further letter to counsel dated October 7, 2010 [ECF No. 6147], the Bankruptcy Court indicated his desire for the defendants in the Fiduciary Duty Action and the D&O Insurance Coverage Action to participate in the Mediation.  The parties entered into discussions, and on October 25, 2010, the Bankruptcy Court entered an order bifurcating the Mediation [ECF No. 6197], whereby the defendants in the Fiduciary Duty Action and the D&O Insurance Coverage Action were not required to attend the first stage of the Mediation, but were required to attend the second stage, at the Mediator's request.  After further discussions, the parties agreed to further revise the schedule to provide that (i) counsel for the First Lien Revolver Lenders, First Lien Term Loan Lenders, Second Lien Term Loan Lenders, Transeastern Lenders and the Debtors would deliver confidential preliminary lists of objections to the Committee Disclosure Statement to the Committee by November 11, 2010; (ii) the deadline to object to the Committee Disclosure Statement would be December 17, 2010; (iii) the Committee's reply deadline to any such objections would be January 8, 2011; and (iv) the hearing on the Committee Disclosure Statement would be adjourned to January 13, 2011.  By order entered November 8, 2010, the Bankruptcy

---

[12] The Revolver Appeal, District Court Case No. 09-60589, is more fully described in section V.G.2.f of this Disclosure Statement.

Court approved the further revised schedule [ECF No. 6299].  The hearing on the Committee Disclosure Statement was subsequently adjourned to February 17, 2011 [ECF No. 6628].  As described in further detail in section V.G.2.k.1 herein, on February 11, 2011, Judge Gold issued a decision reversing the Bankruptcy Court Decision with respect to the Transeastern Lenders.  Accordingly, the Bankruptcy Court further adjourned consideration of the Committee Disclosure Statement and scheduled a status conference with respect to the Committee Plan and Committee Disclosure Statement for April 7, 2011.  At the status conference, the Committee requested that the Bankruptcy Court hold the Committee Disclosure Statement in abeyance pending a decision by the Eleventh Circuit on the Committee's appeal of Judge's Gold ruling (see section V.G.2.l herein).

In connection with the Mediation, the D&O Settlement Parties have agreed upon the D&O Insurance Coverage Settlement, which is a settlement in principle with respect to the Fiduciary Duty Action and the D&O Insurance Coverage Action (except as it relates to the RSUI Insurance Coverage Action).  The Proponents intend to submit the D&O Insurance Coverage Settlement Agreement to the Bankruptcy Court for approval pursuant to Bankruptcy Rule 9019.  All of the terms related to the D&O Insurance Coverage Settlement will be incorporated into such motion and the related order. For the avoidance of doubt, the D&O Insurance Coverage Settlement does not impact the RSUI Insurance Coverage Action.

## G.    SIGNIFICANT CONTESTED MATTERS DURING THE CHAPTER 11 CASES

### 1.    Financing the Chapter 11 Cases

#### a.    Debtor-in-Possession Financing

As discussed in section V.D of this Disclosure Statement, the Debtors' "first day" relief included the DIP Order authorizing the Debtors to (a) obtain secured postpetition financing on a super-priority and priming lien basis and (b) use cash collateral of the Prepetition Secured Lenders.  The DIP Order granted approval for the financing arrangement solely on an interim basis.  The Prepetition Secured Lenders originally had agreed to provide financing and permit use of cash collateral only if the arrangement was approved by May 30, 2008.  Following negotiation with the Committee, the Prepetition Secured Lenders ultimately agreed to extend the financing arrangement on an interim basis through and including June 19, 2008.

On April 23, 2008, the Debtors received the 2007 Federal Tax Refund, which made such financing unnecessary because the Debtors' cash holdings, as a result of the 2007 Federal Tax Refund, would be sufficient to meet projected funding needs.  Accordingly, rather than seeking approval of the proposed financing on a final basis, the Debtors, after consultation with the Committee, decided to seek final authority to use the cash collateral of the Prepetition Secured Lenders.

#### b.    Cash Collateral

##### i.    The First Cash Collateral Order

On April 25, 2008, the Debtors filed a motion [ECF No. 880] seeking authority to use the Prepetition Secured Lenders' cash collateral pursuant to section 363 of the Bankruptcy Code.  The Debtors supplemented that motion on May 19, 2008 [ECF No. 999] (the "First Cash Collateral Motion") and proposed an arrangement whereby the Debtors would provide the Prepetition Secured Lenders with adequate protection in exchange for their consent to the use of cash collateral for a six-month period.

36

The terms of the agreement for use of cash collateral agreed to by the Debtors and First Lien Agents contained approximately twenty forms of adequate protection, including (a) a cash payment to the First Lien Revolver Lenders and the First Lien Term Loan Lenders in the amount of $175 million, subject to certain disgorgement provisions and (b) a grant of liens and allowed administrative priority claims on substantially all of the Debtors' assets to the extent of any diminution in the value of the Prepetition Secured Lenders' collateral. The proposed order regarding the First Cash Collateral Motion also included a carve-out for the fees incurred by professionals for the Debtors and the Committee and a limited timeframe in which parties in interest could bring claims against the Prepetition Secured Lenders or relating to the Loan Documents.

The Committee objected to the First Cash Collateral Motion on the basis of, among other things, the payment of $175 million to the holders of disputed claims. The Committee emphasized that the Debtors' creditors had been studying potential challenges to the Prepetition Secured Lenders' Claims since before the Petition Date and certain creditors had filed objections to the Proofs of Claim filed by the Prepetition Secured Lenders shortly after the Petition Date. The Committee alleged that the Debtors had taken insufficient steps to ensure that the Prepetition Secured Lenders could be compelled to return the funds received through the proposed pay down in the event of an adverse determination on their Claims. Moreover, the Committee believed the proposed order limited the ability of the Committee or any other party in interest to bring claims against the Prepetition Secured Lenders by creating a challenge period, after which all claims and defenses not already plead would be released. The Second Lien Term Loan Lenders also filed a limited objection to the First Cash Collateral Motion contesting the use of cash collateral to pay the Committee's fees and expenses associated with prosecution of the Committee Action.

The Bankruptcy Court held hearings on the First Cash Collateral Motion on May 22, 2008 and June 10, 2008, at which counsel for the Debtors, the Committee, the Prepetition Secured Lenders and certain holders of the Debtors' unsecured notes presented arguments regarding the proposed order granting the First Cash Collateral Motion. Following the June 10, 2008 hearing, at which the Bankruptcy Court issued preliminary rulings on several issues, the parties entered into additional discussions and negotiations with respect to the terms of the proposed order. Ultimately, the First Lien Agents, the Debtors and the Committee agreed on a form of order. Among other things, the Committee negotiated for a pay down certification process, through which any recipient of funds pursuant to the cash collateral order would be required to provide the Committee with quarterly affirmations related to the recipient's (i) net or liquid assets in excess of the pay down received and (ii) consent to the jurisdiction of the Bankruptcy Court. Following a telephonic hearing held on June 19, 2008, during which the parties presented the proposed terms of the final cash collateral order, the Bankruptcy Court approved the proposed agreement, including (a) the payment of $175 million to the First Lien Revolver Lenders and the First Lien Term Loan Lenders and (b) the ability of the Committee to use cash collateral to fund prosecution of the Committee Action. Accordingly, on June 20, 2008, the Bankruptcy Court entered the stipulated and final first cash collateral order [ECF No. 1226] (the "First Cash Collateral Order" and, together with each subsequent order granting the use of cash collateral, the "Cash Collateral Orders"). Given the inability or unwillingness of certain lenders to provide certifications, the Debtors did not pay the full $175 million to the Prepetition Secured Lenders upon entry of the order but, rather, have disbursed almost all of the pay down funds over the course of the Chapter 11 Cases.

### ii.    Appeals of the First Cash Collateral Order

On June 30, 2008, (i) certain of the Debtors' unsecured noteholders – Aurelius Capital Master Ltd., Aurelius Capital Partners, LP, GSO Special Situations Fund L.P., GSO Special Situations Overseas Master Fund Ltd., GSO Credit Opportunities Fund (Helios), L.P., and Carlyle Strategic Partners (the "Objecting Noteholders") and (ii) the Second Lien Term Loan Agent each appealed the First Cash

Collateral Order to the District Court.  The appeals were assigned to Judge Gold and Judge Jordan, respectively, and were subsequently consolidated as Case No. 08-61317 before Judge Gold [ECF No. 10].

The Objecting Noteholders challenged, among other things, the Bankruptcy Court's ruling permitting the $175 million payment to the First Lien Revolver Lenders and the First Lien Term Loan Lenders, while the Second Lien Term Loan Agent challenged the use of cash collateral by the Committee to pursue the Committee Action.  On February 5, 2009, after hearing oral argument on the appeal on December 19, 2008, the District Court entered an order affirming the First Lien Cash Collateral Order and dismissing the appeals [ECF No. 62].  The District Court order noted that the Second Lien Term Loan Agent's argument was mooted by the Intercreditor Agreement, which prohibited the Second Lien Term Loan Agent from raising an objection to financing approved by the First Lien Agents.

### iii.    The Second Cash Collateral Order

On October 28, 2008, the Debtors filed their second motion for authority to use cash collateral pursuant to section 363 of the Bankruptcy Code [ECF No. 2022] (the "Second Cash Collateral Motion"). On December 4, 2008, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral on a consensual basis through January 9, 2009 on substantially the same terms as provided in the First Cash Collateral Order (except for the payment of $175 million to the First Lien Revolver Lenders and the First Lien Term Loan Lenders), including providing the Prepetition Secured Lenders with similar forms of adequate protection with respect to the Debtors' use of cash collateral [ECF No. 2236] (the "Second Interim Cash Collateral Order").  Additionally, the Second Interim Cash Collateral Order, as with the First Cash Collateral Order, permitted the Committee to continue to use cash collateral to pursue the Committee Action.

On January 6, 2009, after discussions among the Debtors and the First Lien Term Loan Agent, the First Lien Term Loan Agent filed a limited objection to the Second Cash Collateral Motion, stating that the First Lien Revolver Lenders and the First Lien Term Loan Lenders were prepared to extend the Debtors' use of cash collateral pursuant to the terms of the Second Interim Cash Collateral Order through March 30, 2009, provided that such order expressly prohibited the use of cash collateral by the Committee to prosecute the Committee Action [ECF No. 2332].  The Debtors did not agree to this limitation.  At a hearing held on January 9, 2009, the Debtors sought to use cash collateral on a contested basis. Following argument and testimony presented at that hearing, the Bankruptcy Court entered an order providing the Debtors with access to cash collateral through April 30, 2009, subject to certain financial covenants and other terms and conditions included therein, and permitting the Committee to continue to use cash collateral to fund the Committee Action [ECF No. 2355].

### iv.    The Third Cash Collateral Order

On April 8, 2009, the Debtors filed their third motion to use cash collateral pursuant to section 363 of the Bankruptcy Code [ECF No. 2658] (the "Third Cash Collateral Motion"), indicating their intent to seek contested use of cash collateral if the Debtors could not reach agreement with the Prepetition Secured Lenders.  In their limited objection [ECF No. 2682] to the Third Cash Collateral Motion, the First Lien Agents expressed concern regarding the decreased value of the collateral of the First Lien Revolver Lenders and the First Lien Term Loan Lenders, the impact of the Debtors' decision to wind down their businesses on the collateral securing the Claims of the Prepetition Secured Lenders and the proposal to continue to allow the Committee to use cash collateral to pursue the Committee Action.  In response, the Committee argued, among other things, that (i) the Committee's entitlement to fees in connection with the Committee Action had already been determined by the previous cash collateral orders and (ii) when awarding adequate protection, the Bankruptcy Court was required to consider the fact that the liens to be protected were subject to dispute.  The Second Lien Term Loan Agent also filed a

statement regarding the Third Cash Collateral Motion and the First Lien Agents' objection, arguing that, under the Intercreditor Agreement, the Debtors were required to pay the Second Lien Term Loan Agent's fees before any payments could be made to the First Lien Revolver Lenders or First Lien Term Loan Lenders.  On April 30, 2009, the Bankruptcy Court determined that the Prepetition Secured Lenders were adequately protected and ordered continued use of cash collateral through August 31, 2009 [ECF No. 2726] (the "Third Cash Collateral Order").

### v.        The Fourth Cash Collateral Order

On August 18, 2009, the Debtors filed their fourth motion for authority to use cash collateral [ECF No. 3076] (the "Fourth Cash Collateral Motion").  In the Fourth Cash Collateral Motion, the Debtors explained that, although the trial in the Committee Action had been scheduled to end in July 2009, additional testimony required an adjournment until late August, just before the expiration of the Third Cash Collateral Order.  At a hearing on August 28, 2009, the Bankruptcy Court approved the Debtors' request for continued use of cash collateral on substantially the same terms, subject to the ability of the parties to review the order before its submission to the Bankruptcy Court.  At the hearing, the parties, including counsel to the Debtors, agreed on the record to extend the termination date of the Third Cash Collateral Order until an agreement on the form of order could be reached.  On September 10, 2009, the Bankruptcy Court entered an interim order [ECF No. 3177] authorizing the Debtors to use cash collateral until October 31, 2009, provided that upon the entry of a judgment or other order resolving the Committee Action, any party would be permitted to file a request for reconsideration.  On September 24, 2009, the Bankruptcy Court entered a final order approving use of cash collateral, on substantially the same terms as the previous orders, until October 31, 2009 [ECF No. 3207].

### vi.       The Fifth Cash Collateral Order

On October 7, 2009, prior to entry of the Decision, the Debtors filed their fifth motion to use cash collateral [ECF No. 3218] (the "Fifth Cash Collateral Motion").  In the Fifth Cash Collateral Motion, the Debtors reiterated the importance of the Committee Action in the ongoing cash collateral negotiations: if the Prepetition Secured Lenders' Liens were avoided at the Conveying Subsidiaries, the nature and extent of the adequate protection required might change.  On October 22, 2009, in advance of the hearing on the Fifth Cash Collateral Motion, the Debtors filed a proposed order that reflected the Bankruptcy Court's findings in the Committee Action [ECF No. 3248].  On October 28, 2009, the Bankruptcy Court entered an interim order that, among other things, made clear that the Claims and related Liens of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders are limited to TOUSA and TOUSA Homes, L.P. and any adequate protection must be on account of the interests at those entities [ECF No. 3263] (the "Fifth Interim Cash Collateral Order").  The language of the Fifth Interim Cash Collateral Order tracked the Decision's findings, providing:

> Pursuant to 11 U.S.C. §§ 544 and 548 and under applicable New York and Florida fraudulent transfer law, (a) all obligations of the Conveying Subsidiaries to the First and Second Lien Lenders arising from the July 31 Transaction; (b) all claims of the First and Second Lien Lenders asserted or assertable against the Conveying Subsidiaries, and (c) all liens granted by the Conveying Subsidiaries to secure such obligations and claims, are . . . **AVOIDED** and all such claims are **DISALLOWED**.

The Decision further concluded that:

> Pursuant to 11 U.S.C. § 550 and under applicable New York and Florida fraudulent transfer law, the First and Second Lien Lenders shall **DISGORGE** to the Conveying Subsidiaries' estates any and all principal, interest, costs, expenses and other fees or

amounts paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders or in respect of the First and Second Lien Lenders' asserted claims or obligations against the Conveying Subsidiaries' estates . . . [which f]or the avoidance of doubt . . . shall include, but not be limited to, any and all (a) fees and expenses paid to, for the benefit of, or on behalf of, the First and Second Lien Lenders' respective counsel and advisors, pursuant to the First and Second Lien Term Loan Agreements, and (b) payments to, for the benefit of, or on behalf of, the First and Second Lien Lenders pursuant to [the prior financing orders].

See Decision, p. 180; Fifth Interim Cash Collateral Order, pp. 43-44.

By its terms, the Fifth Interim Cash Collateral Order superseded all previous financing orders and provided that in the event of a successful appeal of the Decision, any party could file a request for reconsideration of the Fifth Interim Cash Collateral Order.

Through a series of interim orders, the Bankruptcy Court extended the Fifth Interim Cash Collateral Order until entry of a final order on January 8, 2010. The final order authorized use of cash collateral until April 30, 2010 and provided for certain additional changes to the form of adequate protection used in the previous orders [ECF No. 3480] (the "Fifth Cash Collateral Order"). Specifically, the Fifth Cash Collateral Order required the Debtors and the Committee to operate within an agreed budget attached to the Fifth Cash Collateral Order. Further, the order provided that any party could request reconsideration of the order if, among other circumstances, the Debtors or the Committee exceeded the budget.

### vii.    The Sixth Cash Collateral Order

On March 31, 2010, the Debtors filed their sixth motion for authority to use cash collateral [ECF No. 5361] and advised the Bankruptcy Court that the parties were in discussions regarding the appropriate form of order to address (i) the Decision in the Committee Action and (ii) ongoing appeals of the Decision. On April 15, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral on substantially the same terms as provided in the Fifth Cash Collateral Order [ECF No. 5419] (the "Sixth Interim Cash Collateral Order"). In connection with their consent to use of cash collateral, the First Lien Revolver Lenders requested that the Debtors segregate approximately (a) $32.3 million, corresponding to the estimated remaining amount of the 2007 Federal Tax Refund and (b) approximately $98 million, corresponding to the approximate amount of the 2008 Federal Tax Refund. Pursuant to the Sixth Interim Cash Collateral Order, all parties reserved their rights to argue, among other things, that such proceeds (i) were not properly segregated upon receipt, (ii) do not constitute tax refund funds and/or (iii) are otherwise free from restriction or encumbrance. The parties also agreed to a further revised professional fee budget.

On May 18, 2010, the Bankruptcy Court entered an order [ECF No. 5580] (the "Sixth Cash Collateral Order"), authorizing the Debtors to use cash collateral on substantially the same terms as the previous orders through August 31, 2010.

### viii.    The Seventh Cash Collateral Order

On July 28, 2010, the Debtors filed their seventh motion for authority to use cash collateral and advised the Bankruptcy Court that the parties were in discussions regarding the terms of an agreed order for the use of cash collateral on and after September 1, 2010 despite the ongoing appeals of the Decision [ECF No. 5904] (the "Seventh Cash Collateral Motion").

Prior to the hearing on the Seventh Cash Collateral Motion, the First Lien Revolver Agent made two additional demands regarding its consent to the Debtors' continued use of cash collateral.  First, the First Lien Revolver Agent requested that the Bankruptcy Court eliminate the certification procedures established in connection with the pay down under the First Cash Collateral Order, as described in section V.G.1.b.i of this Disclosure Statement.  Second, the First Lien Revolver Agent requested that the Bankruptcy Court modify the professional fee budget such that any professional exceeding its monthly budgeted amount would not be paid for such overage, but would be permitted to apply for such amounts in its final fee application.  On August 23, 2010, the Committee filed a response to the Seventh Cash Collateral Motion, opposing the First Lien Revolver Agent's demands and requesting that the Bankruptcy Court authorize the Debtors to continue use of cash collateral on substantially the same terms as the previous orders [ECF No. 6027].  However, the Committee agreed that the professional fee budget should be modified such that to the extent any professional exceeded its monthly fee budget, such overage would not be paid currently, but could be requested in the interim fee application relevant to the applicable month or months where the budget was exceeded, provided that the First Lien Revolver Agent was subject to the same restrictions as those imposed on the estate professionals.

At the August 25, 2010 hearing, the Bankruptcy Court determined that (i) the certification requirements must remain in place because they provide important protections to the Debtors' estates and (ii) the professional fee budget would be modified to require professionals to request any amounts over the budgeted amounts in the following interim (rather than final) fee application.  Accordingly, on August 27, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to use cash collateral on such terms [ECF No. 6046].  On September 30, 2010, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including January 31, 2011 [ECF No. 6128] (the "Seventh Final Cash Collateral Order").

### ix.    The Eighth Cash Collateral Order

On December 29, 2010, the Debtors filed their eighth motion for authority to use cash collateral [ECF No. 6581] and advised the Bankruptcy Court that the Debtors, the Prepetition Secured Lenders and the Committee were in discussions regarding the Debtors' continued use of cash collateral.  The Debtors also filed a proposed eighth interim order authorizing the Debtors to use cash collateral on January 11, 2011 [ECF No. 6634].  At the hearing on January 27, 2011, the Bankruptcy Court granted the motion, and an interim order authorizing the Debtors to use cash collateral on such terms was entered on February 1, 2011 [ECF No. 6869].  On April 13, 2011, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including May 31, 2011 [ECF No. 7378].

### x.    The Ninth Cash Collateral Order

On May 10, 2011, the Debtors filed their ninth motion for authority to use cash collateral [ECF No. 7544]. The Debtors also filed a proposed ninth interim order authorizing the Debtors to use cash collateral on May 23, 2011 [ECF No. 7557].  At the hearing on May 25, 2011, the Bankruptcy Court granted the motion, and an interim order authorizing the Debtors to use cash collateral on such terms was entered on May 26, 2011 [ECF No. 7580].  On August 26, 2011, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including September 30, 2011 [ECF No. 8081] (the "Ninth Final Cash Collateral Order").

### xi.    The Tenth Cash Collateral Order

On September 14, 2011, the Debtors filed their tenth motion for authority to use cash collateral [ECF No. 8169]. The Debtors also filed a proposed tenth interim order authorizing the Debtors to use cash collateral on September 23, 2011 [ECF No. 8298].  At the hearing on August 18, 2011, the

Bankruptcy Court granted the motion, and an interim order authorizing the Debtors to use cash collateral on such terms was entered on September 29, 2011 [ECF No. 8314]. On December 28, 2011, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including April 30, 2012 [ECF No. 8467].

### xii.    The Eleventh Cash Collateral Order

On April 4, 2012, the Debtors filed their eleventh motion for authority to use cash collateral [ECF No. 8595]. The Debtors also filed a proposed eleventh interim order authorizing the Debtors to use cash collateral on April 20, 2012 [ECF No. 8609]. At the hearing on April 25, 2012, the Bankruptcy Court granted the motion, and an interim order authorizing the Debtors to use cash collateral on such terms was entered on May 1, 2012 [ECF No. 8625]. On June 7, 2012, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including October 31, 2012 [ECF No. 8671].

### xiii.    The Twelfth Cash Collateral Order

On October 3, 2012, the Debtors filed their twelfth motion for authority to use cash collateral [ECF No. 8870]. The Debtors also filed a proposed twelfth interim order authorizing the Debtors to use cash collateral on October 15, 2012 [ECF No. 8881]. At the hearing on October 18, 2012, the Bankruptcy Court granted the motion, and an interim order authorizing the Debtors to use cash collateral on such terms was entered on October 31, 2012 [ECF No. 8895]. On December 10, 2012, the Bankruptcy Court entered a final order approving use of cash collateral on such terms through and including April 30, 2013 [ECF No. 8958].

### xiv.    The Thirteenth Cash Collateral Motion

On March 18, 2013, the Debtors filed their thirteenth motion for authority to use cash collateral [ECF No. 9086] (the "Thirteenth Cash Collateral Motion"). In the Thirteenth Cash Collateral Motion, the Debtors discussed that, as set forth on the record at the status conference held on February 25, 2013, the Debtors, the Committee, MatlinPatterson and Monarch had reached an agreement in principle on a mediation settlement proposal and related term sheet, which agreement would likely form the basis for a consensual plan, and that the Agents and substantially all of the Prepetition Secured Lenders had agreed to support such settlement, subject to definitive documentation. In light of such settlement, the Debtors asserted in the Thirteenth Cash Collateral Motion that extension of the use of cash collateral was appropriate to facilitate the filing and confirmation of a chapter 11 plan.

The Debtors also filed a proposed thirteenth interim order authorizing the Debtors to use cash collateral on March 29, 2013 [ECF No. 9098]. At the hearing on April 2, 2013, the Bankruptcy Court granted the Thirteenth Cash Collateral Motion and an interim order authorizing the Debtors to use cash collateral was entered on April 8, 2013 [ECF No. 9112]. On May [__], 2013, the Bankruptcy Court entered a final order approving the use of cash collateral on such terms through and including October 31, 2013 [ECF No. ___].

### 2.    The Committee Action

As discussed in detail below, on May 28, 2008, the Bankruptcy Court granted the Committee's Standing Motion (defined below) and authorized the Committee to prosecute an adversary proceeding (the "Committee Action") on behalf of the Conveying Subsidiaries against the Term Loan Lenders and the Transeastern Lenders regarding, among other things, allegedly fraudulent transfers made by the Conveying Subsidiaries to the Term Loan Lenders and for the benefit of the Transeastern Lenders. Following a thirteen-day trial in the summer of 2009, the Bankruptcy Court issued the Bankruptcy Court

Decision in favor of the Committee on all of its claims. All of the defendants appealed the Bankruptcy Court Decision to the District Court. The Honorable Alan S. Gold, to whom the Transeastern Lenders' appeal (the "Transeastern Appeal") was assigned, set aside the Bankruptcy Court Decision with respect to the Transeastern Lenders. The Committee appealed Judge Gold's decision to the Eleventh Circuit and the Term Loan Lenders' appeals, which were consolidated and assigned to the Honorable Adalberto Jordan (the "First Lien Appeal" and the "Second Lien Appeal" and, as consolidated, the "Consolidated Term Loan Appeal"), were stayed pending resolution by the Eleventh Circuit. The Term Loan Lenders were granted standing by Judge Gold to intervene in the Transeastern Appeal for the limited purpose of arguing certain open issues before the Eleventh Circuit. On May 15, 2012, the Eleventh Circuit reversed Judge Gold's decision (the "Eleventh Circuit Decision"), affirmed the Bankruptcy Court's finding of liability and remanded the case back to the District Court for further proceedings.

Following entry of the Eleventh Circuit Decision, the various appeals of the Bankruptcy Court Decision pending in the District Court, along with the specific issues on remand from the Eleventh Circuit, were consolidated in the District Court before the Honorable Kevin Michael Moore. Judge Moore ordered all parties in interest to file briefs outlining the issues that remained outstanding in the Committee Action and, in the fall of 2012, the Committee, the Debtors, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Transeastern Lenders submitted briefs. On March 26, 2013, the Debtors, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Committee jointly moved for a stay of the appeal in light of the parties' settlement discussions. Judge Moore granted the motion on March 27, 2013, ordering that the appeal would be stayed and administratively closed and authorizing parties to move to reopen the case following a period of at least 90 days.

<blockquote>

**a.    Standing of the Committee to Prosecute the Committee Action**

</blockquote>

On April 22, 2008, the Committee filed a motion seeking, among other things, authority to investigate, commence and prosecute certain Causes of Action on behalf of the Debtors' Estates against the Prepetition Secured Lenders, the Transeastern Lenders and certain other parties to the Original Transeastern Settlement in connection with the Original Transeastern Settlement [ECF No. 850] (the "Standing Motion"). The Committee also sought sole authority to settle such claims. As discussed in detail in section V.A.2 herein, the Original Transeastern Settlement was part of a global settlement of litigation claims relating to the Transeastern JV that led to the Debtors' entry into the Loan Documents.

By the Standing Motion, the Committee sought authority to pursue certain fraudulent conveyance and other claims relating to the Original Transeastern Settlement and, in particular, the Debtors' entry into the Loan Documents (collectively, the "Committee Action Claims"). On May 28, 2008, the Bankruptcy Court entered an order granting the relief sought in the Standing Motion, but denying the Committee's request for sole authority to settle the Committee Action Claims [ECF No. 1092].

<blockquote>

**b.    The Complaint**

</blockquote>

On July 14, 2008, the Committee commenced the Committee Action by filing the complaint [Adv. Pro. No. 08-01435, ECF No. 1], which set forth several bases for recovery against the Prepetition Secured Lenders, the Transeastern Lenders and other parties to the Original Transeastern Settlement.

The Committee generally set forth two broad categories of "fraudulent transfer" claims under section 548 of the Bankruptcy Code and applicable non-bankruptcy law. The first category included claims brought against the Prepetition Secured Lenders under each of the Loan Documents. With respect to this category of claims, the Committee alleged that the obligations incurred by certain of the Debtors as guarantors and co-borrowers under the Loan Documents were fraudulent transfers. The second category

of claims included fraudulent transfer claims against the Transeastern Lenders, each of whom received certain payments and other consideration from the Debtors as part of the Original Transeastern Settlement. Specifically, the Committee Action asserted fraudulent transfer claims against the Transeastern Lenders under several different state and federal statutes, including sections 544, 548 and 550 of the Bankruptcy Code. The Committee Action sought relief in the form of recovery to certain of the Debtors of the amounts transferred to the Transeastern Lenders as part of the Original Transeastern Settlement.

In addition to these two categories of fraudulent transfer claims, the Committee sought (a) to avoid as a preference under section 547 of the Bankruptcy Code the Prepetition Secured Lenders' security interests in the 2007 Federal Tax Refund and (b) to object to the Claims of the Prepetition Secured Lenders on account of the "savings clause" contained in the guaranty agreements, dated July 31, 2007, which were executed in connection with the Loan Documents. As described below, the Committee amended its complaint on three occasions.

c.    **The First Lien Term Loan Agent and Second Lien Term Loan Agent Answers and Third-Party Complaints**

On August 13, 2008, the First Lien Term Loan Agent filed its answer to the Committee's complaint in the Committee Action, denying the Committee's allegations in large part. In addition to filing its answer, the First Lien Term Loan Agent filed a third-party complaint against TOUSA and each of the Debtor signatories, co-borrowers and co-guarantors under the First Lien Term Loan Credit Agreement (the "First Lien Term Loan Complaint"). The Second Lien Term Loan Agent also filed a substantially similar complaint (together, the "Third-party Complaints"). In the Third-party Complaints, the First Lien Term Loan Agent and Second Lien Term Loan Agent claimed relief based on the theory that, to the extent the Committee established its allegations in the Committee Action, the Debtors would have "materially breached the First [and Second] Lien Term Loan[s]" by representing solvency in the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement (the "Lender Breach Claims"). On September 30, 2008, the Debtors filed their answer to the First Lien Term Loan Complaint, generally denying the First Lien Term Loan Agent's allegations and asserting affirmative defenses. On November 25, 2008, the Debtors filed their answer to the Second Lien Term Loan Complaint. The First Lien Term Loan Agent and Second Lien Term Loan Agent also filed Proofs of Claim against certain of the Debtors for the allegations contained in the Third-party Complaints.

On June 8, 2009, the Debtors, as third-party defendants, filed a motion for summary judgment, asserting first that the Third-party Complaints were fundamentally flawed because, while purportedly pled in the alternative, the solvency representation of the First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement did not match the Committee's allegations. That is, the Committee alleged in the Committee Action that the Conveying Subsidiaries were insolvent, while the solvency representations in the First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement were for consolidated solvency. Therefore, the success of the Third-party Complaints was not dependent on the success or failure of the Committee Action and could not be sustained as a valid third-party claim. The Debtors further asserted that the First Lien Term Loan Agent had failed to produce any evidence that such solvency representations had been breached, and in fact had produced evidence establishing the opposite. On July 9, 2009, the Bankruptcy Court entered an order granting the Debtors' motion for summary judgment and dismissing the Third-party Complaints on the basis that, among other things, the First Lien Term Loan Agent and Second Lien Term Loan Agent had failed to plead proper third-party claims and had not identified any evidence that the Debtors were in breach of the solvency representations at the time of the Original Transeastern Settlement, and thus there was no dispute between the parties regarding that fact [Adv. Pro. No. 08-01435, ECF No. 523]. The Bankruptcy Court further held that the dismissal of the Third-party Complaints was without prejudice to the First Lien Term Loan

Agent's and Second Lien Term Loan Agent's assertions made in their timely filed Proofs of Claim, and that such Claims were more appropriately resolved through the claims reconciliation process.

Later, in the Bankruptcy Court Decision, however, the Bankruptcy Court stated that all Claims asserted or assertable by the Term Loan Lenders against the Conveying Subsidiaries, including any Claims for breach of the solvency representations in the Loan Documents, were avoided and disallowed. *See* Bankruptcy Court Decision, at 180.  The First Lien Term Loan Agent and Second Lien Term Loan Agent appealed the Bankruptcy Court's summary judgment decision as to the Third-party Complaints and also appealed the Bankruptcy Court's avoidance of all claims against the Conveying Subsidiaries pursuant to the Bankruptcy Court Decision (collectively, the "Term Loan Appeals").  The Term Loan Lenders argued that the Bankruptcy Court Decision was inconsistent with the Bankruptcy Court's prior summary judgment ruling indicating that their claims could be resolved through the claims reconciliation process.  The Debtors opposed these assertions.

> **d.      The Bankruptcy Court's Ruling with Respect to Motions to Dismiss the Committee Action**

On September 19, 2008, the Bankruptcy Court held a hearing on motions to dismiss the Committee Action filed by the First Lien Revolver Agent and the Second Lien Term Loan Agent.  In its motion to dismiss, the First Lien Revolver Agent argued that, as a matter of law, the First Lien Revolving Credit Agreement was not a new credit facility and that every draw request under a revolving credit facility was not a new loan obligation.  The Bankruptcy Court agreed and granted the First Lien Revolver Agent's motion to dismiss with leave for the Committee to amend [Adv. Pro. No. 08-01435, ECF No. 87].

The Second Lien Term Loan Agent argued that the Committee's complaint should be dismissed without prejudice for failure to state a claim because the Second Lien Term Loan Lenders had no "property" to recover since interest pursuant to the Second Lien Term Loan Credit Agreement was "PIK" (payment-in-kind), meaning that accruing interest is added to the principal rather than paid in cash, and because only TOUSA and TOUSA Homes, L.P. made and received the benefit of the payments, the Second Lien Term Loan Lenders argued the Conveying Subsidiaries could not recover payments they allegedly did not make or benefit from.  The Bankruptcy Court denied the Second Lien Term Loan Agent's motion to dismiss, finding that the "Doe" new lenders one through 100 were named properly and that the complaint clearly stated a claim upon which relief could be granted [Adv. Pro. No. 08-01435, ECF No. 86].  The Bankruptcy Court further found that the Second Lien Term Loan Agent did not have standing to assert the potential defenses of other defendants.

> **e.      The Amended Complaints and Responsive Pleadings**

On October 17, 2008, the Committee filed its first amended adversary complaint [Adv. Pro. No. 08-01435, ECF No. 120] (the "First Amended Complaint").  The First Amended Complaint supplemented the Committee's original complaint with additional information related to the identity of certain groups of defendants and named certain new defendants.  The First Amended Complaint also included additional allegations about the First Lien Revolving Credit Agreement.

On November 4, 2008, the First Lien Term Loan Agent filed its answer to the First Amended Complaint [Adv. Pro. No. 08-01435, ECF No. 146], generally denying the Committee's allegations and asserting affirmative defenses.  On the same day, the First Lien Revolver Agent filed a motion to dismiss the First Amended Complaint [Adv. Pro. No. 08-01435, ECF No. 148].  In its motion, the First Lien Revolver Agent argued that the substantive changes in the First Amended Complaint failed to cure the fundamental problems identified by the Bankruptcy Court during the September 19, 2008 hearing.

Specifically, the First Lien Revolver Agent argued that the First Amended Complaint still failed to identify exactly which transfers the Committee sought to have avoided and still sought to avoid transfers that occurred after the perfection of the relevant liens.

Also on November 4, 2008, the Second Lien Term Loan Agent filed its answer to the First Amended Complaint [Adv. Pro. No. 08-01435, ECF No. 152]. In its answer, the Second Lien Term Loan Agent generally denied the Committee's allegations and asserted affirmative defenses. On that date, the Second Lien Term Loan Agent also asserted a third-party complaint against TOUSA and each of the Debtor signatories, alleging claims substantially the same as those in the First Lien Term Loan Complaint (described above) [Adv. Pro. No. 08-01435, ECF No. 154]. Additionally, the Transeastern Lenders moved to dismiss the First Amended Complaint. The Transeastern Lenders argued that the Amended Complaint failed to state a claim because, among other reasons, the Committee had not pled that the Conveying Subsidiaries had an interest in the property transferred to the Transeastern Lenders and the Transeastern Lenders were not liable as subsequent transferees of an incurred obligation.

On December 4, 2008, the Bankruptcy Court held oral argument on the First Lien Revolver Agent's motion to dismiss the First Amended Complaint. The Bankruptcy Court again granted the motion to dismiss the Committee's claims relating to the First Lien Revolving Credit Agreement [Adv. Pro. No. 08-01435, ECF No. 228]. The Bankruptcy Court, however, granted the Committee leave to amend the First Amended Complaint to allege claims arising out of the First Lien Revolving Credit Agreement "solely to the extent such claims seek to avoid transfers of liens on real property or other collateral first perfected on or after July 31, 2007." The Bankruptcy Court also denied the motion to dismiss brought by the Transeastern Lenders by order entered December 18, 2008 [Adv. Pro. No. 08-01435, ECF No. 210]. The Committee filed a second amended complaint on January 5, 2009 [Adv. Pro. No. 08-01435, ECF No. 226].

The Transeastern Lenders filed a motion for interlocutory appeal of the Bankruptcy Court's ruling to the District Court. The appeal was docketed as Case No. 09-60055 before Judge Jordan. On February 11, 2009, the District Court denied the Transeastern Lenders' motion for interlocutory appeal of the Bankruptcy Court's denial of their motion to dismiss [Adv. Pro. No. 08-01435, ECF No. 253].

On February 4, 2009, the Committee filed a further amended complaint (the "Third Amended Complaint") that removed all claims relating to the First Lien Revolving Credit Agreement [Adv. Pro. No. 08-01435, ECF No. 243]. As discussed in section V.G.2.f of this Disclosure Statement, the Committee appealed the dismissal of the claims against the First Lien Revolver Lenders to the District Court.

   **f.**  **The Revolver Appeal**

On February 25, 2009, the Bankruptcy Court issued a judgment under Rule 54(b) of the Federal Rules of Civil Procedure (the "Federal Rules") dismissing the majority of claims against the First Lien Revolver Lenders [Adv. Pro. No. 08-01435, ECF Nos. 268, 271]. The Committee filed a notice of appeal of such order on March 9, 2009 [Adv. Pro. No. 08-01435, ECF No. 290] and the appeal was docketed as Case No. 09-60589 before the District Court (the "Revolver Appeal"). The parties fully briefed the appeal in May and June 2009. On August 14, 2009, oral arguments on the appeal were heard by Judge Jordan.

On March 4, 2011, Judge Jordan issued an order in the Revolver Appeal affirming the dismissal and closing the case [Case No. 09-60589, ECF No. 36], and the Committee did not appeal such dismissal.

g.    **The Transeastern Lenders' and Transeastern Agent's Third-party Complaint and Counterclaim**

On February 24, 2009, the Transeastern Lenders and CIT Group/Business Credit, Inc. ("CIT"), in its capacity as administrative agent for the Transeastern Lenders, each filed nearly identical counterclaims and third-party complaints against certain of the Debtors [Adv. Pro. No. 08-01435, ECF Nos. 259, 260, 264, 265]. The Transeastern Lenders and CIT alleged that they were entitled to indemnification and/or recoupment against any recovery the Committee received plus attorneys' fees and costs as a result of the Committee's fraudulent transfer claims under the terms of the credit agreement signed by certain of the Debtors in connection with the formation of the Transeastern JV. The Transeastern Lenders and CIT sought recoupment for the full amount of any recovery against them on each of the Committee's fraudulent transfer claims. On April 1, 2009, the Debtors filed a motion to strike or, in the alternative, to sever and stay the third-party complaints filed by CIT and the Transeastern Lenders [Adv. Pro. No. 08-01435, ECF No. 311]. The Debtors argued that such third-party complaints were untimely and prejudicial to the Debtors and their Estates.

On July 2, 2009, the Bankruptcy Court entered an order striking CIT's and the Transeastern Lenders' counterclaims and third-party complaints based on its findings that (i) such counterclaims and third-party complaints were not timely filed, (ii) the late filing was prejudicial to other parties in interest and (iii) CIT had resolved its third-party complaints through a stipulation [Adv. Pro. No. 08-01435, ECF No. 508] (the "Counterclaim Order"). In addition, the Bankruptcy Court held that the Transeastern Lenders would be permitted to present their affirmative defense during the trial of the Committee Action.

On July 10, 2009, the Transeastern Lenders filed a notice of appeal of the Counterclaim Order [Adv. Pro. No. 08-01435, ECF No. 534]. The Debtors moved to dismiss the appeal as an improper interlocutory appeal. On November 12, 2009, the District Court entered an order exercising its discretion to decline to hear the Transeastern Lenders' interlocutory appeal and finding that all relevant issues could be addressed through a post-judgment appeal [Adv. Pro. No. 09-61308, ECF No. 22]. After the final judgment in the Bankruptcy Court, the Transeastern Lenders again declined to appeal the order dismissing their counterclaim and third-party complaint. Accordingly, the dismissal of those claims is final.

h.    **Judicial Settlement Conference**

On February 11, 2009, the Debtors filed a motion to compel mediation of the Committee Action [Adv. Pro. No. 08-01435, ECF No. 245], and on February 26, 2009, the Bankruptcy Court entered an order granting such motion [Adv. Pro. No. 08-01435, ECF No. 278]. Pursuant to the parties' agreement, United States Bankruptcy Judge Laurel Isicoff conducted a judicial settlement conference on March 23-24, 2009. On April 14, 2009, Judge Isicoff reported that that the parties were at an impasse with respect to the Committee's claims against the Transeastern Lenders, the First Lien Revolver Lenders and the First Lien Term Loan Lenders. Judge Isicoff further reported that the other defendants in the Committee Action had either reached an agreement with the Committee or were continuing settlement discussions. Following the settlement conference, the Committee, the Debtors and the holders of the PIK Note Claims entered into the PIK Notes Stipulation, by which holders of the PIK Note Claims released their Claims against the Conveying Subsidiaries. Despite discussions continuing after the settlement conference, no settlement was reached between the Second Lien Term Loan Lenders and the Committee.

i.    **Pretrial Orders and Interlocutory Appeals**

On April 16, 2009 and May 1, 2009, respectively, the First Lien Term Loan Agent and the Committee each filed a motion for summary judgment based on the allegations in the Count XIX of the

Third Amended Complaint [Adv. Pro. No. 08-01435, ECF Nos. 315, 335], which sought to avoid, as a preferential transfer, the security interest in the 2007 Federal Tax Refund purportedly granted to the Prepetition Secured Lenders pursuant to the Loan Documents. The Second Lien Term Loan Agent joined in the First Lien Term Loan Agent's motion for summary judgment [Adv. Pro. No. 08-01435, ECF No. 345]. The Committee subsequently narrowed its request for summary judgment; rather than seeking summary judgment on all issues presented in Count XIX, the Committee requested only partial summary judgment that the transfer of the security interests in the 2007 Federal Tax Refund occurred within the 90-day preference period. The Bankruptcy Court rejected the First Lien Term Loan Agent's argument that the Debtors had acquired a right to the 2007 Federal Tax Refund mid-year 2007 and held that the Prepetition Secured Lenders' secured interests in the 2007 Federal Tax Refund had been transferred, for purposes of section 547 of the Bankruptcy Code, on January 1, 2008 and, accordingly, were subject to attack as a preferential transfer [Adv. Pro. No. 08-01435, ECF No. 379].

The Committee also moved for summary judgment on the defendants' affirmative defenses based on substantive consolidation, single business enterprise and alter ego. At the hearing on July 6, 2009, the First Lien Agents, Second Lien Term Loan Agent and Transeastern Lenders withdrew their affirmative defense of alter ego in its entirety and withdrew their affirmative defense of substantive consolidation without prejudice to the possibility of seeking to resuscitate it in what they said was the unlikely event that a plan of reorganization that provided for substantive consolidation were to be confirmed before judgment was entered. On July 8, 2009, the Bankruptcy Court entered an order granting the Committee's motion for summary judgment on all three defenses [Adv. Pro. No. 08-01435, ECF No. 513] (the "Summary Judgment Order").

On July 20, 2009, the Transeastern Lenders filed a notice of appeal of the Summary Judgment Order [Adv. Pro. No. 08-01435, ECF No. 560]. The appeal was docketed in the District Court as Case No. 09-61437 before Judge Jordan and was subsequently consolidated with District Court Case No. 09-61308. On November 12, 2009, the District Court entered an order exercising its discretion to decline to hear the Transeastern Lenders' interlocutory appeals and finding that all relevant issues could be addressed through a post-judgment appeal [Adv. Pro. No. 09-61308, ECF No. 22]. Accordingly, Judge Jordan dismissed both appeals as moot and closed the cases.

      **j.**      **The Trial on the Committee Action**

A thirteen-day trial on the Committee Action took place in July and August 2009 before the Bankruptcy Court. Opening and closing arguments were replaced with written submissions, and on October 13, 2009, the Bankruptcy Court released the Bankruptcy Court Decision, and on October 30, 2009, the Bankruptcy Court amended the Bankruptcy Court Decision to remove certain findings with respect to the First Lien Revolver Lenders.

In the Bankruptcy Court Decision, the Bankruptcy Court found that, among other things: (i) the obligations incurred, and the liens granted, by the Conveying Subsidiaries in respect of the First Lien Term Loan Credit Agreement and Second Lien Term Loan Credit Agreement in the Original Transeastern Settlement were fraudulent transfers; (ii) the Transeastern Lenders were entities for whose benefit the transfers were made; (iii) the Term Loan Lenders did not take in good faith, and thus were not entitled to, a defense under section 548(c) of the Bankruptcy Code; (iv) the Transeastern Lenders did not take in good faith, and thus were not entitled to, a defense under section 550 of the Bankruptcy Code and were not entitled to recoupment as a defense to the Committee's claims; (v) the payment under the Original Transeastern Settlement to the Transeastern Lenders was avoidable as a fraudulent transfer; and (vi) the liens granted to the Term Loan Lenders on the 2007 Federal Tax Refund were preferential transfers. The Bankruptcy Court further ruled that the parties should, to the extent possible, be placed in the position that they were in prior to the Original Transeastern Settlement. Accordingly, the Bankruptcy Court held that

the Conveying Subsidiaries were entitled to transaction costs, attorneys' fees and diminution in value of the Liens granted to the Term Loan Lenders and the defendants were required to disgorge monies that they had improperly received as a result of such fraudulent conveyances, plus prejudgment interest and all costs and fees that had been advanced to them for purposes of the litigation.  The Bankruptcy Court Decision did not establish specific payment amounts.  Rather, it directed the Debtors to produce an accounting of the value of the remaining assets of the Conveying Subsidiaries that were subject to the avoided liens.  The Bankruptcy Court left the payment amounts to be resolved by a later ruling, which ultimately was sought by the Committee in the form of the Quantification Motion (see section V.G.2.n of this Disclosure Statement).

In addition, the Bankruptcy Court Decision provided that the Transeastern Lenders had until November 13, 2009 to file proofs of claim asserting claims against TOUSA and TOUSA Homes, L.P. in connection with the Bankruptcy Court Decision.  *See* Bankruptcy Court Decision, at 182.  Accordingly, on or about November 13, 2009, the numerous individual Transeastern Lenders filed Proofs of Claim against the Estates of TOUSA and TOUSA Homes, L.P. in connection with the Transeastern Guarantees, each asserting an unsecured claim for, among other things, such claimant's *Pro Rata* share of the amount to be disgorged by such claimant pursuant to the Bankruptcy Court Decision, including, without limitation, the cost of any supersedeas bond posted by the claimant.  Although the Bankruptcy Court Decision did not provide for the Transeastern Lenders to file proofs of claim against the Conveying Subsidiaries, certain of the Transeastern Lenders nevertheless filed Proofs of Claim against the individual Estates of the Conveying Subsidiaries asserting Claims on account of disgorgement required by the Bankruptcy Court Decision and additional amounts in connection therewith, including the cost of any supersedeas bond posted by the applicable Transeastern Lender.[13]  Certain of the Transeastern Lenders have filed claims against TOUSA Homes Florida, L.P., one of the Conveying Subsidiaries, asserting that they have partially secured claims at that entity.  The Committee has objected to all such claims, including their purportedly secured status based on, among other things, the payoff letter executed in connection with the transaction that purports to preserve the Transeastern Lenders' Claims in the event that the transaction is found to be a fraudulent conveyance, but does not attempt to preserve lien or security interests.

### k.        The District Court Appeals

Following the entry of the Bankruptcy Court Decision, on October 20, 2009, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Transeastern Lenders each filed a notice of appeal [Adv. Pro. No. 08-01435, ECF Nos. 664, 668, 670].

On October 20, 2009, each of the appealing defendants also filed a motion to stay the Bankruptcy Court Decision pending appeal [Adv. Pro. No. 08-01435, ECF Nos. 666, 669, 671].  The Committee filed its opposition to these motions on October 23, 2009 [Adv. Pro. No. 08-01435, ECF No. 695], and a hearing was held on October 26, 2009.  On October 30, 2009, the Bankruptcy Court granted the defendants' stay motions as to their payment and disgorgement obligations, subject to the posting of supersedeas bonds in the amount of 110% of such amounts [Adv. Pro. No. 08-01435, ECF No. 723] (the "Stay Order").  Under the Federal Rules, the stay of a proceeding to enforce a judgment is automatic when a bond is filed.  The Bankruptcy Court explained that the Bankruptcy Court Decision "directs the

---

[13] The Transeastern Lenders have filed in excess of 2,400 Proofs of Claim against the Debtors' Estates.  The foregoing description of such Proofs of Claim and the inclusion of such description in this Disclosure Statement is not to be construed in any way as an admission by the Plan Debtors, the Committee or the Liquidation Trustee as to the validity of such asserted Claims, each of which the Committee disputes.

disgorgement of money by each of the three sets of Defendants (the 'Monetary Awards'), and also provides other relief, including the avoidance of fraudulent transfers and preferences, the avoidance of liens, the disallowance of claims, the accounting for fees and expenses paid, an accounting by the Debtors of the value of the assets which were the subject of the avoided liens, and the fixing of a bar date for the filing of proofs of claim (the 'Nonmonetary Awards')." *See* Stay Order, at 4-5. The Bankruptcy Court held that the Monetary Awards would be stayed pending appeal, but the Nonmonetary Awards would not be stayed, both because the Bankruptcy Court found the defendants' likelihood of success on the merits of their appeal of the Nonmonetary Awards "remote," and because a stay of the Nonmonetary Awards would have left the Debtors' bankruptcy cases "stuck dead in the water" for the pendency of the appeal, contravening the public interest favoring reorganization and disfavoring "interminable Chapter 11 proceedings." *See* Stay Order, at 8-9.

On November 10, 2009, certain defendants filed emergency motions for stays pending appeal in the District Court seeking to eliminate or lower the bond amounts. The District Court issued an order on November 23, 2009, modifying the Bankruptcy Court's order and lowering the amount of the supersedeas bonds that the First Lien Term Loan Lenders were required to post. With respect to the Transeastern Lenders, the order provided that (i) the surety need only obtain an A rather than an A+ rating from the major ratings agencies; (ii) the deadline for posting the bonds was extended to December 22, 2009; and (iii) the Bankruptcy Court could schedule a January 2010 hearing for challenges to the adequacy of any bonds posted prior to that time. A substantial majority of the defendants posted supersedeas bonds on or before December 22, 2009, as required by the District Court's order.

### 1.        Transeastern Appeal

The Transeastern Appeal was docketed in the District Court on January 5, 2010 as Case No. 10-60017 and assigned to Judge Gold. On March 5, 2010, the Committee filed a motion in each of the three appeals [Case Nos. 10-60017, ECF No. 33; 10-60018, ECF No. 47; 10-60019, ECF No. 40] to consolidate the appeals. The Term Loan Lenders and Debtors all agreed that the appeals should be consolidated, but the Transeastern Lenders opposed consolidation. On April 7, 2010, the District Court issued an order [Case No. 10-60019, ECF No. 60] holding in abeyance the Committee's motion to consolidate and setting a briefing and argument schedule.

On June 1, 2010, the Transeastern Lenders filed their brief in the Transeastern Appeal [Case No. 10-60017, ECF No. 75]. In their brief, the Transeastern Lenders argued, among other things, that: (i) the Bankruptcy Court improperly found them liable as either direct transferees or entities for whose benefit the fraudulent transfers were made; (ii) the Bankruptcy Court ordered impermissible remedies; (iii) they are entitled to liens against assets held by TOUSA Homes Florida, L.P., the Conveying Subsidiary that holds the former Transeastern property; and (iv) the case should be reassigned to a different bankruptcy judge in the event of remand. The Transeastern Lenders also incorporated by reference the arguments relating to insolvency made by the First Lien Term Loan Lenders and Second Lien Term Loan Lenders in their respective appeals (as described below).

On May 28, 2010, the First Lien Term Loan Lenders filed a motion to intervene in the Transeastern Appeal [Case No. 10-60017, ECF No. 74], which the Transeastern Lenders opposed [Case No. 10-60017, ECF No. 80]. On June 8, 2010, the Loan Syndications and Trading Association ("LSTA") filed a motion for leave to appear as *amicus curiae* in the Transeastern Appeal [Case No. 10-60017, ECF No. 79]. The Committee filed a response to such motion on June 17, 2010 [Case No. 10-60017, ECF No. 85].

On July 30, 2010, the District Court entered an order (i) granting the First Lien Term Loan Lenders' motion to intervene in the Transeastern Appeal and (ii) granting in part the LSTA's motion to

file an *amicus* brief, but denying LSTA's request to participate in oral argument [Case No. 10-60017, ECF No. 109].

The Committee filed a consolidated brief in the appeals on August 2, 2010 [Case No. 10-60017, ECF No. 111]. The First Lien Term Loan Lenders filed a brief as intervenors on August 4, 2010 [Case No. 10-60017, ECF No. 113], and the LSTA filed an *amicus* brief on August 5, 2010 [Case No. 10-60017, ECF No. 114]. The Transeastern Lenders filed their reply brief on September 8, 2010 [Case No. 10-60017, ECF No. 118]. Oral argument was held on October 22, 2010 before both Judge Gold and Judge Jordan.

On February 11, 2011, Judge Gold issued an opinion reversing the Bankruptcy Court Decision with respect to the Transeastern Lenders on two bases [Case No. 10-60017, ECF No. 131] (the "Gold Transeastern Decision"). First, Judge Gold held there was no fraudulent transfer to the Term Loan Lenders because the Conveying Subsidiaries received reasonably equivalent value when they incurred obligations and granted liens in connection with the Original Transeastern Settlement. Second, Judge Gold held that even if there was a fraudulent transfer to the Term Loan Lenders, the Transeastern Lenders were not entities "for whose benefit" the transfer was made, and the Committee therefore could not recover from them under section 550 of the Bankruptcy Code. Finally, Judge Gold ordered that the bonds posted by the Transeastern Lenders to secure a stay of execution of the judgment of the Bankruptcy Court be discharged, but ordered that the bonds "shall not be discharged if any Party files an appeal of this decision in which case the bonds shall remain in effect pending resolution of any appeals." *See* Gold Transeastern Decision, at 112-13.

On February 17, 2011, the Transeastern Lenders filed a motion for limited rehearing on the conditional release of posted bonds [Case No. 10-60017, ECF No. 132] (the "Transeastern Rehearing Motion"), arguing that supersedeas bonds with language identical to that in the Transeastern Lenders' bonds are routinely discharged when the appellant has "substantially prevailed" on appeal and that there was no longer a judgment enforceable against the Transeastern Lenders, rendering such bonds unnecessary. *See* Transeastern Rehearing Motion, at 3. On February 24, 2011, the Committee filed an opposition to the Transeastern Rehearing Motion [Case No. 10-60017, ECF No. 133], asserting that the bonds remain valid obligations according to their plain terms and that the District Court has discretion to preserve the bonds pending final resolution of the Transeastern Appeal and should do so because the Gold Transeastern Decision could be reversed on appeal by the Eleventh Circuit. On March 3, 2011, the Transeastern Lenders filed a reply in further support of the conditional release of their bonds [Case No. 10-60017, ECF No. 134], asserting that the Gold Transeastern Decision closed the Transeastern Appeal from the Bankruptcy Court Decision, the appeal for which the bonds were posted, and that any appeal to the Eleventh Circuit taken by the Committee in connection with the Transeastern Litigation would be an entirely separate appeal. On May 3, 2011, Judge Gold entered an order [Case No. 10-60017, ECF No. 161] denying the relief requested in the Transeastern Rehearing Motion and requiring all bonds deposited by the Transeastern Lenders with respect to the Bankruptcy Court Decision to remain in place pending final resolution of the Committee Action.

On March 8, 2011, the Committee filed a notice of appeal of the Gold Transeastern Decision to the Eleventh Circuit [Case No. 10-60017, ECF No. 135]. On March 29, 2011 and March 31, 2011 respectively, the Second Lien Term Loan Lenders and First Lien Term Loan Lenders filed a motion to intervene in the Transeastern Appeal [Case No. 10-60017, ECF Nos. 143, 160] to allow them to argue their positions before the Eleventh Circuit, which requests Judge Gold granted on April 26, 2011 [Case No. 10-60017, ECF No. 160] over the Committee's opposition.

## 2. Term Loan Appeals

### A. First Lien Appeal

The First Lien Appeal was docketed in the District Court on January 5, 2010 as Case No. 10-60019 and assigned to Judge Jordan. On April 7, 2010, the District Court issued an order [Case No. 10-60019, ECF No. 60] holding in abeyance the Committee's motion to consolidate and setting a briefing and argument schedule substantially similar to that set in the Transeastern Appeal (Case No. 10-60017, as described in section V.G.2.k.1 herein).

On June 1, 2010, the First Lien Term Loan Lenders filed their brief in the First Lien Appeal [Case No. 10-60019, ECF No. 69]. In their brief, the First Lien Term Loan Lenders argued, among other things, that: (i) the Bankruptcy Court erred as a matter of law in holding that the grant of a security interest in the 2007 Federal Tax Refund was an avoidable preference; (ii) the Bankruptcy Court improperly failed to recognize reasonably equivalent value given to the Conveying Subsidiaries in the Original Transeastern Settlement; (iii) several of the disgorgement remedies ordered by the Bankruptcy Court were improper; and (iv) the Bankruptcy Court improperly dismissed their third-party claims against the Debtors. The First Lien Term Loan Lenders also adopted certain arguments made in the Second Lien Term Loan Lenders' appellate brief (as discussed below).

On June 8, 2010, the LSTA and Commercial Finance Association ("CFA") each filed motions for leave to appear as *amici curiae* in the First Lien Appeal [Case No. 10-60019, ECF Nos. 75, 76]. The Committee filed a response to such motions on June 17, 2010 [Case No. 10-60019, ECF No. 86]. On August 2, 2010, the District Court entered an order granting the motions in part to allow the filing of *amicus* briefs, but declining to allow such parties to participate in oral argument [Case No. 10-60019, ECF No. 114].

The Committee filed a consolidated brief in the appeals on August 2, 2010 [Case No. 10-60019, ECF No. 112]. On August 5, 2010, the LSTA and CFA filed *amicus* briefs in support of reversal [Case No. 10-60019, ECF Nos. 115, 116]. The First Lien Term Loan Lenders filed a reply brief on September 17, 2010 [Case No. 10-60019, ECF No. 119]. Oral argument was held on October 22, 2010 before both Judge Gold and Judge Jordan. On December 16, 2010, Judge Gold entered an order [Case No. 10-60019, ECF No. 126] (the "Transfer Order") indicating that he had made a joint decision with Judge Jordan to consolidate the First Lien Appeal and the Second Lien Appeal and transfer the consolidated Term Loan Appeal to Judge Jordan (the "Consolidated Term Loan Appeal").

### B. Second Lien Appeal

The Second Lien Appeal was docketed in the District Court on January 5, 2010 as Case No. 10-60018 and assigned to the Honorable Cecelia Altonaga. On February 3, 2010, Judge Altonaga recused herself, and the case was reassigned to Chief Judge Federico A. Moreno. On March 29, 2010, Chief Judge Moreno transferred the case to Judge Gold. On March 30, 2010, Judge Gold issued an order setting a briefing and argument schedule in the Second Lien Appeal substantially similar to the schedule in both the First Lien Appeal and the Transeastern Appeal (as described in sections V.G.2.k.1 and V.G.2.k.2.A herein).

On June 1, 2010, the Second Lien Term Loan Lenders filed their brief in the Second Lien Appeal [Case No. 10-60018, ECF No. 71]. In their brief, the Second Lien Term Loan Lenders argued, among other things, that the Bankruptcy Court (i) improperly failed to consider evidence of the solvency of Debtors on a consolidated basis; (ii) improperly admitted testimony of two of the Committee's experts; and (iii) improperly held that the Conveying Subsidiaries did not receive reasonably equivalent value.

The Second Lien Term Loan Lenders also incorporated by reference arguments made by the First Lien Term Loan Lenders in their brief filed in the First Lien Appeal.

On June 8, 2010, the LSTA and CFA filed motions for leave to appear as *amici curiae* in the Second Lien Appeal [Case No. 10-60018, ECF Nos. 73, 74]. The Committee filed a response to such motions on June 17, 2010 [Case No. 10-60018, ECF No. 87], and on July 30, 2010, the District Court entered an order granting the motions in part to allow the filing of *amicus* briefs, but declining to allow such parties to participate in oral argument [Case No. 10-60018, ECF No. 105].

As noted above, the Committee, the LSTA and CFA, and the Second Lien Term Loan Lenders submitted briefs, and oral argument was held on October 22, 2010 before both Judge Gold and Judge Jordan. On December 16, 2010, Judge Gold entered the Transfer Order consolidating the First Lien Appeal and the Second Lien Appeal and transferred the Consolidated Term Loan Appeal to Judge Jordan.

### C.    Consolidated Term Loan Appeal

On February 15, 2011, Judge Jordan issued an order in response to the Transfer Order, in which he solicited guidance from the parties as to the impact of the Gold Transeastern Decision on the Consolidated Term Loan Appeal [Case No. 10-60019, ECF No. 127]. The Committee, the Debtors, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders, and certain *amici curiae* parties submitted briefs on March 15, 2011 [Case Nos. 10-60018, ECF Nos. 121, 122, 123, 124, 125; 10-60019, ECF Nos. 128, 129, 130, 131, 132]. In its brief, the Committee encouraged Judge Jordan to reserve judgment on the Consolidated Term Loan Appeal pending a decision by the Eleventh Circuit on the appeal of the Gold Transeastern Decision, which would likely have a significant (if not conclusive) effect on the issues before him in the Consolidated Term Loan Appeal. Judge Jordan issued an order staying the Consolidated Term Loan Appeal and administratively closing the cases, pending a decision by the Eleventh Circuit [Case Nos. 10-60018, ECF No. 129; 10-60019, ECF No. 138].

### l.    The Eleventh Circuit Appeal and Decision

The Committee's appeal of the Gold Transeastern Decision was docketed in the Eleventh Circuit on March 11, 2011 as Case No. 11-11071. The Committee filed its appellant brief on May 6, 2011.

On May 16, 2011, the National Association of Bankruptcy Trustees and a group of bankruptcy scholars filed motions for leave to appear as *amici curiae* in the appeal, and on June 24, 2011, the LSTA filed a motion for leave to appear as *amicus curiae*. On June 27, 2011, the Eleventh Circuit entered orders denying the National Association of Bankruptcy Trustees' motion and granting the motion of the bankruptcy scholars. The bankruptcy scholars filed an *amicus* brief on June 27, 2011. On July 26, 2011, the Eleventh Circuit entered an order granting the LSTA's motion, and the LSTA filed its *amicus* brief on the same day. The First Lien Term Loan Lenders, Second Lien Term Loan Lenders and Transeastern Lenders each filed a response brief on June 17, 2011, and the Committee filed its reply brief on July 18, 2011.

On May 15, 2012, the Eleventh Circuit issued the Eleventh Circuit Decision reversing the Gold Transeastern Decision and affirming the Bankruptcy Court's judgment that the Conveying Subsidiaries had not received reasonably equivalent value and that the Transeastern Lenders were entities for whose benefit the Conveying Subsidiaries had transferred liens to the Transeastern Lenders. The Eleventh Circuit remanded the case to the District Court to consider the Transeastern Lenders' challenges to remedies and other aspects of the Bankruptcy Court Decision.

### m.    Proceedings Before Judge Moore Following the Eleventh Circuit Decision

On September 6, 2012, Judge Moore, to whom the remanded cases had been transferred following the Eleventh Circuit Decision, entered an order on the District Court docket consolidating the nine separate appeals, including the Quantification Appeals, discussed in detail below (collectively, the "Consolidated Appeals") that had arisen out of the Bankruptcy Court Decision and setting a uniform briefing schedule [Case No. 10-62035, ECF No. 29] (the "Moore Consolidation Order").  *See* Moore Consolidation Order, at 2 ("A review of the nine appeals reveals that the appeals all arise from the same trial, the same set of factual findings, and there is considerable commonality among the issues presented by the different Appellants.  Accordingly, consolidating the nine appeals and setting a uniform briefing schedule among the Parties serves the interests of justice and judicial economy.")  Specifically, the Moore Consolidation Order instructed each appellant in the Consolidated Appeals to file an opening brief on or before October 8, 2012 that "consolidates and addresses only the issues that have not yet been addressed or that remain" following entry of the Eleventh Circuit Decision.  *See id.* at 2-3.[14]  Further, the Moore Consolidation Order instructed the appellees in the Consolidated Appeals to file a response brief on or before November 26, 2012, with any intervenor filing a brief on or before December 3, 2012.  *See id.* at 3.  Finally, the Moore Consolidation Order provided that each appellant could file a reply brief on or before January 7, 2013.

Accordingly, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Transeastern Lenders filed opening briefs setting forth the remaining open issues [Case No. 10-62035, ECF Nos. 32, 33, 34].  Subsequently, on November 26, 2012, the Committee and the Debtors each filed a response brief and on December 3, 2012, the First Lien Term Loan Lenders filed an intervenor brief in support of certain remedies imposed by the Bankruptcy Court [Case No. 10-62035, ECF Nos. 36, 38, 40].  On January 7, 2013, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Transeastern Lenders each filed a reply brief [Case No. 10-62035, ECF No. 42, 43, 44].  On March 26, 2013, the Debtors, the First Lien Term Loan Lenders, the Second Lien Term Loan Lenders and the Committee jointly moved for a stay of the appeal in light of the parties' settlement discussions.  Judge Moore granted the motion on March 27, 2013, ordering that the appeal would be stayed and administratively closed and authorizing parties to move to reopen the case following a period of at least 90 days.

### n.    The Quantification Motion

As part of the Bankruptcy Court Decision, the Debtors were ordered to file an analysis of the value of the remaining assets of the Conveying Subsidiaries that were subject to the avoided liens as of October 13, 2009.  Accordingly, the Debtors filed the RVA under seal with the Bankruptcy Court on November 12, 2009 [Adv. Pro. No. 08-01435, ECF No. 753] and amended such analysis on December 4, 2009 [Adv. Pro. No. 08-01435, ECF No. 778].  In connection with the Quantification Motion (as defined below), the Prepetition Secured Lenders agreed with certain of the adjustments to the RVA by the Committee's professionals, including (i) TOUSA's ownership of the 2007 Federal Tax Refund and 2008 Federal Tax Refund and (ii) elimination of a proposed negative cash balance at TOUSA.  The Prepetition Secured Lenders have disagreed with other aspects of such adjustments.

On March 16, 2010, the Committee filed a motion to set payment amounts in the Bankruptcy Court [Adv. Pro. No. 08-01435, ECF No. 937] (the "Quantification Motion") in order to finalize the

---

[14]By a subsequent order dated September 14, 2012, the District Court noted that it would be closed on October 8, 2012 and, accordingly, requested that the appellants' opening briefs be filed on or before October 9, 2012 [Case No. 10-62035, ECF No. 30].

amounts owed by each of the defendants.  Each of the defendants filed responses to the Quantification Motion on April 14, 2009 [Adv. Pro. No. 08-01435, ECF Nos. 964, 965, 966], and the Committee filed its reply on May 3, 2010 [Adv. Pro. No. 08-01435, ECF No. 974].  A hearing on the Quantification Motion was held on May 17, 2010.

On May 28, 2010, the Bankruptcy Court issued an order granting, in part, the Quantification Motion with regard to the Transeastern Lenders and setting the amounts to be disgorged by each Transeastern Lender [Adv. Pro. No. 08-01435, ECF No. 985] (the "First Quantification Order").  The Bankruptcy Court ordered the disgorgement of the total of approximately $400 million, plus prejudgment interest of 9% running from July 31, 2007 through the date of final judgment as to the Transeastern Lenders, which the Bankruptcy Court ruled to be May 28, 2010, not the date of the Bankruptcy Court Decision, October 30, 2009 [Adv. Pro. No. 08-01435, ECF No. 986].  The Transeastern Lenders filed notices of appeal of the First Quantification Order on June 11, 2010 [Adv. Pro. No. 08-01435, ECF Nos. 993, 994, 1101, 1102] (the "First Quantification Appeal").[15]  In their appellate brief, the Transeastern Lenders raised arguments concerning, among other things, the Bankruptcy Court's jurisdiction to award prejudgment interest after the filing of a notice of appeal and the authority for the Bankruptcy Court's prejudgment interest award generally.  The appeals were docketed in the District Court as Case Nos. 10-61478, 10-62035 and 10-62037 pending before Judge Gold.  On November 23, 2010, the District Court stayed such appeals pending a ruling in the appeals of the Bankruptcy Court Decision.

On July 13, 2010, the Bankruptcy Court further ruled, as to the Term Loan Lenders, that: (i) the First Lien Term Loan Lenders would disgorge principal and interest payments they received pursuant to the First Lien Term Loan Credit Agreement, totaling approximately $29.6 million; (ii) the First Lien Term Loan Lenders and Second Lien Term Loan Lenders would disgorge fees paid to their professionals out of the Debtors' Estates arising out of the fraudulent transfer plus prejudgment interest through July 13, 2010, totaling approximately $25.2 million and $22.8 million, respectively; and (iii) the First Lien Term Loan Lenders would disgorge $70.9 million paid in connection with the pay down under the First Cash Collateral Order.  From the amounts to be disgorged by the Transeastern Lenders, the Conveying Subsidiaries would receive from such disgorged funds (i) approximately $17.0 million in transaction costs from the Original Transeastern Settlement; (ii) the Committee's and the Debtors' fees arising from the Committee Action, totaling approximately $37.7 million; and (iii) a total of $88.5 million for diminution in value of the liens (based on the Bankruptcy Court's ruling that the starting point for calculating diminution of value would be $500 million and the parties' later agreement that the remaining value of the liens was $411.5 million).  The Bankruptcy Court further ruled that prejudgment interest at 9% would run on all of the amounts to be disgorged and paid to the Conveying Subsidiaries, running until the date of final judgment.  On July 13, 2010, the Bankruptcy Court entered an order setting forth these amounts [Adv. Pro. No. 08-01435, ECF No. 1037] (the "Second Quantification Order," and, together with the First Quantification Order, the "Quantification Orders"), which "constitute[d] a final judgment as to the First Lien Lenders and Second Lien Lenders."  *See* Second Quantification Order, at 2.

On July 22, 2010, the First Lien Term Loan Lenders and Second Lien Term Loan Lenders each filed a notice of appeal of the Second Quantification Order [Adv. Pro. No. 08-01435, ECF Nos. 1043, 1042] (the "Second Quantification Appeals," and, together with the First Quantification Appeal, the "Quantification Appeals").  The Term Loan Lenders made arguments concerning, among other things, the Bankruptcy Court's award of diminution in value damages, its jurisdiction to award prejudgment interest

---

[15] Certain of the Transeastern Lenders' appeals were dismissed by the Bankruptcy Court on July 23, 2010 for failure to file a designation of items to be included in the record on appeal and a statement of issues to be presented.  The Transeastern Lenders subsequently filed motions to reinstate the appeals, which the Bankruptcy Court granted on September 1, 2010 [Adv. Pro. No. 08-01435, ECF No. 1092].

and attorneys' fees up to the date of the Second Quantification Order and associated final judgment and the amount of its award of transaction costs to the Conveying Subsidiaries. The Second Quantification Appeals were docketed as Case No. 10-61731 before Judge Jordan and Case No. 10-61681 before Judge Gold, respectively. Also on July 22, 2010, the First Lien Term Loan Lenders and Second Lien Term Loan Lenders each filed a motion seeking a stay of the execution of the Second Quantification Order and requesting that no bonds be required to secure the stay beyond those already posted [Adv. Pro. No. 08-01435, ECF Nos. 1041, 1046]. The Committee did not oppose the motions to stay. By orders entered July 23, 2010 and August 5, 2010, the Bankruptcy Court stayed the execution of judgment on the Quantification Orders without requiring the posting of additional bonds [Adv. Pro. No. 08-01435, ECF No. 1058, 1068].

By an omnibus order entered November 23, 2010, Judge Gold *sua sponte* stayed the briefing of the appeals of the Quantification Orders pending before him and directed the parties thereto not to submit any further briefing in such appeals pending a decision by the District Court in the appeals of the Bankruptcy Court Decision [Case No. 10-61478, ECF No. 21]. The First Lien Term Loan Lenders' appeal of the Quantification Orders pending before Judge Jordan was not stayed, and the Committee's response brief in such appeal was filed on December 16, 2010. On December 16, 2010, Judge Gold and Judge Jordan entered an order transferring all of the appeals related to the Second Lien Term Loan Lenders to Judge Jordan.

As discussed above, on February 15, 2011, Judge Jordan issued an order in response to the Gold Transeastern Decision soliciting guidance from the parties as to the impact of such decision on the various pending appeals, including the appeals of the Quantification Orders. On May 23, 2012, the appeal was reassigned to Judge Moore along with all of the other Consolidated Appeals, as discussed above.

### o.    The Distressed High Yield Settlement Agreement

In February 2008, two defendants in the Committee Action—Distressed High Yield Trading Opportunities Fund Ltd. (the "Offshore Fund") and Distressed High Yield Trading Opportunities Fund LLC (collectively, the "Transeastern Offshore Funds")—decided to liquidate pursuant to British Virgin Islands law and began distributing their assets to their redeeming investors. Because the Transeastern Offshore Funds had not distributed all of their assets at the time they were served in the Committee Action, the Offshore Fund voluntarily set up a Cayman Islands trust to hold a reserve for the claims of the Conveying Subsidiaries. The trust originally held $3 million, but approximately $300,000 of the trust was spent by the Transeastern Offshore Funds in defense costs in connection with the Committee Action.

After entry of the Bankruptcy Court Decision, counsel for the Transeastern Offshore Funds informed the Committee that the Transeastern Offshore Funds lacked sufficient assets to pay their creditors in full. Accordingly, the Transeastern Offshore Funds and the Committee negotiated a settlement agreement (the "Transeastern Offshore Settlement Agreement") resolving the Committee's claims against the Transeastern Offshore Funds. Pursuant to the Transeastern Offshore Settlement Agreement, the Offshore Fund agreed to pay $2.9 million to the Conveying Subsidiaries (representing a distribution of approximately 70% of the Conveying Subsidiaries' claims against the Offshore Fund), subject to adjustment to ensure that the Conveying Subsidiaries received the same percentage recovery as other unsecured creditors of the Transeastern Offshore Funds in accordance with British Virgin Islands law.[16] As a condition to the settlement, the parties agreed that any order approving the Transeastern

---

[16] The Transeastern Offshore Funds had also filed a notice of appeal of the Bankruptcy Court Decision. As part of the Transeastern Offshore Settlement Agreement, the Transeastern Offshore Funds agreed to withdraw such appeal with prejudice.

Offshore Settlement Agreement would include an injunction barring any other defendant in the Committee Action from pursuing any claim or cause of action against the Transeastern Offshore Funds arising out of the Original Transeastern Settlement. On March 19, 2010, the Bankruptcy Court entered an order approving the Transeastern Offshore Settlement Agreement [Adv. Pro. No. 08-01435, ECF No. 948].

**p.**    **Monarch Settlement**

In early 2012, a settlement (the "Monarch Settlement Agreement") was reached among the Committee, the Conveying Subsidiaries and Monarch, the largest Transeastern Lender, to resolve the portion of the Committee Action with respect to Monarch and certain other Transeastern Lenders (the "Monarch Settling Parties"). On March 2, 2012, the Committee, the Conveying Subsidiaries and Monarch filed a joint motion to approve the Debtors' entry into the Monarch Settlement Agreement [ECF No. 8553], which the Bankruptcy Court approved by order entered on March 22, 2012 [ECF No. 8588].

Pursuant to the Monarch Settlement Agreement, Monarch paid 43.43% of $45 million, or $19,543,500, to an account for the benefit of the Conveying Subsidiaries (the "Conveying Subsidiaries Account"), in respect of the Monarch Settling Parties' exposure under the Transeastern Judgment. Since the Monarch Settlement Agreement was approved by the Bankruptcy Court, the Monarch Settling Parties' share of the Transeastern Judgment has increased by approximately 2.50% from 43.43% to 45.93%. Pursuant to the Mediation Settlement, as described in further detail in section VI.C.3.a.iv herein, Monarch, GCAT and Barclays (each of which shall be deemed a Monarch Settling Party with respect to the Additional Monarch Transeastern Liability) shall be permitted to settle the Additional Monarch Transeastern Liability according to the same terms as the Monarch Settlement Agreement. In connection therewith, Monarch will pay the Increased Monarch Settlement Payment of $1,125,000 to the Conveying Subsidiaries Account, such that the total amount paid by the Monarch Settling Parties in respect of the Initial Monarch Settlement Payment shall be increased to 45.93% of $45 million, or $20,668,500.

The Monarch Settlement Agreement also provided that if an order was entered in the Committee Action whereby the Conveying Subsidiaries were awarded monetary damages in excess of $45 million, Monarch would be obligated to pay an additional settlement payment to the Conveying Subsidiaries Account equal to 43.43% (updated based on the Updated Monarch Settlement Percentage 45.93%) of the lesser of (i) $30 million or (ii) the amount by which the actual award to the Conveying Subsidiaries exceeds $45 million, up to $75 million (the "Monarch Supplemental Payment Obligation"). Further, pursuant to the Monarch Settlement Agreement, the settlement payments are to be allocated among the Conveying Subsidiaries and do not constitute collateral of the Prepetition Secured Lenders.

As described in further detail in section VI.C.3.a.iv herein, pursuant to the Plan and the Mediation Settlement, in full and final satisfaction of the Monarch Supplemental Payment Obligation, Monarch shall pay $3,444,750 (the "Monarch Settlement Payment") to the Conveying Subsidiaries Account, representing 25% of the maximum amount of the Monarch Supplemental Payment Obligation.

**3.**    **Additional Litigation and Adversary Proceedings**

**a.**    **The Fiduciary Duty Action**

On February 27, 2009, the Committee moved for entry of an order granting the Committee standing to prosecute certain causes of action on behalf of the Debtors' Estates against the Defendant Directors and Officers, as well as TOUSA's majority shareholder, TOSA. On June 1, 2009, the Court entered an order granting the Committee standing [ECF No. 2828].

i.      **The Complaint**

On June 9, 2009, the Committee commenced the Fiduciary Duty Action to pursue damages from (i) certain of the Debtors' officers and directors for breaching their fiduciary duties to the Conveying Subsidiaries and their creditors in connection with the Original Transeastern Settlement and (ii) TOUSA's majority shareholder, TOSA, for aiding and abetting the alleged breaches.  Following a stay in the proceedings pending the outcome of the Committee Action, the defendants moved on January 29, 2010 to dismiss the Committee's complaint [Adv. Pro. No. 09-01616, ECF Nos. 57, 61-64].

On February 19, 2010, the Committee filed an amended complaint (the "Amended Fiduciary Duty Complaint"), [Adv. Pro. No. 09-01616, ECF No. 93], asserting certain supplemental and alternative causes of action, including claims for aiding and abetting against certain members of the Board.

On March 12, 2010, each of the defendants (other than Tommy McAden) moved to dismiss the Amended Fiduciary Duty Complaint [Adv. Pro. No. 09-01616, ECF Nos. 107-14].  Ultimately, the defendants (including Tommy McAden) filed six separate motions to dismiss.  In their motion to dismiss, defendants Konstantinos Stengos, Andreas Stengos, George Stengos, Marianna Stengou (collectively, the "Stengos Defendants") and TOSA contended that: (i) the Committee is not permitted to bring a direct claim on behalf of TOUSA's creditors; (ii) the Stengos Defendants did not owe fiduciary duties to the Conveying Subsidiaries; and (iii) the Amended Fiduciary Duty Complaint failed to state a claim for breach of fiduciary duty because the Stengos Defendants were entitled to the protection of the business judgment rule.  TOSA also contended that the Amended Fiduciary Duty Complaint failed to state an aiding and abetting claim upon which relief could be granted.

Defendant Antonio Mon joined the arguments made by the Stengos Defendants.  Defendants Larry Horner, William Hasler, Michael Poulos, Susan Parks and J. Bryan Whitworth (collectively, the "Outside Director Defendants") advanced the same arguments in their motion to dismiss as the Stengos Defendants, with the additional claim that the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Decision.

Defendants Paul Berkowitz, David Schoenborn, Stephen Wagman and Russell Devendorf (the "Officer Defendants") made the same arguments in their motion to dismiss as the Outside Director Defendants, except they did not deny that they owed fiduciary duties to the Conveying Subsidiaries.  The Officer Defendants also argued that the Fiduciary Duty Action should be dismissed because of certain exculpation clauses in the Conveying Subsidiaries' governing documents.

In his motion to dismiss, defendant Brian Konderik, like the Stengos Defendants, argued that the Committee was not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors.  He also argued that the Amended Fiduciary Duty Complaint failed to state a claim because of certain limitations on liability in the Conveying Subsidiaries' governing documents.  In their motion to dismiss, defendants Candace Corra, Tom McAndrew and Gordon Stewart argued that: (i) the Committee was not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors; (ii) the Amended Fiduciary Duty Complaint failed to allege sufficient facts to establish a fiduciary relationship; (iii) they are entitled to the protection of the business judgment rule; (iv) the Amended Fiduciary Duty Complaint failed to state a claim because of certain limitations on liability in the Conveying Subsidiaries' governing documents; and (v) the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Committee Action.

Defendant Tommy McAden was granted additional time to respond to the Amended Fiduciary Duty Complaint.  He filed a motion to dismiss on April 2, 2010 [Adv. Pro. No. 09-01616, ECF No. 129]. McAden argued that (i) he did not owe fiduciary duties to the Conveying Subsidiaries; (ii) the Committee

was not permitted to bring a direct claim on behalf of the Conveying Subsidiaries' creditors; (iii) he had abstained from voting on the Original Transeastern Settlement and thus could not have breached his fiduciary duties in connection therewith; and (iv) the recovery sought in the Fiduciary Duty Action is moot because it is duplicative of the recovery awarded in the Committee Action.

The Bankruptcy Court held oral argument on the motions to dismiss, with the exception of defendant McAden's motion to dismiss, on April 19, 2010.  On October 4, 2010, the Bankruptcy Court entered an order denying the motions to dismiss [Adv. Pro. No. 09-01616, ECF No. 193].  On October 18, 2010, certain of the defendants in the Fiduciary Duty Action filed a motion for leave to file an interlocutory appeal of such order [Adv. Pro. No. 09-01616, ECF No. 205].  On November 1, 2010, the Committee filed a response opposing the motion for leave to appeal [Adv. Pro. No. 09-01616, ECF No. 210], which the Committee amended on November 3, 2010 [Adv. Pro. No. 09-01616, ECF No. 212]. On December 3, 2010, the appeal was docketed by the District Court as Case No. 10-62201.

On January 6, 2011, the defendants filed a reply brief with the District Court [Case No. 10-62201, ECF No. 11] in further support of their motion for leave to appeal.  On January 13, 2011, the Committee moved to strike the reply brief as procedurally improper [Case No. 10-62201, ECF No. 12].  On January 19, 2011, the District Court granted the motion and struck the defendants' reply brief [Case No. 10-62201, ECF No. 13].

On November 5, 2010, certain of the defendants in the Fiduciary Duty Action filed answers to the Amended Fiduciary Duty Compliant.  Further, on November 24, 2010 and December 1, 2010, certain of the defendants filed amended answers asserting additional affirmative defenses and alleging that the Committee lacks standing to bring claims against the defendants in the Fiduciary Duty Action and/or that the Bankruptcy Court lacks subject matter jurisdiction over the Committee's claims.

### ii.        The Defendants' Withdrawal Motion

Certain of the defendants filed a motion in the District Court to withdraw the reference of the Fiduciary Duty Action [Case No. 10-60206, ECF No. 1] (the "Withdrawal Motion"), which would have removed the Fiduciary Duty Action from the Bankruptcy Court to the District Court.  The Committee opposed the Withdrawal Motion and, on April 19, 2010, Judge James I. Cohn of the District Court denied the Withdrawal Motion without prejudice [Case No. 10-60206, ECF No. 6].

In denying the Withdrawal Motion, the District Court held that the Bankruptcy Court was in the best position to determine whether the matter was core or non-core and was the appropriate forum for the Fiduciary Duty Action, largely due to the Bankruptcy Court's familiarity with the underlying facts.  The District Court also found that (i) denying the Withdrawal Motion furthered judicial economy, (ii) the Committee had raised the "possibility" that the Withdrawal Motion was motivated by a desire to "forum shop" in light of the Bankruptcy Court's criticism of the defendants' decision-making in the Decision and (iii) given that the defendants had failed to file jury demands and "intended" to file in the future, withdrawal based on a potential jury demand was premature. Because the District Court's decision is without prejudice, it leaves open the possibility that the defendants may attempt to withdraw the reference again at a later date.

### iii.        Participation in the Plan Mediation

By an order dated October 25, 2010, the Bankruptcy Court directed the defendants in the Fiduciary Duty Action to participate in a plan mediation conference at a time to be determined by the mediator [ECF No. 6197].  The plan mediation is more fully described in section V.F.6 in this Disclosure Statement.

Pursuant to the Bankruptcy Court's orders dated October 4, 2010 [Adv. Pro. No. 09-01616, ECF No. 299] and November 23, 2011 [Adv. Pro. No. 09-01616, ECF No. 313], the Fiduciary Duty Action was stayed while the parties awaited further clarity from the appellate courts on certain issues in the Committee Action. The Fiduciary Duty Action was further stayed pending mediation by orders entered on June 18, 2012; September 12, 2012; November 14, 2012; December 12, 2012; and February 12, 2013 [Adv. Pro. No. 09-01616, ECF Nos. 317, 322, 326, 330, 334]. During the stay, the parties engaged in mediation regarding the Fiduciary Duty Action.

In connection with the Mediation, the D&O Settlement Parties have reached agreement in principle, subject to final documentation, as to the terms of the D&O Insurance Coverage Settlement, which is a settlement with respect to the Fiduciary Duty Action and the D&O Insurance Coverage Action (except as it relates to the RSUI Insurance Coverage Action), among other matters. The Proponents intend to submit the D&O Insurance Coverage Settlement Agreement to the Bankruptcy Court for approval pursuant to Bankruptcy Rule 9019. The salient terms of the D&O Insurance Coverage Settlement will be reflected in such motion and the related order.

### b.    The D&O Insurance Coverage Action

#### i.    Background

On January 16, 2009, the Debtors notified their two primary insurance carriers whose policies may cover the claims made in the Fiduciary Duty Action, XL Specialty Insurance Company and Federal Insurance Company (together with the Debtors' secondary insurance carriers, the "D&O Insurers"), that the Committee intended to bring claims against the Defendant Directors and Officers. However, each D&O Insurer denied coverage for claims related to the Fiduciary Duty Action, arguing that the asserted claims fall within the other D&O Insurer's policy period.

#### ii.    The Complaint

Subsequently, the Debtors engaged in negotiations with the D&O Insurers, who continued to deny coverage and refused to advance defense costs to the Defendant Directors and Officers. On November 5, 2009, the Debtors commenced the D&O Insurance Coverage Action against the D&O Insurers by filing a complaint [Adv. Pro. No. 09-02281, ECF No. 1], seeking a declaration that the D&O Insurers must cover claims asserted in, and advance defense costs for, the Fiduciary Duty Action. The D&O Insurers moved to dismiss the D&O Insurance Coverage Action, arguing that (i) the Debtors lacked standing to bring the D&O Insurance Coverage Action; (ii) the Debtors failed to state a claim for which they are entitled to relief; and (iii) the Defendant Directors and Officers are indispensible parties to the D&O Insurance Coverage Action [Adv. Pro. No. 09-02281, ECF Nos. 86, 91, 92, 94]. On December 11, 2009, the D&O Insurers filed a motion to withdraw the reference of the D&O Insurance Coverage Action to the Bankruptcy Court and to instead have the action tried in the District Court [Adv. Pro. No. 09-02281, ECF No. 96], as well as a motion to stay the D&O Insurance Coverage Action pending the District Court's ruling on the motion to withdraw the reference [Adv. Pro. No. 09-02281, ECF No. 95].

On October 14, 2010, the District Court referred the motion to withdraw the reference to the Bankruptcy Court for a report and recommendation [Case No. 10-61768, ECF No. 13]. On December 6, 2010, the Bankruptcy Court issued a report recommending that the motion be denied [Case No. 10-61768, ECF No. 20. The District Court accepted such recommendation in part on January 1, 2011 and denied the motion to withdraw the reference [Case No. 10-61768, ECF No. 25].

### iii.        The Agreement to Mediate

The Committee filed a motion to intervene in the D&O Insurance Coverage Action on December 21, 2009 [Adv. Pro. No. 09-02281, ECF No. 122].  However, the Committee agreed to hold its motion in abeyance while the Debtors negotiated with the D&O Insurers on the points described above.  Shortly thereafter, the Debtors and the D&O Insurers reached an agreement whereby defense costs would be advanced to the D&O Defendants while the issue of coverage is litigated [Adv. Pro. No. 09-02281, ECF No. 156].  Additionally, the Debtors and the D&O Insurers agreed to stay the D&O Insurance Coverage Action in its entirety through August 15, 2010 while the parties attempted to mediate the dispute [Adv. Pro. No. 09-02281, ECF Nos. 155, 160].

On April 15, 2010, the parties selected David Geronemus to mediate the D&O Insurance Coverage Action [Adv. Pro. No. 09-02281, ECF No. 161].  The dispute was mediated on August 3-4, 2010 in New York, New York.  Prior to the mediation, the parties exchanged a statement of facts, a mediation brief, and a reply.  Pursuant to an agreement with the other parties, the Committee submitted a brief and actively participated in the mediation.

Although the parties negotiated in good faith for two days, the mediation did not result in an agreement regarding coverage of the Committee's claims asserted in the Fiduciary Duty Action.  After the expiration of the agreed stay, the parties filed a joint motion to establish a briefing schedule with respect to the pending motions in the D&O Insurance Coverage Action, which the Bankruptcy Court granted by order entered on August 18, 2010 [Adv. Pro. No. 09-02281, ECF No. 175].  Pursuant to the scheduling order, on August 25, 2010, the plaintiffs filed responses to the motion to stay, the motions to dismiss and the motion to withdraw the reference [Adv. Pro. No. 09-02281, ECF Nos. 176-78].  On September 13, 2010, certain of the defendants filed replies in further support of such motions [Adv. Pro. No. 09-02281, ECF Nos. 184-85].  In addition, the plaintiffs and defendants filed responses to the Committee's motion to intervene on August 27, 2010 [Adv. Pro. No. 09-02281, ECF Nos. 180-81] and the Committee filed a reply on September 7, 2010 [Adv. Pro. No. 09-02281, ECF No. 182].  A hearing on the motion to intervene was held on September 29, 2010.  The motions to dismiss were taken under advisement and the Committee's motion to intervene was granted by order entered on October 1, 2010 [Adv. Pro. No. 09-02281, ECF No. 192].

### iv.        Participation in the Plan Mediation

By an order dated October 25, 2010, the Bankruptcy Court directed the defendants in the D&O Insurance Coverage Action to participate in a plan mediation conference at a time to be determined by the Mediator [ECF No. 6197].  The plan mediation is more fully described in section V.F.6 in this Disclosure Statement.

In connection with the Mediation, the D&O Settlement Parties have reached agreement in principle, subject to final documentation, as to the terms of the D&O Insurance Coverage Settlement, which is a settlement with respect to the Fiduciary Duty Action and the D&O Insurance Coverage Action (except as it relates to the RSUI Insurance Coverage Action), among other matters.  The Proponents intend to submit the D&O Insurance Coverage Settlement Agreement to the Bankruptcy Court for approval pursuant to Bankruptcy Rule 9019.  The salient terms of the D&O Insurance Coverage Settlement will be reflected in such motion and the related order. For the avoidance of doubt, the D&O Insurance Coverage Settlement does not impact the RSUI Insurance Coverage Action.

### c.    Additional Potential D&O Actions

According to the Debtors, certain of the defendants in the Committee Action, including the First Lien Agents and Monarch Alternative Capital LP and Trilogy Capital LLC, in their capacities as holders of syndicated interests in the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement (collectively, the "Potential D&O Claimants"), have advised the Debtors and their insurance carriers that the Potential D&O Claimants may have claims against the Directors and Officers related to their conduct in connection with the Original Transeastern Settlement.

Specifically, by letter dated December 11, 2009, Chadbourne & Parke LLP, as counsel to the First Lien Agents, and certain of the First Lien Revolver Lenders and First Lien Term Loan Lenders notified the Directors and Officers and the Debtors' director and officer insurance carriers that if the Bankruptcy Court Decision is upheld on appeal, they may have substantial claims against the Directors and Officers relating to actions taken in connection with the Original Transeastern Settlement.

In addition, by letter dated December 11, 2009, Boies, Schiller & Flexner LLP, as counsel to Monarch Alternative Capital LP and Trilogy Capital LLC, notified the Directors and Officers that they may also have substantial claims against the Directors and Officers relating to actions taken in connection with the Original Transeastern Settlement.

To date, the Potential D&O Claimants have not filed a complaint alleging claims referenced in the foregoing correspondence.  Upon information and belief, the Potential D&O Claimants have entered into tolling agreements with the Directors and Officers regarding any claims or causes of action that the Potential D&O Claimants may have against the Directors and Officers.

### d.    The Falcone Action

#### i.    Standing of the Committee to Pursue the Falcone Action

On December 23, 2009, the Committee filed a motion in the Bankruptcy Court seeking authority to investigate, commence and prosecute certain Causes of Action on behalf of certain of the Debtors' Estates against the Debtors' former joint venture partners (the "Falcones") and certain related parties (collectively, the "Falcone Action Defendants") relating to settlement agreements made as part of the Original Transeastern Settlement [ECF No. 3446].  On January 22, 2010, the Bankruptcy Court entered an order granting the Committee standing to pursue such Causes of Action [ECF No. 4408].

#### ii.    The Complaint

On January 26, 2010, the Committee commenced the Falcone Action [Adv. Pro. No. 10-02125, ECF No. 1].  The complaint sets forth fraudulent transfer claims under the Bankruptcy Code and applicable non-bankruptcy law.

As part of the Original Transeastern Settlement, the Debtors exercised certain land purchase option agreements, and terminated others, resulting in payments of over $50 million to certain of the Falcone Action Defendants.  The assets of the Transeastern JV were assumed by TOUSA Homes Florida, L.P., and the Falcones relinquished their ownership interest in the Transeastern JV.  Simultaneously, certain of the Debtors entered into releases and indemnification agreements with the Falcone Action Defendants, pursuant to which they agreed to provide indemnification for any claims relating to the Transeastern JV.

The Committee alleges that the Debtors did not receive reasonably equivalent value for cash transfers made to the Falcone Action Defendants, nor for the releases and indemnification given in connection therewith.  The Committee alleges that the land received pursuant to the exercised option agreements was worth approximately $28 million, but was encumbered with $42 million in liabilities.  Moreover, as to the Conveying Subsidiaries, who were not obligated on the Transeastern Loans, the Committee alleges that no benefit was received from the transfers made to the Falcone Action Defendants.  The Committee alleges that because the Debtors were insolvent at the time of these transfers, they should be avoided as constructively fraudulent.

### iii.    The Falcone Action Defendants' Motions to Dismiss

The Falcone Action Defendants filed motions to dismiss the Falcone Action or, in the alternative, for a more definite statement, arguing, among other things, that: (i) the Falcone complaint was a shotgun pleading; (ii) the Falcone complaint improperly lumped together all of the Falcone Action Defendants and failed to specify which of the Falcone Action Defendants received the alleged fraudulent transfers; and (iii) the exercise of an option agreement should not be the basis of a fraudulent transfer claim as a matter of public policy [Adv. Pro. No. 10-02125, ECF Nos. 25, 27, 37, 38].

After oral argument on June 16, 2010, the Bankruptcy Court granted the motions to dismiss in part, without prejudice, on the grounds that the Falcone complaint constituted a shotgun pleading, improperly lumped the Falcone Action Defendants together and failed to identify the recipients of the allegedly fraudulent transfers.  The Bankruptcy Court rejected the argument that exercise of an option agreement should not be subject to fraudulent transfer law.  The Bankruptcy Court granted the Committee leave to file an amended complaint, which the Committee did on July 7, 2010 [Adv. Pro. No. 10-02125, ECF No. 79] (the "Amended Falcone Complaint").  The Bankruptcy Court's order partially granting the motions to dismiss was entered on August 3, 2010 [Adv. Pro. No. 10-02125, ECF No. 82].

### iv.    The Amended Falcone Complaint

The Amended Falcone Complaint alleges that the Debtors did not receive reasonably equivalent value in exchange for the cash transfers that the TOUSA entities made to certain defendants.  In addition, it seeks the avoidance of a release (the "Release Transfer") that the TOUSA entities provided to one defendant, Falcone.

To address the issues raised in defendants' motions to dismiss, the Amended Falcone Complaint identifies the provisions in four settlement agreements that created payment obligations to certain defendants and specifies the amounts paid to each of these defendants.  It also identifies the liability from which Falcone was released pursuant to the Release Transfer.  In contrast to the initial Falcone complaint, the Amended Falcone Complaint does not seek to avoid all of the releases and grants of indemnification provided for in each of the settlement agreements.  Rather, by the Amended Falcone Complaint, the Committee seeks to avoid the release related to the guarantees entered into by Falcone as part of the formation of the Transeastern JV.

Because the Conveying Subsidiaries were not obligated on the Transeastern Loans, and because the Conveying Subsidiaries were insolvent at the time of these transfers, the Committee asserts that such transfers should be avoided as constructively fraudulent.  In addition, because none of the Debtors received reasonably equivalent value in exchange for the Release Transfer, and because the Release Transfer was predicated upon the provision of the cash transfers, the Amended Falcone Complaint also seeks the avoidance of the Release Transfer.

63

v.        **Motions to Dismiss the Amended Falcone Complaint**

On August 18, 2010, certain of the Falcone Action Defendants filed motions to dismiss the Amended Falcone Complaint in part, asserting that the Amended Falcone Complaint still failed to provide the Falcone Action Defendants with fair notice of which claims are against which transferee and in what amount [Adv. Pro. No. 10-02125, ECF Nos. 90, 93]. Also on August 18, 2010, certain of the Falcone Action Defendants filed a motion to extend their deadline to respond to certain counts of the Amended Falcone Complaint [Adv. Pro. No. 10-02125, ECF No. 91]. On September 17, 2010, the Committee filed an omnibus response to the motions to dismiss and the extension motion [Adv. Pro. No. 10-02125, ECF No. 102]. A hearing on the motions to dismiss was held on September 29, 2010.

Prior to oral argument, the Committee agreed to enter into a stipulation with defendant Kendall, whereby the Committee would clarify one definition in the Amended Falcone Complaint and Kendall would answer the Amended Falcone Complaint within 21 days. Kendall filed its answer to the Amended Falcone Complaint, along with a jury demand, on October 29, 2010 [Adv. Pro. No. 10-02125, ECF Nos. 118, 119].

At oral argument, defendant Vizcaya in Kendall Community Development District ("Vizcaya") argued that the Committee had failed to set forth sufficient detail as to the monies paid by the Debtors and the monies received by Vizcaya. The Bankruptcy Court granted Vizcaya's motion to dismiss in part from the bench and granted the Committee leave to file a further amended complaint for the limited purpose of adding allegations with respect to the alleged fraudulent transfer to Vizcaya. On September 30, 2010, the Bankruptcy Court entered an order [Adv. Pro. No. 10-02125, ECF No. 104] granting Vizcaya's motion to dismiss in part.

vi.        **The Second Amended Falcone Complaint**

On October 13, 2010, the Committee filed a second amended complaint (the "Second Amended Falcone Complaint") [Adv. Pro. No. 10-02125, ECF No. 109]. Vizcaya filed its answer to the Second Amended Falcone Complaint, along with a jury demand, on October 28, 2010 [Adv. Pro. No. 10-02125, ECF Nos. 115, 116].

On November 3, 2010, the Committee and certain of the Falcone Action Defendants filed a stipulation to extend the deadline for certain of the Falcone Action Defendants to answer or otherwise file a responsive pleading to the Second Amended Falcone Complaint through and including November 8, 2010 [ECF No. 121]. The stipulation was approved by the Bankruptcy Court on November 4, 2010 [ECF No. 122]. On November 8, 2010, the defendants subject to the stipulation order filed an answer to the Second Amended Falcone Complaint, along with a jury demand [ECF Nos. 124, 125].

Pursuant to the Bankruptcy Court's order dated April 21, 2011 [Adv. Pro. No. 10-02125, ECF No. 144], the Falcone Action has been stayed pending the outcome of mediation in the Fiduciary Duty Action and other matters. The Falcone Action was further stayed by orders entered on November 23, 2011; June 21, 2012; September 24, 2012; November 14, 2012; December 17, 2012; and February 12, 2013 [Adv. Pro. No. 10-02125, ECF Nos. 151, 155, 159, 163, 167, 171].

e.        **The Durgin Lawsuit**

TOUSA was previously a defendant in a class action lawsuit pending in the District Court that also named as defendants several of TOUSA's current or former officers, all of TOUSA's directors, TOSA, and the underwriters of certain of TOUSA's offerings (all such defendants, excluding TOUSA, the "Durgin Defendants"). The original consolidated complaint in the action alleged, among other things,

that TOUSA's public filings and other public statements were false and misleading. On January 30, 2008, TOUSA and other defendants filed motions to dismiss the original consolidated complaint on various grounds. On February 5, 2008, the District Court entered an order staying the action as to TOUSA pursuant to section 362 of the Bankruptcy Code. The action continued with respect to the other defendants.

### i.        Case History

On July 15, 2008, the District Court appointed Bricklayers & Trowel Trades International Pension Fund ("Bricklayers") as lead plaintiff. Bricklayers filed a consolidated amended class action complaint (the "Amended Durgin Complaint") on September 19, 2009. The only defendants named in the Amended Durgin Complaint were four of TOUSA's current or former individual officers. Accordingly, neither TOUSA nor any of the other thirty-eight Debtors in the Chapter 11 Cases is named as a defendant in the Amended Durgin Complaint. The name and case number of the action is *Durgin, et al., v. TOUSA, Inc., et al.*, Case No. 06-61844 (S.D. Fla.) (the "Durgin Lawsuit").

On November 21, 2008 and March 2, 2009, the defendants filed their respective motions to dismiss the Amended Durgin Complaint, and on September 21, 2009, the District Court entered an order granting the defendants' motions to dismiss due to various pleading deficiencies, but also granting Bricklayers leave to file a second amended complaint. According to the Debtors, the District Court found, among other things, that the Amended Durgin Complaint contained only conclusory allegations regarding the role the defendants played in the company, did not allege that the defendants were insiders who were directly involved in controlling the content of the statements at issue and did not allege the necessary facts to demonstrate that the defendants acted with scienter. Bricklayers chose not to file a second amended complaint and on October 22, 2009, the District Court entered a judgment in favor of the defendants. The parties each filed appeals with the Eleventh Circuit. The Eleventh Circuit subsequently granted defendant Tommy McAden's motion to dismiss the appeal as moot. Oral argument on the appeals was held on October 28, 2010. On February 18, 2011, the Eleventh Circuit affirmed the decision of the District Court.

### ii.       Access to Insurance

On March 25, 2008, the Debtors filed a motion with the Bankruptcy Court seeking relief from the automatic stay to permit the Debtors' primary directors' and officers' insurance carrier, Federal Insurance Company ("Federal") to advance and reimburse defense costs incurred by the Debtors and the Durgin Defendants in connection with the Durgin Lawsuit both prior to and during the Chapter 11 Cases, solely to the extent of coverage under the $15 million insurance policy issued to the Debtors by Federal (the "Federal Policy") [ECF No. 663]. On May 12, 2008, the Bankruptcy Court entered an order granting the motion and permitting Federal to advance up to $750,000 in defense costs [ECF No. 961].

The Bankruptcy Court entered supplemental orders on January 9, 2009, December 16, 2009 and October 29, 2010 authorizing Federal to advance and reimburse an additional $400,000, $2,000,000, $500,000 and $850,000, respectively, of defense costs to the Durgin Defendants [ECF Nos. 2351, 3419, 6234, 7828].

### f.        The EMF Lawsuit

On September 23, 2008, plaintiffs EMF Fund III, LLC, EMF Fund IV, LLC and EMF Fund V, LLC filed a lawsuit (the "EMF Lawsuit") against four of TOUSA's former Directors and Officers (the "EMF Defendants"). The lawsuit, which does not name TOUSA as a defendant, alleges that the plaintiffs entered into an option agreement with TOUSA based on allegedly false oral and written representations

attributed to the current or former individual officers.  The lawsuit was seeking damages, together with interest and costs in an unspecified amount.  The lawsuit is currently pending in the Broward Circuit Court as *EMF Fund III, LLC, et al., v. Antonio P. Mon, et al.*, No. 0845087 (Fla. Cir. Ct.).

On December 24, 2008, the Debtors filed a motion with the Bankruptcy Court seeking relief from the automatic stay to permit Federal to advance and reimburse defense costs incurred by the Debtors and the EMF Defendants in connection with the EMF Lawsuit, solely to the extent of coverage under the Federal Policy [ECF No. 2296].  On January 9, 2009, the Bankruptcy Court entered an order granting the motion and permitting Federal to advance up to $450,000 in defense costs [ECF No. 2351].  The Bankruptcy Court entered a supplemental order on December 16, 2009 authorizing Federal to advance and reimburse an additional $1.5 million of defense costs to the EMF Defendants [ECF No. 3419].

The defendants filed motions to dismiss and oral argument was heard on August 21, 2009.  The motions to dismiss were denied without prejudice on May 27, 2010.  The plaintiff served discovery requests on TOUSA and the defendants on June 6, 2010 and June 21, 2010, respectively.  Following the hearing on the motions to dismiss, the parties engaged in mediation.  On November 3, 2010, the parties signed a settlement agreement, pursuant to which the parties agreed to release each other from all claims in exchange for a payment of $1,175,000 (the "<u>EMF Settlement Amount</u>") to the plaintiffs to be paid by Federal.  On December 29, 2010, the Debtors filed a motion seeking relief from the automatic stay to permit Federal to pay the EMF Settlement Amount [ECF No. 6582].  The Bankruptcy Court entered an order granting the motion on January 14, 2011 [ECF No. 6726].

### g.        The Krieff Litigation

Robert Krieff ("<u>Krieff</u>") was the Tampa Division president of TOUSA Homes Florida, L.P. from July 2005 to June 2006 pursuant to an employment agreement dated July 28, 2005 (the "<u>Krieff Employment Agreement</u>").  Krieff and TOUSA Homes Florida, L.P. were also parties to an agreement to arbitrate claims, and upon the termination of Krieff's employment with the Debtors, Krieff filed a demand for arbitration against TOUSA Homes Florida, L.P. alleging a breach of the Krieff Employment Agreement for improper termination.  On November 16, 2007, the arbitrator issued her findings of fact and interim award (the "<u>Interim Award</u>"), providing that Krieff was entitled to damages from TOUSA Homes Florida, L.P. in the amount of $632,599. Although the Interim Award was provisional in nature and TOUSA Homes Florida, L.P. put forth numerous objections, the Broward Circuit Court made an oral ruling on December 4, 2007 that the Interim Award would be treated as final and would be confirmed.  On December 7, 2007, TOUSA Homes Florida, L.P. filed a motion to reconsider the decision confirming the arbitrator's award, but on December 17, 2007 the Broward Circuit Court entered a final judgment confirming the interim arbitration award (the "<u>Circuit Court Judgment</u>").

On December 20, 2007, Krieff served a writ of garnishment (the "<u>Writ</u>") on Wachovia Bank, N.A. ("<u>Wachovia</u>") seeking to collect on the Circuit Court Judgment.  Wachovia answered the Writ on January 11, 2008 and made clear that it would comply with the Writ.  The amount retained by Wachovia pursuant to the Writ was $632,599 (the "<u>Garnished Funds</u>").  On January 16, 2008, TOUSA Homes Florida, L.P. appealed the Circuit Court Judgment to the Fourth District Court of Appeals of Florida, which appeal has been stayed as a result of the Chapter 11 Cases.

Krieff subsequently attempted to seek relief from the automatic stay in the Chapter 11 Cases by filing a motion in the Bankruptcy Court on February 29, 2008.  The Bankruptcy Court entered an order denying the stay motion on March 26, 2008 [ECF No. 668].  On April 1, 2009, TOUSA and TOUSA Homes Florida, L.P. commenced an adversary proceeding in the Bankruptcy Court to recover the Garnished Funds [Adv. Pro. No. 09-01303, ECF No. 1].  On March 5, 2010, TOUSA and TOUSA Homes Florida, L.P. filed a motion for summary judgment seeking an order, among other things, avoiding

Krieff's judicial lien pursuant to sections 547 and 550 of the Bankruptcy Code, dissolving the Writ and instructing Wachovia to release the Garnished Funds [Adv. Pro. No. 09-01303, ECF No. 30]. On June 7, 2010, the Bankruptcy Court entered an order granting the motion for summary judgment and rendering judgment against Krieff [Adv. Pro. No. 09-01303, ECF No. 42]. According to the Debtors, Krieff continues to have two filed Proofs of Claim (Claims 1822 and 1823), each in the amount of $632,599, that are subject to the terms of the order granting the Debtors summary judgment. Pursuant to the First Omnibus Claims Objection (as defined herein), the Debtors have objected to Claim 1823 on the basis that it is duplicative of Claim 1822. By agreement among the Debtors and Krieff, the Debtors' objection to Claims 1823 has been adjourned to an omnibus hearing date to be determined by the Debtors and Krieff.

### h.     Procedures for the Settlement of Certain Actions

In connection with the sale of homes in the ordinary course of their business, the Debtors routinely entered into contracts with third parties for the purchase of a home that required such purchasers to place a deposit into an escrow account pending the closing of the sale. The purchase agreements for these home sales typically included provisions that governed the return of a deposit in the event the closing on the home did not take place.

During the course of the Chapter 11 Cases, the Debtors initiated several adversary proceedings in the Bankruptcy Court through the Debtors' special counsel, Greenberg Traurig LLP ("Greenberg Traurig"), to recover customer deposits that were held in escrow and subject to bona fide dispute. Additionally, several customers commenced adversary proceedings against certain of the Debtors seeking return of customer deposits (collectively, the "Deposit Actions").

Given the substantial number of potential Deposit Actions, on March 4, 2009, the Debtors filed a motion to establish settlement procedures for the settlement of de minimis actions and with respect to the Deposit Actions (the "Settlement Procedures") to avoid the expense and delay that would be associated with filing individual, and likely repetitive, pleadings [ECF No. 2535]. Pursuant to the Settlement Procedures, the Debtors have the authority to negotiate and settle actions in connection with the daily operations of the Debtors' business (including the Deposit Actions), regardless of the amount of the action, upon notice to certain parties, including the Committee, without further intervention by the Bankruptcy Court. The Debtors were required to provide notice of each proposed settlement to counsel for the Committee, the U.S. Trustee, counsel for the First Lien Agents and counsel for the Second Lien Term Loan Agent, with each such party given an opportunity to review and object to such proposed settlement. On March 26, 2009, the Bankruptcy Court entered an order approving the Settlement Procedures [ECF No. 2630]. As of January 31, 2013, the Debtors had settled de minimis actions totaling approximately $1,222,479.50 pursuant to the terms of the Settlement Procedures Order and received a total of $861,083.50 in settlement payments.

The Debtors filed a total of 1,514 adversary proceedings to recover preferential transfers in the Chapter 11 Cases. On June 5, 2009, the Debtors filed a motion to establish efficient and cost-effective procedures for settlement of preference actions [ECF No. 2844], which the Bankruptcy Court granted by order entered July 14, 2009 [ECF No. 2979] (the "Preference Settlement Procedures Order"). The Preference Settlement Procedures Order required the Debtors to seek court approval for the settlement of preference claims where the amount demanded was greater than $250,000. On August 30, 2010, the Debtors filed an agreed *ex parte* motion to amend the Preference Settlement Procedures Order to allow settlement of preference claims without court approval where the amount demanded was greater than $1,000,000, which the Bankruptcy Court granted by order entered September 22, 2010 [ECF No. 6108]. On October 14, 2010, the Debtors filed a second agreed *ex parte* motion to amend the Preference Settlement Procedures Order to allow settlement of preference claims without court approval where the

amount demanded was greater than $2,000,000 [ECF No. 6165]. The Bankruptcy Court granted the motion by order entered January 12, 2011 [ECF No. 6681].

On August 27, 2012, the Bankruptcy Court entered the *Order Granting Debtors' Motion for Order Authorizing and Approving Sale of Certain Judgments Free and Clear of All Liens, Claims and Encumbrances Pursuant to 11 U.S.C § 363* (the "Sale Order") [ECF No. 8810], whereby certain of the Debtors (the "Sellers") were given authority to sell to Oak Point Partners, Inc. ("Oak Point") such Sellers' respective rights, title and interests in default judgments (the "Default Judgments") entered against the defendants in the preference action brought by the Sellers. The Sale Order authorized the Sellers, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to sell the Default Judgments to Oak Point upon immediate payment of $300,000. Pursuant to the purchase agreement between the Sellers and Oak Point, in the event Oak Point recovers in excess of $300,000 net of bona fide actual, reasonable and documented collections fees and costs in connection with the Default Judgments (such excess amount, the "Net Recovered Amount"), Oak Point shall pay to the Sellers, within 5 business days of such recovery, an amount equal to twenty percent of the Net Recovered Amount in excess of $300,000 (the "Supplemental Payments"). Berger Singerman LLP ("BSLLP"), counsel for the Debtors (which includes the Sellers), shall receive 27.5% of the Initial Payment and 27.5% of any Supplemental Payments paid by the Purchaser to the Seller. The Sellers shall make such payments to BSLLP within 5 days of receipt from Oak Point.

As of January 31, 2013, 431 default judgments in preference actions commenced by the Debtors have been entered, in the aggregate total judgment amount of $45,984,687.76, and the Debtors have collected in full on one of the default judgments, in the gross amount of $30,990.00.

As of January 31, 2013, the Debtors have settled a total of 1,297 preference actions, resulting in aggregate recoveries in the amount of $18,062,091.11, with $4,974,575.06 having been paid or payable to BSLLP on account of legal fees (resulting in net recoveries of $13,087,516.06). The gross amount of potential prepetition preferential transfers relating to these settlements was $183,267,784.14. As of January 31, 2013, funds received and held in the Debtors' segregated preference trust account and in the segregated trust fund account at BSLLP totaled $10,043,206.92 (net of certain professional fees required to be funded from preference recoveries per the Cash Collateral Orders) and $36,977.39, respectively.

As of January 31, 2013, the Debtors have disbursed a total of $2,191,721.24 in funds from the segregated preference trust account for professional fees incurred by the Committee in connection with the Committee Action and the appeals related thereto, as provided for by the Ninth Final Cash Collateral Order.

    **i.**    **Chinese Drywall**

    **i.**    **Background Information**

Beginning in 2005, as a result of a shortage in construction materials, hundreds of millions of square feet of drywall manufactured in China ("Chinese Drywall") were imported into the United States and were used to rebuild and repair houses in coastal areas of the United States, including certain homes manufactured by the Debtors. Following the installation of Chinese Drywall, certain homeowners began to complain of property damage (and in some cases physical afflictions) allegedly caused by inherent defects in Chinese Drywall.

On or about March 17, 2009, TOUSA issued a press release regarding its investigation surrounding inquiries concerning the use of Chinese Drywall. In this press release, TOUSA acknowledged that its initial findings suggested that a small number of homes constructed under the

"Engle Homes" brand may have used Chinese Drywall and that they were working to develop a plan to assist the affected homeowners.

Following their announcement of their investigation into the use of Chinese Drywall and the filing of hundreds of Proofs of Claim related thereto (discussed in further detail below), the Debtors, together with the Committee, worked to develop a global strategy with respect to the Chinese Drywall Claims (defined below). The Debtors' analysis included a review and discussion with their insurance carriers (the "Debtor Insurers") to determine the scope and availability of insurance proceeds for Chinese Drywall Claims.

### ii.    Chinese Drywall Litigation and Proofs of Claim

In August 2009, certain homeowners and other parties petitioned the Bankruptcy Court for relief from the automatic stay to pursue pending state court litigation against the Debtors arising from their alleged use of Chinese Drywall [ECF Nos. 3044 and 3103]. The Debtors filed an omnibus response to such motions on September 21, 2009 [ECF No. 3196]. On September 23, 2009, the Bankruptcy Court entered an order denying the relief requested in such motions, but encouraged the Debtors to push forward with negotiations in an effort to resolve Chinese Drywall Claims [ECF No. 3206].[17]

On March 1, 2010, the Bankruptcy Court entered an order establishing May 14, 2010 (the "Customer Claims Bar Date") as the deadline for customers that purchased homes from the Debtors to file Proofs of Claim against the Debtors [ECF No. 5123] (the "Customer Bar Date Order"). The Customer Bar Date Order expressly provided that the Customer Claims Bar Date applied to claims on account of damages or injuries allegedly caused by Chinese Drywall.

Numerous parties (collectively, the "Chinese Drywall Claimants" and each such claim, a "Chinese Drywall Claim") filed Proofs of Claim related to damages resulting from the Debtors's alleged use of Chinese Drywall had been filed against the Debtors.[18] As of the date of the Plan, approximately 162 Proofs of Claim in respect of Chinese Drywall Claims have been filed against the Debtors. In addition, several parties commenced actions against certain Debtors in state and federal court seeking damages on account of Chinese Drywall Claims.

In addition, on August 10, 2010, certain Chinese Drywall Claimants filed a motion with the Bankruptcy Court to certify a class of Chinese Drywall Claims [ECF No. 5941], which motion has been adjourned to a date to be determined and is now moot, as discussed in section V.G.3.i.iii below.

---

[17] *See In re TOUSA, Inc.*, Case No. 08-10928, Hr'g Tr. 29:20-24 (Bankr. S.D. Fla. Sept. 23, 2009).

[18] Certain homeowners and other parties sought permission to file late Proofs of Claim against the Debtors on the grounds that such claimants became aware of personal injury and/or property damage to their homes after the deadline to file Proofs of Claim in the Chapter 11 Cases had passed. In an effort to resolve such motions seeking authority to file late Proofs of Claim, the Debtors have entered into agreements with the parties seeking to file such late Proofs of Claim. *See, e.g., Agreed Order Granting in Part Ana Maria Plaza's Motion for Entry of an Order Allowing Late Filed Proof of Claim*, dated July 1, 2009 [ECF No. 2919]; *Agreed Order Resolving Motion for Entry of an Order Allowing Late Filed Class Proof of Claim*, dated March 23, 2010 [ECF No. 5272]; *Agreed Order on Motion of Certain Chinese Drywall Claimants for Entry of an Order Deeming Proofs of Claim to Be Timely Filed*, dated February 1, 2011 [ECF No. 6868]; *Agreed Order Resolving Motion of Billy Bradford Welch and Kay Karl Welch for Entry of an Order Allowing Late Filed Proof of Claim*, dated August 25, 2011 [ECF No. 8078].

iii.        **MDL Settlement Agreement Resolving Chinese Drywall Claims**

On June 15, 2009, the United States Judicial Panel on Multi-District Litigation ordered the transfer and consolidation of ten federal cases alleging damages related to the use of Chinese Drywall to the United States District Court for the Eastern District of Louisiana (the "Chinese Drywall Court") before Judge Eldon E. Fallon. The consolidated litigation was designated as a multidistrict litigation pursuant to 28 U.S.C. § 1407 and styled *In re Chinese Manufactured Drywall Products Liability Litigation*, Case No. 2:09-md-02047-EEF-JCW, MDL No. 2047 (the "Chinese Drywall MDL").[19] Following consolidation of the Chinese Drywall MDL, thousands of additional claimants joined as parties to the litigation through omnibus class action complaints asserted by a plaintiffs' steering committee appointed by the Chinese Drywall Court.

On December 2, 2011, after more than two years of contentious and costly litigation, Judge Fallon directed counsel for all parties in the Chinese Drywall MDL to mediate the litigation with John Perry (the "Chinese Drywall Mediator") in an effort to reach global resolution.[20] In connection therewith, on December 15, 2011, Judge Fallon ordered that all installers, builders and suppliers submit a confidential mediation affidavit indicating the number of residences for which each such party may have responsibility with respect to the use of Chinese Drywall (the "Chinese Drywall Mediation Order").[21] Moreover, each insurer for a builder that was no longer in business or could not be found was required to provide a similar affidavit regarding its insured to the best of such insurance carrier's knowledge, information and belief.[22]

Following the entry of the Chinese Drywall Mediation Order and negotiations related thereto, the Debtor Insurers, who were parties to the Chinese Drywall MDL, contacted certain Debtors who were not previously involved in the Chinese Drywall MDL (specifically, TOUSA, TOUSA Homes, Inc. and TOUSA Homes Florida, L.P.) (collectively, the "Chinese Drywall Debtor Parties") to request certain information related to such Debtors' use of Chinese Drywall. The Debtor Insurers then provided such information to the Chinese Drywall Mediator, as required by the Chinese Drywall Mediation Order, and reported the number of residences for which the Chinese Drywall Debtor Parties may have liability on account of Chinese Drywall Claims. Upon receipt of such information, the Chinese Drywall Mediator invited the Chinese Drywall Debtor Parties to participate directly in the Chinese Drywall MDL as defendants along with the other participating defendants (collectively, the "Chinese Drywall Participating Defendants"). In consultation with the Committee, the Chinese Drywall Debtor Parties engaged in the mediation and settlement negotiations related to the Chinese Drywall MDL.

In May 2012, after five months of mediation and negotiations, the terms of a settlement agreement (the "Chinese Drywall Settlement Agreement," and such settlement, the "Chinese Drywall Settlement") were finalized. The Chinese Drywall Settlement Agreement includes approximately 580 Chinese Drywall Participating Defendants, approximately 80 insurers ("Chinese Drywall Participating Insurers") and a nationwide class of claimants with claims, known or unknown, arising from, or related to, actual or alleged use of Chinese Drywall (such class members, the "Chinese Drywall Class Members").

---

[19] In addition to the original ten actions that were consolidated, numerous other federal actions were treated as tag-along actions pursuant to Rules 7.4 and 7.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001).

[20] *In re Chinese Mfd. Drywall Prods. Liab. Litig.*, MDL No. 2047 (E.D. La. Dec. 2, 2011).

[21] *In re Chinese Mfd. Drywall Prods. Liab. Litig.*, MDL No. 2047 (E.D. La. Dec. 15, 2011).

[22] *Id.*

On May 31, 2012, the Chinese Drywall Court granted preliminary approval of the Chinese Drywall Settlement Agreement.  On July 3, 2012, the Debtors filed a motion in the Bankruptcy Court for the approval of the Chinese Drywall Settlement Agreement [ECF No. 8702], which motion was granted by order entered on July 20, 2012 [ECF No. 8771].

The Chinese Drywall Settlement Agreement provided for an aggregate payment of $80 million to Chinese Drywall Class Members (the "Chinese Drywall Cash Payment").  The Chinese Drywall Debtor Parties' share of the Chinese Drywall Cash Payment, which included contributions by the Debtor Insurers, was $1,422,000.[23]  In consideration for the Chinese Drywall Cash Payment, and subject to the ability to opt out (as explained below), the Chinese Drywall Settlement Agreement provided the Chinese Drywall Participating Defendants and the Chinese Drywall Participating Insurers with a full release from claims relating to Chinese Drywall.  The Chinese Drywall Settlement Agreement further precluded all Chinese Drywall Class Members who did not opt out of the Chinese Drywall Settlement by September 29, 2012 from asserting any claims against Chinese Drywall Participating Defendants or Chinese Drywall Participating Insurers.

As of September 29, 2012, approximately 35 Chinese Drywall Class Members had opted out of the Chinese Drywall Settlement.  The Debtors engaged in discussions with counsel for such members, and, as a result, all opt outs have been timely rescinded.

On November 13, 2012, Judge Fallon held a final hearing to consider approval of the Chinese Drywall Settlement Agreement and ordered that the parties endeavor to resolve any outstanding objections that had been filed in connection with the Chinese Drywall Settlement Agreement.  All outstanding objections were resolved out of court, and on February 7, 2013, Judge Fallon entered an order approving the Chinese Drywall Settlement Agreement and other settlement agreements related thereto.  The appeal period for such order expired on March 11, 2013.  The Chinese Drywall Participating Defendants are required to pay their share of the Chinese Drywall Cash Payment within 15 days of the expiration of the appeal, which payment was made on March 19, 2013.  Accordingly, on April 5, 2013, the Debtors filed a motion in the Bankruptcy Court seeking to disallow and expunge all Proofs of Claim filed in connection with Chinese Drywall.

### j.    The Lake Las Vegas Litigation

In June 2005, LLV-1, LLC ("LLV") and TOUSA Homes, Inc. entered into a Purchase Agreement and Escrow Instructions (as amended, the "LLVR Purchase Agreement"), whereby TOUSA Homes, Inc. agreed to purchase certain real property in Henderson, Nevada at the Lake Las Vegas Resort (the "LLVR Property") from LLV for $81 million.  The LLVR Property was split into two phases for sale.  After closing on the first phase of the LLVR Property, at LLV's request, TOUSA Homes, Inc. began construction on the Lake Las Vegas Resort project (the "LLVR Project").  In connection therewith, TOUSA Homes, Inc., as general contractor, subcontracted with Las Vegas Paving Corporation ("Las Vegas Paving") to provide certain materials, labor and equipment associated with the construction at the LLVR Project (the "Construction Agreement").

---

[23] As a result of additional Chinese Drywall Participating Defendants becoming parties to the Chinese Drywall Settlement Agreement, more than the $80 million originally committed for the Chinese Drywall Settlement was raised and, accordingly, the share of the Chinese Drywall Cash Payment owed by the Chinese Drywall Debtor Parties and the Debtor Insurers was decreased to $1,244,250.

### i.    The LLV Action

On May 25, 2007, LLV brought an action against TOUSA Homes, Inc. in the District Court for Clark County, Nevada (the "LLV Action") alleging that TOUSA Homes, Inc. had breached the terms of the LLVR Purchase Agreement by failing to close on the second phase of the LLVR Property, thereby forfeiting a deposit in the amount of $2.025 million (the "Escrow Deposit").  On July 5, 2007, TOUSA Homes, Inc. filed its answer, counterclaim and third-party complaint in the LLV action, alleging claims against LLV for, among other things, breach of contract, breach of the covenants of good faith and fair dealing and specific performance, and seeking return of the Escrow Deposit, plus interest.  On July 17, 2007, LLV filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the District of Nevada (the "Nevada Bankruptcy Court").  Following its chapter 11 filing, LLV removed the LLV Action to the Nevada Bankruptcy Court, where it is currently pending as Adv. Pro. No. 08-01418-LBR.

On September 9, 2009, the Debtors filed a motion [ECF No. 3169] seeking Bankruptcy Court approval of a settlement agreement (the "LLV Action Settlement Agreement"), whereby TOUSA Homes, Inc. and LLV agreed to settle the LLV Action based on the following terms: (i) the Escrow Deposit was divided between the parties, with LLV receiving approximately $1,097,930 and TOUSA Homes, Inc. receiving approximately $1,135,000, (ii) TOUSA Homes, Inc. agreed to withdraw its proofs of claim filed in LLV's chapter 11 cases with prejudice and (iii) TOUSA Homes, Inc. and LLV agreed to dismiss the LLV Action with prejudice.  Further, LLV, LLV's prepetition lenders and TOUSA Homes, Inc. agreed to release one another from all claims related to the LLV Action, but expressly reserved the parties' rights with respect to the Las Vegas State Court Action (as described in the next section).  On September 23, 2009, the Bankruptcy Court entered an order approving the LLV Action Settlement Agreement [ECF No. 3205].

### ii.    The Las Vegas State Court Action

On January 16, 2008, Las Vegas Paving commenced the action styled *Las Vegas Paving Corporation v. Engle Homes Nevada, LLC, et al.*, Case No. A555448 pending in the District Court for Clark County, Nevada (the "Las Vegas State Court Action"), against, among other entities, TOUSA Homes, Inc.  Pursuant to the Las Vegas State Court Action, Las Vegas Paving seeks payment of approximately $1.3 million under the Construction Agreement, alleging claims of breach of contract and unjust enrichment and seeking to foreclose on an asserted mechanic's lien.  On May 29, 2008, TOUSA Homes, Inc. filed a cross-complaint and third-party complaint in the Las Vegas State Court Action, asserting a claim against LLV for the unpaid principal sum of approximately $7.6 million owed to TOUSA Homes, Inc. for the construction work performed by TOUSA Homes, Inc. as general contractor on the LLVR Project (the "Mechanics Lien Claim").  The amount of the Mechanics Lien Claim includes the full amount of Las Vegas Paving's Claim against TOUSA Homes, Inc., since Las Vegas Paving was acting as a subcontractor for TOUSA Homes, Inc. at the time it performed work on the LLVR Project.  The third-party complaint was subsequently amended to include causes of action against LLV's prepetition lenders for the imposition of an equitable lien, equitable subrogation, determination of lien priority and fraudulent conveyance.  As a result of TOUSA Homes, Inc.'s filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code, the Las Vegas State Court Action was stayed.  TOUSA Homes, Inc.'s third-party complaint against LLV in the Las Vegas State Court Action has been removed to the Nevada Bankruptcy Court and is currently pending as Adv. Pro. No. 09-01064-LBR.

On December 1, 2009, the Debtors filed a motion [ECF No. 3359] seeking Bankruptcy Court approval of a settlement agreement (the "Las Vegas State Court Action Settlement Agreement"), whereby LLV, LLV's prepetition lenders and TOUSA Homes, Inc. agreed to execute and file a stipulated judgment in the Las Vegas State Court Action resolving, in favor of TOUSA Homes, Inc., the dispute

over TOUSA Homes, Inc.'s and the LLV prepetition lenders' relative lien priorities and otherwise dismissing with prejudice all causes of action against LLV and LLV's prepetition lenders in the Las Vegas State Court Action. Such dismissal was without prejudice to TOUSA Homes, Inc.'s right to assert claims related to the amount of the Mechanics Lien Claim, which was to be determined in mandatory binding arbitration. The Las Vegas State Court Action Settlement Agreement also governed the apportionment of the Mechanics Lien Claim over parcels owned by LLV and provided a mechanism whereby LLV could exchange real property with third parties free and clear of the Mechanics Lien Claim provided that the real property received by LLV in the exchange became subject to the Mechanics Lien Claim. On December 17, 2009, the Bankruptcy Court entered an order approving the Las Vegas State Court Action Settlement Agreement [ECF No. 3420].

Subsequently, pursuant to the authority granted to the Debtors by the Bankruptcy Court order approving the Las Vegas State Court Action Settlement Agreement, TOUSA Homes, Inc. continued to negotiate a final resolution of its Mechanics Lien Claim with LLV and LLV's creditor trust (the "LLV Creditor Trust") formed pursuant to LLV's Third Amended Chapter 11 Plan of Reorganization proposed by Lake at Las Vegas Joint Venture, LLC, its Jointly Administered Chapter 11 Affiliates and the Official Committee of Unsecured Creditors Holding Unsecured Claims (the "LLV Plan," which plan was confirmed on July 1, 2010). In February 2012, the parties entered into the Agreement Resolving Claim of TOUSA Homes, Inc. against LLV-1, LLC (the "LLV Final Settlement Agreement"). Under the LLV Final Settlement Agreement, TOUSA Homes, Inc. received a general unsecured claim in the amount of $7 million and agreed to release its Mechanics' Lien Claim. The amount of a final distribution to TOUSA Homes, Inc. under the LLV Plan will depend upon resolution of pending litigation involving LLV and its principals in Nevada Bankruptcy Court. As of the date hereof, neither the Debtors nor the LLV Creditor Trust are able to estimate the timing of such distribution.

### k.    The Zuckerman Litigation

#### i.    Sale of Meadow Run Lots

Following oral arguments and briefing, on September 22, 2008, the Bankruptcy Court issued an order (along with a full opinion) authorizing TOUSA Homes, Inc. to sell 20 residential lots located in the community known as Meadow Run in Martin County, Florida ("Meadow Run") for an aggregate purchase price of $3 million [ECF No. 1803]. The Debtors' authority to consummate the sale was heavily contested by Meadow Run at Palm City, LLC ("Zuckerman") based on a contractual provision that prevented TOUSA Homes, Inc. from selling any Meadow Run lot for less than $325,000 so long as Zuckerman owned lots in Meadow Run. On September 23, 2008, following entry of the sale order, Zuckerman filed an election to appeal the order to the District Court [ECF No. 1814]. Notwithstanding such appeal, the Debtors consummated the sale of Meadow Run.

#### ii.    The Escrow Action

In addition to the dispute with Zuckerman concerning the property at Meadow Run, the parties were also engaged in litigation concerning that certain Agreement for Sale and Purchase of Real Estate, dated April 22, 2005, with respect to certain property in Collier County, Florida and a related purchase agreement, dated June 1, 2005. Specifically, The Zuckerman Group, Inc. commenced a state court action against TOUSA Homes, Inc. and ULT, seeking the return of certain escrowed funds totaling $850,000. Zuckerman filed a proof of claim based on its allegations in the state court action in the Chapter 11 Cases on May 6, 2008 in the amount of $850,000 (as amended, "Claim # 1931").

### iii.  The Settlement Agreement

On February 26, 2009, TOUSA Homes, Inc. and Zuckerman agreed to a resolution of both the appeal and the escrow action including, among other things, a release of $475,000 of the disputed amount held in escrow to Zuckerman, with the remaining deposit, including interest accrual thereon, distributed to TOUSA Homes, Inc., withdrawal of the appeal with prejudice and deemed disallowance of Claim # 1931. The Bankruptcy Court approved the settlement on March 26, 2009 [ECF No. 2629].  On April 6, 2009, the parties filed a joint motion to dismiss the appeal with prejudice, which the District Court granted on April 9, 2009.

### l.  The Trilogy Litigation

In October 2009, certain First Lien Term Loan Lenders filed a complaint in New York state court seeking to enforce the Intercreditor Agreement.  The action is styled as *Trilogy Portfolio Co. LLC v. Citicorp, N.A.*, No. 650619/2009 E (N.Y. Sup. Ct.) (the "Trilogy Action").  By the Trilogy Action, the plaintiffs sought a judicial declaration that the First Lien Revolver Lenders and the First Lien Term Loan Lenders are required to share any proceeds of collateral on a *pro rata* basis, regardless of whether the liens under the applicable agreements are avoided.  Specifically, the plaintiffs sought an order enjoining CitiCorp, as administrative agent under each of the first lien facilities, from making any distributions to the First Lien Revolver Lenders or the First Lien Term Loan Lenders until the court determined the obligations of the parties under the Intercreditor Agreement.  The First Lien Term Loan Lenders believed that the Trilogy Action was necessary because the First Lien Agents were not intending to honor the obligations of the Intercreditor Agreement.  By a stipulation dated July 15, 2010, the plaintiffs agreed to dismiss the Trilogy Action, based on an agreement that the First Lien Agents would hold all principal pay downs in escrow until an agreement could be reached.  The parties further agreed to meet and confer on any further principal pay downs and that any statute of limitations would be tolled until the earlier of (a) 30 days from resolution of all matters related to the Debtors' Chapter 11 Cases and (b) six years from the date of the stipulation.

On November 18, 2011, the Bankruptcy Court entered an order (the "Revolver Paydown Order") authorizing and directing the Debtors to pay to the First Lien Revolver Agent, the First Lien Revolver Lenders and any other party entitled to receive proceeds in respect of the First Lien Revolver Claims pursuant to the Intercreditor Agreement (i) the aggregate amount of $193,163,875.10, constituting the full principal amount outstanding under the First Lien Revolving Credit Agreement as of October 31, 2011 (the "Revolver Paydown") and (ii) the aggregate amount of $1,230,427.42, constituting the full amount of the non-default contract rate interest outstanding under the First Lien Revolving Credit Agreement as of October 31, 2011.  The Debtors paid such amounts to the First Lien Revolver Agent on November 21, 2011.

The Revolver Paydown Order approved the payment of the Revolver Paydown subject to the rights of the First Lien Revolver Agent, the First Lien Revolver Lenders and "third party beneficiaries under the [First Lien Revolving Credit Agreement], if any" to seek, in addition to certain other issues, payment of (i) non-default interest for the period from November 1, 2011 through the repayment date (November 21, 2011), and (ii) default interest.

Prior to and following the payment of the Revolver Paydown, certain of the First Lien Revolver Lenders, First Lien Term Loan Lenders and Second Lien Term Loan Lenders, including Monarch and Trilogy Portfolio Company LLC ("Trilogy"), engaged in negotiations in an attempt to resolve various issues arising under the Intercreditor Agreement with respect to the Revolver Paydown.  On or about December 5, 2011, First Lien Revolver Lenders holding a majority in amount of the First Lien Revolver Claims and First Lien Term Loan Lenders holding a majority in amount of the First Lien Term Loan

Claims entered into a settlement agreement (the "2011 Intercreditor Settlement Agreement") relating to the allocation of the Revolver Paydown, and directed the First Lien Agents to take certain actions to distribute the proceeds pursuant to such allocation.  Trilogy did not agree to the 2011 Intercreditor Settlement Agreement.

On or about December 13, 2011, the First Lien Revolver Agent, as defendant, joined by the First Lien Revolver Sub-Agent and the First Lien Term Loan Agent, as proposed intervenors, jointly filed a motion in the Trilogy Action seeking an order, among other things, (i) reinstating the Trilogy Action, (ii) allowing the First Lien Revolver Sub-Agent and First Lien Term Loan Agent to intervene in the Trilogy Action, (iii) declaring that the prior stipulations with Trilogy that were entered in the Trilogy Action were satisfied as a result of the 2011 Intercreditor Settlement Agreement and vacating such stipulations, and (iv) dismissing the Trilogy Action with prejudice.  The Trilogy Action was reinstated by stipulation of the parties, as so ordered by the New York state court on July 9, 2012.  On or about January 27, 2012, Trilogy filed a memorandum of law in opposition to the First Lien Agents' joint motion, and the First Lien Agents filed a reply on February 10, 2012.

Subsequently, by letter dated August 28, 2012, the parties agreed to mediate the dispute with Professor Jack Williams of Mesirow Financial Consulting, LLC, which commenced with an all-day mediation session on September 10, 2012 and continued thereafter.  As a result of such discussions, First Lien Revolver Lenders holding a majority in amount of First Lien Revolver Claims and First Lien Term Loan Lenders holding a majority in amount of First Lien Term Loan Claims, including Trilogy, Monarch and certain other lenders, entered into the Intercreditor Settlement Agreement, dated as of May 8, 2013, which is described in further detail in section VI.C.3.a.vi herein.  On or about May 10, 2013, counsel for Trilogy, the First Lien Revolver Agent, the First Lien Revolver Sub-Agent and the First Lien Term Loan Agent entered into a stipulation to discontinue the Trilogy Action with prejudice, which the New York state court so ordered on May 13, 2013.

### 4.    Indemnification Obligations with Respect to Directors and Officers and Insurance Relevant to Certain Litigation and Plan Releases

#### a.    The Debtors' Obligations to Indemnify Directors and Officers

TOUSA's certificate of incorporation requires TOUSA to indemnify the Directors and Officers against all costs related to certain suits to the fullest extent permitted under Delaware law.  Specifically, TOUSA must indemnify:

> Each person who was or is made a party . . . in any action, suit or proceeding . . . by reason of the fact that he or she . . . is or was or has agreed to become a director or officer of the Corporation . . . whether the basis of such proceeding is an alleged action in an official capacity as a director or officer, or in any other capacity while serving or having agreed to serve as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law. . . against all expense, liability and loss . . . reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to serve [as a director or officer].

*See* Certificate of Incorporation of TOUSA, Art. X, Sec. II(a).  These indemnification provisions may apply to pending litigation against certain Directors and Officers, including the Fiduciary Duty Action. The language in the certificate of incorporation allows the Directors and Officers to seek advancement of their defense costs before the final disposition of certain litigation if such an indemnified party provides TOUSA with an undertaking to repay in the event that such an indemnified party is found not to be

entitled to indemnification.  Certain of TOUSA's subsidiaries' formation documents also contain various indemnification provisions that also may be implicated by pending litigation.

Additionally, current and former members of the Board may have a right of indemnification pursuant to a director indemnification agreement that was executed by TOUSA and which provides, in relevant part, that TOUSA "shall indemnify and advance Expenses to the Indemnitee . . . to the fullest extent permitted by applicable law in effect."  Pursuant to this provision, directors can demand advancement of expenses within 10 days of the date such expense is incurred, but such expenses must be reimbursed to TOUSA if a director is found not to be entitled to indemnification.

Certain of the Directors and Officers have requested indemnification and/or the advancement of defense costs in connection with various litigations.  The Committee believes that all such claims for indemnification made by the Directors and Officers, to the extent they are found to be valid, constitute prepetition, unsecured claims.  The Debtors believe that the Directors and Officers may assert rights of setoff, recoupment or priority status with respect to any indemnification claims; the outcome of any resulting dispute would be determined by the Bankruptcy Court or any applicable appellate court.

### b.    The Debtors' Insurance Policies

The Plan contains provisions relating to the "D&O Liability Insurance Policies," which the Plan defines as all insurance policies for directors' and officers' liability maintained by the Debtors. Generally, the Debtors have a primary policy and several "excess" policies to cover losses, costs and expenses of the type incurred in connection with various litigations.  Additionally, the policies are "claims made," meaning that they cover only those claims made within the coverage period (and any claim that would relate back to such period if such claim is reported during an allowed runoff period).  The initial aggregate amount of coverage is believed to be $100 million.

### 5.    Review and Analysis of Prepetition Intercompany Transactions

In connection with the Committee Action, the Committee's professionals became concerned with the Debtors' ability to reconcile their prepetition books and records.  In the context of preparing to respond to discovery requests in the Committee Action, the Debtors and their restructuring advisor, Zolfo Cooper f/k/a Kroll Zolfo Cooper ("Zolfo Cooper"), undertook an analysis of intercompany claims and cash flow transactions among the Debtors.  On August 5, 2008, the Debtors and Zolfo Cooper made a presentation to representatives of the Committee and the Prepetition Secured Lenders, at which time the Debtors and Zolfo Cooper disclosed certain preliminary findings.

According to the Debtors, their intercompany accounts could be categorized generally as follows: payroll and payroll taxes, employee benefits, capitalized debt interest, insurance, royalty payments, vendor rebates, capital charges, cash sweeps (net of disbursements), land purchases/sales, intercompany loans and miscellaneous/other.  The Debtors kept journal-entry records of intercompany transactions in the ordinary course of their business.  In their preliminary review of the Debtors' books and records, Zolfo Cooper determined that there were over 400,000 journal-entry line items from the inception of TOUSA through the Petition Date.  The documents that support the journal entries, though available, are widely dispersed among various locations both within TOUSA's corporate division and at the various operating divisions.  According to the Debtors, upon further review, Zolfo Cooper learned and disclosed to creditors that certain supporting documents appeared to be held in off-site storage locations.

As explained in the August 5, 2008 presentation, Zolfo Cooper conducted a sample compilation of the Debtors' intercompany accounts for the month of August 2007, as a means toward understanding TOUSA's accounting processes and the recording of journal entries as related to intercompany

transactions.  According to the Debtors, as part of that endeavor, Zolfo Cooper compiled books detailing all journal entries and supporting documents by legal entity for the month of August 2007 and made those books available for review by the creditor- representatives who attended the August 5, 2008 meeting. According to the Debtors, Zolfo Cooper found that the Debtors' books and records, together with available supporting documentation, contained adequate information to allow them to create entity-by-entity intercompany transaction accounts for the month of August 2007.   Zolfo Cooper explained at the August 5, 2008 meeting that this reconciliation for one sample month took a team of reviewers four weeks to complete.

Historically, the Debtors' accounting system was set up by divisions and regional operating centers as opposed to by legal entity.  Nonetheless, according to the Debtors, the accounting system can be "mapped" to show the correspondence between the divisions/operating centers and the legal entities within the TOUSA group.   In the accounting system, intercompany transactions are created based on services performed, agreements among the Debtors and certain allocations from the "corporate" division (which maps to TOUSA as a legal entity).  In the ordinary course of the Debtors' business, journal entries were allegedly prepared by an employee in the accounting group.  The journal entries were purportedly reviewed by an approved reviewer and posted at least quarterly, although some entries were recorded on a monthly basis.  As set forth in the August 5, 2008 presentation, based upon Zolfo Cooper's review of the Debtors' books and records, it appeared that twenty-six of the thirty-nine Debtors had an intercompany balance (either positive or negative) as of the Petition Date.

According to the Debtors, they did not consistently reconcile their intercompany journal entries on a legal entity basis before the Petition Date.  Instead, the Debtors consistently treated the intercompany balances as equity investments.  As discussed in the Decision, the Debtors' filings with the SEC disclosed that the intercompany balances were recorded as equity investments.  *See* TOUSA, Consolidating Statement of Financial Condition (Form 10-Q) (June 30, 2007).  Based on (i) the Debtors' historical treatment of intercompany balances as equity investments and (ii) the Debtors' inability to fully reconcile the prepetition intercompany transactions, for purposes of maintaining postpetition books and records, the Debtors have assumed the intercompany balances to be zero as of the Petition Date.   Based on the findings in the Decision that the Prepetition Intercompany Claims are appropriately characterized as equity investments in the applicable Debtors, the Plan provides for treatment of Prepetition Intercompany Claims as equity.  Therefore, the Plan does not contemplate any distributions on account of Prepetition Intercompany Claims pursuant to the Plan.

In addition to intercompany accounts based on journal entries, the Debtors historically engaged in certain intercompany loan transactions.  Specifically, TOUSA Funding, LLC holds certain notes from TOUSA Texas, L.P. and TOUSA Homes, Inc.  The notes provide that they are interest-bearing.  In the ordinary course, TOUSA calculates the interest accrued based on the note balance, prepares the appropriate journal entries to reflect interest and posts them to the general ledger.  This practice is applicable to both prepetition and postpetition Intercompany Notes.   The Plan contemplates that Intercompany Notes will be honored.

Postpetition Intercompany Claims, which were documented as required by the financing orders, will be honored under the Plan and paid as administrative expenses to the extent not accounted for (i) in the RVA, as amended by the Committee[24] or (ii) in the Debtors' wind down forecast.

---

[24] In connection with the Quantification Motion (described in section V.G.2.n herein), several adjustments were made to the RVA, including, among other things: (i) excluding the 2008 Federal Tax Refund from the RVA, given that the Debtors' right to such funds did not yet exist on October 13, 2009; (ii) allocating the entirety of the 2007

H.    **OTHER DEVELOPMENTS DURING THE CHAPTER 11 CASES**

    1.    **Filing of the Debtors' Schedules and SOFAs, Bar Dates and the Claims Process**

        a.    **Debtors' Schedules of Financial Affairs and Statements of Liabilities and Assets**

On February 13, 2008, the Debtors filed their Schedules, which provide information concerning each Debtor's assets, liabilities (including accounts payable), Executory Contracts and other financial information as of the Petition Date, all as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. Certain of the Debtors amended and restated their respective Schedules on March 11, 2008. In addition, on October 7, 2008, certain of the Debtors amended and restated their Schedules to reflect postpetition developments, including the payment of certain prepetition claims pursuant to the relief granted in the First Day Orders and other orders in the Chapter 11 Cases.

On August 15, 2008, Beacon Hill filed its Schedules with the Bankruptcy Court.

        b.    **Establishment of the Initial Claims Bar Date**

On March 17, 2008, the Bankruptcy Court entered the Initial Claims Bar Date Order establishing, among other things, the Initial Claims Bar Date and the Governmental Bar Date [ECF No. 614].

In accordance with the Initial Claims Bar Date Order, the Debtors provided written notice of the Initial Claims Bar Date to all known potential creditors of the Debtors according to the Debtors' books and records at the time of mailing of the notice, including all litigation parties and homebuyers within the previous six years. The Debtors also provided written notice of the Initial Claims Bar Date, together with a "personalized" proof of claim form approved by the Bankruptcy Court, to each of the parties and entities identified as creditors on the Debtors' Schedules. The Debtors published notice of the Initial Claims Bar Date in the *Wall Street Journal* and twenty-nine local and trade publications circulated in each of the regions in which the Debtors operated.

        c.    **Additional Bar Dates**

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the last day on which each person or entity asserting a claim against Beacon Hill may file a Proof of Claim against Beacon Hill's Estate [ECF No. 1802].

On September 23, 2008, the Bankruptcy Court entered an order establishing October 22, 2008 as the deadline for (a) homeowners' associations to whom the Debtors have contractual or other obligations and (b) community development districts in which the Debtors own or have owned property to file a written Proof of Claim against any of the Debtors' Estates [ECF No. 1813].

---

Federal Tax Refund to TOUSA; (iii) adjusting the cash allocation in the RVA to eliminate the negative amount of operating cash allocated to TOUSA; and (iv) including in the RVA the additional funds the Conveying Subsidiaries became entitled to pursuant to the Bankruptcy Court Decision (namely, the reimbursement of principal, interest and fees by the Term Loan Lenders, the reimbursement of transaction and litigation costs out of amounts to be disgorged by the Transeastern Lenders, and prejudgment interest running from July 31, 2007 to October 13, 2009). *See* Quantification Motion, at 11-13. Additionally, further updates have been made to the RVA that were not filed with the Bankruptcy Court.

On March 1, 2010, the Bankruptcy Court entered orders establishing May 14, 2010 as the deadline for (i) customers asserting claims arising from or related to a signed agreement to purchase a home from, [or a home closed with], the Debtors before January 29, 2008 (or after January 29, 2008 to the extent the Debtors had not paid or honored such Claim during the Chapter 11 Cases) to file a written Proof of Claim against any of the Debtors' Estates (the "Customer Claims Bar Date") [ECF No. 5123]; (ii) third parties entitled to assert prepetition liens against the Debtors or their property under non-bankruptcy law to (a) file written proof of such liens or (b) take actions to perfect such liens under applicable non-bankruptcy law [ECF No. 5124]; and (iii) parties to file Proofs of Claim with respect to administrative expenses for goods provided or services rendered to the Debtors from the Petition Date through September 1, 2009 [ECF No. 5125]. Further, on September 22, 2010, the Bankruptcy Court entered an order granting the Debtors' *ex parte* motion and establishing November 15, 2010 as the deadline for the Miami-Dade Department of Environmental Resource Management to file a Proof of Claim against the Debtors [ECF No. 6108].

### d.    Claims Filed Against the Debtors

As of February 15, 2013, more than 10,160 Proofs of Claim had been filed against or scheduled by the Debtors on an aggregate basis, totaling approximately $7.5 billion in asserted liabilities. These Proofs of Claim are comprised of the following: approximately $11.7 million in Administrative Claims, $250.1 million in secured Claims, $79.6 million in priority Claims and $7.2 billion in Unsecured Claims. In addition, approximately 3,815 Claims have been asserted in "unliquidated" amounts or in amounts that contain an unliquidated component. Certain of these Claims may be duplicative, such that the total amount of Claims asserted against the Debtors is significantly less when allowance is made for duplicate Claims and unliquidated Claims as to which an estimate was provided or can fairly be interpreted. The Debtors continue to reconcile Claims, and the estimated Claim amounts will likely be adjusted.

### e.    Claims Objection Procedures

In light of the significant number of Claims that were filed or scheduled in the Chapter 11 Cases, on January 27, 2009, the Debtors filed a motion to establish a streamlined process for objecting to and responding to each Claim filed against the Debtors' Estates (with certain exceptions) [ECF No. 2400] (the "Claims Procedures Motion"). The Claims Procedures Motion reflected the Debtors' view that preparing and filing individual pleadings for each objection to a claim would be extremely time-consuming and expensive. On February 18, 2009, the Bankruptcy Court entered an order granting the relief sought in the Claims Procedures Motion [ECF No. 2468].

On February 17, 2010, the Debtors filed an omnibus objection to Claims [ECF No. 5091] (the "First Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 2,600 Claims based on 35 distinct categories of objections to Claims. The first order on the First Omnibus Claims Objection expunged or reduced approximately 1,960 Claims [ECF No. 5461]. The Bankruptcy Court has entered eleven additional orders granting the relief sought in the First Omnibus Claims Objection to the extent set forth therein [ECF Nos. 5523, 5579, 5667, 5788, 5991, 6130, 6291, 6440, 7577, 8523, 9008], resulting in 2,530 resolved Proofs of Claim. The hearing on the remaining Claims objected to in the First Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On January 24, 2011, the Committee filed an omnibus objection to Claims filed by the Transeastern Lenders [ECF No. 6796], whereby the Committee sought an order disallowing approximately 2,400 Claims related to the Committee Action. The hearing on the Committee's objection to such Claims has been adjourned to a future date to be determined by the Bankruptcy Court.

On March 16, 2011, the Debtors filed an omnibus objection to Claims [ECF No. 7132] (the "Second Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 1,610 Claims. The first order on the Second Omnibus Claims Objection expunged or reduced approximately 1,390 Claims [ECF No. 7578]. The hearing on the remaining Claims objected to in the Second Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On December 21, 2011, the Debtors filed an omnibus objection to Claims [ECF No. 8487] (the "Third Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 650 Claims. The first order on the Third Omnibus Claims Objection expunged or reduced approximately 630 Claims [ECF No. 8526]. The hearing on the remaining Claims objected to in the Third Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On March 27, 2012, the Debtors filed an omnibus objection to Claims [ECF No. 8591] (the "Fourth Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 250 Claims. The first order on the Fourth Omnibus Claims Objection expunged or reduced approximately 240 Claims [ECF No. 8675]. The hearing on the remaining Claims objected to in the Fourth Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On August 10, 2012, the Debtors filed an omnibus objection to Claims [ECF No. 8800] (the "Fifth Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 130 Claims. The first order on the Fifth Omnibus Claims Objection expunged or reduced approximately 70 Claims [ECF No. 8857]. The hearing on the remaining Claims objected to in the Fifth Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On October 22, 2012, the Debtors filed the *Motion to Expunge and Disallow Certain Claims Resolved Pursuant to Agreed Order Approving Settlement Procedures and Settlement Terms for Preference Actions* [ECF No. 8873], whereby the Debtors sought an order expunging and disallowing certain waived claims. The order with respect to such motion expunged approximately 30 Claims [ECF No. 8885].

On November 28, 2012, the Debtors filed an omnibus objection to Claims [ECF No. 8950] (the "Sixth Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 50 Claims. The first order on the Sixth Omnibus Claims Objection expunged or reduced approximately 40 Claims [ECF No. 9007]. On April 8, 2013, an additional order was entered with respect to the Sixth Omnibus Claims Objection reinstating 3 claims previously reclassified or disallowed and expunged pursuant to the previous order. The hearing on the remaining Claims objected to in the Sixth Omnibus Claims Objection has been adjourned to a future date to be determined by the Bankruptcy Court.

On March 1, 2013, the Debtors filed an omnibus objection to Claims [ECF No. 9045] (the "Seventh Omnibus Claims Objection"), whereby the Debtors sought an order denying, disallowing, expunging, reducing and/or reclassifying approximately 12 Claims. An order granting the relief requested in such motion was entered on April 8, 2013 [ECF No. 9111].

In addition, the Debtors have filed other motions, including certain motions related to the rejection of executory contracts, that have resulted in the denying, disallowing, expunging, reducing and/or reclassifying of Claims.

On April 22, 2013, the Debtors filed a motion to establish procedures to govern discovery, mediation and potential litigation with respect to certain adjourned claims [ECF No. 9140], which the Debtors assert will provide a streamlined and efficient procedure for final resolution of such claims. A hearing on such motion is currently scheduled for May 16, 2013.

### 2.    Employee Compensation and Changes in Management

The Debtors took the following steps to retain employees and management during the Chapter 11 Cases:

#### a.    Deferred Employee Compensation

On February 20, 2008, the Debtors filed a motion for authority to honor their prepetition deferred compensation obligations to their employees and associates [ECF No. 320]. Because some of the Debtors' employees typically received a portion of their compensation on an annual rather than a quarterly basis, as of the Petition Date, the Debtors owed a significant portion of their employees' compensation for performance during the 2007 calendar year. As stated in the motion, the Debtors believed that honoring their prepetition deferred compensation obligations was imperative to retain their core workforce during the reorganization process. Accordingly, on May 12, 2008, the Bankruptcy Court entered an order authorizing the Debtors, in their discretion, to pay up to $1,208,805 of outstanding prepetition deferred compensation obligations for the 2007 calendar year [ECF No. 950]. The amount authorized for payment did not reflect the entire balance of 2007 deferred compensation obligations. After negotiations with the Committee, the Debtors determined it was appropriate to pay only certain of the prepetition claims during the Chapter 11 Cases, and the Bankruptcy Court approved the reduced amount as described above.

#### b.    Senior Management

##### i.    Chief Executive Officer

On May 28, 2008, the Debtors filed a motion seeking authority to enter into an agreement with Antonio B. Mon (the "EVC Agreement"), then-chief executive officer, president and executive vice chairman of the Board [ECF No. 1086]. Pursuant to the EVC Agreement, Mr. Mon agreed to, among other things, relinquish his role as TOUSA's chief executive officer and remain solely in his position as executive vice chairman of the Board through the end of 2008. The Bankruptcy Court entered an order approving the EVC Agreement on June 11, 2008 [ECF No. 1184] (the "EVC Order"). The Debtors subsequently amended the EVC Order to permit Mr. Mon to serve as chief executive officer through August 2008 for the purposes of, among other things, finalizing and signing TOUSA's 2007 Form 10-K (which was filed on August 12, 2008) [ECF No. 1648]. In accordance with the EVC Order, Mr. Mon's position as executive-vice chairman of the Board of Directors concluded at the end of 2008. Mr. Mon remains a director of TOUSA.

On June 10, 2008, the Debtors filed an application seeking authorization to appoint John R. Boken of Zolfo Cooper as TOUSA's chief executive officer [ECF No. 1167]. Mr. Boken had previously been appointed the Debtors' chief restructuring officer pursuant to an order entered by the Bankruptcy Court [ECF No. 129]. On August 18, 2008, the Bankruptcy Court entered an order authorizing the Debtors to appoint Mr. Boken as chief executive officer [ECF No. 1647]. Mr. Boken has served as the Debtors' chief executive officer and chief restructuring officer since that time.

### ii.    Chief Financial Officer

On January 18, 2008, Stephen Wagman resigned as the Debtors' chief financial officer.  Tommy McAden — previously an executive vice president of TOUSA — subsequently replaced Mr. Wagman. Mr. McAden has served as an executive vice president and chief financial officer throughout the Chapter 11 Cases until leaving the Debtors' employ, effective March 31, 2011.  Mr. McAden was also the Treasurer of TOUSA and continues to be a member of the Board.

### iii.    Chief Operating Officer

In May 2005, George Yeonas became the Debtors' chief operating officer.  Mr. Yeonas served as the Debtors' executive vice president and chief operating officer throughout the Chapter 11 Cases until leaving the Debtors' employ on March 31, 2010.

### iv.    Executive Vice President and Chief of Staff

On February 13, 2008, the Debtors filed a motion for authority to enter into an amended employment agreement with Paul Berkowitz, who had served as TOUSA's executive vice president and chief of staff since January 1, 2007 [ECF No. 241].  As described in the motion, Mr. Berkowitz had planned to leave the Debtors' employ as of the chapter 11 filing and return to his previous employ as a shareholder at Greenberg Traurig, from which position he would continue to provide legal services to the Debtors as outside counsel.  Before the Petition Date, however, the U.S. Trustee indicated that it would object to any such arrangement on the ground that Greenberg Traurig would not be able to satisfy Bankruptcy Code retention requirements if it were to play a substantial role in the strategy or administration of the Chapter 11 Cases.  As a result, TOUSA requested that Mr. Berkowitz remain with the company, and modified employment terms were agreed to by the parties and approved by the Bankruptcy Court.  The Debtors subsequently determined that Mr. Berkowitz's services were no longer required and Mr. Berkowitz left TOUSA on December 31, 2009 and returned to Greenberg Traurig.

### c.    Incentive Plans

On April 8, 2009, the Debtors filed a motion to establish an associate incentive plan (the "Original Associate Incentive Plan") to incentivize their employees during the process of completing the development and sales of homes under construction, selling and delivering remaining inventory of pre-built homes and monetizing the Debtors' remaining land assets [ECF No. 2660].  The Original Associate Incentive Plan was proposed to be in effect from April 1, 2009 through March 31, 2010.  The Debtors asserted that the Original Associate Incentive Plan was necessary to encourage key employees to remain with the Debtors and to continue marketing the Debtors' assets in light of the virtual certainty that their jobs would be eliminated at some point.  On May 6, 2009, the Bankruptcy Court entered an order approving the Original Associate Incentive Plan [ECF No. 2746].

The Debtors did not simultaneously file a motion seeking to implement an incentive plan for their senior management because the Debtors and their major creditor constituencies were continuing to negotiate a management incentive plan.  Ultimately, on June 16, 2009, the Debtors, with the support of the Committee and their other major constituencies, filed a motion seeking to establish a management incentive plan (the "Original Management Incentive Plan" and, together with the Original Associate Incentive Plan, the "Original Incentive Plans") to incentivize three key members of senior management to remain with the Debtors during the monetization of the Debtors' remaining assets [ECF No. 2893].  The Original Management Incentive Plan was also proposed to be in effect from April 1, 2009 through March 31, 2010.  On July 16, 2009, the Bankruptcy Court entered an order approving the Original Management Incentive Plan [ECF No. 2985].

Following the implementation of the Original Incentive Plans, the Debtors reduced their workforce by 537 employees. However, 29 persons remained employed by the Debtors as of March 31, 2010. Accordingly, the Debtors began negotiating with the Committee and other parties in interest regarding extensions of the Original Incentive Plans for their remaining employees. On June 4, 2010, the Debtors filed a motion seeking to implement a revised incentive plan (the "Revised Incentive Plan") to incentivize their remaining employees through the conclusion of the monetization of the Debtors' assets and to thus maximize value for the Debtors' creditors for the period from April 1, 2010 through March 31, 2011 [ECF No. 5612]. On June 17, 2010, the Bankruptcy Court entered an order approving the Revised Incentive Plan [ECF No. 5659]. As of March 31, 2013, the Debtors had 3 employees.

**3.       Sales of Certain Assets**

As of the Petition Date, the Debtors maintained and controlled a wide array of assets, including real, personal and intangible property interests. As set forth below, the Debtors engaged in non-core asset sales immediately after the Petition Date in an effort to streamline their operations.

Beginning in March 2009, in the face of the prolonged and continued decline in the homebuilding industry and after consulting with and receiving the support of each of their major creditor constituencies, the Debtors shifted their focus away from build-to-order new sales and construction starts. Instead, the Debtors began focusing on closing sales of homes currently under construction, selling their remaining inventory of spec homes and monetizing their land assets over time. Consistent with this shift in strategy and their revised business plan, the Debtors engaged in two large asset sales with respect to the Debtors' assets in their Florida and Western Region markets.

**a.       Sales of Non-core Assets**

As of the Petition Date, the Debtors maintained and controlled a wide array of assets, including real, personal and intangible property interests. The Debtors' normal practice was to identify certain "non-core" assets unnecessary to the Debtors' business operations and to market those assets for sale. Such sales allowed the Debtors to streamline their operations by eliminating the cost of maintaining property not essential to their business, allowing for the purchase of other assets and improving their cash position. In addition, from time to time in the ordinary course of business, the Debtors would sell homes or lots on a bulk basis, in which many homes or lots were sold to a single investor. The Debtors believed that many of these asset sales (both non-core asset sales and bulk sales) were in the ordinary course of business and would not require a court order approving them; certain potential buyers and title insurers, however, indicated that they would require the Debtors to seek court approval for particular sales. In fact, at the outset of the Chapter 11 Cases, the Debtors did seek court approval of certain individual sales.

To continue selling non-core assets during the Chapter 11 Cases without the expense and inefficiency of filing numerous similar motions with the Bankruptcy Court, the Debtors filed a motion on February 13, 2008 to establish streamlined procedures for the sale of non-core assets during the Chapter 11 Cases [ECF No. 240] (the "Non-core Asset Sale Procedures"). The Debtors designed the Non-core Asset Sale Procedures to permit them to dispose of non-core assets and engage in bulk sales pursuant to section 363 of the Bankruptcy Code without further motion to the Bankruptcy Court. A particular sale qualifies for treatment under these procedures if, among other things, it is (a) for an aggregate sale price of no more than $15 million and (b) not subject to an objection by certain parties entitled to receive notice of each sale. On March 3, 2008, the Bankruptcy Court entered an order establishing the Non-core Asset Sale Procedures on an interim basis [ECF No. 495].

The Non-core Asset Sale Procedures have facilitated bulk sales in the ordinary course of the Debtors' business and have enabled the Debtors to shed certain non-performing assets and increase their

liquid cash assets throughout the Chapter 11 Cases.  As of February 25, 2012, the Debtors have generated approximately $230.2 million in cash pursuant to the Non-core Asset Sale Procedures and certain individual orders of the Bankruptcy Court authorizing bulk sales of property (which included the sale of the Debtors' Houston and Austin divisions).

### b.        Sale of Florida Assets

Historically, the Debtors' operations in the Florida region were among the Debtors' largest and most significant markets.  To facilitate the sale of the Debtors' property within the Florida region (the "Florida Assets"), the Debtors, together with their investment banker and financial advisors, engaged in an expansive and extensive marketing effort.  After contacting a total of 27 parties between February 2009 and May 2009 to determine interest with respect to the Florida Assets, the Debtors received offers from Starwood Land Ventures, L.L.C. ("Starwood") and, subsequently, from four additional interested parties, contemplating the purchase of substantially all the Debtors' unstarted lots within the Florida region that were not already under contract to other parties.

In July 2009, after consulting with their major creditor constituencies and analyzing each of the offers received, the Debtors and Starwood entered into a non-binding letter of intent, which contemplated the acquisition by Starwood of the Debtors' 5,499 unstarted lots and 36 model homes within the Florida region, plus licenses, contract rights and other property related to these assets, for a purchase price of $61,070,000.  Such letter of intent contemplated that the assets ultimately would be sold through a Bankruptcy Court-approved auction and sale process under section 363 of the Bankruptcy Code to ensure that the highest available purchase price was achieved and that the Debtors' stakeholders would receive a minimum level of recovery.

In October 2009, after rigorous arm's-length negotiations over both price and contract terms, TOUSA Homes, Inc. and TOUSA Homes Florida, L.P. entered into an Agreement for Purchase and Sale with Starwood (as subsequently amended, the "Starwood Agreement").  The Starwood Agreement required an immediate $2 million earnest money deposit and provided Starwood with an exclusive 30-day due diligence period.  Starwood agreed to serve as the "stalking horse" bidder for the property in exchange for certain protections such as a break-up fee and the reimbursement of certain expenses.  The Starwood Agreement contemplated detailed bidding procedures to govern the submission of competing bids for the property being sold and the auction, as well as procedures for the assumption of contracts in connection with the sale.

On November 30, 2009, the Debtors filed a motion seeking approval of certain bidding procedures, break-up fee and expense reimbursement pursuant to the Starwood Agreement, scheduling a hearing to consider approval of the sale of substantially all the Debtors' Florida assets and approving the sale of substantially all of the Florida Assets free and clear of any liens, claims, encumbrances and interests [ECF No. 3355].  The Bankruptcy Court entered an order granting the relief requested on December 21, 2009 [ECF No. 3432] (the "Starwood Bidding Procedures Order").

Pursuant to the Starwood Bidding Procedures Order, an auction was held on January 22, 2010 for the sale of all of the Florida Assets covered by the Starwood Agreement.  At the auction, Starwood became the winning bidder with an offer of $81,000,000.  Paulson RERF Acquisition Corporation ("Paulson") was selected as the back-up bidder at a purchase price of $80,500,000.  The Bankruptcy Court entered an order approving the sale to Starwood [ECF No. 5030].  The Starwood transaction closed in February 2010.

###### c.    Sale of Texas Assets

Historically, the Debtors had operations in three Texas markets: Austin, Houston and San Antonio.  Consistent with the Debtors' wind-down business plan, beginning in February 2009, the Debtors and Lazard contacted potential buyers for the Debtors' remaining assets in the Texas markets.  After receiving several preliminary proposals, only two buyers made offers to purchase the assets of all three Texas divisions.  Ultimately, the Debtors determined that value would be maximized if their Texas assets were sold by division rather than as a whole.

###### i.    Austin Division

Scott Felder Homes, LLC ("Felder") made an offer to purchase certain assets in the Debtors' Austin division pursuant to a takedown schedule for a total purchase price of $11,500,000.  On June 1, 2009, the Bankruptcy Court entered an order approving the sale of the Austin division to Felder [ECF No. 2829].  Following execution of the purchase agreement, Felder sought an amendment to the purchase agreement[25] modifying the takedown timeline in exchange for the payment of interest to the Debtors.  On April 26, 2010, the Debtors filed a motion seeking approval of the amendment to the Felder purchase agreement [ECF No. 5446].  On May 4, 2010, the Bankruptcy Court entered an order approving the amendment to the Felder purchase agreement [ECF No. 5515].

###### ii.    Houston Division

Moody Fedrick Holdings, LLC ("Moody") made an offer to purchase nineteen (of thirty-two) lots in the Debtors' Houston division for a purchase price of $8,800,000.  On June 1, 2009, the Bankruptcy Court entered an order approving the sale of such assets to Moody [ECF No. 2830].

Moody subsequently assigned its rights related to this transaction to Newmark Homes Houston LLC ("NHH").  Pursuant to the purchase agreement, the Debtors were permitted to continue to use the name "Newmark Homes" while their Nashville, Austin, Houston and San Antonio divisions were still operating during their respective wind-down periods, for a period not to exceed twelve months.  After such period, the name of the entity would be changed to TOUSA Texas, LP.  In January 2010, the Debtors began filing approximately 1,400 adversary complaints seeking to avoid and recover payments that were made by the Debtors to certain suppliers of NHH, causing NHH to face issues with suppliers who were confused by the use of the name "Newmark Homes" in the adversary complaints.  In settlement of threatened litigation with NHH, on June 30, 2010, the Debtors filed a motion seeking to confirm the change of the entity's name to TOUSA Texas, LP and to clarify that NHH is unrelated to the Debtors and is not a party to any of the avoidance actions [ECF No. 5707].  On August 17, 2010, the Bankruptcy Court entered an order granting the relief requested in such motion [ECF No. 5969].

###### d.    Sale of Mid-Atlantic Assets

Prepetition, the Debtors sold a significant portion of their assets in the Baltimore/Southern Pennsylvania, Nashville and Virginia markets (the "Mid-Atlantic Region") to NVR, Inc. ("NVR").  On May 4, 2009, pursuant to the Non-core Asset Sale Procedures (described in section V.H.3.a of this Disclosure Statement), the Debtors and NVR entered into a postpetition agreement for the sale of 57 finished lots in the Mid-Atlantic Region.  The sale was consummated on May 15, 2009.

---

[25] On or about May 20, 2009, Felder and the Debtors entered into the first amendment to the purchase agreement, which corrected certain scrivener's errors and did not materially alter the terms of the purchase agreement.

Subsequently, the Debtors approached a local developer and JNP Capital Management, L.L.C. ("JNP Capital") regarding a potential purchase of the Debtors' remaining assets in the Mid-Atlantic Region, consisting of fifteen finished and five unfinished lots (the "Remaining Mid-Atlantic Assets"). Because the construction and completion costs related to the Remaining Mid-Atlantic Assets (estimated at $1,230,000) far exceeded the market value of such assets and the return on any further investment would not have been realized until such assets were sold, the Debtors determined that value could be maximized by a sale of the Remaining Mid-Atlantic Assets to JNP Capital for a purchase price of $100,000. On September 9, 2009, the Bankruptcy Court entered an order approving the sale of the Remaining Mid-Atlantic Assets to JNP Capital [ECF No. 3173].

        **e.**        **Sale of Western Assets**

The Debtors' western region was comprised of five metropolitan markets including three in Colorado (Denver, Boulder and Colorado Springs), as well as Phoenix, Arizona and Las Vegas, Nevada. The Debtors have historically marketed their homes in this region (the "Western Assets") under the "Engle Homes" brand names.

        **i.**        **Initial Marketing Efforts**

The Debtors, in conjunction with the Committee's advisors, began an intensive marketing effort with respect to the Western Assets beginning in April 2009. In connection therewith, the Debtors contacted 42 potential buyers, including builders, developers, investors and brokers. Through this process, the Debtors entered into several one-off transactions with respect to certain portions of the Western Assets, including a sale of 60 lots in the "Sidehill Subdivision," located in Fort Collins, Colorado to Gino Campana [ECF No. 3382], as well as the sale of lots in the Colorado communities of Castlewood Ranch, Riverdale Park, Fox Meadow and Jasper Street to NexGen Lot Holdings, L.L.C. [ECF No. 3503].

        **ii.**        **The Paulson Agreement**

In mid-November 2009, the Debtors received an offer from Paulson that contemplated the purchase of substantially all the remaining Western Assets — approximately 8,277 unstarted lots and 22 models. Importantly, the offer included the Debtors' assets in a development known as Red River, described in further detail in section V.H.3.e.iii below. Subsequent to receiving Paulson's offer, the Debtors engaged in discussions with other potentially interested parties, but Paulson's offer remained the best and highest offer available. As a result, and following consultations with their major creditor constituencies, on March 4, 2010, TOUSA Homes, Inc., Engle Sierra Verde P5, LLC and Beacon Hill entered into a purchase and sale agreement with Paulson for substantially all of the remaining Western Assets (as subsequently amended, the "Paulson Agreement").

        **iii.**        **The Red River Property**

In March of 2005, TOUSA Homes, Inc. purchased approximately 4,025 acres of land, referred to as the "Red River Property," in Pinal County, Arizona. In connection with this purchase, TOUSA Homes, Inc. agreed to make certain payments to Pinal Development Advisory Services ("PDAS") and its wholly owned subsidiaries, Santa Rosa Water Company and Santa Rosa Utility Company, to provide utility services for the Red River Property. In conjunction with the agreement, TOUSA Homes, Inc. paid PDAS approximately $2.4 million and provided a letter of credit for approximately $9.6 million to secure its obligation to continue to make payments. TOUSA Homes, Inc. did not develop the Red River Property and, as a result, PDAS did not commence utility services. Shortly after the Petition Date and pursuant to the terms of the agreement between TOUSA Homes, Inc. and PDAS, PDAS drew down on the letter of credit. In total, PDAS received approximately $12.1 million from TOUSA Homes, Inc.

On December 18, 2009, TOUSA Homes, Inc. filed a complaint in Arizona Superior Court (the "Arizona Court") against PDAS and its subsidiaries seeking the return of the $12.1 million on the basis that PDAS was paid for work it never performed.  On February 8, 2010, PDAS filed a motion to dismiss the proceeding, claiming that it is entitled to all payments made because it has been, and remains willing, to perform on the contract and provide utility services for the Red River Property.  TOUSA Homes, Inc. and PDAS filed additional replies in further support of their positions on March 8, 2010 and March 31, 2010, respectively.

TOUSA Homes, Inc. and PDAS engaged in settlement negotiations, and the Arizona Court placed the matter on the inactive calendar without ruling on any motions.  Following entry into the Paulson Agreement, TOUSA Homes, Inc., Paulson and PDAS negotiated a settlement of the litigation, which is reflected in an "Amended Developer Payments Agreement."

### iv.    Approval of the Paulson Agreement

On June 28, 2010, the Debtors filed a motion to approve bidding procedures for the Western Assets, with Paulson serving as a stalking horse [ECF No. 5691].  As described in the motion, Paulson offered approximately $42 million for substantially all of the Western Assets, including the Red River Property.  On July 15, 2010, the Bankruptcy Court entered an order approving the proposed bidding procedures [ECF No. 5783].

The sale motion sought, among other things, approval for TOUSA Homes, Inc. to enter into the Amended Developer Payments Agreement with PDAS, which would be assumed by the purchaser of the Western Assets.  The Amended Developer Payments Agreement provided that upon Bankruptcy Court approval of the sale motion, TOUSA Homes, Inc. would dismiss its claims against PDAS with prejudice, and TOUSA Homes, L.P. and PDAS would release one another from all obligations relating to the Red River Property.  Further, PDAS would provide TOUSA Homes, Inc. with a refund payment of $2.5 million and the purchaser of the Red River Property would be obligated to make payments to PDAS.  On August 31, 2010, the Bankruptcy Court entered an order approving the sale of the Western Assets to Paulson in accordance with the Paulson Agreement [ECF No. 6058], and the sale of such property closed in late September 2010.

### 4.    Acquisition of Real Property

Before the Petition Date, the Debtors routinely entered into purchase agreements, land bank arrangements and option contracts that gave the Debtors the right, but not the obligation, to buy home sites at predetermined prices on a predetermined takedown schedule anticipated to be commensurate with home starts.  On June 25, 2008, the Debtors filed a motion for authority to establish streamlined procedures for the implementation of real property acquisitions in the ordinary course of the Debtors' business [ECF No. 1249] (the "Acquisition Procedures").  The Bankruptcy Court entered an order approving the Acquisition Procedures on July 15, 2008 [ECF No. 1390].  Upon information and belief, as of the date hereof, the Debtors have not acquired any property pursuant to the Acquisition Procedures.

### 5.    Changes in Certain Joint Ventures and Limited Liability Companies

### a.    The Sunbelt JV

In December 2004, TOUSA Homes, Inc. entered into a Joint Venture with Suntous Investors, LLC ("Suntous") to form Engle/Sunbelt Holdings, LLC (the "Sunbelt JV") to develop and deliver homes in the Phoenix, Arizona market.  TOUSA Homes, Inc. held a 49% voting interest and an 85% equity interest in the Sunbelt JV and was responsible for day-to-day management of the joint venture.  In

addition to capital contributions from Suntous and TOUSA Homes, Inc., the Sunbelt JV also obtained stand-alone financing (the "Sunbelt Facility") from J.P. Morgan Securities, Inc. and CapitalSource Finance, LLC (together, the "Sunbelt Lenders"). As of May 7, 2008, the Sunbelt JV had outstanding obligations totaling approximately $90.5 million.

Although TOUSA was not directly obligated to the Sunbelt Lenders under the Sunbelt Facility, TOUSA did agree to complete any property development commitments of the Sunbelt JV.  TOUSA and Suntous also agreed to indemnify the Sunbelt Lenders for potential losses from fraud, misappropriation and similar acts by the Sunbelt JV.  As part of these obligations, the Sunbelt Facility included certain provisions and events of default specifically tied to the financial strength of TOUSA.  On September 30, 2007, the Sunbelt Lenders declared a default under the Sunbelt Facility.  Although the Sunbelt Lenders eventually waived the default in January 2008, the lack of liquidity caused considerable stress on the Sunbelt JV and damage to its business operations.

Following several unsuccessful attempts to consummate certain strategic transactions with respect to the Sunbelt JV, the Debtors filed a motion on May 7, 2008, for authority to enter into a settlement agreement with several parties in interest [ECF No. 930].  The settlement agreement provided, in relevant part, that a foreclosure would be commenced, a receiver would be appointed to dispose of the Sunbelt JV's assets and neither the Sunbelt JV nor the joint venture partners would contest the foreclosure or receivership.  In exchange, the Sunbelt Lenders agreed to release TOUSA from its guarantee obligations, and the Debtors agreed to fully release the Sunbelt Lenders and the agent under the Sunbelt Facility from all claims arising from or related to the Sunbelt Facility upon the earlier of: (a) the liquidation of the joint venture's assets or (b) six months after entry of an order by the Bankruptcy Court granting the relief requested in the motion.  On May 23, 2008, the Bankruptcy Court granted the Debtors' motion with respect to the Sunbelt JV [ECF No. 1062].  Pursuant to the order and the related agreement, the Debtors no longer have an economic interest in the Sunbelt JV.

### b.    The Beacon Hill JV

On September 29, 2004, TOUSA Homes, Inc. and ORA Residential Investments I, L.P. ("ORA") formed the joint venture Beacon Hill. The parties formed Beacon Hill to develop home sites and deliver homes in the Las Vegas, Nevada market. In 2006, a dispute arose between TOUSA Homes, Inc. and ORA concerning the funding of certain cost overruns by Beacon Hill and whether the Chapter 11 Cases triggered a default under the joint venture agreement. By June 2008, ORA indicated that it wished to dissolve Beacon Hill.

After negotiations with ORA, the Debtors filed a motion on June 25, 2008 for authority to enter into a settlement agreement providing that (a) TOUSA Homes, Inc. would acquire all of ORA's stake in Beacon Hill and cash held in escrow totaling $2.2 million and (b) the parties would enter into mutual releases with respect to any and all claims arising from the joint venture agreement.  On July 15, 2008, the Bankruptcy Court granted the relief requested by the Debtors [ECF No. 1388].

Following the closing of the acquisition, Beacon Hill filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to an order dated August 4, 2008, Beacon Hill's Chapter 11 Case is being jointly administered with the other Chapter 11 Cases [ECF No. 1512].  Moreover, the Bankruptcy Court entered an order providing that all generally applicable orders in the Chapter 11 Cases (other than the Initial Claims Bar Date Order) would apply to Beacon Hill following its chapter 11 filing [ECF No. 1513].

On September 22, 2008, the Bankruptcy Court entered an order establishing, among other things, October 22, 2008 as the Beacon Hill Bar Date [ECF No. 1802].  The Prepetition Secured Lenders filed

Proofs of Claim asserting secured Claims against Beacon Hill's Estate in an unliquidated amount, similar to those filed by the Prepetition Secured Lenders against the Conveying Subsidiaries' Estates. The Committee anticipates that these Claims will be subject to an objection either by the Debtors, the Committee or other parties in interest based on, among other things, the alternative arguments that Beacon Hill is not obligated to the Prepetition Secured Lenders and that any existing obligation would be avoidable by the application of section 552 of the Bankruptcy Code. Accordingly, the Plan provides for no distribution on account of the Prepetition Secured Lenders' Claims at Beacon Hill. The Plan also provides that no distribution will be made by Beacon Hill on account of Senior Note Claims or Subordinated Note Claims as Beacon Hill did not guarantee the Senior Notes or Subordinated Notes.

### c.    The Hearthstone JV

On May 5, 2006, TOUSA Homes, Inc. entered into a joint venture with Lake County Investors, LLC ("LCI") for the purpose of developing and selling homes in Lake County, Florida (the "Hearthstone JV"). The agreement governing the Hearthstone JV provided, among other things, that either TOUSA Homes, Inc. or LCI could exercise a right to buy 100% of the interests in the joint venture upon 120 days' notice to the other party, as long as the notifying party was not otherwise in default under the agreement. The agreement also provided that the non-notifying party was deemed to accept the notifying party's exercise of its buy/sell option if it did not agree, during the 120-day notice period, to buy out the notifying party's joint venture interest at an equivalent price.

On October 26, 2007, LCI informed TOUSA Homes, Inc. of its intent to purchase TOUSA Homes, Inc.'s interest in the Hearthstone JV. TOUSA Homes, Inc. did not respond within the 120-day period provided in the joint venture agreement. Accordingly, on June 16, 2008, LCI filed a motion seeking to modify the automatic stay provided by section 362 of the Bankruptcy Code to allow LCI to enforce its right to purchase TOUSA Homes, Inc.'s interest in the Hearthstone JV [ECF No. 1206]. The Debtors did not object to LCI's motion. On August 27, 2008, the Bankruptcy Court entered an agreed order granting LCI's requested relief [ECF No. 1706]. Pursuant to that order, TOUSA Homes, Inc. sold its interest in the Hearthstone JV to LCI for approximately $19 million, minus assumed liabilities.

### d.    The Waterview Partners JV

Effective as of December 29, 2005, TOUSA Homes, Inc. entered into the Limited Liability Company Agreement of Waterview JV Partners, LLC (the "Waterview Agreement") with Lennar Colorado, LLC ("Lennar Colorado"). The purpose of Waterview JV Partners, LLC ("Waterview Partners JV") was to acquire and develop real property in Fountain Valley, Colorado. Pursuant to the terms of the Waterview Agreement, TOUSA Homes, Inc. held a 50% interest in the Waterview Partners JV. The Waterview Agreement provided, among other things, that TOUSA Homes, Inc. and Lennar Colorado would make additional capital contributions to Waterview Partners JV to make property acquisitions. Following the Petition Date, Lennar Colorado made certain additional contributions to Waterview Partners JV, but TOUSA Homes, Inc. did not. On December 22, 2008, Lennar Colorado filed a motion with the Bankruptcy Court seeking to compel TOUSA Homes, Inc. to accept or reject the Waterview Agreement [ECF No. 2292]. The Debtors did not object to Lennar Colorado's motion. On January 21, 2009, the Bankruptcy Court entered an agreed order rejecting the Waterview Agreement and allowing the Waterview Partners JV 30 days in which to file a Proof of Claim related to the rejection of the Waterview Agreement [ECF No. 2386].

### e.    The TOUSA/Kolter JV

In January 2005, TOUSA Homes, Inc. and Kolter Real Estate Group, LLC ("Kolter") formed TOUSA/Kolter Holdings, LLC, which was the owner of TOUSA/Kolter, LLC (the "TOUSA/Kolter JV").

TOUSA Homes, Inc. and Kolter each had a 50% interest in the TOUSA/Kolter JV.   The parties formed the TOUSA/Kolter JV to develop approximately 500 acres of property located in Cooper City, Florida in the community known as Estrada at Monterra ("Monterra").  The TOUSA/Kolter JV had funded debt (the "TOUSA/Kolter Facility") from KeyBank, N.A. and certain other lenders (together, the "TOUSA/Kolter Lender") totaling approximately $40 million as of December 2008.  In connection with the formation of the TOUSA/Kolter JV, the TOUSA/Kolter JV granted TOUSA Homes, Inc. an option to purchase certain property within Monterra, and as of December 2008, TOUSA Homes, Inc. owned 118 lots within the development.

As a result of its asset value deterioration, TOUSA/Kolter JV could not satisfy the financial and inventory covenants included in the TOUSA/Kolter Facility and defaulted on the TOUSA/Kolter Facility. The TOUSA/Kolter JV also failed to satisfy its obligations under bonds issued by the Monterra Community Development District (the "CDD") and the CDD commenced an action seeking to foreclose on the lots in Monterra, including the lots owned by TOUSA Homes, Inc. (the "CDD Action"). Additionally, TOUSA Homes, Inc. breached certain remarginig agreements in December 2007 and failed to satisfy its obligations under certain completion agreements when it failed to honor its guarantee and complete construction and development of Monterra. TOUSA Homes, Inc. had entered into the remarginig agreements and the completion agreements in connection with the TOUSA/Kolter Facility.

In an effort to avoid litigation with respect to the CDD Action and a potential foreclosure on the Monterra lots, CDD, the Debtors and CC Loan Acquisition ("CC Loan") – which had acquired all of the outstanding debt under the TOUSA/Kolter Facility from the TOUSA/Kolter Lender – entered into arm's length negotiations to effectuate a settlement with respect to the overall dispute and the TOUSA/Kolter JV.  On December 26, 2008, the Debtors filed a motion with the Bankruptcy Court for authority to enter into an agreement pursuant to which (a) the TOUSA/Kolter JV transferred Monterra to an affiliate of CC Loan in satisfaction of approximately $8.5 million of outstanding debt under the TOUSA/Kolter Facility, (b) CC Loan agreed to amend, reduce and limit its Proofs of Claim against TOUSA Homes, Inc. and reduce TOUSA Homes, Inc.'s exposure to certain bonds and letter of credit, (c) the maturity of certain bonds issued under the CDD would be extended from November 1, 2010 until May 1, 2013 and (d) TOUSA Homes, Inc. would avoid a foreclosure on its lots within the Monterra community.  Before the entry of the agreement, and in connection with the extension of the relevant maturity and payment dates under the indenture, the CDD agreed to withdraw the CDD Action.  On January 9, 2008, the Bankruptcy Court approved the Debtors' entry into the settlement agreement, which afforded TOUSA Homes, Inc. the opportunity to retain its interest in the 118 lots it owned in Monterra [ECF No. 2354].

f.       The Layton Lakes JV

TOUSA Homes, Inc. and Lennar Communities Development, Inc. ("Lennar Communities") were previously the sole members of LH-EH Layton Lakes Estates, L.L.C. (the "Layton Lakes JV"), a joint venture that was formed to develop a master-planned community in Gilbert, Arizona known as "Layton Lakes" (the "Layton Lakes Community").  On November 29, 2005, the Layton Lakes JV and the town of Gilbert, Arizona entered into an Off-Site Improvements Agreement (the "Off-Site Improvements Agreement"), pursuant to which the Layton Lakes JV agreed to construct certain improvements for the Layton Lakes Community. The Layton Lakes JV had been funding development within the Layton Lakes Community with, among other things, the proceeds of an acquisition and development loan in the original principal amount of $90 million (the "Midwest Loan") from Bank Midwest N.A. ("Bank Midwest"), which was evidenced by a promissory note dated October 16, 2006.

The prolonged deterioration in the housing markets caused the Layton Lakes JV's asset values to deteriorate.  On November 26, 2007, Bank Midwest made a demand for repayment of $14.5 million in principal and accrued interest outstanding under the Midwest Loan.  The Layton Lakes JV was unable to

make the requested payment and defaulted under the Midwest Loan. As a result, Bank Midwest refused to advance additional funds to the Layton Lakes JV and, following this refusal, the Layton Lakes JV was unable to fund further improvements under the Off-Site Improvements Agreement. Correspondingly, the town of Gilbert, Arizona ceased issuing certificates of occupancy ("COs") for single-family residences completed by Lennar Communities and TOUSA Homes, Inc. within the Layton Lakes Communities, thereby preventing the sale of completed residences. Additionally, on October 24, 2008, the town of Gilbert, Arizona filed a lawsuit (the "Layton Lakes Lawsuit") against the Layton Lakes JV and others alleging, among other things, breach of contract and seeking to recover the costs to complete certain improvements. Lennar Communities subsequently filed a Proof of Claim against TOUSA Homes, Inc. for failure to fulfill funding obligations to the Layton Lakes JV.

On November 17, 2008, TOUSA Homes, Inc. filed a motion [ECF No. 2164] to approve a settlement agreement (the "Layton Lakes Settlement Agreement") among Lennar Communities, TOUSA Homes, Inc., the Layton Lakes JV and the town of Gilbert, Arizona, as well as among other entities, which the Bankruptcy Court granted on November 25, 2008 [ECF No. 2204]. The Layton Lakes Settlement Agreement provided that TOUSA Homes, Inc. would deposit $1.3 million (the "TOUSA Homes Deposit") into a construction escrow (the "Construction Escrow"), which would secure completion of the improvements required under the Off-Site Improvements Agreement. Additionally, the town of Gilbert, Arizona agreed that once the TOUSA Homes Deposit was placed into the Construction Escrow, it would process and issue COs and also maintain an ongoing extension of the answer deadline in the Layton Lakes Lawsuit so long as improvements were being completed.

Importantly, the Layton Lakes Settlement Agreement further provided that TOUSA Homes, Inc. would withdraw as a member of the Layton Lakes JV and Lennar Communities would dissolve the Layton Lakes JV and assume the obligations of the Layton Lakes JV. Lennar Communities and TOUSA Homes, Inc. also agreed to mutually release one another from any and all claims arising under the agreements concerning the Layton Lakes JV.

The Layton Lakes Settlement Agreement also provided for TOUSA Homes, Inc. and Lennar Communities to enter into an option agreement (the "Layton Lakes Option Agreement") with respect to 207 residential lots within the Layton Lakes Community. Specifically, on the effective date of the Layton Lakes Option Agreement, TOUSA Homes, Inc. (i) would be deemed to have exercised the option to purchase seven lots within the Layton Lakes Community for approximately $425,000, (ii) would have the option to purchase the remaining 200 lots prior to May 31, 2009 and (iii) would be required to pay Lennar Communities an option consideration fee in the amount of $1 million to maintain its option for the remaining 200 lots after May 31, 2009. Upon information and belief, TOUSA Homes, Inc. did not exercise such option with respect to the additional 200 lots.

g.    The Newmark/Lennar JV

On August 8, 2006, TOUSA Homes, Inc., Newmark Homes, L.P.,[26] Lennar Texas Holding Company ("LTHC") and Lennar Homes of Texas Land and Construction, Ltd. ("Lennar Texas" and, together with LTHC, the "Lennar JV Members") formed Newmark/Lennar Central Texas, L.P. (the "Newmark/Lennar JV"), a joint venture formed for the purpose of acquiring and developing certain real property in Texas. TOUSA Homes, Inc. and Newmark Homes, L.P. held a combined 50% interest in the Newmark/Lennar JV.

---

[26] Newmark Homes, LP is now known as TOUSA Texas, LP.

The Newmark/Lennar JV had access to a revolving loan from Colonial Bank, N.A. ("Colonial"), which was in default on and after the Petition Date.  Given that the Newmark/Lennar JV lacked other liquidity, the Lennar JV Members made cash advances to the Newmark/Lennar JV that were to be treated as loans, which would be required to be repaid before recovery was available to TOUSA Homes, Inc. and Newmark Homes, L.P. on account of their equity interests.  After discussions with the Lennar JV Members, on February 9, 2009, the Debtors filed a motion [ECF No. 2447] for approval of the sale of the respective partnership interests of TOUSA Homes, Inc. and Newmark Homes, L.P. in the Newmark/Lennar JV to the Lennar JV Members for total cash consideration of $250,000 and certain releases related to the Newmark/Lennar JV and the Colonial loan.  The Bankruptcy Court issued an order approving the relief requested on February 19, 2009 [ECF No. 2472].

> **h.**     **The Brushy Creek JV**

Prior to the commencement of  the Chapter 11 Cases, TOUSA Texas, L.P. (formerly known as Newmark Homes, L.P.) entered into a purchase agreement with Silverado Austin Development, Ltd. to acquire approximately 318 acres in Williamson County, Texas to be developed as a master planned residential project to be known as "The Ranch at Brushy Creek" (the "Brushy Creek Project").  Newmark/Buffington Brushy Creek, L.P. (the "Brushy Creek JV"), of which TOUSA Homes, Inc. was a general partner and TOUSA Texas, L.P. was a limited partner, was formed to acquire certain property within the Brushy Creek Project.

Colonial financed certain acquisitions and operations of the Brushy Creek JV.  The Chapter 11 Cases created certain technical defaults under the financing provided by Colonial.  To cure such defaults, Colonial required that TOUSA Homes, Inc. be replaced as general partner of the Brushy Creek JV.  Accordingly, on September 17, 2008, the Debtors filed a motion [ECF No. 1793] seeking approval of an amendment to the Agreement of Limited Partnership for the Brushy Creek JV (the "Brushy Creek Partnership Agreement"), whereby TOUSA Homes, Inc. agreed to withdraw and be replaced with Castletop Capital Partners GP, LLC ("Castletop") as general partner of the Brushy Creek JV.  Pursuant to the amendment, TOUSA Homes, Inc. also agreed to make certain additional contributions to the Brushy Creek JV in accordance with the revised partner contribution percentages.  On October 24, 2008, the Bankruptcy Court entered an order granting the requested relief [ECF No. 2007].

As a result of the Debtors' determination to suspend new construction efforts and monetize their remaining assets, the Debtors and Castletop negotiated the terms of a further amendment to the Brushy Creek Partnership Agreement to address the consequences of a possible default by the Debtors on their funding obligations pursuant to the agreement.  Accordingly, on June 22, 2009, the Debtors filed a motion [ECF No. 2892] seeking approval of an amendment to the Brushy Creek Partnership Agreement whereby Castletop was authorized to take certain actions without the Debtors' approval, and the non-defaulting parties agreed to waive their right to acquire the partnership interest of any defaulting partner and the right to wind up the Brushy Creek JV as a result of the Debtors' failure to make certain capital contributions pursuant to the agreement.  On July 16, 2009, the Bankruptcy Court entered an order granting the requested relief [ECF No. 2984].

The Brushy Creek JV continued to make distributions to the Debtors until November 2012, when the Brushy Creek JV informed the Debtors that the distributions would temporarily cease as the Brushy Creek JV's only remaining asset is a parcel of land measuring approximately 11 acres and the development of such parcel was not cost effective at that time.

92

### i.      The Centex JV

On November 14, 2005, TOUSA Homes, Inc. and Centex Real Estate Corporation ("Centex") entered into a joint venture agreement for the purpose of acquiring and developing real estate, primarily located in Florida.  Centex and TOUSA Homes, Inc. owned all of the outstanding memberships in the joint venture (the "Centex JV").

The Centex JV was funded by a loan in the principal amount of $50,400,000 (the "PNC Loan") from PNC Bank, National Association ("PNC").  In connection with the PNC Loan, TOUSA entered into the following agreements in favor of PNC: (i) a completion guarantee; (ii) a repayment guarantee; and (iii) an environmental indemnity agreement (collectively, the "Centex Agreements").  PNC filed Proofs of Claim asserting unliquidated general unsecured claims against TOUSA Homes, Inc. and TOUSA arising from the Debtors' obligations relating to the Centex JV and the Centex Agreements.

As part of the Debtors' revised business plan, TOUSA Homes, Inc. agreed to sell its membership interests in the Centex JV and certain residential lots in a development owned by the Centex JV to Centex for the purchase price of $1,100,000.  Pursuant to the agreement, Centex and TOUSA Homes, Inc. also agreed to mutually release one another from all liability relating to the PNC Loan or the Centex JV.  On May 13, 2009, the Debtors filed a motion [ECF No. 2780] seeking to approve the sale agreement, and the Bankruptcy Court entered an order approving the requested relief on June 3, 2009 [ECF No. 2834].

### j.      The Remington Ranch JV

The Remington Ranch joint venture was comprised of a dual structure, including one set of partnerships (the "Remington Ranch Residential JV") formed for the development of the residential portion of the property known as Remington Ranch in Harris County, Texas (the "Remington Ranch Property") and another set of partnerships (the "Remington Ranch Commercial JV") formed for the development of the commercial portion of the Remington Ranch Property.

### i.      The Remington Ranch Residential JV

On February 9, 2010, the Debtors filed a motion seeking authority for TOUSA Texas, L.P. and TOUSA Homes, Inc. to enter into a transaction to unwind their position within the Remington Ranch Residential JV and divest all of their interests in RR Houston Development, L.P. (the "RR Houston Development") and its general partner, RR Houston Developers, L.L.C. ("RR Houston").  Among other things, the motion provided for a payment to TOUSA Homes, Inc. and TOUSA Texas, L.P. of $750,000 in exchange for their interest in the RR Houston Development and RR Houston.  Following a series of other transactions, including a lot swap with a third party, the most valuable assets of the Remington Ranch Residential JV would have been fifty lots in Fort Bend County, Texas.  The Debtors, with the assistance of the Committee, determined the potential value of the lots based on their views of the Fort Bend County market, particularly the comparable lot sales information that was publicly available.

After discussions with the Committee, the Debtors determined that the lots in Fort Bend County were likely worth more than $750,000.  The Debtors reopened negotiations with the other counterparties to the agreements and agreed to purchase the joint venture partner's interest in exchange for forgiveness of an outstanding $750,000 letter of credit.  Pursuant to the revised global settlement agreement, among other things, the Debtors assumed ownership of the fifty lots and agreed to dissolve the Remington Ranch JV and RR Houston.  On March 16, 2010, the Debtors filed a motion to approve the revised settlement agreement [ECF No. 5064].  The Bankruptcy Court entered an order approving the relief requested in the revised motion on March 23, 2010 [ECF No. 5274].

### ii.    The Remington Ranch Commercial JV

The Debtors continue to hold an interest in the Remington Ranch Commercial JV, with TOUSA Homes, Inc. holding a 22% membership interest in R.R. Houston Investors, L.L.C. and TOUSA Texas, L.P. holding a 21.5% limited partnership interest in R.R. Houston Investments, L.P.  The Remington Ranch Commercial JV initially owned 6.3 acres of commercial property in the Remington Ranch community.  The Remington Ranch Commercial JV sold 1.8 acres of commercial property in 2012 for $375,000 and made distributions of such amount to the joint venture partners. The Debtors' portion of such distributions was $66,000.

The Remington Ranch Commercial JV continues to own and market for sale approximately 4.5 acres of commercial property in the Remington Ranch community.

### k.    The Cibola Vista JV

On October 12, 2010, the Debtors filed a motion seeking authority to dissolve the Cibola Vista Community Development, LLC, a joint venture in which TOUSA Homes, Inc. historically maintained a membership interest (the "Cibola Vista JV"), pursuant to and in accordance with the terms of the executed Limited Liability Company Termination Agreement, dated March 31, 2005 (the "Termination Agreement").

TOUSA Homes, Inc. and Lennar Communities Development, Inc. ("Lennar"), through Lennar's affiliates U.S. Home Corporation and U.S. Home of Arizona Construction Co. (together, "U.S. Home"), formed Cibola Vista JV in 2002 for the purpose of purchasing certain real property in Arizona.  TOUSA Homes, Inc. and U.S. Home subsequently entered into a cost sharing agreement setting forth their respective obligations to the Cibola Vista JV.  On July 19, 2002, TOUSA Homes, Inc. and U.S. Home caused the Cibola Vista JV to enter into the Contract for Purchase of Land and Escrow Instructions (the "Purchase Contract") between Lake Pleasant 241 Limited Partnership ("LP241"), as seller, and the Cibola Vista JV, as purchaser, with respect to certain property in a master planned project known as Cibola Vista (the "Cibola Vista Project") in the City of Peoria in Maricopa County, Arizona.  The Cibola Vista Project is a mixed-use community made up of a combination of single-family home lots, large custom home lots and a time-share resort.  Specifically, TOUSA Homes, Inc. and U.S. Home, through the Cibola Vista Project, purchased the single-family home lots of the Cibola Vista Project.  Pursuant to the terms of the Purchase Contract, TOUSA Homes, Inc. purchased Parcel 3 and Parcel 4 from Cibola Vista JV.

On May 7, 2008, the Debtors filed a motion seeking approval of a settlement agreement among TOUSA Homes, Inc., Lennar, LP241, the City of Peoria, Arizona and North American Title Company for resolution of disputes relating to the construction (and related costs) of a traffic signal within the Cibola Vista Project (the "Traffic Signal").  The Bankruptcy Court entered an order approving the same on May 23, 2008 [ECF No. 1061].

With construction of the Traffic Signal and assignment of the real property complete, TOUSA Homes, Inc. and U.S. Home moved forward to effectuate the termination and dissolution of Cibola Vista JV in accordance with the terms set forth in the Termination Agreement.  On November 1, 2010, the Bankruptcy Court entered an order authorizing the dissolution of the Cibola Vista JV [ECF No. 6228].

6.    **Rejection of Certain Option Contracts, Executory Contracts and Unexpired Leases of Nonresidential Real Property**

a.    **Option Contracts**

Before the Petition Date, the Debtors had abandoned their option rights under certain of the Option Contracts that the Debtors believed, in their business judgment, no longer provided a benefit to their homebuilding and home sales operations.  In many cases, the Debtors decided to abandon their option rights because, among other things, the option price to acquire the relevant land exceeded the then-current fair market value of that land.  On February 13, 2008, the Debtors filed a motion to reject the Option Contracts the Debtors had terminated before the Petition Date, to the extent those contracts were executory, *nunc pro tunc* to the Petition Date.  On March 17, 2008, the Bankruptcy Court entered an order granting the Debtors' request [ECF No. 618].  The Debtors rejected additional Option Contracts pursuant to an order dated June 11, 2008 [ECF No. 1183].

b.    **Executory Contracts, Equipment and Advertising Leases**

As of the Petition Date, the Debtors were party to numerous leases of nonresidential real property and contracts as part of the ordinary course of their business operations.  These agreements included, among others, leases of various types and forms of advertising space, leases of various office equipment such as computers, monitors and copiers, and agreements for ongoing telecommunications services, licenses and construction services.  By orders dated May 12, 2008 [ECF No. 952], June 11, 2008 [ECF No. 1183], July 15, 2008 [ECF No. 1399], August 12, 2008 [ECF No. 1597], August 18, 2008 [ECF No. 1644], September 22, 2008 [ECF No. 1811], October 24, 2008 [ECF No. 2010], December 9, 2008 [ECF No. 2243], February 12, 2009 [ECF No. 2458], March 10, 2009 [ECF No. 2572], March 25, 2009 [ECF No. 2627], June 12, 2009 [ECF No. 2863], August 5, 2009 [ECF No. 3036], September 11, 2009 [ECF No. 3180], November 10, 2009 [ECF No. 3315], January 8, 2010 [ECF No. 3482] and November 1, 2010 [ECF No. 6231], the Bankruptcy Court authorized the Debtors to reject identified Unexpired Leases and Executory Contracts that the Debtors had determined, in their business judgment, no longer provided a benefit to the Debtors' ongoing business operations.

c.    **Nonresidential Real Property Leases**

As of the Petition Date, the Debtors were also party to numerous nonresidential real property leases as part of the ordinary course of their business operations. These agreements included leases of "model" homes that the Debtors showed to potential customers and leases of office space. The Bankruptcy Court authorized the Debtors to reject several of these nonresidential real property leases during the Chapter 11 Cases.

Under section 365(d)(4) of the Bankruptcy Code, a debtor is deemed to reject nonresidential real property leases to which it is a party by the earlier of 120 days from the Petition Date or the date on which a bankruptcy court confirms a plan of reorganization. Accordingly, the Debtors' initial period to assume or reject such leases expired on May 28, 2008. On May 12, 2008, the Bankruptcy Court entered an order granting the Debtors' request to extend the time within which to assume unexpired leases of nonresidential real property to August 26, 2008 (the "Lease Deadline") [ECF No. 951].

On August 8, 2008, the Debtors filed a motion for authority to assume identified nonresidential real property leases and pay related cure amounts [ECF No. 1547].  The Bankruptcy Court granted that motion on August 25, 2008, and the ruling was memorialized in an order entered on August 27, 2008 [ECF No. 1703].  On August 26, 2008, the Debtors filed a notice of the Lease Deadline and the requirement for parties with a Claim with respect to any such rejection to file a Proof of Claim on or

95

before September 25, 2008 [ECF No. 1698].  The Debtors also had individual agreements with certain individual landlords that have been resolved as of the date hereof.

### 7.      The Home Warranty Program

#### a.      The Debtors' Initial Home Warranty Program

On the Petition Date, the Debtors filed a motion to continue fulfilling obligations under their prepetition customer programs [ECF No. 10], including standardized limited warranties typically provided to all of their homebuyers (the "Home Warranty Program").  The Home Warranty Program generally required that the Debtors repair or replace any part of a new home that was materially defective due to the Debtors' workmanship or materials.  In many states, the Home Warranty Program was legally mandated.   The Debtors' obligations under the Home Warranty Program were administered by Professional Warranty Service Corporation ("PWC").

To ensure that purchasers of the Debtors' homes would continue to have confidence in the Debtors' home warranties, the Debtors, PWC and Zurich North America ("Zurich") provided a program in which the Debtors contracted with PWC to provide a ten-year transferable supplemental warranty to homebuyers with contracts of sale in force at that time as well as those customers who signed a contract of sale between the Petition Date and April 30, 2008 (the "Original Program").  The Original Program provided that in the event the Debtors failed to fulfill their obligations to eligible homebuyers, one of the member companies of Zurich would perform according to the terms and conditions contained within the supplemental home warranty.   Before the Original Program expired on April 30, 2008, the Debtors extended the Original Program through June 30, 2009.

#### b.      The Debtors' New Home Warranty Program

In connection with the Debtors' business decision to sharply curtail and ultimately eliminate new construction starts while focusing on closing sales of homes currently under construction, selling their remaining inventory of spec homes and monetizing their land assets over time, the Debtors implemented a new home warranty program with PWC, which the Bankruptcy Court approved on April 7, 2009 [ECF No. 2652] (the "New Warranty Program").  The New Warranty Program applied to (a) homes as to which a sale closed after June 30, 2008 and that were not covered by the Original Program and (b) approximately 1,100 homes that the Debtors anticipated selling and delivering during the twelve-month period following April 1, 2009 (the "Warranty Effective Date").  The New Warranty Program provided that all warranty claims after April 15, 2009 would be covered by PWC, while the Debtors would cover all open warranty claims until April 15, 2009.  The New Warranty Program further provided that if the Debtors had not sold and delivered all eligible homes within the twelve-month period following the Warranty Effective Date, PWC and the Debtors would negotiate a reasonable extension of the New Warranty Program to include any remaining unsold eligible homes.

As noted in section V.H.1.c of this Disclosure Statement, the Bankruptcy Court established May 14, 2010 as the Customer Claims Bar Date [ECF No. 5123].  Accordingly, the Debtors are currently in the process of reconciling such customer Claims.

### 8.      Deregistration Under the Securities and Exchange Act of 1934

As noted in section V.B.1 of this Disclosure Statement, the Debtors' equity securities were delisted by the NYSE before the Petition Date.  Since that time, the Debtors' equity securities have traded on the Pink Sheet Electronic Quotation Service.  Nonetheless, the Debtors remained as a "reporting company" under the '34 Act.  The Debtors determined that, in light of the wind down plan and to avoid

the cost and expense associated with being a reporting company, it was appropriate for the Debtors to file such forms and take such actions as are necessary and appropriate to deregister the Debtors' securities under the '34 Act.  The Debtors filed the appropriate forms on March 20, 2009.  Such filings terminated the obligation of the Debtors to file periodic reports under the '34 Act.

## VI.    DESCRIPTION OF THE CHAPTER 11 PLAN

### A.    OVERVIEW

The Plan consists of a separate chapter 11 plan for each of the Plan Debtors and incorporates the Mediation Settlement (including, without limitation, the D&O Insurance Coverage Settlement) and the Unsecured Creditor Settlement. The Plan does not seek to effect a substantive consolidation or other combination of the separate Estates of each Plan Debtor.  Rather, the Plan provides that creditors of each Plan Debtor will be permitted to assert their Claims only against the Plan Debtor(s) against which they hold Allowed Claims and will receive a recovery based on the value of the related Estate(s).  For the avoidance of doubt, in no case will the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim, plus postpetition interest, to the extent applicable.

### B.    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE PLAN DEBTORS

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  The term "allowed" is used throughout the Plan and this Disclosure Statement.  In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees (or in the event of a dispute, that the bankruptcy court has determined) that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor and that any asserted priority or security status is correct.

Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  Section 502(b) of the Bankruptcy Code, however, specifies certain claims that may not be "allowed" in bankruptcy — even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as (a) the right

97

to vote on the plan and (b) the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless the plan (a) does not alter the legal, equitable and contractual rights of the holders of claims or equity interests in such class or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or equity interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive, on the later of the effective date of the plan or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or, if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than with respect to the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's bankruptcy case not been commenced.

Section 1126(c) of the Bankruptcy Code provides that a proposed plan is binding if it is approved by a majority in number and two-thirds in amount of each voting class of claims.  Section 1126(d) of the Bankruptcy Code provides that a class of equity interests accepts a plan if the holders of at least two-thirds of the equity interests in such class vote to accept the plan.  Approval by the requisite majorities of a particular class constitutes "acceptance" of the plan by that class.  A class that is not impaired by a plan is conclusively deemed to accept that plan pursuant to section 1126(f) of the Bankruptcy Code.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the plan on account of their claims or equity interests.  If a class or classes is deemed to reject or votes to reject a proposed plan, the plan proponent may confirm its plan only if it satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to any rejecting class.  Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the claims and equity interests in such classes (see section VIII.D of this Disclosure Statement).

With these requirements in mind, the Plan provides the following separate classifications of claims and equity interests.  Recoveries for Classes of Claims against and Interests in each Plan Debtor are too voluminous to include in the text of this Disclosure Statement.  For convenience, Exhibit C sets forth a schedule showing recoveries at each Plan Debtor.

### 1.    Treatment of Unclassified Claims

#### a.    Administrative Claims

"Administrative Claims" are Claims constituting the costs and expenses of administering the Plan Debtors' Estates, as provided by sections 503(b), 507(b) and 1114(e)(2) of the Bankruptcy Code. Administrative Claims generally include the actual and necessary costs and expenses incurred after the applicable Petition Date of preserving the Estates and operating the business of the Plan Debtors. Administrative Claims also consist of the fees and expenses of various legal, financial and other professionals incurred during the Plan Debtors' Chapter 11 Cases, all of the U.S. Trustee Fees due pursuant to 28 U.S.C. § 1930(a)(6) and Allowed reimbursable expenses of the Committee Members.

The Plan provides that, except to the extent that any Entity entitled to payment of any Allowed Administrative Claim otherwise agrees with the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Distribution Date, (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Claim or (c) the date on which the Proponents, in consultation with the Requisite Lenders, solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, and the holder of such Allowed Administrative Claim otherwise agree and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Plan Debtors, (b) are allowed by the Bankruptcy Court, (c) may be agreed upon between the holder of such Allowed Administrative Claim and the Proponents, in consultation with the Requisite Lenders, solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable or (d) may otherwise be required under applicable law.

The Proponents estimate that the aggregate amount of Allowed Administrative Claims (including Postpetition Intercompany Claims), for all Plan Debtors, will be approximately $6,987,043. The projected recovery for Administrative Claims is 100%. Because there has been no diminution in value of the collateral of the Term Loan Lenders at TOUSA (calculated on a liquidation basis as of the Petition Date), the Plan provides that there shall be no Claims in favor of the Term Loan Lenders against any of the Plan Debtors pursuant to section 507(b) of the Bankruptcy Code.

### i.    Administrative Claims Bar Date

The Plan provides that, unless previously filed pursuant to the Initial Administrative Claims Bar Date, requests for payment of Administrative Claims (other than Postpetition Intercompany Claims and Allowed Professional Compensation) must be filed and served on the Liquidation Trustee pursuant to the procedures specified in the Confirmation Order by the Final Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the applicable Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Plan Debtors or their property and such Administrative Claims shall be disallowed in full as of the Effective Date. Objections, if any, to a timely request for payment of Administrative Claims must be filed and served on the Liquidation Trustee and the requesting party no later than 90 days after the Final Administrative Claims Bar Date. No requests for payment of Postpetition Intercompany Claims shall be required.

### ii.    Professional Compensation

The Plan requires that Retained Professionals or other Entities asserting a Claim for Accrued Professional Compensation (including pursuant to a 503(b) Application) must file and serve on the Liquidation Trustee, and such other Entities as are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Claim no later than 45 days after the Effective Date.

The Plan defines a "Retained Professional" as an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with section 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

The Plan defines "Accrued Professional Compensation" as all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under section 328, 330(a) or 331 of the Bankruptcy Code and that were rendered before the Effective Date by any Retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, and that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by Final Order any amount of a Retained Professional's fees or expenses, then those denied or reduced amounts will not constitute Accrued Professional Compensation.

The Plan further provides that notwithstanding the requirement that Retained Professionals and entities seeking payment of Accrued Professional Compensation file a final fee application as described above, the Liquidation Trustee shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized hereunder.

The Plan further provides that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court order, unless otherwise ordered by the Bankruptcy Court.

Objections to any Claim for Accrued Professional Compensation must be filed and served on the Liquidation Trustee and the requesting party no later than 90 days after the Effective Date. To the extent necessary, the Plan provides that the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Claims for Accrued Professional Compensation. Each holder of a Claim for Allowed Accrued Professional Compensation shall be paid by the Liquidation Trustee in Cash from the Professionals Fee Accounts and, following the depletion of the Professionals Fee Accounts, from the Liquidation Trust Assets.

### b.    Priority Tax Claims

A "Priority Tax Claim" is any Claim of a governmental unit against a Plan Debtor as contemplated in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that each holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, one of the following treatments on account of such Claim: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) such other treatment as may be agreed to by such holder and the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Priority Tax Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, or otherwise determined by an order of the Bankruptcy Court.

The Proponents estimate that the aggregate amount of Allowed Priority Tax Claims, for all Debtors, will be approximately $2,339,345. The projected recovery for Priority Tax Claims is 100%.

c.        **U.S. Trustee Fees**

The Plan provides that, on the Distribution Date, the Liquidation Trustee shall pay, in full and in Cash, any U.S. Trustee Fees due as of the Effective Date.  On and after the Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees until the entry of a final decree in each applicable Plan Debtor's Chapter 11 Case.

2.        **Treatment of Classified Claims Against and Interests in the Plan Debtors**

a.        **Classes of Claims Against and Interests in TOUSA**

i.        **Class 1 – First Lien Claims**

(A)        **Class 1A – First Lien Revolver Claims**

The Plan defines "First Lien Revolver Claim" as any Claim against a Plan Debtor derived from or based upon the First Lien Revolving Credit Agreement.

The Plan provides that the First Lien Revolver Claims shall be Allowed against TOUSA in the amount of $16,643,322, representing unpaid postpetition interest that accrued on amounts outstanding under the First Lien Revolving Credit Agreement, including non-default interest and default interest at the full contract rate from the Petition Date through November 21, 2011.  All other amounts with respect to the First Lien Revolver Claims have been repaid in full, in Cash, during the Chapter 11 Cases. For the avoidance of doubt, the First Lien Revolver Claims against TOUSA shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

The Plan provides that on the Distribution Date, each holder of Allowed First Lien Revolver Claims against TOUSA shall receive, in full and final satisfaction of such Claims, its *Pro Rata* share of $2,874,182, representing 34.5% of the Default Interest Amount, in Cash, which shall be deemed to be paid from TOUSA.

This Class of Claims is Impaired.  Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

(B)        **Class 1B – First Lien Term Loan Claims**

The Plan defines "First Lien Term Loan Claim" as (i) the secured portion of any Claim against TOUSA that is derived from or based upon the First Lien Term Loan Credit Agreement (each, a "First Lien Term Loan Secured Claim") and (ii) the Claim of each First Lien Term Loan Lender against TOUSA for the portion of such lender's Claim that exceeds the value of such lender's interest in TOUSA's property securing such Claims (each, a "First Lien Term Loan Deficiency Claim").

The Plan provides that the First Lien Term Loan Claims shall be Allowed against TOUSA (a) in the amount of $206,222,703 on account of the First Lien Term Loan Secured Claims and (b) in the amount of $108,338,749 on account of the First Lien Term Loan Deficiency Claims.  For the avoidance of doubt, the First Lien Term Loan Claims against TOUSA shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable, contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

101

The Plan provides that on the Distribution Date, each holder of Allowed First Lien Term Loan Claims against TOUSA shall receive, in full and final satisfaction of such Claims and the First Lien Term Loan Lenders' third-party claims settled or otherwise preserved under the Plan, (i) on account of its First Lien Term Loan Secured Claims, its *Pro Rata* share of (a) $26,999,365 in respect of the Encumbered Assets at TOUSA and (b) $71,552,770 in respect of the Term Loan Lender Tax Refund Recovery, (ii) on account of its First Lien Term Loan Deficiency Claims, (a) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of $9,290,352 on account of (I) the Unencumbered Cash at TOUSA, (II) the TOUSA Term Loan Lender Disgorgement Share and (III) the Unsecured Creditor Tax Refund Recovery and (b) its *Pro Rata* share of the TOUSA Class 1B General Liquidation Trust Interests and (iii) on account of its third-party claims settled or otherwise preserved under the Plan, its *Pro Rata* share of (a) $7,657,143, representing 40% of the Term Loan Lender D&O Recovery and (b) the TOUSA Class 1B Transeastern Liquidation Trust Interests.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### ii.    Class 2 – Second Lien Term Loan Claims

The Plan defines "Second Lien Term Loan Claim" as (i) the secured portion of any Claim against TOUSA that is derived from or based upon the Second Lien Term Loan Credit Agreement (each, a "Second Lien Term Loan Secured Claim") and (ii) the Claim of each Second Lien Term Loan Lender against TOUSA for the portion of such lender's Claim that exceeds the value of such lender's interest in TOUSA's property securing such Claims (each, a "Second Lien Term Loan Deficiency Claim").

The Plan provides that the Second Lien Term Loan Claims shall be Allowed against TOUSA (a) in the approximate amount of $0 on account of the Second Lien Term Loan Secured Claims and (b) in the approximate amount of $320,386,837 on account of the Second Lien Term Loan Deficiency Claims. For the avoidance of doubt, the Second Lien Term Loan Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

The Plan provides that on the Distribution Date, each holder of Allowed Second Lien Term Loan Claims against TOUSA shall receive, in full and final satisfaction of such Claims and the Second Lien Term Loan Lenders' third-party claims settled or otherwise preserved under the Plan, (i) on account of its Second Lien Term Loan Deficiency Claims, its *Pro Rata* share of the TOUSA Class 2 General Liquidation Trust Interests and (ii) on account of its third-party claims settled or otherwise preserved under the Plan, its *Pro Rata* share of (a) $11,485,714, representing 60% of the Term Loan Lender D&O Recovery and (b) the TOUSA Class 2 Transeastern Liquidation Trust Interests. Pursuant to the Mediation Settlement, the foregoing distributions of Cash and Liquidation Trust Interests shall not be subject to turnover or sharing with the First Lien Revolver Lenders or the First Lien Term Loan Lenders under the Intercreditor Agreement or the Intercreditor Settlement Agreement. For the avoidance of doubt, pursuant to the Intercreditor Agreement, Cash distributions that would have otherwise been allocable to holders of Allowed Class 2 Claims against TOUSA on account of Second Lien Term Loan Deficiency Claims shall have been reallocated *Pro Rata* to holders of Allowed Class 1B Claims against TOUSA.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### iii.    Class 3 – Other Secured Claims

The Plan defines "Other Secured Claim" as the secured portion of any Claim against a Plan Debtor other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against TOUSA that is secured by valid Liens on property of TOUSA shall receive, in full and final satisfaction of such Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Other Secured Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable: (a) payment of the Claim in full in Cash, including interest, to the extent applicable, (b) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim or (c) such other treatment as may be agreed to by such Claim holder and the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Other Secured Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable.

The Proponents estimate that the amount of Other Secured Claims against TOUSA will total $0 as of the Effective Date.  The projected recovery under the Plan for the Other Secured Claims against TOUSA is 100%.  This Class of Claims is Unimpaired.  Pursuant to the Plan, holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iv.    Class 4 – Other Priority Claims

The Plan defines "Other Priority Claim" as any Claim against a Plan Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against TOUSA shall receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in full in Cash.

The Proponents estimate that the amount of Other Priority Claims against TOUSA will total approximately $0 as of the Effective Date. The projected recovery under the Plan for Other Priority Claims against TOUSA is 100%.  This Class of Claims is Unimpaired.  Pursuant to the Plan, holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### v.    Class 5 – Unsecured Claims

### (A)    Class 5A – Senior Note Claims

The Plan defines "Senior Note Claim" as any Claim against TOUSA derived from or based upon the Senior Notes, other than a Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

The Plan provides that the Senior Note Claims shall be Allowed against TOUSA in the aggregate amount of $573,518,194. For the avoidance of doubt, the Allowed Senior Note Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

The Plan provides that on the Distribution Date, each holder of Allowed Senior Note Claims against TOUSA shall receive: (i) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of $43,083,065 on account of (a) the Unencumbered Cash at TOUSA, (b) the TOUSA Term Loan Lender Disgorgement Share and (c) the Unsecured Creditor Tax Refund Recovery; and (ii) its *Pro Rata* share of the TOUSA Class 5A Liquidation Trust Interests.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (B)    Class 5B – General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor that is not a Priority Tax Claim, Administrative Claim, Accrued Professional Compensation Claim, Senior Note Claim, Senior Note Guaranty Claim, Subordinated Note Claim, Subordinated Note Guaranty Claim, Chinese Drywall Claim, PIK Note Claim, Other Priority Claim, Prepetition Intercompany Claim, Postpetition Intercompany Claim, Term Loan Deficiency Claim or Transeastern Claim.

The Proponents estimate that the Allowed amount of General Unsecured Claims against TOUSA will be approximately $106,670,606 as of the Effective Date.

The Plan provides that on the Distribution Date, each holder of Allowed General Unsecured Claims against TOUSA shall receive: (i) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of $5,211,842 on account of (a) the Unencumbered Cash at TOUSA, (b) the TOUSA Term Loan Lender Disgorgement Share and (c) the Unsecured Creditor Tax Refund Recovery; and (ii) its *Pro Rata* share of the TOUSA Class 5B Liquidation Trust Interests.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (C)    Class 5C – Subordinated Note Claims

The Plan defines "Subordinated Note Claim" as any Claim against TOUSA derived from or based upon the Subordinated Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the Subordinated Note Claims shall be Allowed against TOUSA in the aggregate amount of $532,772,336.

The Plan provides that holders of Allowed Subordinated Note Claims against TOUSA will not receive a distribution on account of such Claims as distributions otherwise allocable to the holders of such Claims shall be reallocated *Pro Rata* to the holders of Allowed Term Loan Deficiency Claims and Allowed Senior Note Claims in accordance with the terms of the Subordinated Note Indentures.

This Class of Claims is Impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(D)    Class 5D – PIK Note Claims

The Plan defines "PIK Note Claim" as any Claim against TOUSA derived from or based upon the PIK Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the PIK Note Claims shall be Allowed against TOUSA in the aggregate amount of $21,564,973.

The Plan provides that holders of Allowed PIK Note Claims against TOUSA will not receive a distribution on account of such Claims as distributions otherwise allocable to the holders of such Claims shall be reallocated *Pro Rata* to the holders of Allowed Term Loan Deficiency Claims and Allowed Senior Note Claims in accordance with the terms of the PIK Note Indenture.

This Class of Claims is Impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

vi.    Class 6 – 510 Claims

The Plan defines "510 Claims" as all Claims against each of the Plan Debtors that are subordinated pursuant to section 510(b) of the Bankruptcy Code, which provides for the subordination of litigation claims asserted on account of the purchase or sale of securities, or section 510(c) of the Bankruptcy Code, which provides for subordination of certain other claims, after notice and a hearing.

The Proponents estimate that the amount of 510 Claims against TOUSA will total $0 as of the Effective Date.  The Plan provides that holders of 510 Claims against TOUSA will not receive a distribution on account of such Claims.  Accordingly, this Class of Claims is Impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

vii.    Class 7 – Interests

The Plan defines "Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Interests in TOUSA shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Interests in TOUSA will receive no distribution on account of such Interests.  This Class of Interests is Impaired.  Holders of Interests in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

105

### b.    Classes of Claims Against and Interests in the Conveying Subsidiaries

#### i.    Class 1 – First Lien Revolver Claims

The Plan defines "First Lien Revolver Claim" as any Claim against a Plan Debtor derived from or based upon the First Lien Revolving Credit Agreement.

The Plan provides that the First Lien Revolver Claims shall be Allowed against the Conveying Subsidiaries in the amount of $16,643,322, representing unpaid postpetition interest that accrued on the amounts outstanding under the First Lien Revolving Credit Agreement, including non-default interest and default interest at the full contract rate from the Petition Date through November 21, 2011.  All other amounts with respect to the First Lien Revolver Claims have been repaid in full, in Cash, during the Chapter 11 Cases.  For the avoidance of doubt, the Allowed First Lien Revolver Claims against the Conveying Subsidiaries shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

The Plan provides that on the Distribution Date, each holder of Allowed First Lien Revolver Claims against the Conveying Subsidiaries shall receive, in full and final satisfaction of such Claims, its *Pro Rata* share of $5,448,735, representing 65.5% of the Default Interest Amount, in Cash, which shall be paid from the Conveying Subsidiaries.

This Class of Claims is Impaired.  Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

#### ii.    Class 2 – Other Secured Claims

The Plan defines "Other Secured Claim" as the secured portion of any Claim against a Plan Debtor other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against one or more of the Conveying Subsidiaries that is secured by valid Liens on property of one or more of the Conveying Subsidiaries shall receive, in full and final satisfaction of such Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents or the Liquidation Trustee, as applicable: (a) payment of the Claim in full, in Cash, including interest, to the extent applicable; (b) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or (c) such other treatment as may be agreed to by the Proponents or the Liquidation Trustee, as applicable, and such Claim holder.

The Proponents estimate that the amount of Other Secured Claims against the Conveying Subsidiaries will total approximately $145,976 as of the Effective Date.  The projected recovery under the Plan for the Other Secured Claims against the Conveying Subsidiaries is 100%.  This Class of Claims is Unimpaired.  Pursuant to the Plan, holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iii.        Class 3 – Other Priority Claims

The Plan defines "Other Priority Claim" as any Claim against a Plan Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against one or more of the Conveying Subsidiaries shall receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in full in Cash.

The Proponents estimate that the amount of Other Priority Claims against the Conveying Subsidiaries will total approximately $5,513 as of the Effective Date. The projected recovery under the Plan for Other Priority Claims against the Conveying Subsidiaries is 100%. This Class of Claims is Unimpaired. Pursuant to the Plan, holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### iv.        Class 4 – Unsecured Claims

#### (A)        Class 4A – Senior Note Guaranty Claims

The Plan defines "Senior Note Guaranty Claim" as any Claim against a Conveying Subsidiary derived from or based upon such Conveying Subsidiary's guaranty of the Senior Notes, other than a Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

The Plan provides that the Senior Note Guaranty Claims shall be Allowed against each of the Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC, in the aggregate amount of $573,518,194. For the avoidance of doubt, the Allowed Senior Note Guaranty Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

The Plan provides that on the Distribution Date, each holder of an Allowed Senior Note Guaranty Claim against a Conveying Subsidiary shall receive: (i) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures) of (a) the Unencumbered Cash of such Conveying Subsidiary; (b) the Monarch Settlement Payments; (c) the Unsecured Creditor D&O Recovery; (d) the Transeastern Offshore Disgorgement; and (e) the Conveying Subsidiaries Term Loan Lender Disgorgement Share; and (ii) its *Pro Rata* share of the Conveying Subsidiaries Class 4A Liquidation Trust Interests allocable to such Conveying Subsidiary. After deducting their respective share of the Liquidation Trust Loan, the distributions set forth above shall be allocated to the holders of Allowed Senior Note Guaranty Claims against each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.B.2 of the Plan.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

#### (B)        Class 4B – General Unsecured Claims

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor that is not a Priority Tax Claim, Administrative Claim, Accrued Professional Compensation Claim,

Senior Note Claim, Senior Note Guaranty Claim, Subordinated Note Claim, Subordinated Note Guaranty Claim, Chinese Drywall Claim, PIK Note Claim, Other Priority Claim, Prepetition Intercompany Claim, Postpetition Intercompany Claim, Term Loan Deficiency Claim or Transeastern Claim.

The Proponents estimate that the amount of General Unsecured Claims against the Conveying Subsidiaries will be approximately $917,951,967 (approximately $729,905,250 of which are Claims derived from documented, prepetition Intercompany Notes) as of the Effective Date.

The Plan provides that on the Distribution Date, each holder of Allowed General Unsecured Claims against a Conveying Subsidiary shall receive the **greater** of (i)(a) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary) of (I) the Unencumbered Cash of such Conveying Subsidiary; (II) the Monarch Settlement Payments; (III) the Unsecured Creditor D&O Recovery; (IV) the Transeastern Offshore Disgorgement; and (V) the Conveying Subsidiaries Term Loan Lender Disgorgement Share; and (b) its *Pro Rata* share of the series of Conveying Subsidiaries Class 4B Liquidation Trust Interests allocable to such Conveying Subsidiary; **or** (ii) the Minimum Conveying Subsidiary Recovery Amount. After deducting their respective share of the Liquidation Trust Loan, the distributions set forth above shall be allocated to the holders of Allowed General Unsecured Claims against each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.B.2 of the Plan.

This Class of Claims is Impaired. Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### (C)    Class 4C – Subordinated Note Guaranty Claims

The Plan defines "Subordinated Note Guaranty Claim" as any Claim against a Conveying Subsidiary derived from or based upon such Conveying Subsidiary's guaranty of the Subordinated Notes other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

The Plan provides that the Subordinated Note Guaranty Claims shall be Allowed against the applicable Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC, in the aggregate amount of $532,772,336.

The Plan provides that holders of Allowed Subordinated Note Guaranty Claims against the Conveying Subsidiaries will not receive a distribution on account of such Claims as distributions otherwise allocable to the holders of such Claims shall be reallocated to the holders of Allowed Senior Note Guaranty Claims in accordance with the terms of the Subordinated Note Indentures.

This Class of Claims is Impaired. Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### v.    Class 5 – 510 Claims

The Plan defines "510 Claims" as all Claims against each of the Plan Debtors that are subordinated pursuant to sections 510(b) and 510(c) of the Bankruptcy Code. Section 510(b) of the Bankruptcy Code provides for the subordination of litigation claims asserted on account of the purchase or sale of securities. Section 510(c) of the Bankruptcy Code provides for subordination of certain other claims, after notice and a hearing.

The Proponents estimate that the amount of 510 Claims against the Conveying Subsidiaries will total $0 as of the Effective Date.  The Plan provides that holders of 510 Claims against each Conveying Subsidiary will receive no distribution on account of such Claims.

This Class of Claims is Impaired.  Holders of Claims in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### vi.    Class 6 – Interests

The Plan defines "Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Interests in the Conveying Subsidiaries shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Interests in the Conveying Subsidiaries will receive no distribution on account of such Interests.

This Class of Interests is Impaired.  Holders of Interests in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### c.    Classes of Claims Against and Interests in Beacon Hill

### i.    Class 1 – Other Secured Claims

The Plan defines "Other Secured Claim" as the secured portion of any Claim against a Plan Debtor other than a First Lien Revolver Claim, a First Lien Term Loan Claim or a Second Lien Term Loan Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against Beacon Hill that is secured by valid Liens on property of Beacon Hill shall receive, in full and final satisfaction of such Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents or the Liquidation Trustee, as applicable: (a) payment of the Claim in full in Cash, including interest, to the extent applicable; (b) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or (c) such other treatment as may be agreed to by the Proponents or the Liquidation Trustee, as applicable, and such Claim holder.

The Proponents estimate that the amount of Other Secured Claims against Beacon Hill will total $0 as of the Effective Date.  The projected recovery under the Plan for the Other Secured Claims against Beacon Hill is 100%.  This Class of Claims is Unimpaired.  Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

ii.        **Class 2 – Other Priority Claims**

The Plan defines "Other Priority Claim" as any Claim against a Plan Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Plan provides that, on the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against Beacon Hill shall receive, in full and final satisfaction of such Claim, payment of the amount of such Allowed Claim in full in Cash.

The Proponents estimate that the amount of Other Priority Claims against Beacon Hill will total $0 as of the Effective Date.  The projected recovery under the Plan for Other Priority Claims against Beacon Hill is 100%.  This Class of Claims is Unimpaired.  Holders of Claims in this Class are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

iii.        **Class 3 – General Unsecured Claims**

The Plan defines "General Unsecured Claim" as any Unsecured Claim against any Plan Debtor, including (a) any Claims derived from documented, prepetition Intercompany Notes, (b) prepetition Claims against the Plan Debtors asserted by Customers (other than the Chinese Drywall Claims), to the extent not covered by an insurance policy, (c) Tort Claims, to the extent not covered by an insurance policy and (d) Other Deficiency Claims.

The Proponents estimate that the Allowed amount of General Unsecured Claims against Beacon Hill will be approximately $3,541 as of the Effective Date.

The Plan provides that, on the Distribution Date, each holder of an Allowed General Unsecured Claim against Beacon Hill shall receive payment of such Allowed Claim in full in Cash (without postpetition interest).

This Class of Claims is Impaired.  Pursuant to the Plan, holders of Claims in this Class are entitled to vote to accept or reject the Plan.

iv.        **Class 4 – Interests**

The Plan defines "Interest" as any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

The Plan provides that, on the Effective Date, all Interests in Beacon Hill shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Interests in Beacon Hill will receive no distribution on account of such Interests.  This Class of Interests is Impaired.  Holders of Interests in this Class are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    MEANS FOR IMPLEMENTATION OF THE JOINT PLAN

    1.    Overview of Settlements in Connection with the Joint Plan

        a.    Mediation Settlement Under the Joint Plan

To consensually resolve all outstanding disputes among the Settlement Parties with respect to the Settled Mediation Causes of Action, the Settlement Parties have agreed to the Mediation Settlement, as summarized below and in the Plan, effective as of the Effective Date. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the various agreements constituting the Mediation Settlement, which is a good-faith settlement among the Settlement Parties relating to (i) the Committee Action, other than with respect to the Non-Settling Transeastern Lenders; (ii) disputes arising under or relating to the Intercreditor Agreement to the extent resolved under the Plan; and (iii) any and all claims asserted by a Settlement Party against another Settlement Party in connection with the Chapter 11 Cases, other than those claims specifically preserved as set forth in Article VIII of the Plan. Distributions to be made pursuant to the Plan shall be made on account of and in consideration of, among other things, the Mediation Settlement. Entry of the Confirmation Order shall confirm (a) the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Plan and all components of any agreements comprising the Mediation Settlement and (b) the Bankruptcy Court's finding that the Mediation Settlement is (i) in the best interests of the Plan Debtors, their respective Estates and the holders of Claims and Interests and (ii) fair, equitable and reasonable.

        b.    Unsecured Creditor Settlement Under the Joint Plan

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve, among other things, the Unsecured Creditor Settlement, which is an agreement between the Debtors and the Committee with respect to the allocation of value among the Debtors' Estates as implemented through the Committee Model and the recoveries under the Plan. Distributions to be made to Non-Term Loan Lender Unsecured Creditors pursuant to the Plan shall be made on account of and in consideration of the Unsecured Creditor Settlement. Entry of the Confirmation Order shall confirm (a) the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Plan and all components of the Unsecured Creditor Settlement and (b) the Bankruptcy Court's finding that the Unsecured Creditor Settlement is (i) in the best interests of the Plan Debtors, their respective Estates and the holders of Claims and Interests and (ii) fair, equitable and reasonable.

        c.    D&O Insurance Coverage Settlement Pursuant to the D&O Settlement Order

To consensually resolve all outstanding disputes among the D&O Settlement Parties with respect to the Fiduciary Duty Action and the D&O Insurance Coverage Action, among other matters, the D&O Settlement Parties have reached agreement in principle, subject to final documentation, as to the terms of the D&O Insurance Coverage Settlement, which shall be set forth in the D&O Insurance Coverage Settlement Agreements. Distributions to be made pursuant to the Plan shall be made on account of and in consideration of, among other things, the D&O Insurance Coverage Settlement, subject to the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order. For the avoidance of doubt, the D&O Insurance Coverage Settlement does not impact the RSUI Insurance Coverage Action.

2.        **The Models**

Distributions under the Plan are premised on Mediation Model Case F and the Committee Model, as described in further detail herein and in the Plan.

Mediation Model Case F was developed to facilitate negotiations in connection with the Mediation.  The Committee Model was initially developed by the Committee's financial advisors for purposes of calculating distributions under previously filed chapter 11 plans for the Debtors.

Mediation Model Case F establishes a method for allocating recoveries in connection with the Mediation Settlement between the Prepetition Secured Lenders, on the one hand, and the Non-Term Loan Lender Unsecured Creditors, on the other hand.  A condition to the Committee's agreement to the Mediation Settlement and the D&O Insurance Coverage Settlement was that the Committee Model— rather than Mediation Model Case F—be used to determine the method of allocating recoveries among the Non-Term Loan Lender Unsecured Creditors.  As such, pursuant to the Mediation Settlement and the D&O Insurance Coverage Settlement, recoveries to the Non-Term Loan Lender Unsecured Creditors will be allocated pursuant to the Committee Model and any drivers underlying the allocations contemplated therein, without regard for how such recoveries are allocated pursuant to Mediation Model Case F and any drivers underlying the allocations contemplated therein.

The Models assume approximately the same base aggregate value available for distribution to all creditors of the Plan Debtors' Estates.  Further, the Models both take into account certain considerations in determining allocations of assets and liabilities among the Plan Debtors, including, without limitation, the following:

- The Models incorporate data for assets, Claims asserted against the Debtors, professional fees and other numerical values allocated by legal entity, per the RVA, for projected recovery purposes and will be updated for actual results as of the Effective Date.

- The drivers for the Models do not include (i) the Monarch Settlement Payments, (ii) the D&O Insurance Settlement Amount, (iii) proceeds of Transeastern Litigation Settlement(s), if any, (iv) the Transeastern Offshore Disgorgement, (v) proceeds of the Falcone Action, (vi) proceeds of the RSUI Insurance Coverage Action, or (vii) proceeds of the Remaining Contingent Assets.

- The Models assume that the 2008 Federal Tax Refund is not subject to any Liens.

- Neither Model provides for the cost of funding the Liquidation Trust or the value of the Liquidation Trust Causes of Action.

- The Models provide that all prepetition intercompany obligations between TOUSA, on the one hand, and the Conveying Subsidiaries, on the other hand, are in the nature of equity contributions, in accordance with the Bankruptcy Court Decision.  As such, the holders of Prepetition Intercompany Claims will receive no distribution under the Plan.[27]

Notwithstanding the above commonalities, the Models rely on a number of distinct considerations, as discussed below.

---

[27] For the avoidance of doubt, prepetition intercompany obligations among the Conveying Subsidiaries that are documented by the prepetition Intercompany Notes will be treated in accordance with Article V.A.7(b) of the Plan.

### a.    Mediation Model Case F

Mediation Model Case F also provides, among other things, the following:

- Mediation Model Case F reflects (1) the assets and liabilities of TOUSA separately from (2) the assets and liabilities of all Conveying Subsidiaries, which are treated on a consolidated basis.

- Mediation Model Case F treats Cash held as of the Petition Date as property of TOUSA and as subject to the Liens of the First Lien Revolver Lenders and First Lien Term Loan Lenders.

- Mediation Model Case F allocates 75% of the postpetition consolidated payroll, information technology and telecommunications expenses paid by TOUSA to the Conveying Subsidiaries.

- Mediation Model Case F does not account for treatment of the Intercompany Notes held by certain Conveying Subsidiaries.

### b.    The Committee Model

Distinct from Mediation Model Case F, the Committee Model provides, among other things, the following:

- The Committee Model reflects (1) the assets and liabilities of TOUSA and (2) the assets and liabilities of each Conveying Subsidiary on an entity-by-entity basis.

- The Committee Model treats Cash held as of the Petition Date as property of the Conveying Subsidiaries and Beacon Hill and as subject to the Liens of the First Lien Revolver Lenders.

- The Committee Model allocates postpetition expenses in accordance with the book value of assets of each Plan Debtor as of the Petition Date.

- The Committee Model provides for allocation of the Intercompany Notes held by TOUSA Funding against certain of the Conveying Subsidiaries.

Following allocation of recoveries between the Term Loan Lenders, on the one hand, and the Non-Term Loan Lender Unsecured Creditors, on the other hand, pursuant to Mediation Model Case F, the Committee Model allocates distributions between Non-Term Loan Lender Unsecured Creditors at TOUSA and Non-Term Loan Lender Unsecured Creditors at each of the Conveying Subsidiaries pursuant to the Committee Model.  Then, (i) distributions to Non-Term Loan Lender Unsecured Creditors at TOUSA are further allocated between the holders of Allowed Senior Note Claims at TOUSA and the holders of Allowed General Unsecured Claims at TOUSA and (ii) distributions to Non-Term Loan Lender Unsecured Creditors at each Conveying Subsidiary are further allocated between the holders of Allowed Senior Note Claims at each applicable Conveying Subsidiary and the holders of Allowed General Unsecured Claims at each applicable Conveying Subsidiary.

      **3.**      **Components of the Mediation Settlement and the D&O Insurance Coverage Settlement**

      **a.**      **The Mediation Settlement**

      **i.**      **The Revolver Agreement**

Pursuant to the Mediation Settlement and the Plan, each holder of an Allowed First Lien Revolver Claim shall receive its *Pro Rata* share of the Default Interest Amount, representing accrued, unpaid postpetition interest in respect of the First Lien Revolver Claims, including default interest at the rate of 1% per annum on the applicable outstanding principal amount due and owing under the First Lien Revolving Credit Agreement at any given time for the period from the Petition Date through November 21, 2011 and waive any right to receive any additional amounts on account of default interest.  Such amounts shall be paid in Cash from the Conveying Subsidiaries; *provided*, *however*, that Mediation Model Case F reallocates from TOUSA to the Conveying Subsidiaries value equal to 34.5% of the Default Interest Amount on account of the additional funds paid by the Conveying Subsidiaries in excess of their allocable share of the payments made hereunder in respect of the Default Interest Amount to the holders of the First Lien Revolver Claims to ensure that the creditors of the Conveying Subsidiaries receive recoveries under the Plan as if 34.5% of the Default Interest Amount was paid by TOUSA.

Mediation Model Case F further provides that all other amounts previously paid with respect to the First Lien Revolver Claims have been or shall be deemed to have been paid *Pro Rata* from the respective pools of collateral held by TOUSA and the Conveying Subsidiaries according to the ratio of such assets (approximately 65.5% from the Conveying Subsidiaries and 34.5% from TOUSA).  The collateral remaining at TOUSA (*i.e.*, the remaining Cash as of the Petition Date and the 2007 Federal Tax Refund, to the extent such funds were not used to satisfy the First Lien Revolver Claims during these Chapter 11 Cases, will be subject to the Liens of the Term Loan Lenders, except as set forth in Article V.C.1(a) of the Plan).

      **ii.**      **2007 Federal Tax Refund Agreement**

Pursuant to the Plan and the Mediation Settlement, all litigation related to the 2007 Federal Tax Refund will be settled as follows: (i) holders of Allowed Unsecured Claims at TOUSA (including the Term Loan Lenders in respect of their Term Loan Deficiency Claims) will receive their *Pro Rata* share of the Unsecured Creditor Tax Refund Recovery (subject to applicable subordination rights as set forth in Article V.C.1(b) of the Plan) and (ii) the Term Loan Lenders will receive the Term Loan Lender Tax Refund Recovery, with all such value allocated to the First Lien Term Loan Lenders on account of the First Lien Term Loan Secured Claims.

      **iii.**      **The Term Loan Lenders' Disgorgement Obligations**

Pursuant to certain orders of the Bankruptcy Court in the Committee Action, the Term Loan Lender Defendants were required to disgorge to TOUSA and the Conveying Subsidiaries amounts that were paid by one or more of the Plan Debtors to the professionals for the Term Loan Lender Defendants [Adv. Pro. No. 08-01435, ECF Nos. 659, 729, 1037].  Mediation Model Case F provides for the disgorgement of such professional fees for the benefit of the holders of Unsecured Claims against TOUSA and the Conveying Subsidiaries as set forth below and in the Plan.  With respect to the Term Loan Lender Professional Fee Disgorgements, Mediation Model Case F provides for payment only of postpetition professional fees allocated to the First Lien Revolver Lenders (given that the First Lien Term Loan Secured Claims are undersecured).  The allocation of fees among the First Lien Revolver Lenders, the First Lien Term Loan Lender Defendants and the Second Lien Term Loan Lender Defendants is

consistent with the Quantification Order, pursuant to which the Term Loan Lender Defendants shall pay all Term Loan Lender Professional Fee Disgorgements on account of professional fees paid to them or on their behalf.

Pursuant to the Plan and the Mediation Settlement, in connection with the Effective Date, the Term Loan Lender Defendants shall be required to make the Term Loan Lender Disgorgement Payments, which shall include: (i) with respect to the First Lien Term Loan Lender Defendants, their respective share of (a) the Principal and Interest Disgorgement and (b) the First Lien Term Loan Professional Fee Disgorgement; and (ii) with respect to the Second Lien Term Loan Lender Defendants, their respective share of the Second Lien Term Loan Professional Fee Disgorgement.

The First Lien Term Loan Lender Defendants shall pay the Principal and Interest Disgorgement to the Liquidation Trust in Cash.  Pursuant to the Mediation Settlement, and in order to implement the Intercreditor Settlement Agreement, the Debtors shall offset the First Lien Term Loan Professional Fee Disgorgement from distributions otherwise allocable to the First Lien Term Loan Lenders on account of the First Lien Term Loan Claims (as if such amounts had been paid), such that the First Lien Term Loan Lender Defendants shall not be required to pay any amounts in respect of the First Lien Term Loan Professional Fee Disgorgement.  The Second Lien Term Loan Lender Defendants shall pay the Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust in Cash. A schedule setting forth the amount of each Term Loan Lender Disgorgement Payment, the amount thereof (if any) that has already been paid, the amount of such disgorgement that shall be paid from supersedeas bonds, cash collateral or other sources and any additional amounts that the Term Loan Lender Defendants shall be required to pay is attached to the Plan as Exhibit E.  The Term Loan Lender Disgorgement Payments shall be allocated between TOUSA and the Conveying Subsidiaries in the amounts of the TOUSA Term Loan Lender Disgorgement Share and the Conveying Subsidiaries Term Loan Lender Disgorgement Share, respectively.  For the avoidance of doubt, the Conveying Subsidiaries Term Loan Lender Disgorgement Share will be allocated among the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.B.2 of the Plan, and distributed to holders of Allowed Claims in accordance with the terms of the Plan and as described herein.

Pursuant to Mediation Model Case F, the Term Loan Lender Disgorgement Payments include prejudgment interest at a rate of 5% per annum and post-judgment interest at a rate of 1% per annum through the Effective Date (such rates of interest shall apply to the Term Loan Lender Disgorgement Payments notwithstanding anything to the contrary in the Bankruptcy Court Decision or the Quantification Order).

To the extent a Term Loan Lender Defendant has not previously paid its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement, or in the case of a Second Lien Term Loan Lender Defendant with respect to its Second Lien Term Loan Professional Fee Disgorgement, such Term Loan Lender Defendant shall make payment thereof within seven Business Days of the Effective Date to the Liquidation Trustee.  To the extent that a Term Loan Lender Defendant has posted supersedeas bonds or cash collateral in respect of the Principal and Interest Disgorgement or the Second Lien Term Loan Professional Fee Disgorgement, (a) in respect of supersedeas bonds, such bonding surety company shall pay the amounts set forth in the Plan to the Liquidation Trustee (and each First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); (b) in respect of cash collateral posted by a Term Loan Lender Defendant with the Bankruptcy Court, such cash collateral shall be released in the amounts set forth in the Plan to the Liquidation Trustee; and (c) in respect of cash collateral escrowed with the Committee (including in attorney trust accounts with Robbins Russell), such cash collateral shall be released in the amounts set forth in the Plan to the Liquidation Trustee.  Upon the full payment of a Term Loan Lender Defendant's Term Loan

Lender Disgorgement Payment, any amounts posted as collateral escrowed by such Term Loan Lender Defendant in excess of the amount of such Term Loan Lender Defendant's Term Loan Lender Disgorgement Payment (including by offset, to the extent applicable) shall be released to or for the benefit of such Term Loan Lender Defendant.  Any amounts paid by any Term Loan Lender Defendant in excess of its Term Loan Lender Disgorgement Payment shall be paid to the applicable First Lien Term Loan Defendant or Second Lien Term Loan Defendant.

Notwithstanding anything to the contrary in the Plan, to the extent any Term Loan Lender Defendant fails to make its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust within seven Business Days of the Effective Date, such Term Loan Lender Defendant shall not be entitled to receive any distributions under the Plan unless and until such amounts have been disgorged or offset as provided under the Plan.  Amounts otherwise allocable to such Term Loan Lender Defendant shall be distributed by the Liquidation Trustee to the holders of Allowed Unsecured Claims against TOUSA and Allowed Unsecured Claims against the Conveying Subsidiaries, as applicable, in an amount equal to the Term Loan Lender Disgorgement Payments with respect to Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement not paid to the Liquidation Trust within seven Business Days of the Effective Date.  Any excess thereafter shall be paid to the applicable Agent for distribution in accordance with the Plan and/or the Intercreditor Settlement Agreement.

Term Loan Lender Defendants that do not comply with the foregoing shall be liable for damages to the Liquidation Trust and shall be deemed to be in contempt of the Confirmation Order and subject to additional sanctions.

### iv.    The Monarch Agreement

As discussed in section V.G.2.p above, pursuant to the Monarch Settlement Agreement, Monarch paid the Initial Monarch Settlement Payment (43.43% of $45 million, or $19,543,500), to the Conveying Subsidiaries Account as an initial settlement payment in respect of the Monarch Settling Parties' exposure under the Transeastern Judgment.  Since the Monarch Settlement Agreement was approved by the Bankruptcy Court, the Monarch Settling Parties' share of the Transeastern Judgment has increased by approximately 2.50%, as reflected in the Updated Monarch Settlement Percentage.  As part of the Mediation Settlement, Monarch, GCAT and Barclays (each of which shall be deemed a Monarch Settling Party with respect to the Additional Monarch Transeastern Liability) shall be permitted to settle the Additional Monarch Transeastern Liability according to the same terms as the Monarch Settlement Agreement.  In connection therewith, within 3 Business Days of the Effective Date, Monarch will pay the Increased Monarch Settlement Payment to the Conveying Subsidiaries Account to account for the Updated Monarch Settlement Percentage, such that the total amount paid by the Monarch Settling Parties in respect of the Initial Monarch Settlement Payment shall be increased to 45.93% of $45 million, or $20,668,500.  The Monarch Settlement Agreement also provided for a supplemental payment by Monarch in the event that a final order is entered in the Transeastern Litigation pursuant to which the Conveying Subsidiaries are awarded monetary damages in excess of $45 million (the Monarch Supplemental Payment Obligation).

Pursuant to the Mediation Settlement and the Plan, Monarch shall pay the Monarch Mediation Settlement Payment to the Conveying Subsidiaries Account, in full and final satisfaction of the Monarch Supplemental Payment Obligation, representing 25% of the maximum amount of the Monarch Supplemental Payment Obligation, as revised to reflect the Updated Monarch Settlement Percentage.

Furthermore, upon the Effective Date:

116

(a) All liability under or in respect of the Additional Monarch Transeastern Liability shall be transferred to and assumed by Monarch, and all rights and claims arising from or related to the Additional Monarch Transeastern Liability shall be transferred and assigned to Monarch (the foregoing liabilities, rights and claims shall each be subject to the compromises under the Plan and under the Monarch Settlement Agreement); and

(b) Solely in respect of the Additional Monarch Transeastern Liability, (i) the supersedeas bond posted by GCAT and/or Barclays shall no longer be required and shall be fully and unconditionally discharged, released and exonerated, and Monarch, GCAT, Barclays and any surety company in respect of such supersedeas bond shall be fully and unconditionally discharged and released from any and all past, present and future liability arising under or in connection with the issuance of such bond and (ii) Monarch, GCAT and Barclays, each in its capacity as a Settling Transeastern Lender, will be fully and finally released from, and the Committee and the Debtors shall be deemed to fully and finally waive with respect to such Settling Transeastern Lenders in respect of the Additional Monarch Transeastern Liability, any requirement to post a supersedeas bond with respect to the Additional Monarch Transeastern Liability or any other amounts as may be adjudged or awarded against such Settling Transeastern Lenders in respect of the Additional Monarch Transeastern Liability in connection with the Transeastern Litigation.

Except as provided in the Plan, or as necessary to effectuate the terms of the Plan, nothing in the Plan or the Mediation Settlement amends or supersedes the terms and conditions of the Monarch Settlement Agreement.

Further, Monarch shall have the right, by the Administrative Claims Bar Date, to file a 503(b) Application seeking reimbursement from TOUSA, up to an aggregate amount of $6 million, of the actual and reasonable professional fees and actual, necessary expenses incurred by Monarch in connection with the Chapter 11 Cases. Pursuant to the Mediation Settlement and the Plan, the Debtors, the Committee, each member of the Committee, MatlinPatterson and the Liquidation Trustee will not object to the reimbursement by TOUSA of up to $6 million of the fees incurred by Monarch as set forth in such 503(b) Application. In order to pay any amounts approved under the 503(b) Application, $6 million shall be reserved from Unencumbered Cash at TOUSA until Monarch's 503(b) Application has been finally adjudicated pursuant to a Final Order.

## v.    The Transeastern Agreement

Pursuant to the Mediation Settlement and the Plan, the Liquidation Trust Agreement shall provide that the Net Proceeds of any Transeastern Disgorgement received from the Non-Settling Transeastern Lenders shall be allocated as follows: First, to repayment of the Liquidation Trust Loan in the amount of (x)(I) 70% of up to $2.5 million to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (II) 30% of up to $2.5 million to holders of Allowed TOUSA Class 2 Claims, each in proportion to the respective amounts funded to the Liquidation Trust Loan from the recoveries on account of such Claims and (y) up to $2.5 million to holders of Conveying Subsidiaries Liquidation Trust Interests to be allocated in accordance with the Committee Model and, thereafter, in respect of the Unsecured Creditor Transeastern Recovery and the Term Loan Lender Transeastern Recovery.

Pursuant to the Mediation Settlement and the Plan, to the extent the Transeastern Litigation is not resolved by a Final Order (either through litigation or settlement(s)) in advance of the Effective Date, on

117

the Effective Date, the Transeastern Litigation shall be transferred to the Liquidation Trust. The Liquidation Trust shall distribute the Net Proceeds of the Transeastern Litigation in a manner consistent with the allocation referenced in the immediately preceding paragraph.

The prosecution of the Transeastern Litigation will be funded by the Liquidation Trust Loan. Any amounts funded in connection with the Liquidation Trust Loan and unused by the Liquidation Trust shall be distributed in a manner consistent with the allocation referenced in (x) and (y) in this Section VI.C.3.a.v and in Article V.C.1(a) of the Plan. For the avoidance of doubt, recoveries to the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary will be allocated in accordance with the Committee Model.

Pursuant to the Mediation Settlement and the Plan, in the event of any Transeastern Litigation Settlement(s), the following shall apply: (i) subject to (ii) and (iii) below, acceptance of a Transeastern Litigation Settlement shall require the consent of the Unsecured Creditors' Liquidation Trust Representatives, holders of a majority in amount of the TOUSA Class 1B Transeastern Liquidation Trust Interests and holders of a majority in amount of the TOUSA Class 2 Transeastern Liquidation Trust Interests; (ii) if the proceeds of any Transeastern Litigation Settlement, net of any recovery on account of 502(h) Claims, are greater than $80.5 million (in the aggregate as if all Non-Settling Transeastern Lenders were party thereto), paid in a single Cash payment at the time of such settlement, the Unsecured Creditors' Liquidation Trust Representatives shall be deemed to consent to such Transeastern Litigation Settlement; and (iii) if the proceeds of any Transeastern Litigation Settlement, net of any recovery on account of 502(h) Claims, are equal to or greater than $100.5 million (in the aggregate as if all Non-Settling Transeastern Lenders were party thereto), the Liquidation Trust will not require consent of the holders of the Lender Transeastern Liquidation Trust Interests to the Transeastern Litigation Settlement before executing and seeking Bankruptcy Court approval of the same; _provided_, _however_, that with respect to any Transeastern Litigation Settlement that requires the approval of holders of Lender Transeastern Liquidation Trust Interests, the Liquidation Trustee will provide holders of Lender Transeastern Liquidation Trust Interests with notice of such proposed Transeastern Litigation Settlement in accordance with the Liquidation Trust Agreement, and each such holder will be deemed to consent to such Transeastern Litigation Settlement unless such holder advises the Liquidation Trustee in writing of an objection thereto in accordance with the Liquidation Trust Agreement no later than the 5th Business Day thereafter; _provided_, _further_, that any Opt-Out Holder may opt out of any such Transeastern Litigation Settlement in accordance with the following opt-out mechanism:

- Opt-Out Trigger. A Transeastern Litigation Settlement must be evidenced by a written agreement executed by the Liquidation Trustee and a Non-Settling Transeastern Lender in a form sufficiently binding to be presented to the Bankruptcy Court for approval (each, a "Transeastern Litigation Settlement Agreement"). Following execution of the Transeastern Litigation Settlement Agreement and filing of a motion to approve such Transeastern Litigation Settlement, the Liquidation Trustee shall provide notice (the "Notice of Transeastern Litigation Settlement"), approved in form and substance by a majority of the Liquidation Trust Advisory Board, to each holder of Lender Transeastern Liquidation Trust Interests. Such Notice of Transeastern Litigation Settlement shall contain, at a minimum, a summary of the material terms of the Transeastern Litigation Settlement Agreement, notice of the Opt-Out Period (as defined below) and instructions on how a holder of Lender Transeastern Liquidation Trust Interests may opt-out of such settlement, in accordance with the terms of the Liquidation Trust Agreement. A copy of the executed Transeastern Litigation Settlement Agreement shall also be attached to the Notice of Transeastern Litigation Settlement.

- <u>Payment of Opt-Out Price</u>. During the Opt-Out Period, a holder of Lender Transeastern Liquidation Trust Interests may opt out of a Transeastern Litigation Settlement by depositing the Opt-Out Price in cash into escrow for the ratable benefit of the holders of Conveying Subsidiaries Liquidation Trust Interests pending Bankruptcy Court approval of such Transeastern Litigation Settlement.

  o <u>Opt-Out Period</u>. As used herein and in the Liquidation Trust Agreement, with respect to any Transeastern Litigation Settlement, the "Opt-Out Period" shall be defined as the period beginning on the date when the Notice of Transeastern Litigation Settlement with respect to such Transeastern Litigation Settlement has been sent to holders of Lender Transeastern Liquidation Trust Interests and ending on the 5th business day thereafter.

  o <u>Opt-Out Price</u>. As used herein and in the Liquidation Trust Agreement, with respect to any Transeastern Litigation Settlement, the "Opt-Out Price" is equal to (a) the Opt-Out Percentage multiplied by (b) the portion of the Net Proceeds of such Transeastern Litigation Settlement that would be allocated to holders of Conveying Subsidiaries Liquidation Trust Interests as an Unsecured Creditor Transeastern Recovery or in repayment of the Liquidation Trust Loan. "Opt-Out Percentage" means, with respect to an Opt-Out Holder, the percentage (up to the percentage of all Lender Transeastern Liquidation Trust Interests held by such holder) of Lender Transeastern Liquidation Trust Interests with respect to which such Opt-Out Holder opts out of a Transeastern Litigation Settlement. For the avoidance of doubt, a holder of Lender Transeastern Liquidation Trust Interests may be an Opt-Out Holder for less than all of the Lender Transeastern Liquidation Trust Interests held by such holder, and a Non-Opt-Out Holder with respect to the remainder.

- <u>Effect of Opt-Out</u>. If an Opt-Out Holder opts out of a Transeastern Litigation Settlement with a Non-Settling Transeastern Lender:

  o Such Transeastern Litigation Settlement may only settle the liability of such Non-Settling Transeastern Lender other than the Opt-Out Percentage. The Transeastern Litigation Settlement Agreement shall provide that the Transeastern Litigation will continue against such Non-Settling Transeastern Lender, but the total liability of such Non-Settling Transeastern Lender will be capped at the Opt-Out Percentage of the amount of such lender's aggregate liability as if such Transeastern Litigation Settlement had not occurred.

  o The holders of Conveying Subsidiaries Liquidation Trust Interests and Non-Opt-Out Holders waive any right to receive any Transeastern Disgorgement paid by such Non-Settling Transeastern Lender with respect to the Opt-Out Percentage shall inure solely for the benefit of such Opt-Out Holder. For the avoidance of doubt, the holders of Conveying Subsidiaries Liquidation Trust Interests and Non-Opt-Out Holders shall continue to share in any Transeastern Disgorgement for other Non-Settling Transeastern Lenders who have not settled their liability pursuant to Transeastern Litigation Settlements. As used herein and in the Liquidation Trust Agreement, "Non-Opt-Out Holder" means, with respect to a Transeastern Litigation Settlement, any holder of Lender Transeastern Liquidation Trust Interests other than an Opt-Out Holder.

For the avoidance of doubt, 50% of the Net Proceeds of each Transeastern Litigation Settlement shall be paid to holders of Conveying Subsidiaries Liquidation Trust Interests in accordance with the terms of the Liquidation Trust Agreement until the Unsecured Creditor Transeastern Recovery is satisfied in full.  Further, in the event of any Transeastern Litigation Settlement(s), the amounts required to be repaid by the Opt-Out Holder shall include amounts in respect of the Liquidation Trust Loan that are otherwise allocable to the Conveying Subsidiaries to ensure that the $2.5 million funded to the Liquidation Trust Loan by the Conveying Subsidiaries is repaid in full.

Pursuant to the Mediation Settlement and the Plan, to the extent the Transeastern Lenders are determined to have Allowed Claims against any of the Plan Debtors' Estates (including, without limitation, 502(h) Claims and Claims arising from purported indemnification rights), any distributions that the Transeastern Lenders would otherwise be entitled to receive on account thereof shall be deducted or netted from the applicable Transeastern Disgorgement amount such that there will be no distribution from the Plan Debtors' Estates to the Transeastern Lenders on account of any Allowed Claims such Transeastern Lenders may have against the Plan Debtors' Estates.

### vi.    Intercreditor Settlement Agreement

To consensually resolve certain outstanding issues and disputes arising under or relating to the Intercreditor Agreement, in addition to those terms of the Mediation Settlement resolving disputes relating to the Intercreditor Agreement, as set forth in the Plan, the First Lien Agents, the First Lien Revolver Lenders, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent and the Second Lien Term Loan Lenders have agreed to the Intercreditor Settlement Agreement, attached to the Plan as Exhibit C.  The Plan incorporates and implements those provisions of the Intercreditor Settlement Agreement relating to the allocation of distributions made pursuant to the Plan.

Pursuant to the Intercreditor Settlement Agreement, the parties thereto agreed on, among other matters, (i) the outstanding amounts of Revolving Credit Obligations and First Lien Term Loan Obligations (as each such term is defined in the Intercreditor Agreement) for purposes of the Intercreditor Agreement, (ii) the allocation of the 2007 Federal Tax Refund previously paid to the First Lien Revolver Lenders and First Lien Term Loan Lenders, and (iii) the allocation and distribution of the Revolver Paydown, in accordance with Section 1 of the Intercreditor Settlement Agreement, and any payment in respect of additional interest with respect to First Lien Revolver Claims.

In addition, the Intercreditor Settlement Agreement provides for the allocation and distribution of any and all future recoveries in respect of the First Priority Obligations (as defined in the Intercreditor Agreement), including, without limitation, a Transeastern Disgorgement, as follows:

- Pursuant to Section 2(a), $18,210,682 of the Revolver Paydown (held back from the first distribution under the Intercreditor Settlement Agreement) and any First Priority Recoveries (excluding any Transeastern Disgorgement received by a First Lien Term Loan Lender or First Lien Revolver Lender), will be deposited into a distribution escrow account maintained by the First Lien Revolver Agent, in its capacity as the First Priority Representative (as defined in the Intercreditor Agreement).  Prior distributions of the Revolver Paydown, any 2007 Federal Tax Refund that a First Lien Revolver Lender or a First Lien Term Loan Lender Defendant previously received and is permitted to retain, and interest payments received in respect of First Lien Revolver Claims are not required to be deposited into such distribution escrow account.  Such amounts will be retained by the Agent or lender that received such payment, but are factored into the calculation of the distributions that the First Lien Term Loan Lenders and First Lien Revolver Lenders receive.

- Pursuant to Section 2(b) of the Intercreditor Settlement Agreement, the amounts in the distribution escrow account will be distributed as follows:

  o First, to the extent there are insufficient funds in the Agents' fee reserve, to pay certain costs and expenses of the Agents;

  o Second, to reimburse any Term Loan Lender Defendant to the extent it has paid a professional fee disgorgement (and prejudgment and postjudgment interest thereon);

  o Third, until the Stipulated First Priority Obligations Payment Date (as defined in the Intercreditor Settlement Agreement) has occurred, the Revolver True-Up and First Lien Term True-Up (each, as defined in and calculated under Section 2(d) of the Intercreditor Settlement Agreement) will be paid to the First Lien Revolver Agent and First Lien Term Loan Agent, respectively, for the benefit of their respective lenders in accordance with the terms of the First Lien Revolving Credit Agreement and the First Lien Term Loan Agreement; and

  o Fourth, the balance, if any, to whomever may be lawfully entitled to receive the same or as a Final Order of a court of competent jurisdiction may direct.

- To the extent a chapter 11 plan of the Debtors provides for the direct issuance to a First Lien Term Loan Lender or First Lien Revolver Lender of liquidation trust interests:

  o With respect to liquidation trust interests related to recoveries in respect of Transeastern Disgorgements, such issuance will be effectuated in accordance with the proportions set forth in Section 3(b)(ii) of the Intercreditor Settlement Agreement, pro rata based on the Revolver Allocation Percentage and First Lien Term Allocation Percentage (each, as defined in and calculated under Section 2(d) of the Intercreditor Settlement Agreement) to the First Lien Revolver Lenders (other than Monarch as to its 45.93% of First Lien Revolver Claims) and the First Lien Term Loan Lenders (other than Monarch as to its 45.93% of First Lien Term Loan Claims).

  o With respect to liquidation trust interests in respect of recoveries from other actions against third parties other than the Debtors or Committee, such issuance will be effectuated in accordance with Section 2(c)(ii) of the Intercreditor Settlement Agreement, pro rata based on the Revolver Allocation Percentage and First Lien Term Allocation Percentage to the First Lien Revolver Lenders and First Lien Term Loan Lenders in accordance with their respective loan agreements.

  o Such issuance, in accordance with the terms above, will be in full and complete satisfaction of the sharing and turnover obligations of the party that owns the claims with respect to which such Liquidation Trust Interests were issued.

Additional terms of the settlement are set forth in the Intercreditor Settlement Agreement, which is incorporated and made a part of the Plan as if fully set forth therein.

Accordingly, to implement the Intercreditor Settlement Agreement, Cash allocable to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims shall, after deduction of their respective shares of the Liquidation Trust Loan, be paid to the First Lien Revolver Agent, in its capacity as the First Priority Representative (as defined in the Intercreditor Agreement) for

distribution to or for the benefit of the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the Term Loan Lender Defendants in accordance with the Intercreditor Settlement Agreement. Cash allocable to holders of Allowed TOUSA Class 2 Claims shall, after deduction of their respective share of the Liquidation Trust Loan, be paid to the Second Lien Term Loan Agent, as Distribution Agent for distribution to or for the benefit of the Second Lien Term Loan Lenders in accordance with the Second Lien Term Loan Credit Agreement (which amounts shall not be subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement).

Pursuant to the Plan, to further implement the Intercreditor Settlement Agreement and notwithstanding the treatment provided in Article III.C of the Plan, TOUSA Class 1B General Liquidation Trust Interests and TOUSA Class 1B Transeastern Liquidation Trust Interests shall be allocated among and directly issued to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims in accordance with the respective interests of such holders in distributions under the Plan, as provided in the Intercreditor Settlement Agreement. In accordance with the Intercreditor Settlement Agreement, such issuance will be in full and complete satisfaction of the sharing and turnover obligations of the First Lien Term Loan Lenders with respect to such Liquidation Trust Interests and any and all distributions on account of such Liquidation Trust Interests. Furthermore, each holder of Allowed TOUSA Class 2 Claims shall be directly issued its respective shares of TOUSA Class 2 General Liquidation Trust Interests and TOUSA Class 2 Transeastern Liquidation Trust Interests.

Pursuant to the Mediation Settlement and the Plan, the provisions of Section 2.6 of the Monarch Settlement Agreement have been incorporated into the Intercreditor Settlement Agreement such that under the Intercreditor Settlement Agreement, Monarch shall not receive TOUSA Class 1B Transeastern Liquidation Trust Interests or TOUSA Class 2 Transeastern Liquidation Trust Interests on account of its holdings of First Lien Revolver Claims, First Lien Term Loan Claims or Second Lien Term Loan Claims to the extent such holdings do not exceed 45.93% of all such Claims, but shall receive TOUSA Class 1B Transeastern Liquidation Trust Interests and TOUSA Class 2 Transeastern Liquidation Trust Interests to the extent its holdings of such Claims exceed 45.93% of the total amount of such Claims.

### b.    The D&O Insurance Coverage Settlement

Pursuant to the D&O Insurance Coverage Settlement Agreements, the Settling D&O Insurers agreed to pay the D&O Insurance Settlement Amount in settlement of the Fiduciary Duty Action, the D&O Insurance Coverage Action as it relates to the Settling D&O Insurers and the Prepetition Secured Lender Demand Claims against the Defendant Directors and Officers, in each case, other than with respect to the RSUI Insurance Coverage Action. In addition, the Settling D&O Insurers agreed to pay legal fees and expenses of the Defendant Directors and Officers in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan up to: (a) $8,270,000 for fees and expenses incurred in litigation defense in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan prior to March 19, 2013. XL Bermuda agreed to pay the legal fees and expenses, up to $250,000, of the Defendant Directors and Officers incurred in finalizing the D&O Insurance Coverage Settlement from and after March 19, 2013.

The following is the allocation of the amounts paid under the D&O Insurance Coverage Settlement, including the D&O Insurance Settlement Amount and the 8,270,000 for fees and expenses incurred in litigation defense in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan prior to March 19, 2013, among the Settling D&O Insurers in accordance with the D&O Insurance Coverage Settlement Agreements:

> Federal: $4,185,980
> XL: $14,930,000
> Zurich American Insurance Company: $10,688,082
> St. Paul Mercury Insurance Company: $10,688,082
> National Union First Insurance Company of Pittsburgh, Pa.: $10,277,856
> Arch Insurance Company: $8,000,000
> AXIS Reinsurance Company: $9,000,000
> Westchester Fire Insurance Company: $3,000,000
> Allied World Assurance Company: $3,000,000
> Beazley Insurance Company, Inc.: $1,500,000

Additional terms of the D&O Insurance Coverage Settlement are set forth in the D&O Insurance Coverage Settlement Agreements. For the avoidance of doubt, recoveries to the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary on account of the D&O Insurance Coverage Settlement will be allocated in accordance with the Committee Model as set forth in Article V.B.2 of the Plan. Further, the summary of the D&O Insurance Coverage Settlement provided in the Plan is qualified in all respects by the terms of the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order. Finally, nothing in the Plan or the Confirmation Order shall limit or impact any terms, conditions or provisions of the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order, including, without limitation, the bar order and releases contained therein.

The D&O Insurance Coverage Settlement Agreements do not resolve the pending RSUI Insurance Coverage Action, and all rights are reserved with respect to RSUI and its insurance policy. Accordingly, the RSUI Insurance Coverage Action shall be transferred to the Liquidation Trust on the Effective Date. Any RSUI Insurance Coverage Action Recovery shall be allocated as follows: (a) the Unsecured Creditor RSUI Insurance Coverage Action Recovery shall be allocated for the benefit of the holders of the Conveying Subsidiaries Liquidation Trust Interests in accordance with the Committee Model and (b) the Term Loan Lender RSUI Insurance Coverage Action Recovery shall be allocated (i) 40% for the benefit of the holders of the TOUSA Class 1B Transeastern Liquidation Trust Interests and (ii) 60% for the benefit of the holders of TOUSA Class 2 Transeastern Liquidation Trust Interests (not subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement).

Should a Defendant Director and Officer be required to participate in litigation in any way involving the RSUI Insurance Coverage Action, through the production of documents, appearing for a deposition(s), testifying at any hearing or a trial or in any other manner, whether pursuant to subpoena or other process or request, such Defendant Director and Officer shall be provided legal representation by counsel for the Liquidation Trust, if such representation is requested by such Defendant Director and Officer. Such representation of the Defendant Director and Officer shall be at no cost to the Defendant Director and Officer, and shall be paid by the Liquidation Trust. Counsel to the Liquidation Trust shall have no obligation to represent a Defendant Director and Officer who does not agree to waive conflicts with respect to such representation. Counsel to the Liquidation Trust shall be permitted to decline to represent a Defendant Director and Officer if such representation would result in an unwaivable conflict, as determined by the Liquidation Trustee, or would violate any applicable rule of professional conduct, rule of ethics, law or court order, as determined by the Liquidation Trustee in its sole discretion.

### 4.    Existing Officers' Insurance and Indemnification

Pursuant to the Mediation Settlement and the Plan, before the Effective Date, the Proponents shall ensure that reasonable and appropriate insurance coverage can be obtained for the Existing Officers.  In the absence of available insurance coverage, the Proponents shall include provisions in the Liquidation Trust Agreement to ensure that the Existing Officers benefit from the indemnification provisions included therein; *provided*, *however*, that to the extent any Existing Officer is the beneficiary of any other indemnification obligation, such obligation shall be applied to the Existing Officer's liability prior to the application of any indemnification provisions contained in the Liquidation Trust Agreement.

### 5.    Valuation

The value of each Plan Debtor for all purposes associated with the Plan, including distributions under the Plan, has been determined by the Proponents, based on, among other things, the Models, the Mediation Settlement, the D&O Insurance Coverage Settlement, the proceeds of Liquidation Trust Causes of Action, the Cash of each Plan Debtor, the 2007 Federal Tax Refund, the 2008 Federal Tax Refund, the RVA, Intercompany Notes and an analysis of the Plan Debtors' books and records.  Attached as Exhibit E is an analysis of the remaining assets at each Plan Debtor.

### 6.    Postpetition Intercompany Claims

Pursuant to the Mediation Settlement, the D&O Insurance Coverage Settlement, Mediation Model Case F and the Plan, expenses attributable to TOUSA are allocated to TOUSA and expenses attributable to the Conveying Subsidiaries are allocated to the applicable Conveying Subsidiary; *provided*, *however*, that (i) Term Loan Lender Professional Fee Disgorgements and associated prejudgment and postjudgment interest shall be allocated 12.5% to TOUSA and 87.5% to the Conveying Subsidiaries and (ii) postpetition consolidated payroll, information technology and telecommunications expenses shall be allocated 25% to TOUSA and 75% to the Conveying Subsidiaries.

### 7.    Prepetition Intercompany Claims and Prepetition Intercompany Notes

Pursuant to the Plan, prepetition Intercompany Notes and Prepetition Intercompany Claims shall be treated as follows:

(a)    Consistent with the Bankruptcy Court Decision and the Mediation Settlement, the Plan treats Prepetition Intercompany Claims as Interests in the applicable Plan Debtors.  Therefore, the holders of Prepetition Intercompany Claims will receive no distributions pursuant to the Plan.

(b)    Consistent with the Bankruptcy Court Decision, the Plan treats prepetition Intercompany Notes as Allowed Claims against the applicable Plan Debtors, all of which are Conveying Subsidiaries.  However, the Plan Debtor beneficiaries of the prepetition Intercompany Notes will not receive a direct recovery on account of the Intercompany Notes; rather, value otherwise allocable to the prepetition Intercompany Notes will be allocated to the applicable beneficiary Conveying Subsidiary and taken into account in connection with the allocation of value among the Conveying Subsidiaries and the distributions to the holders of Allowed Unsecured Claims against the Conveying Subsidiaries that are entitled to a recovery under the Plan.

### 8.   Post-Effective Date Means for Implementation of the Joint Plan

#### a.   Corporate Existence

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Plan Debtors will be deemed authorized and approved without any requirement of further action by the Plan Debtors, the Plan Debtors' shareholders or the Plan Debtors' boards of directors.  The Plan provides that, on the Effective Date, to the extent not otherwise distributed to the holders of Allowed Claims or otherwise provided in the Plan, each Plan Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan.

The Plan provides that to the extent not used in the transfer of Liquidation Trust Assets and not completed prior to the Effective Date, the Plan Debtors (and their respective boards of directors) will dissolve as of the Effective Date and are authorized to dissolve or terminate the existence of wholly owned non-Plan Debtor subsidiaries following the Effective Date as well as any remaining health, welfare or benefit plans.  For the avoidance of doubt, once all assets of a Plan Debtor have been transferred to the Liquidation Trust, the applicable Plan Debtor or the Liquidation Trustee, as applicable, will take all necessary steps to dissolve such Plan Debtor.

#### b.   Closing of the Plan Debtors' Chapter 11 Cases

The Plan provides that when (i) all Disputed Claims filed against a Plan Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) the Committee Action has been resolved by Final Order, (iii) all Liquidation Trust Assets have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan and (iv) all other actions required to be taken by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek authority from the Bankruptcy Court to close such Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

#### c.   Method of Distribution Under the Plan

The Plan provides that distributions to holders of Allowed Claims against the Plan Debtors shall be made by the applicable Distribution Agent in accordance with the terms of the Plan.

#### d.   Monetization of Assets

The Plan provides that the Liquidation Trustee shall, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions to holders of Allowed Claims in accordance with the Plan.  In so doing, the Liquidation Trustee shall exercise its reasonable business judgment to maximize recoveries.  The Liquidation Trustee shall have no liability to any party for the outcome of its decisions in this regard.  For the avoidance of doubt, substantially all assets of the Plan Debtors as of the Effective Date other than Liquidation Trust Assets have been monetized and converted to Cash as of the date of the Plan.

#### e.   Books and Records

The Plan provides that the books and records for each Plan Debtors shall be maintained by the Liquidation Trustee to the extent necessary for the administration of the Liquidation Trust.  For the avoidance of doubt, to the extent the Debtors' books and records are not necessary for the administration of the Liquidation Trust, such books and records may be destroyed or abandoned as appropriate;

*provided*, *however*, that all such records and documents retained by the Liquidation Trustee may be destroyed no earlier than two years following the date of final distribution of Liquidation Trust Assets unless otherwise ordered by the Bankruptcy Court.

   **f.**  **Reporting Duties**

   Pursuant to the Plan, the Liquidation Trustee shall be responsible for filing informational returns on behalf of the Liquidation Trust and paying any tax liability of the Plan Debtors and the Liquidation Trust.  Additionally, the Liquidation Trustee shall file (or cause to be filed) any other statements, returns, reports or disclosures relating to the Plan Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.   In addition, the Liquidation Trustee shall provide unaudited financial statements to each Liquidation Trust Beneficiary on a quarterly basis by posting such unaudited financial statements on a website maintained by the Liquidation Trustee.

   **g.**  **Tax Obligations**

   The Plan provides that the Liquidation Trustee shall have the powers of administration regarding all of the Plan Debtors' and the Liquidation Trust's tax obligations, including filing of returns.  The Liquidation Trustee shall (a) endeavor to complete and file, within 120 days after the Effective Date, each Plan Debtor's final federal, state and local tax returns; (b) request, if necessary, an expedited determination of any unpaid tax liability of the Plan Debtors or their Estates under section 507(b) of the Bankruptcy Code for all taxable periods of the Plan Debtors ending after the applicable Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws; and (c) represent the interests and accounts of the Liquidation Trust or the Plan Debtors' Estates before any Tax Authority in all matters including, without limitation, any action, suit, proceeding or audit.  The Plan further provides that on the Initial Distribution Date, the Liquidation Trustee will place funds sufficient to pay all known tax obligations into a separate account until such obligations are due and payable.  To the extent the segregated funds are in excess of each Plan Debtor's or the Liquidation Trust's actual tax obligations, the segregated amounts will be distributed to holders of Liquidation Trust Interests at the applicable Plan Debtor in accordance with the Plan.

   **h.**  **Compliance with Tax Requirements/Allocations**

   In connection with the Plan, to the extent applicable, the Liquidation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidation Trustee and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Liquidation Trustee reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

   Pursuant to the Plan, for tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

### i.    Surrender of Cancelled Instruments or Securities

The Plan provides that, as a condition precedent to receiving any distribution on account of its Allowed Claim, each record holder of Senior Notes will be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except as provided in Article V.H.9 of the Plan or as otherwise provided in the Plan.  The Senior Note Indenture Trustees may (but shall not be required to) request that registered holders of the Senior Notes surrender their notes for cancellation to the extent such notes are certificated.

### j.    Resolution of Disputed Claims

### i.    Allowance of Claims

The Plan provides that after the Effective Date, the Liquidation Trustee shall have and shall retain any and all rights and defenses, including rights of setoff, that the Plan Debtors had with respect to any Claim.  Except as expressly provided in the Plan or in any order entered in the Plan Debtors' Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Plan Debtors' Chapter 11 Cases allowing such Claim, including, without limitation, the Confirmation Order.

### ii.    Prosecution of Objections to Claims Against the Plan Debtors

The Plan provides that after the Confirmation Date but before the Effective Date, the Proponents, and after the Effective Date, the Liquidation Trustee, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims.  From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court (other than settlement of Claims related to the Liquidation Trust Causes of Action, the settlement of which shall be subject to the approval of the Bankruptcy Court).  The Liquidation Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

With respect to all Tort Claims, the Plan provides that an objection is deemed to have been timely filed, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.  The Committee has objected to each of the claims of the Transeastern Lenders and, therefore, such Claims shall be Disputed Claims for purposes of the Plan.

The Plan provides that, for the avoidance of doubt, pursuant to the Bankruptcy Court Decision and the Mediation Settlement, all Claims asserted or assertable by the Term Loan Lenders against the Debtors, including any claims for breach of the solvency representations in the Loan Documents, have been released and disallowed.  No further objection to such Claims shall be required and no distributions will be made on account of such Claims.

### iii.    Claims Estimation

The Plan provides that after the Confirmation Date, but before the Effective Date, the Proponents, and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim

pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Plan Debtors, the Committee or the Liquidation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Pursuant to the Plan, notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. The Plan further provides that, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Liquidation Trustee may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Debtors, the Committee or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 20 days after the date on which such Claim is estimated. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### iv.    Expungement or Adjustment to Claims Without Objection

Pursuant to the Plan, any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Liquidation Trustee, and any Claim that has been amended may be adjusted thereon by the Liquidation Trustee, in both cases without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court. The Plan provides that beginning at the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court each calendar quarter a list of all Claims that have been paid, satisfied, superseded or amended during such prior calendar quarter.

### v.    Deadline to File Objections to Claims

The Plan provides that objections to Claims shall be filed no later than the Claims Objection Deadline.

### k.    Disallowance of Claims

Pursuant to the Plan, except for the Non-Settling Transeastern Lenders, all Claims of any Entity from which property is sought by the Plan Debtors' Estates or the Liquidation Trustee, as applicable, under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Proponents or the Liquidation Trustee, as applicable, allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity on the one hand, and the Proponents or the Liquidation Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by a Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Notwithstanding the foregoing, the Plan provides that distributions will be made under the Plan to holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, to the extent applicable.

The Plan contains the following important language with respect to the disallowance of Claims:

**EXCEPT AS OTHERWISE AGREED BY THE PROPONENTS OR THE LIQUIDATION TRUSTEE, AS APPLICABLE, AND THE FILER OF THE PROOF OF CLAIM, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (A) THE CONFIRMATION HEARING AND (B) 45 DAYS AFTER THE APPLICABLE BAR DATE.**

> **l.      Professional Fee Accounts**

Pursuant to the Plan, the Professional Fee Accounts established pursuant to paragraph 14 of the Cash Collateral Order shall be used to fund the total amount of Accrued Professional Compensation; *provided* that if the Professional Fee Accounts are not sufficient to pay all Accrued Professional Compensation, the Liquidation Trustee shall fund such excess Accrued Professional Compensation from the Liquidation Trust Assets.

> **m.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

Pursuant to the Plan, the Proponents, in consultation with the Requisite Lenders, or the Liquidation Trustee, subject to any approvals or direction of the Liquidation Trust Advisory Board as set forth in the Liquidation Trust Agreement, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the Liquidation Trust Interests to be issued pursuant to the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant to the Plan.  The secretary and any assistant secretary of each Plan Debtor or the Liquidation Trustee shall be authorized to certify or attest to any of the foregoing actions.

Before, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Plan Debtors shall be deemed to have been so approved and will be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Plan Debtors, or the need for any approvals, authorizations, actions or consents.

Pursuant to sections 106, 1141 and 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Plan Debtor to any person pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Plan Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance

of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Causes of Action to the Liquidation Trust and (ii) any sale or other transfer of the Plan Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

### n.    Cancellation of Notes and Interests

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes, the Subordinated Notes, the PIK Notes and Interests in the Plan Debtors shall be cancelled, and the obligations of the Plan Debtors thereunder or in any way related thereto shall be fully released.  On the Effective Date, except to the extent otherwise provided in the Plan, any indenture relating to any of the foregoing, including, without limitation, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture, shall be cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Plan Debtors thereunder shall be fully released.  Notwithstanding any provision of the Plan, however, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture shall continue in effect solely for the purposes of, as applicable: (a) allowing holders of the Senior Note Claims and Senior Note Guaranty Claims to receive distributions under the Plan; (b) allowing holders of Senior Debt (and/or their respective Indenture Trustees or Agents) to enforce the subordination provisions in Articles 11 and 12 of the Subordinated Note Indentures and the PIK Note Indenture; and (c) allowing and preserving the rights of the Indenture Trustees to (i) make distributions in satisfaction of Allowed Senior Note Claims and Allowed Senior Note Guaranty Claims, (ii) maintain and enforce their respective Charging Liens against any such distributions; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions; (iv) maintain and enforce any right to indemnification under the applicable indentures; (v) exercise their rights and obligations relating to the interests of their holders pursuant to the applicable indentures; and (vi) appear in these Chapter 11 Cases.

### o.    Satisfaction of Obligations Under the Loan Documents

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Debtors' obligations under the Loan Documents shall be satisfied and fully released except that the Loan Documents shall continue in full force and effect solely to permit the relevant Agents to make distributions of Plan consideration to the Prepetition Secured Lenders in accordance with the Plan. Notwithstanding the provisions of the Plan, the Loan Documents shall continue in effect solely for the purposes of, as applicable: (i) allowing holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims to receive distributions under the Plan, including pursuant to the Intercreditor Settlement Agreement; (ii) allowing holders of such Claims (and/or their respective Agents) to enforce the terms of the Intercreditor Settlement Agreement and the Intercreditor Agreement; (iii) allowing and preserving the rights of the Agents to (a) make distributions in satisfaction of the First Lien Revolver Claims, the First Lien Term Loan Claims and the Second Lien Term Loan Claims, (b) maintain and exercise their respective Charging Liens against any such distributions, (c) seek

compensation and reimbursement from holders of the First Lien Revolver Claims, the First Lien Term Loan Claims and the Second Lien Term Loan Claims for any reasonable and documented fees and expenses incurred in making such distributions, (d) maintain and enforce any right to indemnification under the applicable Loan Documents, (e) exercise their rights and obligations relating to the interests of the holders of such Claims pursuant to the applicable Loan Documents and (f) appear in these Chapter 11 Cases.

### 9. Distributions

#### a. Single Satisfaction of Claims

The Plan provides that holders of Allowed Claims may assert such Claims against each Plan Debtor obligated with respect to such Claims, and, except to the extent set forth in the Plan, such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Plan Debtor based upon the full Allowed amount of each such Claim.  The Plan also provides that notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim, plus postpetition interest, to the extent applicable.  The Plan further provides that at such time as holders of Claims have been paid in full, Liquidation Trust Interests issued with respect to such Claims shall be cancelled and of no further force and effect.

#### b. Distributions on Account of Claims Allowed as of the Effective Date

The Plan provides that except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Committee), the Liquidation Trustee shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on the Initial Distribution Date.  Distributions of Cash on account of the Liquidation Trust Interests will be made on the Distribution Date after the net proceeds of the Liquidation Trust Causes of Action are received by the Liquidation Trust, to the extent reasonably practicable.

#### c. Distributions on Account of Claims Allowed After the Effective Date

##### i. Payments and Distributions on Disputed Claims

Pursuant to the Plan, except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim.

##### ii. Distributions to Holders of Disputed Claims

The Plan provides that notwithstanding anything in the Plan or the Liquidation Trust Agreement to the contrary, the Liquidation Trustee shall not be required to make on account of an Allowed Claim: (i) partial distributions or payments of fractions of dollars; (ii) partial distributions or payments of fractions of Liquidation Trust Interests; or (iii) a distribution if the amount to be distributed is or has an economic value of less than $100.  In the event that there are Disputed Claims requiring adjudication and resolution, the Liquidation Trustee shall establish appropriate reserves for potential payment of such Claims pursuant to Article V.I.4 of the Plan.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.  Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Liquidation Trust.

131

### iii. Special Rules for Claims Arising Under Section 502(h) of the Bankruptcy Code

Section 502(h) of the Bankruptcy Code governs the treatment of claims held by entities from which property is recoverable under the avoidance powers permitted a debtor in possession under the Bankruptcy Code. The Plan provides that, notwithstanding anything contained in the Plan to the contrary, 502(h) Claims shall be deemed timely filed despite the filing of such Claims after any otherwise applicable Claims Bar Date, *provided*, *however*, that 502(h) Claims must be filed against the applicable Plan Debtor(s) no later than 30 days after entry of a Final Order for recovery of property under section 550, 552 or 553 of the Bankruptcy Code. The Plan provides that the Term Loan Lenders shall not have any 502(h) Claims in respect of the disgorgements made pursuant to the Plan.

### d. Disputed Claims Reserve

### i. Creation of Disputed Claims Reserve

The Plan provides that from and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Liquidation Trustee shall establish, for the benefit of each holder of a Disputed Claim, the Disputed Claims Reserve consisting of Cash or Liquidation Trust Interests, as applicable, and any dividends, gains or income attributable thereto, in an amount equal to the *Pro Rata* share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Proponents or the Liquidation Trustee, as applicable.

For the avoidance of doubt, any Cash and Liquidation Trust Interests retained and held for the benefit of a holder of a Disputed Claim as part of the Disputed Claims Reserve shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in Liquidation Trust Interests in the event the Disputed Claim ultimately becomes an Allowed Claim. Cash and Liquidation Trust Interests held in the Disputed Claims Reserve (including, with respect to Cash, any earnings that have accrued on such case, net of any expenses, including any Taxes, relating thereto) shall be retained by the Liquidation Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan. Any Cash and proceeds of the Liquidation Trust Interests shall be either (x) held by the Liquidation Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than 30 days. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

For the avoidance of doubt, Cash held in the Disputed Claims Reserve will (i) be deposited in an interest-bearing account and held in trust, pending distribution by the Liquidation Trustee, for the benefit of holders of Allowed Claims (other than Allowed 502(h) Claims), (ii) be accounted for separately and (iii) not constitute property of the Liquidation Trust. Liquidation Trust Interests held in the Disputed Claims Reserve will (i) be held in trust, pending distribution by the Liquidation Trustee, for the benefit of holders of Allowed Claims (other than Allowed 502(h) Claims), (ii) be accounted for separately and (iii) not constitute property of the Liquidation Trust.

### ii.        Distributions After Allowance of Disputed Claims

Pursuant to the Plan, at such time as a Disputed Claim becomes an Allowed Claim, the Liquidation Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan (including, with respect to Cash held in the Disputed Claims Reserve, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any Taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order but in no event more than 90 days thereafter.  The balance of any Cash and Liquidation Trust Interests previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.

Pursuant to the Plan, each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the Liquidation Trust Interests, Cash and its proportionate share of the proceeds from the investment of Cash, if any, held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to the Liquidation Trust or any assets previously distributed on account of any Allowed Claim.

### iii.       Distributions After Disallowance of Disputed Claims

The Plan provides that if a Disputed Claim is disallowed, in whole or in part, the Liquidation Trustee shall cancel the reserve Liquidation Trust Interest, if applicable, and distribute the Cash held in the Disputed Claims Reserve with respect to such Claim to the holders of Allowed Claims against the applicable Plan Debtor in accordance with the terms of Article III of the Plan on the next Distribution Date that is at least 30 days after the date such Claim is disallowed.

### iv.       Tax Treatment of Disputed Claims Reserve

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidation Trustee), the Plan provides that the Liquidation Trustee shall (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Liquidation Trustee, the Plan Debtors and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

### e.        Delivery of Distributions

### i.        Record Date for Distributions

The Plan provides that on the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those holders of Claims listed on the Claims Register (other than holders of publicly traded securities) as of the close of business on the Distribution Record Date.  If a Claim, other than a Claim based on a publicly traded instrument, is transferred 20 or fewer days before the Distribution Record Date, the Plan provides that the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### ii.        Delivery of Distributions in General

The Plan provides that, except as otherwise provided in the Plan, the Liquidation Trustee shall make distributions to holders of Allowed Claims and Liquidation Trust Beneficiaries at the last-known address for each such holder or beneficiary as indicated on the Plan Debtors' or Liquidation Trust's records as of the applicable Distribution Date; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Liquidation Trustee; and *provided*, *further*, that  the address for each holder of an Allowed Claim shall be deemed to be the address included in any Proof of Claim filed by that holder.

### iii.        Delivery of Distributions to the Holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims

The Plan contemplates that all distributions to holders of First Lien Revolver Claims, First Lien Term Loan Claims, and Second Lien Term Loan Claims shall be deemed completed when made to the Agent under the applicable Loan Documents.  Notwithstanding any provisions in the Plan to the contrary, the Loan Documents shall continue in effect to the extent necessary to allow the applicable agents to receive and make distributions pursuant to the Plan.

### iv.        Delivery of Distributions to the Holders of Allowed Unsecured Claims

Pursuant to the Plan, all distributions to holders of Senior Note Claims and Senior Note Guaranty Claims, as applicable, shall be deemed completed when made to the applicable Indenture Trustee as set forth in the paragraph below.  Notwithstanding any provisions in the Plan to the contrary, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture shall continue in effect to the extent necessary to allow the Senior Note Indenture Trustees to (a) receive and make distributions pursuant to the Plan, (b) maintain and exercise their respective Charging Liens against any such distributions, (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions and (d) enforce the subordination provisions of the applicable indentures.

Pursuant to the Plan, the Distribution Agent for each Plan Debtor shall give effect to the provisions of articles 11 and 12 of the Subordinated Note Indentures, such that all distributions made pursuant to the Plan in satisfaction of the Subordinated Note Claims or Subordinated Note Guaranty Claims shall be made to the holders of Senior Debt at the applicable Plan Debtor until all holders of Senior Debt are paid in full (including postpetition interest).  For the avoidance of doubt, distributions on account of Subordinated Note Guaranty Claims at each Conveying Subsidiary shall be reallocated only to holders of Claims that constitute Senior Debt at the applicable Conveying Subsidiary.  Further, pursuant to the PIK Notes Stipulation, solely with respect to TOUSA, the Distribution Agent shall give effect to the provisions of articles 11 and 12 of the PIK Note Indenture, such that all distributions made pursuant to the Plan in satisfaction of the PIK Note Claims shall be made to the holders of Senior Debt at TOUSA. For the avoidance of doubt, any PIK Note Claims against the Conveying Subsidiaries have been released pursuant to the PIK Notes Stipulation and are hereby disallowed.

### v.        Distributions by Distribution Agents

The Plan provides that the Liquidation Trustee and, prior to the Effective Date, the Proponents, in consultation with the Requisite Lenders, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan. As a condition to serving as a Distribution Agent, a Distribution Agent must (a) affirm its obligation to

facilitate the prompt distribution of any documents, (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (c) waive any right or ability to set off, deduct from or assert any Lien or encumbrance against the distributions required under the Plan that are to be distributed by such Distribution Agent (*provided*, *however*, that the Senior Note Indenture Trustees shall retain the right to set off against the distributions required under the Plan after entry of an order by the Bankruptcy Court authorizing such setoff). The Plan Debtors and Liquidation Trustee may pay to the Distribution Agents (including the Senior Note Indenture Trustees) all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents. For the avoidance of doubt, the reasonable and documented fees of the Distribution Agents (including the Senior Note Indenture Trustees) will be paid by the Liquidation Trustee and/or the Plan Debtors, as applicable, and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Distribution Agent.

Pursuant to the Plan, the Distribution Agents (including the Senior Note Indenture Trustees) shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

### vi.      Setoffs and Withholdings

Pursuant to the Plan, the Liquidation Trustee or Distribution Agent may withhold (but not, except as otherwise set forth in the Plan, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim, right or Cause of Action of any nature that the distributing Plan Debtor may hold against the holder of such Claim (including a Term Loan Lender Defendant with respect to Term Loan Lender Disgorgement Payments).

The Plan provides that in the event that the value of a Plan Debtor's claim, rights or Cause of Action against a particular claimant is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Liquidation Trustee may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise become due to such claimant. Neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Plan Debtors or the Liquidation Trustee of any claims, rights or Causes of Action that the Plan Debtors or the Liquidation Trust may possess against any claimant.

### f.      Fractional, De Minimis and Undeliverable Distributions

### i.      Fractional or De Minimis Distributions

The Plan provides that notwithstanding anything in the Plan to the contrary, the Liquidation Trustee or Distribution Agent shall not be required to make on account of an Allowed Claim (i) partial distributions or payments of fractions of dollars; (ii) partial distributions or payments of fractions of Liquidation Trust Interests; or (iii) a distribution if the amount to be distributed is or has an economic value of less than $100. Whenever any distribution of Liquidation Trust Interests of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole number (up or down), with half or less being rounded down. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### ii.  Undeliverable Distributions

#### (A)  Holding of Certain Undeliverable Distributions

The Plan provides that in the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Liquidation Trustee is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Liquidation Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and the Liquidation Trust Agreement, and the Claim of any holder to such property or interest in property shall be forever barred.  Nothing contained in the Plan shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

#### (B)  Failure to Present Checks

The Plan provides that any check issued by the Liquidation Trust or the Distribution Agent on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check.

The Plan further provides that requests for reissuance of any check shall be made directly to the Liquidation Trust by the holder of the relevant Allowed Claim with respect to which such check originally was issued.  If any holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped and enjoined from asserting any Claim against any of the Plan Debtors, the Liquidation Trust or the Liquidation Trustee.  In such cases, any Cash or Liquidation Trust Interests held for payment on account of such Claims shall be property of the Liquidation Trust, free of any Claims of such holder with respect thereto.

In an effort to ensure that all holders of Allowed Claims receive their allocated distributions, the Plan provides that no later than 150 days after the issuance of such checks, the Liquidation Trustee shall file with the Bankruptcy Court a list of the holders of any un-negotiated checks.  For the avoidance of doubt, such list shall not include the holders of any checks that have not been negotiated within six months after the date the check was mailed or otherwise delivered to the holder.  Nothing contained in the Plan shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

### g.  Claims Paid or Payable by Third Parties

### i.  Claims Paid by Third Parties

The Plan provides that to the extent the holder of a Claim receives payment in full on account of such Claim from a party that is not a Plan Debtor or the Liquidation Trust, the Liquidation Trustee shall reduce the Claim in full (or to the extent of payment by the third party), and such Claim shall be disallowed to the extent of payment from such third party without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court.  Further, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Plan Debtor or the Liquidation Trust on account of such Claim, such holder shall,

within two weeks of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the two-week grace period specified above until such amount is repaid.

### ii.    Chinese Drywall Claims

As described in further detail in section V.G.3.i herein, in 2009, certain parties commenced the Chinese Drywall Litigation against homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters and distributors, as well as their insurers and the insurers of homeowners, who were involved with installing Chinese drywall in the affected properties.  The Chinese Drywall Litigation was transferred to the Chinese Drywall Court and was designated MDL No. 09-02047.  The Chinese Drywall Court ordered the parties to the Chinese Drywall Litigation to attend mediation, and on February 7, 2013, the Chinese Drywall Court approved a final settlement of the Chinese Drywall Litigation [E.D. La., MDL No. 09-2047, ECF No. 16570], pursuant to which the Chinese Drywall Claims were settled for approximately $337,655.34, to be paid from the class action settlement, in full and final satisfaction of such Claims.  On April 5, 2013, the Debtors filed a motion seeking to disallow the Chinese Drywall Claims and expunge such claims from the claims register pursuant to the settlement [ECF No. 9106].  A hearing on such motion is currently scheduled for May 16, 2013.  Accordingly, no distribution will be made on account of Chinese Drywall Claims pursuant to the Plan.

### iii.    Claims Payable by Insurance

The Plan provides that holders of Claims that are covered by the Plan Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Plan Debtors and the Liquidation Trust, as applicable, shall have no obligation to pay any amounts in respect of prepetition deductibles or self insured retention amounts.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Plan Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Plan Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Proponents or the Liquidation Trustee, as applicable, may direct the Voting and Claims Agent to expunge such Claim from the Claims Register to the extent of any agreed-upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, or any other Plan document (including any provision that purports to be peremptory or supervening) shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses of the insureds or insurers with respect to any insurance policies issued to the Plan Debtors and any related agreements with the insurance companies.  The rights and obligations of the insureds and insurers under such insurance policies and related agreements shall be determined under such policies and agreements, including the terms, conditions, limitations, exclusions and endorsements thereof, which shall remain in full force and effect under their terms and under any applicable non-bankruptcy law.  Each of the non-Debtor counterparties to such insurance policies and agreements reserves all its rights and defenses under such insurance policies and agreements and applicable non-bankruptcy law, including any defenses to coverage.

Article V.I.7(c) of the Plan shall not apply to distributions made on Allowed Claims on account of the D&O Insurance Coverage Settlement in accordance with the terms of the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order.

**iv.      Applicability of Insurance Policies**

Pursuant to the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except for Claims and Causes of Action released under the Plan against the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Plan Debtors, the Liquidation Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**D.    TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND POSTPETITION CONTRACTS**

**1.      Assumption and Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts**

**a.      Assumption of Executory Contracts, Unexpired Leases and Postpetition Contracts**

The Plan provides that, on the Effective Date, the Plan Debtors shall assume only the Executory Contracts, Unexpired Leases and Postpetition Contracts listed on the schedule of "Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts," attached hereto as <u>Exhibit G</u>.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of such Executory Contract or Unexpired Lease, including objecting to the proposed cure amount related thereto, will be deemed to have consented to such assumption and agreed to the specified cure amount.

**b.      Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts**

The Plan contemplates that, each Executory Contract, Unexpired Lease and Postpetition Contract shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract, Unexpired Lease or Postpetition Contract:

- is listed on the schedule of "Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts" attached hereto as <u>Exhibit G</u> or

- is otherwise assumed pursuant to the terms of the Plan.

The Plan provides that the Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Non-Plan Debtor parties to Executory Contracts, Unexpired Leases or Postpetition Contracts that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts, Unexpired Leases or Postpetition Contracts, including Claims

138

under section 503 of the Bankruptcy Code; *provided* that such Claims must be filed in accordance with the procedures set forth in Article VI.B of the Plan. The Proponents reserve the right to amend the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts at any time before the Effective Date.

The Plan Debtors are deemed to have abandoned any furniture, fixtures, equipment, inventory and other personal property located at the premises of leases of nonresidential real property (as such term is used in section 365 of the Bankruptcy Code) for which the rejection is first effective on or after the Effective Date, as of the later of (i) the Effective Date, (ii) the effective date of such rejection and (iii) the date the Plan Debtors have turned over possession of such premises to the applicable landlord. Further, other than with respect to the books and records required for the administration of the Liquidation Trust, as set forth in Article V.H.5 of the Plan, the Plan Debtors may destroy or abandon all remaining books and records, as applicable. The Plan Debtors shall have no administrative expense liability to any of their landlords for rental charges or occupancy of the leased premises after such abandonment by virtue of the continued presence at such premises of such abandoned property. Landlords at premises with such abandoned property may, in their sole discretion and without further notice, dispose of such abandoned property without liability to the Plan Debtors or any non-Plan Debtor third party claiming any interest in such property (including holders of any First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims or Other Secured Claims) and, to the extent applicable, the automatic stay shall be modified to allow such disposition. The Plan Debtors shall endeavor to provide such third parties prior, specific and reasonable notice that they must retrieve the property in which they claim an interest before or upon such abandonment or such property shall be deemed so abandoned without further notice to or action, order or approval of the Bankruptcy Court and such landlords or their designee shall be free to dispose of same without liability or recourse to such landlords. Notwithstanding the Plan Debtors' required efforts to provide prior, specific and reasonable notice to such third parties, the Plan and any notices of the Effective Date shall be deemed sufficient notice to such third parties to effectuate such abandonment and enable the landlords to dispose of such abandoned property without liability or recourse.

The right of any party in interest to assert a Claim against the Plan Debtors' Estates for costs associated with the removal or disposition of such abandoned property is fully preserved; *provided* that any such Claim must be filed by the applicable Claims Bar Date and otherwise in accordance herewith; *provided*, *further*, that the rights of all parties, including the Proponents and the Liquidation Trustee, to contest any such Claim shall be fully preserved.

### 2.    Claims on Account of the Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts

All Proofs of Claim arising from the rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts must be filed with the Voting and Claims Agent according to the procedures established for the filing of Proofs of Claim in the Initial Claims Bar Date Order. In accordance with Local Rule 3003-1, all such Proofs of Claim must be filed with the Voting and Claims Agent on or before the later of (i) the applicable Claims Bar Date and (ii) 30 days after (a) the entry of the order compelling or approving the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract or (b) the effective date of the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract, if the order contains the notice mandated by Local Rule 6006-1.

The Plan provides that any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Plan Debtor, its Estate or property or the Liquidation Trust or its property, unless

otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.F of the Plan.

### 3. Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan

With respect to Executory Contracts and Unexpired Leases that are deemed to be assumed as of the Effective Date, the Plan contains the following important notice:

**A NOTICE OF THE EFFECTIVE DATE OF THE PLAN, INCLUDING NOTICE REGARDING THE ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, WILL BE SENT TO ALL KNOWN CREDITORS.**

The Plan further provides that for known non-Plan Debtor parties to Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to the Plan, such notice or notices will be sent on or as soon as reasonably practicable after the Effective Date notifying such Entities regarding the Executory Contracts and Unexpired Leases to which it is a counterparty that have been assumed or assumed and assigned pursuant to the Plan.

The Plan further provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption.

The Plan provides that at least 20 days prior to the Confirmation Hearing, the Proponents shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Proponents at least 10 days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and agreed to the specified cure amount.

## E. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### 1. Conditions Precedent to Consummation

The Plan provides it shall be a condition to the Effective Date that the following conditions have been satisfied or waived pursuant to the provisions of Article VII.B of the Plan:

- The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Proponents and the Requisite Lenders.

- The Mediation Settlement shall have been approved by a Final Order, which may be the Confirmation Order, in form and substance satisfactory to the Proponents and the Requisite Lenders.

- The D&O Settlement Order shall have been entered and become a Final Order.

- All documents and agreements necessary to implement the Plan shall have been effected or executed and tendered for delivery in a form acceptable to the Proponents and the Requisite Lenders, and all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- The Liquidation Trust shall be established and funded in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall have been appointed and the members of the Liquidation Trust Advisory Board shall have been designated.

### 2.     Waiver of Conditions

The Plan provides that the conditions to the Effective Date set forth in Article VII.A of the Plan may be waived by joint agreement of the Proponents and the Requisite Lenders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; _provided_ that the following conditions to consummation cannot be waived: (i) the Confirmation Order shall have been entered and (ii) the Mediation Settlement shall have been approved.

### 3.     Effect of Non-Occurrence of Conditions to the Effective Date

The Plan provides that, unless the Proponents and the Requisite Lenders agree otherwise, if the Effective Date does not occur on or before 90 days after entry of the Confirmation Order, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Plan Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (d) the Plan Debtors' obligations with respect to Claims and Interests shall remain unchanged and (e) the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (x) constitute a waiver or release of any claims by or Claims against or Interests in the Plan Debtors; (y) prejudice in any manner the rights of the Proponents, any holders of Claims or any other Entity; or (z) constitute an admission, acknowledgment, offer or undertaking by the Proponents, any holders of Claims or any other Entity in any respect.

## F.     RELEASE, INJUNCTION AND RELATED PROVISIONS

The Plan contains important provisions relating to releases, injunctions and related provisions to be executed in connection with the Plan.

### 1.     Compromise and Settlement of Claims, Interests and Controversies

As contemplated in Article V.A.1 and Article V.A.2 of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution

to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, including the Mediation Settlement and the Unsecured Creditor Settlement, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates and stakeholders, and are fair, equitable and reasonable.

### 2.      Settlement Party Release

The Plan provides the following language with respect to releases of Settlement Parties:

Upon the Effective Date of the Plan, each Releasing Settlement Party will be deemed to forever release, waive and discharge the Released Parties from all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other circumstance taking place on or prior to the Effective Date in connection with, arising out of or in any way relating to the Released Settlement Claims; _provided_, _however_, that the foregoing release shall not apply to Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or criminal misconduct, except to the extent that any such act, omission, conduct or related Claim, liability or Cause of Action is related to, or could have been included in, or is the subject of the Mediation Settlement; _provided_, _further_, that the foregoing release shall not operate to waive or release any Released Party with respect to (i) the subject of a pending action on behalf of the Plan Debtors' Estates as of the date of entry of an order approving the Disclosure Statement, except for the Settled Mediation Causes of Action, which are released pursuant to the terms of the Plan and the various agreements constituting the Mediation Settlement, (ii) a Liquidation Trust Cause of Action, (iii) obligations under agreements effectuating the assignment, participation or other transfer of any Claim against a Plan Debtor or the assumption of any liability to a Plan Debtor or (iv) the subject of an express preservation in, or any right or obligation under or that is part of the Plan, the Liquidation Trust Agreement or the Intercreditor Settlement Agreement, or any agreement entered into pursuant to, in connection with or contemplated by the Plan. For the avoidance of doubt, nothing contained herein shall (x) release (a) any Non-Settling Transeastern Lender from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the Transeastern Litigation or (b) RSUI from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the D&O Insurance Coverage Action or (b) impact the bar order and releases contained in the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order.

### 3.      Third-party Release

The Plan provides the following language with respect to third-party releases:

On the Effective Date, to the fullest extent permissible under applicable law, each holder of a Claim or Interest (other than a Releasing Settlement Party) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether direct or derivative,

liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to any Claims that could have been asserted at any time past, present, or future against any Released Party in connection with, arising out of or in any way relating to the Debtors, the Chapter 11 Cases or the Settled Mediation Causes of Action; _provided_, _however_, that the foregoing release shall not apply to Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or criminal misconduct; _provided_, _further_, that the foregoing release shall not operate to waive or release any Released Party that is (i) the subject of a pending action commenced by the Plan Debtors' Estates as of the date of entry of the order approving the Disclosure Statement, except for the Settled Mediation Causes of Action, which are released pursuant to the terms of the Plan and the various agreements constituting the Mediation Settlement, (ii) a defendant or a potential defendant under a Liquidation Trust Cause of Action, (iii) a party to any agreement effectuating the assignment, participation or other transfer of any Claims against a Plan Debtor or the assumption of any liability to a Plan Debtor or (iv) the subject of an express preservation in, or any right or obligation under or that is part of, the Plan, the Liquidation Trust Agreement, the Intercreditor Settlement Agreement or any agreement entered into pursuant to, in connection with or contemplated by the Plan. For the avoidance of doubt, nothing contained herein shall (x) release (a) any Non-Settling Transeastern Lender from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the Transeastern Litigation or (b) RSUI from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the D&O Insurance Coverage Action or (y) impact the bar order and releases contained in the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order.

**4.     Exculpation**

The Plan provides the following language with respect to the Exculpated Parties:

Except as otherwise specifically provided in the Plan and to the extent not prohibited by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim; _provided_, _however_, that the foregoing exculpation shall not apply to Claims or liabilities arising out of actual fraud or criminal misconduct; _provided_, _further_ that in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have complied with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the distributions contemplated by the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.    **Bar Order**

Pursuant to the D&O Insurance Coverage Settlement Agreement, the Proponents agree to include the following Bar Order[28] in the proposed 9019 Order:

> **ORDERED that all Barred Persons are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting, either derivatively or on behalf of themselves, in the Bankruptcy Court, in any federal or state court or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere, the D&O Insurance Coverage Released Claims; and it is further**

> **ORDERED that because Barred Persons are barred from asserting any D&O Insurance Coverage Released Claims against any of the D&O Insurance Coverage Released Parties, any judgments entered against the Barred Persons with respect to or in connection with the D&O Insurance Coverage Released Claims will be reduced in an amount equal to (a) the amount of the judgment or award against any such Barred Person multiplied by (b) the proportionate share of fault of the D&O Insurance Coverage Released Party or Parties that would have been liable on a D&O Insurance Coverage Released Claim in the absence of this Bar Order, expressed as a percentage of the aggregate fault of (i) Barred Person and (ii) such D&O Insurance Coverage Released Party or Parties in connection thereto, whether or not such persons are sued on account of the D&O Insurance Coverage Barred Claim.**

6.    **Preservation of Rights and Causes of Action**

    a.    **Maintenance of Causes of Action**

The Plan provides that, except as otherwise provided in the Plan or in the Confirmation Order, after the Effective Date, the Liquidation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Liquidation Trust Causes of Action, whether existing as of the applicable Petition Date or thereafter arising, including those Causes of Action arising after the Effective Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Plan Debtors' Chapter 11 Cases.

    b.    **Preservation of All Causes of Action Not Expressly Settled or Released by the Plan Debtors**

The Plan provides that unless a Claim or Cause of Action against a holder of a Claim or an Interest or other Entity is expressly waived, relinquished, released, compromised or settled (including, without limitation, the releases contained in Article VIII.B and VIII.C of the Plan) pursuant to the Plan, the Mediation Settlement or in any Final Order (including, without limitation, the Confirmation Order or the D&O Settlement Order) entered in the Plan Debtors' Chapter 11 Cases, such Claim or Cause of Action is preserved for later adjudication by the Plan Debtors or the Liquidation Trustee, as applicable, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*,

---

[28] Capitalized terms in this section VI.F.5 shall have the meanins ascribed to such terms in the D&O Insurance Coverage Settlement Agreement.

collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or the D&O Settlement Order.  The Liquidation Trustee expressly reserves the right to pursue or adopt any such claims alleged in any lawsuit in which the Plan Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**7.     Injunction**

The Plan provides for the following injunction:

**SUBJECT TO A FINDING THAT THE PLAN WAS FILED IN GOOD FAITH, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, THE CONFIRMATION ORDER OR SUCH OTHER ORDER OF THE BANKRUPTCY COURT THAT MAY BE APPLICABLE, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE PLAN DEBTORS ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE PLAN DEBTORS' ESTATES, THE LIQUIDATION TRUSTEE, THE DISTRIBUTION AGENT OR THE PROPERTY OF THE PLAN DEBTORS' ESTATES OR THE LIQUIDATION TRUST ON ACCOUNT OF ANY SUCH CLAIMS OR INTERESTS INCLUDING, BUT NOT LIMITED TO: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ANY SUCH CLAIM, OR OTHER DEBT OR LIABILITY OR INTEREST OR OTHER RIGHT OR INTEREST THAT IS TERMINATED OR CANCELLED PURSUANT TO THE PLAN; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER; (3) EXCEPT TO THE EXTENT PROVIDED, AND AS PERMITTED BY THE BANKRUPTCY CODE, CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE PLAN DEBTORS' ESTATES OR THE LIQUIDATION TRUST NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PLAN; AND (6) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; _PROVIDED_, _HOWEVER_, THAT NOTHING HEREIN SHALL PRECLUDE ANY ENTITY FROM EXERCISING RIGHTS UNDER THE PLAN OR APPLY WITH RESPECT TO ANY CLAIMS HELD BY THE SEC AS OF THE EFFECTIVE DATE BASED ON THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, THE SECURITIES ACT OF 1933, AS AMENDED OR OTHER SECURITIES LAWS OF THE UNITED STATES; _PROVIDED_, _FURTHER_, THAT SUCH INJUNCTION SHALL NOT PRECLUDE THE UNITED STATES OF AMERICA, ANY STATE, OR ANY OF THEIR RESPECTIVE POLICE OR REGULATORY AGENCIES FROM ENFORCING THEIR POLICE OR**

REGULATORY POWERS; AND, ***PROVIDED***, ***FURTHER***, THAT EXCEPT IN CONNECTION WITH A PROPERLY FILED PROOF OF CLAIM, THE FOREGOING PROVISO DOES NOT PERMIT THE UNITED STATES OF AMERICA, ANY STATE, OR ANY OF THEIR RESPECTIVE POLICE OR REGULATORY AGENCIES FROM OBTAINING ANY MONETARY RECOVERY FROM THE PLAN DEBTORS, OR THEIR RESPECTIVE PROPERTY OR INTERESTS IN PROPERTY WITH RESPECT TO ANY SUCH CLAIM OR OTHER DEBT OR LIABILITY THAT IS DISCHARGED OR INTEREST OR OTHER RIGHT OF INTEREST THAT IS TERMINATED OR CANCELLED PURSUANT TO THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY MONETARY CLAIM OR PENALTY IN FURTHERANCE OF A POLICE OR REGULATORY POWER. SUCH INJUNCTION SHALL EXTEND TO ALL SUCCESSORS OF THE PLAN DEBTORS, INCLUDING THE LIQUIDATION TRUST, THE COMMITTEE AND ITS RESPECTIVE MEMBERS, THE LIQUIDATION TRUSTEE, THE LIQUIDATION TRUST ADVISORY BOARD, THE DISTRIBUTION AGENT AND THE RESPECTIVE PROPERTIES AND INTERESTS IN PROPERTY OF ALL OF THE FOREGOING.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE PLAN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED AND ALL INTERESTS SHALL BE CANCELLED, AND THE PLAN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN DEBTORS, THE PLAN DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G.    BINDING NATURE OF THE PLAN

The Plan provides the following language with respect to its binding nature:

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDER FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## H.    RETENTION OF JURISDICTION

The Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over the Plan Debtors' Chapter 11 Cases and all Entities with respect to all matters related to the Plan Debtors' Chapter 11 Cases, the Plan Debtors and the Plan, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim and the resolution of any and all issues related to the release of Liens upon payment of a secured Claim;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract, Unexpired Lease or Postpetition Contract to which a Plan Debtor is a party or with respect to which a Plan Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts;

- ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving a Plan Debtor that may be pending on the Effective Date or instituted by the Liquidation Trustee after the Effective Date, *provided* that the Liquidation Trustee shall reserve the right to commence actions in all appropriate fora and jurisdictions;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or this Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the occurrence of the Effective Date, Confirmation, interpretation,

147

implementation or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

- hear and determine all Causes of Action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action;

- issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or the consummation, implementation or enforcement of the Plan, except as otherwise provided in the Plan;

- resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

- enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement or the transactions contemplated by the Liquidation Trust Agreement;

- resolve any matters related to the Liquidation Trust;

- resolve any Disputed Claims;

- resolve any cases, controversies, suits or disputes with respect to the releases, exculpation and other provisions contained in Article VIII of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- recover all assets of the Plan Debtors and property of the Plan Debtors' Estates wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

- consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order and the D&O Settlement Order;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order or the D&O Settlement Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relating to the Plan, the Mediation Settlement, the D&O Insurance Coverage Settlement, the Disclosure Statement, the Confirmation Order, the D&O Settlement Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

- resolve any issues relating to the application of the Intercreditor Agreement or Intercreditor Settlement Agreement solely with respect to the distributions under the Plan;

- hear any other matter or for any purpose specified in the Confirmation Order or D&O Settlement Order that is not inconsistent with the Bankruptcy Code;

- hear and determine any timely objections to Administrative Claims or to Proofs of Claim and Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

- enter an order or orders concluding any or all of the Plan Debtors' Chapter 11 Cases; and

- enforce all orders previously entered by the Bankruptcy Court.

## I.    THE LIQUIDATION TRUST

### 1.    Generally

The Plan provides that, on the Effective Date, the Liquidation Trust shall be established and become effective for the benefit of the Liquidation Trust Beneficiaries.  The powers, authority, responsibilities and duties of the Liquidation Trust, the Liquidation Trustee and the Liquidation Trust Advisory Board are set forth in further detail in Article XI of the Plan and shall be governed by the Plan and the Liquidation Trust Agreement, attached to the Plan as Exhibit B.

The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  The Plan provides that the Plan Debtors shall transfer, without recourse, to the Liquidation Trust all of their right, title and interest in the Liquidation Trust Assets, including the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets.  The Plan also provides that the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders shall transfer, without recourse, to the Liquidation Trust all of their right, title and interest in the Transeastern Litigation and the RSUI Insurance Coverage Action.  The Plan further provides that upon the transfer by the Plan Debtors of the Liquidation Trust Assets to the Liquidation Trust, the Plan Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

### 2.    Purposes and Establishment of the Liquidation Trust

The Plan provides that, on the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of liquidating and administering the Liquidation Trust Assets, including prosecuting the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets, and making distributions on account of Liquidation Trust Interests as provided for under the Plan.  The Liquidation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose

of the Liquidation Trust. The Liquidation Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

On the Effective Date, the Liquidation Trustee, on behalf of the Plan Debtors, shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and consistent with the Plan.

### 3.        Liquidation Trust Assets

The Plan provides that on the Effective Date, in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all of the Liquidation Trust Assets, as well as the rights and powers of each Plan Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests for the benefit of the Liquidation Trust Beneficiaries. Upon the transfer of the Liquidation Trust Assets, the Plan Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Plan further provides that in connection with the transfer of such assets, any attorney client privilege, work product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust and its representatives, and the Plan Debtors and the Liquidation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidation Trustee shall agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and the Liquidation Trust Agreement.

The Plan provides that the Plan Debtors, the Liquidation Trustee, the Liquidation Trust Beneficiaries and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust, which documents and instruments shall be in form and substance reasonably acceptable to the Proponents and the Requisite Lenders.

To the extent reasonably requested by the Liquidation Trustee, the professionals retained by the Plan Debtors and the Committee during the Chapter 11 Cases agree, subject to any applicable and non-transferred privileges, to cooperate with the Liquidation Trustee in the prosecution of the Liquidation Trust Causes of Action, including, without limitation, by providing, at the sole cost and expense of the Liquidation Trust, access to those attorneys, accountants and other professionals with knowledge of matters relevant to the Liquidation Trust Causes of Action.

### 4.        Valuation of Assets

The Plan provides that as soon as possible after the establishment of the Liquidation Trust, but in no event later than 60 days thereafter, the Liquidation Trust Advisory Board shall inform, in writing, the Liquidation Trustee of the value of the assets transferred to the Liquidation Trust, based on the good faith determination of the Liquidation Trust Advisory Board, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) for all federal income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Liquidation Trust Advisory Board shall take such other actions in connection therewith as it determines to be appropriate or necessary.    The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

5.        **Appointment of the Liquidation Trustee and the Liquidation Trust Advisory Board**

The Plan provides that on the Effective Date and in compliance with the provisions of the Plan and the Liquidation Trust Agreement, the Committee and the Requisite Lenders shall appoint a person or firm, who is reasonably acceptable to the Plan Debtors, as Liquidation Trustee.    Additionally, on or prior to the Confirmation Date, a four-member Liquidation Trust Advisory Board shall be appointed as follows: (i) two Members consisting of the Unsecured Creditors' Liquidation Trust Representatives, (ii) one Member consisting of the First Lien's Liquidation Trust Representative and (iii) one Member consisting of the Second Lien's Liquidation Trust Representative.    In the event of a split vote among the Members, the Liquidation Trustee shall cast the deciding vote.    Upon the express approval of at least three Members, the Liquidation Trust Advisory Board may appoint *ex officio* members.    Such *ex officio* members shall not be entitled to vote.

In the event the Liquidation Trustee dies, is terminated or resigns for any reason, the Liquidation Trust Advisory Board shall designate a successor by majority vote.    If the Members are unable to secure a majority vote, the Bankruptcy Court will determine the successor Liquidation Trustee on motion from the Members.

The Plan further provides that the Liquidation Trustee shall serve at the direction of the Liquidation Trust Advisory Board, *provided*, *however*, that the Liquidation Trust Advisory Board may not direct the Liquidation Trustee or the members of the Liquidation Trust Advisory Board to act inconsistently with their duties under the Liquidation Trust Agreement and/or the Plan; *provided*, *further*, that (i) the First Lien's Liquidation Trust Representative and the Second Lien's Liquidation Trust Representative shall not have the authority to direct the Liquidation Trustee with respect to Liquidation Trust Causes of Action that would not result in any recovery for the benefit of holders of the TOUSA Class 1B General Liquidation Trust Interests, TOUSA Class 2 General Liquidation Trust Interests, or Lender Transeastern Liquidation Trust Interests and (ii) the Unsecured Creditors' Liquidation Trust Representatives shall not have the authority to direct the Liquidation Trustee with respect to (x) Liquidation Trust Causes of Action that would not result in any recovery for the benefit of holders of TOUSA Class 5A Liquidation Trust Interests, TOUSA Class 5B Liquidation Trust Interests or Conveying Subsidiaries Liquidation Trust Interests or (y) the Transeastern Litigation after the holders of the Conveying Subsidiaries Liquidation Trust Interests have received the full amount of the Unsecured Creditor Transeastern Recovery.

The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement or the Confirmation Order.    Membership, duties, responsibilities and powers of the Liquidation Trust Advisory Board shall be as set forth in the Liquidation Trust Agreement.

6.        **Duties and Powers of the Liquidation Trustee**

The Plan provides that the Liquidation Trustee will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement.    The Plan further provides that the Liquidation

Trustee, upon direction by the Liquidation Trust Advisory Board and in the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Liquidation Trust, make timely distributions and not unduly prolong the duration of the Liquidation Trust.

The Plan further provides that the duties and powers of the Liquidation Trustee shall include all powers necessary to implement the Plan with respect to all Plan Debtors and administer and monetize the Liquidation Trust Assets, including, without limitation, the following:

- *Claims and Causes of Action*. The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise or settle any and all Claims against the Plan Debtors and Causes of Action of the Plan Debtors that have not already been Allowed as of the Effective Date, except as provided in Article V.C.1(e) of the Plan. The Liquidation Trustee, upon direction by the Liquidation Trust Advisory Board, shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. The Liquidation Trustee will prepare and make available to Liquidation Trust Beneficiaries, on a quarterly basis, a written report detailing, among other things, the litigation status of Claims or Causes of Action transferred to the Liquidation Trust, any settlements entered into by the Liquidation Trust, the proceeds recovered to date from the Liquidation Trust Assets, and the distributions made by the Liquidation Trust.

- *Retention of Professionals*. The Liquidation Trustee may enter into employment agreements and retain professionals to pursue the Liquidation Trust Causes of Action and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust in connection with the matters contemplated by the Plan, the Confirmation Order and the Liquidation Trust Agreement without further order of the Bankruptcy Court; *provided*, *however*, that the Liquidation Trustee shall retain Robbins Russell to prosecute the Transeastern Litigation. The terms of such employment agreements shall be acceptable to the Liquidation Trust Advisory Board. Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Proponents or the Liquidation Trustee, as applicable), professionals retained by the Liquidation Trustee will be compensated first from the Liquidation Trust Loan and then, to the extent necessary, from the proceeds of the Liquidation Trust Assets; *provided*, *however*, that in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

- *Agreements*. The Liquidation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Plan Debtors' and Liquidation Trust's obligations thereunder.

- *Reasonable Fees and Expenses*. The Liquidation Trustee may incur any reasonable and necessary expenses in connection with the performance of its

152

duties under the Plan, including in connection with retaining professionals and/or entering into agreements as described above. The Liquidation Trustee shall be paid first from the Liquidation Trust Loan and then, to the extent necessary, from the proceeds of the Liquidation Trust Assets; *provided*, *however*, that in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

- *Other Actions*. The Liquidation Trustee may take all other actions not inconsistent with the provisions of the Plan and the Liquidation Trust Agreement that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

### 7.    Funding of the Liquidation Trust

Pursuant to the Plan, on the Effective Date, the Liquidation Trust will be funded with the Liquidation Trust Loan, which shall be used to administer all Liquidation Trust Assets. The Liquidation Trust Beneficiaries shall have no further obligation to provide any funding with respect to the Liquidation Trust, except as may be funded directly by the Liquidation Trust Assets, other than any proceeds from the Transeastern Litigation. For the avoidance of doubt, the proceeds of the Liquidation Trust Causes of Action will first be applied to the repayment of the Liquidation Trust Loan; *provided*, *however*, that to the extent proceeds of Liquidation Trust Causes of Action are received by the Liquidation Trust on account of the successful prosecution or settlement of the Transeastern Litigation prior to resolution of the other Liquidation Trust Causes of Action, the Liquidation Trust shall retain proceeds to ensure that, unless otherwise approved by the Liquidation Trust Advisory Board, no less than $2 million remains available to fund the remaining Liquidation Trust Causes of Action, which amount shall be allocable as follows:  (i) if the Transeastern Litigation has settled but the RSUI Insurance Coverage Action has not settled, $1.5 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests and $500,000 allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims and (ii) if both the Transeastern Litigation and the RSUI Insurance Coverage Action have settled, $1.75 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests and $250,000 allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims; *provided*, *further*, that to the extent proceeds of Liquidation Trust Causes of Action are received by the Liquidation Trust on account of the successful prosecution or settlement of Liquidation Trust Causes of Action other than the Transeastern Litigation, the Liquidation Trust shall retain proceeds to ensure that, unless otherwise approved by the Liquidation Trust Advisory Board, no less than $5 million remains available ($2.5 million allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims and $2.5 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests) to fund the remaining Liquidation Trust Causes of Action, including the Transeastern Litigation.

Any amounts of the Liquidation Trust Loan that are unused by the Liquidation Trust shall be distributed (a) 50% to holders of Allowed Unsecured Claims against the Conveying Subsidiaries, (b) 35% to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (c) 15% to holders of Allowed TOUSA Class 2 Claims in accordance with the procedures set forth in Article V.C.1(e) of the Plan.

8.     **Investment Powers**

Pursuant to the Plan, the right and power of the Liquidation Trustee to invest assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust shall be limited to the right and power to invest in such assets only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided*, *however*, that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and (b) the Liquidation Trustee may expend the assets of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Liquidation Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement.

9.     **Fees and Expenses of the Liquidation Trust**

Pursuant to the Plan, all fees, expenses and costs of the Liquidation Trust, including, without limitation, fees and expenses incurred by professionals retained by the Liquidation Trust (in accordance with the terms and conditions set forth in the Liquidation Trust Agreement) shall be paid by the Liquidation Trust from the Liquidation Trust Loan and thereafter from the proceeds of the Liquidation Trust Causes of Action; *provided*, *however*, that in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

Pursuant to the Plan, any such funds remaining after the liquidation of the Liquidation Trust Assets is complete, including prosecution of the Liquidation Trust Causes of Action, to be distributed to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement.  Any amounts of the Liquidation Trust Loan that are unused by the Liquidation Trust shall be distributed (a) 50% to holders of Allowed Unsecured Claims against the Conveying Subsidiaries, (b) 35% to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (c) 15% to holders of Allowed TOUSA Class 2 Claims in accordance with the procedures set forth in Article V.C.1(e) of the Plan.

10.     **Liquidation Trustee's Tax Power for Plan Debtors**

As described in Article V.H.6 of the Plan, following the Effective Date, the Liquidation Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Plan Debtors, all tax returns required to be filed or that the Liquidation Trustee otherwise deems appropriate.

The Plan provides that in the event that the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), the Liquidation Trustee shall take any and all necessary actions as it shall deem appropriate to have the Liquidation Trust classified as a partnership for federal tax purposes under Treasury Regulation section 301.7701-3, including, if necessary, creating or converting the Liquidation Trust into a Delaware limited liability partnership or limited liability company that is so classified.

**11.     Prosecution of Liquidation Trust Causes of Action**

Except as otherwise set forth in the Plan, including with respect to the Transeastern Litigation against the Non-Settling Transeastern Lenders, Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, under the supervision and with the acceptance of the Liquidation Trust Advisory Board. Settlement of Liquidation Trust Causes of Action will be subject to Bankruptcy Court approval; *provided, however,* that settlement of Disputed Claims unrelated to the Transeastern Litigation will not require Bankruptcy Court approval.  The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

**12.     Distributions; Withholding**

Pursuant to the Plan, the Liquidation Trustee shall make distributions to the Liquidation Trust Beneficiaries in accordance with the terms of the Liquidation Trust Agreement and the Plan.  The Liquidation Trust Advisory Board may authorize the Liquidation Trustee to retain proceeds from the Liquidation Trust Assets to fund additional litigation with respect to the Liquidation Trust Causes of Action.  The Liquidation Trust may withhold from amounts otherwise distributable to any Entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement.  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other Tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Liquidation Trustee or other Distribution Agent, as applicable, may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Article V.I.6 of the Plan.

**13.     Insurance**

The Plan provides that the Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trust Advisory Board and the Liquidation Trustee on and after the Effective Date.

**14.     Exculpation; Indemnification**

The Plan provides that the Liquidation Trustee, the Liquidation Trust, the Liquidation Trust Advisory Board, the professionals of the Liquidation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement.  The indemnification described in the Liquidation Trust Agreement will exclude willful misconduct or gross negligence.  Any indemnification claim of the Liquidation Trustee or the other individuals entitled to indemnification pursuant to the Plan and the Liquidation Trust Agreement shall be satisfied solely from the Liquidation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Liquidation Trust

Interests and any other claim to or interest in such assets.  The Liquidation Trustee, the Members and their representatives (as applicable) shall be entitled to rely, in good faith, on the advice of their retained professionals.

**15.      Transferability of the Liquidation Trust Interests**

The Liquidation Trust Interests shall be transferable in accordance with applicable law.  The Liquidation Trust Interests will not be certificated.

**16.      Registry of Beneficial Interests**

The Plan provides that the Liquidation Trustee shall maintain a registry of the Liquidation Trust Beneficiaries.

**17.      Federal Income Tax Treatment of Liquidation Trust**

**a.      Liquidation Trust Assets Treated as Owned by Creditors**

The Plan provides that for all U.S. federal income tax purposes, all parties (including, without limitation, the Plan Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, as (i) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries and, to the extent Liquidation Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve, followed by (ii) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Liquidation Trust Interests.  Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to the Disputed Claims Reserve).  Pursuant to the Plan, the foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For a detailed discussion of tax issues and their implications, see section XI of this Disclosure Statement.

**b.      Tax Reporting**

Pursuant to the Plan, the Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Plan also provides that the Liquidation Trustee will annually send to each holder of a Liquidation Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  In accordance with the Plan, the Liquidation Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidation Trust that is required by any governmental unit.

The Plan also provides that the valuation of the Liquidation Trust Assets prepared pursuant to Article XI.D of the Plan shall be used consistently by all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

The Plan further provides that allocations of Liquidation Trust taxable income among the Liquidation Trust Beneficiaries (other than taxable income allocable to the Disputed Claims Reserve) shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time, and without regard to any restrictions on distributions described in the Plan) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve) to the holders of the Liquidation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

Pursuant to the Plan, the Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any Taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

The Plan provides that the Liquidation Trustee may request an expedited determination of Taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidation Trust.

### c.    Tax Withholdings by Liquidation Trustee

Pursuant to the Plan, the Liquidation Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidation Trust Beneficiaries. All such amounts withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement. The Liquidation Trustee shall be authorized to collect such tax information from the Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Liquidation Trust Agreement.  The Plan provides that in order to receive distributions under the Plan, all Liquidation Trust Beneficiaries (including, without limitation, holders of Allowed Other Secured Claims and Allowed Unsecured Claims) will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidation Trustee deems appropriate.  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  Pursuant to the Plan, the Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Liquidation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the Liquidation Trust Beneficiary is entitled, without interest; and, *provided further*, that, if the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the

157

Liquidation Trustee is later held liable for the amount of such withholding, the Plan provides that such holder shall reimburse the Liquidation Trustee for such liability.

### d.      Foreign Tax Matters

The Plan provides that the Liquidation Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Liquidation Trustee or the Liquidation Trust under non-United States law relating to Taxes.   Further, the Liquidation Trustee, or any other legal representative of the Liquidation Trust, shall not distribute the Liquidation Trust Assets or proceeds thereof without having first obtained all certificates required to have been obtained under applicable non-United States law relating to Taxes.

### e.      Dissolution

Pursuant to the Plan, the Liquidation Trust Advisory Board and the Liquidation Trust shall be dissolved at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines, in consultation with the Liquidation Trust Advisory Board, that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional Liquidation Trust proceeds to justify further pursuit or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made; *provided*, *however*, in no event shall the Liquidation Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.  If at any time the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain, and in consultation with the Liquidation Trust Advisory Board, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidation Trust, the Plan provides that the Liquidation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation," as defined in section 509(a) of the Tax Code and (D) that is unrelated to the Plan Debtors, the Liquidation Trust and any insider of the Liquidation Trustee and (iii) dissolve the Liquidation Trust.

## J.      MISCELLANEOUS PROVISIONS

### 1.      Payment of Indenture Trustees' Fees

The Plan provides that, on the Effective Date, the Liquidation Trustee shall pay in Cash from the assets of the Conveying Subsidiaries, all reasonable fees, costs and expenses incurred by the Indenture Trustees prior to the Effective Date including, but not limited to, the reasonable fees, costs and expenses incurred by the Indenture Trustees' professionals in carrying out the Indenture Trustees' duties under the applicable indenture.   The Plan further provides that, following the Effective Date, the Liquidation Trustee shall pay all reasonable fees, costs and expenses incurred by the Indenture Trustees including, but not limited to, the reasonable fees, costs and expenses incurred by the Indenture Trustees' professionals in carrying out the Indenture Trustees' duties under the applicable indenture.  The Plan provides that the foregoing fees, costs and expenses shall be paid by the Liquidation Trustee in the ordinary course, upon

presentation of invoices by the Indenture Trustees and without the need for approval by the Bankruptcy Court, or the filing of a request for payment of an Administrative Claim as required by Article II.A.2 of the Plan, but any disputes concerning such fees, costs and expenses shall be resolved by the Bankruptcy Court.  In the event that the Indenture Trustees and the Liquidation Trustee are unable to resolve a dispute with respect to the payment of the Indenture Trustees' fees, costs and expenses, the Indenture Trustees may elect to submit any such dispute to the Bankruptcy Court for resolution.

### 2.        Dissolution of Committee

The Plan provides that, on the Effective Date, the Committee shall dissolve and the Committee Members shall be released from all further authority, duties, responsibilities and obligations relating to the Plan Debtors' Chapter 11 Cases; *provided*, *however*, that the Committee and its Retained Professionals shall be retained with respect to (a) appeals and related proceedings regarding the Plan and (b) the resolution of applications for Accrued Professional Compensation.

### 3.        Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P.

Debtor TOUSA Homes, L.P. has no assets and no interest in any pending litigation.  Accordingly, no plan can be confirmed at TOUSA Homes, L.P.  The Proponents will file a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of, and to be considered in connection with, the Confirmation Hearing.

### 4.        Modification of the Plan

The Plan contains the following language with respect to modification of the Plan:

Effective as of the date hereof and subject to the limitations and rights contained herein: (a) the Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the Requisite Lenders not to be unreasonably withheld, to amend or modify the Plan before the entry of the Confirmation Order and (b) after the entry of the Confirmation Order, the Proponents or the Liquidation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Neither the Plan nor the Liquidation Trust Agreement may be amended in a manner that is materially adverse to any Settlement Party without the Settlement Party's consent (with respect to matters affecting all of the First Lien Revolver Lenders, First Lien Term Loan Lenders or the Second Lien Term Loan Lenders, such consent shall be deemed given with the consent of the Requisite Lenders (as defined under the applicable Loan Documents)).  Subject to the foregoing, a holder of a Claim that had accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 5.        Revocation of Plan

The Plan provides that the Proponents reserve the right, in consultation with the Requisite Lenders, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  In addition, the Proponents reserve the right to seek or not seek Confirmation of the Plan with respect to one or more of the Plan Debtors.  If the Proponents revoke or withdraw the Plan with respect to any of the Plan Debtors, or if Confirmation or the Effective Date does not occur with respect to one or

more of the Plan Debtors, then: (1) the Plan shall be null and void in all respects with respect to such Plan Debtor or Plan Debtors; (2) any assumption or rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, as applicable, effected by the Plan and any document or agreement executed pursuant thereto shall be deemed null and void with respect to such Plan Debtor or Plan Debtors; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against such Plan Debtor or any other Entity with respect to such Plan Debtor or Plan Debtors; (b) prejudice in any manner the rights of the Plan Debtors, the Committee or any other Entity with respect to such Plan Debtor or Plan Debtors; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Debtors, the Committee or any other Entity with respect to such Plan Debtor or Plan Debtors.

### 6.      Successors and Assigns

The Plan provides that the rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 7.      Reservation of Rights

The Plan provides that, except as expressly set forth therein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Accordingly, neither the filing of the Plan, any statement or provision contained therein nor the taking of any action by a Plan Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Plan Debtor, the Committee or the Liquidation Trust with respect to the holders of Claims or Interests or any other Entity or (b) any holder of a Claim or an Interest or any other Entity before the Effective Date.

### 8.      Further Assurances

Pursuant to the Plan, the Proponents or the Liquidation Trustee, as applicable, all holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 9.      Severability

The Plan provides that if, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, including, without limitation, the inclusion of one or more Plan Debtors in the Plan, the Bankruptcy Court shall, with the consent of the Proponents  and the Requisite Lenders have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, *provided* that any such alteration or interpretation must be in form and substance acceptable to the Proponents; *provided further*, that the Proponents and the Requisite Lenders may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  The Plan further provides that notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  Pursuant to the Plan, the Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10.    **Time**

The Plan provides that in computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, Bankruptcy Rule 9006 shall apply.

11.    **Exhibits/Schedules**

The Plan provides that all exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

12.    **Payment of Statutory Fees**

The Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid as and when due or otherwise pursuant to an agreement between the Liquidation Trust and the United States Department of Justice, Office of the U.S. Trustee, until such time as a Chapter 11 Case for a Plan Debtor shall be closed in accordance with Article V.H.2 of the Plan.

13.    **Substantial Consummation**

The Plan provides that on the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

14.    **Filing of Additional Documents**

The Plan provides that on or before the Effective Date, the Proponents may file with the Bankruptcy Court all agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## VII.    SOLICITATION AND VOTING PROCEDURES

**A.    OVERVIEW**

The Disclosure Statement Order establishes certain procedures that govern the Proponents' solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation and Voting Procedures"). This section provides an overview of those procedures; however, the Disclosure Statement Order is attached to this Disclosure Statement as Exhibit B, and should be reviewed in its entirety.  A summary of the relevant deadlines can be found on page 5 of this Disclosure Statement.

**B.    DISTRIBUTION OF THE SOLICITATION PACKAGE**

The Solicitation Package contains important information and required voting material, including, among other things: (a) a cover letter urging holders of Claims in each of the Classes entitled to vote to accept the Plan; (b) an appropriate form of Ballot, Note Ballot or Master Note Ballot, as applicable; (c) a copy of the Disclosure Statement Order; (d) a copy of the notice of the Confirmation Hearing; (e) a copy of this Disclosure Statement, as approved by the Bankruptcy Court; and (f) a copy of the Plan.

1.    **Voting Classes**

The Bankruptcy Code provides that a creditor or holder of a claim against a debtor is not entitled to vote to accept or reject a plan if the proposed plan does not impair that creditor's rights or if the creditor will not receive any property under the plan. Conversely, parties whose interests are impaired under a proposed plan and who receive property under the plan are entitled to vote on such plan.

In light of this standard, Exhibit C attached hereto indicates which Classes of Claims are entitled to vote to accept or reject the Plan. The Proponents will distribute the Solicitation Packages no fewer than [33] days before the Voting Deadline by first-class mail to holders of Claims in the Voting Classes who are entitled to vote on the Plan, as determined by the following criteria:

- holders of Claims for which Proofs of Claim have been timely filed, as reflected on the Claims Register as of the Voting Record Date; *provided*, *however*, that such Proofs of Claim have not been withdrawn, expunged or disallowed as of the Voting Record Date; *provided*, *however*, that holders of Claims to which an objection is pending at least 15 days before the Voting Deadline shall not be entitled to vote unless such holders become eligible to vote through a "Resolution Event," as such term is defined in section VII.B.2 herein;

- holders of Claims listed in the Schedules in amounts in excess of $0 that are not listed as contingent, unliquidated or Disputed, and for which no Proof of Claim has been timely filed; *provided*, *however*, that each holder of a Claim that is scheduled as contingent, unliquidated or Disputed, or any combination thereof, and that has been superseded by a timely filed Proof of Claim shall receive a Solicitation Package;

- holders of Claims that arise pursuant to an agreement or settlement with the Proponents, as reflected in a document filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Proponents pursuant to authority granted by the Bankruptcy Court, regardless of whether a Proof of Claim with respect to such Claim has been filed;

- applicable nominees with respect to a beneficial holder or record holder of a Claim, as reflected in the relevant records as of the Voting Record Date; and

- the assignee of any transferred or assigned Claim, but only if such transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on or before the Voting Record Date.

If your Claim is in one of the Voting Classes and satisfies one of these criteria, you will have received an appropriate form of ballot along with this Disclosure Statement upon which you may indicate your acceptance or rejection of the Plan.  If your Claim is not in one of the Voting Classes or is in a Voting Class but does not meet one of these criteria, you are not entitled to vote and you will not receive a ballot with this Disclosure Statement.  **DETAILED VOTING INSTRUCTIONS ARE PROVIDED ON THE BALLOT. YOU SHOULD READ YOUR BALLOT CAREFULLY AND FOLLOW ALL LISTED INSTRUCTIONS**.

Please use only the Ballot, Note Ballot and/or Master Note Ballot that accompanies this Disclosure Statement.  If a Ballot, Note Ballot or Master Note Ballot is damaged or lost or if you have any questions concerning the Solicitation and Voting Procedures, you may contact the Voting and Claims Agent (a) by writing to TOUSA Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (b) by calling (888) 647-1742 or (c) by emailing KCC_TOUSA@kccllc.com.

162

### 2.    Temporary Allowance of Claims for Voting Purposes

The Disclosure Statement Order, attached hereto as <u>Exhibit B</u>, establishes certain criteria by which the Proponents will calculate the amount of each Claim for voting purposes.  If a creditor disagrees with the resulting amount of its Claim for voting purposes, the holder of such Disputed Claim may seek to obtain one of the following "Resolution Events" by filing a motion with the Bankruptcy Court.  In order for the holder of a Disputed Claim to be entitled to vote on the Plan, however, any such Resolution Event must occur no later than five Business Days before the Voting Deadline:

- an order entered by the Bankruptcy Court, after notice and a hearing, allowing a Disputed Claim in a specified amount;

- an order entered by the Bankruptcy Court temporarily allowing a Disputed Claim in a specified amount for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

- a stipulation or other agreement executed between the holder of a Disputed Claim and the Proponents resolving the objection and allowing such Disputed Claim in an agreed-upon amount;

- a stipulation or other agreement executed between the holder of the Disputed Claim and the Proponents temporarily allowing such Claim solely to permit such holder to vote its Claim in an agreed-upon amount and for no other purpose; or

- a voluntary withdrawal by the Proponents of a pending objection to a Disputed Claim.

If a Resolution Event occurs, then, no later than two Business Days thereafter, the Voting and Claims Agent shall distribute a Solicitation Package (which may be accompanied by a pre-addressed, postage-prepaid envelope) to the holder of a Claim that has been Allowed for voting purposes only, which must be returned to the Voting and Claims Agent or to the holder's nominee, as applicable, no later than the Voting Deadline.  Additionally, in the event the Proponents object to a Claim at least 15 days before the Voting Deadline but <u>after</u> such holder of a Claim receives a Solicitation Package, the notice of objection is required to inform such holder of the rules applicable to Claims subject to a pending objection and the procedures for temporary allowance for voting purposes described above.  Furthermore, if the holder of a Claim receives a Solicitation Package and the Proponents object to such Claim less than 15 days before the Voting Deadline, the holder's Claim will be deemed temporarily Allowed for voting purposes only without further action by the holder of such Claim and without further order of the Bankruptcy Court.  For the avoidance of doubt, the fact that no objection has been filed prior to the Voting Deadline does not mean that the Claim is an Allowed Claim.

### C.    REQUIREMENTS FOR ACCEPTANCE OF THE PLAN

### 1.    Acceptance by Voting Classes

The Bankruptcy Code determines whether a class entitled to vote accepts a chapter 11 plan by calculating the number of claims voting to accept, based on the total number and amount of claims actually voting.  Acceptance by a class of claims requires an affirmative vote of a majority in number of the total claims voting and two-thirds in amount of the total claims voting.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 2.    Presumed Rejection and "Cram Down"

For purposes of voting on the Plan, Classes 5C, 5D, 6 and 7 for TOUSA, Classes 4C, 5 and 6 for the Conveying Subsidiaries and Class 4 for Beacon Hill are conclusively presumed to have rejected the Plan.  It is possible that other Classes of Claims may vote to reject the Plan as well.  As discussed further in section VIII.D.4 of this Disclosure Statement, the Proponents intend to use the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation notwithstanding the foregoing deemed rejections and the potential rejection of the Plan by any Class entitled to vote.  For a further discussion of the risks with respect to the use of section 1129(b) of the Bankruptcy Code, see section IX of this Disclosure Statement, entitled "Risk Factors and Alternatives to Confirmation and Consummation of the Plan."

## D.    COMPLETION OF BALLOTS

A Ballot, Note Ballot or Master Note Ballot will <u>not</u> be counted in determining the acceptance or rejection of the Plan if it is:

- illegible or contains insufficient information to permit the identification of the holder of a Claim;

- submitted by a holder of a Claim in a Class that is not entitled to vote on the Plan;

- submitted by a holder of a Claim listed in the Schedules as contingent, unliquidated or Disputed, or any combination thereof, for which the applicable Claims Bar Date has passed and no Proof of Claim was timely filed;

- unsigned;

- not **clearly marked** to accept or reject the Plan or marked both to accept and reject the Plan (either with respect to all Plan Debtors or, in the case of a Note Ballot, with respect to an individual Plan Debtor); or

- submitted by any Entity not entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules or otherwise.

## VIII.    CONFIRMATION OF THE PLAN

## A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan.  The Confirmation Hearing has been scheduled to begin on [_____] at [_____] (prevailing Eastern Time) before the Honorable John K. Olson, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom 301, 299 E. Broward Boulevard, Fort Lauderdale, Florida 33301.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

B.    OBJECTIONS TO CONFIRMATION

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to Confirmation must:

- be made in writing;

- conform to the Bankruptcy Rules and the Local Rules;

- state the name of the objector and the nature and amount of the Claims held or asserted by the objector against the Plan Debtors, the basis for the objection and the specific grounds therefor;

- be filed with the Bankruptcy Court;

- if practicable, be accompanied by a proposed modification to the Plan that would resolve such objection; and

- be served upon (a) the office of United States Trustee for the Southern District of Florida, 51 S.W. First Ave., Suite 1204, Miami, Florida 33130 (Attn: Steven D. Schneiderman); (b) Akin Gump Strauss Hauer & Feld LLP, co-counsel for the Committee, One Bryant Park, New York, New York 10036 (Attn: Daniel H. Golden, Philip C. Dublin and Sara L. Brauner); (c) Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., co-counsel for the Committee, 150 West Flagler Street, Miami, Florida  33130 (Attn: Patricia A. Redmond); (d) Kirkland & Ellis LLP, co-counsel for the Debtors, 601 Lexington Avenue, New York, New York 10022 (Attn: Richard M. Cieri and Joshua A. Sussberg); (e) Berger Singerman LLP, co-counsel for the Debtors, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman); (f) Chadbourne & Parke LLP, co-counsel for the First Lien Agents, 30 Rockefeller Plaza, New York, New York  10112 (Attn: Seven Rivera); (g) Smith Hulsey & Busey, co-counsel for the First Lien Agents, 225 Water Street, Suite 1800, Jacksonville, Florida  32202 (Attn: Stephen D. Busey and James H. Post); (h) Stichter, Riedel, Blain & Prosser, P.A., co-counsel for the First Lien Agents, 110 E. Madison Street, Suite 200, Tampa, Florida  33602 (Attn: Amy D. Harris, Harley Edward Riedel and Richard Craig Prosser); (i) Bracewell & Giuliani LLP, co-counsel for the Second Lien Term Loan Agent, Goodwin Square, 225 Asylum Street, Suite 2600, Hartford, Connecticut  06103 (Attn: Gregory W. Nye, Evan Flaschen and Marcy Kurtz); (j) Bilzin Sumberg Baena Price & Axelrod LLP, co-counsel for the Second Lien Term Loan Agent, 2500 Wachovia Financial Center, 200 South Biscayne Boulevard, Miami, Florida  33131 (Attn: Scott L. Baena, Matthew I. Kramer and Jason Z. Jones); and (k) all other parties required by the Bankruptcy Court's March 25, 2008 *Amended Order Establishing Certain Notice, Case Management and Administrative Procedures* [ECF No. 655].

All objections to the Plan must be actually received no later than [____].  All objections to Confirmation are governed by Bankruptcy Rule 9014.

**THE BANKRUPTCY COURT WILL NOT CONSIDER A PLAN OBJECTION UNLESS IT IS TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**C.     OVERVIEW OF STATUTORY REQUIREMENTS TO CONFIRM THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements set forth in section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed by the Proponents in good faith and not by any means forbidden by law.

- Any payment made or promised by the Plan Debtors' Estates or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Plan Debtors' Chapter 11 Cases, or in connection with the Plan and incident to the Plan Debtors' Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation is reasonable or if such payment is to be fixed after Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the applicable Plan Debtor was liquidated under chapter 7 of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full on the Effective Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Plan Debtors or any successor to the Plan Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan, as discussed in section VIII.D.2, below.

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code) at the level established pursuant to the provisions of the Bankruptcy Code at any time prior to Confirmation for the duration of the period the Plan Debtors are obligated to provide such benefits.

**D.     SPECIFIC STATUTORY CONFIRMATION REQUIREMENTS**

**1.     Overview of the Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code provides that one of the factors a bankruptcy court must consider before confirming a proposed plan of reorganization or

166

liquidation, regardless of whether any party in interest objects to confirmation, is that the proposed plan is in the "best interests" of all classes of claims and equity interests that are impaired.

The "best interests" test requires that the Bankruptcy Court find, as a condition to Confirmation, that each holder of a Claim or Interest in each Impaired Class: (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether the liquidation component of the best interests test has been satisfied is to determine the dollar amount that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to chapter 7 cases and the assets of each Plan Debtor's Estate were liquidated. The gross amount of cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of each Plan Debtor and any preference recoveries, augmented by the unencumbered cash held by such Plan Debtor at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to the holders of Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code. A debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in a chapter 7 bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the chapter 11 cases allowed in a chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the debtor and statutory committee of unsecured creditors appointed in the chapter 11 cases and costs and expenses of members of the statutory committee of unsecured creditors, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the debtor during the pendency of the chapter 11 cases.

Finally, the value of such allocations (not taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed to such holder under the Plan. After considering the effect that a chapter 7 liquidation would have on the proceeds ultimately available for distribution to creditors in the chapter 11 cases, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (b) additional costs associated with the rapid transfer or cessation of operations at the facilities and the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (c) the substantial increases in claims that would be satisfied on a priority basis, the Proponents have determined that Confirmation with respect to each Plan Debtor will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Plan Debtors under chapter 7.

The Proponents believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including secured Claims, would be less than the value of distributions under the Plan because of additional fees and expenses that would be incurred in the event that a chapter 7 trustee is appointed. Moreover, it is possible that distribution of the proceeds of the liquidation could be delayed for one or more years after the completion of such liquidation to resolve Claims and prepare for distributions. In the event litigation was necessary to resolve Claims asserted in a chapter 7 case, the delay could be prolonged and Administrative Claims increased.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Committee's financial advisors, in consultation with the Debtors' financial advisors, prepared an analysis of estimated distributions to creditors under the Plan, attached hereto as <u>Exhibit C</u> (the "<u>Recovery Analysis</u>"). The Recovery Analysis presents estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms.

To further assist the Bankruptcy Court in determining that the Plan satisfies the best interests test, the Committee's financial advisors, in consultation with the Debtors' financial advisors, prepared an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Plan Debtors, attached hereto as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"). The Liquidation Analysis is based on a number of significant assumptions. The Liquidation Analysis does not purport to be a valuation of the Plan Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

The Recovery Analysis and the Liquidation Analysis have the same projected Effective Date. In addition, the Recovery Analysis and the Liquidation Analysis utilize the same assumptions regarding anticipated events and proceeds expected to be realized prior to the Effective Date.

## 2.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the debtor, unless such liquidation is proposed in the plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Plan Debtors ultimately will be disposed of and all proceeds of such assets will be distributed to the creditors pursuant to the terms of the Plan. Since no further reorganization of the Plan Debtors will be possible, the Proponents believe that the Plan meets the feasibility requirement. The Proponents believe that sufficient funds will exist to make all payments required by the Plan.

## 3.        Acceptance by Impaired Classes

The Bankruptcy Code generally requires that each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest or (b) cures any prepetition default and reinstates the original terms of such obligation.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but only with respect to those holders of impaired claims who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

<u>Exhibit C</u> hereto identifies the Classes that are not Impaired under the Plan. The holders of Claims in those Classes are deemed to have accepted the Plan. <u>Exhibit C</u> also identifies the Voting Classes, which are those Claims that are Impaired under the Plan and are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes,

168

as both standards are described herein.  As stated above, Classes of Claims entitled to vote will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Exhibit C also identifies the Classes of Claims and Interests that are Impaired under the Plan and will receive no distribution under the Plan.  The holders of Claims and Interests in those Classes are deemed to have rejected the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if there are impaired classes that have voted to reject or are deemed to reject the plan if the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### a.    Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment of such classes be the same or equivalent, but that such treatment is "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### b.    Fair and Equitable

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims (to the extent that the bankruptcy court determines that the claims are allowed and fully secured) requires that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the claimant's secured interest in the debtor's property subject to the liens.

*Unsecured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property with a present value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior equity interest.

*Interests*: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests requires that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a present value, as of the effective date of the plan, equal to the greatest of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest or (b) no class of equity interests junior to the non-accepting class receives a distribution under the plan.

In view of the deemed rejection by certain Classes, as indicated on <u>Exhibit C</u> hereto, and the possible rejection of the Plan by certain of the Voting Classes, the Proponents intend to seek Confirmation under section 1129(b) of the Bankruptcy Code.  To the extent that any of the Voting Classes vote to reject the Plan, the Proponents reserve the right to modify the Plan in accordance with Article XII.D of the Plan.

### 5.    Classification of Claims and Interests Under the Plan

The Proponents believe that the Plan meets the classification requirements of section 1122 of the Bankruptcy Code, which require that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar."  The Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code and as summarized in section VI.B herein.

## IX.    RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

> **PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

### A.    BANKRUPTCY CONSIDERATIONS

### 1.    Failure to Satisfy Voting Requirements

If the Proponents receive votes in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, to confirm the Plan.  In the event the Proponents do not receive sufficient votes, the Proponents may seek to accomplish an alternative chapter 11 plan.  There can be no assurance, however, that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those in the Proponents' proposed Plan.

### 2.    Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, the bankruptcy court may nevertheless confirm the plan under the procedure for nonconsensual confirmation described in section VIII.D.4, above.  The Proponents believe that the Plan satisfies the requirements for nonconsensual Confirmation.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 3.    Failure to Secure Confirmation of the Plan

As discussed in sections VIII.C and VIII.D of this Disclosure Statement, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires a bankruptcy court to make a series of specified, independent findings.

Even if the Proponents receive the required votes accepting the Plan, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  Any objections to the Plan may result in litigation that could delay or even prevent Confirmation.  Litigation surrounding Confirmation could also be expensive and therefore, recoveries to creditors may be decreased.

The Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

Among other things, the Proponents expect that parties in interest may raise the following arguments:

### a.    Parties in Interest May Object to the Classification and/or Allowance of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or equity interests in that class.

The Proponents believe that the classification of Claims against and Interests in the Plan Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Interests that are substantially similar to similarly classified Claims or Interests.  Moreover, the Proponents do not believe that classification of dissimilar Claims in the same Class is appropriate under the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### b.    Certain Parties May Contest the Treatment of Prepetition Intercompany Claims and Intercompany Notes

Certain parties in interest may object to the treatment of Prepetition Intercompany Claims and prepetition Intercompany Notes.  Specifically, parties may argue that the Proponents' treatment of Prepetition Intercompany Claims as equity in the Conveying Subsidiaries constitutes an unconstitutional taking.  Moreover, parties may also argue that treating the Prepetition Intercompany Claims as equity investments constitutes partial substantive consolidation of the Estates. The Proponents disagree with this analysis.  The Bankruptcy Court conducted an extensive trial where it determined that, based on the Debtors' historical practices, the Prepetition Intercompany Claims were properly characterized as equity

171

investments in the Conveying Subsidiaries.  In the event that the Bankruptcy Court or other court of competent jurisdiction determines that the Prepetition Intercompany Claims should receive an alternative treatment, the Proponents may modify or withdraw the Plan.

Similarly, other parties in interest may object to the Proponents' decision to honor the prepetition Intercompany Notes.  The Proponents do not believe there is any basis to ignore the documented, interest-bearing notes.  However, to the extent the Bankruptcy Court or an appellate court determines that the prepetition Intercompany Notes should not be honored, the recoveries for certain creditors may be materially altered.  In the event of an adverse determination, the Proponents may modify or withdraw the Plan.

### 4.  Failure to Receive Bankruptcy Court Approval of the Compromises and Settlements Contemplated by the Plan

The Plan constitutes a settlement, compromise and release of all rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan, taking into account and conforming to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination or section 510(b) and (c) of the Bankruptcy Code.  This settlement, compromise and release require approval by the Bankruptcy Court in the form of a confirmation order.  The Proponents cannot ensure that the Bankruptcy Court will approve of the settlement, compromise and release contemplated in the Plan.

### 5.  Failure to Consummate the Plan

One condition to the Effective Date is the entry of the Confirmation Order.  As of the date of this Disclosure Statement, there can be no assurance that the conditions to the Effective Date will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated or that the Effective Date will occur.

### 6.  The Proponents or the Liquidation Trustee May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Proponents and the Liquidation Trustee reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim against the Plan Debtors where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7.  The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims

The estimated Claims set forth in this Disclosure Statement are based on various assumptions, including the Proponents' estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed Claims may differ significantly from the estimated amount of Allowed Claims contained on Exhibit C attached hereto.  As a result, such differences may materially and adversely affect the recovery realized by holders of such Claims under the Plan.

8.      **Administrative Expenses and Priority Claims May Exceed Expected Levels**

Section 1129(a) of the Bankruptcy Code requires that, in order to confirm a chapter 11 plan, administrative expenses of the chapter 11 case and various classes of priority claims must be paid in full in cash, unless the respective holders of such expenses and claims agree to less favorable treatment. The Proponents currently expect that the amount of Allowed Administrative Claims (including Postpetition Intercompany Claims), Priority Tax Claims and Other Priority Claims will not exceed the amounts reflected in the Plan, but there can be no assurance that such amounts will not be exceeded.

9.      **Liquidation Trust Cause of Action Recoveries and Results are Speculative and Uncertain**

The success of the Liquidation Trust in pursuing the Liquidation Trust Causes of Action and defenses is speculative and uncertain. Litigation may be complex and involve significant delay. Furthermore, even if successful in the Liquidation Trust Causes of Action, in some cases, the Liquidation Trust may encounter difficulty in collection. Although potential recoveries from the Liquidation Trust Causes of Action are not included in the Recovery Analysis attached hereto as <u>Exhibit C</u> or the Liquidation Analysis attached hereto as <u>Exhibit D</u>, such recoveries may have a significant impact on creditors.

B.      **RISK FACTORS ASSOCIATED WITH THE VALUE OF THE LIQUIDATION TRUST INTERESTS TO BE ISSUED UNDER THE PLAN**

Certain tax implications of the Plan Debtors' bankruptcy may increase the tax liability of the Liquidation Trust. Holders of Claims and Interests should carefully review section XI hereof to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Liquidation Trust.

C.      **RISKS ASSOCIATED WITH THE WIND DOWN OF THE DEBTORS' BUSINESS OPERATIONS**

1.      **Dependence on Subcontractors**

Substantially all of the Debtors' construction work was performed by subcontractors. As a result, unsatisfactory performance by these unaffiliated third-party subcontractors could have a material adverse effect on recoveries to creditors.

The Debtors have been actively engaged in a wind down of the Debtors' businesses. There is currently no operating business and the vast majority of the Plan Debtors' assets have been monetized, the proceeds of which have been placed in investment accounts approved by the Bankruptcy Court. The Debtors believe that, while certain assets still remain, the most significant of these are the Liquidation Trust Causes of Action.

2.      **Product Liability and Warranty Claims**

In the ordinary course of business, the Debtors provided homebuyers with a limited warranty covering workmanship and materials and a limited warranty covering major structural defects. Claims arising under these warranties and general liability claims are common in the homebuilding industry and can be costly. Although the Debtors maintain liability insurance, the coverage offered by, and availability of, liability insurance for construction defects is currently limited and, where coverage is available, it may

173

be costly.  Moreover, in certain instances, the Debtors' insurance coverage may contain limitations with respect to coverage; this insurance coverage may not be adequate to cover all liability and warranty claims for which the Debtors may be liable.  In addition, coverage may be further restricted and become more costly in the future.  Furthermore, although the Debtors generally seek to require subcontractors and design professionals to indemnify the Debtors for liabilities arising from their work, the Debtors may be unable to enforce such contractual indemnities.  Uninsured and unindemnified liability and warranty claims, as well as the cost of insurance coverage, could adversely affect the Liquidation Trust's ability to dispose of the Plan Debtors' remaining assets at favorable prices and/or decrease recoveries to creditors.

D.    LIQUIDATION UNDER CHAPTER 7

        If no plan can be confirmed, one or more of the Plan Debtors' Chapter 11 Cases may be converted to a case (or cases) under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Plan Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan in light of the following considerations: (a) the likelihood that the assets of the Plan Debtors would be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (b) delays in distributions to creditors and (c) additional administrative expenses involved in the appointment of a trustee.  The Committee's Liquidation Analysis is attached hereto as Exhibit D.

E.    ALTERNATIVES TO THE PROPOSED PLAN

        If the Plan is not confirmed, other parties in interest could attempt to formulate a different plan.  With respect to an alternative plan of reorganization or liquidation, the Proponents have explored various restructuring alternatives in the formulation of the Plan and believes that the Plan, as described herein, enables creditors to realize a greater value under the circumstances than would other restructuring alternatives.

## X.    CERTAIN SECURITIES LAW MATTERS

A.    ISSUANCE OF LIQUIDATION TRUST INTERESTS

        Given the nature of the Liquidation Trust Interests, the Proponents do not believe such Liquidation Trust Interests constitute securities under the Securities Act of 1933, as amended (the "'33 Act").  If the Liquidation Trust Interests were deemed to be securities, the Proponents believe such Liquidation Trust Interests would qualify for the exemption contained in section 1145 of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code generally exempts the issuance of securities under a chapter 11 plan from registration under the '33 Act and under state securities "blue sky" laws if three principal requirements are satisfied: (a) the offer is of securities in the debtor or its successor under a plan and the securities are issued under a plan of reorganization or liquidation; (b) the recipients of the securities hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor; and (c) the securities are issued entirely in exchange for the recipient's claim against or equity interest in the debtor, or "principally" in such exchange and "partly" for cash or property.

B.    OBLIGATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED

        The '34 Act governs the secondary trading of securities and requires issuers subject thereto to file reports with the SEC on a quarterly and annual basis.  The Proponents do not anticipate that the Liquidation Trust will be subject to the reporting requirements of the '34 Act given the characteristics of

174

the Liquidation Trust Interests.  Therefore, the Liquidation Trust will not file reports with the SEC unless required by law to do so.

### XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

#### A.    INTRODUCTION

The following discussion is a summary of the Proponents' analysis of certain U.S. federal income tax consequences of the consummation of the Plan to the Plan Debtors and certain holders of Claims and Interests.  This summary is based on the Tax Code, the Treasury Regulations, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The Proponents have not requested, nor do they intend to request, a private letter ruling from the IRS or an opinion of counsel with respect to any of the aspects of the Plan.   The discussion below is not binding upon the IRS or any court and does not reflect any independent analysis by the Plan Debtors or the Committee.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the Tax Code) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Plan Debtors or to such holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  The following discussion assumes that each holder of a Claim holds its Claim as a "capital asset" within the meaning of section 1221 of the Tax Code.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

#### B.    FEDERAL INCOME TAX CONSEQUENCES TO PLAN DEBTORS

Pursuant to the Plan, the Plan Debtors' assets will be transferred to the Liquidation Trust, which will be created solely for the purposes of liquidating and monetizing the Liquidation Trust Assets,

prosecuting the Liquidation Trust Causes of Action and making distributions to certain holders of Allowed Claims in an orderly liquidation during the term of the Liquidation Trust. The sale of Liquidation Trust Assets may result in the recognition of taxable gain or loss to the Plan Debtors or the Liquidation Trust, based on the difference between the fair market value of such assets and the Plan Debtors' or the Liquidation Trust's tax basis in such assets. To the extent that the Plan Debtors or Liquidation Trust realize gain from the transfer of such assets or recognize any cancellation of indebtedness income, the Proponents believe that the Plan Debtors or the Liquidation Trust, as applicable, will have sufficient current losses and net operating loss carryovers to shelter these gains, although it is possible that the Plan Debtors or the Liquidation Trust may be required to pay federal income tax on some or all of any gains recognized. There could also be some liability for Taxes in certain states and under the federal alternative minimum tax.

C.    **FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS**

   1.    **Consequences to Holders of TOUSA Class 1 Claims, Class 2 Claims, Class 5A Claims and Class 5B Claims and Conveying Subsidiaries Class 1 Claims, Class 4A Claims and Class 4B Claims on Account of Distributions Other Than Liquidation Trust Interests**

Class 1A Claims at TOUSA and Class 1 Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive payment in Cash of their *Pro Rata* share of the Default Interest Amount. Class 1B Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive (i) on account of their First Lien Term Loan Secured Claims, payment in Cash of their *Pro Rata* share of (a) the proceeds of the Encumbered Assets of TOUSA and (b) the Term Loan Lender Tax Refund Recovery; (ii) on account of their First Lien Term Loan Deficiency Claims, among other things, payment in Cash of their *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and the PIK Note Indenture) of (a) the Unencumbered Cash at TOUSA, (b) the TOUSA Term Loan Lender Disgorgement Share and (c) the Unsecured Creditor Tax Refund Recovery; and (iii) on account of their third-party claims settled pursuant to the Plan, among other things, payment in Cash of their *Pro Rata* share of 40% of the Term Loan Lender D&O Recovery. Class 2 Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, on account of their third-party claims settled pursuant to the Plan, among other things, payment in Cash of their *Pro Rata* share of 60% of the Term Loan Lender D&O Recovery.

Class 5A Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, among other things, their *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and the PIK Note Indenture) of (i) the Unencumbered Cash at TOUSA, (ii) the TOUSA Term Loan Lender Disgorgement Share and (iii) the Unsecured Creditor Tax Refund Recovery. Class 5B Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, among other things, their *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of (i) the Unencumbered Cash at TOUSA, (ii) the TOUSA Term Loan Lender Disgorgement Share and (iii) the Unsecured Creditor Tax Refund Recovery.

Class 4A Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, among other things, their *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures) of (i) the

Unencumbered Cash of such Conveying Subsidiary, (ii) the Monarch Settlement Payments, (iii) the Unsecured Creditor D&O Recovery, (iv) the Transeastern Offshore Disgorgement and (v) the Conveying Subsidiaries Term Loan Lender Disgorgement Share.

Class 4B Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive the **greater** of (i) among other things, their *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary) of (a) the Unencumbered Cash of such Conveying Subsidiary, (b) the Monarch Settlement Payments, (c) the Unsecured Creditor D&O Recovery, (d) the Transeastern Offshore Disgorgement and (e) the Conveying Subsidiaries Term Loan Lender Disgorgement Share **or** (ii) payment in Cash of the Minimum Conveying Subsidiary Recovery Amount.

A holder should recognize gain or loss equal to the difference between (x) the fair market value as of the Effective Date of such holder's right to receive Cash as set forth in the Plan and (y) the holder's tax basis in the Claims surrendered by the holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the holder. To the extent that any portion of the right to receive Cash in the exchange is allocable to accrued but unpaid interest, the holder may recognize ordinary income, which is addressed in the discussion below regarding accrued but unpaid interest. A holder's tax basis in the right to receive the Cash should be equal to the fair market value of such right as of the Effective Date. A holder's holding period for the right should begin on the day following the Effective Date.

2. **Consequences to Holders of TOUSA Class 3 Claims, Conveying Subsidiaries Class 2 Claims and Beacon Hill Class 1 Claims on Account of Distributions Other Than Liquidation Trust Interests**

Class 3 Claims at TOUSA, Class 2 Claims at the Conveying Subsidiaries and Class 1 Claims at Beacon Hill will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive either payment in Cash or delivery of the collateral securing such Claim. If a holder receives Cash or has all collateral securing such Claim returned in satisfaction of its Claim, the satisfaction should be treated as a taxable exchange under section 1001 of the Tax Code. The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received and (y) the holder's adjusted tax basis in its Claim. To the extent that the Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income (see discussion below). A holder's tax basis in any property received should be equal to the fair market value of such property as of the Effective Date. A holder's holding period for the property should begin on the day following the Effective Date.

3. **Consequences to Holders of TOUSA Class 4 Claims, Conveying Subsidiaries Class 3 Claims and Beacon Hill Class 2 Claims and Class 3 Claims on Account of Distributions Other Than Liquidation Trust Interests**

Class 4 Claims at TOUSA, Class 3 Claims at the Conveying Subsidiaries and Class 2 Claims at Beacon Hill will be cancelled on the Effective Date and holders thereof will receive Cash in full satisfaction of their Claims. Class 3 Claims at Beacon Hill will be cancelled on the Effective Date and holders thereof will receive payment in Cash (without postpetition interest). The holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the holder has held its Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received and

177

(y) the holder's adjusted tax basis in its Claim.  To the extent that the Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the holder, the holder may recognize ordinary interest income (see discussion below).

4.    **Consequences to Holders of TOUSA Class 1B Claims, Class 2 Claims, Class 5A Claims and Class 5B Claims and Conveying Subsidiaries Class 4A Claims and Class 4B Claims on Account of Distributions of Liquidation Trust Interests**

Class 1B Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, (i) on account of their First Lien Term Loan Deficiency Claims, among other things, their *Pro Rata* share of TOUSA Class 1B General Liquidation Trust Interests and (ii) on account of their third-party claims settled pursuant to the Plan, among other things, their *Pro Rata* share of TOUSA Class 1B Transeastern Liquidation Trust Interests.  Class 2 Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, (i) on account of their Second Lien Term Loan Deficiency Claims, their *Pro Rata* share of TOUSA Class 2 General Liquidation Trust Interests and (ii) on account of their third-party claims settled pursuant to the Plan, among other things, their *Pro Rata* share of TOUSA Class 2 Transeastern Liquidation Trust Interests. Class 5A Claims and Class 5B Claims at TOUSA will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, among other things, their *Pro Rata* share of the TOUSA Class 5A Liquidation Trust Interests or TOUSA Class 5B Liquidation Trust Interests, as applicable.  Class 4A Claims and Class 4B Claims at the Conveying Subsidiaries will be cancelled on the Effective Date and the holders of such Claims will be entitled to receive, among other things, their *Pro Rata* share of the series of Conveying Subsidiaries Class 4A Liquidation Trust Interests or Conveying Subsidiaries Class 4B Liquidation Trust Interests, as applicable, for the applicable Conveying Subsidiary.  The amount to be received, if any, with respect to the Liquidation Trust Interests is contingent, in part, on the outcome of the Liquidation Trust Causes of Action.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, pursuant to Treasury Regulation section 301.7701-4(d) and related regulations, the Liquidation Trustee intends to take a position on the Liquidation Trust's tax return that the Liquidation Trust should be treated as a grantor trust set up for the benefit of the Liquidation Trust Beneficiaries.  Holders of Allowed Claims that receive Liquidation Trust Interests will be treated for U.S. federal income tax purposes as receiving their *Pro Rata* shares of the Liquidation Trust Assets from the applicable Plan Debtor(s) in a taxable exchange and then depositing them in the Liquidation Trust in exchange for Liquidation Trust Interests.

Holders of Class 1B Claims, Class 2 Claims, Class 5A Claims and Class 5B Claims at TOUSA and Class 4A Claims and Class 4B Claims at the Conveying Subsidiaries should recognize gain or loss equal to the difference between (a) the fair market value as of the Effective Date of their *Pro Rata* share of Liquidation Trust Interests (to the extent such *Pro Rata* share is not allocable to accrued interest) and (b) the holder's tax basis in the Claims surrendered by the holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the holder.  To the extent that any portion of the Liquidation Trust Interests received in the exchange is allocable to accrued interest, the holder may recognize ordinary income (see discussion below).  A holder's tax basis in the Liquidation Trust Interests received should equal their fair market value as of the Effective Date.  A holder's holding period for the Liquidation Trust Interests should begin on the day following the Effective Date.

Holders of Allowed Claims that receive Liquidation Trust Interests will be required to report on their U.S. federal income tax returns their share of the Liquidation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Liquidation Trust.  This requirement may result in such holders being subject to tax on their allocable share of the Liquidation Trust's taxable income prior to

178

receiving any Cash distributions from the Liquidation Trust.  Holders of Allowed Claims that receive Liquidation Trust Interests are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Liquidation Trust.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (A) elect to treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Disputed Claims Reserve will be subject to Tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions from such reserves (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Plan Debtors.  All parties (including, without limitation, the Plan Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

**5.      Accrued but Unpaid Interest**

To the extent that any amount received by a holder of a Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Plan Debtors or the Liquidation Trust. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a holder of a Claim will be attributable to accrued interest is unclear.  Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for holders of Allowed Claims.

**6.      Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for consideration (or the right to receive consideration) on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

179

Gain, if any, recognized by a holder on the exchange of a Claim pursuant to the Plan that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

### 7.    Limitation on Use of Capital Losses

Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### D.    WITHHOLDING AND REPORTING

Certain payments, including payments in respect of Claims pursuant to the Plan, are generally subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding at a rate of 28% unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished to the IRS.

In addition, a Liquidation Trust Beneficiary that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders of Claims.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied.  These requirements are different from, and in addition to, the withholding tax requirements described in the preceding paragraph.  Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF**

**CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

Dated:  May 15, 2013

Respectfully submitted,

By: /s/ Patricia A. Redmond

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789–3553
Facsimile:  (305) 789–3395

–and–

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, NY  10036
Telephone: (212) 872–1000
Facsimile: (212) 872–1002

–and–

**ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**
Lawrence S. Robbins (DC Bar No. 420260)
Michael Waldman (DC Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Co–counsel to the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

By: /s/ Paul Steven Singerman

**BERGER SINGERMAN LLP**
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

–and–

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar No. 4216453)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Co-counsel to the Debtors*