1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                    Judge John K. Olson

3

4                              Case No.:  08-10928-BKC-JKO
                               Jointly Administered
5

6    In Re:

7    TOUSA, INC., et al.,

8         Debtor.
     _____/
9

10

11              ALL MOTIONS ON THE CALENDAR

12                    June 20, 2013

13           (9171), (9196), (9209), (9222)
                (9231), (9178), (9239)
14

15

16         The above-entitled cause came on for hearing

17   before the HONORABLE JOHN K. OLSON, one of the Judges

18   of the UNITED STATES BANKRUPTCY COURT, in and for the

19   SOUTHERN DISTRICT OF FLORIDA, at 299 East Broward

20   Boulevard, Fort Lauderdale, Broward County, Florida, on

21   Thursday, June 20, 2013, commencing at or about 9:30

22   a.m., and the following proceedings were had:

23

24                          REPORTED BY:  Helayne Wills

25

```
 1   APPEARANCES:
 2
         KIRKLAND & ELLIS, by
 3       JOSHUA SUSSBERG, ESQ.,
         and
 4       BERGER SINGERMAN, by
         PAUL S. SINGERMAN, ESQ.,
 5       on behalf of the Debtors
 6
         AKIN GUMP STRAUSS HAUER & FELD, by
 7       PHILIP C. DUBLIN, ESQ.,
         SARA L. BRAUNER, ESQ.,
 8       ASHLEY R. BEANE, ESQ., (via telephone)
         and
 9       STEARNS WEAVER MILLER WEISSLER ALHADEFF &
         SITTERSON, by
10       PATRICIA A. REDMOND, ESQ.,
         and
11       ROBBINS RUSSELL, by
         MICHAEL WALDMAN, ESQ., (via telephone)
12       on behalf of the Committee of Unsecured
         Creditors
13
14       WILLKIE FARR & GALLAGHER, by
         JOSEPH G. MINIAS, ESQ., (via telephone)
15       MARC ABRAMS, ESQ., (via telephone)
         WESTON EGUCHI, ESQ., (via telephone)
16       and
         FOWLER WHITE BOGGS, by
17       SCOTT UNDERWOOD, ESQ., (via telephone)
         on behalf of Monarch Alternative Capital
18
19       GRAYROBINSON, by
         LEYZA F. BLANCO, ESQ.,
20       and
         ARENT FOX, by
21       LEAH EISENBERG, ESQ.,
         on behalf of Wilmington Trust Company
22
23       DLA PIPER US, by
         JAMES ANKLAM, ESQ., (via telephone)
24       on behalf of Antonio B. Mon
25                           ... Continued
```

```
1        CHADBOURNE & PARKE, by
         SEVEN RIVERA, ESQ.
2        MEGHAN TOWERS, ESQ.,
         and
3        STICHTER RIEDEL BLAIN & PROSSER, by
         RICHARD PROSSER, ESQ. (via telephone)
4        on behalf of Citibank as Revolver and First Lien
         Term Agent
5
6        BRACEWELL & GIULIANI, by
         GREG NYE, ESQ. (via telephone)
7        on behalf of the Second Lien Lenders
8
         MILBANK TWEED HADLEY & McCLOY, by
9        ATARA MILLER, ESQ., (via telephone)
         on behalf of Transeastern Lenders
10
11       OFFICE OF THE U.S. TRUSTEE, by
         STEVEN D. SCHNEIDERMAN, ESQ.,
12       on behalf of United States Trustee
13
         WILSON ELSER MOSKOWITZ EDELMAN & DICKER, by
14       CHARITY N. MOORE, ESQ., (via telephone)
         Travelers Casualty & Surety Company
15
16       PAUL McMAHON, ESQ.,
         on behalf of XL Specialty Insurance Company
17
18       CARLTON FIELDS, by
         STEVEN J. BRODIE, ESQ., (via telephone)
19       on behalf of National Union Fire Insurance Company
20
         KRAMER LEVIN NAFTALIS & FRANKEL, by
21       JOSHUA BRODY, ESQ., (via telephone)
         on behalf of Castle Creek Arbitrage and Jeffries
22
23       ALSO PRESENT:
         JOHN BOKEN
24       DENISE LORENZO
         SERANA KEEVER
25       KEVIN CLANCY
```

1          THE COURT:  In the TOUSA case, let me first

2    take appearances in the courtroom, please.

3          MR. SINGERMAN:  Good morning, Your Honor.

4    May it please the Court.  I'm Paul Singerman from

5    Berger Singerman, and our firm is co-counsel to the

6    debtors, along with the Kirkland & Ellis firm.

7          With me at counsel table is my colleague,

8    Joshua Sussberg, from Kirkland & Ellis.  Also in the

9    courtroom is John Boken, the CRO and CEO of the

10   debtors, Denise Lorenzo, also from Zolfo Cooper, and

11   Serona Keever from the company.

12         THE COURT:  Thank you very much.

13         MR. SINGERMAN:  Thank you, Judge.

14         MR. DUBLIN:  Good morning, Your Honor.  Phil

15   Dublin, Akin Gump, along with my colleague, Sara

16   Browner, on behalf of the creditors' committee, as well

17   as Patricia Redmond from Stearns Weaver.

18         THE COURT:  Thank you.

19         MR. ABRAMS:  Good morning, Your Honor.  Marc

20   Abrams on behalf of Monarch Alternative Capital, LP, as

21   investment advisor to Monarch Master Funding, Ltd.  I'm

22   here today with my colleague, Weston Eguchi and Joe

23   Minias from Willkie Farr, and our local counsel,

24   Mr. Underwood.

25         THE COURT:  Good morning.

1           MR. RIVERA:  Good morning, Your Honor.  Seven

2  Rivera from Chadbourne & Parke.  I'm joined at the

3  table with Meghan Towers, also from Chadbourne, and I

4  understand Tom Hall is on the line.  We represent

5  Citibank as revolver and first lien term agent.

6           THE COURT:  Thank you.

7           MS. BLANCO:  Good morning, Judge.  Leyza

8  Blanco of GrayRobinson, together with my co-counsel,

9  Leah Eisenberg, from Arent Fox, and we represent

10  Wilmington Trust Company as indentured trustee for

11  the senior noteholders.

12           THE COURT:  Thank you.

13           MR. McMAHON:  Good morning, Your Honor.  Paul

14  McMahon on behalf of XL Specialty Insurance Company,

15  one of the carriers providing the D&O insurance

16  coverage.

17           THE COURT:  Good morning, Mr. McMahon.

18           MR. SCHNEIDERMAN:  Good morning, Your Honor.

19  Steven Schneiderman for the U.S. Trustee.

20           THE COURT:  Good morning, Mr. Schneiderman.

21           Let me take attendance on those who made

22  reservations on CourtCall as to participate live.

23           Mr. Anklam?

24           MR. ANKLAM:  Yes, Your Honor, here.

25           THE COURT:  Good morning.

1          Ms. Beane?  Ashley Beane?

2          Steven Brodie?

3          MR. BRODIE:  Yes, Your Honor.  Steve Brodie

4    on behalf of National Union Fire Insurance Company of

5    Pittsburgh, PA.

6          THE COURT:  Thank you.

7          Joshua Brody?

8          MR. BRODY:  Good morning, Your Honor.  Josh

9    Brody from Kramer Levin Naftalis & Frankel.

10         THE COURT:  Thank you.

11         Mr. Busey?

12         Kevin Clancy?

13         MR. CLANCY:  Yes, Your Honor.  Kevin Clancy

14   from Cohen Resznick, financial advisor to the

15   committee.

16         THE COURT:  Good morning.

17         Mr. Daucher?

18         Mr. Hall?

19         MR. HALL:  Good morning, Your Honor.

20         THE COURT:  Good morning.

21         Ms. Miller?

22         MS. MILLER:  Good morning, Your Honor.  Atara

23   Miller from Milbank Tweed on behalf of the senior

24   Transeastern lenders.

25         THE COURT:  Thank you.

1          Mr. Nye?

2          MR. NYE:  Good morning, Your Honor.  Here for

3    the second lien agent and lenders.

4          THE COURT:  Thank you.

5          Mr. O'Donnell?

6          Mr. Prosser?

7          MR. PROSSER:  Good morning, Your Honor.

8    Richard Prosser on behalf of the first lien term.

9          THE COURT:  Thank you.

10         Mr. Spitaletto?

11         MR. SPITALETTO:  Good morning, Your Honor.

12   Tommy Spitaletto here on behalf of Travelers, one of

13   the insurers.

14         THE COURT:  Thank you.

15         Mr. Waldman?

16         MR. WALDMAN:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         Mr. Zinman?

19         All right.  Is there anyone on the phone

20   whose name I did not call who wanted to be noted as

21   making an appearance?  I know there are a number of you

22   who are listen only reservations.

23         Let's proceed.  Mr. Sussberg.

24         MR. SUSSBERG:  Good morning, Your Honor.  For

25   the record, Joshua Sussberg from Kirkland & Ellis on

1  behalf of the debtors.

2          We are here today, Your Honor, on one matter
3  and one matter only, and that is the disclosure
4  statement.

5          It's interesting, Your Honor.  I actually was
6  reading one of my favorite books recently from one of
7  my favorite authors, Dr. Seuss, to one of my kids, and
8  the title of the book is Marvin K. Mooney, Will You
9  Please Go Now!  In the book, literally I stopped and
10  paused, because it says, "The time has come, the time
11  is now, Marvin K. Mooney, will you please go now!"

12          And my son said, "Dad, why did you stop
13  reading?"

14          I said, "Because I'm going to use that
15  phrase, not only in our pleadings, but in front of the
16  Court," because it truly is the time to move forward in
17  these cases, and I think it's evident by the fact that
18  all of the stakeholders in these cases stand here today
19  in support of the proverbial grand bargain, which is
20  memorialized in the joint plan that's been filed with
21  the Court, and the related disclosure statement, as
22  well as the D&O settlement motion, which has been
23  filed.  Under Bankruptcy Rule 9019, it will be
24  presented to Your Honor in July, and is part and parcel
25  with the grand bargain and a key element to the plan.

Page 9

1            This is a joint plan, Your Honor, of both the

2     debtors and the official committee, and importantly,

3     obviously, these are fiduciaries to all stakeholders in

4     these cases.

5            Mr. Dublin is going to walk through the

6     disclosure statement, some of the changes that have

7     been made over the course of the last several weeks

8     that led to the filing of a blackline yesterday, but I

9     think Your Honor is aware, 36 months of mediation and

10    negotiations, relentless efforts from the mediator, has

11    led to a plan that's supported by the debtors, to UCC,

12    Monarch, the largest lender in these cases, each of the

13    revolver, first lien and second lien agents, Aurelius,

14    MatlinePatterson, the largest bond holders, all of the

15    key stakeholders, the directors and officers, and the

16    insurance carriers, and it resolved all the various

17    litigation that has been complex during the course of

18    these last five years.

19           For purposes of today's agenda, I think it's

20    important to note that in addition to walking through

21    the changes to the disclosure statement, we will spend

22    a few minutes on the objections that were filed, each

23    of which I believe have, in fact, been resolved, the

24    latest of which was resolved right before the hearing

25    with Mr. Schneiderman.  We'll walk through what the

1   changes were to address Mr. Schneiderman's concerns,

2   but I don't think it's a surprise, Your Honor, that

3   there are no objections to this disclosure statement,

4   because again, this is a result of culmination of

5   efforts amongst many, many parties, to get to a place

6   where we can present both a disclosure statement and

7   ultimately a plan that will bring these cases to an

8   end.

9           One important note, Your Honor, and I'll cede

10  the podium to Mr. Dublin and then address the

11  objections once he's complete.

12          Each and every one of these provisions in the

13  plan and the D&O settlement is again the culmination of

14  intense efforts, conference calls with literally

15  hundreds of people, the roll call of which could take

16  an hour, and all of these provisions are interrelated.

17  One change, one tweak here or there, as we were talking

18  about before the hearing, could set off a reverberation

19  of various provisions in the plan that could lead to

20  issues that would put us all back at the negotiating

21  table.

22          As I'm sure Your Honor appreciates, and the

23  mediator has worked tirelessly to effectuate, this is

24  an interwoven set of provisions that all work together

25  to effectuate what we hope will be the conclusion of

1   these cases.

2           THE COURT:  Thank you.  For what it's worth

3   in preparing your further arguments, I have read each

4   of the four objections, as well as the omnibus response

5   by the debtor and committee filed yesterday.

6           MR. SUSSBERG:  If I may, I'll cede the podium

7   to Mr. Dublin.

8           THE COURT:  You may indeed.

9           MR. DUBLIN:  Good morning again, Your Honor.

10  Phil Dublin, Akin Gump, for the committee.

11          I've always been partial to Green Eggs and

12  Ham myself, but I do echo the sentiment of the

13  Dr. Seuss book referenced by Mr. Sussberg, in that we

14  are definitely taking another huge step towards the

15  long journey that we had in these cases.  The

16  confirmation of a Chapter 11 plan has definitely been

17  long coming, five plus years, extensive litigation.

18          As Mr. Sussberg mentioned, the substantial

19  efforts of the settlement parties involved, led each

20  step of the way by Mr. Borowitz, has been phenomenal.

21          You'll see and you'll hear from some of the

22  provisions that I'm going to talk about that are

23  embodied in the plan and disclosure statement, the work

24  that has been put into this by the debtors, the

25  committee.  Monarch especially has been extremely

1    helpful in reaching the conclusions and the settlement

2    that are contained in the plan and disclosure

3    statement, including bringing along the last of the

4    significant creditor constituencies or parties that was

5    not on board with the settlement when we filed the plan

6    on May 15th, but we've made some modifications to the

7    plan and disclosure statement that have brought along

8    the largest bond holder in Aurelius.

9            Those changes to bring Aurelius along include

10   adding to the disgorgement that is going to be made by

11   the term loan lenders an additional $2.25 million of

12   pre-judgment interest for the benefit of unsecured

13   creditors, as well as the reimbursement of certain fees

14   and expenses to the parties that have been integral to

15   achieving the settlement that are embodied in the plan,

16   some minor tweaks here and there to the liquidation

17   trust agreement, and some language in the plan.  It's

18   been phenomenal efforts all around by the parties to

19   get us where we are today, as we take the first and

20   very important step towards confirmation of this plan.

21           As Mr. Sussberg mentioned, there were a

22   significant number of parties included in the

23   settlement, the debtors, the committee, each member of

24   the committee, Monarch, each of the first lien agents,

25   which we have three, the term loan agent, the revolver

1   agent, and the sub agent for the revolver, the second

2   lien term loan agent, all of the revolver lenders, all

3   of the term loan lenders, the settling Transeastern

4   lenders, MatlinPatterson, and as I mentioned, most

5   recently Aurelius, all worked tirelessly to get us

6   where we are today, with a disclosure statement that is

7   unopposed, and hopefully minimal if no objections once

8   we get to the confirmation stage, assuming that the

9   Court is inclined to approve this disclosure statement

10  today.

11         The plan that is discussed in the disclosure

12  statement is for 38 different debtors.  It is not a

13  substantive consolidation plan.  It is a

14  debtor-by-debtor plan.  We have included as an exhibit

15  to the disclosure statement a recovery analysis for

16  each class of creditors at each debtor, with estimates

17  as to the amount of claims that are asserted in each

18  class and projected recoveries.  They're really

19  projected minimum recoveries, because they don't

20  include recoveries on account of the contingent

21  litigation that's going to continue to go forward

22  pursuant to the liquidation trust that's established

23  under the plan.

24         Your Honor, the settlement embodied in the

25  plan include the D&O insurance coverage action that

1    Mr. Sussberg referenced, that we have a hearing on for

2    July 11th.  Approval of that settlement is a condition

3    precedent to confirmation of the plan, including, which

4    I'm sure we'll discuss a lot on July 11th, the bar

5    order that is contained therein, to ensure that we can

6    get $67 million of value into these estates for the

7    benefit of creditors.

8            In addition to the D&O settlement, the

9    coverage action settlement, there are no less than 14

10   additional settlements embodied in the mediation

11   settlement that Mr. Borowitz helped mediate with the

12   rest of the settlement with the rest of the settlement

13   parties.

14           These settlements include settlement of the

15   committee litigation against the term loan lenders, and

16   the disgorgement required by the term loan lenders on

17   account of this Court's ruling; settlement of the

18   amount of pre-judgment and post-judgment interest

19   allocable to the term loan lenders in connection with

20   making substantial value available to non-term loan

21   lender unsecured creditors; settlement of whether the

22   term loan lenders' lien on the debtors' 2007 tax refund

23   was a preference, the settlement of the term loan

24   lenders' entitlement to a lien on the debtors' 2008 tax

25   refund; the settlement of the revolver lenders'

1  entitlement to default interest; settlement of

2  allocation of value between the parent company, TOUSA,

3  Inc., where the term loan lenders continue to have

4  liens, and the conveying subsidiaries, where they do

5  not have claims or liens, and value among the conveying

6  subsidiaries themselves for purposes of allocation and

7  distribution among all the unsecured creditors at the

8  conveying subsidiary level; the settlement of

9  allocation of future recoveries from the litigation

10  against the non-settling Transeastern lenders, among

11  the term loan lenders and the conveying subsidiary

12  creditors; the settlement of allocation of the proceeds

13  from the D&O litigation that was pending before this

14  Court; settlement with respect to the operation of the

15  post-effective date liquidation trust that will

16  monetize the remaining contingent assets for the

17  benefit of creditors, which litigation includes the

18  remaining Transeastern litigation, the Falcone

19  litigation, and the litigation against the one insurer

20  that is not part of the D&O and coverage litigation

21  settlement; settlement of inter-creditor issues among

22  the revolver lenders and the first lien term loan

23  lenders with respect to their inter-creditor agreement,

24  there's a comprehensive inter-creditor settlement

25  agreement attached as an exhibit to the settlement

1   agreement that was negotiated heavily by Monarch and

2   certain of the other first lien lenders; settlement of

3   inter-creditor issues between the first lien term loan

4   lenders and second lien term loan lenders with respect

5   to the allocation of distributions on account of assets

6   which they have asserted a lien in these cases;

7   settlement of allocation of unsecured creditor

8   recoveries among each debtor to ensure that those

9   debtors where there is no asset value, where unsecured

10  creditors would receive less than a five cent recovery,

11  will receive no less than a five cent recovery, so that

12  we ensure there are recoveries to all unsecured

13  creditors in these cases, even where there would not

14  always be an entitlement; settlement of Monarch's

15  contingent liability to provide value to the conveying

16  subsidiaries with respect to the remaining Transeastern

17  litigation as embodied in the prior Monarch settlement

18  that we had many months ago, where originally 19 and a

19  half million dollars, approximately, came into the

20  estate; and a settlement of all pre-petition and

21  post-petition intercompany claims among the plan

22  debtors' estates, again, in connection with the

23  allocation of value and ensuring proper credit

24  recoveries.

25            Your Honor, in addition to having substantial

1    detail with respect to the various drivers of these

2    settlements, and how they are embodied in a mediator

3    model, which we refer to in the documents as Mediator

4    Model F, and the committee model, which determines all

5    the allocation of value and the recoveries that the

6    parties are going to receive, the disclosure statement

7    contains many of your traditional type disclosure

8    statement information, an overview of the plan, general

9    information regarding the Chapter 11 process, a Q and A

10   session regarding the disclosure statement and the

11   terms of the plan in plain English, or as close to

12   plain English as lawyers can get, the history of the

13   debtors, the background of the Chapter 11 cases

14   specifically, a summary of the proposed solicitation

15   and voting procedures, information regarding the

16   requirements for the plan to actually be confirmed,

17   risk factors associated with confirmation, and

18   alternatives if the plan cannot be confirmed, certain

19   securities law disclosures required in cases of this

20   size and magnitude, and tax consequences for creditors

21   and interest holders, based on their treatment under

22   the plan.

23            Importantly, Your Honor, as I mentioned,

24   there were a substantial number of exhibits that were

25   included in the filings, including a recovery analysis

1   on a debtor-by-debtor, class-by-class basis, setting

2   forth what unsecured creditors and secured creditors

3   should expect to receive on account of their claims

4   prior to taking into account litigation trust

5   interests, a liquidation analysis, which shows that

6   each creditor is receiving no less than they would

7   otherwise receive, to the extent these cases were

8   liquidated under Chapter 7, as opposed to the plan that

9   we have coming before the Court, which embodies the

10  mediation settlement, which absent this plan would not

11  exist, and would keep this estate in litigation

12  potentially forever.

13           A scheduled asset that will be transferred to

14  a liquidation trust upon the effective date of the

15  plan, a schedule of the pre-petition intercompany notes

16  that have been recognized for allocation and valuation

17  purposes, a schedule of executory contracts to be

18  assumed.  In a liquidating case you don't usually

19  expect that, but a lot of this relates to books and

20  records that would be required by the liquidation trust

21  to continue to wind down the estate's post-effective

22  date.

23           The form of a liquidation trust agreement

24  setting forth, among other things, the governing

25  structure agreed to between the secured lenders and the

1    unsecured lenders, and terms with respect to the

2    prosecution of the trust causes of action, and who has

3    say in which settlement discussions, as it pertains to

4    assets in which they have an interest in.

5              A copy of the inter-creditor settlement

6    agreement among the revolver lenders and the first lien

7    term loan lenders, and importantly, a list of

8    disgorgement payments to be made by the first lien term

9    loan lenders and second lien term loan lenders, lender

10   by lender, so that everybody knows what they're

11   required to disgorge shortly after the effective date,

12   to make sure the unsecured creditors receive recoveries

13   that they're entitled to pursuant to the mediation

14   settlement.

15             Running quickly through so everybody is aware

16   of what the recovery percentages are in a minimum,

17   based on the schedule attached to the documents, as

18   expected for all plans that are subject to

19   confirmation, all administrative expenses, priority

20   claims and priority non-tax claims will be paid in full

21   in cash.  The revolver lenders will receive a recovery

22   of 50 percent of the amount of their inserted

23   entitlement to default interest.

24             If you recall, when the revolver was repaid

25   there was a reservation of rights on default interest.

Page 20

1   We have split that 50/50.

2           The first lien term loan lenders will receive

3   net of their disgorgement obligations an aggregate

4   initial recovery of approximately 55 percent, subject

5   to additional recoveries based on liquidation trust

6   causes of action.  The second lien term loan lenders,

7   an aggregate recovery of approximately 4 percent,

8   subject to substantial additional recoveries, based on

9   the continuing prosecution of the Transeastern

10  litigation.

11          The senior noteholders who have claims on

12  every debtor other than Beacon Hill -- Beacon Hill's

13  creditors will be paid in full -- will receive an

14  aggregate recovery of approximately 58 percent on their

15  claims, based on the fact that they do have obligations

16  from all of the plan debtors, other than Beacon Hill,

17  and they have the benefit of the turnover from the

18  subordinated noteholders.

19          The subordinated noteholders and the PIK

20  noteholders will receive no recovery, because their

21  recoveries pursuant to contractual subordination have

22  to be turned over to the holders of senior debt at the

23  applicable plan debtors.

24          Holders of general unsecured claims will

25  receive recoveries from 5 percent to 100 percent.  The

1   5 percent is that minimum recovery amount that we have

2   negotiated to ensure that the unsecured creditors that

3   are plan debtors do not go without any recovery on

4   their claims, and Beacon Hill, again, receiving full

5   recovery.  Beacon Hill is the entity where there is no

6   funded debt obligations.

7           Of course, holders of equity interest are not

8   going to receive a recovery.

9           We have filed, in addition to the 200 pages

10  of information in the disclosure statement, over 500

11  total in documents.  I don't think anybody will be able

12  to say there's not adequate information as it relates

13  to the disclosure statement that has been filed.

14          I would like to touch on a couple of the more

15  material modifications that have been made to the

16  disclosure statement since May 15th, so that the Court

17  is aware and the parties are aware of what those

18  modifications are.

19          In accordance with the D&O settlement

20  agreement, we have modified the release section to

21  ensure that the Ds and Os and the insurers get the

22  benefit of those releases, and that the releases extend

23  to the fiduciary actions and the coverage litigation.

24          We have made clear, per a request from the

25  SEC, that the disclosure statement note that

1   shareholders are not receiving a recovery.  We've done

2   this in all caps, I believe, and that releases, if

3   granted by the Court, will be binding by them, absent

4   an objection filed by a shareholder that is sustained.

5            We have included language -- and this is

6   something where we are going to ask for some scheduling

7   from the Court, based obviously on your availability,

8   Your Honor -- is a dispute with respect to one group of

9   creditor as to whether they are entitled to the benefit

10  of senior debt status at TOUSA Homes, Inc.  TOUSA

11  Homes, Inc. was the primary operating conveying

12  subsidiary of the TOUSA enterprise.

13           Mr. Brody from Kramer Levin is on the phone

14  representing Jeffries and Castle Creek.  His clients

15  have asserted claims under lot option agreements that

16  they are entitled to the benefit of senior debt status

17  at TOUSA Homes, Inc.  So like the senior note claims at

18  those entities, they would be entitled to receive a

19  portion of the turnover from the subordinated

20  noteholders.

21           The proponents of the plan, as well as

22  holders of the senior notes, disagree with this

23  assertion.  The parties, subject to the Court's

24  calendar, have agreed on a briefing schedule as it

25  relates to this issue, which in magnitude and dollar

1   amount is no more than $5 million in recoveries, and

2   agree that there will be no discovery required in

3   connection with this dispute.  It will be an analysis

4   of the subordinated note indenture and the applicable

5   lot option agreement.

6           THE COURT:  Essentially, it will be

7   proceeding on a summary judgment basis?

8           MR. DUBLIN:  In essence, Your Honor.

9           We have two hearings scheduled before you on

10  July 24th, one at 10:30 in the morning and another one,

11  I believe, at 1:30 in the afternoon.  We would like to

12  try to have that dispute heard on that date.  I don't

13  envision we're looking at more than an hour or two of

14  total argument time.

15          The parties, if that date works for the

16  Court, have agreed on a briefing schedule, such that

17  Mr. Brody's clients would file an opening pleading on

18  June 28th.  The proponents and the senior note, and

19  likely the senior note trustee, would file hopefully a

20  joint response, or at least one material response with

21  joinder, so the Court is not inundated with repetitive

22  paper, on July 12th.

23          We give the opportunity for Mr. Brody's

24  clients to file a response on the 19th of July, and

25  then have a hearing five days later, on the 24th.

1          THE COURT:  That schedule should work.

2          The hearing in the afternoon of the 24th is

3   an evidentiary hearing on a $33,000 escrow question; is

4   that right?

5          MR. DUBLIN:  Yes.

6          THE COURT:  Let's schedule this matter for

7   that afternoon, as well, so 1:30.

8          MR. DUBLIN:  We'll put an agreed scheduling

9   order together with Mr. Brody and get that on file.

10          THE COURT:  Very good.  Thank you.

11          MR. BRODY:  Judge, Josh Brody from Kramer

12   Levin on behalf of lot option creditors.  I really

13   don't have anything to add, other than I generally

14   agree with Mr. Dublin's characterization, and

15   appreciate the scheduling.

16          MR. DUBLIN:  And we appreciate Mr. Brody

17   working with us on language that we included in the

18   disclosure statement, which avoided the need for him to

19   have to file an objection.

20          Your Honor, we added provisions to the

21   disclosure statement for modified recoveries, based on

22   the agreements that were reached associated with adding

23   Aurelius to the grand bargain mediation settlement,

24   which resulted in an additional 2.5 million of

25   pre-judgment disgorgement by the term loan lenders,

1   among other benefits for the estate.

2            We have clarified certain provisions that the

3   charging lien of the senior notes trustee will remain

4   in place for work that they perform on behalf of the

5   estate, to the extent not otherwise compensated.

6            We have removed from the disclosure statement

7   specific dollar amounts of recoveries that were in for

8   each class of creditors, because those numbers continue

9   to change.  That was at a point in time we thought it

10  was a little misleading to have those dollar numbers

11  included, and instead are relying on the information

12  contained in the recovery chart that is Exhibit A,

13  which does include numbers and references that they are

14  as of a date certain, and they are likely to move,

15  pending actual numbers, come the effective date.

16           There's one other significant change, which

17  if I didn't mention, Mr. Abrams definitely would have.

18  There's about a page of additional language that's been

19  included with very complicated definitions that only

20  applies to the first lien term loan lenders.

21           If you recall, in connection with the first

22  cash collateral order, there was a pay down of the

23  first lien term loan lenders' claims out of the 2007

24  tax refund.  Certain of the first lien term loan

25  lenders did not certify that they would repay those

1    amounts that requires disgorgement.  They did not

2    receive that payment.

3            Pursuant to the additional language added to

4    the disclosure statement and the plan, there's a

5    mechanism built in for a true up to ensure that all the

6    first lien term loan lenders at the end of the day get

7    the same recovery, whether they received that initial

8    pay down or not.  They're entitled to keep a

9    substantial portion of that, based on the settlement

10   embodied in the plan, notwithstanding the other

11   substantial disgorgement obligations they have, as set

12   forth in the documents.

13           I think I have covered the other issues.

14           We did also add into the disclosure statement

15   and the plan modified language as relates to the bar

16   order from the D&O settlement before you on July 11th.

17   We can get into more specifics with respect to those

18   issues on July 11th.

19           Unless the Court has additional questions,

20   that covers my presentation.  I turn it back over to

21   Mr. Sussberg to deal with the objections that have been

22   filed, the response and the proposed solicitation

23   procedures.

24           THE COURT:  Thank you.

25           Mr. Sussberg.

1          MR. SUSSBERG:  Thank you, Mr. Dublin.  Thank

2   you, Your Honor.

3          Your Honor had mentioned you have a copy of

4   our response.

5          THE COURT:  I do.

6          MR. SUSSBERG:  I'll probably just work from

7   the chart that's included to run through this briefly.

8          THE COURT:  That's fine.

9          MR. SUSSBERG:  In addition, if I may pass up

10  to Your Honor a copy of the revised disclosure

11  statement order.

12          THE COURT:  Very good.

13          MR. SUSSBERG:  Very immaterial changes to

14  that proposed order, but we'll cover that.

15          As we noted, Your Honor, there were four

16  objections that were filed.  They were styled as

17  objections to the disclosure statement, but I think

18  three of them are aptly characterized as claim

19  objections as opposed to disclosure statement

20  objections.

21          Two of the four objections, those filed by

22  the Lazur family and the Landa family, relate to claims

23  that have been disputed, that are pending, and that

24  we're working to potentially resolve, and if not,

25  present to Your Honor for resolution.  We have

1    confirmed with both claimants via telephone, as

2    reflected on the log that's attached to the objection,

3    that they do not have objections to the disclosure

4    statement.

5            The third claim styled objection is from a

6    Mr. Rhynes.  This one is a bit more complicated, but in

7    essence, Mr. Rhynes' claims in the course of the

8    Chapter 11 cases have, in fact, been expunged pursuant

9    to the first omnibus objection, but Mr. Rhynes believes

10   that he's a secured creditor or account of equity that

11   he sold to a third party, and somehow asserts a

12   charging lien with respect to that sale.

13           What we've said to Mr. Rhynes is, to the

14   extent he's a secured creditor and can demonstrate so,

15   he'll be afforded the treatment that's set forth in the

16   plan.  Not a disclosure statement issue.

17           THE COURT:  Thank you for summarizing his

18   objection, because frankly, when I read it, I did not

19   understand it.

20           MR. SUSSBERG:  It's interesting you said

21   that, Your Honor.  I was sitting in my office and had

22   it explained to me, and looked at the paper and could

23   not understand what it said.  So I thought it was time

24   to call Mr. Rhynes.

25           THE COURT:  Good call.

1          MR. SUSSBERG:  Finally, Your Honor, there was

2    an objection asserted by Mr. Schneiderman's office.  We

3    have covered that in detail as part of the omnibus

4    response.  We met with Mr. Schneiderman earlier this

5    morning, and of the 13 objections, while certain of

6    these will carry over to confirmation, and they are, in

7    facts, confirmation objections, we have resolved, I

8    believe for today, each of the issues with either

9    additional disclosure, or agreement to disagree and

10   deal with confirmation objections in the context of

11   confirmation.

12          I do not believe -- and Mr. Schneiderman can

13   speak to this -- there are issues with respect to the

14   adequacy of disclosure at this point, with additional

15   clarification and information that will include, and

16   none of these objections in our minds, the debtors and

17   the UCC, rise to patently unconfirmable issues that

18   cannot be addressed at confirmation.

19          I'm starting on Page 5 of the response.  The

20   first issue was to clarify that the plan was being

21   proposed by both the debtors and the committee.  We

22   believe this was clear.  That was a page that flipped

23   that showed the signature blocks that may have caused

24   some concern.  I believe this one has been addressed.

25   There's no issue here, and no mistake about it.  This

1    is a joint plan.

2            The second was additional language clarifying

3    the treatment as among the unsecured creditors.  As

4    Mr. Dublin alluded to, there are senior notes, there

5    are subordinated notes and there are trade creditors.

6    Trade creditors are getting a smaller recovery, because

7    the senior notes have guaranteed claims, as do the

8    subordinated notes at each of the debtor entities.

9            What we're proposing to do, and what I

10   believe alleviates Mr. Schneiderman's concern, is

11   adding some plain language that clearly highlights this

12   issue, and the relationship among the claims, so people

13   can understand the differences in the treatment.  We'll

14   be adding that up front into a Q and A in the

15   disclosure statement.

16           The third issue, Your Honor, related to

17   professional fees and the fees paid to date, and as

18   noted in the response, we've included a schedule that's

19   Exhibit H that talks about the fees that have been

20   paid.

21           The fourth relates to undeliverable

22   distributions.  I think we're agreeing to disagree on

23   this one, Your Honor.  The debtors and the UCC propose

24   to adhere to the love rule, 3011(b)(2), and that

25   specifically states that undeliverable distributions

1    either come back to the liquidating trust and its

2    estate creditors and/or get delivered to charity.

3    Mr. Schneiderman would like those to be delivered to

4    the clerk of the court.  If we cannot work through

5    something between now and confirmation, we'll raise

6    that for Your Honor at that time.

7              THE COURT:  Okay.

8              MR. SUSSBERG:  On Page 7 of the response,

9    there was a request for language with respect to lease

10   rejection claims.  We've revised to address

11   Mr. Schneiderman's concern, not a substantive point.

12             With respect to Items 6, 7, 8 on Page 7,

13   these all relate to the releases, the injunction, the

14   exculpation provisions, as well as the bar order.

15   Suffice to say, we believe this is a confirmation

16   issue, Your Honor, but also, as we've explained to

17   Mr. Schneiderman, and as we will explain to Your Honor

18   in the context of the D&O settlement, as well as

19   confirmation, all of these provisions were negotiated

20   amongst a large set of parties, and each and every

21   single word was carefully crafted and represents a

22   comprehensive, holistic agreement between the parties.

23             We believe they're all appropriate, comply

24   with applicable law and the governing case precedent,

25   and we'll present that to Your Honor at the

1   confirmation hearing.

2           The one note I would make, and this comes up

3   in Item 12 in the list of objections on Page 8, was a

4   provision in the liquidating trust agreement that

5   carves out malpractice claims.  Mr. Schneiderman raised

6   that, and that has been included, so we've addressed

7   that.

8           Page 8, Item 9, the identity of the liquidity

9   trustee and compensation procedures and amounts, we

10  have noted that we will disclose the identity and the

11  compensation arrangement seven days prior to the voting

12  deadline.  I believe that satisfies Mr. Schneiderman's

13  concern.

14          Number 10, we've agreed with Mr. Schneiderman

15  that we will, in fact, bond the amount of cash that

16  will be in the liquidating trust.  That could be

17  anywhere from zero to $5 million, but we will put a

18  bond in place with respect to that cash amount.

19          Number 11 is another area where there's an

20  agreement to disagree and present to Your Honor in the

21  context of confirmation.  Again, not a disclosure

22  statement issue, but Mr. Schneiderman has requested

23  that professionals retained by the liquidating trust

24  present to Your Honor fee applications in a similar way

25  that we've done during the course of these cases.

1          We believe that's unnecessary and an

2    administrative burden and an expense to the

3    stakeholders in these cases, but we do believe that we

4    adequately solved this issue, because in the trust

5    agreement itself, it contemplates quarterly reports

6    being filed to talk about the expenditures that have

7    been made by the trust, so everyone will know exactly

8    what's being spent and who's being paid what.

9          Finally, Your Honor, the last objection from

10   the U.S. Trustee related to the United States Trustee's

11   request to include specific language regarding the

12   payment of the U.S. Trustee fees.  We will work with

13   Mr. Schneiderman to address this language, and we will

14   agree upon the paragraph, with certain modifications to

15   the timing.

16          THE COURT:  Okay.  Thank you.

17          Does anyone else wish to be heard in

18   connection with the terms of the disclosure statement?

19          MR. SCHNEIDERMAN:  Your Honor, if I may

20   address the --

21          THE COURT:  Yes, Mr. Schneiderman.

22          MR. SCHNEIDERMAN:  Your Honor, I'd like you

23   to understand and be advised that we reached out to the

24   committee.  The objection is titled an objection, Your

25   Honor.  I've been on the phone with Mr. Golden.  We

1   addressed many of these issues.  The matters that were

2   raised in here, as you tell by the language I used, was

3   not intended to be an attempt by my office to get in

4   the way of this case and block any progress, or attempt

5   to block any progress.

6           The main issue in Paragraphs 2 and 3

7   regarding the proposed distribution, Your Honor, I

8   think is a critical change that needed to be made

9   regarding plain language.  I myself have received 30 or

10  40 phone calls.  My office has received phone calls,

11  "What's happening here?  What is being proposed?  What

12  does this mean?"  Because everyone was getting notices

13  of the disclosure statement hearing.

14          When you look at the papers and you see

15  hundreds of pages, you look for charts.  One of the

16  charts buried in the plan says 58 percent versus

17  5 percent, and all I was asking for, and what they have

18  agreed to, which I think is necessary and appropriate,

19  is to provide plain language to explain why there is

20  that difference between the 58 and the 5, and to

21  address, because of the inter-creditor agreements and

22  everything Mr. Dublin and Mr. Sussberg explained.

23          I do think it's important for a disclosure

24  statement, and that was, I think, an appropriate

25  objection.

1          Other matters have been addressed, Your

2    Honor.  The bond issue was very important to us, based

3    on recent history here in South Florida.  Every

4    liquidating plan that I've been involved in and my

5    office has been involved in is supposed to have that

6    language.  If there have been some that have been

7    confirmed without it, it was an oversight.

8          We can always find cases where things may

9    have slipped through the cracks, and it's unfortunate

10   when those are used as the examples to correct or point

11   out an issue for us, but the majority of the cases do

12   have bonds for liquidating trustees.

13         We will address the professional retention

14   issues and compensation issues at the confirmation

15   hearing, Your Honor, but I can tell you all the cases

16   I've been involved in here in Florida have those

17   requirements, because of past history with cases, both

18   after your appointment to the bench and before, Your

19   Honor, where there has been cases where there has been

20   abuse, and the only way to rein that in, Your Honor, is

21   by having the Court continue to oversee those types of

22   matters.

23         I didn't want to let it go unresponded to

24   with that comment, but I didn't want to argue that

25   today.  I just wanted to point out to you why we raised

1   certain of these issues, not to think that we were

2   filing a lengthy objection to block the progress that

3   clearly has been made, and it took several years to

4   accomplish.

5          I appreciate you letting me state those

6   things for the record.

7          THE COURT:  Thank you.

8          Mr. McMahon.

9          MR. McMAHON:  Yes, Your Honor.  Paul McMahon

10  on behalf of XL Specialty Insurance Company.  This is

11  more by way of a status report for the upcoming 9019

12  motion.

13         As you know, achieving this settlement

14  agreement with multiple parties involved has been no

15  mean feat.  What has been negotiated in the bar order

16  to which the Trustee now objects in his objection to

17  the disclosure statement necessitates everyone coming

18  back to the drawing board, or may necessitate that.

19         Mr. Schneiderman has been kind enough to

20  agree to provide us in the next day or so with whatever

21  specific language he believes is required for this bar

22  order to be approved, so that we can consider that

23  language in a timely fashion and see whether or not we

24  can agree or agree to disagree, and have to bring it to

25  Your Honor.  We just need the extra time to do that so

1    that we do not delay this case any longer.

2            So I will expect to receive that from

3    Mr. Schneiderman in the next day or so.

4            THE COURT:  Thank you, Mr. McMahon.

5            As I think many of you in the courtroom have

6    seen me say before, the work of the United States

7    Trustee in normal kinds of cases is invaluable, because

8    nobody else is watching the store.  To the extent that

9    the other people are watching the store, and that

10   everyone with an economic interest in this case is

11   apparently completely on board with the complete

12   resolution, means to me that the advice by the United

13   States Trustee is significantly less meaningful than it

14   is in cases in which no one else is watching.

15           Mr. Sussberg.

16           MR. SUSSBERG:  Briefly, before I cede the

17   podium to Mr. able Abrams, who is chomping at the bit,

18   I did just want to say, Your Honor, with respect to the

19   U.S. Trustee's objection, and more broadly, the

20   relationship that we've all developed with

21   Mr. Schneiderman, it's been entirely collaborative.

22           So I echo the comment he made that no one

23   took this to be an attempt by the U.S. Trustee's Office

24   to stop progress or get in the way.  He's raised valid

25   concerns, from his standpoint.  We appreciate his

1  efforts.  We're glad we're able to solve them today,

2  and of course we will continue to work, as we always

3  do, with Mr. Schneiderman between now and confirmation,

4  and resolve hopefully whatever other issues remain.

5              So we do want to make that clear on the

6  record.

7              THE COURT:  Thank you, Mr. Sussberg.

8              Mr. Schneiderman, I appreciate your comments,

9  as well.

10              Mr. Abrams.

11              MR. ABRAMS:  Your Honor, if I were a horse

12  and chomping at the bit, I hope Mr. Sussberg was

13  thinking of me more as a Secretariat than a workhorse.

14              THE COURT:  No one ever thought of you

15  otherwise, Mr. Abrams.

16              MR. ABRAMS:  Thank you.

17              I thought the job done today by my colleagues

18  was extremely well done.  I don't know if I could have

19  conveyed as well as they did the amount of effort and

20  the vigor and energy that was required to get us to

21  where we are today.

22              The only thing I think that is left to be

23  settled in Southeast Florida as of this moment in time

24  is who will become the next NBA champion, and that will

25  be decided tonight.  So there really is nothing left to

1   settle.  I don't want to say it is a slam dunk that

2   this case will be confirmed, but I have little doubt it

3   will be, and very swiftly, and with very little

4   opposition.

5           Which brings me to a point we were discussing

6   before the doors opened to the courtroom today.  In my

7   mind at least, when this case is confirmed and when it

8   does become effective, the plan, there has to be a deal

9   toy, and that deal toy no doubt will have to be

10   composed of three elements.

11           Of course, it will be encased in a Lucite

12   cube, and there's two additional elements that that

13   cube will contain.  One will be a microgauge replica of

14   a train track, and the second will be a very shiny

15   penny sitting on top of it.

16           Point being, Your Honor, that while the

17   mediator and other parties in this case can be credited

18   with where we are today, we all agreed as we entered

19   the courtroom today that Your Honor has played an

20   extremely, if not probably the most important role in

21   driving this herd into the right direction, which is

22   exactly where we are today, at the disclosure statement

23   for a plan that is imminently and eminently

24   confirmable.  Even if it has to come out of my own

25   pocket, that deal toy will be created.

Page 40

1           So I just wanted to acknowledge, even though

2    it's a bit premature, the role that the Court has

3    played, on behalf of us.

4           THE COURT:  Thank you very much.

5           Anyone else wish to make comments?

6           Well, Mr. Abrams and I are old enough to

7    remember working on the Eli Witt case before Judge

8    Paskay.  While that case was an Act case, it was filed

9    in the summer of 1979, and accordingly, I did nothing

10   for the first two years of the Code, when I handed

11   Judge Paskay the plan in Eli Witt he flipped through it

12   and said, "All the creditors want to know is how much

13   and when.  The rest of this is just New York crap."

14          I don't think that all of this in this case

15   is New York crap.  I am very aware of the fact that

16   every party in this case has made significant

17   concessions to get us to the point where we are, and

18   I'm very much aware of the fact that those concessions

19   are interrelated.

20          I applaud that the concerns that

21   Mr. Schneiderman and the U.S. Trustee raised have been

22   largely accommodated, or at least recognized to be

23   confirmation issues, and while I'm not prepared today

24   to say that he or she who objects to confirmation of

25   the plan is the penny on the rails, I do understand the

1  analogy, and I hope everyone else in the courtroom and

2  in this case does.

3          With that, unless there's something else that

4  needs to be done, I approve the disclosure statement.

5  Someone give me an order in a form that I can execute,

6  and it will be out as soon as you get it out.

7          MR. SUSSBERG:  Thank you, Your Honor.  We'll

8  upload that as soon as we leave here today.

9          THE COURT:  Thank you all very much.  My

10  sincere congratulations.  This was quite an effort.

11          We're adjourned.

12          (Thereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1                           CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6               I, HELAYNE F. WILLS, Shorthand Reporter

7    and Notary Public in and for the State of Florida at

8    Large, do hereby certify that the foregoing proceedings

9    were taken before me at the date and place as stated in

10   the caption hereto on Page 1; that the foregoing

11   computer-aided transcription is a true record of my

12   stenographic notes taken at said proceedings.

13               WITNESS my hand this 24th day of June,

14   2013.

15

16

17        _____

                       HELAYNE F. WILLS
18            Court Reporter and Notary Public
           In and For the State of Florida at Large
19         Commission No:  DD887579  Expires:  8/2/13

20

21

22

23

24

25