

**ORDERED in the Southern District of Florida on August 5, 2013.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| TOUSA, Inc., *et al.*, | ) | Case No. 08-10928-JKO |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**
**(I) CONFIRMING AMENDED JOINT PLAN OF LIQUIDATION**
**OF TOUSA, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS**
**IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**
**(II) DISMISSING THE CHAPTER 11 CASE AGAINST TOUSA HOMES, L.P.**
**AND (III) ESTABLISHING A BAR DATE FOR LEASE REJECTION CLAIMS**

---

[1] The Debtors in these chapter 11 cases are: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; TOUSA Texas, LP.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; TOUSA/West Holdings, Inc. (collectively, the "Conveying Subsidiaries"); TOUSA, Inc. ("TOUSA"), TOUSA Homes, L.P.; and Beacon Hill at Mountain's Edge, LLC ("Beacon Hill").

The Debtors and the Official Committee of Unsecured Creditors of TOUSA, Inc., *et al.*

(the "Committee" and, together with the Debtors, the "Proponents"), as applicable, having:

    a.   filed, on May 15, 2013, the *Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code* [ECF No. 9168][2] and the *Disclosure Statement for Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code* [ECF No. 9169] (the "Disclosure Statement"), which documents were subsequently amended and modified, as described herein;[3]

    b.   filed, on May 15, 2013, the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order Approving the Disclosure Statement and Establishing Solicitation and Voting Procedures with Respect Thereto* [ECF No. 9171];

    c.   filed, on June 6, 2013, the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Settlement of the Fiduciary Duty Action and the D&O Insurance Coverage Action* [ECF No. 9201] (the "D&O Settlement Motion");

    d.   filed, on June 14, 2013, Exhibit D to the Disclosure Statement [ECF No. 9226];

    e.   filed, on June 19, 2013, a revised version of the Joint Plan [ECF No. 9236] and a revised version of the Disclosure Statement [ECF No. 9237];

    f.   filed, on June 21, 2013, the solicitation version of the Joint Plan [ECF No. 9245] and the solicitation version of the Disclosure Statement [ECF No. 9246];

    g.   distributed solicitation materials on or before June 26, 2013, consistent with the Bankruptcy Code, the Bankruptcy Rules and the *Order Granting Joint Motion for Order Approving the Disclosure Statement and Establishing Solicitation and Voting Procedures with Respect Thereto* [ECF No. 9244] (the "Disclosure Statement

---

[2] Capitalized terms used but not otherwise defined in this Confirmation Order shall have the meanings ascribed to such terms in the *Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code*, dated June 21, 2013 [ECF No. 9245] (as the same may be amended and supplemented, the "Joint Plan"), a copy of which is attached hereto as Exhibit A, or the *Disclosure Statement for the Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code*, dated May 15, 2013 [ECF No. 9246] (as the same may be amended and supplemented, the "Disclosure Statement"), as applicable.  Any term used in the Joint Plan, the Disclosure Statement or this Confirmation Order that is not defined in the Joint Plan, the Disclosure Statement or this Confirmation Order, but that is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable.

[3] For the avoidance of doubt, the Disclosure Statement used in connection with the solicitation of votes to accept or reject the Joint Plan, as authorized by the Court, is the *Disclosure Statement for Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code* filed on June 21, 2013 [ECF No. 9246].

Order"), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "Solicitation Procedures") and related notices, forms and ballots (collectively, the "Solicitation Packages"), as evidenced by the *Certificate of Service of Kurtzman Carson Consultants LLC of Solicitation Packages and Non-voting Packages for the Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession under Chapter 11 of the Bankruptcy Code* [ECF No. 9278] (the "Solicitation Affidavit");

h.    published, on July 3, 2013 and July 4, 2013, notice of the Confirmation Hearing in the national edition of *The Wall Street Journal*, the *Miami Herald*, and the *South Florida Sun Sentinel*, as evidenced by the affidavits attached as Exhibit A to the *Notice of Filing Proof of Publication of Proponents' Notice of (A) The Solicitation and Voting Procedures and (B) The Objection Deadline and the Confirmation Hearing with Respect to the Amended Joint Plan* [ECF No. 9344] (collectively, the "Publication Affidavits");

i.    filed, on July 9, 2013, the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a), 502(c) and 1142 Establishing a Disputed Claims Reserve in Connection with the Amended Joint Plan of Liquidation* [ECF No. 9314] (the "Initial Disputed Claims Reserve Motion");

j.    filed, on July 9, 2013, changed pages with respect to the Joint Plan [ECF No. 9316] and changed pages with respect to the Disclosure Statement [ECF No. 9315], reflecting certain non-material modifications; [4]

k.    filed, on July 18, 2013, the *Notice of Selection of the Liquidation Trustee in Connection with the Amended Joint Plan of Liquidation of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9366] (the "Liquidation Trustee Notice") identifying J Beck & Associates, Inc. ("J Beck") as the Liquidation Trustee;

l.    filed, on July 26, 2013, the *Modified Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a), 502(c) and 1142 Establishing a Disputed Claims Reserve in Connection with the Amended Joint Plan of Liquidation* [ECF No. 9383] (together with the Initial Disputed Claims Reserve Motion, the "Disputed Claims Reserve Motion");

m.    filed, on July 30, 2013, the *Notice of Selection of the Members of the Liquidation Trust Advisory Board in Connection with the Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9398] identifying the four initial members of the Liquidation Trust Advisory Board (the "Liquidation Trust Advisory Board Notice");

---

[4] Although the Proponents contend that modifications to the Joint Plan and the Disclosure Statement reflected in the July 9, 2013 filings are non-material, such changed pages were nevertheless sent by the Voting and Claims Agent to all holders of Claims in Classes entitled to vote to accept or reject the Joint Plan.

n.  filed, on July 30, 2013, the *Certification of James Sean McGuire with Respect to the Tabulation of Ballots on the Amended Joint Plan of Liquidation of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9406] detailing the results of the voting process (the "Voting Certification");

o.  filed, on July 30, 2013, the Amendment No. 1 to Settlement Agreement amending Exhibit C to the Joint Plan [ECF No. 9408];

p.  filed, on July 30, 2013, a further revised version of the Joint Plan [ECF No. 9409];

q.  filed, on July 30, 2013, the *Declaration of John R. Boken in Support of Confirmation of the Amended Joint Plan of Liquidation of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9410]; and

r.  filed, on July 30, 2013, the *Proponents' (I) Memorandum of Law in Support of Confirmation of the Amended Joint Plan of Liquidation of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code and (II) Omnibus Response to Joint Plan Objections* [ECF No. 9411] (the "Plan Confirmation Brief").

This Court having:

a.  entered, on June 21, 2013, the Disclosure Statement Order [ECF No. 9244];

b.  entered, on July 12, 2013, the order approving the D&O Insurance Coverage Settlement and the other relief requested in the D&O Settlement Motion [ECF No. 9341] (the "D&O Settlement Order");

c.  set August 1, 2013 at 9:30 a.m., prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128 and 1129 of the Bankruptcy Code;

d.  reviewed the Joint Plan, the Disclosure Statement, the Plan Confirmation Brief and all pleadings, exhibits, statements, responses and comments regarding Confirmation, including all objections, statements and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases (collectively, the "Plan Objections");

e.  heard the statements, arguments and objections made by counsel and parties in interest in respect of Confirmation;

f.  considered all oral representations, testimony, documents, filings and other evidence regarding Confirmation; and

g.  taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

4

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing, the Joint Plan and all modifications thereto have been adequate and appropriate as to all parties affected or to be affected by the Joint Plan and the transactions contemplated thereby and that any party in interest so affected has had the opportunity to object to Confirmation; and, after due deliberation and based upon the record described above, it appearing to the Court that the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; the Court hereby makes and issues the following Findings of Fact, Conclusions of Law and Order:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[5]

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

### A.    Jurisdiction and Venue

1.    On January 29, 2008 (the "Petition Date"),[6] the Debtors commenced these chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Joint Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court has jurisdiction to enter a final order with respect thereto.  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine whether the Joint Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

---

[5] The findings of fact and the conclusions of law set forth herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  *See In re Am. Family Enters.*, 256 B.R. 377, 385 n.2 (Bankr. D.N.J. 2000); *In re Antar*, 122 B.R. 788, 789 (Bankr. S.D. Fla. 1990).

[6] On July 30, 2008, Beacon Hill commenced its Chapter 11 Case, which is being jointly administered with the Chapter 11 Cases.  As used herein, Petition Date means (a) for all Debtors other than Beacon Hill, January 29, 2008 and (b) for Beacon Hill, July 30, 2008.

**B.      Eligibility for Relief**

2.      The Debtors were, and are, Entities eligible for relief under section 109 of the

Bankruptcy Code.

**C.      Joint Administration of the Chapter 11 Cases**

3.       By prior order of the Court, the Chapter 11 Cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015

[ECF No. 6].  Beacon Hill's Chapter 11 Case has been jointly administered with the Chapter 11

Cases of the other Debtors [ECF No. 1512].  The Debtors have operated their businesses and

managed their properties as debtors in possession since each of their respective commencement

dates pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On February 13, 2008, the

United States Trustee for the Southern District of Florida (the "U.S. Trustee") appointed the

Committee pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been

appointed in the Chapter 11 Cases.

**D.      Separate Chapter 11 Plans for Each Debtor**

4.      The Joint Plan constitutes a separate chapter 11 plan of liquidation[7] for each Plan

Debtor.[8]  Unless otherwise expressly stated herein, any statement regarding the Joint Plan or the

satisfaction of any requirements by the Joint Plan, or approval of the Joint Plan, shall be deemed

to apply separately to the chapter 11 plan of each of the Plan Debtors and any statements

included herein referring to actions taken by or on behalf of the Plan Debtors shall be deemed to

mean actions taken by or on behalf of each Plan Debtor in connection with its applicable plan.

---

[7] See Art. III.A of the Joint Plan.

[8] "Plan Debtors" refers to each of the Debtors other than TOUSA Homes, L.P.  As described in the Disclosure
Statement, TOUSA Homes, L.P. has no assets and no interest in any pending litigation.  Accordingly, the Proponents do not
believe that any plan can be confirmed for TOUSA Homes, L.P. and the Chapter 11 Case of TOUSA Homes, L.P. shall be
dismissed as set forth in this Confirmation Order.

E.    **Modifications to the Joint Plan**

5.    Any and all modifications to the Joint Plan since the entry of the Disclosure Statement Order are consistent with all of the provisions of the Bankruptcy Code, including sections 1122, 1123, 1125 and 1127.  None of the modifications made since the entry of the Disclosure Statement Order effect a materially adverse change in the treatment of any holder of a Claim or Interest under the Joint Plan.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, such modifications made to the Joint Plan following entry of the Disclosure Statement Order do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Joint Plan.  Notwithstanding the foregoing, however, after filing changed pages to the Joint Plan and Disclosure Statement on July 9, 2013, the Proponents caused copies of such changed pages to be served on all holders of Claims in Classes entitled to vote to accept or reject the Joint Plan.  The Joint Plan as modified and attached hereto as **Exhibit A** shall constitute the Joint Plan submitted for Confirmation.

F.    **Judicial Notice**

6.    This Court takes judicial notice of (and deems admitted into evidence for purposes of Confirmation) the docket of the Chapter 11 Cases and all related adversary proceedings, appeals, District Court and Circuit Court of Appeals proceedings, maintained by the clerk of the applicable court or its duly-appointed agent, including, without limitation, all pleadings and other documents on file, all orders entered, all hearing transcripts and all evidence and arguments made, proffered or adduced at the hearings held before the applicable court during the pendency of the Chapter 11 Cases.  Any resolutions of objections explained on the record at the Confirmation Hearing are hereby incorporated by reference.

7

**G.    Disclosure Statement Order**

7.    On June 21, 2013, the Court entered the Disclosure Statement Order, which, among other things:  (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed June 20, 2013 as the Voting Record Date; (c) fixed July 26, 2013 as the Voting Deadline; (d) fixed July 22, 2013 as the deadline for objecting to the Joint Plan; (e) fixed August 1, 2013 at 9:30 a.m., prevailing Eastern time, as the date and time for the commencement of the Confirmation Hearing; (f) approved the Solicitation Procedures and the form of the Solicitation Packages; and (g) approved the form and method of notice of the Confirmation Hearing Notice set forth therein.

**H.    Transmittal and Mailing of Materials; Notice**

8.    As evidenced by the Solicitation Affidavit, due, adequate and sufficient notice of the Disclosure Statement, the Joint Plan and the Confirmation Hearing, together with all deadlines for voting on or objecting to the Joint Plan and with respect to Confirmation, has been given to:  (a) all known holders of Claims and Interests; (b) all parties that requested notice in accordance with Bankruptcy Rule 2002; (c) all counterparties to Unexpired Leases, Executory Contracts and Postpetition Contracts with the Debtors; (d) applicable third parties to Unexpired Leases, Executory Contracts and Postpetition Contracts with the Debtors; and (e) all Non-Voting Classes, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rules 2002(b), 3017 and 3020(b), and no other or further notice is or shall be required.  Adequate and sufficient notice of the Confirmation Hearing, and any applicable dates, deadlines and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, as evidenced by the Solicitation Affidavit, and no other or further notice is or shall be required.

8

9.      The Proponents published a modified version of the Confirmation Hearing Notice once each in the national edition of *The Wall Street Journal*, the *Miami Herald* and the *South Florida Sun Sentinel*, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rule 2002(l), as evidenced by the Publication Affidavits, and no other or further notice is or shall be required.

**I.      Solicitation**

10.      Votes to accept or reject the Joint Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws and regulations.

11.      Specifically, the Solicitation Packages approved by the Court in the Disclosure Statement Order (including the Disclosure Statement, the Joint Plan, the form of ballots and related notices approved thereby) were transmitted to and served on all holders of Claims in Classes that were entitled to vote to accept or reject the Joint Plan, and relevant portions of the Solicitation Packages and other notices approved by the Disclosure Statement Order were transmitted to and served on other parties in interest in the Chapter 11 Cases, all in compliance with section 1125 of the Bankruptcy Code, the Disclosure Statement Order, the Solicitation Procedures and the Bankruptcy Rules.  Transmittal and service were adequate and sufficient, and no further notice is or shall be required.

**J.      Voting Certification**

12.      The Proponents filed the Voting Certification before the commencement of the Confirmation Hearing, consistent with the Disclosure Statement Order.  All procedures used to tabulate ballots received in connection with Confirmation were fair, in good faith and conducted in accordance with the Disclosure Statement Order, as evidenced by the Voting Certification.

13.     As set forth in the Joint Plan and Disclosure Statement, holders of Claims in Classes 1A, 1B, 2, 5A and 5B at TOUSA, Classes 1, 4A and 4B at each Conveying Subsidiary and Class 3 at Beacon Hill (collectively, the "Voting Classes") were eligible to vote on the Joint Plan pursuant to the Solicitation Procedures.  Holders of Claims in Classes 3 and 4 at TOUSA, Classes 2 and 3 at each Conveying Subsidiary and Classes 1 and 2 at Beacon Hill were deemed to accept the Joint Plan and, therefore, were not entitled to vote to accept or reject the Joint Plan. Holders of Claims and Interests in Classes 5C, 5D, 6 and 7 at TOUSA, Classes 4C, 5 and 6 at each Conveying Subsidiary and Class 4 at Beacon Hill were deemed to reject the Joint Plan and, therefore, were not entitled to vote to accept or reject the Joint Plan.

14.     As evidenced by the Voting Certification, Classes 1A, 1B, 2, 5A and 5B at TOUSA and Classes 1 and 4A at each Conveying Subsidiary voted to accept the Joint Plan.  With respect to Class 4B at each Conveying Subsidiary, (a) such Classes affirmatively voted to accept the Joint Plan, (b) no votes were cast by holders of Claims in each such Class to accept or reject the Joint Plan but such Classes are deemed to accept the Joint Plan[9] or (c) solely with respect to Class 4B at TOUSA Mid-Atlantic Investment, LLC, such Class voted to reject the Joint Plan. Holders of Claims in Class 3 at Beacon Hill did not vote to either accept or reject the Joint Plan, but are deemed to accept the Joint Plan.[10]

## K.    Bankruptcy Rule 3016

15.     The Joint Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement with the clerk of this Court satisfied Bankruptcy Rule 3016(b).

---

[9] With respect to deemed acceptance, the Joint Plan provides as follows:  "If holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan."  *See* Joint Plan, Art. IV.D.

[10] *See* Joint Plan, Art. IV.D.

**L.      Burden of Proof**

16.      The Proponents have met their burden of proving the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.

**M.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

17.      The Joint Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**i.      <u>Section 1129(a)(1)—Compliance of the Joint Plan with Applicable Provisions of the Bankruptcy Code</u>**

18.      The Joint Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

**a.      <u>Sections 1122 and 1123(a)(1)—Proper Classification</u>**

19.      The classification of Claims and Interests under the Joint Plan is proper under the Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Joint Plan provides for the separate classification of Claims and Interests against each of the Joint Plan Debtors based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims, Priority Tax Claims and statutory fees owed to the U.S. Trustee (the "<u>Statutory Fees</u>"), which are addressed in Article II of the Joint Plan and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  The Joint Plan designates seven Classes of Claims against and Interests in TOUSA, six Classes of Claims against and Interests in each Conveying Subsidiary, to the extent applicable, and four Classes of Claims against and Interests in Beacon Hill.  Valid business, factual and legal reasons exist for separately classifying the various Classes

of Claims and Interests created under the Joint Plan and the creation of such Classes does not

unfairly discriminate between or among holders of Claims and Interests.

20.    As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and

Interests contains only Claims or Interests that are substantially similar to the other Claims and

Interests within such Class.  Accordingly, the requirements of sections 1122(a), 1122(b) and

1123(a)(1) of the Bankruptcy Code have been satisfied.

### b.    Section 1123(a)(2)—Specification of Unimpaired Classes

21.    Article III of the Joint Plan specifies that Claims in Classes 3 and 4 at TOUSA,

Classes 2 and 3 at each Conveying Subsidiary and Classes 1 and 2 at Beacon Hill are

Unimpaired.  Additionally, Article II of the Joint Plan specifies that Administrative Claims,

Priority Tax Claims and the Statutory Fees, although such Claims and Statutory Fees are not

classified under the Joint Plan, are Unimpaired.  Accordingly, the requirements of section

1123(a)(2) of the Bankruptcy Code have been satisfied.

### c.    Section 1123(a)(3)—Specified Treatment of Impaired Classes

22.    Article III of the Joint Plan specifies the treatment of each Impaired Class under

the Joint Plan, including Classes 5C, 5D, 6 and 7 at TOUSA, Classes 4C, 5 and 6 at each

Conveying Subsidiary and Class 4 at Beacon Hill.  Accordingly, the requirements of section

1123(a)(3) of the Bankruptcy Code have been satisfied.

### d.    Section 1123(a)(4)—No Discrimination

23.    In accordance with section 1123(a)(4) of the Bankruptcy Code, Article III of the

Joint Plan provides uniform treatment of each Claim or Interest in a particular Class, as the case

may be, unless the holder of a particular Claim has agreed to a less favorable treatment with

respect to such Claim.  Accordingly, the requirements of section 1123(a)(4) of the Bankruptcy

Code have been satisfied.

e.  **Section 1123(a)(5)—Adequate Means for Plan Implementation**

24.     In accordance with section 1123(a)(5) of the Bankruptcy Code, Article V of the

Joint Plan, along with certain other provisions of the Joint Plan, provides in detail adequate and

proper means for the Joint Plan's implementation, including, but not limited to: (a) the general

settlement of Claims and Interests; (b) sources of consideration for distributions pursuant to the

Joint Plan; (c) entry into the Liquidation Trust Agreement and the vesting of the Liquidation

Trust Assets in the Liquidation Trust; (d) the appointment of the Liquidation Trustee; (e) means

for the designation of the Members of the Liquidation Trust Advisory Board; (f) the authorization

and issuance of Liquidation Trust Interests and the execution of related documents;

(g) authorization to enter into the Mediation Settlement; (h) authorization to enter into the

Unsecured Creditor Settlement; (i) incorporation, implementation and ratification of the

Intercreditor Settlement Agreement[11] and other agreements concerning issues arising under or

relating to the Intercreditor Agreement to the extent resolved under the Joint Plan; (j) the

cancellation of securities, instruments and agreements; (k) the application of section 1146 of the

Bankruptcy Code; (l) the preservation of certain specified rights of action; (m) the payment of

the reasonable fees and expenses of the Indenture Trustees; (n) the exemption from registration

requirements with respect to the Liquidation Trust Interests pursuant to section 1145 of the

Bankruptcy Code; (o) the single satisfaction of Claims under the terms of the Joint Plan; and

(p) the establishment of the Disputed Claims Reserve.

25.     Moreover, the Plan Debtors will have, immediately upon the Effective Date,

sufficient Cash and Liquidation Trust Interests, as applicable, to make all payments required to

---

[11] For the avoidance of doubt, "Intercreditor Settlement Agreement" means the Intercreditor Settlement Agreement attached as Exhibit C to the Plan, as amended, modified or supplemented from time to time, including pursuant to the Amendment No. 1 to Settlement Agreement.

be made on the Effective Date pursuant to the terms of the Joint Plan.  Accordingly, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

### f.      Section 1123(a)(6)—Voting Power of Equity Securities

26.     On the Effective Date, the Plan Debtors will dissolve.  Further, the Proponents or the Liquidation Trustee, as applicable, are authorized to dissolve or terminate the existence of wholly owned non-Plan Debtor subsidiaries following the Effective Date.  Accordingly, the Joint Plan does not provide for any Plan Debtor's charter or applicable governance documents to include the issuance of nonvoting equity securities.  Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code have been satisfied.

### g.      Section 1123(a)(7)—Selection of Officers, Directors, or Trustees

27.     The identity of the Liquidation Trustee and the initial members of the Liquidation Trust Advisory Board have been disclosed in the Liquidation Trustee Notice and the Liquidation Trust Advisory Board Notice, respectively.  Further, Article XI.E of the Joint Plan describes the manner of selection of successor members of the Liquidation Trust Advisory Board and a successor Liquidation Trustee following the Effective Date, to the extent necessary.  The means for selection of the initial Liquidation Trustee and the initial Members of the Liquidation Trust Advisory Board was and is consistent with the interests of holders of Claims and Interests and public policy.  Accordingly, the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

### h.      Section 1123(b)—Discretionary Contents of the Joint Plan

28.     The Joint Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code.  As set forth below, such discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not

inconsistent with the applicable provisions of the Bankruptcy Code.  Accordingly, the

requirements of section 1123(b) of the Bankruptcy Code have been satisfied.

> ### i.    *Section 1123(b)(1)-(2)—Claims and Executory Contracts*

29.    In accordance with sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code,

Article III of the Joint Plan impairs or leaves unimpaired, as the case may be, each Class of

Claims and Interests, and Article VI of the Joint Plan provides for the assumption, assumption

and assignment or rejection of the Executory Contracts, Unexpired Leases and Postpetition

Contracts of the Plan Debtors not previously assumed, assumed and assigned or rejected

pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of this Court;

*provided*, *however*, that subject to the limitations set forth in the Joint Plan, the Proponents or the

Liquidation Trustee, as applicable, shall be authorized to alter, amend or supplement the schedule

of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts in connection

with the Joint Plan until and including the Effective Date.  Accordingly, the requirements of

sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code have been satisfied.

> ### ii.    *Section 1123(b)(3)—Settlements, Releases, Exculpation, Injunction and Preservation of Claims and Causes of Action*

> #### (A)    Settlements Under the Joint Plan

30.    The Joint Plan incorporates and implements numerous settlements among the

Settlement Parties, including, *inter alia*,

- **The Mediation Settlement.**  Pursuant to sections 363 and 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Joint Plan incorporates the Mediation Settlement, which consensually resolves all outstanding disputes among the Settlement Parties with respect to: (a) the Committee Action, other than with respect to the Non-Settling Transeastern Lenders; (b) disputes arising under or relating to the Intercreditor Agreement to the extent resolved under the Joint Plan;[12] and (c) any and all Claims or

---

[12] Although the Proponents were not parties to the Intercreditor Settlement, the other elements of the Mediation Settlement would not have been possible without a resolution of the issues underlying the Intercreditor Settlement Agreement and the other intercreditor disputes resolved under the Plan.  As such the Intercreditor Settlement constitutes an important and integral element of the Mediation Settlement and is incorporated into, implemented by and ratified pursuant to the Plan.

Causes of Action asserted by a Releasing Settlement Party against a Released Party in connection with the Chapter 11 Cases, other than those Claims specifically preserved in Article VIII of the Joint Plan (collectively, the "Settled Mediation Causes of Action").

- **The Unsecured Creditor Settlement.**  Pursuant to sections 363 and 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Joint Plan incorporates the Unsecured Creditor Settlement, which constitutes an agreement between the Debtors and the Committee with respect to the allocation of value among the Plan Debtors' Estates as implemented through the Committee Model[13] and the recoveries under the Joint Plan.

- **The D&O Insurance Coverage Settlement.**  The Joint Plan also implements the previously approved D&O Insurance Coverage Settlement, as set forth in the D&O Settlement Order, which provides for the settlement of (a) all Claims against the Settling D&O Insurers in connection with the D&O Insurance Coverage Action and (b) all Claims against TOUSA or the Defendant Directors and Officers in connection with the Fiduciary Duty Action pursuant to the terms of the D&O Insurance Coverage Settlement Agreements pursuant to Bankruptcy Rule 9019 and sections 105(a) and 363(b) of the Bankruptcy Code.  Such settlement is in consideration of the D&O Insurance Settlement Amount and the distributions and other benefits provided for under the Joint Plan.

31.    Any other compromise and settlement provisions of the Joint Plan and the Joint Plan itself constitute a compromise of all Claims or Causes of Action relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such an Allowed Claim or Interest.  Each of the settlements incorporated into or implemented by the Joint Plan is "fair and equitable" and is in the best interests of the Plan Debtors, their Estates and their creditors in accordance with applicable law.

32.    Specifically, Bankruptcy Rule 9019(a) authorizes a debtor in possession to compromise and settle claims, subject to approval by the Court.  *See* Fed. R. Bankr. P. 9019(a) ("On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.").  The decision to approve a particular settlement lies within the sound discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122–23 (S.D.N.Y.

---

[13] The Committee Model is a model prepared by the financial advisors to the Committee, and the drivers and data incorporated therein, that forms the basis for the distributions to the Non-Term Loan Lender Unsecured Creditors.

1994).  "Settlements are generally favored in bankruptcy proceedings, in that they provide for an

often needed and efficient resolution in a bankruptcy case."  *Tindall v. Mavrode (In re Mavrode*),

205 B.R. 716, 719 (Bankr. D. N.J. 1997); *see also In re Stein*, 236 B.R. 34, 37 (D. Or. 1999)

("Pursuant to Bankruptcy Rule 9019(a), compromises are favored in bankruptcy . . . .").

33.     A central inquiry in determining whether to approve a settlement or compromise

under Bankruptcy Rule 9019 is whether the proposed settlement is "fair and equitable" and is in

the best interests of the estate.  *See, e.g., In re Degenaars,* 261 B.R. 316, 319 (Bankr. M.D. Fla.

2001) (citing *In re Kay*, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998) ("A court should approve a

compromise if the compromise is fair and equitable and in the best interest of an estate.")); *see*

*also Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.*), 898 F.2d 1544, 1549 (11th Cir.

1990) (setting forth four factors to be considered in review of settlements).

34.     In determining whether to approve a settlement, a bankruptcy court must evaluate

whether the proposed compromise falls below the "lowest point in the range of reasonableness."

*Martin v. Pahiakos (In re Martin)*, 490 F.3d 1272, 1275–76 (11th Cir. 2007) (citing *Cosoff v.*

*Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).  If a settlement passes this

low threshold, the court should approve the compromise.  Specifically, a court in this District

must consider the four factors set forth by the Eleventh Circuit in *Justice Oaks* (the "*Justice Oaks*

Factors"):

> (a) The probability of success in the litigation; (b) the difficulties, if any, to
> be encountered in the matter of collection; (c) the complexity of the
> litigation involved, and the expense, inconvenience and delay necessarily
> attending it; [and] (d) the paramount interest of the creditors and a proper
> deference to their reasonable views in the premises.

898 F.2d at 1549.

35.     Each of the *Justice Oaks* Factors is met by the settlements contained in and

implemented by the Joint Plan for the reasons explained below.  With respect to the probability

of success in litigation, each of the Settlement Parties is confident with respect to the merits of

their respective claims in the Settled Mediation Causes of Action and all other proceedings

related to the Chapter 11 Cases.  No litigation, however, can be predicted with certainty.

Accordingly, providing the parties in interest with a guaranteed recovery is in the best interests of

all parties and, accordingly, satisfies the first *Justice Oaks* Factor.  With respect to difficulties

associated with collection, the settlements contained in and implemented by the Joint Plan

eliminate potential collection risk with respect to the Settlement Parties and assure timely

payment.  Accordingly the second *Justice Oaks* Factor is satisfied.  With respect to the nature of

the litigation involved, the Settled Mediation Causes of Action are, without question, complex

litigations and claims.  Prosecuting such actions to conclusion would be a significant drain on the

resources of the Plan Debtors' Estates.  Accordingly the third *Justice Oaks* Factor is satisfied.

Finally, the Debtors, the Committee and each of the other Settlement Parties support the

settlements contained in and implemented by the Joint Plan.  In connection with their analysis of

such settlements, the Proponents reviewed the potential economic impact of each such settlement

and believe that such settlements are in the best interests of the Plan Debtors' Estates and

creditors.  Indeed, such settlements, including, *inter alia*, the Mediation Settlement, the

Unsecured Creditor Settlement and the D&O Insurance Coverage Settlement, are the product of

extensive arm's-length negotiations lead by the Mediator.  Accordingly, the fourth *Justice Oaks*

Factor is satisfied.

36.    The settlements contained in and implemented by the Joint Plan are (a) in the best

interests of the Plan Debtors, their respective Estates and the holders of Claims and Interests and

(b) fair, equitable and reasonable because of the unique facts and circumstances of these cases

and the complexity and fragile nature of the settlement agreements, including the release,

exculpation and injunction provisions of the Joint Plan, as well as the number of parties and interrelatedness of each of the components of the settlements embodied in the Joint Plan. Accordingly, such settlements are approved pursuant to Bankruptcy Rule 9019, to the extent that such settlements have not already been approved by this Court.

**(B)    Settlement Party Release, Third-Party Release, Exculpation and Injunction Provisions**

37.    **Settlement Party Release.**  The release and discharge of Claims and Causes of Action given by the Releasing Settlement Parties described in Article VIII.B of the Joint Plan (the "Settlement Party Release") releases the Released Parties subject to the limitations contained in Article VIII.B.[14]  The Settlement Party Release is a necessary and important aspect of the Joint Plan, is based on sound business judgment and is reasonable.

38.    **Third-Party Release.**  The release of Claims and Causes of Action by holders of Claims and Interests described in Article VIII.C of the Joint Plan (the "Third-Party Release") releases the Released Parties and D&O Insurance Coverage Released Parties subject to the limitations contained in Article VIII.C.[15]  The Third-Party Release is a necessary and important aspect of the Joint Plan and is designed to provide finality for the Released Parties and D&O Insurance Coverage Released Parties regarding matters arising from or relating to the Debtors, the Chapter 11 Cases and such parties' respective obligations under the Joint Plan.  Specifically, the Released Parties and D&O Insurance Coverage Released Parties have, with the assistance of the Mediator, resolved many of the outstanding issues in the Chapter 11 Cases and substantially

---

[14] Pursuant to the Plan, "Released Party" means each, and solely in its capacity as such, Settlement Party and such Settlement Party's predecessors, predecessors in interest, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of the foregoing's current and former officers, directors, managers, principals, shareholders, members, limited and general partners, employees, trustees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.  Notwithstanding the foregoing, Released Party does not include (a) any professional engaged by the Debtors prior to the Petition Date who was not retained by the Debtors in connection with the Chapter 11 Cases as an ordinary course professional or pursuant to an order of this Court or (b) any Entity that entered into a tolling agreement with the Debtors in connection with the Chapter 11 Cases.

[15] Pursuant to the Plan, "D&O Insurance Coverage Released Party" means the Settling D&O Insurers, the Defendant Directors and Officers, XL Bermuda and TOSA, who are parties to the D&O Insurance Coverage Settlement Agreements.

assisted in efforts to maximize the value available for the Debtors' creditors.  The Released

Parties and the D&O Insurance Coverage Released Parties have provided substantial

consideration to the Plan Debtors' Estates and the Chapter 11 Cases by compromising aspects of

their asserted Claims or other legal and/or equitable rights to reach the consensual resolutions

embodied in the Joint Plan that allowed for the maximization and preservation of value for all of

the Debtors' creditors and, without which, the Joint Plan would not be possible.  The Court finds

that absent the foregoing compromises, the potential resulting litigation would have been

extensive and likely would have limited substantially the value available for distribution to

creditors due to an increase in administrative costs attendant to such litigation, the likely

substantial delay in concluding these Chapter 11 Cases and the uncertain outcomes attendant to

continued litigation.  Further, the ballots and notices of non-voting status served on parties in

connection with solicitation of the Joint Plan clearly directed all applicable holders of Claims and

Interests to Article VIII of the Joint Plan for further information regarding the release provisions.

Thus, those holders of Claims and Interests were given due and adequate notice that the Third-

Party Release would be provided under the Joint Plan and the votes in favor of the Joint Plan (or

lack of objection thereto, as applicable) indicate such holders' consent to the Third-Party

Release.

      39.    **Exculpation.**  The exculpation provision described in Article VIII.D of the Joint

Plan is appropriate under applicable law because it is part of a plan proposed in good faith, was

vital to the plan formulation process and is appropriately limited in scope.

      40.    **Injunction.**  The injunction provision set forth in Article VIII.F of the Joint Plan

is essential to the Joint Plan and is necessary to preserve and enforce the Settlement Party

Release, the Third-Party Release and the Joint Plan and is narrowly tailored to achieve that purpose.

41.     Thus, each of the Settlement Party Release, Third-Party Release, exculpation and injunction provisions set forth in the Joint Plan: (a) is within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b) and 1334(d); (b) is an essential means of implementing the Joint Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into and to be implemented in connection with the Joint Plan; (d) confers material benefits on, and is in the best interests of, the Plan Debtors, their Estates and all stakeholders in the Chapter 11 Cases; and (e) is consistent with sections 105, 1123 and 1129 of the Bankruptcy Code, other applicable provisions of the Bankruptcy Code and other applicable law within and outside the Eleventh Circuit.  *See e.g.*, *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879 (Bankr. S.D. Fla. 2009) (applying the factors set forth in *Dow Corning* to approve non-debtor release provision as necessary and fair);[16] *In re Transit Grp., Inc.*, 286 B.R. 811, 817-18 (Bankr. M.D. Fla. 2002) (same); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 263 (Bankr. M.D. Fla. 2006) (finding that an exculpation provision was "appropriate in light of the significant contributions made to this case by the beneficiaries of the exculpation clause, . . . the fact that the exculpation clause was the result of negotiation by all parties, and the overwhelming acceptance of the Plan"); *see also Murphy v. Weathers*, No. 07-00027, 2008 WL 4426080, at *4 (M.D. Ga. Sept. 25, 2008) (finding that exculpation provisions are commonplace and concluding

---

[16] The court in *In re Dow Corning Corp.* established the following factors relevant to the appropriateness of third-party releases: (1) whether there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the debtor; (2) whether the non-debtor has contributed substantial assets to the reorganization; (3) whether the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) whether the impacted class or classes have overwhelmingly voted to accept the plan; (5) whether the plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction; (6) whether the plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) whether the bankruptcy court made a record of specific factual findings that support its conclusions. *See In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002).

that the applicable standard for determining whether such provisions are appropriate is whether

such provisions are "reasonable under the circumstances and in the best interests of the estate");

*In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 928 (S.D.N.Y. 1991), *aff'd*, 960 F.2d

285 (2d Cir. 1992) (approving releases and injunctions "where a material benefit results to the

Debtors' estates and advances consummation of a Plan . . . [which] material benefits [ ] involve .

. . [a]n incentive to third parties to settle, resulting in increased amounts to be received by all

Class members, although in different amounts; [e]limination of competition for the [debtors']

Funds by preventing Fixed Creditors from making claims thereto; . . . [and] protection of the

Debtors' estates from piecemeal dismemberment through claims . . ."). The record of the

Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Settlement Party

Release, Third-Party Release, exculpation and injunction provisions contained in Article VIII of

the Joint Plan. Accordingly, the requirements of section 1123(b)(3) of the Bankruptcy Code have

been satisfied.

### (C)    Preservation of Claims and Causes of Action

42.    Article VIII.E of the Joint Plan appropriately provides for the preservation by the

Liquidation Trust of the Liquidation Trust Causes of Action, whether existing as of the applicable

Petition Date or thereafter arising, including those Causes of Action arising after the Effective

Date, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. Article VIII.E of the

Joint Plan also appropriately authorizes the Liquidation Trustee, on behalf of the Plan Debtors, to

pursue or adopt any Claim or Cause of Action not expressly settled or released by the Plan

Debtors in any lawsuit in which any of the Plan Debtors is a plaintiff, defendant or an interested

party. A list of the Liquidation Trust Causes of Action is provided in the Schedule of Liquidation

Trust Assets, attached as Exhibit D to the Joint Plan, and the Liquidation Trust shall retain all

rights with respect to such Liquidation Trust Causes of Action pursuant to the Joint Plan. The

provisions of the Joint Plan regarding the Liquidation Trust Causes of Action are appropriate and are in the best interests of the Plan Debtors, their Estates and all holders of Claims and Interests. Accordingly, the requirements of section 1123(b)(3) of the Bankruptcy Code have been satisfied.

### iii.    Section 1123(b)(5)—Modification of the Rights of Holders of Secured Claims

43.    Article III of the Joint Plan modifies or leaves unaffected, as the case may be, the rights of holders of Secured Claims at each Plan Debtor. Accordingly, the requirements of section 1123(b)(5) of the Bankruptcy Code have been satisfied.

### iv.    Section 1123(b)(6)—Other Appropriate Provisions

44.    The Joint Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (a) distributions to holders of Claims and Interests, (b) resolution of Disputed Claims, (c) allowance of certain Claims, (d) indemnification of certain persons and Entities and (e) retention of jurisdiction by this Court. Accordingly, the requirements of section 1123(b)(6) of the Bankruptcy Code have been satisfied.

### i.    Section 1123(d)—Cure of Defaults

45.    Article VI.C of the Joint Plan provides for the satisfaction of any monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Joint Plan in accordance with section 365 of the Bankruptcy Code by payment of any "cure amount" pursuant to the terms thereof. The Proponents, in accordance with the terms of the Joint Plan, distributed notices of proposed assumption or assumption and assignment and proposed cure amounts to the applicable counterparties, which notices included procedures for objecting to and resolving proposed assumptions of Executory Contracts and Unexpired Leases and any cure

amounts paid in connection therewith.  Accordingly, the requirements of section 1123(d) of the Bankruptcy Code have been satisfied.

  **ii.**  **Section 1129(a)(2)—Compliance of the Joint Plan with the Applicable Provisions of the Bankruptcy Code**

  46.  The Proponents have complied with all applicable provisions of the Bankruptcy Code and applicable Bankruptcy Rules as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126 and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.

  47.  Votes to accept or reject the Joint Plan were solicited by the Proponents and their respective members, representatives, officers, directors, employees, advisors, attorneys and agents, as applicable, after this Court approved the adequacy of the Disclosure Statement pursuant to section 1125(a) of the Bankruptcy Code.

  48.  The Proponents and their respective members, representatives, officers, directors, employees, advisors, attorneys and agents, as applicable, have (a) solicited and tabulated votes on the Joint Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws and regulations and (b) have participated in good faith and in compliance with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws and regulations and are therefore entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Settlement Party Release, Third-Party Release, exculpation and injunction provisions set forth in Article VIII of the Joint Plan.

49.     The Proponents and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys and agents, as applicable, have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance and distribution of recoveries under the Joint Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Joint Plan or distributions made pursuant to the Joint Plan, so long as such distributions are made consistent with and pursuant to the Joint Plan.  Accordingly, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**iii.    Section 1129(a)(3)—Proposal of Joint Plan in Good Faith**

50.     The Proponents have proposed the Joint Plan in good faith and not by any means forbidden by law.  In determining that the Joint Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Joint Plan itself and the process leading to its formulation.  The good faith of each of the Entities who negotiated the Joint Plan is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.  The Joint Plan is the product of extensive arm's-length negotiations between and among the Settlement Parties and certain other parties in interest and has been overseen by the Court-appointed Mediator.  The Joint Plan itself and the process leading to its formulation provide independent evidence of the good faith of the Entities who negotiated the Joint Plan, serve the public interest and assure fair treatment of holders of Claims and Interests.  The Joint Plan is the culmination of the Proponents' and the other Settlement Parties' efforts to maximize the value available for the Debtors' creditors and to memorialize the progress made over the past thirty-six months of the Mediation.  Thus, consistent with the

25

overriding purpose of chapter 11 of the Bankruptcy Code, the Chapter 11 Cases were filed by the

Plan Debtors, and the Joint Plan was proposed by the Proponents, which include the Debtors,

with the legitimate purpose of maximizing the value of the Debtors' Estates to satisfy their

obligations to creditors.  Further, the release, exculpation and injunction provisions embodied in

the Joint Plan are fair and equitable and a component of the consensual agreement reached

among the Proponents and various parties in interest.  Accordingly, the requirements of section

1129(a)(3) of the Bankruptcy Code have been satisfied.

### iv. Section 1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable

51.     The procedures set forth in the Joint Plan for this Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors in connection with the Chapter

11 Cases, or in connection with the Joint Plan and incident to the Chapter 11 Cases, satisfy the

objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

Specifically, the payment on the Effective Date of (a) $6 million incurred by Monarch, (b) up to

$700,000 incurred by the First Lien Term Loan Agent and (c) up to $700,000 incurred by each of

MatlinPatterson and Aurelius on account of actual professional fees and actual expenses in

connection with the Chapter 11 Cases satisfies the objectives of and is in compliance with

section 1129(a)(4) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(4)

of the Bankruptcy Code have been satisfied.

### v. Section 1129(a)(5)—Disclosure of Identities of Liquidation Trustee and Members of Liquidation Trust Advisory Board, Compensation of Liquidation Trustee and Consistency of Liquidation Trust Provisions with the Interests of Creditors and Public Policy

52.     The Joint Plan complies with the requirements of section 1129(a)(5) of the

Bankruptcy Code because the Proponents have disclosed in the Liquidation Trustee Notice and

the Liquidation Trust Advisory Board Notice, as applicable, the following: (a) the identity of the

Liquidation Trustee, (b) the nature of compensation for the Liquidation Trustee and (c) the identity of the initial members of the Liquidation Trust Advisory Board.  In accordance with Article XI.E of the Joint Plan, the Liquidation Trustee was selected by the Committee and the Requisite Lenders and such appointment was reasonably acceptable to the Plan Debtors.  The method of appointment of the Liquidation Trustee and the initial Members of the Liquidation Trust Advisory Board was and is consistent with the interests of holders of Claims and Interests and public policy.  Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code have been satisfied.

<strong>vi.      Section 1129(a)(6)—Approval of Rate Changes</strong>

53.      The Joint Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Accordingly, the requirements of section 1129(a)(6) of the Bankruptcy Code are inapplicable to the Chapter 11 Cases.

<strong>vii.     Section 1129(a)(7)—Best Interests of Holders of Claims and Interests</strong>

54.      The Liquidation Analysis attached as Exhibit D to the Disclosure Statement and the other evidence related thereto in support of the Joint Plan that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was prepared, presented or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, with respect to each Impaired Class, each holder of an Allowed Claim or Interest in such Class has voted to accept the Joint Plan or will receive under the Joint Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive if the

Plan Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

Accordingly, the requirements of section 1129(a)(7) of the Bankruptcy Code have been satisfied.

> **viii.** **Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Joint Plan by Each Impaired Class**

55.     Classes 3 and 4 at TOUSA, Classes 2 and 3 at each Conveying Subsidiary and Classes 1 and 2 at Beacon Hill are each of the Classes of Unimpaired Claims or Interests that are conclusively presumed to have accepted the Joint Plan under section 1126(f) of the Bankruptcy Code.

56.     Classes 1A, 1B, 2, 5A and 5B at TOUSA, Classes 1, 4A and 4B at each Conveying Subsidiary (other than Class 4B at TOUSA Mid-Atlantic Investment, LLC) and Class 3 at Beacon Hill are Impaired under the Joint Plan and have either voted to accept the Joint Plan or are deemed to accept the Joint Plan.[17]  There are no Impaired Classes of Interests entitled to vote on the Joint Plan.

57.     Only one of the Voting Classes, Class 4B at TOUSA Mid-Atlantic Investment, LLC, voted to reject the Joint Plan (the "4B Rejecting Class").  Classes 5C, 5D, 6 and 7 at TOUSA, Classes 4C, 5 and 6 at each Conveying Subsidiary and Class 4 at Beacon Hill (the "Deemed Rejecting Classes" and, together with the 4B Rejecting Class, the "Rejecting Classes") are Impaired and not receiving any property under the Joint Plan and, as such, are conclusively presumed to reject the Joint Plan.  Accordingly, with respect to the Rejecting Classes, the Proponents sought Confirmation under section 1129(b) of the Bankruptcy Code rather than section 1129(a)(8) of the Bankruptcy Code.  Thus, although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Classes, based upon the record before

---

[17] With respect to Class 4B at each Conveying Subsidiary other than TOUSA Mid-Atlantic Investment, LLC, either (a) the holders of Claims in such Class affirmatively voted to accept the Plan or (b) no votes were cast by holders of Claims in such Class to accept or reject the Plan and such Class is deemed to accept the Plan.  *See* Plan, Art. IV.D.

this Court, the Joint Plan is confirmable because the Joint Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. Accordingly, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied with respect to each such Class.

      **ix.**    **Section 1129(a)(9)—Treatment of Claims Entitled To Priority Pursuant to Section 507(a) of the Bankruptcy Code**

58. The treatment of Administrative Claims, Priority Tax Claims and Statutory Fees under Article II of the Joint Plan and the treatment of Allowed Other Priority Claims under Article III of the Joint Plan satisfy the requirements of, and comply in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code have been satisfied.

59. Specifically, notwithstanding any other provisions of the Joint Plan or this Confirmation Order to the contrary, following the occurrence of the Effective Date, each of the Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within twenty (20) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the cash disbursements for the relevant period for each debtor which had not previously been filed. Each of the Debtors or the Liquidation Trustee, as appropriate, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Debtors or the Liquidation Trustee, as applicable, until the earlier of the closing of the case by the issuance of a Final Decree by the Court, or upon the entry of an order by the Court dismissing the case(s) or converting this case(s) to another chapter under the Bankruptcy Code, and the Debtors or the Liquidation Trustee, as applicable, shall provide to the United States Trustee upon the payment

of each post-confirmation payment, and concurrently filed with the Court, Post-Confirmation

Quarterly Operating Reports indicating all the cash disbursements for the relevant period.

    **x.**    <u>**Section 1129(a)(10)—Acceptance by at Least One Impaired Class**</u>

    60.    As set forth in the Voting Certification, at least one Class of Claims against each

Plan Debtor that is Impaired under the Joint Plan has voted to accept the Joint Plan.  Specifically,

holders of Claims in Classes 1A, 1B, 2, 5A and 5B at TOUSA and Classes 1, 4A and 4B[18] at each

Conveying Subsidiary voted to accept the Joint Plan.  Further, holders of Claims in Class 3 at

Beacon Hill are deemed to accept the Joint Plan for purposes of section 1129(a)(8) of the

Bankruptcy Code because no claimholders in such Class voted either to accept or reject the Joint

Plan.  *See In re Tribune Co.*, 464 B.R. 126, 183-84, *on reconsideration*, 464 B.R. 208 (Bankr. D.

Del. 2011) (finding that a class that is entitled to vote on a plan, but declines to do so may be

deemed to accept such plan where the "deemed acceptance" mechanic is made clear in the plan

documents and finding that such "deemed acceptance" is applicable in the context of section

1129(a)(10) of the Bankruptcy Code); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259-64

(Bankr. S.D.N.Y. 2007) (classes of claims in which no claimholder voted either to accept or

reject the plan deemed to accept for purposes of section 1129(a)(8)); *Heins v. Ruti-Sweetwater,

Inc. (In re Ruti Sweetwater, Inc.)*, 836 F.2d 1263, 1267 (10th Cir. 1988) (same).  As such, there is

at least one Class of Claims at each Plan Debtor that is Impaired under the Joint Plan and has

accepted the Joint Plan, determined without including any acceptance of the Joint Plan by any

insider (as defined by the Bankruptcy Code).  Accordingly, the requirements of section

1129(a)(10) of the Bankruptcy Code have been satisfied.

---

[18] *See supra* n. 17.  Although Class 4B at TOUSA Mid-Atlantic Investment, LLC voted to reject the Plan, because Classes 1and 4A at TOUSA Mid-Atlantic Investment, LLC are Impaired and voted to accept the Plan, the requirements of section 1129(a)(10) are met with respect to TOUSA Mid-Atlantic Investment, LLC.

### xi.    Section 1129(a)(11)—Feasibility of the Joint Plan

61.     The Joint Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The
evidence supporting the Joint Plan proffered or adduced by the Proponents at, or prior to, or in
affidavits filed in connection with, the Confirmation Hearing:  (a) is reasonable, persuasive,
credible and accurate as of the dates such analysis or evidence was prepared, presented or
proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not
been controverted by other evidence; (d) establishes that the Joint Plan is feasible and
Confirmation of the Joint Plan is not likely to be followed by liquidation or the need for further
financial reorganization; and (e) establishes that the Plan Debtors will have sufficient Cash and
Liquidation Trust Interests, as applicable, available to meet their financial obligations under the
Joint Plan.  Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have
been satisfied.

### xii.    Section 1129(a)(12)—Payment of Bankruptcy Fees

62.     Article II of the Joint Plan provides that all fees due and payable as of the
Effective Date pursuant to 28 U.S.C. § 1930 shall be paid, in full and in Cash, as of the Effective
Date. Accordingly, the requirements of section 1129(a)(12) of the Bankruptcy Code have been
satisfied.

### xiii.    Section 1129(a)(13)—Retiree Benefits

63.     Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree
benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to
section 1114 of the Bankruptcy Code.  Because the Plan Debtors have no retiree benefits
obligations, the requirements of section 1129(a)(13) of the Bankruptcy Code are inapplicable to
the Chapter 11 Cases.

xiv. **Sections 1129(a)(14), (15) and (16)—Domestic Support Obligations; Unsecured Claims Against Individual Debtors; Transfers by Nonprofit Organizations**

64.    None of the Plan Debtors have domestic support obligations, are individuals or are nonprofit organizations.  Therefore, the requirements of sections 1129(a)(14), (15) and (16) of the Bankruptcy Code are inapplicable to the Chapter 11 Cases.

xv. **Section 1129(b)—Confirmation of Joint Plan Over Nonacceptance of Impaired Class**

65.    Notwithstanding the fact that the Rejecting Classes voted to reject or are deemed to have rejected the Joint Plan, the Joint Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because (i) Impaired Classes 1A, 1B, 2, 5A and 5B at TOUSA, Classes 1, 4A and 4B[19] at each Conveying Subsidiary and Class 3 at Beacon Hill[20] voted to accept the Joint Plan or are deemed to have accepted the Joint Plan and (ii) the Joint Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Rejecting Classes. Specifically, (a) each holder of Claims or Interests in the Rejecting Classes will receive under the Joint Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive if the Plan Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code, (b) no class of Claims or Interests of similar legal rights is receiving different treatment under the Joint Plan and (c) no holder of any junior Claim or Interest will receive any recovery under the Joint Plan.  Accordingly, the Joint Plan necessarily does not unfairly discriminate and is fair and equitable with respect to the Rejecting Classes.  Further, no Class senior to the Rejecting Classes is receiving more than full recovery on account of its Claims (including Claims for interest and other contractual rights).

---

[19] *See supra* n. 17.

[20] *See* paragraph 60 above.

66.     Accordingly, the Joint Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Joint Plan shall be binding upon the holders of Claims and Interests in the Rejecting Classes.  Accordingly, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied.

**xvi.     Section 1129(c)—Only One Plan**

67.     Other than the Joint Plan (including previous versions thereof), three other plans were filed in the Chapter 11 Cases.  Such plans have either been withdrawn by the proponents thereof or by entry of this Confirmation Order, such plans shall be deemed withdrawn. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**xvii.     Section 1129(d)—Principal Purpose of the Joint Plan Is Not Avoidance of Taxes**

68.     No governmental unit has requested that this Court refuse to confirm the Joint Plan on the grounds that the principal purpose of the Joint Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (as amended, the "Securities Act").  As evidenced by its terms, the principal purpose of the Joint Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**N.     Satisfaction of Confirmation Requirements**

69.     Based upon the foregoing, the Joint Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**O.      Disclosure:  Agreements and Other Documents**

70.      The Proponents have disclosed all material facts regarding the Joint Plan and the documents related to the Joint Plan and Disclosure Statement, including: (a) the Recovery Analysis, which sets forth a description of the treatment of Classes of Claims against and Interests in each Plan Debtor; (b) the Liquidation Trust Agreement; (c) the Intercreditor Settlement Agreement; (d) the Schedule of Liquidation Trust Assets; (e) the Schedule of Term Loan Lender Disgorgement Payments; (f) the Liquidation Analysis; (g) the Schedule of Intercompany Loans; (h) the Schedule of Insurance and Executory Contracts; and (i) the Schedule of Professional Fees.

**P.      Likelihood of Satisfaction of Conditions Precedent to the Effective Date**

71.      Each of the conditions precedent to the Effective Date, as set forth in Article VII.A of the Joint Plan has been satisfied, is reasonably likely to be satisfied or, as set forth in and subject to the terms of the Joint Plan, may be waived by joint agreement of the Proponents and the Requisite Lenders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Joint Plan; *provided* that the following conditions to consummation cannot be waived: (i) the Confirmation Order shall have been entered and (ii) the Mediation Settlement shall have been approved.

**Q.      Implementation**

72.      All documents and agreements necessary to implement the Joint Plan and all other relevant and necessary documents have been negotiated in good faith, at arm's-length and are in the best interests of the Plan Debtors, their Estates and their creditors and shall, upon completion of documentation and execution, be valid, binding and enforceable documents and agreements not in conflict with any federal, provincial or state law.

**R.     Corporate Action**

73.     Upon the Effective Date, all actions contemplated by the Joint Plan shall be deemed authorized and approved in all respects, including: (a) entry into the Liquidation Trust Agreement; (b) appointment of the Liquidation Trustee and designation of the Members of the Liquidation Trust Advisory Board; (c) the establishment of the Disputed Claims Reserve; and (d) all other actions contemplated by the Joint Plan (whether contemplated to occur before, on or after the Effective Date).  All matters provided for in the Joint Plan involving the corporate structure of the Debtors, and any corporate action required by the Proponents or the Liquidation Trustee, as applicable, in connection with implementation of the Joint Plan shall be deemed to have occurred and shall be in effect upon the Effective Date without any requirement of further action by the Plan Debtors or any of their respective directors or officers.

**S.     Executory Contracts, Unexpired Leases and Postpetition Contracts**

74.     The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their Executory Contracts, Unexpired Leases and Postpetition Contracts as set forth in the Joint Plan, this Confirmation Order or otherwise.  Each assumption or rejection of an Executory Contract, Unexpired Lease or Postpetition Contract in accordance with the Joint Plan, this Confirmation Order or otherwise shall be legal, valid and binding upon (a) the applicable Debtor if such Executory Contract, Unexpired Lease or Postpetition Contract is assumed and (b) all non-Debtor parties to such Executory Contract, Unexpired Lease or Postpetition Contract, all to the same extent as if such assumption or rejection had been authorized and effectuated pursuant to a separate order of this Court that was entered pursuant to section 365 of the Bankruptcy Code before Confirmation.

**T.**    **Approval of the Liquidation Trust Agreement and the Issuance of the Liquidation Trust Interests**

75.    The terms and conditions of the Liquidation Trust Agreement have been negotiated in good faith, at arm's length, are fair and reasonable and are approved.  The Liquidation Trust Agreement is an essential element of the Joint Plan and entry into and consummation of the transactions contemplated by the Liquidation Trust Agreement are in the best interests of the Plan Debtors, their Estates and holders of Claims and Interests and are approved in all respects.  The Plan Debtors have exercised reasonable business judgment in determining to enter into the Liquidation Trust Agreement, and the Proponents have provided sufficient and adequate notice of the Liquidation Trust Agreement.  The Proponents are authorized, without any further notice to, or action, order or approval of, this Court to execute and deliver all agreements, documents and instruments relating thereto and to perform their obligations thereunder.  The Liquidation Trust Agreement shall, upon execution, be valid, binding and enforceable, and shall not be in conflict with any federal or state law.

**U.**    **Retention of Jurisdiction**

76.    This Court properly may retain jurisdiction over the matters set forth in (a) Article X and other applicable provisions of the Joint Plan, (b) the Liquidation Trust Agreement and (c) all other documents related to the Joint Plan.

## ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

77.    This Confirmation Order shall confirm the Joint Plan.  A copy of the Joint Plan is attached hereto as **Exhibit A.**

78.    **Confirmation of the Joint Plan.**  The Joint Plan (as may be amended by this Confirmation Order or in accordance with the Joint Plan) and each of its provisions are

confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  Without

further order or authorization of this Court, the Proponents, the Liquidation Trustee, any other

person necessary to take any actions to effectuate the provisions of the Joint Plan and their

respective successors are authorized and empowered to make all modifications to all documents

contemplated by the Joint Plan that are consistent with the Joint Plan.  The terms of the Joint

Plan and the exhibits thereto (including, without limitation, the Liquidation Trust Agreement and

the Intercreditor Settlement Agreement) are incorporated by reference into, and are an integral

part of, this Confirmation Order.  The terms of the Joint Plan, all exhibits thereto and all other

relevant and necessary documents shall be effective and binding as of the Effective Date of the

Joint Plan.

79.    **Objections**.  All parties have had a full and fair opportunity to litigate all issues

raised by the Plan Objections, or which might have been raised, and the Plan Objections have

been fully and fairly litigated.  All Plan Objections, other than those withdrawn with prejudice in

their entirety prior to the Confirmation Hearing or otherwise resolved on the record of the

Confirmation Hearing or herein are overruled for the reasons stated on the record or in this

Confirmation Order, as applicable.

80.    **Findings of Fact and Conclusions of Law**.  The findings of fact and the

conclusions of law set forth in this Confirmation Order shall constitute findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by

Bankruptcy Rule 9014.

81.    **Plan Modifications**.  Subsequent to filing the solicitation version of the Joint

Plan on June 21, 2013, the Proponents made certain non-material modifications to the Joint Plan,

which are reflected in the revised versions of the Joint Plan filed on July 9, 2013 and July 30,

2013 [ECF No. 9136, 9409] and in the version of the Joint Plan attached hereto as **Exhibit A**.

Except as provided for by law, contract or prior order of this Court, none of the modifications

made since the commencement of solicitation adversely affects the treatment of any Claim

against or Interest in any of the Plan Debtors under the Joint Plan.  The filing with this Court of

the Joint Plan, as modified, and the disclosure of such modifications on the record at the

Confirmation Hearing constitute due and sufficient notice thereof.  Accordingly, pursuant to

section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, none of these modifications

require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of

votes under section 1126 of the Bankruptcy Code (especially in light of previously provided

disclosures), nor do they require that holders of Claims be afforded an opportunity to change

previously cast acceptances or rejections of the Joint Plan.[21]  The Joint Plan as modified and

attached hereto shall constitute the Joint Plan submitted for Confirmation by this Court.

82.    **Deemed Acceptance of Joint Plan as Modified.**  In accordance with section

1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims who voted to

accept the Joint Plan or who are conclusively presumed to have accepted the Joint Plan are

deemed to have accepted the Joint Plan as modified.  No holder of a Claim shall be permitted to

change its vote as a consequence of such modifications.

83.    **Plan Classification Controlling.**  The terms of the Joint Plan shall govern the

classification of Claims and Interests for purposes of the distributions to be made thereunder.

The classifications set forth on the ballots tendered to or returned by the holders of Claims in

connection with voting on the Joint Plan pursuant to the Disclosure Statement Order:  (a) were

set forth on the ballots for purposes of voting to accept or reject the Joint Plan; (b) in no event

---

[21] As noted herein, in the interest of full disclosure to holders in the Voting Classes, after filing changed pages on July 9, 2013, the Proponents served such changed pages on all holders of Claims in the Voting Classes.

shall be deemed to modify or otherwise affect, the actual classification of such Claims under the

Joint Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as

representing the actual classification of such Claim under the Joint Plan for distribution

purposes; and (d) shall not be binding on the Proponents or the Liquidation Trustee except for

voting purposes.

84.     **Administrative Claims Bar Date.**  Except as otherwise provided in Article II.A

of the Joint Plan, requests for payment of Administrative Claims must be filed and served on the

Liquidation Trustee pursuant to the procedures specified in this Confirmation Order no later than

45 days after the Effective Date (the "Final Administrative Claims Bar Date").  Holders of

Administrative Claims that are required to, but do not file and serve a request for payment of

such Administrative Claims by such date **shall be forever barred, estopped and enjoined from

asserting such Administrative Claims against the Plan Debtors or their property and such

Administrative Claims shall be disallowed in full as of the Effective Date**.  Objections to such

timely requests, if any, must be filed and served on the Liquidation Trustee and the requesting

party no later than 90 days after the Final Administrative Claims Bar Date.  Notwithstanding the

foregoing, no requests for payment of Postpetition Intercompany Claims shall be required.

85.     The Proponents, in consultation with the Requisite Lenders solely to the extent

that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in

the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, may settle

and pay any Administrative Claim in the ordinary course of business without any further notice

to or action, order or approval of this Court.  In the event that any party with standing objects to

an Administrative Expense Claim, this Court shall determine the Allowed amount of such

Administrative Claim.

86.    **General Settlement of Claims and Interests**.  As one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Joint Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Joint Plan, the provisions of the Joint Plan shall, upon consummation, constitute a good-faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Joint Plan.  Subject to Article V of the Joint Plan, all distributions made pursuant to the Joint Plan to holders of Allowed Claims in any Class are intended to be and shall be final.

87.    **Certifying First Lien Term Loan Lender Defendants' Turn-Over and Payments in Support of 2007 Federal Tax Refund Agreement.**

a.    Each Certifying First Lien Term Loan Lender Defendant shall pay its respective Tax Refund Recovery True-Up Payment to the First Lien Term Loan Agent in Cash within seven Business Days of the Effective Date.  Certifying First Lien Term Loan Lender Defendants that do not comply with the requirements herein shall be liable for damages to the Non-Certifying First Lien Term Loan Lenders and shall be deemed to be in contempt of this Confirmation Order and subject to additional sanctions.

b.    To the extent that a Certifying First Lien Term Loan Lender Defendant has posted supersedeas bonds or cash collateral in respect of the Certifying Lender Tax Refund Payment in connection with the Committee Action (i) in respect of supersedeas bonds, such bonding surety company shall pay the amounts set forth in the Disgorgement Schedule (which is attached hereto as **Exhibit E**) to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants (and each Certifying First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); (ii) in respect of cash

collateral posted by a Certifying First Lien Term Loan Lender Defendant with this Court, such cash collateral shall be released in the amounts set forth in the Disgorgement Schedule to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants (and each Certifying First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); and (iii) in respect of cash collateral escrowed with the Committee (including in attorney trust accounts with Robbins Russell), such cash collateral shall be released in the amounts set forth in the Disgorgement Schedule to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants (and each Certifying First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments).  Subject to a Term Loan Lender Defendant's requirement, if any, to make Term Loan Lender Disgorgement Payments herein or in the Joint Plan, any amounts posted as collateral or escrowed by such Certifying First Lien Term Loan Lender Defendant in excess of the Tax Refund Recovery True-Up Payment and Term Loan Lender Disgorgement Payments required to be paid by such Certifying First Lien Term Loan Lender Defendant hereunder shall be released to or for the benefit of such Certifying First Lien Term Loan Lender Defendant, and any amounts paid by any Certifying First Lien Term Loan Lender Defendant in excess of the Tax Refund Recovery True-Up Payment and Term Loan Lender Disgorgement Payments required hereunder shall be paid to such Certifying First Lien Term Loan Lender Defendant.

88.   **Term Loan Lender Defendants' Disgorgement Obligations.**

a.   Pursuant to the Mediation Settlement, in connection with the Effective Date, the Term Loan Lender Defendants shall be required to make the Term Loan Lender Disgorgement Payments, which shall include (i) with respect to the First Lien Term Loan Lender Defendants,

their respective share of (a) the Principal and Interest Disgorgement and (b) the First Lien Term Loan Professional Fee Disgorgement; and (ii) with respect to the Second Lien Term Loan Lender Defendants, their respective share of the Second Lien Term Loan Professional Fee Disgorgement.

b.    The First Lien Term Loan Lender Defendants shall pay the Principal and Interest Disgorgement to the Liquidation Trust in Cash within seven Business Days of the Effective Date in accordance with the wire instructions attached hereto as **Exhibit F**.  Pursuant to the Mediation Settlement, and in order to implement the Intercreditor Settlement Agreement, the Debtors shall offset the First Lien Term Loan Professional Fee Disgorgement from distributions otherwise allocable to the First Lien Term Loan Lenders on account of the First Lien Term Loan Claims (as if such amounts had been paid), such that the First Lien Term Loan Lender Defendants shall not be required to pay any amounts in respect of the First Lien Term Loan Professional Fee Disgorgement.

c.    The Second Lien Term Loan Lender Defendants shall pay the Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust in Cash within seven Business Days of the Effective Date in accordance with the wire instructions attached hereto as **Exhibit F**.

d.    A schedule setting forth the amount of each Term Loan Lender Disgorgement Payment, the amount thereof (if any) that has already been paid, the amount of such disgorgement that shall be paid from supersedeas bonds, cash collateral or other sources and any additional amounts that the Term Loan Lender Defendants shall be required to pay is set forth in the Disgorgement Schedule attached hereto as **Exhibit E**.

e.    To the extent that a Term Loan Lender Defendant has not previously paid its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement, or

in the case of a Second Lien Term Loan Lender Defendant with respect to its Second Lien Term Loan Professional Fee Disgorgement, such Term Loan Lender Defendant shall make payment thereof within seven Business Days of the Effective Date to the Liquidation Trust.

f.    To the extent that a Term Loan Lender Defendant has posted supersedeas bonds or cash collateral in respect of the Principal and Interest Disgorgement or the Second Lien Term Loan Professional Fee Disgorgement, (i)  in respect of supersedeas bonds, such bonding surety company shall pay the amounts set forth in the Disgorgement Schedule to the Liquidation Trust (and each First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); (ii) in respect of cash collateral posted by a Term Loan Lender Defendant with this Court, such cash collateral shall be released in the amounts set forth in the Disgorgement Schedule to the Liquidation Trust; and (iii) in respect of cash collateral escrowed with the Committee (including in attorney trust accounts with Robbins Russell), such cash collateral shall be released in the amounts set forth in the Disgorgement Schedule to the Liquidation Trust.  Upon the full payment of a Term Loan Lender Defendant's Term Loan Lender Disgorgement Payment and Tax Refund Recovery True-Up Payment (if any), any amounts posted as collateral or escrowed by such Term Loan Lender Defendant in excess of the amount of such Term Loan Lender Defendant's Term Loan Lender Disgorgement Payment (including by offset, to the extent applicable) and Tax Refund Recovery True-Up Payment shall be released to or for the benefit of such Term Loan Lender Defendant.  Any amounts paid by any Term Loan Lender Defendant in excess of its Term Loan Lender Disgorgement Payment and Tax Refund Recovery True-Up Payment shall be paid to the applicable First Lien Term Loan Lender Defendant or Second Lien Term Loan Lender Defendant.

g.   Notwithstanding anything to the contrary herein, to the extent that any Term Loan Lender Defendant fails to make its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust within seven Business Days of the Effective Date, such Term Loan Lender Defendant shall not be entitled to receive any distributions under the Joint Plan unless and until such amounts have been disgorged or offset as provided herein.  Amounts otherwise allocable to such Term Loan Lender Defendant shall be distributed by the Liquidation Trustee to the holders of Allowed Unsecured Claims against TOUSA and Allowed Unsecured Claims against the Conveying Subsidiaries, as applicable, in an amount equal to the Term Loan Lender Disgorgement Payments with respect to the Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement not paid to the Liquidation Trust within seven Business Days of the Effective Date.  Any excess thereafter shall be paid to the applicable Agent for distribution in accordance with the Joint Plan and/or the Intercreditor Settlement Agreement.

h.   Upon payment by a surety company that has posted a bond in respect of any Term Loan Lender Disgorgement of the amounts described in paragraphs 86(b) and 87(f) (including, without limitation, the release of any excess amounts posted as collateral therefore to the respective Term Loan Lender Defendant), (i) such supersedeas bond shall no longer be required and shall be fully and unconditionally discharged, released and exonerated and such Term Loan Lender Defendant and such surety company in respect of such supersedeas bond shall be fully and unconditionally discharged and released from any and all past, present and future liability arising under or in connection with the issuance of such bond (and any instrument representing or evidencing such bond shall be returned to such Term Loan Lender Defendant or, if so directed by such Term Loan Lender Defendant, to such surety company) and (ii) such Term Loan Lender

Defendant will be fully and finally released from, and the Committee and the Debtors shall be deemed to fully and finally waive with respect to such Term Loan Lender Defendant in respect of the Term Loan Lender Disgorgement Payments, any requirement to post a supersedeas bond with respect to the Term Loan Lender Disgorgement Payments or any other amounts as may be adjudged or awarded against such Term Loan Lender Defendants in respect of the Term Loan Lender Disgorgement Payments in connection with the Committee Action.

    i. Term Loan Lender Defendants that do not comply with the foregoing shall be liable for damages to the Liquidation Trust and shall be deemed to be in contempt of this Confirmation Order and subject to additional sanctions.

    89. Consistent with the Quantification Orders, with respect to the foregoing disgorgement obligations, prejudgment interest shall run from July 31, 2007 through June 30, 2010, and postpetition interest shall run from July 1, 2010 through the Effective Date.[22]

    90. **Monarch Agreement.**

    a. As part of the Mediation Settlement, Monarch, GCAT and Barclays shall each be deemed a Monarch Settling Party with respect to the Additional Monarch Transeastern Liability and shall be permitted to settle the Additional Monarch Transeastern Liability according to the same terms as the Monarch Settlement Agreement.  In connection therewith, within three Business Days of the Effective Date, Monarch shall pay the Increased Monarch Settlement Payment to the Conveying Subsidiaries Account to account for the Updated Monarch Settlement Percentage in accordance with the wire instructions attached hereto as **Exhibit F**.

    b. Pursuant to the Mediation Settlement, in full and final satisfaction of the Monarch Supplemental Payment Obligation under the Monarch Settlement Agreement (as modified under

---

[22] A revised Exhibit E to the Plan, reflecting the updated calculation of prejudgment and post-judgment interest,  is attached hereto as **Exhibit E**.

subsection (a) above), Monarch shall pay the Monarch Mediation Settlement Payment to the

Conveying Subsidiaries Account in accordance with the wire instructions attached hereto as

**Exhibit F**.

     c.   Furthermore, upon the Effective Date:

        i.   All liability under or in respect of the Additional Monarch Transeastern

Liability (including, for the avoidance of doubt, any liability of Barclays with respect thereto)

under the Transeastern Litigation shall be transferred to and assumed by Monarch, and all rights

and claims arising from or related to the Additional Monarch Transeastern Liability or the loans,

amounts ordered to be disgorged under the Transeastern Judgment and the supersedeas bond,

each of the foregoing solely in respect of the Additional Monarch Transeastern Liability, shall be

transferred and assigned to Monarch (the foregoing liabilities, rights and claims shall each be

subject to the compromises contained in the Joint Plan and under the Monarch Settlement

Agreement);

        ii.   Pursuant to the Settlement Party Release and the Third-Party Release

under the Joint Plan, upon payment of the Increased Monarch Settlement Payment and the

Monarch Mediation Settlement Payment, Monarch, GCAT and Barclays shall be completely and

unconditionally released from the Additional Monarch Transeastern Liability by the Releasing

Settlement Parties (including, without limitation, the Debtors and the Committee) and, to the

extent set forth in Article VIII.C of the Joint Plan, each holder of a Claim or Interest; and

        iii.   Solely in respect of the Additional Monarch Transeastern Liability, upon

payment of the Increased Monarch Settlement Payment and the Monarch Mediation Settlement

Payment, (a) the supersedeas bond posted by GCAT and/or Barclays shall no longer be required

and shall be fully and unconditionally discharged, released and exonerated, and Monarch, GCAT,

Barclays and any surety company in respect of such supersedeas bond shall be fully and

unconditionally discharged and released from any and all past, present and future liability arising

under or in connection with the issuance of such bond (and any instrument representing or

evidencing such bond shall be returned to Barclays or, if so directed by Barclays, to such surety

company) and (b) Monarch, GCAT and Barclays, each in its capacity as a Settling Transeastern

Lender, will be fully and finally released from, and the Debtors and the Committee shall be

deemed to fully and finally waive with respect to such Settling Transeastern Lenders in respect

of the Additional Monarch Transeastern Liability, any requirement to post a supersedeas bond

with respect to the Additional Monarch Transeastern Liability or any other amounts as may be

adjudged or awarded against such Settling Transeastern Lenders in respect of the Additional

Monarch Transeastern Liability in connection with the Transeastern Litigation.

       iv.    Except as provided herein or in the Joint Plan, or as necessary to effectuate

the terms hereof or the Joint Plan, nothing in this Confirmation Order, the Joint Plan or the

Mediation Settlement amends or supersedes the terms and conditions of the Monarch Settlement

Agreement or the Court's prior order approving such settlement.

    91.    **Intercreditor Settlement Agreement.**  The Joint Plan incorporates and

implements those provisions of the Intercreditor Settlement Agreement relating to the allocation

of distributions made pursuant to the Joint Plan.  The First Lien Revolver Agent, in its capacity

as First Priority Representative (as defined in the Intercreditor Agreement), is hereby authorized

to make distributions of proceeds under the Joint Plan to or for the benefit of the First Lien

Revolver Lenders, the First Lien Term Loan Lenders and the Term Loan Lender Defendants in

accordance with the terms of the Intercreditor Settlement Agreement, and such distributions shall

be approved and binding on all First Lien Revolver Lenders, First Lien Term Loan Lenders and Term Loan Lender Defendants.

92.    **Releases by the Settlement Parties.**  As provided in Article VIII.B of the Joint Plan, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Joint Plan, the Settlement Party Release in the Joint Plan is approved.

93.    **Releases by Holders of Claims and Interests.**  As provided in Article VIII.C of the Joint Plan, as of the Effective Date, the Third-Party Release in the Joint Plan is approved in light of the findings of fact and conclusions of law set forth herein; *provided*, *however*, that nothing in this paragraph shall preclude the SEC from exercising its statutory duties against any Person in any forum.

94.    **Exculpation.**  The exculpation set forth in Article VIII.D of the Joint Plan is hereby approved and authorized; *provided*, *however*, that nothing in this paragraph shall preclude the SEC from exercising its statutory duties against any Person in any forum.

95.    **Injunction.**  From and after the Effective Date, and as contemplated in Article VIII.F of the Joint Plan, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Joint Plan or this Confirmation Order; *provided*, *however*, that nothing in this paragraph shall preclude the SEC from exercising its statutory duties against any Person in any forum.

96.    Notwithstanding anything contained in this Confirmation Order or the Joint Plan to the contrary, nothing in the Joint Plan or this Confirmation Order shall discharge, release, or otherwise preclude any Entity from exercising rights under the Joint Plan or apply with respect to any Claims held by the SEC as of the Effective Date based on the Securities Exchange Act of 1934, as amended, the Securities Act or other securities laws of the United States.  Further,

nothing contained in this Confirmation Order or the Joint Plan shall preclude the United States of

America, any state or any of their respective police or regulatory agencies from enforcing their

police or regulatory powers.

97.    **Distributions.**  Notwithstanding anything contained in the Joint Plan or this

Confirmation Order, as of the entry of this Confirmation Order, the Claims Register shall be

closed and there shall be no further changes made to reflect any new record holders of any

Claims or Interests.  Neither the Proponents nor the Liquidation Trustee shall have any obligation

to recognize any transfer of Claims or Interests occurring on or after the Distribution Record

Date.  Further, if a Claim, other than a Claim based on a publicly traded instrument, has been

transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent or the

Liquidation Trustee, as applicable, shall make distributions to the transferee only to the extent

practical and, in any event, only if the relevant transfer form contains an unconditional and

explicit certification and waiver of any objection to the transfer by the transferor.

98.    **Establishment of the Liquidation Trust and Appointment of the Liquidation**

**Trustee.**  On the Effective Date, the Liquidation Trust will be established and become effective

for the benefit of the Liquidation Trust Beneficiaries pursuant to the Joint Plan and the

Liquidation Trust Agreement and for the purpose of, among other things:  (a) administering the

Liquidation Trust Assets; (b) resolving Disputed Claims; (c) pursuing the Liquidation Trust

Causes of Action; and (d) making all required distributions to the Liquidation Trust

Beneficiaries.  Also on the Effective Date, J Beck is authorized to be and appointed as

Liquidation Trustee. The Liquidation Trustee and the Liquidation Trust Advisory Board shall

thereafter be authorized and appointed to take all actions necessary to operate the Liquidation

Trust pursuant to the terms of the Liquidation Trust Agreement.  The Liquidation Trust is

intended to qualify as a liquidating trust pursuant to Treasury Regulation section 301.7701-4(d) and as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), with no objective to continue or engage in the conduct of a trade or business.  The Liquidation Trust shall not be deemed a successor in interest of the Plan Debtors for any purpose other than as specifically set forth in the Joint Plan or the Liquidation Trust Agreement.  On the Effective Date, the Plan Debtors shall transfer, without recourse, the Liquidation Trust Assets, including the Transeastern Litigation, the Falcone Action, the RSUI Insurance Coverage Action and the Remaining Contingent Assets, to the Liquidation Trust in accordance with the Joint Plan.  In addition, the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders shall transfer, without recourse, to the Liquidation Trust all of their right, title and interest in the Transeastern Litigation and the RSUI Insurance Coverage Action.  Except as otherwise provided in the Joint Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all of the Liquidation Trust Assets, as well as the rights and powers of each Plan Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests for the benefit of the Liquidation Trust Beneficiaries.  The Liquidation Trust Assets may be transferred subject to certain liabilities, as provided in the Joint Plan or the Liquidation Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

99.    **Operation of Liquidation Trust as of the Effective Date.**  On and after the Effective Date, consistent with the terms of the Joint Plan and the Liquidation Trust Agreement, and subject to any required approval of the Liquidation Trust Advisory Board, the Liquidation Trustee may take any action on behalf of the Liquidation Trust or any of the Plan Debtors, as

applicable, including, without limitation: (a) the prosecution, pursuit, estimation, compromise or settlement of all Claims and Causes of Action involving the Plan Debtors that are not otherwise resolved; (b) managing the Liquidation Trust Assets; (c) investing the Liquidation Trust Assets; and (d) preparing or filing, if necessary, all tax returns required to be filed by or on behalf of the Liquidation Trust.

100.    **Removal of the Liquidation Trustee.**  The Bankruptcy Court, on its own initiative, may (a) for cause, and after notice and a hearing, remove the Liquidation Trustee or (b) issue an order requiring interested parties to show cause why the Liquidation Trustee should not be removed.  The U.S. Trustee shall have standing to seek removal of the Liquidation Trustee for cause, after notice and a hearing; *provided*, *however*, that the U.S. Trustee shall have no oversight responsibility with respect to the Liquidation Trustee or the Liquidation Trustee's exercise of his duties and obligations under the Liquidation Trust Agreement.  To the extent there is any dispute regarding the removal of the Liquidation Trustee (including any dispute relating to any compensation or expense reimbursement due under the Liquidation Trust Agreement), this Court shall retain jurisdiction to consider and adjudicate such dispute.

101.    **Standing of the United States Trustee.**  The U.S. Trustee shall have standing to pursue and be heard on any and all matters relating to the Liquidation Trust, the Liquidation Trustee and the Liquidation Trust Agreement, including, without limitation, standing to seek removal of the Liquidation Trustee in accordance with the Liquidation Trust Agreement; *provided*, *however*, that the U.S Trustee shall have no oversight responsibility with respect to the Liquidation Trustee or the Liquidation Trustee's exercise of his duties and obligations under the Liquidation Trust Agreement.

102.    **Section 1145 Exemption.**  To the extent that the Liquidation Trust Interests

constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code shall

apply to the Liquidation Trust Interests to the maximum extent permitted by law without further

act or action by any person.  For the avoidance of doubt, nothing in the Joint Plan, Disclosure

Statement or this Confirmation Order shall limit or restrict the SEC with respect to the

enforcement of its police or regulatory powers against any person or entity in any forum.

103.    **Effectuating Documents; Further Transactions.**  On and after the Effective

Date, the Liquidation Trustee, subject to any approvals or direction of the Liquidation Trust

Advisory Board as set forth in the Joint Plan or the Liquidation Trust Agreement, is authorized to

issue, execute, deliver, file or record such contracts, instruments, releases, and other agreements

or documents related to the foregoing, and take such actions as may be necessary or appropriate

to effectuate, implement and further evidence the terms and conditions of the Joint Plan,

including, without limitation, the distribution of the Liquidation Trust Interests to be issued

pursuant to the Joint Plan without the need for any approvals, authorization or consents except

for those expressly required pursuant to the Joint Plan.  The authorizations and approvals

contemplated in the Joint Plan shall be effective notwithstanding any requirements under

nonbankruptcy law.

104.    **Approval of Consents and Authorization To Take Acts Necessary To**

**Implement Joint Plan.**  Pursuant to the appropriate provisions of the corporate or business

organizations law of the applicable state of organization of each Plan Debtor and section 1142(b)

of the Bankruptcy Code, each of the Plan Debtors is hereby authorized and empowered, without

further notice to or action, order or approval of this Court or further action by the respective

officers, directors, members or stockholders of the Plan Debtors, to take such actions and to

perform such acts as may be necessary, desirable or appropriate to comply with, implement or execute the Joint Plan, the documents included as exhibits to the Joint Plan, all other documents relating to the Joint Plan and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms.  On the Effective Date, the Liquidation Trustee is authorized and empowered to issue, execute and deliver the agreements, documents, and instruments contemplated by the Joint Plan, the documents included as exhibits to the Joint Plan, all other documents relating to the Joint Plan, all documents, instruments and agreements related thereto in the name of and on behalf of the Liquidation Trust.

105.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Joint Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Joint Plan, and any documents, instruments, or agreements, and any amendments or modifications thereto.

106.    **Section 1146 Exemption from Certain Transfer Taxes and Fees.**  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with or pursuant to the Joint Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and this Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically

applies, without limitation, to: (1) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Plan Debtors; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust, lien or other security interest; (3) the making, assignment or recording of any lease or sublease; (3) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Joint Plan, including: (a) any deeds; (b) bills of sale, (c) assignments or (d) other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Joint Plan.

107.    **Assumption and Rejection of Executory Contracts and Unexpired Leases.** Each Executory Contract, Unexpired Lease and Postpetition Contract shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract, Unexpired Lease or Postpetition Contract: (1) is listed on the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts or (2) is otherwise assumed pursuant to the Joint Plan.

108.    Entry of this Confirmation Order shall constitute a bankruptcy court order approving the assumptions or rejections, as applicable, of such Executory Contracts, Unexpired Leases and Postpetition Contracts, as set forth in the Joint Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts, Unexpired Leases and Postpetition Contracts pursuant to the Joint Plan are effective as of the Effective Date.

109.    Notwithstanding anything to the contrary in the Joint Plan, the Proponents reserve the right to amend the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts at any time before the Effective Date.

110.    **Claims Based on Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts.  All Proofs of Claim arising from the rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, if any, must be filed with the Voting and Claims Agent according to the procedures established for the filing of Proofs of Claim in the Initial Bar Date Order and Local Rule 3003-1 on or before the later of (a) the applicable Claims Bar Date and (b) 30 days after (i) the entry of the order compelling or approving the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract or (ii) the effective date of the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract, if the order contains the notice mandated by Local Rule 6006-1.  Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable against any Plan Debtor, its Estate or property or the Liquidation Trust or its property, unless otherwise ordered by this Court or as otherwise provided in the Joint Plan or this Confirmation Order.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.F of the Joint Plan.**

111.    **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.**  Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Joint Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as

the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event

of a dispute regarding: (a) the amount of any payments to cure such a default; (b) the ability of

the Liquidation Trustee or any assignee to provide "adequate assurance of future performance"

(within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or

Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure

payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the

entry of a Final Order or Final Orders resolving the dispute and approving the assumption.  Any

counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the

proposed assumption or cure amount will be deemed to have consented to such assumption and

agreed to the specified cure amount.

     112.    **Provisions Governing Distributions.**  The distribution provisions of Article V of

the Joint Plan are hereby approved and authorized in their entirety.  Notwithstanding anything

contained in the Joint Plan or this Confirmation Order, the Liquidation Trustee will serve as

Distribution Agent to facilitate distributions to holders of Allowed Claims pursuant to the Joint

Plan.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be

allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid

interest that accrued on such Claims.

     113.    **Release of Liens.**  Except as otherwise provided in the Joint Plan or in any

contract, instrument, release or other agreement or document created pursuant to the Joint Plan

(and except as may already have occurred pursuant to previous orders entered in these Chapter

11 Cases), on the Effective Date and concurrently with the applicable distributions made

pursuant to the Joint Plan, and, in the case of a Secured Claim, satisfaction in full of the portion

of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust,

Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other Liquidation Trust Interests, as applicable, shall revert to the Liquidation Trust.  For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of this Court, or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

114.    **Tennenbaum Claims.**  Pursuant to (a) the *Stipulation Between the Committee and Tennenbaum Multi-Strategy Fund* dated June 2, 2010 [Case No. 10-02242, ECF No. 27], (b) this Court's *Final Judgment Against Tennenbaum Multi-Strategy Master Fund* dated February 23, 2011 [Case No. 10-02242, ECF No. 55] and (c) that certain Escrow Agreement by and among the Committee, Tennenbaum Multi-Strategy Master Fund, Tennenbaum Multi-Strategy Fund SPV (Cayman) Ltd. ("Tennenbaum") and Wilmington Trust Company (the "Escrow Agent") dated as of March 25, 2011 (the "Escrow Agreement" and collectively, the "Tennenbaum Agreements"), this Confirmation Order shall serve as a Transfer Instruction (as defined in the Escrow Agreement) jointly issued by the Committee and Tennenbaum, and, notwithstanding anything to the contrary in the Tennenbaum Agreements, effective immediately upon delivery of a copy of this Confirmation Order to the Escrow Agent, for the Escrow Agent to deliver, immediately upon its receipt of a copy of this Confirmation Order, a portion of the Escrowed Property equal to $2,835,961.71, plus postjudgment interest at a rate of 1% per annum, or $65 per day, for the period from June 30, 2013 to the Effective Date of the Joint Plan (the "Tennenbaum Disgorgement Amount") to the Liquidation Trust (on behalf of the Conveying

Subsidiaries) via wire transfer in accordance with the wire instructions attached hereto as **Exhibit F**, with any remaining cash in the Escrow Account contemporaneously to be returned to Tennenbaum via wire transfer in accordance with the wire instructions attached hereto as **Exhibit G**; *provided*, *further*, that upon payment of the Tennenbaum Disgorgement Amount, Tennenbaum has satisfied all disgorgement obligations under the Escrow Agreement, the Tennenbaum Agreements and the Joint Plan, and shall be entitled to the benefit of the Joint Plan release provisions, including, without limitation, under Article VIII of the Joint Plan, applicable to holders of Class 1B First Lien Term Loan Claims.

115.    **Failure of Consummation.**  If the Effective Date of the Joint Plan does not occur, the Joint Plan shall be null and void in all respects, and nothing contained in the Joint Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Interests in the Plan Debtors; (b) prejudice in any manner the rights of the Proponents, any holders of Claims or Interests or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Proponents, any holders of Claims or Interests or any other Entity in any respect.

116.    **Retention of Jurisdiction.**  Notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, this Court shall retain such jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases, the Liquidation Trust Agreement and the Joint Plan, including jurisdiction with respect to those items enumerated in Article X of the Joint Plan, which are incorporated herein by reference.

117.    **Immediate Binding Effect.**  The stays provided under Bankruptcy Rules 3020(e), 6004(h) and/or 7062 are hereby waived.  Subject to Article VII of the Joint Plan, and

notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) or 7062, upon the occurrence of the Effective Date, the terms of the Joint Plan shall be immediately effective and enforceable and deemed binding upon the Plan Debtors and any and all holders of Claims or Interests (irrespective of whether the holders of such Claims failed to vote to reject the Joint Plan or voted or were deemed to have voted to reject the Joint Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Joint Plan, each Entity acquiring property under the Joint Plan, and any and all non-Debtor parties to Executory Contracts, Unexpired Leases and Postpetition Contracts with the Debtors and their respective successors and assigns.

118.    **Conflicts.**    Except as set forth in the Joint Plan, to the extent that any provision of the Disclosure Statement Order or any other order (other than this Confirmation Order) referenced in the Joint Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflicts with or is, in any way, inconsistent with any provision of the Joint Plan, the Joint Plan shall govern and control; *provided*, *however*, that, to the extent that any provision of the Joint Plan conflicts with or is, in any way, inconsistent with any provision of this Confirmation Order, this Confirmation Order shall govern and control.

119.    **Notice of Entry of the Confirmation Order.**    In accordance with Bankruptcy Rules 2002 and 3020(c), (a) within 10 Business Days of the date of entry of this Confirmation Order, the Proponents shall serve a notice of Confirmation, substantially in the form attached hereto as **Exhibit B** (the "Notice of Confirmation") and (b) within 10 Business Days of the occurrence of the Effective Date pursuant to the terms of the Joint Plan, the Proponents shall serve a notice of the Effective Date, substantially in the form attached hereto as **Exhibit C** (the "Notice of Effective Date") by United States mail, first-class postage prepaid, by hand, or by

overnight courier service to all known creditors; *provided*, *however*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Proponents mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Proponents have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

120.    Mailing of the Notice of Confirmation and the Notice of Effective Date in the time and manner set forth herein shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice shall be necessary or required.

121.    The Notice of Confirmation and the Notice of Effective Date shall have the effect of an order of this Court, shall constitute sufficient notice of the entry of this Confirmation Order to such filing and recording officers and shall be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

122.    **Professional Compensation.**  All final requests for Accrued Professional Compensation must be filed and served no later than 45 days after the Effective Date, *provided* that the Liquidation Trustee shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Joint Plan or as authorized pursuant to the Joint Plan; and *provided further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order and without further order of this Court, unless otherwise ordered by this Court.

123.    Objections to any Claim for Accrued Professional Compensation must be filed and served on the Liquidation Trustee and the requesting party no later than 90 days after the Effective Date.  Each holder of a Claim for Allowed Professional Compensation sought under section 503(b) of the Bankruptcy Code shall be paid by the Liquidation Trustee in Cash from the Professionals Fee Accounts and, following the depletion of the Professionals Fee Accounts, from the Liquidation Trust Assets.  The (a) $6 million incurred by Monarch, (b) up to $700,000 incurred by the First Lien Term Loan Agent, (c) up to $700,000 incurred by MatlinPatterson and (d) up to $700,000 incurred by Aurelius on account of actual professional fees and actual expenses in connection with the Chapter 11 Cases shall be paid on the Effective Date without further Court approval.

124.    **Fee Review Committee and Fee Review Committee Protocol**.  For the reasons discussed on the record at the hearing on July 24, 2013, a fee review committee, to be comprised of one representative of the Debtors, one representative designated by the Committee and one representative from the Office of the U.S. Trustee (the "Fee Review Committee"), is hereby established and vested with authority to take actions in connection with the review of Final Fee Applications filed in these Chapter 11 Cases and in accordance with the fee review committee protocol attached hereto as **Exhibit D** (the "FRC Protocol").

125.    The FRC Protocol is approved in its entirety and the Fee Review Committee is hereby designated as a party in interest in these Chapter 11 Cases and its members shall have standing to appear before this Court in matters related to their review of Final Fee Applications. The qualified immunity privileges provided to members of the Fee Review Committee as set forth in the FRC Protocol are specifically approved.

61

126.    **Dissolution of the Committee.**  On the Effective Date, the Committee shall dissolve and the Committee Members shall be released from all further authority, duties, responsibilities and obligations relating to the Plan Debtors' Chapter 11 Cases; *provided*, *however*, that the Committee and its Retained Professionals shall be retained with respect to (a) appeals and related proceedings regarding the Joint Plan and (b) the resolution of applications for Accrued Professional Compensation.

127.    **Dismissal of Chapter 11 Case of TOUSA Homes, L.P.**  Debtor TOUSA Homes, L.P. has no assets and no interest in any pending litigation and, accordingly, no plan can be confirmed at TOUSA Homes, L.P.  Pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code, the Chapter 11 Case of Debtor TOUSA Homes, L.P. is hereby dismissed and the Liquidation Trustee is authorized and directed to dissolve TOUSA Homes, L.P. in accordance with applicable law.

128.    **Closing of Plan Debtors' Chapter 11 Cases**.  When (a) all Disputed Claims filed against a Plan Debtor have become Allowed Claims or have been disallowed by Final Order, (b) the Committee Action has been resolved by Final Order, (c) all Liquidation Trust Assets have been liquidated and the proceeds thereof distributed in accordance with the terms of the Joint Plan and (d) all other actions required to be taken by the Liquidation Trust under the Joint Plan and the Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek authority from this Court to close such Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

129.    **References to Joint Plan Provisions.**  The failure specifically to include or to refer to any particular article, section or provision of the Joint Plan, the exhibits thereto (including, without limitation, the Liquidation Trust Agreement and the Intercreditor Settlement

Agreement) or any related document in this Confirmation Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of this Court that the Joint Plan, the exhibits thereto and any related documents be confirmed and approved in their entirety.

130.   **Nonseverability of Joint Plan Provisions Upon Confirmation.**  Each term and provision of the Joint Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by this Court is valid and enforceable pursuant to its terms.

131.   **Modification of the Joint Plan After Entry of the Confirmation Order.**  The Proponents or the Liquidation Trustee, as applicable, may, upon order of this Court, amend or modify the Joint Plan subsequent to the entry of this Confirmation Order in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Joint Plan in such manner as may be necessary to carry out the purpose and the intent of the Joint Plan.  Neither the Joint Plan nor the Liquidation Trust Agreement may be amended in a manner that is materially adverse to any Settlement Party without the Settlement Party's consent (with respect to matters affecting all of the First Lien Revolver Lenders, First Lien Term Loan Lenders or Second Lien Term Loan Lenders, such consent shall be deemed given with the consent of the Requisite Lenders, as defined under the applicable Loan Documents).  Subject to the foregoing, a holder of a Claim that had accepted the Joint Plan shall be deemed to have accepted the Joint Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

132.   **Final Order and Appeals.**  This Confirmation Order is a Final Order, and the time period during which any party in interest wishing to appeal entry of this Confirmation Order may do so shall run from the date of the entry of this Confirmation Order.

133.    **Authorization To Consummate.**  The Proponents or the Liquidation Trustee, as applicable, are authorized to consummate the Joint Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties and with appropriate notice, if any) of the conditions precedent to the Effective Date set forth in Article VII.A of the Joint Plan.

# # #

Submitted by:

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, Florida  33130
Telephone: (305) 789-3553
Facsimile:  (305) 789-3395
predmond@stearnsweaver.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, New York  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
dgolden@akingump.com,
pdublin@akingump.com

*Co-Counsel to the Committee*

**BERGER SINGERMAN LLP**
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
singerman@bergersingerman.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar. No.
4316453)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
rcieri@kirkland.com
jsussberg@kirkland.com

*Co-Counsel to the Debtors*

## <u>EXHIBIT A</u>

**CONFIRMATION VERSION OF THE PLAN**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) Case No. 08-10928-JKO |
| TOUSA, INC., *et al.*, | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

---

**AMENDED JOINT PLAN OF LIQUIDATION OF TOUSA, INC. AND ITS**
**AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**JULY 30, 2013 VERSION OF PROPOSED PLAN**

---

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar No. 4216453)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Co-counsel to the Debtors*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

**ROBBINS, RUSSELL, ENGLERT, ORSECK,**
**UNTEREINER & SAUBER LLP**
Lawrence S. Robbins  (DC Bar No. 420260)
Michael Waldman (DC Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

Dated:  July 30, 2013

**BERGER SINGERMAN LLP**
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

**STEARNS WEAVER MILLER WEISSLER**
**ALHADEFF & SITTERSON, P.A.**
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile:  (305) 789-3395

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, GOVERNING LAW AND DEFINED TERMS ............. 1
    A.     Rules of Interpretation and Governing Law ................................................................. 1
    B.     Defined Terms ............................................................................................................. 1

ARTICLE II. UNCLASSIFIED CLAIMS................................................................................... 26
    A.     Administrative Claims ............................................................................................... 26
        1.     Payment of Administrative Claims................................................................ 26
        2.     Bar Date for Administrative Claims ............................................................... 27
        3.     Professional Compensation............................................................................ 27
    B.     Priority Tax Claims ................................................................................................... 27
    C.     Statutory Fees ............................................................................................................ 28

ARTICLE III. CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE PLAN
        DEBTORS .................................................................................................................. 28
    A.     Summary ................................................................................................................... 28
    B.     Classification of Claims and Interests ...................................................................... 28
    C.     Classes of Claims Against and Interests in TOUSA .................................................. 28
        1.     TOUSA – Class 1 – First Lien Claims.......................................................... 28
        2.     TOUSA – Class 2 – Second Lien Term Loan Claims .................................... 29
        3.     TOUSA – Class 3 – Other Secured Claims .................................................... 30
        4.     TOUSA – Class 4 – Other Priority Claims .................................................... 31
        5.     TOUSA – Class 5 – Unsecured Claims ......................................................... 31
        6.     TOUSA – Class 6 – 510 Claims .................................................................... 33
        7.     TOUSA – Class 7 – Interests ........................................................................ 33
    D.     Classes of Claims Against and Interests in the Conveying Subsidiaries ..................... 33
        1.     Conveying Subsidiaries – Class 1 – First Lien Revolver Claims ................... 33
        2.     Conveying Subsidiaries – Class 2 – Other Secured Claims........................... 34
        3.     Conveying Subsidiaries – Class 3 – Other Priority Claims ............................ 34
        4.     Conveying Subsidiaries – Class 4 – Unsecured Claims ................................. 34
        5.     Conveying Subsidiaries – Class 5 – 510 Claims ........................................... 36
        6.     Conveying Subsidiaries – Class 6 – Interests ................................................ 36
    E.     Classes of Claims Against and Interests in Beacon Hill ............................................ 37
        1.     Beacon Hill – Class 1 – Other Secured Claims ............................................ 37
        2.     Beacon Hill – Class 2 – Other Priority Claims .............................................. 37
        3.     Beacon Hill – Class 3 – General Unsecured Claims....................................... 37
        4.     Beacon Hill – Class 4 – Interests .................................................................. 38

ARTICLE IV. ACCEPTANCE OR REJECTION OF EACH PLAN .......................................... 38
    A.     Presumed Acceptance of Each Plan............................................................................ 38
    B.     Voting Classes ........................................................................................................... 38
    C.     Acceptance Requirements........................................................................................... 38
    D.     Failure to Vote .......................................................................................................... 38
    E.     Presumed Rejection of Plan ....................................................................................... 39
    F.     Nonconsensual Confirmation..................................................................................... 39

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE JOINT PLAN ................................ 39
    A.     Overview of Settlements in Connection with the Joint Plan ...................................... 39
        1.     Mediation Settlement Under the Joint Plan ................................................... 39
        2.     Unsecured Creditor Settlement Under the Joint Plan ..................................... 39

      3.      D&O Insurance Coverage Settlement Pursuant to the D&O Settlement Order ................................................................................................ 40

B.      The Models ......................................................................................................... 40

      1.      Mediation Model Case F ............................................................................ 41

      2.      The Committee Model ................................................................................ 41

C.      Components of the Mediation Settlement and the D&O Insurance Coverage Settlement ......................................................................................................... 42

      1.      The Mediation Settlement .......................................................................... 42

      2.      D&O Insurance Coverage Settlement ......................................................... 51

D.      Existing Officers' Insurance and Indemnification .............................................. 52

E.      Valuation............................................................................................................ 52

F.      Postpetition Intercompany Claims ..................................................................... 52

G.      Prepetition Intercompany Claims and Prepetition Intercompany Notes.................. 53

H.      Post-Effective Date Means for Implementation of the Joint Plan ...................... 53

      1.      Corporate Existence ................................................................................... 53

      2.      Closing of the Plan Debtors' Chapter 11 Cases ......................................... 53

      3.      Method of Distribution Under the Plan ...................................................... 54

      4.      Monetization of Assets .............................................................................. 54

      5.      Books and Records .................................................................................... 54

      6.      Reporting Duties ....................................................................................... 54

      7.      Tax Obligations......................................................................................... 54

      8.      Compliance with Tax Requirements/Allocations ...................................... 55

      9.      Surrender of Cancelled Instruments or Securities ..................................... 55

      10.     Resolution of Disputed Claims .................................................................. 55

      11.     Disallowance of Claims ............................................................................ 57

      12.     Professional Fee Accounts ......................................................................... 57

      13.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ......................................................................................... 57

      14.     Cancellation of Notes and Interests ........................................................... 58

      15.     Satisfaction of Obligations Under the Loan Documents ............................ 58

I.      Distributions...................................................................................................... 59

      1.      Single Satisfaction of Claims .................................................................... 59

      2.      Distributions on Account of Claims Allowed as of the Effective Date .............. 59

      3.      Distributions on Account of Claims Allowed After the Effective Date .............. 59

      4.      Disputed Claims Reserve ........................................................................... 60

      5.      Delivery of Distributions ........................................................................... 61

      6.      Fractional, De Minimis and Undeliverable Distributions.................................... 64

      7.      Claims Paid or Payable by Third Parties .................................................... 65

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND POSTPETITION CONTRACTS ........................................................................ 66

A.      Assumption and Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts ...................................................................................... 66

      1.      Assumption of Executory Contracts, Unexpired Leases and Postpetition Contracts ................................................................................................... 66

      2.      Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts ................................................................................................... 67

B.      Claims on Account of the Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts ...................................................................................... 68

C.      Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan .......................................................................... 68

ARTICLE VII. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ....................... 69
    A.    Conditions Precedent to Consummation.......................................................... 69
    B.    Waiver of Conditions..................................................................................... 69
    C.    Effect of Non-Occurrence of Conditions to the Effective Date....................... 69

ARTICLE VIII. RELEASE, INJUNCTION AND RELATED PROVISIONS ........................................ 70
    A.    Compromise and Settlement of Claims, Interests and Controversies.............. 70
    B.    Settlement Party Release................................................................................ 70
    C.    Third-party Release........................................................................................ 71
    D.    Exculpation................................................................................................... 71
    E.    Preservation of Rights and Causes of Action.................................................. 72
        1.    Maintenance of Causes of Action....................................................... 72
        2.    Preservation of All Causes of Action Not Expressly Settled or Released
            by the Plan Debtors........................................................................... 72
    F.    Injunction..................................................................................................... 72

ARTICLE IX. BINDING NATURE OF PLAN .................................................................................. 73

ARTICLE X. RETENTION OF JURISDICTION ............................................................................... 74

ARTICLE XI. LIQUIDATION TRUST ............................................................................................. 76
    A.    Generally...................................................................................................... 76
    B.    Purposes and Establishment of the Liquidation Trust .................................... 76
    C.    Liquidation Trust Assets ............................................................................... 76
    D.    Valuation of Assets ...................................................................................... 77
    E.    Appointment of the Liquidation Trustee and the Liquidation Trust Advisory
        Board............................................................................................................ 77
    F.    Duties and Powers of the Liquidation Trustee................................................ 78
        1.    Authority........................................................................................... 78
        2.    Claims and Causes of Action.............................................................. 78
        3.    Retention of Professionals.................................................................. 79
        4.    Agreements........................................................................................ 79
        5.    Reasonable Fees and Expenses........................................................... 79
        6.    Other Actions.................................................................................... 79
    G.    Funding of the Liquidation Trust................................................................... 79
    H.    Investment Powers........................................................................................ 80
    I.    Fees and Expenses of the Liquidation Trust ................................................. 80
    J.    Liquidation Trustee's Tax Power for Plan Debtors ....................................... 81
    K.    Prosecution of Liquidation Trust Causes of Action ...................................... 81
    L.    Distributions; Withholding ........................................................................... 81
    M.    Insurance...................................................................................................... 82
    N.    Exculpation; Indemnification......................................................................... 82
    O.    Transferability of the Liquidation Trust Interests........................................... 82
    P.    Registry of Beneficial Interests..................................................................... 82
    Q.    Federal Income Tax Treatment of Liquidation Trust...................................... 82
        1.    Liquidation Trust Assets Treated as Owned by Creditors ................... 82
        2.    Tax Reporting ................................................................................... 83
        3.    Tax Withholdings by Liquidation Trustee ......................................... 83
        4.    Foreign Tax Matters.......................................................................... 84
        5.    Dissolution........................................................................................ 84

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................................. 85
    A.    Payment of Indenture Trustees' Fees ................................................................. 85
    B.    Dissolution of Committee ................................................................................... 85
    C.    Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P. ........................... 85
    D.    Modification of Plan ........................................................................................... 85
    E.    Revocation of Plan ............................................................................................. 86
    F.    Successors and Assigns ...................................................................................... 86
    G.    Reservation of Rights ......................................................................................... 86
    H.    Further Assurances ............................................................................................. 86
    I.    Severability ........................................................................................................ 86
    J.    Time .................................................................................................................... 87
    K.    Exhibits/Schedules ............................................................................................. 87
    L.    Payment of Statutory Fees ................................................................................. 87
    M.    Substantial Consummation ................................................................................. 87
    N.    Service of Documents ........................................................................................ 87
    O.    Filing of Additional Documents ........................................................................ 89

**AMENDED JOINT PLAN OF LIQUIDATION OF TOUSA, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

TOUSA, Inc. and its affiliated debtors and the Official Committee of Unsecured Creditors of TOUSA, Inc., *et al.*, hereby respectfully propose the following joint plan under chapter 11 of the Bankruptcy Code:

## ARTICLE I.

## RULES OF INTERPRETATION, GOVERNING LAW AND DEFINED TERMS

A.    *Rules of Interpretation and Governing Law*

1.    For purposes of this document: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*2007 Federal Tax Refund*" means the Debtors' federal tax refund of approximately $207.3 million attributable to the carryback of net operating losses from the tax year 2007, which is an asset of TOUSA.

2.    "*2008 Federal Tax Refund*" means the Debtors' federal tax refund of approximately $97.1 million attributable to the carryback of net operating losses from the tax year 2008, which is an asset of TOUSA.

3.    "*502(h) Claims*" means Claims that arise under section 502(h) of the Bankruptcy Code.

1

4.      "*503(b) Application*" means an application for reimbursement, pursuant to section 503(b) of the Bankruptcy Code, of actual and reasonable compensation for professional services and/or actual, necessary expenses incurred in connection with the Chapter 11 Cases.

5.      "*510 Claims*" means Claims against each of the Plan Debtors that are subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

6.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under section 328, 330(a) or 331 of the Bankruptcy Code and were rendered before the Effective Date by any Retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that have not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount).  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

7.      "*Additional Monarch Transeastern Liability*" means the portion of GCAT's liability under the Transeastern Judgment in the bonded amount of $13,300,000.00 (of the aggregate bonded amount), reflecting approximately 2.50% of the aggregate liability of the Transeastern Lenders under the Transeastern Judgment, which portion was transferred to Monarch following the approval of the Monarch Settlement Agreement by the Bankruptcy Court.

8.      "*Administrative Claim*" means any Claim against a Plan Debtor for costs and expenses of administration of the applicable Plan Debtor's Estate under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code during the period up to and including the Effective Date, including, without limitation: (a) the actual and necessary costs and expenses, incurred after the applicable Petition Date, of preserving the respective Estates and operating the businesses of the Plan Debtors; (b) Allowed Professional Compensation; (c) all U.S. Trustee Fees; (d) Allowed reimbursable expenses of Committee Members; and (e) Allowed Claims under section 503(b)(9) of the Bankruptcy Code.

9.      "*Administrative Claims Bar Date*" means the Initial Administrative Claims Bar Date and the Final Administrative Claims Bar Date, as applicable.

10.      "*Agents*" means, collectively, (i) the First Lien Revolver Agents, (ii) the First Lien Term Loan Agent and (iii) the Second Lien Term Loan Agent.

11.       "*Allowed*" means, with reference to any Claim against a Plan Debtor, (a) any Claim that has been listed by the Plan Debtors in their Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim, objection or request for estimation has been filed on or before any applicable objection deadline, if any, set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) any Claim that is not Disputed on or before the Claims Objection Deadline (as the same may be extended from time to time), (c) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Plan Debtors, the Committee or the Liquidation Trust, as the case may be, pursuant to a Final Order of the Bankruptcy Court, (d) any Claim that has been specifically allowed hereunder or (e) any Claim that has been allowed by Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

12.      "*Allowed Professional Compensation*" means all Accrued Professional Compensation Allowed or awarded from time to time by an order of the Bankruptcy Court or any other court of competent jurisdiction.

13.      "*Aurelius*" means Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Convergence Master, Ltd., and Aurelius Investment, LLC and their controlled affiliates, managed accounts or funds and each of the foregoing's current and former officers, directors, managers, principals, management companies, general partners, employees and investment managers.

14.      "*Ballots*" means the ballots accompanying the Disclosure Statement upon which holders of Impaired Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the procedures governing the solicitation process.

15.      "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time.

16.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference under section 157 of title 28 of the United States Code, the District Court.

17.      "*Bankruptcy Court Decision*" means the October 13, 2009, opinion and judgment in the Committee Action [ECF Nos. 658, 659], as amended and replaced on October 30, 2009 [ECF Nos. 722, 721].

18.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075 and the local rules of the Bankruptcy Court.

19.      "*Barclays*" means Barclays Bank PLC, the Entity that caused the supersedeas bond to be posted on behalf of GCAT in respect of the Additional Monarch Transeastern Liability.

20.      "*Beacon Hill*" means Beacon Hill at Mountain's Edge, LLC.

21.      "*Beacon Hill Bar Date*" means October 22, 2008.

22.      "*Beacon Hill Governmental Bar Date*" means January 26, 2009.

23.      "*Business Day*" means any day other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including, without limitation, bank deposits, checks and cash equivalents.

25.      "*Cash Collateral Order*" means the First Cash Collateral Order, as extended and modified by subsequent orders of the Bankruptcy Court [ECF Nos. 2402, 2726, 3207, 3480, 5580, 6128, 7378, 8081, 8467, 8671, 8958, 9112].

26.      "*Causes of Action*" means, without limitation, any and all actions, causes of action, proceedings, controversies, Claims, objections to Claims, benefits of subordination of Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party Claims, indemnity Claims, contribution Claims, demands or any other Claims whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated,

3

fixed or contingent, matured or unmatured, Disputed or undisputed, secured or unsecured, suspected or unsuspected, foreseen or unforeseen, direct or indirect/derivative, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

27.    *"Certifying First Lien Term Loan Lender Defendants"* means the First Lien Term Loan Lender Defendants who received a portion of the Certifying Lender Tax Refund Payment.

28.    *"Certifying Lender Tax Refund Payment"* means the amount of proceeds from the 2007 Federal Tax Refund actually paid to certain First Lien Term Loan Lender Defendants as paydown funds pursuant to the First Cash Collateral Order, in the amount of $70,884,588.

29.    *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to more than one Debtor, the chapter 11 cases pending for such Debtors in the Bankruptcy Court, which are being jointly administered under case number 08-10928-JKO.  Where the context requires, the term Chapter 11 Cases refers to the chapter 11 cases pending for the Debtors or the Plan Debtors, as applicable.

30.    *"Charging Lien"* means any lien or other priority in payment to which the Indenture Trustees are entitled under the applicable indentures.

31.    *"Chinese Drywall Claims"* means prepetition Claims against the Plan Debtors related to alleged damages from defective drywall manufactured in China.

32.    *"Chinese Drywall Court"* means the United States District Court for the Eastern District of Louisiana.

33.    *"Chinese Drywall Litigation"* means the litigation commenced in 2009 in both federal and state courts by certain property owners and occupants along with certain homebuilders against homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters and distributors, as well as their insurers and the insurers of homeowners, who were involved with the Chinese drywall in the affected properties, which litigation was consolidated and transferred to the Chinese Drywall Court, MDL No. 09-02047.

34.    *"Citicorp"* means Citicorp North America, Inc.

35.    *"Claim"* has the meaning set forth in section 101(5) of the Bankruptcy Code.

36.    *"Claims Bar Date"* means, as applicable, (a) May 19, 2008, (b) the Governmental Bar Date, (c) the Beacon Hill Bar Date, (d) the Beacon Hill Governmental Bar Date, (e) the Administrative Claims Bar Date, (f) the Lien Claims Bar Date, (g) the Customer Claims Bar Date or (h) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for the filing of certain Claims.

37.    *"Claims Objection Deadline"* means, for each Claim, 180 days after the Effective Date or such later date as may be otherwise ordered by the Bankruptcy Court.

38.    *"Claims Register"* means the official register of Claims maintained by the Voting and Claims Agent.

39.     "*Class*" means a category of Claims or Interests, as set forth in Article III of the Plan, pursuant to section 1122(a) of the Bankruptcy Code.

40.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases on February 13, 2008, pursuant to section 1102 of the Bankruptcy Code, as such may be amended by the U.S. Trustee from time to time.

41.     "*Committee Action*" means the adversary proceeding [Adv. Pro. No. 08-01435] commenced by the Committee against the Prepetition Secured Lenders, the Transeastern Lenders and certain other parties, as such complaint and the parties thereto may be amended from time to time, and any other avoidance or equitable subordination or recovery actions under section 105, 502(d), 510, 542 through 551 or 553 of the Bankruptcy Code or otherwise challenging the validity of transfers related to or the obligations arising from or relating to the Loan Documents and the Original Transeastern Settlement, including Claims and Causes of Action in connection with such adversary proceeding and any appeals relating thereto.

42.     "*Committee Members*" means the members of the Committee appointed by the U.S. Trustee or by order of the Bankruptcy Court, as such appointment may be in effect or modified from time to time.

43.     "*Committee Model*" means the model prepared by the financial advisors to the Committee, and the drivers and data incorporated therein, that forms the basis for the distributions to the Non-Term Loan Lender Unsecured Creditors.

44.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Plan Debtors' Chapter 11 Cases.

45.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Plan Debtors' Chapter 11 Cases.

46.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

47.     "*Confirmation Order*" means the order of the Bankruptcy Court entered in the Plan Debtors' Chapter 11 Cases confirming the Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended from time to time.

48.     "*Conveying Subsidiaries*" means the Plan Debtors other than TOUSA and Beacon Hill.

49.     "*Conveying Subsidiaries Account*" means the account for the benefit of the Conveying Subsidiaries that was established pursuant to the Monarch Settlement Agreement.

50.     "*Conveying Subsidiaries Class 4A Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed Senior Note Guaranty Claims in Class 4A for each of the Conveying Subsidiaries, which shall entitle each such holder to a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures) of (i) the Unsecured Creditor Transeastern Recovery allocable to the applicable Conveying Subsidiary, (ii) the RSUI Insurance Coverage Action Recovery allocable to the applicable Conveying Subsidiary and (iii) the Remaining Contingent Assets allocable to the applicable Conveying Subsidiary.

51.    "*Conveying Subsidiaries Class 4B Contingent Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed General Unsecured Claims in Class 4B at TOUSA Texas LP, TOUSA Homes Florida, LP and Newmark Homes Purchasing, LP, which shall entitle each such holder to, after first repaying its Minimum Conveying Subsidiary Recovery Adjustment to TOUSA Homes, Inc., a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary) of (i) the Unsecured Creditor Transeastern Recovery allocable to the applicable Conveying Subsidiary and (ii) the Remaining Contingent Assets allocable to the applicable Conveying Subsidiary; *provided, however,* that each holder of Conveying Subsidiaries Class 4B Contingent Liquidation Trust Interests at an applicable Conveying Subsidiary shall receive a recovery on account of such Conveying Subsidiary's Class 4B Contingent Liquidation Trust Interests only in the event that such holder's recoveries on account of the Remaining Contingent Assets, other than the RSUI Insurance Coverage Action and the Falcone Action, allocable to the applicable Conveying Subsidiary exceed the Minimum Conveying Subsidiary Recovery Amount.

52.    "*Conveying Subsidiaries Class 4B Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed General Unsecured Claims in Class 4B for each of the Conveying Subsidiaries, which shall entitle each such holder to a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary) of (i) the Unsecured Creditor Transeastern Recovery allocable to the applicable Conveying Subsidiary, (ii) the RSUI Insurance Coverage Action Recovery allocable to the applicable Conveying Subsidiary and (iii) the Remaining Contingent Assets allocable to the applicable Conveying Subsidiary.

53.    "*Conveying Subsidiaries Liquidation Trust Interests*" means the Conveying Subsidiaries Class 4A Liquidation Trust Interests, the Conveying Subsidiaries Class 4B Contingent Liquidation Trust Interests and the Conveying Subsidiaries Class 4B Liquidation Trust Interests.

54.    "*Conveying Subsidiaries Term Loan Lender Disgorgement Share*" means the portion of the Term Loan Lender Disgorgement Payments to be allocated to the Conveying Subsidiaries, which shall include (i) the Principal and Interest Disgorgement; (ii) 87.5% of the First Lien Term Loan Professional Fee Disgorgement; and (iii) 87.5% of the Second Lien Term Loan Professional Fee Disgorgement.

55.    "*Customer Claims Bar Date*" means May 14, 2010.

56.    "*D&O Insurance Coverage Action*" means the adversary proceeding [Adv. Pro. No. 09-02281] commenced by certain of the Debtors against the D&O Insurers, as such complaint and the parties thereto may be amended from time to time and settled pursuant to the D&O Insurance Coverage Settlement Agreements or other settlements or compromises thereof.

57.    "*D&O Insurance Coverage Released Parties*" means the Settling D&O Insurers, the Defendant Directors and Officers, XL Bermuda and TOSA who are parties to the D&O Insurance Coverage Settlement Agreements, as discussed in Article VIII.C of the Plan.

58.    "*D&O Insurance Coverage Settlement*" means the settlement of (a) all Claims against the Settling D&O Insurers in connection with the D&O Insurance Coverage Action and (b) all Claims against TOSA or the Defendant Directors and Officers in connection with the Fiduciary Duty Action for the D&O Insurance Settlement Amount pursuant to the terms of the D&O Insurance Coverage Settlement Agreement and the XL Bermuda Settlement Agreement.

59.    "*D&O Insurance Coverage Settlement Agreement*" means that certain Settlement Agreement, dated June 4, 2013, by and among the Committee, the Debtors, TOSA, the Defendant Directors and Officers, the Settling D&O Insurers (other than XL Bermuda), the First Lien Term Loan

Agent by and on behalf of itself and the First Lien Term Loan Lenders, the First Lien Revolver Agent and the First Lien Revolver Sub-Agent by and on behalf of themselves and the First Lien Revolver Lenders, and the Second Lien Term Loan Agent by and on behalf of itself and the Second Lien Term Loan Lenders.

60.    "*D&O Insurance Coverage Settlement Agreements*" means the D&O Insurance Coverage Settlement Agreement and the XL Bermuda Settlement Agreement.

61.    "*D&O Insurance Settlement Amount*" means the aggregate obligation of $67 million to be paid by the Settling D&O Insurers to the Conveying Subsidiaries and the Term Loan Lenders in respect of the D&O Insurance Coverage Settlement in accordance with the terms of the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order.

62.    "*D&O Insurers*" means certain of the Debtors' insurance carriers whose policies may cover the claims made in the Fiduciary Duty Action.  For the avoidance of doubt, the D&O Insurers shall include XL Bermuda.

63.    "*D&O Settlement Order*" means the order of the Bankruptcy Court approving the D&O Insurance Coverage Settlement Agreement.

64.    "*D&O Settlement Parties*" means the parties to the D&O Insurance Coverage Settlement Agreements.

65.    "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in its Chapter 11 Cases.

66.    "*Debtors*" means TOUSA, Beacon Hill and each of TOUSA's subsidiaries that filed for chapter 11 protection on January 29, 2008, and whose cases are currently jointly administered in the Bankruptcy Court.

67.    "*Default Interest Amount*" means $8,322,917, representing accrued, unpaid default interest at a rate of 1% per annum outstanding under the First Lien Revolving Credit Agreement.

68.    "*Defendant Directors and Officers*" means the current and former directors and officers of the Debtors who are defendants in the Fiduciary Duty Action.

69.    "*Directors and Officers*" means the Defendant Directors and Officers and the Non-Defendant Directors and Officers.

70.    "*Disclosure Statement*" means the *Disclosure Statement for the Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* dated May 15, 2013, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

71.    "*Disputed*" means, with reference to any Claim against a Plan Debtor, including any portion thereof, (a) any Claim that is listed on the Schedules as unliquidated, disputed or contingent, (b) any Claim as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or that is otherwise disputed by any Debtor, the Committee or the Liquidation Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been determined by a Final

7

Order or (c) any Claim with respect to which a Proof of Claim was required to be filed by order of the Bankruptcy Court but as to which such Proof of Claim was not timely or properly filed.

72.     "*Disputed Claims Reserve*" means the reserve to be created by the Plan Debtors to hold Cash or Liquidation Trust Interests, as applicable, and any dividends, gains or income attributable thereto, which reserve shall be held for the benefit of those holders of Disputed Claims for distribution according to the procedures set forth in Article V.H.10 and Article V.I of the Plan.

73.     "*Distribution Agent*" means the Liquidation Trustee or such Entity or Entities designated by the Liquidation Trustee, in consultation with the Liquidation Trust Advisory Board, which Entities may include, without limitation, the Liquidation Trustee, the Agents and the Indenture Trustees, to make or facilitate distributions required by the Plan.

74.     "*Distribution Date*" means any of the Initial Distribution Date or the Periodic Distribution Dates.

75.     "*Distribution Record Date*" means the date for determining which holders of Allowed Claims, except holders of publicly traded instruments, are eligible to receive distributions pursuant to the Plan, which shall be the Confirmation Date or such other date as designated in the Plan or a Bankruptcy Court order.

76.     "*District Court*" means the United States District Court for the Southern District of Florida.

77.     "*Effective Date*" means the first Business Day following the Confirmation Date selected by the Proponents, in consultation with the Requisite Lenders, on which (a) the conditions to effectiveness of the Plan set forth in Article VII of the Plan have been satisfied or otherwise waived in accordance with Article VII.B of the Plan and (b) no stay of the Confirmation Order is in effect.

78.     "*Eleventh Circuit*" means the United States Court of Appeals for the Eleventh Circuit.

79.     "*Eleventh Circuit Decision*" means the May 15, 2012, opinion and judgment issued by the Eleventh Circuit in the Transeastern Litigation [Case No. 11-11071].

80.     "*Encumbered Assets*" means any of an applicable Plan Debtor's assets encumbered by the Liens securing the First Lien Revolver Claims, the First Lien Term Loan Claims or the Second Lien Term Loan Claims, as applicable.

81.     "*Entity*" means a person (as defined in section 101(41) of the Bankruptcy Code), a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee.

82.     "*Estate*" means, as to each Plan Debtor, the estate created for that Plan Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

83.     "*Exculpated Claim*" means, except as provided herein, any Claim related to any act or omission arising from and after the Petition Date in connection with, relating to or arising out of the Plan Debtors' postpetition restructuring efforts, the Plan Debtors' Chapter 11 Cases, the Mediation, the Settled Mediation Causes of Action and other related settlement discussions, the formulation, preparation,

8

dissemination, negotiation, filing, confirmation, approval, implementation or administration of the Disclosure Statement, the Plan (and all previous disclosure statements and plans), the property to be distributed under the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Plan Debtors' Chapter 11 Cases (including the Mediation and the Mediation Settlement), the pursuit of Confirmation, the issuance of Liquidation Trust Interests, or the distribution of property under the Plan or any other related agreement; *provided*, *however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted actual fraud or criminal misconduct.  For the avoidance of doubt, no Claim, Cause of Action, obligation or liability expressly set forth in or preserved by the Plan constitutes an Exculpated Claim.

84.    "*Exculpated Parties*" means, collectively: (a) the Debtors, the Debtors' advisors and attorneys employed as of the Petition Date or retained or employed during the Chapter 11 Cases, in each case in their capacity as such; (b) the current and former Committee Members and the advisors and attorneys for the Committee, in each case, in their capacity as such; (c) the Indenture Trustees and the advisors and attorneys for the Indenture Trustees, in each case, in their capacity as such; (d) the First Lien Revolver Lenders and the advisors and attorneys for the First Lien Revolver Lenders, in each case, in their capacity as such; (e) the Term Loan Lenders and the advisors and attorneys for the Term Loan Lenders, in each case, in their capacity as such; (f) the Agents and the advisors and attorneys for the Agents, in each case, in their capacity as such; (g) the Settling Transeastern Lenders and the advisors and attorneys for the Settling Transeastern Lenders, in each case, in their capacity as such; (h) MatlinPatterson and the advisors and attorneys for MatlinPatterson, in each case, in their capacity as such; (i) Aurelius and the advisors and attorneys for Aurelius, in each case, in their capacity as such; (j) the Directors and Officers and the advisors and attorneys for the Directors and Officers, in each case, in their capacity as such; (k) the Liquidation Trustee, in its capacity as such; and (l) the Distribution Agent, if any, in its capacity as such.

85.    "*Executory Contract*" means a contract to which one or more of the Plan Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

86.    "*Existing Officers*" means John Boken and Sorana Keever, each in his or her respective capacity as an officer of the Debtors so long as each remains in such capacity until the Effective Date.

87.    "*Falcone Action*" means the adversary proceeding [Adv. Pro. No. 10-02125] commenced by the Committee on behalf of certain of the Debtors' Estates against certain parties to the Original Transeastern Settlement, as such complaint and the parties thereto may be amended from time to time.

88.    "*Fiduciary Duty Action*" means the adversary proceeding [Adv. Pro. No. 09-01616] commenced by the Committee on behalf of the Conveying Subsidiaries' Estates against TOSA, the Defendant Directors and Officers and other parties, as such complaint and the parties thereto may be amended from time to time and settled pursuant to the D&O Insurance Coverage Settlement Agreements or other settlements or compromises thereof.

89.    "*Final Administrative Claims Bar Date*" means the date that is 45 days after the Effective Date.

90.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Plan Debtor's Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing, has expired (or otherwise been waived) and no appeal or petition for certiorari or

other proceeding for a new trial, reargument or rehearing has been timely made, or as to which any right to appeal, petition for certiorari, reargue or rehear shall have been waived in writing in form and substance satisfactory to the Proponents, in consultation with the Requisite Lenders, or, on and after the Effective Date, the Liquidation Trustee, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or otherwise shall have been dismissed with prejudice.

91.    "*Final Transeastern Order*" means a Final Order entered in connection with the Transeastern Litigation or any Transeastern Litigation Settlement.

92.    "*First Cash Collateral Order*" means the *Stipulated Final Order (I) Authorizing Limited Use of Cash Collateral Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, and (II) Granting Replacement Liens, Adequate Protection and Super Priority Administrative Expense Priority to Secured Lenders*, dated June 20, 2008 [ECF No. 1226].

93.    "*First Lien Agents*" means the First Lien Revolver Agents and the First Lien Term Loan Agent.

94.    "*First Lien Agents Demand Claims*" means the alleged claims against the Defendant Directors and Officers described in the demand letter sent by counsel to the First Lien Term Loan Agent and the First Lien Revolver Agent on December 11, 2009.

95.    "*First Lien Revolver Agent*" means Citicorp, in its capacity as administrative agent, or any successor agent under the First Lien Revolving Credit Agreement.

96.    "*First Lien Revolver Agents*" means the First Lien Revolver Agent and the First Lien Revolver Sub-Agent.

97.    "*First Lien Revolver Claims*" means the Claims against the Plan Debtors derived from or based upon the First Lien Revolving Credit Agreement.

98.    "*First Lien Revolver Lenders*" means holders of secured Claims arising from the First Lien Revolving Credit Agreement, including, for the avoidance of doubt, current "Lenders" as shown on the "Register" as each such term is defined in the First Lien Revolving Credit Agreement.

99.    "*First Lien Revolver Sub-Agent*" means Gleacher Products Corp., in its capacity as revolving credit sub-agent under the First Lien Revolving Credit Agreement.

100.    "*First Lien Revolving Credit Agreement*" means that certain Second Amended and Restated Revolving Credit Agreement, dated July 31, 2007, as amended, among TOUSA and certain of its subsidiaries, as borrowers and as guarantors, Citicorp, as administrative agent, and the banks, financial institutions and other lenders party thereto that provided for revolving extensions of credit of up to an aggregate principal amount of $700 million and the other credit documents referenced therein.

101.    "*First Lien Term Loan Agent*" means Citicorp, in its capacity as administrative agent, or any successor agent under the First Lien Term Loan Credit Agreement.

102.    "*First Lien Term Loan Claims*" means, collectively, (i) the First Lien Term Loan Secured Claims and (ii) the First Lien Term Loan Deficiency Claims.

103. "*First Lien Term Loan Credit Agreement*" means that certain Credit Agreement, dated July 31, 2007, among TOUSA and certain of its subsidiaries, as borrowers and as guarantors, Citicorp, as administrative agent, and the banks, financial institutions and other lenders party thereto pursuant to which first lien term loans in an aggregate principal amount of $200 million were made and the other credit documents referenced therein.

104. "*First Lien Term Loan Deficiency Claim Amount*" means the Allowed amount of the First Lien Term Loan Claims that exceeds the amount of the First Lien Term Loan Secured Claims.

105. "*First Lien Term Loan Deficiency Claims*" means Claims of the First Lien Term Loan Lenders against TOUSA for the portion of such lenders' Claims that exceeds the value of such lenders' interest in TOUSA's property securing such Claims.

106. "*First Lien Term Loan Lender Defendants*" means the First Lien Term Loan Lenders and former lenders under the First Lien Term Loan Credit Agreement required, pursuant to the Bankruptcy Court Decision or the Quantification Order, to disgorge and/or forego receipt of (a) professional fees paid for the benefit of the First Lien Term Loan Agent and the First Lien Term Loan Lenders or former lenders, (b) prepetition and postpetition principal and interest payments on the First Lien Term Loan Claims and/or (c) a Certifying Lender Tax Refund Payment or an Unpaid Lender Tax Refund Payment.

107. "*First Lien Term Loan Professional Fee Disgorgement*" means the disgorgement of payments in respect of professional fees paid for the benefit of the First Lien Term Loan Agent and the First Lien Term Loan Lenders ordered to be disgorged pursuant to the Bankruptcy Court Decision and the Quantification Order in the amount of $25,170,432, plus prejudgment and postjudgment interest thereon in accordance with the terms of Article V.C.1(c) of the Plan.

108. "*First Lien Term Loan Lenders*" means holders of Claims arising from the First Lien Term Loan Credit Agreement, including, for the avoidance of doubt, current "Lenders" as shown on the "Register" as each such term is defined in the First Lien Term Loan Credit Agreement.

109. "*First Lien Term Loan Secured Claims*" means the secured portion of all Claims against TOUSA derived from or based upon the First Lien Term Loan Credit Agreement.

110. "*First Lien's Liquidation Trust Representative*" means one Member of the Liquidation Trust Advisory Board to be appointed by holders of a majority in amount of First Lien Term Loan Claims and First Lien Revolver Claims that are entitled to receive TOUSA Class 1B Transeastern Liquidation Trust Interests pursuant to the Plan and the Intercreditor Settlement Agreement.

111. "*GCAT*" means Grand Central Asset Trust, CED Series, in its capacity as a Transeastern Lender.

112. "*General Unsecured Claim*" means any Unsecured Claim against any of the Plan Debtors that is not a Priority Tax Claim, Administrative Claim, Accrued Professional Compensation Claim, Senior Note Claim, Senior Note Guaranty Claim, Subordinated Note Claim, Subordinated Note Guaranty Claim, Chinese Drywall Claim, PIK Note Claim, Other Priority Claim, Prepetition Intercompany Claim, Postpetition Intercompany Claim, Term Loan Deficiency Claim or Transeastern Claim.

113. "*Governmental Bar Date*" means July 28, 2008.

114. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

115.    "*Increased Monarch Settlement Payment*" means $1,125,000 to be paid by Monarch to the Conveying Subsidiaries Account within three (3) Business Days of the Effective Date to account for the Updated Monarch Settlement Percentage.

116.    "*Indenture Trustees*" means, collectively, the Indenture Trustees for each of the series of Senior Notes, Subordinated Notes and PIK Notes.

117.    "*Initial Administrative Claims Bar Date*" means May 14, 2010, the date specifically fixed by order of the Bankruptcy Court [ECF No. 5125] for the filing of Administrative Claims arising between January 29, 2008 and September 1, 2009, other than Claims for compensation of Retained Professionals.

118.    "*Initial Claims Bar Date*" means May 19, 2008, the deadline specifically fixed by the Initial Claims Bar Date Order for the filing of proofs of claim against the Debtors (excluding Beacon Hill).

119.    "*Initial Claims Bar Date Order*" means the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim and (C) Approving Notice Thereof*, entered by the Bankruptcy Court on March 17, 2008 [ECF No. 614].

120.    "*Initial Distribution Date*" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

121.    "*Initial Monarch Settlement Payment*" means the initial settlement payment paid by Monarch pursuant to the Monarch Settlement Agreement in the amount of $19,543,500 (or 43.43% of $45 million), in respect of the Monarch Settling Parties' exposure under the Transeastern Judgment.

122.    "*Intercompany Notes*" means the documented, prepetition intercompany notes among the Debtors that were historically treated as debt.  For the avoidance of doubt, Intercompany Notes do not include the prepetition agreements that the Debtors historically treated as equity.

123.    "*Intercreditor Agreement*" means that certain intercreditor agreement, dated as of July 31, 2007, among the First Lien Revolver Agent, the First Lien Term Loan Agent and the Second Lien Term Loan Agent.

124.    "*Intercreditor Settlement Agreement*" means that certain settlement agreement, dated as of May 8, 2013, attached hereto as Exhibit C, by and among the First Lien Agents, the First Lien Revolver Lenders, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent and the Second Lien Term Loan Lenders resolving certain issues and disputes arising under or relating to the Intercreditor Agreement.

125.    "*Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Plan Debtors, whether or not transferable, issued or outstanding, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Plan Debtor.

126.    "*Lender Transeastern Liquidation Trust Interests*" means the TOUSA Class 1B Transeastern Liquidation Trust Interests and the TOUSA Class 2 Transeastern Liquidation Trust Interests.

127.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code; *provided, however*, that any lien avoided in accordance with section 544, 545, 547, 548 or 549 of the Bankruptcy Code shall not constitute a Lien.

128.     "*Lien Claims Bar Date*" means May 14, 2010.

129.     "*Liquidation Trust*" means the trust created pursuant to the Liquidation Trust Agreement on the Effective Date in accordance with the Plan, the Confirmation Order and the Liquidation Trust Agreement.

130.     "*Liquidation Trust Advisory Board*" means the four-member advisory board of the Liquidation Trust to be established pursuant to Article XI.D of the Plan, which shall consist of the Unsecured Creditors' Liquidation Trust Representatives, the First Lien's Liquidation Trust Representative and the Second Lien's Liquidation Trust Representative.

131.     "*Liquidation Trust Agreement*" means the Liquidation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Liquidation Trust, substantially in the form attached hereto as Exhibit B.

132.     "*Liquidation Trust Assets*" means the Liquidation Trust Causes of Action (including the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets) and the proceeds thereof, and any interest and earnings on such proceeds, which shall be transferred to the Liquidation Trust on the Effective Date.

133.     "*Liquidation Trust Beneficiaries*" means holders of Liquidation Trust Interests.

134.     "*Liquidation Trust Causes of Action*" means collectively, the Claims and Causes of Action transferred to the Liquidation Trust on the Effective Date, including, but not limited to, those Claims and Causes of Action set forth on Exhibit D to the Plan.  For the avoidance of doubt, the Liquidation Trust Causes of Action shall not include the Settled Mediation Causes of Action.

135.     "*Liquidation Trust Interests*" means TOUSA Class 1B General Liquidation Trust Interests, TOUSA Class 1B Transeastern Liquidation Trust Interests, TOUSA Class 2 General Liquidation Trust Interests, TOUSA Class 2 Transeastern Liquidation Trust Interests, TOUSA Class 5A Liquidation Trust Interests, TOUSA Class 5B Liquidation Trust Interests, Conveying Subsidiaries Class 4A Liquidation Trust Interests, Conveying Subsidiaries Class 4B Contingent Liquidation Trust Interests and Conveying Subsidiaries Class 4B Liquidation Trust Interests.

136.     "*Liquidation Trust Loan*" means a loan to the Liquidation Trust in the amount of $5 million in Cash, to be funded as follows: (i) $2.5 million funded *Pro Rata* from recoveries otherwise allocable hereunder to holders of Allowed Unsecured Claims against the Conveying Subsidiaries and (ii) (A) 70% of $2.5 million funded *Pro Rata* from recoveries otherwise allocable hereunder to the holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (B) 30% of $2.5 million funded *Pro Rata* from the recoveries otherwise allocable hereunder to holders of Allowed TOUSA Class 2 Claims.

137.     "*Liquidation Trustee*" means the person or firm to be appointed by the Committee and the Requisite Lenders, and who is reasonably acceptable to the Plan Debtors, to manage the Liquidation Trust pursuant to Article XI.D of the Plan and the Liquidation Trust Agreement.

138.     "*Loan Documents*" means, collectively, the First Lien Revolving Credit Agreement, the First Lien Term Loan Credit Agreement, the Second Lien Term Loan Credit Agreement and any other agreements related thereto.

139.    "*Lot Option Agreement Claims*" means certain Claims other than funded debt Claims against TOUSA Homes, Inc. in the approximate amount of $50 million in the aggregate, the holders of which have asserted that such Claims are entitled to treatment as "Senior Debt," as such term is defined in the Subordinated Note Indenture and as further described in Article V.I.5(e) of the Plan.

140.    "*Lot Option Agreement Dispute*" means the disputes related to the Lot Option Agreement Claims, including (i) whether the Lot Option Agreement Claims are entitled to treatment as Senior Debt and (ii) when reallocating recoveries otherwise allocable to the holders of Subordinated Note Guaranty Claims at TOUSA Homes, Inc. to Senior Debt at TOUSA Homes, Inc., whether the Claims entitled to be treated as Senior Debt include, solely for purposes of allocation of such recoveries, the accrual of postpetition interest from the Petition Date.

141.    "*MatlinPatterson*" means MatlinPatterson Global Advisers.

142.    "*Mediation*" means the mediation ordered by the Bankruptcy Court pursuant to the Mediation Order.

143.    "*Mediation Model Case F*" means the model developed in connection with the Mediation, and the drivers and data incorporated therein, that forms the basis for the Mediation Settlement.

144.    "*Mediation Order*" means the *Order Directing Mediation Regarding the Joint Plan of Liquidation of TOUSA, Inc. and Certain of Its Affiliated Debtors and Debtors in Possession*, dated August 27, 2010 [ECF No. 6042].

145.    "*Mediation Settlement*" means the good-faith settlement among the Settlement Parties in respect of the Settled Mediation Causes of Action.

146.    "*Member*" means a member of the Liquidation Trust Advisory Board.

147.    "*Minimum Conveying Subsidiary Recovery Adjustment*" means the difference between the Minimum Conveying Subsidiary Recovery Amount and the recovery a holder of Allowed Class 4B General Unsecured Claims against an applicable Conveying Subsidiary otherwise would have received under Article III.D.4(b) of the Plan absent payment of the Minimum Conveying Subsidiary Recovery Amount.

148.    "*Minimum Conveying Subsidiary Recovery Amount*" means Cash in an amount equal to 5% of the Allowed amount of the applicable General Unsecured Claim against a Conveying Subsidiary, which shall be paid, to the extent applicable, from the Unsecured Creditor D&O Recovery otherwise allocable to TOUSA Homes, Inc.

149.    "*Models*" means Mediation Model Case F and the Committee Model.

150.    "*Monarch*" means, collectively, Monarch Master Funding Ltd. and Monarch Alternative Capital LP, in its capacity as an investment advisor to Monarch Master Funding Ltd.

151.    "*Monarch Mediation Settlement Payment*" means $3,444,750 to be paid by Monarch to the Conveying Subsidiaries Account pursuant to the Mediation Settlement in settlement of the Monarch Supplemental Payment Obligation.

152.    "*Monarch Settlement Agreement*" means the settlement and compromise by and among the Conveying Subsidiaries, the Committee and Monarch, as set forth in the *Settlement Agreement Relating to Committee Action (Official Committee of Unsecured Creditors v. Citicorp, North America, Inc., et al., Adv. Pro. No. 08-1435 (JKO) (Bankr. S.D. Fla.))*, Exhibit A to *Joint Motion of the Conveying Subsidiaries, the Official Committee of Unsecured Creditors, and Monarch Alternative Capital LP, as Investment Advisor to Monarch Master Funding, Ltd, for Entry of an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving the Partial Settlement of the Transeastern Committee Action*, dated March 2, 2012 [ECF No. 8553].

153.    "*Monarch Settlement Payments*" means the Initial Monarch Settlement Payment, the Increased Monarch Settlement Payment and the Monarch Mediation Settlement Payment.

154.    "*Monarch Settling Parties*" means the Settling Transeastern Lenders (as defined in the Monarch Settlement Agreement), but solely to the extent of such Settling Transeastern Lenders' share of the Transeastern Disgorgement settled thereunder (as supplemented hereunder).  As set forth herein, GCAT and Barclays shall each be deemed a Monarch Settling Party hereunder and a "Settling Transeastern Lender" under the Monarch Settlement Agreement, each solely to the extent of the Additional Monarch Transeastern Liability.

155.    "*Monarch Supplemental Payment Obligation*" means Monarch's obligation, pursuant to the Monarch Settlement Agreement, in the event that a final order is entered in the Transeastern Litigation, pursuant to which the Conveying Subsidiaries are awarded monetary damages in excess of $45 million, to pay an additional settlement payment to the Conveying Subsidiaries Account equal to 43.43% (updated based on the Updated Monarch Settlement Percentage, 45.93%) of the lesser of (x) $30 million, or $13,029,000 (updated to be $13,779,000 based on the Updated Monarch Settlement Percentage) or (y) the amount by which the actual award to the Conveying Subsidiaries in a final order in the Transeastern Litigation (after taking into account the amount the Monarch Settling Parties would have been required to disgorge if they had not entered into the Monarch Settlement Agreement, or to the extent applicable, had been released from the Transeastern Litigation) exceeds $45 million, up to $75 million.

156.    "*Monarch/Trilogy Demand Claims*" means the alleged claims against the Defendant Directors and Officers described in a demand letter sent by counsel to Monarch and Trilogy Capital LLC on December 11, 2009.

157.    "*Net Proceeds*" means the proceeds derived from the disposition of the Liquidation Trust Assets, including prosecution of the Liquidation Trust Causes of Action, less any costs related to such sale or litigation, whether such costs are subtracted from such proceeds at the time of or after the closing of such sale or resolution of such litigation.

158.    "*Non-Certifying First Lien Term Loan Lender Defendants*" means the First Lien Term Loan Lender Defendants who, if appropriate certifications had been provided under the First Cash Collateral Order, would have been entitled, at the time the First Cash Collateral Order was entered, to receive a portion of the Unpaid Lender Tax Refund Payment.

159.    "*Non-Defendant Directors and Officers*" means the current and former directors and officers of the Debtors who are not defendants in the Fiduciary Duty Action.  For the avoidance of doubt, the Non-Defendant Directors and Officers include the Existing Officers.

160.    "*Non-Settling Transeastern Lenders*" means the Transeastern Lenders who are not Settling Transeastern Lenders.

161.    "*Non-Term Loan Lender Unsecured Creditors*" means (a) holders of Senior Note Claims at TOUSA and Senior Note Guaranty Claims at each applicable Conveying Subsidiary, (b) holders of General Unsecured Claims at TOUSA and each applicable Conveying Subsidiary and (c) holders of Subordinated Note Claims at TOUSA and Subordinated Note Guaranty Claims at each applicable Conveying Subsidiary; *provided, however,* that any value otherwise allocable to holders of Subordinated Note Claims and Subordinated Note Guaranty Claims shall be reallocated to holders of Senior Note Claims and Senior Note Guaranty Claims in accordance with the subordination provisions of the Subordinated Note Indentures.

162.    "*Opt-Out Holder*" means any holder of Lender Transeastern Liquidation Trust Interests that opts out of any Transeastern Litigation Settlement, as set forth in Article V.C.1(e) of the Plan.

163.    "*Opt-Out Percentage*" means, with respect to an Opt-Out Holder, such Opt-Out Holder's percentage share of any Term Loan Lender Transeastern Recovery.

164.    "*Ordinary Course Professionals Order*" means the *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business,* entered by the Bankruptcy Court on February 4, 2008 [ECF No. 148], as amended from time to time.

165.    "*Original Transeastern Judgment*" means the Bankruptcy Court Decision as it relates to the Transeastern Lenders.

166.    "*Original Transeastern Settlement*" means the July 31, 2007, global settlement of litigation and other claims relating to the Transeastern JV.

167.    "*Other Deficiency Claims*" means the Claims against the Plan Debtors of all secured lenders, other than the Term Loan Deficiency Claims, for the portion of such lenders' Claims that exceeds the value of such lenders' interest in the applicable Plan Debtor's property securing such Claims.

168.    "*Other Priority Claim*" means any Claim against a Plan Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

169.    "*Other Secured Claim*" means the secured portion of any Claim against a Plan Debtor, other than a First Lien Revolver Claim, First Lien Term Loan Claim or Second Lien Term Loan Claim.

170.    "*Periodic Distribution Date*" means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Initial Distribution Date, and thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date until liquidation of the Liquidation Trust Assets is complete.

171.    "*Petition Date*" means the applicable date on which a Debtor commenced its Chapter 11 Case.

172.    "*PIK Note Claim*" means any Claim against TOUSA other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the PIK Notes.

173.    "*PIK Note Indenture*" means the indenture for the PIK Notes.

174.    "*PIK Notes*" means the $20 million 14.75% Senior Subordinated PIK Notes due July 1, 2015, issued by TOUSA and guaranteed by certain subsidiaries of TOUSA, pursuant to the indenture dated July 31, 2007.

16

175. "*PIK Notes Stipulation*" means the settlement among the Committee and certain holders of the PIK Notes, as approved by the order dated February 5, 2010 [Adv. Pro. No. 08-01435, ECF No. 897].

176. "*Plan*" means this *Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors In Possession Under Chapter 11 of the Bankruptcy Code* dated May 15, 2013, as it may be amended, supplemented or modified from time to time.

177. "*Plan Debtors*" means the Debtors other than TOUSA Homes, L.P.

178. "*Postpetition Contract*" means any Executory Contract or Unexpired Lease entered into or assumed by the applicable Plan Debtor(s) prior to the Effective Date.

179. "*Postpetition Intercompany Claim*" means a Claim arising from and after the Petition Date of one Plan Debtor against another Plan Debtor for assets or Cash transferred to or for the benefit of such Plan Debtor after the Petition Date.

180. "*Prepetition Intercompany Claim*" means any prepetition Claim of a Plan Debtor against another Plan Debtor that is not an Intercompany Note.

181. "*Prepetition Secured Lender Demand Claims*" means the First Lien Agents Demand Claims and the Monarch/Trilogy Demand Claims.

182. "*Prepetition Secured Lenders*" means, collectively, the First Lien Revolver Lenders, First Lien Term Loan Lenders and Second Lien Term Loan Lenders.

183. "*Principal and Interest Disgorgement*" means the prepetition and postpetition principal and interest payments on the First Lien Term Loan Claims ordered to be disgorged pursuant to the Bankruptcy Court Decision and the Quantification Order in the amount of $29,550,726, plus prejudgment and postjudgment interest thereon in accordance with the terms of Article V.C.1(c) of the Plan.

184. "*Priority Tax Claim*" means any Claim against a Plan Debtor of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

185. "*Pro Rata*" means the proportion by amount that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion by amount that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

186. "*Professional Fee Accounts*" means the professional fee escrow accounts established pursuant to paragraph 14 of the Cash Collateral Order.

187. "*Proof of Claim*" means a proof of claim filed against any of the Plan Debtors in the Chapter 11 Cases.

188. "*Proponents*" means the Debtors and the Committee as proponents of the Plan.

189. "*Quantification Order*" means the *Order Granting the Official Committee of Unsecured Creditors' Motion to Set Payment Amounts*, entered on July 13, 2010, in the Committee Action [Adv. Pro. No. 08-01435, ECF No. 1037].

190.    "*Released Party*" means each, and solely in its capacity as such, Settlement Party and such Settlement Party's predecessors, predecessors in interest, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and each of the foregoing's current and former officers, directors, managers, principals, shareholders, members, limited and general partners, employees, trustees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.  Notwithstanding the foregoing, a Released Party shall not include (i) any professional engaged by the Debtors prior to the Petition Date who was not retained by the Debtors in connection with the Chapter 11 Cases as an ordinary course professional or pursuant to an order of the Bankruptcy Court or (ii) any Entity that entered into a tolling agreement with the Debtors in connection with the Chapter 11 Cases.

191.    "*Released Settlement Claims*" means any and all Claims that have been or could be asserted at any time in the past, present or future by or on behalf of a Releasing Settlement Party against a Released Party in connection with, arising out of or in any way relating to the Debtors, the Chapter 11 Cases, the Loan Documents or the Settled Mediation Causes of Action.

192.    "*Releasing Settlement Party*" means (i) each Settlement Party (other than Aurelius) and any of such Settlement Party's predecessors, predecessors in interest, successors and assigns, subsidiaries, controlled affiliates, managed accounts or funds, and each of the foregoing's current and former officers, directors, managers, principals, shareholders, members, partners, employees, trustees and agents and (ii) Aurelius, in each case solely in their capacity as such with respect to a Released Settlement Claim.  For the avoidance of doubt, the Releasing Settlement Parties include (a) former lenders under the First Lien Term Loan Credit Agreement, other than First Lien Term Loan Lenders or First Lien Term Loan Lender Defendants, (b) former lenders under the First Lien Revolving Credit Agreement, other than First Lien Revolver Lenders and (c) former lenders under the Second Lien Term Loan Credit Agreement, other than Second Lien Term Loan Lenders or Second Lien Term Loan Lender Defendants.

193.    "*Remaining Contingent Assets*" means the Plan Debtors' right, title and interest in any Liquidation Trust Causes of Action, other than the Transeastern Litigation, which shall be transferred to, and/or vest in, the Liquidation Trust for the benefit of the applicable Plan Debtor's unsecured creditors, including, with respect to TOUSA, the Term Loan Lenders on account of the Term Loan Deficiency Claims.  For the avoidance of doubt, the Remaining Contingent Assets shall include, among other things, any and all Claims or Causes of Action not settled under the Plan, including those arising under or in connection with chapter 5 of the Bankruptcy Code, the RSUI Insurance Coverage Action and, with respect to the Conveying Subsidiaries, the Falcone Action and the proceeds of any of the foregoing Claims or Causes of Action, and any interest and earnings on such proceeds.

194.    "*Requisite Lenders*" means (a) holders of a majority in amount of the First Lien Term Loan Claims and (b) holders of a majority in amount of Second Lien Term Loan Claims.

195.    "*Retained Professional*" means any Entity: (i) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with section 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before the Effective Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

196.    "*Revolver Paydown*" means the aggregate amounts paid to the First Lien Revolver Agent, representing principal and non-default interest amounts outstanding under the First Lien Revolving Credit Agreement as of October 31, 2011 pursuant to the Revolver Paydown Order.

197. "*Revolver Paydown Order*" means the *Order Authorizing and Directing the Debtors to Repay Certain Secured Claims Pursuant to 11 U.S.C. §§ 105 and 363*, entered by the Bankruptcy Court on November 18, 2011 [ECF No. 8385].

198. "*Robbins Russell*" means Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, co-counsel to the Committee.

199. "*RSUI*" means RSUI Indemnity Company, a D&O Insurer, who is a defendant in the D&O Insurance Coverage Action but will not be a party to the D&O Insurance Coverage Settlement.

200. "*RSUI Insurance Coverage Action*" means the D&O Insurance Coverage Action as it relates to defendant RSUI, which action will not be settled or dismissed pursuant to the D&O Insurance Coverage Settlement and that will be transferred to the Liquidation Trust on the Effective Date. For the avoidance of doubt, any proceeds obtained from the RSUI Insurance Coverage Action shall be allocated among the Term Loan Lenders and the Conveying Subsidiaries in the same proportion as the D&O Insurance Settlement Amount, as described in Article III of the Plan.

201. "*RSUI Insurance Coverage Action Recovery*" means any recovery, disgorgement, settlement payment or other payment received in connection with the RSUI Insurance Coverage Action pursuant to a Final Order.

202. "*RVA*" means the remaining value analysis performed by the Debtors, as ordered in the Bankruptcy Court Decision and set forth in the Debtors' Remaining Value Analysis [Adv. Pro. No. 08-01435, ECF No. 753], which was filed under seal on November 12, 2009, and the Debtors' Remaining Value Analysis Amendment [Adv. Pro. No. 08-01435, ECF No. 778], which was filed under seal on December 4, 2009, as the same may have been amended, modified or supplemented.

203. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as such schedules may have been amended, modified or supplemented from time to time.

204. "*SEC*" means the United States Securities and Exchange Commission.

205. "*Second Lien Term Loan Agent*" means Wells Fargo Bank, N.A., as successor to Citicorp, in its capacity as administrative agent under the Second Lien Term Loan Credit Agreement, and any of its successors or assigns.

206. "*Second Lien Term Loan Claims*" means, collectively, the (i) Second Lien Term Loan Secured Claims and (ii) the Second Lien Term Loan Deficiency Claims.

207. "*Second Lien Term Loan Credit Agreement*" means that certain Second Lien Term Loan Credit Agreement, dated July 31, 2007, among TOUSA and certain of its subsidiaries as borrowers and as guarantors, Citicorp as administrative agent, and the banks, financial institutions and other lenders party thereto pursuant to which second lien term loans in an aggregate principal amount of $300 million were made, and the other credit documents referenced therein.

208. "*Second Lien Term Loan Deficiency Claim Amount*" means the Allowed amount of the Second Lien Term Loan Claims that exceeds the amount of the Second Lien Term Loan Secured Claims.

209.    "*Second Lien Term Loan Deficiency Claims*" means Claims of the Second Lien Term Loan Lenders against TOUSA for the portion of such lenders' Claims that exceeds the value of such lenders' interest in TOUSA's property securing such Claims.

210.    "*Second Lien Term Loan Lender Defendants*" means the Second Lien Term Loan Lenders and former lenders under the Second Lien Term Loan Credit Agreement ordered to disgorge professional fees paid for the benefit of the Second Lien Term Loan Agent and such Second Lien Term Loan Lenders or former lenders pursuant to the Bankruptcy Court Decision and the Quantification Order.

211.    "*Second Lien Term Loan Lenders*" means holders of Claims arising from the Second Lien Term Loan Credit Agreement, including, for the avoidance of doubt, current "Lenders" as shown on the "Register" as each such term is defined in the Second Lien Term Loan Credit Agreement.

212.    "*Second Lien Term Loan Professional Fee Disgorgement*" means the disgorgement of payments in respect of professional fees paid for the benefit of the Second Lien Term Loan Agent and the Second Lien Term Loan Lenders ordered to be disgorged pursuant to the Bankruptcy Court Decision and the Quantification Order in the aggregate amount of $22,797,461, plus prepetition and postjudgment interest thereon in accordance with the terms of Article V.C.1(c) of the Plan.

213.    "*Second Lien Term Loan Secured Claims*" means the secured portion of all Claims against TOUSA derived from or based upon the Second Lien Term Loan Credit Agreement.

214.    "*Second Lien's Liquidation Trust Representative*" means one Member of the Liquidation Trust Advisory Board to be appointed by holders of a majority in amount of Second Lien Term Loan Claims that are entitled to receive TOUSA Class 2 Transeastern Liquidation Trust Interests.

215.    "*Senior Debt*" has the meaning given to such term under the Subordinated Note Indentures and the PIK Note Indenture, as the case may be, and includes all of the applicable Plan Debtors' obligations with respect to the debt under the applicable indentures and includes (1) all obligations for interest, including any interest accrued and (2) all related fees, expenses and all other amounts payable.  For the avoidance of doubt, the Senior Note Claims are Senior Debt at TOUSA, the Senior Note Guaranty Claims are Senior Debt at each of the Conveying Subsidiaries and the Term Loan Deficiency Claims are Senior Debt at TOUSA.

216.    "*Senior Note Claim*" means any Claim against TOUSA other than a Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code derived from or based upon the Senior Notes.

217.    "*Senior Note Guaranty Claim*" means any Claim against a Conveying Subsidiary other than a Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code derived from or based upon such Conveying Subsidiary's guaranty of the Senior Notes.

218.    "*Senior Note Indenture Trustees*" means the indenture trustees under the Senior Notes Indentures.

219.    "*Senior Note Indentures*" means, collectively, the indentures for each of the series of Senior Notes.

220.    "*Senior Notes*" means (a) the $200 million 9.0% Senior Notes due July 1, 2010, (b) the $100 million 9.0% Senior Notes due July 1, 2010 and (c) the $250 million 8.25% Senior Notes due April

1, 2011, all issued by TOUSA and guaranteed by certain subsidiaries of TOUSA pursuant to the indentures (as supplemented) dated June 25, 2002, February 3, 2003 and April 12, 2006, respectively.

221.    "*Settled Mediation Causes of Action*" means (i) the Committee Action, other than with respect to the Non-Settling Transeastern Lenders; (ii) disputes arising under or relating to the Intercreditor Agreement to the extent resolved under the Plan; and (iii) any and all Claims or Causes of Action asserted by a Releasing Settlement Party against a Released Party in connection with the Chapter 11 Cases, other than those Claims specifically preserved in Article VIII of the Plan.  For the avoidance of doubt, the Settled Mediation Causes of Action shall not include the Fiduciary Duty Action or the D&O Insurance Coverage Action which are subject to the D&O Insurance Coverage Settlement as set forth in the D&O Insurance Coverage Settlement Agreements.

222.    "*Settlement Parties*" means, solely in their capacity as such, (i) the Debtors, (ii) the Committee, (iii) the First Lien Revolver Agent, (iv) the First Lien Revolver Sub-Agent, (v) the First Lien Term Loan Agent, (vi) the Second Lien Term Loan Agent, (vii) the First Lien Term Loan Lenders, (viii) the First Lien Term Loan Lenders, (ix) the First Lien Term Loan Lender Defendants, (x) the Second Lien Term Loan Lenders, (xi) the Second Lien Term Loan Lender Defendants, (xi) the Settling Transeastern Lenders, (xii) MatlinPatterson, in its capacity as a holder of Claims against the Plan Debtors, (xiii) Monarch, in its capacity as a holder of Claims against the Debtors, (xiv) Aurelius, in its capacity as a holder of Claims against the Debtors and (xv) the Non-Defendant Directors and Officers.  For the avoidance of doubt, the Settlement Parties do not include TOSA, the Defendant Directors and Officers and the Settling D&O Insurers who are subject to the D&O Insurance Coverage Settlement as set forth in the D&O Insurance Coverage Settlement Agreement.

223.    "*Settling D&O Insurers*" means the D&O Insurers who entered into the D&O Insurance Coverage Settlement with the Debtors and the Defendant Directors and Officers, whereby such D&O Insurers agreed to settle their prospective liability in the D&O Insurance Coverage Action for the D&O Insurance Settlement Amount.  For the avoidance of doubt, the Settling D&O Insurers do not include RSUI.

224.    "*Settling Transeastern Lenders*" means, collectively (i) the Monarch Settling Parties and (ii) the Transeastern Offshore Funds party to the Transeastern Offshore Settlement Agreement.

225.    "*Subordinated Note Claim*" means any Claim against TOUSA other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon the Subordinated Notes.

226.    "*Subordinated Note Guaranty Claim*" means any Claim against a Conveying Subsidiary other than a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code derived from or based upon such Conveying Subsidiary's guaranty of the Subordinated Notes.

227.    "*Subordinated Note Indentures*" means, collectively, the indentures for each of the series of Subordinated Notes.

228.    "*Subordinated Notes*" means (a) the $125 million 7.5% Senior Subordinated Notes due March 15, 2011, (b) the $200 million 7.5% Senior Subordinated Notes due March 15, 2015 and (c) the $185 million 10.375% Senior Subordinated Notes due July 1, 2012, all issued by TOUSA and guaranteed by certain subsidiaries of TOUSA pursuant to the indentures (as supplemented) dated March 17, 2004, December 21, 2004, and June 25, 2002, respectively.

229.    "*Tax Authority*" means a federal, state, local or foreign government or agency, instrumentality or employee thereof, or a court or other body charged with the administration of any law relating to Taxes.

230.    "*Tax Code*" means the Internal Revenue Code of 1986, as amended.

231.    "*Taxes*" means all (i) federal, state, local or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, capital, value-added, franchise, profits and estimated taxes and (ii) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (i) hereof.

232.    "*Tax Refund Recovery True-Up Payment*" means, with respect to a Certifying First Lien Term Loan Lender Defendant, a payment in Cash in the amount of 2.35% of the portion of the Certifying Lender Tax Refund Payment previously paid to such Certifying First Lien Term Loan Lender Defendant.

233.    "*Term Loan Deficiency Claims*" means the First Lien Term Loan Deficiency Claims and the Second Lien Term Loan Deficiency Claims.

234.    "*Term Loan Lender D&O Recovery*" means the funds to be paid by the Settling D&O Insurers pursuant to the D&O Settlement Order for the benefit of the Term Loan Lenders in respect of any claims that the Term Loan Lenders had or may have had against the Defendant Directors and Officers, in the aggregate amount of $19,142,857.14 (or 2/7 of the D&O Insurance Settlement Amount).

235.    "*Term Loan Lender Defendants*" means the First Lien Term Loan Lender Defendants and the Second Lien Term Loan Lender Defendants.

236.    "*Term Loan Lender Disgorgement Payment*" means the amount to be disgorged by a Term Loan Lender and paid to the Liquidation Trust for the benefit of holders of Allowed Unsecured Claims against TOUSA and holders of Allowed Unsecured Claims against the Conveying Subsidiaries, as set forth in Article V.C.1(c) of the Plan.

237.    "*Term Loan Lender Professional Fee Disgorgements*" means the First Lien Term Loan Professional Fee Disgorgement and the Second Lien Term Loan Professional Fee Disgorgement.

238.    "*Term Loan Lender RSUI Insurance Coverage Action Recovery*" means 28.57% of each dollar of the RSUI Insurance Coverage Action Recovery, 40% of which shall be allocated for the benefit of the holders of the TOUSA Class 1B General Liquidation Trust Interests and 60% of which shall be allocated for the benefit of the holders of TOUSA Class 2 General Liquidation Trust Interests.

239.    "*Term Loan Lender Tax Refund Recovery*" means 70% of the Term Loan Lender Tax Refund Share.

240.    "*Term Loan Lender Tax Refund Share*" means the portion of the 2007 Federal Tax Refund against which the First Lien Term Loan Lenders asserted a lien in the aggregate amount of $102,473,572.

241.    "*Term Loan Lender Transeastern Recovery*" means 50% of each dollar of Transeastern Disgorgement until such time as holders of the Conveying Subsidiaries Liquidation Trust Interests have received an aggregate of $37.75 million in Net Proceeds from the Non-Settling Transeastern Lenders (exclusive of any funds allocable to repayment of the Liquidation Trust Loan) and, thereafter, 100% of such Transeastern Disgorgement.

242.    "*Term Loan Lenders*" means the First Lien Term Loan Lenders and Second Lien Term Loan Lenders.

243.    "*Tort Claim*" means any Claim, other than a Chinese Drywall Claim, against a Plan Debtor that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

244.    "*TOSA*" means Technical Olympic S.A.

245.    "*TOUSA*" means TOUSA, Inc.

246.    "*TOUSA Class 1B General Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 1B Claims, which shall entitle each such holder to (i) a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of the Remaining Contingent Assets allocable to the First Lien Term Loan Lenders on account of the First Lien Term Loan Deficiency Claims and (ii) a *Pro Rata* share of 40% of the Term Loan Lender RSUI Insurance Coverage Action Recovery.

247.    "*TOUSA Class 1B Transeastern Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 1B Claims, which shall entitle each such holder to a *Pro Rata* share of 70% of the Term Loan Lender Transeastern Recovery.

248.    "*TOUSA Class 2 General Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 2 Claims, which shall entitle each such holder to (i) a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of the Remaining Contingent Assets allocable to the Second Lien Term Loan Lenders on account of the Second Lien Term Loan Deficiency Claims and (ii) a *Pro Rata* share of 60% of the Term Loan Lender RSUI Insurance Coverage Action Recovery allocable to the Second Lien Term Loan Lenders on account of the Second Lien Term Loan Deficiency Claims, each of the foregoing not subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement.

249.    "*TOUSA Class 2 Transeastern Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 2 Claims, which shall entitle each such holder to a *Pro Rata* share of 30% of the Term Loan Lender Transeastern Recovery (not subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement).

250.    "*TOUSA Class 5A Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 5A Claims, which shall entitle each such holder to a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of the Remaining Contingent Assets allocable to TOUSA.

251.    "*TOUSA Class 5B Liquidation Trust Interests*" means beneficial interests in the Liquidation Trust granted to holders of Allowed TOUSA Class 5B Claims, which shall entitle each such holder to a *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of the Remaining Contingent Assets allocable to TOUSA.

252.    "*TOUSA Funding*" means TOUSA Funding, LLC, the entity that holds certain interest-bearing notes from TOUSA Texas, LP and TOUSA Homes, Inc.

253.    "*TOUSA Term Loan Lender Disgorgement Share*" means that portion of the Term Loan Lender Disgorgement Payments to be allocated to TOUSA, which shall include (i) 12.5% of the First Lien Term Loan Professional Fee Disgorgement and (ii) 12.5% of the Second Lien Term Loan Professional Fee Disgorgement.

254.    "*Transeastern Claim*" means any Claim asserted by a Transeastern Lender against the Plan Debtors, which shall be deemed a Disputed Claim.

255.    "*Transeastern Credit Agreement*" means that certain Credit Agreement, dated August 1, 2005, among TE/TOUSA Senior, LLC as co-borrower, EH/Transeastern, LLC as co-borrower and guarantor, Deutsche Bank Trust Company Americas as administrative agent and the banks, financial institutions and other lenders party thereto pursuant to which loans in an aggregate principal amount of $450 million were made and the other credit documents referenced therein.

256.    "*Transeastern Disgorgement*" means any recovery, disgorgement, settlement payment or other payment received from the Non-Settling Transeastern Lenders pursuant to any Final Transeastern Order(s).

257.    "*Transeastern Judgment*" means the Original Transeastern Judgment, as affirmed by the Eleventh Circuit Decision.

258.    "*Transeastern JV*" means the Entity formed by TOUSA Homes, L.P. and certain Entities related to Falcone/Ritchie LLC to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc.

259.    "*Transeastern Lenders*" means the lenders pursuant to the Transeastern Credit Agreement.

260.    "*Transeastern Litigation*" means the Committee Action, solely as it relates to the claims asserted against the Transeastern Lenders.

261.    "*Transeastern Litigation Settlement*" means any settlement reached between the Liquidation Trust and one or more of the Non-Settling Transeastern Lenders in connection with the Transeastern Litigation, as evidenced by a written agreement executed by the Liquidation Trustee and such Non-Settling Transeastern Lender(s) in a form sufficiently binding to be presented to the Bankruptcy Court for approval.

262.    "*Transeastern Offshore Disgorgement*" means the $2.9 million disgorged, plus any interest earned thereon, by the Transeastern Offshore Funds in respect of their liability pursuant to the Original Transeastern Judgment pursuant to the Transeastern Offshore Settlement Agreement.

263.    "*Transeastern Offshore Funds*" mean collectively (i) the Distressed High Yield Trading Opportunities Fund Ltd and (ii) the Distressed High Yield Trading Opportunities Fund LLC, which funds were party to the Transeastern Offshore Settlement Agreement.

264.    "*Transeastern Offshore Settlement Agreement*" means that certain Settlement Agreement, dated as of February 3, 2010, between the Transeastern Offshore Funds and the Committee on behalf of the Conveying Subsidiaries, pursuant to which the Transeastern Offshore Funds disgorged the

Transeastern Offshore Disgorgement.  The Transeastern Offshore Settlement Agreement was approved by the Bankruptcy Court on March 19, 2010 [ECF No. 948].

265.    "*Treasury Regulations*" means the regulations promulgated by the United States Department of the Treasury under the Tax Code.

266.    "*U.S. Trustee*" means the United States Trustee for the Southern District of Florida.

267.    "*U.S. Trustee Fees*" means the fees due to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6).

268.    "*Unencumbered Cash*" means any Cash of an applicable Plan Debtor's assets that is not an Encumbered Asset as of the Effective Date.

269.    "*Unexpired Lease*" means a lease to which one or more of the Plan Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, if any.

270.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

271.    "*Unpaid Lender Tax Refund Payment*" means the amount of proceeds from the 2007 Federal Tax Refund that had been allocated for the payment of certain First Lien Term Loan Lender Defendants as paydown funds pursuant to the First Cash Collateral Order that were not actually paid, in the amount of $2,572,013.

272.    "*Unsecured Claims*" means (i) Senior Note Claims, (ii) Senior Note Guaranty Claims, (iii) General Unsecured Claims, (iv) Subordinated Note Claims, (v) Subordinated Note Guaranty Claims, (vi) Term Loan Deficiency Claims and (vii) PIK Note Claims, as and to the extent applicable to each Plan Debtor.

273.    "*Unsecured Creditor D&O Recovery*" means the funds to be paid by the Settling D&O Insurers pursuant to the D&O Settlement Order for the benefit of the holders of Unsecured Claims against the Conveying Subsidiaries in respect of any claims the Conveying Subsidiaries had or may have had against the Defendant Directors and Officers, in the aggregate amount of $47,857,142.86 (or 5/7 of the D&O Insurance Settlement Amount).

274.    "*Unsecured Creditor RSUI Insurance Coverage Action Recovery*" means 71.43% of each dollar of RSUI Insurance Coverage Action Recovery, which shall be for the benefit of the holders of the Conveying Subsidiaries Liquidation Trust Interests and distributed in accordance with the Committee Model.

275.    "*Unsecured Creditor Settlement*" means the agreement between the Debtors and the Committee with respect to the allocation of value among the Debtors' Estates as implemented through the Committee Model and the recoveries under the Plan.

276.    "*Unsecured Creditor Tax Refund Recovery*" means 30% of the Term Loan Lender Tax Refund Share.

277.    "*Unsecured Creditor Transeastern Recovery*" means 50% of each dollar of Transeastern Disgorgement until such time as the holders of the Conveying Subsidiaries Liquidation Trust Interests

have received an aggregate of $37.75 million in Net Proceeds from the Non-Settling Transeastern Lenders (exclusive of any funds allocable to repayment of the Liquidation Trust Loan).

278.    "*Unsecured Creditors' Liquidation Trust Representatives*" means two Members of the Liquidation Trust Advisory Board to be appointed by the Committee.

279.    "*Updated Monarch Settlement Percentage*" means the Monarch Settling Parties' share of liability under the Transeastern Judgment, which percentage has increased as a result of the transfer of the Additional Monarch Transeastern Liability by approximately 2.50% (from 43.43% to 45.93%) since the Monarch Settlement Agreement was approved by the Bankruptcy Court.

280.    "*Voting and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent pursuant to the *Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent for the Debtors*, which was entered by the Bankruptcy Court on January 31, 2008 [ECF No. 102].

281.    "*Voting Classes*" means, collectively, TOUSA Classes 1A, 1B, 2, 5A and 5B; Conveying Subsidiaries Classes 1, 4A and 4B; and Beacon Hill Class 3.

282.    "*Voting Record Date*" means June 20, 2013, the date established as the voting record date in the order approving the Disclosure Statement.

283.    "*XL Bermuda*" means XL Insurance (Bermuda) Ltd., in its capacity as a D&O Insurer.

284.    "*XL Bermuda Settlement Agreement*" means that certain agreement settling claims related to XL Bermuda.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

*A.    Administrative Claims*

1.    Payment of Administrative Claims

Except to the extent that any Entity entitled to a payment of any Allowed Administrative Claim otherwise agrees with the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Distribution Date, (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Claim or (c) the date on which the Proponents, in consultation with the Requisite Lenders, solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, and the holder of such Allowed Administrative Claim otherwise agree and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Plan Debtors, (b) are allowed by the Bankruptcy Court, (c) may be agreed upon between the holder of such Allowed Administrative Claim and the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Administrative Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable or (d) may otherwise be required under applicable law.

Because there has been no diminution in value of the collateral of the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders at TOUSA (calculated on a liquidation basis as of the Petition Date), there shall be no Claims in favor of the First Lien Term Loan Lenders and Second Lien Term Loan Lenders against any of the Plan Debtors pursuant to section 507(b) of the Bankruptcy Code.

2.      Bar Date for Administrative Claims

Except as otherwise provided in this Article II.A, unless previously filed pursuant to the Initial Administrative Claims Bar Date, requests for payment of Administrative Claims (other than Postpetition Intercompany Claims and Allowed Professional Compensation) must be filed and served on the Liquidation Trustee pursuant to the procedures specified in the Confirmation Order by the Final Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the applicable Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Plan Debtors or their property and such Administrative Claims shall be disallowed in full as of the Effective Date. Objections, if any, to a timely request for payment of Administrative Claims must be filed and served on the Liquidation Trustee and the requesting party no later than 90 days after the Final Administrative Claims Bar Date. No requests for payment of Postpetition Intercompany Claims shall be required.

3.      Professional Compensation

Retained Professionals or other Entities asserting a Claim for Accrued Professional Compensation (including pursuant to a 503(b) Application) must file and serve on the Liquidation Trustee, and such other Entities as are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Claim no later than 45 days after the Effective Date; *provided* that the Liquidation Trustee shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized hereunder; and *provided further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order and without further Bankruptcy Court order, unless otherwise ordered by the Bankruptcy Court. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Liquidation Trustee and the requesting party no later than 90 days after the Effective Date. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Claims for Accrued Professional Compensation. Each holder of a Claim for Allowed Professional Compensation shall be paid by the Liquidation Trustee in Cash from the Professionals Fee Accounts and, following the depletion of the Professionals Fee Accounts, from the Liquidation Trust Assets.

B.      *Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, one of the following treatments on account of such Claim: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) such other treatment as may be agreed to by such holder and the Proponents, in consultation with the Requisite Lenders, solely to the extent that the aggregate amount of Allowed Priority Tax Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable, or otherwise determined by an order of the Bankruptcy Court.

C.      *Statutory Fees*

On the Distribution Date, the Liquidation Trustee shall pay, in full and in Cash, any U.S. Trustee Fees due as of the Effective Date.  On and after the Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees until the entry of a final decree in each applicable Plan Debtor's Chapter 11 Case.

**ARTICLE III.**

**CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE PLAN DEBTORS**

A.      *Summary*

The Plan includes a separate plan of liquidation for each of the Plan Debtors.  The Plan does not seek to effect a substantive consolidation or other combination of the separate Estates of each Plan Debtor, but instead provides that creditors of each Plan Debtor will be permitted to assert their Claims only against the Plan Debtor(s) against which they hold Allowed Claims and will receive a recovery based on the value of the related Estate(s).  A summary of the classification and treatment of Claims and Interests for each of the Plan Debtors is attached hereto as <u>Exhibit A</u>.

B.      *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in each of the Plan Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan, to the extent applicable, and receiving distributions pursuant to the Plan, to the extent applicable, only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and U.S. Trustee Fees have not been classified.

C.      *Classes of Claims Against and Interests in TOUSA*

    1.      TOUSA – Class 1 – First Lien Claims

        (a)      TOUSA – Class 1A – First Lien Revolver Claims

            (i)      *Classification*: Class 1A for TOUSA shall consist of the First Lien Revolver Claims against TOUSA.

            (ii)      *Allowance*: The First Lien Revolver Claims against TOUSA shall be Allowed in the amount of $16,643,322, representing unpaid postpetition interest that accrued on the amounts outstanding under the First Lien Revolving Credit Agreement, including non-default interest and default interest at the full contract rate from the Petition Date through November 21, 2011.  All other amounts with respect to the First Lien Revolver Claims have been repaid in full, in Cash, during the Chapter 11 Cases.  For the avoidance of doubt, the Allowed First Lien Revolver Claims against TOUSA shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

        (iii)    *Treatment*: On the Distribution Date, in full and final satisfaction of such Claims, each holder of Allowed TOUSA Class 1A Claims shall receive its *Pro Rata* share of 34.4% of the Default Interest Amount in Cash, which shall be deemed to be paid from TOUSA.

        (iv)    *Voting*: Class 1A for TOUSA is Impaired.  Holders of Allowed TOUSA Class 1A Claims are entitled to vote to accept or reject the Plan.

    (b)    TOUSA – Class 1B – First Lien Term Loan Claims

        (i)    *Classification*: Class 1B for TOUSA shall consist of the First Lien Term Loan Claims against TOUSA.

        (ii)    *Allowance*:  The First Lien Term Loan Claims shall be Allowed (x) in the amount of $207,268,002 on account of the First Lien Term Loan Secured Claims and (y) the First Lien Term Loan Deficiency Claim Amount, in the amount of $108,094,247 on account of the First Lien Term Loan Deficiency Claims.  For the avoidance of doubt, the First Lien Term Loan Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

        (iii)    *Treatment*: On the Distribution Date, subject to Article V.C.1(c) of the Plan, in full and final satisfaction of such Claims and the First Lien Term Loan Lenders' third-party claims settled or otherwise preserved hereunder, each holder of Allowed Class 1B Claims against TOUSA shall receive (x) on account of its First Lien Term Loan Secured Claims, (A) its *Pro Rata* share of the Encumbered Assets at TOUSA and (B) the Term Loan Lender Tax Refund Recovery, (y) on account of its First Lien Term Loan Deficiency Claims, (A) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of (I) the Unencumbered Cash at TOUSA, (II) the TOUSA Term Loan Lender Disgorgement Share and (III) the Unsecured Creditor Tax Refund Recovery and (B) its *Pro Rata* share of TOUSA Class 1B General Liquidation Trust Interests and (z) on account of its third-party claims settled or otherwise preserved hereunder, its *Pro Rata* share of (A) 40% of the Term Loan Lender D&O Recovery and (B) the TOUSA Class 1B Transeastern Liquidation Trust Interests.

        (iv)    *Voting*: Class 1B for TOUSA is Impaired.  Holders of TOUSA Class 1B Claims are entitled to vote to accept or reject the Plan.

2.    TOUSA – Class 2 – Second Lien Term Loan Claims

    (a)    *Classification*: Class 2 for TOUSA shall consist of the Second Lien Term Loan Claims against TOUSA.

(b)      *Allowance*: The Second Lien Term Loan Claims against TOUSA shall be Allowed (i) in the approximate amount of $0 on account of the Second Lien Term Loan Secured Claims and (ii) the Second Lien Term Loan Deficiency Claim Amount, in the amount of $320,386,837 on account of the Second Lien Term Loan Deficiency Claims. For the avoidance of doubt, the Second Lien Term Loan Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

(c)      *Treatment*: On the Distribution Date, subject to Article V.C.1(c) of the Plan, in full and final satisfaction of such Claims and the Second Lien Term Loan Lenders' third-party claims settled or otherwise preserved hereunder, each holder of Allowed TOUSA Class 2 Claims shall receive (i) on account of its Second Lien Term Loan Deficiency Claims, its *Pro Rata* share of the TOUSA Class 2 General Liquidation Trust Interests and (ii) on account of its third-party claims settled or otherwise preserved hereunder, its *Pro Rata* share of (x) 60% of the Term Loan Lender D&O Recovery and (y) TOUSA Class 2 Transeastern Liquidation Trust Interests.  Pursuant to the Mediation Settlement, the foregoing distributions of Cash and Liquidation Trust Interests shall not be subject to turnover or sharing with the First Lien Term Loan Lenders or the First Lien Revolver Lenders under the Intercreditor Agreement or the Intercreditor Settlement Agreement. For the avoidance of doubt, pursuant to the Intercreditor Agreement, Cash distributions that would have otherwise been allocable to holders of Allowed Class 2 Claims against TOUSA on account of their Second Lien Term Loan Lender Deficiency Claims shall have been reallocated *Pro Rata* to holders of Allowed Class 1B Claims against TOUSA.

(d)      *Voting*: Class 2 for TOUSA is Impaired.  Holders of TOUSA Class 2 Claims are entitled to vote to accept or reject the Plan.

3.      TOUSA – Class 3 – Other Secured Claims

(a)      *Classification*: Class 3 for TOUSA shall consist of the Other Secured Claims against TOUSA.

(b)      *Treatment*: On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against TOUSA secured by valid Liens on the property of TOUSA shall receive, in full and final satisfaction of such Allowed Other Secured Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of such Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Other Secured Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable: (i) payment in full in Cash, including interest, to the extent applicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Proponents, in consultation with the Requisite Lenders solely to the extent that the aggregate amount of Allowed Other Secured Claims exceeds the estimate contained in the Disclosure Statement by more than 20%, or the Liquidation Trustee, as applicable.

(c)    *Voting*: Class 3 for TOUSA is Unimpaired.  Holders of TOUSA Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

4.    TOUSA – Class 4 – Other Priority Claims

(a)    *Classification*: Class 4 for TOUSA shall consist of Other Priority Claims against TOUSA.

(b)    *Treatment*:  On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against TOUSA shall receive, in full and final satisfaction of such Claim, payment of such Allowed Claim in full in Cash.

(c)    *Voting*: Class 4 for TOUSA is Unimpaired.  Holders of TOUSA Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

5.    TOUSA – Class 5 – Unsecured Claims

(a)    TOUSA – Class 5A – Senior Note Claims

(i)    *Classification*: Class 5A for TOUSA shall consist of the Senior Note Claims against TOUSA.

(ii)    *Allowance*: The Senior Note Claims shall be Allowed in the aggregate amount of $573,518,194.  For the avoidance of doubt, the Allowed Senior Note Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

(iii)    *Treatment*: On the Distribution Date, each holder of Allowed Class 5A Claims against TOUSA shall receive (x) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures and PIK Note Indenture) of (A) the Unencumbered Cash at TOUSA, (B) the TOUSA Term Loan Lender Disgorgement Share and (C) the Unsecured Creditor Tax Refund Recovery; and (y) its *Pro Rata* share of the TOUSA Class 5A Liquidation Trust Interests.

(iv)    *Voting*: Class 5A for TOUSA is Impaired.  Holders of TOUSA Class 5A Claims are entitled to vote to accept or reject the Plan.

(b)    TOUSA – Class 5B – General Unsecured Claims

(i)    *Classification*: Class 5B for TOUSA shall consist of the General Unsecured Claims against TOUSA.

   *(ii)* *Treatment*: On the Distribution Date, each holder of Allowed Class 5B Claims against TOUSA shall receive (x) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against TOUSA) of (A) the Unencumbered Cash at TOUSA, (B) the TOUSA Term Loan Lender Disgorgement Share and (C) the Unsecured Creditor Tax Refund Recovery; and (y) its *Pro Rata* share of the TOUSA Class 5B Liquidation Trust Interests.

   (iii) *Voting*: Class 5B for TOUSA is Impaired. Holders of TOUSA Class 5B Claims are entitled to vote to accept or reject the Plan.

  (c) TOUSA – Class 5C – Subordinated Note Claims

   (i) *Classification*: Class 5C for TOUSA shall consist of the Subordinated Note Claims against TOUSA.

   (ii) *Allowance*: The Subordinated Note Claims shall be Allowed in the aggregate amount of $532,772,336.

   (iii) *Treatment*: Holders of Allowed Class 5C Claims against TOUSA will receive no distribution on account of such Claims as distributions otherwise allocable to the holders of Allowed Class 5C Claims shall be reallocated *Pro Rata* to the holders of Allowed Term Loan Deficiency Claims and Allowed Senior Note Claims in accordance with the terms of the Subordinated Note Indentures.

   (iv) *Voting*: Class 5C for TOUSA is Impaired. Holders of TOUSA Class 5C Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

  (d) TOUSA – Class 5D – PIK Note Claims

   (i) *Classification*: Class 5D for TOUSA shall consist of the PIK Note Claims against TOUSA.

   (ii) *Allowance*: The PIK Note Claims shall be Allowed in the aggregate amount of $21,564,973.

   (iii) *Treatment*: Holders of Allowed Class 5D Claims against TOUSA will receive no distribution on account of such Claims as distributions otherwise allocable to the holders of the Allowed Class 5D Claims shall be reallocated *Pro Rata* to the holders of Allowed Term Loan Deficiency Claims and Allowed Senior Note Claims in accordance with the terms of the PIK Note Indenture.

   (iv) *Voting*: Class 5D for TOUSA is Impaired. Holders of TOUSA Class 5D Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

6.       TOUSA – Class 6 – 510 Claims

(a)      *Classification*: Class 6 for TOUSA shall consist of all 510 Claims against TOUSA.

(b)      *Treatment*: Holders of 510 Claims against TOUSA will receive no distribution on account of such Claims.

(c)      *Voting*: Class 6 for TOUSA is Impaired.  Holders of TOUSA 510 Claims are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

7.       TOUSA – Class 7 – Interests

(a)      *Classification*: Class 7 for TOUSA shall consist of all Interests in TOUSA.

(b)      *Treatment*:  On the Effective Date, all Interests in TOUSA shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Interests in TOUSA.

(c)      *Voting*: Class 7 for TOUSA is Impaired.  Holders of Interests in TOUSA are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

D.      *Classes of Claims Against and Interests in the Conveying Subsidiaries*

1.       Conveying Subsidiaries – Class 1 – First Lien Revolver Claims

(a)      *Classification*: Class 1 for each of the Conveying Subsidiaries shall consist of the First Lien Revolver Claims against each such Conveying Subsidiary.

(b)      *Allowance*: The First Lien Revolver Claims against the Conveying Subsidiaries shall be Allowed in the amount of $16,643,322, representing unpaid postpetition interest that accrued on the amounts outstanding under the First Lien Revolving Credit Agreement, including non-default interest and default interest at the full contract rate from the Petition Date through November 21, 2011.  All other amounts with respect to the First Lien Revolver Claims have been repaid in full, in Cash, during the Chapter 11 Cases.  For the avoidance of doubt, the Allowed First Lien Revolver Claims against the Conveying Subsidiaries shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

(c)      *Treatment*:  On the Distribution Date, in full and final satisfaction of such Claims, each holder of Allowed Conveying Subsidiaries Class 1 Claim shall receive its *Pro Rata* share of 65.6% of the Default Interest Amount in Cash, which shall be paid from the Conveying Subsidiaries.

(d)      *Voting*: Class 1 for each of the Conveying Subsidiaries is Impaired.  Holders of Allowed Claims in Class 1 for each of the Conveying Subsidiaries are entitled to vote to accept or reject the Plan.

2.      Conveying Subsidiaries – Class 2 – Other Secured Claims

(a)      *Classification*: Class 2 for each of the Conveying Subsidiaries shall consist of the Other Secured Claims against each such Conveying Subsidiary.

(b)      *Treatment*: On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against one or more of the Conveying Subsidiaries secured by valid Liens on the property of one or more of the Conveying Subsidiaries shall receive, in full and final satisfaction of such Allowed Other Secured Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents or the Liquidation Trustee, as applicable: (i) payment in full in Cash, including interest, to the extent applicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Proponents or the Liquidation Trustee, as applicable.

(c)      *Voting*: Class 2 for each of the Conveying Subsidiaries is Unimpaired.  Holders of Claims in Class 2 for each of the Conveying Subsidiaries are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      Conveying Subsidiaries – Class 3 – Other Priority Claims

(a)      *Classification*: Class 3 for each of the Conveying Subsidiaries shall consist of the Other Priority Claims against each such Conveying Subsidiary.

(b)      *Treatment*: On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against one or more of the Conveying Subsidiaries shall receive, in full and final satisfaction of such Claim, payment of such Allowed Claim in full in Cash.

(c)      *Voting*: Class 3 for each of the Conveying Subsidiaries is Unimpaired.  Holders of Claims in Class 3 for each of the Conveying Subsidiaries are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

4.      Conveying Subsidiaries – Class 4 – Unsecured Claims

(a)      Conveying Subsidiaries – Class 4A – Senior Note Guaranty Claims

(i)      *Classification*: Class 4A for each Conveying Subsidiary shall consist of the Senior Note Guaranty Claims against such Conveying Subsidiary.

(ii)      *Allowance*: The Senior Note Guaranty Claims shall be Allowed in the aggregate amount of $573,518,194.  For the avoidance of doubt, the Allowed Senior Note Guaranty Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable

34

law or regulation.  Each Allowed Senior Note Guaranty Claim will be asserted against each of the Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC.

(iii)    *Treatment*: On the Distribution Date, each holder of an Allowed Class 4A Claim against a Conveying Subsidiary shall receive (x) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary and taking into account the benefit of the subordination provisions of the Subordinated Note Indentures) of (A) the Unencumbered Cash of such Conveying Subsidiary; (B) the Monarch Settlement Payments; (C) the Unsecured Creditor D&O Recovery; (D) the Transeastern Offshore Disgorgement and (E) the Conveying Subsidiaries Term Loan Lender Disgorgement Share; and (y) its *Pro Rata* share of the Conveying Subsidiaries Class 4A Liquidation Trust Interests allocable to such Conveying Subsidiary. After deducting their respective share of the Liquidation Trust Loan, the distributions set forth above shall be allocated to the holders of Allowed Class 4A Claims against each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.A.3 herein.

(iv)    *Voting*: Class 4A for each Conveying Subsidiary is Impaired.  Holders of Claims in Class 4A for each Conveying Subsidiary are entitled to vote to accept or reject the Plan.

(b)    Conveying Subsidiaries – Class 4B – General Unsecured Claims

(i)    *Classification*: Class 4B for each Conveying Subsidiary shall consist of the General Unsecured Claims against each such Conveying Subsidiary.

(ii)    *Treatment*: On the Distribution Date, each holder of an Allowed Class 4B Claim against a Conveying Subsidiary shall receive the **greater** of (x)(A) its *Pro Rata* share (calculated with reference to all Allowed Unsecured Claims against the applicable Conveying Subsidiary) of (I) the Unencumbered Cash of such Conveying Subsidiary; (II) the Monarch Settlement Payments; (III) the Unsecured Creditor D&O Recovery; (IV) the Transeastern Offshore Disgorgement; and (V) the Conveying Subsidiaries Term Loan Lender Disgorgement Share; and (B) its *Pro Rata* share of the series of Conveying Subsidiaries Class 4B Liquidation Trust Interests allocable to such Conveying Subsidiary; **or** (y) (A) the Minimum Conveying Subsidiary Recovery Amount and (B) to the extent applicable, the Conveying Subsidiaries Class 4B Contingent Liquidation Trust Interests allocable to such Conveying Subsidiary. After deducting their respective share of the Liquidation Trust Loan, the distributions set forth above shall be allocated to the holders of Allowed Class 4B Claims against each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.A.3 herein.

(iii)  *Voting*: Class 4B for each Conveying Subsidiary is Impaired.  Holders of Claims in Class 4B for each Conveying Subsidiary are entitled to vote to accept or reject the Plan.

(c)  Conveying Subsidiaries – Class 4C – Subordinated Note Guaranty Claims

(i)  *Classification*: Class 4C for each Conveying Subsidiary shall consist of the Subordinated Note Guaranty Claims against such Conveying Subsidiary.

(ii)  *Allowance*: The Subordinated Note Guaranty Claims against each Conveying Subsidiary shall be Allowed in the aggregate amount of $532,772,336.  Each Allowed Subordinated Note Guaranty Claim will be asserted against each of the Conveying Subsidiaries, excluding Engle Sierra Verde P5, LLC and Engle/Gilligan, LLC.

(iii)  *Treatment*: Holders of Allowed Class 4C Claims against the Conveying Subsidiaries will receive no distribution on account of such Claims as distributions otherwise allocable to the holders of Class 4C Claims against the Conveying Subsidiaries shall be reallocated to the holders of Allowed Senior Note Guaranty Claims in accordance with the terms of the Subordinated Note Indentures.

(iv)  *Voting*: Class 4C for each Conveying Subsidiary is Impaired.  Holders of Conveying Subsidiary Class 4C Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

5.  Conveying Subsidiaries – Class 5 – 510 Claims

(a)  *Classification*: Class 5 consists of all 510 Claims against the Conveying Subsidiaries.

(b)  *Treatment*: Holders of 510 Claims against each Conveying Subsidiary will receive no distribution on account of such Claims.

(c)  *Voting*: Class 5 for each Conveying Subsidiary is Impaired.  Holders of 510 Claims against each Conveying Subsidiary are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

6.  Conveying Subsidiaries – Class 6 – Interests

(a)  *Classification*: Class 6 for each Conveying Subsidiary shall consist of all Interests in each of the Conveying Subsidiaries.

(b)  *Treatment*: On the Effective Date, all Interests in the Conveying Subsidiaries shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to holders of Interests in any of the Conveying Subsidiaries.

(c)      *Voting*: Class 6 for each Conveying Subsidiary is Impaired.  Holders of Interests in each Conveying Subsidiary are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

E.      *Classes of Claims Against and Interests in Beacon Hill*

1.      Beacon Hill – Class 1 – Other Secured Claims

(a)      *Classification*: Class 1 for Beacon Hill shall consist of the Other Secured Claims against Beacon Hill.

(b)      *Treatment*: On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Secured Claim against Beacon Hill secured by valid Liens on the property of Beacon Hill shall receive, in full and final satisfaction of such Claim, to the extent not previously paid pursuant to an order of the Bankruptcy Court authorizing payment of Lien Claims during the Chapter 11 Cases, one of the following treatments on account of the value of the Liens securing such Claim, determined at the option of the Proponents or the Liquidation Trustee, as applicable: (i) payment in full in Cash, including interest, to the extent applicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim to the holder of such Claim; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Proponents or the Liquidation Trustee, as applicable.

(c)      *Voting*: Class 1 for Beacon Hill is Unimpaired.  Holders of Beacon Hill Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.      Beacon Hill – Class 2 – Other Priority Claims

(a)      *Classification*: Class 2 for Beacon Hill shall consist of the Other Priority Claims against Beacon Hill.

(b)      *Treatment*: On the later of the Distribution Date or as soon as reasonably practicable after such Claim becomes Allowed, each holder of an Allowed Other Priority Claim against Beacon Hill shall receive, in full and final satisfaction of such Claim, payment of such Allowed Claim in full in Cash.

(c)      *Voting*: Class 2 for Beacon Hill is Unimpaired.  Holders of Beacon Hill Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      Beacon Hill – Class 3 – General Unsecured Claims

(a)      *Classification*: Class 3 for Beacon Hill shall consist of the General Unsecured Claims against Beacon Hill.

(b)      *Treatment*: On the Distribution Date, each holder of an Allowed General Unsecured Claim against Beacon Hill shall receive payment of such Allowed Claim in full in Cash (without postpetition interest).

(c)      *Voting*: Class 3 for Beacon Hill is Impaired.  Holders of Beacon Hill Class 3 Claims are entitled to vote to accept or reject the Plan.

4.        Beacon Hill – Class 4 – Interests

(a)      *Classification*: Class 4 for Beacon Hill shall consist of all Interests in Beacon Hill.

(b)      *Treatment*: On the Effective Date, all Interests in Beacon Hill shall be deemed cancelled and shall be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Interests in Beacon Hill.

(c)      *Voting*: Class 4 for Beacon Hill is Impaired.  Holders of Interests in Beacon Hill are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF EACH PLAN

*A.      Presumed Acceptance of Each Plan*

Classes 3 and 4 for TOUSA are Unimpaired under the Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 2 and 3 for each of the Conveying Subsidiaries are Unimpaired under the Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 1 and 2 for Beacon Hill are Unimpaired under the applicable Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*B.      Voting Classes*

Each holder of an Allowed Claim as of the Voting Record Date in each of the Voting Classes shall be entitled to vote to accept or reject the Plan.  The Voting Classes are TOUSA Classes 1A, 1B, 2, 5A and 5B; Conveying Subsidiaries Classes 1, 4A and 4B; and Beacon Hill Class 3.

*C.      Acceptance Requirements*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan as it pertains to each Plan Debtor if the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.  There are no Impaired classes of Interests entitled to vote on the Plan.

*D.      Failure to Vote*

If holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

E.     *Presumed Rejection of Plan*

Classes 5C, 5D, 6 and 7 for TOUSA are Impaired, and holders of Claims or Interests in such Classes shall receive no distribution under the Plan on account of their Claims or Interests.  Classes 4C, 5 and 6 for the Conveying Subsidiaries are Impaired, and holders of Claims or Interests in such Classes shall receive no distribution under the applicable Plan on account of their Claims or Interests.  Class 4 for Beacon Hill is Impaired, and holders of Interests in such Class shall receive no distribution under the applicable Plan on account of their Interests.  Those Classes are therefore presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

F.     *Nonconsensual Confirmation*

With respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code or is deemed to reject the Plan pursuant to 1126(g) of the Bankruptcy Code, the Proponents request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.   The Proponents reserve the right to modify the Plan or revoke the Plan as to one or more Plan Debtors in accordance with Article XII.D and Article XII.E of the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification or the Proponents determine that revocation of the Plan as to any such Plan Debtor is appropriate.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE JOINT PLAN

A.     *Overview of Settlements in Connection with the Joint Plan*

1.     Mediation Settlement Under the Joint Plan

To consensually resolve all outstanding disputes among the Settlement Parties with respect to the Settled Mediation Causes of Action, the Settlement Parties have agreed to the Mediation Settlement, as summarized below, effective as of the Effective Date.   Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the various agreements constituting the Mediation Settlement.  Distributions to be made pursuant to the Plan shall be made on account of and in consideration of, among other things, the Mediation Settlement.  Entry of the Confirmation Order shall confirm (i) the Bankruptcy Court's approval, as of the Effective Date, of the Plan and all components of any agreements comprising the Mediation Settlement and (ii) the Bankruptcy Court's finding that the Mediation Settlement is (a) in the best interests of the Plan Debtors, their respective Estates and the holders of Claims and Interests and (b) fair, equitable and reasonable.

2.     Unsecured Creditor Settlement Under the Joint Plan

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve, among other things, the Unsecured Creditor Settlement as implemented through the Committee Model.  Distributions to be made to Non-Term Loan Lender Unsecured Creditors pursuant to the Plan shall be made on account of and in consideration of the Unsecured Creditor Settlement.  Entry of the Confirmation Order shall confirm (i) the Bankruptcy Court's approval, as of the Effective Date, of the Plan and all components of the Unsecured Creditor Settlement and (ii) the Bankruptcy Court's finding that the Unsecured Creditor Settlement is (a) in the best interests

of the Plan Debtors, their respective Estates and the holders of Claims and Interests and (b) fair, equitable and reasonable.

        3.      D&O Insurance Coverage Settlement Pursuant to the D&O Settlement Order

To consensually resolve all outstanding disputes among the D&O Settlement Parties with respect to the Fiduciary Duty Action and the D&O Insurance Coverage Action, among other matters, the D&O Settlement Parties have reached agreement in principle, subject to final documentation, as to the terms of the D&O Insurance Coverage Settlement, which shall be set forth in the D&O Insurance Coverage Settlement Agreements.  Distributions to be made pursuant to the Plan shall be made on account of and in consideration of, among other things, the D&O Insurance Coverage Settlement, subject to the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order.  For the avoidance of doubt, the D&O Insurance Coverage Settlement does not impact the RSUI Insurance Coverage Action.

*B.*     *The Models*

Distributions under the Plan are premised on Mediation Model Case F and the Committee Model, as described in further detail herein.

Mediation Model Case F was developed to facilitate negotiations in connection with the Mediation.  The Committee Model was initially developed by the Committee's financial advisors for purposes of calculating distributions under previously filed chapter 11 plans for the Debtors.

Mediation Model Case F establishes a method for allocating recoveries in connection with the Mediation Settlement between the Prepetition Secured Lenders, on the one hand, and the Non-Term Loan Lender Unsecured Creditors, on the other hand.  A condition to the Committee's agreement to the Mediation Settlement and the D&O Insurance Coverage Settlement was that the Committee Model—rather than Mediation Model Case F—be used to determine the method of allocating recoveries among the Non-Term Loan Lender Unsecured Creditors.  As such, pursuant to the Mediation Settlement and the D&O Insurance Coverage Settlement, recoveries to the Non-Term Loan Lender Unsecured Creditors will be allocated pursuant to the Committee Model and any drivers underlying the allocations contemplated therein, without regard for how such recoveries are allocated pursuant to Mediation Model Case F and any drivers underlying the allocations contemplated therein.

 The Models assume approximately the same base aggregate value available for distribution to all creditors of the Plan Debtors' Estates.  Further, the Models both take into account certain considerations in determining allocations of assets and liabilities among the Plan Debtors, including, without limitation, the following:

- The Models incorporate data for assets, Claims asserted against the Debtors, professional fees and other numerical values allocated by legal entity, per the RVA, for projected recovery purposes and will be updated for actual results as of the Effective Date.

- The drivers for the Models do not include (i) the Monarch Settlement Payments, (ii) the D&O Insurance Settlement Amount, (iii) proceeds of Transeastern Litigation Settlement(s), if any, (iv) the Transeastern Offshore Disgorgement, (v) proceeds of the Falcone Action, (vi) proceeds of the RSUI Insurance Coverage Action or (vii) proceeds of the Remaining Contingent Assets.

- The Models assume that the 2008 Federal Tax Refund is not subject to any Liens.

- Neither Model provides for the cost of funding the Liquidation Trust or the value of the Liquidation Trust Causes of Action.

- The Models provide that all prepetition intercompany obligations between TOUSA, on the one hand, and the Conveying Subsidiaries, on the other hand, are in the nature of equity contributions, in accordance with the Bankruptcy Court Decision. As such, the holders of Prepetition Intercompany Claims will receive no distribution under the Plan.[1]

Notwithstanding the above commonalities, the Models rely on a number of distinct considerations, as discussed below.

1.    Mediation Model Case F

Mediation Model Case F also provides, among other things, the following:

- Mediation Model Case F reflects (1) the assets and liabilities of TOUSA separately from (2) the assets and liabilities of all Conveying Subsidiaries, which are treated on a consolidated basis.

- Mediation Model Case F treats Cash held as of the Petition Date as property of TOUSA and as subject to the Liens of the First Lien Revolver Lenders and First Lien Term Loan Lenders.

- Mediation Model Case F allocates 75% of the postpetition consolidated payroll, information technology and telecommunications expenses paid by TOUSA to the Conveying Subsidiaries.

- Mediation Model Case F does not account for treatment of the Intercompany Notes held by certain Conveying Subsidiaries.

2.    The Committee Model

Distinct from Mediation Model Case F, the Committee Model provides, among other things, the following:

- The Committee Model reflects (1) the assets and liabilities of TOUSA and (2) the assets and liabilities of each Conveying Subsidiary on an entity-by-entity basis.

- The Committee Model treats Cash held as of the Petition Date as property of the Conveying Subsidiaries and Beacon Hill and as subject to the Liens of the First Lien Revolver Lenders.

- The Committee Model allocates postpetition expenses in accordance with the book value of assets of each Plan Debtor as of the Petition Date.

- The Committee Model provides for allocation of the Intercompany Notes held by TOUSA Funding against certain of the Conveying Subsidiaries.

- Recoveries allocable to holders of Allowed Senior Note Claims and Allowed Senior Note Guaranty Claims include aggregate recoveries at all applicable Plan Debtors.

---

[1] For the avoidance of doubt, prepetition intercompany obligations among the Conveying Subsidiaries that are documented by the prepetition Intercompany Notes will be treated in accordance with Article V.G of the Plan.

Following allocation of recoveries between the Term Loan Lenders, on the one hand, and the Non-Term Loan Lender Unsecured Creditors, on the other hand, pursuant to Mediation Model Case F, the Committee Model allocates distributions between Non-Term Loan Lender Unsecured Creditors at TOUSA and Non-Term Loan Lender Unsecured Creditors at each of the Conveying Subsidiaries pursuant to the Committee Model.  Then, (i) distributions to Non-Term Loan Lender Unsecured Creditors at TOUSA are further allocated between the holders of Allowed Senior Note Claims at TOUSA and the holders of Allowed General Unsecured Claims at TOUSA and (ii) distributions to Non-Term Loan Lender Unsecured Creditors at each Conveying Subsidiary are further allocated between the holders of Allowed Senior Note Claims at each applicable Conveying Subsidiary and the holders of Allowed General Unsecured Claims at each applicable Conveying Subsidiary.

Proceeds recovered by the Liquidation Trust in connection with the prosecution or settlement of the Transeastern Litigation, the Falcone Action and the RSUI Insurance Coverage Action that are allocable to holders of Allowed Unsecured Claims at the Conveying Subsidiaries shall be allocated to holders of Allowed Unsecured Claims at TOUSA Homes, Inc.  Proceeds allocable to holders of Allowed Unsecured Claims at TOUSA Homes, Inc. will be allocated *Pro Rata* among holders of Allowed Class 4A Senior Note Guaranty Claims at TOUSA Homes, Inc. and holders of Allowed Class 4B General Unsecured Claims at TOUSA Homes, Inc.  As described in Article III.D.4(c) of the Plan, holders of Allowed Class 4C Subordinated Note Guaranty Claims will receive no distribution on account of such Claims because distributions allocable to such holders shall be reallocated to the holders of Allowed Class 4A Senior Note Guaranty Claims in accordance with the terms of the Subordinated Note Indentures.  For the avoidance of doubt, to the extent holders of Allowed Unsecured Claims at Conveying Subsidiaries other than TOUSA Homes, Inc. receive recoveries on account of Remaining Contingent Assets, other than the RSUI Insurance Coverage Action and the Falcone Action, that exceed the Minimum Conveying Subsidiary Recovery Amount, such holders shall also be entitled, after first repaying the Minimum Conveying Subsidiary Recovery Adjustment, to share in (i) the Unsecured Creditor Transeastern Recovery allocable to the applicable Conveying Subsidiary and (ii) the Remaining Contingent Assets allocable to the applicable Conveying Subsidiary.

C.      *Components of the Mediation Settlement and the D&O Insurance Coverage Settlement*

        1.      The Mediation Settlement

                (a)      The Revolver Agreement

Pursuant to the Mediation Settlement, each holder of an Allowed First Lien Revolver Claim shall receive its *Pro Rata* share of the Default Interest Amount, representing accrued, unpaid postpetition interest in respect of the First Lien Revolver Claims, including default interest at the rate of 1% per annum on the applicable outstanding principal amount due and owing under the First Lien Revolving Credit Agreement at any given time for the period from the Petition Date through November 21, 2011, and waive any right to receive any additional amounts on account of default interest.  Such amounts shall be paid in Cash from the Conveying Subsidiaries; *provided*, *however*, that Mediation Model Case F reallocates from TOUSA to the Conveying Subsidiaries value equal to 34.4% of the Default Interest Amount on account of the additional funds paid by the Conveying Subsidiaries in excess of their allocable share of the payments made hereunder in respect of the Default Interest Amount to the holders of the First Lien Revolver Claims to ensure that the creditors of the Conveying Subsidiaries receive recoveries under the Plan as if 34.4% of the Default Interest Amount were paid by TOUSA.

Mediation Model Case F further provides that all other amounts previously paid with respect to the First Lien Revolver Claims have been or shall be deemed to have been paid *Pro Rata* from the respective pools of collateral held by TOUSA and the Conveying Subsidiaries according to the ratio of

such assets (approximately 65.6% from the Conveying Subsidiaries and 34.4% from TOUSA). The collateral remaining at TOUSA (i.e., the remaining Cash as of the Petition Date and the 2007 Federal Tax Refund, to the extent that such funds were not used to satisfy the First Lien Revolver Claims during the Chapter 11 Cases), will be subject to the Liens of the Term Loan Lenders, except as set forth in this Article V.C.

(b)    2007 Federal Tax Refund Agreement

Pursuant to the Mediation Settlement, all litigation related to the 2007 Federal Tax Refund will be settled as follows:

(i)    holders of Allowed Unsecured Claims at TOUSA (including the Term Loan Lenders in respect of their Term Loan Deficiency Claims) will receive their *Pro Rata* share of the Unsecured Creditor Tax Refund Recovery (subject to applicable subordination rights as set forth in Article V.I.5(d) of the Plan) and

(ii)    the Certifying First Lien Term Loan Lender Defendants and the Non-Certifying First Lien Term Loan Lender Defendants will receive the benefit of the Term Loan Lender Tax Refund Recovery as follows:

(x)    $846,912, representing the amount of the Term Loan Lender Tax Refund Recovery less the amount previously paid to the Certifying First Lien Term Loan Lender Defendants pursuant to the First Cash Collateral Order, shall be paid in Cash from TOUSA to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants;

(y)    each Certifying First Lien Term Loan Lender Defendant shall be entitled to retain approximately 97.65% of its respective portion of the Certifying Lender Tax Refund Payment previously paid to it; and

(z)    each Certifying First Lien Term Loan Lender Defendant shall be required to turnover and pay its respective Tax Refund True-Up Payment to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants, such that, together with the payments under subsection (x) above, each Non-Certifying First Lien Term Loan Lender Defendant shall receive from the Term Loan Lender Tax Refund Recovery the benefit of approximately 97.65% of the amount of its respective portion of the Unpaid Lender Tax Refund Payment.

Each Certifying First Lien Term Loan Lender Defendant shall pay its respective Tax Refund Recovery True-Up Payment to the First Lien Term Loan Agent in Cash within seven Business Days of the Effective Date. Certifying First Lien Term Loan Lender Defendants that do not comply with the requirements herein shall be liable for damages to the Non-Certifying First Lien Term Loan Lenders and shall be deemed to be in contempt of the Confirmation Order and subject to additional sanctions. For the avoidance of doubt, the Debtors shall not be entitled to any portion of the Tax Refund Recovery True-Up Payments.

To the extent that a Certifying First Lien Term Loan Lender Defendant has posted supersedeas bonds or cash collateral in respect of the Certifying Lender Tax Refund Payment in connection with the Committee Action (a) in respect of supersedeas bonds, such bonding surety company shall pay the amounts set forth herein to the First Lien Term Loan Agent for the benefit of the Non-Certifying First Lien Term Loan Lender Defendants (and each Certifying First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); (b) in respect of cash collateral posted by a Certifying First Lien Term Loan Lender Defendant with the Bankruptcy Court, such cash

collateral shall be released in the amounts set forth herein to the First Lien Term Loan Agent; and (c) in respect of cash collateral escrowed with the Committee (including in attorney trust accounts with Robbins Russell), such cash collateral shall be released in the amounts set forth herein to the First Lien Term Loan Agent.  Subject to a Term Loan Lender Defendant's requirement, if any, to make Term Loan Lender Disgorgement Payments herein, any amounts posted as collateral or escrowed by such Certifying First Lien Term Loan Lender Defendant in excess of the Tax Refund Recovery True-Up Payment and Term Loan Lender Disgorgement Payments required to be paid by it hereunder shall be released to or for the benefit of such Certifying First Lien Term Loan Lender Defendant, and any amounts paid by any Certifying First Lien Term Loan Lender Defendant in excess of the Tax Refund Recovery True-Up Payment and Term Loan Lender Disgorgement Payments required hereunder shall be paid to such Certifying First Lien Term Loan Lender Defendant.

(c)        The Term Loan Lenders' Disgorgement Obligations

Pursuant to certain orders of the Bankruptcy Court in the Committee Action, the Term Loan Lender Defendants were required to disgorge to TOUSA and the Conveying Subsidiaries amounts that were paid by one or more of the Plan Debtors to the professionals for the Term Loan Lender Defendants [Adv. Pro. No. 08-01435, ECF Nos. 659, 729, 1037].  Mediation Model Case F provides for the disgorgement of such professional fees for the benefit of the holders of Unsecured Claims against TOUSA and the Conveying Subsidiaries as set forth below.  With respect to the Term Loan Lender Professional Fee Disgorgements, Mediation Model Case F provides for payment only of postpetition professional fees allocated to the First Lien Revolver Lenders (given that the First Lien Term Loan Secured Claims are undersecured).  The allocation of fees among the First Lien Revolver Lenders, the First Lien Term Loan Lender Defendants and Second Lien Term Loan Lender Defendants is consistent with the Quantification Order, pursuant to which the Term Loan Lender Defendants shall pay all Term Loan Lender Professional Fee Disgorgements on account of professional fees paid to them or on their behalf.

Pursuant to the Mediation Settlement, in connection with the Effective Date, the Term Loan Lender Defendants shall be required to make the Term Loan Lender Disgorgement Payments, which shall include: (i) with respect to the First Lien Term Loan Lender Defendants, their respective share of (a) the Principal and Interest Disgorgement and (b) the First Lien Term Loan Professional Fee Disgorgement; and (ii) with respect to the Second Lien Term Loan Lender Defendants, their respective share of the Second Lien Term Loan Professional Fee Disgorgement.

The First Lien Term Loan Lender Defendants shall pay the Principal and Interest Disgorgement to the Liquidation Trust in Cash.  Pursuant to the Mediation Settlement, and in order to implement the Intercreditor Settlement Agreement, the Debtors shall offset the First Lien Term Loan Professional Fee Disgorgement from distributions otherwise allocable to the First Lien Term Loan Lenders on account of the First Lien Term Loan Claims (as if such amounts had been paid), such that the First Lien Term Loan Lender Defendants shall not be required to pay any amounts in respect of the First Lien Term Loan Professional Fee Disgorgement.  The Second Lien Term Loan Lender Defendants shall pay the Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust in Cash.  A schedule setting forth the amount of each Term Loan Lender Disgorgement Payment, the amount thereof (if any) that has already been paid, the amount of such disgorgement that shall be paid from supersedeas bonds, cash collateral or other sources, and any additional amounts that the Term Loan Lender Defendants shall be required to pay is attached hereto as Exhibit E.

The Term Loan Lender Disgorgement Payments shall be allocated between TOUSA and the Conveying Subsidiaries in the amounts of the TOUSA Term Loan Lender Disgorgement Share and the Conveying Subsidiaries Term Loan Lender Disgorgement Share, respectively.  For the avoidance of

doubt, the Conveying Subsidiaries Term Loan Lender Disgorgement Share will be allocated among the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary in accordance with the Committee Model as set forth in Article V.B.2 of the Plan, and distributed to holders of Allowed Claims in accordance with the terms herein.

Pursuant to Mediation Model Case F, the Term Loan Lender Disgorgement Payments include prejudgment interest at a rate of 6.9% per annum and post-judgment interest at a rate of 1% per annum through the Effective Date (such rates of interest shall apply to the Term Loan Lender Disgorgement Payments notwithstanding anything to the contrary in the Bankruptcy Court Decision or the Quantification Order).

To the extent that a Term Loan Lender Defendant has not previously paid its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement, or in the case of a Second Lien Term Loan Lender Defendant with respect to its Second Lien Term Loan Professional Fee Disgorgement, such Term Loan Lender Defendant shall make payment thereof within seven Business Days of the Effective Date to the Liquidation Trustee.  To the extent that a Term Loan Lender Defendant has posted supersedeas bonds or cash collateral in respect of the Principal and Interest Disgorgement or the Second Lien Term Loan Professional Fee Disgorgement, (a) in respect of supersedeas bonds, such bonding surety company shall pay the amounts set forth herein to the Liquidation Trustee (and each First Lien Term Loan Lender Defendant shall direct its respective bonding surety company to make such payments); (b) in respect of cash collateral posted by a Term Loan Lender Defendant with the Bankruptcy Court, such cash collateral shall be released in the amounts set forth herein to the Liquidation Trustee; and (c) in respect of cash collateral escrowed with the Committee (including in attorney trust accounts with Robbins Russell), such cash collateral shall be released in the amounts set forth herein to the Liquidation Trustee.  Upon the full payment of a Term Loan Lender Defendant's Term Loan Lender Disgorgement Payment and Tax Refund Recovery True-Up Payment (if any), any amounts posted as collateral or escrowed by such Term Loan Lender Defendant in excess of the amount of such Term Loan Lender Defendant's Term Loan Lender Disgorgement Payment (including by offset, to the extent applicable) and Tax Refund Recovery True-Up Payment shall be released to or for the benefit of such Term Loan Lender Defendant.  Any amounts paid by any Term Loan Lender Defendant in excess of its Term Loan Lender Disgorgement Payment and Tax Refund Recovery True-Up Payment shall be paid to the applicable First Lien Term Loan Defendant or the Second Lien Term Loan Defendant.

Notwithstanding anything to the contrary herein, to the extent that any Term Loan Lender Defendant fails to make its Term Loan Lender Disgorgement Payment with respect to the Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement to the Liquidation Trust within seven Business Days of the Effective Date, such Term Loan Lender Defendant shall not be entitled to receive any distributions under the Plan unless and until such amounts have been disgorged or offset as provided herein.  Amounts otherwise allocable to such Term Loan Lender Defendant shall be distributed by the Liquidation Trustee to the holders of Allowed Unsecured Claims against TOUSA and Allowed Unsecured Claims Against the Conveying Subsidiaries, as applicable, in an amount equal to the Term Loan Lender Disgorgement Payments with respect to Principal and Interest Disgorgement or Second Lien Term Loan Professional Fee Disgorgement not paid to the Liquidation Trust within seven Business Days of the Effective Date.  Any excess thereafter shall be paid to the applicable Agent for distribution in accordance with the Plan and/or the Intercreditor Settlement Agreement.

Term Loan Lender Defendants that do not comply with the foregoing shall be liable for damages to the Liquidation Trust and shall be deemed to be in contempt of the Confirmation Order and subject to additional sanctions.

(d)        The Monarch Agreement

Pursuant to the Monarch Settlement Agreement, Monarch paid the Initial Monarch Settlement Payment (43.43% of $45 million, or $19,543,500) to the Conveying Subsidiaries Account as an initial settlement payment in respect of the Monarch Settling Parties' exposure under the Transeastern Judgment.   Since the Monarch Settlement Agreement was approved by the Bankruptcy Court, the Monarch Settling Parties' share of the Transeastern Judgment has increased by approximately 2.50%, as reflected in the Updated Monarch Settlement Percentage.  As part of the Mediation Settlement, Monarch, GCAT and Barclays (each of which shall be deemed a Monarch Settling Party with respect to the Additional Monarch Transeastern Liability) shall be permitted to settle the Additional Monarch Transeastern Liability according to the same terms as the Monarch Settlement Agreement.  In connection therewith, within three Business Days of the Effective Date, Monarch will pay the Increased Monarch Settlement Payment to the Conveying Subsidiaries Account to account for the Updated Monarch Settlement Percentage, such that the total amount paid by the Monarch Settling Parties in respect of the Initial Monarch Settlement Payment shall be increased to 45.93% of $45 million, or $20,668,500.

Pursuant to the Mediation Settlement, Monarch shall pay the Monarch Mediation Settlement Payment to the Conveying Subsidiaries Account, in full and final satisfaction of the Monarch Supplemental Payment Obligation, representing 25% of the maximum amount of the Monarch Supplemental Payment Obligation, as revised to reflect the Updated Monarch Settlement Percentage.

Furthermore, upon the Effective Date:

1.        All liability under or in respect of the Additional Monarch Transeastern Liability shall be transferred to and assumed by Monarch, and all rights and claims arising from or related to the Additional Monarch Transeastern Liability shall be transferred and assigned to Monarch (the foregoing liabilities, rights and claims shall each be subject to the compromises hereunder and under the Monarch Settlement Agreement); and

2.        Solely in respect of the Additional Monarch Transeastern Liability, (i) the supersedeas bond posted by GCAT and/or Barclays shall no longer be required and shall be fully and unconditionally discharged, released and exonerated, and Monarch, GCAT, Barclays and any surety company in respect of such supersedeas bond shall be fully and unconditionally discharged and released from any and all past, present and future liability arising under or in connection with the issuance of such bond and (ii) Monarch, GCAT and Barclays, each in its capacity as a Settling Transeastern Lender, will be fully and finally released from, and the Committee and the Debtors shall be deemed to fully and finally waive with respect to such Settling Transeastern Lenders in respect of the Additional Monarch Transeastern Liability, any requirement to post a supersedeas bond with respect to the Additional Monarch Transeastern Liability or any other amounts as may be adjudged or awarded against such Settling Transeastern Lenders in respect of the Additional Monarch Transeastern Liability in connection with the Transeastern Litigation.

Except as provided herein, or as necessary to effectuate the terms hereof, nothing in the Plan or the Mediation Settlement amends or supersedes the terms and conditions of the Monarch Settlement Agreement.

Further, following submission to the Proponents of reasonably detailed invoices at least twenty (20) days prior to the Confirmation Hearing, Monarch shall receive on the Effective Date, from

unencumbered assets at TOUSA, reimbursement of $6 million on account of actual professional fees and actual expenses incurred by Monarch in connection with the Chapter 11 Cases.

(e)     The Transeastern Agreement

Pursuant to the Mediation Settlement, the Liquidation Trust Agreement shall provide that the Net Proceeds of any Transeastern Disgorgement received from the Non-Settling Transeastern Lenders shall be allocated as follows: First, to repayment of the Liquidation Trust Loan in the amount of (x)(I) 70% of up to $2.5 million to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (II) 30% of up to $2.5 million to holders of Allowed TOUSA Class 2 Claims, each in proportion to the respective amounts funded to the Liquidation Trust Loan from the recoveries on account of such Claims and (y) up to $2.5 million to holders of the Conveying Subsidiaries Liquidation Trust Interests to be allocated in accordance with the Committee Model and thereafter, in respect of the Unsecured Creditor Transeastern Recovery and the Term Loan Lender Transeastern Recovery.

To the extent that the Transeastern Litigation is not resolved by a Final Order (either through litigation or settlement(s)) in advance of the Effective Date, on the Effective Date, the Transeastern Litigation shall be transferred to the Liquidation Trust, as discussed in detail in Article XI of the Plan. The Liquidation Trust shall distribute the Net Proceeds of the Transeastern Litigation in a manner consistent with the allocation referenced in the immediately preceding paragraph.

As discussed in further detail in Article XI.G of the Plan, the prosecution of the Transeastern Litigation will be funded by the Liquidation Trust Loan. Any amounts funded in connection with the Liquidation Trust Loan and unused by the Liquidation Trust in the prosecution of the Transeastern Litigation shall be distributed in a manner consistent with the allocation referenced in subsections (x) and (y) in this Article V.A.3(e). For the avoidance of doubt, recoveries to the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary will be allocated in accordance with the Committee Model as set forth in Article V.B.2 herein.

In the event of any Transeastern Litigation Settlement(s), the following shall apply: (i) subject to (ii) and (iii) below, acceptance of a Transeastern Litigation Settlement shall require the consent of the Unsecured Creditors' Liquidation Trust Representatives, holders of a majority in amount of the TOUSA Class 1B Transeastern Liquidation Trust Interests and holders of a majority in amount of the TOUSA Class 2 Transeastern Liquidation Trust Interests; (ii) if the proceeds of any Transeastern Litigation Settlement, net of any recovery on account of 502(h) Claims, are greater than $80.5 million (in the aggregate as if all Non-Settling Transeastern Lenders were party thereto), paid in a single Cash payment at the time of such settlement, the Unsecured Creditors' Liquidation Trust Representatives shall be deemed to consent to such Transeastern Litigation Settlement; and (iii) if the proceeds of any Transeastern Litigation Settlement, net of any recovery on account of 502(h) Claims, are equal to or greater than $105.0 million (in the aggregate as if all Non-Settling Transeastern Lenders were party thereto), the Liquidation Trust will not require consent of the holders of the Lender Transeastern Liquidation Trust Interests to the Transeastern Litigation Settlement before executing and seeking Bankruptcy Court approval of the same; *provided*, *however*, that any Opt-Out Holder may opt out of any such Transeastern Litigation Settlement and shall be issued additional Liquidation Trust Interests (or provided some alternative legally and economically equivalent form of ability to receive future distributions from the Liquidation Trust) on account of such Opt-Out Holder's payment made in exchange for satisfying the amounts that holders of the Conveying Subsidiaries Liquidation Trust Interests would have received under such Transeastern Litigation Settlement in respect of such Opt-Out Holder's Opt-Out Percentage of the aggregate Conveying Subsidiaries Liquidation Trust Interests; *provided*, *further*, that the true-up to any such Opt-Out Holder shall be accomplished in a tax-efficient manner for the Liquidation Trust. Notwithstanding the foregoing, with respect to any Transeastern Litigation Settlement

47

that requires the approval of holders of Lender Transeastern Liquidation Trust Interests, the Liquidation Trustee will provide holders of Lender Transeastern Liquidation Trust Interests with notice of such proposed Transeastern Litigation Settlement in accordance with the Liquidation Trust Agreement, and each such holder will be deemed to consent to such Transeastern Litigation Settlement unless such holder advises the Liquidation Trustee, in writing, of an objection thereto in accordance with the terms of the Liquidation Trust Agreement no later than the fifth Business Day thereafter in accordance with sections 8.2 and 8.4 of the Liquidation Trust Agreement.

For the avoidance of doubt, 50% of the Net Proceeds of each Transeastern Litigation Settlement shall be paid to holders of Conveying Subsidiaries Liquidation Trust Interests in accordance with the terms of the Liquidation Trust Agreement until the Unsecured Creditor Transeastern Recovery is satisfied in full. Further, in the event of any Transeastern Litigation Settlement(s), the amounts required to be repaid by the Opt-Out Holder shall include amounts in respect of the Liquidation Trust Loan that are otherwise allocable to the Conveying Subsidiaries to ensure that the $2.5 million funded to the Liquidation Trust Loan by the Conveying Subsidiaries is repaid in full.

To the extent that the Transeastern Lenders are determined to have Allowed Claims against any of the Plan Debtors' Estates (including, without limitation, 502(h) Claims and Claims arising from purported indemnification rights), any distributions that the Transeastern Lenders would otherwise be entitled to receive on account thereof shall be deducted or netted from the applicable Transeastern Disgorgement amount such that there will be no distribution from the Plan Debtors' Estates to the Transeastern Lenders on account of any Allowed Claims such Transeastern Lenders may have against the Plan Debtors' Estates.

(f)    Intercreditor Settlement Agreement

To consensually resolve certain outstanding issues and disputes arising under or relating to the Intercreditor Agreement, in addition to those terms of the Mediation Settlement resolving disputes relating to the Intercreditor Agreement, as set forth herein, the First Lien Agents, the First Lien Revolver Lenders, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent and the Second Lien Term Loan Lenders have agreed to the Intercreditor Settlement Agreement, attached hereto as <u>Exhibit C</u>. The Plan incorporates and implements those provisions of the Intercreditor Settlement Agreement relating to the allocation of distributions made pursuant to the Plan.

Pursuant to the Intercreditor Settlement Agreement, the parties thereto agreed on, among other matters, (i) the outstanding amounts of Revolving Credit Obligations and First Lien Term Loan Obligations (as each such term is defined in the Intercreditor Agreement) for purposes of the Intercreditor Agreement, (ii) the allocation of the 2007 Federal Tax Refund previously paid to the First Lien Revolver Lenders and First Lien Term Loan Lenders and (iii) the allocation and distribution of the Revolver Paydown, in accordance with Section 1 of the Intercreditor Settlement Agreement, and any payment in respect of additional interest with respect to First Lien Revolver Claims.

In addition, the Intercreditor Settlement Agreement provides for the allocation and distribution of any and all future recoveries in respect of the First Priority Obligations (as defined in the Intercreditor Agreement), including, without limitation, a Transeastern Disgorgement, as follows:

- Pursuant to Section 2(a), $18,210,682 of the Revolver Paydown (held back from the first distribution under the Intercreditor Settlement Agreement) and any First Priority Recoveries (excluding any Transeastern Disgorgement received by a First Lien Term Loan Lender or First Lien Revolver Lender) will be deposited into a distribution escrow account maintained by the First Lien Revolver Agent, in its capacity as the First Priority

Representative (as defined in the Intercreditor Agreement).  Prior distributions of the Revolver Paydown, any 2007 Federal Tax Refund that a First Lien Revolver Lender or a First Lien Term Loan Lender Defendant previously received and is permitted to retain, and interest payments received in respect of First Lien Revolver Claims are not required to be deposited into such distribution escrow account.  Such amounts will be retained by the Agent or lender that received such payment, but are factored into the calculation of the distributions that the First Lien Term Loan Lenders and First Lien Revolver Lenders receive.

- Pursuant to Section 2(b) of the Intercreditor Settlement Agreement, the amounts in the distribution escrow account will be distributed as follows:

  o First, to the extent that there are insufficient funds in the Agents' fee reserve, to pay certain costs and expenses of the Agents;

  o Second, to reimburse any Term Loan Lender Defendant to the extent that it has paid a professional fee disgorgement (and prejudgment and postjudgment interest thereon);

  o Third, until the Stipulated First Priority Obligations Payment Date (as defined in the Intercreditor Settlement Agreement) has occurred, the Revolver True-Up and First Lien Term True-Up (each, as defined in and calculated under Section 2(d) of the Intercreditor Settlement Agreement) will be paid to the First Lien Revolver Agent and First Lien Term Loan Agent, respectively, for the benefit of their respective lenders in accordance with the terms of the First Lien Revolving Credit Agreement and the First Lien Term Loan Agreement; and

  o Fourth, the balance, if any, to whomever may be lawfully entitled to receive the same or as a Final Order of a court of competent jurisdiction may direct.

- To the extent that a chapter 11 plan of the Debtors provides for the direct issuance to a First Lien Term Loan Lender or First Lien Revolver Lender of liquidation trust interests:

  o With respect to Liquidation Trust Interests related to recoveries in respect of Transeastern Disgorgements, such issuance will be effectuated in accordance with the proportions set forth in Section 3(b)(ii) of the Intercreditor Settlement Agreement, pro rata based on the Revolver Allocation Percentage and First Lien Term Allocation Percentage (each, as defined in and calculated under Section 2(d) of the Intercreditor Settlement Agreement) to the First Lien Revolver Lenders (other than Monarch as to its 45.93% of First Lien Revolver Claims) and the First Lien Term Loan Lenders (other than Monarch as to its 45.93% of First Lien Term Loan Claims).

  o With respect to Liquidation Trust Interests in respect of recoveries from other actions against third parties other than the Debtors or Committee, such issuance will be effectuated in accordance with Section 2(c)(ii) of the Intercreditor Settlement Agreement, pro rata based on the Revolver Allocation Percentage and First Lien Term Allocation Percentage to the First Lien Revolver Lenders and First Lien Term Loan Lenders in accordance with their respective loan agreements.

49

o   Such issuance, in accordance with the terms above, will be in full and complete satisfaction of the sharing and turnover obligations of the party that owns the claims with respect to which such Liquidation Trust Interests were issued.

Additional terms of the settlement are set forth in the Intercreditor Settlement Agreement, which is incorporated and made a part of the Plan as if fully set forth therein.

Accordingly, to implement the Intercreditor Settlement Agreement, Cash allocable to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims shall, after deduction of their respective shares of the Liquidation Trust Loan, be paid to the First Lien Revolver Agent, in its capacity as the First Priority Representative (as defined in the Intercreditor Agreement) for distribution to or for the benefit of the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the Term Loan Lender Defendants in accordance with the Intercreditor Settlement Agreement.  Cash allocable to holders of Allowed TOUSA Class 2 Claims shall, after deduction of their respective share of the Liquidation Trust Loan, be paid to the Second Lien Term Loan Agent, for distribution to or for the benefit of the Second Lien Term Loan Lenders in accordance with the Second Lien Term Loan Credit Agreement (which amounts shall not be subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement).

To further implement the Intercreditor Settlement Agreement and notwithstanding the treatment provided in Article III.C of the Plan, TOUSA Class 1B General Liquidation Trust Interests and TOUSA Class 1B Transeastern Liquidation Trust Interests shall be allocated among and directly issued to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims in accordance with the respective interests of such holders in distributions under the Plan, as provided in the Intercreditor Settlement Agreement.  In accordance with the Intercreditor Settlement Agreement, such issuance will be in full and complete satisfaction of the sharing and turnover obligations of the First Lien Term Loan Lenders with respect to such Liquidation Trust Interests and any and all distributions on account of such Liquidation Trust Interests.  Furthermore, each holder of Allowed TOUSA Class 2 Claims shall be directly issued its respective shares of TOUSA Class 2 General Liquidation Trust Interests and TOUSA Class 2 Transeastern Liquidation Trust Interests.

The provisions of Section 2.6 of the Monarch Settlement Agreement have been incorporated into the Intercreditor Settlement Agreement such that, under the Intercreditor Settlement Agreement, Monarch shall not receive TOUSA Class 1B Transeastern Liquidation Trust Interests or TOUSA Class 2 Transeastern Liquidation Trust Interests on account of its holdings of First Lien Revolver Claims, First Lien Term Loan Claims or Second Lien Term Loan Claims to the extent that such holdings do not exceed 45.93% of all such Claims, but shall receive TOUSA Class 1B Transeastern Liquidation Trust Interests and TOUSA Class 2 Transeastern Liquidation Trust Interests to the extent that its holdings of such Claims exceed 45.93% of the total amounts of such Claims.

(g)   Payment of Additional Professional Fees as Administrative Expenses

Pursuant to the Mediation Settlement, following submission to the Proponents of reasonably detailed invoices at least twenty (20) days prior to the Confirmation Hearing, the First Lien Term Loan Agent, MatlinPatterson and Aurelius shall each receive payment on the Effective Date of up to $700,000 from unencumbered assets at TOUSA on account of actual professional fees and actual expenses incurred by such entity in connection with the Chapter 11 Cases.

2.      D&O Insurance Coverage Settlement

Pursuant to the D&O Insurance Coverage Settlement Agreement, the Settling D&O Insurers agreed to pay the D&O Insurance Settlement Amount in settlement of the Fiduciary Duty Action, the D&O Insurance Coverage Action as it relates to the Settling D&O Insurers and the Prepetition Secured Lender Demand Claims against the Defendant Directors and Officers, in each case, other than with respect to the RSUI Insurance Coverage Action.  In addition, the Settling D&O Insurers agreed to pay the fees and expenses of the Defendant Directors and Officers in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan up to $8,270,000 for fees and expenses incurred in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan prior to March 19, 2013.  XL Bermuda agreed to pay the legal fees and expenses, up to $250,000, of the Defendant Directors and Officers incurred in finalizing the D&O Insurance Coverage Settlement from and after March 19, 2013.

The following is the allocation of the amounts paid under the D&O Insurance Coverage Settlement, including the D&O Insurance Settlement Amount and the $8,270,000 for fees and expenses incurred in connection with the Fiduciary Duty Action, the D&O Insurance Coverage Action, the D&O Insurance Coverage Settlement and the Plan prior to March 19, 2013, among the Settling D&O Insurers in accordance with the D&O Insurance Coverage Settlement Agreement:

Federal:  $4,185,980
XL:  $14,930,000
Zurich American Insurance Company:  $10,688,082
St. Paul Mercury Insurance Company:  $10,688,082
National Union Fire Insurance Company of Pittsburgh, Pa.:  $10,277,856
Arch Insurance Company:  $8,000,000
AXIS Reinsurance Company:  $9,000,000
Westchester Fire Insurance Company:  $3,000,000
Allied World Assurance Company (U.S.), Inc.:  $3,000,000
Beazley Insurance Company, Inc.:  $1,500,000

Additional terms of the D&O Insurance Coverage Settlement are set forth in the D&O Insurance Coverage Settlement Agreements.  For the avoidance of doubt, recoveries to the Non-Term Loan Lender Unsecured Creditors at each applicable Conveying Subsidiary on account of the D&O Insurance Coverage Settlement will be allocated in accordance with the Committee Model as set forth in Article V.B.2 of the Plan.  Further, the summary of the D&O Insurance Coverage Settlement provided in the Plan is qualified in all respects by the terms of the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order.  Finally, nothing in the Plan shall limit or impact any terms, conditions or provisions of the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order, including, without limitation, the bar order and releases contained therein.

The D&O Insurance Coverage Settlement Agreements do not resolve the pending RSUI Insurance Coverage Action, and all rights are reserved with respect to RSUI and its insurance policy.  Accordingly, the RSUI Insurance Coverage Action shall be transferred to the Liquidation Trust on the Effective Date.  Any RSUI Insurance Coverage Action Recovery shall be allocated as follows: (a) the Unsecured Creditor RSUI Insurance Coverage Action Recovery shall be allocated for the benefit of the holders of the Conveying Subsidiaries Liquidation Trust Interests in accordance with the Committee Model and (b) the Term Loan Lender RSUI Insurance Coverage Action Recovery shall be allocated (i) 40% for the benefit of the holders of the TOUSA Class 1B General Liquidation Trust Interests and (ii)

60% for the benefit of the holders of TOUSA Class 2 General Liquidation Trust Interests (not subject to turnover or sharing under the Intercreditor Agreement or the Intercreditor Settlement Agreement).

Should a Defendant Director and Officer be required to participate in litigation in any way involving the RSUI Insurance Coverage Action, through the production of documents, appearing for a deposition(s), testifying at any hearing or a trial, or in any other manner, whether pursuant to subpoena or other process or request, such Defendant Director and Officer shall be provided with legal representation by counsel for the Liquidation Trust, if such representation is requested by such Defendant Director and Officer. Such representation of the Defendant Director and Officer shall be at no cost to the Defendant Director and Officer, and shall be paid by the Liquidation Trust. Counsel to the Liquidation Trust shall have no obligation to represent a Defendant Director and Officer who does not agree to waive conflicts with respect to such representation. Counsel to the Liquidation Trust shall be permitted to decline to represent a Defendant Director and Officer if such representation would result in an unwaivable conflict or would violate any applicable rule of professional conduct, rule of ethics, law or court order, as determined by the Liquidation Trustee in its sole discretion.

D.    *Existing Officers' Insurance and Indemnification*

Before the Effective Date, the Proponents shall ensure that reasonable and appropriate insurance coverage can be obtained for the Existing Officers. In the absence of available insurance coverage, the Proponents shall include provisions in the Liquidation Trust Agreement to ensure that the Existing Officers benefit from the indemnification provisions included therein; *provided, however,* that to the extent that any Existing Officer is granted indemnification by a source other than the Debtors or the Debtors' insurers, such indemnification shall be applied to the Existing Officer's liability prior to the application of any indemnification provisions contained in the Liquidation Trust Agreement.

E.    *Valuation*

The value of each Plan Debtor for all purposes associated with the Plan, including distributions under the Plan, has been determined by the Proponents, based on, among other things, the Models, the Mediation Settlement, the D&O Insurance Coverage Settlement, the proceeds of Liquidation Trust Causes of Action, the Cash of each Plan Debtor, the 2007 Federal Tax Refund, the 2008 Federal Tax Refund, the RVA, Intercompany Notes and an analysis of the Plan Debtors' books and records.

F.    *Postpetition Intercompany Claims*

Pursuant to the Mediation Settlement, the D&O Insurance Coverage Settlement and Mediation Model Case F, expenses attributable to TOUSA are allocated to TOUSA and expenses attributable to the Conveying Subsidiaries are allocated to the applicable Conveying Subsidiary; *provided, however,* that (i) Term Loan Lender Professional Fee Disgorgements and associated prejudgment and postjudgment interest shall be allocated 12.5% to TOUSA and 87.5% to the Conveying Subsidiaries and (ii) postpetition consolidated payroll, information technology and telecommunications expenses shall be allocated 25% to TOUSA and 75% to the Conveying Subsidiaries.

G.      *Prepetition Intercompany Claims and Prepetition Intercompany Notes*

Prepetition Intercompany Notes and Prepetition Intercompany Claims shall be treated as follows:

1.      Consistent with the Bankruptcy Court Decision and the Mediation Settlement, Prepetition Intercompany Claims are treated as Interests in the applicable Plan Debtors. Therefore, the holders of Prepetition Intercompany Claims will receive no distributions pursuant to the Plan.

2.      Consistent with the Bankruptcy Court Decision, prepetition Intercompany Notes are treated as Allowed Claims against the applicable Plan Debtors, all of which are Conveying Subsidiaries. The Plan Debtor beneficiaries of the prepetition Intercompany Notes will not receive a direct recovery on account of the Intercompany Notes; rather, value otherwise allocable to the prepetition Intercompany Notes will be allocated to the applicable beneficiary Conveying Subsidiary and taken into account in connection with the allocation of value among the Conveying Subsidiaries and the distributions to the holders of Allowed Unsecured Claims against the Conveying Subsidiaries that are entitled to a recovery under the Plan.

H.      *Post-Effective Date Means for Implementation of the Joint Plan*

1.      Corporate Existence

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Plan Debtors will be deemed authorized and approved without any requirement of further action by the Plan Debtors, the Plan Debtors' shareholders or the Plan Debtors' boards of directors. On the Effective Date, to the extent not otherwise distributed to the holders of Allowed Claims or otherwise provided in the Plan, each Plan Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan.

To the extent not used in the transfer of Liquidation Trust Assets and not completed prior to the Effective Date, the Plan Debtors (and their respective boards of directors) will dissolve as of the Effective Date and are authorized to dissolve or terminate the existence of wholly owned non-Plan Debtor subsidiaries following the Effective Date, as well as any remaining health, welfare or benefit plans. For the avoidance of doubt, once all assets of a Plan Debtor have been transferred to the Liquidation Trust, the applicable Plan Debtor or the Liquidation Trustee, as applicable, will take all necessary steps to dissolve such Plan Debtor.

2.      Closing of the Plan Debtors' Chapter 11 Cases

When (i) all Disputed Claims filed against a Plan Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) the Committee Action has been resolved by Final Order, (iii) all Liquidation Trust Assets have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan and (iv) all other actions required to be taken by the Liquidation Trust under the Plan and the Liquidation Trust Agreement have been taken, the Liquidation Trust shall seek authority from the Bankruptcy Court to close such Plan Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

3.      Method of Distribution Under the Plan

Distributions to holders of Allowed Claims against the Plan Debtors shall be made by the applicable Distribution Agent in accordance with the terms of the Plan.

4.      Monetization of Assets

The Liquidation Trustee shall, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions to holders of Allowed Claims in accordance with the Plan.  In so doing, the Liquidation Trustee shall exercise its reasonable business judgment to maximize recoveries.  The Liquidation Trustee shall have no liability to any party for the outcome of its decisions in this regard.  For the avoidance of doubt, substantially all assets of the Plan Debtors as of the Effective Date other than Liquidation Trust Assets have been monetized and converted to Cash as of the date of the Plan.

5.      Books and Records

Books and records for each Plan Debtor shall be maintained by the Liquidation Trustee to the extent necessary for the administration of the Liquidation Trust.  For the avoidance of doubt, to the extent that the Debtors' books and records are not necessary for the administration of the Liquidation Trust, such books and records may be destroyed or abandoned as appropriate and as permitted by applicable law; *provided*, *however*, that all such records and documents retained by the Liquidation Trustee may be destroyed no earlier than two years following the date of final distribution of Liquidation Trust Assets, unless otherwise ordered by the Bankruptcy Court.

6.      Reporting Duties

The Liquidation Trustee shall be responsible for filing informational returns on behalf of the Liquidation Trust and paying any tax liability of the Plan Debtors and the Liquidation Trust.  Additionally, the Liquidation Trustee shall file (or cause to be filed) any other statements, returns, reports or disclosures relating to the Plan Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.  In addition, the Liquidation Trustee shall provide unaudited financial statements to each Liquidation Trust Beneficiary on a quarterly basis by posting such unaudited financial statements on a website maintained by the Liquidation Trustee.

7.      Tax Obligations

The Liquidation Trustee shall have the powers of administration regarding all of the Plan Debtors' and the Liquidation Trust's tax obligations, including filing of returns.  The Liquidation Trustee shall (i) endeavor to complete and file, within 120 days after the Effective Date, each Plan Debtor's final federal, state and local tax returns; (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Plan Debtors or their Estates under section 507(b) of the Bankruptcy Code for all taxable periods of the Plan Debtors ending after the applicable Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws; and (iii) represent the interests and accounts of the Liquidation Trust or the Plan Debtors' Estates before any Tax Authority in all matters, including, without limitation, any action, suit, proceeding or audit.  On the Initial Distribution Date, the Liquidation Trustee will place funds sufficient to pay all known tax obligations into a separate account until such obligations are due and payable.  To the extent that the segregated funds are in excess of each Plan Debtor's or the Liquidation Trust's actual tax obligations, the segregated amounts will be distributed to holders of Liquidation Trust Interests at the applicable Plan Debtor in accordance with the Plan.

8.      Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Liquidation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidation Trustee and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Liquidation Trustee reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

9.      Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record holder of Senior Notes shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to this Article V.H.9, except as provided in Article V.H.14 or as otherwise provided herein. The Senior Note Indenture Trustees may (but shall not be required to) request that registered holders of the Senior Notes surrender their notes for cancellation to the extent that such notes are certificated.

10.     Resolution of Disputed Claims

(a)     Allowance of Claims

After the Effective Date, the Liquidation Trustee shall have and shall retain any and all rights and defenses, including rights of setoff, that the Plan Debtors had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Plan Debtors' Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Plan Debtors' Chapter 11 Cases allowing such Claim, including, without limitation, the Confirmation Order.

(b)     Prosecution of Objections to Claims Against the Plan Debtors

After the Confirmation Date, but before the Effective Date, the Proponents, and after the Effective Date, the Liquidation Trustee, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims. From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court (other than settlement of Claims related to the Liquidation Trust Causes of Action, the settlement of which shall be subject to the approval of the Bankruptcy Court). The Liquidation Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

55

With respect to all Tort Claims, an objection is deemed to have been timely filed, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.  The Committee has objected to each of the claims of the Transeastern Lenders, and, therefore, such Claims shall be Disputed Claims for purposes of the Plan.

For the avoidance of doubt, pursuant to the Bankruptcy Court Decision and the Mediation Settlement, all Claims asserted or assertable by the Term Loan Lenders against the Debtors, including any claims for breach of the solvency representations in the Loan Documents, have been released and disallowed.  No further objection to such Claims shall be required, and no distributions will be made on account of such Claims.

> (c)    Claims Estimation

After the Confirmation Date, but before the Effective Date, the Proponents, and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Plan Debtors, the Committee or the Liquidation Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation, concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Liquidation Trustee may elect to pursue additional objections to the ultimate distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Debtors, the Committee or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 20 days after the date on which such Claim is estimated.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

> (d)    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Liquidation Trustee, and any Claim that has been amended may be adjusted thereon by the Liquidation Trustee, in both cases without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Beginning at the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court each calendar quarter a list of all Claims that have been paid, satisfied, superseded or amended during such prior calendar quarter.

(e)      Deadline to File Objections to Claims

Objections to Claims shall be filed no later than the Claims Objection Deadline.

11.      Disallowance of Claims

Except for the Non-Settling Transeastern Lenders, all Claims of any Entity from which property is sought by the Plan Debtors' Estates or the Liquidation Trustee, as applicable, under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Proponents or the Liquidation Trustee, as applicable, allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Proponents or the Liquidation Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by a Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED BY THE PROPONENTS OR THE LIQUIDATION TRUSTEE, AS APPLICABLE, AND THE FILER OF THE PROOF OF CLAIM, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (a) THE CONFIRMATION HEARING AND (b) 45 DAYS AFTER THE APPLICABLE BAR DATE.**

12.      Professional Fee Accounts

The Professional Fee Accounts established pursuant to paragraph 14 of the Cash Collateral Order shall be used to fund the total amount of Accrued Professional Compensation, *provided* that, if the Professional Fee Accounts are not sufficient to pay all Accrued Professional Compensation, the Liquidation Trustee shall fund such excess Accrued Professional Compensation from the Liquidation Trust Assets.

13.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Proponents, in consultation with the Requisite Lenders, or the Liquidation Trustee, subject to any approvals or direction of the Liquidation Trust Advisory Board as set forth in the Liquidation Trust Agreement, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the Liquidation Trust Interests to be issued pursuant hereto without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto. The secretary and any assistant secretary of each Plan Debtor or the Liquidation Trustee shall be authorized to certify or attest to any of the foregoing actions.

Before, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Plan Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders,

directors, managers or partners of the Plan Debtors, or the need for any approvals, authorizations, actions or consents.

Pursuant to sections 106, 1141 and 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Plan Debtor to any person pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Plan Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Causes of Action to the Liquidation Trust and (ii) any sale or other transfer of the Plan Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

14.    Cancellation of Notes and Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes, the Subordinated Notes, the PIK Notes and Interests in the Plan Debtors shall be cancelled, and the obligations of the Plan Debtors thereunder or in any way related thereto shall be fully released.  On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including, without limitation, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture, shall be cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Plan Debtors thereunder shall be fully released.  Notwithstanding any provision of the Plan, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture shall continue in effect solely for the purposes of, as applicable: (a) allowing holders of the Senior Note Claims and Senior Note Guaranty Claims to receive distributions under the Plan; (b) allowing holders of Senior Debt (and/or their respective Indenture Trustees or Agents) to enforce the subordination provisions in Articles 11 and 12 of the Subordinated Note Indentures and the PIK Note Indenture; and (c) allowing and preserving the rights of the Indenture Trustees to (i) make distributions in satisfaction of Allowed Senior Note Claims and Allowed Senior Note Guaranty Claims; (ii) maintain and exercise their respective Charging Liens against any such distributions; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions; (iv) maintain and enforce any right to indemnification under the applicable indentures; (v) exercise their rights and obligations relating to the interests of their holders pursuant to the applicable indentures; and (vi) appear in these Chapter 11 Cases.

15.    Satisfaction of Obligations Under the Loan Documents

On the Effective Date, except to the extent otherwise provided herein, the Plan Debtors' obligations under the Loan Documents shall be satisfied and fully released except that the Loan Documents shall continue in full force and effect solely to permit the relevant Agents to make distributions of Plan consideration to the Prepetition Secured Lenders in accordance with the Plan.

Notwithstanding the provisions of the Plan, the Loan Documents shall continue in effect solely for the purposes of, as applicable: (i) allowing holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims to receive distributions under the Plan, including pursuant to the Intercreditor Settlement Agreement; (ii) allowing holders of such Claims (and/or their respective Agents) to enforce the terms of the Intercreditor Settlement Agreement and the Intercreditor Agreement; and (iii) allowing and preserving the rights of the Agents to (a) make distributions in satisfaction of the First Lien Revolver Claims, the First Lien Term Loan Claims and the Second Lien Term Loan Claims; (b) maintain and exercise their respective Charging Liens against any such distributions; (c) seek compensation and reimbursement from holders of the First Lien Revolver Claims, the First Lien Term Loan Claims and the Second Lien Term Loan Claims for any reasonable and documented fees and expenses incurred in making such distributions; (d) maintain and enforce any right to indemnification under the applicable Loan Documents; (e) exercise their rights and obligations relating to the interests of the holders of such Claims pursuant to the applicable Loan Documents; and (f) appear in these Chapter 11 Cases.

*I.    Distributions*

1.    Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Plan Debtor obligated with respect to such Claims, and, except to the extent set forth in the Plan, such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Plan Debtor based upon the full Allowed amount of each such Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim, plus postpetition interest, to the extent applicable.

At such time as holders of Claims have been paid in full, Liquidation Trust Interests issued with respect to such Claims shall be cancelled and of no further force and effect.

2.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Committee), the Liquidation Trustee shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on the Initial Distribution Date.  Distributions of Cash on account of the Liquidation Trust Interests will be made on the Distribution Date after the net proceeds of the Liquidation Trust Causes of Action are received by the Liquidation Trust, to the extent reasonably practicable.

3.    Distributions on Account of Claims Allowed After the Effective Date

(a)    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, by Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim.

(b)    Distributions to Holders of Disputed Claims

Notwithstanding any other provision herein and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Liquidation Trustee shall establish appropriate reserves for potential payment of such Claims pursuant to Article V.I.4 of the Plan.

(c)        Special Rules for Claims Arising Under Section 502(h) of the Bankruptcy Code

Notwithstanding anything contained herein to the contrary, 502(h) Claims shall be deemed timely filed despite the filing of such Claims after any otherwise applicable Claims Bar Date; *provided*, *however*, that 502(h) Claims must be filed against the applicable Plan Debtor(s) no later than 30 days after entry of a Final Order for recovery of property under section 550, 552 or 553 of the Bankruptcy Code.  The Term Loan Lenders shall not have any 502(h) Claims in respect of the disgorgements made hereunder.

4.        Disputed Claims Reserve

(a)        Creation of Disputed Claims Reserve

From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Liquidation Trustee shall establish, for the benefit of each holder of a Disputed Claim, the Disputed Claims Reserve consisting of Cash or Liquidation Trust Interests, as applicable, and any dividends, gains or income attributable thereto, in an amount equal to the *Pro Rata* share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Proponents or the Liquidation Trustee, as applicable.  For the avoidance of doubt, any Cash and Liquidation Trust Interests retained and held for the benefit of a holder of a Disputed Claim as part of the Disputed Claims Reserve shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in Liquidation Trust Interests in the event the Disputed Claim ultimately becomes an Allowed Claim.  Cash and Liquidation Trust Interests held in the Disputed Claims Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any Taxes, relating thereto) shall be retained by the Liquidation Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan. Any Cash and proceeds of the Liquidation Trust Interests shall be either (x) held by the Liquidation Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

For the avoidance of doubt, Cash held in the Disputed Claims Reserve will (i) be deposited in an interest-bearing account and held in trust, pending distribution by the Liquidation Trustee, for the benefit of holders of Allowed Claims (other than Allowed 502(h) Claims), (ii) be accounted for separately and (iii) not constitute property of the Liquidation Trust.  Liquidation Trust Interests held in the Disputed Claims Reserve will (a) be held in trust, pending distribution by the Liquidation Trustee, for the benefit of holders of Allowed Claims (other than Allowed 502(h) Claims), (b) be accounted for separately and (iii) not constitute property of the Liquidation Trust.

(b)      Distributions After Allowance of Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Liquidation Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan (including, with respect to Cash held in the Disputed Claims Reserve, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any Taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, but in no event more than 90 days thereafter.  The balance of any Cash and Liquidation Trust Interests previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the Liquidation Trust Interests, Cash and its proportionate share of the proceeds from the investment of Cash, if any, held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to the Liquidation Trust or any assets previously distributed on account of any Allowed Claim.

(c)      Distributions After Disallowance of Disputed Claims

If a Disputed Claim is disallowed, in whole or in part, the Liquidation Trustee shall cancel the reserve Liquidation Trust Interest, if applicable, and distribute the Cash held in the Disputed Claims Reserve with respect to such Claim to the holders of Allowed Claims against the applicable Plan Debtor in accordance with the terms of Article III of the Plan on the next Distribution Date that is at least 30 days after the date such Claim is disallowed.

(d)      Tax Treatment of Disputed Claims Reserve

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Liquidation Trustee, the Plan Debtors and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

5.      Delivery of Distributions

(a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those holders of Claims listed on the Claims Register (other than holders of publicly traded securities) as of the close of business on the Distribution Record Date.  If a Claim, other than a Claim based on a publicly traded instrument, is transferred 20 or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

        (b)        Delivery of Distributions in General

Except as otherwise provided herein, the Liquidation Trustee shall make distributions to holders of Allowed Claims and Liquidation Trust Beneficiaries at the last-known address for each such holder or beneficiary as indicated on the Plan Debtors' or Liquidation Trust's records as of the applicable Distribution Date; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Liquidation Trustee; and *provided*, *further*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that holder.

        (c)        Delivery of Distributions to the Holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims

All distributions to holders of First Lien Revolver Claims, First Lien Term Loan Claims and Second Lien Term Loan Claims shall be deemed completed when made to the Agent under the applicable Loan Documents.  Notwithstanding any provisions herein to the contrary, the Loan Documents shall continue in effect to the extent necessary to allow the applicable agents to receive and make distributions pursuant to the Plan.

        (d)        Delivery of Distributions to the Holders of Allowed Unsecured Claims

All distributions to holders of Senior Note Claims and Senior Note Guaranty Claims, as applicable, shall be deemed completed when made to the applicable Indenture Trustee as set forth in the paragraph below.  Notwithstanding any provisions herein to the contrary, the Senior Note Indentures, the Subordinated Note Indentures and the PIK Note Indenture shall continue in effect to the extent necessary to allow the Senior Note Indenture Trustees to (i) receive and make distributions pursuant to the Plan, (ii) maintain and exercise their respective Charging Liens against any such distributions, (iii) seek compensation and reimbursement for any fees and expenses incurred in making such distributions and (iv) enforce the subordination provisions of the applicable indentures.

The Distribution Agent for each Plan Debtor shall give effect to the provisions of articles 11 and 12 of the Subordinated Note Indentures such that all distributions made pursuant to the Plan in satisfaction of the Subordinated Note Claims or Subordinated Note Guaranty Claims shall be made to the holders of Senior Debt at the applicable Plan Debtor until all holders of Senior Debt are paid in full (including postpetition interest).  For the avoidance of doubt, distributions on account of Subordinated Note Guaranty Claims at each Conveying Subsidiary shall be reallocated only to holders of Claims that constitute Senior Debt at the applicable Conveying Subsidiary.

Pursuant to the PIK Notes Stipulation, solely with respect to TOUSA, the Distribution Agent shall give effect to the provisions of articles 11 and 12 of the PIK Note Indenture, such that all distributions made pursuant to the Plan in satisfaction of the PIK Note Claims shall be made to the holders of Senior Debt at TOUSA.  For the avoidance of doubt, any PIK Note Claims against the Conveying Subsidiaries have been released pursuant to the PIK Notes Stipulation and are hereby disallowed.

        (e)        Preservation of Subordination Provisions in Certain Note Indentures

The Plan contemplates that only Senior Note Claims, Senior Note Guaranty Claims and Term Loan Deficiency Claims are to be treated as Senior Debt under the Subordinated Note Indentures.  Certain holders of Lot Option Agreement Claims against TOUSA Homes, Inc., however, have asserted that such Lot Option Agreement Claims are entitled to treatment as Senior Debt at TOUSA Homes, Inc.   The Proponents and the Holders of Senior Note Guaranty Claims dispute that Lot Option Agreement Claims

against TOUSA Homes, Inc. are Senior Debt.  To the extent the Bankruptcy Court (or other court of competent jurisdiction) finds that the Lot Option Agreement Claims are entitled to treatment as Senior Debt at TOUSA Homes, Inc., such Claims will be treated as Senior Debt hereunder, as and to the extent applicable, and the amount distributable to holders of Senior Note Guaranty Claims on account of their Claims at TOUSA Homes, Inc. will be modified accordingly.  Further, the Committee and certain holders of Senior Note Guaranty Claims believe that, pursuant to the applicable Subordinated Note Indentures, when reallocating recoveries otherwise allocable to the holders of Subordinated Note Guaranty Claims at TOUSA Homes, Inc. to Senior Debt at TOUSA Homes, Inc., the Claims entitled to be treated as Senior Debt include, solely for purposes of allocation of such recoveries, the accrual of postpetition interest from and after the Petition Date.  For the avoidance of doubt, nothing contained in the Disclosure Statement or the Plan shall impact any party's rights with respect to any arguments in connection with the Lot Option Agreement Dispute.

To the extent that a Final Order is not entered in connection with the Lot Option Agreement Dispute in advance of the Effective Date, amounts that would be due to the holders of the Lot Option Agreement Claims, to the extent such Claims were entitled to be treated as Senior Debt at TOUSA Homes, Inc., will be held in reserve pending entry of a Final Order and released in accordance with the terms of the Plan and such Final Order.  The amount of the reserve shall be established by the Bankruptcy Court at or prior to the Confirmation Hearing.  Notwithstanding the foregoing, the Lot Option Agreement Claims will be treated as General Unsecured Claims for purposes of voting on the Plan.

(f)    Distributions by Distribution Agents

The Liquidation Trustee and, prior to the Effective Date, the Proponents, in consultation with the Requisite Lenders, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  As a condition to serving as a Distribution Agent, a Distribution Agent must (a) affirm its obligation to facilitate the prompt distribution of any documents, (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder and (c) waive any right or ability to set off, deduct from or assert any Lien or encumbrance against the distributions required hereunder that are to be distributed by such Distribution Agent; _provided_, _however_, that notwithstanding any provision of the Plan to the contrary, nothing herein shall be deemed to impair or negatively impact the Charging Lien, which Charging Lien is hereby expressly preserved.  The Plan Debtors and Liquidation Trustee may pay to the Distribution Agents (including the Senior Note Indenture Trustees) all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.  For the avoidance of doubt, the reasonable and documented fees of the Distribution Agents (including the Senior Note Indenture Trustees) will be paid by the Liquidation Trustee and/or the Plan Debtors, as applicable, and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Distribution Agent.

The Distribution Agents (including the Senior Note Indenture Trustees) shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

(g)    Setoffs and Withholdings

The Liquidation Trustee or Distribution Agent may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any

claim, right or Cause of Action of any nature that the distributing Plan Debtor may hold against the holder of such Claim (including a Term Loan Lender Defendant with respect to Term Loan Lender Disgorgement Payments).  In the event that the value of a Plan Debtor's claim, rights or Cause of Action against a particular claimant is undisputed, is resolved by settlement or has been adjudicated by Final Order of any court, the Liquidation Trustee may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise become due to such claimant.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Debtors or the Liquidation Trustee of any claims, rights or Causes of Action that the Plan Debtors or the Liquidation Trust may possess against any claimant.

      6.      Fractional, De Minimis and Undeliverable Distributions

      (a)      Fractional or De Minimis Distributions

Notwithstanding anything herein to the contrary, the Liquidation Trustee or Distribution Agent shall not be required to make on account of an Allowed Claim (i) partial distributions or payments of fractions of dollars; (ii) partial distributions or payments of fractions of Liquidation Trust Interests; or (iii) a distribution if the amount to be distributed is or has an economic value of less than $100.  Whenever any distribution of Liquidation Trust Interests of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole number (up or down), with half or less being rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.  Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Liquidation Trust.

      (b)      Undeliverable Distributions

      (i)      Holding of Certain Undeliverable Distributions

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Liquidation Trustee is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; _provided_, _however_, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After said date, in accordance with Local Rule 3011-1(B)(2), all "unclaimed property" or interests in property shall revert to the Liquidation Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and the Liquidation Trust Agreement to the other creditors of the Debtors' estates, and the Claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

      (ii)      Failure to Present Checks

Any check issued by the Liquidation Trust or the Distribution Agent on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Liquidation Trust by the holder of the relevant Allowed Claim with respect to which such check originally was issued.  If any holder of an Allowed

Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped and enjoined from asserting any Claim against any of the Plan Debtors, the Liquidation Trust or the Liquidation Trustee. In such cases, any Cash or Liquidation Trust Interests held for payment on account of such Claims shall be property of the Liquidation Trust, free of any Claims of such holder with respect thereto.

In an effort to ensure that all holders of Allowed Claims receive their allocated distributions, no later than 150 days after the issuance of such checks, the Liquidation Trustee shall file with the Bankruptcy Court a list of the holders of any un-negotiated checks. For the avoidance of doubt, such list shall not include the holders of any checks that have not been negotiated within six months after the date the check was mailed or otherwise delivered to the holder. Nothing contained herein shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

      7.      Claims Paid or Payable by Third Parties

      (a)      Claims Paid by Third Parties

To the extent that the holder of a Claim receives payment in full on account of such Claim from a party that is not a Plan Debtor or the Liquidation Trust, the Liquidation Trustee shall reduce the Claim in full (or to the extent of payment by the third party), and such Claim shall be disallowed to the extent of payment from such third party without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court. Further, to the extent that a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Plan Debtor or the Liquidation Trust on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent that the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the two-week grace period specified above until such amount is repaid.

      (b)      Chinese Drywall Claims

In 2009, certain parties commenced the Chinese Drywall Litigation against homebuilders, developers, installers, retailers, realtors, brokers, suppliers, importers, exporters and distributors, as well as their insurers and the insurers of homeowners, who were involved with installing Chinese drywall in the affected properties. The Chinese Drywall Litigation was transferred to the Chinese Drywall Court and was designated MDL No. 09-2047. The Chinese Drywall Court ordered the parties to the Chinese Drywall Litigation to attend mediation, and on February 7, 2013, the Chinese Drywall Court approved a final settlement of the Chinese Drywall Litigation [E.D. La., MDL No. 09-2047, ECF No. 16570], pursuant to which the Chinese Drywall Claims were settled for approximately $337,655.34 in full and final satisfaction of such Claims, to be paid from the class action settlement. Accordingly, no distribution will be made on account of Chinese Drywall Claims pursuant to the Plan.

      (c)      Claims Payable by Insurance

Holders of Claims that are covered by the Plan Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Plan Debtors and the Liquidation Trust, as applicable, shall have no obligation to pay any amounts in respect of prepetition deductibles or self insured retention amounts. No distributions under the Plan shall be made on account of an Allowed

Claim that is payable pursuant to one of the Plan Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Plan Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction or settled in accordance with the applicable insurer's reasonable business judgment in consultation with the Liquidation Trustee), then, immediately upon such insurers' agreement, the Proponents or the Liquidation Trustee, as applicable, may direct the Voting and Claims Agent to expunge such Claim from the Claims Register to the extent of any agreed-upon satisfaction without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be peremptory or supervening) shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses of the insureds or insurers with respect to any insurance policies issued to the Plan Debtors and any related agreements with the insurance companies. The rights and obligations of the insureds and insurers under such insurance policies and related agreements shall be determined under such policies and agreements, including the terms, conditions, limitations, exclusions and endorsements thereof, which shall remain in full force and effect under their terms and under any applicable non-bankruptcy law. Each of the non-Debtor counterparties to such insurance policies and agreements reserves all its rights and defenses under such insurance policies and agreements and applicable non-bankruptcy law, including any defenses to coverage.

This Article V.I.7(c) shall not apply to distributions made on Allowed Claims on account of the D&O Insurance Coverage Settlement in accordance with the terms of the D&O Insurance Coverage Settlement Agreements and the D&O Settlement Order. Notwithstanding anything to the contrary herein, insurers' rights (if any) to reimbursement, recovery, collection, setoff, subrogation or recoupment are expressly preserved and, for the avoidance of doubt, the Plan Debtors' and Liquidation Trustee's defenses and objections to any such claims or asserted rights are expressly preserved.

(d)     Applicability of Insurance Policies

Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan against the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Plan Debtors, the Liquidation Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND POSTPETITION CONTRACTS**

A.     *Assumption and Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts*

1.     Assumption of Executory Contracts, Unexpired Leases and Postpetition Contracts

On the Effective Date, the Plan Debtors shall assume only the Executory Contracts, Unexpired Leases and Postpetition Contracts listed on the schedule of "Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts." The Confirmation Order shall constitute an order of the Bankruptcy

Court approving the assumptions described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of such Executory Contract or Unexpired Lease, including objecting to the proposed cure amount related thereto, will be deemed to have consented to such assumption and agreed to the specified cure amount.

      2.        Rejection of Executory Contracts, Unexpired Leases and Postpetition Contracts

Each Executory Contract, Unexpired Lease and Postpetition Contract shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract, Unexpired Lease or Postpetition Contract:

            (a)      is listed on the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts or

            (b)      is otherwise assumed pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Plan Debtor parties to Executory Contracts, Unexpired Leases or Postpetition Contracts that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts, Unexpired Leases or Postpetition Contracts, including Claims under section 503 of the Bankruptcy Code; *provided* that such Claims must be filed in accordance with the procedures set forth in Article VI.B of the Plan. The Proponents reserve the right to amend the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts at any time before the Effective Date.

The Plan Debtors are deemed to have abandoned any furniture, fixtures, equipment, inventory and other personal property located at the premises of leases of nonresidential real property (as such term is used in section 365 of the Bankruptcy Code) for which the rejection is first effective on or after the Effective Date, as of the later of (i) the Effective Date, (ii) the effective date of such rejection and (iii) the date the Plan Debtors have turned over possession of such premises to the applicable landlord. Further, other than with respect to the books and records required for the administration of the Liquidation Trust, as set forth in Article V.H.5 of the Plan, the Plan Debtors may destroy or abandon all remaining books and records, as applicable. The Plan Debtors shall have no administrative expense liability to any of their landlords for rental charges or occupancy of the leased premises after such abandonment by virtue of the continued presence at such premises of such abandoned property. Landlords at premises with such abandoned property may, in their sole discretion and without further notice, dispose of such abandoned property without liability to the Plan Debtors or any non-Plan Debtor third party claiming any interest in such property (including holders of any First Lien Revolver Claims, First Lien Term Loan Claims, Second Lien Term Loan Claims or Other Secured Claims) and, to the extent applicable, the automatic stay shall be modified to allow such disposition. The Plan Debtors shall endeavor to provide such third parties prior, specific and reasonable notice that they must retrieve the property in which they claim an interest before or upon such abandonment or such property shall be deemed so abandoned without further notice to or action, order or approval of the Bankruptcy Court and such landlords or their designee shall be free to dispose of same without liability or recourse to such landlords. Notwithstanding the Plan Debtors' required efforts to provide prior, specific and reasonable notice to such third parties, the Plan and any notices of the Effective Date shall be deemed sufficient notice to such third parties to effectuate such abandonment and enable the landlords to dispose of such abandoned property without liability or recourse.

The right of any party in interest to assert a Claim against the Plan Debtors' Estates for costs associated with the removal or disposition of such abandoned property is fully preserved; *provided* that any such Claim must be filed by the applicable Claims Bar Date and otherwise in accordance herewith; *provided*, *further*, that the rights of all parties, including the Proponents and the Liquidation Trustee, to contest any such Claim shall be fully preserved.

B.     *Claims on Account of the Rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts*

**All Proofs of Claim arising from the rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts must be filed with the Voting and Claims Agent according to the procedures established for the filing of Proofs of Claim in the Initial Claims Bar Date Order and Local Rule 3003-1 on or before the later of:**

**1.     the applicable Claims Bar Date and**

**2.     30 days after (a) the entry of the order compelling or approving the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract or (b) the effective date of the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract, if the order contains the notice mandated by Local Rule 6006-1.**

**Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Plan Debtor, its Estate or property or the Liquidation Trust or its property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.F of the Plan.**

C.     *Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan*

**A NOTICE OF THE EFFECTIVE DATE OF THE PLAN, INCLUDING NOTICE REGARDING THE ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, WILL BE SENT TO ALL KNOWN CREDITORS.** For known non-Plan Debtor parties to Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to the Plan, such notice or notices will be sent on or as soon as reasonably practicable after the Effective Date notifying such Entities regarding the Executory Contracts and Unexpired Leases to which it is a counterparty that have been assumed or assumed and assigned pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption.

At least 20 days prior to the Confirmation Hearing, the Proponents shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Proponents at least 10 days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and agreed to the specified cure amount.

## ARTICLE VII.

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to Consummation*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article VII.B of the Plan:

1.     The Confirmation Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to the Proponents and the Requisite Lenders.

2.     The Mediation Settlement shall have been approved by a Final Order, which may be the Confirmation Order, in form and substance satisfactory to the Proponents and the Requisite Lenders.

3.     The D&O Settlement Order shall have been entered and become a Final Order.

4.     All documents and agreements necessary to implement the Plan shall have been effected or executed and tendered for delivery in a form acceptable to the Proponents and the Requisite Lenders, and all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

5.     The Liquidation Trust shall be established and funded in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall have been appointed and the Members of the Liquidation Trust Advisory Board shall have been designated.

B.     *Waiver of Conditions*

The conditions to the Effective Date set forth in Article VII.A may be waived by joint agreement of the Proponents and the Requisite Lenders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; *provided* that the following conditions to consummation cannot be waived: (i) the Confirmation Order shall have been entered and (ii) the Mediation Settlement shall have been approved.

C.     *Effect of Non-Occurrence of Conditions to the Effective Date*

Unless the Proponents and the Requisite Lenders agree otherwise, if the Effective Date does not occur on or before 90 days after entry of the Confirmation Order, (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Plan Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (iv) the Plan Debtors' obligations with respect to Claims and Interests shall remain unchanged; and (v) the Plan shall be null and void in all respects and

nothing contained in the Plan or the Disclosure Statement shall: (x) constitute a waiver or release of any claims by or Claims against or Interests in the Plan Debtors; (y) prejudice in any manner the rights of the Proponents, any holders of Claims or any other Entity; or (z) constitute an admission, acknowledgment, offer or undertaking by the Proponents, any holders of Claims or any other Entity in any respect.

## ARTICLE VIII.

## RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests and Controversies*

As contemplated in Article V.A.1 and Article V.A.2, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, including the Mediation Settlement and the Unsecured Creditor Settlement, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates and stakeholders, and are fair, equitable and reasonable.

B.      *Settlement Party Release*

Upon the Effective Date of the Plan, each Releasing Settlement Party will be deemed to forever release, waive and discharge the Released Parties from all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other circumstance taking place on or prior to the Effective Date in connection with, arising out of or in any way relating to the Released Settlement Claims; *provided*, *however*, that the foregoing release shall not apply to Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or criminal misconduct; *provided*, *further*, that the foregoing release shall not operate to waive or release any Released Party with respect to (i) the subject of a pending action on behalf of the Plan Debtors' Estates as of the date of entry of an order approving the Disclosure Statement, except for the Settled Mediation Causes of Action, which are released pursuant to the terms of the Plan and the various agreements constituting the Mediation Settlement, (ii) a Liquidation Trust Cause of Action, (iii) obligations under agreements effectuating the assignment, participation or other transfer of any Claim against a Plan Debtor or the assumption of any liability to a Plan Debtor or (iv) the subject of an express preservation in, or any right or obligation under or that is part of, the Plan, the Liquidation Trust Agreement or the Intercreditor Settlement Agreement, or any agreement entered into pursuant to, in connection with or contemplated by the Plan.  For the avoidance of doubt, nothing contained herein shall (x) release (a) any Non-Settling Transeastern Lender from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the Transeastern Litigation or (b) RSUI from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the D&O Insurance Coverage Action or (y) impact the bar order and releases contained in the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order.

C.      *Third-party Release*

On the Effective Date, to the fullest extent permissible under applicable law, each holder of a Claim or Interest (other than a Releasing Settlement Party) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to any Claims that could have been asserted at any time past, present or future against any Released Party or D&O Insurance Coverage Released Party in connection with, arising out of or in any way relating to the Debtors, the Chapter 11 Cases,  the Loan Documents, the Settled Mediation Causes of Action, the Fiduciary Duty Action or the D&O Insurance Coverage Action; *provided*, *however*, that the foregoing release shall not apply to Claims or liabilities arising out of or relating to any act or omission of a Released Party or D&O Insurance Coverage Released Party that constitutes actual fraud or criminal misconduct; *provided*, *further*, that the foregoing release shall not operate to waive or release any Released Party or D&O Insurance Coverage Released Party that is (i) the subject of a pending action commenced by the Plan Debtors' Estates as of the date of entry of the order approving the Disclosure Statement, except for the Settled Mediation Causes of Action, which are released pursuant to the terms of the Plan and the various agreements constituting the Mediation Settlement, and the Fiduciary Duty Action and the D&O Insurance Coverage Action, which are released pursuant to the terms of the D&O Insurance Coverage Settlement Agreements, (ii) a defendant or a potential defendant under a Liquidation Trust Cause of Action, (iii) a party to any agreement effectuating the assignment, participation or other transfer of any Claims against a Plan Debtor or the assumption of any liability to a Plan Debtor or (iv) the subject of an express preservation in, or any right or obligation under or that is part of, the Plan, the Liquidation Trust Agreement, the Intercreditor Settlement Agreement, the D&O Insurance Coverage Settlement Agreements or any agreement entered into pursuant to, in connection with or contemplated by the Plan; *provided*, *further*, *however*, that nothing in this Article VIII.C precludes the SEC from exercising its statutory duties against any Person in any forum.  For the avoidance of doubt, nothing contained herein shall (x) release (a) any Non-Settling Transeastern Lender from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the Transeastern Litigation or (b) RSUI from any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities that have been or could be asserted in connection with the D&O Insurance Coverage Action or (y) impact the bar order and releases contained in the D&O Insurance Coverage Settlement Agreements or the D&O Settlement Order.

D.      *Exculpation*

Except as otherwise specifically provided in the Plan and to the extent not prohibited by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim; *provided*, *however*, that the foregoing exculpation shall not apply to Claims or liabilities arising out of actual fraud, criminal misconduct, willful misconduct or gross negligence; *provided*, *further* that, in all respects, such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided*, *further*, *however*, that nothing in this Article VIII.D precludes the SEC from exercising its statutory duties against any Person in any forum. The Exculpated Parties (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have complied with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the distributions contemplated by the Plan and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any

applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.     *Preservation of Rights and Causes of Action*

     1.     Maintenance of Causes of Action

Except as otherwise provided herein or in the Confirmation Order, after the Effective Date, the Liquidation Trust shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Liquidation Trust Causes of Action, whether existing as of the applicable Petition Date or thereafter arising, including those Causes of Action arising after the Effective Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Plan Debtors' Chapter 11 Cases.

     2.     Preservation of All Causes of Action Not Expressly Settled or Released by the Plan Debtors

Unless a Claim or Cause of Action against a holder of a Claim or an Interest or other Entity is expressly waived, relinquished, released, compromised or settled (including, without limitation, the releases contained in Article VIII.B and Article VIII.C of the Plan) herein, pursuant to the Mediation Settlement or in any Final Order (including, without limitation, the Confirmation Order or the D&O Settlement Order) entered in the Plan Debtors' Chapter 11 Cases, such Claim or Cause of Action is preserved for later adjudication by the Plan Debtors or the Liquidation Trustee, as applicable, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or the D&O Settlement Order. The Liquidation Trustee expressly reserves the right to pursue or adopt any such claims alleged in any lawsuit in which the Plan Debtors are a plaintiff, defendant or an interested party, against any entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

F.     *Injunction*

**SUBJECT TO A FINDING THAT THE PLAN WAS FILED IN GOOD FAITH, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, THE CONFIRMATION ORDER OR SUCH OTHER ORDER OF THE BANKRUPTCY COURT THAT MAY BE APPLICABLE, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE PLAN DEBTORS ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE PLAN DEBTORS' ESTATES, THE LIQUIDATION TRUSTEE, THE DISTRIBUTION AGENT OR THE PROPERTY OF THE PLAN DEBTORS' ESTATES OR THE LIQUIDATION TRUST ON ACCOUNT OF ANY SUCH CLAIMS OR INTERESTS INCLUDING, BUT NOT LIMITED TO: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ANY SUCH CLAIM, OR OTHER DEBT OR LIABILITY OR INTEREST OR OTHER RIGHT OR INTEREST THAT IS TERMINATED OR CANCELLED PURSUANT TO THE PLAN; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER; (3) EXCEPT TO THE EXTENT PROVIDED, AND AS PERMITTED BY THE BANKRUPTCY CODE, CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY**

OBLIGATION DUE FROM THE PLAN DEBTORS' ESTATES OR THE LIQUIDATION TRUST NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; (5) COMMENCING OR CONTINUING, IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING OF ANY KIND THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PLAN; AND (6) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT NOTHING HEREIN SHALL PRECLUDE ANY ENTITY FROM EXERCISING RIGHTS UNDER THE PLAN OR APPLY WITH RESPECT TO ANY CLAIMS HELD BY THE SEC AS OF THE EFFECTIVE DATE BASED ON THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, THE SECURITIES ACT OF 1933, AS AMENDED OR OTHER SECURITIES LAWS OF THE UNITED STATES; *PROVIDED*, *FURTHER*, THAT SUCH INJUNCTION SHALL NOT PRECLUDE THE UNITED STATES OF AMERICA, ANY STATE, OR ANY OF THEIR RESPECTIVE POLICE OR REGULATORY AGENCIES FROM ENFORCING THEIR POLICE OR REGULATORY POWERS.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE PLAN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND ALL INTERESTS SHALL BE CANCELLED, AND THE PLAN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN DEBTORS, THE PLAN DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT NOTHING IN THIS ARTICLE VIII.F PRECLUDES THE SEC FROM EXERCISING ITS STATUTORY DUTIES AGAINST ANY PERSON IN ANY FORUM.  FOR THE AVOIDANCE OF DOUBT, THE PLAN DEBTORS WILL NOT RECEIVE A DISCHARGE UNDER SECTION 1141 OF THE BANKRUPTCY CODE OR ANY APPLICABLE LAW.

ARTICLE IX.

BINDING NATURE OF PLAN

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDER FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

# ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over the Plan Debtors' Chapter 11 Cases and all Entities with respect to all matters related to the Plan Debtors' Chapter 11 Cases, the Plan Debtors and the Plan, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim, the resolution of any and all issues related to the release of Liens upon payment of a secured Claim and the resolution of the Lot Option Agreement Dispute;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract, Unexpired Lease or Postpetition Contract to which a Plan Debtor is a party or with respect to which a Plan Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the schedule of Assumed Executory Contracts, Unexpired Leases and Postpetition Contracts;

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving a Plan Debtor that may be pending on the Effective Date or instituted by the Liquidation Trustee after the Effective Date; *provided* that the Liquidation Trustee shall reserve the right to commence actions in all appropriate fora and jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the occurrence of the Effective Date, Confirmation, interpretation, implementation or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

8.      hear and determine all Causes of Action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action;

9.      issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or the consummation, implementation or enforcement of the Plan, except as otherwise provided in the Plan;

10.      resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

11. enforce the terms of the Liquidation Trust Agreement and decide any claims or disputes that may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement or the transactions contemplated by the Liquidation Trust Agreement;

12. resolve any matters related to the Liquidation Trust;

13. resolve any Disputed Claims;

14. resolve any cases, controversies, suits or disputes with respect to the releases, exculpation and other provisions contained in Article VIII of the Plan and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

15. recover all assets of the Plan Debtors and property of the Plan Debtors' Estates wherever located;

16. hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

17. consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order and the D&O Settlement Order;

18. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order or the D&O Settlement Order is modified, stayed, reversed, revoked or vacated;

19. resolve any other matters that may arise in connection with or relating to the Plan, the Mediation Settlement, the D&O Insurance Coverage Settlement, the Disclosure Statement, the Confirmation Order, the D&O Settlement Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

20. resolve any issues relating to the application of the Intercreditor Agreement or Intercreditor Settlement Agreement solely with respect to the distributions under the Plan;

21. hear any other matter or for any purpose specified in the Confirmation Order or D&O Settlement Order that is not inconsistent with the Bankruptcy Code;

22. hear and determine any timely objections to Administrative Claims or to Proofs of Claim and Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

23. enter an order or orders concluding any or all of the Plan Debtors' Chapter 11 Cases; and

24. enforce all orders previously entered by the Bankruptcy Court.

# ARTICLE XI.

# LIQUIDATION TRUST

*A.    Generally*

On the Effective Date, the Liquidation Trust shall be established and become effective for the benefit of the Liquidation Trust Beneficiaries.  The powers, authority, responsibilities and duties of the Liquidation Trust, the Liquidation Trustee and the Liquidation Trust Advisory Board are set forth in and shall be governed by the Plan and the Liquidation Trust Agreement.  The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  The Plan Debtors shall transfer, without recourse, to the Liquidation Trust all of their right, title and interest in the Liquidation Trust Assets, including the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets.  In addition, the First Lien Revolver Lenders, the First Lien Term Loan Lenders and the Second Lien Term Loan Lenders shall transfer, without recourse, to the Liquidation Trust all of their right, title and interest in the Transeastern Litigation and the RSUI Insurance Coverage Action.  Upon the transfer by the Plan Debtors of the Liquidation Trust Assets to the Liquidation Trust, the Plan Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

*B.    Purposes and Establishment of the Liquidation Trust*

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of liquidating and administering the Liquidation Trust Assets, including prosecuting the Transeastern Litigation, the RSUI Insurance Coverage Action and the Remaining Contingent Assets, and making distributions on account of Liquidation Trust Interests as provided for under the Plan.  The Liquidation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.  The Liquidation Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

On the Effective Date, the Liquidation Trustee, on behalf of the Plan Debtors, shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and consistent with the Plan.

*C.    Liquidation Trust Assets*

On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all of the Liquidation Trust Assets, as well as the rights and powers of each Plan Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests for the benefit of the Liquidation Trust Beneficiaries.  Upon the transfer of the Liquidation Trust Assets, the Plan Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney-client privilege, work-product privilege or other privilege or immunity

76

attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust and its representatives, and the Plan Debtors and the Liquidation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidation Trustee shall agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and the Liquidation Trust Agreement.

The Plan Debtors, the Liquidation Trustee, the Liquidation Trust Beneficiaries and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust, which documents and instruments shall be in form and substance reasonably acceptable to the Proponents and the Requisite Lenders.

To the extent reasonably requested by the Liquidation Trustee, the professionals retained by the Debtors and the Committee during the Chapter 11 Cases agree, subject to any applicable and non-transferred privileges, to cooperate with the Liquidation Trustee in the prosecution of the Liquidation Trust Causes of Action, including, without limitation, by providing, at the sole cost and expense of the Liquidation Trust, access to those attorneys, accountants and other professionals with knowledge of matters relevant to the Liquidation Trust Causes of Action.

D.    *Valuation of Assets*

As soon as possible after the establishment of the Liquidation Trust, but in no event later than 60 days thereafter, the Liquidation Trust Advisory Board shall inform, in writing, the Liquidation Trustee of the value of the assets transferred to the Liquidation Trust, based on the good- faith determination of the Liquidation Trust Advisory Board, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) for all federal income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Liquidation Trust Advisory Board shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

E.    *Appointment of the Liquidation Trustee and the Liquidation Trust Advisory Board*

On the Effective Date and in compliance with the provisions of the Plan and the Liquidation Trust Agreement, the Committee and the Requisite Lenders shall appoint a person or firm, who is reasonably acceptable to the Plan Debtors, as Liquidation Trustee. The identity of the Liquidation Trustee and the Liquidation Trustee's compensation shall be identified no fewer than seven days prior to the Voting Deadline. Additionally, on or prior to the Confirmation Date, a four-member Liquidation Trust Advisory Board shall be appointed as follows: (i) two Members consisting of the Unsecured Creditors' Liquidation Trust Representatives (ii) one Member consisting of the First Lien's Liquidation Trust Representative and (iii) one Member consisting of the Second Lien's Liquidation Trust Representative. In the event of a split vote among the Members, the Liquidation Trustee shall cast the deciding vote. Upon the express approval of at least three of the Members, the Liquidation Trust Advisory Board may appoint *ex officio* members. Such *ex officio* members shall not be entitled to vote.

77

In the event the Liquidation Trustee dies, is terminated or resigns for any reason, the Liquidation Trust Advisory Board shall designate a successor by majority vote. If the Members are unable to secure a majority vote, the Bankruptcy Court will determine the successor Liquidation Trustee on motion from the Members.

The Liquidation Trustee shall serve at the direction of the Liquidation Trust Advisory Board, *provided*, *however*, that the Liquidation Trust Advisory Board may not direct the Liquidation Trustee or the Members of the Liquidation Trust Advisory Board to act inconsistently with their duties under the Liquidation Trust Agreement and/or the Plan; *provided*, *further*, that (i) the First Lien's Liquidation Trust Representative and Second Lien's Liquidation Trust Representative shall not have the authority to direct the Liquidation Trustee with respect to Liquidation Trust Causes of Action that would not result in any recovery for the benefit of holders of the TOUSA Class 1B General Liquidation Trust Interests, TOUSA Class 2 General Liquidation Trust Interests, or Lender Transeastern Liquidation Trust Interests and (ii) the Unsecured Creditors' Liquidation Trust Representatives shall not have the authority to direct the Liquidation Trustee with respect to (x) Liquidation Trust Causes of Action that would not result in any recovery for the benefit of holders of TOUSA Class 5A Liquidation Trust Interests, TOUSA Class 5B Liquidation Trust Interests or Conveying Subsidiaries Liquidation Trust Interests or (y) the Transeastern Litigation after the holders of the Conveying Subsidiaries Liquidation Trust Interests have received the full amount of the Unsecured Creditor Transeastern Recovery.

The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement or the Confirmation Order. Membership, duties, responsibilities and powers of the Liquidation Trust Advisory Board shall be as set forth in the Liquidation Trust Agreement.

F.    *Duties and Powers of the Liquidation Trustee*

1.    Authority

The duties and powers of the Liquidation Trustee shall include all powers necessary to implement the Plan with respect to all Plan Debtors and to administer and monetize the Liquidation Trust Assets, including, without limitation, the duties and powers listed herein. The Liquidation Trustee will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement. The Liquidation Trustee, upon direction by the Liquidation Trust Advisory Board and in the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Liquidation Trust, make timely distributions and not unduly prolong the duration of the Liquidation Trust.

2.    Claims and Causes of Action

The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise or settle any and all Claims against the Plan Debtors and Causes of Action of the Plan Debtors that have not already been Allowed as of the Effective Date, except as provided in Article V.C.1(e) of the Plan. The Liquidation Trustee, upon direction by the Liquidation Trust Advisory Board, shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. The Liquidation Trustee will prepare and make available to Liquidation Trust Beneficiaries, on a quarterly basis, a written report detailing, among other things, the litigation status of Claims or Causes of Action transferred to the Liquidation Trust, any settlements entered into by the

Liquidation Trust, the proceeds recovered to date from the Liquidation Trust Assets and the distributions made by the Liquidation Trust.

3.    Retention of Professionals

The Liquidation Trustee may enter into employment agreements and retain professionals to pursue the Liquidation Trust Causes of Action and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust in connection with the matters contemplated by the Plan, the Confirmation Order and the Liquidation Trust Agreement without further order of the Bankruptcy Court, *provided*, *however*, that the Liquidation Trustee shall retain Robbins Russell to prosecute the Transeastern Litigation.  The terms of such employment agreements shall be acceptable to the Liquidation Trust Advisory Board.  Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Proponents or the Liquidation Trustee, as applicable), professionals retained by the Liquidation Trustee shall be compensated by the Liquidation Trust Loan and thereafter from the proceeds of the Liquidation Trust Assets; *provided*, *however*, that, in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

4.    Agreements

The Liquidation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Plan Debtors' and Liquidation Trust's obligations thereunder.

5.    Reasonable Fees and Expenses

The Liquidation Trustee may incur any reasonable and necessary expenses in connection with the performance of its duties under the Plan, including in connection with retaining professionals and/or entering into agreements pursuant to subsections 3 and 4 above.  The Liquidation Trustee shall be paid by the Liquidation Trust Loan and thereafter from the proceeds of the Liquidation Trust Assets; *provided*, *however*, that, in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

6.    Other Actions

The Liquidation Trustee may take all other actions not inconsistent with the provisions of the Plan and the Liquidation Trust Agreement that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

G.    *Funding of the Liquidation Trust*

On the Effective Date, the Liquidation Trust will be funded with the Liquidation Trust Loan, which shall be used to administer all Liquidation Trust Assets.  The Liquidation Trust Beneficiaries shall have no further obligation to provide any funding with respect to the Liquidation Trust, except as may be funded directly by the Liquidation Trust Assets, other than any proceeds from the Transeastern Litigation. For the avoidance of doubt, the proceeds of the Liquidation Trust Causes of Action will first be applied to the repayment of the Liquidation Trust Loan; *provided*, *however*, that, to the extent that proceeds of Liquidation Trust Causes of Action are received by the Liquidation Trust on account of the successful

prosecution or settlement of the Transeastern Litigation prior to resolution of the other Liquidation Trust Causes of Action, the Liquidation Trust shall retain proceeds to ensure that, unless otherwise approved by the Liquidation Trust Advisory Board, no less than $2 million remains available to fund the remaining Liquidation Trust Causes of Action, which amount shall be allocable as follows: (i) if the Transeastern Litigation has settled but the RSUI Insurance Coverage Action has not settled, $1.5 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests and $500,000 allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims and (ii) if both the Transeastern Litigation and the RSUI Insurance Coverage Action have settled, $1.75 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests and $250,000 allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims; *provided*, *further*, that, to the extent proceeds of Liquidation Trust Causes of Action are received by the Liquidation Trust on account of the successful prosecution or settlement of Liquidation Trust Causes of Action other than the Transeastern Litigation, the Liquidation Trust shall retain proceeds to ensure that, unless otherwise approved by the Liquidation Trust Advisory Board, no less than $5 million remains available ($2.5 million allocable to the holders of Allowed TOUSA Class 1A Claims, Allowed TOUSA Class 1B Claims and Allowed TOUSA Class 2 Claims and $2.5 million allocable to holders of Conveying Subsidiaries Liquidation Trust Interests) to fund the remaining Liquidation Trust Causes of Action, including the Transeastern Litigation.

Any amounts of the Liquidation Trust Loan that are unused by the Liquidation Trust shall be distributed (i) 50% to holders of Allowed Unsecured Claims against the Conveying Subsidiaries, (ii) 35% to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (iii) 15% to holders of Allowed TOUSA Class 2 Claims in accordance with the procedures set forth in Article V.C.1(e) of the Plan.

H.      *Investment Powers*

The right and power of the Liquidation Trustee to invest assets transferred to the Liquidation Trust, the proceeds thereof or any income earned by the Liquidation Trust shall be limited to the right and power to invest in such assets only in Cash and U.S. government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided*, *however*, that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Liquidation Trustee may expend the assets of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Liquidation Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement.

I.      *Fees and Expenses of the Liquidation Trust*

All fees, expenses and costs of the Liquidation Trust, including, without limitation, fees and expenses incurred by professionals retained by the Liquidation Trust (in accordance with the terms and conditions set forth in the Liquidation Trust Agreement) shall be paid by the Liquidation Trust Loan and thereafter from the proceeds of the Liquidation Trust Causes of Action; *provided*, *however*, that, in connection with Article XI.G of the Plan, no more than $2 million shall be retained in net proceeds from the Transeastern Litigation to fund expenses (including professional fees) incurred or to be incurred in connection with the monetization of Liquidation Trust Assets unrelated to the Transeastern Litigation.

Any such funds remaining after the liquidation of the Liquidation Trust Assets is complete, including prosecution of the Liquidation Trust Causes of Action, are to be distributed to the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement. Any amounts of the Liquidation Trust Loan that are unused by the Liquidation Trust shall be distributed (i) 50% to holders of Allowed Unsecured Claims against the Conveying Subsidiaries, (ii) 35% to holders of Allowed TOUSA Class 1A Claims and holders of Allowed TOUSA Class 1B Claims and (iii) 15% to holders of Allowed TOUSA Class 2 Claims in accordance with the procedures set forth in Article V.C.1(e) of the Plan.

*J.*      *Liquidation Trustee's Tax Power for Plan Debtors*

As described in Article V.H.6 of the Plan, following the Effective Date, the Liquidation Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Plan Debtors, all tax returns required to be filed or that the Liquidation Trustee otherwise deems appropriate.

In the event that the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), the Liquidation Trustee shall take any and all necessary actions as it shall deem appropriate to have the Liquidation Trust classified as a partnership for federal tax purposes under Treasury Regulation section 301.7701-3, including, if necessary, creating or converting the Liquidation Trust into a Delaware limited liability partnership or limited liability company that is so classified.

*K.*      *Prosecution of Liquidation Trust Causes of Action*

Except as otherwise set forth herein, including with respect to the Transeastern Litigation against the Non-Settling Transeastern Lenders, Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, under the supervision and with the acceptance of the Liquidation Trust Advisory Board. Settlement of Liquidation Trust Causes of Action will be subject to Bankruptcy Court approval; *provided*, *however*, that settlement of Disputed Claims unrelated to the Transeastern Litigation will not require Bankruptcy Court approval. The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

*L.*      *Distributions; Withholding*

As described in Article V.I herein, the Liquidation Trustee shall make distributions to the Liquidation Trust Beneficiaries in accordance with the terms of the Liquidation Trust Agreement and the Plan. The Liquidation Trust Advisory Board may authorize the Liquidation Trustee to retain proceeds from the Liquidation Trust Assets to fund additional litigation with respect to the Liquidation Trust Causes of Action. The Liquidation Trust may withhold from amounts otherwise distributable to any Entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement. Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other Tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations, and, if any party issuing any instrument or making any distribution under the Plan fails to

withhold with respect to any such holder's distribution and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Liquidation Trustee or other Distribution Agent, as applicable, may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Article V.I.6 herein.

M.    *Insurance*

The Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trust Advisory Board and the Liquidation Trustee on and after the Effective Date.

N.    *Exculpation; Indemnification*

The Liquidation Trustee, the Liquidation Trust, the Liquidation Trust Advisory Board, the professionals of the Liquidation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement.  The indemnification described in the Liquidation Trust Agreement will exclude willful misconduct, gross negligence and professional malpractice.  Any indemnification claim of the Liquidation Trustee or the other individuals entitled to indemnification under this subsection shall be satisfied solely from the Liquidation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Liquidation Trust Interests and any other claim to or interest in such assets.  The Liquidation Trustee, the Members and their representatives (as applicable) shall be entitled to rely, in good faith, on the advice of their retained professionals.

O.    *Transferability of the Liquidation Trust Interests*

The Liquidation Trust Interests shall be transferable in accordance with applicable law.  The Liquidation Trust Interests will not be certificated.

P.    *Registry of Beneficial Interests*

The Liquidation Trustee shall maintain a registry of the Liquidation Trust Beneficiaries.

Q.    *Federal Income Tax Treatment of Liquidation Trust*

1.    Liquidation Trust Assets Treated as Owned by Creditors

For all U.S. federal income tax purposes, all parties (including, without limitation, the Plan Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date as (i) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries and, to the extent that Liquidation Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve, followed by (ii) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Liquidation Trust Interests.  Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to the Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

2.        Tax Reporting

The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article XI.Q.  The Liquidation Trustee also will annually send to each holder of a Liquidation Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Liquidation Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidation Trust that is required by any governmental unit.

The valuation of the Liquidation Trust Assets prepared pursuant to Article XI.D of the Plan shall be used consistently by all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

Allocations of Liquidation Trust taxable income among the Liquidation Trust Beneficiaries (other than taxable income allocable to the Disputed Claims Reserve) shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time, and without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve) to the holders of the Liquidation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust.  Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidation Trust Assets.  The tax book value of the Liquidation Trust Assets for the purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any Taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent that such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

The Liquidation Trustee may request an expedited determination of Taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidation Trust.

3.        Tax Withholdings by Liquidation Trustee

The Liquidation Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidation Trust Beneficiaries.  All such amounts

withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement. The Liquidation Trustee shall be authorized to collect such tax information from the Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Liquidation Trust Agreement. In order to receive distributions under the Plan, all Liquidation Trust Beneficiaries (including, without limitation, holders of Allowed Other Secured Claims and Allowed Unsecured Claims) will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent that the Liquidation Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; _provided_, _however_, that, upon the delivery of such information by a Liquidation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the Liquidation Trust Beneficiary is entitled, without interest; and, _provided_, _further_, that, if the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidation Trustee for such liability.

4.      Foreign Tax Matters

The Liquidation Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Liquidation Trustee or the Liquidation Trust under non-United States law relating to Taxes. The Liquidation Trustee, or any other legal representative of the Liquidation Trust, shall not distribute the Liquidation Trust Assets or proceeds thereof without having first obtained all certificates required to have been obtained under applicable non-United States law relating to Taxes.

5.      Dissolution

The Liquidation Trust Advisory Board and the Liquidation Trust shall be dissolved at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines, in consultation with the Liquidation Trust Advisory Board, that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional Liquidation Trust proceeds to justify further pursuit or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made; _provided_, _however_, that in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If, at any time, the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain and in consultation with the Liquidation Trust Advisory Board, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidation Trust, the Liquidation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation," as defined in section 509(a) of the Tax Code and (D) that is unrelated to the Plan Debtors, the Liquidation Trust and any insider of the Liquidation Trustee and (iii) dissolve the Liquidation Trust.

84

# ARTICLE XII.

# MISCELLANEOUS PROVISIONS

A.      *Payment of Indenture Trustees' Fees*

Notwithstanding any provisions of the Plan to the contrary, on the Effective Date, the Liquidation Trustee shall pay in Cash from the assets of the Conveying Subsidiaries all reasonable fees, costs and expenses incurred by the Indenture Trustees prior to the Effective Date, including, but not limited to, the reasonable fees, costs and expenses incurred by the Indenture Trustees' professionals in carrying out the Indenture Trustees' duties under the applicable indenture.  Following the Effective Date, the Liquidation Trustee shall pay all reasonable fees, costs and expenses incurred by the Indenture Trustees, including, but not limited to, the reasonable fees, costs and expenses incurred by the Indenture Trustees' professionals in carrying out the Indenture Trustees' duties under the applicable indenture.  The foregoing fees, costs and expenses shall be paid by the Liquidation Trustee in the ordinary course, upon presentation of invoices by the Indenture Trustees and without the need for approval by the Bankruptcy Court, or the filing of a request for payment of an Administrative Claim as required by Article II.A.2 of the Plan, but any disputes concerning such fees, costs and expenses shall be resolved by the Bankruptcy Court.  In the event that the Indenture Trustees and the Liquidation Trustee are unable to resolve a dispute with respect to the payment of the Indenture Trustees' fees, costs and expenses, the Indenture Trustees may elect to submit any such dispute to the Bankruptcy Court for resolution.  Notwithstanding any provision of the Plan to the contrary, nothing herein shall be deemed to impair or negatively impact the Charging Lien, which Charging Lien is hereby expressly preserved.

B.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve and the Committee Members shall be released from all further authority, duties, responsibilities and obligations relating to the Plan Debtors' Chapter 11 Cases; *provided*, *however*, that the Committee and its Retained Professionals shall be retained with respect to (1) appeals and related proceedings regarding the Plan and (2) the resolution of applications for Accrued Professional Compensation.

C.      *Motion to Dismiss Chapter 11 Case of TOUSA Homes, L.P.*

Debtor TOUSA Homes, L.P. has no assets and no interest in any pending litigation.  Accordingly, no plan can be confirmed at TOUSA Homes, L.P. The Proponents will file a motion to dismiss the Chapter 11 Case of TOUSA Homes, L.P. in advance of, and to be considered in connection with, the Confirmation Hearing.

D.      *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained herein: (a) the Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the Requisite Lenders not to be unreasonably withheld, to amend or modify the Plan before the entry of the Confirmation Order and (b) after the entry of the Confirmation Order, the Proponents or the Liquidation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Neither the Plan nor the Liquidation Trust Agreement may be amended in a manner that is materially adverse to any Settlement Party without the Settlement Party's consent (with respect to matters affecting all of the First Lien Revolver Lenders, First Lien Term Loan Lenders or Second Lien

Term Loan Lenders, such consent shall be deemed given with the consent of the Requisite Lenders (as defined under the applicable Loan Documents)).  Subject to the foregoing, a holder of a Claim that had accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

E.      *Revocation of Plan*

        The Proponents reserve the right, in consultation with the Requisite Lenders, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  In addition, the Proponents reserve the right to seek or not seek Confirmation with respect to any of the Plan Debtors.  If the Proponents revoke or withdraw the Plan with respect to one or more of the Plan Debtors, or if Confirmation or the Effective Date does not occur with respect to one or more of the Plan Debtors, then: (1) the Plan shall be null and void in all respects with respect to such Plan Debtor or Plan Debtors; (2) any assumption or rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, as applicable, effected by the Plan and any document or agreement executed pursuant thereto shall be deemed null and void with respect to such Plan Debtor or Plan Debtors; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against such Plan Debtor or any other Entity with respect to such Plan Debtor or Plan Debtors; (b) prejudice in any manner the rights of the Plan Debtors, the Committee or any other Entity with respect to such Plan Debtor or Plan Debtors; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Debtors, the Committee or any other Entity with respect to such Plan Debtor or Plan Debtors.

F.      *Successors and Assigns*

        The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

G.      *Reservation of Rights*

        Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein nor the taking of any action by a Plan Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Plan Debtor, the Committee or the Liquidation Trust with respect to the holders of Claims or Interests or any other Entity or (2) any holder of a Claim or an Interest or any other Entity before the Effective Date.

H.      *Further Assurances*

        The Proponents or the Liquidation Trustee, as applicable, all holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

I.      *Severability*

        If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, including, without limitation, the inclusion of one or more Plan Debtors in the Plan, the Bankruptcy Court shall, with the consent of the Proponents and the Requisite Lenders have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; *provided* that

any such alteration or interpretation must be in form and substance acceptable to the Proponents; *provided further*, that the Proponents and the Requisite Lenders may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

J.    *Time*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, Bankruptcy Rule 9006 shall apply.

K.    *Exhibits/Schedules*

All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

L.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid as and when due or otherwise pursuant to an agreement between the Liquidation Trust and the United States Department of Justice, Office of the U.S. Trustee, until such time as a Chapter 11 Case for a Plan Debtor shall be closed in accordance with Article V.H.2 of the Plan.

Further, notwithstanding any other provisions of the Plan to the contrary, following the occurrence of the Effective Date, each of the Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within twenty (20) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the cash disbursements for the relevant period for each debtor which had not previously been filed. Each of the Debtors or the Liquidation Trustee, as appropriate, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Debtors or the Liquidation Trustee, as applicable, until the earlier of the closing of the case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an order by the Bankruptcy Court dismissing the case(s) or converting this case(s) to another chapter under the United States Bankruptcy Code, and the Debtors or the Liquidation Trustee, as applicable, shall provide to the United States Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, Post-Confirmation Quarterly Operating Reports indicating all the cash disbursements for the relevant period.

M.    *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

N.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Plan Debtors shall be sent by overnight mail to:

TOUSA, Inc.
4000 Hollywood Boulevard
Suite 555-S
Hollywood, FL 33021
Attn: Sorana Keever

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn: Richard M. Cieri and Joshua A. Sussberg

and

Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Attn: Paul Steven Singerman

Any pleading, notice or other document required by the Plan to be served on or delivered to the Committee or the Liquidation Trust shall be sent by overnight mail to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Daniel H. Golden, Philip C. Dublin and Sara L. Brauner

and

Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Attn: Lawrence S. Robbins and Michael Waldman

and

Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Miami, FL 33130
Attn: Patricia A. Redmond

Copies of any pleading, notice or other document served on or delivered to the Plan Debtors, the Committee or the Liquidation Trust shall be sent by overnight mail to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attn:  Seven Rivera

and

Bracewell & Giuliani LLP
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103
Attn:  Evan D. Flaschen

O.    *Filing of Additional Documents*

On or before the Effective Date, the Proponents may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Dated:  July 30, 2013

     Respectfully submitted,

By:  */s/ Patricia A. Redmond*             By:  */s/ Paul S. Singerman*

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, FL  33130
Telephone: (305) 789-3553
Facsimile:  (305) 789-3395

    –and–

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

    –and–

**ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP**
Lawrence S. Robbins (DC Bar No. 420260)
Michael Waldman (DC Bar No. 414646)
1801 K Street N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Co–counsel to the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*

**BERGER SINGERMAN LLP**
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

    –and–

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar No. 4216453)
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-  4900

*Co-counsel to the Debtors*

**EXHIBIT B**

**NOTICE OF CONFIRMATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

|  |  |
|---|---|
| In re: | Chapter 11 Cases |
| TOUSA, INC., *et al.*, | Case No. 08-10928-JKO |
| Debtors.[1] | Jointly Administered |

**NOTICE OF ENTRY OF ORDER CONFIRMING THE AMENDED JOINT PLAN
OF LIQUIDATION OF TOUSA, INC., AND ITS AFFILIATED DEBTORS AND
<u>DEBTORS IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

  **PLEASE TAKE NOTICE THAT**, on [_____], 2013, the United States Bankruptcy Court for the Southern District of Florida (the "<u>Court</u>") entered the *Findings of Fact, Conclusions of Law and Order Confirming Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* (the "<u>Confirmation Order</u>") [ECF No. ____].  Among other things, the Confirmation Order confirmed the *Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9168] (as amended from time to time in accordance with the terms of the Confirmation Order, the "<u>Joint Plan</u>"),[2] thereby authorizing the Debtors to implement the Joint Plan in accordance with its terms.

  **PLEASE TAKE FURTHER NOTICE THAT**, in accordance with the Joint Plan, the Distribution Record Date shall be August 1, 2013.

  **PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Confirmation Order, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, if any, must be filed on or before the later of (a) the applicable Claims Bar Date and (b) 30 days after (i) the entry of the order compelling or approving the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract or (ii) the effective date of the rejection of such Executory Contract, Unexpired Lease or Postpetition Contract, if the order contains the notice mandated by Local Rule 6006-1.  Any

---

  [1]  The Debtors are: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; TOUSA, Inc.; TOUSA Texas, LP.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; TOUSA/West Holdings, Inc.; TOUSA Homes, L.P.; and Beacon Hill at Mountain's Edge, LLC.

  [2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to such terms in the Plan.

entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Plan Debtor, its Estate or property or the Liquidation Trust or its property, unless otherwise ordered by the Court or as otherwise provided in the Joint Plan or Confirmation Order.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.F of the Joint Plan.  The deadline to object to Claims arising from the rejection of Executory Contracts, Unexpired Leases or Postpetition Contracts, if any, shall be the later of (a) 180 days after the Effective Date or (b) such later date as may be otherwise ordered by the Court for objecting to such Claims.

**PLEASE TAKE FURTHER NOTICE THAT**, any Proof of Claim with respect to a Claim arising from the rejection of an Executory Contract, Unexpired Lease or Postpetition Contract must be filed with the Voting and Claims Agent, Kurtzman Carson Consultants LLC, at the following address: Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  Proofs of Claim must be delivered via first class U.S. Mail (postage prepaid), in person, by courier service or by overnight delivery.  Facsimile and electronic submissions are not acceptable.  In addition, copies of the Confirmation Order and the Joint Plan may be obtained (a) from the Voting and Claims Agent by (i) calling (888) 647-1742; (ii) visiting http://www.kccllc.net/tousa; and/or (iii) writing to TOUSA, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245 or (b) for a fee, via PACER, by visiting https://ecf.flsb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT**, the Joint Plan and its provisions are binding on the Plan Debtors, their Estates, the Liquidation Trust, the Settlement Parties and Releasing Settlement Parties, any holder of a Claim or Interest and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Joint Plan and whether or not such holder voted to accept the Joint Plan, and all other parties in interest.

Dated:  August [___], 2013

Respectfully submitted,

**BERGER SINGERMAN LLP**

By: */s/* _____
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
Singerman@bergersingerman.com

-and-

**KIRKLAND & ELLIS LLP**

Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar. No. 4316453)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
rcieri@kirkland.com
jsussberg@kirkland.com

*Co-Counsel to the Debtors*

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

By: */s/* _____
Patricia A. Redmond (Florida Bar No. 303739)
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3553
Facsimile:   (305) 789-3395
predmond@stearnsweaver.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
dgolden@akingump.com
pdublin@akingump.com

*Co-Counsel to the Committee*

## **EXHIBIT C**

**NOTICE OF EFFECTIVE DATE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

|  |  |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |

**NOTICE OF (A) THE OCCURRENCE OF THE EFFECTIVE DATE UNDER THE AMENDED JOINT PLAN OF LIQUIDATION OF TOUSA, INC., AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE; (B) ADMINISTRATIVE CLAIMS BAR DATE; AND (C) DEADLINE FOR PROFESSIONALS TO FILE FINAL FEE APPLICATIONS**

      **PLEASE TAKE NOTICE THAT**, on [_____], 2013, the United States Bankruptcy Court for the Southern District of Florida (the "Court") entered the *Findings of Fact, Conclusions of Law and Order Confirming Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* (the "Confirmation Order") [ECF No. _____]. Among other things, the Confirmation Order confirmed the *Amended Joint Plan of Liquidation of TOUSA, Inc. and Its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* [ECF No. 9168] (as amended from time to time in accordance with the terms of the Confirmation Order, the "Joint Plan"),[2] thereby authorizing the Debtors to implement the Joint Plan in accordance with its terms.

      **PLEASE TAKE FURTHER NOTICE THAT** copies of the Confirmation Order and the Joint Plan may be obtained (a) from the Voting and Claims Agent (i) at its website at http://www.kccllc.net/tousa, (ii) by writing to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, (iii) by calling (888) 647-1742 or (iv) by emailing KCC_TOUSA @kccllc.com or (b) for a fee, via PACER, by visiting https://ecf.flsb.uscourts.gov.

      **PLEASE TAKE FURTHER NOTICE THAT**, on **August [___], 2013**, the Effective Date under the Joint Plan occurred.

---

    [1]  The Debtors are: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; TOUSA, Inc.; TOUSA Texas, LP.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; TOUSA/West Holdings, Inc.; TOUSA Homes, L.P.; and Beacon Hill at Mountain's Edge, LLC.

    [2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** an updated schedule setting forth the amount of each Term Loan Lender Disgorgement Payment, the amount thereof (if any) that has already been paid, the amount of such disgorgement that shall be paid from supersedeas bonds, cash collateral or other sources and any additional amounts that the Term Loan Lender Defendants shall be required to pay is attached hereto as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to Article II.A of the Joint Plan, unless previously filed pursuant to the Initial Administrative Claims Bar Date, requests for payment of Administrative Claims (other than Postpetition Intercompany Claims and Allowed Professional Compensation) must be filed and served on the Liquidation Trustee pursuant to the procedures specified in the Confirmation Order no later than **[_____], 2013**, the date that is the 45th day after the Effective Date. **Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the applicable Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Plan Debtors or their property and such Administrative Claims shall be disallowed in full as of the Effective Date.**

**PLEASE TAKE FURTHER NOTICE THAT** objections to payment of Administrative Claims, if any, must be filed and served on the Liquidation Trustee and the requesting party no later than **[_____], 2013**, the date that is the 90th day after the Final Administrative Claims Bar Date.

**PLEASE TAKE FURTHER NOTICE THAT** Retained Professionals or other Entities asserting a Claim for Accrued Professional Compensation (including pursuant to a 503(b) Application) must file an applications for final allowance of such Claim and serve such application on the Liquidation Trustee and such other Entities as are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court no later than **[_____], 2013**, the date that is the 45th day after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** objections to any Claim for Accrued Professional Compensation must be filed and served on the Liquidation Trustee and the requesting party no later than **[_____], 2013**, the date that is the 90th day after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** the Joint Plan and its provisions are binding on the Plan Debtors, their Estates, the Liquidation Trust, the Settlement Parties and Releasing Settlement Parties, any holder of a Claim or Interest and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Joint Plan and whether or not such holder voted to accept the Joint Plan, and all other parties in interest.

Dated:  August [___], 2013

Respectfully submitted,

**BERGER SINGERMAN LLP**

By: */s/*_____
Paul Steven Singerman (Florida Bar No. 378860)
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
Singerman@bergersingerman.com

-and-

**KIRKLAND & ELLIS LLP**

Richard M. Cieri (New York Bar No. 4207122)
Joshua A. Sussberg (New York Bar. No. 4316453)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
rcieri@kirkland.com
jsussberg@kirkland.com

*Co-Counsel to the Debtors*

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

By: */s/*_____
Patricia A. Redmond (Florida Bar No 303739)
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3553
Facsimile:   (305) 789-3395
predmond@stearnsweaver.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
dgolden@akingump.com
pdublin@akingump.com

*Co-Counsel to the Committee*

**<u>EXHIBIT 1</u>**

**DISGORGEMENT SCHEDULE**

**<u>EXHIBIT D</u>**

**FEE REVIEW COMMITTEE PROTOCOL**

## PROPOSED PROTOCOL FOR FEE REVIEW COMMITTEE

The following is the protocol (the "Protocol") to be followed by the members of the fee review committee (the "FRC") appointed in connection with the above-captioned chapter 11 cases of the above-referenced debtors and debtors in possession (collectively, the "Debtors"), Case No. 08-10928-JKO, pending in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court"). The FRC has been formed to review final compensation and expense reimbursement requests made by professional for the Debtors' and the statutory committee of unsecured creditors (the "Committee") in these chapter 11 cases submitted pursuant to Article II.A.3. of the *Second Amended Joint Plan of Liquidation of TOUSA, Inc. and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code* (collectively, the "Final Fee Applications"). The Protocol shall guide the FRC in its review of Final Fee Applications filed in the Debtors' chapter 11 cases.

## BACKGROUND

The members of the FRC (collectively, the "Members") are as follows: (a) one representative of the Debtors, (b) one representative designated by the Committee and (c) one representative from the Office of the United States Trustee for the Southern District of Florida (the "U.S. Trustee"). The Members of the FRC are set forth on **Exhibit 1** hereto. In the event that a Member is unable to attend a particular meeting, another representative, designated by the Member, may attend in his or her place; *provided*, *however*, that no professional submitting a Final Fee Application shall be permitted to serve as a Member's designee.

## PROTOCOL

In furtherance of the goal to evaluate the reasonableness of professional fees incurred in these chapter 11 cases, the FRC will: (i) review each Professional's Final Fee Applications in light of the billing guidelines set forth pursuant to Rule 2016-1(B)(3)(b) of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rule 2016") and the Guidelines for Fee Applications For Professionals in the Southern District of Florida in Bankruptcy Cases, dated December 1, 2009 (the "Guidelines" and, together with Local Rule 2016, the "Fee Guidelines"); (ii) negotiate with the Professionals regarding issues or concerns the FRC may raise with respect to the fees or expenses requested in any Professional's Final Fee Applications; and (iii) make recommendations to the Professionals and, to the extent necessary, the Bankruptcy Court regarding the amounts sought by each Professional in each Final Fee Application.

## Proposed Procedures

(i)     Simultaneously with their filing of each Final Fee Application with the Bankruptcy Court, each Professional shall furnish to the FRC and the U.S. Trustee an electronic and searchable copy of their Final Fee Application detailing all professional fees and disbursements incurred by the respective Professional during the chapter 11 cases;

(ii)    each Final Application will contain the following information: (a) a list of the individuals and their respective titles (*e.g.*, attorney, accountant, or paralegal) who provided services during the Fee Period; (b) a summary schedule of the fees for each individual (broken down by professional and/or paraprofessional with applicable billing rates); (c) the aggregate hours worked by each individual; (d) the blended rate of lawyers that performed services; (e) contemporaneously maintained time entries for each individual in increments of tenths (1/10) of an hour, unless otherwise approved by the Bankruptcy Court; (f) a reasonably detailed breakdown of the disbursements incurred; and (g) documentation in support of any expenses as the FRC may request;

(iii)    should the FRC request additional information with respect to any fees requested or disbursements incurred from one or more of the Professionals, such Professional shall provide the requested information to the FRC on a timely basis;

(iv)    the FRC is required to convene a meeting to review the Final Fee Applications, which may be telephonic, at which meeting all three Members shall constitute a quorum;

(v)    at any such meeting, the FRC will consider the Final Fee Applications, formulate objection(s) to such Final Fee Applications, if appropriate, and determine whether to recommend that the amount of the fees or disbursements to be paid pursuant to any of the Final Fee Applications be reduced.  The FRC will act by the majority vote of its Members, with each Member having one vote.  Any recommendation by the FRC to reduce such Professional's fees or expenses is without prejudice to such Professional's right to seek allowance of the entire fee and disbursement amount pursuant to the Final Fee Application;

(vi)    no less than 14 days before the hearing at which the Final Fee Applications will be presented to the Bankruptcy Court (the "Hearing"), the FRC will circulate to the Professionals its recommendations with respect to the reasonableness of the fees and disbursements requested in the Final Fee Applications, which recommendations may be informal and delivered either in writing (via email or otherwise) or orally;

(vii)    each Professional and the FRC will work, in good faith, to resolve any issues the FRC raises in its recommendations with respect to a Professional's Final Fee Application;

(viii)    in the event that a Professional and the FRC are unable to resolve an issue with respect to the FRC's recommendations, the FRC shall have standing to raise such issues with the Bankruptcy Court;

(ix)    in its discretion, the FRC may file a statement or pleading with the Bankruptcy Court detailing its conclusions as to the reasonableness of the fees and disbursements requested in the Final Fee Applications, its recommendations for allowance of such fees and disbursements and any resolutions it may have

2

reached with a particular Professional, if applicable, and shall serve a hard copy of any such statement or pleading, if any, on the U.S. Trustee pursuant to Rule 9034 of the Federal Rules of Bankruptcy Procedure;

(x)    any Professional whose Final Fee Application is the subject of a recommended reduction by the FRC may file a reply to any statement or pleading with the Bankruptcy Court and shall serve a hard copy of the reply on the U.S. Trustee;

(xi)   the FRC shall consider the Fee Guidelines in making recommendations for the allowance or reduction of fees and expenses;

(xii)  a determination by the FRC with respect to any Final Fee Application will not prejudice the right of the U.S. Trustee, any party in interest or any individual Member to object to a Final Fee Application in its non-Member capacity;

(xiii) to the extent necessary, the FRC may utilize the services of the Debtors' professionals, the Committee's professionals, in the FRC's discretion, to assist the FRC in ministerial acts complying with this Protocol (*e.g.*, the electronic filing of court documents). In the event that the Debtors' professionals or the Committee's professionals assist the FRC, such firms may seek reasonable fees and expenses incurred in connection with the provision of such services. In the event that the FRC decides to retain its own professionals to represent the FRC in Court, such professionals shall be retained by further order of the Court and may apply for compensation in accordance with the Bankruptcy Court's compensation orders;

(xiv)  Members of the FRC will not receive compensation for their service on the FRC or time expended on FRC matters and service on the FRC will not entitle any Member to compensation under section 503(b) of the Bankruptcy Code and any right to such claim is expressly waived;

(xv)   all Members are entitled to reimbursement for reasonable, documented out-of-pocket costs and expenses under section 503(b) of the Bankruptcy Code or otherwise; and

(xvi)  none of the Members of the FRC, in their capacity as a Member, shall have or incur any liability to any entity (including the Debtors and their affiliates) for any act taken or omitted to be taken in connection with their service on the FRC as described herein; *provided*, *however*, that the foregoing shall not affect the liability of any Member protected pursuant to this paragraph that otherwise would result from any such act or omission to the extent that such act or omission is determined in a final non-appealable order to have constituted a breach of fiduciary duty, gross negligence, or willful misconduct, including, without limitation, fraud and criminal misconduct, or the breach of any confidentiality agreement or order.  Without limiting the foregoing, the exculpation provided in this paragraph shall be coextensive with any Member's qualified immunity under applicable law.

The Protocol may be amended only by a majority vote of the FRC or by Order of the Bankruptcy Court, and the Professionals and the U.S. Trustee shall be afforded notice of any proposed amendment to the Protocol.

## EXHIBIT 1

**FEE REVIEW COMMITTEE MEMBERS**

**Sorana Keever**

**[MEMBER #2]**

**[Steven Schneiderman]**

**<u>EXHIBIT E</u>**

**DISGORGEMENT SCHEDULE**

Schedule of First Lien Term Loan ("FLTL") Bonded Amounts

| First Lien Term Loan Lender Defendant | Bonded Amount | Bonding Mechanism | Bonding Agent |
|---|---|---|---|
| Bank Of America, N.A. | $ 404,008 | Bond | Travelers |
| Castlerigg Master Investments, Ltd | 536,071 | Cash Deposit | |
| CFIP Master Fund, Ltd. / Chicago Fundamental Investment Partners, Llc | 5,886,936 | Bond[1] | US Specialty |
| CGDO, LLC As Agent For Chilton Global Distressed Opportunities Master Fund, LP / CGDO, LLC | 189,514 | Cash Deposit | |
| Citibank, N.A. | 16,425,066 | Bond | Travelers |
| Citicorp North America, Inc | 1,673,569 | Bond | Travelers |
| Deutsche Bank AG, New York Branch | 1,776,607 | Bond[4] | US Specialty |
| Esperance C/O Scotiabank (Ireland) Limited | 435,239 | Escrow w/ Committee | |
| Fidelity Fixed Income Trust: Fidelity Strategic Real Return Fund / STRLRRE | 2,289,932 | Cash Deposit | |
| Fidelity Real Cayman Ltd / RECPCYM | 2,291,429 | Cash Deposit | |
| Foothill Group, Inc. / Wells Fargo Foothill | 376,006 | Cash Deposit | |
| Fortress Credit Investments I Ltd | 396,716 | Cash Deposit | |
| Fortress Credit Investments II Ltd | 99,179 | Cash Deposit | |
| Goldman Sachs Credit Partners L.P. | 2,762,569 | Bond | SafeCo |
| Goldman Sachs Lending Partners LLC/MTGLQ Investors, L.P. dba Re SSIG SPF One LQ L.L.C. | 143,435 | Bond | Westchester Fire Insurance |
| Grand Central Asset Trust, GAIA Series | 1,714,749 | Bond[1] | US Specialty |
| Grand Central Asset Trust, SIL Series | 1,521,399 | Bond[1] | US Specialty |
| HBK Master Fund, L.P. | 323,251 | Cash Deposit | |
| Helios Funding LLC | 303,261 | Cash Deposit | |
| Investments CBNA Loan Funding LLC / Investments CFPI Loan Funding LLC | 2,245,828 | Bond | Travelers |
| J.P. Morgan Chase Bank, N.A. | 12,555,885 | Bond | Travelers |
| J.P. Morgan Whitefriars Inc. | 116,914 | Bond | Travelers |
| M.D. Sass RE/Enterprise Portfoliocompany, L.P. (Resurgence) | 46,382 | Bond[3] | Federal Insurance Co. |
| Marathon Financing I, B.V. | 570,645 | Trust Account w/ RR | |
| Matlinpatterson Global Opportunities Partners (Cayman) III L.P. (Matlinpatterson) | 19,237 | Paid to TOUSA | |
| Matlinpatterson Global Opportunities Partners III L.P. (Matlinpatterson) | 64,585 | Paid to TOUSA | |
| McDonnell Loan Opportunity Ltd | 123,574 | Cash Deposit | |
| Merrill Lynch Pierce Fenner & Smith Inc. | 20,047 | Bond | Travelers |
| Monarch Master Funding Ltd / Quadrangle Master Funding Ltd. | 37,204,992 | Bond[3] | Federal Insurance Co. |
| Morgan Stanely Senior Funding, Inc. | 450,215 | Bond[2] | Liberty Mutual |
| Perry Principals LLC / Perry Capital | 1,149,698 | Cash Deposit | |
| Promethean I Master Ltd. (F/K/Agala Offshore Master Fund Ltd.) | 2,992,334 | Cash Deposit | |
| Promethean II Master LP | 186,470 | Cash Deposit | |
| Royal Bank Of Canada | 268,613 | Bond[1] | US Specialty |
| Sandelman Partners Multi-Strategy Master Fund, Ltd (Sandelman Partners) | 4,955,166 | Bond[1] | US Specialty |
| Sandelman Partners Opportunity Master Fund, L.P. (Sandelman Partners, L.P.) | 3,443,420 | Bond[1] | US Specialty |
| SOF Investments, Lp | 507,964 | Cash Deposit | |
| Taconic Capital Partners 1.5 L.P. | 777,502 | Bond[1] | US Specialty |
| Taconic Opportunity Fund L.P. | 3,110,007 | Bond[1] | US Specialty |
| Trilogy Portfolio Company, Llc (Mariner Investment Group) | 25,819,242 | Bond[14] | US Specialty |
| Van Kampen Dynamic Credit Opportunities Fund | 329,289 | Bond[2] | Liberty Mutual |
| Van Kampen Senior Income Trust | 87,602 | Bond[2] | Liberty Mutual |
| Van Kampen Senior Loan Fund fka VK Senior Floating Rate Fund (Van Kampen) | 95,360 | Bond[2] | Liberty Mutual |
| WCP Real Estate Strategies Fund (Cayman) L.P. | 5,341,677 | Bond[1] | US Specialty |
| WCP Real Estate Strategies Fund L.P. | 1,975,689 | Bond[1] | US Specialty |
| Tennenbaum Multi-Strategy Fund | 3,120,100 | Escrow | Wilmington Trust |
| Totals | $ 146,788,375 | | |

1 - Single Bond through Agent ("Agent Bond")
2 - Single Bond through Van Kampen entities ("Van Kampen Bonds")
3 - Monarch owns supersedeas bond for MD Sass total
4 - Trilogy owns supersedeas bond for Sandelman and Deutsche Bank totals

**Schedule of First Lien Term Loan ("FLTL") Professional Fee and Principal and Interest Disgorgements**

| First Lien Term Loan Lender Defendant | FLTL Professional Fee Disgorgement (without Interest) | FLTL Professional Fee Disgorgement (with Interest)[1,2] | FLTL Principal & Interest Disgorgement (without Interest) | FLTL Principal & Interest Disgorgement (with Interest)[1,2] | Bonded Amount Posted | Amount Paid to Estate from Bond Collateral | Net Disgorgement Amount Payable to Estate in Excess of Bond |
|---|---|---|---|---|---|---|---|
| Bank Of America, N.A. | $ 87,439 | $ - | $ 296,595 | $ 352,392 | $ 404,008 | $ 352,392 | $ - |
| Castlerigg Master Investments, Ltd | - | 96,560 | 487,337 | 584,092 | 536,071 | 536,071 | 48,021 |
| CFIP Master Fund, Ltd. / Chicago Fundamental Investment Partners, Llc | 1,129,036 | 1,246,813 | 644,925 | 728,269 | 5,886,936 | 728,269 | - |
| CGDO, LLC As Agent For Chilton Global Distressed Opportunities Master Fund, LP / CGDO, LLC | 42,265 | 46,674 | 139,128 | 169,223 | 189,514 | 169,223 | - |
| Citibank, N.A. | 2,837,621 | 3,133,633 | 2,595,909 | 2,969,642 | 16,425,066 | 2,969,642 | - |
| Citicorp North America, Inc | 376,503 | 415,779 | 1,228,618 | 1,504,656 | 1,673,569 | 1,504,656 | - |
| Deutsche Bank AG, New York Branch | - | - | 1,610,808 | 1,953,050 | 1,776,607 | 1,776,607 | 176,443 |
| Esperanza C/O Scotiabank (Ireland) Limited | - | - | 435,239 | 523,298 | 435,239 | 435,239 | 88,059 |
| Fidelity Fixed Income Trust: Fidelity Strategic Real Return Fund / STRLRRE | 449,926 | 496,828 | 494,505 | 582,909 | 2,289,932 | 582,909 | - |
| Fidelity Reol Cayman Ltd / REOPICYM | 449,896 | 496,861 | 501,829 | 578,453 | 2,291,429 | 578,453 | - |
| Foothill Group, Inc. / Wells Fargo Foothill | 128,680 | 142,103 | 422,863 | 515,029 | 576,006 | 515,029 | - |
| Fortress Credit Investments I Ltd | - | - | 396,716 | 481,897 | 396,716 | 396,716 | 85,181 |
| Fortress Credit Investments II Ltd | - | - | 99,179 | 120,475 | 99,179 | 99,179 | 21,296 |
| Fortress Credit Opportunities II LP | 570,691 | 630,224 | 1,215,093 | 1,450,575 | 2,762,569 | 1,450,575 | - |
| Goldman Sachs Credit Partners L.P. | - | - | 118,270 | 131,739 | 143,435 | 131,739 | - |
| Goldman Sachs Palmetto State Credit Fund, L.P. dba fka SSfG SPF One LQ L.L.C. | 341,618 | 377,255 | 470,693 | 554,909 | 1,714,749 | 554,909 | - |
| Grand Central Asset Trust, GAIA Series | 335,908 | 370,949 | 1,116,905 | 1,347,861 | 1,521,399 | 1,347,861 | - |
| Grand Central Asset Trust, SIL Series | 65,785 | 72,648 | 237,308 | 268,834 | 323,251 | 268,834 | - |
| HBK Master Fund, L.P. | - | - | 275,692 | 333,423 | 303,261 | 303,261 | 30,162 |
| Helios Funding LLC | 473,465 | 522,855 | 1,648,731 | 1,919,325 | 2,245,828 | 1,919,325 | - |
| Investments CBNA Loan Funding LLC / Investments CFPI Loan Funding LLC | 2,415,072 | 2,667,005 | 1,135,987 | 1,315,775 | 12,555,885 | 1,315,775 | - |
| J.P. Morgan Chase Bank, N.A. | - | - | 85,830 | 100,916 | 116,914 | 100,916 | - |
| J.P. Morgan Whitefriars Inc. | 24,966 | 27,570 | 43,058 | 46,835 | 46,382 | 46,382 | 453 |
| M.D. Sass RE Enterprise Portfoliocompany, L.P. (Resurgence) | - | - | 330,517 | 387,038 | 450,215 | 387,038 | - |
| Marathon Financing I, B.V. | 95,639 | 105,615 | 31,645 | 38,672 | 31,645 | 31,645 | 7,027 |
| Matlinpatterson Global Opportunities Partners (Cayman) III L.P. (Matlinpatterson) | 255,613 | 282,278 | 19,237 | 21,135 | 19,237 | 19,237 | 1,898 |
| Matlinpatterson Global Opportunities Partners III L.P. (Matlinpatterson) | 574,099 | 633,987 | 64,585 | 70,957 | 64,585 | 64,585 | 6,372 |
| McDonnell Loan Opportunity Ltd | 36,763 | 40,598 | 112,340 | 136,836 | 123,574 | 123,574 | 13,262 |
| Merrill Lynch Pierce Fenner & Smith Inc. | 59,727 | 65,958 | 5,155,597 | 5,837,031 | 37,204,992 | 5,837,031 | - |
| Monarch Master Funding Ltd / Quadrangle Master Funding Ltd | - | - | 844,029 | 1,024,127 | 1,149,698 | 1,024,127 | - |
| Morgan Stanley Senior Funding, Inc. | 4,217 | 4,657 | 212,298 | 244,347 | 2,169,234 | 244,347 | - |
| Perry Principals LLC / Perry Capital | 7,158,874 | 7,905,663 | 136,893 | 151,356 | 186,470 | 151,356 | - |
| Promethean Master Ltd. (F/K/A Apana Offshore Master Fund Ltd.) | - | - | 197,197 | 239,294 | 268,613 | 239,294 | - |
| Promethean II Master LP | - | - | 411,832 | 455,887 | 4,955,166 | 455,887 | - |
| Royal Bank Of Canada | - | - | 286,189 | 316,802 | 3,443,420 | 316,802 | - |
| Sandelman Partners Multi-Strategy Master Fund, Ltd (Sandelman Partners) | 149,219 | 164,785 | 461,785 | 529,438 | 507,964 | 507,964 | 21,474 |
| Sandelman Partners Opportunity Master Fund, L.P. (Sandelman Partners, L.P.) | 598,876 | 659,141 | 86,534 | 97,840 | 777,502 | 97,840 | - |
| SOF Investments, Lp | - | - | 346,134 | 391,361 | 3,110,007 | 391,361 | - |
| Taconic Capital Partners 1.5 L.P. | 4,992,476 | 5,510,956 | 3,879,662 | 4,419,765 | 25,319,042 | 4,419,765 | - |
| Taconic Opportunity Fund L.P. | 71,552 | 79,016 | 241,741 | 288,111 | 329,289 | 288,111 | - |
| Tricadia Portfolio Company Ltd (Mariner Investment Group) | 19,533 | 21,571 | 64,311 | 78,213 | 87,602 | 78,213 | - |
| Van Kampen Dynamic Credit Opportunities Fund | 21,281 | 23,501 | 70,007 | 85,194 | 95,360 | 85,194 | - |
| Van Kampen Senior Income Trust | 1,026,298 | 1,133,358 | 640,917 | 726,460 | 5,341,677 | 726,460 | - |
| Van Kampen Senior Loan Fund VK Senior Floating Rate Fund (Van Kampen) | 379,589 | 419,187 | 237,051 | 268,690 | 1,975,689 | 268,690 | - |
| WCP Real Estate Strategies Fund (Cayman) L.P. | - | - | - | - | - | - | - |
| WCP Real Estate Strategies Fund L.P. | - | - | - | - | - | - | - |
| Tennenbaum Multi-Strategy Fund | - | - | 2,382,425 | 2,835,962 | 3,120,100 | 2,835,962 | - |
| **Totals** | $ 25,170,432 | $ 27,796,126 | $ 31,933,151 | $ 37,206,195 | $ 146,788,375 | $ 36,708,549 | $ 499,646 |

1 – The total prejudgement and postjudgement interest is based on Mediation Model Case F (Feb. 14, 2013 version), which estimates postjudgement interest based on a June 30, 2013 Effective Date. The final amount of such interest shall be calculated with reference to the actual Effective Date.

2 – Reflects Prejudgement Interest (6.9%) and Postjudgement Interest (1%)

Schedule of Second Lien Term Loan Professional Fee Disgorgements

| Second Lien Term Loan Lender Defendant | Second Lien Term Loan Professional Fee Disgorgement (without interest) | Prejudgment (6.9%) and Postjudgment Interest (1%)[1] | Second Lien Term Loan Professional Fee Disgorgement (with interest) | Amount Already Paid | Bond Amount Posted | Net Amount of Disgorgement |
|---|---|---|---|---|---|---|
| Alexandra Global Master Fund, Ltd. | $ 311,949 | $ 41,252 | $ 353,200 | $ - | $ 325,769 | $ 27,432 |
| American General Life Insurance Company | $ 226,724 | $ 29,982 | $ 256,705 | $ - | $ 236,768 | $ 19,937 |
| American International Group, Inc. | $ 377,873 | $ 49,969 | $ 427,842 | $ - | $ 394,613 | $ 33,229 |
| Avenue Investments LP | $ 453,916 | $ 60,025 | $ 513,941 | $ - | $ 474,026 | $ 39,916 |
| Citibank, N.A. | $ 685,227 | $ 90,613 | $ 775,840 | $ - | $ 715,584 | $ 60,257 |
| Citicorp North America, Inc. | $ 104,410 | $ 13,807 | $ 118,217 | $ - | $ 109,035 | $ 9,181 |
| FBS CBNA Loan Funding, LLC | $ 75,746 | $ 10,017 | $ 85,763 | $ - | $ 79,102 | $ 6,661 |
| JPMorgan Chase Bank, N.A. | $ 1,041,683 | $ 137,751 | $ 1,179,434 | $ - | $ 1,087,831 | $ 91,602 |
| Longacre Capital Partners QP, LP | $ 93,771 | $ 12,400 | $ 106,171 | $ - | $ 97,926 | $ 8,246 |
| Longacre Master Fund LTD | $ 415,554 | $ 54,952 | $ 470,506 | $ - | $ 433,964 | $ 36,542 |
| Monarch Master Funding Ltd (includes HBK Master Fund LP, M.D. Sass Re/Enterprise Portfolio Company, L.P., The Master Trust Bank of Japan, Ltd. and Third Point Loan LLC) | $ 17,658,910 | $ 2,335,185 | $ 19,994,095 | $ - | $ 18,441,226 | $ 1,552,869 |
| Stonehill Institutional Partners LP | $ 116,599 | $ 15,419 | $ 132,018 | $ - | $ 121,765 | $ 10,253 |
| SunAmerica Income Funds - SunAmerica High Yield Bond Fund | $ 74,345 | $ 9,831 | $ 84,177 | $ - | $ 77,639 | $ 6,538 |
| SunAmerica Series Trust - High Yield Bond Portfolio | $ 74,345 | $ 9,831 | $ 84,177 | $ - | $ 77,639 | $ 6,538 |
| The Variable Annuity Life Insurance Company | $ 377,873 | $ 49,969 | $ 427,842 | $ - | $ 394,613 | $ 33,229 |
| Trilogy Portfolio Company LLC | $ 256,317 | $ 33,895 | $ 290,212 | $ - | $ 267,672 | $ 22,540 |
| VALIC Company II High Yield Bond Fund | $ 74,345 | $ 9,831 | $ 84,177 | $ - | $ 77,639 | $ 6,538 |
| Western National Life Insurance Company | $ 377,873 | $ 49,969 | $ 427,842 | $ - | $ 394,613 | $ 33,229 |
| Totals | $ 22,797,461 | $ 3,014,699 | $ 25,812,160 | $ - | $ 23,807,423 | $ 2,004,737 |

1 - The total prejudgment and postjudgment interest is based on Mediation Model Case F (Feb. 14, 2013 version), which estimates postjudgment interest based on a June 30, 2013 Effective Date. The final amount of such interest shall be calculated with reference to the actual Effective Date.

## <u>EXHIBIT F</u>

## CONVEYING SUBSIDIARIES WIRE INSTRUCTIONS

| | |
|---|---|
| Bank: | Wells Fargo Bank NA |
| | 401 E Jackson Street, ste 1450 |
| | Tampa, FL  33602 |
| | |
| ABA #: | 121000248 |
| | |
| Account Name: | TOUSA, Inc. FBO Conveying Subsidiaries |
| | |
| Account Number: | 2000049242526 |

## <u>EXHIBIT G</u>

## TENNENBAUM WIRE INSTRUCTIONS

| | |
|---|---|
| Bank: | Wells Fargo Bank NA |
| ABA #: | 121-000-248 |
| FAO: | Trust Wire Clearing |
| Account Number: | 0000-840245 |
| FFC Account Name: | Tennenbaum Multi-Strategy Fund SPV (Cayman), Ltd. |
| FFC Account Number: | 23823700 |